# 23-1162

## United States Court of Appeals for the Second Circuit

National Association for Gun Rights, Toni Theresa Spera Flanigan,
*Plaintiffs-Appellants*,
Patricia Brought,
*Plaintiff*,
v.
Ned Lamont, in his official capacity as the Governor of the State of Connecticut,
Patrick J. Griffin, in his official capacity as the Chief States Attorney of the State
of Connecticut, Sharmese L. Walcott, in her official capacity as the States's
Attorney, Hartford Judicial District,
*Defendants-Appellees*,
David R. Shannon, in his official capacity as the State's Attorney, Lichfield
Judicial District,
*Defendant*.

**On Appeal from the United States District Court
for the District of Connecticut (New Haven), No. 22-cv-1118**

---

**JOINT APPENDIX VOL. I OF V (JA-1—JA-269)**

---

JAMES MICHAEL BELFORTI
JANELLE MEDEIROS
CONNECTICUT OFFICE OF THE
ATTORNEY GENERAL
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5436
james.belforti@ct.gov
janelle.medeiros@ct.gov

*Counsel for Defendants-Appellees*

BARRY K. ARRINGTON
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com

*Counsel for Plaintiffs-Appellants*

CASE NO. 23-1162
INDEX TO DOCUMENT REFERENCES IN APPENDIX

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|

**VOLUME I**

**Docket U.S. District Court for the District of Connecticut (New Haven) Case #: 3:22-cv-01118-JAM**............................................ NA — JA-1

**Complaint for Declaratory Judgment and Injunctive Relief (09/06/2022)** ...................................................... 1 — JA-13

**First Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right (09/13/2022)** ...................................................... 9 — JA-27

**Unopposed Motion for Leave to Amend Complaint (110/21/2022)** .................................................... 24 — JA-40

    **Attachment – Second Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right** .................................................. 24-2 — JA-43

**Second Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right (10/25/2022)** ................................................... 26 — JA-57

**Plaintiff's Motion for Preliminary Injunction (11/03/2022)** ................................................... 28 — JA-71

    **Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction (11/03/2022)** . 28-1 — JA-74

    **Declaration of Dudley Brown**................................ 28-2 — JA-102

i

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| Declaration of Toni Theresa Spera Flanigan ....... | 28-3 | JA-104 |
| Declaration of James Curcuruto .......................... | 28-4 | JA-106 |
| Defendants' Motion to Dismiss (11/18/2022)................................................... | 32 | JA-108 |
| Memorandum of Law in Support of Defendants' Motion to Dismiss ............................ | 32-1 | JA-110 |
| Response in Opposition to Defendants' Motion to Dismiss (12/09/2022)................................................... | 33 | JA-126 |
| Attachment – Declaration of Ryan J. Flugaur | 33-1 | JA-137 |
| Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss (12/23/2022)................................................... | 34 | JA-139 |
| Motion to Strike Defendants' Reply in Support of Their Motion to Dismiss (12/24/2022)................................................... | 35 | JA-150 |
| Defendants' Memorandum in Support of Their Opposition to Plaintiffs' Motion for Preliminary Injunction (01/31/2023)................................................... | 37 | JA-153 |
| Exhibit A – Declaration of Detective Brindiana Warenda.................................................... | 37-1 | JA-195 |
| Exhibit B – Declaration of Professor John J. Donohue.................................................... | 37-2 | JA-203 |

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|

### VOLUME II

**Exhibit C – Declaration of Professor Louis Klarevas**..........................................  37-3  **JA-270**

    **Exhibit A – Expert Report of Louis Klarevas** ...........................................  **JA-272**

### VOLUME III

**Exhibit C – Declaration of Professor Louis Klarevas –Continued–** ...........................................

    **Exhibit A – Expert Report of Louis Klarevas –Continued–**........................................  **JA-560**

**Exhibit D – Declaration of Lucy P. Allen** .............  37-4  **JA-787**

### VOLUME IV

**Exhibit E – Declaration of Dr. Dennis E. Baron** ..  37-5  **JA-848**

**Exhibit F – Declaration of Professor Randolph Roth** .......................................................................  37-6  **JA-884**

**Exhibit G – Declaration of Professor Saul Cornell**......................................................................  37-7  **JA-935**

**Exhibit H – United Nations Office on Drugs and Crime Diagrams**................................................  37-8  **JA-965**

**Reply in Support of Plaintiffs' Motion for Preliminary Injunction (03/02/2023)** .......................................................  64  **JA-968**

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Exhibit 1 – Detailed Analysis of Ten Laws Cited by State**......................... | **64-1** | **JA-1019** |
| **Declaration of Mark Passamaneck**........................ | **64-2** | **JA-1026** |

### VOLUME V

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Third Amended Complaint for Declaratory Judgment and Injunctive Relief (03/07/2023)** ................................................ | **69** | **JA-1030** |
| **Answer and Affirmative Defenses (03/31/2023)** ................................................ | **73** | **JA-1045** |
| **Amicus Brief of Everytown for Gun Safety Support Fund in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction (04/17/2023)** ................................................ | **78** | **JA-1052** |
| **Transcript Hearing regarding Motion for Preliminary Injunction held June 5, 2023 (06/12/2023)** ................................................ | **83** | **JA-1072** |
| **Notice of Appeal (08/16/2023)** ................................................ | **86** | **JA-1150** |

iv

APPEAL,EFILE

# U.S. District Court
## District of Connecticut (New Haven)
## CIVIL DOCKET FOR CASE #: 3:22-cv-01118-JAM

National Association for Gun Rights et al v. Lamont et al

Assigned to: Judge Jeffrey A. Meyer

Cause: 42:1983 Civil Rights Act

Date Filed: 09/06/2022

Jury Demand: Defendant

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**Plaintiff**

**National Association for Gun Rights**    represented by    **Barry K Arrington**
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
303-205-7870
Email: barry@arringtonpc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John J. Radshaw , III**
John J. Radshaw III, Esquire
65 Trumbull Street, 2d Fl.
New Haven, CT 06510
203-654-9695
Fax: 203-721-6182
Email: jjr@jjr-esq.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Patricia Brought**
*TERMINATED: 09/13/2022*    represented by    **John J. Radshaw , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Toni Theresa Spera Flanigan**    represented by    **Barry K Arrington**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John J. Radshaw , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ned Lamont**
*is his official capacity as the Governor of*
*the State of Connecticut*

represented by **James Michael Belforti**
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
860-808-5436
Fax: 860-808-5591
Email: james.belforti@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janelle Medeiros**
Office of the Attorney General
Public Safety
165 Capitol Avenue
Hartford, CT 06106
860-808-5444
Fax: 860-808-5591
Email: janelle.medeiros@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terrence M. O'Neill**
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
860-808-5450
Fax: 860-808-5591
Email: terrence.oneill@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Patrick J. Griffin**
*is his official capacity as the Chief States*
*Attorney of the State of Connecticut*

represented by **James Michael Belforti**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janelle Medeiros**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terrence M. O'Neill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**David R. Shannon**
*in his official capacity as the State's*

*Attorney, Litchfield Judicial District*
*TERMINATED: 09/13/2022*

**Defendant**

| | |
|---|---|
| **Sharmese L. Walcott** | represented by **James Michael Belforti** |
| *in her official capacity as the State's* | (See above for address) |
| *Attorney, Hartford Judicial District* | *LEAD ATTORNEY* |
| | *ATTORNEY TO BE NOTICED* |

**Janelle Medeiros**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terrence M. O'Neill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | |
|---|---|
| **Brady** | represented by **Daniel Scott Noble** |
| | Finn Dixon & Herling LLP |
| | 6 Landmark Square |
| | Ste 600 |
| | 06901 |
| | Stamford, CT 06901 |
| | 203-325-5000 |
| | Fax: 203-325-5001 |
| | Email: dnoble@fdh.com |
| | *LEAD ATTORNEY* |
| | *ATTORNEY TO BE NOTICED* |

**Timothy Channing Hester**
Covington & Burling
850 Tenth Street, N.W.
Washington, DC 20001-4956
202-662-5324
Fax: 202-778-5324
Email: thester@cov.com
*ATTORNEY TO BE NOTICED*

**Amicus**

| | |
|---|---|
| **March for Our Lives** | represented by **Daniel Scott Noble** |
| | (See above for address) |
| | *LEAD ATTORNEY* |
| | *ATTORNEY TO BE NOTICED* |

**Timothy Channing Hester**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Giffords Law Center to Prevent Gun Violence**                     represented by    **Aaron R. Marcu**
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue
31st Floor
New York, NY 10022
212-284-4854
Email: aaron.marcu@freshfields.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Deirdre M. Daly**
Finn Dixon & Herling LLP
Six Landmark Square
Suite 600
Stamford, CT 06901
203-325-5000
Fax: 203-325-5001
Email: ddaly@fdh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elliot Friedman**
Freshfields Bruckhaus Deringer US LLP
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue, 31st floor
New York, NY 10022
212-277-4000
Email: elliot.friedman@freshfields.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Loeb**
Freshfields Bruckhaus Deringer US LLP
700 13th Street NW
10th Floor
Washington, DC 20005
202-777-4524
Email: jennifer.loeb@freshfields.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Everytown for Gun Safety Support Fund**          represented by    **Damian K. Gunningsmith**
Carmody Torrance Sandak & Hennessey,
LLP - NH
195 Church St. 18th floor
PO Box 1950
New Haven, CT 06509-1950
203-777-5501
Fax: 203-784-3199
Email: dgunningsmith@carmodylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William James Taylor , Jr**
Everytown Law
450 Lexington Ave.
#4184
10017
New York, NY 10271-0332
646-324-8215
Email: wtaylor@everytown.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/06/2022 | 1 | COMPLAINT against Patrick J. Griffin, Ned Lamont, David R. Shannon ( Filing fee $402 receipt number ACTDC-7057374.), filed by National Association for Gun Rights, Patricia Brought. (Attachments: # 1 Civil Cover Sheet)(Radshaw, John) (Entered: 09/06/2022) |
| 09/06/2022 |  | Request for Clerk to issue summons as to Patrick J. Griffin, Ned Lamont, David R. Shannon. (Radshaw, John) (Entered: 09/06/2022) |
| 09/06/2022 |  | Judge Janet Bond Arterton added. (Oliver, T.) (Entered: 09/06/2022) |
| 09/06/2022 | 2 | Order on Pretrial Deadlines: Amended Pleadings due by 11/6/2022 Discovery due by 3/9/2023 Dispositive Motions due by 4/13/2023<br>Signed by Clerk on 9/6/2022.(Chartier, AnnMarie) Modified to correct file date on 9/7/2022 (Chartier, AnnMarie). (Entered: 09/07/2022) |
| 09/06/2022 | 3 | ELECTRONIC FILING ORDER FOR COUNSEL - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER<br>Signed by Judge Janet Bond Arterton on 9/6/2022.(Chartier, AnnMarie) (Entered: 09/07/2022) |
| 09/06/2022 | 4 | STANDING PROTECTIVE ORDER<br>Signed by Judge Janet Bond Arterton on 9/6/2022.(Chartier, AnnMarie) (Entered: 09/07/2022) |
| 09/07/2022 | 5 | NOTICE TO COUNSEL/SELF-REPRESENTED PARTIES : Counsel or self-represented parties initiating or removing this action are responsible for serving all parties with attached documents and copies of 2 Order on Pretrial Deadlines, 1 Complaint filed by National Association for Gun Rights, Patricia Brought, 4 Protective Order, 3 Electronic Filing Order<br>Signed by Clerk on 9/7/2022.(Chartier, AnnMarie) (Entered: 09/07/2022) |
| 09/07/2022 | 6 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Patrick J. Griffin, Ned Lamont, David R. Shannon* with answer to complaint due within *21* days. Attorney *John J. Radshaw, III* *John J. Radshaw III, Esquire* *65 Trumbull Street, 2d Fl.* *New Haven, CT 06510*. (Chartier, AnnMarie) (Entered: 09/07/2022) |
| 09/08/2022 | 7 | MOTION for Attorney(s) Chris Wiest to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7061021) by Patricia Brought, National Association for Gun Rights. (Attachments: # 1 Affidavit of Attorney Chris Wiest, # 2 Certificate of Good Standing - Ohio, # 3 Certificate of Good Standing - Kentucky)(Radshaw, John) (Entered: 09/08/2022) |
| 09/12/2022 | 8 | ORDER granting 7 Motion to Appear Pro Hac Vice. Signed by Clerk on 9/12/2022. (Chartier, AnnMarie) (Entered: 09/12/2022) |

| 09/13/2022 | 9 | AMENDED COMPLAINT *as of Right* against All Defendants, filed by National Association for Gun Rights, Patricia Brought.(Radshaw, John) (Entered: 09/13/2022) |
|---|---|---|
| 09/13/2022 | 10 | MOTION for Christopher Wiest to Withdraw as Attorney by Patricia Brought, National Association for Gun Rights. (Wiest, Christopher) (Entered: 09/13/2022) |
| 09/15/2022 | 11 | MOTION for Attorney(s) Barry Arrington to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7069306) by National Association for Gun Rights, Toni Theresa Spera Flanigan. (Attachments: # 1 Affidavit of Barry Arrington)(Radshaw, John) (Entered: 09/15/2022) |
| 09/15/2022 | | Request for Clerk to issue summons as to Sharmese L. Walcott. (Radshaw, John) (Entered: 09/15/2022) |
| 09/20/2022 | 12 | ORDER granting 11 Motion to Appear Pro Hac Vice. Certificate of Good Standing due by 11/19/2022. Signed by Clerk on 9/20/2022. (Chartier, AnnMarie) (Entered: 09/20/2022) |
| 09/20/2022 | 13 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Sharmese L. Walcott* with answer to complaint due within *21* days. Attorney *John J. Radshaw, III* *John J. Radshaw III, Esquire* *65 Trumbull Street, 2d Fl.* *New Haven, CT 06510*. (Chartier, AnnMarie) (Entered: 09/20/2022) |
| 09/20/2022 | 14 | ORDER granting 10 Motion to Withdraw as Attorney Christopher West. Signed by Judge Janet Bond Arterton on 9/20/22. (Tooker, Aimee) (Entered: 09/20/2022) |
| 09/20/2022 | 15 | SUMMONS Returned Executed by Toni Theresa Spera Flanigan, National Association for Gun Rights. Patrick J. Griffin served on 9/13/2022, answer due 10/4/2022; Ned Lamont served on 9/13/2022, answer due 10/4/2022; David R. Shannon served on 9/13/2022, answer due 10/4/2022. (Radshaw, John) (Entered: 09/20/2022) |
| 09/21/2022 | 16 | NOTICE of Appearance by Barry K Arrington on behalf of National Association for Gun Rights, Toni Theresa Spera Flanigan (Arrington, Barry) (Entered: 09/21/2022) |
| 09/21/2022 | 17 | Corporate Disclosure Statement by National Association for Gun Rights. (Radshaw, John) (Entered: 09/21/2022) |
| 09/30/2022 | 18 | NOTICE of Appearance by Janelle Medeiros on behalf of Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott (Medeiros, Janelle) (Entered: 09/30/2022) |
| 09/30/2022 | 19 | NOTICE of Appearance by James Michael Belforti on behalf of Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott (Belforti, James) (Entered: 09/30/2022) |
| 09/30/2022 | 20 | NOTICE of Appearance by Terrence M. O'Neill on behalf of Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott (O'Neill, Terrence) (Entered: 09/30/2022) |
| 09/30/2022 | 21 | MOTION FOR A PRE-FILING CONFERENCE by Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott.Responses due by 10/21/2022 (Medeiros, Janelle) (Entered: 09/30/2022) |
| 10/04/2022 | 22 | ORDER granting 21 Motion for Pre-Filing Conference. Signed by Judge Janet Bond Arterton on 10/4/22. (Tooker, Aimee) (Entered: 10/04/2022) |
| 10/04/2022 | | A telephonic pre-filing conference will be held 10/26/22 at 3:00 p.m. as follows:1-877-402-9753; access code: 3535720. (Tooker, Aimee) (Entered: 10/04/2022) |
| 10/13/2022 | 23 | CERTIFICATE OF GOOD STANDING re 11 MOTION for Attorney(s) Barry Arrington to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7069306) by National Association for Gun Rights, Toni Theresa Spera Flanigan. (Attachments: # 1 Colorado, # 2 Texas)(Radshaw, John) (Entered: 10/13/2022) |

**JA-6**

| | | |
|---|---|---|
| 10/20/2022 | | The parties' telephonic pre-filing conference has been rescheduled to 10/28/22 at 2:30 p.m. All call in details remain unchanged. (Tooker, Aimee) (Entered: 10/20/2022) |
| 10/21/2022 | 24 | MOTION to Amend/Correct *Complaint* by National Association for Gun Rights, Toni Theresa Spera Flanigan.Responses due by 11/11/2022 (Attachments: # 1 Proposed Amended Complaint)(Arrington, Barry) (Entered: 10/21/2022) |
| 10/25/2022 | 25 | ORDER granting 24 Motion to Amend/Correct Complaint, on consent. The Clerk is requested to docket Second Amended Complaint as the operative complaint in this case. Signed by Judge Janet Bond Arterton on 10/24/22. (Tooker, Aimee) (Entered: 10/25/2022) |
| 10/25/2022 | 26 | SECOND AMENDED COMPLAINT against Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott, filed by Toni Theresa Spera Flanigan, National Association for Gun Rights. (Sichanh, Christina) (Entered: 10/26/2022) |
| 10/28/2022 | 29 | Minute Entry for proceedings held before Judge Janet Bond Arterton: Telephonic Pre-Filing Conference held on 10/28/2022. TOTAL TIME: 25 minutes(Court Reporter Corrine Thomas.) (Sichanh, Christina) (Entered: 11/10/2022) |
| 10/31/2022 | 27 | SCHEDULING ORDER: Pursuant to the colloquy with counsel on the record 10/28/22, the following is ordered: (1) Defendants' motion to dismiss will be filed by 11/18/22; opposition will be filed by 12/9/22; reply, if any, will be filed by 12/23/22. (2) The parties' 26(f) Planning Report shall be filed ten days following ruling. (Tooker, Aimee) (Entered: 10/31/2022) |
| 11/03/2022 | 28 | MOTION for Preliminary Injunction by National Association for Gun Rights, Toni Theresa Spera Flanigan.Responses due by 11/24/2022 (Attachments: # 1 Memorandum in Support, # 2 Affidavit, # 3 Affidavit, # 4 Affidavit)(Arrington, Barry) (Entered: 11/03/2022) |
| 11/16/2022 | 30 | SCHEDULING ORDER: On consent of the parties, the deadline for Defendant's response to the Plaintiff's Motion for Preliminary Injunction 28 is reset to January 31, 2023; Plaintiff's reply is due March 2, 2023. Oral argument will be held March 22, 2023, at 11 AM in Courtroom Two, 141 Church St., New Haven, CT. Signed by Judge Janet Bond Arterton on 11/16/2022. (Anderson, Colleen) (Entered: 11/16/2022) |
| 11/17/2022 | 31 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Oral Argument re 28 is scheduled for 3/22/2023 at 11:00 AM in Courtroom Two, 141 Church St., New Haven, CT before Judge Janet Bond Arterton. (Sichanh, Christina) (Entered: 11/17/2022) |
| 11/18/2022 | 32 | MOTION to Dismiss by Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott.Responses due by 12/9/2022 (Attachments: # 1 Memorandum in Support)(Medeiros, Janelle) (Entered: 11/18/2022) |
| 12/09/2022 | 33 | RESPONSE *to Motion to Dismiss* filed by National Association for Gun Rights, Toni Theresa Spera Flanigan. (Attachments: # 1 Declaration)(Arrington, Barry) (Entered: 12/09/2022) |
| 12/23/2022 | 34 | REPLY to Response to 32 MOTION to Dismiss filed by Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott. (Belforti, James) (Entered: 12/23/2022) |
| 12/24/2022 | 35 | MOTION to Strike *Reply in Support of Motion to Dismiss* by National Association for Gun Rights, Toni Theresa Spera Flanigan.Responses due by 1/14/2023 (Arrington, Barry) (Entered: 12/24/2022) |
| 01/26/2023 | 36 | MOTION for Leave to File Excess Pages by Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott. (Medeiros, Janelle) (Entered: 01/26/2023) |

**JA-7**

| 01/31/2023 | [37](#) | OBJECTION re [28](#) MOTION for Preliminary Injunction filed by Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E, # [6](#) Exhibit F, # [7](#) Exhibit G, # [8](#) Exhibit H)(Medeiros, Janelle) (Entered: 01/31/2023) |
| 02/02/2023 | [38](#) | NOTICE of Appearance by Daniel Scott Noble on behalf of Brady, March for Our Lives (Noble, Daniel) (Entered: 02/02/2023) |
| 02/02/2023 | [39](#) | MOTION for Attorney(s) Timothy C. Hester to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7221457) by Brady, March for Our Lives. (Noble, Daniel) (Entered: 02/02/2023) |
| 02/03/2023 | [40](#) | NOTICE of Appearance by Deirdre M. Daly on behalf of Giffords Law Center to Prevent Gun Violence (Daly, Deirdre) (Entered: 02/03/2023) |
| 02/06/2023 | 41 | ORDER granting [39](#) Motion for Timothy C. Hester to Appear Pro Hac Vice Certificate of Good Standing due by 4/7/2023. Signed by Clerk on 2/6/2023. (Sichanh, Christina) (Entered: 02/06/2023) |
| 02/06/2023 | [42](#) | MOTION for Attorney(s) Jennifer Loeb to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7226242) by Giffords Law Center to Prevent Gun Violence. (Daly, Deirdre) (Entered: 02/06/2023) |
| 02/06/2023 | [43](#) | MOTION for Attorney(s) Aaron R. Marcu to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7226258) by Giffords Law Center to Prevent Gun Violence. (Daly, Deirdre) (Entered: 02/06/2023) |
| 02/06/2023 | [44](#) | MOTION for Attorney(s) Elliot Friedman to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7226272) by Giffords Law Center to Prevent Gun Violence. (Daly, Deirdre) (Entered: 02/06/2023) |
| 02/06/2023 | 45 | ORDER granting [42](#) Motion for Jennifer Loeb to Appear Pro Hac Vice. Signed by Clerk on 2/6/2023. (Sichanh, Christina) (Entered: 02/06/2023) |
| 02/06/2023 | 46 | ORDER granting [43](#) Motion for Aaron R. Marcu to Appear Pro Hac Vice. Signed by Clerk on 2/6/2023. (Sichanh, Christina) (Entered: 02/06/2023) |
| 02/06/2023 | 47 | ORDER granting [44](#) Motion for Elliot Friedman to Appear Pro Hac Vice. Signed by Clerk on 2/6/2023. (Sichanh, Christina) (Entered: 02/06/2023) |
| 02/07/2023 | [48](#) | NOTICE by Giffords Law Center to Prevent Gun Violence re 46 Order on Motion for Admission Pro Hac Vice, 45 Order on Motion for Admission Pro Hac Vice, 47 Order on Motion for Admission Pro Hac Vice (Daly, Deirdre) (Entered: 02/07/2023) |
| 02/07/2023 | [49](#) | Amicus Curiae APPEARANCE entered by Damian K. Gunningsmith on behalf of Everytown for Gun Safety Support Fund. (Gunningsmith, Damian) (Entered: 02/07/2023) |
| 02/07/2023 | [50](#) | Amicus Curiae APPEARANCE entered by Aaron R. Marcu on behalf of Giffords Law Center to Prevent Gun Violence. (Marcu, Aaron) (Entered: 02/07/2023) |
| 02/07/2023 | [51](#) | Amicus Curiae APPEARANCE entered by Jennifer Loeb on behalf of Giffords Law Center to Prevent Gun Violence. (Loeb, Jennifer) (Entered: 02/07/2023) |
| 02/07/2023 | [52](#) | Amicus Curiae APPEARANCE entered by Elliot Friedman on behalf of Giffords Law Center to Prevent Gun Violence. (Friedman, Elliot) (Entered: 02/07/2023) |
| 02/07/2023 | [53](#) | Corporate Disclosure Statement by Everytown for Gun Safety Support Fund. (Gunningsmith, Damian) (Entered: 02/07/2023) |

Case 23-1162, Document 24, 11/22/2023, 3592632, Page14 of 274

| 02/07/2023 | 54 | NOTICE of Appearance by Timothy Channing Hester on behalf of Brady, March for Our Lives. (Hester, Timothy) (Entered: 02/07/2023) |
|---|---|---|
| 02/07/2023 | 55 | MOTION for Leave to File *Amicus Curiae Brief* by Brady, March for Our Lives. (Attachments: # 1 Exhibit [Proposed] Amicus Curiae Brief)(Hester, Timothy) (Entered: 02/07/2023) |
| 02/07/2023 | 56 | Corporate Disclosure Statement by Giffords Law Center to Prevent Gun Violence. (Loeb, Jennifer) (Entered: 02/07/2023) |
| 02/07/2023 | 57 | MOTION for Leave to File *Amicus Curiae Brief* by Giffords Law Center to Prevent Gun Violence. (Attachments: # 1 Exhibit [Proposed] Amicus Curiae Brief)(Loeb, Jennifer) (Entered: 02/07/2023) |
| 02/07/2023 | 58 | MOTION for Leave to File *Amicus Curiae Brief* by Everytown for Gun Safety Support Fund. (Attachments: # 1 Exhibit [Proposed] Amicus Curiae Brief)(Gunningsmith, Damian) (Entered: 02/07/2023) |
| 02/08/2023 | 59 | CERTIFICATE OF GOOD STANDING re 39 MOTION for Attorney(s) Timothy C. Hester to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7221457) by Brady, March for Our Lives. (Hester, Timothy) (Entered: 02/08/2023) |
| 02/09/2023 | 60 | MOTION for Attorney(s) William J. Taylor, Jr. to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7230564) by Everytown for Gun Safety Support Fund. (Attachments: # 1 Exhibit A)(Gunningsmith, Damian) (Entered: 02/09/2023) |
| 02/27/2023 | 61 | AFFIDAVIT re 60 MOTION for Attorney(s) William J. Taylor, Jr. to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7230564) Signed By William J. Taylor, Jr. filed by Everytown for Gun Safety Support Fund. (Gunningsmith, Damian) (Entered: 02/27/2023) |
| 02/28/2023 | 62 | MOTION for Leave to File Excess Pages by National Association for Gun Rights, Toni Theresa Spera Flanigan. (Arrington, Barry) (Entered: 02/28/2023) |
| 03/02/2023 | 63 | ORDER granting 60 Motion to Appear Pro Hac Vice Certificate of Good Standing due by 5/1/2023. Signed by Judge Janet Bond Arterton on 3/2/2023. (Sichanh, Christina) (Entered: 03/02/2023) |
| 03/02/2023 | 64 | REPLY to Response to 28 MOTION for Preliminary Injunction filed by National Association for Gun Rights, Toni Theresa Spera Flanigan. (Attachments: # 1 Exhibit, # 2 Declaration)(Arrington, Barry) (Entered: 03/02/2023) |
| 03/02/2023 | 65 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Oral argument on Motion to Dismiss will be held 3/10/23 at 11:00 AM in Courtroom Two, 141 Church Street, New Haven, CT.(Tooker, Aimee) (Entered: 03/02/2023) |
| 03/02/2023 | 66 | MOTION Reschedule Oral Argument re 65 Calendar Entry by National Association for Gun Rights, Toni Theresa Spera Flanigan.Responses due by 3/23/2023 (Arrington, Barry) (Entered: 03/02/2023) |
| 03/03/2023 | 67 | ORDER: Plaintiffs' motion to reschedule the March 10, 2023 oral argument 66 is GRANTED with modification as follows. In light of Plaintiffs' objection that Plaintiff Flanigan's standing is raised for the first time in Defendants' reply, Defendants' motion to dismiss 32 is DENIED without prejudice. Plaintiffs are granted leave to amend their complaint to address Defendants' arguments as to Plaintiffs' standing by March 10, 2023. Defendants may refile an amended motion to dismiss by March 17, 2023 with Plaintiffs' response due by March 24, 2023, and any reply by Defendants due March 29, 2023. The oral argument on the motion to dismiss scheduled for March 10, 2023 is cancelled. The |

| | | |
|---|---|---|
| | | preliminary injunction oral argument currently scheduled for March 22, 2023 will be postponed; if the Court does not grant Defendants' motion to dismiss, a new date will be promptly set. Plaintiffs' motion to strike Defendants' reply 35 is denied as moot. Signed by Judge Janet Bond Arterton on 3/3/2023. (Anderson, Colleen) (Entered: 03/03/2023) |
| 03/03/2023 | | Set Deadlines/Hearings: Amended Pleadings due by 3/10/2023 (Sichanh, Christina) (Entered: 03/07/2023) |
| 03/06/2023 | 68 | ORDER finding as moot 36 Motion for Leave to File Excess Pages in light of Memorandum 37 ; granting 62 Motion for Leave to File Excess Pages. Plaintiffs' Reply in Support of Motion for Preliminary Injunction may not exceed 48 pages. Signed by Judge Janet Bond Arterton on 3/6/23. (Tooker, Aimee) (Entered: 03/06/2023) |
| 03/07/2023 | 69 | AMENDED COMPLAINT against All Defendants, filed by Toni Theresa Spera Flanigan, National Association for Gun Rights.(Arrington, Barry) (Entered: 03/07/2023) |
| 03/17/2023 | 70 | Consent MOTION for Extension of Time until March 31, 2023 *of the* deadline to respond to Plaintiffs' Third Amended Complaint by Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott. (Belforti, James) (Entered: 03/17/2023) |
| 03/21/2023 | 71 | ORDER granting 70 Motion for Extension of Time to respond to Plaintiffs' Amended Complaint, 69 , on consent, to 3/31/23. Signed by Judge Janet Bond Arterton on 3/21/23. (Tooker, Aimee) (Entered: 03/21/2023) |
| 03/21/2023 | | Answer deadline updated for All Defendants. (Tooker, Aimee) (Entered: 03/21/2023) |
| 03/23/2023 | 72 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Oral Argument on Motion for Preliminary Injunction 28 will be held May 9, 2023 at 3:00 p.m. in Courtroom Two, 141 Church St., New Haven, CT. (Tooker, Aimee) (Entered: 03/23/2023) |
| 03/31/2023 | 73 | ANSWER to 69 Amended Complaint with Affirmative Defenses. by Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott.(Medeiros, Janelle) (Entered: 03/31/2023) |
| 04/12/2023 | 74 | ORDER granting 55 Motion for Leave to File; granting 57 Motion for Leave to File; granting 58 Motion for Leave to File. Signed by Judge Janet Bond Arterton on 4/12/23. (Tooker, Aimee) (Entered: 04/12/2023) |
| 04/13/2023 | 75 | NOTICE by Giffords Law Center to Prevent Gun Violence *of Filing of Amicus Brief in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction - Leave to File Granted April 12, 2023* (Loeb, Jennifer) (Entered: 04/13/2023) |
| 04/17/2023 | 76 | NOTICE of Appearance by William James Taylor, Jr on behalf of Everytown for Gun Safety Support Fund (Taylor, William) (Entered: 04/17/2023) |
| 04/17/2023 | 77 | CERTIFICATE OF GOOD STANDING re 60 MOTION for Attorney(s) William J. Taylor, Jr. to be Admitted Pro Hac Vice (paid $200 PHV fee; receipt number ACTDC-7230564) by Everytown for Gun Safety Support Fund. (Taylor, William) (Entered: 04/17/2023) |
| 04/17/2023 | 78 | Memorandum in Opposition re 28 MOTION for Preliminary Injunction filed by Everytown for Gun Safety Support Fund. (Taylor, William) (Entered: 04/17/2023) |
| 04/18/2023 | 79 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Oral argument has been rescheduled to 6/5/23 at 11:00 a.m., Courtroom Two, 141 Church St., New Haven, CT. (Tooker, Aimee) (Entered: 04/18/2023) |
| 04/18/2023 | 80 | NOTICE by Brady, March for Our Lives *of Filing of Amicus Brief in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction - Leave to File Granted April 12, 2023* (Hester, Timothy) (Entered: 04/18/2023) |

Case 23-1162, Document 24, 11/22/2023, 3592632, Page16 of 274

| 06/02/2023 | [81] | NOTICE by Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott re [37] Objection, (Medeiros, Janelle) (Entered: 06/02/2023) |
| --- | --- | --- |
| 06/02/2023 | [82] | NOTICE by Patrick J. Griffin, Ned Lamont, Sharmese L. Walcott *of Supplemental Authority* (Medeiros, Janelle) (Entered: 06/02/2023) |
| 06/05/2023 | [84] | Minute Entry. Proceedings held before Judge Janet Bond Arterton: taking under advisement re [28] MOTION for Preliminary Injunction filed by National Association for Gun Rights, Toni Theresa Spera Flanigan. Total Time: 1 hour and 51 minutes (Court Reporter Corinne Thomas) (Barry, L) (Entered: 06/23/2023) |
| 06/12/2023 | [83] | TRANSCRIPT of Proceedings: Type of Hearing: Oral Argument. Held on 6/5/2023 before Judge Janet Bond Arterton. Court Reporter: Corinne Thomas. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 7/3/2023. Redacted Transcript Deadline set for 7/13/2023. Release of Transcript Restriction set for 9/10/2023. (Thomas, Corinne) (Entered: 06/12/2023) |
| 08/03/2023 | [85] | ORDER denying [28] Motion for Preliminary Injunction. Signed by Judge Janet Bond Arterton on 08/03/2023. (Anderson, Colleen) (Entered: 08/03/2023) |
| 08/16/2023 | [86] | NOTICE OF APPEAL as to [85] Order on Motion for Preliminary Injunction by National Association for Gun Rights, Toni Theresa Spera Flanigan. Filing fee $ 505, receipt number ACTDC-7450658. (Radshaw, John) (Entered: 08/16/2023) |
| 08/17/2023 | [87] | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: [86] Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Dinah Milton Kinney, Clerk. Documents manually filed not included in this transmission: none (Sichanh, Christina) (Entered: 08/17/2023) |
| 08/31/2023 | 88 | **CASE TRANSFER NOTICE AND NOTICE RE: CONSENT TO MAGISTRATE JUDGE JURISDICTION**. This case has been selected for automatic transfer to another district judge (DJ) <u>in 14 days</u>. The parties may elect to consent to the jurisdiction of a United States Magistrate Judge (USMJ). United States Magistrate Judges do not conduct felony criminal trials; as a result, parties are often able to schedule a civil jury trial before a USMJ sooner and with more flexibility than a jury trial before a DJ. If **all** parties consent to the jurisdiction of a USMJ, the parties shall complete and jointly file the consent form found at https://www.uscourts.gov/forms/civil-forms/notice-consent-and-reference-civil-action-magistrate-judge. If any party does **not** consent, that information should not be conveyed to the Court, and no consent form should be filed. The Court notes that ordinarily, where the parties consent to the jurisdiction of a USMJ, any USMJ previously involved in confidential settlement discussions would not be assigned to hear the trial. **If no consent form is filed within 14 days, this matter will be automatically reassigned to another district judge.**<br>Signed by Clerk on 8/31/2023.(Barry, L) (Entered: 08/31/2023) |
| 09/06/2023 | 89 | ORDER OF TRANSFER. Case reassigned to Judge Jeffrey A. Meyer for all further proceedings. |

**JA-11**

Signed by Judge Janet Bond Arterton on 9/6/23.(Ruocco, M.) (Entered: 09/06/2023)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/07/2023 15:26:58 | | | |
| **PACER Login:** | bg0034bg | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-01118-JAM |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and PATRICIA BROUGHT | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | 3:22 CV 1118 |
| | ) | |
| NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and DAVID R. SHANNON, in his official capacity as the State's Attorney, Litchfield Judicial District, | ) ) ) ) ) ) ) | |
| | ) | September 6, 2022 |
| Defendants. | ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

**I. PARTIES**

1.      Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit

membership and donor-supported organization qualified as tax-exempt under 26 U.S.C. §

501(c)(4).  NAGR seeks to defend the right of all law-abiding individuals to keep and bear arms.

NAGR has members who reside within the State of Connecticut (the "State").  NAGR represents

the interests of its members who reside in the State. Specifically, NAGR represents the interests

of those who are affected by State's prohibition of commonly used firearms and magazines.  In

addition to their standing as citizens and taxpayers, those members' interests include their

intention to exercise their constitutionally protected right to acquire, keep and bear arms, and

specifically the arms and components that are currently prohibited, without being subjected to

criminal prosecution.  This litigation and the interests that NAGR seeks to vindicate and protect

in this litigation, are germane to, and within a core purpose of, NAGR and its mission.  NAGR

- 1 -

members have a present intention to seek to acquire, keep, possess and/or transfer lawful arms for self-defense and other lawful purposes, which are prohibited by the challenged firearm and component restrictions. For purposes of this Complaint, the term "Plaintiffs" is meant to include NAGR in its capacity as a representative of its members.

2. Plaintiff Patricia Brought is a resident of New Milford, Connecticut and is a law-abiding citizen of the United States. She is a member of NAGR. She currently owns certain semi-automatic firearms that are putatively made illegal by the Statutes (defined below), and she currently owns magazines capable of holding more than 10 rounds of ammunition also putatively made illegal by the Statutes. She has possessed this property lawfully for years. She intends to continue possessing her lawfully owned property within Connecticut and specifically within the area near her home in New Milford, Connecticut, intends acquire additional arms putatively made illegal by the Statutes, and intends to eventually lawfully transfer her property to others. Plaintiff reasonably fears criminal prosecution for violating these restrictions, but intends to continue to possess her firearms and magazines that are putatively made illegal by the Statutes, acquire additional firearms and magazines that are putatively made illegal by the Statutes, and/or transfer them to others.

3. The individual plaintiffs and members of plaintiff NAGR are eligible under the laws of the United States and, but for the Statutes, of the State of Connecticut to receive and possess firearms, including pistols, rifles, and shotguns, with the exception of the Statutes.

4. Defendant Ned Lamont is the Governor of Connecticut. His principal place of business is in Hartford (Hartford County), Connecticut. Defendant Lamont is required to "take care that the laws be faithfully executed." CONN. CONST., Article IV, § 12.

- 2 -

5.      Defendant Patrick J. Griffin is the Chief State's Attorney for the State of Connecticut.  His principal place of business is in Rocky Hill (Hartford County), Connecticut. Pursuant to Article XXIII of the Connecticut Constitution, "[t]he prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district."  As Chief State State's Attorney for the State of Connecticut, Defendant Griffin is the "chief of the division of criminal justice." CONN. GEN. STAT. § 51-275. The division is responsible for prosecuting all crimes and offenses against the laws of the state. CONN. GEN. STAT. § 51-277(b). The Chief State's Attorney may sign any warrants, informations, and applications for grand jury investigations; may in certain circumstances appear in court to represent the state or represent the state in lieu of a state's attorney for a judicial district; and shall participate on behalf of the state in all appellate, post-trial and post-conviction proceedings arising out of the initiation of any criminal action.  CONN. GEN. STAT. §§ 51-277(c), (d). These prosecutorial activities include commencement of criminal actions against those individuals and/or entities accused of violating the Statutes.  Further, under CONN. GEN. STAT. § 51-281, "[t]he Chief State's Attorney … shall be qualified to act in any judicial district in the state and in connection with any matter regardless of the judicial district where the offense took place, and may be assigned to act in any judicial district at any time on designation by the Chief State's Attorney or the Inspector General, as applicable."

6.      Defendant David R. Shannon is the State's Attorney, Litchfield Judicial District, which encompasses the district where Plaintiff Patricia Brought resides.  Pursuant to Article XXIII of the Connecticut Constitution, "[t]he prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district."    Further, under CONN.

- 3 -

JA-15

GEN. STAT. § 51-281, "[t]he … State's Attorney … shall be qualified to act in any judicial district in the state and in connection with any matter regardless of the judicial district where the offense took place…."  And, under CONN. GEN. STAT. § 51-286a, "[e]ach state's attorney… shall diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court or in which the court may proceed, whether committed before or after his appointment to office."

7.      Defendants are, have, and/or will enforce the unconstitutional provisions of the Statutes against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

## III.  JURISDICTION AND VENUE

8.      The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

9.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

10.      Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

- 4 -

## IV.  GENERAL ALLEGATIONS

11.    The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed."  U.S. CONST. Amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008) ("*Heller*"); *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ("*McDonald*"); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*").

12.    The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment.  *McDonald, supra*.

13.    This action challenges the constitutionality of CONN. GEN. Stat. § 53-202c(a) and CONN. GEN. STAT. § 53-202w(b) and (c) (collectively, the "Statutes").

14.    CONN. GEN. STAT. § 53-202a(1) defines the term "assault weapon."

15.    The term "assault weapon" as used in the Statutes is not a technical term used in the firearms industry or community for firearms commonly available to civilians.  Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes.  Plaintiffs refuse to adopt State's politically charged rhetoric in this Complaint. Therefore, for purposes of this Complaint, the term "Banned Firearm" shall have the same meaning as the term "assault weapon" in CONN. GEN. STAT. § 53-202a(1).

16.    CONN. GEN. Stat. § 53-202c(a) providers that any person within the State who possesses a Banned Firearm shall be guilty of a class D felony.

17.     Plaintiffs and/or their members have the present intention, and seek to acquire,
keep, possess and/or transfer the Banned Firearms for self-defense and other lawful purposes.

18.     The Second Amendment protects the right of law-abiding citizens to own
weapons in common use by law-abiding citizens for lawful purposes.  *Heller*, *supra*, at 627.

19.     There is a venerable tradition in this country of lawful private ownership of
semiautomatic rifles such as those banned by the Statutes.  The Supreme Court has held as much.
In *Staples v. United States*, 511 U.S. 600 (1994), the Court noted that semiautomatics, unlike
machine guns, "traditionally have been widely accepted as lawful possessions. " *Id*., 511 U.S.
611-12 (identifying the AR-15 – the archetypal "assault weapon" – as a traditionally lawful
firearm).  The vast majority of States do not ban they type of semiautomatic rifles deemed
"assault weapons" in the Statutes.

20.     Millions of law-abiding citizens choose to possess firearms such as the Banned
Firearms. *Duncan v. Becerra ("Duncan IV)"*, 970 F.3d 1133, 1147 (9th Cir. 2020) [1]
("Commonality is determined largely by statistics."); *Ass 'n of N.J Rifle & Pistol Clubs, Inc. v.
Att '.Y Gen*., 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned because
"[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass 'n, Inc. v.
Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited
by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term
was used in *Heller*."); *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We
think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' ").

---

[1] , *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub
nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

This is demonstrated by the AR-15 and other modern semiautomatic rifles, which epitomize the firearms that the State bans.

21.     The AR-15, as just one example among many of a Banned Firearm, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). Already in early 2013, sources estimated that there were five million AR-15s in private hands. Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9, 2013), https://bit.ly/3whtDTj (last visited August 25, 2022); *see also Duncan v. Becerra ("Duncan III")*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019). [2]

22.     Millions of law-abiding citizens own and use for lawful purposes semi-automatic firearms such as the Banned Firearms currently possessed by Plaintiffs.  The Statutes' prohibition on the possession, sale, or other transfer of the Banned Firearms possessed by Plaintiffs and/or their members violates the Second Amendment.

23.     CONN. GEN. STAT. § 53-202w(a)(1) defines the term "large-capacity magazine" to mean any firearm magazine capable of holding more than ten rounds of ammunition.

24.     The Statutes again uses politically charged rhetoric to describe the arms it bans. The Statutes' characterization of these magazines as "large capacity" is a misnomer.  Magazines capable of holding more than 10 rounds are standard capacity magazines.  Plaintiffs refuse to adopt the State's politically charged rhetoric in this Complaint.  Therefore, for purposes of this

---

[2] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and on *reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

Complaint, the term "Banned Magazine" shall have the same meaning as the term "large-capacity magazine" in CONN. GEN. STAT. § 53-202w(a)(1).

25. CONN. GEN. STAT. § 53-202w(b) and (c) generally state that any person who within the State, possesses, distributes, imports, keeps for sale, offers or exposes for sale, transfers, or purchases a Banned Magazine shall be guilty of a class D felony.

26. Magazines are indisputably "arms" protected by the Second Amendment, as the right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate. *See United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless").

27. The magazines the State has banned unquestionably satisfy the "common use" test. *Duncan III,* 366 F. Supp. 3d at 1143-45; *Duncan IV*, 970 F.3d at 1146-47.

28. In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated by Bruen*, *supra*, Judge Traxler (whose dissenting opinion almost certainly accurately states the law post *Bruen*) stated:

> The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States. These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds. Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds."

*Id*., 849 F.3d at 154, Traxler, J. dissenting (internal citations and quotation marks omitted).

- 8 -

29.     Magazines capable of holding more than 10 rounds of ammunition are commonly owned by millions and millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting. They come standard with many of the most popular handguns and long guns on the market, and Americans own roughly 115 million of them, *Duncan IV*, 970 F.3d at 1142, accounting for "approximately half of all privately owned magazines in the United States," *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).  Indeed, the most popular handgun in America, the Glock 17 pistol, comes standard with a 17-round magazine. *See Duncan III*, 366 F.Supp.3d at 1145.

30.     There can be no serious dispute that magazines capable of holding more than 10 rounds are bearable arms that satisfy the common use test and thus are presumptively protected by the Second Amendment.  Law-abiding citizens own over 100 million magazines such as the Banned Magazines.  The Statutes' prohibition on the possession, sale, or other transfer of the Banned Magazines owned by Plaintiffs and/or their members violates the Second Amendment.

31.     The Second Amendment's plain text covers the Banned Firearms and the Banned Magazines.  It therefore falls to the Defendants to justify its regulation as consistent with historical tradition rooted in the Founding. This they cannot possibly do so, because *Bruen* has already established that there is no tradition of banning commonly possessed arms, such as the Banned Firearms and the Banned Magazines.

32.     In the post-*Bruen* decision of *Rocky Mountain Gun Owners v. The Town of Superior*, Case No. 22-cv-1685 (July 22, 2022), the court entered an order in which it restrained enforcement of certain provisions of a Town of Superior, Colorado ordinance that banned semiautomatic weapons and magazine with a capacity greater than ten rounds.  The court held

- 9 -

**JA-21**

there was a strong likelihood that the plaintiffs in that case would prevail on the merits of their constitutional challenge to the ordinance provisions. The restrained ordinance is substantially identical to the statutory provisions challenged in this action.

33.     There is an actual and present controversy between the parties. The Statutes infringe on Plaintiffs' right to keep and bear arms under the Second Amendment by generally prohibiting the possession of arms that are commonly possessed by millions of Americans for lawful purposes and Defendants continue to enforce the Statutes. Plaintiffs desire a judicial declaration that the Statutes sections identified above, facially and/or as applied to them, violate their constitutional rights. Plaintiffs should not be forced to choose between risking criminal prosecution and exercising their constitutional rights. This is true even if certain provisions of the Statutes provide affirmative defenses to criminal prosecution. The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

34.     Plaintiffs are and will continue to be injured by Defendants' enforcement of the Statutes sections identified above insofar as those provisions violate Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, transfer and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide. If not enjoined by this Court, Defendants will enforce the Statutes in derogation of Plaintiffs' constitutional rights. Plaintiffs have no plain, speedy, and adequate remedy at law. Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs

- 10 -

because they are unable to engage in constitutionally protected activity due to Defendants' present or contemplated enforcement of these provisions.

## V. FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

35.    Paragraphs 1 through 34 are realleged and incorporated by reference.

36.    The Statutes bans firearms and firearm magazines that are "typically possessed by law-abiding citizens for lawful purposes" nationwide. The Statutes, therefore, generally prohibit residents of State, including Plaintiffs, from acquiring, keeping, possessing, and/or transferring arms protected by the Second Amendment. There are significant penalties for violations of the Statutes.

37.    These restrictions infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to the states and its political subdivisions by the Fourteenth Amendment.

38.    The Statutes' prohibitions extend into Plaintiffs' homes, where Second Amendment protections are at their zenith.

39.    Defendants cannot satisfy their burden of justifying these restrictions on the Second Amendment right of the People, including Plaintiffs, to bear, acquire, keep, possess, transfer, and use arms that are in common use by law-abiding adults throughout the United States for the core right of self-defense in the home and other lawful purposes.

**PRAYER FOR RELIEF**

Plaintiffs pray that the Court:

1. Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Statutes sections identified herein are unconstitutional on their face or as applied to the extent their prohibitions apply to law-abiding adults seeking to acquire, use, transfer, or possess arms that are in common use by the American public for lawful purposes;

2. Enter preliminary and permanent prospective injunctive relief enjoining Defendant and its officers, agents, and employees from enforcing the unconstitutional Statutes sections identified above;

3. Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law; and

4. Grant any such other and further relief as the Court may deem proper.

<div style="margin-left:40%">

THE PLAINTIFFS
NATIONAL ASSOCIATION FOR
GUN RIGHTS, and PATRICIA
BROUGHT

Christopher Wiest
25 Town Center Blvd., Suite 104
Crestview Hills, KY 41017
Phone: 513-257-1895
chris@cwiestlaw.com
*Admission Pro Hac Vice Pending*

*/s/ John Radshaw*
John J. Radshaw (ct19882)
65 Trumbull Street
2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

</div>

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| National Association of Gun Rights and Patricia Brought | Ned Lamont, Patrick Griffin and David Shannon |

| (b) County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant **Hartford** |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| John J. Radshaw III, 65 Trumbull St, New Haven, CT 06510 203.654.9695 | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [x] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 840 Trademark | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | [x] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 2201, 42 USC 1983

Brief description of cause:
Constitutionality of CGS 53-202c(a) and 53-202w(b)

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND: [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____  DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 9/6/2022 | *John J. Radshaw III* |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)    County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)    Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions</u>.

**V.    Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:22 CV 1118 |
| | ) | |
| NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, | ) ) ) ) ) ) ) | |
| Defendants. | ) | September 13, 2022 |

## FIRST AMENDED
## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
## AS OF RIGHT

### I. PARTIES

1.      Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit

membership and donor-supported organization qualified as tax-exempt under 26 U.S.C. §

501(c)(4).  NAGR seeks to defend the right of all law-abiding individuals to keep and bear arms.

NAGR has members who reside within the State of Connecticut (the "State").  NAGR represents

the interests of its members who reside in the State. Specifically, NAGR represents the interests

of those who are affected by State's prohibition of commonly used firearms and magazines.  In

addition to their standing as citizens and taxpayers, those members' interests include their

intention to exercise their constitutionally protected right to acquire, keep and bear arms, and

specifically the arms and components that are currently prohibited, without being subjected to

criminal prosecution.  This litigation and the interests that NAGR seeks to vindicate and protect

- 1 -

in this litigation, are germane to, and within a core purpose of, NAGR and its mission. NAGR members have a present intention to seek to acquire, keep, possess and/or transfer lawful arms for self-defense and other lawful purposes, which are prohibited by the challenged firearm and component restrictions. For purposes of this Complaint, the term "Plaintiffs" is meant to include NAGR in its capacity as a representative of its members.

2.    Plaintiff Toni Theresa Spera Flanigan is a resident of Connecticut and is a law-abiding citizen of the United States. She is a member of NAGR. She intends to acquire arms putatively made illegal by the Statutes and but for the Statutes would do so.

3.    The individual plaintiff and members of plaintiff NAGR are eligible under the laws of the United States and, but for the Statutes, of the State of Connecticut to receive and possess firearms, including pistols, rifles, and shotguns, with the exception of the Statutes.

4.    Defendant Ned Lamont is the Governor of Connecticut. His principal place of business is in Hartford (Hartford County), Connecticut. Defendant Lamont is required to "take care that the laws be faithfully executed." CONN. CONST., Article IV, § 12.

5.    Defendant Patrick J. Griffin is the Chief State's Attorney for the State of Connecticut. His principal place of business is in Rocky Hill (Hartford County), Connecticut. Pursuant to Article XXIII of the Connecticut Constitution, "[t]he prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district." As Chief State State's Attorney for the State of Connecticut, Defendant Griffin is the "chief of the division of criminal justice." CONN. GEN. STAT. § 51-275. The division is responsible for prosecuting all crimes and offenses against the laws of the state. CONN. GEN. STAT. § 51-277(b). The Chief State's Attorney may sign any warrants, informations, and applications for grand jury

- 2 -

investigations; may in certain circumstances appear in court to represent the state or represent the state in lieu of a state's attorney for a judicial district; and shall participate on behalf of the state in all appellate, post-trial and post-conviction proceedings arising out of the initiation of any criminal action. CONN. GEN. STAT. §§ 51-277(c), (d). These prosecutorial activities include commencement of criminal actions against those individuals and/or entities accused of violating the Statutes. Further, under CONN. GEN. STAT. § 51-281, "[t]he Chief State's Attorney … shall be qualified to act in any judicial district in the state and in connection with any matter regardless of the judicial district where the offense took place, and may be assigned to act in any judicial district at any time on designation by the Chief State's Attorney or the Inspector General, as applicable."

6.      Defendant Sharmese L. Walcott is the State's Attorney, Hartford Judicial District, which encompasses the district where Plaintiff Flanigan resides. Pursuant to Article XXIII of the Connecticut Constitution, "[t]he prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district."   Further, under CONN. GEN. STAT. § 51-281, "[t]he … State's Attorney … shall be qualified to act in any judicial district in the state and in connection with any matter regardless of the judicial district where the offense took place…."  And, under CONN. GEN. STAT. § 51-286a, "[e]ach state's attorney… shall diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court or in which the court may proceed, whether committed before or after his appointment to office."

7.      Defendants are, have, and/or will enforce the unconstitutional provisions of the Statutes against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

- 3 -

### III. JURISDICTION AND VENUE

8.      The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331,

because the action arises under the Constitution and laws of the United States.  The Court also

has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to

redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of

the State, of rights, privileges or immunities secured by the United States.

9.      Plaintiffs' claims for declaratory and injunctive relief are authorized by

28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42

U.S.C. § 1988.

10.      Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a

substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this

district.

### IV. GENERAL ALLEGATIONS

11.      The Second Amendment to the United States Constitution declares that "the right

of the people to keep and bear arms shall not be infringed."  U.S. CONST. Amend. II; *see also*

*D.C. v. Heller*, 554 U.S. 570 (2008) ("*Heller*"); *McDonald v. City of Chicago*, 561 U.S. 742

(2010) ("*McDonald*"); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111

(2022) ("*Bruen*").

12.      The right to keep and bear arms recognized in the Second Amendment is made

applicable to the states by the Fourteenth Amendment.  *McDonald, supra*.

13.      This action challenges the constitutionality of CONN. GEN. Stat. § 53-202c(a) and

CONN. GEN. STAT. § 53-202w(b) and (c) (collectively, the "Statutes").

- 4 -

14.     CONN. GEN. STAT. § 53-202a(1) defines the term "assault weapon."

15.     The term "assault weapon" as used in the Statutes is not a technical term used in the firearms industry or community for firearms commonly available to civilians.  Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes.  Plaintiffs refuse to adopt State's politically charged rhetoric in this Complaint. Therefore, for purposes of this Complaint, the term "Banned Firearm" shall have the same meaning as the term "assault weapon" in CONN. GEN. STAT. § 53-202a(1).

16.     CONN. GEN. Stat. § 53-202c(a) providers that any person within the State who possesses a Banned Firearm shall be guilty of a class D felony.

17.     Plaintiffs and/or their members have the present intention, and seek to acquire, keep, possess and/or transfer the Banned Firearms for self-defense in the home and other lawful purposes.

18.     The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes.  *Heller*, *supra*, at 627.

19.     There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles such as those banned by the Statutes.  The Supreme Court has held as much. In *Staples v. United States*, 511 U.S. 600 (1994), the Court noted that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions. " *Id*., 511 U.S. 611-12 (identifying the AR-15 – the archetypal "assault weapon" – as a traditionally lawful

- 5 -

**JA-31**

firearm). The vast majority of States do not ban they type of semiautomatic rifles deemed "assault weapons" in the Statutes.

20. Millions of law-abiding citizens choose to possess firearms such as the Banned Firearms. *Duncan v. Becerra ("Duncan IV)"*, 970 F.3d 1133, 1147 (9th Cir. 2020) [1] ("Commonality is determined largely by statistics."); *Ass 'n of N.J Rifle & Pistol Clubs, Inc. v. Att '.Y Gen*., 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modem semiautomatic rifles, which epitomize the firearms that the State bans.

21. The AR-15, as just one example among many of a Banned Firearm, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). Already in early 2013, sources estimated that there were five million AR- 15s in private hands. Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9,

---

[1] , *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

- 6 -

2013), https://bit.ly/3whtDTj (last visited August 25, 2022); *see also Duncan v. Becerra ("Duncan III")*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019).[2]

22.     Millions of law-abiding citizens own and use for lawful purposes semi-automatic firearms such as the Banned Firearms currently possessed by Plaintiffs.  The Statutes' prohibition on the possession, sale, or other transfer of the Banned Firearms possessed by Plaintiffs and/or their members violates the Second Amendment.

23.     CONN. GEN. STAT. § 53-202w(a)(1) defines the term "large-capacity magazine" to mean any firearm magazine capable of holding more than ten rounds of ammunition.

24.     The Statutes again uses politically charged rhetoric to describe the arms it bans.  The Statutes' characterization of these magazines as "large capacity" is a misnomer.  Magazines capable of holding more than 10 rounds are standard capacity magazines.  Plaintiffs refuse to adopt the State's politically charged rhetoric in this Complaint.  Therefore, for purposes of this Complaint, the term "Banned Magazine" shall have the same meaning as the term "large-capacity magazine" in CONN. GEN. STAT. § 53-202w(a)(1).

25.     CONN. GEN. STAT. § 53-202w(b) and (c) generally state that any person who within the State, possesses, distributes, imports, keeps for sale, offers or exposes for sale, transfers, or purchases a Banned Magazine shall be guilty of a class D felony.

26.     Magazines are indisputably "arms" protected by the Second Amendment, as the right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate. *See United States v.*

---

[2] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and on *reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

- 7 -

*Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless").

27.     The magazines the State has banned unquestionably satisfy the "common use" test. *Duncan III,* 366 F. Supp. 3d at 1143-45; *Duncan IV*, 970 F.3d at 1146-47.

28.     In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated by Bruen, supra*, Judge Traxler (whose dissenting opinion almost certainly accurately states the law post *Bruen*) stated:

> The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States.  These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.  Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds."

*Id*., 849 F.3d at 154, Traxler, J. dissenting (internal citations and quotation marks omitted).

29.     Magazines capable of holding more than 10 rounds of ammunition are commonly owned by millions and millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting. They come standard with many of the most popular handguns and long guns on the market, and Americans own roughly 115 million of them, *Duncan IV*, 970 F.3d at 1142, accounting for "approximately half of all privately owned magazines in the United States," *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).  Indeed, the most popular handgun in America, the Glock 17 pistol, comes standard with a 17-round magazine. *See Duncan III*, 366 F.Supp.3d at 1145.

- 8 -

30.    There can be no serious dispute that magazines capable of holding more than 10 rounds are bearable arms that satisfy the common use test and thus are presumptively protected by the Second Amendment.  Law-abiding citizens own over 100 million magazines such as the Banned Magazines.  The Statutes' prohibition on the possession, sale, or other transfer of the Banned Magazines owned by Plaintiffs and/or their members violates the Second Amendment.

31.    The Second Amendment's plain text covers the Banned Firearms and the Banned Magazines.  It therefore falls to the Defendants to justify its regulation as consistent with historical tradition rooted in the Founding. This they cannot possibly do so, because *Bruen* has already established that there is no tradition of banning commonly possessed arms, such as the Banned Firearms and the Banned Magazines.

32.    In the post-*Bruen* decision of *Rocky Mountain Gun Owners v. The Town of Superior*, Case No. 22-cv-1685 (July 22, 2022), the court entered an order in which it restrained enforcement of certain provisions of a Town of Superior, Colorado ordinance that banned semiautomatic weapons and magazine with a capacity greater than ten rounds.  The court held there was a strong likelihood that the plaintiffs in that case would prevail on the merits of their constitutional challenge to the ordinance provisions.  The restrained ordinance is substantially identical to the statutory provisions challenged in this action.

33.    There is an actual and present controversy between the parties.  The Statutes infringe on Plaintiffs' right to keep and bear arms under the Second Amendment by generally prohibiting the possession of arms that are commonly possessed by millions of Americans for lawful purposes and Defendants continue to enforce the Statutes.  Plaintiffs desire a judicial declaration that the Statutes sections identified above, facially and/or as applied to them, violate

- 9 -

their constitutional rights.  Plaintiffs should not be forced to choose between risking criminal prosecution and exercising their constitutional rights.  This is true even if certain provisions of the Statutes provide affirmative defenses to criminal prosecution.  The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

34.     Plaintiffs are and will continue to be injured by Defendants' enforcement of the Statutes sections identified above insofar as those provisions violate Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, transfer and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.  If not enjoined by this Court, Defendants will enforce the Statutes in derogation of Plaintiffs' constitutional rights.  Plaintiffs have no plain, speedy, and adequate remedy at law.  Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity due to Defendants' present or contemplated enforcement of these provisions.

### V. FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

35.     Paragraphs 1 through 34 are realleged and incorporated by reference.

36.     The Statutes bans firearms and firearm magazines that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.  The Statutes, therefore, generally prohibit residents of State, including Plaintiffs, from acquiring, keeping, possessing, and/or transferring

- 10 -

arms protected by the Second Amendment. There are significant penalties for violations of the Statutes.

37. These restrictions infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to the states and its political subdivisions by the Fourteenth Amendment.

38. The Statutes' prohibitions extend into Plaintiffs' homes, where Second Amendment protections are at their zenith.

39. Defendants cannot satisfy their burden of justifying these restrictions on the Second Amendment right of the People, including Plaintiffs, to bear, acquire, keep, possess, transfer, and use arms that are in common use by law-abiding adults throughout the United States for the core right of self-defense in the home and other lawful purposes.

## PRAYER FOR RELIEF

Plaintiffs pray that the Court:

1. Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Statutes sections identified herein are unconstitutional on their face or as applied to the extent their prohibitions apply to law-abiding adults seeking to acquire, use, transfer, or possess arms that are in common use by the American public for lawful purposes;

2. Enter preliminary and permanent prospective injunctive relief enjoining Defendant and its officers, agents, and employees from enforcing the unconstitutional Statutes sections identified above;

3. Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law; and

4. Grant any such other and further relief as the Court may deem proper.

<div style="margin-left:40%;">

THE PLAINTIFFS
NATIONAL ASSOCIATION FOR
GUN RIGHTS, and TONI
THERESA SPERA FLANIGAN

Barry K. Arrington
3801 E. Florida Ave., Suite 830
Denver, CO 80210
(303) 205-7870
barry@arringtonpc.com
*Admission Pro Hac Vice*
*Forthcoming*

*/s/ John Radshaw*
John J. Radshaw (ct19882)
65 Trumbull Street, 2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

</div>

- 12 -

**C E R T I F I C A T I O N**

     I hereby certify that on SEPTEMBER 13, 2022, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all appearing parties by operation of the Court's electronic filing. Parties may access this filing through the Court's system.

                             /s/ John J. Radshaw III

                             _____

                             John J. Radshaw III

- 13 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. |
| v. | ) ) | 3:22 CV 1118 |
| NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, | ) ) ) ) ) ) ) ) | |
| | ) | October 21, 2022 |
| Defendants. | ) | |

**UNOPPOSED MOTION FOR LEAVE TO AMEND COMPLAINT**

Plaintiffs National Association for Gun Right and Toni Flanigan move the Court for

leave to file the attached amended complaint. As grounds for this motion, they state:

**Conferral**: The undersigned has conferred with counsel for Defendants. Defendants do

**not** oppose this motion.

Review of this motion for leave to amend complaint is governed by Federal Rule of Civil

Procedure 15(a)(2). That rule provides that a party may amend its pleading with the opposing

party's consent or the court's leave, and further provides that the court "should freely give leave

when justice so requires." *Id*. Rule 15(a)(2) "is a liberal and permissive standard, and the only

grounds on which denial of leave to amend has long been held proper are upon a showing of

undue delay, bad faith, dilatory motive, or futility." *Sacerdote v. N.Y. Univ*., 9 F.4th 95, 115 (2d

Cir. 2021) (cleaned up), *cert. denied*, 142 S. Ct. 1112 (2022). The rule in this Second Circuit has

been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of

- 1 -

prejudice or bad faith. *See State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981). In determining what constitutes "prejudice," the courts consider whether the amended pleading would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction. *See, e.g., Tokio Marine & Fire Ins. Co.*, 786 F.2d at 103; Fluor, 654 F.2d at 856; *Strauss v. Douglas Aircraft Co.*, 404 F.2d 1152, 1157–58 (2d Cir.1968); *Calloway v. Marvel Entertainment Group*, 110 F.R.D. 45, 48 (S.D.N.Y.1986). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Fluor*, 654 F.2d at 856.

This action has been pending less than two months, so there can be no claim of undue delay. Defendants have not filed any responsive pleading and discovery has not begun. Thus, Defendants cannot reasonably assert that they would be prejudiced by the amended pleading. The pleading is not futile because it adequately addresses a standing/jurisdictional issue that has been identified by Defendants.

Accordingly, Plaintiffs respectfully move for leave to file the attached Second Amended Complaint.

THE PLAINTIFFS
NATIONAL ASSOCIATION FOR
GUN RIGHTS, and TONI
THERESA SPERA FLANIGAN

*/s/ Barry K. Arrington*
Barry K. Arrington
3801 E. Florida Ave., Suite 830
Denver, CO 80210
(303) 205-7870
barry@arringtonpc.com
*Admission Pro Hac Vice*

- 2 -

John J. Radshaw (ct19882)
65 Trumbull Street, 2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

### C E R T I F I C A T I O N

I hereby certify that on October 21, 2022, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all appearing parties by operation of the Court's electronic filing. Parties may access this filing through the Court's system.

*/s/ Barry K. Arrington*
_____

Barry K. Arrington

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and | ) | |
| TONI THERESA SPERA FLANIGAN | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | 3:22 CV 1118 |
| | ) | |
| NED LAMONT, is his official capacity as the Governor | ) | |
| of the State of Connecticut; | ) | |
| PATRICK J. GRIFFIN, is his official capacity as the | ) | |
| Chief State's Attorney of the State of Connecticut; and | ) | |
| SHARMESE L. WALCOTT, in her official capacity as | ) | |
| the State's Attorney, Hartford Judicial District, | ) | |
| | ) | |
| Defendants. | ) | September 13, 2022 |

**SECOND AMENDED**
**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**AS OF RIGHT**

**I. PARTIES**

1.      Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit

membership and donor-supported organization qualified as tax-exempt under 26 U.S.C. §

501(c)(4).  NAGR seeks to defend the right of all law-abiding individuals to keep and bear arms.

NAGR has members who reside within the State of Connecticut (the "State").  NAGR represents

the interests of its members who reside in the State. Specifically, NAGR represents the interests

of those who are affected by State's prohibition of commonly used firearms and magazines.  In

addition to their standing as citizens and taxpayers, those members' interests include their

intention to exercise their constitutionally protected right to acquire, keep and bear arms, and

specifically the arms and components that are currently prohibited, without being subjected to

criminal prosecution.  This litigation and the interests that NAGR seeks to vindicate and protect

- 1 -

in this litigation, are germane to, and within a core purpose of, NAGR and its mission. NAGR members have a present intention to seek to acquire, keep, possess and/or transfer lawful arms for self-defense and other lawful purposes, which are prohibited by the challenged firearm and component restrictions. For purposes of this Complaint, the term "Plaintiffs" is meant to include NAGR in its capacity as a representative of its members.

2. NAGR has expended and diverted resources otherwise reserved for different institutional functions and purposes and is adversely and directly harmed by the illegal and unconstitutional actions of the Defendants. NAGR has diverted, and continues to divert, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein that would otherwise be used for educational outreach, public relations, and/or programmatic purposes. Among other diversions and threatened diversions, the Defendants' unconstitutional enforcement of the laws complained of herein has forced, or likely will force, NAGR to divert funds, energies, and resources to the cause of this legal action. Rather than working on other educational, outreach, public relations, and/or programmatic events and operations, NAGR's agents have devoted, are continuing to devote, or are likely to devote, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein. NAGR and its agents will be forced to continue diverting such time, money, effort, and resources from NAGR's normal educational, outreach, public relations, and/or programmatic events and operations so long as the Defendants' unconstitutional enforcement of the laws complained of herein persists. As to NAGR's representative capacity claims, there are common questions of law that substantially affect the rights, duties and liabilities of many of NAGR's members as well as

potentially numerous similarly situated residents whose constitutional rights have been, and are continuing to be, infringed by the Defendants' unconstitutional enforcement of the laws complained of herein. The interests NAGR seeks to protect are germane to its purpose.

3.     Plaintiff Toni Theresa Spera Flanigan is a resident of Connecticut and is a law-abiding citizen of the United States. She is a member of NAGR. She intends to acquire arms putatively made illegal by the Statutes and but for the Statutes would do so.

4.     The individual plaintiff and members of plaintiff NAGR are eligible under the laws of the United States and, but for the Statutes, of the State of Connecticut to receive and possess firearms, including pistols, rifles, and shotguns, with the exception of the Statutes.

5.     Defendant Ned Lamont is the Governor of Connecticut. His principal place of business is in Hartford (Hartford County), Connecticut. Defendant Lamont is required to "take care that the laws be faithfully executed." CONN. CONST., Article IV, § 12.

6.     Defendant Patrick J. Griffin is the Chief State's Attorney for the State of Connecticut. His principal place of business is in Rocky Hill (Hartford County), Connecticut. Pursuant to Article XXIII of the Connecticut Constitution, "[t]he prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district." As Chief State State's Attorney for the State of Connecticut, Defendant Griffin is the "chief of the division of criminal justice." CONN. GEN. STAT. § 51-275. The division is responsible for prosecuting all crimes and offenses against the laws of the state. CONN. GEN. STAT. § 51-277(b). The Chief State's Attorney may sign any warrants, informations, and applications for grand jury investigations; may in certain circumstances appear in court to represent the state or represent the state in lieu of a state's attorney for a judicial district; and shall participate on behalf of the state

- 3 -

**JA-45**

in all appellate, post-trial and post-conviction proceedings arising out of the initiation of any criminal action. CONN. GEN. STAT. §§ 51-277(c), (d). These prosecutorial activities include commencement of criminal actions against those individuals and/or entities accused of violating the Statutes. Further, under CONN. GEN. STAT. § 51-281, "[t]he Chief State's Attorney … shall be qualified to act in any judicial district in the state and in connection with any matter regardless of the judicial district where the offense took place, and may be assigned to act in any judicial district at any time on designation by the Chief State's Attorney or the Inspector General, as applicable."

7.      Defendant Sharmese L. Walcott is the State's Attorney, Hartford Judicial District, which encompasses the district where Plaintiff Flanigan resides. Pursuant to Article XXIII of the Connecticut Constitution, "[t]he prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district."    Further, under CONN. GEN. STAT. § 51-281, "[t]he … State's Attorney … shall be qualified to act in any judicial district in the state and in connection with any matter regardless of the judicial district where the offense took place…." And, under CONN. GEN. STAT. § 51-286a, "[e]ach state's attorney… shall diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court or in which the court may proceed, whether committed before or after his appointment to office."

8.      Defendants are, have, and/or will enforce the unconstitutional provisions of the Statutes against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

- 4 -

### III. JURISDICTION AND VENUE

9.      The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

10.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

11.      Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

### IV. GENERAL ALLEGATIONS

12.      The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed."  U.S. CONST. Amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008) ("*Heller*"); *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ("*McDonald*"); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*").

13.      The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment.  *McDonald, supra*.

14.      This action challenges the constitutionality of CONN. GEN. Stat. § 53-202c(a) and CONN. GEN. STAT. § 53-202w(b) and (c) (collectively, the "Statutes").

- 5 -

15.   CONN. GEN. STAT. § 53-202a(1) defines the term "assault weapon."

16.   The term "assault weapon" as used in the Statutes is not a technical term used in the firearms industry or community for firearms commonly available to civilians.  Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes.  Plaintiffs refuse to adopt State's politically charged rhetoric in this Complaint. Therefore, for purposes of this Complaint, the term "Banned Firearm" shall have the same meaning as the term "assault weapon" in CONN. GEN. STAT. § 53-202a(1).

17.   CONN. GEN. Stat. § 53-202c(a) providers that any person within the State who possesses a Banned Firearm shall be guilty of a class D felony.

18.   Plaintiffs and/or their members have the present intention, and seek to acquire, keep, possess and/or transfer the Banned Firearms for self-defense in the home and other lawful purposes.

19.   The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes.  *Heller*, *supra*, at 627.

20.   There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles such as those banned by the Statutes.  The Supreme Court has held as much. In *Staples v. United States*, 511 U.S. 600 (1994), the Court noted that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions. " *Id.*, 511 U.S. 611-12 (identifying the AR-15 – the archetypal "assault weapon" – as a traditionally lawful

- 6 -

**JA-48**

firearm). The vast majority of States do not ban they type of semiautomatic rifles deemed "assault weapons" in the Statutes.

21. Millions of law-abiding citizens choose to possess firearms such as the Banned Firearms. *Duncan v. Becerra ("Duncan IV")*, 970 F.3d 1133, 1147 (9th Cir. 2020) [1] ("Commonality is determined largely by statistics."); *Ass 'n of N.J Rifle & Pistol Clubs, Inc. v. Att '.Y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modem semiautomatic rifles, which epitomize the firearms that the State bans.

22. The AR-15, as just one example among many of a Banned Firearm, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). Already in early 2013, sources estimated that there were five million AR- 15s in private hands. Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9,

---

[1] , *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

- 7 -

2013), https://bit.ly/3whtDTj (last visited August 25, 2022); *see also Duncan v. Becerra ("Duncan III")*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019). [2]

23.    Millions of law-abiding citizens own and use for lawful purposes semi-automatic firearms such as the Banned Firearms currently possessed by Plaintiffs.  The Statutes' prohibition on the possession, sale, or other transfer of the Banned Firearms possessed by Plaintiffs and/or their members violates the Second Amendment.

24.    CONN. GEN. STAT. § 53-202w(a)(1) defines the term "large-capacity magazine" to mean any firearm magazine capable of holding more than ten rounds of ammunition.

25.    The Statutes again uses politically charged rhetoric to describe the arms it bans. The Statutes' characterization of these magazines as "large capacity" is a misnomer.  Magazines capable of holding more than 10 rounds are standard capacity magazines.  Plaintiffs refuse to adopt the State's politically charged rhetoric in this Complaint.  Therefore, for purposes of this Complaint, the term "Banned Magazine" shall have the same meaning as the term "large-capacity magazine" in CONN. GEN. STAT. § 53-202w(a)(1).

26.    CONN. GEN. STAT. § 53-202w(b) and (c) generally state that any person who within the State, possesses, distributes, imports, keeps for sale, offers or exposes for sale, transfers, or purchases a Banned Magazine shall be guilty of a class D felony.

27.    Magazines are indisputably "arms" protected by the Second Amendment, as the right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate. *See United States v.*

---

[2] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and on *reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

- 8 -

*Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless").

28.     The magazines the State has banned unquestionably satisfy the "common use" test. *Duncan III,* 366 F. Supp. 3d at 1143-45; *Duncan IV*, 970 F.3d at 1146-47.

29.     In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated by Bruen*, *supra*, Judge Traxler (whose dissenting opinion almost certainly accurately states the law post *Bruen*) stated:

> The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States.  These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.  Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds."

*Id*., 849 F.3d at 154, Traxler, J. dissenting (internal citations and quotation marks omitted).

30.     Magazines capable of holding more than 10 rounds of ammunition are commonly owned by millions and millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting. They come standard with many of the most popular handguns and long guns on the market, and Americans own roughly 115 million of them, *Duncan IV*, 970 F.3d at 1142, accounting for "approximately half of all privately owned magazines in the United States," *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).  Indeed, the most popular handgun in America, the Glock 17 pistol, comes standard with a 17-round magazine. *See Duncan III*, 366 F.Supp.3d at 1145.

- 9 -

**JA-51**

31.     There can be no serious dispute that magazines capable of holding more than 10 rounds are bearable arms that satisfy the common use test and thus are presumptively protected by the Second Amendment.  Law-abiding citizens own over 100 million magazines such as the Banned Magazines.  The Statutes' prohibition on the possession, sale, or other transfer of the Banned Magazines owned by Plaintiffs and/or their members violates the Second Amendment.

32.     The Second Amendment's plain text covers the Banned Firearms and the Banned Magazines.  It therefore falls to the Defendants to justify its regulation as consistent with historical tradition rooted in the Founding. This they cannot possibly do so, because *Bruen* has already established that there is no tradition of banning commonly possessed arms, such as the Banned Firearms and the Banned Magazines.

33.     In the post-*Bruen* decision of *Rocky Mountain Gun Owners v. The Town of Superior*, Case No. 22-cv-1685 (July 22, 2022), the court entered an order in which it restrained enforcement of certain provisions of a Town of Superior, Colorado ordinance that banned semiautomatic weapons and magazine with a capacity greater than ten rounds.  The court held there was a strong likelihood that the plaintiffs in that case would prevail on the merits of their constitutional challenge to the ordinance provisions.  The restrained ordinance is substantially identical to the statutory provisions challenged in this action.

34.     There is an actual and present controversy between the parties.  The Statutes infringe on Plaintiffs' right to keep and bear arms under the Second Amendment by generally prohibiting the possession of arms that are commonly possessed by millions of Americans for lawful purposes and Defendants continue to enforce the Statutes.  Plaintiffs desire a judicial declaration that the Statutes sections identified above, facially and/or as applied to them, violate

- 10 -

their constitutional rights.  Plaintiffs should not be forced to choose between risking criminal prosecution and exercising their constitutional rights.  This is true even if certain provisions of the Statutes provide affirmative defenses to criminal prosecution.  The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

35.     Plaintiffs are and will continue to be injured by Defendants' enforcement of the Statutes sections identified above insofar as those provisions violate Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, transfer and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.  If not enjoined by this Court, Defendants will enforce the Statutes in derogation of Plaintiffs' constitutional rights.  Plaintiffs have no plain, speedy, and adequate remedy at law.  Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity due to Defendants' present or contemplated enforcement of these provisions.

**V. FIRST CLAIM FOR RELIEF**
**Right to Keep and Bear Arms**
**U.S. Const., amends. II and XIV**

36.     Paragraphs 1 through 35 are realleged and incorporated by reference.

37.     The Statutes bans firearms and firearm magazines that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.  The Statutes, therefore, generally prohibit residents of State, including Plaintiffs, from acquiring, keeping, possessing, and/or transferring

- 11 -

arms protected by the Second Amendment.  There are significant penalties for violations of the Statutes.

38.     These restrictions infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to the states and its political subdivisions by the Fourteenth Amendment.

39.     The Statutes' prohibitions extend into Plaintiffs' homes, where Second Amendment protections are at their zenith.

40.     Defendants cannot satisfy their burden of justifying these restrictions on the Second Amendment right of the People, including Plaintiffs, to bear, acquire, keep, possess, transfer, and use arms that are in common use by law-abiding adults throughout the United States for the core right of self-defense in the home and other lawful purposes.

**PRAYER FOR RELIEF**

Plaintiffs pray that the Court:

1. Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Statutes sections identified herein are unconstitutional on their face or as applied to the extent their prohibitions apply to law-abiding adults seeking to acquire, use, transfer, or possess arms that are in common use by the American public for lawful purposes;

2. Enter preliminary and permanent prospective injunctive relief enjoining Defendant and its officers, agents, and employees from enforcing the unconstitutional Statutes sections identified above;

3. Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law; and

4. Grant any such other and further relief as the Court may deem proper.

<div style="margin-left:40%">

THE PLAINTIFFS
NATIONAL ASSOCIATION FOR
GUN RIGHTS, and TONI
THERESA SPERA FLANIGAN

*/s/ Barry K. Arrignton*
Barry K. Arrington
3801 E. Florida Ave., Suite 830
Denver, CO 80210
(303) 205-7870
barry@arringtonpc.com
*Pro Hac Vice*

John J. Radshaw (ct19882)
65 Trumbull Street, 2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

</div>

- 13 -

- 14 -

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. |
| v. | ) ) | 3:22 CV 1118 |
| NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | September 13, 2022 |

**SECOND AMENDED**
**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**AS OF RIGHT**

**I.  PARTIES**

1.      Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit

membership and donor-supported organization qualified as tax-exempt under 26 U.S.C. §

501(c)(4).  NAGR seeks to defend the right of all law-abiding individuals to keep and bear arms.

NAGR has members who reside within the State of Connecticut (the "State").  NAGR represents

the interests of its members who reside in the State. Specifically, NAGR represents the interests

of those who are affected by State's prohibition of commonly used firearms and magazines.  In

addition to their standing as citizens and taxpayers, those members' interests include their

intention to exercise their constitutionally protected right to acquire, keep and bear arms, and

specifically the arms and components that are currently prohibited, without being subjected to

criminal prosecution.  This litigation and the interests that NAGR seeks to vindicate and protect

- 1 -

in this litigation, are germane to, and within a core purpose of, NAGR and its mission. NAGR members have a present intention to seek to acquire, keep, possess and/or transfer lawful arms for self-defense and other lawful purposes, which are prohibited by the challenged firearm and component restrictions. For purposes of this Complaint, the term "Plaintiffs" is meant to include NAGR in its capacity as a representative of its members.

2. NAGR has expended and diverted resources otherwise reserved for different institutional functions and purposes and is adversely and directly harmed by the illegal and unconstitutional actions of the Defendants. NAGR has diverted, and continues to divert, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein that would otherwise be used for educational outreach, public relations, and/or programmatic purposes. Among other diversions and threatened diversions, the Defendants' unconstitutional enforcement of the laws complained of herein has forced, or likely will force, NAGR to divert funds, energies, and resources to the cause of this legal action. Rather than working on other educational, outreach, public relations, and/or programmatic events and operations, NAGR's agents have devoted, are continuing to devote, or are likely to devote, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein. NAGR and its agents will be forced to continue diverting such time, money, effort, and resources from NAGR's normal educational, outreach, public relations, and/or programmatic events and operations so long as the Defendants' unconstitutional enforcement of the laws complained of herein persists. As to NAGR's representative capacity claims, there are common questions of law that substantially affect the rights, duties and liabilities of many of NAGR's members as well as

- 2 -

potentially numerous similarly situated residents whose constitutional rights have been, and are continuing to be, infringed by the Defendants' unconstitutional enforcement of the laws complained of herein. The interests NAGR seeks to protect are germane to its purpose.

3. Plaintiff Toni Theresa Spera Flanigan is a resident of Connecticut and is a law-abiding citizen of the United States. She is a member of NAGR. She intends to acquire arms putatively made illegal by the Statutes and but for the Statutes would do so.

4. The individual plaintiff and members of plaintiff NAGR are eligible under the laws of the United States and, but for the Statutes, of the State of Connecticut to receive and possess firearms, including pistols, rifles, and shotguns, with the exception of the Statutes.

5. Defendant Ned Lamont is the Governor of Connecticut. His principal place of business is in Hartford (Hartford County), Connecticut. Defendant Lamont is required to "take care that the laws be faithfully executed." CONN. CONST., Article IV, § 12.

6. Defendant Patrick J. Griffin is the Chief State's Attorney for the State of Connecticut. His principal place of business is in Rocky Hill (Hartford County), Connecticut. Pursuant to Article XXIII of the Connecticut Constitution, "[t]he prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district." As Chief State State's Attorney for the State of Connecticut, Defendant Griffin is the "chief of the division of criminal justice." CONN. GEN. STAT. § 51-275. The division is responsible for prosecuting all crimes and offenses against the laws of the state. CONN. GEN. STAT. § 51-277(b). The Chief State's Attorney may sign any warrants, informations, and applications for grand jury investigations; may in certain circumstances appear in court to represent the state or represent the state in lieu of a state's attorney for a judicial district; and shall participate on behalf of the state

- 3 -

in all appellate, post-trial and post-conviction proceedings arising out of the initiation of any criminal action.  CONN. GEN. STAT. §§ 51-277(c), (d). These prosecutorial activities include commencement of criminal actions against those individuals and/or entities accused of violating the Statutes.  Further, under CONN. GEN. STAT. § 51-281, "[t]he Chief State's Attorney … shall be qualified to act in any judicial district in the state and in connection with any matter regardless of the judicial district where the offense took place, and may be assigned to act in any judicial district at any time on designation by the Chief State's Attorney or the Inspector General, as applicable."

7.     Defendant Sharmese L. Walcott is the State's Attorney, Hartford Judicial District, which encompasses the district where Plaintiff Flanigan resides.  Pursuant to Article XXIII of the Connecticut Constitution, "[t]he prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district."   Further, under CONN. GEN. STAT. § 51-281, "[t]he … State's Attorney … shall be qualified to act in any judicial district in the state and in connection with any matter regardless of the judicial district where the offense took place…."  And, under CONN. GEN. STAT. § 51-286a, "[e]ach state's attorney… shall diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court or in which the court may proceed, whether committed before or after his appointment to office."

8.     Defendants are, have, and/or will enforce the unconstitutional provisions of the Statutes against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

- 4 -

JA-60

## III.  JURISDICTION AND VENUE

9.      The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331,

because the action arises under the Constitution and laws of the United States.  The Court also

has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to

redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of

the State, of rights, privileges or immunities secured by the United States.

10.      Plaintiffs' claims for declaratory and injunctive relief are authorized by

28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42

U.S.C. § 1988.

11.      Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a

substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this

district.

## IV.  GENERAL ALLEGATIONS

12.      The Second Amendment to the United States Constitution declares that "the right

of the people to keep and bear arms shall not be infringed."  U.S. CONST. Amend. II; *see also*

*D.C. v. Heller*, 554 U.S. 570 (2008) ("*Heller*"); *McDonald v. City of Chicago*, 561 U.S. 742

(2010) ("*McDonald*"); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111

(2022) ("*Bruen*").

13.      The right to keep and bear arms recognized in the Second Amendment is made

applicable to the states by the Fourteenth Amendment.  *McDonald, supra*.

14.      This action challenges the constitutionality of CONN. GEN. Stat. § 53-202c(a) and

CONN. GEN. STAT. § 53-202w(b) and (c) (collectively, the "Statutes").

- 5 -

15.   CONN. GEN. STAT. § 53-202a(1) defines the term "assault weapon."

16.   The term "assault weapon" as used in the Statutes is not a technical term used in the firearms industry or community for firearms commonly available to civilians. Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes. Plaintiffs refuse to adopt State's politically charged rhetoric in this Complaint. Therefore, for purposes of this Complaint, the term "Banned Firearm" shall have the same meaning as the term "assault weapon" in CONN. GEN. STAT. § 53-202a(1).

17.   CONN. GEN. Stat. § 53-202c(a) providers that any person within the State who possesses a Banned Firearm shall be guilty of a class D felony.

18.   Plaintiffs and/or their members have the present intention, and seek to acquire, keep, possess and/or transfer the Banned Firearms for self-defense in the home and other lawful purposes.

19.   The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes. *Heller*, *supra*, at 627.

20.   There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles such as those banned by the Statutes. The Supreme Court has held as much. In *Staples v. United States*, 511 U.S. 600 (1994), the Court noted that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions. " *Id*., 511 U.S. 611-12 (identifying the AR-15 – the archetypal "assault weapon" – as a traditionally lawful

- 6 -

firearm).  The vast majority of States do not ban they type of semiautomatic rifles deemed "assault weapons" in the Statutes.

21.     Millions of law-abiding citizens choose to possess firearms such as the Banned Firearms. *Duncan v. Becerra ("Duncan IV)"*, 970 F.3d 1133, 1147 (9th Cir. 2020) [1] ("Commonality is determined largely by statistics."); *Ass 'n of N.J Rifle & Pistol Clubs, Inc. v. Att '.Y Gen*., 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modem semiautomatic rifles, which epitomize the firearms that the State bans.

22.     The AR-15, as just one example among many of a Banned Firearm, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). Already in early 2013, sources estimated that there were five million AR- 15s in private hands. Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9,

---

[1] , *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

2013), https://bit.ly/3whtDTj (last visited August 25, 2022); *see also Duncan v. Becerra ("Duncan III")*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019). [2]

23.     Millions of law-abiding citizens own and use for lawful purposes semi-automatic firearms such as the Banned Firearms currently possessed by Plaintiffs.  The Statutes' prohibition on the possession, sale, or other transfer of the Banned Firearms possessed by Plaintiffs and/or their members violates the Second Amendment.

24.     CONN. GEN. STAT. § 53-202w(a)(1) defines the term "large-capacity magazine" to mean any firearm magazine capable of holding more than ten rounds of ammunition.

25.     The Statutes again uses politically charged rhetoric to describe the arms it bans. The Statutes' characterization of these magazines as "large capacity" is a misnomer.  Magazines capable of holding more than 10 rounds are standard capacity magazines.  Plaintiffs refuse to adopt the State's politically charged rhetoric in this Complaint.  Therefore, for purposes of this Complaint, the term "Banned Magazine" shall have the same meaning as the term "large-capacity magazine" in CONN. GEN. STAT. § 53-202w(a)(1).

26.     CONN. GEN. STAT. § 53-202w(b) and (c) generally state that any person who within the State, possesses, distributes, imports, keeps for sale, offers or exposes for sale, transfers, or purchases a Banned Magazine shall be guilty of a class D felony.

27.     Magazines are indisputably "arms" protected by the Second Amendment, as the right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate. *See United States v.*

---

[2] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and on *reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

- 8 -

*Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless").

28.　　The magazines the State has banned unquestionably satisfy the "common use" test. *Duncan III,* 366 F. Supp. 3d at 1143-45; *Duncan IV*, 970 F.3d at 1146-47.

29.　　In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated by Bruen*, *supra*, Judge Traxler (whose dissenting opinion almost certainly accurately states the law post *Bruen*) stated:

> The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States.  These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.  Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds."

*Id*., 849 F.3d at 154, Traxler, J. dissenting (internal citations and quotation marks omitted).

30.　　Magazines capable of holding more than 10 rounds of ammunition are commonly owned by millions and millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting. They come standard with many of the most popular handguns and long guns on the market, and Americans own roughly 115 million of them, *Duncan IV*, 970 F.3d at 1142, accounting for "approximately half of all privately owned magazines in the United States," *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).  Indeed, the most popular handgun in America, the Glock 17 pistol, comes standard with a 17-round magazine. *See Duncan III*, 366 F.Supp.3d at 1145.

- 9 -

**JA-65**

31.     There can be no serious dispute that magazines capable of holding more than 10 rounds are bearable arms that satisfy the common use test and thus are presumptively protected by the Second Amendment.  Law-abiding citizens own over 100 million magazines such as the Banned Magazines.  The Statutes' prohibition on the possession, sale, or other transfer of the Banned Magazines owned by Plaintiffs and/or their members violates the Second Amendment.

32.     The Second Amendment's plain text covers the Banned Firearms and the Banned Magazines.  It therefore falls to the Defendants to justify its regulation as consistent with historical tradition rooted in the Founding. This they cannot possibly do so, because *Bruen* has already established that there is no tradition of banning commonly possessed arms, such as the Banned Firearms and the Banned Magazines.

33.     In the post-*Bruen* decision of *Rocky Mountain Gun Owners v. The Town of Superior*, Case No. 22-cv-1685 (July 22, 2022), the court entered an order in which it restrained enforcement of certain provisions of a Town of Superior, Colorado ordinance that banned semiautomatic weapons and magazine with a capacity greater than ten rounds.  The court held there was a strong likelihood that the plaintiffs in that case would prevail on the merits of their constitutional challenge to the ordinance provisions.  The restrained ordinance is substantially identical to the statutory provisions challenged in this action.

34.     There is an actual and present controversy between the parties.  The Statutes infringe on Plaintiffs' right to keep and bear arms under the Second Amendment by generally prohibiting the possession of arms that are commonly possessed by millions of Americans for lawful purposes and Defendants continue to enforce the Statutes.  Plaintiffs desire a judicial declaration that the Statutes sections identified above, facially and/or as applied to them, violate

- 10 -

**JA-66**

their constitutional rights.  Plaintiffs should not be forced to choose between risking criminal prosecution and exercising their constitutional rights.  This is true even if certain provisions of the Statutes provide affirmative defenses to criminal prosecution.  The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

35.      Plaintiffs are and will continue to be injured by Defendants' enforcement of the Statutes sections identified above insofar as those provisions violate Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, transfer and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.  If not enjoined by this Court, Defendants will enforce the Statutes in derogation of Plaintiffs' constitutional rights.  Plaintiffs have no plain, speedy, and adequate remedy at law.  Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity due to Defendants' present or contemplated enforcement of these provisions.

**V. FIRST CLAIM FOR RELIEF**
**Right to Keep and Bear Arms**
**U.S. Const., amends. II and XIV**

36.      Paragraphs 1 through 35 are realleged and incorporated by reference.

37.      The Statutes bans firearms and firearm magazines that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.  The Statutes, therefore, generally prohibit residents of State, including Plaintiffs, from acquiring, keeping, possessing, and/or transferring

- 11 -

arms protected by the Second Amendment.  There are significant penalties for violations of the Statutes.

38.     These restrictions infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to the states and its political subdivisions by the Fourteenth Amendment.

39.     The Statutes' prohibitions extend into Plaintiffs' homes, where Second Amendment protections are at their zenith.

40.     Defendants cannot satisfy their burden of justifying these restrictions on the Second Amendment right of the People, including Plaintiffs, to bear, acquire, keep, possess, transfer, and use arms that are in common use by law-abiding adults throughout the United States for the core right of self-defense in the home and other lawful purposes.

**PRAYER FOR RELIEF**

Plaintiffs pray that the Court:

1. Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Statutes sections identified herein are unconstitutional on their face or as applied to the extent their prohibitions apply to law-abiding adults seeking to acquire, use, transfer, or possess arms that are in common use by the American public for lawful purposes;

2. Enter preliminary and permanent prospective injunctive relief enjoining Defendant and its officers, agents, and employees from enforcing the unconstitutional Statutes sections identified above;

3. Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law; and

4. Grant any such other and further relief as the Court may deem proper.

<div style="margin-left: 50%;">

THE PLAINTIFFS
NATIONAL ASSOCIATION FOR
GUN RIGHTS, and TONI
THERESA SPERA FLANIGAN

*/s/ Barry K. Arrignton*
Barry K. Arrington
3801 E. Florida Ave., Suite 830
Denver, CO 80210
(303) 205-7870
barry@arringtonpc.com
*Pro Hac Vice*

John J. Radshaw (ct19882)
65 Trumbull Street, 2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

</div>

- 13 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN <br>     Plaintiffs, <br><br> v. <br><br> NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, <br>     Defendants. | Civil Action No. <br> 3:22 CV 1118 (JBA) <br><br><br><br><br><br><br><br> November 3, 2022 |

### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Fed.R.Civ.P. 65, the Plaintiffs, NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN, now move for the entry of a preliminary injunction against the Defendants, NED LAMONT, is his official capacity as the Governor of the State of Connecticut, PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut, and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, (collectively, the "State") prohibiting the enforcement of CONN. GEN. Stat. § 53-202c(a) and CONN. GEN. STAT. § 53-202w(b) and (c) (collectively, the "Statutes") because these statutes are unconstitutional.

The Statutes purport to ban (1) certain semi-automatic firearms that are held by millions of law-abiding American citizens for lawful purposes and (2) certain firearm magazines that are held by millions of law-abiding American citizens for lawful

**ORAL ARGUMENT REQUESTED**

purposes.  The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes.  *D.C. v. Heller*, 554 U.S. 570, 627 (2008).  Thus, these provisions of the Statutes are unconstitutional. Accordingly, Plaintiffs hereby move the Court to enter a preliminary injunction enjoying the State from enforcing these unconstitutional provisions of the Statutes.

Consistent with D.Conn.L.R. 7(a), the Plaintiffs have submitted a memorandum of law in support of their Motion for Preliminary Injunction.

WHEREFORE, the Plaintiffs pray that their Motion for Preliminary Injunction is granted.

THE PLAINTIFFS
NATIONAL ASSOCIATION FOR
GUN RIGHTS, and TONI
THERESA SPERA FLANIGAN

*/s/ Barry K. Arrington*
Barry K. Arrington
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com
*Pro Hac Vice*

John J. Radshaw (ct19882)
65 Trumbull Street
2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

- 2 -

<u>**C E R T I F I C A T I O N**</u>

I hereby certify that on November 4, 2022, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all appearing parties by operation of the Court's electronic filing. Parties may access this filing through the Court's system.

*/s/ Barry K. Arrington*
Barry K. Arrington

- 3 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN | ) ) ) | |
|     Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:22 CV 1118 (JBA) |
| NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, | ) ) ) ) ) ) ) ) | |
|     Defendants. | ) ) | November 3, 2022 |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The Plaintiffs submit the following Memorandum of Law in support of their Motion for Preliminary Injunction against Defendants (collectively, the "State").

**Certification**:  The undersigned has conferred with counsel for defendants. Defendants oppose this motion.

## INTRODUCTION

This action challenges the constitutionality of CONN. GEN. Stat. § 53-202c(a) and CONN. GEN. STAT. § 53-202w(b) and (c) (collectively, the "Statutes"). The Statutes ban (1) certain semi-automatic firearms that are held by millions of law-abiding American citizens for lawful purposes and (2) certain firearm magazines that are held by millions of law-abiding American citizens for lawful purposes.  The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes. *D.C. v. Heller*, 554 U.S. 570, 627 (2008).  Thus, these provisions of

- 1 -

**JA-74**

the Statutes are unconstitutional. Accordingly, Plaintiffs hereby move the Court to enter a preliminary injunction enjoying the State from enforcing these unconstitutional provisions of the Statutes.

## FACTS

1. CONN. GEN. STAT. § 53-202a(1) defines the term "assault weapon." The term "assault weapon" as used in the Statutes is not a technical term used in the firearms industry or community for firearms commonly available to civilians. Brown Dec. ¶ 3. Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes. *Id.* Plaintiffs refuse to adopt State's politically charged rhetoric. Therefore, for purposes of this Motion, the term "Banned Firearm" shall have the same meaning as the term "assault weapon" in CONN. GEN. STAT. § 53-202a(1).

2. CONN. GEN. Stat. § 53-202c(a) providers that any person within the State who possesses a Banned Firearm shall be guilty of a class D felony.

3. CONN. GEN. STAT. § 53-202w(a)(1) defines the term "large-capacity magazine" to mean any firearm magazine capable of holding more than ten rounds of ammunition. The Statutes again use politically charged rhetoric to describe the arms it bans. Brown Dec. ¶ 4. The Statutes' characterization of these magazines as "large capacity" is a misnomer. *Id.* Magazines capable of holding more than 10 rounds are standard capacity magazines. *Id.* Plaintiffs refuse to adopt the State's politically charged rhetoric in this Motion. Therefore, for purposes of this Motion, the term "Banned

- 2 -

Magazine" shall have the same meaning as the term "large-capacity magazine" in CONN. GEN. STAT. § 53-202w(a)(1).

4.      CONN. GEN. STAT. § 53-202w(b) and (c) generally state that any person who within the State, possesses, distributes, imports, keeps for sale, offers or exposes for sale, transfers, or purchases a Banned Magazine shall be guilty of a class D felony.

5.      Plaintiff Toni Flanigan and NAGR's members on whose behalf this action is brought are residents of the State and law-abiding citizens of the United States. Flanigan Dec. ¶ 3; Brown Dec. ¶ 6.  They are otherwise eligible under the laws of the United States and the State to receive and possess firearms and magazines, including the Banned Firearms and Banned Magazines. *Id.* They intend to and, but for the credible threat of prosecution under the Statutes, would acquire Banned Firearms and Banned Magazines to keep in their homes for self- defense and for other lawful purposes. *Id.*

6.      At least 20 million semi-automatic firearms such as those defined as "assault weapons" are owned by millions of American citizens who use those firearms for lawful purposes.  Declaration of James Curcuruto ¶ 6.  Mr. Curcuruto's declaration was originally submitted in *Rocky Mountain Gun Owners, et al. v. Town of Superior*, 22-CV-1685-RM.  It is used with permission in this action.

7.      At least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes. Declaration of James Curcuruto ¶ 7.

**STANDARD FOR GRANTING PRELIMINARY INJUNCTION**

To obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction. *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (cleaned up). The movant also must show that the balance of equities tips in his or her favor. *Id.* In cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm. *Id.* Therefore, "[l]ikelihood of success on the merits is [] **the dominant, if not the dispositive, factor**.' *Id.*, *quoting New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). See also *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir.2004) ("When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor.")[1]

### THE GOVERNMENT BEARS THE BURDEN OF DEMONSTRATION

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court unambiguously placed on the government a substantial burden of demonstrating that any law seeking to regulate firearms is consistent with this Nation's historical tradition of firearm regulation. [2] Specifically, the Court stated:

---

[1] These were First Amendment cases, but that difference does not matter, because in *Bruen*, *infra*, the Supreme Court held that Second Amendment rights should be protected in the same way First Amendment rights are protected. *Id.*, 142 S. Ct. at 2130.

[2] "Significantly, the plaintiff need not demonstrate the absence of regulation in order to prevail; the burden rests squarely on the government to establish that the activity has been subject to some measure of regulation." *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 415 (7th Cir. 2015) (Manion, J., dissenting).

- 4 -

> "To support that [its claim that its regulation is permitted by the Second Amendment], the burden falls on [the government] to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct."

*Bruen*, 142 S. Ct. at 2135.

In this case, the Second Amendment's plain text covers Plaintiffs' conduct in seeking to acquire bearable arms. *Bruen*, 142 S. Ct. at 2132 ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms"). Accordingly, Plaintiff's conduct is **presumptively** protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2126 ("when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"). The government may attempt to rebut that presumption by demonstrating that its law is consistent with this Nation's historical tradition of firearm regulation. If the government attempts to meet that burden in its response, Plaintiff will have an opportunity to submit rebuttal evidence in its reply.

## ARGUMENT

I. **The Supreme Court has Reaffirmed the *Heller* Standard**

A. **A Regulation Burdening the Right to Keep and Bear Arms is Unconstitutional Unless it is Consistent with the Text of the Second Amendment and the Nation's History and Traditions**

In *Bruen*, the Court rejected the two-part balancing test for Second Amendment challenges that several courts of appeal adopted in the wake of *Heller* and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010). Instead, it reiterated the *Heller* standard, which it summarized as follows:

- 5 -

"Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."

*Bruen*, 142 S. Ct. at 2126 (internal quotation marks omitted).

The *Bruen* court spent significant time describing how lower courts are to proceed in Second Amendment cases. As particularly relevant here, *Bruen* described the proper analysis of the term "arms." That word, *Bruen* affirmed, has a "historically fixed meaning" but one that "applies to new circumstances." *Id.* at 2132. It thus "covers modern instruments that facilitate armed self-defense." *Id.*, *citing Caetano v. Massachusetts*, 577 U.S. 411, 411-412 (2016) *(per curiam)* (stun guns). Accordingly, the text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*

The Court then explained that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Id.* In considering history, courts are to engage in "reasoning by analogy." *Id.* This analogical reasoning requires the government to identify a well-established and representative historical analogue to the challenged regulation. *Id.* at 2133. But to be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the Court today. *Id.* at 2132. Two metrics are

- 6 -

particularly salient in determining if a historical regulation is relevantly similar: [1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense. *Id*. at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a modern-day regulation is analogous enough to historical precursors that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id*.

As noted above, the Court held that the judicial balancing of means and ends pursuant to intermediate scrutiny review plays no part in Second Amendment analysis. "*Heller* does not support applying means-end scrutiny." *Id*., 142 S. Ct. at 2127; *see also Id*., 142 S. Ct. at 2129 (inquiry into the statute's alleged "salutary effects" upon "important governmental interests" is not part of the test).

### B. Only "Dangerous and Unusual Arms" Can be Banned Consistent with Our History and Tradition

This case involves a blanket prohibition on two classes of arms. Both *Bruen* and *Heller* identified only one aspect of the nation's history and tradition that is sufficiently analogous to – and therefore capable of justifying – such a ban: the tradition, dating back to the Founding, of restricting "dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of arm is in common use, there is, by definition, no historical tradition of banning it. Thus, for the type of restriction at issue in this case, the Court has already analyzed the relevant historical tradition and established its scope: "dangerous and unusual" weapons may be subject to a blanket ban, but arms "in common use at the time" may not be. *Id*.

The *Heller* test is based on historical practice and "the historical understanding of the scope of the right," but with reference to modern realities of firearm ownership.

- 7 -

**JA-80**

*Heller*, 554 U.S. at 625; *see also Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.") In summary, in the context of blanket bans on bearable arms, the Supreme Court has already done the historical spadework, and the only restrictions of this kind that it has deemed consistent with the historical understanding of the right to keep and bear arms are restrictions limited to dangerous and unusual arms that are not in common use.

This Court's task is therefore a simple one: it merely must determine whether the banned arms are "dangerous and unusual." Importantly, this is a "conjunctive test: A weapon may not be banned unless it is both dangerous and unusual." *Caetano*, 577 U.S. at 417 (Alito, J., *concurring*). An arm that is in common use for lawful purposes is, by definition, not unusual. Such an arm therefore cannot be both dangerous and unusual and therefore cannot be the subjected to a blanket ban. *Bruen*, 142 S. Ct. at 2143*; Heller*, 554 U.S. at 629.

Importantly, the burden remains on the government to justify its regulation. "Plaintiffs do not have to shoulder the burden of proving that they are entitled to enjoy Second Amendment rights." *Rigby v. Jennings*, 2022 WL 4448220, at *7 (2022) (internal citation and quotation marks omitted). The Second Amendment commands that the right to keep and bear arms 'shall not be infringed.' It follows that when a citizen complains in a facial challenge that the government is infringing, then it is the government that must carry the burden of justifying its restriction of Second Amendment rights. *Id*. The correct starting orientation is that no arm may be prohibited. *Id*. If a

- 8 -

plaintiff challenges the government's prohibition, it the government burden to prove the banned arm is dangerous and unusual. *Id.*

To determine whether an arm is "unusual" the Supreme Court has likewise made clear that the Second Amendment focuses on the practices of the American people nationwide, not just, say, in this State. *See id.* at 2131 ("It is this balance – struck by the traditions of the American people – that demands our unqualified deference."); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by American society" for self-defense); *Caetano*, 577 U.S. at 420 (Alito, J., *concurring*) ("stun guns are widely owned and accepted as a legitimate means of self-defense across the country"). Therefore, the Second Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms from outlier legislation (like the State's ban here) just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions.

Furthermore, courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. While *Heller* noted several reasons that a citizen may prefer a handgun for home defense, the Court held that "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.*, 554 U.S. at 629. The Court reaffirmed that the traditions of the American people, which includes their choice of preferred firearms, demand the courts' "unqualified deference." *Id.*, 142 S. Ct. at 2131.

- 9 -

As set forth below, the Banned Firearms and the Banned Magazines are "typically possessed by law-abiding citizens for lawful purposes." **Under *Heller* and *Bruen*, that is the end of the analysis**. The Second Amendment "[does] not countenance a complete prohibition on the use of the most popular weapon chosen by Americans for self-defense in the home." *Id.*, 142 S. Ct. at 2128 (internal quotation marks omitted).

Finally, the Second Amendment inquiry focuses on the choices commonly made by contemporary law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," *Id.* at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that arms protected by the Second Amendment need not have been in existence at the time of the Founding. 577 U.S. 411-12, *quoting Heller*, 554 U.S. at 582. The *Caetano* Court flatly denied that a particular type of firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id.* And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

## II. The Second Circuit's Decision in *Cuomo* is no Longer Good Law

This Court is bound by prior decisions of the Second Circuit unless and until the precedents established therein have been reversed by the Supreme Court. *In re Arab*

- 10 -

**JA-83**

*Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 154–55 (2d Cir. 2015).[3] There is, however, an exception to this rule when an intervening Supreme Court decision casts doubt on the Second Circuit's precedent. *Id.* (cleaned up). For this exception to apply, the intervening decision need not address the precise issue already decided by the Second Circuit. *Id.* Instead, there must be a conflict, incompatibility, or inconsistency between the Second Circuit's precedent and the intervening Supreme Court decision. *Id.* If the impact of the intervening Supreme Court decision is fundamental it requires this Court to conclude that the prior Second Circuit decision no longer good law. *Id.* (cleaned up). Such is the case here.

In *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Second Circuit considered a regulation of what it deemed to be a right that was not at the core of Second Amendment protections. *Id.*, 701 F.3d at 93. The Court applied intermediate scrutiny and upheld the regulation because it was "substantially related to the achievement of an important governmental interest." *Id.*, 701 F.3d at 93.

In *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), the Court considered a challenge to a ban on so-called "assault weapons" and so-called "high capacity magazines" that was practically identical to the ban at issue in this case. Expressly relying on *Kachalsky*, the Court announced a two-step means-end scrutiny test, which it described as follows:

> [T]his Circuit has begun to develop a framework for determining the constitutionality of firearm restrictions. It requires a two-step inquiry. First, we consider whether the restriction burdens conduct protected by the

---

[3] as amended (Dec. 17, 2015), *aff'd sub nom. Jesner v. Arab Bank, PLC*, 200 L. Ed. 2d 612, 138 S. Ct. 1386 (2018).

Second Amendment. If the challenged restriction does not implicate conduct within the scope of the Second Amendment, our analysis ends and the legislation stands. Otherwise, we move to the second step of our inquiry, in which we must determine and apply the appropriate level of [means-end] scrutiny.

Id. 804 F.3d at 254.

The Second Circuit's actual holding in *Kachalsky* was expressly abrogated in

*Bruen. Id.*, 142 S. Ct. at 2127.  The Supreme Court did not expressly abrogate *Cuomo*

in *Bruen.*  The Supreme Court did, however, expressly reject in no uncertain terms the

mode of review applied by the Second Circuit in that case.  First, the Supreme Court

described the mode of Second Amendment analysis that had been adopted by several

circuit courts (including the Second Circuit in *Cuomo*):

> Since *Heller* and *McDonald*, the two-step test that Courts of Appeals have developed to assess Second Amendment claims proceeds as follows. At the first step, the government may justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood. The Courts of Appeals then ascertain the original scope of the right based on its historical meaning. If the government can prove that the regulated conduct falls beyond the Amendment's original scope, then the analysis can stop there; the regulated activity is categorically unprotected. But if the historical evidence at this step is inconclusive or suggests that the regulated activity is not categorically unprotected, the courts generally proceed to step two.
>
> At the second step, courts often analyze how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right. The Courts of Appeals generally maintain that the core Second Amendment right is limited to self-defense in the home. If a core Second Amendment right is burdened, courts apply strict scrutiny and ask whether the Government can prove that the law is narrowly tailored to achieve a compelling governmental interest. Otherwise, they apply intermediate scrutiny and consider whether the Government can show that the regulation is substantially related to the achievement of an important governmental interest. *Kachalsky*, 701 F.3d at 96.

*Bruen*, 142 S. Ct. at 2126–27 (cleaned up).

- 12 -

After describing the test developed by the courts of appeals after *Heller* and *McDonald*, the Supreme Court rejected it:

> Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* **do not support applying means-end scrutiny in the Second Amendment context**. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

*Id*, 142 S. Ct. at 2126–27 (cleaned up; emphasis added).

In summary, therefore, the Seventh Circuit's holding in *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo* is fundamentally incompatible with *Bruen*. It follows that *Cuomo* is no longer good law.

## III. The State's Prohibition on Possession of Banned Firearms is Unconstitutional

### A. Introduction

Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *Bruen*, 142 S. Ct. at 2126. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. Here, the Second Amendment's plain text covers the Banned Firearms, so it falls to the State to attempt to justify its law as consistent with historical tradition rooted in the Founding. It cannot possibly do so, because the Banned Firearms are commonly possessed by law abiding citizens, and *Bruen* has already established that, by definition, there cannot be a tradition of banning an arm if it is commonly possessed.

- 13 -

**B.    The Banned Firearms are in Common Use**

This case thus reduces to the following, straightforward inquiry: are the arms banned by the State in "common use," according to the lawful choices by contemporary Americans? They unquestionably are.  There is no class of firearms known as "assault weapon." "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." *Stenberg v. Carhart*, 530 U.S. 914, 1001 (2000) at n. 16 (Thomas, J., dissenting). But while "assault weapon" is not a recognized category of firearms, "semiautomatic rifle" is. And it is semiautomatic rifles that the State's "assault weapon" ban targets. The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic rifle, a semiautomatic rifle will not fire continuously on one pull of its trigger; rather, a semiautomatic rifle requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 (1994) at n. 1.

There is therefore a significant practical difference between a truly automatic and a merely semiautomatic rifle. According to the United States Army, for example, the maximum effective rates of fire for various M4- and M16-series firearms is between forty-five and sixty-five rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. Dept. of the Army, RIFLE MARKSMANSHIP: ML6-/M4-SERIES WEAPONS,  2-1 tbl. 2-1 (2008), available at https://bit.ly/3pvS3SW.

There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles. The Supreme Court has held as much.  In *Staples,* it concluded that semiautomatics, unlike machine guns, "traditionally have been widely accepted as

- 14 -

lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic rifles have been commercially available for over a century. *See Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contmp. L. 381, 413 (1994).

In contrast to this long history of legal ownership of semi-automatic rifles, the first "assault weapon" ban was not enacted until California did so in 1989, a full 200 years after the Constitution became effective. Obviously, that is far too late to demonstrate anything about the original meaning of the Second or Fourteenth Amendment, no matter which is the relevant historical reference point. *Bruen*, 142 S.Ct. at 2126 (cautioning against giving post enactment history more weight than it can rightly bear). Even today, the vast majority of states (42 out of 50)[4], do not ban semiautomatic weapons that would be deemed "assault weapons" under the statute at issue in this action.[5]

Thus, there is no historical tradition of banning semi-automatic firearms. This is borne out by the fact that millions of law-abiding citizens choose to possess firearms in that category. *Duncan v. Becerra ("Duncan IV")*, 970 F.3d 1133, 1147 (9th Cir. 2020)

---

[4] The federal government banned semi-automatic rifles from 1994 to 2004 when Congress allowed that law after the Justice Department concluded that it produced "no discernible reduction" in gun violence. Christopher S. Koper, Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms, 19 Crim'y & Pub. Pol'y 96 (2020).

[5] The bans and the year each was enacted are: Cal. Penal Code §§ 30600, 30605 (**1989**); N.J. Stat. §§ 2C:39-5(f), 2C:39-9(g) (**1990**); Haw. Rev. Stat. § 134-8(a) (**1992**); Conn. Gen. Stat. § 53-202c (**1993**); Md. Code Ann., Crim. Law §§ 4-301, 4-303 (**1994**); Mass. Gen. Laws ch. 140, § 131M (**1994**); N.Y. Penal Law §§ 265.02(7), 265.10(1)-(3) (**2000**); 11 Del. Code § 1466 (**2022**).

- 15 -

("Commonality is determined largely by statistics."); *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned because the record shows that "millions" are owned); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'").

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009); *see also Duncan v. Becerra* ("*Duncan III*"), 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019).

This issue was addressed in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), abrogated by *Bruen*, *supra*. In his dissent (which, after *Bruen*, likely represents the correct interpretation of the law), Judge Traxler stated:

> "It is beyond any reasonable dispute from the record before us that a statistically significant number of American citizens possess semiautomatic rifles (and magazines holding more than 10 rounds) for lawful purposes. Between 1990 and 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were manufactured in or imported into the United States. In 2012, semiautomatic sporting rifles accounted for twenty percent of all retail firearms sales. In fact, in 2012, the number of AR- and AK- style weapons manufactured and imported into the United States was more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150. In terms of absolute numbers, these statistics lead to the unavoidable conclusion that popular semiautomatic rifles such as the AR-15 are commonly possessed by American citizens for lawful purposes within the meaning of *Heller*."

*Id.*, 849 F.3d at 153, Traxler, J. dissenting (internal citations and quotation marks omitted).

Today, the number of AR-rifles and other modern sporting rifles in circulation in the United States exceeds twenty-four million. The Firearms Industry Trade Ass'n, *Commonly Owned:  NSSF Announces Over 24 Million MSRS in Circulation*, (July 20, 2022), available at https://bit.ly/3pUj8So.[6]

According to industry sources, as of 2018, roughly thirty-five percent of all newly manufactured guns sold in America are modern semiautomatic rifles, Bloomberg, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, FORTUNE (June 20, 2018), available at https://bit.ly/3R2kZ3s, and an estimated 5.4 million Americans purchased firearms for the first time in 2021. The Firearms Industry Trade Ass'n, *NSSF Retailer Surveys Indicate 5.4 million First-Time Gun Buyers in 2021,* (Jan. 25, 2022), available at https://bit.ly/3dV6RKI.  In fact, a recent survey of gun owners estimated that 24.6 million Americans have owned AR-15 or similar rifles. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), available at https://bit.ly/3yPfoHw .

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes.  In a 2021 survey of 16,708 gun owners, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). English, *supra*, at 33-34. This is consistent with the findings of an earlier

---

[6] *See also* Declaration of James Curcuruto ¶ 6 ("At least 20 million semi-automatic firearms such as those defined as "assault weapons" are owned by millions of American citizens who use those firearms for lawful purposes."

2013 survey of 21,942 confirmed owners of such firearms, in which home-defense again followed (closely) only recreational target shooting as the most important reason for owning these firearms. *See also Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 904 (N.D. Ill. 2014), *aff'd* 784 F.3d 406 (7th Cir. 2015). "An additional survey estimated that approximately 11,977,000 people participated in target shooting with a modern sporting rifle." *Id*. Indeed the "AR-15 type rifle . . . is the leading type of firearm used in national matches and in other matches sponsored by the congressionally established Civilian Marksmanship program." *Shew v. Malloy*, 994 F. Supp. 2d 234, 245 n.40 (D. Conn. 2014).

The fact that "assault" rifles are used extremely rarely in crime underscores that AR-15s and other Banned Firearms are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'" Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997). This conclusion is borne out by FBI statistics. In the five years from 2015 to 2019 (inclusive), there were an average of 14,556 murders per year in the United States. On average, rifles of all types (of which so-called "assault weapons" are a subset) were identified as the murder weapon in 315 murders per year. U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at https://bit.ly/31WmQ1V. By way of comparison, on average 669 people are murdered by "personal weapons" such as hands, fists and feet. *Id*. According to the FBI, a murder victim is more than twice as likely to have been killed by hands and feet than by a rifle of any type.

Even in the counterfactual event that a modern semiautomatic rifle had been involved in each rifle-related murder from 2015 to 2019, an infinitesimal percentage of the approximately 24 million modern sporting rifles in circulation in the United States during that time period –around .001 percent – would have been used for that unlawful purpose. More broadly, as of 2016, only 0.8 percent of state and federal prisoners reported using any kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates*, 2016, U.S. DEPT OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. 5 tbl. 3 (Jan. 2019), available at https://bit.ly/31VjRa9

Finally, the Supreme Court's decision in *Caetano* further confirms that the arms banned by the State are in common use.  That case concerned Massachusetts's ban on the possession of stun guns, which that state's highest court had upheld on the ground that such weapons are not protected by the Second Amendment.  *Id.*, 577 U.S. at 411. In a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id.* at 411-12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, Justice Alito filed a concurring opinion expressly concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id.* at 420 (Alito, J., concurring) (cleaned up) (citation omitted). If hundreds of thousands" of arms constitute wide ownership, *a fortiori* so does the tens of millions of semiautomatic rifles sold to private citizens nationwide.

- 19 -

The Massachusetts court got the message. In a subsequent case, that court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the State to rebut the prima facie presumption of Second Amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E. 3d 93, 96 (Ill. 2019). This reasoning is sound, and it necessarily entails the invalidity of the State's blanket ban, which restricts arms that are many times more common than stun guns.

## III. The State's Prohibition on Possession of Banned Magazines is Unconstitutional

### A. Magazines Capable of Holding More Than 10 Rounds Are in Common Use

Magazines are indisputably "arms" protected by the Second Amendment, as the right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate. *See United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth-century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (without bullets, the right to bear arms would be meaningless).

- 20 -

Just as the First and Fourteenth Amendments protect modern forms of communications and search, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *Caetano*, *supra* (stun guns). Thus, as the Supreme Court reiterated in *Bruen*, when assessing whether arms are protected by the Second Amendment, the question is whether they are "in common use today." 142 S.Ct. at 2134. If they are, then they are presumptively protected by the Second Amendment, and it is the government's burden to prove that any efforts to restrict their possession or use have a "well- established and representative historical analogue." *Bruen*, 142 S.Ct. at 2133. But, as noted above, in the context of a blanket prohibition such as that at issue here with respect to the Banned Magazines, establishing such an analogue is impossible. The State may impose a blanket prohibition only on "dangerous and unusual" arms, but by definition, an arm in common use is not unusual. The Second Amendment "[does] not countenance a complete prohibition on the use of the most popular weapon chosen by Americans for self-defense in the home." *Id.*, 142 S. Ct. at 2128 (internal quotation marks omitted).

The magazines the State has banned unquestionably satisfy the "common use" test. *See Duncan III*, 366 F.Supp.3d at 1143-45; *Duncan IV*, 970 F.3d at 1142, 1146-47. Magazines capable of holding more than 10 rounds of ammunition are commonly owned by millions and millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting.[7] They come standard with many of the most

---

[7] *See* Declaration of James Curcuruto ¶ 7 ("At least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes.")

popular handguns and long guns on the market, and Americans own roughly **115 million of them**, *Duncan IV*, 970 F.3d at 1142, accounting for "approximately half of all privately owned magazines in the United States," *Duncan v. Bonta ("Duncan V")*, 19 F.4th 1087, 1097 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022). Indeed, the most popular handgun in America, the Glock 17 pistol, comes standard with a 17-round magazine. *See Duncan III*, 366 F.Supp.3d at 1145. In short, there can be no serious dispute that magazines capable of holding more than 10 rounds are bearable arms that satisfy the common use test and thus are presumptively protected by the Second Amendment.

In his dissent in *Kolbe v. Hogan*, Judge Traxler also addressed magazines such as the Banned Magazines. He stated:

> "The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States. These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds. Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds."

*Id.*, 849 F.3d at 154, Traxler, J. dissenting (internal citations and quotation marks omitted).

Magazines such as those banned by the State are without the slightest question commonly possessed by law abiding citizens for lawful purposes (again, the dispositive fact under *Heller* and *Bruen*). Therefore, based on this fact alone, the Statute is unconstitutional.

- 22 -

**JA-95**

**B. There Is No Historical Tradition of Restricting Firearms Capable of Firing More Than 10 Rounds Without Reloading.**

Even if magazines such as those banned by the State were not in common use, the State cannot come close to proving that restrictions on firing or magazine capacity are part of the nation's historical tradition. To the contrary, history and tradition establish the exact opposite. *See Duncan III*, 366 F.Supp.3d at 1149-53; *Duncan IV*, 970 F.3d at 1147-51 (when the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years); *Duncan V*, 19 F.4th at 1148-59 (Bumatay, J., dissenting) (summarizing history)

Firearms capable of firing more than 10 rounds without reloading are nothing new. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580," and several such handguns and long guns "pre-date[d] the American Revolution." *Duncan IV*, 970 F.3d at 1147. Well before the framing of the Fourteenth Amendment, they had become "common," as witnessed by popular firearms such as the Pepperbox-style pistol, which could "shoot 18 or 24 shots before reloading individual cylinders." *Id.* By the end of the Civil War, "repeating, cartridge-fed firearms" were ubiquitous, and many of the most popular models had magazines that held more than 10 rounds. Id. at 1148. For example, the Winchester 66 had a 17- round magazine and could fire all 17 rounds plus the one in the chamber in under nine seconds. *Id.* Later models, including the famed Winchester 73 ("the gun that won the West"), likewise had magazines that held more than 10 rounds and sold a combined "over 1.7 million total copies" between 1873 and 1941. *Id.*

- 23 -

As detachable box-style magazines became more popular around the turn of the twentieth century, so too did rifles and handguns with box magazines capable of holding more than 10 rounds, such as Auto Ordnance Company's semi-automatic rifle (1927, 30 rounds) and the Browning Hi-Power pistol (1935, 13 rounds). *Id.* In 1963, the U.S. government sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount. *Id.* That same year, the first AR-15 rifle was released. *Id.* The AR-15 comes standard with a 30-round magazine and as noted above, remains the most popular rifle in America today. *Id.*; *Duncan III*, 366 F.Supp.3d 1145. Today, the most popular handgun in America is the Glock 17, which comes standard with a 17-round magazine. *Duncan IV*, 970 F.3d at 1142, 1148. Many other popular pistols likewise come standard with magazines that hold more than 10 rounds. For example, the Beretta Model 92 comes standard with a sixteen-round magazine, Smith & Wesson M&P 9 M2.0 nine-millimeter magazines contain seventeen rounds, and the Ruger SR9 has a 17-round standard magazine. *Id.* at 1142 & n.4.

Firearms capable of firing more than 10 rounds predate the founding by more than a century. *See Duncan IV*, 970 F.3d at 1147. Such arms were neither novelties nor confined to the military; to the contrary, they were marketed to and bought by civilians from the start. "[I]n 1821, the New York Evening Post described the invention of a new repeater as 'importan[t], both for public and private use,' whose 'number of charges may be extended to fifteen or even twenty.'" *Ass 'n of N J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N J.* ("ANJRPC II"), 974 F.3d 237, 255 (3d Cir. 2020) (Matey, dissenting). The popular Pepperbox-style pistol was marketed to civilians, the Girandoni air rifle "was famously carried on the Lewis and Clark expedition," and millions of Winchesters were

- 24 -

sold to civilians in the decades following the ratification of the Fourteenth Amendment. *Duncan IV*, 970 F.3d at 1147-48; *Duncan V*, 19 F.4th at 1154-55 (Bumatay, J., dissenting). And the federal government itself sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its standard 30-round magazine came on the market. *Duncan IV*, 970 F.3d at 1148.

The historical record confirms that, "[l]ong before 1979, magazines of more than ten rounds had been well established in the mainstream of American gun ownership." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 862 (2015). In short, arms that could fire more than 10 rounds without reloading would by no means have been "unforeseen inventions to the Founders." *Duncan IV*, 970 F.3d at 1147. They have been available for centuries, and "magazines of more than ten rounds had been well established in the mainstream of American gun ownership" "long before" a handful of capacity restrictions started to pop in the late twentieth century. *See Kopel, supra* at 862-64.

There were no restrictions on firing or magazine capacity when either the Second or the Fourteenth Amendment was ratified. The first such laws did not come until the Prohibition Era, and, even then, they were few and far between. Many states and the federal government began regulating automatic weapons almost as soon as they came on the market in the 1920s and 1930s. In contrast, only during Prohibition did a handful of state legislatures enact capacity restrictions, many of which were soon repealed. *Duncan IV*, 970 F.3d at 1150. These states included Michigan (1927, repealed in 1959), Rhode Island (1927, repealed in 1975), and Ohio (1933, repealed in 2014). *Id.* at n.10. It is important to note that the Rhode Island and Michigan statutes applied only

- 25 -

to weapons rather than magazines, and the Ohio statute was interpreted to only forbid the simultaneous purchase of a firearm and compatible 18-round magazine. *Id.*

These anomalous laws not only were "short lived," *Bruen*, 142 S.Ct. at 2155, but emerged several decades after the isolated "late-19th-century" territorial laws that the Supreme Court found to be too few and too late to have meaningful historical relevance. *Id.* at 2154; *cf Heller II*, 670 F.3d at 1292 (Kavanaugh, J., dissenting) (six states not enough to make a "strong showing that such laws are common"). Here too, then, "the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting law-abiding citizens to keep and bear arms with a firing capacity of more than 10 rounds.

The first state to restrict magazine capacity as such (New Jersey) did not do so until 1990 – more than two centuries after the founding. As with "assault weapon" bans, that is far too late to demonstrate anything about the original meaning of the Second or Fourteenth Amendment. The federal government did not restrict magazine capacity until 1994, and Congress allowed that law to expire in 2004. Since 1990, when the first magazine capacity restriction was adopted, a total of 12 states have enacted such restrictions, with half of those restrictions enacted within the last decade.[8] The State thus cannot even identify a "well-established" tradition of restricting magazine capacity

---

[8] The statutes and the year they were enacted are: N.J. Stat. Ann. §2C:39- l(y), -3G) (**1990**); 1992 Haw. Sess. Laws 740, 742 (**1992**); Md. Code Ann., Crim. Law §4-305 (**1994**); Cal. Penal Code §§32310, 16740 (**1999**); Mass. Gen. Laws ch. 140 §§121, 131a (**1998**); N.Y. Penal Law §265.36 (**2000**); Colo. Rev. Stat. §18-12-302(1)) (**2013**); Conn. Gen. Stat. §53- 202w (**2013**); Vt. Stat. Ann. tit. 13, §4021 (**2017**); Wash. Rev. Code Ann. §§9.41.010, .370 (**2022**); 11 R.I. Gen. Laws Ann. § 11-47.1-3 (**2022**); Del. Code Ann. tit. 11, § 1469 (**2022**).

today, let alone identify any representative historical analogue that might justify its confiscatory magazine ban. *Bruen*, 142 S.Ct. at 2133 (emphasis omitted).

Yet, despite a long historical tradition of law-abiding citizens possessing these firearms for lawful purposes, there is no similar tradition of government regulation, let alone confiscation. To the contrary, the historical tradition of advancement in firearms technology reflects a steady trend toward increasing the firing capacity of the most popular and common arms, with no corresponding trend of government restrictions on firing capacity. The State thus cannot possibly meet its burden of "affirmatively prov[ing] that its [magazine ban] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to enter an order preliminary enjoining enforcement of CONN. GEN. Stat. § 53-202c(a) and CONN. GEN. STAT. § 53-202w(b) and (c).

THE PLAINTIFFS
NATIONAL ASSOCIATION FOR
GUN RIGHTS, and TONI
THERESA SPERA FLANIGAN

*/s/ Barry K. Arrington*
Barry K. Arrington
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com
*Pro Hac Vice*

John J. Radshaw (ct19882)
65 Trumbull Street
2d Floor
New Haven, CT 06510
(203) 654-9695 Office

- 27 -

**JA-100**

(203) 721-6182 Facsimile
jjr@jjr-esq.com

**C E R T I F I C A T I O N**

      I hereby certify that on November 4, 2022, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all appearing parties by operation of the Court's electronic filing. Parties may access this filing through the Court's system.

*/s/ Barry K. Arrington*
Barry K. Arrington

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

NATIONAL ASSOCIATION FOR GUN RIGHTS, and  )
TONI THERESA SPERA FLANIGAN )
    Plaintiffs, )
     )
v. )
     )  Civil Action No.
     ) 3:22 CV 1118 (JBA)
NED LAMONT, is his official capacity as the Governor of )
the State of Connecticut; )
PATRICK J. GRIFFIN, is his official capacity as the Chief )
State's Attorney of the State of Connecticut; and )
SHARMESE L. WALCOTT, in her official capacity as the )
State's Attorney, Hartford Judicial District, )
    Defendants. )
     )
     )

## DECLARATION OF DUDLEY BROWN

My name is Dudley Brown. I am over the age of 18 and have personal knowledge of the matters set forth in this Declaration.

I am the President of National Association for Gun Rights ("NAGR").

Conn. Gen. Stat. § 53-202a(1) defines the term "assault weapon." The term "assault weapon" as used in the Statutes is not a technical term used in the firearms industry or community for firearms commonly available to civilians. Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes.

Conn. Gen. Stat. § 53-202w(a)(1) defines the term "large-capacity magazine" to mean any firearm magazine capable of holding more than ten rounds of ammunition. The statute again uses politically charged rhetoric to describe the arms it bans. The statutes' characterization of these magazines as "large capacity" is a misnomer. Magazines capable of holding more than 10 rounds are standard capacity magazines.

For purposes of this Declaration, the term "Banned Firearm" shall mean "assault weapon" as that term is defined in the statute that is the subject of this action, and the term "Banned Magazine" shall mean "large-capacity magazine" as

**JA-102**

that term is defined in the statutes that are the subject of this
action.

NAGR's members on whose behalf this action is brought
are residents of the State of Connecticut and law-abiding
citizens of the United States. They are otherwise eligible under
the laws of the United States and the State to receive and possess
firearms and magazines, including the Banned Firearms and
Banned Magazines. They intend to and, but for the credible
threat of prosecution under the statutes challenged in this action,
would acquire Banned Firearms and Banned Magazines to keep
in their homes for self- defense and for other lawful purposes.

I, Dudley Brown, pursuant to 28 U.S.C. § 1746, declare
under penalty of perjury that I have reviewed the foregoing, that
I am competent to testify in this matter, and that the facts
contained therein are true and correct

Dudley Brown
November 4, 2022
- 2 -

JA-103

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS,<br>and TONI THERESA SPERA FLANIGAN<br>　　Plaintiffs, | )<br>)<br>)<br>) |
| v. | )　Civil Action No.<br>)　3:22 CV 1118 (JBA) |
| NED LAMONT, is his official capacity as the<br>Governor of the State of Connecticut;<br>PATRICK J. GRIFFIN, is his official capacity as the<br>Chief State's Attorney of the State of Connecticut;<br>and SHARMESE L. WALCOTT, in her official<br>capacity as the State's Attorney, Hartford Judicial<br>District,<br>　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF TONI THERESA SPERA FLANIGAN

1.　My name is Toni Theresa Spera Flanigan. I am over the age of 18 and have personal knowledge of the matters set forth in this Declaration.

2.　For purposes of this Declaration, the term "Banned Firearm" shall mean "assault weapon" as that term is defined in the statute that is the subject of this action, and the term "Banned Magazine" shall mean "large-capacity magazine" as that term is defined in the statute that is the subject of this action.

3.　I am a resident of the State of Connecticut and a law-abiding citizens of the United States. I am otherwise eligible under the laws of the United States and the State to receive and possess firearms and magazines, including the Banned Firearms and Banned Magazines. I intend to and, but for the credible threat of prosecution under the Statutes challenged in this action, would acquire Banned Firearms and Banned Magazines to keep in my home for self- defense and for other lawful purposes. *Id*

I, Toni Theresa Spera Flanigan, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that I have reviewed the foregoing, that I am competent to testify in this matter, and that the facts contained therein are true and correct

Toni Theresa Spera Flanigan
November 4, 2022

- 2 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-1685

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS, and
CHARLES BRADLEY WALKER,

       Plaintiffs,

v.

THE TOWN OF SUPERIOR, a Colorado municipality, and
JOE PELLE, in his capacity as Sheriff of Boulder County, Colorado

       Defendant.

---

## DECLARATION OF JAMES CURCURUTO

---

1. My name is James Curcuruto.

2. I received my associate's degree in business administration from the State University of New York at Cobleskill in 1991 and my bachelor's degree in business management from the University of North Carolina at Wilmington in 1993. My 30-year business work history has focused primarily on sales, marketing, advertising, research, and analysis. I am currently the Executive Director of Outdoor Stewards of Conservation Foundation.

3. From November 2009 until January 2021, I was the Director, Research and Market Development, at the National Shooting Sports Foundation, Inc. (the "NSSF"). The NSSF, formed in 1961, is the trade association for the firearms, ammunition, hunting, and recreational shooting sports industry. Its mission is to promote, protect and preserve hunting and the shooting sports. The NSSF has a membership of 8,000 manufacturers, distributors, firearms retailers, shooting ranges, sportsmen's organizations, and publishers.

4. In my position as Director, Research and Market Development at the NSSF, I was responsible for most of the research activities at NSSF, and I directed the activities of an internal research manager as well as several outside companies retained to conduct research and gather market and consumer information useful to NSSF members.

5. Under my direction, dozens of informational reports and studies focusing on industry topics and trends, including firearms, ammunition, target shooting, and hunting, were released

to the NSSF member base, and many NSSF reports were shared outside the organization as well. Data from these releases has been referenced many times in endemic, non-endemic, online and print newspaper and magazine articles, used in corporate 10K reports, and mentioned in other media. I have authored and provided information for several articles published in trade magazines.

6. Plaintiffs' counsel has asked me to provide an opinion on (1) the prevalence of AR15 and similar firearms in American society, including rates of ownership of such firearms by law-abiding citizens; and (2) the prevalence of firearm magazines capable of holding more than ten rounds of ammunition in American society, including rates of ownership of such magazines by law-abiding citizens.

7. In summary, (1) between 1990 – 2021, more than 20 million AR-platform rifles have been manufactured in the United States and are owned by millions of persons in the United States and, (2) there are at least one hundred fifty million magazines of a capacity of more than ten rounds in possession of American citizens, commonly used for various lawful purposes including, but not limited to, recreational and competitive target shooting, self-defense, collecting and hunting.

I, James Curcuruto, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that I have reviewed the foregoing, that I am competent to testify in this matter, and that the facts contained therein are true and correct

James Curcuruto

Date:  July 13, 2022

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN | : | CIVIL NO. 3:22-CV-01118(JBA) |
| RIGHTS, ET. AL. | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | NOVEMBER 18, 2022 |
| *Defendant.* | | |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Defendants hereby move, pursuant to Fed. R. Civ. Pro. 12(b)(1), to dismiss the organizational Plaintiff—National Association for Gun Rights. ("NAGR")—from this case because it lacks standing. As set forth more fully in the accompanying memorandum of law, this Court therefore lacks subject matter jurisdiction over this Plaintiff and its claims and must dismiss them from this case.

DEFENDANTS
Lamont, et. al.

WILLIAM TONG
ATTORNEY GENERAL

BY: _____
_____
James M. Belforti
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Tel: (860) 808-5450
Fax: (860) 808-5591

1

Federal Bar No. ct30449
E-Mail: james.belforti@ct.gov

*/s/ Janelle R. Medeiros*

Janelle R. Medeiros
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30514
E-Mail: janelle.medeiros@ct.gov
Tel.: (860) 808-5450
Fax: (860) 808-5590

## CERTIFICATION

I hereby certify that on November 18, 2022, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

_____
James M. Belforti
Assistant Attorney General

2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NATIONAL ASSOCIATION FOR GUN :          CIVIL NO. 3:22-CV-01118(JBA)
RIGHTS, ET. AL.                  :
    *Plaintiff,*              :
                                  :
    v.                        :
                                   :
NED LAMONT, ET AL.,              :          NOVEMBER 18, 2022
    *Defendant.*

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Defendants move, pursuant to Fed. R. Civ. Pro. 12(b)(1), to dismiss the organizational Plaintiff—National Association for Gun Rights. ("NAGR")—from this case because it lacks standing. Therefore, this Court lacks subject matter jurisdiction over this Plaintiff and its claims and must dismiss them from this case.

## I.    BACKGROUND

Plaintiffs, NAGR and Toni Theresa Spera Flanigan, bring this action pursuant to 42 U.S.C. § 1983. (Doc. #26 at 1, 3-5, ¶¶1, 3, 8, 9.) Plaintiffs challenge "the constitutionality of CONN. GEN. Stat. § 53-202c(a) and CONN. GEN. STAT. § 53-202w(b) and (c) (Doc. #26 at 5, ¶14.) Plaintiffs seek declaratory and injunctive relief and "remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses. . ." (Doc. #26 at 13, ¶¶1-3.)

NAGR describes itself as "a nonprofit membership and donor-supported organization" that "seeks to defend the right of all law-abiding individuals to keep and bear arms." (Doc. #26 at 1, ¶1.) NAGR claims it "has members who reside within the State of Connecticut" and "represents the interests of its members who reside in the State." (Id.) NAGR claims to represent "the interests

of those who are affected by [Connecticut's alleged] prohibition of commonly used firearms and

magazines." (Id.) As for standing, NAGR alleges:

> In addition to their standing as citizens and taxpayers, those members' interests include their intention to exercise their constitutionally protected right to acquire, keep and bear arms, and specifically the arms and components that are currently prohibited, without being subjected to criminal prosecution. This litigation and the interests that NAGR seeks to vindicate and protect in this litigation, are germane to, and within a core purpose of, NAGR and its mission. NAGR members have a present intention to seek to acquire, keep, possess and/or transfer lawful arms for self-defense and other lawful purposes, which are prohibited by the challenged firearm and component restrictions. For purposes of this Complaint, the term "Plaintiffs" is meant to include NAGR in its capacity as a representative of its members."

(Doc. #26 at 1-2, ¶1.)

> In addition to the injuries allegedly suffered by its members, NAGR claims it:

> has expended and diverted resources otherwise reserved for different institutional functions and purposes and is adversely and directly harmed by the illegal and unconstitutional actions of the Defendants. NAGR has diverted, and continues to divert, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein that would otherwise be used for educational outreach, public relations, and/or programmatic purposes. Among other diversions and threatened diversions, the Defendants' unconstitutional enforcement of the laws complained of herein has forced, or likely will force, NAGR to divert funds, energies, and resources to the cause of this legal action. Rather than working on other educational, outreach, public relations, and/or programmatic events and operations, NAGR's agents have devoted, are continuing to devote, or are likely to devote, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein. NAGR and its agents will be forced to continue diverting such time, money, effort, and resources from NAGR's normal educational, outreach, public relations, and/or programmatic events and operations so long as the Defendants' unconstitutional enforcement of the laws complained of herein persists. As to NAGR's representative capacity claims, there are common questions of law that substantially affect the rights, duties and liabilities of many of NAGR's members as well as potentially numerous similarly situated residents whose constitutional rights have been, and are continuing to be, infringed by the Defendants' unconstitutional enforcement of the laws complained of herein. The interests NAGR seeks to protect are germane to its purpose.

(Doc. #26 at 2-3, ¶2.)  Paragraphs 1-2 of the Second Amended Complaint contain the entirety of the allegations related to NAGR's alleged standing in this case.

## II.    ARGUMENT AND APPLICABLE LAW

### A.    Standard of Review.

Because "[t]he exercise of judicial power . . . can so profoundly affect the lives, liberty, and property of those to whom it extends. . . the decision to seek review must be placed in the hands of those who have a direct stake in the outcome." *Diamond v. Charles*, 476 U.S. 54, 62, (1986) (internal quotation marks omitted).  "It is not to be placed in the hands of 'concerned bystanders,' who will use it simply as a 'vehicle for the vindication of value interests.'" *Id*. (quoting *United States v. SCRAP*, 412 U.S. 669, 687 (1973)).

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when the plaintiff lacks constitutional standing to bring the action." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021) (quotation omitted); *see also Beaupre v. Chubb & Son, Inc.*, No. 3:19-CV-834 (JBA), 2020 WL 4569990, at *3 (D. Conn. Aug. 7, 2020). "'It is a fundamental precept that federal courts are courts of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (quoting *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978)).

"Article III standing 'serves to prevent the judicial process from being used to usurp the powers of the political branches.'" *Martinez v. Malloy*, 350 F. Supp. 3d 74, 84 (D. Conn. 2018) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).  "The constitutional standing requirement promotes separation of powers among the different branches of government, the

system of federalism which leaves certain authority to state governments, judicial efficiency, and, finally, fairness by 'ensuring that people will raise only their own rights and concerns' and not those of others who may not completely concur with the litigants." *Juvenile Matters Trial Lawyers Ass'n v. Judicial Dep't*, 363 F. Supp. 2d 239, 244 (D. Conn. 2005) (quotation omitted). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Controlled Air, Inc. v. Barr*, No. 3:19-CV-1420 (JBA), 2020 WL 979874, at *4 (D. Conn. Feb. 28, 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Whether a claimant has standing is the threshold question in every federal case, determining the power of the Court to entertain the suit." *Id.* (quoting *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 361 (2d Cir. 2003)).

"Determining that a matter before the federal courts is a proper case or controversy under Article III therefore assumes particular importance in ensuring that the Federal Judiciary respects 'the proper—and properly limited—role of the courts in a democratic society.'" *McNiece v. Connecticut*, No. 3:15-CV-1036 (MPS), 2016 WL 1118249, at *6 (D. Conn. Mar. 22, 2016), *aff'd*, 692 F. App'x. 655 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 334 (2017) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *Id.* (quoting *Allen*, 468 U.S. at 750). Therefore, "[i]f plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Id.* (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)).

"The irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact' . . . . Second, there must be a causal connection between the injury and the conduct complained of. . . . Third, it must be likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision." *Martinez*, 350 F. Supp. 3d at 84 (quoting *Lujan*, 504 U.S. at 560-61 (citations omitted)).

"When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Beaupre*, 2020 WL 4569990, at *3 (quoting *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000)). "However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (citing *Norton v. Larney*, 266 U.S. 511, 515 (1925)); *see also Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) ("In determining whether a plaintiff has met this burden, we will not draw argumentative inferences in the plaintiff's favor").

"In response to a motion to dismiss pursuant to Rule 12(b)(1), '[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'" *Id*. (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d. Cir. 2000)); *see also Peterson v. Cont'l Airlines, Inc.*, 970 F. Supp. 246, 249 (S.D.N.Y. 1997) ("Once challenged, the burden of establishing a federal court's jurisdiction rests with the party asserting jurisdiction."). "[I]t is the affirmative burden of the party invoking [federal subject matter] jurisdiction... to proffer the necessary factual predicate-not just an allegation in a complaint-to support jurisdiction." *Juvenile Matters Trial Lawyers Ass'n*, 363 F. Supp. 2d at 243 (quoting *London v. Polishook*, 189 F.3d 196, 199 (2d Cir.1999)). The Second Circuit has repeatedly observed that, in contrast to a motion to dismiss for failure to state a claim, 'when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Rodriguez v.*

5

*Winski*, 444 F. Supp. 3d 488, 494 (S.D.N.Y. 2020) (quoting *Shipping Fin. Serv. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

### B.     Organizations attempting to invoke the jurisdiction of the federal courts must meet specific standing requirements.

Litigants are generally prohibited from "asserting the rights or legal interests of others in order to obtain relief from injury to themselves.'" *Laquer v. Priceline Grp., Inc.*, 722 F. App'x. 22, 24 (2d Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 509 (1975)).  "The prudential limitations on jurisdiction require that a plaintiff establish that he or she is the proper proponent of the rights asserted; a litigant may not raise the rights of a third-party, or assert speculative, conjectural or generalized grievances more appropriately resolved by a governmental body, other than the courts." *Am. Psychiatric Assoc. v. Anthem Health Plans*, 50 F. Supp. 3d 157, 162 (D. Conn. 2014), *aff'd sub nom. Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352 (2d Cir. 2016) (quoting *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1346–47 (2d Cir. 1989)).

"Organizations like [NAGR] may have standing in one of two ways: by establishing so-called 'associational' or 'representational' standing to sue on behalf of its members, or by establishing that it was directly injured as an organization." *Conn. Parents Union*, 8 F.4th at 172 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); <u>*Warth*</u>, 422 U.S. at 511).  "Under the organizational standing theory, 'an association may have standing in its own right to seek judicial relief to itself and to vindicate whatever rights and immunities the association itself may enjoy.'" *Rodriguez*, 444 F. Supp. 3d at 492 (quoting *Warth*, 422 U.S. at 511).  "In contrast, under the associational standing theory, 'an association has standing to bring suit on behalf of its members.'" *Id*. (quoting *Hunt*, 432 U.S. at 343).

6

**JA-115**

C.  **NAGR lacks associational standing because it cannot assert the rights of its members in a case brought under 42 U.S.C. § 1983.**

"The Supreme Court has held that 'an association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity.'" *Juvenile Matters Trial Lawyers Ass'n*, 363 F. Supp. 2d at 246–47 (quoting *Hunt*, 432 U.S. 343). "To do so, '[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" *Id.* (quoting *Warth*, 422 U.S. at 511). "In other words, an association must demonstrate that: '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 649 (2d Cir. 1998)).

However, the Second Circuit has also repeatedly and consistently held that organizations "do not have standing to assert claims under 42 U.S.C. § 1983 on behalf of their members." *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 788 F. App'x 85 (2d Cir. 2019); *see also Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973) ("Neither [the] language nor the history [of § 1983] suggests that an organization may sue under the Civil Rights Act for the violations of rights of members."). "It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983, as we have 'interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured.'" *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (quoting *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984)). Notably, individual panels of the Second Circuit

7

consistently adhere to this precedent. *See Nnebe*, 644 F.3d at 156 ("Accordingly, we are bound by the implicit determination of prior panels that the rule survives *Warth* "until such time as [our prior decisions] are overruled either by an *en banc* panel of our Court or by the Supreme Court." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004)).

This Complaint is brought pursuant to 42 U.S.C. § 1983. (Doc. #26 at 4-5, 13 ¶¶8-9, 3.) NAGR cannot assert the rights of any of its members in a federal civil rights case. *See N.Y. State Citizens Coal. for Child. v. Poole*, 922 F.3d 69, 74-75 (2d Cir. 2019) ("In a string of opinions, this Court has held that organizations suing under Section 1983 must, without relying on their members' injuries, assert that their own injuries are sufficient to satisfy Article III's standing requirements"). Thus, clear Second Circuit precedent bars NAGR from invoking associational standing to bring civil rights claims in this action.

### D. NAGR lacks organizational standing because its theory of injury is insufficient to constitute an injury-in-fact.

Since NAGR cannot avail itself of associational standing, that leaves it only with organizational standing as a basis for invoking the jurisdiction of this Court. "To succeed on that theory, it is [NAGR's] burden to satisfy the 'irreducible constitutional minimum of standing' by showing: '(i) an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable; (ii) that its injury is fairly traceable to [the challenged act]; and (iii) that a favorable decision would redress its injuries.'" *Conn. Parents Union*, 8 F.4th at 172-73 (citing *Lujan*, 504 U.S. at 560; *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017)).

"[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (quoting *Simon v. Eastern Ky. Welfare*

*Rights Org.*, 426 U.S. 26, 40 (1976)); *see also Conn. Parents Union*, 8 F.4th at 173 ("abstract social harm" insufficient to constitute organizational standing).

"Moreover, an organization lacks standing to sue in its own right as a result of injuries that are not fairly traceable to the defendant." *Nat'l Rifle Assoc. of Am. v. Cuomo*, 480 F. Supp.3d 404, 411 (N.D.N.Y. 2020) (quoting *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 541 (S.D.N.Y. 2006) (citing *Bennett v. Spear*, 520 U.S. 154, 162 (1997))). "An organization cannot manufacture injury in fact by bootstrapping the expenditure of resources on the lawsuit in which it alleges that it has standing." *Id*. (quoting *Doe*, 462 F. Supp. 2d at 541). "In other words, an organization must show 'concrete and demonstrable injury to the organization's activities,' as opposed to a mere 'setback to the organization's abstract social interests.'" *Id*. (quoting *Natural Res. Defense Council, Inc. v. Wheeler*, 367 F. Supp. 3d 219, 229 (S.D.N.Y. 2019) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))).

Further, an organization seeking injunctive relief "must carry the burden of establishing that [it] has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Juvenile Matters Trial Lawyers Ass'n*, 363 F. Supp. 2d at 245 (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). "Abstract injury is not enough; rather, the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Id*. (internal quotation marks omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983). An organization "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that [it] . . . will be injured in the future." *Id*. (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)).

NAGR advances a theory of injury-in-fact based on an allegation that it has "diverted resources otherwise reserved for different institutional functions and purposes." (Doc. #26 at 2-3,

9

¶2.)  However, NAGR's only allegation about what it has diverted resources to fund, is telling. "[T]he Defendants' unconstitutional enforcement of the laws complained of herein has forced, or likely will force, NAGR to divert funds, energies, and resources to the cause of *this legal action*." (Id.) (emphasis added).  As shown below, these allegations are insufficient for several reasons.

### 1.  NAGR cannot demonstrate injury by claiming a diversion of resources related to this very lawsuit.

Courts within this Circuit have repeatedly rejected claims by organizations based on depletion of resources claims even more detailed and arguably more concrete than that of NAGR. *See NRA of Am.,* 480 F. Supp. 3d at 415 (rejecting claim of organizational standing as "futile" based on alleged injuries of dedication of "staff and resources to fielding . . . calls and providing advice to its members."); *Rodriguez*, 444 F. Supp. 3d at 495 (holding association of journalists lacked organizational standing based on alleged expenditure of time and resources where association failed to provide specifics as to how defendants' alleged conduct caused any perceptible impairment or even any adverse effect to association's ordinary advocacy operations).[1]

Recently, the Second Circuit found no organizational standing based on an almost identical diversion of resources theory.  In *Connecticut Parents Union*, an organizational plaintiff brought a declaratory and injunctive relief action against state officials pursuant to §1983 asserting that Connecticut's statewide racial quota for inter district magnet schools (Public Act 17-172) violated

---

[1] *See also Ctr. for Food Safety v. Price*, No. 17-CV-3833 (VSB), 2018 WL 4356730, at *5 (S.D.N.Y. Sept. 12, 2018) (rejecting food safety organization's "depletion of resources" theory because the "purported injuries are not sufficiently distinct from the general mission of the organizations at issue . . . to allow standing based on these allegations alone would mean that any entity that spends money on an issue of particular interest to it would have standing, which would in turn contravene the principle that an entity's mere interest in a problem cannot support standing."); *NCPRR v. City of New York*, 75 F.Supp.2d 154 (S.D.N.Y. 1999) (holding no standing based on civil rights groups claim that it "expends substantial resources . . . to advocate reforms to end police misconduct").

the Equal Protection Clause. *Conn. Parents Union,* 8 F.4th at 170. The plaintiff was CTPU, an organization whose mission was "to ensure that parents, guardians, and families are connected with the educational resources and support system necessary to protect their children's educational rights thus ensuring that neither race, zip-code, nor socio-economic status is a predictor of a child's success." *Id.* at 170-71. CTPU contested the alleged racial quota by "hosting community events, information sessions, bus tours, and other events in order to educate the public about the statewide racial quota's harmful effects and leading legislative-reform efforts to repeal the racial quota." *Id.* at 171. CTPU alleged that its "attempts to counteract the statewide quota . . . have 'prevented [it] from devoting [its] time and energies to other . . . matters,' imposing 'opportunity costs' on the organization.'" *Id.* "CTPU maintain[ed] that its work was perceptibly impaired because it expended resources to counteract illegal activity touching on its core mission and in so doing diverted resources away from other activities." *Id.*

The Second Circuit rejected this, holding under that "argument, an organization could establish standing by claiming to have been injured by any law or regulation touching any issue within the scope of its mission (which the organization itself can define) so long as it expends resources to oppose that law or regulation." *Id.* at 173. The Court further held "expenditures or other activities, if incurred at the organization's *own initiative*, cannot support a finding of injury— that is, when the expenditures are not reasonably necessary to continue an established core activity of the organization bringing suit, such expenditures, standing alone, are insufficient to establish an injury in fact for standing purposes. In other words, an organization's decision to embark on categorically new activities in response to action by a putative defendant will not ordinarily suffice to show an injury for standing purposes, even if the organization's own clients request the change." *Id.* at 174.

11

The injury-in-fact inquiry must focus on "*involuntary* and *material* impacts on *core activities*." *Id*. at 175 (emphasis in original). Here, NAGR does not allege what core activities it has been forced to forgo or even curtail as a result of the challenged statutes which have been in place for the better part of a decade. Much like the organization in *Conn. Parents Union*, "it is clear that [NAGR] incurred costs because it decided to initiate a campaign against the [challenged statutes] to advance its own abstract social interests; thus any costs [NAGR] incurred from this campaign were not involuntary." *Id*. Simply put, an organization cannot sue to invalidate a statute and claim the cost of bringing that lawsuit constitutes an injury in fact.[2] As the Supreme Court has observed, "Art. III forecloses the conversion of courts of the United States into judicial versions of college debating forums." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982).

For this reason alone, NAGR cannot satisfy its burden to demonstrate standing and it must be dismissed from this lawsuit.

### 2. Even if NAGR could establish injury in fact, it cannot establish causation.

NAGR also fails it burden to establish standing because its alleged injury is not "fairly traceable to [the challenged statutes]." *Conn. Parents Union*, 8 F.4th at 173. Here, NAGR's

---

[2] *See also Young Advocates for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215 (E.D.N.Y. 2019) ("If any plaintiff with a strong objection to a statute could manufacture standing by spending time and money opposing that very statute—and then arguing that the expenditure of that time and money was itself an injury—there would be no real constraint upon standing at all, except perhaps the size of the plaintiff's bank account."); *Mental Hygiene Legal Service v. Cuomo*, 13 F.Supp.3d 289, 299 (S.D.N.Y. 2014) (finding a lack of standing where plaintiff "ha[d] not indicated that its activities [opposing the law] detracted the attention of [its] staff members from their regular tasks"); *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 (3d Cir. 1998) (finding a lack of standing where "[t]he record [did] not establish that the [plaintiff] altered its operations in any way as a result of the allegedly discriminatory advertisements or diverted any of its resources to a bona fide investigation"); *National Taxpayers Union, Inc. v. U.S.*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The impact of Section 13208 upon [plaintiff's] programs, such as its educational and legislative initiatives, also does not constitute an injury in fact.").

12

alleged injury—diversion of resources to cover the cost of this lawsuit—stems not from the challenged statutes, but its own decision to sue.

Chief Judge Underhill ruled on this prong of the test in *Conn. Parents Union*, holding that though the plaintiff made allegations of "expenditure of resources," the "complaint pleads no facts showing how the Act compelled CTPU to forgo those activities. . . ."[3] *Conn. Parents Union v. Wentzell,* 462 F. Supp. 3d 167, 172 (D. Conn. 2020). The court held that the causation requirement was not satisfied. *Id*. at 173. Specifically, the court held that "[c]ausation is not met when a plaintiff's injury arises from 'the independent action of some third party.'" *Id*. (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

The court recognized the "relatively modest" burden to show causation, but found "that burden is harder to meet where, 'traceability depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict.'" *Id*. (quoting *New York v. United States Dep't of Commerce*, 315 F. Supp. 3d 766, 785 (S.D.N.Y. 2018)); *see also Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish."). There, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation." *Lujan*, 504 U.S. at 562; *see also Bennett*

---

[3] The Second Circuit ultimately did not address the causation or "traceability" issue because both parties agreed "that our standing inquiry here turns principally on the first element: injury-in-fact." *Conn. Parents Union*, 8 F.4th at 173 n.19. The Court stated "[t]he connection between injury and causation is particularly close where, as here, the plaintiff is not the object of the challenged legislation and is therefore not under any direct physical or legal compulsion that would require it to incur costs constituting an injury. But here, because we conclude that CTPU fails to demonstrate injury-in-fact, consideration of the injury prong is sufficient to resolve the dispute before us." *Id*.

13

*v. Spear*, 520 U.S. 154, 169 (1997) (concluding that a party may meet the standing requirement if it suffered an "injury produced by determinative or coercive effect upon the action of someone else").

Chief Judge Underhill concluded that CTPU did not carry its burden. "CTPU is not the object of the Act, and the complaint does not allege that parents whose children were impacted by the Act were forced to seek assistance from CTPU. Nor does the complaint proffer any facts showing that the parents' calls 'coerc[ed]' or otherwise compelled CTPU to expend resources to oppose the Act. CTPU was free to decline the parents' requests at no cost to the organization; that it opted to do otherwise does not grant it standing." *Conn. Parents Union*, 462 F. Supp. 3d at 174 (quoting *Bennett*, 520 U.S. at 169).

Similarly, NAGR claims the expense of this lawsuit constitutes an opportunity cost. But there is nothing compelling NAGR to bring this lawsuit as opposed to engaging in its core functions. Much like CTPU, NAGR is free to decline spending its time and money attempting to invalidate state statutes via the federal courts. They are not required to divert resources from whatever alternative actions they would be taking—the Second Amended Complaint does not specify—to expend the resources necessary to sue the State. NAGR chooses to do this, but voluntarily choosing to engage in this activity cannot confer standing. *See Young Advocates*, 359 F. Supp. 3d at 231 ("Individual persons cannot obtain judicial review of otherwise non-justiciable claims simply by incorporating, drafting a mission statement, and then suing on behalf of the newly formed and extremely interested organization.") (quoting *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996)).

For this reason, even if NAGR could establish an injury-in-fact, it cannot satisfy the causation prong of the standing test, and therefore must be dismissed from this case.

14

## III.    CONCLUSION

The Article III "standing requirement assures that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party; where that need does not exist, allowing courts to oversee legislative or executive action would significantly alter the allocation of power away from a democratic form of government." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  "[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his [or her] advocacy." *Valley Forge*, 454 U.S. at 486.  A special interest group does not have the right to challenge a state statute in federal court simply because it objects to its impact upon its members on general policy grounds.  Such advocacy is better left to the political process, and utilization of the organization's resources does not constitute an injury sufficient to invoke the jurisdiction of this Court.  NAGR has not met its burden to establish either associational or organizational standing.  It must therefore be dismissed from this case.  The Court should grant this Motion.

DEFENDANT
Lamont, et. al.

WILLIAM TONG
ATTORNEY GENERAL

BY: _____

_____
James M. Belforti
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Tel:  (860) 808-5450
Fax:  (860) 808-5591
Federal Bar No. ct30449
E-Mail:  james.belforti@ct.gov

15

**JA-124**

/s/ Janelle R. Medeiros

Janelle R. Medeiros
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30514
E-Mail: janelle.medeiros@ct.gov
Tel.: (860) 808-5450
Fax: (860) 808-5590

**<u>CERTIFICATION</u>**

I hereby certify that on November 18, 2022, a copy of the foregoing was filed

electronically. Notice of this filing will be sent by e-mail to all parties by operation of the

Court's electronic filing system. Parties may access this filing through the Court's system.

_____
James M. Belforti
Assistant Attorney General

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:22 CV 1118 |
| NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | December 9, 2022 |

RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS

Plaintiffs submit the following response in opposition to Defendants' Motion to Dismiss

[Doc. 32].

I.    **Defendants' Motion Fails Because At least One Plaintiff Has Standing**

The *Bruen* case itself demonstrates why Defendants' motion to dismiss should be denied.

The plaintiffs in that case were the New York State Rifle & Pistol Association ("NYSRPA"),

Robert Nash and Brandon Koch.  The State of New York moved to dismiss NYSRPA for lack of

standing. The district court denied the motion, writing:

> Defendants argue that NYSRPA lacks standing to bring this case on behalf of the Individual Plaintiffs. 'For federal courts to have jurisdiction over' a party's asserted claims, however, '**only one named plaintiff need have standing with respect to each [of those] claims.**' *Comer v. Cisneros*, 37 F.3d 775, 788 (2d Cir. 1994); *accord Town of Chester v. Laroe Estates, Inc.*, __ U.S. __ 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017) ('At least one plaintiff must have standing to seek each form of relief requested in the complaint.'). Although NYSRPA's failure to

- 1 -

allege any institutional injury may be 'plainly insufficient to give rise to standing,' *Kachalsky v. Cacase*, 817 F.Supp.2d 235, 251 (S.D.N.Y. 2011), Defendants do not dispute that Plaintiffs Nash and Koch, as individuals, have standing to bring the claims asserted. . . . Accordingly, the Court need not address the issue further here.

*New York State Rifle & Pistol Ass'n, Inc. v. Beach*, 354 F. Supp. 3d 143, 147 (N.D.N.Y. 2018), *aff'd*, 818 F. App'x 99 (2d Cir. 2020), *rev'd on other grounds and remanded sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) (emphasis added).

In this case, Defendants have challenged the standing of the National Association for Gun Rights ("NAGR"), but they have not disputed that Plaintiff Flanigan, as an individual, has standing to bring the claims asserted. Accordingly, the Court need not address the issue further.[1]

The district court in *Bruen* cited *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433 (2017), in support of its holding. The Court may remember that Plaintiffs also cited this case at the October 28 hearing in this matter. But *Town of Chester* is not the only case in which the Supreme Court has expressed a similar view. The Court has held in the context of multi-plaintiff constitutional challenges to legislative and regulatory actions that sufficient injury on the part of one plaintiff "is sufficient to confer standing under . . . Article III." *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *see also Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2, (noting with approval that the Court of Appeals "did not determine whether the other plaintiffs have standing because **the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement**") (emphasis added); *cf. Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider their petition for review.").

---

[1] Standing is required for subject matter jurisdiction and may be raised for the first time on appeal. *Strubel v. Comenity Bank*, 842 F.3d 181, 187 (2nd Cir. 2016). If the Court were to grant Defendants' motion it would call into question the Supreme Court's decision in *Bruen* on the ground that the Supreme Court did not have subject matter jurisdiction.

- 2 -

As the district court noted in *Bruen*, the Second Circuit has also stated the same thing. In *Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994), the plaintiffs brought several constitutional and statutory claims against government officials, and the district court granted the defendants' motion to dismiss for lack of standing. The Second Circuit reversed, holding that for "federal courts to have jurisdiction over any of the[] claims, only one named plaintiff need have standing with respect to each claim." *Id.*, 37 F.3d at 788. Similarly, in *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017), the Court held that where one plaintiff had standing to bring a First Amendment challenge to a local ordinance, that was "a sufficient predicate for federal jurisdiction," and the Court did not need to reach whether the second plaintiff /organization had standing. *Id.*, 868 F.3d at 109. The Court noted that "[i]t is well settled that where . . . multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Id.*, (*quoting Rumsfeld*, *supra*.)

Other circuits are in accord. For example, in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), organizational plaintiffs challenged on Second Amendment grounds a Chicago ordinance that prohibited firing ranges in the city. The City moved to dismiss the organizations for lack of standing and the district court granted the motion. The Seventh Circuit reversed and stated: "[t]he district court's emphasis on the organizational plaintiffs' standing is puzzling. As we have noted, it's clear the individual plaintiffs have standing. **Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not.**" *Id.*, 651 F.3d at 696 n.7 (emphasis added).

- 3 -

This Court reached a similar conclusion in *Barfield v. Cook*, 2019 WL 3562021, at \*5 (D. Conn. 2019), where the Court cited *Bowsher, supra*, for the proposition that "standing of single plaintiff was sufficient for Article III purposes" and *Comer, supra*, for the proposition that "[O]nly one named plaintiff need have standing with respect to each claim." *See also CNY Fair Hous., Inc. v. Welltower Inc*., 588 F. Supp. 3d 282, 299 (N.D.N.Y. 2022) (where multiple parties seek the same relief, the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement, *citing Centro, supra*); and *Doe v. Zucker*, 520 F. Supp. 3d 217, 244 n.10 (N.D.N.Y. 2021), *aff'd sub nom. Goe v. Zucker*, 43 F.4th 19 (2d Cir. 2022) (since it was undisputed that the individual plaintiffs had standing with respect to each claim, the Court need not address the issue of association's standing); and *State v. United States Dep't of Com*., 315 F. Supp. 3d 766, 790 (S.D.N.Y. 2018) (same).

In summary, "[i]t is well settled that where . . . multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro, supra*. Defendants have not disputed that Plaintiff Flanigan has standing to bring all claims asserted. Accordingly, Article III is satisfied and the motion to dismiss should be denied.

## II. NAGR Has Alleged Facts Sufficient to Establish Associational Standing

NAGR has alleged facts sufficient to establish associational standing on behalf of its members. Defendants have argued that Second Circuit precedent prevents nonprofit entities from asserting associational standing on behalf of their members. To the extent the Second Circuit has held that a nonprofit entity does not have standing to assert constitutional claims on behalf of its members, such holdings are contrary to clear Supreme Court precedent. See *Ne.*

- 4 -

JA-129

*Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla*., 508 U.S. 656, 668 (1993) (holding that association has standing to bring constitutional claim on behalf of its members). *See also, N.Y. State Club Ass'n, Inc. v. City of N.Y*., 487 U.S. 1, 9 (1988) (holding that an association had standing to bring a constitutional claim on behalf of its members because the members "would have standing to bring this same suit"); *Thomas v. City of N.Y*., 143 F.3d 31, 36 n.9 (2d Cir. 1998) (finding that associations of livery car drivers had standing to bring an Equal Protection Clause challenge on behalf of their members); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 458 (1958); *Bates v. City of Little Rock*, 361 U.S. 516, 524 n.9 (1960); *Louisiana ex rel. Gremillion v. Nat'l Ass'n for the Advancement of Colored People*, 366 U.S. 293, 296 (1961).

## III.    NAGR Has Alleged Facts Sufficient to Establish Individual Standing

### A.    Legal Standard

An organization establishes an injury-in-fact if it can show that it was 'perceptibly impaired' by defendant's actions." *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2nd Cir. 2021), *quoting Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017), *quoting Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Accordingly, "where an organization diverts its resources away from its current activities, it has suffered an injury [that is] independently sufficient to confer organizational standing." *Id., quoting Centro,* 868 F.3d at 111.

Significantly, the injury necessary to support standing need not be large or even significant. In *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669 (1973) the Court held that injury in fact serves to distinguish a person with a direct stake in

- 5 -

the outcome of a litigation "**even though small** from a person with a mere interest in the problem. *Id*., 412 U.S. at 690, n.14 (internal quotation marks omitted; emphasis added). The Court noted that it has allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, a $5 fine, or a $1.50 poll tax. *Id*. Thus, "an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." *Id*. (internal quotation marks omitted). *See also Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (even a "small" loss is sufficient for Article III standing); *Nnebe v. Daus*, 644 F.3d 147, 156–57 (2d Cir. 2011) ("scant" evidence supplied by association is sufficient).

In *Silva v. Farrish*, 47 F.4th 78, 87 (2d Cir. 2022), the Court held that where standing is challenged on the basis of the pleadings, a court must "accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party." *Id*., 47 F. F.4th at 87, *quoting Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 109 (1979). Defendants cannot deny the truth of NAGR's allegations by complaining that NAGR did not supply "detailed information" about the specific expenditures it has diverted from its other activities. Such details are assuredly not required under the regime set forth in Rule 8(a)(1). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations" (citation and internal quotation marks omitted)); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations").

## B.     NAGR Has Incurred Perceptible Harm

NAGR alleges that it "has expended and diverted resources otherwise reserved for different institutional functions and purposes and is adversely and directly harmed by the illegal and unconstitutional actions of the Defendants." Compl. ¶ 2. NAGR further alleges that it "has diverted, and continues to divert, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein that would otherwise be used for educational outreach, public relations, and/or programmatic purposes." *Id*. NAGR also alleges that "[r]ather than working on other educational, outreach, public relations, and/or programmatic events and operations, NAGR's agents have devoted, are continuing to devote, or are likely to devote, significant time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the laws complained of herein, and that NAGR and its agents will be forced to continue diverting such time, money, effort, and resources from NAGR's normal educational, outreach, public relations, and/or programmatic events and operations so long as the Defendants' unconstitutional enforcement of the laws complained of herein persists." *Id*.

For purposes of the Defendants' motion to dismiss, these allegations must be accepted as true, and they are more than sufficient to establish standing, because "[A] nonprofit organization establishes an injury-in-fact if, as here, it establishes that it spent money to combat activity that harms its . . . core activities." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) (internal quotation marks omitted). NAGR has expended resources to mitigate the unconstitutional law's impact on those it serves. In so doing, it has diverted resources that would otherwise have been available for other programming, which is a "perceptible opportunity cost" that suffices to confer standing. *Nnebe v. Daus*, 644 F.3d 147,

- 7 -

JA-132

157 (2d Cir. 2011).  These injuries constitute "far more than simply a setback to the [NAGR's] abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The law has caused a "perceptible impairment" of NAGR's activities. *Oyster Bay*, 868 F.3d at 110 (internal quotation marks omitted).

Defendants cite *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167 (2d Cir. 2021), for the proposition that NAGR's allegations do not establish standing.  That is not correct. Where, as here, an organization has been required to divert, and continues to divert, significant time, money, effort, and resources to addressing the Defendants' enforcement of an unconstitutional law that would otherwise be used for educational outreach, public relations, and/or programmatic purposes, it has standing to challenge the law. *Connecticut Parents Union* does not hold otherwise.

In addition to the foregoing, NAGR is prepared to supply further particularized facts demonstrating the injury it has incurred.  It is within the Court's power to allow such supplementation through amendment or affidavit. *Calcano v. Swarovski N. Am. Ltd*., 36 F.4th 68, 77 n.9 (2d Cir. 2022), *quoting Warth v. Seldin*, 422 U.S. 490, 501 (1975). As set forth in the attached declaration, NAGR employs a sweepstakes multiple times a year and has done so for at least 10 years in order to increase donations and membership. Declaration of Ryan J. Flugaur, ¶ 3. The sweepstakes works by sending communications to members and potential members around the country informing them that they may be eligible to participate in the sweepstakes. *Id*. The prize for the sweepstakes is often an AR-15 and almost always the firearm is of a type that is banned in Connecticut pursuant to the law challenged in this action. *Id*. The

- 8 -

**JA-133**

communication requests each recipient to send in a sweepstakes entry form. *Id.* A donation to NAGR is suggested but is not required. *Id.*

The sweepstakes entry form states that citizens of states that are not eligible to receive the firearm prize are not eligible to participate in the sweepstakes. Flugaur Dec., ¶ 4. This sweepstakes is one of NAGR's main fundraising techniques and has been tremendously successful in many states across the country. Flugaur Dec., ¶ 5. Citizens of Connecticut are almost always not eligible to participate in the sweepstakes and this disincentivizes their participation in the sweepstakes, which in turn reduces the rate at which citizens of Connecticut donate to NAGR. Flugaur Dec., ¶ 6. NAGR loses many thousands of dollars in donations each year because citizens of Connecticut are not eligible to participate in the sweepstakes. Flugaur Dec., ¶ 7. To the extent the Court believes the allegations of the Complaint are insufficient, NAGR requests leave to supplement the allegations through amendment or declaration with this information.

**IV.    Defendants Misconstrue NAGR's Allegations**

Defendants argue that NAGR has not alleged facts sufficient to establish the causation element of standing. Motion 12. The "causal connection" element of Article III standing, is the requirement that the plaintiff's injury be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). This "does not create an onerous standard." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016). The standard is lower than that of proximate causation. *Id.* NAGR has alleged

- 9 -

that it is Defendants' conduct in enforcing the unconstitutional laws that has caused its injuries. Compl. ¶ 2. This is sufficient to meet this minimal standard.

Defendants argue that NAGR's allegations do not establish standing because its claimed injury is **only** the diversion of resources is merely to "cover the cost of this lawsuit." Resp. 10, 12. This is not accurate. While NAGR did mention the cost of this lawsuit (Compl. ¶ 2), it specifically stated that the costs of this lawsuit was not the only injury it has incurred (cost of legal action "[a]mong other diversions and threatened diversions . . ."). Again, this allegation must be taken as true for purpose of the motion to dismiss.

## V. Conclusion

For the foregoing reasons, Plaintiffs respectfully request the Court to deny Defendants' motion to dismiss.

<div align="right">

THE PLAINTIFFS
NATIONAL ASSOCIATION FOR
GUN RIGHTS, and TONI
THERESA SPERA FLANIGAN

*/s/ Barry K. Arrington*
Barry K. Arrington
3801 E. Florida Ave., Suite 830
Denver, CO 80210
(303) 205-7870
barry@arringtonpc.com
*Admission Pro Hac Vice*

John J. Radshaw (ct19882)
65 Trumbull Street, 2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

</div>

## C E R T I F I C A T I O N

- 10 -

I hereby certify that on December 9, 2022, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all appearing parties by operation of the Court's electronic filing. Parties may access this filing through the Court's system.

/s/ Barry K. Arrington
_____
Barry K. Arrington

- 11 -

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:22 CV 1118 |
| NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | December 9, 2022 |

**DECLARATION OF RYAN J. FLUGAUR**

1.      My name is Ryan J. Flugaur.  I am over the age of 18 and have personal knowledge of the matters set forth in this Declaration.

2.      I am a Vice President of National Association for Gun Rights ("NAGR").

3.      NAGR employs a sweepstakes multiple times a year and has done so for at least 10 years in order to increase donations and membership.  The sweepstakes works by sending communications to members and potential members around the country informing them that they may be eligible to participate in the sweepstakes. The prize for the sweepstakes often an AR-15 and almost always the firearm is of a type that is banned in Connecticut pursuant to the laws challenged in this action. The communication requests that recipient to send in a sweepstakes entry form. A donation to NAGR is suggested but not required.

4.      The sweepstakes entry form states that citizens of states that are not eligible to receive the firearm prize are not eligible to participate in the sweepstakes.

1

**JA-137**

5.      This sweepstakes is one of NAGR's main fundraising techniques and has been

tremendously successful in many states across the country.

6.      Citizens of Connecticut are almost always not eligible to participate in the sweepstakes

and this disincentivizes their participation in the sweepstakes, which in turn reduces the rate at

which citizens of Connecticut donate to NAGR.

7.      NAGR loses many thousands of dollars in donations each year because citizens of

Connecticut are not eligible to participate in the sweepstakes.

I, Ryan J. Flugaur, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that I

have reviewed the foregoing, that I am competent to testify in this matter, and that the facts

contained therein are true and correct

Ryan J. Flagaur
December 9, 2022

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN | : | CIVIL NO. 3:22-CV-01118(JBA) |
| RIGHTS, ET. AL. | : | : |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | DECEMBER 23, 2022 |
| *Defendant.* | | |

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Pursuant to Local Rule 7(d), the Defendants respectfully respond to Plaintiffs' Opposition to the Motion to Dismiss. (Doc. #33.)

### I. ARGUMENT AND APPLICABLE LAW

**A. Plaintiff Flanigan has not demonstrated or alleged in the Second Amended Complaint that her harm is redressable via this action and therefore her standing is not conceded or established for purposes of this Motion.**

Because "[t]he exercise of judicial power . . . can so profoundly affect the lives, liberty, and property of those to whom it extends. . . the decision to seek review must be placed in the hands of those who have a direct stake in the outcome." *Diamond v. Charles*, 476 U.S. 54, 62, (1986) (internal quotation marks omitted). "It is not to be placed in the hands of 'concerned bystanders,' who will use it simply as a 'vehicle for the vindication of value interests.'" *Id*. (quoting *United States v. SCRAP*, 412 U.S. 669, 687 (1973)).

Plaintiff NAGR essentially argues that since Plaintiff Flanigan has standing, it does not matter that NAGR lacks standing. This argument is flawed for two reasons. First, this would essentially allow NAGR to run an end around the Second Circuit's prohibition on associational standing in §1983 cases by simply ignoring whether it has any actual injury. *See Davis v. FEC*,

554 U.S. 724, 734 (2008) ("standing is not dispensed in gross.").  Second, and more importantly, Defendants do not concede that Plaintiff Flanigan actually has standing in this case.

"Article III, § 2, of the Constitution extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.'"  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)(quoting U.S. Const. art III, § 2).  "In its constitutional dimension, standing imports justiciability:  whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III."  *Cortlandt St. Recovery Corp. v. Hellas Telecomm*., *S.à.r.l*, 790 F.3d 411, 417 (2d Cir. 2015)(quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "Standing to sue is part of the common understanding of what it takes to make a justiciable case."  *Steel Co*., 523 U.S. at 102 (citation omitted).

"The 'irreducible constitutional minimum of standing' contains three requirements."  *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The "triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and *the party invoking federal jurisdiction bears the burden of establishing its existence*."  *Steel Co.*, 523 U.S. at 103–04 (emphasis added).  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."  *Id*. at 107; *see also Pettus v. Morgenthau*, 554 F.3d 293, 298 (2d Cir. 2009)("In the standing context, courts have used the redressability and causation requirements as a means of ensuring that there is an appropriate nexus between a plaintiff's alleged injury-in-fact and the claim for relief that the plaintiff wishes to assert.").

In the Second Amended Complaint (Doc. #26), there are two sparse allegations related to Plaintiff Flanigan:

**JA-140**

3. Plaintiff Toni Theresa Spera Flanigan is a resident of Connecticut and is a law-abiding citizen of the United States. She is a member of NAGR. She intends to acquire arms[1] putatively made illegal by the Statutes and but for the Statutes would do so.

4. The individual plaintiff and members of plaintiff NAGR are eligible under the laws of the United States and, but for the Statutes, of the State of Connecticut to receive and possess firearms, including pistols, rifles, and shotguns, with the exception of the Statutes.

(Doc. #26 at 3, ¶¶3-4.)  This contains the entirety of the allegations about Plaintiff Flanigan in this case.  What is notably absent from this is an allegation or any other kind of demonstration that Plaintiff Flanigan actually possesses an eligibility certificate or permit which is required to "purchase or receive" any "pistol or revolver" or "any long gun."  *See* Conn. Gen. Stat. §§ 29-33(b), 29-37a(c).

Plaintiff Flanigan's claimed injury rests on the premise that but for General Statutes § 53-202c(a) and § 53-202w(b) and (c), she would be able to "acquire arms putatively made illegal by [said] Statutes. . ." (Doc. #26 at 5, ¶14.)  Plaintiff seeks a declaratory judgment that the challenged statutes are unconstitutional both on their face and as applied to her.  But invalidating these statutes would not automatically entitle Plaintiff Flanigan or anyone else to purchase or otherwise acquire an AR-15.[2]

Since an AR-15 is a "firearm" for purposes of General Statute § 53a-3(19) because it is a "rifle . . . from which a shot may be discharged" and since it is a "long gun" for purposes of General Statute § 29-37a because it is a "firearm, as defined in section 53a-3, other than a pistol or revolver," "no person may purchase or receive" an AR-15 "unless such person holds a valid long gun eligibility certificate issued pursuant to section 29-37p, a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28, a valid permit to sell at retail a

---

[1] Plaintiff does not specify what "arms" she would seek to acquire but for the challenged statutes.
[2] Again, Plaintiff does not actually allege that she would like to purchase an AR-15 or any other specific weapon.  Defendants utilize this firearm as an example since it is mentioned by name most frequently in the Second Amended Complaint.

3

pistol or revolver issued pursuant to subsection (a) of section 29-28 or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f."  Conn. Gen. Stat. § 29-37a(c).

In other words, eliminating the challenged statutes would not necessarily redress Plaintiff Flanigan's alleged injury because there are other laws preventing the purchase or receipt of any long gun, unrelated to the challenged statutes.  Paragraph 4 in the Second Amended Complaint, in addition to being difficult to decipher grammatically, does not sufficiently address this issue. Being "eligible" to obtain a long gun eligibility certificate or pistol permit is not the same as currently possessing one, notably because to receive such a certificate, one must "successfully complete a [firearms safety training] course approved by the Commissioner of Emergency Services and Public Protection…" pursuant to General Statutes §§ 29-36f(b)(1) or 29-37p(b)(1). This naturally takes time, and if Plaintiff Flanigan has not yet obtained these certificates and/or permits, then simply having no criminal history disqualifier would not entitle her to otherwise purchase assault weapons.

This Court cannot merely assume that Paragraph 4 satisfies the redressability requirement to establish Plaintiff Flanigan's standing.  "Federal courts 'are courts of limited jurisdiction whose power is limited strictly.'  There is always a 'presumption against jurisdiction.'" *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 64 (2d Cir. 2012)(quoting *Ahmed v. Holder*, 624 F.3d 150, 154 (2d Cir. 2010); *see also Miller v. United States*, 78 U.S. 268, 299, 11 Wall. 268 (1870); and citing 13 Charles Alan Wright, et al., Federal Practice & Procedure § 3522 (3d ed. 2012)).  And it is the "plaintiff asserting subject matter jurisdiction [who] has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v.*

4

*United States*, 201 F.3d 110, 113 (2d Cir. 2000). The Second Amended Complaint does not satisfy this burden based on the barebones allegations contained therein.

Therefore, Plaintiff NAGR's claim that "Defendants have not disputed that Plaintiff Flanigan has standing to bring all claims asserted" is faulty and so too is its claim that this Court can simply ignore its lack of standing. That issue must be addressed at the threshold.

### B. NAGR lacks standing in its own right.

Plaintiff NAGR's only response to Defendants' arguments addressing its own standing is that this Court should depart from binding Second Circuit precedent or alternatively, that its deficient pleading should be ignored because "a court must 'accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party.'" (Doc. #33 at 6) (quoting *Silva v. Farrish*, 47 F.4th 78, 87 (2d Cir. 2022)). The first argument merits little response. Plaintiff cannot bid this Court to ignore binding Second Circuit precedent. *See Garthwait v. Eversource Energy Co.*, No. 3:20-CV-00902 (JCH), 2022 U.S. Dist. LEXIS 220309, at *10 (D. Conn. Dec. 7, 2022) ("Lower courts are constrained to follow directly controlling precedent even where that decision appears to rest on reasons rejected in another line of decisions."); *Kahn v. D&A Servs., LLC*, No. 20 CV 4792 (VB), 2021 U.S. Dist. LEXIS 92378, at *5 n.4 (S.D.N.Y. May 14, 2021) ("this Court must follow binding precedent in this Circuit.").

As for the second argument, this is equally unavailing. Plaintiff does not allege any actual *facts* about diversion of resources other than the costs of this lawsuit, which is insufficient to confer standing. Instead, Plaintiff merely responds that it is diverting other resources from its core purpose—which is presumably defending "the right of all law-abiding individuals to keep and bear arms" (Doc. #26 at 2)—despite its failure to allege what those diversions are. Plaintiff

NAGR argues this Court must simply accept this legal conclusion as true thereby side-stepping standing altogether. NAGR's argument fatally conflicts with *Iqbal*.

"[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, 'the-defendant-unlawfully-harmed-me accusation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citations omitted). "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.' *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 679. "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."

Plaintiff NAGR's reliance on its threadbare allegation that it has actually suffered an injury, without actually stating what that injury consists of, is the epitome of "the-defendant-unlawfully-harmed-me accusation" that *Iqbal* specifically rejects. This is particularly problematic in this case because "[t]here is always a 'presumption against jurisdiction.'" *Garanti*, 697 F.3d at 64; *see also Bardsley v. Nonni's Foods LLC*, 2022 U.S. Dist. LEXIS 47104, at *15-16 (S.D.N.Y. Mar. 16, 2022) ("any 'doubts are resolved against [jurisdiction] out of

6

**JA-144**

respect for the limited jurisdiction of the federal courts and the rights of states.'") (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 488 F.3d 112, 124 (2d Cir. 2007). Further, as the Supreme Court noted in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quotations omitted).

Plaintiff has not and cannot meet its burden to show any actual injury here, so it instead relies on the formulaic recitation of the "diversion of resources" theory to satisfy the requirement that it demonstrate standing. The Second Circuit rejected a very similar attempt to invoke the jurisdiction of the District Court in another Second Amendment case. In *CCDL v. Lamont*, another special interest group attempted to demonstrate standing by asserting a diversion of resources theory of injury. *Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021).

In that case, the plaintiff organization actually went further than NAGR, alleging that it diverted resources from their ordinary activities by "communicat[ing] with individuals across Connecticut whose access to pistol permits was limited by [the challenged executive order], and sent a letter to the Governor…" *Id*. The Second Circuit still rejected this assertion, finding a lack of standing, and reversed the District Court. "The sole indication that CCDL might suffer future injury is Sullivan's statement that 'CCDL has [expended and diverted] and continues[] to expend and divert its resources and has been and continues to be adversely and directly harmed by the Defendants' actions.' Such a conclusory assertion cannot support standing, see *Baur v.*

*Veneman*, 352 F.3d 625, 636-37 (2d Cir. 2003), and falls short of establishing a 'likelihood' of future injury, *Deshawn E.*, 156 F.3d at 344." *Id.* at 448.

NAGR's pleading is even more deficient than CCDL's. NAGR simply says it diverted resources, without actually explaining what those diversions were or are, apart from the cost of the litigation. To allow such pleading to demonstrate organizational standing would essentially remove the standing requirement altogether at the motion to dismiss phase. Any organization could simply allege that the existence of a challenged statute or regulation required it to divert resources and that legal assertion alone would suffice. This, of course, is not the state of the law. "Rather, 'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis*, 554 U.S. at 734 (quoting *DaimlerChrysler Corp.*, 547 U.S. at 352 (quoting *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 185 (2000)).

Even if Plaintiff NAGR had alleged any actual facts about its diversion of resources theory, it would still fail because the "allegations" are about *past* acts. "A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) (citation omitted); *see also Christa McAuliffe*, 788 F. App'x at 85 ("[E]ven if the organizations have standing to assert claims on their own behalf, they have not demonstrated an injury sufficient to secure injunctive relief, since their purported injury . . . is entirely retrospective.").

NAGR's final attempt to bootstrap its claim into this Court is an allegation that a sweepstakes it runs is not as successful in Connecticut because the prize it hands out is a banned AR-15 rifle. First of all, a plaintiff "cannot amend his Complaint by asserting new allegations in

his objection to the motion to dismiss." *Thomas v. Brasher-Cunningham*, No. 3:19-cv-1981 (VAB), 2020 U.S. Dist. LEXIS 132362, at *28 (D. Conn. July 27, 2020); *see also Aldrich v. Town of Bloomfield*, No. 3:17-cv-00581 (VLB), 2018 U.S. Dist. LEXIS 28451, 2018 WL 1015337, at *4 (D. Conn. Feb. 22, 2018) ("Plaintiff cannot amend her complaint with assertions contained in an objection to a motion to dismiss."); *Miley v. Hous. Auth. of City of Bridgeport*, 926 F. Supp. 2d 420, 432 (D. Conn. 2013) ("It is well established that plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to [d]efendants' motion to dismiss."). This is precisely the purpose behind this Court's prefiling conference requirement. Plaintiff was given yet another opportunity to amend the complaint and did not seek to do so. NAGR should not be allowed to amend their complaint for a third time now in response to a motion to dismiss, particularly when the amendment itself would be futile.

Plaintiff NAGR's new allegation is that it fails to receive as much money as it could in suggested, but not required, donations from Connecticut residents in a sweepstakes where the grand prize is an AR-15. Even if this attenuated theory could establish an injury in fact, it certainly cannot establish causation as required by the standing test. As argued more thoroughly in the initial Motion to Dismiss, an injury in fact must be "fairly traceable to [the challenged statutes]." *Conn. Parents Union*, 8 F.4th at 173. NAGR cannot trace this new alleged injury to the challenged statutes especially when considering the individual decisions of potential participants, their lack of requirement to provide any donation to participate in the sweepstakes, and the fact that NAGR has chosen a prize that citizens from many states, not just Connecticut, cannot legally possess, instead of another. Furthermore, even if these statutes did not exist, there are other laws in Connecticut, and other states, that would prevent the possession of AR-15s by potential participants in this sweepstakes, not the least of which are the permit and eligibility laws already

described *supra*. As is the case with NAGR's other claims of injury, this newly alleged
sweepstakes injury is simply insufficient to demonstrate standing.

## II.  CONCLUSION

The Court should grant Defendants' Motion to Dismiss.

DEFENDANT
Lamont, et. al.

WILLIAM TONG
ATTORNEY GENERAL

BY: _____

James M. Belforti
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Tel:  (860) 808-5450
Fax:  (860) 808-5591
Federal Bar No. ct30449
E-Mail:  james.belforti@ct.gov

 /s/ *Janelle R. Medeiros*

Janelle R. Medeiros
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30514
E-Mail:  janelle.medeiros@ct.gov
Tel.:  (860) 808-5450
Fax:  (860) 808-5590

## CERTIFICATION

I hereby certify that on December 23, 2022, a copy of the foregoing was filed
electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the
Court's electronic filing system.  Parties may access this filing through the Court's system.

_____
James M. Belforti
Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. |
| v. | ) ) | 3:22 CV 1118 |
| NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | December 24, 2022 |

**MOTION TO STRIKE DEFENDANTS' REPLY
IN SUPPORT OF THEIR MOTION TO DISMISS**

Plaintiffs move to strike Defendants' Reply in support of the motion to dismiss [Doc. 34].

As grounds for this motion, Plaintiffs state:

**A.** **Defendants' Reply is a Classic Case of Sandbagging**

Defendants filed their motion to dismiss on November 18, 2022. [Doc. 32]. The first

sentence of Defendants' motion states: "Defendants move . . . to dismiss the organizational

Plaintiff – National Association for Gun Rights. ("NAGR") – from this case because it lacks

standing." All of Defendants arguments in their motion to dismiss were directed at NAGR.

Defendants did **not** challenge Plaintiff Flanigan's standing. Indeed, they did not say a single

word about Ms. Flanigan's standing in their 15-page motion.

Plaintiffs responded to the motion to dismiss by citing, *inter alia*, the Second Circuit's

decision in *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d

- 1 -

104 (2d Cir. 2017), where the Court held that when one plaintiff has standing to bring a constitutional challenge to a local ordinance, it is "a sufficient predicate for federal jurisdiction," and the Court need not reach the issue of whether the second plaintiff/organization has standing. *Id.*, 868 F.3d at 109. The Court noted that "[i]t is **well settled** that where . . . multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Id.* (emphasis added).

In their Reply, Defendants were conspicuously silent regarding Plaintiffs' argument based on the "well settled" rule discussed in *Centro*. They did not attempt to distinguish *Centro* or any of Plaintiffs' other authorities. Instead, despite not saying a single word regarding Ms. Flanigan's standing in their motion, Defendants devoted several pages to that issue in their Reply. See Reply 2-4. Having realized their error in attacking the standing of only one of the Plaintiffs in their motion, Defendants attacked the standing of the second Plaintiff for the first time in their Reply. This is a classic case of sandbagging.

**B.     Sandbagging is Prohibited**

Courts reject attempts to raise matter for the first time in a reply (a practice known as "sandbagging") because it would be fundamentally unfair to the non-moving party, because it would deprive that party of an opportunity to respond. *Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, 2013 WL 4012795, at *2 (D. Conn. 2013). Indeed, it is "established beyond peradventure" that it is improper to sandbag one's opponent. *Id*, n.3 *quoting Wolters Kluwer Fin. Servs. Inc. v. Scivantage*, 2007 WL 1098714, at *1 (S.D.N.Y. 2007).

- 2 -

**JA-151**

## C.    The Remedy for Sandbagging is Striking the Reply

"Typically, in [cases of sandbagging], the Court strikes the evidence presented for the first time in reply, and does not consider it for purposes of ruling on the motion." *Wolters Kluwer Fin. Servs. Inc. v. Scivantage*, *supra*. Accordingly, Plaintiffs move the Court to strike all references to Ms. Flanigan in Defendants' reply.

Respectfully submitted this 24th day of December 2022.

THE PLAINTIFFS
NATIONAL ASSOCIATION FOR
GUN RIGHTS, and TONI
THERESA SPERA FLANIGAN

*/s/ Barry K. Arrington*
Barry K. Arrington
3801 E. Florida Ave., Suite 830
Denver, CO 80210
(303) 205-7870
barry@arringtonpc.com
*Pro Hac Vice*

John J. Radshaw (ct19882)
65 Trumbull Street, 2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

## C E R T I F I C A T I O N

I hereby certify that on December 24, 2022, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all appearing parties by operation of the Court's electronic filing. Parties may access this filing through the Court's system.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington

- 3 -

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ET. AL. | : | CIVIL NO. 3:22-CV-01118(JBA) |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | JANUARY 31, 2023 |
| *Defendant.* | | |

## TABLE OF CONTENTS

I.  BACKGROUND ....................................................................................................... 4

II. ARGUMENT ............................................................................................................ 7

  A.  Legal Standard. ................................................................................................. 7

  B.  Plaintiffs cannot show a substantial likelihood of success on the merits. ...................... 9

    1.  Plaintiffs' facial challenge fails because some applications of the challenged statutes plainly fall outside the Second Amendment's protections. .................................. 9

    2.  Plaintiffs are unlikely to succeed on the merits because they fail to show that the Second Amendment protects assault weapons or LCMs. ................................................ 11

      a.  Plaintiffs do not show that the regulated LCMs and features are "arms" instead of accoutrements. ................................................................................................... 12

      b.  Plaintiffs do not show that assault weapons and LCMs are anything other than "dangerous and unusual" weapons. ........................................................................ 16

      c.  Plaintiffs fail to show that assault weapons and LCMs are typically used by law-abiding citizens for lawful purposes like self-defense. ................................................ 20

      d.  Assault weapons and LCM's are not even commonly *owned*. .............................. 24

    3.  Even if Plaintiffs could show that the Second Amendment extends to assault weapons and LCMs, they cannot show substantial likelihood of success because Connecticut's common-sense gun regulations are consistent with the American tradition of firearm regulation. ..................................................................................... 26

      a.  The historical analogue analysis is broader here because the challenged statutes respond to unprecedented societal concerns and technological advancements. ........ 28

      b.  Plaintiffs cannot show a likelihood of success because Connecticut's regulations are relevantly similar to regulations throughout American history. .......................... 32

1

       **i.    There is a historical tradition of restricting possession of specific types of dangerous new weapons technologies.** ........................................................................ 33

       **ii.   Historical regulations on carrying certain weapons are also relevant analogues showing that the challenged statutes comport with the tradition of American firearm regulation.** ..................................................................... 35

   **C.  Plaintiffs cannot satisfy the remaining criteria for a mandatory preliminary injunction.** ........................................................................................................ 39

**III.  CONCLUSION** ........................................................................................................ 41

2

JA-154

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF # 28)

Connecticut enacted common-sense gun safety laws almost a decade ago to protect its residents from mass murder—like the 2012 execution of 26 Connecticut students and teachers by a killer armed with an AR-15 style rifle and large capacity magazines. Now Plaintiffs, without discovery and trial, seek a mandatory injunction that would force the State to immediately lift restrictions on residents selling and owning those same military-style weapons—and some even more deadly ones, like grenade launchers. But Plaintiffs have not carried their heavy burden on any of the preliminary injunction factors, so they cannot prevail.

First: Plaintiffs' facial challenge fails because Connecticut's gun safety laws cover some weapons—like grenade launchers—that the Second Amendment undisputedly does not reach. So Plaintiffs cannot show—as they must—that Connecticut's statutory scheme is categorically unconstitutionally in every application.

Second: Plaintiffs fail to show a substantial likelihood of success on the merits of their Second Amendment claim, because neither large capacity magazines ("LCMs") nor assault weapons meet the threshold criteria for constitutional protections. First, many of the regulated items are firearm accessories, not "arms" within the meaning of the Second Amendment. Second, the regulated weapons, features, and LCMs are dangerous and unusual, military style weapons outside the Second Amendment's scope. Third, Plaintiffs have not met their burden to demonstrate the regulated weapons are in common use. Lastly, neither assault weapons nor LCMs are typically possessed by law-abiding individuals for lawful purposes like self-defense. And even if all the regulated assault weapons and LCMs were within the Second Amendment's scope, Plaintiffs still could not show a substantial likelihood of success on the merits, since Connecticut's regulations are entirely consistent with historical tradition.

3

**JA-155**

Third, and finally: Plaintiffs are not entitled to the extraordinary relief they seek because they fail to show irreparable injury or to explain how the balance of equities and public interest favor immediate relief. These factors heavily weigh against Plaintiffs, given the minute impact of the challenged statutes on Plaintiffs and the extraordinary and potentially irreversible damage the requested injunction would do to public health and safety.

On this inadequate showing and in an emergency posture, Plaintiffs ask this Court to be the first to find Conn. Gen. Stat. §§ 53-202a-c and Conn. Gen. Stat. § 53-202w—Connecticut's assault weapons ban and LCM ban—unconstitutional. The Court should reject Plaintiffs' arguments, decline to provide the extraordinary relief they seek, and heed the Supreme Court's instruction that the Second Amendment's right to armed self-defense is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller (Heller I)*, 554 U.S. 570, 626 (2008)).

## I.  BACKGROUND

The Connecticut General Assembly recognized the significant threat to public safety posed by dangerous military-style weapons when it adopted the state's original assault weapon ban in 1993. Like other laws that have existed for decades at the federal, state, and local levels, the 1993 statute prohibited a small subset of dangerous military-style semiautomatic weapons. Alongside this common-sense law, Connecticut residents have continued to enjoy their constitutionally protected rights to possess firearms, including handguns, rifles, and shotguns.

In 2013, responding to the 2012 massacre at Sandy Hook Elementary School, the General Assembly passed the challenged statutes: Conn. Gen. Stat. §§ 53-202a-c and 53-202w. These statutes strengthened existing law by prohibiting semiautomatic firearms with enumerated

4

**JA-156**

military-style features and by regulating the possession of LCMs, which render any weapon more dangerous and more lethal. These statutes continue to recognize the rights of law-abiding citizens. There remain more than one thousand different makes and models of firearms that Connecticut residents can purchase for responsible and lawful uses like self-defense. Ex. A, Declaration of Detective Brindiana Warenda, ¶ 33.[1]

The statutes prohibit a sub-category of semiautomatic weapons. *Id.*, ¶ 20. A semiautomatic weapon fires one round for each squeeze of the trigger. *Id.* After each shot, the firearm automatically loads the next round in the chamber and arms the firing mechanism for the next shot, permitting a faster rate of fire as compared to manually operated guns. *Id.* ¶¶ 20-21. Unlike semiautomatic weapons, fully automatic weapons, such as machine guns, fire continuously as long as the trigger is pressed. *Id.*

Assault weapons listed in the statutes are essentially civilian versions of military weapons used by armed forces around the world. *Id.* ¶¶ 23-26. The most widely used military firearms are the M-16/AR-15 and the AK-47. *Id.* The AR-15 originally was manufactured as a selective-fire— capable of either semi-automatic or fully automatic firing—machine gun and was adopted by the United States military in the form of the M-16 machine gun during the Vietnam War. *Id.*, ¶ 24. Colt Manufacturing Company retained the AR-15 trademark for its semiautomatic version of the AR-15, which it began selling to civilians in the early 1960s. *Id.*, ¶ 25. The AR-15 is now the civilian commercial version of the M-16, without the fully automatic fire option. *Id.* Like other military weapons, the AR-15 and M-16 were designed expressly to kill large numbers of people

---

[1] The statutes allow a person who applied for a certificate of possession to continue possessing assault weapons that they lawfully possessed before the 2014 effective date. Conn. Gen. Stat. § 53-202d(a), (f). There are also exceptions to assault weapons LCM restrictions for law enforcement and members of the military. *See* Conn. Gen. Stat. §§ 53-202b(b)(1), 53-202c(b), 53-202d(a)(1)(B), (2)(B), § 53-202d(d).

as quickly as possible, and the M-16 has been called a "perfect killing machine." Ex. B, Declaration of John Donohue, ¶ 108. Most of the firearms specifically enumerated in the challenged statutes and the 1993 law are semiautomatic versions of the original selective-fire AR-15/M-16 and the AK-47.[2]

The statutes also prohibit LCM possession. An LCM is a particular type of "magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device…" Conn. Gen. Stat. § 53-202w(a)(1). It is not itself a bullet or other type of ammunition. It contains no firing mechanism. Ex. A, ¶¶ 35-37. Rather, it holds bullets or ammunition and feeds it into a firearm, often attaching at the bottom of the weapon. See Ex. H, Figures 14, 15. Like assault weapons, magazines capable of holding large amounts of ammunition, regardless of type, are particularly designed and most suitable for military and law enforcement applications. Ex. B, ¶ 162. Magazines are manufactured for all types of firearms, including handguns, rifles, and shotguns. Ex. A, ¶¶ 41-42. LCMs, as defined by the statute, can hold more than 10 rounds of ammunition at a time. *Id.* LCMs have been manufactured for many firearms, including handguns, rifles, and shotguns. *Id.* Most firearms, however, can accept magazines with a capacity of fewer than 10 rounds, and thus can still function without an LCM—but without the same mass-killing capacity. *Id.* ¶ 42.

The statutes also restrict firearms with certain features that either may be manufactured already attached to a weapon or manufactured separately and attached to enhance lethality. For example, the statutes prohibit semiautomatic weapons with telescoping stocks, shrouds, flash suppressors, or grenade launchers. None of these are weapons themselves. All are features—often

---

[2]  The statutes list 49 assault rifles (as opposed to handguns or shotguns) by name. Of these, 20 are variants of the AK-47; 13 are variants of the AR-15/M-16; and 3 are variants of the HK 91 or FN type. Ex. A, ¶ 27. The statutes also ban certain semiautomatic pistols. *Id.*, ¶ 30. A pistol is defined under Connecticut law as any firearm that has a barrel under twelve inches long. Conn. Gen. Stat. § 29-27. Of the 22 assault pistols listed in the statutes, 6 are variants of the AK-47 and 7 are variants of the M-16/AR-15. *Id.*, ¶ 30.

6

detachable—that facilitate use of weapons for crimes or mass-killing. A folding or telescoping stock is a stock that makes it easier to conceal a firearm by reducing its length or size. Ex. A, ¶ 15. A flash suppressor attaches to a rifle's muzzle to reduce visible muzzle flash. *Id.*, ¶ 16.

## II. ARGUMENT

### A. Legal Standard.

Plaintiffs seek to preliminarily enjoin state officials and a state statutory scheme on constitutional grounds. This is "an extraordinary and drastic remedy," requiring a "clear showing" of the "most compelling necessity." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007); *Cerilli v. Rell*, No. 3:08CV242(SRU), 2010 WL 1330998, at *1 (D. Conn. Mar. 31, 2010). Plaintiffs' burden is even higher than usual because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995).

Plaintiffs' burden is higher still because they seek a mandatory injunction that gives them all the relief they will ultimately seek at trial, enjoining enforcement of in-force statutes that have been upheld as constitutional.[3] *See Consumer Directed Pers. Assistance Ass'n of N.Y. State v. Zucker*, No. 1:18-CV-746 (FJS/CFH), 2018 U.S. Dist. LEXIS 123988, at *6 n.2 (N.D.N.Y. July 25, 2018) (citing *Pankos Diner Corp. v. Nassau Cty. Legislature*, 321 F. Supp. 2d 520, 524 (E.D.N.Y. 2003)). Plaintiffs therefore seek to change the status quo: "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "[The] heightened standard also

---

[3] *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 269 (2d Cir. 2015) ("The core prohibitions by New York and Connecticut of assault weapons and large-capacity magazines do not violate the Second Amendment."); see ECF # 26, at 13.

applies where the injunction 'will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Democratic Cong. Campaign Comm. v. Kosinski*, No. 22-CV-1029 (RA), 2022 WL 2712882, 2022 U.S. Dist. LEXIS 124144, at *26 (S.D.N.Y. July 13, 2022) (quoting *People ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).

Plaintiffs must "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Since Plaintiffs seek a mandatory injunction, they must "carry the burden of persuasion by a clear showing for each factor." *Bergamaschi v. Cuomo*, No. 20 CIV. 2817 (CM), 2020 U.S. Dist. LEXIS 68937, at *15 (S.D.N.Y. Apr. 20, 2020) (quoting *Abbott Labs. v. Adelphia Supply USA*, No. 15 CV 5826, 2015 WL 10906060, 2015 U.S. Dist. LEXIS 189555, at *45 (E.D.N.Y. Nov. 6, 2015), *aff'd sub nom. Abbott Labs. v. H&H Wholesale Servs., Inc.*, 670 Fed. Appx. 6 (2d Cir. 2016)).

The burden of persuasion for each factor is clear and convincing evidence. *Sound Around Inc. v. Shenzhen Keenray Innovations Ltd.*, No. 22-CV-06943 (HG), 2022 U.S. Dist. LEXIS 227247, at *6 (E.D.N.Y. Dec. 18, 2022). To win a mandatory injunction, a movant's "right to relief must be indisputably clear." *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972). "Thus, 'if there is doubt as to the probability of plaintiff's ultimate success, a request for preliminary mandatory relief must be denied.'" *Audio-Video Grp., LLC v. Green*, No. 1:14cv169 (JCC/TCB), 2014 U.S. Dist. LEXIS 25413, at *14 (E.D. Va. Feb. 26, 2014) (quoting *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 704 (E.D. Va. 2000)).

8

Plaintiffs can only meet their burden by "evidentiary submissions." *Thurman v. Bun Bun Music*, No. 13-CV-5194 (CM) (MHD), 2015 U.S. Dist. LEXIS 61514, at *10 (S.D.N.Y. May 7, 2015) (denying preliminary injunction because Plaintiffs did not carry their burden to submit credible evidence in support of their application). "If Plaintiff's evidence is contested, the court cannot consider it in adjudicating the motion unless an evidentiary hearing is held." *Id.* (citing *Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003) ("The existence of factual disputes necessitates an evidentiary hearing. . . before a motion for a preliminary injunction may be decided.")).

**B. Plaintiffs cannot show a substantial likelihood of success on the merits.**

Plaintiffs cannot point to a single controlling case where an assault weapon or LCM ban has been struck down. The only case from the Second Circuit which has considered such laws was *Cuomo*, which upheld both of the statutes Plaintiffs challenge here, albeit under a pre-*Bruen* analysis. 804 F.3d 242, 269. The Supreme Court has never considered the constitutionality of any similar law. So there is certainly "doubt" as to Plaintiffs' likelihood of success, and so their motion should be denied.

Plaintiffs also fail to satisfy the first *Winter* factor because their facial challenge is deficient; they cannot demonstrate that the Second Amendment applies to the prohibited firearms and accoutrements; and even if they could, there are historical analogues that satisfy *Bruen*.

**1. Plaintiffs' facial challenge fails because some applications of the challenged statutes plainly fall outside the Second Amendment's protections.**

Plaintiffs do not carry their burden of showing that any regulated weapons and accoutrements warrant Second Amendment protections. But their facial challenge fails even if this Court finds that some—but not all—weapons and accoutrements regulated by the challenged statutes are within the Amendment's scope.

9

Plaintiffs bring facial challenges to Connecticut's assault weapons and LCM statutes. See ECF # 26 (seeking "a declaratory judgment…that the Statutes identified herein are unconstitutional *on their face*…"). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also United States v. Westley*, No. 3:17-CR-171 (MPS), 2018 U.S. Dist. LEXIS 64009, at *8 (D. Conn. Apr. 17, 2018) ("To prevail on a facial challenge, a plaintiff must show that the law is unconstitutional in all possible applications."). "The Second Circuit has upheld gun regulations after acknowledging *Salerno's* application to facial challenges in the Second Amendment context." *United States v. Jimenez*, 2016 U.S. Dist. LEXIS 73169, at *4 (S.D.N.Y. June 3, 2016). Plaintiffs bear a "heavy burden" in bringing a facial challenge, and such challenges are "disfavored." *Salerno*, 481 U.S. at 745); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

This distinction between facial and as-applied challenges is particularly important here, where the challenged statutes restrict ownership and possession of a range of weapons and features. *See* Conn. Gen. Stat. § 53-202(a) (listing specific weapons, parts, and features which render a weapon prohibited). For example, some restricted weapons or parts include "grenade launcher[s]," types of "Uzis" and various types of shotguns, including "Street Sweepers." *Id.* Plaintiffs do not target particular weapons or features, but rather argue the *entire statute* is unconstitutional. They must therefore show that the statute is unconstitutional in all aspects, which means here that every weapon and feature merits Second Amendment protection and that the challenged restrictions fail to meet the *Bruen* test.

10

**JA-162**

Plaintiffs have not met and cannot meet their high burden to show that the statute is "unconstitutional in all of its applications" because they have not even tried to explain how or why a grenade launcher, an Uzi carbine, or other weapons designed for combat would be protected by the Second Amendment. They could not do so. *See, e.g., N.Y. State Rifle & Pistol Ass'n v. Cuomo,* 990 F. Supp. 2d 349, 369-70 (W.D.N.Y. 2013), *affirmed in relevant part by Cuomo*, 804 F.3d at 247 (noting certain "outlawed features" are "particularly unnecessary for lawful use" such as "a grenade launcher, bayonet mount, or a silencer" and that bans on such features "require no explanation."); *United States v. Fincher*, 538 F.3d 868, 870, 873-74 (8th Cir. 2008) (sawed-off shotgun is not protected by the Second Amendment because it is not in common use by law-abiding citizens for lawful purposes); *United States v. White*, No. 13-0440-01-CR-W-SRB, 2017 U.S. Dist. LEXIS 229493, at *8-9 (W.D. Mo. Oct. 13, 2017) ("[T]he Street Sweeper is both a 'dangerous and usual weapon' and well within the 'historical tradition of prohibiting the carrying of dangerous and usual weapons.'") (citing *Heller I*, 554 U.S. at 627).

Ultimately, Plaintiffs' inability to support their facial challenges is dispositive at this preliminary stage, and this Court should deny their Motion.

**2. Plaintiffs are unlikely to succeed on the merits because they fail to show that the Second Amendment protects assault weapons or LCMs.**

Plaintiffs must make several threshold showings before they may invoke the Second Amendment's protections. First, they must prove that they are members of "the people" and that the regulated instrument is a "bearable arm" as those phrases are used in the Second Amendment. *Bruen*, 142 S. Ct. at 2132. Next, even if the instrument is an "arm," Plaintiffs must demonstrate that it is not a "dangerous and unusual" weapon that falls outside the Second Amendment's protection. *See Cuomo,* 804 F.3d at 256 (quoting *Heller I,* 554 U.S. at 627) (weapons that are "'dangerous and unusual' in the hands of law-abiding civilians… including 'weapons that are most

11

useful in military service' such as the fully automatic M-16 rifle" fall outside Second Amendment protection). Further, Plaintiffs must prove that such weapons are in "common use" for "lawful purposes like self-defense." *Heller I*, 554 U.S. at 624. Lastly, Plaintiffs must show that such weapons are "typically owned by 'law-abiding citizens for lawful purposes.'" *United States v. Perez,* 6 F.4th 448, 451 (2d Cir. 2021) (quoting *Heller I,* 554 U.S. at 624, 627). Unless a plaintiff makes all these showings, any claim brought pursuant to the Second Amendment must fail on the threshold inquiry of whether the Second Amendment even applies.

Even assuming that plaintiffs are all members of "the people" within the meaning of the Amendment—NAGR is not and cannot assert the rights of those who are, Defendants' motion to dismiss shows, ECF # 32—they still cannot carry their threshold burden. "If the challenged restriction does not implicate conduct within the scope of the Second Amendment, our analysis ends." *Cuomo,* 804 F.3d at 254.[4]

### a. Plaintiffs do not show that the regulated LCMs and features are "arms" instead of accoutrements.

The Second Amendment only applies to "arms" as that term was historically understood. *Bruen,* 142 S. Ct. at 2132 (quoting *Heller I,* 554 U.S. at 582) (internal quotation marks omitted). Plaintiffs fail to show that either LCMs under § 53-202w or the assault weapon accessories listed under § 53-202a fall within that historical understanding of "arms" when either the Second or

---

[4] Plaintiffs' argument that *Cuomo* "is no longer good law"—See ECF #28-1, at 10-12—misstates *Bruen's* holding. While *Bruen* did away with any means-end test for Second Amendment claims as applied in *Cuomo* (and nearly every Second Amendment challenge before *Bruen*), it did not eliminate the primary threshold question of whether the challenged restrictions even reach conduct protected by the Second Amendment. *See Bruen,* 142 S. Ct. at 2157 (Alito, J. concurring) ("Our holding decides nothing about . . . the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or [*McDonald*]. . .")." Rather, *Bruen* altered "step two" of the framework set out in *Cuomo. See Bruen,* 142 S.Ct. at 2129 ("The Courts of Appeals' *second step* is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny") (emphasis added). Thus, as reiterated in *Bruen*, Plaintiffs must still make the threshold showing that the Second Amendment is implicated.

Fourteenth Amendments were ratified[5], nor can they. LCMs and other prohibited accessories are analogues to the Founding-era cartridge boxes and would have been considered "accoutrements" beyond the Second Amendment's scope. That is why two post-*Bruen* federal courts have agreed that LCMs are not "arms." *Ocean State Tactical, LLC v. Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 U.S. Dist. LEXIS 227097 (D.R.I. Dec. 14, 2022); *Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391 (D. Or. Dec. 6, 2022).

When the Second Amendment was ratified, the term "arms" referred only to weapons: typically swords, knives, rifles, and pistols. Ex. E, Declaration of Dr. Dennis E. Baron, ¶ 9. *Heller* explained that, in Founding-era dictionaries, "arms" meant "'[w]eapons of offence, or armour of defence'" and "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id.* (quoting Samuel Johnson, 1 Dictionary of the English Language 106 (4th ed. 1773) (reprinted 1978) and Timothy Cunningham, 1 A New and Complete Law Dictionary (1771), respectively). Samuel Johnson's dictionary further defines "weapon" as an "instrument of offence; something with which one is armed to hurt another." Samuel Johnson, 2 Dictionary of the English Language (4th ed. 1773).

At the Founding, militiamen kept cartridge boxes with ammunition, which they manually fed into their weapons. They did not carry ammunition in "magazines." Ex. E, ¶ 32. Neither the Founders, nor Reconstruction lawmakers would have considered a magazine an "arm." To them, a magazine was a building or physical location that stored gunpowder. The modern-day usage of "magazine" as "a bullet storage container" only first appeared in the late 1880s and remained relatively rare until the 1920s. Ex. E, ¶ 24.

---

[5] *See Bruen*, 142 S. Ct. at 2136 (2022) (quoting *Heller* and noting that "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" represented a "critical tool of constitutional interpretation.").

Founding-era Americans classified a cartridge box, the closest historical equivalent to the modern-day magazine, as an "accoutrement"—"ancillary equipment associated with soldiering, or service in the military"—in contrast to "arms," or actual weapons. Ex. E, ¶ 24. These terms identified distinct categories. See *id.* ¶¶ 27, 38 ("arms and accoutrements are separate categories"); *Id.*, ¶ 78 (finding "no data" that "arms" includes "accoutrements"). A 1778 Continental Congress resolution promised that the United States would reimburse states for "[e]very horse and all arms and accoutrements, which shall be taken, by the enemy in action . . .." Congress Undertakes to Raise a Cavalry Corps., in 2 PUBLIC PAPERS OF GEORGE CLINTON, FIRST GOVERNOR OF NEW YORK 827, 828 (Wynkoop Hallenbeck Crawford Co. ed., 1900). And the Connecticut General Assembly distinguished between "arms," "accoutrements," and "ammunition" in its own eighteenth century militia regulations. *See* 1799 Conn Acts 511, *An Act For The Militia*, § 4 (referring to "Arms," "Ammunition," and "Accoutrements" separately).

LCMs regulated by the challenged statutes are not arms or even weapons, but accessories or "accoutrements." "An LCM is a particular type of "magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device . . . ." Conn. Gen. Stat. § 53-202w(a)(1). It is not itself a bullet or other type of ammunition. It contains no firing mechanism. Ex. A, ¶ 40. Rather, it holds bullets or ammunition and feeds it into a firearm. A firearm can be used for self-defense without a large capacity magazine—any ammunition feeding device of lesser capacity will do the job. *See Cuomo*, 804 F.3d at 260 (noting that "while citizens may not acquire high-capacity magazines, they can purchase any number of magazines with a capacity of ten or fewer rounds"). Because LCMs are an enhancement that does not affect the functioning of the firearm—the firing of a projectile loaded into the chamber—they are more akin to silencers, which federal courts of appeals have held do not fall within the scope of the Second Amendment. *See United States v. Cox*, 906 F.3d 1170, 1186

14

(10th Cir. 2018) (holding that "[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')" and thus "can't be a 'bearable arm' protected by the Second Amendment"); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) (same), *aff'd*, 26 F.4th 610 (4th Cir. 2022).

Similarly, to the extent that Conn. Gen. Stat. § 53-202a lists banned features rather than weapons themselves, such restrictions fall outside the Second Amendment because those features are not "arms." For example, the statute restricts "folding or telescoping stock[s]" as well as "a forward pistol grip… a flash suppressor… a second hand grip." Conn. Gen. Stat. § 53-202a(1)(E). None of these features are weapons. A folding or telescoping stock is a stock that makes it easier to conceal a firearm by reducing its length or size. Ex A, ¶ 15. A forward pistol grip or a second hand grip are merely features on weapons, are not essential to the operation of a firearm, are often detachable, and are not weapons themselves. *Id.*, ¶ 17. Similarly, a flash suppressor is not a weapon but is instead a device attached to the muzzle of a rifle that reduces the visibility of discharging muzzle flash and is like a silencer, which reduces sound of gunfire rather than visibility. *Id.*, ¶ 16. Unless used to bludgeon someone, a stock, pistol grip, silencer, or suppressor are not weapons. They are merely features, accessories, or "accoutrements" to weapons which would otherwise be obtainable without such features or accessories. The restricted items in § 53-202a(1)(E) are not arms and do not warrant Second Amendment protection.

Because Plaintiffs do not even argue that LCMs or the features listed in Conn. Gen. Stat. § 53-202a(1)(E) are protected arms, they have failed to carry their preliminary burden. The Court's analysis need go no further. LCMs and the features listed in Conn. Gen. Stat. § 53-202a(1)(E) are firearms accessories, not arms, so Plaintiffs cannot succeed on the merits.

**b. Plaintiffs do not show that assault weapons and LCMs are anything other than "dangerous and unusual" weapons.**

Even if the LCMS and regulated features were "arms" within the Second Amendment's public meaning, they would not be entitled to constitutional protection, and neither would assault weapons themselves. The Second Amendment "extends only to certain types of weapons," and does not encompass a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller I*, 554 U.S. at 623, 626 (citing *Miller*, 307 U.S. at 178-82). It does not protect "dangerous and unusual" weapons, which can include "weapons that are most useful in military service—M-16 rifles and the like—[that] may be banned." *Heller I*, 554 U.S. at 627.

Plaintiffs' motion fails because they offer no evidence that the challenged weapons and LCMs are anything other than "dangerous and unusual." But even if they had tried, they would fail. All the evidence shows that assault weapons and LCMs are military style weapons and accoutrements; are unusually and particularly dangerous; and so are excluded from the Second Amendment's ambit.

Assault weapons are not manufactured for self-defense in a home. Donohue ¶ (Assault weapons are less maneuverable than handguns in confined areas). Instead, they are built for killing large numbers of people rapidly in open spaces. When used against others, assault weapons and LCMs result in more shots fired, more victims wounded, and more wounds per victim. That means more injuries, more lethal injuries, and higher rates of death than incidents involving more conventional firearms. "[S]emiautomatic assault weapons have been understood to pose unusual risks. When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims." *Cuomo*, 804 F.3d 242, 262.

16

**JA-168**

Most of the weapons restricted by the challenged statutes are adaptations of the M-16 or AK-47, the most commonly used military weapons in the world. Ex. A, ¶ 22-28; *see also Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon."). Like other military weapons, the M-16 was designed expressly to kill large numbers of people as quickly as possible. Ex. B, 106. Precisely for that reason, the Supreme Court highlighted the M-16 as exemplifying a "dangerous and unusual" weapon that falls outside the Second Amendment's protections. *Heller I*, 554 U.S. at 627; *see United States v. Zaleski*, 489 Fed. App'x 474, 475 (2d Cir. 2012). Similarly, the original, automatic AR-15 was designed for combat use, not for civilian use, due to its "phenomenal lethality," and was "engineered to generate maximum wound effect" as a "perfect killing machine." Ex. B, ¶¶ 106-108; Ex. C, Declaration of Professor Louise Klarevas, Pgs. 112-115.

LCMs allow shooters to continuously fire without reloading: a "uniquely military feature" intended to "enable a shooter to hit multiple human targets very rapidly." *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017). The first detachable, interchangeable LCMs were originally designed for military use during World War I. The LCMs that the statutes restrict were also designed for military use. Ex. F, ¶¶ 49, 51. Handguns capable of accepting LCMs like those the Plaintiffs seek did not become widely available for civilian use until the 1980s. *Id.*, ¶ 51 The District of Columbia Circuit Court noted in its consideration of *Heller* after remand that LCMs are engineered for particular dangerousness and suited for military use: They are designed to "shoot multiple human targets very rapidly" and to "allow the shooter to spray-fire from the hip position." *Heller II*, 670 F.3d at 1262-63. Large capacity magazines pose a grave danger to public health and safety in part because they can be and are used with assault weapons and non-assault weapons alike. Like assault weapons, magazines capable of holding large amounts of ammunition,

17

regardless of type, are particularly designed and most suitable for military and law enforcement applications.

The challenged statutes regulate military-style features that enhance a weapon's offensive killing capacity. As discussed above, various features regulated by the statutes including silencers, flash suppressors, forward pistol grips, and grenade launchers all increase a weapon's dangerousness, lethality, and concealability. "The dangers posed by [these] military-style features prohibited by the statutes—such as grenade launchers and silencers—are manifest and incontrovertible." *Cuomo*, 804 F.3d at 262.

The unusual dangerousness and lethality of the restricted weapons, features, and accoutrements is borne out by their undisputed ability to cause significantly more deaths, injuries, and severe injuries than other firearms. Attacks with assault weapons and LCMs result in "more shots fired, persons wounded, and wounds per victim than do other gun attacks." *Heller II*, 670 F.3d at 1263 (internal quotations omitted); Ex. F, ¶ 56 ("[W]ith extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semi-automatic handguns").

Because assault weapons and LCMs are designed, suitable, and useful for causing severe injuries and deaths, they are often the weapons and accoutrement of choice for mass-murderers. *See* Ex. C, ¶ 12 ("among mass shooters, there is a growing preference for using assault weapons and LCMS to perpetrate their attacks"); Ex. B, ¶ 92 ("Unsurprisingly, a growing number of mass killers turn to these assault rifles when they launch their deadly onslaughts" and have been used in 80% of all massacres with 25 or more deaths); Ex. D, Declaration of Lucy Allen ¶ (LCMs have been used in 73 out of 115, or 63% of mass shootings). Examples—including the horrific slaughter of 26 students and teachers at Connecticut's Sandy Hook Elementary School—demonstrate the

18

dangerousness and lethality of these weapons: "[The Sandy Hook Killer] was able to slaughter 26 in less than five minutes with his Bushmaster AR-15. [The Aurora Killer] used a Smith & Wesson 'Military & Police' (M&P) AR-15 fitted with a 100-round magazine to kill 12 and wound 58 in a Colorado movie theater. The ISIS-inspired San Bernardino, California, shooters used a pair of AR-15s to kill 14. [The Orlando Killer] unleashed Sig Sauer's concealable 'next-generation AR' to leave 49 dead and dozens more injured at the Pulse nightclub." Ex. B, ¶ 111.

For these reasons, courts have found assault weapons and LCMs to be "dangerous and unusual" and placed them outside the Second Amendment's scope. For example, the district court in *Heller II* held that assault weapons and LCMs are "military-style weapons of war, made for offensive military use," are "disproportionately likely to be used by criminals," and "are not generally recognized as particularly suitable or readily adaptable to sporting [or self-defense] purposes." The court further noted that such weapons "are unusually dangerous because they place law enforcement officers at a particularly grave risk due to their high firepower." *Id.* at 194. Based on these findings, the court concluded that "assault weapons and large capacity ammunition feeding devices constitute weapons that are not in common use, are not typically possessed by law-abiding citizens for lawful purposes and are 'dangerous and unusual' within the meaning of *Heller*." *Id.* at 194; *see also Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (quoting *Heller I*, 554 U.S. at 627)). Ultimately, as the Second Circuit found, the "net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." *Cuomo*, 804 F.3d at 262.

All the evidence demonstrates that assault weapons and LCMs are military-style weapons and are dangerous and unusual because of their extreme lethality. Assault weapons and LCMs are therefore "categorically unprotected," and Plaintiffs' challenge fails. *Bruen*, 142 S. Ct. at 2126.

### c. Plaintiffs fail to show that assault weapons and LCMs are typically used by law-abiding citizens for lawful purposes like self-defense.

Again, the Court need inquire no further. The regulated weapons and accoutrements are outside the Second Amendment's scope both because they are not arms and because they are dangerous and unusual. And there is another reason that Second Amendment does not protect the regulated instrumentalities: they are unsuited to, and used vanishingly rarely in, self-defense. But the Second Amendment only protects arms "'in common use at the time' for lawful purposes like self-defense." *Heller I,* 554 U.S. at 624 (quoting *Miller,* 307 U.S. at 179); *see also id.* at 625 (asking whether the arms are "typically possessed by law-abiding citizens for lawful purposes.").

This part of the threshold inquiry looks to suitability and purpose, not mere ownership. Rather than ask how many people own the regulated weapons and accoutrement, this factor requires a court to determine how the regulated instrumentalities are actually designed and function—what they are "useful" for, *Heller I*, 554 U.S. at 627—and how they are actually "used." *Bruen*, 142 S. Ct. at 2138 (referring to "commonly used firearms for self-defense."). That is why *Heller I* takes the time to look at the functionality of handguns—the "reasons that a citizen may prefer a handgun for home defense." 554 U.S. at 629 (listing, among other things, ease of accessible storage and design that accommodates one-handed use).

Unlike the laws at issue in *Heller*, *McDonald*, and *Bruen*, the challenged Connecticut statutes do not prohibit or impact an entire class of firearms, like conventional handguns that are the "quintessential self-defense weapon." *Heller I*, 554 U.S. at 629. Nor do they even ban all semiautomatic firearms, long guns, rifles, or fully automatic firearms. Rather, the statutes ban a

20

small subset of unusually dangerous military-style weapons, features, and magazines (with some exceptions for particular individuals) that "are designed to enhance [firearms'] capacity to shoot multiple human targets very rapidly." *Heller II*, 670 F.3d at 1262. Such weapons, features, and LCMs are not actually useful or used for any such lawful self-defense purposes in practice.

Firearms of any kind are used defensively in fewer than 1% of all U.S. violent crimes. Ex. D, ¶¶ 9-10; Ex. B ¶ 150 (recent study showed victims of violent crime did not defend with any type of gun in 99.2 % of those incidents). And the overwhelming majority of lawful defensive firearm shootings involve handguns, not assault weapons. Ex. D, ¶¶ 23-24. Only a handful of anecdotal incidents of use of assault weapons for self-defense exist. And there is no evidence that the federal assault weapons ban had any negative effect on the self-defense of average citizens. Ex. B, ¶¶ 147-149.

In contrast, significant data show that assault weapons are frequently used in mass shootings and unlawful violence. This trend has increased over time, with 62% of all high fatality gun massacres in the last four years perpetrated with an assault weapon. Ex. C, ¶ 12. Their use is "particularly prominent in public mass shootings and those resulting in the highest casualty counts." *Id.*, Pgs. 169-170 (citing *Koper*). They are also used to "inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff." Ex. F, ¶ 51. The fact that assault weapons and LCMs are typically used for non-lawful purposes like gun massacres is underscored by the significant decrease in both fatalities and instances of mass shootings/gun massacres while the federal assault weapons ban was in place. *See* Ex. C, Pg. 169 (gun massacres decreased during the decade the ban was in place, then skyrocketed after the ban was lifted); Ex. B, ¶ 72 (the decade after the ban was lifted showed an overall 266% increase in mass shootings

and 347% increase in fatalities). Such weapons are also particularly popular weapons for drug traffickers and gang members both in the U.S. and Mexico. Ex. B, ¶¶ 64-65.

LCMs are similarly chosen for mass shootings and unlawful purposes rather than self-defense. Semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)." *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019). "Large-capacity magazines are disproportionately used in mass shootings, like the one in Newtown, in which the shooter used multiple large-capacity magazines to fire 154 rounds in less than five minutes." *Cuomo*, 804 F.3d at 242. "In Thousand Oaks, California, a shooter equipped with large-capacity magazines murdered twelve people at a bar in 2018." *Duncan v. Bonta*, 19 F.4th 1087, 1106 (9th Cir. 2021), *vacated and remanded by Duncan v. Bonta*, 142 S. Ct. 2895 (2022). As the Fourth Circuit observed,

> Other massacres have been carried out with handguns equipped with magazines holding more than ten rounds, including those at Virginia Tech (thirty-two killed and at least seventeen wounded in April 2007) and Fort Hood, Texas (thirteen killed and more than thirty wounded in November 2009), as well as in Binghamton, New York (thirteen killed and four wounded in April 2009 at an immigration center), and Tucson, Arizona (six killed and thirteen wounded in January 2011 at a congresswoman's constituent meeting in a grocery store parking lot).

*Kolbe*, 849 F.3d at 120. "These weapons are disproportionately used in crime, and particularly in criminal mass shootings like the attack in Newtown. They are also disproportionately used to kill law enforcement officers: one study shows that between 1998 and 2001, assault weapons were used to gun down at least twenty percent of officers killed in the line of duty." *Cuomo*, 804 F.3d at 262.

There is also little evidence that LCMs are used or needed in self-defense. In reported instances of self-defense involving firearm use from 2011-2017, on average, only 2.34 shots are

fired in self-defense. Ex. D, ¶ 16. In 97.3 % of all incidents, individuals using a firearm in self-defense fire 5 or fewer shots. *Id.* This national data also holds true in Connecticut, where a review of incidents from 2011-2017 yielded no evidence that any individual fired more than 10 rounds in self-defense, nor is there any evidence that it would have been necessary to do so. *Id.*

Manufacturers' advertising evidences assault weapons' intended purposes. Even manufactures do not tout assault weapons as "quintessential" self-defense weapons, like handguns. *Heller I*, 554 U.S. at 629. Instead, advertising campaigns for assault weapons "are hawked with explicit depictions of combat and phrases like 'the closest you can get without having to enlist.'" Ex. B, ¶ 91. Tragically, in the closest to home and perhaps the most infamous and horrific example of a mass shooting—the Newtown Sandy Hook massacre where first graders and teachers were gunned down—the weapons of choice included an assault weapon that had been advertised under the slogan "Forces of opposition, bow down." *Id.* The typical purpose of these weapons is attack, domination, and death, not self-defense.

Other courts have found little or no evidence of civilian use of assault weapons and large capacity magazines for home or self-defense. *See Hightower* v. *City of Boston*, 693 F.3d 61, 66, 71 & n.7 (1st Cir. 2012) ("[L]arge capacity weapons" with the capacity to carry more than ten rounds are not "of the type characteristically used to protect the home"); *Heller II*, 698 F. Supp. 2d at 193-94 (banned weapons and magazines do not have "any legitimate use as self-defense weapons" and "in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations") (internal quotation marks omitted); *Heller II*, 670 F.3d at 1263-64 ("[H]igh-capacity magazines are dangerous in self-defense situations because the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders.") (internal quotation marks omitted).

23

**JA-175**

Plaintiffs have not met their burden of showing that assault weapons and LCMs are "typically possessed by law-abiding citizens for lawful purposes," or that such weapons or accoutrements are even suitable for purposes like self-defense. The overwhelming evidence points the other way. So the Second Amendment does not apply.

### d. Assault weapons and LCM's are not even commonly *owned*.

Plaintiffs would reduce their threshold burden to a circular inquiry into whether the regulated weapons and accoutrements are commonly owned, without regard to their usage or purpose. That is not what Supreme Court precedent requires. *See, e.g., Bruen*, 142 S. Ct. at 2138 (reiterating the phrase "commonly *used* firearms for *self-defense*") (emphasis added); *Heller I*, 554 U.S. at 629 (examining the "reasons" a handgun may be used for "home defense"); *see also Friedman*, 784 F.3d at 409 ("[R]elying on how common a weapon is at the time of litigation would be circular."); *Worman*, 922 F.3d at 35 (measuring "common use" by the sheer number of weapons lawfully owned is "illogical"); *Heller II*, 670 F.3d at 1261 (numerosity is not enough where "we cannot be certain whether" the weapons are "used or useful specifically for self-defense or hunting."); *Kolbe,* 849 F.3d at 143-44 (finding large capacity magazines to be "most useful in military service" and therefore not protected by the Second Amendment, no matter their popularity).

But Plaintiffs could not carry their burden even if common ownership were the end of the threshold inquiry. Their sole evidence of common ownership of the regulated weapons is that "between 1990-2021, more that 20 million AR-15 platform rifles have been manufactured in the United States and are owned by millions of persons in the United States." ECF # 28-4. But the simple and vague assertion there are "millions" of assault weapon owners does not tell us how many people actually possess those weapons or how many of those people are the "law abiding citizens" at the core of the Second Amendment's concerns. *Heller I*, 554 U.S. at 625. Even an

accurate raw number, which Plaintiffs do not provide, would shed no light on commonality absent analysis of how many individuals *could* possess such weapons. And even knowing a percentage would tell us nothing legally relevant without some presentation of authority on what "common" means as used in *Heller* and *Bruen*. Plaintiffs offer none.

So here are the facts. AR-15 platform rifles—which include the assault weapons regulated in Connecticut—make up approximately 5% of privately owned guns, compared to 50% for handguns. Ex. B, ¶¶ 27-28. Even among gun owners, such weapons are not commonly owned.

Plaintiffs' 20 million number for AR-15 platform rifles does not represent the number of *individuals* who own these weapons but represents the number of these weapons that have been *produced.* And research has shown that the average assault weapons owner has "three or more of the guns." Ex. B, ¶ 92. So while the number of assault weapons produced is relatively small in the context of the overall gun stock of an estimated 461.9 million firearms in circulation the nation, the number of individual owners of assault weapons is likely even smaller. Ex. C, ¶ 13. Even if 20 million individuals owned AR-15 style weapons (which they do not, as Plaintiffs seem to concede), that would still only be about 6% of the entire United States population. *Id.,* ¶ 27.

Put simply, AR-15 style weapons constitute a fraction of guns in existence today, and even a smaller slice of the entire American population actually owns them. These weapons are not in common use on a national level. In Connecticut, assault weapons and AR-15 style weapons are even rarer. Only 81,982 assault weapon certificates have been issued in Connecticut since the passage of the challenged statutes. Ex. A, ¶ 19. Thus, even if the inquiry were limited to common ownership, and even if we assume (baselessly) that each assault weapon is owned by a unique individual, at *best* 2% of the Connecticut population owns an AR-15 style weapon. In actuality, nationwide, 70% of adults nationwide do not own *any* firearms, let alone assault weapons or

25

**JA-177**

LCMs. Ex. B, ¶ 28. This data is underscored by the majority, common support for assault weapons bans and LCM bans among the general population. *See id.*, ¶ 135 (two-thirds of Americans favor bans high-capacity magazines). Owning an assault weapon is both uncommon and unpopular.

Statistics on LCMs in Connecticut also undercut Plaintiffs' claims. In Connecticut, about 3.8 million LCMs are lawfully owned. Ex. A, ¶ 38. These LCMs, though, were owned by only about 41,000 individuals. *Id.* Thus, only about 1% of the 3.6 million citizens of this state lawfully own LCMs. The preferences of this extraordinarily small minority of the population cannot amount to commonality.

Plaintiffs have not established and cannot establish that either LCMs or assault weapons are commonly owned. So even if this question were the end of the inquiry, as they erroneously assert, Plaintiffs have not shown any likelihood of success on the merits of their claims.

**3. Even if Plaintiffs could show that the Second Amendment extends to assault weapons and LCMs, they cannot show substantial likelihood of success because Connecticut's common-sense gun regulations are consistent with the American tradition of firearm regulation.**

Because the Second Amendment does not protect the regulated weapons and accoutrements, Plaintiffs cannot show any likelihood —much less a substantial likelihood—of success on the merits, and their request for a mandatory injunction against Connecticut's gun safety laws should be denied. *See Bruen*, 142 S. Ct. at 2126 (decreeing that the analysis can stop, and the state's regulations survive, if the threshold inquiry shows that the regulated conduct is beyond the scope of the Second Amendment protections). But even if they survived the threshold inquiry, Plaintiffs would still fail because Connecticut's regulations are entirely "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-2130.

If a plaintiff shows that they are entitled to the Second Amendment's protections, courts must consider whether "historical precedent from before, during, and even after the founding

evinces a comparable tradition of regulation" as to that before the Court. *Id.* at 2131-32. As the Court noted in *Bruen*, "[i]n some cases, that inquiry will be fairly straightforward." *Id.* at 2131. Such cases include situations where states try to address "a general societal problem that has persisted since the founding" and where there may be previous attempts to enact "analogous regulations during the time frame" that would suggest a modern-day restriction's constitutionality. *Id.*

The Court recognized that regulations intended to address "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. So even when they trigger Second Amendment scrutiny, state gun safety regulations like Connecticut's—motivated by unprecedented concerns and dramatic technological change that would have been "unimaginable at the founding," *id.*—are constitutional where a court can identify a "well-established and representative historical *analogue*, not a historical *twin*" for regulations. *Id.* (emphasis in original). To survive, the challenged regulation need only be "relevantly similar" to a historical regulation. *Id.* at 2133.

At this early stage, Defendants and their experts have not yet completed the expansive historical inquiry mandated by *Bruen*. They have not yet exhaustively surveyed 300 years of evolving state and municipal laws or the rich literature on arms regulation throughout the Nation's history. Because of the impossibility of complete research at this stage, the Court should deny the mandatory injunction and permit discovery to flesh out the record rather than granting extraordinary preliminary relief on an issue of unsettled law. It should also deny the motion

27

**JA-179**

because Plaintiffs cannot demonstrate a substantial likelihood of success. The record at this preliminary stage record shows that the challenged statutes are consistent with historical tradition.

### a. The historical analogue analysis is broader here because the challenged statutes respond to unprecedented societal concerns and technological advancements.

This case, unlike *Bruen* and *Heller*, does not address restrictions on handguns, and the statutes here were not designed to address a general societal concern that has remained relatively unchanged since the 18th century. Rather, Connecticut's General Assembly enacted the challenged statutes to address an unprecedented societal concern resulting from rapid and dramatic technological advancements that have, tragically and with irreversible consequences, facilitated a national epidemic of mass shootings.

The Connecticut legislature enacted the challenged statutes in response to the horrific shooting that took 26 lives in Newtown in 2012. *See Cuomo*, 804 F.3d at 242 ("The legislation is also specifically targeted to prevent mass shootings like that in Newtown, in which the shooter used a semiautomatic assault weapon" and LCMs); *Shew v. Malloy*, 994 F. Supp. 2d 234, 249 (D. Conn. 2014) ("Connecticut's General Assembly made its legislative judgment concerning assault weapon and LCM possession after the mass-shooting at Sandy Hook Elementary School").[6]

Mass shootings and gun massacres are not something that "the Founders themselves could [have] confront[ed]" and were not a "general societal problem" in the 18th century. *Bruen*, 142 S. C.t at 2132. Rather, such incidents are a modern phenomenon that have dramatically increased in frequency in the last 25 years. Ex. B, ¶ 35. There was simply no "comparable societal ill" to mass

---

[6] "At the end of that unimaginable day, we learned that we had lost 20 elementary school children and 6 teachers and administrators. They were killed with a weapon of war, a semi-automatic assault rifle, the platform of which - was originally designed for the battlefield and mass killings. . . The legislature recognized that access to guns is a big part of the public health challenges in our country today." *Shew*, 994 F. Supp. 2d at 249 n.50 (D. Conn. 2014) (citing Connecticut Senate Session Transcript for April 3, 2013).

shootings in the 18th century. Ex. G, ¶ 18; Ex. F, ¶¶ 14-16. Even general gun violence was very low compared to the current day, particularly in New England. Ex. G, ¶ 19. As one expert concludes: Guns were not the "weapon of choice for those with evil intent" during the founding. Ex. G, ¶ 21.

Founding and Reconstruction era firearms lacked the lethal potential of the modern assault weapons, features, and LCMs the challenged statutes restrict. *Id.*, ¶ 24; Ex. F, ¶ 56. The new generation of unprecedentedly lethal weapons and accoutrements targeted by Connecticut's safety laws emerged from technologies developed for military use during the Cold War. Ex. F, ¶ 49.

During the Founding Era and Reconstruction, America was not daily put at mortal risk by weapons that let a single person decimate an elementary school in under five minutes. There were no such weapons and no such incidents. *See* Ex. F. Rather, at the Founding, most arms were flintlock muzzleloaders capable of firing a single lead ball.[7] *Id.*, ¶¶ 15-30. For example, the Boston Massacre—which drove Colonial America and particularly New England closer to revolution—resulted in *five* deaths from *nine* British soldiers firing into a crowd. *Id.*, ¶ 41. A single person murdering dozens of children within seconds with a single weapon would have been impossible given then-existing weaponry, and therefore unthinkable to the Founding generation.

The near-exponential increase in firearms' lethality is precisely the "dramatic technological change" that *Bruen* anticipated. The lethality of the regulated weapons is evident in an index devised for the U.S. Army, which classifies the lethality of various weapons—defined as the number of people who could be killed in one hour by a particular weapon. *See* Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508

---

[7] For this reason, as discussed above, ammunition or bullets were not stored in a type of device like a modern day "magazine" because such devices did not exist. Ex. E, ¶ 24.

(2022). This index demonstrates that the lethality of a Founding-era flintlock muzzleloader was 43; that of a Civil War-era rifle capable of firing conoidal bullets was 102; and that of a 1903 bolt-action rifle equipped with a magazine was 495—"a ten-fold increase over the flintlock musket." *Id.* at 2507–08 (And that manually re-loaded rifle did not even have an LCM—it carried only a five-round clip-magazine. Classic Firearms, "U.S. Model 1903," https://tinyurl.com/2p8c74rj).

In contrast, the Sandy Hook Killer murdered 26 children and adults in five minutes, and an expert can fire an entire 30-round LCM from a Glock handgun in five seconds. Ex. B, ¶ 58; Ex. F, ¶ 50. Weapons at the time of the Founding and Reconstruction simply did not have the lethality potential as the weapons regulated by the challenged statutes. Ex. C, ¶ 18; Ex. B, ¶¶ 171-172; See also, Ex. G, ¶ 20 ("limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period"). And, as discussed above, LCMs for handguns did not become widely available for civilian use until the 1980s—similarly rendering them a thoroughly modern development. Ex. C, ¶ 12.

It would be no surprise to the legislators at the Founding or the Reconstruction that their modern counterparts would try to address a thoroughly modern problem just as they themselves sought to address the problems of their day, albeit through sometimes different legislative approaches. Lawmakers at the Founding and Reconstruction were not strangers to the idea of mass casualty events, and even mass murder. But the problem of gun massacres by a single individual, facilitated by the lethality of a single weapon, was never before a major societal concern like it is today. *See* Ex. F, ¶ 41 (mass murder "has been a fact of life in the United States" but it was a "group activity" until technological advancements like advances in weaponry permitted otherwise). Before technological advancements in the 20th century allowed individuals to create unthinkable carnage, "the only way to kill a large number of people was to rally like-minded

30

**JA-182**

neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal" but simply did not have anywhere near the lethality of modern assault weapons and LCMs. *Id.*

Technology was not the driver before the contemporary era—criminality and ideology were. *Id.*, ¶¶ 41-43. And Congress tried to respond, just as contemporary legislators do to our own crises. For instance: in the Reconstruction era, Congress responded to a crisis of domestic mass-murder events by deploying federal troops to prevent lynchings by the Ku Klux Klan. *Id.* Lawmakers during Reconstruction tried to regulate and address the conduct through enforcement of existing criminal laws. At the time, the United States Army and loyal state militias sought to prevent arms from reaching unlawful insurgent groups, using intelligence gathering to intercept arms shipments. *Id.* They targeted the perpetrators, rather than particular instrumentalities, since post-Civil War mass violence was perpetrated with a variety of weapons rather than with a specific, identifiable type of weapon. *Id.*

At the Founding, military style weapons were not as easily accessible and purchasable as today. Such weapons were expensive and had less utility in rural colonial society than other non-military weapons. Ex. G, ¶ 19 ("Nobody bayoneted turkeys…the most widely owned and desired weapons were fowling pieces and light hunting muskets"). But today, new semiautomatic handgun can be bought for less than $200 and equipped with a 33-round magazine for less than $15. Ex. F, ¶ 46. Given the lack of any technology or concern which could allow one person to murder so many others in such a small time as assault weapons and LCMs allow, let alone technologies as easily accessible as LCMs, it would likely have been incomprehensible to the Founders that mass shootings like those the statutes attempt to address could ever become a societal problem.

Mass shootings are an unprecedented societal concern driven by dramatic technological advancements, and Connecticut's responsive laws are "modern regulations . . . unimaginable at the founding." *Bruen*, 142 S. Ct. at 2132. It is unsurprising that legislators in the 1790s and 1860s did not regulate non-existent military-style firearms capable of killing hundreds in minutes. *See McCullen v. Coakley*, 573 U.S. 464, 481–82 (2014) (noting that the Constitution does not "require States to regulate for problems that do not exist."). So this Court should uphold Connecticut's challenged regulations without looking for a "historical twin." Instead, as *Bruen* commands, it should look to the relevantly similar historical analogues identified below and should deny Plaintiffs their extraordinary injunction.

> **b. Plaintiffs cannot show a likelihood of success because Connecticut's regulations are relevantly similar to regulations throughout American history.**

The *Bruen* Court held that defendants need only identify a "well-established and representative historical *analogue*, not a historical *twin*" for modern day challenged regulations in order to demonstrate it is consistent with historical tradition. *Bruen*, 142 S. Ct. at 2132. (emphasis in original). The Court did not specify how narrow or how similar this analogue must be, particularly in cases like this where an unprecedented societal concern and modern technological advancement is implicated. The Court did, however, note that "[w]hen confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* Building on *Heller* and *McDonald*, the Court identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

**JA-184**

Throughout American history, states' inherent police power—their sovereign prerogative to protect public safety—included the power to regulate firearms and accessories and protect residents from interpersonal violence. Ex. G, ¶¶ 25-32. As societal and technological change brought new types of weapons that posed new social concerns and public safety threats, states responded with new regulations. This tradition of common-sense regulation offers multiple clear analogues to Connecticut's gun safety laws which, like their predecessors, target new weapons technologies used primarily for crime while allowing multiple options for self-defense.

### i. There is a historical tradition of restricting possession of specific types of dangerous new weapons technologies.

Historically, states used their police powers to regulate new weapons that posed an unprecedented risk to public safety, albeit on a far less deadly scale than assault weapons and LCMs do today. *Id*. For example, as technologies developed and new weapons emerged that were primarily used for attacking others rather than self-defense, states and territories regulated those weapons. Folding knives, dirk knives, and Bowie knives—newer inventions specifically designed for and primarily used in "an alarming proportion of the era's murders and serious assaults"— were banned in their entirety. Ex. F, ¶ 24. These weapons, just like assault weapons and LCMs, were newer technologies that created a societal concern until then unmatched and were therefore regulated for the same purpose as the challenged statutes here—public safety and reducing ambush and attacks.[8] See *id.*, ¶ 25 ("Dirks and Bowie knives had longer blades than ordinary knives,

---

[8] Relevant regulations included: *See, e.g.*, 1837 Ala. Laws 7, No. 11, § 2 (prohibitive tax on Bowie knives); 1837 Ga. Laws 90, § 1 (prohibiting sale and possession of Bowie and other kinds of knives as well as "pistols, dirks, sword canes, [and] spears"); 1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2 (prohibiting sale and carrying of Bowie knives, Arkansas toothpicks, and other fighting knives); 1838 Fla. Laws 36, No. 24, § 1 (prohibitive tax on sale and possession of pocket pistols, sword canes, and Bowie knives); 1838 Va. Acts 76, ch. 101, § 1 (banning "keep[ing] or carry[ing]" Bowie knives and other deadly weapons); 1839 Ala. Acts 67, ch. 77 (banning the concealed carry of Bowie knives and other deadly weapons); 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws., ch. 25, § 27, pt. 15 (imposing $1.25 tax on "[e]very dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane," while exempting weapons "used for mustering"); 1868 Ala. Laws 11 (prohibiting the "carrying of hostile deadly weapons" known as "'rifle' walking canes" or

crossguards to protect the combatants hands, and clip points to make it easier to cut or stab opponents."). These regulations did not entirely ban knives, or bladed weapons, or arms in general. They simply banned specific kinds of knives that were particularly dangerous, leaving the citizenry more than capable of defending itself with other weapons. So too here.

These types of regulations on classes of unprecedentedly dangerous weapons also included some handguns. For example, during the Founding era, some areas in the country restricted newly developed percussion-cap pistols, which users could carry loaded for a long period without concern for corrosion—a concern that previously limited the use of weapons. These new kinds of handguns, thought to be "primary murder weapons," were restricted "during the lifetimes of Jefferson, Adams, Marshall, and Madison." *Id.*, ¶¶ 25-27. Even during the Reconstruction era, as behaviors and technologies changed, states "singled out weapons" that posed a new danger or concern and regulated them. Ex. G, ¶¶ 30-45.

As technologies with high killing capacity developed and contributed to problems of violence or death, they were immediately regulated and banned. For example, dynamite and the submachine gun—which had much higher potential for lethality than any other weapons at the time, just like assault weapons and LCMs— were quickly regulated. See Ex. F, ¶¶ 44-45 (dynamite and submachine guns were mainly used for attacking others and had high capacity for lethality that had never been experienced before and had little use in self-defense).

---

"'gunshot' walking canes"); 1868 Fla. Laws 95, ch. 7, § 11 (prohibiting the manufacture or selling of slung shots or metallic knuckles). Bowie knives, like assault weapons used with an LCM, was considered "in its device and design . . . the instrument of *almost certain death*." *Cockrum v. State*, 24 Tex. 394, 402 (1859) (emphasis added); *see also Aymette v. State*, 21 Tenn. 154, 158 (1840) (explaining that Bowie knives "are efficient only in the hands of the robber and the assassin"). Massachusetts, Connecticut's neighbor, also passed a law banning "slungshots," a weapon like a slingshot with a large, heavy shot that was primarily used to attack others. See 1850 Mass. Gen. Law, ch. 194 § 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

34

The challenged statutes here are entirely consistent with the kind of laws that states have passed to address new and evolving societal concerns presented by technologically advanced weapons throughout history.

### ii. Historical regulations on carrying certain weapons are also relevant analogues showing that the challenged statutes comport with the tradition of American firearm regulation.

So states traditionally regulated by banning possession of some particularly dangerous new weapons. They also have a relevant tradition of regulating how some advanced new weapons—which posed new threats because they were readily concealable—could be carried.

For example, after Reconstruction, Colt revolvers were more deadly than predecessor handguns because they could fire more shots in rapid succession. Ex. F, ¶¶ 33-35. Similarly, revolvers began to develop features which allowed shooters to shoot more quickly without having to reload, and were designed to be concealed, allowing for easier ability to murder. *Id.*, ¶ 33-34. As a result of these technological advancements, homicide and violence rates increased around the country. *Id.*, ¶ 34. States and territories tried to regulate this problem of ambushes, attacks, assaults, and rising homicide rates by prohibiting concealed carrying of such weapons—indeed, every state (including Connecticut) except one passed regulations restricting carrying certain concealable weapons. *Id.*, ¶¶ 35-40. In short, when faced with changes in technology, consumer behavior, and faced with novel threats to public safety, individual states enacted laws to address these problems.

These regulations responded to changing technology and new societal threats. But, like the challenged statutes, they ultimately did not prevent citizens from defending themselves. Restrictions on concealed carrying certainly touched on the bearing of arms but were never considered anathema to the Second Amendment or struck down by the courts. So too with the challenged statutes, which are a contemporary equivalent of longstanding firearm regulation that addresses a newly-pressing problem.

35

**JA-187**

### iii.  Historical regulations about the possession and storage of gunpowder are relevantly similar to Connecticut's modern efforts to address gun safety.

Because mass shootings are a modern problem and because there were no weapons at the Founding or Reconstruction that contributed to mass casualty events the way assault weapons do today, the Court should look to laws aimed at preventing other types of mass casualty events to find similar historical analogues.

For example, access to unlimited amounts of gunpowder has never been permitted. Gunpowder was highly regulated throughout the colonial era, when individuals were not free to stockpile as much gunpowder and ammunition as they wished or to store it as they wished. *See, e.g.*, 1706-7 Mass. Acts ch. 4, reprinted in Acts and Resolves Passed by the General Court 588 (1869), available at https://tinyurl.com/27ubvvvn; A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763), https://tinyurl.com/5273xd57; 1821 Me. Laws 98, chap. 25, § 5, https://tinyurl.com/up948844. Colonial era restrictions often limited how much gun powder could be stored in the home and citizens would often have to store such excess gunpowder in the public "magazine"—a place, as noted above, not a device or accessory. These gunpowder storage laws have been historically regarded as appropriate exercises "of the police power." *Brown v. Maryland,* 25 U.S. 419, 443 (1827); Ex. G, ¶¶ 26-30. Since munitions posed a uniquely dangerous risk to society, the government could lawfully regulate them. See *id.*

The historical analogues were many, if not necessarily uniform. For instance, some jurisdictions placed a predetermined limit on the quantity of gunpowder a citizen could store in his home: New York City (28 pounds) 1784 N.Y. Laws 627, *An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof*, ch. 28; Philadelphia (30 pounds) *A Digest of the Acts of Assembly, and the Ordinances, of the*

36

**JA-188**

*Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District*, Pg. 45-47, Image 48-50 (1832) available at The Making of Modern Law: Primary Sourcesor; Portsmouth, New Hampshire (10 pounds) 1786 N.H. Laws 383-84.

Other jurisdictions, like Connecticut, went further and empowered local officials to determine, based on their "opinion," whether a certain "quantity of gunpowder" in the possession of a private citizen "may endanger the persons or dwellings of any individuals whatsoever." If so, the officials could order the owner to move their gunpowder to "some safe and convenient place within said town" at a time and place of their choosing. If the citizen failed to do so, the officials could move it "to such place within said town, as in their opinion shall be deemed safe and convenient." The officials even retained "a lien upon the said powder for all necessary expenses in removing and keeping the same." 1832 Conn. Acts 391, *An Act Regulating the Mode Of Keeping Of Gunpowder,* Chap. 25, § 1-2. In other words, the first selectman or mayor or town council of a locality had the right to determine how much stored gunpowder was "too much" for a private citizen and could force him to move it—or actually seize it.

Such a law placed a far greater burden on the right to "keep and bear arms" than a restriction on possessing assault weapons and LCMs while leaving hundreds of types of firearms untouched by regulation. If in 1832, the first selectman of Granby decided an amount of gunpowder in excess of half a pound was "dangerous," he could order it removed to basically any location he desired.[9] The only limit on this discretion was the official's "opinion." A citizen could therefore have been prevented from possessing gunpowder, making it impossible to use any and

---

[9] This would not have been an unusually small amount. Indeed, New Haven limited gun powder possession in the home to one pound only a few years earlier. *See* Charter and By-Laws of the City of New Haven, November, 1848 Page 48-49, Image 48-49 (1848).

all of their firearms, since all such weapons required gunpowder to operate. This is unlike modern day LCMs, which are not an essential part of most firearms.

It is not difficult to understand why such regulations were in place. Storing too much gun powder in a private home could lead to an explosion or a fire that could threaten a large portion of a community. *See Saul Cornell and Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 511-12 (2004) ("the point of these statutes, was, as they themselves proclaimed, to protect communities from fire and explosion… [and] also provided a check on the creation of a private arsenal."). Such an explosion or fire would be the mass casualty event of the Founding era, and legislators then understood that limiting the right to "keep," in the form of a restriction on the amount of gun powder possessed, was a perfectly permissible limitation on the Second Amendment right. Much like the challenged statutes, such regulations did not deprive a law-abiding citizen of his ability to defend himself either in the home or in public.

As argued above, the Founders would not have considered an LCM as an "arm" but rather an "accoutrement." But the gun powder storage analogues fit even more precisely regarding LCMs because these would have been the Founding era equivalent of a limitation on magazine size or capacity. Again, the word "magazine" had a specific meaning to the Founders and Reconstruction era legislators: it was not a cartridge holding ammunition but was instead an actual physical building or location. Connecticut's LCM ban does not limit the number of rounds or magazines one can own or carry on their person, the way that historical regulations of gunpowder and bullets limited a person's ability to use a firearm. Connecticut does not limit the number of firearms a resident can carry on their person or store in their home. The statute merely limits how many rounds can be in one magazine at one time. This statute does not burden the right of self-defense

38

and certainly far less than a law requiring excess bullets or firearms or gunpowder to be stored in a communal location based on the opinion of a local official.

The right to keep and bear arms is not a "regulatory straightjacket." *Bruen*, 142 U.S. at 2133. It accommodates state and local variation in "devis[ing] solutions to social problems that suit local needs and values," *McDonald v. City of Chi.*, 561 U.S. 742, 784 (2010). Principles of federalism permit variation among the states in addressing matters of public safety and concern, consistent with the Second Amendment. Indeed, in determining that the Second Amendment applies to the states, the Court explained that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *Id.* The regulations here are consistent with historical regulation of arms and are a permissible exercise of the long accepted and traditional police powers the states enjoy to promote public safety. So Plaintiffs have failed to show a substantial likelihood of success on the merits, and this Court should deny their motion.

### C. Plaintiffs cannot satisfy the remaining criteria for a mandatory preliminary injunction.

Plaintiffs' motion should be denied because they cannot show a substantial likelihood of success on the merits. They cannot satisfy the other three *Winter* factors, either. They do not even try. They offer no argument, evidence, or briefing on the factors of balance of the equities or public interest. ECF 28-1 at 4. So they cannot have met their burden to demonstrate each factor by a clear showing. *See Abbott Labs. v. Adelphia Supply USA,* No. 15-CV-5826 (CBA)(MDG), 2015 U.S. Dist. LEXIS 189555, at *45 (E.D.N.Y. Nov. 6, 2015) ("Preliminary injunctive relief is an extraordinary remedy that requires the plaintiff to carry the burden of persuasion by a clear showing for each factor") (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). But even if they tried, they would ultimately prove unsuccessful.

39

Plaintiffs cannot show irreparable injury for the same reason they cannot show a substantial likelihood of success on the merits. Plaintiffs' entire argument for irreparable harm stems from their presumption that the prohibited assault weapons, features, and LCMs merit constitutional protection. But Plaintiffs fail to show any likelihood of success on the merits, so they also cannot show irreparable harm.

Plaintiff Flanigan's only alleged "hardship" is the asserted impairment to her ability to defend herself through wielding multiple redundant weapons of war. But she has been unable to purchase and possess assault weapons and LCMs for the last 10 years, and there is no evidence she has ever needed them. And Connecticut places no limit on how many firearms or magazines she may carry on her person, let alone how many she may possess in her home. Since assault weapons are not typically used for self-defense and the likelihood that she will need to discharge firearms in self-defense in Connecticut is extremely low, as discussed above, Ms. Flanigan's ability to defend herself is not impacted by the challenges statutes at all. Indeed, the risk that Ms. Flanigan or any American will be the victim of an accidental shooting is 35 times higher than the chance that she will need to defend herself at all—much less with an assault rifle—from an armed attacker. Ex. D, ¶ 37.

The organizational Plaintiff has alleged even less hardship. At best, NAGR claims they may need to simply continue to do more of the activities their members already expect them to do—answer questions and advocate on behalf of their members.

In contrast, a mandatory injunction will work immediate and severe hardship on Defendants, the State of Connecticut, and the public. The public interest in avoiding mass shootings dramatically outweighs a single plaintiff's interest in owning one more gun that she is wildly unlikely to ever use for any legitimate self-defense purpose.

40

JA-192

An injunction would cut directly against the public interest, striking down public safety legislation demanded by Connecticut citizens and enacted by their elected representatives in response to one of the worst mass shootings in American history. It would severely, negatively, and potentially irreversibly harm Connecticut and its citizens. Connecticut's gun safety laws protect every person in the state against "the ultra-lethal pathogen of mass murders—shootings in which multiple people are killed and, often, dozens of others injured." *Ocean State Tactical*, 2022 U.S. Dist. LEXIS 227097, at *43. Courts have found that governments have "a very strong interest in regulating the use of [firearms]. The threat to public safety posed by illegal and/or irresponsible [firearm] usage is well known." *Waltier v. N.Y. Police Dep't*, 856 F. Supp. 196, 200 (S.D.N.Y. 1994). "A State's most basic responsibility is to keep its people safe," *Caetano v. Massachusetts,* 477 U.S. 411, 421 (2016) (Alito, J. concurring), and the "interest of public safety stemming from mass gun murders could not be more undeniably compelling." *Ocean State Tatical*, 2022 U.S. Dist. LEXIS 227097, at *46.

This Court should deny Plaintiffs' extraordinary and dangerous request for mandatory injunctive relief. They have not met their heavy burden to demonstrate the balance of harms weigh in their favor or that the public interest would be best served by granting their Motion.

### III. CONCLUSION

For all these reasons the Defendants respectfully ask this Court to deny the Plaintiffs' Motion for Preliminary Injunction.

DEFENDANTS
Lamont, et al.

WILLIAM TONG
ATTORNEY GENERAL

BY:

41

JA-193

    /s/ *Janelle R. Medeiros*

       Janelle R. Medeiros
       Assistant Attorney General
       110 Sherman Street
       Hartford, CT 06105
       Federal Bar #ct30514
       E-Mail: janelle.medeiros@ct.gov
       Tel.: (860) 808-5450
       Fax: (860) 808-5590

_____
       James M. Belforti
       Assistant Attorney General
       110 Sherman Street
       Hartford, CT 06105
       Tel: (860) 808-5450
       Fax: (860) 808-5591
       Federal Bar No. ct30449
       E-Mail: james.belforti@ct.gov

## **CERTIFICATION**

    I hereby certify that on January 31, 2023, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

    /s/ *Janelle R. Medeiros*

       Janelle R. Medeiros
       Assistant Attorney General

# EXHIBIT A

## Declaration of Detective Brindiana Warenda

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NATIONAL ASSOCIATION FOR GUN      :      CIVIL NO. 3:22-CV-01118(JBA)
RIGHTS, ET. AL.                   :                                      :
     *Plaintiff,*              :
                               :
     v.                        :
                               :
NED LAMONT, ET AL.,               :      JANUARY 31, 2023
     *Defendant.*

## **AFFIDAVIT OF BRINDIANA WARENDA**

I, Brindiana Warenda, having been duly sworn, testifies and affirms as follows:

1.     I am over eighteen years of age and understand the obligations of an oath.

2.     I have been employed as a Trooper with the Connecticut State Police (CSP) since 2012. The CSP is a division within the Connecticut Department of Emergency Services and Public Protection (DESPP).

3.     I am presently assigned to the Special Licensing & Firearms Unit (SLFU) as a Detective and have been since September 2018. There are several different detective sections within SLFU including but not limited to Revocations, the Firearms Vault, Boxing/MMA, and Special Licensing (e.g. Bail Bondsmen, Security Guards, Armed Security Guards, etc.). From September 2018 to October 2019, I was assigned to Revocations. In October 2019, I was reassigned to the Firearms Vault and I am currently the primary detective at the Firearms Vault.

4.     In my capacity as a Detective at the Firearms Vault, I specialize in firearm destruction and firearm legality. The Firearms Vault is the clearinghouse for firearm destruction in the State of Connecticut and processes over 3,000 firearms per year for destruction. I also assist local, State and Federal law enforcement, as well as Federal Firearm Licensed (FFL) dealers and public, with Connecticut State Statutes regarding firearm legality within the State of Connecticut.

5.     While I am directly assigned to the Firearms Vault, I assist on a regular basis with Revocations. Revocation duties include, but are not limited to revoking pistol permits for statutory prohibitors, making the determination if a person is suitable for a pistol permit, interacting with law enforcement agencies in the State of Connecticut and Federal, State and local law enforcement agencies throughout the United States, preparing Board of Firearms Permit Examiners (BFPE) hearing packets for DESPP's Legal Affairs Unit, and explaining firearms laws/regulations to various agencies, organizations and citizens.

1

6.     I am certified by the Police Officer Standards and Training Council (P.O.S.T.) to instruct in "Weapons and Permits." The purpose of "Weapons and Permits" is to familiarize recruits and sworn law enforcement with the Connecticut State Statutes and federal laws relative to various firearms and firearms permits. One of the performance objectives is to identify the Connecticut Statutes relative to the illegal sale, carrying of, and safe securing of various firearms such as rifles, shotguns, and handguns. I am re-certified every three years by P.O.S.T.

7.     I have received extensive training with respect to the use and safe handling of firearms. In addition, I have been trained and certified as an "armorer" on specific firearm platforms. An armorer is someone who is authorized by the manufacturer to repair and replace parts of firearms.

8.     In 2020, I attended an armorer school established by Glock, Inc., a firearm manufacturer, and became a certified armorer on all Glock model pistols, excluding the G18 select fire models. I was trained to take apart a Glock pistol and replace/repair any defective part to make the firearm functional. In 2022, I attended a similar armorer school established by Smith & Wesson, another firearm manufacturer, where I became certified in repairing Smith & Wesson M&P 2.0 pistols.

9.     I am also certified by the International Firearm Specialist Academy (IFSA) as a Certified Firearm Specialist. The training included, but was not limited to rules of safe handling, clearing procedures, safety precautions, classification of firearms pursuant to the Gun Control Act (GCA), firearm markings, nomenclature (identification of parts necessary to safety and/or marking locations), ammunition components, mechanical types of operations (e.g. semiautomatic versus fully automatic), and National Firearms Act (NFA) items.

10.    Since I have been assigned to the Firearms Vault, I have had an opportunity to work with thousands of different types of firearms beyond what is issued to me by CSP. This handling of non-CSP issued firearms is invaluable because, not only do I need to know how to make firearms safe, but I also need to be able to identify features that could make a firearm illegal in the State of Connecticut.

11.    In 1993, the Connecticut State Legislature passed Public Act 93-306 which prohibited possessing, selling, or transporting assault weapons with limited exceptions. The act defined an assault weapon as: 1. Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user, including but not limited to AK-47 type, MAC-type, Auto-Ordnance Thompson-Type, and Colt AR-15; 2. any of a list of named firearms; 3. A part or combination of parts designed or intended to convert a firearm into an assault weapon or from which an assault weapon may be rapidly assembled if they are in the possession or under the control of the same person.

12.    In 2001, the Connecticut State Legislature passed Public Act 01-130 which expanded the definition of assault weapon to include semiautomatic firearms with certain features. The features that were added consisted of the following: 1. semiautomatic rifle that can accept a detachable magazine if the rifle has any two of the following features: (a) a folding or

2

telescoping stock, (b) a pistol grip that protrudes conspicuously beneath the action of the weapon, (c) a bayonet mount, (d) a flash suppressor or threaded barrel designed to accommodate a flash suppressor, or (e) a grenade launcher; 2. semiautomatic pistol that can accept a detachable magazine if the pistol has any two of the following features: (a) an ammunition magazine that attaches to the pistol outside of the pistol grip; (b) a threaded barrel that can accept a barrel extender, flash suppressor, forward handgrip, or silencer; (c) a shroud attached to, or partially or completely encircling, the barrel that permits the shooter to hold the firearm with the non-trigger hand without being burned; (d) a manufactured weight of 50 ounces or more when unloaded; and (e) a semiautomatic version of an automatic firearm; 3. semiautomatic shotgun with any two of the following features: (a) a folding or telescoping stock, (b) a pistol grip protruding conspicuously beneath the action of the weapon, (c) a fixed magazine capacity over five rounds, and (d) the ability to accept a detachable magazine; and 4. part or parts in one person's possession either designed or intended to convert any firearm into one of the newly covered assault weapons or from which one may be assembled rapidly.

13.    In 2013, the Connecticut State Legislature passed Public Act 13-3 which made extensive changes to the firearm laws. Three of the major changes were significantly expanding the assault weapon ban, banning the sale, purchase, or transfer of large capacity magazines (LCMs) and requiring a state issued permit or eligibility certificate to purchase long guns.

14.    Public Act 13-3 (Conn. Gen. Stat. § 53-202a) retained the list of firearms banned by name in Public Act 93-306 but added additional semiautomatic firearms by name and created a new features test for firearms not banned by name. The new features were: 1. semiautomatic centerfire rifles that can accept a detachable magazine and at least one of five specified features (folding/telescoping stock, any grip of the weapon that would result in any finger on the trigger hand being directly below that action of the weapon when firing, a forward pistol grip, a flash suppressor, or grenade/flare launcher); 2. semiautomatic centerfire rifles that have a fixed magazine that can accept more than 10 rounds of ammunition; 3. Semiautomatic centerfire rifles that are less than 30 inches long; 4. Semiautomatic pistols with a fixed magazine that can accept more than 10 rounds of ammunition; 5. Semiautomatic pistols that can accept a detachable magazine and have at least one of four specified features (ability to accept a detachable magazine outside of pistol grip, a threaded barrel, a shroud permitting the shooter to fire the firearm without being burned, or a second hand grip); 5. semiautomatic shotguns that have both of the following features: a folding or telescoping stock and any grip of the weapon that would result in any finger on the trigger hand being directly below that action of the weapon when firing; 6. semiautomatic shotgun that can accept a detachable magazine; and 7. a shotgun with a revolving cylinder

15.    A telescoping stock or collapsible stock is a stock that can retract into and shorten itself to make a firearm more compact.

16.    A flash suppressor is a device attached to the muzzle of a firearm that reduces its visible signature while firing.

3

17.   A forward pistol grip or second pistol grip is a grip on the front of the firearm or simply a second grip on a firearm.

18.   Public Act 93-306 and Public Act 13-3 allowed individuals who possessed assault weapons as defined by Connecticut law to obtain a Certificate of Possession by specific dates to retain the firearms lawfully.

19.   Since the passage of Public Acts 93-306 and 13-3 and as of January 30, 2023, the total number of Certificate of Possessions that have been issued is 81,982. This number is subject to change due to the provision that allows members of the military and law enforcement to purchase assault weapons.

20.   The assault weapons banned in Connecticut are a sub-category of the larger group of all semiautomatic weapons. A semiautomatic weapon fires one round for each squeeze of the trigger. After each shot, the firearm automatically loads the next round in the chamber and arms the firing mechanism for the next shot, thereby permitting a faster rate of fire as compared to manually operated guns.

21.   In contrast to semiautomatic weapons, fully automatic weapons (e.g. machine guns) fire continuously for as long as the trigger is pressed. A federal tax stamp is required to legally possess a machine gun in Connecticut. Further, Connecticut State law requires that anyone that owns a machine gun to register it with DESPP within 24 hours of acquiring it and annually thereafter.

22.   Assault weapons listed in both Public Acts 93-306 and 13-3 are essentially civilian versions of military weapons used by armed forces across the world. The most prolific military firearms in the world are the M-16/AR-15 and the AK-47. The primary difference between these military weapons and those assault weapons listed in the Public Acts is that the civilian commercial version does not have the fully automatic selective-fire option. Selective-fire allows the operator to choose between semiautomatic and fully automatic.

23.   Based upon my experience and expertise, the majority of the firearms specifically named in the statutes are semiautomatic versions of the original selective-fire AR-15/M-16, the AK-47, or variants of these weapon platforms in an assortment of calibers.

24.   The AR-15 originally was manufactured as a selective-fire machine gun and was adopted by the United States military as the M-16 machine gun during the Vietnam War. The M16 rifle was designed by Eugene Stoner of ArmaLite Corporation in response to a request from the U.S. military for an improved infantry weapon in the 1950s. The ArmaLite AR-15, the predecessor firearm to the M16, first went into mass production in June 1959.

25.   Colt Manufacturing Company retained the AR-15 trademark for its semiautomatic version of the AR-15, which it began selling to the civilian market in the early 1960s.  The AR-15 is now the civilian commercial term for the M-16, without the fully automatic fire option.

4

**JA-199**

26. The AK-47 was created by Mikhail Kalashnikov and was initially intended to replace the rifles and submachine guns carried by Soviet forces at the end of World War II. The AK-47 was officially adopted by the Soviet Army in 1949 and has since been used by countries throughout the world due to its simplicity, reliability and affordability. The AK-47 is one of the most recognizable rifles in the world.

27. Conn. Gen. Stat. § 53-202a lists 49 assault rifles by name. Of these 49 assault rifles, nineteen (19) are variants of the AK-47; thirteen (13) are variants of the AR-15/M-16; and three (3) are variants of the HK 91 or FN type.

28. The remaining twelve (12) rifles listed are types of rifles that are unique and different from the AK-47, M-16/AR-15 and HK91. It would be fair to say that although 49 rifles are listed in the Act, only fifteen (15) distinct types of rifles are covered by the Act: semiautomatic versions of AK-47s, M-16/AR-15s, HK91, and the twelve (12) distinct rifles that are unique and not of "a type."

29. The assault rifle provision of Conn. Gen. Stat. § 53-202a only covers semiautomatic, centerfire rifles, except for the Remington Tactical 7615, which is a pump action rifle. Centerfire rifles are designed for centerfire cartridges which are more powerful projectiles because they have a larger bullet, higher velocity, greater range, and more "foot pounds of energy" or stopping power, than other cartridges such as rimfire or pistol ammunition. An example of a centerfire cartridge would be a .223 round that is often used in an AR-15 type assault rifle.

30. Conn. Gen. Stat. § 53-202a also banned certain semiautomatic pistols listed. A pistol is defined under Connecticut law as any firearm that has a barrel under twelve inches in length (Connecticut General Statute § 29-27). Of the 22 assault pistols listed in the Act, six (6) are variants of the AK-47 and seven (7) are variants of the M-16/AR-15. The remaining nine (9) pistols are unique and not of "a type."

31. There is only one shotgun specifically listed in Public Act 13-3: the IZHMASH SAIGA 12 shotgun. Although it is a shotgun, the IZHMASH is based on an AK-47 platform.

32. The Remington Tactical 7615 is a pump action rifle, not a semiautomatic. It uses detachable magazines that can accept more than ten rounds of ammunition. However, in 2015, the United States Court of Appeals for the Second Circuit decided in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) that the ban on the Remington Tactical 7615 pump action rifle was unconstitutional.

33. Notwithstanding the assault weapons prohibited by Connecticut General Statute § 53-202a, there remain more than one thousand firearms that Connecticut residents can purchase for responsible and lawful uses like self-defense, home defense, and other lawful purposes such as hunting and sport shooting.

5

34.  There are many resources such as "Guns and Ammo" and "Gun Digest" that identify numerous firearms (including rifles, pistols, revolvers and shotguns) that remain legal in Connecticut. Many of these firearms are suitable for home and self-defense.

35.  Conservatively speaking, I would expect that a gun purchaser could identify over a thousand firearms he/she could purchase as an alternative to those banned in Connecticut.

36.  Conn. Gen. Stat. § 53-202w defined an LCM as any firearm magazine, belt, drum, feed strip, or similar devices that can be readily restored or converted to accept more than 10 rounds of ammunition with limited exceptions.

37.  Public 13-3 allowed individuals who possessed LCMs to declare them by January 1, 2014 to retain possession of them lawfully.

38.  As of January 30, 2023, there are 3,822,718 large capacity magazines declared in the State of Connecticut to 41,241 individuals. This number is subject to change due to the provision that allows members of the military and law enforcement to purchase LCMs.

39.  A magazine, sometimes incorrectly referred to as a "clip," is a container that holds ammunition for a firearm. Typically, they hold bullets and feed the ammunition into the firearm. There are both fixed and detachable magazines. Detachable magazines may be removed from the firearm and replaced quickly with another fully loaded magazine. Fixed magazines are typically reloaded by reloading bullets into a magazine that is attached to the firearm.

40.  A magazine contains no firing mechanism.

41.  Ordinary ammunition magazines extend perpendicularly from the frame of the firearm and are fed with one round on top of the other.  Tubular magazines, by contrast, generally are fixed magazines that run horizontally along the length of the barrel and are fed with cartridges end to end. Tubular magazines are only typically designed for lever action rifles, rimfire rifles and shotguns.

42.  Magazines are manufactured for all types of firearms, including handguns, rifles, and shotguns. Large capacity magazines, as defined by the statute, are those which can hold more than 10 rounds of ammunition at a time. Large capacity magazines have been manufactured for a variety of firearms, including handguns, rifles, and shotguns.

43.  Most firearms that accept large capacity magazines can also function using a magazine that has a capacity of under ten rounds.

44.  Beginning April 1, 2014, Conn. Gen. Stat. § 29-37a required anyone purchasing or receiving a long gun to hold a valid state-issued permit to carry a pistol or revolver, handgun eligibility certificate or long gun eligibility certificate with limited exceptions (e.g. peace officer).  Under prior law, no credential was required to buy long guns.

6

45. As of January 30, 2023, there are 328,502 active permits to carry a pistol or revolver, 187 active handgun eligibility certificates and 1,886 long gun eligibility certificates.

**DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746**

I declare that the foregoing is true and correct under penalty of perjury under the laws of

the United States.

Executed on January 30, 2023

Brindiana Warenda

7

# EXHIBIT B

## Declaration of Professor John J. Donohue

## EXPERT REPORT AND AFFIDAVIT OF JOHN J. DONOHUE

I, John J. Donohue, being duly sworn, hereby depose and state as follows, based on my personal knowledge:

1.    I am a citizen of the United States and a Resident of California.

2.     I am over 21 years of age.

### BACKGROUND AND QUALIFICATIONS

3.    I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School. (A copy of my complete cv is attached as Exhibit A.) After earning a law degree from Harvard and a Ph.D. in economics from Yale, I have been a member of the legal academy since 1986. I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School. I have also been a visiting professor at a number of prominent law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallens (Switzerland), Tel Aviv University, and Renmin University (Beijing).

4.     For a number of years, I have been teaching at Stanford a course on empirical law and economics issues involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, and St. Gallen University School of Law in Switzerland. Since gun crime is such an important aspect of American criminal justice, my courses evaluate both the nature of gun regulation in the United States and the impact of gun regulation (or the lack thereof) on crime, which is an important part of my research, about which I have published extensively (as reflected in my c.v.). I have also consistently taught courses on law and statistics for two decades.

5.    I am a Research Associate of the National Bureau of Economic Research, and an elected member of the American Academy of Arts and Sciences. I was a Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-01 and served as the co-editor (handling empirical articles) of the *American Law and Economics Review* for six years. I have also served as the President of the American Law and Economics Association and as Co-President of the Society of Empirical Legal Studies.

6.     From October 2011 – December 2018, I served on the Committee on Law and Justice of the National Research Council ("NRC"), which "reviews, synthesizes, and proposes research related to crime, law enforcement, and the administration of justice, and provides an

intellectual resource for federal agencies and private groups." (See http://www7.national-academies.org/claj/ online for more information about the NRC.)

7.    I filed an expert declaration in each of two cases involving a National Rifle Association ("NRA") challenge to city restrictions on the possession of large-capacity magazines: *Fyock v. City of Sunnyvale*, United States District Court (N.D. Cal.), January 2014; *Herrera v. San Francisco*, United States District Court (N.D. Cal.), January 2014.

8.    I also filed an expert declaration in a case involving an NRA challenge to Maryland's restrictions on assault weapons and large-capacity magazines: *Tardy v. O'Malley*, United States District Court (District of Maryland), February 2014.

9.    In all these cases, the relevant gun regulations have (ultimately) been sustained in the relevant federal appellate courts.

10.    I also filed (June 1, 2017) an expert declaration in a case involving a challenge to California's restrictions on carrying of weapons in public in *Flanagan v. Becerra*, United States District Court (C.D. Cal.), Case No. 2:16-cv-06164-JAK-AS and expert declarations on June 4, 2017 and June 16, 2017 in two separate cases challenging California's ban on the possession of large-capacity magazines: *Duncan v. Becerra*, United States District Court (S.D. Cal.), Case No. 17-cv-1017-BEN-JLB and *Weise v. Becerra*, United States District Court (E.D. Cal.), Case No. 2:17-cv-00903-WBS-KJN. I filed a supplemental declaration in Duncan (now *Duncan v. Bonta*) on November 8, 2022.

11.    I filed an expert declaration, and provided expert testimony, in a case involving a challenge to New Jersey's restrictions on large-capacity magazines in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:18–cv–10507–PGS–LHG (D.N.J.)

12.    I filed an expert declaration in *Chambers v. City of Boulder*, Case No. 2018CV30581, in the District Court of Boulder County in September 2020, involving a challenge to the City of Boulder's restrictions on assault weapons.

13.    At the request of the United States Department of Justice, I filed an expert declaration in July 2020 and testified at trial in April 2021 in a case arising out of the Sutherland Springs mass shooting that killed 26 in November 2017: *Holcombe, et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.). On December 9, 2020, I submitted an expert report on behalf of the City of San Francisco in a wrongful conviction lawsuit, *Caldwell v. City of San*

*Francisco*, Case No. 12-cv-1892 DMR, United States District Court, Northern District of California, Oakland Division.

14.    I was the main author of the Brief of Amici Curiae Social Scientists and Public Health Researchers in Support of Respondents, which was submitted to the United States Supreme Court on September 21, 2021 in *New York State Rifle & Pistol Association v. Bruen*, Case No. 20-843.

15.    On January 24, 2022, I submitted an expert declaration in *Worth v. Harrington*, a lawsuit in the District of Minnesota (Case No. 21-cv-1348) challenging how Minnesota regulates the concealed carry of firearms by individuals aged 18 to 20. I was deposed in this case on March 28, 2022.

16.    On May 31, 2022, I submitted an expert declaration in *Meyer v. Raoul*, a lawsuit in the Southern District of Illinois (Case No. 21-cv-518-SMY) challenging how Illinois regulates the concealed carry of firearms by individuals aged 18 to 20.

17.    On September 14, 2022, I submitted an expert declaration in *Viramontes v. The County of Cook*, a lawsuit in the Northern District of Illinois (Case No. 1:21-cv-04595) challenging the Blair Holt Assault Weapons Ban enacted by Cook County, Illinois in 2006.

18.    On October 13, 2022, I submitted an expert declaration in *Miller v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:19-cv-01537-BEN-JLB) challenging how California regulates assault weapons. This report supplemented my earlier wok in that case which involved submission of an expert declaration on January 23, 2020, followed by testimony on October 23, 2020. during an evidentiary hearing on the Plaintiffs' motion for a preliminary injunction.

19.    On January 6, 2023, I submitted an expert declaration in *Rupp v. Bonta*, a lawsuit in the Central District of California (Case No. 8:17-cv-00746-JLS-JDE) challenging how California regulates assault weapons.

20.    On January 6, 2023, I submitted an expert declaration in *State of Vermont v. Misch*, Criminal Division, Docket No. 173-2-19 Bncr in a case challenging magazine-size restrictions for handguns and long-guns.

## SUMMARY OF CONCLUSIONS

21.    It is a sound, evidenced-based, and longstanding harm-reducing strategy virtually uniformly embraced throughout the developed world for governments to place constraints on the

3

harm that weapons can inflict. Restrictions on assault weapons and the size of large-capacity magazines (LCMs) sit comfortably in this appropriate regulatory approach and can be expected to reduce deaths and injury from gun violence.

22. A ban on assault weapons and LCMs would be expected to have little or no effect on the ability of individuals to possess weapons for self-defense in the home but should have a restraining impact on the effectiveness of those who have the criminal intent to kill as many individuals as possible. The restrictions imposed by the state of Connecticut that are challenged in this litigation are well-tailored to limit the behavior of criminals engaging in the most dangerous forms of violent criminal behavior, and at the same time are likely to have little or no impact on the defensive capabilities of law-abiding citizens.

23. The problem of public mass shootings in the United States is a serious and worsening national problem that imposes substantial burdens on the American public far beyond the growing numbers of dead and injured victims that are besieged every year. Since so many of these shootings are committed (or made possible) by previously "law-abiding" citizens with no basis under current law to prevent them from possessing firearms and since such a large proportion of the mass shooters die in the course of their deadly massacres, improved background checks and increased criminal penalties alone cannot adequately address this growing problem. Moreover, the empirical evidence indicates that another possible policy response – allowing increased gun carrying by the untrained public – rarely generates any benefit by stopping public mass shootings and is indeed self-defeating since it generates substantial increases in violent crime.[1]

---

[1] See Donohue, John, Abhay Aneja, and Kyle Weber, 2019, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis," *Journal of Empirical Legal Studies*, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219. The amicus brief submitted to the United States Supreme Court on behalf of "Social Scientists and Public Health Researchers in Support of Respondents" in *New York State Rifle & Pistol Association v. Bruen*, September 21, 2021, further discusses the evidence that right-to-carry laws increase violent crime, citing 14 studies that have so found in the last five years. Since that brief was submitted, three additional empirical studies have confirmed the conclusion that increased gun carrying leads to higher violent crime: Van Der Wal, W. M. (2022). Marginal Structural Models to Estimate Causal Effects of Right-to-Carry Laws on Crime. *Statistics and Public Policy*, 9(1):163–174.; Doucette, M. L., Ward, J. A., McCourt, A. D., Webster, D., and Crifasi, C. K. (2022). Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020. *Journal of Urban Health*, pages 1–12.; Donohue, J. J., Cai, S. V., Bondy, M. V., and Cook, P. J. (2022). More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities. Working paper no. 30190, National Bureau of Economic Research.

24. Indeed, gun massacres fell substantially during the ten years of the federal assault weapons ban, which curtailed the proliferation of both assault weapons and high-capacity magazines, and then rose sharply when the ban was lifted in 2004. FBI data show that the problem of active shooters inflicting mayhem on the public has been rising substantially since the end of the federal ban. State laws restricting assault weapons and high-capacity magazines have also been shown to reduce mass shooting deaths and overall casualties.

25. The Plaintiffs' Motion for Preliminary Injunction in this case makes an array of absurd claims about the nature of weaponry over time, but the important point to note is that when the problem of mass shooting began to emerge in the United States, state and federal governments began responding to this growing menace with lawful, appropriate, and effective restrictions on the type of weaponry that both facilitated mass shootings and was attractive to mass shooters. As we learned from the repeal of the federal assault weapons ban, any backsliding on these wise restraints that promote the health, safety, and freedom of Americans would be costly in lives and in devastating firearm injuries.

## DISCUSSION

26. The Plaintiffs' Motion for Preliminary Injunction states on page 9 that "the Banned Firearms and the Banned Magazines are 'typically possessed by law-abiding citizens for lawful purposes.' Under Heller and Bruen, that is the end of the analysis." While the comment is either intentionally or unintentionally ambiguous, it is important to clarify that the typical law-abiding citizen does not posess any firearm --whether an assault weapon or not, and whether it has a high-capacity magazine or not. The clear majority of Americans do not own any firearm.

27. By a wide margin, most Americans do not own guns, and most Americans who do own guns do not own assault weapons. Both statements are particularly true for Connecticut residents.

28. 70 percent of all American adults do not own any firearm according to recent survey data.[2] Moreover, many of the 30 percent of Americans who do own firearms, only possess shotguns, hunting rifles, and revolvers and do not possess assault weapons or firearms

---

[2] This is the finding of a June 2021 survey of 10,606 adults by the Pew Research Center. https://www.pewresearch.org/fact-tank/2021/08/04/wide-differences-on-most-gun-policies-between-gun-owners- and-non-owners-but-also-some-agreement/.

equipped with high-capacity magazines of the type covered by the federal assault weapons ban from 1994-2004.

29. Since assault weapons are only a small fraction of the overall gun supply in the United States, it is clear that only a relatively small minority of Americans owns assault weapons, and most Americans recognize that assault weapons are not important to their self-defense.

30. The majority of Americans have consistently supported bans on assault weapons for years. A poll conducted for the *New York Times* from June 17-20, 2016 among a national sample of 1975 registered voters found that 67 percent of Americans favored such a ban.

31. Less than a year later, a Pew Research Center survey among 3,930 adults (conducted from March 13-27 and April 4-18, 2017) again showed broad opposition to assault weapons.[3]

32. The Pew survey results released on October 18, 2018 again showed that 67 percent of Americans favored bans on assault weapons and on high-capacity magazines.[4] The same Pew survey based on interviews from September 3 – 15, 2019 showed that 69 percent of Americans supported a ban on assault weapons.[5] A national survey by Pew Research Center, conducted from April 5-11, 2021 among 5,109 adults found that 63 percent of Americans supported a ban on assault weapons.[6]

33. Importantly, the *New York Times* also polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy" to ask them what measures would be most effective in dealing with

---

[3] Ruth Igielnik and Anna Brown, "Key takeaways on Americans' views of guns and gun ownership," Pew Research Center, June 22, 2017, http://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership/. The authors noted that this poll was conducted *prior* to two of the five deadliest mass shootings in modern US history, which occurred in October and November of 2017: "a staggering [59] people were killed and more than 500 were hurt when [Steven Paddock] opened fire on a Las Vegas concert and at least 26 people were killed in a Texas church" only five weeks later.
[4] Pew Research Center, "Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support," October 18, 2018, http://www.people-press.org/2018/10/18/gun-policy-remains-divisive-but-several-proposals-still-draw-bipartisan-support/. This survey had 5307 respondents and was conducted from September 24 through October 7, 2018.
[5] Katherine Schaeffer, "Share of Americans who favor stricter gun laws has increased since 2017," https://www.pewresearch.org/fact-tank/2019/10/16/share-of-americans-who-favor-stricter-gun-laws-has-increased-since-2017/ (October 16, 2019).
[6] https://www.pewresearch.org/politics/2021/04/20/amid-a-series-of-mass-shootings-in-the-u-s--gun-policy-remains-deeply-divisive/.

America's mass shooting problem, and an assault weapons ban was deemed overall by this panel to have the highest level of effectiveness among the 20 evaluated measures.[7]

34.     Similarly, American adults consistently support bans on such high-capacity magazines, because it is widely recognized that such accoutrements threaten public security and have little utility for personal defense. A national survey by Pew Research Center, conducted from April 5-11, 2021 among 5,109 adults found that almost two-thirds of Americans -- 64 percent -- supported a ban on magazines with greater than 10 rounds.[8] This is a consistent and persistent finding: The Pew survey results released on October 18, 2018 similarly found that 67 percent of Americans favored bans on high-capacity magazines.[9]

**The Growing Problem of Public Mass Shootings**

35.     Although the long-term (pre-pandemic) secular trend in overall crime over the last 25 years has been benign, the opposite is true for the trend in public mass shootings since the end of the Federal Assault Weapons Ban in 2004. As the Third Circuit stated in upholding New Jersey's restrictions on high-capacity magazines, "plaintiffs attempt to discount the need for [governmental weaponry restrictions] by describing mass shootings as rare incidents" gives insufficient weight "to the significant increase in the frequency and lethality of these incidents." Association Of New Jersey Rifle and Pistol Clubs v. Attorney General of New Jersey (3d Cir., December 5, 2018).

36.     According to a report of the Congressional Research Service, there were an average of 2.7 public mass shootings per year in the 1980s rising to an average of 4.5 events per year from 2010 to 2013.[10] Since then things have only gotten worse.

---

[7] The list of 32 academics included not only me, but also many strong gun-rights supporters, including John Lott, Gary Kleck, David Kopel, Carlisle E. Moody, and Eugene Volokh. See, Margot Sanger-Katz And Quoctrung Bui, "How to Reduce Mass Shooting Deaths? Experts Rank Gun Laws," *New York Times*, October 5, 2017, https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html.

[8] https://www.pewresearch.org/politics/2021/04/20/amid-a-series-of-mass-shootings-in-the-u-s--gun-policy-remains-deeply-divisive/.

[9] Pew Research Center, "Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support," October 18, 2018, http://www.people-press.org/2018/10/18/gun-policy-remains-divisive-but-several-proposals-still-draw-bipartisan-support/. This survey had 5307 respondents and was conducted from September 24 through October 7, 2018.

[10] William J. Krouse & Daniel J. Richardson, Cong. Research Serv., R44126, Mass Murder with Firearms: Incidents and Victims, 1999-2013, at 14-15 (2015), http://fas.org/sgp/crs/misc/R44126.pdf [http://perma.cc/RC4C-SP48]; Mark Follman, "Yes, Mass Shootings Are Occurring More Often," *Mother Jones* (Oct. 21, 2014, 5:05 am), http://www.motherjones.com/politics/2014/10/mass-shootings-rising-harvard.

37.     Writing in May 2018, Louis Klarevas, an Associate Lecturer of Global Affairs at the University of Massachusetts–Boston, noted:

> "Last week's school shooting in Texas marks a new milestone in American history. It's the first time we have ever experienced four gun massacres resulting in double-digit fatalities within a 12-month period. In October 2017, [60] were killed at a concert in Las Vegas. A month later, 26 were killed at a church in Sutherland Springs, Texas. Earlier this year, 17 people lost their lives at a high school in Parkland, Fl. And to this list we can now add the 10 people who lost their lives at a high school in Santa Fe, Texas."[11]

Sadly, the mayhem did not let up in 2019. In May of that year, 12 were killed in <u>Virginia Beach</u> by a shooter equipped with high-capacity magazines. In August 2019, a gunman again took advantage of the enhanced lethality of high-capacity magazines to kill <u>23 were killed in El Paso, Texas</u>. Just 13 hours later, rapid action by police stopped a similarly equipped mass shooter in Dayton, Ohio, limiting the body count to <u>nine killed and 27 wounded</u>. That same month, 7 were killed and 25 were wounded – again facilitated by high-capacity magazines – in Odessa, Texas.

38.     In response to the growing list of gun tragedies, President Obama signed into law in 2013 the Investigative Assistance for Violent Crimes Act of 2012, which granted authority to the U.S. Attorney General to assist in the investigation of "violent acts and shootings occurring in a place of public use" and in the investigation of "mass killings and attempted mass killings."[12]

39.     To better understand the nature of these threats, the Federal Bureau of Investigation (FBI) in 2014 initiated a study of "active shooter" incidents designed to identify the prevalence of and trend in these events, how they unfolded, what brought them to an end, and other details that would be of assistance to law enforcement (Id.).[13]

40.     In 2018, the FBI announced that the active shooter problem in the United States was growing ominously, as illustrated in Figure 1 below.[14] At that time, I stressed that this

---

[11] Louis Klarevas, "After the Santa Fe massacre, bury the 'good guy with a gun' myth: Armed staffers won't deter shooters or keep kids safe," *New York Daily News*, May 22, 2018, http://www.nydailynews.com/opinion/santa-fe-massacre-bury-good-guy-gun-myth-article-1.4003952.
[12] Blair, J. Pete, and Schweit, Katherine W. (2014). "A Study of Active Shooter Incidents, 2000 - 2013." Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014, at 4.
[13] Note that if an active shooter bent on inflicting widespread casualties is stopped quickly enough, this incident would not appear in a count of "public mass shootings" that required, say, at least four individuals to be shot and killed, not counting the shooter (which is a standard, although not the only, definition of a mass shooting).
[14] https://www.usatoday.com/story/news/2018/06/20/fbi-most-active-shooters-dont-have-mental-illness-get-guns-legally/718283002/.

problem would only be getting worse if significant action was not taken to address it. Sadly, my predictions based on the growing lethality of weaponry in the United States have been fulfilled. As bad as the active shooter problem looked in 2018, it is considerably worse today, as seen in the same FBI active shooter data now extended through 2021 in Figure 2. Last year, the 61 active shooter incidents were more than double the previous high of 30 in 2017!

**Figure 1**



SOURCE FBI data and the FBI's report on active shooter incidents in the United States in 2016 and 2017

41. The ominous and steep upward trend in the FBI data charting the growth in active shooter incidents is unmistakable. Not surprisingly, the number of mass shootings clearly is higher following the termination of the federal assault weapons ban in 2004. In that year, the

9

FBI counted 4 active shooter incidents in which 14 died. Since then, the mayhem has accelerated so much that in 2021 the FBI counted 61 active shooter incidents killing 103.[15]

**Figure 2**



Active Shooter Incidents, 2000-2021

Source: FBI's Active Shooter Reports

Years

42.    Just in the last two years, the United States has experienced numerous, devastating mass shootings with firearms equipped with high-capacity magazines, including the March 16, 2021 Atlanta spa shootings (8 killed), the March 22, 2021 shooting at King Soopers supermarket in Boulder, Colorado (10 killed); the April 15, 2021 shooting at an Indianapolis FedEx warehouse (8 killed); the May 26, 2021 shooting at a transportation authority facility in San Jose, California (9 killed);[16] the May 14, 2022 supermarket shooting in Buffalo, New York (10 killed); the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children

---

[15] FBI, "Active Shooter Incidents in the United States in 2021," https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2021-052422.pdf/view.
[16] Woolfolk, John; Salonga, Robert; Savidge, Nico; Baron, Ethan (May 27, 2021). "San Jose shooting: VTA gunman was 'highly disgruntled,' had 32 illegal high-capacity magazines". *East Bay Times*. Walnut Creek, California.

and 2 adults killed); the July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed), the November 20, 2022 shooting in a Colorado Springs nightclub in which five people were killed and 17 wounded, and the November 22, 2022 shooting at a Virginia Walmart that left 7 dead. These figures do not reflect the countless people injured, both physically and emotionally, and the devastation inflicted on the communities in which they occurred. For example, during the July 4 mass shooting in Highland Park, Illinois, an 8-year-old boy was paralyzed and may never walk again after a bullet severed his spinal cord.[17]

43. The consequences for the shooter are also severe. Tellingly, the 18-year-old Buffalo shooter, who killed 10 using the same weapon as the Sandy Hook shooter— a Bushmaster XM-15 semiautomatic rifle—had written, "I am well aware that my actions will effectively ruin my life. If I'm not killed during the attack, I will go to prison for an inevitable life sentence." [18]

44. Assault weapons also pose particular dangers and problems to law enforcement. Because of the types of rounds typically fired by assault weapons as well as the muzzle velocities they tend to have, assault weapons are "capable of penetrating the soft body armor customarily worn by law enforcement."[19] The ability to fire rapidly also allows criminals to more effectively engage with responding police officers, even from a significant distance.[20] Empirical research by the Violence Policy Center shows that "one in five law enforcement officers slain in the line of duty was killed with an assault weapon," despite the relative rarity of assault weapon use in crime in general.[21] Christopher S. Koper et al. find that assault weapons, virtually all of which were assault rifles, "accounted for 13.2% of the firearms used in [police murders]" from 2009-2013 (note that this excludes cases involving the officer's own firearm).[22] Many law

---

[17] NBC Chicago, *Cooper Roberts, Boy, 8, Paralyzed in Highland Park Shooting, Continues to Push Forward, Mother Says,* Dec. 19, 2022, https://www.nbcchicago.com/news/local/cooper-roberts-8-year-old-paralyzed-in-highland-park-shooting-continues-to-push-forward-mother-says/3026490/.

[18] Ashley Parker, Tyler Pager, and Colby Itkowitz, "From Sandy Hook to Buffalo and Uvalde: Ten years of failure on gun control," *Washington Post,* May 22, 2022; Jesse McKinley, Jonah E. Bromwich, Andy Newman and Chelsia Rose Marcius, "Buffalo Suspect Planned Attack for Months, Online Posts Reveal," *The New York Times*, May 16, 2022; Craig Whitlock, David Willman, and Alex Horton, "Massacre Suspect Said He Modified Bushmaster Rifle to Hold More Ammunition," *Washington Post*, May 15, 2022.

[19] Brown Decl. ¶ 23, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).
[20] Kyes Decl. ¶ 15-17, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).
[21] Violence Policy Center, *Officer Down: Assault Weapons and the War on Law Enforcement,* May 2003, *available at* http://www.vpc.org/studies/officer%20down.pdf (last visited Oct. 12, 2018) at 5.
[22] Christopher S. Koper et al. 2017, Finding at 317.

enforcement officers and agencies report that the possibility of encountering criminals with assault weapons necessitates that they spend a great deal of time and resources preparing for such encounters.[23] Both the February 2018 mass killing at Parkland High School and the May 2022 mass killing in Uvalde, Texas – where police delayed entering the school during a shooting – vividly underscored how police responses to violence are impaired when the officers are confronted by a shooter armed with an assault rifle.

**The Importance of the Instrumentality Effect**

45.    Decades of research has shown that there is a considerable variation in the survivability of a gun assault depending on the instrumentality employed. A seminal 1972 study by UC Berkeley Professor Frank Zimring found "that the outcome of gun assaults had a large random element, and that the power of the firearm was one systematic factor influencing the likelihood that an individual with a gunshot injury would survive."[24]

46.    A meticulous study by Anthony Braga and Phil Cook in 2018 has powerfully confirmed this instrumentality effect. Braga and Cook examined the files of 511 gunshot victims kept by the Boston Police Department and found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound. Specifically, the death rate from handgun assault injuries increased substantially as the caliber of the firearm increased—even though the caliber was not correlated with observable indicators of the intent and determination to kill by the shooter. The shooter's use of a medium caliber handgun (.38, .380, and 9 mm) more than doubled the odds that the wounded victim would die compared to small caliber handguns (.22, .25, and .32). Large caliber handguns (.357 magnum, or greater) more than doubled the odds of death compared to medium caliber handguns.

47.    The authors conclude that:

> The results here support the view that the intrinsic power and lethality of the weapon had a direct effect on the likelihood that a victim of a criminal shooting died. For Boston, in the period studied here, simply replacing larger-caliber guns with small-caliber guns with no change in location or number of wounds would have reduced the gun homicide rate by 39.5 percent. It is

---

[23]Brady Center to Prevent Gun Violence 2008 at 4-6.
[24] The description of the Zimring study comes from Braga and Cook (2018), infra, note 6.

plausible that larger reductions would be associated with replacing all types of guns with knives or clubs (p.8, Braga and Cook 2018).[25]

48.     Of course, the conclusion of the Braga and Cook study—that switching to less deadly firearm options could reduce firearm deaths—applies directly to bans on assault weapons and high-capacity magazines. The greater the lethality of the weapon, the more killed and injured in active shooter incidents. This was clearly illustrated in a study for the *Journal of the American Medical Association* that examined deaths and injuries documented in the FBI Active Shooter Database from 2000-2017.[26]  The authors found that deaths and injuries were substantially higher for the 61 active shooter incidents using a semiautomatic rifle versus the 187 episodes using some other firearm. Specifically, in the incidents in which the shooter employed a semi-automatic rifle the average number killed or wounded was 9.72 versus only 5.47 killed or wounded when other firearms were used. (Note that the authors excluded the horrific Las Vegas shooting from the numbers above, since that case was so extreme, with 60 killed and almost 500 wounded—all with semi-automatic rifles.)

49.     Indeed, if one looks at the deadliest acts of intentional mass violence in the United States since 9/11, they all share one feature. The killer in every case used an assault weapon and/or a firearm equipped with a high-capacity magazine. Table 1 provides a list of these most deadly mass violence incidents, with the numbers killed ranging from 13 – 60 in these mass shooting spasms of violence aided by the greater lethality afforded by these weapons and accessories formerly banned by the federal government and currently banned under Connecticut law. (Eleven incidents are listed because there were two killings tied for tenth with 13 killed.)

---

[25] Anthony A. Braga and Philip J. Cook, "The Association of Firearm Caliber with Likelihood of Death from Gunshot Injury in Criminal Assaults," *JAMA Network Open*. 2018; 1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2688536.

[26] Elzerie de Jager, et al., "Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States," *JAMA*. 2018;320(10):1034-1035. doi:10.1001/jama.2018.11009, https://jamanetwork.com/journals/jama/fullarticle/2702134.

13

**Table 1. The 11 Deadliest Acts of Intentional Violence in the U.S. since 9/11**

| Deaths | Date | Location | Used Assault Weapons and/or High-Capacity Magazines |
|--------|------|----------|------------------------------------------------------|
| 60 | October 1, 2017 | Las Vegas, NV | ✓ |
| 49 | June 12, 2016 | Orlando, FL | ✓ |
| 32 | April 16, 2007 | Blacksburg, VA | ✓ |
| 27 | December 14, 2012 | Newtown, CT | ✓ |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ |
| 23 | August 3, 2019 | El Paso, TX | ✓ |
| 21 | May 24, 2022 | Uvalde, TX | ✓ |
| 17 | February 14, 2018 | Parkland, FL | ✓ |
| 14 | December 2, 2015 | San Bernardino, CA | ✓ |
| 13 | April 3, 2009 | Binghamton, NY | ✓ |
| 13 | November 5, 2009 | Fort Hood, TX | ✓ |

50.     In addition to the well-documented increase in overall public mass shootings in the United States, there has been an equally dramatic rise of these events in school settings.[27] Indeed, the authors of a study on mass school shootings – written before the May 2022 shooting at Robb Elementary School in Uvalde, Texas left 21 dead – concluded in 2018 that "More people have died or been injured in mass school shootings in the US in the past 18 years than in the entire 20th century."[28] The impact of the elevated stress experienced by students and parents across the country as the reality of America's tragic mass shooting problem penetrates their consciousness

---

[27] Antonis Katsiyannis, Denise K. Whitford, Robin Parks Ennis. Historical Examination of United States Intentional Mass School Shootings in the 20th and 21st Centuries: Implications for Students, Schools, and Society. *Journal of Child and Family Studies*, 2018; DOI: 10.1007/s10826-018-1096-2.

[28] Springer, "Rapid rise in mass school shootings in the United States, study shows: Researchers call for action to address worrying increase in the number of mass school shootings in past two decades." *ScienceDaily*, 19 April 2018. <www.sciencedaily.com/releases/2018/04/180419131025.htm>.

14

is undeniable. While these horrendous gun massacres are relatively rare compared with the totality of gun homicides in the U.S, each one harms tens of millions, if not hundreds of millions, beyond those killed or wounded at the scene.

51.     Indeed, consider the impact of the following student response to a recent mass shooting at a Texas high school:

> "It's been happening everywhere," student Paige Curry said after a gunman's attack at Santa Fe High School … killed [ten and wounded ten]. Asked if there was a moment where she felt as though the shooting could not be real, could not be actually happening at her school, Paige shook her head. "No, there wasn't," she said with a small hitch in her voice. "I've always kind of felt like eventually it was going to happen here, too," she said. "So, I don't know. I wasn't surprised, I was just scared."[29]

This is the reality of modern America: fear over the prospect of mass shootings for millions of students and their parents throughout the U.S. The harm of mass shooting in the United States is measured in the millions, far beyond the narrow death count the plaintiffs seek to minimize.

52.     The FBI's analysis of active shooters over age 18 found that 65 percent had no adult convictions prior to the active shooting event.[30] Moreover, the FBI report found that only a tiny fraction would have qualified as "adjudicated mental defectives" that would have been barred from possessing weapons.[31] In other words, the lack of a basis for prohibiting gun ownership under current law for most active shooters means that tighter background checks would not have likely blocked their homicidal objectives.

53.     The *Wall Street Journal* analyzed data from the 32 school shootings since 1990 with at least three victims dead or injured.[32] In 25 cases, the shooters were in their teens or younger. Of the 20 cases in which information was available, 17 of the shooters obtained their guns from their home or a relative. In other words, law-abiding citizens who possess weapons

---

[29] Adam Carlson, "'I've Always Felt Like Eventually It Was Going to Happen Here, Too,' Says Texas Shooting Survivor," People, May 18, 2018, https://www.yahoo.com/entertainment/apos-ve-always-felt-eventually-174424389.html.
[30] Silver, J., Simons, A., & Craun, S. (2018). A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 – 2013. Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 20535.
[31] The Gun Control Act of 1968 prohibits gun possession by felons and adjudicated "mental defectives" (18 U.S.C. §922 (d) (4) 2016).
[32] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," (April 5, 2018), https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600.

equipped with high-capacity magazines can and do unwittingly assist their young children and relatives who take their lethal weaponry to commit mass shootings.

54. Nor can we hope to limit these horrific crimes by elevating the probability of apprehending mass shooters once their crime is completed since almost all mass killers are either captured, commit suicide, or are killed at the scene.[33] Tellingly, the recent 18-year-old Buffalo shooter, who killed 10 using the same weapon as the Sandy Hook shooter — a <u>Bushmaster XM-15</u> semiautomatic rifle equipped with high-capacity magazines – had written, "I am well aware that my actions will effectively ruin my life. If I'm not killed during the attack I will go to prison for an inevitable life sentence."

55. Note the contrast of a school attack in China that occurred only hours before Adam Lanza used an assault weapon armed with 30-round magazines to kill 26: while 22 children and an adult were injured in the attack in China, no one died – a likely result, at least in part, of the attacker using a knife instead of an assault weapon.[34]

56. Consider the assassination attempt on the life of Ronald Reagan by John Hinckley on March 30, 1981. Hinckley fired six shots with a six-shot .22 caliber revolver – striking Reagan and three others (White House Press Secretary James Brady in the head, Metropolitan Police Officer Thomas Delahanty in the neck, and Special Agent Tim McCarthy in the abdomen as he turned to shield the president). Hinckley was tackled after he had emptied his gun, and all four of the wounded victims survived the attack.[35]

57. A similar attempt today would likely by far more devastating -- as a modern semi-automatic pistol with 15 or more bullets would have enabled the assassin to fire off many more rounds, hitting many more victims and delaying the opportunity to stop his attack. Moreover, as careful research has demonstrated, a typical 9 mm pistol round would have been far more lethal

---

[33] According to the FBI, in 156 of the 160 episodes, the mass shooter was either captured, committed suicide (64 cases), or was killed (30 cases). Blair, J. Pete, and Schweit, Katherine W. (2014). "A Study of Active Shooter Incidents, 2000 - 2013." Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014. Of course, those who are captured alive are already punished as severely as the law allows, and the abundant number of mass shootings in Texas and Florida highlights the inefficacy of the death penalty in addressing this problem.

[34] Mallory Ortberg, "Man Arrested in China After Knife Attack on Students," http://gawker.com/5968740/man-arrested-in-china-after-knife-attack-on-students.

[35] U.S Secret Service, Forty Years Since the Assassination Attempt on President Reagan, https://www.secretservice.gov/reagan40thanniversary.

than a .22 caliber round[36] and the likelihood that individual victims would suffer more bullet wounds – which occurs with high-capacity magazines -- would also enhance the risk of death.

**The Far-Reaching Costs of Public Mass Shootings**

58.     The large number of overall gun homicides compared with mass shootings should not obscure that major public mass shootings cause profound social damage. This harm of course includes the tragic deaths and extraordinarily devastating injuries, but extends far beyond these mere statistical counts of the fatal and non-fatal casualties. Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety. Horrific mass shootings – such as those perpetrated by Adam Lanza at Sandy Hook School (killing 26), Stephen Paddock in Las Vegas (killing 59 and shooting 422 others), or by ISIS sympathizers at Inland Regional Center in San Bernardino (killing 14)[37] and at Pulse in Orlando (killing 49)[38] or at various houses of worship in Charleston, South Carolina (killing 9), Sutherland Springs, Texas (killing 26), and Pittsburgh, Pennsylvania (killing 11) – although small in number compared to the total number of homicides, have generated widespread apprehension and increased demand for effective responses from government. It is abundantly clear that the horrors of mass shootings -- such as the killing of 20 students and 6 teachers at Sandy Hook Elementary School in Newtown, Connecticut in December 2012; the killing of 19 elementary school students and two teachers in Uvalde, Texas; and 10 individuals who died in a

[36] An inspired study by Anthony Braga and Phil Cook in 2018 that examined the files of 511 gunshot victims kept by the Boston Police Department found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound. Specifically, the death rate from handgun assault injuries increased substantially as the caliber of the firearm increased – a victim was twice as likely to die from a wound from a 9 mm pistol than from a .22 caliber revolver.
Two studies have found that the fatality rates of those victims hit by more than 1 bullet were more than 60% higher than the fatality rates of gunshot wound victims who were hit by only a single bullet. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. Arch Surg. 1992;127(6): 694–698; Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. J Quant Criminology. 2001; 17(1):81–88.
Not surprisingly, analyses of gunshot wound victims at level I trauma centers suggest that high-capacity magazines are associated with higher rates of multiple bullet wounds per victim. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. J Trauma Acute Care Surg. 2014;76(1):2–9; Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. J Trauma Acute Care Surg. 2017;84(1):58–65.
[37] Christine Hauser, San Bernardino Shooting: The Investigation So Far, N.Y. Times (Dec. 4, 2015), http://www.nytimes.com/2015/12/05/us/san-bernardino-shooting-the-investigation-so-far.html (noting fourteen were killed in December 2015).
[38] Gregor Aisch et al., What Happened Inside the Orlando Nightclub, N.Y. Times (June 12, 2016), http://www.nytimes.com/interactive/2016/06/12/us/what-happened-at-the-orlando-nightclub-shooting.html (noting a gunman killed forty-nine in a June 2016 attack).

hate crime in Buffalo, New York, both in May 2022 -- have inflicted psychological distress far beyond the contours of those small communities and indeed caused suffering throughout the entire country (and the world).

59. A considerable scientific literature has documented the significant emotional and mental health harms that mass shootings inflict on survivors, community members, wounded victims, active responders, and children. The consistent finding of these studies is that mass shootings can lead to increased levels of post-traumatic stress disorder (PTSD), anxiety, and depression.[39] For example, on February 14, 2008, Steven Kazmierczak opened fire in a crowd of Northern Illinois University students, killing 5 people and wounding 17 more before killing himself. This shooting led to dramatic increases in the levels of post-traumatic stress (PTS) symptoms in a sample of Northern Illinois University students.[40]

60. Similar findings of the broad social damage from mass shootings were also documented in three studies of the broader harm from the 2011 Norway shooting, when Anders Breivik killed 68 people at a Youth Camp and wounded at least 32. Four to five months following the shooting, survivors were six times more likely to exhibit elevated PTS symptoms compared to an age- and gender-adjusted sample derived from the overall population.[41] But the psychic trauma was not limited to the victims and survivors of mass shootings. Two additional studies, which focused on the broader harm to the surrounding community following the Breivik shooting in Norway, found measurable increases in stress reactions in the general population, with the effects especially strong for young people with a prior history of trauma.[42] Sadly, we

---

[39] Shultz, James M., Siri Thoresen, Brian W. Flynn, et al. 2014. "Multiple Vantage Points on the Mental Health Effects of Mass Shootings." *Current Psychiatry Reports.* 16:469. To complete this meta-analysis of the scientific literature from 2010 to early 2014, the authors searched the PUBMED, SCOPUS, PILOTS, PSYCINFO, and CINAHL databases using combinations of terms for mass shooting incidents with MeSH (Medical Subject Heading) vocabulary on mental health.

[40] Bardeen, Joseph R., Mandy J. Jumpula, and Holly K. Orcutt. 2013. "Emotional regulation difficulties as a prospective predictors of posttraumatic stress symptoms following a mass shooting." *Journal of Anxiety Disorders* 27, no.2 (March): 188-196. This longitudinal study assessed the presence of PTS symptoms in a sample of female undergraduates at Northern Illinois University at three time points: T1, the starting period (pre-shooting) (n=1,045), T2, short term post-shooting (17-100 days post-shooting, n=691), and T3, roughly 7-8 months post-shooting (n=588). In the sample of 691 students that were assessed at T1 and T2, clinically significant levels of PTS rose from 20% pre-shooting to almost 50% post-shooting.

[41] Dyb, Grete, Tine K. Jensen, Egil Nygaard, et al. 2014. "Post-traumatic stress reactions in survivors of the 2011 massacre on Utoya Island, Norway." *The British Journal of Psychiatry* 204, no. 5 (May): 361-367. Of the 490 survivors from the Utoya shooting invited to participate in the study, 325 agreed. Semi-structured face-to-face interviews were conducted by health personnel approximately 4-5 months after the shooting.

[42] Thoresen, Siri, Helene Flood Aakvaag, Tore Wentzel-Larsen, et al. 2012. "The day Norway cried: Proximity and

must remember that Breivik wrote in his manifesto that he was grateful that he was able to purchase ten 30-round ammunition magazines from a U.S. supplier who mailed the devices to him since these were not available to him in Europe.

61. More generally, survivors of serious gunshot injuries and multiple victim incidents involving intentionally inflicted harm are at higher risk of experiencing PTS symptoms.[43]

62. Not surprisingly, those who have experienced previous trauma or psychological disorders are especially vulnerable to potential mental health problems after a mass shooting.[44] Moreover, children are more susceptible experiencing PTS symptoms following a mass shooting. For example, a study of 320 students who survived a mass public shooting at a Danish high school found that seven months later 35 percent of students reported PTS symptoms and 7 percent had PTSD.[45]

---

distress in Norwegian citizens following, 22nd July 2011 terrorist attacks in Oslo and on Utoya Island." *European Journal of Traumatology* 3, (Nov). The study drew a representative sample from the Norwegian Population Registry. A total of 465 individuals living in Oslo and 716 individuals living in other parts of Norway were interviewed over the phone 4-5 months after the Breivik attacks.

Nordanger, Dag, Kyrre Breivik, Bente Storm Haugland, et al. 2014. "Prior adversities predict posttraumatic stress reactions in adolescents following the Oslo terror events 2011." *European Journal of Traumatology* 5, (May). The study was based on a survey of 10,220 Norwegian high school students that was conducted 7 months after the Oslo and Utoya terrorist attacks. It collected information both on adverse life experiences (e.g. exposure to sexual trauma, violence, etc.) and the exposure and reactions to the Breivik attacks.

[43] Greenspan, Arlene I., and Arthur L. Kellerman. 2002. "Physical and Psychological Outcomes 8 Months After Serious Gunshot Injury." The Journal of Trauma: Injury, Infection and Critical Care 53, no.4 (Oct): 709-716. This study interviewed 60 patients who were admitted to a Level 1 trauma center for firearm-related injuries, first, at the time of their hospitalization, and second, 8 months after they were discharged. Most respondents indicated symptoms of PTS 8-months post-discharge, with 39% reporting severe symptoms of intrusion and 42% reporting severe avoidance behaviors.

Santiago, Patcho N., Robert J. Ursano, Christine L. Gray, et al. 2013. "A Systematic Review of PTSD Prevalence and Trajectories in DSM-5 Defined Trauma Exposed Populations: Intentional and Non-Intentional Traumatic Events." *PLoS One* 8, no. 4 (April). The authors identified 2,537 articles published from January 1, 1998 to December 31, 2010 and covering longitudinal studies of directly exposed trauma populations. Of these articles, they closely surveyed 58 articles that met the DSM-5 definition of having experienced a traumatic event and assessed PTSD symptoms at two or more time points within a 12-month window. The authors found that in the 5 studies with sufficient data, a median of 37.5% of individuals exposed to intentional traumatic events developed PTSD.

[44] See Shultz et al (2014), supra note 39, and Littleton, Heather, Amie E. Grills-Taquechel, Danny Axsom, et al. 2012. "Prior Sexual Trauma and Adjustment Following the Virginia Tech Campus Shooting: Examination of the Mediating Role of Schemas." *Journal of Psychological Trauma* 4, no.6 (Nov): 579-586. This study had interviewed 215 Virginia Tech college women prior to the school's mass shooting and then followed up with them two months and then one year after the shooting. The authors compared the post-shooting PTSD and depression symptoms of women with and without a history of sexual trauma. The authors found that women who had experienced sexual trauma reported significantly higher levels of depression (p=0.006) and shooting-related PTSD symptoms (p=0.04) in the post-shooting interview.

[45] Elklit, Ask, and Sessel Kurdahl. 2013. "The psychological reactions after witnessing a killing in public in a Danish high school." *European Journal of Traumatology* 4, (Jan). Seven months after the mass public shooting, researchers administered the Harvard Trauma Questionnaire to Danish students in the second and third grade of high school (this is roughly equivalent to the final two years of high school in the US system). The questionnaire was also

19

JA-222

63.     A recent study of broad scope by Maya Rossin-Slater et al (2019) tries to estimate the impact on mental health of the over 240,000 American students who experienced and survived a school shooting in the last two decades. Using large-scale prescription data from 2006 to 2015, the authors examined the effects of 44 school shootings on youth antidepressant use in a difference-in-difference framework. Their main finding was that local exposure to fatal school shootings increased youth antidepressant use by 21.4 percent in the following two years.[46] Given such evidence, any notion that the problem of public mass shootings in the U.S. is relatively minor is untenable. With only 5 percent of the world's population, the U.S. has roughly one-third of the public mass shootings across 171 countries since the late 1960s.[47]

**Banning Assault Weapons Saves Lives and Reduces Injuries**

64.     The objective of Connecticut's assault weapons ban is to reduce the prevalence of weapons that will be most attractive to mass killers and most effective for committing mass murder or the type of rapid, sustained deadly fire that would be most advantageous for criminal purposes. In other words, there are two dimensions of assault weapons that are highly problematic in civilian hands: their dangerous symbolic and cosmetic features as well as their capacity to assist in mass killing. The zealous, pro-gun Texas politician Jerry Patterson – author of the 1995 Texas law that first allowed concealed carry of handguns – recognized the importance of the symbolic and cosmetic appeal of these weapons when he acknowledged that the primary value of an AR-15 in civilian life is to be "a look-at-me gun."[48] Unfortunately, no one desires this symbolic feature more than mass shooters, who frequently express the view that assault weapons will finally make others realize they are powerful. Moreover, as Senator Mark Warner noted in referring to a new proposed federal assault weapons ban, we must "recognize that the features and tactical accessories that define assault weapons under this legislation were designed for a specific purpose — to give soldiers an advantage over the enemy, not to mow

---

mailed to parents' addresses of students who had graduated in June. Of the 415 students enrolled at the time of the shooting, 320 students returned the questionnaire.

[46] Maya Rossin-Slater, Molly Schnell, Hannes Schwandt, Sam Trejo, Lindsey Uniat, Local Exposure to School Shootings and Youth Antidepressant Use, NBER Working Paper No. 26563 (December 2019), https://www.nber.org/papers/w26563. See also, "My son survived Sandy Hook. It's changed me as a parent," *The Washington Post,* December 13, 2019, https://www.washingtonpost.com/lifestyle/2019/12/13/i-cry-high-school-meets-how-sandy-hook-changed-me-parent/.

[47] Lankford, Adam, "Public Mass Shooters and Firearms: A Cross-National Study of 171 Countries," *Violence and Victims*, Vol 31, Issue 2, DOI: 10.1891/0886-6708.VV-D-15-00093, http://connect.springerpub.com/content/sgrvv/31/2/187.

[48] Rachel Monroe, "Are Texas Republicans Budging on Gun Control?" *The New Yorker* (June 16, 2022).

down students in school hallways."[49] The ominous and growing problem of mass public shootings since 2013 convinced the Virginia Senator to reverse his prior opposition to an assault weapons ban.

65.     Rifles that incorporate military-style features add to their capacity to enhance the death toll in a public mass shooting event: pistol grips and thumbhole stocks enable easier spray-firing; a collapsible or folding stock allows the weapon to be shortened and more easily concealed;[50] and barrel shrouds are essential for mass shooters to continuously fire their weapons without suffering discomfort from an overheated barrel.[51] As a consequence, these attributes make these weapons particularly appealing to mass shooters, drug traffickers, and people who may want to exchange fire with law enforcement.[52]

66.     Assault weapons, at least of the long gun variety, tend to have higher muzzle velocities than ordinary handguns.[53] They also tend to utilize .223 rounds designed to fragment and mushroom in a person's body, as illustrated in the 60 Minutes video referenced below at footnote 85.[54] These two factors in conjunction mean that injuries from being shot by assault weapons tend to cause more complex damage to the body in ways that make these wounds more dangerous and deadly in both the short and long term.[55]

---

[49] Mark Warner, "I voted against an assault weapons ban. Here's why I changed my mind," *The Washington Post*, October 1, 2018, https://www.washingtonpost.com/opinions/i-voted-against-an-assault-weapons-ban-heres-why-i-changed-my-mind/2018/10/01/3bfa76a0-c594-11e8-9b1c-a90f1daae309_story.html.

[50] Erica Goodejan, "Even Defining 'Assault Rifles' Is Complicated," *The New York Times* January 16, 2013, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html.

[51] *See* Rovella Aff. ¶¶ 34-38, *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014), *aff'd in part, rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); H.R. Rep. No. 103-489 (1994) at 18-19.

[52] H.R. Rep. No. 103-489 (1994) at 14-16; Brady Center to Prevent Gun Violence, *Assault Weapons: Mass Produced Mayhem*, October 7, 2008, *available at* http://www.bradycampaign.org/resources/assault-weapons-mass-produced-mayhem (last visited Oct. 12, 2018) at 3; Batts Decl. ¶¶ 33, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), *aff'd in part, vacated in part, remanded sub nom.* Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), and *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017).

[53] *See* Defs' Stmt. Docket Entry 63 ¶¶ 44–45, 58–59, 61, 64–65, *Worman v. Healey*, 1-17-CV-10107, 293 F. Supp. 3d 251 (D. Mass. 2018).

[54] *See* Batts Decl. ¶¶ 44-45, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), aff'd in part, vacated in part, remanded sub nom. Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), and *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017); Rovella Aff. ¶¶ 39, *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014), *aff'd in part, rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); Duncan Long, *The Complete AR-15/M16 Sourcebook* (2d ed.), 2001 at 50; Colwell Decl. at 2-4, *Worman v. Healey*, 293 F. Supp. 3d 251 (D. Mass. 2018).

[55] *See* Colwell Decl. in Supp. of Defs.' Opp. to Mot. for Prelim. Inj. ¶ 8.

**Banning High-Capacity Magazines Saves Lives and Reduces Injuries**

67.     Louis Klarevas, the author of Rampage Nation: Securing America from Mass Shootings (Amherst, NY: Prometheus 2016), has become the primary authority on research concerning mass shootings in the United States. Klarevas finds that the use of large-capacity magazines leads to more bullet wounds for victims (thereby substantially increasing the death toll of those who are shot), results in more shots fired (thus increasing the number of individuals who are shot) and reduces the capacity of potential victims to flee to safety or take effective defensive action.

68.     Klarevas was the first to highlight that the ten-year federal ban on assault weapons and high-capacity magazines reduced the toll from mass shootings. Klarevas illustrated that the pattern of the deadliest mass shootings changed over the period from 1984-2014. Examining gun massacres in which at least six were killed, Klarevas found that these incidents and the number of resulting deaths fell during the decade in which the federal assault weapons ban was in place and then rebounded when the ban was lifted in 2004.

69.     Specifically, Klarevas found that, from 1994-2004, there were only 12 incidents – slightly over one per year – due to assault weapons, resulting in 89 deaths. In the following decade, when the federal assault weapons ban was no longer in place, there was a dramatic surge in both the number of gun massacres and the total death toll: From 2004-2014, the number of gun massacres rose from 12 to 34 and the number of gun deaths jumped from 89 to 302. Moreover, since overall crime was trending down over this period, the link between the expansion of high-capacity magazines following the lapse in the federal assault weapon ban and the increased number of gun massacres is further buttressed.

22

**JA-225**

**Figure 3**



# Gun massacres fell during the assault weapons ban

Gun massacre (6+ deaths) incidents and fatalities in the decades before, during and after the federal assault weapons ban of 1994

Source: Louis Klarevas
THE WASHINGTON POST

70.    Since the Klarevas data ended in 2014, I conducted my own study both to verify the accuracy of his findings and then to extend the analysis forward to the present. In implementing his definition of a gun massacre as a mass shooting incident in which 6 or more people died, Klarevas notes in his book that "It doesn't matter if there is one gunman or several gunmen. It doesn't need to occur in public. It can be for any reason whatsoever." In my study, I chose to use the *Mother Jones* database, which does limit the gun crimes to killings occurring in a public place and omits killings related to armed robbery, gang activity, or domestic violence in accord with recent FBI practice. I augmented the Mother Jones data whenever I found it had missed relevant mass shootings that appeared in other mass shooting databases.

23

71.     Figure 4 below shows the number of incidents of such gun massacres and the deaths resulting therefrom based on these criteria.[56] The figure illustrates clearly that the number and deadliness of these mass shootings dropped during the ten years of the federal assault weapons ban from September 1994 through 2004 and rose sharply after the federal ban was lifted.[57] Although the number of incidents is too limited to highlight the 25 percent drop in gun massacres, the 40 percent drop in overall fatalities during the period of the federal ban is substantial and noteworthy.

72.     After the federal ban lapsed in 2004, the gun market was flooded with increasingly more powerful weaponry that allowed mass killers to kill ever more quickly with predictable results. The decade after the ban elapsed saw a 266 percent increase in mass shooting incidents and a 347 percent increase in fatalities, even as overall violent crime continued downward (reflected in the dotted line in Figure 4). In other words, my independent assessment confirms the pattern first revealed by Louis Klarevas: gun massacres fell during the assault weapons ban and rose sharply when it was removed in 2004.

73.     What has happened since 2014 is even more alarming. In five years, the number of fatalities in these gun massacres has already topped the previous high that occurred during the first decade after the federal assault weapon ban was removed. This murderous leap has occurred at the same time that overall violent crime persisted on a downward trend, as the dotted line in Figure 4 confirms.[58] If we continue at the post-2014 pace until 2024, the last column of Figure 4 shows that we will have an astonishing order of magnitude increase in gun massacre deaths over a 20-year period.[59]

---

[56] Figures 1 and 2 are replicated from John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV and discussed further in John Donohue, "The Swerve to 'Guns Everywhere:' A Legal and Empirical Analysis," *Law and Contemporary Problems*, (forthcoming, February 2020). See also the earlier piece: John Donohue and Theodora Boulouta, "That Assault Weapon Ban? It Really Did Work," *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html.

[57] The Federal Assault Weapons Ban took effect September 13, 1994, and expired on September 13, 2004, due to a sunset provision that enabled the law to lapse after President George W. Bush reneged on his campaign promise to support retention of the federal ban.

[58] This downward trend in violent crime even as mass shootings rise after 2004 is important evidence of the harmful impact of ending the federal assault weapons ban. Without that evidence one might mistakenly think that the overall violent crime drop of roughly 14 percent during the decade of the federal assault weapons ban was simply part of downward crime which itself explains the drop in mass shooting deaths. The experience after 2004 undermines that view.

[59] Note that the numbers of mass shootings would be substantially larger using alternative definitions, such as the Gun Violence Archive definition of *four individuals wounded by gunfire in a single incident*. Using that more

24

74.     The evident effectiveness of the ten-year federal ban in reducing mass shooting deaths is exactly what we would expect, since during that decade mass killers could not simply enter a gun store and buy a weapon with a large capacity magazine, as they can do in most of the U.S. today.[60]

75.     Figure 5 illustrates the average number of fatalities in each mass shooting for the same four periods shown in Figure 4. The pattern is the same: fatalities per incident fell during the federal assault weapon ban and have risen sharply thereafter. With the weaponry available to citizens getting increasingly more potent and plentiful, the average number of people who die in every incident has increased by 90 percent since the decade after elimination of the federal assault weapons ban.

76.     Assault weapons and/or high-capacity magazines were used in all 15 gun massacres since 2014 in which at least six were killed (other than the shooter) shown in Figure 4; all 272 people who died in these 15 gun massacres were killed by weaponry prohibited under the federal assault weapons ban (as well as the comparable Connecticut ban).[61]

---

capacious definition, there have been 366 mass shootings in the first 318 days of 2019, killing 408 and injuring 1477. https://www.insider.com/number-of-mass-shootings-in-america-this-year-2019-8.

[60] With the adoption of a new law in Illinois this week, 9 states and the District of Columbia ban assault weapons and all of those states plus Colorado and Vermont restrict the permissible size of ammunition magazines.

[61] After Figure 4 was created another victim of the Las Vegas shooting died after two horrendous and agonizing years as a quadriplegic, which elevates to 272 the number of deaths form public gun massacres in the last five years. The following article highlights some of the devastating injuries that result from being shot by an assault rifle, such as that used by the Las Vegas shooter. https://www.kptv.com/news/vancouver-woman-says-sister-injured-in-las-vegas-shooting-has/article_af9198c6-099c-11ea-87c1-37de7096726f.html.

25

**Figure 4**



Gun Massacres Were Less Frequent And Less Deadly During The Federal Assault Weapons Ban
(six or more killed, not including perpetrator)

Mass shooting data from Mother Jones; dates begin and end in September to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place, except for the last column, which ends in 9/2/2019. Violent crime rate data from UCR; dots mark ten-year averages, except for the last dot, which ends in 6/2018.

**Figure 5**



Gun Massacres: Deaths per Incident
(six or more killed, not including perpetrator)

Mass shooting data from Mother Jones; dates begin and end in September to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place, except for the last column, which ends in 9/2/2019.

77.     This instrumentality effect was further demonstrated in an article I authored with Phil Cook since my 2019 Report, demonstrating that the federal assault weapons ban—which banned both new semi-automatic assault rifles with certain features that made them attractive to mass shooters *and* new ammunition magazines that could hold more than ten rounds— suppressed deaths in public mass shootings.[62] Figure 6 below shows that the deaths that occurred from these public mass shootings over the period from 1985-2019 in five year increments. The Figure highlights that by the second half of the ten-year existence of the federal assault weapons ban (1999-2004), fatalities from public mass shootings using banned weaponry had virtually been cut in half (falling from 30 down to 16). Conversely, there was no decline in public mass shooting deaths over this period with non-banned weaponry.

---

[62] Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," *JAMA*. 2022; 328(12):1191-1192. https://jamanetwork.com/journals/jama/fullarticle/2796675.

**Figure 6**



Victim Counts for Mass Public Shootings in the United States, 1985 - 2019
Using Assault Weapons and/or High-Capacity Magazines versus Other Firearms

in the last five year period, the 18 incidents with the more lethal weapons were far more deadly than the 14 incidents with the less lethal firearms.

78.     After the federal ban lapsed in 2004, the deaths from public mass shootings using the previously banned weaponry rose sharply: rising from 16 in the last five years of the federal ban to 271 in the five-year span from 2015-2019—with the latter figure 17 times as high as the former. Meanwhile, there was relatively little movement in public mass shooting deaths using the less-lethal weaponry (neither an assault weapon nor a high-capacity magazine). Indeed, as Figure 6 illustrates, there was roughly the same number of deaths from less lethal weaponry in the five-years prior to the federal assault weapons ban (1990-1994) as there was from 2015-2019—specifically 83 in the pre-ban period and 81 in the final period.

79.     Figure 6 also highlights that while there was a roughly comparable *number of incidents* of public mass shootings that used either the most lethal (previously federally banned) weaponry or less lethal firearms not subject to the federal ban, the incidents involving assault weapons and/or high-capacity magazines were far more lethal. Specifically, the 18 public mass shootings conducted with the most lethal weapons killed 271 (roughly 15 deaths per episode),

while the 14 public mass shootings with the less lethal firearms killed 81 (about 5.8 deaths per episode).

**Restrictions on Assault Weapons Reduce Mass Shooting Deaths and Casualties**

80.     Table 2 provides an original econometric analysis of Mother Jones mass shootings data from 1982-2019 to assess empirically whether assault weapons bans at the state and federal level have limited mass shootings deaths and overall casualties. This analysis reveals that such bans do generate statistically significant reductions in mass shooting deaths and casualties.

81.      This panel data analysis simultaneously examines data from all 50 states and the District of Columbia from 1982-2019 to ascertain what happens when federal or state bans on assault weapons and/or high-capacity magazines go into effect or are eliminated. The statistical model specifically controls for national influences on mass shootings that occur each year ("year effects") as well as the stable differences in mass shooting rates across states ("state effects").[63] This panel data model also controls for a variety of criminal justice, socio-economic, and demographic factors that could also influence violent crime.[64]

82.     Table 2 indicates that having an assault weapon ban (whether at the state or federal level) and/or high-capacity magazine ban in place in a given state is associated with a statistically significant decrease in per capita rates of deaths and casualties due to mass shootings.[65] Overall, this analysis serves to further reinforce and expand upon earlier findings that bans on assault weapons and high-capacity magazines save lives.

---

[63] This is a population-weighted, state-level two-way fixed effects regression.

[64] The controls include the lagged incarceration rate in each state for each year, the lagged police employee rate, real per capita personal income, the unemployment rate, poverty rate, beer consumption, the percentage of the population living in MSAs, and six demographic variables (based on different age-sex-race categories).  This statistical model is described in greater details in Donohue, John, Abhay Aneja, and Kyle Weber, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

[65] The model also suggests that these gun safety restrictions suppress the rate of mass shooting incidents and injuries, although the evidence is statistically weaker for these dependent variables although the injury-alone effect is statistically significant at the .10 level.

**Table 2**

*The Effect of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings, 1982-2019*

| | Mass Shooting [a] *Incidents* per 10,000,000 Population | Mass Shooting *Deaths* per 1,000,000 Population | Mass Shooting *Injuries* per 1,000,000 Population | Mass Shooting *Casualties* [b] per 1,000,000 Population |
|---|---|---|---|---|
| Assault Weapon or High-Capacity Magazine Ban [c] | -.07 (0.05) | -.09** (0.04) | -.22* (0.12) | -.31** (0.15) |

Notes: Outcome variables are based on *Mother Jones*' database of mass shootings in the 50 states plus Washington DC from 1982 to 2019. The OLS regressions also included the socioeconomic control variables used in DAW 2019 as well as state and year fixed effects. The coefficients on these variables were omitted from this table to conserve space. Regressions are weighted by each state's 1999 population, and standard errors are clustered at the state level.

[a] Mass shootings are defined as attacks in public places in which four or more victims were killed.

[b] Casualties are defined as people who were either injured or killed during a mass shooting.

[c] The variable "Assault Weapon or High-Capacity Magazine Ban" is assigned a value of 1 for each state-year for which either an assault weapon ban or high-capacity magazine ban was active, and 0 for all other state-years.

∗ $p<0.1$; ∗∗ $p<0.05$; ∗∗∗ $p<0.01$

83.     One of the unfortunate consequences of the continuing advances in the lethality and power of modern firearms is that without appropriate government action the dangers posed by civilian weaponry will continue to outpace any legitimate crime-reducing benefit that firearms might provide. The lesson of the November 2017 massacre at the Sutherland Springs Baptist

Church in Texas highlights the growing dangers. The killer in that case used an AR-15 that was modified to include a laser scope and features that could allow large capacity magazines to be more quickly reloaded to maintain a relentless barrage. The killer stood outside the church and fired straight through the walls of the church as he strafed along at just above the top of the levels of the church pews, allowing him to shoot 254 shots from **outside** the church in a matter of minutes on his way to killing 26 men, women, and children. No portable weapon in civilian hands at the time of the adoption of the Second Amendment could possibly generate this degree of destruction so rapidly. The evident social harms will only grow as gun technology increases firearm lethality.

84.     The tragedy that first brought mass shootings into the public consciousness is often thought to be the 1966 reign of death from the top of the University of Texas memorial tower when Charles Whitman used scoped hunting rifles to kill 14 and wound 32. Whitman was an expert Marine marksman, perched in a very protected space to continue his barrage, and it took him 90 minutes to produce this level of mayhem. Fast forward to November 5, 2009, and Nidal Hasan, an inexperienced shooter, was able to fire 214 times at Fort Hood in less than 10 minutes with a faster shooting handgun equipped with high-capacity magazines, killing 13 and also wounding 32.[66] The August 4, 2019 attack targeting a Dayton, Ohio bar district lasted only 32 seconds, yet armed with a 100 round drum magazine, the shooter was still able to kill nine and shoot 17 others.[67]

85.     By 1981, as we saw with the Hinckley attempted assassination of Reagan, the US had not moved into the era of pervasive possession of modern weaponry, which was launched by both the increased advertising of assault rifles and the move towards modern pistols with high-capacity magazines that was catalyzed by the advent of the Glock 9 mm semiautomatic pistol, introduced into the U.S. market in 1986.  These developments were accompanied by the U.S. gun market's fixation on ever bigger magazines and growing military-style appearance and enhanced lethality, turning mass shootings from once in a decade events in the 1960s and 1970s

---

[66] Lee Hancock, The gun Nidal Hasan used to kill at Fort Hood, Jun 17, 2011, https://www.dallasnews.com/opinion/commentary/2011/06/17/lee-hancock-the-gun-nidal-hasan-used-to-kill-at-fort-hood/.

[67] Although the shooter had previously been suspended from high school for making hit lists of students he wanted to rape and kill, he met the gun industry definition of a responsible, law-abiding citizen who should be able to purchase the weaponry he employed to commit mass murder. Biesecker, Michael; Carr Smyth, Julie (August 5, 2019). "Classmates: Ohio shooter kept a 'hit list' and a 'rape list'". Associated Press.

31

into the growing menace that they have become today. As the problem grew in the 1980s, government efforts at the state and federal level began, with the only serious national effort designed to address the problem coming in 1994 with the passage of the federal prohibition of new assault weapons and high-capacity magazines. While the ten years in which this federal ban was in place did restrict mass shootings, the lapsing of the federal ban and the continued expansion of these weapons has correlated tightly with the growing menace of mass shootings.

86.    The dramatic increases in gun massacre incidents and fatalities closely tracks the growth in U.S. sales of previously federally banned weaponry that was ignited by the expiration of the federal assault-weapons ban in 2004, the removal of potential liability on the part of gun merchants, and intense advertising of the militarized upgrades, ranging from high-capacity magazines to flash suppressors, that stimulated the demand for this highly dangerous consumer product. Josh Sugarmann, executive director of the Violence Policy Center, notes that "The end of the assault-weapons ban allowed for the customization and modification of these weapons to make them look even more militaristic, even more grand in the eyes of their owners."[68]

87.    Research published following the mass shootings in Buffalo, New York and Uvalde, Texas killing a total of 31 in May 2022 further confirms these findings.[69] Specifically, an analysis of mass shooting data by a group of injury epidemiologists and trauma surgeons reached the following conclusion:

> We calculated that the risk of a person in the U.S. dying in a mass shooting was 70% lower during the period in which the assault weapons ban was active. The proportion of overall gun homicides resulting from mass shootings was also down, with nine fewer mass-shooting-related fatalities per 10,000 shooting deaths.

88.    Another empirical study that examined high-fatality mass shootings killing at least six victims between 1990 and 2017 similarly concluded that "LCM bans have been effective at saving lives" by reducing the incidence of and deaths in these mass shootings.[70] The authors found that:

---

[68] Quoted in Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

[69] Klein, Michael, 2022. Did the assault weapons ban of 1994 bring down mass shootings? Here's what the data tells us, *The Conversation*, June 8, 2022, https://theconversation.com/did-the-assault-weapons-ban-of-1994-bring-down-mass-shootings-heres-what-the-data-tells-us-184430.

[70] Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. *Am J Public Health*. 2019;109(12):1754-61. doi: 10.2105/ajph.2019.305311.

89.     Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

**Industry Advertising Appeals to Potential Mass Shooters**

90.     A year after the lapsing of the federal assault weapons ban, the Protection of Lawful Commerce in Arms Act (PLCAA) was passed, which provided gun manufacturers with near-blanket immunity from suits based on the criminal misuse of their products. This emboldened a torrent of consumer advertising designed to highlight the battlefield appeal of modern assault weapons, and sales soared in response. The dramatic rises in gun massacres followed.

91.     These advertising campaigns reveal exactly how the gun industry sought to market assault weapons: they are hawked with explicit depictions of combat and phrases like "The closest you can get without having to enlist."[71]

92.     Unsurprisingly, a growing number of mass killers turn to these assault rifles when they launch their deadly onslaughts. Moreover, an industry survey of civilian assault-rifle ownership "reveals that the average civilian assault-rifle owner keeps a small arsenal, owning three or more of the guns; 27 percent of owners have bought four or more. [Unfortunately,] many civilian assault-rifle owners fail to secure their arms; nearly one owner in five does not lock up his rifle, and more than 30 percent take no care to secure their ammunition."[72] In other words, a very substantial fraction of owners of assault rifles act irresponsibly, thereby exposing their weapons to loss or theft and resulting criminal misuse. For example, the weapons used by Adam Lanza to kill his mother, Nancy Lanza, and in the Newtown shooting were owned by his mother – a pattern that has repeated itself all too often as the *Wall Street Journal* noted (see footnote 32, above).

---

[71] *Id.*

[72] The NSSF periodically conducts research on civilian assault rifles intended for gun sellers, and these figures are from their latest survey. Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

93.     The makers of the Bushmaster assault rifle Nancy Lanza owned and that her son Adam Lanza used to gun down first-graders and teachers in Newtown was sold under the slogan "Forces of opposition, bow down." While such weapons are designed for and appropriately used by trained military personnel and law enforcement, they are exceedingly dangerous when wielded by mentally unstable civilians.

94.     While the United States does not have a higher rate of mental illness than other advanced industrialized nations, it certainly has a higher rate of public mass shootings. This is in part because young men are saturated in a gun culture created by advertising designed to exploit their weaknesses.

95.     In their Motion for Preliminary Injunction, the Plaintiffs quote the oft-repeated but clearly erroneous gun industry assertion that "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." Stenberg v. Carhart, 530 U.S. 914, 1001 (2000) at n. 16 (Thomas, J., dissenting). The truth is exactly the opposite.

96.     Throughout the 1980s the gun industry marketed AR-type rifles as "assault" weapons because this marketing promoted sales. The image below of a Guns & Ammo magazine cover highlighting assault rifles in July 1981 is just one of the numerous such advertisements and gun industry publications concerning assault weapons that one can find on the web throughout the 1980s.[73] Only when the increase in civilian ownership of these weapons was followed by outrage over (and fears of potential tort liability for) prominent mass shootings did the industry shift away from that direct terminology in its advertisements (while continuing to market guns with appeals to their military character).

---

[73] See, https://www.democraticunderground.com/126210025.

**Figure 7**

Cover of the July 1981 Issue of Guns & Ammo[74]



97.     Consider the following Bushmaster advertisement for the gun that Adam Lanza used, and imagine the impact it could have on someone struggling with substantial mental health problems:

---

[74] Reproduced from the *New York Times*, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html.

35

**Figure 8**



98.    Notably, while Lanza used a Savage Mark II bolt-action .22-caliber rifle to kill his sleeping mother, he chose the much more dangerous Bushmaster assault weapon with 30-round magazines that enabled him to fire 154 bullets over the 264 seconds in his lethal rampage at Sandy Hook School.[75] We can surmise that if he had only a bolt action hunting rifle, he could not have fired as many bullets and many lives would have been spared.

99.    The impact of the gun industry's efforts to exploit messages about assault weapons directed at those with deep insecurities and even mental health issues showed up in another recent mass shooting.

---

[75] Coalition to Stop Gun Violence, "What Adam Lanza Took, and Didn't Take, to Sandy Hook Elementary," https://www.csgv.org/adam-lanza-took-didnt-take-sandy-hook-elementary/ (last visited on October 22, 2018).

**Figure 9**



100.     The nineteen-year old killer of 17 at Parkland High School (on February 14, 2018) was moved to post the above NRA image on his Instagram account. He stated in a recording that he had had enough of being told what to do and was tired of being called "an idiot." "I am nothing. I am no one, my life is nothing and meaningless. With the power of the A.R., you will know who I am."

101.     Industry advertisements of guns "for the 'warrior' in you" undoubtedly enhance sales, but they convey an entirely inappropriate message to a civilian population.[76] The marketing strategy of gun sellers that exploits the fantasies of young men leads troubled individuals like the Sutherland Springs mass shooter to highlight their attachment to their weapons: he posted a picture of his AR-15 with the heading "She's a bad bitch" shortly before he killed 26 in Texas in 2017.[77]

---

[76] E-mail advertisement by the U.S. Concealed Carry Association, September 8, 2022.
[77] Seventeen-year-old Kyle Rittenhouse was drawn to the illegal purchase of the AR-15-style rifle he used to kill two and maim one because it "looked cool." Donohue, "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," *The Conversation*, December 6, 2021, https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-

37

102.     Of course, banning assault weapons does not eliminate the threat from troubled individuals, but since these weapons are particularly attractive to troubled potential mass killers and specifically designed to facilitate the most rapid and effective annihilation of all intended targets, bans on assault weapons is not only prudent but indeed indispensable in any governmental effort designed to effectively address the mass shooting problem in America. A brief discussion of how and why the AR-15 came to be chosen as the primary military combat weapon used by the U.S. in Vietnam explains why.

**The Army Adopts the AR-15 for Battlefield Use**

103.     In 1957, the Army invited Armalite's chief gun designer, Eugene Stoner, to produce a lightweight, high-velocity rifle, that could operate in both semi- and full-automatic modes with firepower capable "of penetrating a steel helmet or standard body armor at 500 yards." Stoner devised the AR-15 to meet these specifications. The Advanced Research Projects Agency (ARPA) –today known as DARPA – was so impressed with the AR-15's value as a combat weapon that it pushed to have 1,000 rifles shipped for use by South Vietnamese troops and their American special-forces trainers in 1961.

104.     The performance of this new assault weapon was assessed in a confidential ARPA report in July 1962, stating "The AR-15 Armalite rifle has been subjected to a comprehensive field evaluation under combat conditions in Vietnam."[78] The report noted that "The lethality of the AR-15 and its reliability record were particularly impressive."[79] The wounds generated by this weapon were prodigious: "At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic hitting one VC [(Viet Cong)] with 3 rounds [of Caliber .223] with the first burst. One round in the head-took it completely off. Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter. It cannot be determined which round killed the VC but it can be assumed that *any one of the three would have caused death*."[80]

105.     The report enumerated the wounds in a Ranger ambush of a Viet Cong position, including: a back wound that "caused the thoracic cavity to explode"; a buttock wound that

---

the-rittenhouse-verdict-172741.

[78] Advanced Research Projects Agency, Office of the Secretary of Defense, *Field Test Report, AR-15 Armalite Rifle*, at 4 (July 31,1962,). Retrieved October 12, 2018 from http://www.dtic.mil/dtic/tr/fulltext/u2/343778.pdf
[79] Id. at 15.
[80] Id. at 22 (emphasis added).

38

"destroyed all tissue of both buttocks"; and finally "a heel wound," where "the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip." All the deaths were "instantaneous," "except the buttock wound. He lived approximately five minutes."[81]

106.     The "phenomenal lethality" of the AR-15 described by ARPA led the Army in December 1963 to adopt the AR-15 – rebranding it the M16.

107.     Of course, the civilian AR-15 lacks the fully automatic (and burst) mode of the M16, but it still retains all the other aspects that made it such a valuable lethal weapon for deadly combat. In fact, the Army's own Field Manual states that semi-automatic fire is the "most important firing technique during fast-moving, modern combat," noting, "It is surprising how devastatingly accurate rapid semi-automatic fire can be."[82] In other words, saying that this semi-automatic assault weapon is not a weapon of war because it doesn't have fully automatic capacity is like saying that a conventional bomber is not a war plane because it isn't carrying a nuclear payload. Indeed, the ability to convert a civilian AR-15 into a fully automatic weapon – or the near fully-automatic capacity that Stephen Paddock used in the Las Vegas shooting of a year ago – is yet an additional factor that renders it unusually dangerous.

108.     According to one of its designers, the AR-15 assault rifle was originally engineered to generate "maximum wound effect." "It's a perfect killing machine," says Dr. Peter Rhee, a trauma surgeon and retired Navy captain.[83]

109.     Rhee was the doctor who saved the life of Arizona Rep. Gabby Giffords after she was shot in the head with a handgun fired during a mass shooting in 2011. According to Rhee: "A handgun [wound] is simply a stabbing with a bullet. It goes in like a nail. [But with the AR-15,] it's as if you shot somebody with a Coke can."

110.     The identical message was conveyed by one of the emergency room doctors who treated some of the pulverized victims of AR-15 wounds inflicted during the catatostrophic Parkland shooting that killed 17 and wounded 17 others in a span of four minutes.[84] The CBS show 60 Minutes also provided a dramatic experiment to illustrate the far more destructive

---

[81] Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/
[82] Id.
[83] Id.

[84] Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic*, February 2018, https://www.theatlantic.com/amp/article/553937/

impact on human tissue of being shot with an AR-15 than a handgun, as seen in the referenced video "What Makes the AR-15 so Deadly?"[85]

**The Allure of and Value to Mass Shooters of Assault Weapons**

111. It is not surprising that mass shooters employing these particularly lethal weapons are able to kill so many so quickly: Adam Lanza was able to slaughter 26 in less than five minutes with his Bushmaster AR-15. James Holmes used a Smith & Wesson "Military & Police" (M&P) AR-15 fitted with a 100-round magazine to kill 12 and wound 58 in a Colorado movie theater. The ISIS-inspired San Bernardino, California, shooters used a pair of AR-15s to kill 14. Orlando shooter Omar Mateen unleashed Sig Sauer's concealable "next-generation AR" to leave 49 dead and dozens more injured at the Pulse nightclub.

112. In July 2016, incensed by police shootings of unarmed black men, Gavin Long used a rifle with a 40-round magazine to shoot six police officers in Baton Rouge, Louisiana, killing three before he himself was killed by a police sniper. Long used a TAVOR assault rifle – which the manufacturer describes as "the ultimate weapon of the 21st century" employed by armed forces around the globe. Israel Weapon Industries notes on its webpage that this particular weapon, developed in co-operation with the Israeli Defense Forces, was "especially created" in response to "dynamic changes in the modern battlefield, the threats of global terrorism and the demands of ever-changing combat situations."[86]

113. Moreover, there is not the slightest evidence that the federal restrictions on assault weapons that was enacted in 1994 (and lapsed ten years later) compromised the safety of law-abiding citizens. Since these weapons are useful for those bent on mass killing, further limiting their availability should have a beneficial effect on the active shooter and mass shooting problems that are serious and worsening in the United States.

114. Hundreds of law-abiding citizens have been killed in mass shootings and the problem of mass shootings is getting worse. Since the value of assault weapons over non-assault weapons for legitimate self-defense is virtually non-existent, the primary impact of removing such weapons from circulation will be to decrease the prospect that a law-abiding citizen will be confronted by a criminal with such weaponry.

[85] https://www.cbsnews.com/news/ar-15-used-mass-shootings-weapon-of-choice-60-minutes-2019-06-23/.
[86] James Gill, "Civilians carrying 'ultimate weapon' Gavin Long used in Baton Rouge would be regarded worldwide as insane," The New Orleans Advocate, August 10, 2016.

40

115. "[L]aw-abiding citizens" whose guns are lost or stolen each year are one of the most important sources of weapons for criminals in the United States. The best current estimates are that roughly 400,000 guns move into the hands of criminals this way each year in the United States.[87] In other words, it is orders of magnitudes more likely that a criminal will steal a gun of a law-abiding citizen than a law-abiding citizen will fire an assault weapon in lawful self-defense. More assault weapons in the hands of law-abiding citizens like Nancy Lanza means more assault weapons in the hands of criminals such as Adam Lanza.

116. Further, many of the most horrific mass shootings in America were perpetrated by previously law-abiding citizens. The list, which is too long to recite, includes Stephen Paddock, who killed 59 in Las Vegas; Omar Mateen, who killed 49 in the Pulse nightclub in Orlando; Adam Lanza, who killed 26 in Newtown, Connecticut; and the Batman killer in Aurora, Colorado, who killed 12, as well as the Buffalo and Uvalde, Texas shootings in May 2022, where 10 and 21 died, respectively, after being shot with assault weapons equipped with high-capacity magazines.

117. The empirical evidence supports the conclusion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban, many of the gun tragedies of recent years would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States. It is also my opinion that Connecticut's ban on high-capacity magazines is one tool in the important governmental effort to reduce the likelihood that residents of the state will be killed in mass shootings by making it incrementally harder for prospective mass shooters to equip weapons with lethal accoutrements that are both uniquely appealing to their criminal aspirations as well as uniquely designed to aid in their homicidal rampages.

---

[87]According to Larry Keane, senior vice president of the National Shooting Sports Foundation (a trade group that represents firearms manufacturers), "There are more guns stolen every year than there are violent crimes committed with firearms." More than 237,000 guns were reported stolen in the United States in 2016, according to the FBI's National Crime Information Center. The actual number of thefts is obviously much higher since many gun thefts are never reported to police, and "many gun owners who report thefts do not know the serial numbers on their firearms, data required to input weapons into the NCIC." The best survey estimated 380,000 guns were stolen annually in recent years, but given the upward trend in reports to police, that figure likely understates the current level of gun thefts. See, Freskos, Brian. 2017c. "These Gun Owners Are at the Highest Risk of Having Their Firearms Stolen." *The Trace*. 4/11/2017. https://www.thetrace.org/2017/04/gun-owners-high-risk-firearm-theft/ and Freskos, Brian. 2017b. "Missing Pieces." *The Trace*. 11/20/2017. https://www.thetrace.org/features/stolen-guns-violent-crime-america/.

**Gun Control Dramatically Reduced Mass Shootings in Australia**

118.     In this regard, consider what happened in Australia after a gunman shot and killed 35 people in Port Arthur, Tasmania in 1996. The Australian federal government persuaded all states and territories to implement tough new gun control laws. Under the National Firearms Agreement (NFA), firearms legislation was tightened throughout the country, national registration of guns was imposed, and it became illegal to hold certain long guns that might be used in mass shootings. The effect was that both while there were 7 public mass shootings in Australia during the seventeen-year period 1979–96 (a per capita rate that was higher than in the U.S. at the time), there have been none in the 23 years since (in contrast to the bleak trend in public mass shootings in the United States[88]). Adjusting for the relative populations of the two countries, it would be as though there were 103 separate mass shooting events in the 18 years prior to the massive Australian gun buyback and none in the 23 years since.[89]

119.     The important point of the Australian experience for present purposes is that by depriving disturbed individuals of the vehicle by which they imagined they would unleash their murderous impulses, Australia showed that strong gun control measures such as bans on semiautomatic rifles could dramatically reduce the number of mass shootings – even if guns are still widely available, as they remain in Australia.

120.     Although the ban was highly controversial when enacted in 1996, the results have been so unambiguously positive for the country that there is now overwhelming support for it throughout Australia, as repeatedly shown in public opinion polls. For example, a survey by Essential Research in 2016 confirmed that 44 percent thought Australians gun restrictions were "about right" and 45 percent thought the laws were "not strong enough."[90] Against this 89 percent in support of gun restrictions, only 6 percent thought the laws were "too strong." Significantly, the poll specifically noted that these views were now consistent regardless of political party voting tendency for Labor, Coalition, or Greens voters.

---

[88] Dan Diamond, "**Mass Shootings Are Rising. Here's How To Stop Them,**" *Forbes,* June 18, 2015 (depicting the accelerating trend in the U.S. versus the benign trend in Australia), https://www.forbes.com/sites/dandiamond/2015/06/18/charleston-deaths-are-an-american-tragedy-mass-shootings-are-rising/#12bd32ef787b.

[89] The population of Australia in 1996 was 18.3 million and the population of the US in the same year was 269.4 million, according to data from the World Bank.

[90] Essential Research, "Gun laws", 1 November 2016.

121.     New Zealand followed the Australian lead after a horrific mass murder with an assault rifle,[91] and Canada announced in May 2022 its plans for a similar gun buyback for its current stock of assault weapons after its own horrendous mass shooting prompted the enactment of a ban on assault weapons in 2020.[92] Tellingly, in announcing an array of stringent gun safety measures, Canadian Prime Minister Justin Trudeau showed that he has learned from the lamentable experience of mass killings in the United States: "We need only look south of the border to know that if we do not take action, firmly and rapidly, it gets worse and worse and more difficult to counter."

## **High-Capacity Magazines Enhance The Danger from Firearms, Which Can be Curtailed by Regulation**

122.     While defensive gun ownership is designed to prevent violence, the intent of the public mass shooter is to kill as many people as possible. Accordingly, the lethal capacity of the weapon will influence that toll of these homicidal events (as opposed to the defensive setting when brandishing typically achieves its goal). As Klarevas, Koper, and courts have observed, assault weapons with large capacity magazines are disproportionately used in mass shootings.[93] When such weapons are deployed in mass shootings, they "result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.'"[94] Among the mass shootings identified in a 2016 study by Everytown for Gun Safety, use of a large capacity magazine, or assault weapon that likely included a large capacity magazine, was associated with more than twice as many people being shot and nearly 50 percent more people being killed.[95]

---

[91] Associated Press, "New Zealanders hand in 50,000 guns after assault weapon ban," Dec. 21, 2019, https://www.nbcnews.com/news/world/new-zealanders-hand-50-000-guns-after-assault-weapon-ban-n1106081 ("The government banned the most lethal types of semi-automatic weapons less than a month after a lone gunman in March [2019] killed 51 worshippers at two Christchurch mosques. The police then launched a six-month program to buy the newly banned weapons from owners.")

[92] The Prime Minister also announced that magazine size would be restricted to five rounds in long guns. Justin Trudeau, "Further strengthening our gun control laws,' (May 30, 2022), https://pm.gc.ca/en/news/news-releases/2022/05/30/further-strengthening-our-gun-control-laws. Amanda Coletta, "Canada vows to 'freeze' handgun sales, buy back assault-style weapons," *The Washington Post* (May 30, 2022)("[T]he government banned 1,500 makes and models of "military-style assault weapons" in 2020, after a gunman posing as a police officer charged across rural Nova Scotia, killing 22 people, including a Royal Canadian Mounted Police officer, in the country's deadliest mass shooting.")

[93] Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, Washington Post, February 15, 2018, https://www.washingtonpost.com/news/wonk/wp/2018/02/15/its-time-to-bring-back-the-assault-weapons-ban-gun-violence-experts-say/; Koper 2004 Assessment at 14, 18.

[94] *N.Y.S. Rifle*, 804 F.3d at 264 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011)).

[95] Mass Shootings in the United States: 2009 – 2016, Appendix of Shootings Profiled, https://everytownresearch.org/documents/2017/03/appendix-mass-shootings-united-states-2009-2016.pdf.

43

**JA-246**

123.    The argument that the federal assault weapons ban could not be effective since it only limited acquisitions of newly acquired weapons, but did not by itself reduce the stock of assault weapons or high-capacity magazines turned out to be incorrect. Figure 10 shows data from Chris Koper's investigation in six cities of the percent of guns recovered at crime scenes that were assault weapons, documenting how this percentage changed after the federal assault weapons ban went into effect. The figure clearly shows that the prevalence of assault weapons found at crime scenes fell in all six cities when the ban went into effect.

**Figure 10**



**Assault weapons as a share of guns recovered by police at crime scenes**

Time periods for data for each city vary based on when data was collected.

Source: Christopher Koper, 2004 National Institute of Justice study          THE WASHINGTON POST

124.    Subsequent research by Koper et al (2017: 319) further highlights both the increased danger from assault weapons (AWs) and firearms with large-capacity magazines (LCM firearms):

> LCM firearms, which include AWs as well as other high-capacity semiautomatics, appear to account for 22 to 36% of crime guns in most places, with some estimates

44

upwards of 40% for cases involving serious violence. These estimates are comparable to or higher than earlier estimates of LCM use. …

Consistent with prior research, this study also finds that AWs and LCM firearms are more heavily represented among guns used in murders of police and mass murders. AWs account for 13–16% of guns used in murders of police, while LCM weapons overall account for about 41% of these weapons. Estimates for firearm mass murders are very imprecise due to lack of data on the guns and magazines used in these cases, but available information suggests that AWs and other high-capacity semiautomatics are involved in as many as 57% of such incidents. Further, they are particularly prominent in public mass shootings and those resulting in the highest casualty counts.

Importantly, trend analyses suggest that LCM firearms have grown substantially as a share of crime guns since the expiration of the federal ban on AWs and LCMs.[96]

125.      In other words, the use of banned firearms and magazines by criminals fell during the federal AWB and rose when it lapsed. These weapons also account for a major share of murders of police and overall crime, as well as for firearm mass murder.

126.      As the Fourth Circuit held in upholding Maryland's assault weapons ban in 2017: "the issue is whether the banned assault weapons and large-capacity magazines possess an amalgam of features that render those weapons and magazines like M16s and most useful in military service. The uncontroverted evidence … is that they do.[97] Indeed, the industry is constantly striving to find new ways to increase the lethality of their merchandise, so the notion that some threshold of "common use" erects a constitutional impediment that can obstruct governmental initiatives to promote citizen safety is wholly misguided. The ability and right of citizens to enact safety promoting measures designed to deal with the serious and growing problem of public mass shootings should not be affected by how quickly gun manufacturers can sell their products before regulations can be put into place.

---

[96] Koper, Christopher et al. (2017), Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources, J Urban Health (2018) 95:313–321, DOI 10.1007/s11524-017-0205-7. The authors summarized their findings based on crime data from Minneapolis from January - August 2014 as follows:This study has highlighted the potential value of LCM restrictions for reducing HVG cases, which pose clear public dangers (nearly all HVG cases in this study occurred in public or outdoor settings). The findings underscore the concern that criminal use of semiautomatic weapons with large ammunition magazines facilitates particularly dangerous and injurious HVG incidents that contribute to a notable share of gunshot victimisations. Koper, Christopher et al. (2018), "Gunshot victimisations resulting from high-volume gunfire incidents in Minneapolis: findings and policy implications,"
[97] *Kolbe v. Hogan*, (4th Circuit Court of Appeals, February 21, 2017), https://cases.justia.com/federal/appellate-courts/ca4/14-1945/14-1945-2017-02-21.pdf?ts=1487707284.

45

127.     In 2016, fourteen-year old Jesse Osborne of South Carolina wanted to top the death toll of Adam Lanza, and he made numerous attempts to get his father's assault weapon from a gun safe as he planned a school shooting at a nearby elementary school.  When that failed, he took his father's loaded handgun from his bed dresser and killed his father before heading to the school where he opened fire on the playground, killing a 6-year-old boy before his gun jammed. As the *Wall Street Journal* study referenced above found, a sizeable proportion of students aged 12-18 had access to firearms without adult permission. For students and others who harbor homicidal fantasies similar to Jesse Osborne, the most powerful and deadly weapons will be most helpful for their criminal designs.[98]

128.     As stated above, an enormous source of guns used by teens in school shootings come from the home and the ability to kill is greatly enhanced if the gun at home is an assault weapon with a high-capacity magazine (see footnote 32, above). Adam Lanza could not have made this point any more powerfully when he used his mother's assault rifle to kill 26 (also killing himself as the police closed in). Of course, this is part of the larger problem of the enormous rates of gun thefts in the United States each year – in the neighborhood of 400,000 stolen. The more assault weapons lying around in the home of law-abiding citizens, the more will be made available to criminals via these enormous rates of theft.

129.     My empirical evaluation of data through 2019 has emphasized that restrictions on high-capacity magazines are essential if one wants to reduce the risk of Las Vegas style killings that enable hundreds of individuals to be shot.[99] The evidence that the federal assault weapons bans reduced deaths from public mass shootings is powerful and unrefuted.

**Gun Ownership Is Becoming More Concentrated in a Declining Portion of the Population**

130. A discussion of the social science literature concerning gun ownership rates must begin with the General Social Science Survey (GSS), which is an annual survey conducted by the National Opinion Research Center, headquartered at the University of Chicago. The GSS is widely regarded by social science researchers as the most reliable indicator of national social trends, in part because of its professional implementation of face-to-face interviews using a very large sample size (the latest GSS data comes from 2,867 respondents versus roughly 1000 in a

---

[98] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," *The Wall Street Journal*, https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600, April 5, 2018.
[99] John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV.

46

**JA-249**

typical telephone survey) with a high response rate (always in excess of 70 percent versus telephone survey responses which have fallen below 10 percent in recent surveys). See Pew Research Center, "Assessing the Representativeness of Public Opinion Surveys," (May 15, 2012); http://www.people-press.org/2012/05/15/assessing-the-representativeness-of-public-opinion-surveys/.

131.     GSS data from 2016, the most recent year that data is available, states that 30.8% of American households have at least one gun, and that 20.5% of adults personally own a gun. See Donohue & Rabbani, "Recent Trends in American Gun Prevalence," (attached as Exhibit B). A carefully executed 2015 national survey showed that 34% of households owned guns, and that ownership of private firearms is highly concentrated among a small percentage of gun owners.[100]

132.     The evidence that gun ownership is concentrated is strong and uncontradicted. Researchers analyzing the results of a 2015 national survey found that 8% of individual gun owners reported owning ten or more firearms—collectively accounting for 39% of the American gun stock—and that 20% of gun owners, who owned the most guns collectively, possessed about 60% of the nation's guns.[101] A decade earlier, researchers found a similar pattern: a 2004 survey indicated that 48% of gun owners possessed four or more guns and that the top 20% of firearms owners possessed 65% of all firearms.[102]

133.     While I am not aware of any current social science research providing an estimate for the number of American households that own large-capacity magazines or LCMs (defined as an ammunition feeding device with the capacity to hold more than 10 rounds of ammunition) or for the number of LCMs in private hands in America, many firearms owned by American households do not accommodate LCMs, including shotguns and many types of handguns and rifles.

134. Accordingly, the share of households containing a weapon with a large-capacity magazine will only be a subset of gun owners. This minority status of LCM ownership by

---

[100] Azrael et al., "The Stock and Flow of US Firearms: Results from the 2015 National Firearms Survey," (Russell Sage Foundation J. Soc. Sci., forthcoming (2018) (attached as Exhibit C).
[101] See Azrael et al., supra.
[102] Hepburn et al., "The US Gun Stock: Results from the 2004 National Firearms Survey," Injury Prevention 2007;13:15–19.

household both reflects the judgment of most Americans that LCMs are not important to their self-defense.

135. The minority status of LCM ownership is also consistent with numerous polls showing that two thirds or more of respondents favor limiting magazine size.[103] A January 2013 New York Times/CBS News poll of 1,110 adults nationwide found that nearly two-thirds of Americans overall favored a ban on large-capacity magazines.[104]

**Firing Capacity Restrictions Have Historically Corresponded with Increased Use and Criminal Abuse**

136. Restrictions on weaponry have historically followed growing criminal abuse and social harm, rather than at the time these weapons are first introduced. This makes sense because it is not always clear at the outset which inventions will lead to adverse impacts on public safety. Frequently, the dangers of products and practices fly below the radar until their proliferation generates sufficient social damage to enable the public and the scientific community to become aware of the full extent of their social harm.

137. The first group of state restrictions on the number of rounds that could be fired by a firearm without reloading were adopted in the 1920s and 1930s after weapons like the Tommy gun became a preferred weapon for gangsters.[105] More recently, after pistols replaced revolvers as the most commonly used handguns in the United States in the 1980s, a second round of restrictions addressing magazine capacity and assault weapons began to be adopted, including the now expired 10 year federal ban on large capacity magazines.[106] State restrictions continued to be adopted following the expiration of the federal ban, often in response to public mass shootings.

---

[103] VPR – Vermont PBS Poll (July 2018), http://projects.vpr.net/vpr-vermont-pbs-poll.; Castleton Poll Measures Vermonters' Support for Gun Control Measures, Complete Poll Results (Feb. 21, 2013), https://www.castleton.edu/academics/undergraduate-programs/political-science/poll-results/castleton-poll-measures-vermonters-support-for-gun-control-measures/complete-poll-results/

[104] Jennifer Steinhauer, "Pro–Gun Lawmakers Are Open to Limits on Size of Magazines," *N.Y. Times* (Feb. 18, 2013), http://www.nytimes.com/2013/02/19/us/politics/lawmakers-look-at-ban-on-high-capacity-gun-magazines.html?_r=1&.

[105] *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68 (2017).

[106] *See* 1990 N.J. Sess. Law Serv. 32 (West); Haw. Rev. Stat. Ann § 34–(8); Pub. L. 103–322, § 110103 (Sep. 13, 1994).

48

**Limiting the Size of Ammunition Magazines Should Save Lives and Reduce Injuries**

138. No single gun control measure is likely to be as effective in addressing the problem of public mass shootings as the limitation on the size of the ammunition magazine, and the evidence from the ten-year period when the federal assault weapons ban was in effect from 1994-2004 indicates that this federal law, which contained the limitation on the size of ammunition magazines to ten bullets saved lives and reduced the mayhem from mass shootings.

139. A review of the resolution of mass shootings and other public shootings unleashed with large-capacity magazines in the U.S. suggests that bans on large-capacity magazines can help save lives by forcing mass shooters to pause and reload ammunition. Citizens have frequently taken advantage of a perpetrator stopping to reload his weapon to tackle him or otherwise subdue him in at least 20 separate shootings in the United States since 1991, notably including the December 7th, 1993 shooting of passengers on a Long Island Railroad car,[107] the October 29th, 1994 shooting near the grounds of the White House,[108] the May 21, 1998 shooting at Thurston High School in Springfield, Oregon,[109] and the January 8th, 2011 shooting in Tucson, AZ that targeted U.S. Congresswoman Gabby Giffords.[110] In many other incidents, targeted victims were able to escape while a shooter reloaded. Perhaps the most vivid illustration of this benefit was seen when at least nine children at Sandy Hook Elementary School were able to escape while Adam Lanza reloaded his 30 round LCM.[111]

---

[107] "DEATH ON THE L.I.R.R.: The Rampage; Gunman in a Train Aisle Passes Out Death," *The New York Times*, December 9, 1993 - http://www.nytimes.com/1993/12/09/nyregion/death-on-the-lirr-the-rampage-gunman-in-a-train-aisle-passes-out-death.html (9-millimeter pistol, 15 round magazine).

[108] "Public Report of the White House Security Review," Department of the Treasury, 1995 - http://www.fas.org/irp/agency/ustreas/usss/t1pubrpt.html (Chinese-made SKS semiautomatic rifle, 30 round magazine).

[109] When an already wounded student realized the shooter's 50 round magazine was empty, the student ran 10 to 15 feet and tackled the shooter as he tried to reload his rifle. At that point, other boys helped subdue the gunman as he reached for a handgun in his belt. Jere Longman, "SHOOTINGS IN A SCHOOLHOUSE: THE HERO; Wounded Teen-Ager Is Called a Hero," *The New York Times*, May 23, 1998, https://www.nytimes.com/1998/05/23/us/shootings-in-a-schoolhouse-the-hero-wounded-teen-ager-is-called-a-hero.html.

[110] "Crowd members took gunman down," *Los Angeles Times*, January 9, 2011 - http://articles.latimes.com/2011/jan/09/nation/la-na-arizona-shooting-heroes-20110110 (9mm Glock handgun, 30-round extended magazine).

[111] "Legislative Leaders Say Bipartisan Agreement Could Yield Nation's Strongest Gun-Control Bill," *The Hartford Courant*, April 1, 2013. http://www.courant.com/news/politics/hc-gun-deal-newtown-0413-20130401,0,7341094.story (Bushmaster .223 caliber rifle, high-capacity 30 round magazine). While some contend that 11 children were saved in this fashion at Sandy Hook, Louis Klarevas puts the number at 9 in his book, Rampage Nation: Securing America from Mass Shootings (Amherst, NY: Prometheus 2016). p. 22.

140. On April 22, 2018, a man walked into a Nashville Waffle House and opened fire, killing four and wounding seven. The police credited a customer with ending the slaughter when he saw the shooter trying to reload his rifle. The 29-year-old customer "burst out from behind a swinging door where he had been hiding, wrested the weapon away and threw it over a countertop."[112] When shooters stop to reload, they are overtaken by citizens, shot by police, or provide opportunities for escape, all of which government policy should seek to facilitate. The lower the size of the magazine, the more reloading must take place in mass shooting situations.

141. Indeed, an effective ban on high-capacity magazines would likely have significantly reduced the number of deaths and non-fatal gun shot victims at the Las Vegas concert. The *New York Times* video of the 2017 Las Vegas shooting shows how the Las Vegas concert attendees would use the pauses in firing when the shooter's high-capacity magazines were spent to flee the deadly venue before more shots were fired.[113] If Stephen Paddock had been limited to using only 10-round magazines during his deadly rampage, potentially hundreds of victims at the concert could have been spared.

142. No one has a greater desire or use for a large-capacity magazine than a determined mass killer, and governments have a responsibility to thwart those desires and those uses. A ban on such magazines is an important tool in the effort to stop the most egregious homicidal rampages.

143. As noted above, Adam Lanza was able to kill more (a total of 20 children and six adults) because he was using lawfully purchased weapons equipped with a 30-round LCM.  It may well be that Lanza would have criminally abused the guns that his mother had made available to him even if he had not had an LCM, but there is every reason to believe that he would have killed fewer individuals if he had to persistently reload during his murderous rampage. In other words, the LCM ban is designed precisely to save lives and by raising the costs for killers, the LCM ban would be expected to advance that goal.

144. Further, most mass killings by Americans involve the use of guns, and many of these killers – Adam Lanza (Newtown), James Holmes (the Batman movie killer in Aurora, Colorado

---

[112] Christopher Mele and Jacey Fortin, "Man Sought in Waffle House Shooting Had Been Arrested Near White House," *The New York Times*, April 22, 2018, https://www.nytimes.com/2018/04/22/us/waffle-house-shooting.html.
[113] Malachy Browne, et al., *10 Minutes. 12 Gunfire Bursts. 30 Videos. Mapping the Las Vegas Massacre*, N.Y. TimesVideo, Oct. 21, 2017, *available at* https://www.nytimes.com/video/us/100000005473328/las-vegas-shooting-timeline-12-bursts.html (last visited Nov. 1, 2017).

50

killed 12 and injured 70), Jared Loughner (shooting Congresswoman Gabby Giffords), Stephen Paddock (who killed 58 and wounded roughly 500 in Las Vegas in October 2017) to name just a few – were drawn to a vision of killing large number of individuals in a certain way that included the use of LCM's. On November 5, 2009, Nidal Hasan killed 13 and injured more than 30 others at Fort Hood, near Killeen, Texas. When Hasan purchased his killing arsenal, he asked for "the most technologically advanced weapon on the market and the one with the highest standard magazine capacity."[114] This is exactly what one would do if one wanted to simply kill as many people as possible in the shortest amount of time. If one is serious about stopping mass killings, a good first step is to deprive such killers of their preferred killing approaches.[115]

**Assault Weapons Bans are Critical to Reducing the Cost of Mass Shootings**

145. The response that bans on assault weapons will have a limited effect on overall gun crime, which is most commonly committed with a handgun, is misplaced because Connecticut's' assault weapons ban was not primarily enacted to address gun crime generally, but rather was adopted in response to the growing mass shooting problem in the United States. Indeed, the first assault weapons ban was enacted in California in the immediate aftermath of the 1989 mass shooting in the schoolyard of Cleveland Elementary School in Stockton, California by an individual armed with an AK-47 semiautomatic rifle (killing 5 schoolchildren and wounding 32 others).

146. The Stockton massacre was a pivotal moment when the public first began to appreciate that the proliferation of increasingly lethal weaponry was causing a significant threat to public safety. For example, shortly after the massacre in March 1989, Republican Vermont Congressman Peter Smith announced that he was cosponsoring "a bill to stop the spread of semiautomatic assault weapons in this country. … I cannot — and will not — defend … the proliferation of paramilitary assault weapons that were designed solely for one purpose: killing human beings. These are not hunting rifles. These are killing machines." Realizing this threat to

---

[114] Scott Huddleston, "Hasan Sought Gun with 'High Magazine Capacity,'" MySanAntonio.com, October 21, 2010, http://blog.mysanantonio.com/military/2010/10/hasan-sought-gun-with-high-magazine-capacity/.

[115] Anders Breivik, who committed mass murder in Norway, was aided in his efforts because of lax rules concerning LCM's in the United States. Breivik was very unhappy that he could not get the large-capacity magazines that he wanted to use since they were banned in Europe. In his manifesto, he wrote about his attempts to legally buy weapons, stating, "I envy our European American brothers as the gun laws in Europe sucks ass in comparison." Under the section titled, "December and January - Rifle/gun accessories purchased," Breivik wrote that he purchased ten 30-round ammunition magazines from a U.S. supplier who mailed the devices to him. Stephanie Condon, **"Norway Massacre Spurs Calls For New U.S. Gun Laws,"** CBS News, July 28, 2011, http://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/.

the lucrative new market in AR-15-style weapons, the NRA immediately targeted Congressman Smith, who in 1990 became the first incumbent member of Congress from Vermont to lose re-election in 30 years.[116] Connecticut's assault weapons ban was implemented in the wake of the horrific Sandy Hook shooting in December 2012, again highlighting the importance of governmental responses to the heightened risk of mass shooting in order to promote public safety.

147. There is not the slightest evidence that the restrictions on assault weapons and large-capacity magazines exceeding 10 rounds compromised the safety of law-abiding citizens. Since assault weapons and large-capacity magazines are useful for those bent on mass killing, further limiting their availability will have a beneficial effect on a problem that is serious and growing in the United States.

148. The first line of defense to reducing mass shootings is clearly to try to keep guns out of the hands of those who may end up using them for criminal purposes, but this approach will never be fully effective since not all killers can be easily identified in advance. Therefore, a critical element in trying to stop the death and injury from the growing problem of mass shootings is to limit the killing power of the weaponry available to prospective mass shooters. The value of a ban on high-capacity magazines is that it is easily definable, hard to circumvent through cosmetic changes by gun merchants, and effective at reducing the lethality of mass shooters by limiting the number of bullets that can be fired without reloading.

149. It is my opinion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban, tragedies like the one in Las Vegas would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States and perhaps the world.[117] It is also my opinion that Connecticut's restrictions challenged in this litigation are effectively designed to reduce the likelihood that its citizens and visitors will be killed in mass shootings by making it incrementally harder for prospective mass shooters to equip themselves with weapons that are

---

[116] Paul Heintz, "Stickin' to His Guns? The NRA Helped Elect Bernie Sanders to Congress," *Seven Days*, June 26, 2019.

[117] The horrendous mass killing in Norway by Anders Breivik, endangered by the restrictive gun laws of Europe, was salvaged by his ability to procure ten 30-round, high-capacity magazines from the United States. Stephanie Condon, "Norway Massacre Spurs Call for New U.S. Gun Laws," CBS News, July 28, 2011, *available at* https://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/ (last visited Nov. 1, 2017).

both uniquely appealing to their criminal aspirations as well as uniquely designed to aid in their homicidal rampages.

## Uses of Assault Weapons and LCMs for Self-Defense are Extremely Rare

150. In the face of the clear evidence from around the United States and the world, Plaintiffs' motion for preliminary injunction fails to acknowledge the threat posed by weapons accessories, and features that Connecticut restricts. First, it is worth noting that the vast majority of the time that an individual in the United States is confronted by violent crime, they do *not* use a gun for self-defense. Specifically, over the period from 2007-2011 when roughly 6 million violent crimes occurred each year, data from the National Crime Victimization Survey shows that the victim did not defend with a gun in 99.2 percent of these incidents – this in a country with 300 million or more guns in civilian hands.

151. Second, even if a gun were available for self-defense use, the need for an LCM is slight according to decades of statements by NRA-affiliated and pro-gun experts. For example, John Lott has repeatedly made the following claims:

- based on "about 15 national survey[s] … about 98 percent of [defensive gun uses] involve people brandishing a gun and not using them."[118]

- "When victims are attacked, 98 percent of the time merely brandishing a gun is enough to cause the criminal to stop his attack."[119]

- "Considerable evidence supports the notion that permitted handguns deter criminals. …. In 98% of the cases, people simply brandish weapons to stop attacks."[120]

152. Gary Kleck has similarly stated: "Of the … times citizens use their guns to defend themselves every year, the overwhelming majority merely brandish their gun or fire a warning shot to scare off their attackers."[121]

---

[118] Statements by John R. Lott, Jr. on Defensive Gun Brandishing Posted by Tim Lambert on October 17, 2002 http://scienceblogs.com/deltoid/2002/10/17/lottbrandish/. Page 41, State of Nebraska, Committee on Judiciary LB465, February 6, 1997, statement of John Lott, Transcript prepared by the Clerk of the Legislature, Transcriber's Office.
[119] John R. Lott, Jr., Packing Protection, Letters, *Chicago Sun-Times*, April 30, 1997, Pg. 52.
[120] John R. Lott Jr., "Unraveling Some Brady Law Falsehoods," *Los Angeles Times*, July 2, 1997.
[121] Gary Kleck and Marc Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun," 86(1) *Journal of Criminal Law and Criminology* 150-187 (Fall 1995).
https://pdfs.semanticscholar.org/91da/afbf92d021f06426764e800a4e639a1c1116.pdf.

153. In other words, a gun is used in defense less than 1 percent of the time when someone is attacked in the United States. In the "overwhelming majority" of the less than 1% of cases in which a gun *is* used, brandishing is all that is needed for defense. One would imagine that the vast majority of the times that the gun is fired in this increasingly small subset, it will be fired no more than 10 times. All firearms that can accept high-capacity magazines can also accept magazines that hold fewer rounds. It cannot be seriously maintained that assault weapons and high-capacity magazines play any important role in furtherance of the Second Amendment goal of self-defense. Indeed, if they did, the industry would have marketed them as protection weapons instead of assault weapons – or in the more recent gun-marketing jargon "sporting" or "tactical" rifles.

154. Should there be a future case of a law-abiding citizen who 1) has a gun and 2) the need and opportunity to use it in self-defense, and 3) the desire to fire more than 10 rounds, the individual can either re-load the defensive weapon by inserting a new clip or by using a second weapon, which an increasingly large number of gun owners currently possess. This implies that the challenged Connecticut restrictions, which are designed to limit the mayhem caused by criminals engaging in the most dangerous forms of violent criminal behavior, are likely to have little or no impact on the defensive capabilities of law-abiding citizens.

155. Bullets fired by assault weapons or a modern weapon with an LCM will easily penetrate walls, threatening family members or occupants in attached dwellings. This point was dramatically underscored when a concealed carry permit holder attending a gun safety class inadvertently fired his weapon, which discharged a bullet that easily penetrated the classroom wall, striking and killing the owner of the gun store who was working in the next room.[122] Encouraging untrained, stressed individuals to spray bullets from a high-capacity magazine is a

---

[122] Peter Holley, *Ohio gun store owner accidentally killed by student during firearm-safety cl*ass, *Washington Post*, June 19, 2016, *available at* https://www.washingtonpost.com/news/morning-mix/wp/2016/06/19/ohio-gun-store-owner-accidentally-killed-by-student-during-firearm-safety-class/?utm_term=.ed4c232d20ad (last visited Nov. 1, 2017).

     Another example of how doors and walls do not stop bullets from modern handguns occurred on September 13, 2015, when "39-year-old Mike Lee Dickey was babysitting an 8-year-old Casa Grande, Arizona boy. According to police, at about 2 a.m., Dickey was in the bathroom removing his .45-caliber handgun from the waistband of his pants when he unintentionally discharged the gun. The bullet passed through two doors and struck the 8-year-old in his arm while he lay sleeping in a nearby bedroom. The boy was flown to a hospital in Phoenix for treatment." *8-year-old boy unintentionally shot by babysitter*, Ohh Shoot, Sept. 13, 2016, *available at* http://ohhshoot.blogspot.com/2015/09/8-year-old-boy-unintentionally-shot-by.html (last visited Nov. 1, 2017).

recipe for generating similar unwelcome outcomes that will put family members and neighbors at considerable risk.

**Law Enforcement and Military Support for Assault Weapon and LCM Bans**

155. The testimony of United States Attorney (District of Colorado) John Walsh before the Senate Judiciary Committee on February 27, 2013,[123] is worth quoting:

> From the point of view of most law enforcement professionals, a perspective I share as a long-time federal prosecutor and sitting United States Attorney, shutting off the flow of military-style assault weapons and high-capacity magazines is a top public safety priority. […]

Like military-style assault weapons, high-capacity magazines should be reserved for war, and for law enforcement officers protecting the public.[124]

156. Dean L. Winslow, a retired Air Force colonel, flight surgeon, and professor of medicine at Stanford University has particularly valuable insight into the wisdom of having assault weapons in civilian hands.

157. Dr. Winslow noted that "as commander of an Air Force hospital in Baghdad during the surge, I have seen what these weapons do to human beings. The injuries are devastating."[125] Moreover, unlike a shotgun filled with birdshot, which is far more likely to hit a target and less likely to penetrate walls than a bullet from an assault weapon, assault weapons are simply not well suited for defensive use in the home. Based on his extensive military and medical experience, Dr. Winslow noted that it is "insane … that in the United States of America a civilian can go out and buy a semiautomatic weapon like an AR-15."

158. According to Maryland Police Superintendent Marcus Brown, "in many home defense situations assault weapons are likely to be less effective than handguns because they are less maneuverable in confined areas."[126] Experts consider handguns clearly more suitable than assault weapons for self-defense. Massachusetts Chief of Police Mark K. Leahy said that when

---

[123] Statement of John F. Walsh before the United States Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited Nov. 1, 2017).
[124] See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise*, *Washington Post*, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).
[125] Dean L. Winslow, "I spoke my mind on guns. Then my Senate confirmation was put on hold," *The Washington Post*, December 20, 2017. See also, Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic Monthly*, February 22, 2018, https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937/.
[126] Brown Decl. ¶ 20, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).

"asked to recommend a weapon for home defense or concealed carry, I always recommend a handgun."[127]

159. Since AR-15's were selected by the Defense Department as a weapon of choice for the battlefield in Vietnam because the destructive force of the gun made it especially lethal to even outer extremity wounds, the point could not be clearer: keeping these weapons out of civilian hands will reduce the death toll and seriousness of injuries in cases of mass shootings or other criminal or accidental uses of these weapons.

160. A wise December 2016 editorial in the *Las Vegas Sun* noted the danger presented— and the lack of practical use for—LCMs:

> By overwhelmingly supporting universal background checks for firearms purchases, Clark County voters made it abundantly clear last month that they were concerned about gun violence.
>
> Now, it's time for Las Vegas-area lawmakers to go a step further to protect Nevadans and push to ban the sale of high-capacity magazines in the state. Eight states and the District of Columbia already have imposed such prohibitions, and with good reason. There's simply no legitimate civilian use for magazines that hold dozens upon dozens of rounds of ammunition.
>
> Don't believe us? Fine, then listen to Clark County Sheriff Joe Lombardo. "I'm a very avid hunter, I was in the military myself, and there's no need to have a high-capacity magazine for any practical reason," Lombardo said during a recent interview with the Sun.
>
> To the contrary, the dangers posed by such magazines are obvious. Lombardo says the time it takes for suspects to change magazines gives potential victims an opportunity to escape and law enforcement officials an opportunity to safely fire back. That being the case, the fewer times a shooter has to switch out magazines, the fewer chances for people to get away and authorities to get a protected shot.[128]

The prescience of the editorial was powerfully underscored ten months later when On October 1, 2017, the deadliest mass shooting in U.S. history occurred in Las Vegas (60 killed and hundreds wounded) – only possible because of the use of high- capacity magazines.

---

[127] Leahy Decl. ¶ 22, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).

[128] *High-capacity magazine ban a must for Nevadans' safety*, Las Vegas Sun, Dec. 11, 2016, *available at* https://lasvegassun.com/news/2016/dec/11/high-capacity-magazine-ban-a-must-for-nevadans-saf/(last visited Nov. 1, 2017).

161.     One of the most disturbing aspects of the recent mass shootings our Nation has endured is the ability of a shooter to inflict massive numbers of fatalities in a matter of minutes due to the use of high-capacity magazines. High-capacity magazines were defined in the 1994 ban as magazines capable of holding more than 10 rounds, and this is a definition the Department endorses. The devastating impact of such magazines is not limited to their use in military-style assault rifles; they have also been used with horrific results in recent mass shootings involving handguns. The 2007 mass shooting at Virginia Tech involved a shooter using handguns with high-capacity magazines. Similarly, recent mass shootings in Tucson, Arizona; Oak Creek, Wisconsin; and Fort Hood, Texas all involved handguns with magazines holding more than 10 rounds. As evidenced by these events, a high-capacity magazine can turn any weapon into a tool of mass violence. Forcing an individual bent on inflicting large numbers of casualties to stop and reload creates the opportunity to reduce the possible death toll in two ways: first, by affording a chance for law enforcement or bystanders to intervene during a pause to reload; and second, by giving bystanders and potential victims an opportunity to seek cover or escape when there is an interruption in the firing. This is not just theoretical: In the mass shooting in Tucson, for example, 9-year old Christina-Taylor Green was killed by the 13th shot from a 30-round high-capacity magazine. The shooter was later subdued as he was trying to reload his handgun after those 30 shots. The outcome might have been different if the perpetrator had been forced to reload after firing only 10 times.

162.     Furthermore, high-capacity magazines are not required for defending one's home or deterring further action by a criminal. The majority of shootings in self-defense occur at close range, within a distance of three yards. In such a scenario, and at such close ranges, a 10-round magazine is sufficient to subdue a criminal or potential assailant. Nor are high-capacity magazines required for hunting or sport shooting. Like military-style assault weapons, high-capacity magazines should be reserved for war, and for law enforcement officers protecting the public. The continued commercial sale of high-capacity magazines serves only to provide those determined to produce a high body count with the opportunity and the means to inflict maximum damage. Indeed, there is evidence suggesting that when the previous ban was in effect, it

reduced the number of high-capacity magazines seized by the police, as well as the lethality of incidents.[129][The citation is from Walsh's statement.][130]

**Threats to Civil Peace and to Democracy Itself**

163.     There is also a larger issue at stake with the proliferation of assault weapons: their capacity to facilitate political violence and threaten American democracy. The concern is heightened by the sharp rise in the percentage of Americans who think that violence against the government could be appropriate, which doubled from 16 percent in 2010 to 34 percent in 2021 (over 40 percent of Republicans and independents and 23 percent of Democrats agreed).[131]

164.     The extent and severity of these concerns have been clarified by the events of January 6, 2021, which I have written elsewhere has provided new insight into the dangers of such weaponry and the utter folly of many of the claims of the gun lobby:

> Consider the gun lobby protestation that "Gun control simply doesn't work." Imagine for a moment what that rally would have looked like in Houston, Texas, or some other "gun-friendly" jurisdiction. Without Washington, DC's profoundly wise firearm restrictions [including its assault weapons ban], a very large number of the rioters would have been marching on the U.S. Capitol armed with assault rifles equipped with high-capacity magazines and other highly lethal weapons. When the mob storming the Capitol spun out of control, guns would have been flashing everywhere, and it is not hard to imagine that bullets would have been cutting down scores or even hundreds of victims. Those who remember the 1970 Kent State massacre understand that once the bullets start flying in a riotous atmosphere, the consequences quickly turn lethal and dire….
>
> The pernicious Proud Boys leader Enrique Tarrio [currently being tried for seditious conspiracy],[132] who had planned to address the crowd before the U.S. Capitol riot, was thankfully taken off the streets two days earlier when he was arrested for tearing down a Black Lives Matter banner on a Washington, DC, church and lighting it on fire. At the time of his arrest, Tarrio was carrying two high-capacity magazines festooned with the Proud Boys logo. Washington, DC's wise prohibition on such unnecessary accoutrements to lethal weaponry managed to keep one conspiring criminal away from the U.S. Capitol on January 6, and

---

[129] See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise*, Washington Post, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).

[130] Statement of John F. Walsh before the United States Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited Nov. 1, 2017).

[131] Meryl Kornfield and Mariana Alfaro, "1 in 3 Americans say violence against government can be justified, citing fears of political schism, pandemic," *Washington Post*, January 1, 2022, https://www.washingtonpost.com/politics/2022/01/01/1-3-americans-say-violence-against-government-can-be-justified-citing-fears-political-schism-pandemic/.

[132] Alan Feuer and Zach Montague (Jan. 12, 2023). "Prosecutors Open Arguments Against Proud Boys in Sedition Trial," *The New York Times*.

thousands of others, knowing of Washington, DC's strict gun laws, were dissuaded from carrying weapons because of these laws. [Moreover, the claim that weapons equipped with high-capacity magazines could protect American democracy is fanciful.] First, the thought that private gun owners could stand up to the modern U.S. military if it backed a tyrannical federal government is absurd. There is no circumstance in which private citizens in modern America could promote democracy by using assault weapons to kill government employees to show their disapproval of what they perceive to be a "tyrannical" government. Second, the idea that gun owners can be expected to *oppose* rather than support the tyrant was dealt a fatal blow by the violence at the U.S. Capitol.[133]

**<u>Comments on Some of The Errors in The Plaintiffs' Allegations</u>**

165. Any discussion of assault weapons must address the tragic problem of public mass shootings. The Plaintiffs' Motion for Preliminary Injunction marches down the misguided path of trying to diminish the importance of governmental action to address this problem by making an array of misguided, erroneous, and misleading claims.

166. The Plaintiffs seem to believe that because automatic weapons are potentially more dangerous than semiautomatic assault weapons, this should disempower the ability of the state to address the worsening problem of mass shootings. In support of this logically uncompelling argument they offer this claim at page 11 of their Motion for Preliminary Injunction:

"There is therefore a significant practical difference between a truly automatic and a merely semiautomatic rifle. According to the United States Army, for example, the maximum effective rates of fire for various M4- and M16-series firearms is between forty-five and sixty-five rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. Dept. of the Army, RIFLE MARKSMANSHIP: ML6-/M4-SERIES WEAPONS, 2-1 tbl. 2-1 (2008), available at https://bit.ly/3pvS3SW."

167. The Plaintiffs claim is misguided in two respects. First, the current and worsening problem of mass shootings is not a problem of automatic weapons, which have been effectively been addressed by government action. Since the evidence from the United States and the world indicates that restrictions on assault weapons and large-capacity magazines reduces the harm from mass shootings, this is the area where protective government action is needed.

---

[133] John Donohue, "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf.

168. The second problem is that the Plaintiffs' misguided claim is entirely undercut by the very Army Manual that they cite, which goes on to state in two sections that the Plaintiffs ignore that:

7-12. The most important firing technique during fast-moving, modern combat is rapid semiautomatic fire. It is the most accurate technique of placing a large volume of fire on poorly defined targets or target areas, such as short exposure, multiple, or moving targets.

7-14. While Soldiers sacrifice some degree of accuracy to deliver a greater volume of fire, it is surprising how devastatingly accurate rapid semiautomatic fire can be. At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit. Proper training and repeated practice increases the degree of accuracy.

169. It is for this reason that all knowledgeable commentators on the lethality of the AR-15 understand that it fully enables – in the words of the Army Manual that the Plaintiff's cite -- the "most important firing technique during fast-moving, modern combat" that in the typical circumstances of an attempted mass shooting "is superior to automatic fire in all measures."

170. The nature of the misleading character of the Plaintiffs' claims is confirmed by the comments of Retired Army Maj. Gen. Paul D. Eaton:

"As the former Commanding General of the Infantry Center at Fort Benning and Chief of Infantry, I know a bit about weapons. **Let me state unequivocally — For all intents and purposes, the AR-15 and rifles like it are weapons of war….It is a very deadly weapon with the same basic functionality that our troops use to kill the enemy.** Don't take the bait when anti-gun-safety folks argue about it. They know it's true. Now you do too."[134]

171. At the same time that the Plaintiffs are inaccurately trying to obscure the lethality of the type of weaponry covered by the Connecticut Assault Weapons Ban, they also make preposterous claims about the lethality of the weapons available at the time of the founding of our nation. The Plaintiffs contend at page 23 of their motion that: "Firearms capable of firing more than 10 rounds without reloading are nothing new. '[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580,' and several such handguns and long guns 'pre-date[d] the American Revolution.'" It should be immediately obvious to all that

---

[134] Paul Eaton, June 2, 2022 (emphasis supplied).

if there was any weapon remotely as available, lethal, effective, and portable as a modern assault weapon, the soldiers commanded by George Washington would have been using them. Instead, the soldiers were using muskets utterly incapable of inflicting the mass mayhem in a matter of seconds that modern Americans have to fear.

172. It is widely recognized that "Early firearms were expensive. They were complicated. They required extensive training to use, and they were very slow to load."[135] Moreover, "The flintlock musket was the most important weapon of the Revolutionary War. It represented the most advanced technological weapon of the 18th century. Muskets were smooth-bored, single-shot, muzzle-loading weapons. The standard rate of fire for infantrymen was three shots per minute." With this type of weaponry, there would be absolutely no concern about a lone gunman blasting away at unsuspecting crowds with the lethal and tragic effect that even teenage mass shooters increasingly inflict in seconds or minutes in modern America. Any suggestion that 18th Century weaponry in civilian hands could impose anywhere near the risk to the public of the modern assault weapon is simply absurd on its face.

### Figure 11



A musket from the 18th century, when the Second Amendment was written, and an assault rifle of today.
Top, MPI, via Getty Images; bottom, Joe Raedle/Getty Images .

---

[135] "Learn about American Revolutionary War usage of muskets, bayonets, and gunpowder," Britannica https://www.britannica.com/video/195113/gunpowder-muskets-American-Revolution.

173. The Plaintiffs also try to minimize the risk of the weaponry restricted by Connecticut by arguing that the deaths from mass shootings and by assault weapons are only a relatively small portion of the total homicides in the United States (they don't even try to make that claim for weapons with high-capacity magazines). In furtherance of this misguided approach, the Plaintiffs' Motion for Preliminary Injunction at Page 19 states:

"as of 2016, only 0.8 percent of state and federal prisoners reported using any kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates, 2016, U.S. DEPT OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. 5 tbl. 3 (Jan. 2019), available at https://bit.ly/31VjRa9.

174. It is unclear whether the Plaintiffs understand that the number they present is meaningless since they are looking at the entire population of state and federal prisoners. Presumably, most of the tax cheats, embezzlers, and other swindlers are not using any firearm to commit their crimes, so using the entire base of all prisoners is nonsensical.

175. If the Plaintiffs would like to cite from this prisoner survey, a more justifiable number would be that 6.25% of those criminals who used a gun in committing a crime used a rifle – a number almost eight times as large as they statistic they provide. Moreover, since regulation of assault weapons is not about stopping armed robbery or other less serious crimes that can lead to incarceration, but about trying to reduce mass shootings, it would be helpful to note that almost 60% of mass shooters die at the scene – see the large numbers of mass shooters who commit suicide or are killed at the scene according to the FBI. In other words, most of the mass shooters never end up in prison and therefore would not show up in a survey of prisoners.[136]

176. The Plaintiffs continue the implausible effort at minimization of the problem of mass shootings by offering the following error-filled and misleading statement (on page 18):

In the five years from 2015 to 2019 (inclusive), there were an average of 14,556 murders per year in the United States. On average, rifles of all types (of which so-called "assault weapons" are a subset) were identified as the murder weapon in 315 murders per year. U.S. Dept. of Just., Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States, 2019, FBI, available at https://bit.ly/31WmQ1V. By way of comparison, on average 669 people are murdered by "personal weapons" such as hands, fists and feet. Id. According to the FBI, a murder victim is more than twice as likely to have been killed by hands and feet than by a rifle of any type.

---

[136] See the numbers reported from an FBI report on mass shooters in footnote 33, above.

177. Every statement in this passage from the Plaintiffs' motion is either wrong or misleading – or both. Let's start with the first sentence in which the Plaintiffs average five numbers to give us a figure for the murders per year. The number they use for 2019, for example, is 13,927 – but in fact the actual number of murders recorded in 2019 by the FBI (itself an undercount due to incomplete police agency reporting) was 16,425 (so the Plaintiffs were off by 2198 murders if they wanted to report the FBI murder count).

178. The table the Plaintiffs use then tells us that in 2019 there were 364 killings with rifles. But the Plaintiffs don't reveal that this 364 is clearly an understatement of the number of rifle killings because in a substantial number of the allegedly 10,258 firearm murders that year, the FBI doesn't know or report what type of firearm was used. For example, the table the Plaintiffs rely on says there were also 45 murders with "other guns" and 3281 murders with "firearms, type not stated" in 2019. In other words, even for the 10,258 firearm murders counted for 2019 in Plaintiffs' UCR data source, they have no information about what gun was used in 3326 of these murders, which severely undermines the value of this FBI data as shown in Table 3 below.

179. But pretending that 3326 firearm murders about which the FBI provides no information about the firearm contain no murders with rifles is not the only massive error in the Plaintiffs' misguided effort to minimize the social burden of mass shootings. But we also know that total number of firearm homicides the Plaintiffs use for 2019 – the 10,258 figure shown in Table 3 -- is itself severely inadequate since it fails to capture more than 4000 other firearm homicides in 2019. The problem lies in the fact that police departments are not required to report data to the FBI, so the FBI data the Plaintiffs reference is not only inadequate in not identifying the type of lethal firearm in a very large number of the murder cases it knows about, but it also completely ignores an even larger number of firearm homicides. We know this because the CDC data on homicide is based on mandatory reporting requirements for all death certificates, which indicate if the homicide was caused by a firearm.[137] As Table 4 reveals,

---

[137] The superiority of the CDC data on firearm homicide over the data that the Plaintiffs provide is well known by researchers of gun violence, as described in this Bureau of Justice Statistics report: "Homicide data in this report are primarily from the Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports developed from the National Vital Statistics System (NVSS) of the National Center for Health Statistics (NCHS), a part of the Centers for Disease Control and Prevention. NVSS mortality data are produced from standardized death

many thousands of firearm homicides occurred but are not even captured in the "full" FBI data. When one compares in the table below the CDC total of 14,414 firearm homicides to the 6932 homicides that the Plaintiffs based their numbers on, one sees that their data is grossly deficient and should not be relied upon. A more relevant, and sobering statistic is that the percentage of firearm homicides committed with long guns has grown steadily since 1993, doubling from 17.9 percent in that year to 35.6 percent in 2018.[138]

**Table 3**



certificates and include causes of death reported by attending physicians, medical examiners, and coroners…. Generally, the NVSS produces more accurate information than the SHR on annual homicide rates at the national level …." Grace Kena and Jennifer L. Truman, "Trends and Patterns in Firearm Violence, 1993–2018," Bureau of Justice Statistics Special Report (April 2022), https://bjs.ojp.gov/content/pub/pdf/tpfv9318.pdf.
[138] Id.

64

Source: U.S. Dept. of Just., <u>Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019,</u> Crime in the United States, 2019, FBI.

**Table 4**



180.    As a final exclamation point on the inadequacy of Plaintiffs' 2019 data, one should note that firearm homicides spiked 35 percent between 2019 and 2020, rendering their flawed 2019 accounting even less meaningful. It is also worth noting that in 2020 firearms were used in 79 percent of homicides, which was the greatest proportion ever, up from 74 percent in 2019.[139] Moreover, the Plaintiffs would have you forget the considerable number of victims of assault weapons who do not show up in the homicide count because they survive – often with crushingly damaging and life-altering injuries.

---

[139] Jennifer Mascia, <u>*"It's Official: Gun Deaths Hit an All-Time High in 2020,"*</u> *The Trace*, Jan. 7, 2022.

181.    Not only is the general ploy to minimize the number of deaths caused by assault weapons and firearms equipped with high-capacity magazines based in this case on Plaintiffs' wholly inadequate data, but the entire enterprise is misguided for three additional reasons: 1) the deaths and injuries caused by mass shootings are increasing at an alarming pace, 2) the social harm from these traumatic events is far larger than the mere numerical casualty counts, and 3) the incessant efforts to enhance the deadliness of firearms to increase gun sales means that, if this deadly arms race is not restrained, mass shootings with deaths of many hundreds of individuals may well be our fate. This growing menace cannot be effectively addressed without concerted and effective governmental action, including bans on assault weapons and high-capacity magazines.

## CONCLUSION

182.    The problem of mass shootings in the United States is socially damaging, growing worse, and will be exacerbated if appropriate limitations on the lethality of weaponry, such as the restrictions on assault weapons and high-capacity magazines enacted first by the federal government and then by the state of Connecticut as this dire social harm first emerged, are not sustained as constitutionally permissible measures.

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

I declare that the foregoing is true and correct under penalty of perjury under the laws of the United States.

Executed on January 26, 2023

_John J. Donohue III_

_____

John J. Donohue

66