# 23-1162

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

National Association for Gun Rights, Toni Theresa Spera Flanigan,
*Plaintiffs-Appellants*,
Patricia Brought,
*Plaintiff*,
v.
Ned Lamont, in his official capacity as the Governor of the State of Connecticut,
Patrick J. Griffin, in his official capacity as the Chief States Attorney of the State
of Connecticut, Sharmese L. Walcott, in her official capacity as the States's
Attorney, Hartford Judicial District,
*Defendants-Appellees*,
David R. Shannon, in his official capacity as the State's Attorney, Lichfield
Judicial District,
*Defendant*.

**On Appeal from the United States District Court
for the District of Connecticut (New Haven), No. 22-cv-1118**

_____

**JOINT APPENDIX VOL. III OF V (JA-560—JA-847)**

_____

JAMES MICHAEL BELFORTI
JANELLE MEDEIROS
CONNECTICUT OFFICE OF THE
ATTORNEY GENERAL
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5436
james.belforti@ct.gov
janelle.medeiros@ct.gov

*Counsel for Defendants-Appellees*

BARRY K. ARRINGTON
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com

*Counsel for Plaintiffs-Appellants*

CASE NO. 23-1162
INDEX TO DOCUMENT REFERENCES IN APPENDIX

| Description of Item | Record Entry No. | Appendix Page No. |
| --- | --- | --- |
| **VOLUME I** | | |
| **Docket U.S. District Court for the District of Connecticut (New Haven) Case #: 3:22-cv-01118-JAM**............................................ | NA | JA-1 |
| **Complaint for Declaratory Judgment and Injunctive Relief (09/06/2022)** .................................................... | 1 | JA-13 |
| **First Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right (09/13/2022)** .................................................... | 9 | JA-27 |
| **Unopposed Motion for Leave to Amend Complaint (110/21/2022)** .................................................... | 24 | JA-40 |
| **Attachment – Second Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right** .................................................... | 24-2 | JA-43 |
| **Second Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right (10/25/2022)** .................................................... | 26 | JA-57 |
| **Plaintiff's Motion for Preliminary Injunction (11/03/2022)** .................................................... | 28 | JA-71 |
| **Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction (11/03/2022)** . | 28-1 | JA-74 |
| **Declaration of Dudley Brown**................................ | 28-2 | JA-102 |

i

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| Declaration of Toni Theresa Spera Flanigan ....... | 28-3 | JA-104 |
| Declaration of James Curcuruto .......................... | 28-4 | JA-106 |
| Defendants' Motion to Dismiss (11/18/2022) ................................................... | 32 | JA-108 |
| Memorandum of Law in Support of Defendants' Motion to Dismiss ............................ | 32-1 | JA-110 |
| Response in Opposition to Defendants' Motion to Dismiss (12/09/2022) ................................................... | 33 | JA-126 |
| Attachment – Declaration of Ryan J. Flugaur | 33-1 | JA-137 |
| Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss (12/23/2022) ................................................... | 34 | JA-139 |
| Motion to Strike Defendants' Reply in Support of Their Motion to Dismiss (12/24/2022) ................................................... | 35 | JA-150 |
| Defendants' Memorandum in Support of Their Opposition to Plaintiffs' Motion for Preliminary Injunction (01/31/2023) ................................................... | 37 | JA-153 |
| Exhibit A – Declaration of Detective Brindiana Warenda................................................... | 37-1 | JA-195 |
| Exhibit B – Declaration of Professor John J. Donohue................................................... | 37-2 | JA-203 |

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|

**VOLUME II**

| | | |
|---|---|---|
| Exhibit C – Declaration of Professor Louis Klarevas................................................. | 37-3 | JA-270 |
|     Exhibit A – Expert Report of Louis Klarevas ............................................... | | JA-272 |

**VOLUME III**

| | | |
|---|---|---|
| Exhibit C – Declaration of Professor Louis Klarevas –Continued– ............................................. | | |
|     Exhibit A – Expert Report of Louis Klarevas –Continued–........................................ | | JA-560 |
| Exhibit D – Declaration of Lucy P. Allen ............. | 37-4 | JA-787 |

**VOLUME IV**

| | | |
|---|---|---|
| Exhibit E – Declaration of Dr. Dennis E. Baron .. | 37-5 | JA-848 |
| Exhibit F – Declaration of Professor Randolph Roth ....................................................... | 37-6 | JA-884 |
| Exhibit G – Declaration of Professor Saul Cornell.................................................... | 37-7 | JA-935 |
| Exhibit H – United Nations Office on Drugs and Crime Diagrams............................... | 37-8 | JA-965 |
| Reply in Support of Plaintiffs' Motion for Preliminary Injunction (03/02/2023) ............................................... | 64 | JA-968 |

| **Description of Item** | **Record Entry No.** | **Appendix Page No.** |
|---|---|---|
| **Exhibit 1 – Detailed Analysis of Ten Laws Cited by State**............................... | **64-1** | **JA-1019** |
| **Declaration of Mark Passamaneck**....................... | **64-2** | **JA-1026** |

### **VOLUME V**

| | | |
|---|---|---|
| **Third Amended Complaint for Declaratory Judgment and Injunctive Relief (03/07/2023)** ................................... | **69** | **JA-1030** |
| **Answer and Affirmative Defenses (03/31/2023)** ................................... | **73** | **JA-1045** |
| **Amicus Brief of Everytown for Gun Safety Support Fund in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction (04/17/2023)** ................................... | **78** | **JA-1052** |
| **Transcript Hearing regarding Motion for Preliminary Injunction held June 5, 2023 (06/12/2023)** ................................... | **83** | **JA-1072** |
| **Notice of Appeal (08/16/2023)** ................................... | **86** | **JA-1150** |

narios and examined how respondent perceptions of sanction risks were affected by scenario conditions (Nagin and Paternoster 1993) We found that respondent perceptions of sanction cost in a drunk-driving scenario were higher in the scenario condition involving a police crackdown on drunk driving versus a scenario condition described as involving state police cutbacks In addition, perceptions of sanction cost were lower if surveillance could be avoided by driving on back roads In scenarios concerning peer provocation, Wikstrom et al (2012) found that adolescents reported a lower likelihood of violent response in scenario conditions in which adult monitors were present Evidence from ethnographic studies suggests that offenders are very conscious of police presence when selecting targets Wright and Decker (1994) report that burglars avoid neighborhoods with a heavy police presence and that robbers prefer to target individuals unlikely to report the crime to the police, such as drug dealers

*C Summary*

Perceptual deterrence research has established that self-reported offending or intention to do so is linked to sanction risk perceptions The outstanding question is whether those perceptions are grounded in reality If they are not, behavior is beyond the reach of public policy The evidence on the sources of sanction risk perceptions suggests that risk perceptions are affected by an individual's own experience with success or failure at averting apprehension The link between perception and the legally authorized sanctions is less compelling but does indicate that there is at least a rough awareness among individuals in a need-to-know scenario The other key component of the sanction regime is the intensity of application of the legally authorized sanctions Research on this topic is based on general population studies of the correlations of perceptions of quantities of the ratio of arrest to crimes with estimates of these ratios calculated from offical statistics For reasons discussed above, in my judgment these studies are not informative about whether perceptions of intensity among the population with need-to-know sanction risks are affected by the actual intensity of application of legally authorized sanctions

Pogarsky (2007) offers a useful taxonomy of responsiveness to legal threats for considering the implications of these summary observations The taxonomy distinguishes three groups acute conformists, deterrables, and incorrigibles In the context of the decision model laid out

252     Daniel S. Nagin

in Section I, conformists are individuals for whom reward minus commission cost is negative. For reasons I have already discussed, they have no need to gain knowledge of sanction risks because there is no profit in crime even without potential sanction costs. Deterrables are individuals for whom reward minus commission cost is positive and who are attentive to sanction threats. For such individuals the issue is whether the net benefit of successful commission exceeds the potential costs attending failure. The incorrigible group is also composed of individuals for whom crime is profitable but who for whatever reason are not attentive to sanction threats. The relative sizes of the incorrigible and deterrable groups and the specific form of the sanction regime will determine the effectiveness of criminal justice public policy in preventing crime via deterrence and thereby avoiding the sanction costs of incapacitation.

Future research on sanction risk perceptions needs to target Pogarsky's deterrables and incorrigibles to gain better knowledge of their awareness of the two key elements of the sanction regime—the legally authorized sanctions and the intensity of their application. For the types of crime in the FBI index this will require abandoning surveys of the general population and instead sampling populations with a large representation of deterrables and incorrigibles. An example of such a survey is the Pathways to Desistance project used in the Anwar and Loughran (2011) analysis, which sampled juveniles adjudicated for felony offenses in Philadelphia and Phoenix.

Surveys targeting deterrables and incorrigibles should also include batteries of questions designed to learn how the actions of the police and other guardians affect perceptions of the probability of success, which, for the reasons described in Section V, is likely to be particularly decisive in the deterrence process.

## VII. Conclusions

Over the past four decades, much has been learned about the foundations of deterrence that were laid out more than two centuries ago by Cesare Beccaria and Jeremy Bentham. We now know that deterrence is ubiquitous but that the effects are heterogeneous, ranging in size from seemingly null to very large. There is little evidence that increasing already long prison sentences has a material deterrence effect. Evidence on the deterrent effect of the certainty of punishment

is more consistent, but the source of the effect is less clear. In this essay I have argued that the certainty effect stems primarily from police functioning in their official guardian role rather than in their apprehension agent role.

These conclusions have important policy implications that are developed in detail in Durlauf and Nagin (2011*b*). They suggest that lengthy prison sentences cannot be justified on deterrent grounds, but rather must be justified either on crime prevention through incapacitation or on retributive grounds. The crime prevention efficiency of incapacitating aged criminals is dubious, and thus the case for lengthy prison sentences must rest on retributive considerations. The conclusions also suggest that crime control effectiveness would be improved by shifting resources from corrections to policing methods that enhance the effectiveness of police in their official guardian role.

While much progress has been made in understanding sources of deterrence and the circumstances in which deterrence is and is not effective, much remains to be learned. Theory needs to be generalized to combine the response to the threat of punishments, known as general deterrence in criminology, and the response to the experience of punishment, which I have argued is inappropriately labeled specific deterrence. A second theoretical and empirical gap concerns the concept of a sanction regime and its two dimensions: the legal authority for different types of sanctions and the way in which authority is administered. These two dimensions combine to determine the certainty, severity, and celerity of sanction options available for punishment of a specific type of crime. Theories of deterrence, however, specify sanction threats in the singular, not in the plural. Theories of deterrence that conceive of sanctions in the singular do not provide the conceptual basis for considering the differential deterrent effect of different types of sanction options. The empirical companion to this theoretical expansion involves assembling the data required to measure sanction regimes.

A third theoretical and empirical gap involves sanction risk perceptions. Deterrence is the behavioral response to the perception of sanction threats. Establishing the link between risk perceptions and actual sanction regimes is imperative because policy cannot directly manipulate perceptions. Unless perceptions adjust, however crudely, to changes in the sanction regime, the desired deterrent effect will not be achieved. More research on the sources of sanction risk perceptions in

254     Daniel S Nagin

crime-prone populations is likely to pay large dividends for theory and policy

The fourth major gap in theory and empirical knowledge involves a thorough testing of my contention that the guardian role, not the apprehension role, of the police is the most important source of their effectiveness in crime prevention  This theory also needs to be expanded to account for how the police and other guardians affect the distribution of criminal opportunities

REFERENCES

Andenaes, Johannes  1974  *Punishment and Deterrence*  Ann Arbor  University of Michigan Press

Anwar, Shamena, and Thomas A Loughran  2011  "Testing a Bayesian Learning Theory of Deterrence among Serious Juvenile Offenders"  *Criminology* 49 667–98

Apel, Robert  2013  "Sanctions, Perceptions, and Crime  Implications for Criminal Deterrence"  *Journal of Quantitative Criminology* 29(1) 87–101

Apel, Robert, and Daniel S Nagin  2009  "Deterrence"  In *Crime*, edited by James Q Wilson and Joan Petersilia  Oxford  Oxford University Press

Aposporı, Eleni, and Geoffrey Alpert  1993  "Research Note  The Role of Differential Experience with the Criminal Justice System in Changes in Perceptions of Severity of Legal Sanctions over Time"  *Journal of Research in Crime and Delinquency* 39 184–94

Assembly Committee on Criminal Procedure  1968  *Deterrent Effects of Criminal Sanctions*  Sacramento  Assembly of the State of California

Bachman, Ronet, Raymond Paternoster, and Sally Ward  1992  "The Rationality of Sexual Offending  Testing a Deterrence/Rational Choice Conception of Sexual Assault"  *Law and Society Review* 26(2) 343–72

Beccaria, Cesare  1986  *On Crimes and Punishments*  Translated by Henry Paolucci  New York  Macmillan  (Originally published 1764 )

Becker, Gary S  1968  "Crime and Punishment  An Economic Approach"  *Journal of Political Economy* 76(2) 169–217

Bentham, Jeremy  1988  *An Introduction to the Principles of Morals and Legislation*  Amherst, NY  Prometheus Books  (Originally published 1789 )

Blake, L , and R T Coupe  2001  "The Impact of Single and Two-Officer Patrols on Catching Burglars in the Act"  *British Journal of Criminology* 41 381–96

Blumstein, Alfred, and Allen J Beck  1999  "Population Growth in the U S Prisons, 1980–1996 "  In *Prisons*, edited by Michael Tonry and Joan Petersilia  Vol 26 of *Crime and Justice  A Review of Research*, edited by Michael Tonry  Chicago  University of Chicago Press

———— 2005 "Reentry as a Transient State between Liberty and Recommitment." In *Prisoner Reentry and Crime in America*, edited by Jeremy Travis and Christy Visher. Cambridge. Cambridge University Press.

Blumstein, Alfred, Jacqueline Cohen, and Daniel Nagin, eds. 1978. *Deterrence and Incapacitation. Estimating the Effects of Criminal Sanctions on Crime Rates.* Washington, DC. National Academies Press.

Blumstein, Alfred, and Daniel Nagin. 1976. "The Deterrent Effect of Legal Sanctions on Draft Evasion." *Stanford Law Review* 29(2) 241–75.

Braga, Anthony A. 2008. *Police Enforcement Strategies to Prevent Crime in Hot Spot Areas.* Edited by Office of Community Oriented Policing. Washington, DC. US Department of Justice.

Braga, Anthony A., Edward A. Flynn, George L. Kelling, and Christine M. Cole. 2011. "Moving the Work of Criminal Investigators towards Crime Control." *New Perspectives in Policing.* Washington, DC. US Department of Justice, National Institute of Justice.

Braga, Anthonly A., and David L. Weisburd. 2012. "The Effects of 'Pulling Levers' Focussed Deterrence Strategies on Crime." Campbell Systematic Reviews. http //campbellcollaboration org/lib/project/96/

Braithwaite, John. 1989. *Crime, Shame, and Reintegration.* Cambridge. Cambridge University Press.

Brantingham, Patricia L., and Paul J. Brantingham. 1999. "Theoretical Model of Crime Hot Spot Generation." *Studies on Crime and Crime Prevention* 8 7–26.

Bridges, George S., and James A. Stone. 1986. "Effects of Criminal Punishment on Perceived Threat of Punishment. Toward an Understanding of Specific Deterrence." *Journal of Research in Crime and Delinquency* 23 207–39.

Bureau of Justice Statistics. 1999. *Prisoners in 1998.* Edited by Allen J. Beck and Christopher J. Mumola. Washington, DC. Bureau of Justice Statistics.

———— 2010. *Felony Defendants in Large Urban Counties, 2006.* Edited by Thomas H. Cohen and Tracey Kyckelhahn. Washington, DC. Bureau of Justice Statistics.

———— 2011. *Prisoners in 2010 (Revised).* Edited by Paul Guerino, Paige M. Harrison, and William J. Sabol. Washington, DC. Bureau of Justice Statistics.

———— 2012. *Correctional Populations in the United States, 2011.* Edited by Lauren E. Glaze and Erika Parks. Washington, DC. Bureau of Justice Statistics.

Bushway, Shawn. 1996. "The Impact of a Criminal History Record on Access to Legitimate Employment." PhD dissertation, Carnegie Mellon University.

Canela-Cacho, Jose A., Alfred Blumstein, and Jacqueline Cohen. 1997. "Relationship between the Offending Frequency of Imprisoned and Free Offenders." *Criminology* 35(1) 133–76.

Chalfin, Aaron, Amelia M. Haviland, and Steven Raphael. 2013. "What Do Panel Studies Tell Us about a Deterrent Effect of Capital Punishment? A Critique of the Literature." *Journal of Quantitative Criminology* 29(1) 5–43.

Charles, Kerwin K., and Steven N. Durlauf. 2013. "Pitfalls in the Use of Time

256        Daniel S. Nagin

Series Methods to Study Deterrence and Capital Punishment." *Journal of Quantitative Criminology* 29(1) 45–66.

Clarke, Ronald V. 1995. "Situational Crime Prevention." In *Building a Safer Society. Strategic Approaches to Crime Prevention*, edited by Michael Tonry and David P. Farrington. Vol. 19 of *Crime and Justice. A Review of Research*, edited by Michael Tonry. Chicago. University of Chicago Press.

Cohen, Lawrence E., and Marcus Felson. 1979. "Social Change and Crime Rate Trends. A Routine Activity Approach." *American Sociological Review* 44(4) 588–608.

Cook, Philip J. 1979. "The Clearance Rate as a Measure of Criminal Justice System Effectiveness." *Journal of Public Economics* 11 135–42.

——— 2009. "Potential Savings from Abolition of the Death Penalty in North Carolina." *American Law and Economics Review* 11(2) 498–529.

——— 2012. "The Impact of Drug Market Pulling Levers Policing on Neighborhood Violence. An Evaluation of the High Point Drug Market Intervention." *Criminology and Public Policy* 11(2) 161–64.

Cook, Philip J., and Jens Ludwig. 2006. "Aiming for Evidence-Based Gun Policy." *Journal of Policy Analysis and Management* 48 691–735.

Cornish, Derek B., and Ronald V. Clarke. 1986. *The Reasoning Criminal. Rational Choice Perspectives on Offending*. Secausus, NJ. Springer-Verlag.

Corsaro, N., E. D. Hunt, N. K. Hipple, and E. F. McGarrell. 2012. "The Impact of Drug Market Pulling Levers Policing on Neighborhood Violence." *Criminology and Public Policy* 11 167–99.

DeAngelo, Greg, and Benjamin Hansen. 2008. "Life and Death in the Fast Lane. Police Enforcement and Roadway Safety." Unpublished manuscript. University of California, Santa Barbara, Department of Economics.

Di Tella, Rafael, and Ernesto Schargrodsky. 2004. "Do Police Reduce Crime? Estimates Using the Allocation of Police Forces after a Terrorist Attack." *American Economic Review* 94 115–33.

Donohue, John J. 2009. "Assessing the Relative Benefits of Incarceration. The Overall Change over the Previous Decades and the Benefits on the Margin." In *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, edited by Steven Raphael and Michael A. Stoll. New York. Sage.

Donohue, John J., and Justin Wolfers. 2005. "Uses and Abuses of Empirical Evidence in the Death Penalty Debate." *Stanford Law Review* 58 791–846.

——— 2009. "Estimating the Impact of the Death Penalty on Murder." *American Law and Economic Review* 11(2) 249–309.

Draca, Mirko, Stephen Machin, and Robert Witt. 2008. *Panic on the Streets of London. Police, Crime, and the July 2005 Terror Attacks*. Bonn. Institute for the Study of Labor.

Durlauf, Steven N., and Daniel S. Nagin. 2011a. "The Deterrent Effect of Imprisonment." In *Controlling Crime. Strategies and Tradeoffs*, edited by Philip J. Cook, Jens Ludwig, and Justin McCrary. Chicago. University of Chicago Press.

——— 2011b. "Imprisonment and Crime. Can Both Be Reduced?" *Criminology and Public Policy* 10 9–54.

Durlauf, Steven, S. Navarro, and D. Rivers. 2008. "On the Interpretation of Aggregate Crime Regressions." In *Crime Trends*, edited by A. Goldberger and R. Rosenfeld. Washington, DC: National Academy of Sciences Press.

Eck, John E. 1992. "Criminal Investigation." In *What Works in Policing? Operations and Administrations Examined*, edited by Gary W. Cordner and Donna C. Hale. Cincinnati: Anderson.

Eck, John E., Jeffrey S. Gersh, and Charlene Taylor. 2000. "Finding Crime Hot Spots through Repeat Address Mapping." In *Analyzing Crime Patterns Frontiers of Practice*, edited by Victor Goldsmith, Philip G. McGuire, John H. Mollenkopf, and Timothy A. Ross. Thousand Oaks, CA: Sage.

Ehrlich, Isaac. 1975. "The Deterrent Effect of Capital Punishment: A Question of Life and Death." *American Economic Review* 65(3): 397–417.

Erickson, Maynard L., and Jack P. Gibbs. 1979. "On the Perceived Severity of Legal Penalties." *Journal of Criminal Law, Criminology, and Police Science* 70: 102–16.

Evans, William N., and Emily G. Owens. 2007. "COPS and Crime." *Journal of Public Economics* 91: 181–201.

Ferrier, M., and Jens Ludwig. 2011. "Crime Policy and Informal Social Control." *Criminology and Public Policy* 10: 1029–36.

Freeman, Richard B. 1991. *Crime and the Employment of Disadvantaged Youths.* Cambridge, MA: National Bureau of Economic Research.

Gibbs, Jack P. 1975. *Crime, Punishment, and Deterrence.* New York: Elsevier.

Granger, C. W. J. 1969. "Investigating Causal Relations by Econometric Models and Cross-Spectral Methods." *Econometrica* 37: 424–38.

Grasmick, Harold, and George Bryjak. 1980. "The Deterrent Effect of Perceived Severity of Punishment." *Social Forces* 59(2): 471–91.

Greenwood, Peter, Jan Chaiken, and Joan Petersilia. 1977. *The Investigation Process.* Lexington, MA: Lexington.

Greenwood, Peter, and Angela Hawken. 2002. *An Assessment of the Effect of California's Three-Strikes Law.* Toronto: Greenwood Associates.

Grube, Joel W., and Kathleen A. Kearney. 1983. "A 'Mandatory' Jail Sentence for Drinking and Driving." *Evaluation Review* 7: 235–46.

Hawken, Angela. 2010. "Behavioral Triage: A New Model for Identifying and Treating Substance-Abusing Offenders." *Journal of Drug Policy Analysis* 3: 1–5.

Hawken, Angela, and Mark Kleman. 2009. *Managing Drug-Involved Probationers with Swift and Certain Sanctions: Evaluating Hawaii's HOPE.* Washington, DC: National Institute of Justice.

Heaton, Paul. 2010. "Understanding the Effects of Antiprofiling Policies." *Journal of Law and Economics* 53(1): 29–64.

Helland, E., and A. Tabarrok. 2007. "Does Three Strikes Deter? A Nonparametric Estimation." *Journal of Human Resources* 42(2): 309–30.

Hjalmarsson, Randi. 2008. "Criminal Justice Involvement and High School Completion." *Journal of Urban Economics* 63: 613–30.

———. 2009. "Crime and Expected Punishment: Changes in Perceptions at

258        Daniel S. Nagin

the Age of Criminal Majority." *American Law and Economics Review* 7 209–48

Horney, Julie, and Ineke Haen Marshall. 1992. "Risk Perceptions among Serious Offenders: The Role of Crime and Punishment." *Criminology* 30 575–93

Jacobs, Bruce A., and Richard Wright. 2006. *Street Justice: Retaliation in the Criminal Underworld.* New York: Cambridge University Press

Johnson, Rucker, and Steven Raphael. 2012. "How Much Crime Reduction Does the Marginal Prisoner Buy?" *Journal of Law and Economics* 55(2) 275–310

Johnston Lloyd, D., Patrick M. O'Malley, and Jerald G. Bachman. 1981. "Cannabis Decriminalization: The Impact on Youth 1975–1980." In *Monitoring the Future: Occasional Paper.* Ann Arbor, MI: Institute for Social Research

Kansas City Police Department, eds. 1977. *Response Time Analysis.* Kansas City: Kansas City Police Department

Kennedy, David M. 2009. *Deterrence and Crime Prevention: Reconsidering the Prospect of Sanction.* New York: Routledge

Kennedy, David M., Anthony A. Braga, Anne Morrison Piehl, and Elin J. Waring. 2001. *Reducing Gun Violence: The Boston Gun Project's Operation Ceasefire.* Washington, DC: US National Institute of Justice

Kessler, Daniel, and Steven Levitt. 1999. "Using Sentence Enhancements to Distinguish between Deterrence and Incapacitation." *Journal of Law and Economics* 42 348–63

Kleck, Gary, and J. C. Barnes. Forthcoming. "Do More Police Lead to More Crime Deterrence?" *Crime and Delinquency.* doi:10.1177/0011128710382263

Kleck, Gary, Brion Sever, Spencer Li, and Marc Gertz. 2005. "The Missing Link in General Deterrence Research." *Criminology* 46 623–59

Kleiman, Mark. 2009. *When Brute Force Fails: How to Have Less Crime and Less Punishment.* Princton, NJ: Princeton University Press

Klein, Lawrence R., Brian Forst, and Victor Filatov. 1978. "The Deterrent Effect of Capital Punishment: An Assessment of the Estimates." In *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates,* edited by Alfred Blumstein, Jacqueline Cohen, and Daniel S. Nagin. Washington, DC: National Academy of Sciences

Klepper, Steven, and Daniel Nagin. 1989a. "The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited." *Criminology* 27(4) 721–46

———. 1989b. "Tax Compliance and Perceptions of the Risks of Detection and Criminal Prosecution." *Law and Society Review* 23 209–40

Klick, Jonathan, and Alexander Tabarrok. 2005. "Using Terror Alert Levels to Estimate the Effect of Police on Crime." *Journal of Law and Economics* 46 267–79

Lee, David S., and Justin McCrary. 2009. *The Deterrent Effect of Prison: Dynamic Theory and Evidence.* Princeton, NJ: University of Princeton, Industrial Relations Section

Levitt, Steven D. 1996. "The Effect of Prison Population Size on Crime Rates

Evidence from Prison Overcrowding Legislation." *Quarterly Journal of Economics* 111 319–52

———. 1997. "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime." *American Economic Review* 87 270–90

———. 1998. "Juvenile Crime and Punishment." *Journal of Political Economy* 106 1156–85

———. 2002. "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime  Reply." *American Economic Review* 92 1244–50

———. 2006. "The Case of the Critics Who Missed the Point  A Reply to Webster et al." *Criminology and Public Policy* 5 449–60

Liedka, Raymond V., Anne Morrison Piehl, and Bert Useem  2006 "The Crime-Control Effect of Incarceration  Does Scale Matter?" *Criminology and Public Policy* 5 245–76

Lochner, Lance  2007 "Individual Perceptions of the Criminal Justice System." *American Economic Review* 97 444–60

Loftin, Colin, Milton Heumann, and David McDowall  1983 "Mandatory Sentencing and Firearms Violence  Evaluating an Alternative to Gun Control." *Law and Society Review* 17 287–318

Loftin, Colin, and David McDowall  1981 "'One with a Gun Gets You Two'  Mandatory Sentencing and Firearms Violence in Detroit." *Annals of the American Academy of Political and Social Science* 455(1) 150–67

———. 1984 "The Deterrent Effects of the Florida Felony Firearm Law." *Journal of Criminal Law and Criminology* 75 250–59

Ludwig, Jens, Jeffrey R  Kling, and Sendhil Mullainathan  2011 "Mechanism Experiments and Policy Evaluations." *Journal of Economic Perspectives* 25(3) 17–38

MacCoun, Robert, Rosalie Liccardo Pacula, Jamie Chriqui, Katherine Harris, and Peter Reuter  2009 "Do Citizens Know Whether Their State Has Decriminalized Marijuana?  Assessing the Perceptual Component of Deterrence Theory." *Review of Law and Economics* 5 347–71

Marvell, Thomas B., and C  Moody Jr  1994 "Prison Population Growth and Crime Reduction." *Journal of Quantitative Criminology* 10 109–40

———. 1996 "Specification Problems, Police Levels, and Crime Rates." *Criminology* 34 609–46

Matsueda, Ross L., D  A  Kreager, and D  Huizinga  2006 "Deterring Delinquents  A Rational Choice Model of Theft and Violence." *American Sociological Review* 71 95–122

McCrary, Justin  2002 "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime  Comment." *American Economic Review* 92 1236–43

McDowall, D., C  Loftin, and B  Wiersema  1992 "A Comparative Study of the Preventive Effects of Mandatory Sentencing Laws for Gun Crimes." *Journal of Criminal Law and Criminology* 83 378–94

Meier, R  F., and W  T  Johnson  1977 "Deterrence as Social Control  The Legal and Extralegal Production of Conformity." *American Sociological Review* 42 292–304

260    Daniel S Nagin

Minor, W W 1977 "A Deterrence-Control Theory of Crime " In *Theory of Criminology*, edited by R F Meier Beverly Hills, CA. Sage

Mulvey, E P 2011 *Highlights from Pathways to Desistance A Longitudinal Study of Serious Adolescent Offenders* Juvenile Justice Fact Sheet Washington, DC Department of Justice

Nagin, Daniel S 1998 "Criminal Deterrence Research at the Outset of the Twenty-First Century " In *Crime and Justice A Review of Research*, vol 23, edited by Michael Tonry Chicago University of Chicago Press

Nagin, Daniel S , Francis T Cullen, and Cheryl Lero Jonson 2009 "Imprisonment and Reoffending " In *Crime and Justice A Review of Research*, vol 38, edited by Michael Tonry Chicago University of Chicago Press

Nagin, Daniel S , and Raymond Paternoster 1993 "Enduring Individual Differences and Rational Choice Theories of Crime " *Law and Society Review* 27 467–99

———— 1994 "Personal Capital and Social Control The Deterrence Implications of Individual Differences in Criminal Offending " *Criminology* 32 581–606

Nagin, Daniel S , and John V Pepper, eds 2012 *Deterrence and the Death Penalty* Washington, DC National Academies Press

Nagin, Daniel S , and Greg Pogarsky 2001 "Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence Theory and Evidence " *Criminology* 39 865–92

———— 2003 "An Experimental Investigation of Deterrence Cheating, Self-Serving Bias, and Impulsivity " *Criminology* 41 167–93

Owens, Emily G 2009 "More Time, Less Crime? Estimating the Incapacitative Effects of Sentence Enhancements " *Journal of Labor Economics* 53(3) 551–79

Packer, H L 1968 *The Limits of the Criminal Sanction* Stanford, CA. Stanford University Press

Papachristos, Andrew V , Tracey L Meares, and Jeffrey Fagan 2007 "Attention Felons Evaluating Project Safe Neighborhoods in Chicago " *Journal of Empirical Legal Studies* 4 223–72

Paternoster, Raymond 1983 "Estimating Perceptual Stability and Deterrent Effects The Role of Perceived Legal Punishment in the Inhibition of Criminal Involvement " *Journal of Criminal Law and Criminology* 74 210–97

———— 2010 "How Much Do We Really Know about Criminal Deterrence?" *Journal of Criminal Law and Criminology* 10(3) 765–823

Paternoster, Raymond, and Alex Piquero 1995 "Reconceptualizing Deterrence An Empirical Test of Personal and Vicarious Experiences " *Journal of Research in Crime and Delinquency* 32 251–86

Paternoster, Raymond, Linda E Saltzman, Theodore G Chiricos, and Gordon P Waldo 1982 "Perceived Risk and Deterrence Methodological Artifacts in Perceptual Deterrence Research " *Journal of Criminal Law and Criminology* 73 1238–58

Pilavin, Irving, Craig Thornton, Rosemary Gartner, and Ross L Matsueda

1986  "Crime, Deterrence, and Rational Choice." *American Sociological Review* 51 101–19

Piquero, Alex, Raymond Paternoster, Greg Pogarsky, and Thomas A Loughran  2011  "Elaborating the Individual Difference Component in Deterrence Theory." *Annual Review of Law and Social Science* 7 355–60

Pogarsky, Greg  2007  "Deterrence and Individual Differences among Convicted Offenders." *Quantitative Criminology* 23(1) 59–74

Pogarsky, Greg, KiDuek Kim, and Raymond Paternoster  2005  "Perceptual Change in the National Youth Survey· Lessons for Deterrence Theory and Offender Decision-Making." *Justice Quarterly* 22 1–29

Pogarsky, Greg, and Alex R Piquero  2003  "Can Punishment Encourage Offending? Investigating the 'Resetting' Effect." *Journal of Research in Crime and Delinquency* 40 95–120

Pogarsky, Greg, Alex R Piquero, and Raymond Paternoster  2004  "Modeling Change in Perceptions about Sanction Threats  The Neglected Link in Deterrence Theory." *Journal of Quantitative Criminology* 20 343–69

Poutvaara, Panu, and Mikael Priks  2006  "Hooliganism in the Shadow of a Terrorist Attack and the Tsunami  Do Police Reduce Group Violence?" Working Paper no  1882  Munich  Center for Economic Studies and Ifo Institute for Economic Research

Raphael, Steven  2006  "The Deterrent Effects of California's Proposition 8 Weighing the Evidence." *Criminology and Public Policy* 5 471–78

Raphael, Steven, and Jens Ludwig  2003  "Prison Sentence Enhancements The Case of Project Exile." In *Evaluating Gun Policy Effects on Crime and Violence*, edited by Jens Ludwig and Philip J  Cook. Washington, DC  Brookings Institution Press

Raphael, Steven, and Michael A. Stoll  2009  "Why Are So Many Americans in Prison?" In *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, edited by Steven Raphael and Michael A Stoll  New York  Sage

Reuter, Peter, and Howard Pollack  2012  "Good Markets Make Bad Neighbors  Regulating Open-Air Drug Markets." *Criminology and Public Policy* 11(2) 211–20

Roncek, Dennis W  2000  "Schools and Crime." In *Analyzing Crime Patterns Frontiers of Practice*, edited by Victor Goldsmith, Philip G  McGuire, John H  Mollenkopf, and Timothy A  Ross  Thousand Oaks, CA  Sage

Ross, H  Laurence  1973  "Law, Science, and Accidents  The British Road Safety Act of 1967." *Journal of Legal Studies* 2 1–78

———  1982  *Deterring the Drinking Driver  Legal Policy and Social Control* Lexington, MA  Lexington

Sherman, Lawrence W  1990  "Police Crackdowns  Initial and Residual Deterrence." In *Crime and Justice  A Review of Research*, vol 12, edited by Michael Tonry and Norval Morris  Chicago  University of Chicago Press

———  In this volume  "The Rise of Evidence-Based Policing  Targeting, Testing, and Tracking."

Sherman, Lawrence W, and Richard A  Berk  1984  "The Specific Deterrent

Effects of Arrest for Domestic Assault." *American Sociological Review* 49:261–72.

Sherman, Lawrence W., and John E. Eck. 2002. "Policing for Prevention." In *Evidence Based Crime Prevention*, edited by Lawrence W. Sherman, David Farrington, and Brandon Welsh. New York: Routledge.

Sherman, Lawrence W., Patrick Gartin, and Michael Buerger. 1989. "Hot Spots of Predatory Crime: Routine Activities and the Criminology of Place." *Criminology* 27:27–55.

Sherman, Lawrence, and David Weisburd. 1995. "General Deterrent Effects of Police Patrol in Crime 'Hot Spots': A Randomized Study." *Justice Quarterly* 12:625–48.

Shi, Lan. 2009. "The Limits of Oversight in Policing: Evidence from the 2001 Cincinnati Riot." *Journal of Public Economics* 93:99–113.

Snell, T. L. 2010. *Capital Punishment 2009—Statistical Tables*. Washington, DC: US Department of Justice.

Spelman, William. 2000. "What Recent Studies Do (and Don't) Tell Us about Imprisonment and Crime." In *Crime and Justice: A Review of Research*, vol. 27, edited by Michael Tonry. Chicago: University of Chicago Press.

Spelman, William, and Dale K. Brown. 1981. *Calling the Police: A Replication of the Citizen Reporting Component of the Kansas City Response Time Analysis*. Washington, DC: Police Executive Research Forum.

Stafford, Mark C., and Mark Warr. 1993. "A Reconceptualization of General and Specific Deterrence." *Journal of Research in Crime and Delinquency* 30:123–35.

Stolzenberg, Lisa, and Stewart J. D'Alessio. 1997. "'Three Strikes and You're Out': The Impact of California's New Mandatory Sentencing Law on Serious Crime Rates." *Crime and Delinquency* 43(4):457–69.

Tittle, Charles. 1977. "Sanction Fear and the Maintenance of Social Order." *Social Forces* 55:579–96.

———. 1980. *Sanctions and Social Deviance: The Question of Deterrence*. New York: Praeger.

Tonry, Michael. 1996. *Sentencing Matters*. Oxford: Oxford University Press.

———. 2009. "The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings." In *Crime and Justice: A Review of Research*, vol. 38, edited by Michael Tonry. Chicago: University of Chicago Press.

Vollaard, Ben. 2013. "Preventing Crime through Selective Incapacitation." *Economic Journal* 123(567):262–84.

Waldfogel, Joel. 1994. "The Effect of Criminal Conviction on Income and the Trust 'Reposed in the Workmen.'" *Journal of Human Resources* 29:62–81.

Webster, Cheryl Marie, Anthony Doob, and Franklin Zimring. 2006. "Proposition 8 and Crime Rates in California: The Case of the Disappearing Deterrent." *Criminology and Public Policy* 5:417–48.

Weisburd, David, Shawn Bushway, Cynthia Lum, and Su-Ming Yang. 2004. "Trajectories of Crime at Places: A Longitudinal Study of Street Segments in the City of Seattle." *Criminology* 42:238–320.

Weisburd, David, and John Eck. 2004. "What Can Police Do to Reduce

Crime, Disorder, and Fear?" *Annals of the American Academy of Political and Social Science* 593 42–65

Weisburd, David, Tomar Einat, and Matt Kowalski 2008 "The Miracle of the Cells An Experimental Study of Interventions to Increase Payment of Court-Ordered Financial Obligations" *Criminology and Public Policy* 7 9–36

Weisburd, David, and Lorraine Green 1995 "Policing Drug Hot Spots The Jersey City Drug Market Analysis Experiment" *Justice Quarterly* 12 711–35

Wikstrom, Per-Olof H, D Oberwittler, K. Treiber, and B Hardie 2012 *Breaking Rules The Social and Situational Dynamics of Young People's Urban Crime* Oxford Oxford University Press

Williams, Kirk R, Jack P Gibbs, and Maynard L Erickson 1980 "Public Knowledge of Statutory Penalties The Extent and Basis of Accurate Perception" *Sociological Review* 23 105–28

Williams, Kirk R, and Richard Hawkins 1986 "Perceptual Research on General Deterrence A Critical Overview" *Law and Society Review* 20 545–72

Wilson, J M, and S Chermak 2011 "Community-Driven Violence Reduction Programs" *Criminology and Public Policy* 10 993–1027

Wood, Peter B, and David C May 2003 "Racial Differences in Perceptions of Severity of Sanctions A Comparison of Prison with Alternatives" *Justice Quarterly* 20(3) 605–31

Wright, Richard T, and Scott H Decker 1994 *Burglars on the Job Streetlife and Residential Break-ins* Boston Northeastern University Press

Zimring, Franklin, and Gordon Hawkins 1973 *Deterrence The Legal Threat in Crime Control* Chicago University of Chicago Press

Zimring, Franklin E, Gordon Hawkins, and Sam Kamin 2001 *Punishment and Democracy Three Strikes and You're Out in California* New York Oxford University Press

# EXHIBIT N

## to Expert Report of Professor Louis Klarevas

Journal of Economic Psychology 47 (2015) 1–16



Contents lists available at ScienceDirect

# Journal of Economic Psychology

journal homepage: www.elsevier.com/locate/joep





Review

# Like ripples on a pond: Behavioral spillovers and their implications for research and policy

CrossMark

Paul Dolan, Matteo M. Galizzi *

Department of Social Policy, Behavioral Research Lab, London School of Economics, UK
Centre for the Study of Incentives in Health, Institute of Psychiatry, King's College London, UK

ARTICLE INFO

Article history:
Received 30 March 2014
Received in revised form 15 December 2014
Accepted 18 December 2014
Available online 5 January 2015

JEL classification:
C18
C91
C93
D03

PsycINFO classification:
2260
2346
2360
3040

Keywords:
Behavioral spillovers
Policy-making
Nudges
Crowding in/out

ABSTRACT

No behavior sits in a vacuum, and one behavior can greatly affect what happens next. We propose a conceptual frame within which a broad range of behavioral spillovers can be accounted for when applying behavioral science to policy challenges. We consider behaviors which take place sequentially and are linked, at a conscious or unconscious level, by some underlying motive. The first behavior leads to another behavior which can either work in the same direction as the first (*promoting* spillover), or push back against it (*permitting* or *purging* spillover). Looking through this conceptual lens at the existing evidence, we find pervasive evidence for all kinds of spillover effects across a variety of fields and domains. As a result, behavioral scientists, especially those seeking to inform policy, should try to capture all the ripples from one behavior to the next when a pebble of intervention is thrown in the pond, and not just at the immediate behavioral splash it makes.

© 2014 The Authors. Published by Elsevier B.V. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

## Contents

1. Introduction ................................................................. 2
2. Behavioral spillovers ........................................................ 2
3. Promoting spillovers ........................................................ 6
4. Permitting spillovers ........................................................ 7
5. Purging spillovers ........................................................... 8
6. Facilitating conditions for promoting, permitting, and purging spillovers ........... 8

* Corresponding author at: Department of Social Policy, Behavioral Research Lab, LSE Health, London School of Economics, Houghton Street, G09 Cowdray House, WC2A 2AE London, UK. Tel.: +44 020 7955 5386.
 E-mail address: m.m.galizzi@lse.ac.uk (M.M. Galizzi).

http://dx.doi.org/10.1016/j.joep.2014.12.003
0167-4870/© 2014 The Authors. Published by Elsevier B.V.
This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

7.    Future directions and challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10
      Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11
      References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

## 1. Introduction

Policymakers have begun taking seriously the results of behavioral research (Camerer, 1999; Camerer, Issacharoff, Loewenstein, O'Donoghue, & Rabin, 2003; Congdon, Kling, & Mullainathan, 2011; Dolan et al., 2011; Shafir, 2012; Sunstein, 2011; Thaler & Sunstein, 2003). This trend is to be welcomed but the various discussions of the evidence are typically made in 'behavioral silos', focusing on one specific behavioral response at a time (Thøgersen, 1999a). Yet no behavior sits in a vacuum and we need to consider the possible spillover effects from one behavioral response to the next.

Imagine an intervention that successfully reduces energy consumption in the home, e.g. by installing LED light bulbs, but that has the spillover effect of increasing energy use elsewhere, e.g. through leaving more lights on at work. Some or all of the benefits from the reduction in $CO_2$ emissions could be lost (Gillingham, Kotchen, Rapson, & Wagner, 2013; Jacobsen, Kotchen, & Vandenbergh, 2012; Thøgersen & Crompton, 2009; Tiefenbeck, Staake, Roth, & Sachs, 2013). To inform policy, we should ideally capture all ripples of behavior when a pebble of intervention is thrown in the pond. The '*mapping of these ripples is now one of the most exciting pursuits in psychological research*' (Kahneman, 2011, p.53).

## 2. Behavioral spillovers

We propose a conceptual frame within which a broad range of 'behavioral spillovers' (Thøgersen, 1999a) can be systematically interpreted when applying behavioral science to policy challenges. Our framework is based on three building blocks.

First, we begin by assuming that two *different* behaviors take place sequentially: *behavior 1* is followed by *behavior 2*. This differentiates the analysis of behavioral spillovers from the long-established, distinct, literature on *adaptive learning*, which typically focuses on the repetition of the *same* behavior over time (e.g. learning in repeated games, as opposed to playing one-shot games, Fudenberg & Levine, 1998; Goeree & Holt, 2001; Vega-Redondo, 1996).

The typical situation we have in mind is a sequence of two different behaviors where *behavior 1* is the target of an intervention. An intervention is defined broadly here: it could be a policy intervention by a public decision-maker, or an experimental manipulation by a researcher. Implicitly, the following discussion is conducted on the presumption that we can compare a 'treatment' case where *behavior 1* is targeted by an intervention with a 'control' group where there is no intervention. What we would like to emphasize, however, is that the key focus of our interest here is what happens to *behavior 2* as the consequence of the intervention.

It is not uncommon, in fact, to find studies in the economics and psychology literatures where it is looked at when and how a policy intervention could '*backfire*' in the sense of having unintended compensatory or offsetting effects with respect to the ones originally envisaged by the decision-maker (e.g. Schultz, Nolan, Cialdini, Goldstein, & Griskevicius, 2007). For instance, for interventions in the context of risk and safety (e.g. seat belts in cars), the theories of *risk compensation*, *risk homeostasis*, or *behavioral adaptation* have since long argued that people can adjust their behavior in response to the perceived level of risk (Asch, Levy, Shea, & Bodenhorn, 1991; Bhattacharyya & Layton, 1979; Cohen & Einav, 2003; Evans & Graham, 1991; Garbacz, 1990a, 1990b, 1991, 1992; Peltzman, 1975; Rudin-Brown & Jamson, 2013; Schoemaker, 1993; Viscusi & Cavallo, 1994; Wilde, 1982a, 1982b, 1998; Wilde, Robertson, & Pless, 2002). This is an interesting but distinct question, the difference with our focus here being that those analyses typically look at the impact of the intervention on the *same* behavior originally targeted, not at what happens to *another* behavior occurring later on.

To narrow further down the scope of our analysis, we exclude from our remit two types of 'interventions' that deserve separate investigation. The first one refers to all those situations where *behavior 1* is not conceptually distinguishable from the intervention itself. Some archetypical examples of these situations refer to the literature on *priming* (Bargh, 1990; Gollwitzer, Heckhausen, & Steller, 1990). Priming occurs unconsciously when '*the passive activation of trait categories in one situational context carried over to influence social judgments in subsequent, ostensibly unrelated contexts*' (Bargh, 2006, p.148). Among the many examples, more self-sufficient behavior was prompted by the mere presence of a pile of Monopoly notes or a screensaver with various denominations of currency (Vohs, Mead, & Goode, 2006), whereas more cooperative, or competitive, behavior was prompted by the mere presence of a backpack, or a briefcase, respectively (Kay, Wheeler, Bargh, & Ross, 2004). As another 'ideomotor' example, subjects shown pictures of a library spoke more quietly thereafter than subjects shown pictures of a railway station (Aarts & Dijksterhuis, 2003).

While in all these priming situations, the intervention clearly affects a subsequent behavior, it is also clear that '*behavior 1*' consists of the mere exposure to the priming manipulation itself which, more often than not, is a subliminal presentation of words or images. In other words, rather than a triplet '*intervention – behavior 1 – behavior 2*' most priming situations consist of a manipulation and *a single* behavior.

The second area excluded from our analysis pertains to *price mechanisms* and financial incentives. For instance, the overall use of energy can increase in response to an environmental policy intervention that results in lower costs of the energy. We

P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16

3

do not see this effect as a 'behavioral spillover', though: it is merely a market adjustment to a relative price change, similarly to many other 'rebound' effects commonly referred to as 'Jevons paradoxes' (Alcott, 2005; Jevons, 1866).

Analogously, the economic and psychology literature on *financial incentives* has since long highlighted the '*hidden costs*' of incentives (Fehr & List, 2004), including crowding out of intrinsic motivation (Deci, Koestner, & Ryan, 1999; Frey & Oberholzer-Gee, 1997); changing social norms or individual beliefs about social norms (Gneezy & Rustichini, 2000a, 2000b; Heyman & Ariely, 2004); interacting in unpredictable ways with reciprocity, reputation, and social comparison concerns (Ariely, Bracha, & Meier, 2009; Dur, Non, & Roelfsema, 2010; Fehr & Gachter, 1997; Gachter & Thoni, 2010; Greiner, Ockenfels, & Werner, 2011; Rigdon, 2009); and 'choking' due to the anxiety aroused by relating payment to performance (Ariely, Gneezy, Loewenstein, & Mazar, 2009). In such cases, incentives may '*backfire*', in that they result in the opposite effects to the ones originally envisaged (Bénabou & Tirole, 2003, 2006; Fehr & Falk, 2002; Kamenica, 2012). The focus of such 'unintended consequences' of financial incentives, however, has mainly been on the *same* behavior originally targeted by the incentive. With few exceptions (e.g. Al-Ubaydli, Andersen, Gneezy, & List, in press; Dolan & Galizzi, 2014), this stream of literature has not looked at the spillover effects that incentives may have on behaviors *other* than the one directly targeted. For the same reasons highlighted above about the studies on risk compensation and price adjustments, we thus exclude the literature on financial incentives from our analysis, and reiterate that our core interest here is on what happens to *behavior 2* after the intervention.

The second building block of our conceptual framework is that we assume that the two subsequent behaviors are linked, at a conscious or unconscious level, by some underlying *motive*. With motives here we mean a broadly intended range of factors that drive behavior (Bargh & Barndollar, 1996). When behaviors occur under conscious deliberation and individuals are fully aware of their *preferences*, the motive can be represented as the argument of a standard utility function, as typically postulated in traditional economics models.

More generally, motives can also be conceptualized as *deep preferences*, '*self-defining*' or '*identity goals*' (Wicklund & Gollwitzer, 1981, 1982), or '*long-term goals, major affiliations, and basic values*' (Baumeister, 1986): individuals may at times be uncertain over these motives, may not consciously attend to them, or may even be unaware of them, because, for instance, of imperfect recall, or because distracted by other more salient or tempting options (Aarts & Dijksterhuis, 2000; Akerlof & Kranton, 2000; Bargh & Barndollar, 1996; Bargh, Gollwitzer, Lee-Chai, Barndollar, & Trotschel, 2001; Bénabou & Tirole, 2006, 2011; Chartrand & Bargh, 1996; DellaVigna, 2009; Dijksterhuis & Bargh, 2001; Dijksterhuis, Bos, Nordgren, & van Baaren, 2006; Dijksterhuis & Nordgren, 2006; Gneezy, Gneezy, Riener, & Nelson, 2012; Gneezy, Imas, Brown, Nelson, & Norton, 2012; Gollwitzer, 1990; Kahneman, 2003; Kruglanski et al., 2002; Norton, 2012; Novemsky & Dhar, 2005; Trope & Fishbach, 2000).

To visualize this most general case, what we have in mind is an analytical framework such as the prominent '*Beliefs As Assets*' model for moral behavior by Bénabou and Tirole (2011), to which we refer for a full theoretical analysis. For the sake of illustration only, we report here a simplified variant of the Bénabou and Tirole (2011) model inspired to the '*general satisfaction*' idea by Frijters (2000) and Van Praag, Frijters, and Ferrer-i-Carbonell (2003), and to its extension in terms of the *Adaptive Global Utility Model (AGUM)* by Bradford and Dolan (2010).

In our setting, we imagine that an individual derives satisfaction from $k = 1, \ldots, K$ primitive life-satisfaction 'accounts': for instance, wealth, health, career, family, morality, friendship, pleasure, purpose, political engagement, the environment, and so on. In this setting, *motives* correspond to those life satisfaction accounts, the '*deep preferences*' driving individual choices and actions. The multiplicity of motives reflects the fact that, in reality, we may hold different, possibly conflicting, identity goals simultaneously (Baumeister & Vohs, 2007; Carver, 2003; Carver & Scheier, 1998; Dhar & Simonson, 1999; Fishbach & Dhar, 2005; Kruglanski et al., 2002; Louro, Pieters, & Zeelenberg, 2007; Simon, 1967; Stroebe, Mensink, Aarts, Schut, & Kruglanski, 2008; Susewind & Hoelzl, 2014), and corresponds to the case of '*multidimensional identity*' in Bénabou and Tirole (2011).

We next imagine that $X^N$ represents the space of all possible *behavioral outcomes*. For instance, think at an outcome as a consumption bundle, an allocation of money across different destinations, or a distribution of time or effort among different activities. A specific behavioral outcome $x_i \in X^N$ is thus an observable metrics: the amount of money spent in a luxury good or donated to a charity; the hours in a day spent working, exercising, or volunteering; the number of $CO_2$ emissions. Individuals are assumed to have a, conscious or unconscious, single preference relation, $\geqslant$, which supports a one-dimensional ranking across all pair-wise comparisons of possible outcomes $(x_i, x_j) \in X^N$ where $(x_i, x_j)$ represent $N$-dimensional vectors of specific points in the overall behavioral outcomes space $X^N$.

What is more, we assume that there exists a *profile* of preference relations

$$P \equiv (\geqslant_1, \geqslant_2, \ldots, \geqslant_k) \tag{1}$$

which maps the possible outcomes $(x_i, x_j) \in X^N$ onto rankings defined over each of the $k = 1, \ldots, K$ primitive life-satisfaction 'accounts' for a specific individual. Thus, for instance, one behavioral outcome can be preferred to an alternative over a motive (e.g. pleasure, career) but not over another one (e.g. health, family).

As in the *AGUM* model, one can visualize each preference relation using functional relationships $v^k(x_i) : X^N \to R^+$, $\forall k = 1, \ldots, k$, such that $v^k(x_i) \geqslant v^k(x_j)$ if and only if $x_i \geqslant_k x_j$. These functions can be rationalized as value functions of the *direct* satisfaction from a behavioral outcome for each of the $k = 1, \ldots, K$ primitive accounts, such that the single vector of outcomes $x_i$ simultaneously generates $K$ measures of direct life satisfaction. This reflects the idea that the same behavior or mean can serve more than one identity goal ('*multifinality*' in Shah, Friedman, and Kruglanski (2002)).

*P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*

Importantly, besides direct satisfaction from a behavioral outcome, each motive's life satisfaction also includes indirect utility from *self-perception* or *self-image* $I^k(\cdot)$ over that same account. This reflects the idea that we may derive satisfaction not just from tangible behavioral outcomes, but also from the accumulation of signals and beliefs about our own identities (Bénabou & Tirole, 2012; Gomez-Minambres, 2012; Mazar, Amir, & Ariely, 2008; Nisan & Horenczyk, 1990; Tesser, 1988; Wicklund & Gollwitzer, 1981). For instance, in the prominent context of donations, one can derive direct utility from contributing to a public good ('*pure altruism*') but also indirectly from feeling good about the act of giving itself (e.g. the '*warm-glow*' in Andreoni (1990)). In line with the '*self-inference*' process described by Bénabou and Tirole (2011), in fact, individuals derive indirect satisfaction from signals because they may have no conscious access to their deep preferences, or because they recall their true motives and identities only imperfectly. The indirect satisfaction from self-image signals, moreover, is a key channel through which the various self-regulation mechanisms based on entitlement and justification take place (De Witt Huberts, Evers, & De Ridder, 2014; Hsee, 1995; Kivetz & Simonson, 2002; Kivetz & Zheng, 2006; Merritt, Effron, & Monin, 2010; Mukhopadhyay & Johar, 2009).

Alike in Bénabou and Tirole (2011) we imagine that the accumulation of *self-image* follows a dynamic process, where the levels of $I^k(\cdot)$ at $t = 2$ typically depends on the outcomes of behavior 1 and on the initial level of self-image in that account, that is: $I^k_{t=2} = I^k(x^k_{t=1}; I^k_{t=1})$ where $t = 1, 2$ refers to the time when behavior 1 and 2 take place respectively. This reflects the idea that self-beliefs are, to some extent, '*malleable through actions*' (Bénabou & Tirole, 2011). In what follows we assume that there are no links between self-images across different motives (e.g. '*being healthy*' and '*being green*'), but we will return to this point in Section 7.

We further imagine that the account value functions can be combined into an ultimate '*global life-satisfaction*' function as in Frijters (2000) and Van Praag et al. (2003). Alike in the *AGUM* model, one way to do it is by attaching increasing and quasi-concave weights $\omega_k(\cdot)$ to each particular life account, and, for instance, taking a linear generalized utilitarian form for the global satisfaction such as

$$U(x) = \sum_k \omega_k(\cdot) V(v^k(x), I^k(\cdot)) \qquad (2)$$

The weight attached, consciously or unconsciously, to a specific life satisfaction account reflects the facts that the value of a given motive can be known only at a subconscious level (Bodner & Prelec, 2003; Fishbach, Friedman, & Kruglanski, 2003; Simon, 1967), and that at times people may even be unaware of the existence of some accounts (e.g. one may be unaware of career or family motives before getting a job, or meeting the significant other, respectively). This also reflects the idea of '*multidimensional identity*' in Bénabou and Tirole (2011), where people tradeoff between different dimensions of identity '*linked by uncertainty over their relative value*' (p.815). Equivalently, the weights attached to each life satisfaction account can be interpreted in terms of *attention* (Chabris & Simons, 2011; Dolan, 2014; Kahneman, 1973; Moskowitz, 2002), or as indicators of the cognitive '*accessibility*' of each specific construct: the higher is the weight, the more accessible is the motive (Forster, Liberman, & Higgins, 2005; Goschke & Kuhl, 1993; Higgins & King, 1981; Kruglanski, 1996; Kruglanski & Webster, 1996; Shah & Kruglanski, 2002, 2003; Srull & Wyer, 1979; Zeigarnik, 1927).

Finally, alike in the *AGUM* model, we imagine that the weights attached to each account can also change over time following a dynamic process similar to the one imagined for the self-images. In particular, the weight of motive $k$ at time $t = 2$, $\omega_k(\cdot)$ typically depends on the initial level of the weight at $t = 1$, and on the outcomes of behavior 1, that is $\omega^k_{t=2} = \omega^k(x^k_{t=1}; \omega^k_{t=1})$ where $t = 1, 2$ refers to the time when behavior 1 and 2 take place respectively. Here too we imagine that there are no cross-motives effects on the weights. Such a dynamics of weights readjustment does not necessarily need to be conscious or deliberate, though. Weights attached to different motives can shift as result of an unconscious reprioritization process where an unattended goal 'demands' a higher priority by '*intruding on awareness*' (Carver, 2003; Simon, 1967). For instance, not only intrusive thoughts, rumination, and dreams, but also moods, affects, and emotions can often manifest themselves as calls for reprioritizing weights across identity motives (Carver, 2003; Forster et al., 2005; Fredrickson, 1998; Isen, 1987, 2000; Isen & Simmonds, 1978; Lewin, 1951; Martin & Tesser, 1996; Simon, 1967; Tesser, Crepaz, Collins, Cornell, & Beach, 2000; Trope & Neter, 1994; Trope & Pomerantz, 1998).

In our setting, thus, having a high *motive* is the amalgamation of three main factors: enjoying direct satisfaction from the behavioral outcome ('*I have just donated £10 to a good cause*'); benefitting from the associated self-inference ('*I am a good person*'); and, consciously or unconsciously, attaching a high weight to that motive in terms of life satisfaction ('*Being a good person makes me happy*').

This conceptualization of the motives naturally lends itself to introduce the last building block of our framework, the link between behavior 1 and 2. In our framework, in fact, the first behavior leads to a subsequent behavior which, as the motive is concerned, can either work in the same direction as the first, or push back against it.

Consider the initial motive to reduce $CO_2$ emissions by cycling or car-sharing to work (Evans et al., 2013). This could lead to another behavior which also reduces emissions, e.g. by using the train instead of the airplane for domestic travel. We refer to this sequence of behaviors with concordant sign as a *promoting* spillover: the initial push to the motive promotes a further increase later on.

The same first behavior, however, might instead lead to another behavior which increases emissions, e.g. using the car more with our family. We refer to this kind of behaviors as a *permitting* spillover: the initially increased motive permits a subsequent disengagement from the same. There is then a final class of spillovers, which we call *purging*, where the second behavior is motivated out of a, conscious or unconscious, desire to undo some of the damage caused by the first behavior. For example, we

P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16

might use the train for holidays in response to using long-haul flights for work, so that the 'environmental' motive is first undermined and then restored.

In practice, the sequence of concordant or discordant signs can be visualized referring to the observable *behavioral outcome*, while the motive's *self-image* and *weight* mainly illustrate the mechanisms linking the two behaviors. Consider these further examples.

Wearing a charity's pin today (*behavior 1*) can have a number of effects on tomorrow's charitable giving (*behavior 2*). On the one hand, it can highlight an underlying 'pro-sociality' motive of which we were previously unsure or even unaware, leading us to attach a higher weight to that account tomorrow. This more accessible motive, in turn, may lead us to deliberately maximize the direct utility from donating to a charity tomorrow, thus triggering a *promoting* behavioral spillover. Similarly, signing at the top of a tax return form before filling it out, can lead to unconsciously highlight a previously unattended 'morality' account, with the result of cheating less in the subsequent tax declaration (Shu, Mazar, Gino, Ariely, & Bazerman, 2012).

On the other hand, if the 'pro-sociality' motive has already some positive weight attached to it, today's wearing of the charity's pin can boost our self-image of 'being a do-gooder'. In turn, this can lead to *permitting* spillovers through two channels. If the utility from self-image is a, perfect or imperfect, substitute for the direct satisfaction from donating money, we can end up donating *less* to a charity tomorrow. Alternatively, or concurrently, having already accomplished, or attended to, the 'pro-sociality' motive today means that resources can be, consciously or unconsciously, redirected toward other accounts tomorrow, with a consequent reprioritization of weights that also leads to donate *less* to the charity tomorrow.

On the other hand, a small lie today when claiming a welfare benefit (*behavior 1*) can have various effects on tomorrow's 'moral' behavior (*behavior 2*). For instance, as long as the 'morality' motive is already accessible, today's lying can depress our self-image of 'being a good person'. In turn, this can lead to *purging* spillovers through two channels. If the disutility from a depressed self-image is a, perfect or imperfect, substitute for the direct satisfaction from paying taxes, we can cheat *less* in our tax declaration tomorrow in order to restore our satisfaction in that account. Alternatively, or concurrently, depressed self-image leads to a weight reprioritization that increases the accessibility of the 'morality' motive tomorrow. This heightened accessibility, in turn, may also lead us to cheat *less* in our tax declaration tomorrow.

Finally, one can also imagine cases of *all-negative promoting* spillovers. For instance, lying to claim a welfare benefit today can compress or temporarily 'shut down' the underlying 'morality' motive, leading us to no longer attach any weight to that account of life satisfaction tomorrow. This reduced accessibility, in turn, may lead us to cheat *more* in the tax declaration tomorrow under the presumption that our moral identity 'has already gone', thus triggering a 'downward spiral' all-negative promoting spillover.

Fig. 1 illustrates some further possible examples of promoting, permitting, and purging spillovers in the context of *health* behavior.

Our tri-partition of behavioral spillovers is thus in line with the well-established distinctions in psychology between *consistency* (assimilation) and *contrast* (compensatory) behavior (Bargh et al., 2001; Bem, 1972; Cialdini, Trost, & Newsom, 1995; Conway & Peetz, 2012; Cooper & Fazio, 1984; Dijksterhuis & Bargh, 2001; Dijksterhuis et al., 1998; Festinger, 1957; Gneezy, Imas et al., 2012; Liberman, Forster, & Higgins, 2007; Mussweiler, 2003; Norton, 2012; Schwarz & Bless, 2005); and between *reinforcing* (highlighting) and *compensating* (balancing) self-regulatory dynamics (Baumeister, Heatherton, & Tice, 1994; Carver, 2003; Carver & Scheier, 1981, 1998; Dhar & Simonson, 1999; Fishbach & Choi, 2012; Fishbach & Dhar, 2005; Fishbach, Koo, & Finkelstein, in press; Fishbach & Zhang, 2008; Fishbach, Zhang, & Koo, 2009). In economics, our tri-partition echoes the distinctions between motivation *crowding-in* and *crowding-out*; *complement* and *substitution* effects; and *positive* and *negative externalities* (Bénabou & Tirole, 2003, 2006; Frey & Oberholzer-Gee, 1997; Gneezy & Rustichini, 2000a, 2000b).

Also, our tri-partition openly reckons that, when it comes to compensatory or contrast behavior, the order of discordant signs really matters (Forster, Grant, Idson, & Higgins, 2001; Truelove, Carrico, Weber, Raimi, & Vandenbergh, 2014). The psychological drivers beyond *permitting* and *purging* spillovers, in fact, are conceptually and practically very distinct. The permitting versus purging distinction, for instance, is closely in line with 'self-completion theory' (Wicklund & Gollwitzer, 1981, 1982), which postulates that, upon achieving an identity-relevant goal, we can feel 'complete' and thus 'temper' our future identity goal strivings. Conversely, upon experiencing a failure in pursuing an identity goal, we can feel 'incomplete' and step up our goal striving. The distinction is also in line with the closely connected 'cybernetic control', 'feedback-loop', or 'cruise control' model (Carver, 2003; Carver & Scheier, 1981, 1982, 1990, 1998): while after feeling a failure we

| | | Behavior 2 | |
|---|---|---|---|
| | | Eat healthy | Eat Less Healthy |
| Behavior 1 | A run after work | **Promoting** | **Permitting** |
| | | *I ran an hour, let's keep up the good work* | *I ran an hour, I deserve a big slice of cake* |
| | Sofa-sitting after work | **Purging** | **Promoting** |
| | | *I've been lazy today, best not eat so much tonight* | *I've been lazy today, so what the heck, let's have a big slice of cake* |

**Fig. 1.** Examples of promoting, permitting, and purging behavioral spillovers in health behavior.

*P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*



**Fig. 2.** Main types of promoting, permitting, and purging behavioral spillovers documented in the behavioral science literatures.

typically try harder in an attempt to catch up, after experiencing a progress in excess of our envisaged target we are likely to 'coast' a little, '*not necessarily stop, but ease back*' (Carver, 2003, p. 246). In our setting, this temporary 'pull back' dynamics is one of the mechanisms explaining how 'freed up' resources can lead to reprioritize weights across motives.

All the above conceptualizations in psychology and economics have insofar proceeded along parallel streams, and our framework attempts to bring them closer together. Looking at the evidence from behavioral science through our conceptual lens, we can see that spillovers are documented extensively across a variety of fields and domains: Fig. 2 summarizes the main types of promoting, permitting, and purging spillovers.

### 3. Promoting spillovers

The two archetypical promoting spillovers are the *cognitive dissonance* (Bem, 1972; Festinger, 1957; Festinger & Carlsmith, 1959) and the *foot-in-the-door* effects (Burger, 1999; Freedman & Fraser, 1966; Pliner, Hart, Kohl, & Saari, 1974). What they have in common is that both essentially posit a *preference for consistency* (Alberracin & Wyler, 2000; Cialdini, 1984; Cialdini et al., 1995): we tend to behave consistently with our prior actions and beliefs. So, for instance, if we have already agreed to a relatively costless request (e.g. signing a petition in favor of '*Keeping California Beautiful*'), we are more likely to agree to another more costly request (e.g. displaying a large signboard in the front lawn supporting safe driving) (Burger, 1999; Freedman & Fraser, 1966). In an all-negative analogy, if we have already rejected a highly demanding initial request, we are less willing to grant a smaller request later on (DeJong, 1979).

In some ways analogous to von Heisenberg's *uncertainty principle* in physics, the *intention-behavior effect* posits that the mere measurement of intention can have an influence on subsequent behavior (Morwitz & Fitzsimons, 2004; Morwitz, Johnson, & Schmittlein, 1993). Simply asking people whether they intended to vote increased their actual participation in the following day's elections, whereas merely measuring purchasing intention led to higher purchases of PCs or cars (Fitzsimons & Morwitz, 1996).

Similarly, in *question-behavior* and *survey effects*, the mere fact of answering hypothetical questions or being surveyed can remind subjects of a motive not previously attended to (Fitzsimons & Moore, 2008; Fitzsimons & Shiv, 2001; Fitzsimons & Williams, 2000; Levav & Fitzsimons, 2006; Moore, Neal, Fitzsimons, & Shiv, 2012). Households assigned to more frequent health surveys, one year later had higher levels of chlorine in their stored drinking water, or were more likely to take up health insurance (Zwane et al., 2011). Consumers who, during a door-to-door survey, were asked to imagine themselves subscribing to cable TV, few months later were more likely to actually subscribe to it than neighbors who just received information about the service (Gregory, Cialdini, & Carpenter, 1982).

*Rationality crossovers* promote the use of economic rationality from a behavior occurring in market-like settings (e.g. a choice between two lotteries in presence of arbitrage), to a subsequent behavior taking place in the absence of financial incentives (e.g. non-market valuation of willingness to pay) (Cherry, Crocker, & Shogren, 2003; Cherry & Shogren, 2007). Similar forms of *extrapolation* have been documented by experimental economists looking at the links between the lab and the field (Harrison & List, 2004; Levitt & List, 2007a, 2007b; Levitt, List, & Reiley, 2010). Successful skills and heuristics evolved in some familiar situations carryover to other similar field or lab settings: for instance, experienced sports-cards dealers did not fall prey to the typical winner's curse in a lab auction (Harrison & List, 2008), whereas professional football players played more equilibrium strategies than students in laboratory coordination games (Palacios-Huerta & Volji, 2008). These

P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16

rationality crossovers are conceptually close to some of the *semantic* or *procedural priming* effects documented in the psychology literature (Forster, Liberman, & Friedman, 2007; Gollwitzer et al., 1990; Kruglanski et al., 2002; Neely, 1977).

Experiments in game theory have found that playing a sequence of two different strategic games is not the same of playing one of the games in isolation (Knez & Camerer, 2000). Two distinct *cross-games spillovers* can occur, both of which are essentially promoting spillovers (Bednar, Chen, Liu, & Page, 2012). First, players can learn about the structural properties of a game and transfer this knowledge to another game, e.g. whether the game is a coordination game (*structural learning, cross-games learning*: Cooper & Kagel, 2003; Huck, Jehiel, & Rutter, 2011; Mengel & Sciubba, 2010). Second, when playing a game, subjects can resort to cognitive or behavioral heuristics developed while playing *another* game (Bednar et al., 2012). If subjects had previously bid more aggressively in an auction, they next tended to contribute less in a subsequent public good game (Cason & Gangadharan, 2013; Cason, Savikhin, & Sheremeta, 2012; Savikhin & Sheremeta, 2013). Low donors to a charity cooperated less in a subsequent, unrelated, prisoners' dilemma game (Albert, Guth, Kirchler, & Maciejkovsy, 2007). Players managed to coordinate their moves more efficiently in a game if they had previously played another game in which they had experienced efficient coordination (*precedent*: Knez & Camerer, 2000) (Ahn, Ostrom, Schmidt, Shupp, & Walker, 2001; Devetag, 2005; Knez & Camerer, 2000). If subjects had played a structurally similar (different) game before, they were quicker (slower) to achieve equilibrium in another game (Grimm & Mengel, 2012).

*Carryover effects of emotions* and *self-herding* suggest that incidental emotions not only directly affect decisions at an unconscious level, but also indirectly spillover on other subsequent choices and actions taking place long after the initial emotional experience (Harlé & Sanfey, 2007; Lerner, Small, & Loewenstein, 2004). This is because, when we look back to our initial behavior, we tend to misattribute it to some of our deep preferences rather than to a fleeting emotion, and we choose our subsequent actions to follow suit the same inferred path (Andrade & Ariely, 2009). For instance, subjects who first watched a video that induced anger were not only more likely to reject unfair offers in a following, unrelated, ultimatum game than subjects who watched a happy video; but also made fairer offers to their partners in a subsequent dictator game, and even in a second ultimatum game where they acted as proposers (Andrade & Ariely, 2009). Conceptually similar is the already discussed *self-signaling* or *self-inference* tendency (Bénabou & Tirole, 2011; Gneezy, Gneezy et al., 2012). For instance, wearing counterfeit sunglasses can send a self-signal that we are cheaters, which can lead us to actually cheat more when reporting our performance in a math puzzle task (Gino, Norton, & Ariely, 2010).

According to the *what-the-hell* effect, another all-negative promoting spillover, once individuals decide upon a course of behavior that is inconsistent with a motive (a diet), they are less likely to take the middle ground (low fat cookie) and more likely to exacerbate their failure to behave in line with the motive (eating the whole bag of cookies) (Herman & Mack, 1975; Herman & Polivy, 2010; Urbszat, Herman, & Polivy, 2002). Similar *abstinence violation* effects have been documented among alcoholics (Collins & Lapp, 1991), smokers (Shiffman et al., 1996), and drug users (Stephens & Curtin, 1994).

## 4. Permitting spillovers

*Ego depletion* is perhaps the 'classic' case of *permitting* spillovers: after having exerted high levels of self-control or effort in the first behavior, the same subject exerts lower levels of effort or self-control in the second behavior. Having resisted the temptation of indulging in sweets, or stifled emotions in emotion-arousing movies, subjects gave up earlier in impossible-to-solve puzzles (Baumeister, Bratslavsky, Muraven, & Tice, 1998). Having completed a difficult puzzle, subjects were more likely to cheat on their performance in an ostensibly unrelated task (Mead, Baumeister, Gino, Schweitzer, & Ariely, 2009). Ego depletion has physiological roots, in that to exert self-control we draw from a limited pool of mental energy: physical, but also mental activities consume energy that is converted from glucose into neurotransmitters (Baumeister & Vohs, 2007; Baumeister, Vohs, & Tice, 2007; Gailliot et al., 2007).

*Moral licensing* is a *permitting* spillover where, after having done 'well' in behavior 1, we act as if we have earned the moral entitlement to reward ourselves in behavior 2. Using the metaphor of a 'moral bank account', good deeds establish moral credits that can be withdrawn to purchase the right to undertake 'bad' actions. Subjects who, in a hypothetical choice to appoint a manifestly better candidate for a job, had the chance to establish they were not racist or sexist, were more likely to make prejudiced choices in a subsequent harder hiring decision (Monin & Miller, 2001). Subjects who said they were endorsing Obama in political elections, then allocated money to a charity fighting poverty in a white rather than in a black neighborhood (Effron, Cameron, & Monin, 2009). Advisors who disclosed their conflict of interest to advisees provided more biased advices (Cain, Loewenstein, & Moore, 2005). Subjects who first imagined teaching homeless children were less likely to donate to a local charity part of the experimental earnings, and made more frivolous purchases afterwards (Khan & Dhar, 2006; Strahilevitz & Myers, 1998).

Other related 'permitting' spillovers are the *resting on laurels effect*, by which seeing a progress as a sub-goal makes us spending less effort toward the final goal (Amir & Ariely, 2008); the *single-action bias*, by which an initial motive-directed action induces the impression that no further action is needed, even when is actually beneficial (Weber, 1997); the *reverse foot-in-the-door* effect, by which having said 'yes' to a request (e.g. signing a petition in favor of greater government aid for the homeless) leads to say 'no' to another request later on (e.g. volunteering to help at a canned food drive for the homeless) (Guadagno, Asher, Demaine, & Cialdini, 2001); and the already mentioned '*coasting*' tendency, by which after having exceeded our target rate of progress, we typically 'ease back' subsequent effort for the same motive (Carver, 2003).

## 5. Purging spillovers

*Moral cleansing* (or '*Lady Macbeth effect*') is the reverse of licensing: a *purging* spillover where, after having done 'badly', we act as if we need to restore our integrity. Subjects who hand-copied a story describing in the first person an unethical act, manifested higher desirability of cleansing products over neutral items, and, when offered the choice between an antiseptic wipe and a pencil, were more likely to take the antiseptic wipe (Zhong & Liljenquist, 2006). Participants who recalled a past unethical deed but also had cleansed their hands with an antiseptic wipe volunteered less to help out a colleague (Zhong & Liljenquist, 2006). Subjects who first hand-wrote a story using words for negative traits gave more to a local charity (Sachdeva, Iliev, & Medin, 2009), while participants who were induced to lie to a fictitious person on the phone, preferred mouthwash over soap, whereas the opposite held for subjects induced to lie in an email (Lee & Schwarz, 2010).

Similarly, the *conscience accounting* effect posits that people who have earned a given payoff by lying or stealing are more likely to donate to a charity than subjects who have earned the same amount without deceiving: anticipating this, subjects lied more when they knew that there would be an opportunity to donate immediately afterwards (Gneezy, Imas, & Madarasz, in press).

Other 'purging' spillovers related to moral cleansing are the *transgression-compliance* effect and the *negative state relief* by which, after that our personal values or moods (respectively) are affected by a negative state, we tend to act more altruistically in the attempt to restore them (Carlsmith & Gross, 1969; Manucia, Baumann, & Cialdini, 1984). Subjects led to believe that they had harmed someone else, were then more likely to comply with a request or to help a third person when given the opportunity (Manucia et al., 1984). Subjects with artificially 'lowered' mood but who also received an unexpected gratifying praise, however, no longer had to act altruistically to restore their mood (Manucia et al., 1984).

The *moral balancing* and *self-concept maintenance* effects share the same 'compensatory ethics' idea of both moral licensing and cleansing (Zhong, Ku, Lount, & Murnighan, 2010), and posit that people who think highly of themselves in terms of honesty behave dishonestly only to the extent to which they can retain their positive views of themselves (Mazar et al., 2008; Nisan & Horenczyk, 1990): when given the possibility to cheat on their payments with no consequences, subjects cheated only about 20 percent of the maximal possible amount they could get away with (Mazar et al., 2008).

## 6. Facilitating conditions for promoting, permitting, and purging spillovers

Spillovers from one behavior to the next could thus lead to either amplify or offset the initial intervention effect on the motive. From both the research and the policy perspective it seems imperative to explore under which conditions behavioral spillovers are more likely to manifest themselves as promoting, permitting, or purging: when is an initial nudge likely to feed into a further push to the motive, and when instead into a push-back?

There is, surprisingly, relatively little systematic research on this key point (Fishbach et al., in press; Susewind & Hoelzl, 2014). Mazar and Zhong (2010), for instance, explicitly compare *priming* and *licensing* effects. Subjects who previously were merely exposed to a store selling green items, then, in an ostensibly unrelated dictator game, shared more money than those who were exposed to a conventional store. This pattern, however, completely reversed when subjects selected products to purchase: participants who had purchased in the green store shared *less* money in the dictator game than those who had purchased in the conventional store.

Looking more broadly at the various literatures in the behavioral science, it is possible to identify at least five main streams of research that have looked at the boundary conditions that facilitate the occurrence of promoting, permitting, and purging spillovers. They focus, respectively, on: (i) the relative costs of behavior 1; (ii) the completeness of behavior 1 and its interaction with the focus of attention; (iii) the concreteness and the (temporal or spatial) proximity of behaviors 1 and 2; (iv) the trade-offs between different motives, or between a motive and a resource; and, finally, (v) the cognitive mindset during the two behaviors. In what follows we try to distill and summarize the state-of-the-art evidence from those streams of literature.

On (i), Gneezy, Imas et al. (2012) explicitly investigate the role of different costs of behavior 1 on the type of spillover. They find that subjects who donated part of their own earnings to a charity were less likely to deceive their counterpart in a subsequent sender–receiver game, while subjects who participated into a costless charitable donation were *more* likely to lie. This suggests that permitting spillovers are more likely over promoting when the costs of behavior 1 are low. High costs, in fact, self-signal the commitment toward the motive in question. Dolan and Galizzi (2014) link these findings to the distinct literature on financial incentives in health: they focus on whether incentives targeting one health behavior (physical exercise) spillover to another non-targeted health behavior (healthy eating), and find that spillovers are more likely to manifest themselves as permitting when the incentives associated to behavior 1 significantly outdo its costs. Relatedly, and in line with *counter-attitudinal advocacy*, promoting spillovers are less likely to occur when we can attribute our behavior 1 to an external cause, such as being paid or coerced to do something (Pittman, 1975; Zanna & Cooper, 1974). The different overall costs of behavior 1 can also explain why in some situations encountering and resisting a temptation can automatically activate the weight attached to a motive and thus lead to promoting spillovers, as postulated by *counteractive control theory* (Fishbach et al., 2003; Kroese, Evers, & De Ridder, 2009, 2011), while in other occasions it can trigger permitting spillovers through the activation of *justification* and *entitlement* feelings (De Witt Huberts et al., 2014; Hsee, 1995; Kivetz & Simonson, 2002; Kivetz & Zheng, 2006; Merritt et al., 2010; Mukhopadhyay & Johar, 2009). The literatures on justification

*P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*

9

and entitlement, in fact, show that what matters for self-regulatory dynamics are *perceived* costs and efforts, rather than their actual levels (Clarkson, Hirt, Jia, & Alexander, 2010; De Witt Huberts, Evers, & De Ridder, 2012; Kivetz & Zheng, 2006; Werle, Wansink, & Payne, 2011).

On (ii), Fishbach et al. (in press) argue that permitting spillovers are more likely over promoting when, while pursuing a goal, individuals focus on completed, rather than missing, actions. This is because, generally, missing actions increase motivation by self-signaling a need for progress. This, however, depends on the underlying motive and focus of attention (Marsh, Hicks, & Bink, 1998). Similarly to what discussed above, Fishbach and Dhar (2005) argue that what really matters is the *perception* of progress rather than its objective level. Attention to completed actions, in fact, signals personal commitment and increases motivation when we are not yet committed to our goals, while attention to missing actions signals a need to progress and increases motivation when we are already committed.

Fishbach et al. (in press) observe that this combines with the so-called '*goal-gradient hypothesis*': regardless of the focus of attention, motivation increases with proximity to a goal's end state (Brown, 1948; Forster, Higgins, & Idson, 1998; Hull, 1932; Kivetz, Urminsky, & Zheng, 2006). For instance, consumers in a coffee-shop's '*buy 10, get 1 free*' program (a song-rating website) accelerate their purchases (site visits) as they get closer to the final reward (Kivetz et al., 2006). A simple psychophysical explanation of the *goal-gradient* effect is that '*the last action accomplishes 100% of the remaining progress, which is twice the impact of the second-to-last action*' (Fishbach et al., in press, p. 39). Using a similar psychophysical argument, Fishbach et al. (in press) observe that, when striving toward a goal, we are more motivated when we focus on whichever is smaller in size between the completed and the missing actions. According to this '*small-area hypothesis*', at the beginning of goal pursuit, when our commitment is typically low, the focus on completed actions increases motivation by signaling commitment, while later on, beyond the midpoint, the focus on remaining actions increases motivation by self-signaling need to progress (Fishbach et al., in press). This potential mechanism for promoting spillovers would also explain why motivation is typically lower in the middle of goal pursuit, a phenomenon known as '*stuck in the middle*' (Bonezzi, Brendl, & De Angelis, 2011).

On (iii), Conway and Peetz (2012) find that permitting spillovers are more likely over promoting when we visualize behavior 1 in a concrete and tangible fashion. This is because abstract construals tend to activate self-identity considerations, while concrete constructs may activate self-regulatory or compensatory mindsets (Trope & Liberman, 2003). For instance, subjects who were asked to describe how they would perform a '*fair, friendly, generous*' behavior donated less money to a charity than subjects who described how they would perform an '*unfair, unfriendly, greedy*' behavior, whereas no difference was found for subjects discussing what those traits would mean for their personality. Similarly, subjects who were asked to make concrete plans to exercise later that day, consumed more sweet snacks in a subsequent tasting test than control subjects who only wrote abstract statements (Kronick & Knauper, 2010). Coherently with the idea that distal events are perceived in a more abstract way, while temporally proximate events are perceived more concretely (Liberman, Sagristano, & Trope, 2002; Trope & Liberman, 2003), the same pattern emerged when concreteness was manipulated in terms of recalling deeds '*within the past week*' (concrete), as opposed to '*over one year ago*' (abstract). Similarly, Fishbach and Zhang (2005) find that permitting spillovers are more likely over promoting when in each behavior the two options (e.g. healthy and unhealthy food items) are physically presented together, and they seem to complement each other. Conversely, promoting spillovers are more likely to occur when the two options appear spatially apart, and seem to compete against each other.

On (iv), Dhar and Simonson (1999) propose that promoting spillovers are more likely in situations where each behavior involves a trade-off between a motive (e.g. pleasure) and a resource (e.g. money): for instance, after having chosen a tasty, expensive entrée over a less tasty, less expensive entrée, we are more likely to choose a tasty, expensive main course over a less tasty, less expensive one. Permitting spillovers, however, are more likely to occur in situations where each behavior involves a trade-off between two motives (e.g. pleasure and health): for instance, after having chosen a healthy entrée over a tasty one, we are more likely to prefer a tasty, over a healthy, main course.

On (v), Cornelissen, Bashshur, Rode, and Le Menestrel (2013) argue that permitting spillovers are more likely over promoting when we are in an outcome-based mindset rather than a rule-based mindset. The reason is that in an outcome-based (consequentialist) mindset we appraise the consequences of each behavioral alternative both for ourselves and for the others involved, allowing us to be relatively flexible when trading off different motives. Moral rules, at the contrary, do not naturally lend themselves to such trade-offs, because 'a rule is a rule'. They find that subjects who recalled a past episode that they thought was ethical '*because it benefitted other people*' (outcome-based mindset) cheated more in their payments than subjects who recalled a past episode that was unethical '*because it hurt other people*'. In contrast, subjects asked to recall a past episode that was ethical because they did their '*duty to follow an ethical norm or principle*' (rule-based mindset) cheated less in their payments than subjects who recalled a past episode that was unethical because they did not their duty.

More broadly, it should be noted that exploring under which conditions spillovers are most likely to be promoting, permitting, or purging, is a necessary but not a sufficient condition to be able to draw conclusions on the overall effect of a sequence of behaviors. Both researchers and policy-makers, in fact, would typically be interested also in quantifying the relative magnitude of permitting and purging spillovers. There is virtually no evidence at date, in the lab nor in the field, from systematically testing head-to-head two or more types of spillovers, with the objective of measuring their relative strength, magnitude, and persistence over time. Quantifying the magnitude of permitting and purging spillovers, in particular, is imperative in order to disentangle 'rebound' from 'backfire' (or 'boomerang') effects (Gillingham et al., 2013; Goeschl & Perino, 2009; Jacobsen et al., 2012; Jenkins, Nordhaus, & Shellenberger, 2011): although the two terms are often used interchangeably, from a policy

perspective it is crucial to conceptually distinguish when the net effect of the two behaviors results in an overall increase or decrease in the behavioral outcome (Tiefenbeck et al., 2013).

## 7. Future directions and challenges

Lab and field experiments across all the behavioral sciences thus show that behaviors are history-dependent and that spillovers are pervasive. From the methodological perspective, this reinstates the importance of the current best practices by lab researchers of counter-balancing sequences of tasks and explicitly controlling for order effects. It is encouraging to see that field and online experiments increasingly adhere to such practices even in settings which are naturally less controllable than the lab.

Evidence shows that spillovers occur through deliberation and also unconsciously. This confirms the importance of considering a broad operational definition of behaviors and motives, consistent with the recognition of the major role of automatic, involuntary, and unconscious processes in human decisions and behavior (Aarts & Dijksterhuis, 2000; Bargh & Chartrand, 1999; Chaiken & Trope, 1999; Chartrand & Bargh, 2002; Chartrand, Huber, Shiv, & Tanner, 2008; Dijksterhuis & Nordgren, 2006; Fitzsimons et al., 2002; Kahneman, 2003, 2011; Wilson & Schooler, 1991). Our framework can be used to consider the ripple effects of sequences of behavior and not just the initial splash from the first behavioral response. As such, it provides the glue that can help to hold together our understanding of the conscious and unconscious spillovers from one behavior to the next. It also provides a useful lexicon for researchers and policy decision-makers from different fields and perspectives.

From a research and policy perspective, we should abandon 'behavioral silos' and 'sector-thinking' (Thøgersen, 1999a). The impact of a policy intervention can be greatly enhanced in presence of promoting spillovers, but it can also be severely hindered, or completely jeopardized, by the occurrence of permitting effects. And this is to further disregard the possible role of purging spillovers as potential levers to trigger envisaged changes in behavior.

There are a number of outstanding issues. Most of the evidence to date documents the occurrence of spillovers within short temporal horizons. We know very little about the longevity of spillovers beyond the time frame typically considered in lab experiments (Fitzsimons & Morwitz, 1996; Gregory et al., 1982; Tiefenbeck et al., 2013; Zwane et al., 2011). The design of field experiments in naturalistic settings is practically challenging if one really wants to map all possible ramifications of a behavior. This gap in the evidence calls for a further integration of longitudinal surveys and experimental methods in behavioral science, and for higher efforts to link experiments, administrative records, and 'big data' that are already available (Dolan & Galizzi, in press).

Future efforts should also be directed toward understanding the contexts and domains under which spillovers are most likely to take place. Most of the evidence at date, in fact, considers spillovers occurring within the same domain, such as environmental behavior (Evans et al., 2013; Jacobsen et al., 2012; Lanzini & Thøgersen, 2014; Poortinga, Whitmarsh, & Suffolk, 2013; Thøgersen, 1999a, 1999b; Thøgersen & Crompton, 2009; Thøgersen & Olander, 2003; Tiefenbeck et al., 2013); prosocial behavior (Brañas-Garza, Bucheli, Espinosa, & Garcia-Muñoz, 2013; Cornelissen et al., 2013; Effron, Miller, & Monin, 2012; Gneezy, Imas et al., 2012; Gneezy et al., in press; Jordan, Mullen, & Murnighan, 2011; Merritt et al., 2010, 2012; Norton, 2012; Ploner & Regner, 2013; Zhong & Liljenquist, 2006); or health behavior (Chiou, Wan, Wu, & Lee, 2011; Chiou, Yang, & Wan, 2011; De Witt Huberts et al., 2012; Dolan & Galizzi, in press; Effron, Monin, & Miller, 2013; Epstein, Dearing, Roba, & Finkelstein, 2010; Kroese et al., 2009, 2011; Van Kleef, Shimizu, & Wansink, 2011; Werle, Wansink, & Payne, 2010; Wilcox, Vallen, Block, & Fitzsimons, 2009; Wisdom, Downs, & Loewenstein, 2010).

There is little evidence on whether spillovers can occur across different domains, and whether such cross-domains spillovers are most likely to be promoting, permitting, or purging (Baird, Garfein, McIntosh, & Özler, 2012; Khan & Dhar, 2006; Mazar & Zhong, 2010; Sachdeva et al., 2009). Conceptually, such spillovers can be visualized as cross-motives links between self-images ('*I am healthy and environment-friendly*'), accounts weights ('*what makes me happy is working hard and being a good father*') or both. From the policy perspective, a comprehensive mapping of the links between behaviors, contexts, and domains will illuminate not only *which* areas to target to induce behavior change, but also *where* to start from (Thøgersen, 1999a). For example, does more responsible behavior at school feed into healthier choices, or what happens if we start by 'nudging' healthy behavior instead?

Evidence is also missing on whether behavioral spillovers are only related to specific contexts, domains, and situations, or whether they are also explained by differences across people, such as personality, cognitive skills, and socio-economic conditions (Borghans, Duckworth, Heckman, & ter Weel, 2008; Heckman, 2007a, 2007b; Heckman & Rubinstein, 2001).

We should finally seek to better understand the neuro-physiological roots of behavioral spillovers. Research in neuroscience has substantially advanced our current understanding of the neural correlates of human decision-making and behavior (Camerer, Loewenstein, & Prelec, 2005; Glimcher, Fehr, Camerer, & Poldrack, 2008). The forthcoming efforts to thoroughly map the human brain will provide precious insights on how the numerous ripples documented here might spread through the complex network of our mind.

Notwithstanding these open questions, the time seems ripe to explicitly account for the pervasive impact of behavioral spillovers. Behavioral scientists, especially those seeking to inform policy, should try to capture all the ripples when a pebble of intervention is thrown in the pond, and not just the immediate splash it makes.

## Acknowledgments

The project was funded by the Centre for the Study of Incentives in Health (CSIH), from a strategic award from the Wellcome Trust Biomedical Ethics Programme (PI Marteau: 086031/Z/08/Z). We gratefully acknowledge this funding. We thank the Editor and two anonymous referees for excellent comments and suggestions that have substantially improved the article. We also thank our colleagues at CSIH, Alex Imas, Heather Kappes, Natasha Perkins, and the participants to seminars at Aberdeen, Cologne, and LSE for helpful comments and suggestions.

## References

Aarts, H., & Dijksterhuis, A. (2000). Habits as knowledge structures: Automatic in goal-directed behavior. *Journal of Personality and Social Psychology, 78*, 53.

Aarts, H., & Dijksterhuis, A. (2003). The silence of the library: Environment, situational norm, and social behavior. *Journal of Personality and Social Psychology, 84*, 18–28.

Ahn, T. K., Ostrom, E., Schmidt, D., Shupp, R., & Walker, J. (2001). Cooperation in PD games: Fear, greed, and history of play. *Public Choice, 106*, 137–155.

Akerlof, G. A., & Kranton, R. A. (2000). Economics and identity. *Quarterly Journal of Economics, 105*, 715–753.

Albarracin, D., & Wyler, R. S. (2000). The cognitive impact of past behavior: Influences on beliefs, attitudes, and future behavioral decisions. *Journal of Personality and Social Psychology, 79*(1), 5–22.

Albert, M., Guth, W., Kirchler, E., & Maciejkovsy, B. (2007). Are we nicer to nicer people? An experimental analysis. *Experimental Economics, 10*, 53–69.

Alcott, B. (2005). Jevon's paradox. *Ecological Economics, 54*(1), 9–21.

Al-Ubaydli, O., Andersen, S., Gneezy, U., & List, J. A. (in press). Carrots that look like sticks: Toward an understanding of multitasking incentive schemes. *Southern Economic Journal.*

Amir, O., & Ariely, D. (2008). Resting on laurels: The effects of discrete progress markers as subgoals on task performance and preferences. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 34*(5), 1158–1171.

Andrade, E. B., & Ariely, D. (2009). The enduring impact of transient emotions on decision making. *Organizational Behavior and Human Decision Processes, 109*, 1–8.

Andreoni, J. (1990). Impure altruism and donations to public goods: A theory of warming glow giving? *Economic Journal, 100*(401), 464–477.

Ariely, D., Bracha, A., & Meier, S. (2009a). Doing good or doing well? Image motivation and monetary incentives in behaving prosocially. *American Economic Review, 99*, 544–555.

Ariely, D., Gneezy, U., Loewenstein, G., & Mazar, N. (2009b). Large stakes and big mistakes. *Review of Economic Studies, 76*, 451–469.

Asch, P., Levy, D. T., Shea, D., & Bodenhorn, H. (1991). Risk compensation and the effectiveness of safety belt use laws: A case study of New Jersey. *Policy Sciences, 24*(2), 181–197.

Baird, S. J., Garfein, R. S., McIntosh, C. T., & Özler, B. (2012). Effect of a cash transfer programme for schooling on prevalence of HIV and herpes simplex type 2 in Malawi: A cluster randomised trial. *The Lancet, 379*, 1320–1329.

Bargh, J. A. (1990). Auto-motives: Preconscious determinants of thought and behavior. In E. T. Higgins & R. M. Sorrentino (Eds.), *Handbook of motivation and cognition: Foundations of social behavior* (Vol. 2, pp. 93–130). New York: Guildford.

Bargh, J. (2006). Agenda 2006: What have we been priming all these years? On the development, mechanisms, and ecology of nonconscious social behavior. *European Journal of Social Psychology, 36*, 147–168.

Bargh, J., & Barndollar, K. (1996). Automaticity in action: The unconscious as repository of chronic goals and motives. In P. M. Gollwitzer & J. A. Bargh (Eds.), *The psychology of action: Linking cognition and motivation to behavior* (pp. 457–481). New York: Guildford Press.

Bargh, J., & Chartrand, T. L. (1999). The unbearable automaticity of being. *American Psychologist, 54*(7), 462–479.

Bargh, J. A., Gollwitzer, P. M., Lee-Chai, A., Barndoliar, K., & Trotschel, R. (2001). The automated will: Non-conscious activation and pursuit of behavioral goals. *Journal of Personality and Social Psychology, 81*, 1014–1027.

Baumeister, R. F. (1986). *Identity: Cultural change and the struggle for self.* Oxford: Oxford University Press.

Baumeister, R. F., Bratslavsky, E., Muraven, M., & Tice, D. M. (1998). Ego depletion: Is the active self a limited resource? *Journal of Personality and Social Psychology, 74*(5), 1252–1265.

Baumeister, R. F., Heatherton, T. F., & Tice, D. M. (1994). *Losing control: How and why people fail at self-regulation.* San Diego, CA: Academic Press.

Baumeister, R. F., & Vohs, K. D. (2007). Self-regulation, ego-depletion, and motivation. *Social and Personality Psychology Compass, 1*(1), 115–128.

Baumeister, R. F., Vohs, K. D., & Tice, D. M. (2007). The strength model of self-control. *Current Directions in Psychological Science, 16*, 351–355.

Bednar, J., Chen, Y., Liu, T. X., & Page, S. (2012). Behavioral spillover and cognitive load in multiple games: Experimental results. *Games and Economic Behavior, 74*, 12–31.

Bem, D. J. (1972). Self-perception theory. In L. Berkowitz (Ed.). *Advances in experimental social psychology* (Vol. 6, pp. 1–62). New York: Academic Press.

Bénabou, R., & Tirole, J. (2003). Intrinsic and extrinsic motivation. *Review of Economic Studies, 70*(3), 489–520.

Bénabou, R., & Tirole, J. (2006). Incentives and prosocial behaviour. *American Economic Review, 96*(5), 1652–1678.

Bénabou, R., & Tirole, J. (2011). Identity, morals, and taboos: Beliefs as assets. *Quarterly Journal of Economics, 126*, 805–855.

Bhattacharyya, M. N., & Layton, A. P. (1979). Effectiveness of seat belt legislation on the Queensland road toll: An Australian case study in intervention analysis. *Journal of the American Statistical Association, 74*(367), 596–603.

Bodner, R., & Prelec, D. (2003). Self-signaling and diagnostic utility in everyday decision-making. In I. Brocas & J. Carillo (Eds.). *The psychology of economic decisions* (Vol. 1, pp. 105–124). Oxford: Oxford University Press.

Bonezzi, A., Brendl, C. M., & De Angelis, M. (2011). Stuck in the middle: The psychophysics of goal pursuit. *Psychological Science, 22*(5), 607–612.

Borghans, L., Duckworth, A. L., Heckman, J. J., & ter Weel, B. (2008). The economics and psychology of personality traits. *Journal of Human Resources, 43*(4), 972–1059.

Bradford, W. D., & Dolan, P. (2010). Getting used to it: The adaptive global utility model. *Journal of Health Economics, 29*(6), 811–820.

Brañas-Garza, P., Bucheli, M., Espinosa, M. P., & García-Muñoz, T. (2013). Moral cleansing and moral licensing: Experimental evidence. *Economics and Philosophy, 29*, 199–212.

Brown, J. S. (1948). Gradients of approach and avoidance responses and their relation to level of motivation. *Journal of Comparative and Physiological Psychology, 41*(6), 450–465.

Burger, J. M. (1999). The foot-in-the-door procedure: A multiple-process analysis and review. *Personality and Social Psychology Review, 3*, 303–325.

Cain, D. M., Loewenstein, G., & Moore, D. A. (2005). The dirt on coming clean: Perverse effects of disclosing conflicts of interest. *Journal of Legal Studies, 34*, 1–25.

Camerer, C. (1999). Behavioral economics: Reunifying psychology and economics. *Proceedings of the National Academy of Sciences United States of America, 96*(19), 10575–10577.

Camerer, C. F., Issacharoff, S., Loewenstein, G., O'Donoghue, T., & Rabin, M. (2003). Regulation for conservatives: Behavioral economics and the case for asymmetric paternalism. *University of Pennsylvania Law Review, 1151*, 1211–1254.

Camerer, C., Loewenstein, G., & Prelec, D. (2005). Neuroeconomics: How neuroscience can inform economics. *Journal of Economic Literature, 18*, 9–64.

Carlsmith, J. M., & Gross, A. E. (1969). Some effects of guilt on compliance. *Journal of Personality and Social Psychology, 11*, 232–239.

12            *P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*

Carver, C. S. (2003). Pleasure as a sign you can attend to something else: Placing positive feelings within a general model of affect. *Cognition and Emotion, 17*, 241–261.

Carver, C. S., & Scheier, M. F. (1981). *Attention and self-regulation: A control theory approach to human behavior*. New York: Springer-Verlag.

Carver, C. S., & Scheier, M. F. (1982). Control theory: A useful conceptual framework for personality, social, clinical, and health psychology. *Psychological Bulletin, 92*, 111–135.

Carver, C. S., & Scheier, M. F. (1990). Origins and functions of positive and negative affect: A control-process view. *Psychology Review, 97*(1), 19–35.

Carver, C. S., & Scheier, M. F. (1998). *On the self-regulation of behavior*. New York: Cambridge University Press.

Cason, T. M., & Gangadharan, L. (2013). Cooperation spillovers and competition in experimental markets. *Economic Inquiry, 51*(3), 1715–1730.

Cason, T., Savikhin, A. C., & Sheremeta, R. M. (2012). Behavioral spillovers in coordination games. *European Economics Review, 56*, 233–245.

Chabris, C., & Simons, D. (2011). *The invisible gorilla: How our intuitions deceive us*. London: Harmony.

Chaiken, S., & Trope, Y. (1999). *Dual-process theories in social psychology*. New York: Guildford Press.

Chartrand, T. J., & Bargh, J. A. (1996). Automaticity of impression formation and memorization goals. *Journal of Personality and Social Psychology, 71*, 464–478.

Chartrand, T. L., & Bargh, J. A. (2002). Non-conscious motivations: Their activation, operation and consequences. In A. Tesser, D. Stapel, & J. Wood (Eds.). *Self-motivation: Emerging psychological perspectives* (Vol. 2, pp. 13–41). New York: American Psychological Association Press.

Chartrand, T., Huber, J., Shiv, B., & Tanner, R. (2008). Non-conscious goals and consumer choice. *Journal of Consumer Research, 35*, 189–201.

Cherry, T. L., Crocker, T. D., & Shogren, J. F. (2003). Rationality spillovers. *Journal of Environmental Economics and Management, 45*, 63–84.

Cherry, T. L., & Shogren, J. F. (2007). Rationality crossovers. *Journal of Economic Psychology, 28*, 261–277.

Chiou, W. B., Wan, C. S., Wu, W. H., & Lee, K. T. (2011a). A randomized experiment to examine unintended consequences of dietary supplement use among daily smokers: Taking supplements reduces self-regulation of smoking. *Addiction, 106*(12), 2221–2228.

Chiou, W. B., Yang, C. C., & Wan, C. S. (2011b). Ironic effects of dietary supplementation: Illusory invulnerability created by taking dietary supplements licenses health-risk behaviors. *Psychological Science, 22*, 1081–1086.

Cialdini, R. B. (1984). *Influence: How and why people agree to things*. New York: Morrow.

Cialdini, R. B., Trost, M. R., & Newsom, J. T. (1995). Preference for consistency: The development of a valid measure and the discovery of surprising behavioral implications. *Journal of Personality and Social Psychology, 69*, 318–328.

Clarkson, J., Hirt, E., Jia, L., & Alexander, M. (2010). When perception is more than reality: The effects of perceived versus actual resource depletion on self-regulatory behavior. *Journal of Personality and Social Psychology, 98*, 29–46.

Cohen, A., & Einav, L. (2003). The effects of mandatory seat belt laws on driving behavior and traffic fatalities. *Review of Economics and Statistics, 85*(4), 828–843.

Collins, L. R., & Lapp, W. M. (1991). Restraint and attributions: Evidence of the abstinence violation effect in alcohol consumption. *Cognitive Therapy and Research, 15*, 68–94.

Congdon, W. J., Kling, J. R., & Mullainathan, S. (2011). *Policy and choice: Public finance through the lens of behavioural economics*. New York: Brookings.

Conway, P., & Peetz, J. (2012). When does feeling moral actually make you a better person? Conceptual abstraction moderates whether past moral deeds motivate consistency or compensatory behavior. *Personality and Social Psychology Bulletin, 38*(7), 907–919.

Cooper, J., & Fazio, R. H. (1984). A new look at dissonance theory. *Advances in Experimental Social Psychology, 17*, 229–266.

Cooper, D., & Kagel, J. H. (2003). Lessons learned: Generalizing learning across games. *American Economic Review, 93*(2), 202–207.

Cornelissen, G., Bashshur, M. R., Rode, J., & Le Menestrel, M. (2013). Rules or consequences? The role of ethical mindsets in moral dynamics. *Psychological Science*.

De Witt Huberts, J. C., Evers, C., & De Ridder, D. T. D. (2012). License to sin: Self-licensing as a mechanism underlying hedonic consumption. *European Journal of Social Psychology, 42*, 490–496.

De Witt Huberts, J. C., Evers, C., & De Ridder, D. T. D. (2014). 'Because I Am Worth It': A theoretical framework and empirical review of a justification-based account of self-regulation failure. *Personality and Social Psychology Review, 18*(2), 119–138.

Deci, E. L., Koestner, R. M., & Ryan, R. (1999). A meta-analytic review of experiments examining the effect of extrinsic rewards on intrinsic motivation. *Psychological Bulletin, 125*, 627–668.

DeJong, W. (1979). An examination of self-perception mediation in the foot-in-the-door effect. *Journal of Personality and Social Psychology, 37*, 2221–2239.

DellaVigna, S. (2009). Psychology and economics: Evidence from the field. *Journal of Economic Literature, 47*, 315–372.

Devetag, G. (2005). Precedent transfer in coordination games: An experiment. *Economics Letters, 89*, 227–232.

Dhar, R., & Simonson, I. (1999). Making complementary choices in consumption episodes: Highlighting versus balancing. *Journal of Marketing Research, 36*, 29–44.

Dijksterhuis, A., & Bargh, J. A. (2001). The perception–behavior expressway: Automatic effects of social perception on social behavior. In M. Zanna (Ed.). *Advances in experimental social psychology* (Vol. 33, pp. 1–40). San Diego, CA: Academic Press.

Dijksterhuis, A., Bos, M. W., Nordgren, L. F., & van Baaren, R. B. (2006). On making the right choice: The deliberation-without-attention effect. *Science, 311*, 1005–1007.

Dijksterhuis, A., & Nordgren, L. F. (2006). A theory of unconscious thought. *Perspectives on Psychological Science, 1*, 95–109.

Dijksterhuis, A., Spears, R., Postmes, T., Stapel, D., Koomen, W., Knippenberg, A. V., et al (1998). Seeing one thing and another: Contrast effects in automatic behavior. *Journal of Personality and Social Psychology, 75*, 862–871.

Dolan, P. (2014). *Happiness by design: Change what you do, not how you think*. London: Hudson Street Press.

Dolan, P., & Galizzi, M. M. (2014). Because I'm worth it. A lab-field experiment on the spillover effects of incentives in health. LSE CEP discussion paper CEPDP 1286.

Dolan, P., & Galizzi, M. M. (in press). Getting policy-makers to listen to field experiments. *Oxford Review of Economic Policy, 30*(4).

Dolan, P., Hallsworth, M., Halpern, D., King, D., Metcalfe, R., & Vlaev, I. (2011). Influencing behavior: The mindspace way. *Journal of Economic Psychology, 33*, 264–277.

Dur, R., Non, A., & Roelfsema, H. (2010). Reciprocity and incentive pay in the workplace. *Journal of Economic Psychology, 31*, 676–686.

Effron, D. A., Cameron, J. S., & Monin, B. (2009). Endorsing Obama licenses favoring whites. *Journal of Experimental Social Psychology, 45*, 590–593.

Effron, D. A., Miller, D. T., & Monin, B. (2012). Inventing racist roads not taken: The licensing effect of immoral counterfactual behaviors. *Journal of Personality and Social Psychology, 103*, 916–932.

Effron, D. A., Monin, B., & Miller, D. T. (2013). The unhealthy road not taken: Licensing indulgence by exaggerating counterfactual sins. *Journal of Experimental Social Psychology, 49*, 573–578.

Epstein, L. H., Dearing, K. K., Roba, L. G., & Finkelstein, E. (2010). The influence of taxes and subsidies on energy purchased in an experimental purchasing study. *Psychological Science*, 1–9.

Evans, W. N., & Graham, J. D. (1991). Risk reduction or risk compensation? The case of mandatory safety-belt laws. *Journal of Risk and Uncertainty, 4*(1), 61–73.

Evans, L., Maio, G. R., Corner, A., Hodgetts, C. J., Ahmed, S., & Hahn, U. (2013). Self-interest and pro-environmental behavior. *Nature Climate Change, 3*, 122–125.

Fehr, E., & Falk, A. (2002). Psychological foundations of incentives. *European Economic Review, 46*, 687–724.

Fehr, E., & Gachter, S. (1997). Reciprocity as a contract enforcement device: Experimental evidence. *Econometrica, 65*, 833–860.

Fehr, E., & List, J. (2004). The hidden costs and returns of incentives: Trust and trustworthiness among CEOs. *Journal of the European Economic Association, 2*(5), 743–771.

Festinger, L. (1957). *A theory of cognitive dissonance*. Stanford, CA: Stanford University Press.

Festinger, L., & Carlsmith, J. M. (1959). Cognitive consequences of forced compliance. *Journal of Abnormal and Social Psychology, 58*(2), 203–210.

Fishbach, A., & Choi, J. (2012). When thinking bout goals undermines goal pursuit. *Organizational Behavior and Human Decision Processes, 118*, 99–107.
Fishbach, A., & Dhar, R. (2005). Goals as excuses or guides: The liberating effect of perceived goal progress on choice. *Journal of Consumer Research, 32*, 370–377.
Fishbach, A., Koo, M., & Finkelstein, S. R. (in press). Motivation resulting from completed and missing actions. In Olson, J., & Zanna, M. P. (Eds.). *Advances in experimental social psychology* (Vol. 50).
Fishbach, A., Friedman, R. S., & Kruglanski, A. W. (2003). Leading us not into temptation: Momentary allurements elicit overriding goal activation. *Journal of Personality and Social Psychology, 84*, 296–309.
Fishbach, A., & Zhang, Y. (2008). Together or apart: When goals and temptations complement versus compete. *Journal of Personality and Social Psychology, 94*, 547–559.
Fishbach, A., Zhang, Y., & Koo, M. (2009). The dynamics of self-regulation. *European Review of Social Psychology, 20*, 315–344.
Fitzsimons, G., Hutchinson, J. W., Williams, P., Alba, J. W., Chartrand, T. L., Huber, J., et al (2002). Non-conscious influences on consumer choice. *Marketing Letters, 13*(3), 269–279.
Fitzsimons, G., & Moore, S. (2008). Should I ask our children about sex, drugs and Rock'n'Roll? Potentially harmful effects of asking questions about risky behaviours. *Journal of Consumer Psychology, 18*, 82–95.
Fitzsimons, G. J., & Morwitz, V. (1996). The effect of measuring intent on brand-level purchasing behavior. *Journal of Consumer Research, 23*, 1–11.
Fitzsimons, G. J., & Shiv, B. (2001). Non-conscious and contaminative effects of hypothetical questions on subsequent decision-making. *Journal of Consumer Research, 334*, 782–791.
Fitzsimons, G., & Williams, P. (2000). Asking questions can change choice behaviour. Does it do so automatically or effortfully? *Journal of Experimental Psychology: Applied, 6*, 195–206.
Forster, J., Grant, H., Idson, L. C., & Higgins, E. T. (2001). Success/failure, feedback, expectancies, and approach/avoidance motivation: How regulatory focus moderates classic relations. *Journal of Experimental Social Psychology, 37*(3), 253–260.
Forster, J., Higgins, E. T., & Idson, L. C. (1998). Approach and avoidance strength during goal attainment: Regulatory focus and the 'Goal Looms Larger' effect. *Journal of Personality and Social Psychology, 75*(5), 1115–1131.
Forster, J., Liberman, N., & Friedman, R. S. (2007). Seven principles of goal activation: a systematic approach to distinguishing goal priming from priming of non-goal constructs. *Personality and Social Psychology Review, 11*(3), 211–233.
Forster, J., Liberman, N., & Higgins, E. T. (2005). Accessibility from active and fulfilled goals. *Journal of Experimental Social Psychology, 41*, 220–239.
Fredrickson, B. L. (1998). What good are positive emotions? *Review of General Psychology, 2*, 300–319.
Freedman, J. L., & Fraser, S. C. (1966). Compliance without pressure: The foot-in-the-door technique. *Journal of Personality and Social Psychology, 4*, 195–202.
Frey, B. S., & Oberholzer-Gee, F. (1997). The cost of price incentives: An empirical analysis of motivation crowding-out. *American Economic Review, 87*(4), 746–755.
Frijters, P. (2000). Do individuals try to maximize general satisfaction? *Journal of Economic Psychology, 21*(3), 281–304.
Fudenberg, D., & Levine, D. K. (1998). *The theory of learning in games.* Cambridge, MA: MIT Press.
Gachter, S., & Thoni, C. (2010). Social comparison and performance: Experimental evidence on the fair wage-effort hypothesis. *Journal of Economic Behavior & Organization, 76*, 531–543.
Gailliot, M. T., Baumeister, R. F., DeWall, C. N., Maner, J. K., Plant, E. A., Tice, D. M., et al (2007). Self-control relies on glucose as a limited energy source: Willpower is more than a metaphor. *Journal of Personality and Social Psychology, 92*, 325–336.
Garbacz, C. (1990a). Estimating seat belt effectiveness with seat belt usage data from the Centre for Disease Control. *Economics Letters, 34*, 83–88.
Garbacz, C. (1990b). How effective is automobile safety legislation? *Applied Economics, 22*, 1705–1714.
Garbacz, C. (1991). Impact of the New Zealand seat belt law. *Economic Inquiry, 29*, 310–316.
Garbacz, C. (1992). More evidence on the effectiveness of seat belt laws. *Applied Economics, 24*, 313–315.
Gillingham, K., Kotchen, M. J., Rapson, D. S., & Wagner, G. (2013). Energy policy: The rebound effect is overplayed. *Nature, 493*, 475–476.
Gino, F., Norton, M. I., & Ariely, D. (2010). The counterfeit self. *Psychological Science, 21*(5), 712–720.
Glimcher, P. W., Fehr, E., Camerer, C., & Poldrack, R. A. (2008). *Neuroeconomics: Decision-making and the brain.* New York: Academic Press.
Gneezy, U., Imas, A., & Madarasz, K. (in press). Conscience accounting: Emotion dynamics and social behavior. *Management Science.*
Gneezy, A., Gneezy, U., Riener, G., & Nelson, L. D. (2012). Pay-what-you-want, identity, and self-signaling in markets. *Proceedings of the National Academy of Sciences United States of America, 109*(19), 7236–7240.
Gneezy, A., Imas, A., Brown, A., Nelson, L. D., & Norton, M. I. (2012). Paying to be nice: Consistency and costly prosocial behavior. *Management Science, 58*(1), 179–187.
Gneezy, U., & Rustichini, A. (2000a). Pay enough or don't pay at all. *Quarterly Journal of Economics, 115*(3), 791–810.
Gneezy, U., & Rustichini, A. (2000b). A fine is a price. *Journal of Legal Studies, 29*(1).
Goeree, J., & Holt, C. (2001). Ten little treasures of game theory and ten intuitive contradictions. *American Economic Review, 91*(5), 1402–1422.
Goeschl, T., & Perino, G. (2009). On backstops and boomerangs: Environmental R&D under technological uncertainty. *Energy Economics, 31*(5), 800–809.
Gollwitzer, P. M. (1990). Action phases and mindsets. In E. T. Higgins & R. M. Sorrentino (Eds.). *Handbook of motivation and cognition: Foundations of social behavior* (Vol. 2, pp. 53–92). New York: Guildford.
Gollwitzer, P. M., Heckhausen, H., & Steller, B. (1990). Deliberative and implemental mindsets: Cognitive tuning towards congruous thoughts and information. *Journal of Personality and Social Psychology, 59*, 1119–1127.
Gomez-Minambres, J. (2012). Motivation through goal setting. *Journal of Economic Psychology, 33*(6), 1223–1239.
Goschke, T., & Kuhl, J. (1993). Representation of intentions: Persisting activation in memory. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 19*, 1211–1226.
Gregory, W. L., Cialdini, R. B., & Carpenter, K. M. (1982). Self-relevant scenarios as mediators of likelihood estimates and compliance: Does imagining make it so? *Journal of Personality and Social Psychology, 43*, 89–99.
Greiner, B., Ockenfels, A., & Werner, P. (2011). Wage transparency and performance: A real-effort experiment. *Economics Letters, 111*, 236–238.
Grimm, V., & Mengel, F. (2012). An experiment on learning in a multiple games environment. *Journal of Economic Theory, 147*(6), 2220–2259.
Guadagno, R. E., Asher, T., Demaine, L. J., & Cialdini, R. B. (2001). When saying yes leads to saying no: Preference for consistency and the reverse foot-in-the-door effect. *Personality and Social Psychology Bulletin, 27*(7), 859–867.
Harlé, K. M., & Sanfey, A. G. (2007). Incidental sadness biases social economic decisions in the ultimatum game. *Emotion, 7*, 876–881.
Harrison, G. W., & List, J. A. (2004). Field experiments. *Journal of Economic Literature, 42*(4), 1009–1055.
Harrison, G. W., & List, J. A. (2008). Naturally occurring markets and exogenous laboratory experiments. A case study of the winner's curse. *The Economic Journal, 118*(528), 822–843.
Heckman, J. J. (2007a). The economics, technology, and neuroscience of human capability formation. *Proceedings of the National Academy of Sciences United States of America, 104*(33), 13250–13255.
Heckman, J. J. (2007b). The technology, and neuroscience of capacity formation. *Proceedings of the National Academy of Sciences United States of America, 104*(3), 13250–13255.
Heckman, J. J., & Rubinstein, Y. (2001). The importance of noncognitive skills: Lessons from the Ged testing program. *American Economic Review, 91*(2), 145–149.
Herman, P. C., & Mack, D. (1975). Restrained and unrestrained eating. *Journal of Personality, 43*, 647–660.
Herman, P. C., & Polivy, J. (2010). The self regulation of eating: Theoretical practical problems. In R. F. Baumeister & K. D. Vohs (Eds.), *Handbook of self-regulation: Research, theory, and applications* (2nd ed., pp. 522–536). New York: Guildford.
Heyman, J., & Ariely, D. (2004). Effort for payment: A tale of two markets. *Psychological Science, 15*(11), 787–793.

14 P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16

Higgins, E. T., & King, G. (1981). Accessibility of social constructs: Information processing consequences of individual and contextual variability. In N. Cantor & J. Kihlstrom (Eds.), *Personality, cognition, and social interaction* (pp. 69–121). Hillsdale, NJ: Erlbaum.

Hsee, C. K. (1995). Elastic justification: How tempting but task-irrelevant factors influence decisions. *Organizational Behavior and Human Decision Processes, 62,* 330–337.

Huck, S., Jehiel, P., & Rutter, T. (2011). Feedback spillover and analogy-based expectations: A multi-game experiment. *Games and Economic Behaviour, 71*(2), 351–365.

Hull, C. L. (1932). The goal-gradient hypothesis and maze learning. *Psychological Review, 39*(1), 25–43.

Isen, A. M. (1987). Positive affect, cognitive processes, and social behavior. In L. Berkowitz (Ed.), *Advances in experimental social psychology* (Vol. 20, pp. 203–252). San Diego, CA: Academic Press.

Isen, A. M. (2000). Positive affect and decision-making. In M. Lewis & J. M. Haviland-Jones (Eds.), *Handbook of emotions* (2nd ed., pp. 417–435). New York: Guildford Press.

Isen, A. M., & Simmonds, S. F. (1978). The effect of feeling good on a helping task that is incompatible with good mood. *Social Psychology Quarterly, 41,* 345–349.

Jacobsen, G. D., Kotchen, M. J., & Vandenbergh, M. P. (2012). The behavioral response to voluntary provision of an environmental public good: Evidence from residential electricity demand. *European Economic Review, 56,* 946–960.

Jenkins, J., Nordhaus, T., & Shellenberger, M. (2011). *Energy emergence: Rebound and backfire as emergent phenomena: A review of the literature.* Oakland, CA: Breakthrough Institute. February.

Jevons, W. S. (1866). *The coal question.* London: MacMillan and Company.

Jordan, J., Mullen, E., & Murnighan, J. K. (2011). Striving for the moral self: The effects of recalling past moral actions on future moral behavior. *Personality and Social Psychology Bulletin, 37*(5), 701–713.

Kahneman, D. (1973). *Attention and effort.* Englewood Cliffs, NJ: Prentice Hall.

Kahneman, D. (2003). Maps of bounded rationality: Psychology for behavioral economics. *American Economics Review, 93,* 1449–1475.

Kahneman, D. (2011). *Thinking, fast and slow.* London: Penguin, p. 53.

Kamenica, E. (2012). Behavioural economics and psychology of incentives. *Annual Review of Economics, 4*(13), 1–26.

Kay, A. C., Wheeler, S. C., Bargh, J., & Ross, L. (2004). Material priming: The influence of mundane physical objects on situational constructs and competitive behavioral choice. *Organizational Behavior and Human Decision Processes, 95,* 83–96.

Khan, U., & Dhar, R. (2006). Licensing effect in consumer choice. *Journal of Marketing Research, 43,* 259–266.

Kivetz, R., & Simonson, K. (2002). Earning the right for self: Effort as a determinant of customer preferences toward frequency program rewards. *Journal of Marketing Research, 39,* 155–170.

Kivetz, R., Urminsky, O., & Zheng, Y. (2006). The goal-gradient hypothesis resurrected: Purchase acceleration, illusionary goal progress, and customer retention. *Journal of Marketing Research, 43,* 38–58.

Kivetz, R., & Zheng, Y. (2006). Determinants of justification and self-control. *Journal of Experimental Psychology: General, 135,* 572–587.

Knez, M., & Camerer, C. F. (2000). Increasing cooperation in Prisoners' Dilemma by establishing a precedent of efficiency in coordination games. *Organizational Behavior and Human Decision Processes, 82,* 194–216.

Kroese, F. M., Evers, C., & De Ridder, D. T. D. (2009). How chocolate keeps you slim: The effect of food temptations on weight watching goal importance, intentions, and eating behavior. *Appetite, 53,* 430–433.

Kroese, F. M., Evers, C., & De Ridder, D. T. D. (2011). Tricky treats: Paradoxical effects of temptation strength on self-regulation processes. *European Journal of Social Psychology, 41,* 281–288.

Kronick, I., & Knauper, B. (2010). Temptations elicit compensatory intentions. *Appetite, 54,* 398–401.

Kruglanski, A. W. (1996). Goals as knowledge structures. In P. M. Gollwitzer & J. A. Bargh (Eds.), *The psychology of action: Linking cognition and motivation to behavior* (pp. 599–618). New York: Guildford.

Kruglanski, A. W., Shah, J. Y., Fishbach, A., Friedman, R., Chun, W., & Sleeth-Keppler, D. (2002). A theory of goal systems. In M. P. Zanna (Ed.), *Advances in experimental social psychology* (Vol. 34, pp. 331–378). San Diego, CA: Academic Press.

Kruglanski, A. W., & Webster, D. M. (1996). Motivated closing of the mind: "seizing" and "freezing". *Psychological Review, 103,* 263–283.

Lanzini, P., & Thøgersen, J. (2014). Behavioral spillover in environmental domain: An intervention study. *Journal of Environmental Psychology, 40,* 381–390.

Lee, S., & Schwarz, N. (2010). Dirty hands and dirty mouths: Embodiment of the moral-purity metaphor is specific to the motor modality involved in moral transgression. *Psychological Science, 21,* 1423–1425.

Lerner, J. S., Small, D. A., & Loewenstein, G. (2004). Heart strings and purse strings: Carryover effects of emotions on economic decisions. *Psychological Science, 15,* 337–341.

Levav, J., & Fitzsimons, G. (2006). When questions change behaviour: The role of ease of representation. *Psychological Science, 17,* 207–213.

Levitt, S., & List, J. (2007a). What do laboratory experiments measuring social preferences reveal about the real world? *Journal of Economic Perspectives, 21*(2), 153–174.

Levitt, S., & List, J. (2007b). On the generalizability of lab behaviour in the field. *Canadian Journal of Economics, 40*(2), 343–370.

Levitt, S., List, J., & Reiley, D. (2010). What happens in the field stays in the field: Exploring whether professionals play minimax in laboratory experiments. *Econometrica, 78*(4), 1413–1434.

Lewin, K. (1951). *Field theory in social science: Selected theoretical papers.* New York: Harper & Row.

Liberman, N., Forster, J., & Higgins, E. T. (2007). Set/reset or inhibition after goal fulfillment? A fair test between two mechanisms producing assimilation and contrast. *Journal of Experimental Social Psychology, 43,* 258–264.

Liberman, N., Sagristano, M. D., & Trope, Y. (2002). The effect of temporal distance on level of mental construal. *Journal of Experimental Social Psychology, 38*(6), 523–534.

Louro, M. J. S., Pieters, R., & Zeelenberg, M. (2007). Dynamics of multiple goal pursuit. *Journal of Personality and Social Psychology, 93,* 174–193.

Manucia, G. K., Baumann, D. J., & Cialdini, R. B. (1984). Mood influences on helping: Direct effects or side effects? *Journal of Personality and Social Psychology, 46*(2), 357–364.

Marsh, R. L., Hicks, J. L., & Bink, M. L. (1998). Activation of completed, uncompleted, and partially completed intentions. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 24,* 350–361.

Martin, L. L., & Tesser, A. (1996). Some ruminative thoughts. In R. S. Wyer (Ed.), *Advances in social cognition* (Vol. 9, pp. 1–47). Hillsdale, NJ: Lawrence Erlbaum.

Mazar, N., Amir, O., & Ariely, D. (2008). The dishonesty of honest people: A theory of self-concept maintenance. *Journal of Marketing Research, 45*(6), 633–644.

Mazar, N., & Zhong, C. B. (2010). Do green products make us better people? *Psychological Science, 21*(4), 494–498.

Mead, N. L., Baumeister, R. F., Gino, F., Schweitzer, M. E., & Ariely, D. (2009). Too tired to tell the truth: Self-control resource depletion and dishonesty. *Journal of Experimental Social Psychology, 45,* 594–597.

Mengel, F., & Sciubba, E. (2010). Extrapolation and structural learning in games. Maastricht University Working Papers.

Merritt, A. C., Effron, D. A., Fein, S., Savitsky, K. K., Tuller, D. M., & Monin, B. (2012). The strategic pursuit of moral credentials. *Journal of Experimental Social Psychology, 48,* 774–777.

Merritt, A. C., Effron, D., & Monin, B. (2010). Moral self-licensing: When being good frees us to be bad. *Social and Personality Psychology Compass, 4*(5), 344–357.

Monin, B., & Miller, D. T. (2001). Moral credentials and the expression of prejudice. *Journal of Personality and Social Psychology, 81,* 33–43.

Moore, S. G., Neal, D. T., Fitzsimons, G. J., & Shiv, B. (2012). Wolves in sheep's clothing: How and when hypothetical questions influence behavior. *Organizational Behavior and Human Decision Processes, 117*, 168–178.

Morwitz, V., & Fitzsimons, G. (2004). The mere measurement effect: Why does measuring intentions change actual behaviour? *Journal of Consumer Psychology, 14*, 64–74.

Morwitz, V., Johnson, E., & Schmittlein, D. (1993). Does measuring intent change behavior? *Journal of Consumer Research, 20*, 46–61.

Moskowitz, G. B. (2002). Preconscious effects of temporary goals on attention. *Journal of Experimental Social Psychology, 38*, 397–404.

Mukhopadhyay, A., & Johar, G. V. (2009). Indulgence as self-reward for prior shopping restraint: A justification-based mechanism. *Journal of Consumer Psychology, 19*, 334–345.

Mussweiler, T. (2003). Comparison processes in social judgment: Mechanisms and consequences. *Psychological Review, 110*, 472–489.

Neely, J. H. (1977). Semantic priming and retrieval from lexical memory: Roles of inhibition less spreading activation and limited-capacity attention. *Journal of Experimental Social Psychology: General, 106*, 226–254.

Nisan, M., & Horenczyk, G. (1990). Moral balance: The effect of prior behaviour on decision in moral conflict. *British Journal of Social Psychology, 29*(1), 29–42.

Norton, E. (2012). Shame on the rich. *Science now*. Posted on news.sciencemag.org, February 27.

Novemsky, N., & Dhar, R. (2005). Goal fulfillment and goal targets in sequential choice. *Journal of Consumer Research, 32*, 396–404.

Palacios-Huerta, I., & Volji, O. (2008). Experiencia docet: Professionals play minimax in laboratory experiments. *Econometrica, 76*(1), 71–115.

Peltzman, S. (1975). The effects of automobile safety regulation. *Journal of Political Economy, 83*, 667–725.

Pittman, T. S. (1975). Attribution of arousal as a mediator in dissonance reduction. *Journal of Experimental Social Psychology, 11*(1), 53–63.

Pliner, P., Hart, H., Kohl, J., & Saari, D. (1974). Compliance without pressure: Some further data on the foot-in-the-door technique. *Journal of Experimental Social Psychology, 10*, 17–22.

Ploner, M., & Regner, T. (2013). Self-image and moral balancing: an experimental analysis. *Journal of Economic Behavior & Organization, 93*, 374–383.

Poortinga, W., Whitmarsh, L., & Suffolk, C. (2013). The introduction of a single-use carrier bag charge in Wales: Attitude change and behavioral spillover effects. *Journal of Environmental Psychology, 36*, 240–247.

Rigdon, M. (2009). Trust and reciprocity in incentive contracting. *Journal of Economic Behavior & Organization, 70*, 93–105.

Rudin-Brown, C., & Jamson, S. (2013). *Behavioural adaptation and road safety: Theory, evidence, and action*. London: CRC Press.

Sachdeva, S., Iliev, R., & Medin, D. L. (2009). Sinning saints and saintly sinners: The paradox of moral self-regulation. *Psychological Science, 20*(4), 523–528.

Savikhin, A. C., & Sheremeta, R. M. (2013). Simultaneous decision-making in competition and cooperative environments. *Economic Inquiry, 51*(2), 1311–1323.

Schoemaker, P. J. H. (1993). Determinants of risk-taking: Behavioral and economic views. *Journal of Risk and Uncertainty, 6*, 49–73.

Schultz, P. W., Nolan, J. M., Cialdini, R. B., Goldstein, N. J., & Griskevicius, V. (2007). The constructive, destructive, and reconstructive power of social norms. *Psychological Science, 18*(5), 429–434.

Schwarz, N., & Bless, H. (2005) Mental construal processes: The inclusion/exclusion model. In D. Stapel & J. Suls (Eds.), *Assimilation and contrast in social psychology* (pp. 119–141). Philadelphia: Psychology Press.

Shafir, E. (2012). *The behavioral foundations of public policy*. Princeton: Princeton University Press.

Shah, J. Y., Friedman, R. S., & Kruglanski, A. W. (2002). Forgetting all else: On the antecedents and consequences of goal shielding. *Journal of Personality and Social Psychology, 83*, 1261–1280.

Shah, J. Y., & Kruglanski, A. W. (2002). Priming against your will: How goal pursuit is affected by accessible alternatives. *Journal of Experimental Social Psychology, 38*, 368–383.

Shah, J. Y., & Kruglanski, A. W. (2003). When opportunity knocks: Bottom-up priming of goals by means and its effects on self-regulation. *Journal of Personality and Social Psychology, 84*, 1109–1122.

Shiffman, S., Hickcox, M., Paty, J., Gnys, M., Kassel, J. D., & Richards, T. J. (1996). First lapses to smoking: Within-subjects analysis of real-time reports. *Journal of Consulting and Clinical Psychology, 64*, 993–1002.

Shu, L. L., Mazar, N., Gino, F., Ariely, D., & Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. *Proceedings of the National Academy of Sciences United States of America, 109*(38), 15197–15200.

Simon, H. (1967). Motivational and emotional controls of cognition. *Psychology Review, 74*, 29–39.

Srull, T. K., & Wyer, R. S. Jr., (1979). The role of category accessibility in the interpretation of information about persons: Some determinants and implications. *Journal of Personality and Social Psychology, 37*, 1660–1672.

Stephens, R. S., & Curtin, L. (1994). Testing the abstinence violation effect construct with marijuana cessation. *Addictive Behaviors, 19*, 23–32.

Strahilevitz, M., & Myers, J. (1998). Promised donations to charity as purchase incentives: How well they work may depend on what you're trying to sell. *Journal of Consumer Research, 24*(4), 434–446.

Stroebe, W., Mensink, W., Aarts, H., Schut, H., & Kruglanski, A. W. (2008). Why dieters fail: Testing the goal conflict model of eating. *Journal of Experimental Social Psychology, 44*, 25–36.

Sunstein, C. R. (2011). Empirically informed regulation. *University of Chicago Law Review, 78*, 1349–1429.

Susewind, M., & Hoelzl, E. (2014). A matter of perspective: Why past moral behavior can sometimes encourage and other times discourage future moral striving. *Journal of Applied Social Psychology, 44*(3), 201–209.

Tesser, A. (1988). Toward a self-evaluation maintenance model of social behavior. In L. Berkowitz (Ed.). *Advances in experimental social psychology* (Vol. 21, pp. 181–227). San Diego, CA: Academic Press.

Tesser, A., Crepaz, N., Collins, J. C., Cornell, D., & Beach, S. R. H. (2000). Confluence of self-esteem regulation mechanisms: On integrating the self-zoo. *Personality and Social Psychology Bulletin, 26*, 1476–1489.

Thaler, R. H., & Sunstein, C. R. (2003). Libertarian paternalism. *American Economics Review, 93*(2), 175–179.

Thøgersen, J. (1999a). Spillover processes in the development of a sustainable consumption pattern. *Journal of Economic Psychology, 20*, 53–81.

Thøgersen, J. (1999b). The ethical consumer: Moral norms and packaging choice. *Journal of Consumer Policy, 22*, 439–460.

Thøgersen, J., & Crompton, T. (2009). Simple and painless? The limitations of spillover in environmental campaigning. *Journal of Consumer Policy, 32*, 141–163.

Thøgersen, J., & Olander, F. (2003). Spillover of environment-friendly consumer behavior. *Journal of Environmental Psychology, 32*, 141–163.

Tiefenbeck, V., Staake, T., Roth, K., & Sachs, O. (2013). For better or for worse? Empirical evidence of moral licensing in a behavioral energy conservation campaign. *Energy Policy, 57*, 160–171.

Trope, Y., & Fishbach, A. (2000). Counteractive self-control in overcoming temptations. *Journal of Personality and Social Psychology, 79*(4), 493–506.

Trope, Y., & Liberman, N. (2003). Temporal construal. *Psychological Review, 110*, 403–421.

Trope, Y., & Neter, E. (1994). Reconciling competing motives in self-evaluation: The role of self-control in feedback seeking. *Journal of Personality and Social Psychology, 66*, 646–657.

Trope, Y., & Pomerantz, E. M. (1998). Resolving conflicts among self-evaluative motives: Positive experiences as a resource for overcoming defensiveness. *Motivation and Emotion, 22*, 53–72.

Truelove, H. B., Carrico, A. R., Weber, E. U., Raimi, K. T., & Vandenbergh, M. P. (2014). Positive and negative spillover of pro-environmental behavior: An integrative review and theoretical framework. *Global Environmental Change, 29*, 127–138.

Urbszat, D., Herman, C. P., & Polivy, J. (2002). Eat, drink, and be merry, for tomorrow we diet: Effects of anticipated deprivation on food intake in restrained and unrestrained eaters. *Journal of Abnormal Psychology, 111*, 396–401.

Van Kleef, E., Shimizu, M., & Wansink, B. (2011). Food compensation: Do exercise ads change food intake? *International Journal of Behavioral Nutrition and Physical Activity, 8*(6), 661–664.

JA-588

*P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*

Van Praag, B. M. S., Frijters, P., & Ferrer-i-Carbonell, A. (2003). The anatomy of subjective well-being. *Journal of Economic Behavior & Organization, 51*(1), 29–49.

Vega-Redondo, F. (1996). *Evolution, games, and economic behaviour*. Oxford: Oxford University Press.

Viscusi, P., & Cavallo, G. O. (1994). The effect of product safety regulation on safety precautions. *Risk Analysis, 14*(6), 917–930.

Vohs, K., Mead, N. L., & Goode, M. R. (2006). The psychological consequences of money. *Science, 314*, 1154–1156.

Weber, E. U. (1997). Perception and expectation of climate change. In M. H. Bazerman (Ed.), *Environment, ethics, and behavior: The psychology of environmental valuation* (pp. 314–341). New York: Lexington Books.

Werle, C., Wansink, B., & Payne, C. (2010). Just thinking about exercise makes me serve more food. Physical activity and calorie compensation. *Appetite, 56*(2), 332–335.

Werle, C. O. C., Wansink, B., & Payne, C. R. (2011). 'Just thinking about exercise makes me serve more food': Physical activity and calorie compensation. *Appetite, 56*(2), 332–335.

Wicklund, R. A., & Gollwitzer, P. M. (1981). Symbolic self-completion, attempted influence, and self-deprecation. *Basic and Applied Social Psychology, 2*(2), 89–114.

Wicklund, R. A., & Gollwitzer, P. M. (1982). *Symbolic self-completion*. Hillsdale, NJ: Erlbaum.

Wilcox, K., Vallen, B., Block, L., & Fitzsimons, G. J. (2009). Vicarious goal fulfilment: when the mere presence of a healthy option leads to an ironically indulgent decision. *Journal of Consumer Research, 36*(3), 380–393.

Wilde, G. J. S. (1982a). The theory of risk homeostasis: Implications for safety and health. *Risk Analysis, 2*, 209–225.

Wilde, G. J. S. (1982b). Critical issues risk homeostasis theory: A reply. *Risk Analysis, 2*, 249–258.

Wilde, G. J. S. (1998). Risk homeostasis theory: An overview. *Injury Prevention, 4*, 89–91.

Wilde, G. J. S., Robertson, L. S., & Pless, I. B. (2002). For and against: Does risk homeostasis theory have implications for road safety? *British Medical Journal, 324*, 1149–1152.

Wilson, T. D., & Schooler, J. W. (1991). Thinking too much: Introspection can reduce the quality of preferences and decisions. *Journal of Personality and Social Psychology, 60*, 181–192.

Wisdom, J., Downs, J. S., & Loewenstein, G. (2010). Promoting healthy choices: Information versus convenience. *American Economic Journal: Applied Economics, 2*, 164–178.

Zanna, M. P., & Cooper, J. (1974). Dissonance and the pill: An attribution approach to studying the arousal properties of dissonance. *Journal of Personality and Social Psychology, 29*(5), 703–709.

Zeigarnik, B. (1927). Das Behalten erledigter und unerledigter Handlugen [The memory of completed and uncompleted actions]. *Psychologische Forschung, 9*, 1–85.

Zhong, C. B., Ku, G., Lount, R. B., & Murnighan, J. K. (2010). Compensatory ethics. *Journal of Business Ethics, 92*, 323–339.

Zhong, C. B., & Liljenquist, K. (2006). Washing away your sins: Threatened morality and physical cleansing. *Science, 313*, 1451–1452.

Zwane, A. P. et al (2011). Being surveyed can change later behavior and related parameter estimates. *Proceedings of the National Academy of Sciences United States of America, 108*(5), 1821–1826.

# EXHIBIT O

## to Expert Report of Professor Louis Klarevas



Methodology

For reprint orders, please contact: reprints@futuremedicine.com

# Analyzing the concept of spillover effects for expanded inclusion in health economics research

Journal of **Comparative Effectiveness Research**

K Jane Muir*,1 & Jessica Keim-Malpass1

1Department of Acute and Specialty Care, University of Virginia School of Nursing, Charlottesville, VA 22903, USA
1
*Author for correspondence: kjm5xw@virginia.edu

**Background:** The incorporation of spillover effects in health economic research is recognized by regulatory agencies as useful for valuing health interventions and technologies. To date, spillover effects are not universally used within economic evaluations and conceptual definitions of spillover effects are vague within the context of health economics research. **Materials & methods:** In an effort to enhance awareness of spillover effects for health economic evaluations, a concept analysis using Walker and Avant's approach was performed to elucidate the key attributes, definitions, antecedents and consequences of spillover effects across a range of disciplines. **Results:** Key attributes included lack of intention, positive and negative impacts, and two entity/domain involvement. Antecedents included an initial action and desired outcome. Consequences involved spillovers across industries, work life to personal life domains, patient to family member domains and across healthcare markets. **Conclusion:** The analysis provides greater clarification around the dimensions of spillover effects and reveals opportunities to enhance methodological approaches to assessing spillovers.

First draft submitted: 1 April 2020; Accepted for publication: 1 June 2020; Published online: 17 June 2020

Keywords: concept analysis • economic evaluations • health economics • spillover effects

Health economic evaluations have been indicated to facilitate decision-making around medical interventions, technological advancement, pharmaceutical innovation, healthcare professional workforce projections and other healthcare-related topics [1–3]. Given rising US healthcare spending, information gleaned from economic evaluations can lead to the appropriate allocation of resources needed to improve patient outcomes, healthcare systems, health policy and other healthcare-related decisions [3].

Economic evaluations are commonly classified as cost–effectiveness analyses, cost–utility analyses and cost–benefit analyses [4]. The various economic evaluation techniques similarly compare costs in the form of monetary units and differ with regards to measuring consequences [4,5]. For example, cost–effectiveness analyses, as described by Drummond and colleagues [4], measure a single consequence in the form of a natural unit, such as blood sugar reduction, life years gained or averted missed work days. Cost–utility analyses can measure outcomes of interventions based on preferences or utility weights. Cost–utility analyses are considered a broader type of cost–effectiveness analysis. A common cost–utility measurement is the quality-adjusted life year [4]. Cost–benefit analyses focus on a single cost and benefit measurement in the form of a monetary unit alone [4,5]. The availability of multiple economic evaluation techniques is beneficial for evaluating health programs and interventions, as well as resource allocation decision making where value judgments may vary by research question or approach [4,5].

An important concept discussed in the health economics literature is spillover effects, known as the health impacts and costs that extend beyond a health intervention or program's targeted recipient (the patient) to unintentionally impact other recipients either in a positive or negative way [6,7]. Health economic studies have predominantly assessed spillover effects within the family unit, where a patient's health status spills over to impact the quality of life of a family member [6]. Despite acknowledgement by the Second US Panel on Cost–Effectiveness in Health and Medicine that spillover effects are needed to enhance cost and benefit estimates of health interventions, a gap exists



Future **Medicine**

| Table 1. Spillover effect concept characteristics. | | |
|---|---|---|
| Attributes | Antecedents | Consequences |
| • Unintentional | • Initial action | • Unintentional impact from one entity to a second entity |
| • Positive or negative impacts | • Desired outcome | • Cross-industry, interpersonal, professional life to personal life domain |
| • Two entity/domain involvement | | |

in health economics research regarding universal inclusion of such effects [8]. A potential cause of such spillover effect exclusion could be uncertainty around the concept of spillover effects, given the existing focus in health economics on the family caregiver spillover domain [9,10].

The purpose of this analysis was to examine the concept of spillover effects in order to identify defining attributes, antecedents and consequences across a variety of academic disciplines. An expanded analysis of the concept across multiple disciplines can inform increased integration of spillovers within health economic evaluations. Additionally, an analysis of the concept may expand the types of spillovers evaluated in health economic studies. The concept analysis consists of an eight-step process outlined in subsequent paragraphs, followed by implications for health economics research.

## Concept analysis of spillover effects

In analyzing the concept of 'spillover effects', a systematic eight-step procedure was conducted using Walker and Avant's concept analysis process [9]. The Walker and Avant [9] concept analysis process consists of: selecting a concept, determining the purpose(s) of the analysis, identifying uses of the concept, identifying attributes, identifying a model case, identifying contrary cases, identifying antecedents and consequences and defining empirical referents. The first two steps of Walker and Avant's approach (concept selection and purpose development) are addressed in the introduction; the remaining steps are discussed in the following sections [9].

## Materials & methods

The concept of interest for the analysis was spillover effects, which is identified in a variety of terms in the literature as 'spillovers', 'spillover effects' and 'externalities' among a wide range of academic disciplines. These terms were all considered related to the identified concept of spillover effects. For the analysis, the literature search was restricted to health economics, psychology, sociology and business. A comprehensive search of the literature was conducted using PubMed, Google Scholar and Ovid Medline to understand the range of definitions and uses of spillovers. The primary search terms and Medical Subject Headings terms used either in combination or alone were 'spillover', 'spillover effects', 'externalities', 'economic', 'economic evaluation', 'economic modeling', 'Markov', 'cost–effectiveness', 'health', 'nurse', 'nursing', 'physician', 'caregiver', 'psychology', 'sociology' and 'business'. The search was filtered such that keywords were identified in the title and abstract of the articles. The article inclusion criteria included: articles or white papers that included the words 'spillovers' or 'externalities' written in English language within the past 15 years. Papers published in non-peer-reviewed journals, as well as gray literature and editorials were included.

A total of 50 articles that met the inclusion criteria were initially reviewed. A total of 34 articles were selected [10–41,44,45]. A total of 21 articles were from the health economics discipline, six from psychology, four from sociology and three from business. The majority of excluded articles discussed mathematical modeling of spillover effects, which was not relevant to the current research topic. The identified literature was reviewed and analyzed to identify attributes, antecedents and consequences of spillover effects (Table 1).

## Identifying uses of the concept

The initial step of the analysis involved examining the definition of 'spillovers' in the dictionary and uses in the relevant published literature. According to Merriam-Webster [42], 'spillover' refers to 'an extension of something, especially when an excess exists'. Use of the term 'spillover effects' are discussed in the following sections within the domains of health economics, psychology, sociology and business. A total of 23 of the articles explicitly described a definition of spillover effects, while the remaining articles described examples without clear definitions.

### Uses in health economics

Spillover effects were examined within the academic discipline of health economics and were discussed as either 'spillovers', 'spillover effects' or 'externalities'. Within the health economics field, spillovers were most commonly discussed in relation to a health intervention, scientific advancement or technological development. Gold [7], discusses spillovers, synonymous with externalities, as a positive or negative market exchange impacting individuals or groups who are not direct participants in such exchanges (p. 66). In a case study discussion on measuring spillover effects of patients with meningitis, Bhaduri and colleagues [22], refer to spillovers as 'wider health benefits' impacting patients in addition to individuals who are close to the patient (p. 1). Lakdawalla and colleagues [26], defined spillovers within the concept of scientific spillovers as the benefit of a scientific advancement imparted upon future knowledge development. Scientific spillovers occur when one advancement is made and other scientists, researchers or innovators expand on the given idea or advancement over time.

Much of the health economics literature studied spillovers in the context of the family caregiver or informal carer. Caregiver spillover effects, first introduced by Basu and Meltzer [6], refer to the various conditions, treatments and contacts that impact the welfare of family members. Spillovers manifest as the caregiver health effects and/or informal care time costs resulting from the health status/condition of a family member or close individual [13]. Spillovers have also been explored in terms of their impact on healthcare markets and provider practice patterns. A study by Johnson and colleagues [27], posited that decreases in fee-for-service traditional Medicare spending resulted from the spillover effect of increased Medicare Advantage penetration within states. Baicker and Robbins [16], found that a 10% increase in Medicare Advantage state penetration was associated with an approximate US$250 reduction in fee-for-service traditional Medicare resource use per patient. Cost-controlling measures within Medicare Advantage, such as the presence of health maintenance organizations, resulted in decreased costly inpatient hospitalizations and more cost-reducing outpatient service use. Overall, the health economics literature considered spillovers the impacts that extend beyond a patient and impact individuals or groups within a social network of a patient.

### Uses in psychology

Within the psychology discipline, spillovers were discussed as an attitudinal or behavioral transfer from one life to domain to another [30,32]. In studying shift work among nurses with families, Kunst and colleagues referred to spillovers as "... transfers of mood, energy and skills from one sphere to another" [30]. Spillovers were described in psychology as bidirectional in movement, occurring between work and family life domains [30]. Behavioral spillovers were a particular domain of spillovers in the psychology literature defined as a secondary process that can lead to larger-scale societal and scientific consequences [33]. Nash and colleagues described behavioral spillover theory as, "a way to catalyze broad lifestyle change from one behavior to another in ways that generate greater impacts than piecemeal interventions" [34]. Behavioral spillovers have been contextualized within environmental impacts within countries, where the concept of a conscious spillover can be cultivated in countries that value pro-environmental behavior [34]. Additional behavioral spillovers have evaluated exercise and healthy eating practices [34]. Overall, spillovers in psychology emphasized behaviors and the transfer of emotional or behavioral influences from one life or societal domain to another.

### Uses in sociology

Uses of spillover effects in the sociology literature shed light on intersections between individual disparities, institutions and social outcomes. Timmermans and colleagues situated their qualitative study on lack of health insurance spillovers based on neoclassical economic underpinnings [37]. Within this study, spillovers were discussed as 'collateral effects' and 'externalities' that are costs or benefits resulting from activities impacting "an otherwise uninvolved party who did not choose to incur that cost or benefit" [37]. Spillovers were further described as a tool to examine the effects of activities between entities that are unrelated but seemingly impacted by one another [37]. In studying the spillover effects of deterrence strategies to reduce crime, Braga and colleagues did not explicitly define spillover effects, but reference them as synonymous with indirect effects [38]. Hagan and Foster [36], assessed spillovers in the context of incarcerated mothers and the associated 'social costs' incarceration can have on children's education. Thus, the identified sociology literature referred to spillovers as the unintentional impacts of a policy, process, or phenomenon on societal institutions and outcomes.

### Uses in business

In the business literature, spillovers were discussed in the context of innovation and idea expansion between groups. Frischmann and Lemley [39], define spillovers as the, *"uncompensated benefits that one person's activity provides to another"*. Grillitsch and Nillson [41], examined knowledge spillovers in Swedish firms that are located within industrial 'clusters' or regions of high local knowledge density versus firms that are located within a knowledge 'periphery'. The study found that innovative firms in the knowledge periphery collaborate with external firms to compensate for the lack of knowledge spillovers that are gained by firms located within the knowledge/industrial cluster [41].

In a business advertising context, Sahni analyzed the impact of online advertisements on advertiser competition [40]. The findings from the randomized field experiments from a restaurant-search website suggested that spillovers were significant when advertising efforts were of the lowest frequency, while minimal spillovers occurred with high-intensity advertising techniques. Thus, the stronger intensity advertising techniques saturated consumer interest in the main advertiser, which offset spillovers toward other competitors [40]. Business spillover effects in the identified literature referenced spillovers in the context of innovation, marketing influences and consumer activities.

### Defining attributes

The determination of defining attributes is central to identify and define characteristics central to the concept under study. Based on the relevant review of the literature, three common attributes of spillover effects were noted: lack of intention, positive or negative impacts and two entity/domain involvement.

### Lack of intention (unintentional)

The majority of the literature examined described spillovers as unintentional in nature. Frischmann and colleagues [38], described spillovers as never planned nor calculated from the outset of an activity, process, intervention, or phenomenon. Thus, the receiving individual or third party is not privy to a transaction or compensations [19,22,39]. Sahni discusses the unintentional nature of advertisement techniques that invoke consumer memory recall of associated brands or products [40]. The literature described advertising techniques as having an unintentional consequence of priming a consumer to recall a non-advertised option in addition to the primary product/service advertised [40]. Health economics spillover effects around health interventions were described as an unintended effect on informal caregivers, family members, or other individuals within the social network of a patient. The majority of the identified spillover literature in the psychology and sociology disciplines discussed spillovers within the frame of being unintentional. One domain of psychology with a greater level of intentionality described was within behavioral spillovers specifically within environmental research. For example, Nash and colleagues [34] described behavioral spillovers as strongly influenced by *"behavioral interventions, changes in awareness, availability of infrastructure and resources and technological advances and policy change."* Across the identified literature, spillovers were not intentionality imparted upon the indirect recipient.

### Positive or negative impacts

Each of the disciplines characterized spillovers as capable of causing positive or negative effects. Within the realm of business and innovation, spillovers were cited as a social benefit that expands the influence of ideas to wider groups [39,40]. The social benefit of such a spillover is viewed as the advancement of an idea or innovation for the benefit of an industry. Furthermore, ideas cultivated in one industrial field were considered to commonly spill over into other fields – considered an interindustry spillover – in which case the benefit of these spillovers are accrued by both fields [39]. Frischmann and Lemley [39] attributed, in part, the 1980s computer boom to positive spillovers effects due to knowledge spillovers moving freely within Silicon Valley. Similarly, Grillitsch and Nillson's examination of knowledge spillovers between firms further supports the notion of positive innovation spillovers within regional clusters [41]. The study demonstrated that innovative spillovers between firms is positive, valuable and firms will strive to obtain these spillovers either through geographical means (internal access) or through collaborations externally [41]. Sahni discussed spillovers within advertising as positive or negative, based on the advertising effort companies implement [40]. Lower frequency advertising strategies resulted in positive spillovers for the advertising company's competitors, while higher frequency techniques resulted in positive spillovers for the advertising company.

In the discipline of psychology, spillovers have been described as both positive and negative within the work–family life spheres. Amstad and Semmer [32] describe work as a positive spillover where workers can develop

beneficial time management and efficiency habits that benefit productivity and communication within the family unit. Conversely, work is described as a negative spillover when stress transfers from the work domain to the home life domain [32]. Negative spillovers manifest as the undue stress imparted to family members by an employee ruminating at work within the family setting [31].

Much of the literature on spillover effects within health economics described the negative spillovers from a patient illness to a family member or individual close to the patient. Caregiver spillover effects, first introduced by Basu and Meltzer [6], refer to the various conditions, treatments and contacts that impact the welfare of family members. Such spillovers manifest as caregiver health effects and/or informal care time costs resulting from the health status/condition of a family member or close individual [13]. Al-Janabi and colleagues [22], describe family caregiver spillovers as the psychological, physical, financial and emotional burden that family caregivers experience while caring for a sick family member. Family caregiver spillovers have been studied among parents of children with medical complexity and autism, as well as spouses of adult patients; such effects include increased parent absenteeism, physical injury, depression and anxiety [10,12]. Bhadhuri and colleagues assessed meningitis family spillovers and found that long-term morbidity for meningitis survivors caused negative spillovers in the form of family member health losses [23]. Thus, negative spillover health impacts toward family members/caregivers predominated the health economics literature.

### Two entity/domain involvement

A unifying theme across the spillover effect literature was the involvement of two entities or domains impacted by an action or process. Specifically, spillovers were described to have a direct impact on a targeted entity (or domain), as well as a second entity unintentionally. This common characteristic manifested within the business literature as innovation spillovers from one entity, or industry, to another. Within one sociology study, one family entity, an incarcerated mother, had an unintentional impact on her child's performance in the school domain [36]. An additional sociology perspective assessed the impact of a health insurance domain on societal institutions (schools and churches) [37]. Among the identified literature, there were noted similarities between psychology and health economics in that family members were the two entities frequently impacted by spillovers [10–13,30–32]. As mentioned previously, spillover effects studied within the psychology discipline assessed professional life spillovers to the home and family setting [30,32]. Within the health economics literature, spillover effects were most commonly referenced as well-being impacts on family members of patients. Further health economic studies referenced changes in innovation from a present scientific to future scientific domain [26].

## Identifying a model case & contrary case
### Model case

Model case construction is the fifth step of Walker and Avant's [9] concept analysis and consists of including the identified attributes in a model case based on literature or invention by the author. The following case was created by the author and discusses the spillover impacts of a healthcare unit systems-level intervention on patient outcomes.

Elkwood Hospital Emergency Department (ED) provides adult, pediatric and women's health services. It has a triage section, a main ED treatment area and a pediatric treatment area. Recently, the ED has experienced a surge in patient volumes due to local population growth. The department decides to implement a new triage workflow configuration for patients after identifying that 70% of all presenting ED patients are low acuity and do not need to be seen in the main ED treatment area. Thus, the department initiates a 'triage quick assessment' process facilitating quick assessment and treatment of low-acuity patients in order to free up bed and clinician resources for high-acuity patients and to reduce patient wait times.

In order to increase efficiency in the new triage center, patients are initially brought into a triage room after patient registration where vital signs, initial assessments and labs are taken by a nurse. After this process, the patient is returned to the waiting room where they wait to be called back into the triage room for a physician assessment. As the first patient waits in the waiting room, new low-acuity patients are brought into the triage room to go through the same process by the nurse.

The new triage configuration is efficient in that it facilitates a quick assessment of every patient, where a nurse can identify if a patient is truly stable (or not) and return patients to the waiting room until their physician assessment. The additional benefit of the quick assessment process is that it allows for continuous bed availability should a high-acuity patient present in need of immediate stability and subsequent transfer to a permanent room.

**JA-595**

Over time, the ED observes significant drops in patient wait times due to this new configuration. However, although the process has benefited overall patient time metrics in the ED, the process has been detrimental to patient satisfaction ratings. Patients have reported negative feedback regarding the constant transport between the triage room and the waiting room and report perceived fragmented care imparted by the staff. Additionally, the department has observed a 10% increase in clinician turnover since implementation of the new triage configuration. Nurses on the unit cite increased moral distress due to the rising time pressures and increased constraints related to quickly completing patient registration, assessments and labs. The physicians have reported missed nursing care on common tasks, such as incomplete vital signs and delayed medication administration. Upon closer evaluation, the director of the ED has noted rising patient re-admissions to the ED. Despite quick evaluations among these low-acuity patients, approximately 30% are returning within one week to the ED again.

This case addresses the defining attributes of spillover effects wherein the intervention resulted in unintentional impacts such as decreased patient satisfaction, clinician turnover, nurse moral distress, patient adverse events and increased patient re-admissions. The department did not intend from the outset for a systemic intervention to cause clinician moral distress impacting clinician performance and patient outcomes. The resulting spillovers of increased efficiency in one arena (reducing wait times) included increased clinician error detrimentally impacted patient outcomes and/or reduced patient satisfaction impacting patient utilization.

The case results in negative spillovers, evidenced by increased patient utilization, clinician error, moral distress and patient dissatisfaction. Though the same entities are involved (patients, clinicians and the emergency department), different domains, or 'arenas' as mentioned in the psychology literature base, are impacted. Overall, the primary intention of the intervention was to increase patient efficiency (domain 1), while a variety of secondary domains were unintentionally impacted through spillovers (patient satisfaction, quality of care delivery, clinician turnover, patient health status, patient utilization).

### Model case: methods expansion

This case additionally highlights the need for close examination of the methods used to measure the identified spillovers. A mixed-methods approach could be used to elucidate such effects mentioned within the case, particularly within an economic evaluation [43,44]. For example, a cost–benefit analysis could be conducted to quantify the impact of the new triage intervention, with spillover effects evaluated through increased patient re-admission costs and clinician turnover-rate costs. Furthermore, qualitative methodologies could be used to elucidate the systemic impacts on clinician challenges linked to fulfilling the identified workflow. Mixed-methods approaches could be employed to assess the quantifiable aspects of these spillovers, with qualitative methods informing the moral distress, intention to leave the workplace and patient dissatisfaction [43,44]. Thus, a variety of measurement strategies could be employed to best understand spillovers in the context of a health system intervention.

### Contrary case

An ED creates a triage configuration to rapidly assess patients. Upon evaluating performance metrics, ED identifies that on a daily basis, 70% of the total patients seen in the ED who are low-acuity patients are successfully being treated and discharged from this new triage configuration. The physicians and nurses who work in the main section of the ED have noticed that the time to treat patients who are high acuity has decreased, meaning clinicians are seeing the sickest patients faster than before the intervention. This is a contrary case to a spillover because the implementation of the new triage configuration is intended to increase efficiency for low- and high-acuity patients. The ED aimed to treat 70% of the patients through a rapid assessment configuration in order to increase time to treat efficiency for high-acuity patients. Only one domain is impacted in this case – patient efficiency – given that it is the ED's intent to reduce wait times for all patients due to a workflow change. Thus, this case lacks the attributes of two entities and being unintentional in nature.

### Identifying antecedents

Antecedent identification helps to understand the characteristics of attributes of spillover effects that exist prior to fulfillment of the concept [9]. There are two antecedents of spillovers: an intentional first action and a desired outcome. The intentional first action is the act of delivering or implementing a primary process. The desired outcome is inherently linked to the first action. A first action would be considered, for example, the development of a new healthcare technology to help patients with chronic pain. The desired outcome of technological advancement would be to reduce a patient's perceived or pathophysiologic suffering from pain. An initial action and desired

outcome are an antecedent because it determines the first entity or domain impacted in the spillover effect cascade. The secondary aspect, or consequences of the spillover effect involves impacts to secondary entities. Consequences are discussed in subsequent paragraphs.

### Identifying consequences

Consequences are resulting events or phenomena that emerge from the identified concept [9]. As previously described, consequences of spillovers are considered the unintentional impacts resulting from an intentional first action and can have positive or negative impacts. The magnitude of the spillover effect consequences varied among the disciplines reviewed and provided rich perspectives on micro- and macro-level impacts among various entities under study. For example, the business literature predominantly described spillover effects as having a large-scale impact as various industries were involved [39–41]. Geographic context strongly influenced the transference of knowledge and innovation spillovers [39,41].

Similarly, health economic spillovers were discussed in the context of scientific innovation, however the majority of studies discussed spillover impacts between individuals [26]. Specifically, individuals with illnesses and their social networks were the focus of health economic spillover effect research [19,20]. Health economic studies, therefore focused mostly on individual versus industry spillovers. A noted methodological consequence of measuring spillovers relates to the issue of double-counting [25]. An example is in the case of a patient experiencing depression or anxiety related to watching a family or clinician caregiver provide challenging care. This situation poses a methodological risk of double counting, in which the quality of life decrement is 'counted' as a utility for the patient when it could already be 'counted' in the utility of the caregivers [25].

The discipline of psychology also discussed smaller magnitude spillovers within the family unit, however behavioral spillover literature addressed environmental spillovers on a national level of larger magnitude [32,33]. Finally, spillovers within the sociology context assessed broader societal impacts of policies, processes, or access challenges [35–37]. Though individual family unit spillovers were assessed, a broader spillover focus was on societal impacts. The analyzed literature expressed a variety of spillover effect impacts that are important to consider in developing research around spillovers.

### Identifying empirical referents

The final stage of Walker and Avant's approach [9] is identifying empirical referents, specifically how the concept is measured. The measurement of spillover effects was identified as highly variable across the various disciplines. Although definitions of spillovers across the disciplines overlap, there existed noted differences in the measurement of spillovers among the examined literature.

Spillovers evaluated within the fields of psychology, sociology and business have used both qualitative, quantitative and mixed-methods approaches to assess spillover effects. In the sociology context, Timmermans and colleagues [37] evaluated how lack of health insurance affects religious institutions and school (kindergarten–12th grade) functioning. Using in-depth, qualitative interviewing methods, the authors found negative education spillovers relevant to increased student absenteeism, as well as increased ED utilization rates and 'waiting illnesses out' (p. 367) [37]. In examining spillover crime impacts, Braga and colleagues [38] used a quasi-experimental design and regression analysis to examine gang shooting trends. During data collection for the study, the team employed qualitative interviewing to gain insight into shooting events, relationships between gang victims and other contextual information relevant to gun-related gang activity [38]. Spillover inclusion in the examined business literature has predominantly included quantitative regression analyses of market impacts or consumer behaviors [39,40].

Within the health economic literature, quantitative approaches to assess spillovers have dominated over qualitative approaches. Health economic studies have assessed spillovers using state-preference valuation techniques, such as surveys like the EuroQoL-5 Dimension (EQ-5D-3L) and the Short Form-6 Dimension (SF-6D) to assess individuals' health status [45,46]. Such surveys ask participants to rate their health within a wide range of dimensions such as sleep quality, anxiety/depression, pain/discomfort and more. Data from these surveys are then quantitatively evaluated using regression-based or correlational analyses to understand associations between patient health quality and caregiver quality to determine potential spillovers [23].

Additional spillover assessments in economic evaluations include discrete choice experiments, where caregivers are given a set of scenarios and are asked to select their preferences of variables/choices within specific scenarios [15]. Such assessments are useful in determining willingness-to-accept values regarding caregiver informal care payment [20,28].

Other spillover assessments include accounting for displaced time due to caregiving through opportunity costs in economic models and recording caregiver tasks in diary logs [13].

Qualitative approaches have been used sparsely in health economic studies [47]. One identified study by Canaway and colleagues [19] used in-depth interviewing and hierarchical mapping to identify the social networks of end-of-life (EOL) patients [19]. The authors found that EOL patient caregiving network size was dependent on disease trajectory; EOL patients had an average of eight close family members/and or caregivers. Information gleaned from the interviews can be used by economists to assess the emotional and personal connectedness spillover effects of EOL caregiving within a network [19].

Despite the use of mixed-methods and qualitative approaches in the fields of psychology and sociology, qualitative methodologies are less prominent in health economics literature. No general consensus existed among the selected literature on how to universally assess spillovers. The implications of the identified diverse approaches to assessing spillover effects is discussed in subsequent paragraphs.

### Implications for health economics & comparative effectiveness research

Implications from this concept analysis include expanding the types of spillover effects assessed in economic evaluations, as well as the methods used to assess spillovers. First, this concept analysis demonstrates an opportunity to expand spillover effect analyses to include entities beyond family caregivers or scientific innovation advancement in the future. Health economic studies have evaluated spillovers between healthcare markets in a similar manner to inter-industry spillovers in the business literature. However, increased opportunity exists in quantifying spillovers beyond the patient social network to include frontline caregivers, systems-level spillovers of health interventions (i.e., increased outpatient clinic visits, ED re-admissions) and health intervention spillovers to manufacturing industries [19]. Additionally, there is a gap in understanding the existence and potential impact of multiple spillovers occurring at the same time. Future research is needed to understand multidimensional spillovers, where, for example, an entity experiences multiple spillover effects at once. Family caregivers, for example, may experience health spillovers while informally caring for a sick loved one while simultaneously experiencing financial spillovers from a new medication for the patient's symptom relief.

Second, the examined methods used to assess spillover effects (empirical referents) from the examined literature can be applied to health economic studies to further elaborate on spillover effects comprehensively. Qualitative methodologies, for example, can be used to best elaborate on spillover effects that may be challenging to quantify in traditional spillover effect measures such as regression analyses, choice experiments or surveys. Dopp and colleagues [44] suggest that qualitative perspectives can facilitate mixed-method approaches in economic evaluations to fill a 'qualitative residual' where stakeholder and contextual information is traditionally absent (p. 2). The mixed approaches to assessing spillovers, for example in the sociology literature, where qualitative methods were used, suggests that spillovers may employ rich, descriptive contextual perspectives that are well-suited to compare health interventions [18,37]. Qualitative methodologies are well suited to assess spillovers due to inherent epistemological underpinnings in thick, contextual descriptions, emic–etic (insider, outsider) perspectives and observational data on drivers and mechanisms of topics under study [48–50,53]. Inclusion of qualitative methods to assess spillovers in economic studies may result in the investment of healthcare resources that are appropriately allocated to targeted populations. The subsequent section addresses factors to consider when integrating spillover effect assessments into health economic research.

### Expanding spillover effect inclusion in health economic studies

Figure 1 can be used as a framework to guide spillover effect inclusion in health economic evaluations. Adapted from Galizzi and Whitmarsh's [29], methodological recommendations for behavioral spillovers, relevant questions to consider about spillover effect inclusion based on Figure 1 factors are listed below.

Context: What is the setting where the spillover effect(s) takes place?

Entities: What are the entities, domains and/or populations involved? What is the intended (directed) and unintended impact? What are any targeted interventions targeting directed outcomes?

Magnitude: What are the potential outcomes from the intended outcome? What is the breadth and depth of the impacts?

Methods: Can these spillovers best be elucidated through experimental or non-experimental approaches? Are there opportunities for qualitative or mixed-method approaches?

**JA-598**



**Figure 1.**   Framework for spillover effect research inclusion.

    The highlighted factors are gleaned from the concept analysis and were developed after assessing relevant attributes, antecedents, definitions and overall characteristics of spillover effects. The first relevant factor–context describes the need to identify the environment where the spillover effect takes place. Such settings could include a hospital, a patient/family home, a healthcare corporation, or an academic evaluation of a healthcare market. The second important factor to consider is entities and domains. This factor aims to identify what/who is the entity intended to be impacted and which entity is receiving a potential spillover impact. Subsequently, the third domain is the magnitude or overall impact of spillovers. Magnitude can be considered a geographic, interpersonal or interindustry impact. Estimating the potential magnitude can aid in understanding the extent to which the spillover needs to be studied. A final consideration is the methods approach. Finally, methods selection should be guided by the contextual, entity and magnitude considerations. Such evaluation of important factors driving spillover effects, as determined from this concept analysis, can guide spillover effect integration in health economic studies.

## Conclusion

This concept analysis expands definitions and characteristics of spillover effects for consideration in health economic studies. Few health economic studies to date adequately incorporate spillover effects and when incorporated, most evaluations focus on family spillovers evaluated quantitatively [20]. Spillover effects serve a role in enhancing the societal perspective of a study, given that they reveal contexts and unintended effects of a strategy or intervention on various groups or entities that have been traditionally overlooked in a traditional economic model [25,51]. This concept analysis used a multidisciplinary lens to identify defining characteristics of spillover effects to expand considerations of spillover effects for use in health economic evaluations.

---

**Summary points**

- Within health economics research, spillover effects are traditionally considered the health impacts of an intervention unintentionally imparted upon the family member of an ill individual. Broader considerations of spillover effects can enhance economic evaluations.
- A concept analysis was conducted across academic disciplines. Key attributes included: lack of intention (unintentional), positive or negative impacts and two entity/domain involvement. An initial action and targeted outcome were identified as antecedents of spillover effects. Consequences varied in terms of magnitude and domain of impact across industries, life domains and interpersonal relationships.
- Expanded conceptualizations of spillover effects can strengthen economic evaluations. Economic evaluations assessing spillovers should consider the context, entities and magnitude of spillovers to inform method selection.

---

### Author contributions

KJ Muir contributed substantially to manuscript conception and design, literature review and drafting of manuscript work. J Keim-Malpass contributed substantially to manuscript conception and design, drafting of manuscript work and revisions of drafts. Both authors agree to be accountable for all aspects of the work, inclusive of manuscript integrity.

### Financial & competing interests disclosure

The authors have no relevant affiliations or financial involvement with any organization or entity with a financial interest in or financial conflict with the subject matter or materials discussed in the manuscript. This includes employment, consultancies, honoraria, stock ownership or options, expert testimony, grants or patents received or pending, or royalties.

No writing assistance was utilized in the production of this manuscript.

### References

Papers of special note have been highlighted as: ● of interest

1   Kamal AH, Wolf SP, Troy J *et al.* Policy changes key to promoting sustainability and growth of the specialty palliative care workforce. *Health Aff.* 38(6), 910–918 (2019).

2   Dowd B, Nyman JA. cost–effectiveness analysis in the context of us commercial health insurance. *Pharmacoeconomics* 37(6), 743–744 (2019).

3   Ward MJ, Bonomo JB, Adeoye O *et al.* cost–effectiveness of diagnostic strategies for evaluation of suspected subarachnoid hemorrhage in the emergency department. *Acad. Emerg. Med.* 19(10), 1134–1144 (2012).

4   Drummond MF, Sculpher MJ, Claxton K, Stoddart GL, Torrance GW. *Methods for the Economic Evaluation of Health Care Programmes.* NY, USA, USA (2015).

5   Sanders GD, Neumann J, Basu A *et al.* Recommendations for conduct, methodological practices and reporting of cost–effectiveness analyses: second panel on cost–effectiveness in health and medicine. *JAMA* 316(10), 1093–1103 (2016).

6   Basu A, Meltzer D. Implications of spillover effects within the family for medical cost–effectiveness analysis. *J. Health Econ.* 24(4), 751–773 (2005).

7   Gold M. Panel on cost–effectiveness in health and medicine. *Med. Care* 34(12), DS197–DS199 (1996).

8   Sanders GD, Neumann PJ, Basu A *et al.* Recommendations for conduct, methodological practices and reporting of cost–effectiveness analyses: second panel on cost–effectiveness in health and medicine. *JAMA* 316(10), 1093–1103 (2016).

9   Walker LO, Avant KC. *Strategies for Theory Construction in Nursing. (4th Edition).* Pearson Education, NJ, USA (2004).

10   Lin PJ, D'Cruz B, Leech AA *et al.* 2019. Family and caregiver spillover effects in cost-utility analyses of Alzheimer's disease interventions. *Pharmacoeconomics* 37(4), 597–608 (2019).

11   Tubeuf S, Saloniki EC, Cottrell D. Parental health spillover in cost–effectiveness analysis: evidence from self-harming adolescents in England. *Pharmacoeconomics* 37(4), 513–530 (2019).

●   **Used data from a randomized, controlled trial comparing two interventions for self-harming adolescents, family therapy with treatment as usual. Findings suggested that parents' utility values increased throughout the duration of the trial and were positively associated with their adolescent's health status, measured by utility values.**

12   Wittenberg E, James LP, Prosser LA. Spillover effects on caregivers' and family members' utility: a systematic review of the literature. *Pharmacoeconomics* 37(4), 475–499 (2019).

13   Grosse SD, Pike J, Soelaeman R, Tilford JM. Quantifying family spillover effects in economic evaluations: measurement and valuation of informal care time. *Pharmacoeconomics* 37(4), 461–473 (2019).

14   Jacobs JC, Van Houtven CH, Tanielian T, Ramchand R. Economic spillover effects of intensive unpaid caregiving. *Pharmacoeconomics* 37(4), 553–562 (2019).

**JA-600**



15   Hurley J, Mentzakis E. Health-related externalities: evidence from a choice experiment. *J. Health Econ.* 32(4), 671–681 (2013).

16   Baicker K, Robbins JA. Medicare payments and system-level health-care use: the spillover effects of Medicare managed care. *Am. J. Health Econ.* 1(4), 399–431 (2015).

17   Brown CC, Tilford JM, Payakachat N *et al.* Measuring health spillover effects in caregivers of children with autism spectrum disorder: a comparison of the eq-5d-3l and sf-6d. *Pharmacoeconomics* 37(4), 609–620 (2019).

18   Campbell JA, Ezzy D, Neil A *et al.* A qualitative investigation of the health economic impacts of bariatric surgery for obesity and implications for improved practice in health economics. *Health Econ.* 27(8), 1300–1318 (2018).

•   **Cost-effectiveness analysis on bariatric surgery; authors finds positive human capital spillovers from patients reflecting positive self-worth into their productivity as an employee in the workplace after bariatric surgery.**

19   Canaway A, Al-Janabi H, Kinghorn P *et al.* Close-person spill-overs in end-of-life care: using hierarchical mapping to identify whose outcomes to include in economic evaluations. *Pharmacoeconomics* 37(4), 573–583 (2019).

20   Hoefman RJ, van Exel J, Brouwer WBF. The monetary value of informal care: obtaining pure time valuations using a discrete choice experiment. *Pharmacoeconomics* 37(4), 531–540 (2019).

21   McCabe C. Expanding the scope of costs and benefits for economic evaluations in health: some words of caution. *Pharmacoeconomics* 37(4), 457–460 (2019).

22   Al-Janabi H, McLoughlin C, Oyebode J *et al.* Six mechanisms behind carer wellbeing effects: a qualitative study of healthcare delivery. *Soc. Sci. Med.* 235, 112382 (2019).

23   Bhadhuri A, Jowett S, Jolly K *et al.* A comparison of the validity and responsiveness of the EQ-5D-5L and SF-6D for measuring health spillovers: a study of the family impact of meningitis. *Med. Decis. Mak.* 37(8), 882–893 (2017).

24   Miller C, Pender J, Hertz T. *Employment Spillover Effects of Rural Inpatient Healthcare Facilities.* (Economic Research Report No. (ERR-241)) (2017). https://www.ers.usda.gov/publications/pub-details/?pubid=86253

25   Brouwer WBF. The inclusion of spillover effects in economic evaluations: not an optional extra. *Pharmacoeconomics* 37(4), 451–456 (2019).

26   Lakdawalla DN, Doshi JA, Garrison LP Jr, Phelps CE, Basu A, Danzon PM. Defining elements of value in health care – a health economics approach: an ISPOR Special Task Force Report. *Value Health* 21(2), 131–139 (2018).

27   Johnson G, Figueroa JF, Zhou X, Orav EJ, Jha AK. Recent growth in Medicare Advantage enrollment associated with decreased fee-for-service spending in certain US counties. *Health Affairs* 35(9), 1707–1715 (2016).

28   Arora S, Goodall S, Viney R *et al.* Using discrete-choice experiment methods to estimate the value of informal care: the case of children with intellectual disability. *Pharmacoeconomics* 37(4), 501–511 (2019).

29   Galizzi MM, Whitmarsh L. How to measure behavioral spillovers: a methodological review and checklist. *Front. Psychol.* 10, 342 (2019).

30   Kunst JR, Løset GK, Hosøy D *et al.* The relationship between shift work schedules and spillover in a sample of nurses. *Int. J. Occup. Saf. Ergon.* 20(1), 139–147 (2014).

31   Zhou ZE, Meier LL, Spector PE. The spillover effects of coworker, supervisor and outsider workplace incivility on work-to-family conflict: a weekly diary design. *J. Organizational Behav.* 40(9–10), 1000–1012 (2019).

32   Amstad FT, Semmer NK. Spillover and crossover of work-and family-related negative emotions in couples. *Psychol. Everyday Activity* 4(1), 43–55 (2011).

33   Jones CR, Whitmarsh LE, Byrka K *et al.* Methodological, theoretical and applied advances in behavioural spillover. *Front. Psychol.* 10, 2701 (2019).

34   Nash N, Whitmarsh L, Capstick S *et al.* Climate-relevant behavioral spillover and the potential contribution of social practice theory. *WIREs Clim. Change* 8, e481 (2017).

35   Aranda E, Menjívar C, Donato KM. The spillover consequences of an enforcement-first u.s. immigration regime. *Am. Behav. Sci.* 1687–1695 (2014).

36   Hagan J, Foster H. Children of the american prison generation: student and school spillover effects of incarcerating mothers. *Law Soc. Rev.* 46(1), 37–69 (2012).

37   Timmermans S, Orrico LA, Smith J. Spillover effects of an uninsured population. *J. Health Soc. Behav.* 55(3), 360–374 (2014).

•   **Uses open-interviewing, qualitative methods to elucidate the effects of a lack of insurance on two institutions, churches and schools. Negative spillover effects noted with increased absenteeism within schools, while less spillovers were noted in religious institutions.**

38   Braga AA, Zimmerman G, Barao L, Farrell C, Brunson RK, Papachristos AV. Street gangs, gun violence and focused deterrence: comparing place-based and group-based evaluation methods to estimate direct and spillover deterrent effects. *J. Res. Crime Delinquency* 56(4), 524–562 (2019).

39   Frischmann BM, Lemley MA. Spillovers. *Colum. L. Rev.* 107, 257 (2007).

40   Sahni NS. Advertising spillovers: evidence from online field experiments and implications for returns on advertising. *J. Marketing Res.* 53(4), 459–478 (2016).

41  Grillitsch M, Nilsson M. Innovation in peripheral regions: do collaborations compensate for a lack of local knowledge spillovers? *Ann. Reg. Sci.* 54(1), 299–321 (2015).

42  Merriam-Webster. *Merriam-Webster Online* (2020). https://www.merriam-webster.com/dictionary/spillover?utm_campaign=sd&utm_medium=serp&utm_source=jsonld

43  Jemna LM. Qualitative and mixed research methods in economics: the added value when using qualitative research methods. *J. Public Admin. Finance Law* 154–67 (2016).

44  Dopp AR, Mundey P, Beasley LO *et al.* Mixed-method approaches to strengthen economic evaluations in implementation research. *Implement. Sci.* 14(1), 1–9 (2019).

•  **Overview of qualitative methodological integration into mixed methods research. Asserts that elucidation of patient preferences can be overlooked when qualitative investigations are omitted from economic evaluations.**

45  Brazier J, Roberts J, Tsuchiya A. A comparison of the EQ-5D and SF-6D across seven patient groups. *Health Econ.* 13(9), 873–884 (2004).

46  Brooks R, Group E. EuroQol: the current state of play. *Health Pol.* 37(1), 53–72 (1996).

47  Husbands S, Jowett S, Barton P *et al.* How qualitative methods can be used to inform model development. *Pharmacoeconomics* 35(6), 607–612 (2017).

48  Kauffman KS. The insider/outsider dilemma: field experience of a white researcher "getting in" a poor black community. *Nursing Res.* 43(3), 179–183 (1994).

49  Wolcott HF. On ethnographic intent. *Educat. Admin. Q* 21(3), 187–203 (1985).

50  Lincoln YS, Guba EG. *Naturalistic Inquiry.* Sage Publications Inc., CA, USA (1985).

51  Siebert U, Alagoz O, Bayoumi AM *et al.* Conceptualizing a model: a report of the ispor-smdm modeling good research practices task force-2 mark. *Med. Decis. Mak.* 32(5), 678–689 (2012).

52  Coast J. Qualitative methods for health economics. Rowman & Littlefield, MD, USA, 261–270 (2009).

•  **Systematic review article evaluates the use of economic evaluations for decision making on a national and local (within hospitals or among providers) level. Institutional, methodological and cultural factors influences the use of economic evaluations for decision-making.**

**JA-602**

# EXHIBIT P

## to Expert Report of Professor Louis Klarevas

ANNALS, AAPSS, **455**, May 1981

# The Effect of Gun Availability on Violent Crime Patterns

By PHILIP J. COOK

ABSTRACT: Social scientists have started to find answers to some of the questions raised in the ongoing debate over gun control. The basic factual issue in this debate concerns the effect of gun availability on the distribution, seriousness, and number of violent crimes. Some evidence is available on each of these dimensions of the violent crime problem. The distribution of violent crimes among different types of victims is governed in part by the "vulnerability pattern" in weapon choice. The seriousness of robbery and assault incidents is influenced by weapon type, as indicated by the objective dangerousness and instrumental violence pattern. A reduction in gun availability would cause some weapon substitution and probably little change in overall robbery and assault rates—but the homicide rate would be reduced.

---

*Philip J Cook is an associate professor of public policy studies and economics, Duke University His research has focused primarily on the criminal justice system and other aspects of social regulation He has collaborated with Mark H Moore on a series of studies relating to gun control*

63

THE DEBATE over the appropriate degree of governmental regulation of firearms has been a prominent feature of the political landscape for the last two decades. The claims and counterclaims for various gun control strategies have been bruited in congressional and state legislative hearings, political campaigns, editorials, and bumper strips. The issues are by this time familiar to even disinterested bystanders: the proper interpretation of the Second Amendment, the value of guns as a means of defense against burglars, or foreign invaders, or local tyrants, the difficulty of depriving criminals of guns without depriving the rest of us of basic rights, and so forth. This "great American gun war"[1] clearly involves both value questions and questions of fact, and the latter have been the subject of numerous statistical skirmishes. Strangely, however, the relevant factual questions have not attracted much attention from scholars until very recently. The role of guns—and other types of weapons—in violent crime is a fit and important subject for scientific inquiry. No etiological theory of violent crime is complete without due consideration of the technology of violent crime. This would be true even in the absence of political interest in gun control.

Each of the major categories of violent crime—criminal homicide, aggravated assault, robbery, and rape—is committed with a variety of weapons. Guns are used in a minority of violent crimes, but are of special concern because they are used in almost two thirds of the most serious events, criminal homicides,

and because, unlike most other commonly used weapons (hands, kitchen knives, and baseball bats), it is conceivable that we might reduce the availability of guns without imposing unacceptable costs on the public. The principal factual question in the gun control debate is whether reducing gun availability would reduce the amount and/or seriousness of violent crime. Can potential violent criminals be deterred from obtaining guns, carrying guns, and using guns in crime? If so, will this reduction in gun use make any difference, or will criminals simply substitute other weapons to equal effect? The answers to these questions are crucial to policy evaluation. Our ability to answer these questions—to make accurate predictions about the effects of legal interventions in this area—is one measure of our scientific understanding of the role of weapons in violent crime.

At the sacrifice of some dramatic tension, I provide a preview of my results here. The type of weapon used in a violent crime is in part determined by the nature of the victim; guns are most likely to be used against the least vulnerable victims in robbery and homicide. The type of weapon used in a violent crime influences the outcome of the crime: gun robberies, when compared with other types of robbery, are more likely to be successful, less likely to result in injury to the victim, and more likely to result in the victim's death; gun assaults are more likely to result in the victim's death than knife assaults, *ceteris paribus*. A general increase in gun availability would probably have little effect on the overall robbery rate, but would increase the homicide rate, including the rate of robbery murder, and possibly reduce

---

1. A phrase coined by B. Bruce-Briggs, "The Great American Gun War," *The Public Interest*, 45:1–26 (fall 1976).

the number of aggravated assaults These and other predictions emerge from the empirical results presented here My overall conclusion is that the technology of violent crime matters a great deal in a number of dimensions, with important implications for the gun control debate

## THE BASIC ISSUES

Gun control measures come in a variety of forms, but most share the objective of reducing the availability of guns for use in violent crime Most federal and state gun regulations in the United States are moderate interventions intended to reduce criminal use while preserving the majority's access to guns for legitimate uses.[2] Washington, D C , and New York City have adopted a much broader attack on the handgun problem, with a ban on sales to all but a few people Whether the regulations are moderate or extreme, some opponents of gun control insist that a regulatory approach will be ineffective in reducing criminal violence Their position is summarized in two bumper strips. "When guns are outlawed, only outlaws will have guns," and "Guns don't kill people—people kill people." The former suggests that "outlaws" will acquire guns, despite whatever steps are taken to stop them, that is, that criminals will continue to do what is necessary to obtain guns, even if the price, hassle, and legal threats associated with obtaining a gun are increased substantially. The latter bumper strip apparently is meant to suggest that people who decide to kill will find a way even if they do not have access to guns. This is one aspect of a more general issue, the degree of "sub-

stitutability" between guns and other weapons in homicide and other violent crimes. In short, does the type of weapon matter?

Supposing that we were somehow successful in discouraging some violent people from obtaining guns and using them in crime, how might violent crime patterns change? Three dimensions of the violent crime problem are important. (1) the *distribution* of robberies, aggravated assaults, rapes, and homicides across different types of victims, for example, commercial versus noncommercial robbery, (2) the *seriousness* of robberies, rapes, and aggravated assaults, and (3) the overall *rates* of each of these crimes These three dimensions are considered in turn in the next three sections.[3]

## DISTRIBUTION: THE VULNERABILITY PATTERN

People who attempt robbery or homicide are more likely to succeed with a gun than with other commonly used weapons A gun is particularly valuable against victims who are physically strong, armed, or otherwise relatively invulnerable—the gun is "the great equalizer." The patterns of weapon use in criminal homicide and robbery demonstrate that perpetrators are most likely to use guns against victims who would have the best chance of defending themselves against other weapons, that is, the likelihood of a gun being chosen by a robber or killer increases with the value of a gun in effecting a successful completion of the crime. These observations suggest that a program that is successful in re-

---

2  For a summary of federal and state gun control measures, see my article, with James Blose, in this issue

3  I am indebted to Mark Moore for this approach to carving up the violent crime problem  In the review that follows I omit any discussion of rape, since relevant empirical studies are lacking for this crime

ducing the rate of gun ownership by potential robbers or killers will change the relative distribution of these crimes among different types of victims. The evidence and implications of the vulnerability pattern are presented in the following sections, beginning with criminal homicide.

*Criminal homicide*

A decision to kill is easier and safer to implement with a gun than with other commonly available weapons—there is less danger of effective victim resistance during the attack, and the killing can be accomplished more quickly and impersonally, with less sustained effort than is usually required with a knife or blunt object A gun has greatest value against relatively invulnerable victims, and the vulnerability of the victim appears to be an important factor in determining the probability that a gun will be used as the murder weapon

The least vulnerable victims are those who are guarded or armed All presidential assassinations in U S. history were committed with a handgun or rifle. Almost all law enforcement officers who have been murdered in recent years were shot: in 1978, 91 of 93 murdered officers were killed by guns.[4]

Physical size and strength are also components of vulnerability. In 1977, 68.5 percent of male homicide victims were shot, compared with only 51.0 percent of female homicide victims.[5] The victims' age pattern of gun use also reflects the vulnerability pattern about 70 percent of victims aged 20–44 are shot, but this fraction drops off rapidly for younger and older—that is, more vulnerable—victims.[6]

Vulnerability is of course a relative matter. We would expect that the lethality of the murder weapons would be directly related to the difference in physical strength between the victim and killer, other things being equal. To investigate this hypothesis, I used FBI data coded from the supplemental homicide reports submitted for 1976 and 1977 by police departments in 50 large cities. These data include the demographic characteristics of the victim and, where known, the offender, as well as the murder weapon, immediate circumstances, and apparent motive of the crime The results calculated from these data tend to confirm the relative vulnerability hypothesis. First, women tend to use more lethal weapons to kill their spouses than do men. 97 percent of the women, but only 78 percent of the men, used a gun or knife The gun fractions in spouse killings are 67 percent and 62 percent, respectively—not a large difference, but one that is notable, since women typically have less experience than men in handling guns and are less likely to think of any guns kept in the home as their personal property. It is also true that women who kill their "boyfriends" are more likely to use a gun than men who kill their "girlfriends."

Table 1 focuses on killings resulting from arguments and brawls in which both the killer and the victim were males The gun fraction increases with the age of the killer and is inversely related to the age

4 FBI, *Crime in the United States, 1978* (Washington, DC U S Government Printing Office)

5 U S Department of Commerce, Bureau of the Census, *Statistical Abstract of the U S , 1978* (Washington, DC U S Government Printing Office)

6 FBI

Case 3:22-cv-01118-JAM Document 37-302 Filed 01/31/23 Page 339 of 517

TABLE 1

GUN USE IN MURDERS AND NONNEGLIGENT HOMICIDES RESULTING FROM
ARGUMENTS OR BRAWLS, MALE VICTIM AND MALE OFFENDER

| | OFFENDER S AGE | | |
|---|---|---|---|
| VICTIM S AGE | 18–39 | 40–59 | 60+ |
| 18–39 (in percentage) | 68 0 | 79 6 | 87 2 |
| N* | 1906 | 368 | 47 |
| 40–59 (in percentage) | 54 5 | 64 1 | 66 7 |
| N | 398 | 245 | 57 |
| 60+ (in percentage) | 48 3 | 49 2 | 63 3 |
| N | 58 | 61 | 30 |

SOURCE FBI Supplemental Homicide Reports, 50 large cities, 1976 and 1977 combined (unpublished)
* N = the sample size that is, the denominator of the fraction Cases in which the age of the killer is not known are excluded

of the victim. the highest gun fraction—87 percent—involves elderly killers and youthful victims, the lowest gun fraction—48 percent—involves youthful killers and elderly victims. Since age is highly correlated with strength and robustness, these results offer strong support for the relative vulnerability hypothesis.

Why are less vulnerable murder victims more likely to be shot than relatively vulnerable victims? A natural interpretation of this result is that intended victims who are physically strong or armed in some fashion are better able to defend themselves against homicidal assault than more vulnerable victims—unless the assailant uses a gun, the "great equalizer." The "vulnerability pattern" can then be explained as resulting from some combination of three mechanisms. (1) Homicidal attacks are more likely to fail against strong victims than weak ones, and the difference in the likelihood of failure is greater for nongun attacks than attacks with a gun. (2) The likelihood that an individual will act on a homicidal impulse depends in part on the perceived probability of success The intended

victim's ability to defend himself acts as a deterrent to would-be killers—but this deterrent is much weaker if the killer has a gun than otherwise. (3) In the case of a planned murder, the killer will have the opportunity to equip himself with a tool that is adequate for the task. Against well-defended victims, the tool chosen will almost certainly be a gun, if one can be obtained without too much difficulty.

Each of these mechanisms is compatible with the prediction that a reduction in gun availability will cause a reduction in homicide, a reduction that will be concentrated on killings that involve a victim who is physically stronger than the killer. A number of specific hypotheses are suggested by this observation, including the following: a reduction in gun availability will reduce the male:female victimization ratio in killings of spouses and other intimates, reduce the fraction of homicide victims who are youthful males, and reduce the fraction of killers who are elderly.

*Robbery*

Robbery is defined as theft or attempted theft by means of force or

the threat of violence.[7] The robber's essential task is to overcome through intimidation or force the victim's natural tendency to resist parting with his valuables A variety of techniques for accomplishing this task are used in robbery, including actual attack—as in "muggings" and "yokings"—and the threatening display of a weapon such as a gun, knife, or club. Whatever the means employed, the objective is to quickly gain the victim's compliance or to render him helpless, thereby preventing the victim from escaping, summoning help, or struggling The amount of what could be called "power"—capability of generating lethal force—the robber needs to achieve these objectives with high probability depends on the characteristics of the robbery target—victim—and in particular on the vulnerability of the target The most vulnerable targets are people who are young, elderly, or otherwise physically weak or disabled—for example, by alcohol—who are alone and without ready means of escape The least vulnerable targets are commercial places, especially where there are several customers and clerks and possibly even armed guards—a bank being one extreme example

A gun is the most effective tool for enhancing the robber's power. Unlike other common weapons, a gun gives a robber the capacity to threaten deadly harm from a distance, thus allowing him to maintain a buffer zone between himself and the victim and to control several victims simultaneously A gun serves to pre-empt any rational victim's inclination to flee or resist[8] Wesley Skogan documented the effectiveness of a gun in forestalling victim resistance in his analysis of a national sample of victim-reported robberies,[9] only 8 percent of gun robbery victims resisted physically in noncommercial robberies, compared with about 15 percent of victims in noncommercial robberies involving other weapons[10] Other types of resistance—arguing, screaming, and fleeing—were also less common in gun robbery than in robbery involving other weapons.

It seems reasonable to assume that, from the robber's viewpoint, the value of employing a gun tends to be inversely related to the vulnerability of the target A gun will cause a greater increase in the likeli-

7  The perspective of this section was first developed in John Conklin's seminal work on robbery in Boston *Robbery and the Criminal Justice System* (Philadelphia J B Lippincott, 1972)

8  Ibid, pp 110–11, Conklin analyzes a gun's usefulness in terms of the ability it provides the robber to (1) maintain a buffer zone, (2) intimidate the victim, (3) make good the threat, if necessary, and (4) ensure escape

9  Wesley Skogan, "Weapon Use in Robbery Patterns and Policy Implications," unpublished manuscript (Northwestern University Center for Urban Affairs, 1978) He used the robbery incident reports collected from the National Crime Panel, which occurred during calendar year 1973 It should be noted that any analysis of victim survey data relies on the victim's impression of the nature of the weapon that was employed in the robbery In some cases the "gun" may be a toy, or simulated, Floyd Feeney and Adrianne Weir [*The Prevention and Control of Robbery A Summary,*" unpublished manuscript (University of California, Davis Center on Admin of Criminal Justice, 1974) report that of 58 "gun" robbers interviewed in Oakland, 3 claimed to have used toys and 4 to have simulated the possession of a gun

10  Richard Block [*Violent Crime* (Lexington, MA Lexington Books, 1977)] found from studying robbery police reports in Chicago that victims who resisted with physical force typically (68 percent) did so in response to the robber's use of force Other types of resistance typically (70 percent) preceded the robber's use of force

hood of success against well-defended targets than against more vulnerable targets. A strong-arm technique will be adequate against an elderly woman walking alone on the street—a gun would be redundant with such a victim—but a gun is virtually a requirement of successful bank robbery. Skogan provides evidence supporting this claim he finds little relationship between robbery success rates and weapon type for personal robbery, but a very strong relationship for commercial robbery He reports that success rates in commercial robbery were 94 percent with a gun, 65 percent with a knife, and 48 percent with other weapons [11]

In economic terms, we can characterize robbery as a production process with weapons, robbers, and a target as "inputs"[12] The "output" of the production process can be defined as the probability of success This probability increases with the number and skill of the robbers, the vulnerability of the target, and the lethal effect of the weapons For given robber and target characteristics, the "marginal product" of a gun can be defined as the increase in probability of success if the robber(s) substitute a gun for, say, a knife The evidence presented in the preceding paragraphs suggests that the marginal product of a gun is small against vulnerable targets and is relatively large against well-defended targets We can go one step further and define the "value of a gun's marginal product" as its marginal product (increase in success probability) multiplied by the amount of loot if the robbery is successful Since for obvious reasons, targets with greater potential loot tend to be better defended against robbery,[13] the *value* of the gun's marginal product is even more strongly related to target vulnerability than is the marginal product of the gun The conclusion can be put in the form of a proposition.

The economic value of a gun in robbery tends to be greatest against commercial targets and other well-defended targets, and least against highly vulnerable targets.

It makes good economic sense, then, for gun use in robbery to be closely related to target vulnerability This is indeed the case, as demonstrated in Table 2, which is based on tabulating results of more than 12,000 robbery reports taken from victim survey data gathered in 26 large cities

From Table 2, we see that 55 percent of gun robberies committed by adults, but only 13 percent of other adult armed robberies, involve commercial targets. Those relatively few gun robberies that were committed against people on the street are concentrated on relatively invulnerable targets—groups of two or more victims or prime-age males—while street robbery with other weapons was more likely to involve women, children, and elderly victims Skogan

---

11  Skogan

12  This perspective is further developed in Philip J Cook, "The Effect of Gun Availability on Robbery and Robbery Murder A Cross Section Study of Fifty Cities," in *Policy Studies Review Annual*, eds Robert H Haveman and B Bruce Zellner, Vol 3 (Beverly Hills, CA Sage, 1979), pp 752–53 (hereafter cited as "The Effect of Gun Availability")

13  It is obvious that commercial targets tend to be more lucrative than noncommercial and that a group of two or more victims will be more lucrative on the average than a single victim Feeney and Weir (p 24) report the not-so-obvious result that robberies of male victims resulted in a much higher median take ($50) than robberies of female victims (less than $20)

Case 3:22-cv-01118-DJN Document 37-30 Filed 01/31/23 Page 342 of 517

TABLE 2

DISTRIBUTION OF ROBBERIES (IN PERCENTAGE)

| ALL ROBBERIES ACROSS LOCATIONS | | | |
|---|---|---|---|
| | GUN | KNIFE OR OTHER WEAPON | UNARMED |
| Commercial | 55 1 | 13 3 | 19 1 |
| Residence | 6 4 | 10 4 | 8 5 |
| Street, vehicle, and so forth | 38 5 | 76 3 | 72 4 |
| Total | 100 0 | 100 0 | 100 0 |

| STREET ROBBERIES BY VICTIM CHARACTERISTICS | | | |
|---|---|---|---|
| | GUN | KNIFE OR OTHER WEAPON | UNARMED |
| Male victim age 16–54 | 59 8 | 53 8 | 41 1 |
| Two or more victims | 10 5 | 5 8 | 3 7 |
| All others (young, elderly, and/or female victim) | 29 7 | 40 4 | 55 2 |
| Total | 100 0 | 100 0 | 100 0 |

SOURCE Adapted from Philip J Cook, ' Reducing Injury and Death Rates in Robbery,  p 43 © 1980 by The Regents of the University of California. Reprinted from *Policy Analysis*, Volume 6, No 1 (Winter 1980), by permission of The Regents The distributions are calculated from National Crime Panel victimization survey data of 26 cities

NOTE All incidents involved at least one male robber age 18 or over  Entries in the table reflect survey sampling weights

provides further detail for commercial robberies, reporting that the likelihood that a gun is present in such robberies is only 44 percent for commercial places that have only one employee, but 68 percent for commercial places with two or more employees.[14]

What is the causal process that produces these patterns in gun robbery? There are two plausible explanations, both compatible with the evidence presented in the preceding paragraphs: (1) robbers who aspire to well-defended, lucrative targets equip themselves with a gun in order to increase their chance of success or (2) robbers who happen to have a gun are more tempted to rob lucrative, well-defended targets than robbers who lack this tool  In short, the question is whether the weapon is chosen to suit the task or, rather,

the available weapon helps define the task. There is doubtless some truth in both explanations.

The first explanation suggests that the observed relationship between gun use and target choice is the result of differences between the kinds of people that rob lucrative targets and those who commit relatively petty street robberies—a difference reminiscent of John Conklin's distinction between "professionals" and "opportunists."[15] Victim survey evidence does suggest that gun robbers as a group have more of the earmarks of professionalism than other armed robbers: besides the fact that they make bigger "scores," gun robbers are older, less likely to rob acquaintances, and less likely to work in large groups of three or more. The factors that determine a robber's choice of weapon have some tendency to persist: a cohort of adult

14 Ibid, calculated from figures in his Table 3

15 Ibid

men arrested for gun robbery in the District of Columbia showed a greater propensity to use guns in subsequent robberies than the corresponding cohort of nongun robbery arrestees [16]

It seems reasonable to hypothesize, then, that robbers who engage in planning and who seek out big scores will take pains to equip themselves with the appropriate weapon —usually some type of firearm. The frequency with which other less professional robbers use guns, and hence the kinds of targets they choose, may be more sensitive to the extent to which such people have access to guns and are in the habit of carrying them, for whatever reason. Increased availability of guns may then result in some target switching by this group—substitution of more lucrative, better-defended targets for more vulnerable targets Increased gun availability may also result in weapon substitution for a given type of target, implying an increase in the fraction of street robberies committed with a gun, that is, guns will be put to less valuable uses, as guns become "cheaper" These hypotheses can be stated more precisely as follows:

An increase in gun availability in a city will (1) increase the fraction of noncommercial robberies committed with a gun and (2) increase the fraction of robberies committed against commercial and other well-defended targets.

In an earlier study of robbery patterns across 50 cities,[17] I found some confirmation for the first of these two predictions, controlling for other robbery-related variables, the fraction of robberies committed with a gun increases with the density of gun ownership in a city A 10 percent increase in the fraction of households that owns guns is associated with approximately a 5 percent increase in the rate of gun robbery

## Conclusions

The preceding evidence demonstrates the existence of an important vulnerability pattern in weapon choice in homicide and robbery. Guns give assailants the power to succeed in killing or robbing relatively invulnerable victims who would have a good chance of fending off attack with a less lethal weapon If some potential killers were deprived of guns, the criminal homicide rate would be reduced The reduction would be concentrated among the least vulnerable types of potential victims—law enforcement officers, people with bodyguards, husbands of homicidal women, youthful men, and so forth. If robbers were deprived of guns, there would be a reduction in robberies against commercial places and other well-defended victims. In general, a reduction in gun availability would change the distribution of violent crimes, with greater concentration on vulnerable victims.

16 Philip J Cook and Daniel Nagin, *Does the Weapon Matter?* (Washington, DC Institute for Law and Social Research, 1979) The results cited here are based on 541 adult male gun robbery arrestees and 761 nongun robbery arrestees This cohort, which was arrested in 1973, was tracked through 1976 through Prosecutor's Management Information System (PROMIS) The robbery re-arrest rate for the gun cohort was 43 percent, of which 58 percent were gun robberies The robbery re-arrest rate for the nongun cohort was 45 percent, of which 40 percent were gun robberies The two cohorts had the same re-arrest rate for burglary (13 percent), but the nongun cohort was much more likely to be re-arrested for assaultive crimes (22 percent, as opposed to 13 percent for the gun cohort), see Table 9 of Cook and Nagin

17 Cook "The Effect of Gun Availability "

### SERIOUSNESS THE OBJECTIVE DANGEROUSNESS PATTERN

Recall that I am concerned with three dimensions of violent crime. the distribution, the seriousness, and the number of incidents. The vulnerability pattern suggests that gun availability will in certain respects influence the distribution of robberies and homicides across different categories of victims. I now turn to the seriousness dimension of violent crime. "Seriousness" in this discussion will be defined as the degree of injury to the victim A violent or potentially violent confrontation, as in robbery, rape, or assault, can result in a range of possible outcomes, from no physical harm up to serious injury or death of the victim The likelihood that the victim will be killed is influenced by the lethal effects of the weapon used by the perpetrator The evidence on this "objective dangerousness" pattern is presented first for serious assaults, and subsequently for robbery

#### Serious assaults

The fraction of serious gun assaults that result in the victim's death is much higher than for assaults with other weapons. Richard Block, for example, found that of all aggravated assaults resulting in injury to the victim—and reported to the Chicago Police—14 percent of the gun cases, but only 4 percent of the knife cases, resulted in the victim's death [18] In part, this difference is the result of differences between gun and knife attacks in intent and capability. An assailant who intends to kill his victim, and who has some chance to prepare, is more likely to equip himself with a gun than an assailant who merely intends to hurt his victim. Furthermore, an attack that is intended to kill is more likely to be successful if perpetrated with a gun than with a knife or other weapon —especially against victims who are capable of defending themselves But differences in intent and capability are not the whole story

Franklin Zimring has demonstrated that a large proportion of murders are similar to serious assaults in that the attacks are unsustained[19]—the assailant does not administer the coup de grace, the blow that would ensure the death of his victim Indeed, the victim was shot only once in about two thirds of the gun homicides in Zimring's Chicago samples These cases differ very little from serious assaults for every death resulting from a single wound in the head or chest, Zimring found 1 8 victims with the same type of wound who did not die[20]—victims who were clearly not saved by any differences in the gunman's intent or capability, but rather just by good luck with respect to the precise location of the wound

Evidently, some proportion of gun murders are not the result of a clear intent to kill, given that the majority of murders are the immediate result of altercations, often involving alcohol and rarely much thought, it seems unlikely that many killers have any clearly formulated "intent" at the time of their attack. The assailant's mental state is characterized by an impulse—to punish, avenge an insult, or stop a verbal or physical attack—backed by more or less

18  Ibid , p 33

19  Franklin Zimring, "The Medium is the Message  Firearm Calibre as a Determinant of Death from Assault," *J  Legal Studies*, I(1) 97–124 (Jan 1972), and idem, "Is Gun Control Likely to Reduce Violent Killings?" *Univ  Chicago Law Review*, 35 721–37 (1967)

20  Ibid , computed from Table 7, p 104

cathexis The immediate availability of a gun makes these circumstances more dangerous than would a less lethal weapon because an unsustained attack with a gun—a single shot—is more likely to kill than an unsustained attack with another weapon.

Zimring buttressed the conclusions from his first study, which compared knife and gun attacks, with a later study comparing large and small caliber gun attacks Even after controlling for the number and location of wounds, he found that 38 caliber attacks were more than twice as likely to kill as 22 caliber attacks [21] It appears, then, that weapon dangerousness has a substantial independent impact on the death rate from serious assaults

Zimring's seminal work in this area supports several important propositions, including

1. A restrictive gun control policy that causes knives and clubs to be substituted for guns will reduce the death rate in serious assault

2 A gun control policy that focuses on handguns may increase the death rate from gun assault if shotguns and rifles are substituted for handguns as a result [22]

3 In setting prosecution and sentencing priorities for aggravated assault cases, gun assaults should be viewed as more serious than assaults with other weapons, *ceteris paribus*, since there is a higher probability of the victim's dying in the gun assaults This is Zimring's "objective dangerousness" doctrine [23]

Richard Block extended Zimring's work on instrumentality by comparing death rates in aggravated assault and robbery cases. He concludes that "the relative fatality of different weapons in violent crime may be a technological invariant—. the probability of death given injury and a particular weapon remains relatively constant and unrelated to the type of crime committed "[24]

The notion that the number of deaths per 100 injuries is a "technical" constant, largely determined by the lethality of the weapon, is not supportable, however. Zimring demonstrated that the type of weapon was one important determinant of the outcome of serious attacks, but did not claim it was the only determinant Presumably the weapon-specific death rates in such attacks will differ across jurisdictions and vary over time depending on the mix of circumstances, the quality of medical care, and so forth Arthur Swersey presents an interesting case in point [25]

Swersey reports that the number of assaultive—as opposed to felony—gun homicides in Harlem increased from 19 in 1968 to 70 in 1973, and then fell back to 46 in 1974 Much of the change between 1968 and 1973 was from an increase in intentional killings resulting from disputes involving narcotics activities. The importance of changes in the intent of violent perpetrators during this period is indicated by the fact that the death rate in gun attacks doubled between 1968 and 1973, and then fell back in 1974 Swersey concludes that more than 80 percent

21  Ibid , 1972

22  This implication has been pointed out by Gary Kleck, "The Assumptions of Gun Control" (Florida State University, 1980) (unpublished)

23  "In the generality of cases, how likely is it that conduct such as that engaged in by the offender will lead to death?" Zimring, p 114

24  Block, p 32

25  "A Greater Intent to Kill The Changing Pattern of Homicide in Harlem and New York City" (Yale School of Organization and Management, 1980) (unpublished)

TABLE 3

Likelihood of Physical Attack and Injury in Robbery (in Percentage)

| | Gun* | Knife† | Other Weapon | Unarmed |
|---|---|---|---|---|
| **Noncommercial robbery**\*\* | | | | |
| Victim attacked | 22 1 | 39 4 | 60 4 | 73 5 |
| Victim required medical treatment† | 7 2 | 10 9 | 15 5 | 11 1 |
| Victim hospitalized overnight | 2 0 | 2 6 | 2 7 | 1 6 |
| Number of cases (not in percentage) | 892 | 841 | 1060 | 1259 |
| **Commercial robbery** | | | | |
| Victim required medical treatment | 4 8 | 10 8 | 17 9 | 5 1 |
| Victim hospitalized overnight | 1 5 | 3 5 | 6 0 | 0 4 |
| Number of cases (not in percentage) | 2307 | 288 | 117 | 570 |

Source  National Crime Panel victimization surveys of 26 cities  This table is excerpted from Philip J Cook   Reducing Injury and Death Rates in Robbery  Table 2  © 1980 by The Regents of the University of California. Reprinted from *Policy Analysis*  Volume 6  No 1 (Winter 1980)  by permission of The Regents

Note  All incidents included in this table involved at least one male robber age 18 or over  Entries in the table do not reflect the survey sampling weights  which differed widely among the 26 cities

\* Many robberies involve more than one type of weapon  Incidents of that sort were classified according to the most lethal weapon used

\*\* Robberies occurring on the street  in a vehicle  or near the victim s home

† Only about one third of the injured gun robbery victims were actually shot  Two thirds of the injured knife robbery victims were stabbed

of the rise and fall in Harlem homicides was due to changes in the number of deliberate murders  He finds a similar pattern for the rest of New York City [26]

Swersey's findings do not undermine Zimring's position  Zimring did not deny that some killings were unambiguously motivated, or that the importance of intent in murder was subject to change over time, or that it might be more important in Harlem than in Chicago. In any event, Swersey's results are useful in documenting these possibilities

My conclusions can be briefly stated  The likelihood of death from a serious assault is determined, *inter alia*, by the assailant's intent and the lethal nature of the weapon he uses  The type of weapon is especially important when the intent is ambig-

uous  The fraction of homicides that can be viewed as deliberate—unambiguously intended—varies over time and space, but is probably fairly small as a rule  The fraction of gun assaults that results in the death of the victim is one indication of the relative prevalence of deliberate gun murders

*Robbery*

The principal role of a weapon in robbery is to aid the robber in coercing the victim—either by force or threat—to part with his valuables  If the threat is sufficiently convincing, physical force is not necessary  For this reason, it is hardly surprising that the use of force is closely related to the weapon type in robbery, being very common in unarmed robbery and rare in gun robbery  Table 3 documents this pattern for both commercial and noncommercial robberies committed by adult males  As shown in this table, gun robberies are less likely than other armed robberies to involve

26  Swersey also notes several other indications of an increasing fraction of deliberate murders in the homicide statistics for New York City as a whole  During the 1970s, the clearance rate declined for homicide, as did the fraction of homicides occurring on the weekend and the fraction involving family members

Case 3:22-cv-01616-AJM Document 37-302 Filed 06/13/23 Page 346 of 517

physical violence and, furthermore, are less likely to injure the victim.[27] These patterns are compatible with the notion that violence plays an instrumental role in robbery—that it is employed when the robber believes it is needed to overcome or forestall victim resistance and that this need is less likely to arise when the robber uses a gun than otherwise.

There is evidence, however, that this "instrumental violence" pattern can account for only a fraction of the injuries and deaths that result from robbery. Three observations are relevant in this respect First, over two thirds of victims injured in noncommercial gun robberies do not resist in any way—even after the attack,[28] similarly, 20 out of 30 victims killed in gun robberies in Dade County between 1974 and 1976 did not resist the robber. Second, the likelihood that the victim will be injured in an armed robbery is much higher if the robbery is committed by a gang of three or more than otherwise, since victims are less likely to offer resistance to a group of three or four robbers than to a lone robber, this result is clearly incompatible with the "instrumental violence" hypothesis. Third, judging from re-arrest statistics for a large cohort of adult robbery arrestees in Washington, D.C., it appears that robbers who injure their victims tend to be more violence prone than other robbers.[29]

These findings are different aspects of an "excess violence" pattern: much of the violence in robbery is not "necessary," in the sense of being an instrumental response to anticipated or actual resistance by the victim. Rather, it is motivated by objectives or impulses that have little to do with ensuring successful completion of the theft In particular, the high incidence of violence in street robberies committed by larger groups—which typically have a low "take"—is best viewed as a form of recreation, and the gratuitous violence against the victim may be just part of the fun

Given these findings, it is useful to attempt a distinction between "robbery with intent to injure" or kill and robbery without such intent—in which violence would only be used to overcome victim resistance The latter form of robbery dominates the statistics—most victims are not in fact injured, and the likelihood of injury is less with guns than with other weapons. However, the more violent strain of robbery, involving an intent to injure, apparently accounts for a high percentage of the serious injuries and deaths that do occur in the robbery context. Furthermore, the incidence of excess violence in robbery is subject to change over time, as Zimring demonstrated in his study of robbery murder in Detroit [30] He found a sharp discontinuity in 1972 in the fraction of victims killed in armed robbery· after 10 years of stable weapon-specific death rates, this fraction doubled between 1971 and 1973 for gun robberies and increased even more during this period for other armed robberies

---

27 Other sources on this pattern include Conklin, Skogan, and Philip J Cook, "A Strategic Choice Analysis of Robbery" in *Sample Surveys of the Victims of Crimes*, ed Wesley Skogan (Cambridge, MA Ballinger, 1976) (hereafter cited as "A Strategic Choice Analysis of Robbery")

28 Philip J Cook, "Policies to Reduce Injury and Death Rates in Robbery," *Policy Analysis*, 6(1) 36 (winter 1980) (hereafter cited as "Policies to Reduce Injury and Death Rates")

29 Cook and Nagin, p 39

30 Franklin Zimring, "Determinants of the Death Rate from Robbery A Detroit Time Study," *J Legal Studies*, 6(2) 317–32 (June 1977)

Are gun robberies more dangerous than other armed robberies, in the sense of being more likely to result in the victim's death? Victims are killed in a higher fraction of gun robberies than others: based on victim surveys and homicide data in eight cities, I calculated that there are 9 0 victim fatalities for every 1000 gun robberies, compared with 1.7 victim fatalities per 1000 nongun armed robberies.[31] Furthermore, it appears that the type of weapon plays an independent role in determining the likelihood of robbery murder, in a cross-sectional analysis of 50 cities, I found that the fraction of robberies resulting in the victim's death is closely related to the fraction of robberies that involve firearms [32] Thus the objective dangerousness pattern applies to robbery as

well as assault, for reasons that remain a bit obscure.

Why does the presence of a loaded, authentic gun in robbery increase the probability of the victim's death? My studies of robbery murder in Atlanta and Dade County[33] indicated that in at least half of the cases the killing was deliberate for example, the victim was tied and then executed, or shot several times from close range But insofar as intent could be ascertained from police reports, it appears that these intentional killings were not premeditated, but rather decided on during the course of the robbery. Perhaps the explanation for why these spontaneous decisions are more likely to occur when the robber is holding a gun is related to Marvin Wolfgang's suggestion. "The offender's physical repugnance to engaging in direct physical assault by cutting or stabbing his adversary, may mean that in the absence of a firearm no homicide occurs "[34]

Two conclusions can be inferred from the preceding discussion.

1 A reduction in gun availability will increase the robbery injury rate,[35] but reduce the robbery murder rate

2 Given the excess violence pattern in robbery, the robbery cases in which the victim is injured should be allocated special emphasis in establishing criminal prosecution and sentencing priorities.[36] In a high proportion of these crimes, the attack that caused the injury was not instrumental to the robbery, but

31  Cook, "Policies to Reduce Injury and Death Rates," p 39

32  Cook, "The Effect of Gun Availability," p 775 The regression equation is as follows

$$\frac{\text{Robbery murders}}{1000 \text{ robberies}}$$

$$= \underset{(1\,16)}{1\,52} + \underset{(2\,38)}{5\,68} \; \frac{\text{Gun robberies}}{\text{Robberies}}$$

A closely related result uses the per capita, rather than "per robbery," murder rate

$$\frac{\text{Rob murders}}{100,000} = \underset{(\,232)}{-\,284} + \underset{(\,089)}{907} \; \frac{\text{Gun robs}}{1000}$$

$$+ \underset{(\,072)}{136} \; \frac{\text{Nongun robs}}{1000}$$

(Numbers in parentheses are the standard errors of the ordinary least squares regression coefficients ) The data for 50 cities are 1975–76 averages  The second equation has an $R^2 = 82$, suggesting that robbery murder is very closely linked to robbery  Inclusion of the assaultive murder rate in this equation as an independent variable does not affect the other coefficients much—and the coefficient on the murder variable is not statistically significant  I conclude that robbery murder is more robbery than murder

33  Cook, "Policies to Reduce Injury and Death Rates "

34  Marvin Wolfgang, *Patterns in Criminal Homicide* (Philadelphia  University of Pennsylvania, 1958), p 79

35  See Skogan

36  Cook, "Policies to Reduce Injury and Death Rates "

rather was a distinct act. A relatively severe judicial response to such cases might act as a deterrent to excess violence in robbery.

### Coercion and assault

Does the instrumental violence pattern in robbery have any parallel in assault? I suspect the answer is yes, but I know of no empirical evidence

Some unknown fraction of assault cases are similar to robbery in that the assailant's objective is to coerce the victim's compliance—the assailant wants the victim to stop attacking him, physically or verbally, or stop dancing with his girlfriend, or get off his favorite barstool, or turn down the stereo. And, as in the case of robbery, the probability of a physical attack in such cases may be less if the assailant has a gun than otherwise because the victim will be less inclined to ignore or resist a threat enforced by the display of a gun. It may also be true that the assailant would be more hesitant to use a gun than another weapon to make good his threat. If this reasoning is correct, than a general increase in gun availability may reduce the number of assault-related injuries

### INCIDENCE THE SUBSTITUTION PATTERN

The preceding evidence suggests that gun availability has a substantial effect on the distribution and seriousness of violent crime. The third dimension of the violent crime problem is incidence—the number of violent confrontations and attacks For each of the crimes under consideration—assault, robbery, and homicide—a reduction in gun availability to criminals would presumably cause a reduction in the number

of incidents involving guns. But for each crime there is a real possibility that the number of incidents involving weapons other than guns would increase as a result of the reduction in gun availability. If this weapon substitution does occur, the net effect of reduced gun availability on crime rates could be either positive or negative

First, consider the crime of assault. In an environment in which a high percentage of the violence-prone people carry guns, it is possible that a sort of mutual deterrent is created, whereby a rational person would think twice before picking a fight A protagonist that is foolish enough to start a fight in such an environment may be persuaded to back off if his intended victim pulls a gun When physical attacks do occur, they are likely to be perpetrated with a gun and to be serious. This line of argument may explain why the Bartley-Fox Amendment in Massachusetts—an anticarrying law that was apparently quite effective—may have resulted in an increase in the rate of aggravated assaults—the gun assault rate went down substantially following implementation, but the non-gun assault rate increased even more [37] A legal intervention that is successful in getting guns off the streets may encourage relatively harmless fights with fists and broken bottles. Definitive results in this area are hard to come by, in part due to the difficulty in measuring the assault rate in a consistent manner over time or across jurisdictions.

My cross-sectional analysis of robbery in 50 cities found that one measure of gun availability—the

37 Glenn L. Pierce and William J. Bowers, "The Impact of the Bartley-Fox Gun Law on Crime in Massachusetts," unpublished manuscript (Northeastern University Center for Applied Social Research, 1979)

density of gun ownership—was statistically unrelated to the overall robbery rate when other causal factors were taken into account.[38] By way of illustration, the two cities with the highest robbery rates—Detroit and Boston—differed markedly in gun ownership. Boston was one of the lowest, and Detroit was above average. The same study demonstrated that the fraction of robberies committed with a gun was closely related to the density of gun ownership in the city. Apparently robbers tend to substitute guns for other weapons as guns become readily available, but with little or no change in their rate of commission.

If guns were less widely available, the criminal homicide rate would fall. This prediction is justified by three distinct arguments developed in this article. (1) knives and clubs are not close substitutes for guns for implementing a decision to kill, especially when the intended victim is relatively invulnerable, (2) Zimring's "objective dangerousness" results demonstrate that a reduction in gun use in serious—but ambiguously motivated—assaults will reduce the homicide rate, and (3) my results on robbery murder in the 50-cities study indicate that the fraction of robberies that result in the victim's death is closely related to the fraction of robberies involving guns. A final bit of evidence comes from evaluations of the Bartley-Fox Amendment, which suggest that it reduced the criminal homicide rate in Massachusetts.[39] The tough new handgun law in the District of Columbia has also apparently been effective in this regard.[40] It should be noted that a

crackdown focused on the least lethal type of gun—small caliber handguns—might not have the desired effect on criminal homicide if perpetrators substituted large caliber handguns or longguns.

My conclusion is that effective gun control measures are unlikely to reduce the total number of violent confrontations and attacks, but may well reduce the criminal homicide rate

## CONCLUSIONS

The type of weapon matters in violent crime, both in terms of its seriousness and its distribution. If robbers could be deprived of guns, the robbery murder rate would fall, the robbery injury rate would rise, and robberies would be redistributed to some extent from less to more vulnerable targets. The assaultive murder rate would decline, with the greatest reductions involving the least vulnerable victims. The overall assault rate might well increase. These predictions are based on common sense and a variety of empirical observations. None of this evidence is conclusive, but it is the best that is currently available.

Is it reasonable to suppose that moderate gun control measures have the potential to discourage some violent criminals—potential or active—from obtaining guns? No doubt there are some active criminals and other violence-prone people who have the incentive and resources required to acquire a gun even in the face of substantial legal barriers. But such determined people do not figure importantly in the violent crime statistics—indeed, most assaults and robberies do not even involve guns now, despite the fact that guns are readily available in most

38  Cook, "The Effect of Gun Availability."
39  See the article by Pierce and Bowers in this issue
40  See Jones's article in this issue

jurisdictions A gun control measure that increases the average cost and hassle of a youthful urban male acquiring his first handgun may at least delay acquisition for a year or two—with noticeable effect on the gun crime rate A vigorous crackdown on carrying concealed weapons may have a similar beneficial effect.

Not all of the predicted effects on violent crime of a reduction in gun availability are attractive None of these predictions can be made with a high degree of certainty. But it is not unreasonable to suggest that a moderate, vigorously enforced program for regulating the sale and use of guns would save a substantial number of lives Gun control is not "the solution" to America's violent crime problem, but perhaps it should be one aspect of the effort to find a solution

# EXHIBIT Q

## to Expert Report of Professor Louis Klarevas



*Annual Review of Criminology*

# Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?

Anthony A. Braga,[1] Elizabeth Griffiths,[2]
Keller Sheppard,[1] and Stephen Douglas[1]

[1]School of Criminology and Criminal Justice, Northeastern University, Boston, Massachusetts 02115, USA; email: a.braga@northeastern.edu

[2]School of Criminal Justice, Rutgers University, Newark, New Jersey 07102, USA

Annu. Rev. Criminol. 2021. 4:147–64

First published as a Review in Advance on September 14, 2020

The *Annual Review of Criminology* is online at criminol.annualreviews.org

https://doi.org/10.1146/annurev-criminol-061020-021528

Copyright © 2021 by Annual Reviews. All rights reserved

ANNUAL
REVIEWS **CONNECT**

www.annualreviews.org
- Download figures
- Navigate cited references
- Keyword search
- Explore related articles
- Share via email or social media

**Keywords**

firearm, gun, gun policy, gun violence, firearm instrumentality, homicide

**Abstract**

One of the central debates animating the interpretation of gun research for public policy is the question of whether the presence of firearms independently makes violent situations more lethal, known as an instrumentality effect, or whether determined offenders will simply substitute other weapons to affect fatalities in the absence of guns. The latter position assumes sufficient intentionality among homicide assailants to kill their victims, irrespective of the tools available to do so. Studies on the lethality of guns, the likelihood of injury by weapon type, offender intent, and firearm availability provide considerable evidence that guns contribute to fatalities that would otherwise have been nonfatal assaults. The increasing lethality of guns, based on size and technology, and identifiable gaps in existing gun control policies mean that new and innovative policy interventions are required to reduce firearm fatalities and to alleviate the substantial economic and social costs associated with gun violence.

*147*

## INTRODUCTION

Weapon instrumentality is based on the straightforward idea that the type of weapon deployed in an assault influences the mortality of the victim. Logically, guns are regarded as more lethal instruments than knives, knives more lethal than blunt instruments, and so on. Yet the National Rifle Association and other progun activists often invoke the familiar slogan "guns don't kill people, people kill people" to support their arguments for more-permissive gun controls (Henigan 2016). This perspective suggests that an attacker who has a very strong determination to kill will take the necessary steps to be successful regardless of available weapons (Cook 1991, Cook et al. 2011). As such, the assailant's will to kill is reliably measured by whether the victim survives or perishes (Braga & Cook 2018, Zimring 1972). This perspective is reified in criminal law, wherein murderers are subjected to the harshest sanctions, including life without the possibility of parole or even death (Vernick & Hepburn 2003). The "people kill people" perspective further suggests that gun control is futile in reducing homicides because determined killers will simply find another way (Kleck 1997, Wolfgang 1958, Wright et al. 1983). If guns are not available, assailants will substitute knives, blunt instruments, or other means.

The alternate view is that "guns do kill people" and gun control advocates suggest that reducing firearm availability to violent people will save lives even if determined killers select other weapons instead (Cook 1991, Cook et al. 2011, Henigan 2016). Injuries in assaultive violence are often inflicted by whatever means are most available to the attacker, most commonly fists or feet followed by other objects that are close at hand (Hedeboe et al. 1985). Although a person who is determined to kill will sometimes acquire a lethal weapon, gun-inflicted deaths often ensue from varying kinds of impromptu arguments or fights (Spitzer 1995, Zimring & Hawkins 1997). Gun control advocates suggest that many of these deaths would be replaced by nonfatal injuries if guns were not available; in essence, they suggest that a more refined slogan would be "people without guns injure people; guns kill them" (Baker 1985, p. 588).

The purported strong will to kill as the key determinant of mortality is challenged by the noteworthy similarity in the characteristics and circumstances of fatal and nonfatal gun-assault incidents (Cook et al. 2019). Mortality in many gun attacks seems to be influenced by chance events, such as the number and placement of wounds, the availability and quality of medical help, and other factors (Braga & Cook 2018). The considerable overlap between fatal and nonfatal shootings is well captured by the observation of a Boston police investigator that the difference between the two events "is often only a matter of inches and luck—a lot of times a nonfatal shooting is just a failed homicide" (Braga et al. 2014, p. 119). In her in-depth examination of South Los Angeles homicides, investigative reporter Jill Leovy (2015, p. 49) notes that there were approximately five nonfatal injury shootings for every one gun homicide and, given the similarity between the events, detectives called these nonfatal shootings *almoscides*, for 'almost homicides.'" Research on fatal and nonfatal gun assaults further suggests that mortality is influenced by the type of gun used in the attack, and the selection of the gun in these events is largely independent of other indicators of the assailant's intent (Braga & Cook 2018, Zimring 1972). As such, the types of guns deployed in assaults dramatically influence whether the intended victim lives or dies beyond the determination of the assailant to commit murder.

Firearm instrumentality is controversial among academics who study gun control policy issues. The controversy stems from disagreement over an assailant's purported intention to kill and whether a would-be killer would merely substitute other means to complete the act if guns were not available. In their recent survey of gun policy experts, the RAND Corporation discovered two distinct groups of scholars: those who favored more-restrictive gun regulations and those who favored more-permissive gun regulations (Morral et al. 2018). According to this research, "a

striking result of the survey concerns the wide disparity between estimates made by the two expert groups about means substitution.... That is, they disagree about the extent to which any reductions of firearm...homicides attributable to a policy are undermined because individuals simply use other means to achieve those ends" (Morral et al. 2018, p. xii). The average survey participant who favored more-permissive gun controls responded that if a policy successfully reduced a state's firearm homicides, 90% of the prevented homicides would still end as a homicide by some other means. In contrast, the average survey participant who preferred more-restrictive gun controls indicated that only 20% would still end in homicide. As such, gun policy experts with preferences for more-permissive gun regulations view legislative efforts to reduce gun homicides as futile since they believe would-be killers will complete their murderous acts through other means.

Firearm instrumentality is clearly a foundational issue in the great American gun control debate. Broader arguments that seek to limit the availability of guns to violence-prone individuals through the adoption of more-restrictive gun controls are based on the idea that lives would ultimately be saved (Cook et al. 2011). In this review, we examine the available scientific evidence on whether guns make situations more lethal. The review begins by examining extensive research on the lethality of gun assaults, focusing on a range of studies that attempt to determine the existence of instrumentality effects in violent gun and non-gun crimes. Extended coverage is given to two comprehensive studies that estimate whether gun caliber, killer intent, and other chance elements in gun assaults determine the likelihood of death for victims. We find strong support for gun instrumentality effects in our review of the literature. The final sections consider the policy implications of these findings and offer recommendations for further research in this area.

## THE LETHALITY OF GUNS

Guns are obviously designed to be lethal instruments. And although guns in civilian hands are used for sport shooting, hunting, and dealing with animal pests, they can also be deployed against people for legal self-defense or criminal purposes. In 2018, guns were used in more than 10,000 murders, 38,000 rapes/sexual assaults, 42,000 aggravated assaults with injury, and 96,000 robberies (Bur. Justice Stat. 2019, FBI 2018). However, it is important to note that most serious violent crime victimizations do not involve guns. The 2018 US Bureau of Justice Statistics National Crime Victimization Survey (NCVS) reveals that only 5% of rapes/sexual assault, 11% of aggravated assault with injury, and 17% of robbery victimization incidents involved a firearm (**Figure 1**). When used in violent crime, guns are usually not fired; more than three-quarters of nonfatal gun crime victims do not suffer gunshot wounds (Planty & Truman 2013). Instead, as is discussed further below, guns are typically deployed by criminals to gain compliance or threaten victims rather than to injure them. Most gun crimes involve handguns, which are used in roughly two-thirds of gun homicides and 90% of nonfatal gun violence (Planty & Truman 2013).

Among those violent gun incidents that do generate injuries, whether the victim lives or dies is often dependent upon the technology (i.e., type and characteristics) of the guns used in the assaults (for an excellent overview from a public health perspective, see Karlson & Hargarten 1997). The kinetic energy of a bullet is determined by its mass and velocity when fired from a gun. In general, the larger the caliber, the more mass the bullet will have. Larger-caliber bullets (such as .40, .44, and .45) generate more tissue damage than smaller-caliber bullets (such as .22, .25, and .32) when they strike the same body parts (Hargarten et al. 1996). Jacketed bullets tend to cause perforating wounds with less tissue damage relative to bullets designed to fragment and/or mushroom (Fackler et al. 1988). Cartridge cases can vary in the amount of explosive gun powder they hold, with larger cartridges generating higher bullet velocities when fired. Rifles are considered more lethal than handguns given the higher bullet velocities generated by the larger cartridges and the increased



**Figure 1**

Personal violent victimization with and without guns, 2018. Data taken from Bureau of Justice Statistics (2019).

accuracy of the longer barrel lengths (which also contribute to increased bullet velocity). Shotguns generally fire shells filled with multiple small pellets (gauges represent pellet sizes with 10 and 12 gauge being the most common; shotguns can also fire a single rifled "slug") that can be quite lethal at close range because of the extensive tissue damage generated by a concentration of pellets and much less lethal at distance because of the dispersion of pellets after firing (Karlson & Hargarten 1997).

The number and location of gunshot wounds also influence the mortality of the victim in gun-assault incidents. Holding other factors constant, injuries to the head and upper spinal cord are considered the most lethal gunshot wounds followed by injuries to the chest and abdomen (depending on whether vital organs are hit) and to extremities such as arms and legs (Karlson & Hargarten 1997, Kellermann et al. 1991). The number of gunshot wounds involved in a gun assault also elevates victim mortality, as each wound represents additional traumatic tissue injury (D'Alessio 1999, Hargarten et al. 1996). Other factors, such as the availability of quality trauma care to save injured victims (Coupet et al. 2019) and the speed at which first responders locate gunshot victims also influence the lethality of gun attacks. By one estimate, almost three-fourths of gun homicide victims die before they reach the hospital (Karlson & Hargarten 1997).

Empirical evidence suggests that guns are becoming more lethal over time with larger shares featuring higher-capacity magazines and using larger-caliber bullets (D'Alessio 1999, Kellermann et al. 1991, McGonigal et al. 1993, Webster et al. 1992, Wintemute 1996). For instance, in Boston, higher-capacity semiautomatic pistols capable of shooting more bullets replaced revolvers as the most frequently recovered type of handgun beginning in the 1990s (Braga 2017). As a consequence, the share of smaller-caliber handguns among crime gun recoveries decreased over the 2000s as the prominence of larger-caliber handguns increased. According to **Table 1**, the share of semiautomatic pistols recovered by the Boston Police Department increased from only 34.6% of total handguns recovered between 1981 and 1985 to a peak of 75.7% between 2001 and 2005, before dropping to 66.6% between 2011 and 2015. **Table 1** shows that large-caliber handguns

Table 1  Types and calibers of recovered handguns in Boston, 1981–2015

| Period | N | Percent semiauto | Percent .22, .25, .32 | Percent .38, .357 | Percent .380, 9mm | Percent .40, .44, .45 |
|---|---|---|---|---|---|---|
| 1981–1985 | 3,134 | 34.6 | 44.9 | 38.6 | 7.5 | 4.3 |
| 1986–1990 | 3,114 | 41.6 | 44.2 | 33.2 | 14 | 5.1 |
| 1991–1995 | 3,449 | 60.9 | 38.3 | 23.3 | 30.2 | 4.8 |
| 1996–2000 | 2,008 | 74.2 | 38.9 | 23.9 | 27.5 | 6.8 |
| 2001–2005 | 2,905 | 75.7 | 29.2 | 20.9 | 29.7 | 12.9 |
| 2006–2010 | 2,195 | 65.7 | 26.4 | 20.6 | 33.4 | 18 |
| 2011–2015 | 2,352 | 66.6 | 26.7 | 20.7 | 31.7 | 19.9 |

Table adapted from Braga (2017).

(.40, .44, and .45) increased almost fivefold from 4.3% of total handguns recovered between 1981 and 1985 to almost 20% of total handguns recovered between 2011 and 2015. Equally important, **Table 1** also documents the noteworthy shift away from medium-caliber bullets often used in revolvers (.38, .357) toward medium-caliber bullets typically used in semiautomatic pistols (.380, 9mm). The transition from revolvers to semiautomatic pistols and from smaller to larger-caliber handguns mirrors national trends in handgun production in the United States between the 1980s and 1990s (Wintemute 2010).

The increased killing power of handguns recovered by law enforcement agencies in the United States seems to have increased the lethality and number of wounds that gunshot victims experience over time. In epidemiology, the case-fatality rate is generally defined as the proportion of deaths (i.e., gun homicides) within a designated population of cases (total gunshot injury victims) (see Efron et al. 2006). For gun-assault victimizations, the case-fatality rate is roughly 1 in 6, wherein approximately 17% of gun-assault victims with injuries die from their wounds (Cook 1985). Furthermore, this rate has remained fairly stable since the 1980s, leading Cook and colleagues (2017) to conclude that national declines in gun homicide rates were better explained by decreases in the number of gun assaults rather than improvements in trauma care for firearm injuries. City-level studies, however, show that local case-fatality rates can diverge markedly from national trends and these differing patterns may be linked to changes in the technology of guns used in assaults. For instance, an analysis of gunshot wound patients treated in a Denver trauma center between 2000 and 2013 suggests that case-fatality rates increased over time as gunshot patients suffered more severe wounds and an increased number of serious wounds per patient (Sauaia et al. 2016). A similar study of 6,322 gunshot wound patients treated at the New Jersey Trauma Center at University Hospital in Newark reported significant increases in patients with three or more wounds from 13% to 22%, with a corresponding increase in mortality from 9% to 14%, between 2000 and 2011 (Livingston et al. 2014).

Criminological studies have shown that case-fatality rates can vary over the course of gun violence epidemics. For instance, in a classic study of the influence of the heroin epidemic on serious violence in New York City, the RAND Corporation found that the rapid increase in homicide in Harlem between 1968 and 1974 was driven by an increase in the case-fatality rate of gun assaults rather than an increase in the number of gun assaults (Swersey & Enloe 1975). More recently, Braga (2003) analyzed youth gun assaults in one police district located in a mostly black disadvantaged neighborhood in Boston between 1987 and 1995, representing the years before and during a gun violence epidemic initiated by the emergence of crack cocaine in the city. He found that the nature of youth gun assaults changed over time in several noteworthy ways: Larger-caliber semiautomatic pistols were more likely to be fired in gun attacks, incidents were likely to occur in public

places, a larger share of youth gun assaults resulted in a wound, and, for those assaults that involved a wound, a larger share involved multiple gunshot injuries. Most importantly, although the absolute number of youth gun assaults in 1995 was essentially the same as 1987, the case-fatality rate in this high-risk policing district tripled over the study period. Braga (2003) identified changes in both firearm instrumentality effects, as indicated by increased use of more powerful handguns with higher-capacity magazines, and shooters' intent to kill, as indicated by the increased number of wounds on youth gun-assault victims.

The empirical evidence reviewed above shows that there are several factors associated with the lethality of guns deployed in criminal assaults. In sum, it is not controversial in public health and medical research that mortality increases with the power of the gun deployed in assaults. As such, this research suggests the existence of firearm instrumentality effects. However, some observers argue that the selection of the firearm used in gun attacks is simply a reflection of the shooters' intent to kill and determined killers will complete their acts by substituting other deadly means if guns are unavailable. The next section considers findings of the criminological research on firearm instrumentality, intentionality, and the lethality of possible weapon substitution effects.

## Intention Versus Instrumentality

There is considerable evidence that the risk of death is elevated when a violent incident involves a gun. In particular, Cook (2018) found that crime victims who suffered gunshot wounds were more than seven times as likely to die when compared to knife attack victims who were seriously injured. In the case of robbery, the greatest difference between fatal and nonfatal robberies was the perpetrator's choice of weapon, wherein the likelihood of victim death in gun robberies (0.41% or approximately 1 in 250) was three times higher than knife robberies (0.13% or approximately 1 in 750) and 10 times higher than robberies committed with other weapons (0.04% or approximately 1 in 2,500), such as blunt instruments (Cook 1987). The likelihood of death in an unarmed robbery was approximately 1 in 5,000 (or 0.02%). Given that only 17% of total robberies involve firearms, but 65% of robbery murders are committed with a gun, the choice of weapon appears to have a significant and independent effect on the likelihood of victim fatality (Cook 1987). Cook (1987) found further evidence of firearm instrumentality effects in his panel analysis of changes in crime rates across 43 US cities; in this case, an additional 100 gun robberies increased the robbery-murder rate by three times as much as an additional 100 non-gun robberies. Cook (2018) observed that the 3:1 ratio was congruent with the difference in case-fatality rates for robbery and suggested a possible causal impact where robbery-murder was a by-product of robbery that occurred with a likelihood determined by the intrinsic lethality of the weapon deployed.

Using data from the National Incident-Based Reporting System (NIBRS), Libby & Corzine (2007) investigated the impact of weapon type on the lethality of violent interpersonal encounters. Controlling for incident circumstance, the relationship between the offender and victim, and their respective characteristics, firearms were found to have the strongest effect on the lethality of violent encounters, with handguns and shotguns representing the most lethal weapons overall (Libby & Corzine 2007). Similarly, Weaver et al. (2004) found that incidents involving firearms were 11 times more likely to result in victim homicide compared to unarmed assaults, whereas the use of knives was only approximately 2.5 times more likely to result in victim homicide. These findings support previous research in demonstrating independent weapon instrumentality effects, even when controlling for approximate measures of offender motive and intent (Wells & Horney 2002).

Weapon type has also been shown to influence victim mortality in family and intimate assaults. Research by Saltzman et al. (1992) showed that firearm assaults were three times as likely to result

152    *Braga et al.*

in death as assaults involving knives or other cutting weapons, and approximately 23 times as likely to result in death as assaults involving other weapons or bodily force Overall, family and intimate assaults with a firearm were 12 times more likely to result in death than non-firearm assaults Additionally, approximately 50% of assaults with firearms resulted in a nonfatal injury, compared to 66% of assaults with knives, indicating that firearm attacks were less likely to result in nonfatal injuries than were knife attacks (Saltzman et al 1992)

These findings reinforce other research in demonstrating that gun assaults are particularly lethal For example, Felson & Messner (1996) found that offenders who used a gun were more than 40 times more likely to kill the victim than offenders who did not use a weapon, comparatively, offenders who used a knife were only 4 4 times more likely to kill the victim than offenders without weapons Additionally, guns were more strongly associated with homicides when the initiating offense was an assault compared to a robbery, suggesting that guns facilitate homicide for offenders with a determination to kill, as offenders engaging in assault are more likely than offenders engaging in robbery to harbor lethal intent (Felson & Messner 1996)

This question of intent motivated some of the earliest studies related to firearm instrumentality Wolfgang's (1958) seminal study of homicide in Philadelphia posited that few homicides would be prevented solely by eliminating the presence of firearms, as determined offenders would likely substitute other weapons to achieve the same result. Wright et al (1983) concur with this observation and suggest that firearms simply make the act of killing easier If no guns were available and the assailant was committed to completing the act, they would find another method of achieving it But it was roughly 50 years ago that Zimring (1968, 1972) offered the first critical tests of the extent of overlap between fatal and nonfatal attacks in an effort to disentangle whether instrumentality or intentionality distinguished homicides from serious assaults (either with guns or with other weapons) Although he could not directly measure intentionality with existing official data, he suggested that it could be inferred if firearm homicides exhibit different features—such as victim–offender relationship, motive, location of wounds, number of wounds, etc.—from nonfatal attacks Contrary to Wolfgang (1958), Zimring (1968, p 722) believed that at least some homicides may be ambiguously motivated rather than "deliberate and determined," and "if the probable substitute for firearms in these situations is less likely to lead to death, then the elimination of guns would reduce the number of homicides." His research showed substantial similarities between the profiles of homicides and serious assaults, implying an ambiguity in intent to kill and leading him to conclude that what distinguishes a homicide from an assault is simply that the victim does not survive the attack

As noted earlier, intentionality may be evaluated even more directly on the basis of the location of the wound (Braga & Cook 2018, Zimring 1968, 1972) Those determined to commit homicide should target vital organs or areas of the body, including the trunk of the body or the head, rather than extremities, like arms or legs Yet Zimring (1968) found that nearly half of all gun attacks (44%) in Chicago resulted in wounds to nonvital parts of the victim's body, whereas a majority of knife attacks known to police resulted in wounds to the head, neck, chest, or back This means that attackers with a gun appear to no more intend a fatal outcome than do attackers using other weapons, and because "the rate of knife deaths per 100 reported knife attacks was less than 1/5 the rate of gun deaths per 100 reported gun attacks" (Zimring 1968, p 728), substituting knife attacks for gun attacks should drive the homicide rate down by a large margin If intention is relatively even across attacks that end in fatalities and those that do not, then the major factor distinguishing homicides from assaults is the dangerousness of the weapon This is particularly problematic, as guns can be fired from longer ranges, more easily, and with less skill than can other weapons of choice for assailants

Even among only those attacks committed with a gun, if larger-caliber guns produce a greater proportion of homicides versus assaults under similar circumstances, then the dangerousness of the weapon can be said to independently contribute to fatalities. Excluding shotguns and large-caliber rifles, Zimring's (1972, p. 105) analyses showed that 38 caliber attacks to the head and chest, in particular, but also the abdomen, back, and neck were "more than twice as deadly as 22 caliber attacks" to the same areas, providing additional support for an instrumentality argument. Based on these two influential studies, Zimring (1972, p. 110) concluded that patterns in fatal and nonfatal gun attacks are highly similar in "structure, intention, and motivational background" and, furthermore, that intent to kill is largely ambiguous across gun homicides and serious but nonfatal gun assaults. The results of this early work and later replications (Sarvesvaran & Jayewardene 1985, Vinson 1974) provide direct support for the instrumentality effect, wherein guns influence the lethality of attacks primarily as a function of their dangerousness (see also Braga & Cook 2018, Cook 1991, Cook & Ludwig 2000, Cook et al. 2019, Zimring & Hawkins 1997).

In a more recent and comprehensive study on weapon instrumentality and intentionality, Braga & Cook (2018) demonstrated that, compared to smaller-caliber firearms, larger-caliber guns produce substantially more fatalities among shooting victims in Boston. Their research showed that the circumstances, neighborhood, prior criminal history, and demographic characteristics of fatal and nonfatal shootings are indistinguishable. Given the substantial overlap in the features of gun homicides and nonfatal shootings, and mirroring the findings in Zimring's 1970s Chicago studies, Braga & Cook (2018) argued that there was little evidence to support the contention that fatal and nonfatal shootings are qualitatively distinct. They then examined a subset of those cases in which the caliber of the weapon used in the shooting was known to police. Compared to nonfatal shootings, gun homicides were found to be significantly more likely to involve large-caliber handguns, to be characterized by a greater number of shots fired, to result in multiple gunshot wounds to victims, and to wound the victim in the head or neck relative to peripheral parts of the body (Braga & Cook 2018).

If the selection of a more powerful, larger-caliber handgun were dependent on the attacker's intention to kill, however, then the characteristics of shootings involving small caliber handguns should differ from the features of shootings involving medium- and large-caliber handguns respectively. Yet Braga & Cook's (2018, p. 1) research illustrated that "caliber was not significantly correlated with other observable characteristics of the assault, including indicators of intent and determination to kill," such as the number of wounds, the location of wounds, and victim characteristics. In effect, there was no evidence that sex, race, age, criminal history, circumstances of the shooting, the skill and determination of the shooter, or other features of incidents were associated with the caliber of the handgun used in the attack. Consequently, shooters do not appear to be selecting a more powerful handgun according to their intent to kill. This "lack of systematic association is what would be expected if caliber were assigned at random, as in an experiment" (Braga & Cook 2018, p. 6).

The overlap in profiles of fatal and nonfatal shootings combined with the failure of incident-specific characteristics to distinguish shootings involving small- versus large-caliber guns enables a strict test of weapons instrumentality. That is, if the size and power of the handgun used in a shooting influence the likelihood of death independent of other features of the violence, and there is no direct effect of those features on the selection of the type of handgun, then the argument for instrumentality is considerably stronger. In a model predicting fatal versus nonfatal shootings, Braga & Cook (2018) found that victims of attackers who use a medium-caliber handgun are more than twice as likely to die as a consequence of the shooting as those who are shot with a small-caliber handgun, and those odds double for victims shot with large caliber handguns. They conclude that "if the medium- and large-caliber guns had been replaced with small-caliber (assuming everything

else unchanged), the result would have been a 39.5% reduction in gun homicides" (Braga & Cook 2018, p. 7). Importantly, then, gun fatalities are substantially elevated in the context of attacks with more powerful firearms, holding other features of the shooting constant.

Collectively, the studies that most directly focus on intentionality and instrumentality in gun violence point to a relatively clear conclusion: the dangerousness of the instrument used in violent attacks plays a critical role in producing fatal outcomes. Attackers using larger-caliber guns conduct attacks that bear striking similarities to those who use smaller-caliber guns in circumstance, accuracy, number of shots fired, and the location of wounds to victims (Braga & Cook 2018; Zimring 1968, 1972). Yet the likelihood of death increases with the power of the firearm used in the attack; larger-caliber weapons are increasingly likely to produce lethal consequences. Ultimately, then, "whether the victim of a serious assault lives or dies is to a large extent a matter of chance, rather than a question of the assailant's intent. The probability of death is connected to the intrinsic power and lethality of the weapon" (Braga & Cook 2018, p. 8). From a public health perspective, reducing the objective dangerousness of gun violence could be accomplished more readily by controlling the size and power of firearms available to the public than by assuming intentionality on the part of the offender on the basis of what amount to chance outcomes in shooting incidents.

## Offender Firearm Use, Victim Compliance, and Injury Incidence Rates

Weapon instrumentality effects also appear to influence the likelihood that violent incidents result in any injury to victims. Using data from the 1979–1985 NCVS and the FBI's 1982 Supplementary Homicide Report, Kleck & McElrath (1991) assessed the impact of various weapon types on the likelihood that a threatening situation escalated into a physical attack, whether the attack resulted in an injury, and whether the injury resulted in the death of the victim. Regarding the likelihood of injurious attacks on victims, the study suggested that the net effect of the presence of deadly weapons—firearms and, to a lesser extent, knives—in threatening situations is to reduce the probability that the possessors of the weapons attack. As the lethality of the weapon present increases, the probability of a physical and injurious attack decreases (Kleck & McElrath 1991). In effect, the threat alone is sufficient to subdue the victim. Libby (2009) attempted to replicate these findings using National Incident-Based Reporting System (NIBRS) data for 2003–2005 and generally confirmed the results of Kleck & McElrath (1991). His analysis indicated that the chances of nonlethal victim injury decreased by approximately 80% in incidents featuring a firearm. However, when firearms were used in the commission of a crime, the likelihood of death was substantially greater (Libby 2009).

Research suggests the source of these more nuanced instrumentality effects of guns on injury incidence may be rooted in offender decision-making processes and victim resistance in violent attacks. Criminal offenders may use firearms to facilitate the successful commission of their intended crimes (Jacobs 2000, Kleck & McElrath 1991, Wright & Decker 1997, Wright & Rossi 1994). Guns also tend to be used when offenders are planning robberies that involve larger amounts of cash and/or more expensive items (Cook 2009). Robbers report their desire to use the overwhelming force made possible through firearms to secure victim compliance via the threat of serious injury and death (Feeney 1986, Jacobs 2000, Wright & Decker 1997). In noncommercial robbery cases, the standard technique is to threaten victims and take their valuables without actually attacking them [78% of gun robberies and 64% of knife robberies (Cook 1980)]. In contrast, 74% of unarmed noncommercial robberies and 60% of blunt instrument noncommercial robberies involved physical attacks on victims followed by attempts to take their valuables by force (Cook 1980). The likelihood of injury followed the same pattern, ranging from only 11% of gun

robberies to 36% of robberies with blunt instruments (Cook 1980). As described earlier, when guns are present and fired, victim injuries are far more likely to be lethal.

Although less developed than the empirical evidence on weapon use in robbery, qualitative interviews with sexual assault offenders similarly show that they use weapons like guns to control their victims, discourage resistance, and secure compliance (Beauregard & Leclerc 2007, Reid & Beauregard 2017). As one serial sex offender noted, "It was better to threaten a victim with a gun when she was further away, she knew I could shoot her from that distance, which isn't the case with a knife" (Beauregard & Leclerc 2007, p. 123). Offender views on the subduing power of guns seem to be well supported, as victims were less likely to resist and offenders were more likely to complete the robbery or sexual assault successfully when a firearm was present (Cook 1980, 2009; Kleck & DeLone 1993; Libby 2009; Tillyer & Tillyer 2014).

Physical assaults sometimes serve as an inappropriate outlet for negative emotions or deep frustrations held by violent offenders (Langhinrichsen-Rohling et al. 2012). Kleck & McElrath (1991) considered a broad spectrum of assaults ranging from mere threats to homicides at multiple stages of the incident to explore this hypothesis. They suggest that offenders can successfully threaten or intimidate their intended target with the mere presence of a firearm, whereas they may need to objectively demonstrate their power through actual physical harm if in possession of another weapon type. Using event history analysis, Wells & Horney (2002) extended this line of inquiry by assessing how possession of a weapon influenced the likelihood of an attack and subsequent injury while controlling for offender intent. Their results indicated that persons armed with a firearm were more likely to confront a victim than those armed with another type of weapon; however, incidents featuring firearms were substantially less likely to result in any injury to victims.

Despite some contradictory evidence (Tark & Kleck 2004), the available research generally suggests that the mere threat of gun injury assists offenders in achieving their aims and often nullifies the need to use deadly force. As such, offenders do not typically employ firearms in an effort to inflict maximum harm against their victims (Zimring 1968) but rather to avoid potential confrontation and injury through implicit assertions of dominance. However, in cases in which the victim is attacked and injured, the likelihood of death in violent gun crimes is far higher than with knives or blunt objects, which accounts for the relatively high case-fatality rate for incidents featuring guns.

## POLICY IMPLICATIONS

The most important implication of instrumentality effects is that policies that decrease gun use in violent crime should reduce the homicide rate even if the overall volume of violent crime was unchanged (Cook et al. 2011). A variety of law enforcement approaches attempt to reduce gun violence by incapacitating those who have been convicted of gun crimes and deterring future gun crimes. Others suggest that policies designed to deprive potentially violent people of guns could save lives (Cook et al. 2011). This is a central element of the argument to restrict gun availability. In this section, we first discuss criminal justice approaches to reduce gun use by violent criminals, briefly review the existing evidence on the relationship between gun availability and violent crime, and summarize the impacts of gun control legislation designed to reduce gun availability on violence.

Firearm sentence-enhancement laws require minimum mandatory sentences or additional time in prison for gun felonies. To many observers, gun use in robberies and assaults deserves harsher punishments because of the increased chance that victims are killed (Cook & Nagin 1979). Sentencing enhancements are intended to reduce gun use in violence, encourage desistance from violent gun crimes, and induce prospective gun offenders to substitute less-lethal weapons. What

is more, stiffer prison penalties for gun crimes do not impact the ability of law-abiding citizens to own guns for recreational and self-defense purposes As such, this approach is supported by gun control and gun rights advocates alike Although there is some evidence to the contrary (e g , Marvell & Moody 1995), the available research evidence suggests firearm sentence-enhancement laws generally seem to work in reducing gun violence (see, e g , McDowall et al 1992, Pierce & Bowers 1981) In a careful analysis of state-level firearms sentence enhancements, Abrams (2012) found that the introduction of these laws in several states reduced gun robberies by 5% without any discernible impact on non-gun robberies

A more controversial approach to reducing gun violence involves focusing local law enforcement agencies on deterring illegal gun possession and carrying in public spaces Police departments need to ensure that such approaches safeguard against illegal searches and seizures and do not devolve into harassment of citizens, especially young minority men, lawfully present in public places (Moore 1980) However, the available empirical evidence suggests gun-oriented patrols can reduce gun violence (Cohen & Ludwig 2002, McGarrell et al 2001, Sherman 2000) Gun violence tends to concentrate in very small hot-spot locations in urban environments (Braga et al 2010) Hot-spots policing programs designed to increase gun seizures have been shown to generate significant reductions in gun violence without causing negative externalities such as crime displacement or police-community relations problems (Braga et al 2019, Sherman & Rogan 1995)

Another criminal justice–led intervention attempts to deter groups of high rate offenders from using guns to settle ongoing disputes with other criminally active groups Focused deterrence, sometimes called pulling-levers policing, follows an action research model that tailors the strategy to specific gun violence problems and builds upon local operational capacities to deliver sanctions and mobilize support to control those high-rate offenders who drive persistent gun violence (Braga et al 2001, Kennedy 2011) Focused deterrence attempts to prevent gang and group-involved violence by making group members believe that gun use by any one member of the group would result in legal problems for all members The intent is to create an incentive for group members to discourage each other from gunplay, thus reversing the usual group norm in support of violence A key element of the strategy involves the delivery of a direct and explicit "retail deterrence" message to a relatively small target audience regarding what kind of behavior would provoke a special law enforcement response and detailing what that response would be Social services are provided to gang and criminally active group members who want to change their life trajectories The deterrence message is delivered by talking to gang members on the street, handing out fliers in the hot-spot areas explaining the enforcement actions, and organizing forums between violent group members and representatives (Kennedy 2011) A growing body of rigorous program evaluation evidence suggests focused deterrence programs are effective in reducing gang and group-involved gun violence problems (Braga et al 2018)

Reducing firearm availability can make violent events less lethal The difficulty and legal risks associated with obtaining and using guns influence offender decisions on what weapon to use when committing a crime (Wright & Rossi 1994) Reducing firearm availability should, in turn, reduce the prevalence of guns used in violent crimes However, to some observers, widespread access to guns induces a deterrent effect on criminal behavior as offenders' fear of confronting potentially armed victims should dissuade them from crime (Kates & Mauser 2006, Lott 2010) The proposed negative relationship between firearm availability and crime reduction (or "more guns, less crime") has been generally unsubstantiated when sound measurement and methodological strategies are utilized (Cook & Ludwig 2006a, Kleck 2015) And although guns certainly give some law-abiding citizens the opportunity to escape injury at the hands of violent criminals, it remains unclear how often guns are actually used in self-protection Definitional issues about what constitutes defensive

gun use make it difficult to develop reliable and valid estimates of the annual frequency of such events (Cook et al 2011, Natl Res Counc 2005)

Attempts to analyze the relationship between firearm availability and violent crime are characterized by substantial variation in the methodological approaches used by analysts The current state-of-the-art considers how temporal and spatial differences in community gun ownership affect the extent and nature of violent crime The United States exhibits the highest rate of civilian gun ownership in the world with more than 350 million guns in private hands (Inst Med & Natl Res Counc 2013) However, gun prevalence varies markedly across communities—e g , states, counties, and cities—and over time (Cook et al 2011) Comparisons across place, time, or both afford researchers insight into the relationship between community gun availability and violent crime However, such analyses are often complicated by unreliable measures of community firearm prevalence Although a precise measure of gun prevalence proves elusive due to the lack of centralized administrative data on gun ownership, the proportion of suicides that involve a firearm [firearm suicides/total suicides (FS/S)] is generally regarded as a well-validated proxy measure (for a discussion, see Natl Res Counc 2005) Analyses of survey data generally find that FS/S is highly correlated with gun ownership rates and, furthermore, these data can be used to reliably track trends in gun prevalence over both space and time (Azrael et al 2004, Cook et al 2011, Kleck 2004)

The preponderance of empirical evidence indicates that higher levels of firearm ownership do not have any effect or, at best, only modest effects on overall violent crime rates (Cook & Ludwig 2006b, Cook & Pollack 2017, Duggan 2001) Firearms do not necessarily intensify the prevalence of violent crime, as rates of assaults and robberies appear largely unaffected by the availability of guns However, examining the effects of gun availability on homicides demonstrates their critical role in shaping the outcomes of violent encounters Whereas the connection between firearms and the general incidence of violence appears weak, strong and positive associations between community gun ownership rates and homicide rates indicate that guns do increase the intensity and lethality of violence These positive associations are observable across regions (Miller et al 2002), states (Siegel et al 2013), counties (Duggan 2001), and cities (Cook 1979) Furthermore, studies using longitudinal methods and appropriate measures of gun prevalence suggest that this increase in lethality is restricted to just the firearm homicide rate, as non firearm homicides, like general levels of nonlethal crime, appear unrelated (Cook & Ludwig 2006b, Miller et al 2002, Siegel et al 2013) Consistent with the instrumentality hypothesis, firearms alter the quality and lethality of violence but not its quantity

Recent studies indicate that high levels of community gun ownership may extend to other forms of lethal violence such as police use of deadly force and the homicide of on-duty police officers The majority of persons shot at and/or killed by the police were in possession of a firearm at the time of the incident and the majority of felonious killings of police officers are committed with a firearm (Klinger et al 2016, Zimring 2017) State-level analyses document significant and positive associations between state gun ownership rates and both rates of fatal police-involved shootings and homicides of law enforcement officers, independent of other contextual factors (Hemenway et al 2019, Swedler et al 2015) In the case of police use of deadly force, gun prevalence was positively associated with the shooting rate of citizens armed with guns and, to a lesser degree, citizens armed with other types of weapons Nagin (2020) similarly found positive associations between firearm ownership and the prevalence of fatal police shootings, demonstrating that this relationship was observed across race

Finally, some studies have also examined this issue by evaluating the impacts of gun control legislation and gun ownership levels on violent crime rates For instance, a cross sectional analysis of 170 cities with a 1980 population of 100,000 residents or greater found that gun prevalence

*158    Braga et al.*

levels generally had no net positive effect on total violence rates; homicide, gun-assault, and rape rates increased gun prevalence; gun control restrictions had no net effect on gun prevalence levels; and most gun control restrictions generally had no net effect on violence rates (Kleck & Patterson 1993). These findings provide some support to the notion that more-restrictive gun laws merely force offenders to shift from guns to other weapons in their criminal pursuits while failing to reduce overall homicide or crime rates (Kleck & Patterson 1993). Relatedly, Kleck (1984) suggests that criminals might substitute rifles and shotguns in response to handgun control policies, and the use of more powerful firearms could ultimately serve to increase the death rate.

Other research, however, supports the use of policies that are aimed at restricting the accessibility of handguns to high-risk individuals (Cook et al. 2011). For instance, Wright et al. (1999) assessed whether denial of handgun purchase can influence an individual's subsequent risk for crimes involving guns or violence. Specifically, individuals with a prior felony conviction who were denied the purchase of a handgun were compared over a 3-year period to individuals with prior felony arrests who purchased handguns. The results indicate that the denial of handgun purchase was associated with a 20% to 30% reduction of risk for new crimes involving guns or violence (Wright et al. 1999), supporting the findings of other research (Wintemute et al. 1999). Indeed, much of the gun violence problem is concentrated among prohibited possessors and other high-risk individuals and gun control policies designed to keep firearms out of the wrong hands could be used to good effect in reducing serious violence (Braga & Cook 2018, Cook et al. 2005).

## CONCLUSION

The potential lethality of gun violence has motivated vigorous debate about the utility of gun control for reducing fatalities. From a dangerousness perspective, if the weapons used in assaults were less deadly (hands, knives, etc.), fewer people would die. But this premise rests on the assumption that there is nothing distinctive about gun violence vis-à-vis non-gun violence, save for the weapon of choice. That is, those intent on committing assault may be more likely to cause fatal injuries to the victim if they attack with a gun; however, their intent to injure is no different than had they opted for a knife or stick or any other available weapon. The outcome may vary, but the goal does not. Consequently, the instrumentality of firearms, or their heightened potential for causing fatal injury relative to other kinds of weapons, elevates the chances of death (Braga & Cook 2018; Cook et al. 2019; Zimring 1968, 1972). Alternatively, if gun violence represents a clear intent to kill that is absent in other types of assault or attack, the features of assaults with guns versus assaults with other weapons should be distinctive. In this latter scenario, intentionality drives the attack; fatal outcomes are more likely not because guns are more dangerous but rather because the attacker chooses a more dangerous weapon to achieve the result they intend.

Our review of the available scientific evidence suggests that guns do indeed make violent situations more lethal. It is important to note that the type of weapon used in violent situations matters in several ways. Guns are usually not fired and the victims of most gun assaults and gun robberies are not injured. Criminals deploy guns to control violent encounters and intimidate their victims without actually firing bullets and generating gunshot wounds. Victims are much more likely to resist attackers who use knives, blunt instruments, and other means. As such, victims in non-gun assaults are more likely to suffer injuries. However, when gun assaults and gun robberies result in injuries, victims are much more likely to die. Many factors influence mortality in injurious gun assaults; the number and placement of gunshot wounds on victims significantly influence the lethality of gun attacks, as do factors such as how quickly first responders provide initial aid and the proximity of high-quality trauma care centers. Finally, the technology of the guns deployed

in injurious assaults influences mortality, wherein firearms with higher-capacity magazines and larger-caliber bullets are more deadly than guns without these features

The guns used in violent crime are becoming more deadly over time, with the police recovering increasing shares of higher-capacity, large-caliber semiautomatic pistols. Yet case-fatality rates have stabilized, despite the more lethal technology of contemporary firearms, at roughly one gun homicide for every six victims with nonfatal gunshot injuries. Some evidence suggests that improved trauma care may be offsetting the increased lethality of handguns available to violence-prone individuals. Unfortunately, one-third of roughly 74,000 annual emergency department admissions for gunshot injuries are treated in community hospitals that do not have high-quality trauma centers (Coupet et al 2019). Increasing the number of hospitals that can provide life-saving care for traumatic gunshot injuries may save lives and decrease case-fatality rates in underserved areas. It is also tempting to consider increasing the use of new technologies, such as Shotspotter acoustic gunshot detection systems, that get first responders to life-threatening gun assault scenes quickly so short-term care can be administered immediately and patients can be transported to trauma centers more rapidly.

The available program evaluation evidence suggests that criminal justice interventions designed to change offender decisions to use guns in violent crimes, such as firearm sentencing enhancements and proactive policing efforts, are effective in reducing gun violence. Another policy issue that undergirds consideration of firearm instrumentality effects, however, is whether interventions that reduce the availability of guns to potentially violent people reduce the homicide rate. To gun rights advocates, gun controls are futile, as determined killers will simply complete their acts via the substitution of other means. Research highlighted here appears to provide a strong counter to this enduring argument made by gun rights activists by challenging the notion that gun-assault outcomes are determined by the intent of the shooter. Zimring's (1968, 1972) seminal studies and the Braga & Cook (2018) update indicate enhanced gun controls could indeed reduce homicide. These studies suggest that gun homicides and nonfatal gun assaults with injury are very similar in terms of incident circumstances and the characteristics of offenders and victims. Furthermore, mortality in gun assaults seems to be strongly influenced by chance events rather than indicators of assailant intent to kill. Importantly, the research finds that the likelihood of death was systematically associated with the caliber of the gun deployed in the attack. More powerful handguns were more likely to result in the death of the gunshot victim. The selection of gun caliber in these violent events was not correlated with available indicators of shooter determination to kill, such as the location and number of wounds. In sum, reducing the lethality of the weapons available to would-be killers may result in fewer fatalities in gun-assault events.

The existence of firearm instrumentality effects supports a wide range of gun control efforts to reduce the availability of firearms to high-risk people (Cook et al 2011). These policy interventions include tax initiatives to raise the price of guns and ammunition to dissuade violence-prone individuals from making purchases (Cook & Leitzel 1996), screening out high-risk purchasers via background checks (Ludwig & Cook 2000, Wintemute et al 1999), regulating secondary firearms markets (Cook et al 1995), and reducing illegal gun trafficking (Braga et al 2012). Unfortunately, we do not currently have much guidance on what works in reducing the availability of guns to high-risk individuals (Inst. Med & Natl Res Counc 2013, Natl Res Counc 2005). Like others, we think that it is time to experiment with alternative gun control measures in an effort to develop more effective interventions than the current array of policies and programs. And, in doing so, we should be mindful of potential substitution effects in which prohibited persons acquire guns through other mechanisms. For instance, a longitudinal study found that the passage of the Brady Handgun Violence Prevention Act of 1994, intended to screen out prohibited handgun purchasers through mandatory criminal history background checks at licensed gun dealers, had a negligible

effect on homicide rates (Ludwig & Cook 2000). However, the study authors suggested the homicide reduction impact of the Brady Act may have been undermined by continued criminal access to firearms through unregulated transactions made by unlicensed private sellers.

The potential impacts of developing such a portfolio of evidence-based gun control interventions could be quite large. One estimate suggests gun violence in the United States costs roughly US$100 billion per year (Cook & Ludwig 2006b). In their simulation of the impacts of the effects of replacing medium- and large-caliber handguns with small-caliber handguns on gun-assault outcomes, Braga & Cook (2018) estimate a near 40% homicide reduction if all shootings were committed with small-caliber handguns rather than the existing mix of large-, medium-, and small-caliber handguns. The RAND Corporation estimates that each murder costs some US$8.6 million and each aggravated assault costs roughly US$87,000 (RAND 2010). In 2018, there were approximately 10,265 gun murders in the United States (FBI 2018). If we were able to achieve a 40% reduction in gun deaths, the monetary savings would be in the range of US$35 billion. And, more importantly, such an intervention would spare families and friends the devastation of losing loved ones to senseless gun violence. As such, expenditures to test new interventions could ultimately prove to be highly cost-effective and reduce the tragic human costs perpetuated by ongoing gun violence in the United States.

## DISCLOSURE STATEMENT

The authors are not aware of any affiliations, memberships, funding, or financial holdings that might be perceived as affecting the objectivity of this review.

## LITERATURE CITED

Abrams D. 2012. Estimating the deterrent effect of incarceration using sentencing enhancements. *Am. Econ. J. Appl. Econ.* 4(4):32–56

Azrael D, Cook PJ, Miller M. 2004. State and local prevalence of firearms ownership measurement, structure, and trends. *J. Quant. Criminol.* 20:43–62

Baker SP. 1985. Without guns, do people kill people? *Am. J. Public Health* 75:587–88

Beauregard E, Leclerc B. 2007. An application of the rational choice approach to the offending process of sex offenders: a closer look at the decision-making. *Sex. Abuse* 19:115–33

Braga AA. 2003. Serious youth gun offenders and the epidemic of youth violence in Boston. *J. Quant. Criminol.* 19:33–54

Braga AA. 2017. Long-term trends in the sources of Boston crime guns. *Russell Sage Found. J. Soc. Sci.* 3:76–95

Braga AA, Cook PJ. 2018. The association of firearm caliber with likelihood of death from gunshot injury in criminal assaults. *JAMA Netw. Open* 1:e180833

Braga AA, Hureau DM, Papachristos AV. 2014. Deterring gang-involved gun violence: measuring the impact of Boston's Operation Ceasefire on street gang behavior. *J. Quant. Criminol.* 30:113–39

Braga AA, Kennedy DM, Waring EJ, Piehl AM. 2001. Problem-oriented policing, deterrence, and youth violence: an evaluation of Boston's Operation Ceasefire. *J. Res. Crime Delinq.* 38:195–225

Braga AA, Papachristos AV, Hureau DM. 2010. The concentration and stability of gun violence at micro-places in Boston, 1980–2008. *J. Quant. Criminol.* 26:33–53

Braga AA, Turchan BS, Hureau DM, Papachristos AV. 2019. Hot spots policing and crime reduction: an update of an ongoing systematic review and meta-analysis. *J. Exp. Criminol.* 15:289–311

Braga AA, Weisburd DL, Turchan BS. 2018. Focused deterrence strategies and crime control: an updated systematic review and meta-analysis of the empirical evidence. *Criminol. Public Policy* 17:205–50

Braga AA, Wintemute GJ, Pierce GL, Cook PJ, Ridgeway G. 2012. Interpreting the empirical evidence on illegal gun market dynamics. *J. Urban Health* 89:779–93

Bur. Justice Stat. 2019. NCVS Victimization Analysis Tool (NVAT). *Bureau of Justice Statistics.* **https://www. bjs.gov/index.cfm?ty=nvat**

Cohen J, Ludwig J 2002 Policing crime guns In *Evaluating Gun Policy Effects on Crime and Violence*, ed J Ludwig, P Cook, pp 217–39 Washington DC Brookings Inst Press

Cook PJ 1979 The effect of gun availability on robbery and robbery murder a cross section study of fifty cities *Policy Stud. Rev Annu* 3 743–81

Cook PJ 1980 Reducing injury and death rates in robbery *Policy Anal* 6 21–45

Cook PJ 1985 The case of the missing victims gunshot woundings in the National Crime Survey *J Quant Criminol* 1 91–102

Cook PJ 1987 Robbery violence *J Crim Law Criminol.* 78 357–76

Cook PJ 1991 The technology of personal violence *Crime Justice* 14 1–71

Cook PJ 2009 Robbery In *The Oxford Handbook of Crime and Public Policy*, ed M Tonry, pp 102–14 New York Oxford Univ Press

Cook PJ 2018 Gun markets *Annu Rev Criminol* 1 359–77

Cook PJ, Braga AA, Moore MH 2011 Gun control In *Crime and Public Policy*, ed JQ Wilson, J Petersilia, pp 257–92 New York Oxford Univ Press

Cook PJ, Braga AA, Turchan BS, Barao LM 2019 Why do gun murders have a higher clearance rate than gunshot assaults? *Criminol. Public Policy* 18 525–51

Cook PJ, Leitzel JA. 1996 Perversity, futility, jeopardy an economic analysis of the attack on gun control *Law Contemp Probl* 59 91–118

Cook PJ, Ludwig J 2000 *Gun Violence The Real Costs* New York Oxford Univ Press

Cook PJ, Ludwig J 2006a Aiming for evidence based gun policy *J Policy Anal Manag* 25 691–735

Cook PJ, Ludwig J 2006b The social costs of gun ownership *J Public Econ* 90 379–91

Cook PJ, Ludwig J, Braga AA 2005 Criminal records of homicide offenders *JAMA* 294 598–601

Cook PJ, Molliconi S, Cole TB 1995 Regulating gun markets *J Crim Law Criminol.* 86 59–92

Cook PJ, Nagin D 1979 *Does the Weapon Matter? An Evaluation of a Weapons-Emphasis Policy in the Prosecution of Violent Offenders* Washington, DC INSLAW

Cook PJ, Pollack HA. 2017 Reducing access to guns by violent offenders *Russell Sage Found J Soc Sci* 3 2–36

Cook PJ, Rivera Aguirre AE, Cerda M, Wintemute G 2017 Constant lethality of gunshot injuries from firearm assault United States, 2003–2012 *Am J Public Health* 107 1324–28

Coupet F Jr., Huang Y, Delgado MK 2019 US emergency department encounters for firearm injuries according to presentation at trauma versus nontrauma centers *JAMA Surg* 154 360–62

D'Alessio JG 1999 Gunshot wounds Bullet caliber is increasing *J Trauma* 47 992–93

Duggan M 2001 More guns, more crime *J Political Econ* 109 1086–114

Efron DT, Haider A, Chang D, Haut FR, Brooke B, Cornwell EE III 2006 Alarming surge in nonsurvivable urban trauma and the case for violence prevention *Arch Surg* 141 800–5

Fackler ML, Bellamy RF, Malinowski JA. 1988 The wound profile illustration of the missile tissue interaction *J Trauma* 28 S21–29

FBI (Fed Bur Investig) 2018 *Murder victims by weapon, 2014–2018* Rep , Dep Justice, Washington, DC

Feeney F 1986 Robbers as decision makers In *The Reasoning Criminal Rational Choice Perspectives on Offending*, ed DB Cornish, RV Clarke, pp 53–71 New Brunswick, NJ Transaction Publ

Felson RB, Messner SF 1996 To kill or not to kill? Lethal outcomes in injurious attacks *Criminology* 34 519–45

Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman F 1996 Characteristics of firearms involved in fatalities *JAMA* 275 42–45

Hedeboe J, Charles AV, Nielsen J, Grymer F, Moller BN, et al 1985 Interpersonal violence patterns in a Danish community *Am J Public Health* 75 651–53

Hemenway D, Azrael D, Conner A, Miller M 2019 Variation in rates of fatal police shootings across US states the role of firearm availability *J Urban Health* 96 63–73

Henigan DA 2016 *"Guns Don't Kill People, People Kill People" And Other Myths About Guns and Gun Control* Boston Beacon Press

Inst Med , Natl Res Counc 2013 *Priorities for Research to Reduce the Threat of Firearm Related Violence* Washington, DC Natl Acad Press

Jacobs BA 2000 *Robbing Drug Dealers: Violence Beyond the Law* New York Transaction Publ

Karlson TA, Hargarten SW 1997 *Reducing Firearm Injury and Death A Public Health Sourcebook on Guns* New Brunswick, NJ Rutgers Univ Press

Kates DB, Mauser G. 2006. Would banning firearms reduce murder and suicide? A review of international and some domestic evidence. *Harv. J. Law Public Policy* 30:649–94

Kellermann AL, Lee RK, Mercy JA, Banton J. 1991. The epidemiologic basis for the prevention of firearm injuries. *Annu. Rev. Public Health* 12:17–40

Kennedy DM. 2011. *Don't Shoot.* New York: Bloomsbury

Kleck G. 1984. Handgun-only control: a policy disaster in the making. In *Firearms and Violence: Issues of Public Policy*, ed. DB Kates, pp. 167–99. Cambridge, MA: Ballinger

Kleck G. 1997. *Point Blank: Guns and Gun Violence in America.* Hawthorn, NY: Aldine de Gruyter

Kleck G. 2004. Measures of gun ownership levels for macro-level crime and violence research. *J. Res. Crime Delinq.* 41:3–36

Kleck G. 2015. The impact of gun ownership rates on crime rates: a methodological review of the evidence. *J. Crim. Justice* 43:40–48

Kleck G, DeLone MA. 1993. Victim resistance and offender weapon effects in robbery. *J. Quant. Criminol.* 9:55–81

Kleck G, McElrath K. 1991. The effects of weaponry on human violence. *Soc. Forces* 69:669–92

Kleck G, Patterson EB. 1993. The impact of gun control and gun ownership levels on violence rates. *J. Quant. Criminol.* 9:249–87

Klinger DA, Rosenfeld R, Isom D, Deckard M. 2016. Race, crime, and the micro-ecology of deadly force. *Criminol. Public Policy* 15:193–222

Langhinrichsen-Rohling J, McCullars A, Misra TA. 2012. Motivations for men and women's intimate partner violence perpetration: a comprehensive review. *Partner Abuse* 3:429–68

Leovy J. 2015. *Ghettoside: A True Story of Murder in America.* New York: Spiegel & Grau

Libby NE. 2009. *Predictors of firearm use and effects of weaponry on victim injury in violent crime: a criminal events approach.* PhD Thesis, Univ. Cent. Fla., Orlando. 137 pp.

Libby NE, Corzine J. 2007. Lethal weapons: effects of firearm types on the outcome of violent encounters. *Justice Res. Policy* 9:113–37

Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. 2014. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a Level I trauma center. *Trauma Acute Care Surg.* 76:2–11

Lott JR. 2010. *More Guns, Less Crime: Understanding Crime and Gun Control Laws.* Chicago: Univ. Chicago Press

Ludwig J, Cook PJ. 2000. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *JAMA* 284:585–91

Marvell T, Moody C. 1995. The impact of enhanced prison terms for felonies committed with guns. *Criminology* 33:247–81

McDowall D, Loftin C, Wiersema B. 1992. A comparative study of the preventive effects of mandatory sentencing laws for gun crimes. *J. Crim. Law Criminol.* 83:378–94

McGarrell E, Chermak S, Weiss A, Wilson J. 2001. Reducing firearms violence through directed police patrol. *Criminol. Public Policy* 1:119–148

McGonigal MD, Cole J, Schwab CW, Kauder DR, Rotondo MF, Angood PB. 1993. Urban firearm deaths: a five year perspective. *J. Trauma* 35:532–37

Miller M, Azrael D, Hemenway D. 2002. Rates of household firearm ownership and homicide across US regions and states, 1988–1997. *Am. J. Public Health* 92:1988–93

Moore MH. 1980. Police and weapons offenses. *Ann. Am. Acad. Political Soc. Sci.* 452:22–32

Morral AR, Schell TL, Tankard M. 2018. *The magnitude and sources of disagreement among gun policy experts.* Rep. 1977400302, Rand Corp., Santa Monica, CA

Nagin DS. 2020. Firearm availability and fatal police shootings. *Ann. Am. Acad. Political Soc. Sci.* 687:49–57

Natl. Res. Counc. 2005. *Firearms and Violence: A Critical Review.* Washington, DC: Natl. Acad. Press

Pierce GL, Bowers WJ. 1981. The Bartley-Fox gun law's short-term impact on crime in Boston. *Ann. Am. Acad. Political Soc. Sci.* 455:120–37

Planty M, Truman JL. 2013. *Firearm violence, 1993–2011.* Bur. Justice Stat. Rep. NCJ 241730, Dep. Justice, Washington, DC

RAND. 2010. Cost of crime calculator. *RAND.* https://www.rand.org/well-being/justice-policy/centers/quality-policing/cost-of-crime.html

JA-638

Reid JA, Beauregard E 2017 A mixed methods exploratory examination of victim injury and death effect of weapon type and victim resistance during sexual assaults by strangers *Vict. Offenders* 12 253–76

Saltzman LE, Mercy JA, O'Carroll PW, Rosenberg ML, Rhodes PH 1992 Weapon involvement and injury outcomes in family and intimate assaults *JAMA* 267 3043–47

Sarvesvaran R, Jayewardene C 1985 The role of the weapon in the homicide drama *Med. Law* 4 315–26

Sauaia A, Gonzalez E, Moore HB, Bol K, Moore EE 2016 Fatality and severity of firearm injuries in a Denver trauma center, 2000–2013 *JAMA* 315 2465–67

Sherman L 2000 Gun carrying and homicide prevention *JAMA* 283 1193–95

Sherman L, Rogan D 1995 Effects of gun seizures on gun violence hot spots patrol in Kansas City *Justice Q* 12 673–94

Siegel M, Ross CS, King C III 2013 The relationship between gun ownership and firearm homicide rates in the United States, 1981–2010 *Am J Public Health* 103 2098–105

Spitzer RJ 1995 *The Politics of Gun Control* Chatham, NJ Chatham House

Swedler DI, Simmons MM, Dominici F, Hemenway D 2015 Firearm prevalence and homicides of law enforcement officers in the United States *Am. J Public Health* 105 2042–48

Swersey A, Enloe E 1975 *Homicide in Harlem* New York Rand Institute

Tark J, Kleck G 2004 Resisting crime the effects of victim action on the outcomes of crimes *Criminology* 42 861–910

Tillyer MS, Tillyer R 2014 Violence in context a multilevel analysis of victim injury in robbery incidents *Justice Q* 31 767–91

Vernick JS, Hepburn LM 2003 State and federal gun laws trends for 1970–99 In *Evaluating Gun Policy Effects on Crime and Violence*, ed J Ludwig, PJ Cook, pp 392–95 Washington, DC Brookings Inst Press

Vinson T 1974 Gun and knife attacks *Aust J Forensic Sci* 7 76–83

Weaver GS, Wittekind JEC, Huff Corzine L, Corzine J, Petee TA, Jarvis JP 2004 Violent encounters a criminal event analysis of lethal and nonlethal outcomes *J Contemp Crim Justice* 20 348–68

Webster DW, Champion HR, Gainer PS, Sykes L 1992 Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990 *Arch Surg* 127 694–98

Wells W, Horney J 2002 Weapon effects and individual intent to do harm influences on the escalation of violence *Criminology* 40 265–96

Wintemute GJ 1996 The relationship between firearm design and firearm violence handguns in the 1990s *JAMA* 275 1749–53

Wintemute GJ 2010 Guns and gun violence In *The Crime Drop in America*, ed A Blumstein, J Wallman, pp 45–96 New York Cambridge Univ Press

Wintemute GJ, Wright MA, Parham CA, Drake CM, Beaumont JJ 1999 Denial of handgun purchase a description of the affected population and a controlled study of their handgun preferences *J Crim Justice* 27 21–31

Wolfgang ME 1958 *Patterns in Criminal Homicide* Philadelphia Univ Pa Press

Wright JD, Rossi PH 1994 *Armed and Considered Dangerous: A Survey of Felons and Their Firearms* New York Aldine de Gruyter

Wright JD, Rossi PH, Daly K 1983 *Under the Gun Weapons, Crime, and Violence in America* Hawthorne, NY Aldine de Gruyter

Wright MA, Wintemute GJ, Rivara FP 1999 Effectiveness of denial of handgun purchase to persons believed to be at high risk for firearm violence *Am J Public Health* 89 88–90

Wright RT, Decker SH 1997 *Armed Robbers in Action Stickups and Street Culture* Lebanon, NH Univ Press N Engl

Zimring FE 1968 Is gun control likely to reduce violent killings? *Univ Chicago Law Rev* 35 721–37

Zimring FE 1972 The medium is the message firearm caliber as a determinant of death from assault *J Leg Stud.* 1 97–123

Zimring FE 2017 *When Police Kill* Cambridge, MA Harv Univ Press

Zimring FE, Hawkins G 1997 *Crime Is Not the Problem Lethal Violence in America* Oxford, UK Oxford Univ Press



Annual Review
of Criminology

Volume 4, 2021

# Contents

**The Discipline**

On Becoming "A Teacher or Something": An Autobiographical Review
*Ruth D. Peterson* ............................................................ 1

**Perspectives**

Perspectives on Policing: Cynthia Lum
*Cynthia Lum* ................................................................ 19

Perspectives on Policing: Phillip Atiba Goff
*Phillip Atiba Goff* ........................................................... 27

**Theory and Method in Criminology**

Toward a Criminology of Sexual Harassment
*Christopher Uggen, Ráchael A. Powers, Heather McLaughlin,
and Amy Blackstone* ........................................................ 33

The Causes and Consequences of Urban Riot and Unrest
*Tim Newburn* ............................................................... 53

Genocide, Mass Atrocity, and Theories of Crime: Unlocking
Criminology's Potential
*Susanne Karstedt, Hollie Nyseth Brehm, and Laura C. Frizzell* .............. 75

Human Mobility and Crime: Theoretical Approaches and Novel
Data Collection Strategies
*Christopher R. Browning, Nicolo P. Pinchak, and Catherine A. Calder* ........ 99

Where Is This Story Going? A Critical Analysis of the Emerging Field
of Narrative Criminology
*Shadd Maruna and Marieke Liem* ........................................... 125

Firearms Instrumentality: Do Guns Make Violent Situations
More Lethal?
*Anthony A. Braga, Elizabeth Griffiths, Keller Sheppard, and Stephen Douglas* ........ 147

## Uses and Abuses of Criminal Records

A Policy Review of Employers' Open Access to Conviction Records
*Shawn D Bushway and Nidhi Kalra*                                                   165

The Intended and Unintended Consequences of Ban the Box
*Steven Raphael*                                                                    191

Artificial Intelligence, Predictive Policing, and Risk Assessment for
Law Enforcement
*Richard A Berk*                                                                    209

## Criminalization and Criminal Legal Institutions

Decarceration Problems and Prospects
*Todd R Clear*                                                                      239

The Mass Criminalization of Black Americans A Historical Overview
*Elizabeth Hinton and DeAnza Cook*                                                  261

Life Sentences and Perpetual Confinement
*Christopher Seeds*                                                                 287

Local Government Dependence on Criminal Justice Revenue and
Emerging Constraints
*Shannon R Graham and Michael D Makowsky*                                           311

Models of Prosecutor-Led Diversion Programs in the
United States and Beyond
*Ronald F Wright and Kay L Levine*                                                  331

Opioids and the Criminal Justice System New Challenges Posed by
the Modern Opioid Epidemic
*Jonathan P Caulkins, Anne Gould, Bryce Pardo, Peter Reuter,
and Bradley D Stein*                                                                353

Plea Bargaining, Conviction Without Trial, and the Global
Administratization of Criminal Convictions
*Maximo Langer*                                                                     377

## Errata

An online log of corrections to *Annual Review of Criminology* articles may be found at
http //www annualreviews org/errata/criminol

# EXHIBIT R

## to Expert Report of Professor Louis Klarevas

PA 13-3, SB 1160

Senate Session Transcript for 04/03/2013

SENATOR LOONEY:

Thank you, Madam President.

Having adopted the three Agendas, would ask the Clerk to immediately proceed to call the single item appearing on Senate Agenda Number 3, which is Emergency Certified Bill 1160, if the Clerk would please call that item.

THE CHAIR:

Mr. Clerk.

THE CLERK:

Emergency Certified Bill Number 1160, AN ACT CONCERNING GUN VIOLENCE PREVENTION AND CHILDREN'S SAFETY, LCO Number 5428 [sic], introduced by Senator Williams and Representative Sharkey.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I move adoption and passage of the Emergency Certified Bill and seek leave to summarize.

THE CHAIR:

The request is on passage. Will you reply (inaudible).

SENATOR WILLIAMS:

Thank you, Madam President.

I would like to take us back to December 14, 2012. Here at the State Capitol, leaders, Democrats and Republicans, were involved

in negotiations concerning the budget of the State of Connecticut. We were working through the morning when word came to us that there had been a shooting at an elementary school in our state. Initially, that's all we knew about it. A little later, we heard that there was a possible fatality, an administrator, perhaps the principal.

We continued our work. We left to go to the press quarters here, where they were having their annual Christmas party and luncheon. As we spoke with reporters, the TV monitors were on in the background. All at once, there was a report that as many as 20 children had been killed, together with a number of teachers and administrators.

For a few seconds, it was hard to breathe. I looked around at my colleagues, as we recoiled at the horror of what we were learning at that moment. The center of the world's attention was Newtown, Connecticut, and the Sandy Hook Elementary School.

I remember thinking this could not be happening in our state. It could not be happening in our country and to our children. Senator McKinney went directly to be with his constituents in Newtown. Later, Governor Malloy joined the parents and the first responders.

At the end of that unimaginable day, we learned that we had lost 20 elementary school children and 6 teachers and administrators. They were killed with a weapon of war, a semi-automatic assault rifle, the platform of which was -- was originally designed for the battlefield and for mass killings. That was 110 days ago.

As we take action today, and as stunned as we are at the events of Newtown, we must also acknowledge this is not the first time in the history of the United States, most importantly the recent history of the United States, that we have confronted horrific gun violence. Think of Columbine High School; a nursing class at a college in Oakland, California; an Amish school, in Pennsylvania; Virginia Tech University; a shopping mall, in Nebraska; Fort Hood, Texas; a parking lot, in Tucson, where Congresswoman Gabby Giffords was meeting with her constituents; a Sikh temple, in Wisconsin; a Baptist Church, in Fort Worth; a movie theater, in Aurora; and, workplace shootings in every state in America, including a beer distribution center in Manchester, Connecticut, and the Connecticut State Lottery Offices. And those are just a few of the mass killings that receives tremendous attention. Every day in America, children are killed in our cities, without the attendant publicity. Every

**JA-644**

day in America, urban gun crime claims the lives of tomorrow's Americans.

We are obligated as leaders of this state to do all we can to protect our communities and our children. I remember the father of one of the slain children at Newtown, at a public hearing that we held in Newtown, who reminded us that his child deserved the rights of life, of liberty, and the pursuit of happiness.

Madam President, the tragedy in Newton demands a powerful response. It demands a response that transcends politics. Today, we have before us legislation that is the culmination of a bipartisan effort in the Connecticut State Legislature. It's the product of a task force of Democrats and Republicans, of public input at an unprecedented four public hearings, and a fifth public hearing conducted by the Public Safety Committee.

This bill addresses gun violence prevention, school security, and mental health services. It is the strongest and most comprehensive bill in the country.

I am going to now recount some of the main points of this bill. Then, Madam President, I will yield to Senators Looney, Harp, Boucher, Bye, and Stillman, for a more detailed review of those provisions of the bill, and then I will accept questions, Madam President.

But at this time I would like to say as to gun violence prevention, the bill includes a first-in-the-nation dangerous weapon offender registry. It requires criminal background checks for the purchase of all firearms. It expands and strengthens Connecticut's assault weapon ban and requires permits for existing weapons.

It bans the sale or purchase of high-capacity magazines, magazines containing more than ten rounds and requires a declaration of existing magazines. It requires a criminal background check for the purchase of ammunition.

It increases penalties for firearms' trafficking and illegal possession.

It amends the earned risk reduction program to ensure that gun offender felons and other violent criminals serve at least 85 percent of their sentences.

It bans the sale of armor-piercing ammunition.

In terms of mental health issues, it prohibits the possession of a firearm by a person who has been involuntarily committed to a hospital for persons with psychiatric disabilities; it expands the prohibition period from one year to five years. It prohibits the possession of a firearm by a person who is voluntarily committed to a hospital for persons with psychiatric disabilities, and that prohibition period is six months after release.

It requires the Department of Mental Health and Addiction Services to work with the Department of Education to provide mental health training for teachers and school employees, that they might catch cases earlier and obtain counseling and programs for our children.

It requires the Department of Mental Health and Addiction Services to create three additional, assertive community treatment programs designed to provide recovery oriented treatment and support services.

It requires the Department of Children and Families to implement a behavioral health consultant program to provide care coordination for primary care providers, that they can turn to experts in the field of mental health as they serve our children.

And it requires the Insurance Department to determine compliance with state and federal mental health parity laws.

As to school security, we are creating a fund so that schools may access the resources necessary to strengthen the -- the security at all of our schools. It also requires that an audit be conducted at our schools to pinpoint any particular safety problems. And it also requires that our teachers and administrators have heightened awareness, and in some cases receive training, so that they can detect issues resulting from behavioral problems or mental health issues and ensure that children get the attention and care that they need.

Madam President, at this time for the discussion of additional details regarding gun violence prevention, I would yield to Senator Marty Looney.

THE CHAIR:

Senator Looney, will you accept the yield, sir?

SENATOR LOONEY:

Thank you, Madam President; I do.

I wanted to thank Senator Williams for the yield, but in particular I wanted to thank him for his superb leadership in every way leading up to today's vote on this bill. Beginning on that tragic day of December 14th and through every twist and turn of our process leading up to today, his leadership has been magnificent.

It was my great honor to be the Co-chair of the Gun Violence Prevention Working Group, which was part of the -- the Task Force on Gun Violence Prevention, School Security, and Mental Health issues that was set up in January in the wake of the -- the Newtown tragedy.

As Senator Williams said, we had a lengthy public hearing of that, of that working group, followed by a second, follow-up hearing. The other working groups also had public hearings. There was a hearing of the entire task force that was held in -- in Newtown, at Newtown High School, on the evening of -- of January 30th, and in -- in addition to that, another lengthy, marathon hearing in the Public Safety Committee recently so that all of the concepts considered in this bill had been the subject of public comment in public hearings.

Would like to, as Senator Williams said, highlight some of the additional items related to the gun violence prevention section in more -- more detail. Obviously, one of the -- the key components is that now we establish our permitting process to go beyond pistols and revolvers to cover, to cover long guns, also a certificate of eligibility for the, for the possession, the legal possession of ammunition.

One of the great flaws in our law up until now is that someone who was in illegal possession of a gun, because he was a convicted criminal or one of the other reasons for -- for legal disability under our statutes, was able to -- to go in and legally buy ammunition for the gun which he was unable to possess legally. We are closing that loophole in our law with a provision in this, in this current bill. So we have the significant expansion of our, of our permitting and our -- our background checks, which is something that will put us, I think, in a much better position in terms of protecting public safety.

And also, Madam President, clearly there is, there is nothing in this bill that should be seen as -- as improperly infringing upon the rights of legitimate gun owners under either the Second Amendment, either under the Second Amendment of the Constitution or the corresponding provisions of our own, of our own State Constitution.

One of the things I would like to -- to point out is a key provision in this bill is something that a number of us who represent urban areas in the state have been advocating for, for several years, and that is for the establishment of a deadly weapon offender registry. And that is addressed in Sections 18 to 22 of the bill, and it highlights a problem that has been brought to us by many of our police chiefs, especially in urban areas. And that is the fact that in some cases, violent offenders, those who committed their -- their crimes with -- with deadly weapons, often come out of prison under no supervision at all because they have been, in effect, hard-core offenders who have not been able to earn any -- any reduction in their sentence, serve their maximum time, and come out into our communities, once again, without any additional restriction. So the irony, of course, is that some of these, the people who are the ones in -- in most need of -- of supervision get the least of it.

But under this bill, they will be required to -- to register with the department, with -- with DESPP, Department of Emergency Services and -- and Public Protection for a period of five years and be required to report in annually to their local police department as to their residence and their, and their current status. This is the way, I think, to -- to have these offenders given a cautionary warning by their local police department that where they are is known to the police and that they are, in effect, on a watch list.

This is, in -- in a way, somewhat analogous to the -- the Megan's Law registry for -- for sexual offenders, although this list is not one that would be accessible to the general public but for law enforcement purposes only, so that this is a -- a significant advance, I think, in -- in helping to put additional restrictions on those who have already demonstrated a propensity for violence by conviction of many violent offenses using guns and other weapons; so that is a -- one key section of the, of the bill.

As Senator Williams mentioned, of course, the bill also expands our -- our definition of assault weapons. We first passed an

assault weapons ban in 1993, here in Connecticut, a year before
the -- the federal ban went into effect, that was in effect for
a ten-year period, until it expired.

We are expanding that in -- in this bill and also addressing the
issue of -- of large-capacity magazines, as Senator Williams
said, that after, on or after January 1, 2014, anyone who
possesses a large-capacity magazine obtained before the bill's
effective date would be guilty of an infraction punishable by a
$ 90 fine and a class D penalty for any subsequent offense. So
we will have a -- a relation and a prospective prohibition on
the purchase of large-capacity magazines under the provisions of
-- of this bill. It is a very significant component that there
was a great deal of interest in.

As we said, we have an expansive definition of what constitutes
an assault weapon, that those who possess them currently would
have to register them and -- and banning future purchase of
those, of those weapons.

So we have in addition, Madam President, as we said, one of the
other things that was requested and that we included in this
bill, the Connecticut Police Chiefs Association had asked that
we expand our definition of armor-piercing bullets. Under
current law, only . 50 caliber armor-piercing bullets were
prohibited under

-- in Connecticut. This bill will expand that definition to
include ammunition of other calibers, other than . 50 caliber,
that are designated as "armor-piercing bullets. " This has been,
again, at the request of our police departments around the
state.

In addition, Madam President, while current law allows for the -
- the seizure of weapons that police officers under limited
circumstances can secure warrants to seize guns from anyone who
poses an imminent risk of injuring himself or herself or someone
else or has a -- a criminal conviction or restraining order
against that person, the bill expands that legal-seizure
provision to also include ammunition, as it could, because as we
all know, without the ammunition, a gun is only a club. And so
the -- the bill confronts -- conforms the law to current
practice, by allowing an ammunition seizure by the police as
well.

We also provide an expansion in funding for the state-wide
trafficking task force, and another very significant section of

**JA-649**

the bill. Throughout the bill, we have in Sections 42 to 43, 46 to 50, and 52 and 53, increased criminal penalties for gun trafficking and other gun-related offenses, a very important provision of the bill, that many of these crimes that previously were perhaps class D felonies are now being raised to class C felonies or class C felonies being raised to class B felonies, and also establishing substantial fines, as well, for people who have the capacity and financial resources to pay a fine. And the fines will be required unless the court makes a specific finding on the record to remit or reduce the fine and find inability to pay.

So, for instance, the crime of trafficking in firearms, under Section 53-202 of our statutes, that currently is a class C felony if the transfer is less than five firearms, that are class B felony, if more than five firearms. Now we make it a class B felony for all and also creating a minimum mandatory three-year prison term and a $ 10,000 fine.

The crime of stealing a firearm, which currently is a class D felony is going to be elevated to a class C felony, with a mandatory minimum two-year prison term and a $ 5000 fine.

The -- the crime of transferring a pistol or revolver to a prohibited person or violating transfer procedures, which is currently a class D felony, will be elevated to a class C felony, with a mandatory minimum two-year prisons term and $ 5000 fine.

And then the crime of transferring a pistol or revolver to a prohibited person or violating transfer procedures knowing the transferred weapon is stolen or has an altered identification mark, which is currently a class B felony, will continue to be a class B felony but now will also have with it a mandatory three-year prison term and $ 10,000 fine.

So one of the -- the areas of concern in this bill was that we also needed to try to find ways to address urban crime, which is also often committed with -- with handguns and illegally transferred handguns through straw purchasers and other things. And those concerns are addressed in this bill as well. So we have the -- the crime of an ineligible person soliciting a firearm through a straw man, which is currently a class B misdemeanor. That is be -- going to be elevated to a class D felony in this bill, with a mandatory minimum one-year prison term and a $ 3000 fine. An ineligible person obtaining a firearm from a straw man, class -- it will now be a class C felony.

So we have, throughout our criminal penalty statutes, enhanced penalties and mandatory provisions added to this bill that did not exist previously. So there, this is almost every element of gun-related crimes for possession or sale has an enhanced penalty under this bill.

Another provision, Madam President, that's an expansion upon existing law, is the safe-storage requirement. Under our law currently we have a provision that anyone who is in legal possession of a weapon but is in a household where there is someone under the age of 16 has to have the safe-storage provisions in our law that the weapons be kept secured and under lock and key. We are expanding that under this bill in two ways.

First of all, the -- the safe-storage requirement will be imposed on people who if they know or should know that a resident of the premises, one, is ineligible to possess the firearms under state or federal law; so, for instance, anyone, if anyone in the household has any legal disability because of a prior criminal conviction or -- or mental health commitment, that would also impose the safe-storage requirement rather than just the age requirement under current law.

And, also, anyone who poses a risk of imminent personal injury to himself -- himself or others, if that is known by the, by the owner, that also would invoke the safe-storage requirement, so that's also a significant expansion of our, of our existing law.

So there are -- we also in the bill make a -- a couple of changes to the Board of Firearm Permit Examiners, expand that board from seven to nine by adding one, retired, Superior Court judge to be appointed by the Chief Court Administrator and Department of Mental Health and Addiction Services' nominee to be appointed by the, by the Governor.

In addition, Madam President, we have a -- a provision that will prevent forum shopping for -- for pistol permits, by requiring that someone who is seeking a permit would only be to -- able to file one application per year and also would only be able to file in the town of residence rather than in the town where someone is employed. And we have seen some cases where people tried to perhaps forum shop, in that category. They will no longer be able to do that.

So there are a number of provisions, Madam President, that -- that address the concern about -- about excessively dangerous weapons but also, as we said, enhancing penalties, where

penalties exist under -- under current law, and trying to address the -- the concerns that arose in the wake of the terrible tragedy in Newtown but also the concerns that have existed in many of our urban areas for so many years.

So I am pleased to support this bill and all of its particulars, Madam President and would, at this point, yield to Senator Toni Harp to address the -- the mental health components of the bill.

THE CHAIR:

Thank you.

Senator Harp, will you accept the yield?

SENATOR HARP:

Yes, I will. Thank you, very much --

THE CHAIR:

Thank you, Senator.

SENATOR HARP:

-- Madam President.

I, too, want to thank Senator Williams for his leadership in this issue, and I also want to thank him for appointing me Co-chair of the Mental Health Working Group. And I'm going to thank a -- a hunch of people, because this is really the first time that we have worked in a bipartisan way. So, with that, I want to thank Senator McKinney as well.

I want to thank my Co-chair, Representative Terrie Wood; she was a joy to work with. I also want to thank the members of the Bipartisan Mental Health Working Group. The Mental Health Working Group had one of the best-attended -- by Legislators -- public hearings this year. All members stayed throughout the over-12-hour hearing. I want to thank them for their participation throughout this process.

I also want to thank caucus staff members who helped our working group, Ellen Scalettar, Katie Duggan, Mary Cyriac, Cara Passaro, Michael Goodwine, and Jason Stark.

This part of the bill requires the Department of Mental Health and Addiction Services, in consultation with the State Department of Education, to administer a mental health first aid training program that teaches educators and related staff to recognize the signs of mental disorders in children and young adults and helps them connect those children and young adults needing services to services.

Mental health's first aid is an established, evidence-based approach that has proved to be effective in helping participants learn to recognize and respond to individuals showing signs of mental illness. The bill creates a task force to conduct a comprehensive study of Connecticut's mental health delivery system, with a special focus on vulnerable 16 through 25-year-olds in our population.

The research topics include early intervention, the mental health work force, mental health professional's reporting responsibilities, intervention services available in our state and provided in our schools, behavioral health screening, involuntary outpatient commitment, and reducing mental health stigma, among other things. The behavioral health task force is charged to report to the General Assembly by February 1, 2014.

The bill also expands the Department of Mental Health and Addiction Services assertive community treatment program to three additional locations. The assertive community treatment program or "ACT teams," as they are called, are mobile, multi-disciplinary teams that provide recovery oriented treatment and support to those who have severe and persistent mental illness.

The bill adds, as well, more case management and coordination slots to assist people with mental illness who are involved with the probate system. And we heard from a program called "Melissa's Project" which is currently in the state, that we hope will be expanded through this authorization.

As well, the bill establishes an access mental health program, modelled after the Massachusetts Child Psychiatry Access Project and similar programs in 26 other states. The program will provide training, support, and professional consultations for pediatricians to help them intervene with children who have a mental health condition.

The bill also makes various changes to insurance statutes to improve the operation of the state's mental health parity statute, based upon the recommendations of the Program Review

and Investigations Committee. This legislation responds to
concerns that patients with mental health and substance abuse
treatment needs have faced barriers when attempting to utilize
private health insurance to access needed services. In some
cases, the costs of these uncovered treatments are borne by the
state, either through the Department of Children and Families
voluntary Behavioral Health Services for children program or
through the Department of Mental Health -- Department of Mental
Health Services for the services that they provide to adults.

There has also been confusion about the rationale behind the
carriers' decisions about what services are medically necessary.
These provisions seek to increase transparency and consistency
in that decision-making process.

And with that, I urge adoption, Madam President, but yield to
Senator Boucher.

THE CHAIR:

Senator Boucher, will you accept the yield, ma'am?

SENATOR BOUCHER:

Yes. Thank you, very much, Madam President.

Madam President, when a child is sent to school, their parents
expect them to be safe. The Sandy Hook Elementary School
shooting rampage was a parent's, school system and community,
and the nation's worst nightmare. Newtown teachers, first
responders, town leaders, first selectwoman, and the community
response was heroic, and we couldn't be more prouder of them.

I also would like to take this opportunity to thank my Co-chair
from the House, Representative Fleischmann, and the wonderful
members of the committee, who many were Chairs of various
relevant committees of the Legislature in their own right and
added valuable expertise and consensus recommendations to the
task force.

On behalf of the very conscientious and hardworking, Bipartisan
School Security and Safety Subcommittee members, we thank the
staff and the over 200 individuals that supplied written
testimony and over the 100 individuals who testified in person
on this very critical issue.

To guide our consensus recommendations, the School Security
Working Group held two informational forums. The first included
the Connecticut Association of School Superintendents; CAS, the
Connecticut Association of Schools; Connecticut Association of
School Business Officers; the State Department of Education
commissioner; the Police Chiefs Association; Fire Chiefs
Association; the Board of Regents; the UConn Security Police
chief, who was very instrumental in more than one meeting, I
might add; the CEA; the AFT; the Connecticut Association of
School Administrators; the Connecticut Association of School
Psychologists; CCM; and the -- also, COST.

The second meeting that we had included two recognized threat
assessment and forensic psychology experts, as well as an
additional meeting with state police, the State Department of
Education school construction personnel, and SROs.

Our public hearings, as I have just mentioned a minute ago, had
a hundred in-person testimony and over 222 written testimonies,
and we participated also in another meeting where we all met
together as combined subcommittees in Newtown, itself.

It's very important to note that the committee was able to
proceed expeditiously and with great efficiency in consensus, by
taking two very controversial proposals off the table; the
first, not creating costly mandates for our towns and cities by
requiring either ratios or quotas for added personnel; the
second, not arming or training teachers for school shootouts, as
80 to 90 percent of all stakeholders that contacted us, that
provided testimony, opposed this action as well as our law
enforcement community.

It was believed that the potential for collateral damage is too
risky when the safety of children and staff is at stake. In
fact, there was general consensus, even, that school security
guards or armed SROs should also be POST-Certified, and I think
that came across in some of the material we provided.

As far as our school security and safety plans, in our first
meeting we reviewed current law regarding school safety, and
what we learned is that there is no real, current, specific
state statute that requires school boards to establish an
emergency management plan. While we do not think that yet we
have the final police report on this particular tragedy, it is
pretty safe to assume that the emergency policies and procedures
that were employed by the brave staff and students at Sandy Hook
saved lives. We wanted to ensure that not only do we require

that every school have a school safety and security plan but that we should give municipalities the guidance and tools necessary to develop and implement these plans.

It was also of prime concern to our school communities that came before us and asked for guidance and best practices so that they can use them as they develop their own, local procedures. And they asked for this assistance. Section 86 of the bill requires our DESPP or Department of Emergency Services and Public Protection, along with the Department of Education to develop standard and state-wide school security and safety plans.

There are currently some really great plans that are being utilized by schools in Connecticut and in different municipalities, Westport being one that it was often cited as a good model. We wanted to give, however, the communities flexibility to develop and implement their own plans but also have state-wide standards that had to be met.

The standards developed by DESPP and the State Department of Education must include some of the following, as recommended by our working group: An all-hazards approach; the involvement of local officials, including the chief executive officer of the municipality; the superintendent of schools; law enforcement; fire; public health; emergency management, and emergency medical services; a command center organizational standard; a requirement that a School Security and Safety Committee be established at each school; crisis management procedures; a requirement that local law enforcement and other local safety officials evaluate, score, and provide feedback on fire drills and crisis response drills and annually submit this report to the DESPP regarding such fire drills and crisis response drills; procedures for managing various types of emergencies, because as we all know, there are many others, and that's why an all-hazards approach was recommended strongly; a requirement that each local and regional board of education conduct a security and vulnerability assessment for each school under the jurisdiction of such board, every two years, and develop a school security and safety plan for each such school; a requirement that the school's Safe Climate Committee, which is the bullying committee, collect and evaluate information relating to the incidences of disturbing and threatening behavior that may not meet the current definition of bullying; a requirement that school security and safety plan for each school provide an orientation on such school security and safety plan to each school employee at such school and provide violence

prevention training in a manner prescribed in such school security and safety plan.

Now, under this bill, the DESPP and the State Department of Education must develop these standards, by next January. In researching these issues nationwide, we found many states with excellent school safety programs, so it is our hope that our agencies don't try to reinvent the wheel but rather use existing or proven records and methods.

Section 87 -- 87 of the bill requires local and regional boards of education to develop and implement a school security and safety plan based on the new standards being provided, by July 2014. And they should review and submit these plans on an annual basis.

Section 87 also will -- requires the establishment of a School Safety and Security Committee at each school to assist in the development of safety and security plans. The committee must include in those particular committees a local police officer, a first responder, a teacher and administrator employed at the school, and a mental health professional. The board of education has the ability to name others to this particular group if they wish, such as, perhaps, a custodian or a paraprofessional. We all know the custodians know everything about the school, for sure.

The subcommittee heard compelling testimony regarding the free flow of information on potentially disturbing behavior in schools. Experts told us that following a school shooting, in interviewing those who had contact with the shooter prior to the incident, many had information that, when seen in isolation may not have seen like a problem at first, but when taken together, may have given a clue as to the mental state of the individual.

Maybe a student drew something disturbing in art class or wrote a disturbing essay in English or perhaps withdrew from sports or other extracurricular activities. We need a mechanism for someone to connect all the dots and evaluate and report this information. The bill utilizes an already existing model, as was mentioned, to accomplish this goal, as the school Safe Climate Committee, which is Connecticut's bullying statute.

Under this bill, this committee would be the repository of disturbing and threatening behaviors that do not meet the already established definition of bullying. The idea is not to investigate every instance of disturbing and threatening

behavior, rather to look at the information in total and report as necessary to the district school safe school climate coordinator and the School Security and Safety Committee.

In Section 90, we require Mental Health and Addiction Services, with the State Department of Education, to administer a mental health first aid training program and require the district -- a district-wide safe school climate coordinator to participate in this particular program.

Of course, on everybody's mind right at first is infrastructure, the infrastructure of a school. The subcommittee discussed this physical infrastructure and received valuable, very valuable public testimony on methods to harden our schools without making them prisons. It is very important to maintain a proper learning environment while balancing safety, and that was heard time and again.

In Section 80 of the bill, we establish a School Safety Infrastructure Council consisting of experts in school and buildings security. The council must develop school building safety standards, by next January.

In the bill, we ask the council to develop standards based on some of the recommendations we learned through the subcommittee process including: Entryways to school buildings and classrooms, such as reenforcement of entry ways' ballistic glass, solid-core doors -- that was mentioned time and again as the most effective and least costly -- double-door access; computer-controlled electronic locks; remote locks on all entrances and exists; and a buzzer system; the use of cameras throughout the school building and all entrances and exits, including the use of close-circuit television monitoring; penetration-resistance vestibules; and, other security infrastructure improvements and devices as they become industry standards.

After January 2014, all new school construction projects must comply with these standards, which will be reimbursable through the regular school construction process, and these requirements are contained in Sections 81 through 82 of the bill.

But we didn't want to wait until 2014 to assist our municipalities with the expense of school security infrastructure, so in Section 84, you'll find that we resurrected the 2007, school security competitive grant program to reimburse towns for certain expenses incurred in the development and the improvement of school security.

The DESPP, along with Construction Services, and the State Department of Ed, will jointly administer this program, and towns are eligible for a grant percentage equal to the same percentage used in our school construction process. Once the program is up and running, funds should be made available immediately, if anyone asks about that in your local community in Section 85, we authorize bonds in the amount of 15 million for this particular competitive grant.

I'm going to end with the area of higher education. While the subcommittee on school security focused on K-12, and most of this bill does deal with that, we believe that a safety component for our colleges and universities should be raised and was raised by the Higher Education Committee for a public hearing, as the leadership of this committee were also represented on our subcommittee.

And in yielding to the distinguished Chairwoman of the Higher Education Committee, Senator Bye, who will proceed to outline the -- the content of this portion of the bill, I wanted to end with -- by saying that it was truly a privilege to serve as your Co-chair on the School Security Subcommittee and very proud to report that our recommendations were developed in a bipartisan and fully consensus manner. The members of this committee were grateful to see that the school security language contained in this bill substantially matches the spirit of the subcommittee recommendations.

And I would also like to thank, very much, the President of our Senate, Senator Williams; Majority Leader, Senator Looney; Minority Leader, John McKinney, who's a great mentor and a wonderful friend to all of us on our side of the aisle; and, also, to Speaker Sharkey, for their guidance and leadership throughout this very difficult but very vital process.

Thank you, very much. And I yield, again, to my wonderful Co-chair, Senator Bye.

THE CHAIR:

Senator Bye, will you accept the yield, ma'am?

SENATOR BYE:

Yes. Thank you, Madam President.

And through you, Madam President, thank you, Senator Boucher for that summary of the school safety. And I just want to join you, while you've just finished in thanking our leaders for their work on this bill and their incredible leadership. I think it's a very proud day for the state, and your leadership made that happen. And you were also very supportive of our subcommittee work, as Senator Boucher said.

Let me start, as many have, by thanking Senator Boucher, who's always there on Higher Ed asking tough questions and pushing important policies and making policies better, also, our -- our House Ranking Member, Representative LeGeyt, was very helpful with this bill and my Co-chair, Representative Willis, has such a deep understanding of higher education and our system in Connecticut, and that helped this process as well.

I'm sure that members of this body know that, as Senator Williams referenced, there have been mass shootings on campuses. Our campuses house adolescents and we all know that a lot of times when people have mental health challenges, it's that early adolescence when that happens. And so we really believed that a part of this education security provisions and safety should be extended to higher education, and we worked with the Education Co-chairs, Senator Boucher, and Representative Fleischmann to develop these, but it was a very collaborative process.

And I must thank the police officers at our CSUs, community colleges, and UConn, who are such a source of knowledge and understanding about adolescents and about what their campuses need to make sure that our students are safe on those campuses. And our independent colleges were also a part of this work and real team players.

So the higher education portion of this bill asks that state and independent colleges submit a security plan to the Department of Emergency Services and Public Protection. One thing that Sandy Hook showed us is how important it is that everybody understands, if you will, the lay of the land. And it's important to have a state and a local component, and so this bill will have those plans for all our public and private colleges.

It also requires a security and vulnerability assessment of campuses every two years, and each campus will be required to develop a threat assessment team that brings in input from many different sources. It also requires a board of regents for

higher education to study the creation of a police department at
our community colleges and when that might be appropriate.

We all remember, just several weeks ago, the scare that happened
on Manchester Community College campus. Senator Cassano has been
a real champion for doing this study and having a set of
policies about police officers on campus.

It also requires that there are security audits of the state
universities and community colleges, that are performed by the
Department of Emergency Services and Public Protection.

That summarizes the broad points, Madam President. I'll be happy
to entertain questions, but at this point I would like to yield
to the fabulous Co-chair of the Education Committee,
Representative [sic] Stillman.

THE CHAIR:

Representative Stillman, will you accept --

A VOICE:

No, it's Senator.

SENATOR BYE:

Senator Stillman.

THE CHAIR:

What are you doing to me? Senator Stillman, will you accept the
yield, please?

SENATOR STILLMAN:

Yes, thank you, Madam President, I do accept the yield.

And thank you, Senator Bye, for that lovely introduction; I
appreciate it.

I -- I, too, as -- as a member of the School Security
Subcommittee and -- and a member of the task force, itself, was
honored to play a role in developing policy, a new policy for
the state; specifically in my, in my role as the Senate Chair of
the Education Committee, that was really my focus. And I want to
thank Senator Boucher for her leadership on that subcommittee

and for her very clear and synopsis of what is in this particular bill in reference to school security and outlining the steps that it took to develop these policies that are in front of us today.

I, too, would like to thank Senator Williams and Senator Looney for their leadership, and Senator McKinney on -- in terms of make -- continuing to make this a true bipartisan bill and a bipartisan effort to address an issue in the state which was -- was so overwhelming for so many of us, as we wrapped -- grappled with the events that happened at the Sandy Hook School.

You know, for the parents and families that send their children to school every day, this was a real wake up call for them, in terms of the fact that, as parents and members of families who -- who send our children to schools, there's that very long day that we -- we are not in control of our children's activities and we rely on our schools to keep our children safe and secure and -- and feel comfortable in their respective school settings. And it's so for those reasons we really did need to address enhanced safety measures at our schools.

And Senator Boucher did, as I said, a very good job outlining the concerns that were raised and what do we do about it. I -- I will tell you that the subcommittee, itself, worked very hard, and all the members of the subcommittee, I -- I thank them, actually members of every single subcommittee, for the extra hours that they put in, in this Legislative Session to craft a bill that is before us today.

You know, I think it's important to remember, though, that even though the state is going to develop some standards through the new School Safety Infrastructure Council, that these will still be standards that when they are developed will be an opportunity for our schools to determine if they are appropriate for their -- their school buildings. This bill really focused more on the infrastructure, as -- as opposed to some other issues that came before us that many felt were more appropriate to the Mental Health Subcommittee. And I -- I thank them for addressing some of the concerns that were raised in our subcommittee.

One thing that we established when the bullying bill was passed, a couple of years ago, were the Safe School Climate Committees. And I think the fact that we had put that in place really allowed us to enhance their value in our schools. And that's what these recommendations are doing; that's another part of the recommendations, to enhance how this -- those School Safety

Climate Committees, who are dealing, some of them with bullying issues -- can also be a new resource, a new opportunity, too, for people, for kids, especially in the schools or for teachers to go and have someone to talk to and say, You know, I'm concerned about what I saw or I'm concerned about a certain child; I'd like to bring it to your attention or -- or I don't like what I heard.

And so I -- I think the fact that we had advanced such a comprehensive school bullying bill, I -- is really helpful to this process as we make our schools even more safe and secure. And so when we do send our children to school every day, we can, we can feel as though they are in -- in the safe place that we've always hoped they -- they would be in every single day, because if they don't, if the children don't feel safe in their schools, they're not going to learn. And the teachers aren't going to be able to teach as

-- as well as they do, so it's, so I'm very pleased that the provisions are in this bill.

And, again, I want to thank the leadership for leading us to this point of a comprehensive bill on a bipartisan basis, one that I'm proud to support and certainly hope that my colleagues here in the Circle will do the same. I believe that this bill is a great opportunity for Connecticut to set a framework for other states to follow.

And with that, I will, if I may, Madam President, I would like to yield back to Senator Williams.

THE CHAIR:

Senator Williams, will you accept the yield, sir?

SENATOR WILLIAMS:

Thank you, Madam President. Yes, I accept the yield.

I, too, would like the thank my fellow Senators, particularly those who just spoke, Senator looney, Senator Harp, Senator Boucher, Senator Bye, Senator Stillman. I also want to thank all of the Senators and Representatives who served on the Bipartisan Task Force addressing Gun Violence and Children's Safety. And, in particular, Speaker Sharkey; Minority Leader in the House, Larry Cafero; but, especially my friend and colleague, Minority

Senate Leader John McKinney, all have provided tremendous leadership on this issue.

And, Madam President, as a process clarification, I do want to underscore the fact that Connecticut is doing something that no other state has done. It's addressing this issue not in a partisan way, not in a political way, but in a bipartisan way with Democrats and Republicans working together. After the tragedy in Newtown, I -- I spoke with Senator McKinney; I spoke with Speaker Sharkey, and we decided to approach it in that way. We have been criticized by folks on both sides for that approach, but we have done something fundamentally different in the State of Connecticut. And the legislation that is before us is a better product for it.

Thank you, Madam President.

THE CHAIR:

Thank you.

Will you remark?

Senator Kissel.

SENATOR KISSEL:

Thank you, very much, Madam President.

December 14, 2012, for our family, was holiday time. It's a Friday. Many of us who have children drove them to school, kissed them good-bye. My friends and colleagues here in the Circle are well aware that I have two sons that I am extremely proud of, my son Nathaniel, who's 17, but my little guy, Tristan, who just happens to be born on December 15th. So on that Friday, not only was our family looking forward to the Christmas holidays but we were very much looking forward to that Saturday when we would celebrate Tristan's 9th birthday.

And as I drove home that Friday and listened to all the accounts on the radio and was completely overwhelmed that what I saw at the beginning of day, while physically it had not changed, emotionally it had changed because of the events that we were being told had enfolded in Newtown. There was a pall not only over Connecticut but our entire nation and to those that were following the story from throughout the world.

And when I got home, my little guy was there, and as all moms and dads did that night and probably have reassured themselves to do every day, is I gave Tristan in particular a hug and a kiss. And I said, Did you know what happened today? And he did. Not in any great detail, but they had explained it at his school. And we went over and we chatted a little bit. Was he afraid? And he actually wasn't.

He actually confided that he was more disturbed by the fact of what took place in Colorado, because as a little 9-year-old or 8-year-old, going on 9, he was a huge Dark Knight, Batman fan. And it's almost as if he understood that there weren't -- might be rigors in a school environment, but a movie theater, that's where magic was supposed to happen. You're supposed to be safe and transported into a different world. Wow. So I would acknowledge that these events do have an impact on us as well as our children. And to the extent we make efforts to try to stop these events, those efforts are worthwhile.

We had an enormously long public hearing on the 28th of January; I've had longer in Judiciary, when we would start at ten and end at quarter-to-three. We had panels in the morning, and the public didn't begin testifying until one. But, again, it was one of those marathon hearings where we didn't end until about quarter-to-three.

And then on that Wednesday, everybody who was honored enough to serve on the General Task Force was invited to go to Newtown High School, and it was an unusually warm January 30th, but still overcast. And I arrived in Newtown, a town I had passed through probably dozens of times but hadn't really spent an awful lot of time in the town. And our hearing was to begin at six, and I got there an hour early, and I and I just wanted to drive around and get a feel for the community. And I drove by the front of Sandy Hook Elementary School and saw probably four cones blocking the entrance, and where that fire department is. And clearly no one was going down that -- that roadway.

I just wanted to drive around the neighborhood, and I saw houses with -- with tributes on their front of their houses. And I just sort of followed the roads, and I followed a road up a hill. And lo and behold, to my right I saw a beautiful park, and I just decided to go in there. And there was only one vehicle in there; it was a commercial trucker, just finishing up his paperwork. And as I parked, he drove out, and now I'm in a park up on a hill in Newtown, in the Sandy Hook section of town, just looking about, trying to get a feel for that community.

I think the school is close to that park. I got a sense that that was the case. It was a beautiful park; it still is. I haven't been back to Newtown since that day, January 30th, but I remember walking. There was an area, pool area, soccer fields, picnic pavilion, and up near the edge of a hill, that little playscape area where you know little kindergartners and first-graders and second-graders would like to play.

And I walked near that area. And in that park it sort of falls down, and there's deep woods and paths. And it was too muddy to -- to even travel down there, but I had a sense that near that park was that school. And I almost had a sense that perhaps some of the souls of those little children, administrators, and teachers -- I like to believe that one goes up to Heaven -- but if they were going to come down as angels and visit, that would be familiar territory and friendly territory, a happy memory.

What do those moms and dads feel? They testified before us on that Monday. They came to Newtown High School and testified again. I have told my constituents, I said, as a dad, if that happened to my children, I don't know what I would fight for or not fight for, because to lose a child before yourself and to lose a child in that kind of situation has got to be every parent's worse nightmare.

So I spent a good half-hour in that park, just trying to get a sense of where I was, wondering if maybe down that hill, in those woods was that school. But I wanted to be up where the playscape was, trying to hope that there were still some of those good sentiments. And before I left, a young woman with an English accent -- I don't know if she was the mom or the nanny -- but two little kids on little bikes with little training wheels, and it was nice. They were just -- I mean, when in January 30th do you get to go to a park? And they got to go to a park.

And I go, lucky day for these guys. And she goes, yes. I go, what's the name of this park? And -- and I thought she said "Dreadwell," and that seemed sort of -- she goes, "No, Treadwell" -- maybe that was a Freudian slip. But that was the park. That was the place. I will always remember that place because I think there's something special there. There's something special in that community, and they will struggle with this for the rest of their lives, but to the parents and the first responders and everybody that came and testified, I have got to give them huge respect.

Now, very briefly, I want to bring you back 30-odd years to when
I was a student, an undergrad student, at the University of
Connecticut, and it was a beautiful, late-September, early-
October day. It was a Saturday or Sunday and I just decided to -
- I was a freshman -- I wanted to explore the territory. I
didn't, you know, you know where you are. You have your dorm; it
was the Northwest Quadrangle. I wanted to take a walk, and it
may have been North Eagle Hill Road -- I'm not exactly sure --
but I walked by myself, just enjoying the autumn leaves. And I
stumbled upon what could only be a colonial graveyard, and I
read some of the tombstones over on the right-hand side. And
they were really incredible, and I actually wrote, wanted to
write one down, use it for myself.

Sort of being a little -- and I wouldn't -- necessarily
adventurous, but I like to explore, I walked into this colonial
graveyard that didn't really have a formal gate opening or
anything; it was just tucked away from the woods, and I went to
the back of it. And I was startled by what I saw -- 18-year-old
kid, new to a territory, a State of Connecticut -- and over in
the distance I saw something that was so strange, it was like
out of a movie.

And it was a set of buildings, stark, and someone was in a caged
area with someone standing not too far away, maybe holding a
baton or holding the keys to the, to the caged area. And this
person was, like, just kept, like, shaking spiders off
themselves or something like that; it was, it was very odd. I
couldn't actually, I mean, part of it is you watch that and then
you skedaddle out of there as fast as you humanly can.

Well, turns out, lo and behold, I had stumbled into one of the
back areas of Mansfield Training School, and back in those days,
people with severe mental illness were housed in these
institutions. And folks got it in their heads that, you know
what, this is not a humane way to treat people with mental
disabilities.

And so we went about as a society in the last 30 years or so
deinstitutionalizing individuals, and those that are severely
disabled, we still make sure have appropriate housing and care.
But for so many with mental disabilities, there is not the
appropriate medical attention. There is not the appropriate
housing. There is not the appropriate care as a society, whether
they are new Veterans returning back from war, whether they are
the homeless, whether they are young people spotted in schools,
even at the earliest ages, we don't do a good job in that area.

We did a good job letting folks out of the institutional
climate, but we haven't really done the other part of it. And
there are good things in this bill regarding mental health
parity, the recommendations of the Program Review and
Investigations Committee. In fact, in the bill that we have
before us, there's a lot of good things.

But then I get to my other point, because we had the litany of
experiences that people have pointed to and said look at this
horrific event and look at that honorific event. And I say look
at it in the totality of circumstances in our country. And while
in many instances guns are involved, the thing that I see as the
common thread is the mental health issue. And while the bill
before us this afternoon touches that and creates a task force
to study it further and is very ambitious in its laudable goals,
to my mind, that's where we need to look first.

And, unfortunately, what I have seen over the years, whether one
disagrees with me or agrees with me, is that we turn to guns
first. It's like that movie "Casablanca," where the French
police chief goes, bring in the usual suspects. Well, anybody
involved in law enforcement knows you match the evidence to the
suspect; you don't bring in the usual suspects.

There are people that will be against certain guns, no matter
what. I do not state that any of my colleagues whom I care for
in the Circle feel that way, but there are folks out there that
have no use for the Second Amendment, whatsoever. And so the
first thing they look to is how do we regulate guns even
further; how do we regulate ammunition? How do we make it more
difficult?

And I say that's okay to discuss; it's worthwhile. We owe it to
the parents and the loved ones and the sisters and the brothers
and the husbands, the moms and the dads, we owe them that
discussion. But at the end of the day, making it more onerous,
more cumbersome, more burdensome on law-abiding citizens in our
state is not the solution.

Please don't. Please don't.

THE CHAIR:

Excuse me, Senator.

SENATOR KISSEL:

You -- you --

THE CHAIR:

Excuse --

SENATOR KISSEL:

You are --

THE CHAIR:

-- me, Senate -- Senator --

SENATOR KISSEL:

You are not --

THE CHAIR:

Excuse me.

SENATOR KISSEL:

-- helping my argument.

THE CHAIR:

Excuse me, a minute, Senator.

Ladies and gentlemen, I asked before, I ask you again, please hold your applause or your boos. This is not the time. I have been told and asked by the -- the state police, the Capitol Police to -- if you continue this, they are going to remove you. I ask you not to do that, because we really do think you should be in this Chamber.

Thank you, very much --

SENATOR KISSEL:

Thank --

THE CHAIR:

-- Senator.

SENATOR KISSEL:

Thank you, Madam President.

And it's not an easy decision. I can tell you right here and right now, I didn't sleep at all Monday night because I had the images of little kids in my face, in my dreams, the 20, little, first-year, first-graders.

So I have my public policy views. I have what I believe in, that I've stood for, for over 20 years. But I will say this to everyone in the State of Connecticut, this is not an easy vote for any of us. If any one of us had the magic solution, we would be done. Nothing could make me happier than if this bill solved all of these issues. But in my heart of hearts, I don't believe that to be the case.

I respect those that brought this bill before us. I can state unequivocally that if it were not for Senator McKinney, Representative Cafero, and others in that room negotiating this bill, it would be far more onerous on law-abiding gun owners, hunters, sportsmen, competitors, those that just want to collect firearms. But at the end of the day, I have to weigh all the good things -- and there's lots of good things in here -- versus those steps that I feel that go too far in maybe not necessarily demonizing law-abiding gun owners but making their lives much more difficult.

Some people have said have you changed your position, because you've got the bill here and you're going through it. This isn't the bill. This isn't the bill. This is five years old, District of Columbia v. Heller; this is the United States Supreme Court decision, that finally was handed down, that stated succinctly that that prefatory clause in the Second Amendment does not limit the substantive clause that people have a right to bear arms. And you don't have a right to bear arms in the United States because you need to join a militia; you have a right to bear arms because you can protect yourself. That has been the multi-centuries' history of folks blazing a way through the wilderness and protecting themselves through all sort of hazards in the United States.

I have heard there will be legal challenges to the bill before us this afternoon. I do not know if this will be grounds to overturn any of the portions in the bill before us, but I will say this -- and I will conclude with these sentiments -- our founding fathers knew exactly what they were doing.

And I stumbled upon something in the last couple of months, purely be chance -- hard winter, cold -- cold now -- it's April; it's cold -- I was listening to an audio book, going to and from work, to and for -- from session, sometimes just taking half-hour walks in my neighborhood, just trying to get out of that house, because it's winter and you get cabin fever. And the book I selected, a long one, was the Biography of John Adams. I was fascinated. I'm a New Englander; he's a New Englander. I always thought he got a little short shrift, being boxed in between Washington and Jefferson, and it was fascinating. My love and respect for that man, that president, went up astronomically with the rendition of his story of his life.

One of the things I liked the most is he doesn't view life as a ladder, where you're trying to always get ahead; he viewed it as a journey, where you need to try to learn something all along the way. But buried in there, as I'm listening, six, seven, eight weeks ago, on March 14, 1776, the Continental Congress -- not the bad guys, the good guys -- as they voted on all issues at that time, knowing that they were about to go to war with Britain, in revolution -- obviously behind closed doors, because you don't want to be accused of defying your nation -- on March 14, 1776, they voted to take away all the firearms of every Colonial citizen that was leaning towards or supportive of the British, any Tory, approximately one-third of the colonists. They don't teach us that in school, but that's what they voted on. John Adams, Ben Franklin, our heroes. They knew war was on the horizon and they said, well, better get the guns away from these folks so that we don't have to watch behind our back as we're fighting the British in front of us.

Well, doesn't then it make sense, they knew how powerful a weapon that was, that later on, as the Constitution is being formed and they amend the Constitution, right to keep and bear arms shall not be infringed. That makes sense, because guess what? Most of those folks were the same. They were certainly informed about the same events. And they said to themselves, wow, we were able to go do that. Granted it was the anticipation of war, but you know what? We got to make sure that never happens to us. So going forward, we're going to make sure that we have that right so that never can happen to us, because we -- that's a scary thing.

Is it something legitimate that I'm concerned about happening a year from now or two years from now or three years from now? I don't know. I would not suspect it to be so. But for those individuals that are concerned about their Second Amendment

rights, incrementalism is a real concern. And having all the information in one area is a real concern, because while this year people are grandfathered, there clearly are individuals that would not go that far and would say, you know what, these magazines should be gone now. And you know what? We're not going to compensate you for them. And you know what? These hundred guns should be gone now. And you know what? We're not going to compensate you for them, and if you don't like us, like it, sue us.

And then maybe the Supreme Court would decide it five or six or seven years down the line, because my constituents in north-central Connecticut and many other places that I've heard from understand incrementalism. They understand big government. They have a slight suspicion. Oh, you only want to go this far today but tomorrow you might go a little farther. And I can't blame them for that concern when I hear that we have this great compromise in the bill -- the bill before you -- but at the same time both Governor Malloy and advocates for further gun control say it doesn't go far enough but it's -- it's a good first step.

How can I turn to my constituents that are concerned about incrementalism and losing their Second Amendment rights? How can I turn to them and say they're not being reasonable when at the very same time this bill is before us, folks that want further control are saying it's just a good first step. That's their proof. And while there may be an agreement between the leaders not to go further this year with further gun control efforts, it's my understanding there is no such agreement for next year or the year after or the year after that.

So I will conclude by saying this: You just can't have a heart at all if you don't feel for the families and friends and neighbors of the victims of that Newtown massacre. You don't have to be a mom or a dad to know how diabolically evil it is for someone to go in there and shoot first-graders. Everyone understands that we need to do something to address that. Mental health issues, school safety enhancements, but when it comes to further regulations on guns and ammunition, in one of the states that is touted as having right now some of the most tough gun laws in the United States of America, I think goes one step too far.

And for that reason, Madam President, with the utmost respect to the proponents of legislation, and with the utmost respect to the moms and the dads and the husbands and the wives and the brothers and the sisters and all of the God-fearing, law-abiding

citizens in the State of Connecticut, I will have to vote no this afternoon.

Thank you.

THE CHAIR:

Thank you.

Senator Meyer.

SENATOR MEYER:

Thank you, Madam President.

What a journey it's been for us, these last several months, for each one of us. I'm 77 years of age, and yet I have learned so much in the last two-and-a-half months about Connecticut, about our residents, about their feelings.

I heard, first and foremost, fear because of Newtown. And fear came from two sources -- and you, you heard it too, I'm sure -- the fear of -- of homeowners that if they didn't have guns with multiple rounds, they would never be able to protect themselves. One -- one constituent of mine, in Guilford, said to me, I need more than ten rounds in my gun magazine because I'm lousy shot. When they come in my home, I'll -- I'll miss the first ten rounds.

And -- and I also heard fear, as you've heard fear, from so many people who have families and are concerned about what's going to happen as long as we have this obsession with guns. And I -- I felt and I've -- I'm sure many of you feel that there is too great, in Connecticut and in the country, an obsession with assault guns and with the large-capacity gun magazines.

I also heard -- we heard a bit from Senator Kissel on this -- about great objection to government interference. I went into a gun shop yesterday. There was a huge poster, as you walk in the gun shop. It said, Background checks start with the President; okay? Government interference is another thing that I heard more loudly than I've ever heard before, in my eight years in the State Senate.

So what do we have before us today? Clearly we have the most comprehensive gun violence legislation in America. It deals with so many facets and in such a comprehensive way; reasonable gun

restriction; mental health; school security, as our colleagues have well articulated this morning and this afternoon.

But I must say to you, too, that this bill has a significant and alarming omission that we must in the future address, and that omission is that it allows gun owners today who have the large-capacity magazines of more than ten rounds, it allows them to keep them for the rest of their lives.

Adam Lanza killed those kids and adults because he had a 30-round -- he had 10, actually -- 30-round magazines that he brought to that elementary school that morning. And we learned that because of these gun magazines, he was able to fire what looks like 154 bullets, 154 rounds in about 4 minutes.

The Newtown parents, we all got a letter from them on Monday of this week. They reminded us of the key issue here. The letter says that our proposal grandfathers existing, large-capacity magazines, leaving a gaping hole on what we believe is the most dangerous feature of an assault weapon. And it goes on and says how can we not remove large-capacity magazine from Connecticut if we know that it might save even one more child, teacher or parent? That addresses a problem that we in the future must undertake.

Yesterday, I stood in line, for a long time, at a gun shop and -- and purchased a couple of gun magazines that I want to share with you. This -- this one here is -- is the kind that the -- the Newtown killer used. It's a 30; it contains 30 bullets, 30 rounds in it. And, unfortunately, those of -- those people who have this magazine will be able to keep it under the current legislation. This one actually contains 60 rounds. The salesman in the gun shop said, you better grab it quick; it's the last one. We won't get any more in until Friday, he said. Okay? That's the climate. That's the environment that we're facing today.

I did prepare, I did prepare an amendment that I'm not going to call. I prepared an amendment, which actually is LCO 5453, to deal with this omission, what I believe is an omission. We will look at that some other day, maybe in some other year. But we made a step today, but I want to just remind you from the vantage point of many of us and many of our constituents, what we're doing today is a work in progress.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Guglielmo.

SENATOR GUGLIELMO:

Thank you, Madam President.

You know, I have -- I'm the Ranking Member on Public Safety, so I sat through the two, 18-hour-or-so public hearings, and I heard from a lot of people. And like Senator Meyer, I learned a lot, myself. I -- I did know something about firearms from my time in the service and because I'm a member of a local rod and gun club, but rather hardly an expert; but I did learn.

But even before we get into the weeds of this bill, which is -- I don't know, Scott has it here -- 140 pages or so, I -- I knew I was going to vote no because I didn't need to get into the weeds of the legislation; I can't get by the premise.

See, the premise set, that boggles my mind and boggled the minds of so many of the people who testified in front of our committee, is you have two columns, you know. And one column you have a deranged young man, a mass murderer. I wouldn't even call him a "shooter" -- that kinds of glorifies him -- he's a mass murderer. A sick individual hero-worshipped other mass murders, apparently. We don't know that for a fact, because we don't have the police report; we got drips and drabs, but that's an argument for another day. I mean, should we even be here without a complete police report? I -- I think not, but that's what happened.

So that's the column we have; we have a mass murderer, somebody who's very, very sick. And then in the other column, we have ordinary citizens, clean record, work hard, pay their taxes, many of them Veterans, want to be left alone, never caused a problem in the past, won't today, won't tomorrow. So how does this body connect the dots between the mass murderer and the ordinary citizen? See, that's what I don't get. So getting into the weeds about what we're going to ban from the average citizen, the ordinary guy and gal, I'm not interesting in that. Because anytime you go down that path, I think it's wrong, because you're punishing the wrong teem; it's just simple. The premise is wrong.

And I'm going to wait today to hear if anybody connects those dots for me, how we get Adam Lanza tied up with the guys at the Rockville Fish and Game Club. That's what I want to know. And I have a lot of rod and gun clubs in my district. I'm a member of Rockville Fish and Game. I'm an honorary member of the Fin Fur and Feather, up in Chaplin. I've gone to all the game dinners, wondered what I was eating in the game stew, always a concern of mine but a lot of, lot of others, too, I think. We got Somers sportsmen's club, one in Ashford, one in Pomfret, so I know a lot of these folks over the 21 years that I've served.

I'm a city boy, basically, so this was all an education to me when I moved up here in the 1960s. And so I got to know these people. So what I do know is that they're not a problem; never were, never will be, not now, not ever. But I also know we're doing them great harm psychologically, because they feel hurt that they're being lumped together with somebody who's obviously sick and deranged, and being a straw man, basically, to be knocked down for what happened in Newtown. I don't know if they're more sad than mad, but I've been talking to a lot of them and it's hard to say.

The other component of this, which I'll just touch on, is there is an economic component to this; and they were here a couple of weeks ago, all the guys and gals that work in the industry in Connecticut that produces firearms and ammunition. We're a state that's known for that. We had pride in being -- oh, in fact we designated a park over there, at Colt. It was state money, as I recall, because we were proud of our history of firearms, but now I don't know as -- I guess we're not.

But the point I'm having to make or want to make is there's 5000 jobs connected indirectly or directly with the firearms' industry is Connecticut. Hartford Courant today, if you haven't read it, there's a column in the business page and Dan Haar makes that point, made it -- has had several good columns on the economic impact.

But one point I hadn't thought about until today, when he raised that in his column, I thought that, well, this will be bad for these manufacturers because they'll lose the Connecticut market. But see, there's a component that I wasn't aware of that he brought up in the article, that people who buy firearms in other states, the other 49, boycott guns that are made in states that have a bad repetition, who stick a sharp stick in the eye of gun owners. So you can buy that AR-15, because there's no patent, in several states by several manufacturers; don't have to buy the

Connecticut AR-15, and they won't. And that's what happens in other states, have done this.

And I believe it was the Vice President of Mossberg who said, he called it "brand damage." We're going to have damage to the brand. He is getting offers every day, from all over this country, from other states, to relocate. And we all know here that this is not exactly the home of business friendly. We tax people too much. We regulate them too much. I ran a small business most of my life, my daughter runs it now; it is hard. It's hard everywhere, but it -- we make it really hard in Connecticut, almost adversarial in Connecticut. So now he's getting all these offers from other states, and his quote was something to the effect, if I stay here I might be out of business in three years because of this brand damage. What choice do I have? So that's the economic component.

You never want to trade, you know, guns for blood -- I mean money for blood, but there is an economic component, and I think if you don't mention it, you're make -- it's avoiding part of the equation.

Then, you know, the interesting thing that I thought about, you -- you know, most of the, most of you who know me know I don't care for corporate welfare. I don't like giving money to big companies, but we do it. We did it under Republican Governors, too, so I'm not blaming Governor Malloy. I think it takes -- is a bad precedent for Governor -- government to pick winners and losers; never made any sense to me. I was a small-business guy. I never understood why government was in that business of picking winners and losers, but we do it.

So here we are willing to throw out, potentially, 5000 jobs, and we gave $ 291 million to Jackson Laboratories for 300 jobs; I didn't vote for that. That didn't make any sense. Ninety-one million to Starwood Corporation for 800 jobs. We have ESPN, CIGNA, and its goes on and on. So what are we going to -- you know, it just doesn't make any sense to me.

On the one hand -- in fact, when Cabelas came in, we

-- we -- they got state aid. Any you, any of you've gone to Cabelas, you see where that road leads. You get off 84; you drive into their parking lot. You go there before you go to Rentschler Field; it's easier to get in there. And we designed that for them because we wanted them here. Now we're saying, apparently, we don't want them here.

And, finally, like Senator Kissel said, you know, just because I'm on this side of the issue does not mean I don't respect the others; I do. And just because I'm on this side of the issue doesn't mean that I'm not appalled by what happened in Newtown. I'm a grandfather of eight. I've got three in elementary school, and if you think that I thought that anything in this bill would help make them safer, that I wouldn't vote for it, you're mistaken.

The morning that this happened, I was in my youngest grandson's preschool class. Preschool and kindergarten, December 14th, 9: 30, had their Christmas pageant. My little guy has got red, curly hair and blue eyes. I don't know where that came from but I don't ask. But he's a red, curly headed guy, blue eyes, and if I may say so, really cute as a button. They're all in there and they've got their little hats, their elf hats, taped to their head that they made in art class. And they're singing Christmas songs and Kwanzaa and -- and all the different songs of the season. And they're so earnest and they're trying so hard. You know, you can't walk -- everybody walked out with a smile. My -- my mother was there; she's 96. Even my oldest grandson, who's 20, he came. Obviously my daughter and son-in-law and my wife and I, along with a packed room full of people, grandparents, parents, aunts and uncles, everybody is smiling.

And then you get into your car. You turn on the radio and you say, wow, how can this happen? How can somebody be so sick as to kill 20 babies, like my little guy, like John's little guys? So I understand that we have to do something.

People say you have to do something, but we could do a lot of things, and some of them are in this bill. We could reinstate the gun trafficking task force, for a million bucks; it's in this bill. That's a good thing, like John said, you know, Senator Kissel said, there are good things in this bill. That's a good thing. It worked.

We can make a minimum mandatory sentence for straw buyers. You buy a, you buy a weapon for somebody who is illegal and you know what? That judge has got no discretion. You're going to jail for two or three years, whatever we say. And if you think that wouldn't be a deterrent, I think you're mistaken. Because to be a straw buyer, you got to have a clean record. To have a clean record, you can't be familiar with our corrections' system. And the last thing most people with clean records want to do is go into our correction system. That would be a real deterrent. That would be doing something.

You could put more money into Senator Williams' hand for school security, which we did do in this bill, $ 15 million.

You could totally eliminate the early release program, which I'm not sure whether this does it or not. There's -- we've only had the bill for a little bit, so I'm not sure. It says it does it but I'd like to read the details.

So basically, I guess, the problem is I can't connect the dots between Adam Lanza and the -- and the good guys. So I think we need to do something, but I guess we should be doing something that does good, not something that just feels good.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Coleman.

SENATOR COLEMAN:

Thank you, very much, Madam President.

I rise in proud support of this bill before us, and the first thing that I want to do is to commend all of the members who served on the Bipartisan Task Force, but, in particular, Senator Williams and Senator McKinney for, I think, the phenomenal leadership that they exhibited in the work that they did in connection with the task force.

I'm very pleased that the task force efforts were characterized by bipartisanship and that the approach, as well as the product that was yielded, was comprehensive in nature. And I had the honor of serving on the Gun Violence Prevention Work Group that was chaired or Co-chaired by Senator Looney, who did his usual, very capable and thoughtful job in leading the work of that work group.

I'll be very brief. I certainly just wanted to make two comments, and the first was that I do believe that what we do today will make it less likely that an incident like the incident that occurred in Newtown will occur again. Will it guarantee that such an incident will not occur? I don't believe so. But, frankly, I have a difficult time in understanding those who argue that because we can't guarantee that regulation of

firearms will prevent such an incident from occurring in the future, that we should do -- do nothing.

Doing nothing, it seems to me, would tend to make it likely that such an incident will reoccur, and that is not sensible to me. I think the young lives that were taken in Newtown demand some type of action on our part and including some type of action that will involve regulation of firearms.

The second point that I wanted to make very briefly is that I find it to be tragic and unfortunate that it took an incident like the one in Newtown to focus our concern and our attention on gun violence. And I say it because gun incidents and killings occur on too frequent and regular basis in some of the urban centers in our state; but having said that, I'm very gratified that there was an effort, considerable effort that was made in the provision that's in -- of this bill that will have the effect of addressing some of the violence, that occurs in districts like mine and in some of the urban centers throughout our state.

There was reference made to the Heller Decision. And the thing that struck me about the Heller Decision is paraphrasing. I believe it was Justice Scalia who said that no person has the right to own any kind of weapon for any purpose whatsoever. And I find that language in that U. S. Supreme Court decision to be very consistent with what we're doing in this bill, and particularly as regards the expansion of our assault weapons ban.

And our own State Supreme Court, in Benjamin v. Bailey, upheld our assault weapons ban, which, again, is consistent, I think, with our effort here today. And so, Madam President, again, I commend the members of the task force and particularly the leaders of that group, and I intend to be a proud supporter of this bill.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Frantz.

SENATOR FRANTZ:

Thank you, Madam President.

I rise to make one, very short comment about the bill in the backdrop of what every single person in this Circle would agree to be a completely unacceptable massacre that occurred on December 14th in Sandy Hook. And my short comment, before I introduce a couple of amendments, three amendments, through you, Madam President, is that way too much of this bill is, it emphasizes gun-related regulations and rules and conditions.

If you look at the 139 pages of this bill, two-thirds of it is devoted to guns, and it happens to be in the first section of the bill, as opposed to the second or third section of the bill, which cover mental health and school security. It's a big bill and, as usual, we got it very shortly before we came onto the floors here, so we haven't had a chance to completely review everything, but we got the gist of it, thanks to the people at OLR who was -- who were able to summarize it.

So, despite the fact that I believe, in my judgment, there is too much emphasis on gun regulations and new ones, it does have and make provisions for mental health improvements and school security improvements, and the money is there. And so there are some good parts to this bill.

And so through you, Madam President, the Clerk has an amendment, LCO Number 5458. Will the Clerk please call that amendment.

THE CHAIR:

Mr. Clerk.

Senator, do you want to summarize?

SENATOR FRANTZ:

Yes. I move adoption of the amendment, waive the reading, and seek to summarize, if okay --

THE CHAIR:

Please --

SENATOR FRANTZ:

-- with you.

THE CHAIR:

-- Senator -- Mr. Clerk.

THE CLERK:

LCO Number 5458, Senate Amendment Schedule "A," offered by Senator Frantz.

THE CHAIR:

Senator Frantz, now you make your motion, please.

SENATOR FRANTZ:

Thank you, Madam President.

I do move -- I move adoption of the amendment, waive the reading, and seek to summarize. And --

THE CHAIR:

The motion is on adopting and summarize. Will you remark, sir?

SENATOR FRANTZ:

Thank you, Madam President.

What this amendment does, 5458, is it simply carves out shotguns from all of the new regulations that are suggested in the bill before you today. And additionally what it does is it carves out shotgun shell purchases from all the regulations that are suggested in today's bill before us.

Everybody who has read the bill knows that if you are going to -- if this bill is signed into law -- in the future go out and buy a couple of boxes of shotgun shells, you will have to show some form of credential, whether it's an ammunition certificate, an eligibility certificate, a carry permit or the like.

This -- this covers shotguns, which as most of us know who are involved with the sport of shooting, shotguns are primarily used for recreational purposes. They're used to train younger people how to shoot a -- a longer gun responsibly, used for sporting clay purposes and for bird hunting, and that about it. And there aren't very many of those types of firearms that are used in

criminal activities, and therefore I think it's a reasonable request to -- to carve them out.

Additionally, gun clubs -- there are many, many of them throughout the entire State of Connecticut -- and it's going to be a nightmare to try to figure out how to get rounds of -- of shotgun shells to club members as well as to guests. Are they purchasing this ammunition? Are they not purchasing it? Is it part of the, you know, guest fees that they pay? Is part of the -- membership fee? We don't know. It's a can of worms. How are we going to enforce something like that?

So, Madam President, I would ask for a roll call vote on this particular amendment, whenever you're ready.

THE CHAIR:

A roll call will be had, sir.

Senate -- Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I rise to oppose the amendment. What we're striving for in this bill is consistency as to ammunition and to firearms, for that matter, in terms of the permitting process and the certificates that are required.

I certainly agree with Senator Frantz that shotguns, when properly used, are absolutely legitimate sporting rifles and they have been for many, many years. However, shotguns, unfortunately, are not immune from being used by criminals for illegal purpose. As a matter of fact, there are some shotguns that have nicknames such as "street sweeper. " For that reason, Madam President, I oppose the amendment.

THE CHAIR:

Thank you.

Will you remark? Will you remark?

If not, Mr. Clerk, will you call for a roll call vote on Senate "A," and the machine will be open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Immediate roll call has been ordered in the Senate.

THE CHAIR:

Have all members voted? If all members have voted, the machine will be closed. And Mr. Clerk, will you call the tally, please.

THE CLERK:

Senate Amendment Schedule "A," for Emergency Certified Bill Number 1160.

Total Number Voting 36 Necessary -- those voting Yea 11

Those voting Nay 25

THE CHAIR:

The amendment fails.

Will you remark?

Senator Frantz.

SENATOR FRANTZ:

Thank you, Madam President.

Second amendment of the three that I'd like to introduce to you, the Clerk has that amendment. It's LCO Number 5459. Will the Clerk please call that amendment.

THE CHAIR:

Mr. Clerk.

THE CLERK:

LCO Number 5459, Senator Amendment Schedule "B," offered by Senator Frantz.

THE CHAIR:

Senator Frantz.

SENATOR FRANTZ:

Thank you, Madam President. I move adoption and seek to summarize.

THE CHAIR:

The question is on adoption. Will you remark, sir?

SENATOR FRANTZ:

Thank you, Madam President.

What 5459 does is it distinguishes handguns and pistols from long guns, in terms of their maximum magazine capacity. In this bill, we're looking at a maximum capacity of 10 for the long rifles and 10 for pistols and handguns. What the amendment calls for is there to be a carve-out of handguns and pistols and allow that maximum capacity to be 17 as opposed to 10. The simple reason for that is that you have a much shorter gun, which is much more inaccurate because of its shorter barrel length, typically about three-to-five inches -- some are longer, but three-to-five inches is a normal pistol barrel length -- and the fact that it's very hard to steady, unlike a rifle which you can use your shoulder to steady and draw a bead on whatever the target is.

If, in fact, the Constitution, both the State Constitution and the U. S. Constitution guarantees our right to defend ourselves with firearms, I believe that it's a fair concession to make because they're more inaccurate. It's probably about the equivalent of 10 in a longer gun in terms of accuracy. But when you're trying to defend yourself, it's very difficult to hit your target. We know for a fact that police departments average about 16 percent when they're going after a perpetrator. It takes a lot of rounds to stop that perpetrator in his or her tracks.

So with that, Madam President, unless there are any questions, I would ask for a roll vote as well.

THE CHAIR:

A roll call vote will be taken --

SENATOR FRANTZ:

A roll call vote.

THE CHAIR:

-- at the time.

Will you remark?

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I rise to oppose the amendment. Again, we want to be consistent.
We want to have our ten-round limitation for magazines to be
consistent throughout, whether it's long guns or pistols.

I would also point out the worst mass shooting in American
history, at Virginia Tech University, was conducted with
pistols, more than 50 people shot, more than 30 people killed.

THE CHAIR:

Thank you.

Will you remark? Will you remark?

If not, Mr. Clerk, will you call for a roll call vote, and the
machine will be open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators
please report to the Chamber. Immediate roll call has been
ordered in the Senate.

THE CHAIR:

If all members have voted, if all members have voted, the
machine will be closed. Mr. Clerk, will you please call a tally.

THE CLERK:

Senator Amendment Schedule "B," for Emergency Certified Bill
Number 1160.

**JA-686**

Those voting Yea 10

Those voting Nay 26

Absent, not voting 0

Total Voting Number is 36

THE CHAIR:

Senate Bill -- Senate Amendment "B" has failed.

Senator -- Senator Frantz.

SENATOR FRANTZ:

Thank you, Madam President.

The last amendment is LCO 5461. The Clerk, I believe, has that amendment. And will the Clerk please call that amendment.

THE CHAIR:

Mr. Clerk, will you please call the amendment.

THE CLERK:

LCO Number 5461, Senate Amendment Schedule "B," [sic] offered by Senator Frantz.

THE CHAIR:

Senator Frantz.

SENATOR FRANTZ:

Thank you, Madam President.

I move adoption and seek to summarize (inaudible) --

THE CHAIR:

The motion is on adoption. Will you proceed, sir?

SENATOR FRANTZ:

Thank you.

Madam President and colleagues around the Circle, 5461 very
simply exempts from the regulations called for in today's bill
the scrutiny and the required credentials to purchase . 22
caliber ammunition. Most of you know what it is. It's very
small. It's about an inch long or so, something like that. And,
you know, 20 -- it's quarter-of-an-inch in diameter, as far as
the projectile, the actual bullet part of the, of the round is
concerned. It's not very powerful. It's used primarily for
plinking and for target shooting. It's used by young,
youngsters, you know, as young as 8 and 10 years old, when
they're first learning how to use a firearm for target practice.

It's -- I think the law just goes far too -- it just goes too
far when it comes to regulating essentially a very, very tiny
round of ammunition that is enjoyed by older folks, younger
folks, and people of all ages, for that matter.

And, with that, Madam President, I would also ask for a roll
call vote.

THE CHAIR:

A roll call vote will be had.

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President

I rise to oppose the amendment; . 22 caliber can certainly be
fatal. And, again, what we want is consistency in how we treat
the purchase of ammunition and the credentialing and the
background checks that are required.

Thank you, Madam President.

THE CHAIR:

Thank you.

Will you remark? Will you remark?

If not, Mr. Clerk, please call for the, a roll call vote, and
the machine will be open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators please report to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

Have all members voted? If all members voted, the machine will be closed. And, Mr. Clerk, will you please call the tally.

THE CLERK:

Senate Amendment Schedule "B," [sic] for Senate Bill 1160.

Those voting Yea 10

Those voting Nay 26

Absent, not voting 0

Total Voting Number 36

THE CHAIR:

Senate Amendment "C" fails.

Will you remark?

Senator Duff?

SENATOR DUFF:

Yup. Thank you, Madam President.

You know, we go back to that day, on December 14th, and it started off like any other day. It was a cold, clear day, almost like today is, and we were having meetings. As a matter of fact, Senator Boucher and I were sitting next to each other at the Norwalk Senior Center when we received an e-mail about a shooting in Newtown and not quite sure what that meant and what was really happening, on only to find out later the horror of that day, what really had actually happened.

And I remember thinking that we all wanted to do something. And as elected officials, that's kind of why we're here; we like to fix things. We want to help people and do good. And I remember that a lot of other people felt the same way as well. Everybody wanted to do something, where it was money to Newtown, whether

it was -- people were sending Teddy Bears. It almost evoked memories after 9-11.

And today, because of the hard work of so many people, my colleagues who worked on those committees, our Legislative leaders, our Governor, our Lieutenant Governor, we're here today to vote on something that will hopefully prevent future tragedies like the one that we saw in Newtown.

As a citizen of this state and as a State Senator, I'm honored and privileged to vote for this bill today. I'm proud of the fact that it is a bipartisan bill, that Democrats and Republicans have come together to make a law that addresses not only gun violence but also mental health and school security.

I would hope that the residents of the state are proud that we have a strong, comprehensive, and bipartisan bill. Indeed, the eyes of the state and the nation are on us, and I can only hope that other Legislatures around the nation and in Washington will follow our bipartisan lead today.

Some will say that we have gone too fast, but the process that we have has worked. We have taken our time. We are here to pass laws without passion or prejudice, and I would say that if we came in a few days after the Newtown tragedy, a bill that we have might look a lot different than the one we have today.

But we had bipartisan committees to look and investigate and to make recommendations. And I was not on those committees, but whether you were on those committees or not, we've all taken the time and met with our constituents here at the Capitol, in our districts, we've talked on the phone, we have literally returned thousands of e-mails to our constituents, and we have attended forums. We've had a lengthy and a thoughtful process, whether you agree or disagree with the legislation we have today.

And because of that, while not a unanimous sentiment, I feel confident in how a majority of my constituents feel about this issue today. Therefore, I will be voting yes and I urge my colleagues to do the same.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator LeBeau, first.

SENATOR LeBEAU:

Thank you, Madam President.

I rise in support of the bill, and I'd like to thank the leadership of this Chamber, particularly Senator Williams and the -- and Senator McKinney for their work, and all of the members of the task force that led us here today.

I did not attend many of those meetings, but I have to tell you I watched some of CPTV that went late into the night. I could not believe the number of people who showed and gave of themselves and their opinions, many of here -- I'm sure are here today, and the -- the patience and the forbearance of the -- the Legislators who were part of that process. I, in some ways, this was our finest hour.

I find the debate and the general debate that we've had over the last three months rather ironic, because it seems that both sides -- and actually Senator Meyer mentioned this earlier -- that both sides are coming from a place of fear. We saw a slaughter in Newtown, and I think that's what we fear. We fear that again. We fear that for our kids. With fear that for our families. And we've, the other side -- and you can tell from their signs and their words -- they fear tyranny, the -- the loss of their rights.

And I'm reminded of a book that I recently read for the second time, the Pulitzer Prize-winning book called, "The Battle Cry of Freedom. " It's about the Civil War. And in the preface to the book, the author, McPherson, talks about how both and -- both sides thought they were fighting for freedom, the South for the freedom to have its way of life; the North for the personal freedom for the slaves.

Now, interesting that that is not what the war started off as. The South, because of its fear, because of its fear of its loss of rights, started the war. The North was not there to get rid of slavery; they just didn't want the expansion of slavery. But by 1863, the purpose of the war had changed for -- to have to

-- as a declaration for freedom for all.

Today, there's a war, and thank God it's not a war. Thank God that we're not fighting each other. We're disagreeing with each

**JA-691**

other in a civil way, in a, in a way that our forefathers laid out for us to settle our differences. The hearing process that -- that was an -- an incredible -- as I was referring to earlier -- an incredible hearing process, over 60 hours of hearings and people listening and to each other and trying to reason with each other.

And I believe that what has come out of this is a balanced bill, a bill that contains -- I, you know, I out talking at a -- a meeting the other night in South Windsor -- it's part of my district -- and people, all they could, all they focused on were the gun aspects of the bill. And I said, no, there's -- there's a lot more to this bill. There's a major emphasis on mental health. There's a major emphasis on school safety. And, yes there are restrictions on guns and ammunition.

And so I think -- and I think that part of the bill is balanced. I know some folks in the audience here today, and in the galleries, do not believe so but I do. And it balances the need that we have, our basic needs for public safety versus the need, as -- and said by Senator Kissel -- for -- for self-prosection and the Second Amendment rights.

But let me remind folks that no rights are unabridged. There is no right in the Constitution that is unabridged, whether -- whether it's the right to free speech or the right to gun ownership. There's nobody here asking because want to have RPGs or a tank or a nuclear weapon or grenades. That's an abridgment of the rights, and those have been accepted by the Supreme Court. The question is whether these rights, these abridgments of rights are reasonable. And I believe that are.

And I find it ironic, I -- listening to Senator Kissel, who I have tremendous respect for and is my neighbor, that his -- we come back to fear, the fear of incrementalism, the fear not of what we're voting on today but what we might vote on tomorrow.

I accept what we're voting on today as a good and balanced bill, and I will vote for it for that reason. And I respect the members of this Circle, and I respect the members up in the galleries. And I respect the voters at home, to ensure that as we move forward, we will continue to act in a fair and balanced way.

And to Senator Guglielmo, my other neighbor on the other side, and that we share Ellington, we don't share this view, Senator,

because I believe that this bill does good and not just feels good.

Thank you, Madam President.

THE CHAIR:

Senator Gerratana.

SENATOR GERRATANA:

Madam President, thank you, so much, for the opportunity to speak today in favor of this emergency certified bill. Yes is it emergency certified, but let me tell you, many, many months of work has gone into it.

I want to thank my leadership, Senator Williams, and, of course, Senator Looney for appointing me to the Bipartisan Task Force. My focus and my energy was on the subcommittee, the Mental Health Subcommittee, and I am proud to say that the work that Senator Harp, under the leadership of Senator Harp and also Representative Woods, we came up with some legislation that goes a long, long way to helping us all deal with the, not just with the tragedy that happened in Newtown but for our state in understanding what the mental health challenges are going to be.

Amongst the provisions are ones that we talked to about with the health care providers in our state and, indeed, beyond our state. And I have to applaud them all. They came to our hearing, our 12-hour hearing on mental health issues; many of them came with such wonderful suggestions. And, also, we got to know so many things about behavioral mental health that we were not totally aware of. Amongst that information was that we have many loops and gaps in our system of delivery, here in the state. So this underlying bill, of course, goes to address that.

I want to thank, in particular, the American Academy of Pediatricians. Our pediatricians in our country have been, indeed, on the front line in bringing forth to us the changes in health care and health care reform. They have developed a concept called the "patient-centered homes. " This is where, for pediatricians, it is the child who is at the center, and it is for pediatricians to coordinate all the care for that child.

So I want to applaud them and, in particular, two doctors, two distinguished doctors here in our state. One is Dr. Andrew Lustbader, of Yale University, and the other is Dr. Dan Connor,

at UConn Health Center, both researchers in child psychology and actively treating children and also adolescents. I thank them for their work and for bringing to us a plan that will make sure that no child, no child in the State of Connecticut will go without some access to mental health, a system of coordination and care that we are badly in need of. And this came out during the task force, and that is being enacted.

I also want to say that, you know, we all spent a lot of time researching and reading, and in his book, David Hemenway, in "Private Guns and Public Health" says public health is pro-health; it is not anti-gun. And access to guns is a big part of the public health challenges in our country today. Nine thousand people are killed a day, due to this chronic illness.

So I want to say that the underlying bill also provides for us further work to do. But, Senator LeBeau, I want you to know that we should not live in fear. Connecticut should not live in fear, and Connecticut should know that from this day forward, with passage of this bill, that we will heal.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Bye.

SENATOR BYE:

Thank you, Madam President.

Thanks to members of the Senate for their comments so far.

I want to focus on five ways that this bill and the process to getting here makes Connecticut safer. Number one, this bill requires an ammunition eligibility certificate to purchase ammunition. This could easily be an overlooked part of this bill, but this requirement keeps ammunition out of the hands of illegal gun owners. So I think, you know, Senator Looney has been championing this, and I think he's right. I think this is one of the most important parts of this bill.

The bill, also, number two, establishes a behavioral health task force that will work to create a system of supports for adolescents who have behavioral health challenges. As many of

you, I heard from so many people through this process. But one
Connecticut tragedy is the supports that are not there for
families who are begging for help for their adolescents who need
mental health supports. That's a tragedy that's going on now,
and this bill has a process in place to address that Connecticut
tragedy. Parents' stories are so difficult to hear, those who
are struggling.

Number three, this bill bans high-capacity magazines with over
ten rounds. Again, over the fourth -- four months, I've come to
understand that this accessory is what enables mass destruction,
the number of bullets that can be fired so quickly. And this
bill is in reaction to a mass shooting. This is a critical
component of this bill that will make Connecticut safer.

The bill also addresses safety in our schools and safety on our
college campuses in a smart, systematic way. It will be informed
my best practices and by law enforcement professionals in our
state.

This bill also will set up a process that -- again, something
that could be overlooked -- to develop standards for our public
schools. Right now, there are really no standards that
superintendents have to say how many social workers do I need;
how many guidance counselors; how many school psychologists. And
I'm really proud that this was added into the task force, the
behavioral health task force. Because, let's face it, schools
are focused on education, but that's where the kids are. That's
where some of these problems are expressed, and that's a really
critical component.

The fifth way that this bill makes Connecticut safer is the
model that our leadership presented to us and to our state about
how to solve problems with a democratic process. Sandy Hook
brought us together as a state. We had a collective grief, a
collective love for the families of the victims, and a
collective resolve to address all the different facets of this
terrible tragedy.

What's making us different is how we're approaching it. We took
our time. We listened to both sides. We were bonded by this
experience, and we knew that for our state to heal, we needed to
model respectful discourse; that's what democracy is. And a fair
and balances democracy helps avoid violence; there's a peaceful
transfer, a peaceful imposition of laws.

**JA-695**

Our grief, our love, and our resolve for change in Connecticut does not know party labors -- party labels. Our legislative leaders decided that we would just proceed in a bipartisan fashion and we would have a conversation as a state. We had many hours of conversations and not just here. Like many of you, I spent hours in hearings.

I also talked for hours with mothers who organized and were horrified by these murders and mobilized to make a difference. I spent an afternoon at a gun club, and I learned a lot that helped me understand about guns.

I went to community forums about gun safety. One gun owner spent hours in his living room showing me his equipment, how easily guns are adapted, what a magazine is. He -- he literally wanted me to understand the vocabulary and the way that the guns worked.

And then last Monday I was privileged to join the Episcopal Bishops of Connecticut in the Stations of the Cross in honor of Sandy Hook.

These are the five ways, the process, and the items in that bill that I believe Connecticut will be safer, democracy at work.

There are members of this Senate who are going to vote against this bill, and they've told you their concerns, and -- and others will too. That's part of democracy. But be sure that every member of this Circle cares deeply for the victims and for their families and made contributes to this bill or other policies that help the public be more safe in Connecticut.

Our Senate leaders spent weeks, literally weeks negotiating and talking through proposals in good faith. Thank you for your belief in us and for your determination to get a bill that was collective and that will make a difference for Connecticut.

I'm so proud of our state today, but I wish we weren't here right now doing this emergency certified bill. Like everyone sitting here today, I wish we could turn back the clock and take back those five minutes, about as long as my remarks; that's how long it took for that mass destruction where over 150 bullets were fired at children and at teachers, and 26 of them were murdered.

Courageous staff put themselves in harm's way; some were killed. Countless others' lives were saved because of the courage of

other teachers. That day, every parent and every teacher realized that any teacher would give what Lincoln coined "the last full measure of devotion" for their students to protect them. I wish Connecticut never had to realize that.

Families in Sandy Hook faced terror as they raced to gather their children. Twenty of those families would return with a state trooper and not with their child. No one wishes we could turn back the clock more than those families or the hundreds of others whose children escaped but who face repercussions of this senseless violence.

In his calls for improved gun safety laws, our President keeps referring to all the missed birthdays, the missed graduations and other life events that have been robbed by American -- from American families because of gun violence. In Connecticut, these references hold special meanings for so many of us sitting here today and at home.

Some of us in the Chamber know someone who will miss a life event in the wake of Sandy Hook, like President Obama referred to. For me, it's Ana Grace Marquez-Greene. Ana Grace would have turned seven this week. Anyone who's seen her pictures or heard her sing knows that our whole world lost a Connecticut treasure on that day. Her brother and parents will never have that amazing little girl in their lives again. We all wish she was having an uneventful seventh birthday this week and that she would be showered with the love and caring that her family showered on her each day; if only. But we can't turn back the clock; we can only go forward.

And we've gone forward with collaborative, innovative, ground-breaking legislation, and we can look forward with Connecticut and with pride in this democratic process. And in the legacy and in the model policies that I believe this legislation brings to these United States.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Model Bottolea -- Bartolomeo -- I'm sorry, Dante, again.

SENATOR BARTOLOMEO:

Thank you, Madam President.

I stand here to thank our leadership, the Republican leadership
and every single one of --

THE CHAIR:

Senator, the microphone is not on.

SENATOR BARTOLOMEO:

Hello?

A VOICE:

(Inaudible. )

THE CHAIR:

Senator, would you use -- oh, there you go.

SENATOR BARTOLOMEO:

I think --

THE CHAIR:

Try it.

SENATOR BARTOLOMEO:

-- we're on. Are we --

THE CHAIR:

No.

SENATOR BARTOLOMEO:

-- live?

THE CHAIR:

Why don't you try Senator Meyer's microphone.

SENATOR BARTOLOMEO:

Thank you, Madam President.

THE CHAIR:

Thank you.

SENATOR BARTOLOMEO:

I would like to thank not only our leadership on the Democratic's Caucus but also the leadership of the Republican Caucus and every Senator and Representative who serves in this building and serves their community, because each and every one of us, regardless of how we choose to vote on this bill, has spent countless hours of research or reflection to do what's right for them and to make this decision, and no one has taken this lightly.

I do support this bill and I'd like to mention a few of the things that I appreciate most, that are within this bill. This bill works to strengthen laws that we already have on the books. We look to straw purchases, which was previously a class B misdemeanor. And the penalty at that point was a slap on the wrist. And now we are increasing this penalty to a two-year, mandatory minimum, with prison sentence, and we do that for at least ten other felonies.

It also closes at least one of the loopholes in the earned risk reduction credit program, and these are both issues that I have fought for since I began here, recently.

It also -- I served on the School Safety and Security Working Group, and this bill helps our districts who are looking for guidance with the existing and future school construction so that we can harden our buildings but not our learning environment. And, for me, that's very important, and for educators and for children. We need our schools to remain a place where our students and our teachers feel comfortable and enthusiastic about learning. So this bill will help us to recognize that school districts are already struggling for funding for educational purposes and for their, for their educational programs. And it will make available grant funding to increase the security measures to harden their exteriors and not their interiors.

This bill also has the Department of Mental Health and Addiction Services working in collaboration with the State Department of Education to administer training of an international, already

**JA-699**

established program called the "mental health first aid program. " It teaches educators and staff to recognize this, the signs of mental health issues and concerns, and it connects them to those mental health services.

Certainly there's aspects of this bill that may be difficult for some of us to swallow. But, actually, as my grandmother always said, when you're faced with a very difficult decision, you have to weigh your pluses and minuses. The fact that we've compromised and worked in a bipartisan way to put together a bill that I believe will lead the nation in very important and much-needed reform absolutely is -- is a positive. And I am proud and pleased to be able to support this bill.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Markley.

SENATOR MARKLEY:

Thank you, Madam President.

I want to say that it's a difficult thing to speak about anything in reference to this tragedy. I think that our language is inadequate to the pain that we know was suffered, especially by the parents involved, by the relatives of the children and the teachers who were involved and by the responders, by the people who -- who felt the pain, you -- you, yourself, Madam President, and the Governor who were very much on the scene throughout it.

We only have the language that we have, ourselves, to speak with, and that's the best we can do. I think that it's a tragedy that made me think back to other experiences I've had in my life that I think we all shared. I'd go back so far, beyond most of you here in this Circle or most of you in this room, back to the moment I remember in second grade when I heard that President Kennedy had been shot, something that I'll never forget, one of those experiences where I can see where I was sitting and who was standing where and how we were told about it and over the years, other such events, that sometimes I think are what makes old men and women of us, the emotion that we go through and what

**JA-700**

ıt takes out of us; so my apologıes for not havıng words commensurate to address such a sıtuatıon.

I'm also goıng to -- ın the course of what I have to say -- use a few analogıes, and I feel lıke analogıes are always dangerous thıngs, because they're ınherently ımperfect, ıllumınatıng, as far as ıt goes, but I thınk they can tend to be reductıve of -- of the sıtuatıon, and I -- I certaınly don't mean to do that.

But I want to express myself as clearly as I can and speak my mınd on thıs, and not at great length. I've kınd of taken an oath to myself not to ımpede unnecessarıly the busıness of thıs Chamber. I'd lıke to use my words as much as possıble to ıllumınate, ıf nothıng else, my own perspectıve but not to be a barrıer to fınıshıng the work that needs to be done here.

Let me say ıt's a strange thıng ın my own mınd that I've become so ınvolved and so commıtted on thıs ıssue. I'm not a gun owner. I was not raısed ın that, ın that culture. I thınk I probably, as a young person, shared some of doubts about the reasons that somebody would be ınterested ın those actıvıtıes, and huntıng, so forth.

I had a perıod of my lıfe when I had the experıence of lıvıng wıth a number of young men for, well, from out West, who came from a very dıfferent part of the world and had a very dıfferent background and who became very good frıends of mıne, who I've had affectıon and respect for. And ıt was at that tıme that I realızed that my own perspectıve on these thıngs was -- was not the only perspectıve that exısted but that one ıs accustomed to what you grow up wıth that seems rıght, and ıt seems natural. And ıt made me, let's say, neutral on the subject ın a certaın way, neıther drawn to or ınterested, partıcularly, ın guns but apprecıatıng the fact that others were drawn to them and as, perhaps, was an ımportant lesson for me to learn at that poınt ın my lıfe, because I've seen that ın many other ways ın many other thıngs sınce then.

I guess the questıon when you look at a gun ıs to some extent what do you see. Do you see somethıng whıch ıs a -- a tool, a mechanıcal object desıgned, whether ıt's for shootıng a target, shootıng an anımal, for self-defense, whatever ıt ıs, but a neutral object ın the way that most mechanıcal objects we deal wıth ın thıs world are? Or do we see somethıng whıch ıs essentıally, ınherently a bad thıng, an evıl? And I would say ıf ıt ıs, ıf a gun ıs a tool lıke other guns, ıf ıt's some -- lıke other thıngs -- lıke other mechanıcal objects, ıt's reasonable

to expect restrictions on its safety, like we would with anything else, like we do with cars, for instance, to say they have to be operated safely, there has to be a reasonable amount of regulation and so forth. And if there are problems with them that can be addressed by putting restrictions on them, we might consider those restrictions, leaving aside the question of whether guns for other reasons have -- are -- are privileged.

If you see a gun inherently as an evil thing, then I think it's a natural thing to want to restrict it to the point of extinction. And I think that's the basic division in this Chamber. And, again, I don't say this to put words in anyone's mouth -- and forgive me if I do that -- but I think that there's an outlook toward guns, which naturally lends one to want to restrict it as much as possible.

I used the analogy in discussing this, a few months ago, to alcohol. I think that alcohol is, perhaps, as much an evil, in a way, as anything that we have in common circulation; I say that as one who has tasted and enjoyed that evil myself. But it is, what I can tell my young nephews, it's a vice, and a vice to my mind is something that you always want to be trying to do less of and not more of, that you want to be consciously aware of. But I think alcohol has done -- and I've seen in my own life -- more damage that maybe anything else that I've seen and I think something that kills more people a year than almost anything else.

It was recognized; a movement emerged in this country a-hundred-and-fifty years ago, a-hundred-and-forty years ago to get alcohol out of our society, I think a reasonable position, in many ways. And by political process and political pressure, it triumphed finally, and the decision was made to eliminate it entirely. That, to my mind, is a reasonable position if you see something as an inherent evil, which is to get rid of it, to say no more of it. The trouble in that case was it couldn't be done.

And I would say the trouble with, in this case, is it can't be done either, whatever you might think of the wisdom of it. What I think we have with guns is an attempt to identify some of them as particularly bad as opposed to others, as if we were to say we have an alcohol problem, we have a drinking problem, so we're going to ban not even hard liquor, let's say, but -- but mixed drinks that are served in cocktail glasses. We'll ban Manhattans; we'll ban martinis. Well, if you think there's a drinking problem, that might have some very small effect, but it

doesn't get at it, because essentially the danger is still
there.

I feel that we're doing a very similar thing, when we talk about
what we call "assault weapons. " Every gun is an assault weapon
if it is used with the intent to commit an assault. And to try
to pick out certain guns and say this is the problem, I think is
intellectually dishonest in the sense that we're not really
addressing what the problem is nor are we really being honest
about what we're trying to accomplish.

I think that the characteristics by which we define an assault
weapon are, in fact, largely cosmetic. We were sitting in the
caucus on Monday, looking at pictures of different guns which
would or would not be prohibited. If we wanted to talk about
what makes the guns dangerous, I think we'd talk about what's
brought to my attention many times by people who are in favor of
gun control, which is the rate of fire of the guns. But the fact
is all these guns fire fast.

The -- with a semi-automatic gun -- and almost the guns that we
-- are manufactured and bought now in our society are semi-
automatic -- the limiting factor on the rate of fire is not the
gun, it's -- it's the finger on the trigger. And the bullet, one
bullet is going to come out every time that trigger is squeezed.
And, really, the only thing to control that finger is the mind
of the person that's holding the weapon or the potential weapon
and the soul of the person that holds that weapon.

There's something wrong in our society that events take place
like what happened in Newtown, that can't be, can't be credited
to any inanimate object. They are the result of a kind of a
derangement that I think is beyond our understanding. The idea
that a young man could -- whatever he might have fantasized
about or imagined -- that he could actually walk into a
classroom and look at those young children and do what we did is
-- is something that, to my mind, is closer to a kind of a
possession. And I don't believe that as Legislators, we can do
very much to address that.

I think that it behooves us to look about it, to look at it in
the broadest sense that we possibly can and not in the narrowest
sense. And I think the broadest sense is a lack of humanity that
has occurred between people, in part because of the way that we
relate to each other and that we communicate with each other. I
feel like there's -- there's a dissociation that I've -- I've
witnessed increase in my own lifetime.

We might say, what is the harm of attempting to limit the kind
of guns that are available? I'd say that at the point that we
recognize that that is not the solution to the problem and that
the discrimination between guns is not going to make this world
a safer place, I think then we face the problem that we have
people who have a deep interest in this, just as they, as they
might have an interest in anything else. And that's something
you can only understand by knowing the people involved, law-
abiding, and in many ways could not be more law abiding, the
pillars of the society, frequently Veterans, frequently law
enforcement officers who have not done anything to -- to
threaten or to destroy life in this society, who find that their
-- their past time, their interest is going to be demonized and
they, themselves, brought under suspicion and made to be in a
criminal position to suit what I would only say is an obscure
agenda. And if they feel that what is going on moves in the
direction of confiscation, I think they are entitled, and I
think they're right to feel that way, because I see no sense
that there is an end to what those who are suspicious of guns
would ask for to try to make the society safer.

We've heard today, and I don't -- I -- I think it's an honest
response -- I don't -- I don't mean to criticize the statement,
that this is -- from some advocates of this legislation -- that
this is a step in the right direction. I've not heard anyone who
advocates it say this is the end of what needs to be done. If it
were, we might at least have something to talk about, but I feel
that if the point of this is to, is to take at any given moment
what can be taken, then to come back for what remains at another
moment, then those who are being affected by it are bound to
feel that way.

I'd say that there's two other issues, I think, in America, one
in history and one current, that are very similar that way. One
was abolition, where the South was very defensive, not
necessarily because of what they were defending as far as the
rights to open the territories up to slavery and so forth, but
the sense that any constriction of those rights put them on the,
on the way to the elimination of slavery.

I think the same situation exists today with abortion. Those who
defend abortion are very jealous of every kind of abortion,
every situation, every restriction on abortion, because they
know that once the, once the -- the ban starts to tighten around
it, that the practice or the legality of the practice moves in
the direction of extinction, the same as the case with gun --

with guns. And I think that -- that their, that those who are concerned are right to be concerned.

In response to this situation and in response to the fact that I think that the bill before us contains many things which are helpful -- I don't think anything which is decisively helpful -- you know, I think the task forces did the best job they could in the time they had available to them. I was on the Mental Health Task Force. Senator Harp, my respect for Senator Harp over the years, working with her on Appropriations has risen week by week, and I thought she did an excellent job, and Terrie Wood, my Co-Ranking Member on Human Services, likewise, yet all we really could do was to identify a few things that we thought were working and put more weight behind them and identify a few things that we thought needed to be looked at and ask that they be looked at, nonetheless, I think a step in the right direction, the same with the school security section.

And the gun safety section, I think, also has elements in it that we all agreed upon, what elements of what started out to be, to my mind, a genuinely bipartisan bill, a genuinely consensus bill that could attract the votes of everyone in this Chamber.

In the interest of promoting that approach, I would ask that the Clerk call an amendment, LCO Number 5460.

THE CHAIR:

Mr. Clerk, will you please call the amendment.

THE CLERK:

LCO Number 5460, Senate Amendment Schedule "D," offered by Senator Markley, and Representative Sampson.

THE CHAIR:

Senator Markley.

SENATOR MARKLEY:

Thank you, Madam President.

I would move adoption of the amendment and beg your leave to summarize without reading.

THE CHAIR:

The motion is on -- on adoption. Will you remark, sir?

SENATOR MARKLEY:

Thank you, very much, Madam President.

As I said, this preserves the recommendations of the

-- the Mental Health and the School Safety Task Force. It also, it also preserves those aspects of the Gun Safety Task Force that I think are, in fact, the most likely to deal with the kinds of problems which led to the tragedy in December; that is, it includes the mental health look-back periods. It includes the increased penalty for crimes, either committed with a gun or involving the possession of a gun illegally. It includes the safe-storage provisions and, in fact, also offers a tax credit to encourage the purchase of safes, which would enable safe storage. And it also provides an opportunity for schools to incorporate into the grants, which we've made available to them for school security, the opportunity to apply for funds to be used for school security officers, as well as for the hardening of the, of the building, itself.

I think it is, I think it's a good bill, which I do not believe infringes on the rights of law-abiding gun owners, who I do not believe are the people who deserve to be -- who -- who deserve what the, what the bill before us would do. And I urge adoption of the amendment.

THE CHAIR:

Will you remark?

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I would ask that then the vote is taken, it be taken by roll.

And I rise to oppose the amendment. In my review of this, it appears that it strikes out more or less the essence of the gun violence preservation or protection and prevention measures. You know, I -- I appreciate Senator Markley's point of view, but I

believe I don't see anything in here in term of the background
checks. Am I wrong about that? I -- I mean, I don't, I don't
mean to ask that as a, as a question, but I -- I -- and, of
course, the dangerous offender registry is very important.

But, Madam President, really, the heart of our response in terms
of gun violence prevention when it cams to the Newtown tragedy
and all of the other mass shootings that I enumerated at the
outset, come down to a stronger restriction on the assault
weapons that have been used in these mass shootings and a
limitation on the large-capacity magazines. So for those
reasons, Madam President, I oppose the amendment.

THE CHAIR:

Will you remark?

Senator Welch.

SENATOR WELCH:

Thank you, Madam President.

I -- I rise in support of this amendment, and my purpose for
speaking is something that I think Senator Coleman mentioned
earlier, and that is that those of us who do not support the
underlying bill couldn't fathom that, that doing nothing was an
option. And this is to say that we're not for doing nothing; in
fact, we are for doing something. All of us have been moved,
have been touched by this horror that happened in Newtown and --
and all that was revealed to us in the days that follow.

An action is appropriation, action with mental health, action
with hardening our schools, even action in keeping guns out of
the hands of felons, on ending straw purchases, on background
checks. We need to do something and this amendment, I think, is
an appropriate something.

Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Will you remark?

Senator Boucher.

SENATOR BOUCHER:

Thank you. Thank you, Madam President.

Madam President, I have a question, please, through you to the proponent of the amendment, if I could, please.

THE CHAIR:

Senator Markley, prepare yourself.

Please proceed, sir --

SENATOR BOUCHER:

Madam --

THE CHAIR:

-- ma'am.

SENATOR BOUCHER:

Madam President, the question has to do with school resource offices and the funding of school resource office, if I could get clarification on that point, through you.

THE CHAIR:

Senator Markley.

SENATOR MARKLEY:

Senator Boucher, and through you, Madam President, I

-- I believe as the, as the bill was put together by myself and Representative Sampson, that the idea is that the money which is available for -- for towns to apply for -- for grants for hardening of the schools would also include in a competitive grant basis the possibility of applying for grants for school security officers as well.

THE CHAIR:

Senator Boucher.

SENATOR BOUCHER:

**JA-708**

Thank you, Madam President.

I appreciate that clarification. The -- the further question,
and the last question would be, would that funding continue into
the future or is it a one-time, one-year funding; and, does then
the school district have to support that additional operating
expense going forward? Through you, Madam President.

THE CHAIR:

Senator Markley.

SENATOR MARKLEY:

I believe that the funding would last as long as the

-- and from the state -- as long as the money which is
designated for the general program of school hardening was --
was available. If that was no longer there, then it would not go
forward unless the state made a decision to fund -- fund it.

THE CHAIR:

Senator Boucher.

SENATOR BOUCHER:

Thank you, Madam President. I'm much appreciative for the
answers.

THE CHAIR:

Thank you.

Will you remark? Will you remark?

If not, Mr. Clerk, will you please call for a roll call vote and
the machine will be open.

THE CLERK:

Immediate roll call has been ordered to the Senate. Senators to
the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

If all members have voted, all members have voted, the machine will be closed. Mr. Clerk, will you please call a tally.

THE CLERK:

Senate Amendment Schedule "D," for Senate Bill 1160.

Total Number Voting 36

Those voting Yea 11

Those voting Nay 25

Absent, not voting 0

THE CHAIR:

Senate "D" has failed.

Senator Markley.

SENATOR MARKLEY:

Thank you, Madam President.

If I may continue briefly, one aspect of this amendment that I, in fact, neglected to mention is addressing the section concerning the Risk Reduction Earned Credit Program, the so-called "early release" program. I voted against that when it first showed up as an implement in the implementer bill and have been an opponent of the program ever since. I know it is addressed in the bill which we have before us. I feel that what has been done in that bill is inadequate and, again, possibly worse than inadequate in that it -- it would seem to make almost no difference, while giving us the sense that we've addressed something which is a danger.

And if I may say in -- in reference to that, we're told in this bill that violent criminals will be forced to serve at least 85 percent of their original sentence. It's my understanding, from what both the Governor and Mike Lawlor, his advisor on these issues has said, that the violent criminals are already serving 85 percent of their sentences. I think they've been thoroughly clear on that, and I feel like either this program needs to be changed to change clearly or we should get rid of it and start over again.

**JA-710**

I'm going to say after we're done on this amendment, I have just a word to say about the process by which we arrived here today, but I think that we are repeating the mistake we made with the early release program when it was initiated. It was initiated without any hearings, as part of an implementer bill, something that was so little understood at the time it was voted on that the -- the fine Democratic State Representative who brought it out had to explain the next day, after the vote had taken place, that he had not been correctly informed as to the terms of the bill. We've lived with it since, and I believe that we have lived with it and we've lived with tragedy as a result of it since.

We have another one before us, again, on very short notice, and one part of the bill that changed between yesterday afternoon and this morning was specifically the Risk Reduction Program. I think that I have no confidence in the changes that have been made, and I don't have the opportunity between now and the moment that we vote to gain the confidence that I'd need to in these changes.

So I have a second amendment, LCO Number 5462. If

I --

THE CHAIR:

Mr. Clerk.

SENATOR MARKLEY:

-- may ask the Clerk.

THE CLERK:

LCO Number 5462, Senate Amendment Schedule "E," offered by Senator Markley.

THE CHAIR:

Senator Markley.

SENATOR MARKLEY:

Thank you, Madam President.

Again, if I -- I would move adoption of the amendment and ask
that the reading be waived, so that I may summarize it.

THE CHAIR:

Motion is on adoption. Will you remark, sir?

SENATOR MARKLEY:

Thank you, Madam President.

This amendment would simply eliminate the Risk Reduction Earned
Credit Program. I believe there may be aspects of it which are
worthwhile, but I think that, I think fiddling with it in the
way that we're doing with the underlying bill is going to give
us a false sense of security. And unless we can take this up,
from the ground up and subject it to the regular public hearing
process, which it has never been through, and have a full
discussion of it, we will not have a piece of legislation we can
all have confidence in. So I would urge adoption of this
amendment.

Thank you.

THE CHAIR:

Thank you.

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I rise to oppose the amendment and also to -- to bring good news
to Senator Markley, even though I'm opposing the amendment.

The good news is that the -- the language which affects the risk
reduction credit in our bill, which prohibits anyone who's been
convicted of a violent crime as defined in the statute from
being released prior to serving a minimum of 85 percent of their
original sentence, that language is identical to language in
Raised Bill 6657 of the current session, sponsored by your
colleagues, Senators Kissel and Welch. That bill had a public
hearing before the Judiciary Committee on March 22nd.

For those reasons, Madam President, I oppose the amendment.

THE CHAIR:

Will you remark?

Senator Boucher.

SENATOR BOUCHER:

Thank you, Madam President.

Madam President, I actually rise to support the amendment. I think our good colleague, Senator Markley, has made excellent points. I think the fact that this particular program, after it was rolled out, clearly was seen to have serious flaws, problems, and actually resulted in some very serious crimes being perpetrated after the fact.

And I think he does bring up a good, a good argument for the support of this particular amendment, although I do appreciate the President of the Senate's description of the fact, in giving us at least some amount of comfort, that possibly this works to mitigate some of the issues. However, I think the idea of eliminating the language and starting fresh and looking at the issue does deserve some credit. For that reason, I am supporting the amendment.

Thank you.

THE CHAIR:

Thank you, Senator.

Will you remark?

Senator Williams.

SENATOR WILLIAMS:

Madam President, I must have neglected to ask for a roll call vote. I do that, so at this time.

Thank you.

THE CHAIR:

A roll call vote will be had.

And will you remark? Will you remark?

If not, Mr. Clerk, will you open the machine -- oh, yeah -- call for a roll call vote, and I will open the machine.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators please return to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

If all members have voted, if all members have voted, the machine will be closed. Mr. Clerk, will you call the tally.

THE CLERK:

Senate Bill -- I'm sorry -- Senate Amendment Schedule "E," for Senate Bill 1160.

Total Number Voting 36

Those voting Yea 14

Those voting Nay 22

Absent, not voting 0

THE CHAIR:

The amendment fails.

Will you remark?

Senator Markley.

SENATOR MARKLEY:

Thank you, Madam President.

Let me say one thing as I've, as I promised, about the process of this -- which I was referring to the process of the amendment before -- the process of the bill that's before us. I may be the only person that rises to say this, and I say it with all respect for the leadership we have here, which I've -- I deeply respect on both sides -- but I think we made a mistake by trying

to move forward with this bill the way we did. I think that we
have the experience in this Chamber of moving bills through a
regular process, through committees, and subjecting them to
normal public hearings. And I think that when we step away from
that process, we are on, we are on shifting ground, and we never
know how it's going to end up.

In this case, I think it was done, as I think almost everything
here is done, with the best intentions. But I feel that the
intention may have been, first of all, to bring unanimity, which
we will not achieve and maybe could not achieve, and, second, I
think to speed the process. I think in the end, it's rather
paralyzed our process here.

I think that we've gone through a period of a couple of months
when other business has moved forward in a desultory way while
the attention of the leadership was focused on reaching an
agreement on these issues.

I'd further say, and maybe most pointedly, that although the
process lasted a number of months, it still has ended in an
unseemly rush, to my mind. A final version of this bill was only
in my hands this morning. The bill that we had before us
yesterday afternoon was still not the final bill, and it wasn't
until Monday that we really knew for sure what the outlines of
that final bill were going to be. That's not time enough for us
to act properly, and I would -- I'm somewhat at a loss as to why
the extra days -- because it would only be a matter of days and
not weeks -- were not granted for us to examine this bill.

I'm also at a loss to understand why there was no hearing on the
bill in its final form. This has been -- and it's something that
I've brought up throughout the process -- I know that it can't
be guaranteed by any given party involved in it, but I think
it's something that we owe to the people of Connecticut with
these bills. The fact that there were hearings on the subject
matter, that there were opportunities on different individual
bills that were going through the process for people to testify
-- well, it may be better than nothing, but to my mind it's not
adequate, especially to -- for a bill of the significance of
what we're voting on here today.

And, again, when we're talking about something that is only a
matter of days or a week, I wouldn't be favoring delaying this
process for a matter of months but long enough for the people to
weigh in on it. I think we do wrong when we do this, and I've

**JA-715**

seen it more times than I like since I've been back in this
Chamber.

I'll say two final things. One is I've had a very unusual
experience in returning here after many years, and I wasn't sure
how well I'd handle it. Until recently, I thought I was handling
it pretty well, but I have thought to myself what -- what was it
that -- that -- what was it that -- why did fate desire that I
should be here again at this time. And every now and then I feel
like I have a message from the past to deliver. So my message
from today, for those who might be weighing in their own minds
how to vote on this, I was out of this Chamber for 24 years
fully -- I won't say, I won't, I won't round up -- 24 years from
the end of my first term to the beginning of my second term.

And I didn't think about my service in this. You know, my name,
my name is on that plaque over there, because I happen to be
here when we renovated the hall. I used to drive by and think
isn't it funny I used to serve there and that my name is there,
never thinking that I'd -- I'd join it, I'd -- I'd be reunited
with my plaque.

I didn't think obsessively about that term but I thought about
it from time to time. And one thing, when I thought about votes
that I cast, was I thought I have never regretting doing what I
thought was right, looking at it over decades. The only votes I
regretted were the votes that I cast for what I thought were
political reasons, because I felt pressure of one sort or
another. And take that as the advice of somebody who had a long
time to reflect on it.

And the second thing I'd say, as I said before, I don't have a
passion for firearms. But for whatever reason, I have a passion
far personal liberty, and I am very wary to do anything without
extremely strong cause which restricts personal liberty. And I
also have a passion and a deep respect that has grown throughout
my life perhaps to love, for the Constitution of this country,
which is really what makes us a country. We don't come from the
same place. We haven't always occupied the same piece of land.
We don't even necessarily share the same history, but there is
one document that defines what the country is. And out of
respect for that document, among other reasons, I will oppose
this bill.

Thank you.

THE CHAIR:

Senator Hartley.

SENATOR HARTLEY:

Thank you, very much, Madam President.

Madam President, it was some weeks ago when we gathered in this Chamber to deal with the first responders on that day, to provide for them a safety net which we never had to previously think about before, never having been faced with this kind of tragedy. And we came together and did that, and there -- there was a collective sigh of relief at -- as we finished that proposal that day.

But it was truncated because we knew that our work had only just begun. We knew that the next iteration was one that was going to be far more difficult of a task. And from that time to this afternoon, and perhaps going into this evening, we have strived to resolve that next and looming part of this situation.

Madam President, in all of my years of service -- and I served with you in the House and now have the pleasure to have you officiate in this Chamber -- I have never seen a more polarized issue than this. And yes it is a tragedy that brought us here. We, I don't believe, would be talking and dealing with the -- the gravity of this situation, that unspeakable day, that horror, the -- the mass, the violent slaughter of the innocents and those who were their appointed caretakers.

But this assembly came together and we came together in a way that we have never come together before. It wasn't partisan and was beyond bipartisanship; it was a way that we've never been together before. We were one body. There were no divides, no D's, no R's, we were talking about policy and the terrible circumstances that brought us here. And we strove to recognize, to the best of our ability, that it is our job to ensure the welfare and the security of our citizenry, our families, our children, but we also knew, at the very same time, that it was our duty, our charge to protect the rights of the law-abiding citizens of this state, and that weighed upon us equally.

As the Chairman of the Public Safety Committee and as also a member of the Gun Task Force, I would be derelict if I didn't recognize the incredible efforts that went in. And -- and I would also like to say that perhaps maybe some might interpret this as self-congratulations and back-patting; there is none of that here today. It is about a tragedy that brought us here and

about our respect for each other; opinions, the same or different; and, how we proceeded in a respectful, dignified manner with a task that we all would choose not to have had before us.

But I -- I do want to recognize the work of the Public Safety Committee and particularly our clerk, all of our members, and -- and probably most of all the hundreds and the thousands of citizens who communicated with us, e-mail, letters, phone calls, and -- and those who then came to all of the hearings, and -- and to the hearing that the Public Safety Committee had, which was some 16 hours in the offing.

And especially to those who came and signed up that day but couldn't stay to testify, because as we went into the wee hours of the morning, one particular individual who was there with their children who could not stay, another individual who had to get home to take care of a family member, know that we read your testimony. We recognized your presence, and it was all very much part of our process.

And for those who actually were in the room and testified and felt outnumbered, felt outnumbered because their position was very different than perhaps the greater number that were in the room, I apologize to you if you felt outnumbered. But you should know that everyone who came before us was on an equal footing and everyone's input counted in the same manner.

And I should hope that as you look at this legislation today, you will see the reflection of your input, of your participation, because it clearly is a result of all of that input. I think what we have here today is very, very different than where we started in this conversation, and that is to your credit and in large measure because you, in a very respectful, democratic way, worked with us and -- and continued to dialogue with us.

Having said that, though, this legislation is not unlike other legislation that we pass, and it is far from perfect. It is very infallible; we recognize that. In fact, there's no legislation that we can pass or even presume to pass that is going to be the legislation, the end-all, the be-all, in terms of the cure. And many have said it before me, and probably far more articulate, that we cannot ensure, as we stand here today, to those families and to this entire state that this will never happen again, but yet we can do our best.

And I recall the affirmism which says that the perfect is the enemy of the good, and we know that we're not perfect. In fact, we know how imperfect we are and we know how imperfect our work is. However, that does not mean that we should ever sit by idly without trying to do better.

I recognize the shortcomings in S. B. 11 -- what is it, 1160? But there are some very important parts to that, the gun felony registry, the universal background checks, the addressing the issue of the private transfers; we recognize the -- the flaws and the holes in those processes, they, the behavioral health portion, which is so important, which so many families who find themselves in these circumstances recognize the need for, whether they have insurance or not. And -- and, of course, the school security piece.

And so, Madam President, for those reasons and recognizing our shortcomings, I would like to point out that this is our humble effort and it will bear a dividend.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Cassano.

SENATOR CASSANO:

Thank you, Madam President.

I, too, rise to support the bill, and I'd like to make a couple comments about the bill, itself, and -- and why we're here, I guess. Obviously Newtown was the trigger.

I grew up in Nantucket. I'll never forget, as a junior in high school, I had to go to a town meeting to -- as part of a political science class or history class and see our town meeting form of government work. The town meeting had a bill before it, $ 15,000; an allocation of $ 15,000 would be the local share to pay for an instrument landing system for Nantucket. The federal government would have paid the rest; I think it was 85,000, and the good voters of Nantucket voted it down. It was too much money.

August 15th that year, 1958, about 11 o'clock, I was driving in from the beach. We were fishing and we could hear a plane, but we couldn't see it in Nantucket fog, and it crashed. Twenty-four Nantucket people died that night. And they called for a special meeting, and we appropriated the $ 15,000, a month later. Tragedy brings about a response.

And the tragedy of Newtown has brought a response, a response that for many of us is very difficult to support because none of us can be happy with every part of the bill. Perhaps the good thing is that it's taken a month for the bill to pass, over a month. Four hearings have taken place. I was not on a committee but I kept going in and out on that hearing that went until 3 a. m. in the morning. I left by ten o'clock. I congratulate those that waited and stayed through it.

The courtesy, the respect of the hundreds who waited all day, came here in the morning and left here at night was incredible to see. Some of the things that we might have included in the bill if we passed it then, antique guns might have had to be registered, retroactive takings, a whole bunch of things that would have made the bill far more draconian are not in this bill, as we tried to balance it.

Mental health issues are now a part of the bill that might not have been at that time. Think about what that might have meant? Columbine happened years ago; maybe the bill should have been written after Columbine or after the movie theater massacre or after one of those other types of events that has happened. But when it happened in our own state, we had to react.

As we see the recent news of both the shooter and his mother, maybe if good mental health was available to either one of those, this might not have happened, but we don't have those protections. This bill provides those protections.

I've heard from people that, you know, the gun, that the gun manufacturers will leave. If I live in Montana and I want a Colt, I'm buying a Colt; it's as simple as that. When you buy a gun, you buy a brand. You buy something that you're comfortable with, Remington if you do or (inaudible), whatever it might be, Winchester, you buy a brand. So I'm not concerned about that.

Schools; I think it's a start. I'm not satisfied with that part of the bill. I don't think it goes far enough. We have a public school in Manchester for children through -- two through four, five; Head Start school, 212 kids. Why aren't they protected or

the parochial schools? And maybe some day they will be, as we look at future legislation to deal with those issues. I understand that you have to start somewhere, and what this bill does, it starts.

E-mails; we have literally hundreds of e-mails. I have 192 e-mails in the last 24 hours. I get a kick out of one guy, said I had to e-mail you three times because I get points. I don't know who's giving the points out, but the e-mails are pretty much split, maybe 55/45, whatever it might be, mostly, many of them, good friends of mine, former police officers. I was a mayor for 14 years; I used to go and qualify every year when they qualified. And friends that I qualified with are saying you can't support this. I think we have to support it because it's a step forward.

And to the crowd that came that night, to the crowd that's here today, I applaud them. I applaud them for either side that they stand on because of the respect that they have offered us through this process today.

When I went on Public Safety, three years ago, they said, oh, Public Safety; ha-ha, you got the gun crowd. Well, the gun crowd ought to be pretty proud of themselves, the way they handled themselves in this whole process, because they did try to provide information.

I can't tell you how many times I met with people in my office, in town, and so on, to learn about this gun and that gun and this clip and that clip and this magazine, and so on. And so I look at this, I look at this as a, as a compromise that is important to Connecticut, because I think it will make us a better state.

And I would hope that as we have bills in the future dealing with things such as a billion-dollar deficit and some of the other types of legislation, that we get the same kind of citizen support that this bill has gotten from both sides.

Thank you.

THE CHAIR:

Thank you.

Senator Crisco.

SENATOR CRISCO:

Thank you, Madam President.

Madam President, I rise in -- in support of the bill. I wish to commend Senator Williams and Senator Looney and Senator McKinney and Senator Fasano and the Chairs of our various subcommittees for their leadership. I was particularly impressed not with the knee-jerk reaction to issues that occur from time to time, but about the, but also about the thoughtful, responsible consideration with the numerous hearings and the hours by various Chairmen, like Senator Hartley, to wee hours of the morning to hear every position possible. And I just want to laud my -- my colleagues for what, for their leadership, what they have done.

Because what we are doing, we're acting responsible. We are not addressing gun control; we're addressing gun sense. And we heard many times that the major issue is mental illnesses. And through the leadership of Senator Harp, we have drafted something like 12 different measures, 12 different measures in regard to mental illness. Granted, maybe some of them should have been addressed before and it took a tragedy like Newtown to refocus us on mental illness.

I have the utmost respect for those people who have their ideology in regards to the Second Amendment, their rights. But what about the rights of Ana, Daniel, and -- and Madeline; they have rights too. As in the Declaration of Independence, they have the right to life. That right was taken away from them, and in their honor, the least we could do is provide legislation that will address the issue, not a hundred percent; that can never happen, but hopefully it could address the issue that might avert another Newtown.

So, you know, the -- we have been criticized for our process, but I believe it's better to have tried than to not have tried at all. And I just take great pride as being a member of this Circle. There are great many profiles in courage by both sides of the issue, and I hope that when we take the final vote, that they'll be all green lights for the children of Newtown and the adults.

Thank you.

THE CHAIR:

The next speaker will be Senator Welch, followed by Leone, followed by Musto, followed by Ayala -- Ayala.

Senator Welch

SENATOR WELCH:

Thank you, Madam President.

As I said in support of Senator Markley's amendment, there is no doubt that this tragedy has touched every person, every heart in this Circle, in this room, in the stands there, whether as a citizen watching the horror on TV that day, whether as a member of this government or a Legislator on the ground there that day, whether as a part of a task force.

And I do thank Senator Williams, Senator Looney, and Senator McKinney for placing me on the Mental Health Task Force, where you could hear the testimony of the moms and dads, the brothers and sisters, the friends who lost their loved ones that day. No doubt it was moving.

It was moving to me, even the next day, as I dropped my wife off to go into the bakery to pick up some cookies for an event we were going to, to listen to my 5-year-old girl, my 5-year-old daughter say, Daddy, I hope they don't shoot her in that restaurant. It is moving. It motivated me. It motivated me to roll up my sleeves and be a part of a task force to make sure that a madman could never commit a mass murder like this again.

But the bill we have before us falls short of that. If that is our goal, this bill falls short. And it does so at the cost of losing liberty. What this -- this country is all about freedom; it's all about liberty. Whether you believe it was divinely given to us, whether or not it was a natural progression of government over the years, whether or not it was our following a natural law, this country is about freedom. And with great freedom comes great responsibility; I think everybody here acknowledges that, great responsibility. And I will be the first to concede that as -- as citizens, as moms and dads, as neighbors, we have not lived up to that responsibility. But the irresponsibility of some ought not to mean the loss of liberty for others.

Senator Kissel, I think, rightly noted on the fear of incrementalism, fear shared by some in the Circle, fear shared by people we represent out there. And no sooner did he express

that fear that I think it was somewhat confirmed by the comments
that Senator Meyer made then; there's more to be done here. And
I think Senator Markley rightly noted that if this was the end,
if this was all we were talking about, maybe there would be more
consensus. But I think there's a general consensus that that is
not all we are talking about.

I think Senator Williams appropriately listed the horrible
events that have taken place in this country over the years and
identified a common theme of weapons, guns used in those
horrible events. But -- but I see another common theme, and that
is evil. That is evil men and women doing evil things,
irrespective of what the modality is. And I don't see this Bill
1160 getting to the heart of evil. I don't see this bill
convincing the mass murder of Newtown that there's another way,
that he could change. I don't see this bill accomplishing those
goals.

What I do see is I see us saying to one generation, it is okay
to defend yourself in a certain manner but to the next
generation, in a world that continues to grow darker, that
continues to become less safe, that continues to become scarier,
it's not okay for you to defend yourself in that same manner.

I do applaud those who put the process together, who worked so
hard to come up with some really good ideas. And 1160 does
contain some really good ideas, things we ought to do, things we
ought to execute on. But at the end of the day, weighing what
this country is about, I cannot support it.

Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Senator Leone.

SENATOR LEONE:

Thank you, Madam President.

I wish to rise, just to make some brief comments on the bill
before us. And first, I'd like to thank our Senate leadership on
both sides of the aisle, as well as our House leadership on both
sides of the aisle for all the work that has been done to
present what's before us today. And I know it couldn't have been

easy; rightly so, it shouldn't be easy. This is a very, as was
mentioned, polarizing, personal, emotional issue.

We have a lot of history in our country on the ability to defend
ourselves, and we should be able to defend ourselves. I respect
the ability for a person to defend their life, their personal
property, their family, and I don't see anything in this bill
that takes that away. You can still own your weapons. You can
still have your ammunition. You can still defend your personal
property, your family. You can still go to the gun clubs and the
shooting ranges for your sport. You can still do those things.
And as I look at the -- the language of the bill, and as I look
at the title -- and I think the title says it all in term of
what we're trying to do here -- this is AN ACT CONCERNING GUN
VIOLENCE PREVENTION AND CHILDREN'S SAFETY. Again, that's gun
violence prevention, not gun violence taking-away, gun violence
prevention and improving children's safety, all because of what
happened that dreadful day, December 14th, in Newtown.

And as I look back at the common thread of all the other areas
that had those mass shootings, those mass killings, whether it
was the two times in Colorado, Arizona, Virginia, numerous
others, the common thread is not the one rifle, the one pistol,
the one revolver; it's these assault weapons with high-capacity
rounds that can shoot multiple rounds in a minute, weapons that
are meant for war to defend our country, not to shoot our
neighbors, not to shoot our loved ones, not to shoot someone
going to school, not to shoot someone going to the store or to a
place or worship. It's for war.

And if anyone has been in the military and has shot those
weapons, you would know the destruction that it's capable of.
And I suspect that many of these mass murderers never served a
day in their life in the military to know what it could do, to
see the effects. And I respect all the people that are here
today on both sides of the issue. I know they're -- they're
real; we can't discount them but we do have to confront them. We
do have to debate this issue to find the way to move forward to
protect the public welfare, to protect the safety of our
constituents.

So December 14th, unfortunately, is going to be forever etched
in the minds of every Connecticut citizen, maybe not other
states. I suspect so, because it seems that this particular act,
that has culminated after so many others, all of which we had
hoped something would have done then, but because this was so
heinous, so horrendous that it went after our children, five,

six, seven years old. And any parent that has children in that age range -- and I'm one of them, as well as many others -- and even for those that have older children, you can still see that face in your children when they were that old or that young, I should say, the kind of impact that it has on any parent, on anybody. I don't think you would have a heart if -- if it didn't.

So today I see as a defining moment for us here in Connecticut. It's a defining moment because we have to act. We can choose not do something here because of the tragedy that happened, and I ask how can we not? We must. Those children, our children are our future. Those deaths in Newtown -- and I don't call Newtown as some other place; it's not my town; those aren't my constituents -- I look at them as they are my constituents. Those are our children. It could have been any of our children. It's the old phrase it happened over there; it's not going to happen here.

Well, in fact, it did happen here, and those deaths in Newtown, they represent the loss, not only those of those children and those families but all of us. We've all lost a sense of humanity when that happened. And if we choose not to act, to address it in some way -- and it's been mentioned, this may not be perfect. It doesn't address every need. It may go too far for some, not far enough for others, but the point is we're here to try and prevent it from happening again, to have some measure of prevention, to have some measure of improvement in our children's safety.

So I hope that some day when history looks back and looks back on this Chamber and the House and the State of Connecticut -- and I hope all eyes are watching us in what we're trying to do here -- the message that we're trying to send is not to harm people and to harm their rights but to protect those rights and to protect our children, to protect our people from having this kind of tragedy happen again here in Connecticut, and not just in Connecticut but in other states as well and across the world, I hope.

I just don't want another senseless act to happen and we have not acted. At some point, we have to ask ourselves, when is it enough? When, how terrible does it have to be for us to do something? I believe this legislation will help. I pray and hope that it will, not just in Connecticut but everywhere.

And it's because of that, it's because of the prevention and the improvement in safety for our children and our families and our neighbors that we hope this never happens again. And if there's some other loophole where some madman finds a way to circumvent these, these precautions that we've put into place, we'll have to come back. We'll have to do something. But my hope is well, we don't. My hope is that this sends a clear message, and it's for that, that I support this bill.

And I thank you.

THE CHAIR:

Thank you.

It'll be Senator Musto, followed by Ayala, Maynard, and Linares.

Senator Musto.

SENATOR MUSTO:

Thank you, Madam President.

Madam President, I rise in support of this bill. The incident in Newtown may have gotten us here today, but what we are doing is we are setting policy for the whole state, both those people who own guns, the sportsmen, people who enjoy shooting them, people who collect them, and also for people who are victims of gun violence and the rest of us who are neither.

I support both sides of this argument and my concerns with this bill, I share some of them. Senator Markley brought up some; Senator Kissel brought up some. I share some of those concerns, but on balance, I think this bill strikes the right balance for the State of Connecticut and the people here.

We have heard a great deal from people who are opposed to this bill, and one of the reasons I support this bill is because a lot of those concerns are addressed in the bill. We've heard that we should not be confiscating people's magazines, confiscating people's guns. This bill does not do that.

We have heard that we should be focusing on mental health. We should be focusing on school safety. We should be focusing on the things that make people safer outside of the gun arena -- this bill does do that -- and that we should enforce the laws we have on the books and make them stronger for people who are

actually criminals, who are using guns in a way that harm other people, not for self-defense, not guns in the hands of our law enforcement and military, but for those criminals who are using them in robberies, in murders, in home invasions, who are trafficking guns to those people who shouldn't have them, who are trafficking ammunition to those people who shouldn't have them. This bill does that as well.

We are talking about school safety here as well and trying to figure out how to make those areas where we leave our children every day safer. Senators Cassano -- Senator Cassano's points on that are well taken as well. There are a lot of good arguments from the people around the Circle on all sides of this bill, and I'm proud to be part of this debate. I'm not going to talk a lot about those things that have already been spoken of, because there's no need to hear it again.

This bill will not prevent all gun crimes. It will not prevent a lunatic from getting a hold of a firearm and killing a bunch of people, children, adults, teachers, law enforcement, others. But we all hope, even those who are not supporting this bill, I suspect, hope that this bill will at least save some lives, that it will prevent some gun crimes.

And that is why I'm supporting this bill, in the hope that it will prevent future crimes that some people will be saved by it, and that it does not take anything away from the people who currently have guns and it puts the proper focus on criminals and our mental health system and the safety of our society.

So if there is, I know there are some people in this Circle who have, are still thinking about this; I would just ask you to consider the arguments that have been made against the bill or against this process, in general, are addressed in this bill. The good things are addressed in this bill and we do them. The things that we've been warned against, this bill does not do. And for that reason, I support it.

Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Senator Ayala.

SENATOR AYALA:

Thank you, Madam President.

Today I stand in support of this bill. I want to thank the leadership in this Chamber and the leadership in the Chamber below in spending the countless hours, days, in putting together this bill that we're going to vote for.

We're here today because of that tragic event that happened in Newtown, and many people in this Circle have spoken, probably much more eloquent that I can, in defense of those little ones that their lives were so tragically taken.

But today I stand in support of the people in my community, in my district, in urban centers that have faced this, year in, year out, countless number of youth who have died in the streets of our urban centers. Their stories are not told. They have been forgotten. The mothers, fathers, family members, brothers, and sisters who in their own way have lost a piece of their lives; they didn't have advocacy groups stand up for them. They had no e-mail campaigns done in favor of them.

They have had vigils. They have had church services. They have had moments in places like Bridgeport, New Haven, Hartford, and other urban centers where they reach out to their community leaders. They reach out to their mayors. They reach out to their council members. They reach out to local law enforcement, and they reach out to Legislators.

And in a roundabout way, we've gotten here today, and today I want to present their stories. And I want to support this bill because I do believe that there are portions in this bill that speak directly to the tools, to the resources that our police officers can use to combat gun violence in our urban centers.

I pray that there will never, ever be another Newtown tragedy in the State of Connecticut or in these, in these United States. I don't know if that will happen or not. Unfortunately, what I can predict is that somewhere, sometime before this year is out, the city that I call home, Bridgeport will face gun violence again. New Haven and Hartford, other places that without a doubt, probably they can't predict the day or time, but somewhere throughout, gun violence will erupt.

When I look at this bill, I had the opportunity to speak to our chief of police, Chief Gaudette, in Bridgeport, and one of the items that he asked us to do, one of the points that he thought was important was having a gun offender registry. This is in

this bill. This piece provides another tool, another resource for our chief of police, for local police to go after the bad guys, to go after those people that would terrorize our community.

As I continue to look at this bill and I look at another piece that speaks to becoming another tool or resource for our police department and our legal system is the reclassification of gun trafficking laws, higher fines and higher penalties. That's where the problem is at when we look at places like Bridgeport, the trafficking of guns, people coming into our city, bringing these guns and putting them into the hands of criminals, of people who want to do bad. I have no pity for any one of those if they have to serve more time or if they have to pay more money because they decide that the City of Bridgeport is fair game to bring in their guns.

I don't mind if a person from the City of Bridgeport attains a gun legally through gun permits and does what he or she have to do. That's the law; I respect that. But when I have thugs, and when I have folks coming into my community and they want to put the -- their -- those guns into the hands of little ones, teenagers who may not necessarily have the level of respect for life as a grown folk, there's a problem. Our little ones, unfortunately through all types of different issues, whether it's violent games that they're playing or any other things that they might be seeing on TV, sometime are conditioned to think that life is a game and that you can hit the restart button after you lose a life, that things come back to normal. Well, that's not the reality that we live in, and I hope that after this bill gets passed, it's not the reality that those drug -- those -- excuse me -- those gun traffickers are going to have thinking that Bridgeport is still open for business for them.

The last piece that I'd like to address, I'd like to address the issue of mental health. The mental health issue is a serious component to this bill and one that I think is just as important as the violence, the gun violence prevention.

As a teacher, I've had the opportunity to see many students, students that for whatever reason may have been socially awkward, introverts, students that may have had a tough time in socializing with other students. And there's a tremendous responsibility as a classroom teacher to identify who those students are, because in doing so, we can prevent some honorific other event from happening.

But it goes much further than just having a teacher identify. Most of my colleagues, I would say a great portion of them, are able to do so, are able to do so, but it goes a step further than that. After identifying who these students are, after putting in a referral into a school social worker, school psychologist, it's about having the resources at the schools to be able to take that referral, analyze, talk with the student, and hopefully bring this young man or young lady to a place where they're not at odds with who they are. Will we save a life because of that? Your guess is as good as mine, but I do believe that we do prevent anything from happening if we have those resources there.

So I hope that in this brief moment in sharing my thoughts with my colleagues around the Circle and sharing the stories of the countless number of individuals in my 43 years that I lived in the City of Bridgeport who have lost their lives, friends, relatives, and on a very sad note, several of my students, former students of mine who have lost their lives on the streets of Bridgeport because of the senseless gun violence.

I believe that this is a proper step. I believe that this is the right thing to do for the State of Connecticut, and, as such, I will be voting in the -- I mean the affirmative, today.

Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Senator Maynard.

SENATOR MAYNARD:

Thank you, Madam President.

We consider today legislation that was conceived in tragedy and borne out of the hard labor of political compromise, and it's that compromise that I think has led us today to a lot of the discussion and misgivings that some of us feel about the bill. I speak to colleagues with whom, for whom I have the highest regard, and I am so grateful for the opportunity over the last three months to have had, even at different times in the moments of heating dialogue and debate, a mutual respect that was offered to each of us on both sides of the aisle.

I think the tragedy at Newtown left us in its initial days with a -- a sense that we needed to act with a spirit of unity and bipartisanship and that we wanted a bill that would address comprehensively what we thought might be the underlying causes. I think, unfortunately in some respects, the bipartisanship that we have sought and that we are achieving in some measure today also put some of us in a bit of a box as we began to consider what elements of a bill we could all agree upon. And I think it was there that we began to see the challenges of bipartisanship on an issue so emotionally driven.

I come from a part of the state that has a great many rural residents, has a -- a proud gun tradition, and has so many folks who are friends and neighbors, sportsmen, gun owners, folks who really take great pride personally in their safe handling of guns and their knowledge of weapons, in their respect for the rule of law, in teaching those to their children and enjoying hunting and competitions and shooting and also feel a very strong connection to the right to protect themselves personally, either against intruders or against, as they feel might occur in some future time, a -- an oppressive government.

It is their right to feel that. I don't share their same wariness of the government, because I have the great privilege of working within a governmental body. And I know that while we don't always get everything right, we do have the opportunity to change the law, and undoubtedly will again, as we discuss these issues down the road.

But I understand the misgivings of my neighbors and friends and people from all over the state and, indeed, all over the country who feel very passionately about any erosion of their Second Amendment rights and will defend them as a principle, not because their gun nuts, not because they're some fringe element, but because they hold this deep conviction that this is part of who we are as a people. It was established in the Bill of Rights when we, when we confirmed the Constitution, itself, when it was ratified. So I understand that passion, and I often think, as a Democrat, we also defend hard-won rights as we perceive them.

And I know it's not analogous, except for the underlying right, that we jealously guard a woman's right to choose. After that hard-won battle, Democrats are very wary of giving any ground, even if it seems reasonable, even at something as simple in -- in some states as a, as a 24-hour waiting period, we will not see to any infringement of that right.

And so while I don't share the same doubt and misgiving about an
abusive government that my Second Amendment friends do, I
understand their passion. I understand their desire not to let
government act precipitously and infringe that right without
deep reflection and care. We've sought to do that here. I
believe our leaders have done an incredible job trying to forge
a package that we can have broad bipartisan support. And I
believe that they sought with the best of intentions to protect
the citizens of this state, particularly our young children in
this aftermath of such a horror.

On the other hand, I feel that the process, itself, confined us
to a point where I am not comfortable with some provisions of
the bill that I feel I don't have a great enough understanding
of or a comfort level with what it might mean down the road. I -
- I think a bill this large, this comprehensive, and with as
many moving parts as it has really deserves more scrutiny than I
feel I've had the ability to give it.

Now, there's no question everyone in this room wants to ensure
that no tragedy occurs to the lives of any children in this
state or any person in this state, similar to the kind of mass
shooting that we experienced. I think where, in my view, the
bill runs a little off track is that it seeks to address the
actions of people determined to inflict harm on others in a mass
shooting.

You know, ten of the worst mass murders in the history of the
United States were committed by white men under 25 years of age.
They're all -- many ended in suicide, and -- and the acts were
carried out with a kind of calculated indifference and
dispassion that is just hard for us to comprehend. We come to
the conclusion that these people must be mentally hill because
who but a -- a crazy, mad person could -- could kill people
wantonly without cause. And yet it happens over and over again
in various parts of our country, perpetrated by people who are
not making a political statement so much as acting out in
frustration. Perhaps it is a political statement. Who knows the
minds of these people; they die, often at their own hand, before
we have the opportunity to understand what could have provoked
such an attack.

But I believe that our law-abiding citizens who are going to be
affected by this bill deeply resent, as I would, the implication
that they cannot be trusting with these weapons, that they
cannot be trusted to abide by the law, and that somehow the
gesture that we're making to hopefully assuage the pain and

suffering of those who've been so affected by the shootings in Newtown, that -- that may must give up or be burdened with a new set of requirements and reporting and -- and potential felony convictions, should they choose not to or make some kind of mistake in the future.

I just don't have a comfort level with a bill that goes that far, and I know it's very hard to balance things at -- these things out. We live in a, in a country that respects the rule of law, and we, and we try our -- our very best to respect each other's rights.

I've -- I've operated as a Democrat, again, as I say, under the principle that I would like to pass laws that provide maximum benefit, while preserving maximum liberty.

CONNECTICUT GENERAL ASSEMBLY

SENATE

WEDNESDAY, APRIL 3, 2013

SENATOR MAYNARD:

-- and that is a tough balance to achieve very often in this country. And as a member of this body, I feel a much greater level of comfort as, as someone who deals with the law, because I know, as I said at the beginning, that we have the ability to change it.

But I am aware of the discomfiture of those who feel that we may not come back, we may not correct those excesses in this law. And they may see, now or in the future, a diminution of their Second Amendment rights or their right to defend their family or themselves.

So I guess what I'm asking of this body is even if we make the decision today, as we in every likelihood will, to go forward with this bill that we maintain a respect for the rights of those people who think differently about the role of government who are not quite as comfortable with it as we are, who don't feel that it always provides a benevolent protection for them but sometimes may, actually, appear to them as, as something that is intrusive in their lives. And that is their right, as it is ours, to, to believe differently.

While I'd like to join today with colleagues who've worked so diligently to produce this bill, I find myself troubled, as I said, by those aspects of the bill and will be voting no today. The hard work that's gone into this bill though is not without merit. I am deeply committed to future efforts toward greater gun safety and improved mental health access.

And I intend to join with my colleagues as we leave here and go forward either in this session or in future sessions to do that which protects the lives of our children and, and makes the kinds of laws that, that can balance the interests of our, of our citizens against the need for further protection. So I thank you, Madam President, for the opportunity.

THE CHAIR:

Thank you.

Senator Linares.

SENATOR LINARES:

Thank you, Madam President.

I represent 12 towns, 12 beautiful towns, on the Connecticut River and the Connecticut Shoreline. And on behalf of my entire district, I wanted to take a moment to share my thoughts and prayers with the families that were affected by this horrific tragedy in Newtown, Connecticut.

When just making a decision about this bill, ultimately my, my thought was that at some point I'm going to be knocking on the door of a, of a constituent's house and looking in the eyes of a mother with her kids by her side. And ultimately, my decision would be based on whether or not I feel we have done the best work to help prevent another act of evil from horrifying our state.

Today, I will vote no on this bill and stand here for the honest, hardworking, law-abiding citizens that I feel we are, is, this bill is creating unnecessary harm for. I do believe that we need to head in the direction of improving our mental health system in the State of Connecticut. I believe that we missed an opportunity to reform our mental health programs in a responsible and thoughtful way.

As I was sitting here, an e-mail came to me from a constituent.
He said, I'm writing to ask for your help. There has been a
proposal that will eliminate all grant funding for inpatient and
outpatient mental health programs. That means nearly $ 3 million
in reductions to mental health programs for people in your
district. This is not the direction I believe we need to head in
in order to prevent another tragedy like this from occurring.

I also feel that never should the voice of the people be
silenced. I do have my reservations with the fact that the
people have not had a chance to voice their opinion on the final
language of this bill. I think that we, more work needs to be
done, that we need to focus on mental health, and I stand today
in opposition to this bill for those reasons, and I ask my
colleagues to follow. Thank you.

THE CHAIR:

Thank you.

Senator Fonfara.

SENATOR FONFARA:

Thank you, Madam President.

I rise in support of this bill, and I want to thank all those
who helped us get us to this point today. Madam President, there
are two things that are true, among many things, particularly
true about the legislative process. The first is that we rarely
act proactively, and the second is that we deal with issues du
jour or of the day.

With respect to the tragedy that has brought us here today,
we're unable to do anything to address that issue proactively,
sadly. But I pray that we do not treat what happened in Newtown
and the effects of it as the issue du jour, because,
unfortunately, and sadly likely, somewhere in this country, and
hopefully I'm wrong on this but maybe even in this state, there
exists and likely will exist other Adam Lanzas.

And while this bill and this process never will allow us to
prevent fully a repeat of the horror of Sandy Hook or Aurora,
Colorado, or Virginia Tech, our charge is to do everything we
can to minimize such a thing from happening again. I think this
bill goes a long way in making that effort.

What is the profile, sadly, what is the profile of these individuals, young, angry and withdrawn, some mentally disturbed, maybe a video game watcher, a violent video game watcher, access to firearms, maybe copycatters? Like with suicide, many contemplated, few committed.

But as lawmakers, it is impossible for us to write a law that could identify that, those few individuals that go from contemplation to action. And I believe that it is our responsibility to not treat this tragedy and the results of it as an issue du jour. The mental health aspect of this must continue to be our challenge.

We must find ways to identify those better, the Adam Lanzas of our communities better so that the families who are living with and will live with this tragedy for the rest of their lives will feel at least something, something positive came from it so that others don't have to live with it as well. And I pray that we will continue to work at that aspect of this as we move beyond today. Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Senator Boucher, for the second time, and then followed by Senator McLachlan and then Senator Kane.

SENATOR BOUCHER:

Thank you, Madam President.

And for the second time, as was mentioned very often this afternoon, that this has become one of the most polarizing issues that we have faced and that we have 36 Senate seats around this circle, all of them about exactly the same size. And I have to say that the district that I represent with seven towns is probably one of the most polarized in this particular issue and oftentimes in other district, other issues as well.

I might add just as an aside that those individuals that reside in that Senate seat tend to vote maybe 15 to 20,000 more individuals or votes that are cast in many of our elections, which means they're very politically active. And they were never more active than they were on this particular issue. I think many of the busses that came up here on both sides of the issue probably emanated from the 26th District.

I can tell you this, that I, you have all received phone calls and e-mails by the hundreds. We have received them by the thousands. And it's one person, our aide, that's there that's on the front line of these phone calls and these e-mails. And although you strive to get back to everyone, it's become literally impossible to do that given the reaction that we've received.

And I have to say that this issue has touched all of us personally in some way or another. And some of those very children that were in the room next door to the ones where none of the children survived sat with me here in this chair on many an occasion and in cars and in parades. And, fortunately, they survived but not without the kind of emotional damage that those children have received.

And I know that even those that were not immediately there, my next-door neighbors' fifth graders and fourth graders come over regularly and tell me about how they're practicing hiding in their closets to see if they can all fit in their school closets. And one of them said to me she's even tried to fit in her locker, and she can do it. To think that that is what is going through their minds right now is absolutely devastating.

But I also have to speak up on behalf of some parents and family members that have individuals like Adam Lanza in their household, and they live in fear in every day. And I have to speak on behalf as well, because one of my priorities is not just school security, but it's mental health issues.

And I was very torn on the area to spend some time on in delving into this issue and in speaking on behalf of them and the many hospitals that we have in our state that have told me that their psychiatric units and ERs confront this issue every day where they have the severely mentally impacted and ill individuals that they do not have a place to, to put them at the same time that we, as a state, have closed down mental health facilities that the Mental Health Subcommittee has done a lot of work but has left a big, gaping hole and gap in addressing the serious lack of placement, appropriate placements, in institutions that we have closed for politically correct and, and cost-related reasons.

One of the individuals from one of my districts in Ridgefield called me to talk to me about the fact that their son was also killed by someone that was let out of Fairfield Hills, which was a mental illness facility in Newtown, Connecticut. That patient

was mainstreamed and put in a community in Stamford. They ended up burning the apartment where their son resided and was killed. This individual should have had oversight.

Someone should be, have been watching to see that they received their medication. When they were in a facility, they had that oversight. They had that expertise located there. We have to ask ourself as a state, are we going to continue to be politically correct, or are we going to broach this subject in an honest way, and is there a proper place for institutionalization and the issue of involuntary commitment, all of which in this bill becomes a study?

And I understand that there's financial constraints, but we have to address this, and I hope that we do look at this very serious issue in a future session. And also to mention in support of our good, new Senator from Bridgeport, Senator Ayala, he is so right that we have gun violence every single day and every single week in our major cities in Connecticut. It disproportionately affects our minority populations in those cities, and it's something that we can't turn a deaf ear to and eye to. And fortunately, there are some aspects of this bill that do think about that.

I had an interesting experience that maybe some of the others here had as well in the House when we were debating the assault weapons ban when members of the Clerk's Office would follow me into the ladies' room to say, you know, I live in the inner city in Hartford, and every weekend somebody comes in there with a vehicle full of contraband weapons and opens up the trunk of their car and sells them straight out for cash without any background check, without any permits. And how do we address that? I'm very pleased to see that some of that is in here.

I know that finally what I wanted to talk about was the fact that our founding fathers were actually, and mothers, I might add, were brilliant, brilliant in the aspect that they created three branches of government, the executive branch that proposes, the legislative branch that disposes or decides, and the judiciary, which adjudicates.

And although the Connecticut Constitution gives every citizen the right to bear arms in defense of himself and even the state, the law though also does regulate the sale, the use, and the possession of firearms. And as such, our judiciary, some say that this bill is too far-reaching. It goes too far. Then, in

fact, it will be adjudicated, and those aspects that don't pass muster can be struck down as was in New York.

This was quite an effort, and for those that say it was a closed effort, I don't believe it was. I think it was one of the more open that we've had in a long time just judging by the individuals that have come forward, provided testimony, that provided e-mails, calls, all of which we have read and all of which were considered with, with regards to the final product.

Thank you, Madam President. Appreciate the opportunity to just say a few closing remarks.

THE CHAIR:

Thank you.

Senator McLachlan.

SENATOR MCLACHLAN:

Thank you, Madam President.

I was proud to have served on the bipartisan task force that studied the problems following December 14th and was assigned to the School Security Subcommittee where we clearly identified that Sandy Hook Elementary School's procedures, including lockdown, actually saved lives. But the process of our study told us there's much more that can be done.

This bill begins the process of looking carefully at security of our children. But let us be clear that we can't possibly expect our school buildings to become Fort Knox. We should look carefully, much more carefully, though at mental health in our state. We've heard a lot of comments about that today, but it's not proportionately showing in this piece of legislation. And I think that it deserves priority attention.

I must say I am disappointed the bill has created a task force where we really should be leaving the real action, should not be leaving the real action for another day. It's a complicated question. Clearly understood, it's very complicated. How do we address the nightmare of a madman? No question that's a difficult question.

But the professionals in the mental health field have told us and have made it really very clear that one of the major

problems in Connecticut is insufficient resources. Senator Linares just mentioned a, an e-mail that he received just today, and I've gotten several of those over the last several days, whereby mental health funding is being dramatically cut. That's a problem.

I also heard many stories of families struggling with challenged children. They were very vocal over the last several months, those families who have lived through apparently what the murderers' family may have lived through, the challenge of how to, to get resources within the system in Connecticut.

Now we have some best practices here in Connecticut. One of them I learned from the Commissioner was something known as assertive community treatment, and that's in this bill today. That's good news. But here's the problem. It's currently in three cities, and we're only adding three more. We have 169 towns in Connecticut.

Now granted, this is an expensive program that needs to be prioritized, and I understand that. But if we have a best practice like that, let us find ways quickly to use those best practices in a more cost-efficient manner and make it statewide or more readily available than what we're talking about. So we have much more work to do.

Gun control is a very tough topic for everyone in this room today, for the literally thousands of people that I have heard from and tried to communicate with over the last several months who have called my office, my home, my cellphone, e-mails, thousands of people. And I'm just one of 36 Senate districts. And I heard from people across the state. It wasn't just Western Connecticut who was communicating with me. They were calling and writing from all over the state.

It's a very challenging topic and, I must tell you, a painful, sleepless night challenge for me. The major problem that I had with early discussions about gun control here since the task force started working was seizure. There seemed to be a need, and I heard it again today from Senator Meyer, who he and I disagree that illegal seizure is a priority in the Constitution, and we should not be going down that road.

And so I'm thankful that the bill before us today does have the grandfather clause and allows for those responsible gun owners to keep the property that they've bought and paid for. Now that

comes with strings, and I understand that. And they're not happy about that either, but that's a balance. That is a balance.

Our State Constitution has very firm rights to bear arms. Some would say that the Connecticut Constitution right to bear arms exceeds that of the United States Constitution. And so I asked questions of a lot of experts in constitutional law. What happens with the legislation before us in a future contest in the court?

I'm told, and this is a matter of opinion that I've gotten from professionals -- I'm not a lawyer, I'm a layperson Legislator, I call myself -- this, I am told this bill will withstand a challenge. And the reason why is that the leadership decided to take out the grandfather, take out the, the seizure part of it and add the grandfather clause to the bill. There are so many more things about this legislation that make so many people uncomfortable, including me.

But I've got to share with you where I was on December 14th. Immediately upon hearing news of this tragedy -- I was in Danbury -- I drove straight to Saint Rose of Lima Church in Newtown where I have friends who are parishioners there, family members who are parishioners there and whose, the pastor, Monsignor Bob Weiss, is someone who I respect a great deal.

So I went to Saint Rose and kneeled down and prayed for hours. And during that period of time in the afternoon, I greeted family members who lost their family member at Sandy Hook Elementary School. And later that day, in the evening, I stayed there and joined the community in a prayer service.

December 14th changed a lot of people's viewpoint on a lot of things, on the preciousness of life, on the priority of our lives, and it certainly affected me in a very great way, quite frankly, more than I would have anticipated, something as emotional as that would have done for me. And so it forced me to take pause and think about this debate in a different way that I never had before.

What I found was that Caroline Phoebe Previdi, who was six years old, a first grader, an adorable young girl whose grandparents and great-grandparents I've known all of my life, was lost that day at Sandy Hook. And that's what I'm talking about, that it forces you to really look at things differently, I, I hope objectively, because under different circumstances, I would look at this bill very differently.

But today I'm supporting this bill in hopes, in hopes that I am properly honoring Carline Phoebe Previdi.

Thank you.

THE CHAIR:

Thank you, Senator.

Senator Kane.

SENATOR KANE:

Thank you, Madam President. If I may, I have a few questions to the proponent of the bill.

THE CHAIR:

Please proceed, sir.

Senator Williams, prepare yourself.

SENATOR KANE:

Thank you, Madam President.

Just a few questions, if I may, Senator Williams. In the bill, it talks about the provision of individuals under the age of 21, and it says that military individuals may use or may be exempt in the use and discharge of their duties.

What about those individuals who may have been, who have served their service through our country, come back, and they're still under 21, possibly -- maybe they were injured, maybe, who knows -- and want to purchase a long gun? These individuals, are they still exempt? I mean, they served our country. They have incredible training in the military. They come back, and they're not able to get a gun without a certificate or a permit.

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

Federal law, from what I understand, prohibits them from purchasing a pistol. And in the State of Connecticut, the law before us conforms that to centerfire assault rifles as well.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

So a . 22-caliber or a shotgun, that, that would be okay? It's, you know, hunting, that kind of thing. It's just not the centerfire, centerfire.

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Through you, Madam President, that's correct.

SENATOR KANE:

Thank --

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

Thank you for that answer.

On the mental health eligibility verification, it, I think it says that if you were voluntarily in a facility, let's say, it, within six months or involuntary, involuntarily within five years, there would be this look-back. The, is, is that just a check-off on the application?

Through you, Madam President.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

A check-off on the application, you mean if they are attempting
to purchase a firearm? Yeah, they would be asked that question,
but it's my understanding, and I can double check this, that
that information of the commitment at a hospital for psychiatric
disabilities, which is the commitment that we're talking about,
would be reported to the Commissioner of DMHAS, the Department
of Mental Health and Addiction Services, and that that could
also be reported to DESPP --

THE CHAIR:

Senator Kane.

SENATOR WILLIAMS:

-- which is our public safety agency.

SENATOR KANE:

Thank you, Madam President.

And is that a violation of our HIPAA laws?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Not that I'm aware of.

Madam President, through you.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

There's also in the bill a gun offender registry, but it says that it is not public record or subject to FOI. And part of the argument that law-abiding gun owners make and I will make and many people will make is that many of the crimes that are committed by, with guns are committed by the bad guys.

And why wouldn't this registry be ethi-liable? I mean, if we have a sex offender registry, and you're able to know if in your neighborhood there is a, a sex offender, why wouldn't we be able to know if someone is a convicted felon with a gun crime? Why wouldn't we have that information available to our public?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Madam President, through you to Senator Kane, the purpose of the registry is to assist law enforcement. So law enforcement has access to this list for the very purpose that you're talking about to be aware of the propensity, not the guarantee, but the propensity of those who have offended in the past in terms of gun crimes to offend again.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Through you, Madam President.

Thank you, but what's the difference between a gun offender registry and a sex offender registry? If, if those are made public, why wouldn't this be made public? I would consider, I don't know, but maybe they're equally as dangerous if not more.

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I can only tell the good Senator Kane that the purpose of this was as a tool for law enforcement. It was not discussed in terms of the sex offender list. I suspect if we had discussed that, we might have talked about the different natures of the crime.

In terms of a sex offender list, you're very concerned about whether that person might be around young people in some way. In, in this instance, we are talking about a tool for law enforcement. Whether we want to consider what you are proposing to make this public in the future, that is something that we could certainly consider. Right now, it's for law enforcement.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I, I appreciate that answer. That's, that's, I appreciate that. That's, I think it's important, because we, we're, you know, we're talking about the bad guys here. I think the public has a right to know, so I, I appreciate that answer.

When we talk about the, registering the high-capacity magazines, it's, it, one of the stipulations is that that registration would go to the DMHAS Commissioner. A, am I right about that, and, B, why would we submit those names to the Commissioner of DMHAS, Department of Mental Health?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

You're talking about the magazines that are in possession now prior to the enactment of this law that would be declared.

**JA-747**

SENATOR KANE:

Yes.

SENATOR WILLIAMS:

Because there has to be a repository for that declaration, and to us, it made the most sense to have that repository in our public safety agency.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I'm not disputing that. I, I believe it says, not in, in addition to Department of Public Safety but DMHAS, Department of Mental Health and Addiction Services.

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I suspect that it is a backup registry in terms of the information that would be available to DMHAS and as, as a, a, registry for the Public Safety Department. I think that the DMHAS reference may be important when we look at some of the other potential gun issues regarding what we were just talking about in terms of commitment. Does a person have not only a gun, but does the person in addition have a high-capacity magazine?

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I, I appreciate that answer, but I still don't understand how owning a large-capacity magazine has any connection with mental health and the fact that these individuals' names would be given to the Department of Mental Health and Addiction Services. I can understand the public safety, because public safety, you know, you would have that registration.

But that, that just puts a, an assumption that if an individual owns a large-capacity magazine that there may be a mental health issue as well, and you're submitting the name to the Department of Mental Health and Addiction Services. And, and I don't, I, I don't know if I, and I can't agree with that, and I don't have to believe that's fair. If, if you want to respond, you're more than welcome, but I can move on, certainly, if you want.

SENATOR WILLIAMS:

I'll stand by my previous answer. Thank you, Senator Kane.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

In the list of banned weapons, there is a Colt Match Target rifle. Can you describe what that rifle is?

Through you, Madam President.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

I don't have a photograph in front of me, Senator Kane, so I could not describe that from a photographic point of view.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I guess my question is, is it a target rifle, meaning one that is used for target shooting, one that is used in a, in a range? And I was just curious why that one was on the list.

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

Through you to Senator Kane, all of the guns that are on the list meet the criteria of the physical characteristics test. And that, those are the assault weapons, for the most part designed originally with a military platform, capable of semi-automatic fire and centerfire as opposed to rimfire.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President. And of these rifles that are on this banned list, how many of them are made in Connecticut? Are we aware of how many?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

I am not aware of the precise number.

Through you, Madam President.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

And the OFA analysis, is there any impact on the economic impact this will have on the State of Connecticut, meaning the, the number of manufacturers we have in the State of Connecticut, the number of manufacturing jobs we have in the State of Connecticut, the ancillary businesses who feed those manufacturers in the State of Connecticut? Is there any economic impact in this OFA analysis?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Madam President, not to my knowledge, no.

THE CHAIR:

Senator Kane.

SENATOR KANE:

That's, thank you, Madam President.

And one last question, if I may, through you. It talks about the statewide trafficking task force, and, and I know that Senator Harp and I have been in agreement in trying to keep that in the budget. It was removed from the budget. Will it be placed in the budget yet again, or are we going to fund this task force?

I know Senator Guglielmo came and testified in front of the Public Safety Committee not too recently and asked for this to be placed back in. So if, if we're going to put this in, in this bill, are we then going to be funding the statewide trafficking task force?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

Through you to Senator Kane, yes, in the amount of $ 1 million.

SENATOR KANE:

Good. Great.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I thank the Senate President for indulging me in answering --

SENATOR WILLIAMS:

Thank you.

SENATOR KANE:

-- my questions. I appreciate the answers that you gave. I certainly appreciate the fact that you're willing to work with me on a couple of those questions that I asked you. And hopefully, we can move those discussions forward as, as we progress.

I still believe that we have some very deep questions on the economic impact that this bill is going to have on the State of Connecticut and the great manufacturing that we have here and the history that we have here.

I also, if I may, Madam President, I just want to change gears a little bit, because I, too, have a couple of amendments that I would like to offer to this body, one of which, well, actually, if you don't mind, I'll ask the Clerk to read LCO 5467, and I'd be allowed to summarize.

THE CHAIR:

Mr. Clerk, will you please call the LCO.

JA-752

THE CLERK:

LCO Number 5467, Senate Amendment Schedule "F" offered by
Senator Kane.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you. I move adoption.

THE CHAIR:

Motion is on adoption. Will you remark, sir?

SENATOR KANE:

I will. Thank you, Madam President.

In the bill -- I believe it's in Section 23, Lines 1008 through
1011 -- it talks about the exemption of police officers in this
bill. And I think that's a very good idea, because I've gotten
calls, e-mails, Facebook messages from police officers
throughout the state who said, you know, these guys put their,
these men and women put their lives on the line every day. And
they are targets for crime. They are targets for the bad guys.

And it does say in the bill that whether they're on duty or off
duty, they are exempt from this bill. However, it doesn't
mention retired members of the military and/or police
departments. And I still believe that these individuals who have
given, you know, ultimate and incredible sacrifices for the
State of Connecticut by putting on a badge and, and protecting
the citizens of our state are still targets even after they
retire. So this amendment simply adds retired officers to that
list.

Thank you, Madam President.

THE CHAIR:

Will you remark?

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I rise to oppose the amendment. The intention of the exemption is for active members of police departments and the military. The exemption that you're talking about would allow them to purchase or import high-capacity magazines as retired members, so we do not want to endorse that. I understand your respect for their service. We have great respect for their service, and that's why we have an exemption for active members of police departments in the military.

THE CHAIR:

Will you remark?

Senator Kane.

SENATOR KANE:

I would ask for a roll call vote, please.

THE CHAIR:

Thank you. Will you remark? If not, Mr. Clerk, will you call for a roll call vote? And the machine will be open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators return to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

If all members have voted, if all members have voted, the machine will be closed, and the Clerk will call the tally. Please, please.

THE CLERK:

On Senate Amendment Schedule "F" for Senate Bill 1160,

Total Number Voting 35

Necessary for Adoption 18

Those voting Yea 12

Those voting Nay 23

Those absent and not voting 1

THE CHAIR:

Amendment fails.

Senator Kane.

SENATOR KANE:

Well, you didn't have to bang that so hard, Madam President.

THE CHAIR:

I wanted to wake you up, sir.

SENATOR KANE:

I, I would, if you'll indulge me, I'd like to offer another amendment.

THE CHAIR:

Is that a question?

SENATOR KANE:

It's a promise.

THE CHAIR:

Please proceed, sir.

SENATOR KANE: If, if the Clerk would call LCO 5475, and I'd be allowed to summarize.

THE CHAIR:

Mr. Clerk.

THE CLERK:

LCO Number 5475, Senate Amendment Schedule "G" offered by
Senator Kane.

THE CHAIR:

Senator Kane.

SENATOR KANE:

I move adoption.

THE CHAIR:

Motion is on adoption. Will you remark, sir?

SENATOR KANE:

I will. Thank you, Madam President.

This amendment comes to me from a constituent of mine who is
very knowledgeable on this issue and on the Second Amendment
and, and the different guns that are out there. And it was
actually very interesting meeting with this gentleman many
times, because he provided me with a great deal of education on
this issue.

The idea, Madam President, if you look at Sections 54 through 56
of the bill, it talks about safe storage. And what we've done is
we've added individuals who may not be legally able to possess
a, a weapon and if you know of someone who is possibly a felon
or what have you. So I think the idea for all of us, right,
around this circle, is we want safety. We want more people to be
careful, mindful, and protective of their guns. So what we want,
ladies and gentlemen, is more safe storage.

Now in the bill, it says what a person would consider, consider
reasonable. And we talked about this in caucus, and we says,
well, if you have a, a two-year-old, then you could put it up on
a shelf, you know. But in my mind, maybe that's not reasonable.
Maybe to you it is. Maybe to the next person it isn't. What I
would like to see is individuals go out and buy safes and safe
storage and lock these weapons up if they are in possession of
them, because we know how many accidents happen.

However, that is quite a burden on these individuals, because
these safes, this storage, lockboxes, if you will, cost hundreds
of dollars if not thousands of dollars. What this amendment

would do is provide incentive for people to go out and purchase
these safes by giving them a tax credit on their personal income
tax return.

So we're going to say to you, John Q. Public, we want you to be
safe. We want your children to be safe. Please go out and get us
a lock box or some kind of safe, store it properly, and we will
give you a tax credit, a simple tax credit on your personal
income tax return that will create a great incentive for more
safety. After all, that's why we're here today, is to provide
better safety for our constituents in the State of Connecticut.
And when it does come to a vote, I would ask for roll call.

Thank you, Madam President.

THE CHAIR:

Thank you, Senator Kane.

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I again rise to oppose the amendment. Folks who have dangerous
weapons also have responsibilities to safeguard those weapons.
And it's not appropriate to ask the rest of the people of the
state to pay for that through a tax exemption. So, Madam
President, I would oppose this.

I would also further note that the way the lockbox is defined is
also vague enough to include someone's safe for not just
firearms but for all sorts of other valuables. Madam President,
this is the wrong road to go down, and I would oppose the
amendment.

THE CHAIR:

Thank you. Will you remark? Will you remark?

If not, Mr. Clerk, will you call for a roll call vote, and the
machine will be open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators, please return to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

Have all Members voted? All Members have voted. The machine will be closed.

And, Mr. Clerk, will you call for the tally, please.

THE CLERK:

On Second Amendment Schedule "G" for Senate Bill 1160,

Total Number Voting 36

Necessary for Adoption 19

Those voting Yea 12

Those voting Nay 24

Those absent and not voting 0

THE CHAIR:

Amendment fails.

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I did want to offer a couple things that I thought would make the bill a little bit better. Obviously, we can continue those conversations as the session moves on. As everyone in this circle, I have had many, many meetings on this subject.

And, in fact, you know, I tell my, my daughter, who's six, when she asks, well, where are you going today, because I, I went on Sunday morning, I went on Saturday morning, I, I've been all over the district, and she said, where are you going? I said, to another meeting on guns? And I said, yeah. My daughter recommended that all guns be replaced by Nerf guns. So that's her recommendation. And it's not a bad idea, but --

JA-758

THE CHAIR:

Is that an amendment, sir?

SENATOR KANE:

Yeah, yeah, I, I would, I would like to make that amendment. But in, in all honesty, it has taken all of us away from everything that is, is taking place in, in the Legislature, the, the budget and all the other bills that are taking place during this Legislative Session. And, of course, it's important that we be here today and that we solve this issue once and for all so we can maybe start looking at the budget and the budget deficit that we have.

As you know, I serve a nearby town, and, and Southbury is part of my district, which is a neighboring of Newtown. In fact, I have a bill in the Public Safety Committee that just got out of the Public Safety Committee in regards to active shooter incidents and the communication that takes place between police departments. And I think it will go a long way to help police departments respond to these type of incidents.

But you also know, Madam President, that my wife is a clinical psychologist. And she was in Newtown right from minute one. And she got a call at her organization that said there was a gun at a elementary school. And not knowing what is taking place, she went down there, because she thought maybe a, a child had a gun, or there was an incident of a person with a gun. And she was there to provide counseling and support to the children, to the teachers, to the families.

When she had gotten there, she had no idea what was taking place but certainly spent the day, Senator McKinney, yourself, Governor, and was assigned to one of the families of the victims. And she stayed there Friday until 3: 00 in the morning and went again on Saturday, went again on Sunday, was there all week with this family that she was assigned to with a state trooper and a person from the clergy, and that was another thing I had to educate my children on. Why, why isn't Mom home on the weekends? She never works on the weekends. Where is she?

So she spent a great deal of time in Newtown with the families of this tragic event. She also spent a great deal of time with the teachers and the first responders subsequently and has recently been down there as this past week. And it's been a very difficult situation in our household, certainly, because of the

**JA-759**

type of response that her and her team have given to the people
of Newtown. So I've struggled with this since December 14th.

And as a lot of people mentioned, we were here doing the deficit
mitigation, and all you knew was what you saw on the news. And,
but what I did was I agreed to meet with people on the issue.
And I agreed to meet with members or constituents of the 32nd
District and even beyond sometimes, whether it be locally or
here or wherever. And I wanted to educate myself on the bill,
because I don't want to just look at it from an emotional
standpoint, but I want to look at it from a logical standpoint.

And one of the biggest things I've heard from many people is
that we need to enforce the laws that we currently have, because
many, many crimes are committed by people who do bad things and
are bad people, not the good guys who are law-abiding citizens
who want to protect their family or protect the Second Amendment
and protect their rights. So what we need to do is start looking
in the mirror and start looking at the laws that we have in
place, and why not make sure that we enforce those laws to the
nth degree?

The last thing we want to do here today, ladies and gentlemen,
is give people a false sense of security that once we slap this
paper down, that's it, there will be no further Newtowns, there
will be no further Virginia Techs, there will be no Columbines
and what have you. That's not true, because you can't stop evil,
and you can't stop evildoers. So whatever we do here today,
let's not pretend to the public of the State of Connecticut that
we have solved the issue, because I don't believe we have.

When we talk about the issue of guns, we took action, right? We
said, all right, we're going to ban this, do this, do this, do
this. When we talk about mental health, we created a task force.
And let's talk about the real problem in the State of
Connecticut and in the United States of America. It's the
societal problems that we have in our families and in mental
health with a whole host of different issues.

So rather than we take action on one particular portion of this
bill, let's take action on all of it. Let's talk about the real
issues that are affecting our society and why we are going in a
direction that none of us would like to see. I, I participated
on the Mental Health Subcommittee, and I appreciated what
Senator Harp said and how we sat there for 12 hours, and it was
well-participated.

But did we go enough? Did we do enough? You know, did we really attack the problem, which is the mental health in our state? We need, as Senator Linares stated, to be funding more programs and to be not looking at cuts in social services or certain areas that we can really help. So instead, we're going to say, we're going to ban this, ban this, ban this, because that's the real issue. It's not, folks. It's not.

The real issue is our society and how far it has dropped and where we're going with it. So let's not kid ourselves. Let's make sure that the way we prevent another tragedy is to, by really looking at the, in the mirror and looking at society as a whole.

So for those reasons, Madam President, although I can tell you that my wife certainly won't be happy with my vote, but I will tell you that I don't believe we've done enough in mental health to solve this problem, yet, are looking at one portion and not the whole thing. Thank you.

THE CHAIR:

Thank you, Senator Kane.

Senator Harp.

SENATOR HARP:

Thank you very much, Madam President.

I'm sure you know that I stand to support this bill, but I, I want to talk a little bit about experiences that I had as a child. When I was eight years old, I had a classmate who sat a couple of seats behind me in the opposite row. And in my school, in the third grade, they wanted kids to dance with each other. And there was only one person who would dance with me, and that was the guy that sat behind me in the row. His name was Myron Hanson.

And so Myron Hanson was a, a lot taller than me, but most people probably were at that time, a hazel-eyed kid with spiky blonde hair, I guess a crew cut. That's what kids had back then. And he was also one of the kids who would play with me on the playground, so Myron was someone that I knew. We talked about, we had a lot of fun with our group of friends.

So one day after a long weekend, I came back to school only to
learn from our principal who came into our classroom to tell us
that Myron Hanson had been killed. And he had been killed
accidentally, because he and his cousin went into their
grandfather's house and got the hunting rifle that the
grandfather had, took it into the barn and were playing with it,
and he was accidentally shot and killed.

And so the thing that I remember the most about the third grade,
the only name I remember is Myron Hanson. And so I know that
we've heard about the families. They will be traumatized. But
what I think about are all of the children in that school who
knew one of the children, who knew those teachers. They will be
my age decades later seeing those faces, remembering those
names.

And I've got to tell you, one of the things that I learned in
doing the mental health task force is that there are these
things that they have now identified called adverse childhood
events. What happened to our classroom with Myron Hanson was an
adverse childhood event.

They basically say that if you have, and those are traumatic
events, if you have more than three of those before the time you
become an adult -- and they've studied this with actually
middle-class populations in California -- they have discovered
that people who have had more than three -- if you think about
how many you could have in a lifetime before you're an adult --
that you are more likely as an adult to have a chronic illness,
that your life expectancy is shorter and so that these traumatic
events are really, really important.

And as a society, we have not figured out yet how to deal with
them. But I've got to say that like Senator Kane's wife, there
are so many of our child guidance clinics that have been in
Newtown helping the families but also helping the children who
have suffered through and will suffer through for the rest of
their life this experience. So I just want to set that aside,
because this is something that will live with them forever. And
those are names and faces that they will remember forever, I
know.

I wanted to just say something about guns. And I know in our
caucus -- and we heard this at the hearing turned in another way
-- that -- and I think Senator Williams shared this story --
that right around the time this happened in Newtown, there was a

**JA-762**

person who went and attacked a classroom full of children in China with a knife. No one died.

What we learned is that of all the gun deaths in the nation, most of them are not homicides. Only a third of them are. Two-thirds of them are suicides. And they are not the people that we think of as sick in the same way that the shooter in Newtown was sick. These are people who are depressed. And as you know, depression is something even, that is very difficult to get help for in our state.

And the thing that makes guns different, we learn, is the lethality of them. You know, you can be a cutter, and you can survive from that, but if you shoot that gun accidentally, as my friend Myron shot that gun, it is lethal. And so it really is something that ought to be respected. It is a privilege that ought to be respected and handled with care.

Now about five years ago, we -- and I guess it started as long ago as eight years ago -- we engaged in an effort to raise the age of juvenile jurisdiction. What did we learn during that time? We learned that Connecticut did not have an agency or a system of mental health services for 16- and 17-year-olds.

There was not one agency that was responsible for that. The Department of Mental Health and Addiction Services was responsible for people who are 18 years and over. The Department of Children and Families largely took care of children up to about 15. So you had this gap that existed until, I guess we actually just implemented the 17-year-olds recently. And so there was no mental health delivery system for them. There still isn't now.

During the hearings, and I think a lot of my colleagues were really shocked to find we were one of the first states in this country to implement mental health and substance abuse parity. And it was, when we debated that, there were those who said to us, be careful what you ask for, because you may lose access to mental health care. And the reality is that we did.

And one of the things that this bill is trying to do is to assure that what we thought we have we will actually have, because it was said time and time again during the hearing that you had to almost make yourself poor to get access to the best mental health services. They either occurred in the Department of Mental Health and Addiction Services or in DMHAS. The things that helped the most commercial insurance won't pay for.

The other thing that we learned was that because there's no real place to get paid from, we don't have adequate numbers of child psychiatrists. And that's why you see the access mental health initiative in the bill. So, yes, we have a long way to go to build an adequate mental health delivery system. There are a lot of reasons for that.

And, yes, there were cuts in the proposal that was made to us, but we can together do something about that as that bill rolls forward. And, yes, there was not a lot in this bill, but there are opportunities to begin to embellish that system as we move forward on the budget.

But what is important about this bill is that it represents to the people, to the children whose lives are forever changed, the ones who will live this, with this for the rest of their lives, that we intend to ameliorate the conditions as best we can.

Is it perfect? Absolutely not. But does it reflect our care, our concern, and our worry for the people of this state? Does it reflect our concern for their safety? Does it reflect an intent to build a system that is fragile at best? It does. And I would say to you that vote with me on behalf of the children who will live with this horrific scene in their mind for the rest of their lives.

THE CHAIR:

Thank you, Senator.

Senator Osten.

SENATOR OSTEN:

Thank you, Madam President.

I find myself today in a quandary. I plan on voting no on this piece of legislation. And I've thought about it ever since December 14th knowing that I had been elected and would be sitting in this room with legislation that would try to address a tragedy that happened to children.

And I would very much like to say that the package before us here today would make changes so that no one would have to see another dead six-year-old, that no one would have to respond to a tragedy as significant that happened down at Sandy Hook. But

this legislation does not provide that protection, in my opinion.

It puts at risk legal gun owners, the constituents in the 19th District, many of whom have reached out to me in rural Connecticut. It puts at risk those people who purchase weapons for their own use whether through hunting or in competitions or just as hobbyists. And they have that right by our Constitution. The Second Amendment in Connecticut's Constitution is clear that people have the right to bear arms.

I forever fight for the rights that are implicit in our Constitution. Freedom of speech and freedom of religion are two that I also hold very dear to my heart. We have already enough rules on the books today. Some of you may not know it, but I worked in the Department of Correction for 21 years. I saw people come back year after year after year. They plea bargained away the gun charges that were already put against them.

We can create a registry of those who commit crimes with deadly weapons, but if we don't find them guilty of weapons charges, the registry will remain empty. It's terrible to sit, stand here today and say that there will be children who will forever have effects against them. This is not a new phenomenon.

We have children and families that are being damaged every day in, in our urban cities, and today, this piece of legislation does nothing to stop handguns and young men from killing other young men. I'd like to stand here and say that we're going to correct all the ills of the world with those who use weapons illegally, but I believe that this piece of legislation attacks the legal gun owners and those who have them for their own protection.

We have a clear problem with mental health in this state that we have not addressed for years. And while this holds a little bit of promise for something to happen in the future, the problem is expensive. We currently use our prison system every day to house those that judges cannot find another place for.

As a matter of fact, about 20 to 25 percent of the inmate population is chronically mentally ill. Because we have no other spot for them, we have our correctional officers and those in, those staff who work there handling people with mental illness on a daily basis. And if our population is in the 20,000 range, that's 5,000 people.

I would very much like to say today that what you have crafted here -- and I know you worked very hard on it -- it's clear that people put their minds and their hearts into this legislation -- but I do believe it gives people a false sense of security here. I don't think it stops those people who have chosen to act out badly.

Adam Lanza and his family were troubled. We ignored that for many years. Other people knew that family was troubled. It's clear just by the report that they knew that family was troubled. Adam Lanza was the one who killed those 20 young children and those six adults. He's the one we should hold accountable today, not the legal gun owners in this state.

There are things in this bill that I could support, but there are many things in this bill that I cannot based on what my constituents have said to me. People have a right to bear arms, and we already have enough restrictions on them, and we do not need any more. I also cried when those young children died that day, as every one of us around here did.

And if I could assure those parents that this legislation would stop it from happening again, I would vote yes. That is not the truth. I look forward to working with this body as we move forward to stop plea bargaining of gun charges so that we can hold those people accountable over and over again.

I'm very proud of standing here today. As a Vietnam era veteran, I'm so proud of our country, but I also know that we protect our company, our country with that very basic right, that right to bear arms. I've sat here today and listened to everyone that's spoken, and you've all spoken from the heart. I also speak from the heart, and I believe with all my heart that this is not the right way to go. I think this bill should have had another public hearing so we could have heard yet one more time with exact language what people needed to say. It would have been a week or so more. That's not a bad thing.

We can't make our schools into prisons. We want our children to flourish. We don't want them to be afraid to go to school. I worked in that prison environment for 21 years. I think that you can make our schools safer. Please don't make them into prisons. They'll be impacted, as I have been, as all my colleagues have been that worked in that system.

I, today, stand in opposition to the bill here, as I have said all along I would, representing the constituents in the 19th

District, representing those legal gun owners, representing corrections officers and police officers from around the state who have contacted me and respecting each and every one of you for the opinions that you hold. Thank you very much.

THE CHAIR:

Thank you. Will you remark?

Senator Witkos.

SENATOR WITKOS:

Thank you, and good evening, Madam President.

I want to preface my remarks by offering my condolences once again to the families of the Newtown victims and not only to the families of the Newtown victims but to the victims of everyone who's suffered a needless loss to gun violence in our big cities, which we hear about almost on a weekly basis.

I'd also like to offer my, my thanks to all the members of the, the different task forces, the working groups. I think they carried out their duties with dignity, countless hours listening to testimony from everybody that came to Hartford and down in the town of Newtown. I'd also like to offer thanks to the leaders and the time that they put in negotiating the final aspects of the bill.

It certainly was a struggle to try to achieve balance. And the balance I talk about is the balance of making sure that we do something productive in the State of Connecticut while guarding the rights of others. I'd also like to thank the manufacturers and the citizens who took days off from work to come up and testify numerous times.

Imagine, it's not something to gloat about, what did you do on vacation? Well, I spent my day at the State Capitol two and three times testifying in front of a legislative panel. I, myself, served on two of the working groups, School Safety and Gun Violence. I also sat through hearings on the Public Safety Committee. But I didn't think that was enough, because I didn't see a lot of my constituents here.

So I held my own gun hearing in my district. It went for six hours. And I sat across the table from my constituents, giving them the opportunity to speak to me and speak their mind. I also

received over 7,000 e-mails since December 15th on this topic from in-state residents and over the past two days over 100 phone calls. But all of this is in the name of good government, I would say.

But what I find to be distasteful are the comments of folks that say, ignore the people on the fringe. We're saying to ignore the people that we were chosen to represent here in Hartford, and I don't believe that's right. All they're asking at times is to see and read the bill. And I ask you, is that too much to ask for?

I know we can say we've had a public hearing on different parts of the bill, and it's been in through different committees. But the sum of the parts don't necessarily mean the whole of the bill. It could be taken out in a different context.

So I thought personally that Senate Bill 1160 should have been out there for the public to read its, in its entirety and offer comments too. I wouldn't have minded another 7,000 e-mails, honestly. But when I read through the bill, and I did read the bill, I thought the root cause was barely mentioned, and that was mental health.

Yes, we formed a task force to look at some case management of up to 100 people in probation. And we created a consultation and care coordination program. But we didn't get to the two words that I felt were so prevalent in all the hearings, which was access and control. From speaker to speaker to expert to novice, it was all about access and control.

We did a couple access and control items. We created a safe storage provision in the bill, and we offered a five-year look-back for, of mental health illness, but that's it. I wish we could have done something on psychotropic drugs. I wish we could have done something to work with a task force with our federal legislative delegation to loosen up the HIPAA regulations so our agencies can talk to each other, so if somebody is aware of something that's happening, they have the ability to communicate that.

As I said, I sat down face to face with my constituents for over six hours. And as they came up to the table, they said, I want you to oppose everything, some people did. And I said, well, let's wait a minute. Let's talk about somebody just opposing everything. Do you support universal background checks? Well, yes, I do.

What about if you, if we created a, the provision that's in the
bill that says you have to show an identification to buy
ammunition, because what I'm told, the big mayors, the big-city
mayors that came up said that's the problem in their inner
cities. They buy the guns on the black market, but they don't
necessarily get the ammunition. So if we can control the flow of
the ammunition, maybe we can prevent some of the inner city
deaths.

And as I explained myself, they said, well, I, I guess I can
support that too. And then we were going down through the items,
and they said, well, we can support that. So I said, there is
common ground, but we just need to give them the opportunity to
have that conversation.

And then somebody said to me something that I hadn't thought of
from that perspective before. It was about technology. They
said, Kevin, how many people do you know use wooden golf clubs
on the golf course anymore? Well, they're aluminum. How many
people use a wooden tennis racquet? That was graphite. How many
people ski with wooden water skis? Those are fiberglass.

And then I said, well, you know, obviously, the next question
would be, well, those don't kill people. They said, well, Kevin,
automobiles, they used to, when they first were created, they
used to run ten miles an hour. Now they can go 150 miles an
hour. And drugs, years ago, it was marijuana, but now it's crack
cocaine.

And, yes, even guns have evolved with technology, from the
single-shot black powder musket to today's modern sporting
rifle. You know, it changes so quickly. When I started in law
enforcement 28 years ago, I carried a six-shot revolver with
double speed loaders. People probably don't even know what a
double speed loader is. And when I retired, I was carrying a .
40-caliber semi-automatic Smith and Wesson.

Nobody can foresee the future, because we don't know where
technology is going to bring us in ten to 15 years from now. But
this bill attempts to address that through cosmetic limitations.
And I ask you, if you happen to put makeup on, when you look in
the mirror, you begin the makeup process, you know what it does?
It changes your appearance, but it does not change who you are.

And that's what we're attempting to do here with the limiting of
the cosmetic features on these weapons. If you use the same
caliber of bullet, excuse me, if you use the same caliber of a

bullet, you'll have the same velocity and the same penetration. The only thing you're changing is what it looks like and how you hold it.

The bill further attempts to limit gun ownership. And I say to you that your actions and the actions of the media have caused gun ownership to increase. How often do we see on the 6: 00 news lines at the gun stores and the retail outlets and the empty spaces on the shelf? That's a direct cause of the action of this Legislature.

During my hearing I had in my district, I had a manufacturer come up to me and said, you know, Kevin? He goes, I manufacture the springs in these magazines. I've sold more springs in the past four months than I have in the past four years, because there's a buying spree, because people are afraid. The lines are being created by law-abiding citizens, because criminals don't wait in lines, nor do they follow the law.

You know, I asked the tough questions of both the opponents and the proponents during the public hearings to see if what we did would have any impact. And sadly, both sides agreed that it won't. Ownership without banning allows the magazines to stay in the population. And requiring only ten rounds in a 30-round magazine focuses on law-abiding citizens, something that we all know a criminal will never, ever follow.

In closing, there are a lot of great things in the bill, and I wish I could be casting a yes vote today. And it's the two issues in the bill that I have difficulty with, and those were the two issues that took the longest time, I believe -- though I was not in the room -- that caused the negotiations to get us to where they are today. And that is the assault weapon expansion and the high-capacity magazine.

And during my time in my hearings, people would come up to me and say, where do you stand on the Second Amendment? And I'd say, well, what do you mean? And more people carried around a pocketbook of the Constitution. They'd flip to open a page, and they'd start reading the Second Amendment. My comment to them were, don't tell me something from 1791.

Look to the most recent case in 2008 in the Heller versus D. C. case, because it was the United States Supreme Court that analyzed the Second Amendment and offered an opinion. And in their opinion, they said that the government has the right to

say who can own guns, where they can carry them, and what types
of guns can they carry.

So they had me thinking, well, maybe I will be supporting this
bill, because if that's the most recent ruling, it's not an
infringement upon the Second Amendment rights of our citizens
that is so profoundly spoken. But then I started doing a little
research, and I found out that as recent as last Friday there's
over 1. 28 million guns registered in the State of Connecticut.

And those are only the number of guns that are registered, that
there are many, many long guns that were purchased that never
had to be registered. So I would, I think it would be fair to
say that it would probably be closer to two million. And
somewhere during the hours and hours of testimony, I heard that
there were 154,000 AR-15's.

So I thought to myself, if there's 154,000 AR-15's registered in
the State of Connecticut, maybe five percent, how, how does that
dovetail into what was ruled in the Heller versus D. C. case?
Now I told you they said they, they can state who has them,
where they have them, and what types.

But it went on further to say the who are the folks that are
convicted felons and folks with mental illness, the where,
government has a right to create gun-free zones in our schools,
in our municipal buildings, and on the what types, government
has the right to ban guns that are not in common use at that
time. That's where my difficulties lay. Is five percent
considered common use at that time? I probably could go either
way on that one.

But the one part that I could not overcome was the high capacity
magazines, because I know that almost every handgun and every
long gun that can be sold has a magazine capacity greater than
ten. And it has been around a long, long time. Therefore, that I
consider to be in common use.

And I believe by us passing this bill today, we are creating a
direct violation of the Constitution. It was said that the tree
of liberty shall be pruned at times to make it stronger, but I
say to you that once you start pruning the roots of the tree,
the tree of liberty will suffer a withering death.

Thank you.

THE CHAIR:

Thank you, Senator. Will you remark? Will you remark?

Senator Fasano.

SENATOR FASANO:

Thank you, Madam President.

Madam President, I debated whether or not to speak tonight, and, because we've been here for so long, but I'm going to approach this perhaps in a little different method. And this is the reason why I have decided to speak.

Madam President, when the Newtown issue tragedy struck our state, we began to be polarized literally that day and days after. People were clinging to sides and talking about these gun issues before we even had the chance and the opportunity to mourn those that were lost at Newtown. And as time went on, we did mourn, but then there came time that we realized, and all of us in this circle know that everyone is going to be looking at us, State of Connecticut, the Legislature, to determine what to do.

And what it seemed to me was happening was in Washington, D. C. , they were doing nothing. There was a lot of finger pointing. There was a lot of discussion and press conferences, but there was no talking. There was no communicating. And I think it what's abundantly clear to this Legislature is we need not to follow what Washington did, and that takes courage. That takes courage.

The leaders of the Senate, the leaders of the House, the six leaders, got together and said, at the very least, let's start with a public hearing, and let's do it bipartisan and see what we have out there and listen. And then from those parts, Republicans and Democrats, core beliefs on all sides, let's see what we can put together, if possible.

And after the public hearings, now some may argue that when we had those hearings -- and I was not part of those committees except for the, when we went down to Sandy Hook -- but some may argue, well, that's your job to be in those hearings. And I, I, and we're elected. That's what you voluntarily decide to do.

I agree with that in part, but I would suggest an argument can be made that many folks around this circle and in the House went above and beyond the call of duty to stay 14, 16 hours during a

hearing to hear every single person that came to speak. And for those Legislators and all, most of us in the circle who did that, I think that's important. And they didn't just disappear. Legislators sat there through those hearings taking copious notes so that they could formulate ideas, which they gave to leaders.

The bill we have in front of us is a culmination of that, but there were other steps, because when those ideas got to the leaders, the leaders had to decide what they were going to do. And their choice was either stay with the core beliefs that could bifurcate a nation and started bifurcate our state or try to find common ground, which means certain core beliefs would have to be left to the wayside.

And I congratulate the leaders, because each of them, to be at that table, had to give up something they believe in to reach a common ground. Is this the perfect solution? No. Are you ever going to draft any legislation that's going to stop another Sandy Hook? I suggest never, no matter what you do. Unfortunately, it's the society that we live in, and it's sad. It's sad we're even having a conversation about 20 kids being killed in a school, sad.

But to reach common ground, you have to have the will to say, we have to unite the state, and we have to bring essential values together, and that's what these leaders did. Now there are a variety of amendments around this floor. And part of reaching a compromise is to be devoted to that work ethic and that compromise.

I voted against a number of my colleagues' amendments. Had it not been on this bill, I would have supported my colleagues' amendments. But when leadership and others give their word that they're going to support a bill that brings a common ground to this Chamber, then you cannot say, but I will support amendments to that common ground.

So I voted no on those amendments, because we came to a conclusion. Once again, it's not perfect, and that's why I voted against those amendments, not that they were not good ideas, not that they did not have validity, but in this building, you have one thing, and that is your promise and your word. And if you don't have that, you have nothing.

This bill is going to get criticized by many for a variety of reasons coming from a variety of levels. One thing they can't

criticize is our work ethic, our ability to listen to our
constituents, take in what we heard, and for our leadership,
House, Senate, Democrat, and Republicans, to be able to come
together and work on probably one of the hardest if not the
hardest problem to face -- I'll talk for myself, for me -- for
the last 12 years and I would suggest for this Chamber in who
knows how many years.

We can disagree, because that's what this Chamber is about. If I
had a criticism, I do agree that the mental health issue, which
is complicated, and we are doing a task force on it, has to come
through at the end of the day. Are we going to find some
glitches that have to be fixed? Yes, we will.

Some people we, said we went too fast. Others say we went too
slow. Without a doubt, there isn't a person in this Chamber who
can't say we felt pressure to do something. And that pressure
mounted, and we did the best we could. So, Madam President, I
plan on supporting this bill. I think it's the right thing to
do. Thank you.

THE CHAIR:

Thank you, Senator Fasano.

Senator Looney.

SENATOR LOONEY:

Thank you, Madam President.

I'm rising to speak in support of the bill. Madam President,
parts of this bill are a culmination of 20 years of debate and
discussion dating back to the original assault weapons ban that
was passed in 1993. And, of course, the issue of assault weapons
is only, is only a part of what's in this comprehensive package.

Some of the provisions of the bill were actually approved by
this State Senate in 2001, including adding the Bushmaster
assault rifle that was used by Adam Lanza at Sandy Hook school,
adding that weapon to the list of assault weapons that are
banned from future sale or required to be registered. That was
in that, in that bill, as was the ban on large capacity
magazines.

That was a, a bill that many of us were proud to support and the
State Senate passed in 2001. Unfortunately, it was not passed by

the House of Representatives that year. But that was also a
bipartisan vote, just as we are hoping to have a bipartisan vote
this evening. And Senator McKinney showed great leadership then
in supporting that bill as he has shown throughout this whole
process in working for consensus on this one.

Then Senator Nickerson, Freedman, Gennaro, and Aniskovich were
all supporters of that, of that bill, and it was a, a strongly
supported bipartisan bill in the Senate. Other provisions in
this bill are, are more recently advocated, and that is the, the
issue of the Violent Weapon Offender Registry, which has been
pushed by a number of urban Legislators for several years at the
request of urban police chiefs, the expansion of the permit
process for ammunition and for long guns, as well as universal
background checks.

These are issues that have been debated for several years in one
form or another in the General Assembly and have come forward to
be included in this, in this comprehensive bill. In addition, in
terms of the, the discussions of the, of the six leaders after
the conclusion of the work of, of the task force, I certainly
wanted to second what Senator Fasano said, that there was a, a
great deal of good will and genuine good faith in all of those
discussions.

And, certainly, as I said earlier, Senator Williams deserves
enormous credit for his leadership in keeping us on task as does
Speaker Sharkey and, but Senator McKinney and Representative
Cafaro I think also deserve great credit for their work in that,
in that process, the, the willingness to find consensus, the
willingness to, to move from, from prior positions, the
willingness to look for common ground. All of us worked
together.

My counterpart, Representative Arasimowicz, the House Majority
Leader, and I, we're also very proud and very pleased to be part
of that, of that process. And it was one that when we finally
came to conclusion, we were, in fact, proud of the result and
hoping that we would have a result here that would be a model
for the nation, a model of bipartisanship and not reflecting
the, the very destructive divides that we see in other states
and in the United States Congress.

Much discussion has been made this, this evening of, of the
mental health portions of the bill and the fact that, that some
of it relates to a, a study of the, a task force with a special
focus on 16- to 25-year-olds to study Connecticut's mental

health system. And that is true, there is that task force, but there are also substantive provisions in the bill that address mental health as well.

Requiring the insurance department to evaluate and report on its method for determining compliance with state and federal mental health parity laws, that is a, that is a requirement, not just a, a subject of future study. Requiring that certain mental health and substance abuse services be considered urgent care requests and shorten the review time of those from 72 hours in current law to 24 hours, that is an important change, also instituting a more robust definition of clinical peer with regard to the review of mental health and substance abuse services to ensure that the health professionals who review the claim have similar qualifications to the health professional who prescribed the treatment, also designating disorder treatment criteria for mental health and substance abuse so that coverage decisions are, in fact, more consistent from carrier to carrier, and consumers are given a clear reason for a denial when there is a denial, requires insurers also to inform consumers that they have the right to appeal a denial and that they can request additional information and can contact the Office of Health Care Advocate for assistance.

In fact, Madam President, one of the, the commentators on the mental health portions of the bill was our health care advocate, Victoria Veltri, who described this as a very strong and bold piece of legislation that includes many more protections for consumers than ever existed before in the state, she said. And she also added that the bill adds a level of transparency that never existed before.

So this is a very important step forward, not just, in effect, a, a promise for future study but a substantive change that we are all looking to implement now. So this is a very important bill on so many fronts, Madam President, that, that I certainly am, am proud to support this evening. I think it is historic legislation for our state and for our nation and urge support of the bill this evening.

And one final, just one final note, Madam President, a word of special thanks and commendation I think should go to, to Joel Rudikoff, our counsel who has been working on these issues for so many years, was a, a advisor to then Majority Leader George Jepsen on the, on the, the 2001 legislation.

And obviously, there was a, there was staff of all four caucuses in the meetings with the, with the six leaders, but, but Joel, in so many ways, was the, was the key person in terms of staff because of the fact on the, on the gun-related issues that he has been living with this and working with this for, for so long.

So, so, Madam President, on so many fronts, this is an important bill that we need to support this evening that comes to us out of the terrible, the crucible of the tragedy of Newtown. But it is something that gives us something of which we can be proud not only of the end result but also of the process that got us here. Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Senator McKinney.

SENATOR MCKINNEY:

Thank you, Madam President.

Madam President, like many in this circle, perhaps downstairs in the House and around the State of Connecticut, as I stand here today, I'm brought back to December 14th. I started that morning going to a meeting in Bridgeport, actually, I'm sorry, in Fairfield, with a group of nonprofits from Bridgeport and the Greater Bridgeport area about concerns they had over some budget cuts.

And after the meeting, I got into my car and saw a news alert on my phone that there had been reported a shooting in a school in Newtown, Connecticut. And for some reason, I turned my car around and headed up to Newtown.

Other things have happened during the 14-plus years I've been fortunate to serve in this Senate, but I've never driven to that type of an event. When bad things happen, I think it's best for elected officials to stay away and let the public safety officials do what they need to do. But there was something that told me I needed to go.

When I arrived, the scene was unlike anything I had ever seen before, and I parked my car in downtown Sandy Hook, because the police had blocked off streets. And as I, not running, but

walking fast up to the firehouse, parents were walking by with their children, some holding them, some holding their hands, many crying.

I got to the firehouse, and the first person I saw was Pat Llodra, who's been a friend for many years and is an incredible woman and the first selectman of Newtown. And she informed me privately off to the side of what was the initial report given to her from the public safety officials, which was a conversation I won't forget. It was actually an initial report that was worse than what happened. But I knew then that my life had changed, as had so many others.

And seeing the parents that day, parents who had reconnected with their children and then parents who, who did not, the teachers and school administrators who were in the firehouse, state and local police officers, volunteer and professional firefighters, emergency service personnel, EMS from all over the State of Connecticut, clergy from all different faiths but especially Father Bob, Monsignor, Robert Weiss, as Senator McLachlan mentioned, and just the community of Newtown and then my phone ringing off the hook and text messages from colleagues around the circle and in the House.

I said the other day in Danbury, and I'll say again, Mike McLachlan has been a second state senator for Newtown since December 14th, and I appreciate his words and, and more his prayers for the people in Newtown. And since then, I've been working, as have others, especially with my colleagues in the House, Representative Hovey and Representative Bolinsky and Representative Carter, yourself, the Governor, and others, to see what we can do to heal that community, if we can do anything, what we can do to make Connecticut safer, and what we can do to hope that this is a one-time event that never happens again.

I've said that this issue for me is something that should be and is above politics. We have all talked, and I, I have not been shy in the past in this circle about talking about my frustration with the partisanship of our politics today.

We are all elected to come to our government to see what we can do to make Connecticut better. And we all come representing diverse citizens across the state with different ideas and different ideologies. And no one should put their principles down, but everyone should try to work with each other to see if we can find common ground.

**JA-778**

And I'm proud that we've done that on what is in my 14-plus
years the most important issue that I've had to deal with.
Keeping people safe, protecting our citizens, is a core function
of what we do, and that's what we're trying to accomplish in the
bill before us. And I also hope the message that we can send --
if those outside the walls of Connecticut are listening -- is to
encourage them to do the same, encourage our elected officials
in Washington to put aside the politics and try to see if they
can work with one another to find some common ground.

I have been, not surprised, heartened by the immense citizen
involvement in this issue. I have received more e-mails and
phone calls and text messages, I think. Starting on Monday, I've
received over 500, 600 text messages alone from people
advocating their positions. We've had 63 hours of public
hearings, 34 hours alone on gun-related bills. I don't know if
we've ever had that many hours of public testimony on any one
issue in the 14 years that I've served here.

Most heartening is all of the first-time, I'll call them first-
time activists on both sides of the issue. I can't tell you how
many people have, have met with me or talked to me or called me
and said, I've never called my state senator before. I didn't
know who my state senator was. But I'm doing it now. I have to.
I feel compelled. This is so important to me.

And to all those, people on both sides, I say two things. One,
thank you, thank you for bringing your voice to us as your
elected officials. And secondly, keep paying attention. Keep
paying attention to everything that we do, because it has an
impact on how we represent you.

What we have today is a comprehensive package. Many people have
said it, and I'll, I, I don't disagree. It's not perfect. But it
is a package that attempts to make our schools safer. It is a
package that tries to improve our mental health system, although
admittedly there is much more we need to do there. And it is a
package that tries to reduce gun violence in our society.

The media has focused a lot on the gun violence part of that
issue and not as much on the school safety issue or the mental
health. I think it is worth pointing out though that in many of
the public hearings in the School Security Committee that
Senator Boucher chaired and the Governor's Task Force, there
were various experts who came forward and said, there are things
that we can do that can prevent this from happening again. And

one of the most critical is the threat assessment teams that
we've put into this bill.

So there are measures beyond guns that people and experts have
said, if you do them, you can prevent something like this from
happening. And I think we've done some of those. Many people
today, on both sides but especially those who stand against the
bill before us, have talked about the Constitution and the need
to protect the rights of the citizens of Connecticut that are
guaranteed under our state and federal Constitution. And the
Second Amendment is one of those rights.

The United States Constitution guarantees the right to keep and
bear arms, a right that existed long before the Constitution.
The Constitution didn't create the right. It guarantees that
right. As someone who had the good fortune of clerking for our
state's highest court and was a law clerk to a Connecticut
Supreme Court justice as he sat and made decisions on what our
state Constitution meant and rights afforded under that
Constitution, I know how important that is and with any laws but
particularly gun laws or speech laws or search and seizure-type
laws.

My threshold question always is and must be, will this law
violate that Constitution? And although I know there are people
that disagree, I do not believe this violates either the rights
afforded in the State Constitution or the Federal Constitution.
I don't do that based on emotion. I do that based on studying
and research, reading articles and cases. I've read the Heller
case several times and the Miller case and what they mean.

I also know that there is precedence for things like limiting
magazine sizes to ten and assault weapon definitions. We've had
one in Connecticut since 1993. Other states have had them. New
York has limited magazine sizes to ten rounds for years, and our
country lived with a magazine ban and an assault weapon ban for
ten years. None of those laws were ever seen as violating
constitutions and thrown out.

And I would argue that some didn't challenge many of those laws,
because they knew indeed their challenges would have failed.
That doesn't mean this bill doesn't have burdens on people to
exercise their rights, because there are some. I clearly admit
that.

I've done a lot of town hall meetings. I know we all tend to do
them. And one of the things that, a, a theme that's come through

**JA-780**

many of the meetings is that people are very fearful of what they believe is in the bill or what they believe passing this bill will lead to in the future more so than what this bill actually does.

Last night, I spent several hours talking to people about what was in the bill. And I think many were surprised. Many thought the bill required them to annually register all of their guns. It does not. Many thought they were going to be required to purchase liability insurance. They are not. Others thought the bill confiscated their guns or magazines. It does not. Some thought there was going to be a tax on ammunitions that they couldn't afford. The bill does not do that.

We have heard from our colleagues today, we've heard from advocates, we've, we will probably hear from people in the House that this bill doesn't go as far as some would like. And those individuals get to exercise their rights as elected officials or as citizens to advocate for further laws if they see fit.

But those bills in the future that may come are not before me today. And I am voting today on what is before us, and I believe it is a good package. I, I will close with the reason I stand here. I, I am blessed, I have been blessed for over 14 years to be the State Senator for Newtown, Connecticut.

And I've told you all -- and I apologize for repeating myself -- I wake up in the morning, I got the green ribbon and the guardian angel from a police officer, and I try to put it on my jacket every day to remember those that we've lost, because I stand here, I stand here as their voice, as their elected representative and the 20 children we've lost.

And so today, in making this vote, I want to be the voice for Charlotte Bacon and Daniel Barden and Olivia Engel and Josephine Gay and Ana Marquez-Green and Dylan Hockley and Madeleine Hsu and Catherine Hubbard and Chase Kowalski and Jessie Lewis and James Mattioli and Grace McDonnell and Emilie Parker and Jack Pinto and Noah Pozner and Caroline Previdi and Jessica Rekos and Avielle Richman and Benjamin Wheeler and Allison Wyatt and their siblings and their moms and their dads.

And I get to be the voice of six incredible professionals, teachers, administrators, principals, Rachel Davino and Anne Marie Murphy and Lauren Rousseau and Victoria Soto and Mary Sherlach and Dawn Hochsprung.

I, I received a text early this morning from a friend of mine I've known for over 35 years. We met in eighth grade. His wife works at Sandy Hook Elementary School, and, and one of the guilts I carry with me is that it took me several hours at the firehouse before I realized I forgot to ask if she survived. I've known him for 35 years. I've known his wife for 25 years. And I frantically asked Colonel Stebbins if she was alive. So I wanted to read his text and let him have the last word for me as their voice today.

His text read, John, good luck and good job on all your efforts following Sandy Hook. You are making the world a better and safer place. And I pray that he's right.

THE CHAIR:

Thank you, Senator.

Ladies and gentlemen, ladies and gentlemen, I ask you not to do that. I apologize. We asked both sides not to do this.

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I want to begin by thanking Senator McKinney for his leadership on behalf of his constituents and his caring in their incredible hour of need and his leadership here in this circle and in this process. Senator McKinney, we don't agree all the time, but you are a treasured and valued friend and colleague in this circle, and I appreciate your leadership on this issue. This has been a journey for all of us.

The last 110 days after the tragedy in Newtown has brought a new commitment in the State of Connecticut. What we have seen is Legislators, Democrats and Republicans, not turning away but looking to take action to bring meaning to this senseless tragedy. This will go beyond today.

Folks have talked about mental health issues, and I want to point out the task force that was put together by Governor Malloy is continuing to meet. Their recommendations on mental health issues are not due until December of this year. I want to thank the Governor for his work. I want to thank Governor Malloy

for his priorities, so many of which are incorporated in this bill.

And, Madam President, Lieutenant Governor Wyman, I want to thank you. I know that you and the Governor have been to Newtown so many times and attended the funerals of those young children. Thank you for representing us and our state. For those who believe we should be doing more in terms of mental health services, I don't think anyone in this, in this circle will disagree.

But if you're saying we cannot or should not move forward on gun violence prevention measures because it's all about mental health, I would strongly disagree. Senator Harp mentioned the example of the mentally deranged individual who went into an elementary school armed with a knife, and he injured many children. None died.

It's access to the weapons of war, the access to the weapons that can kill mass amounts of children or adults in our schools and in our communities. That is the essential issue when it comes to mass killings and all of the mass killings that we have seen in the last ten to 20 years but primarily the last ten years.

So, yes, we must address mental health issues, but we cannot ignore the access to those weapons. And we must do all we can to prevent those who would harm our children from having those weapons. There are those who would say, you know, I don't think this bill is going to do anything, all that permitting, all of the background checks. You know, they can't even agree on background checks in Washington, D. C. But that's what it takes to keep the guns out of the hands of criminals. Isn't that what we all want?

There was just some information that came out very recently from the Johns Hopkins School of Public Health, and they have studied this issue carefully. They've said, common sense policies adopted at the state and local level succeed in reducing the diversion of guns to criminals.

And what specifically? Strong regulation and oversight of licensed gun dealers, regulation of gun sales by private sellers, and permit to purchase licensing systems, exactly what we have in this bill. And what's the result of that? Significantly fewer guns are diverted into criminal hands. This

is exactly what we should be doing to help protect our children and our communities.

Now there are some who would say, well, there's enough rules on the books. But if you have a loophole in your rules that allows folks to purchase firearms, perhaps as many as 40 percent of all the firearm sales, without background checks, those checks that can keep the guns out of criminal hands, do we have enough rules on the books, or does it not make sense to close that loophole? That's what this bill does.

There are some who would say, well, this bill will simply provide a false sense of security. And you know what? You can't promise that this will prevent all of the mass shootings and Adam Lanza murders in the future. Well, you know what? No one is guaranteeing that. No one is claiming that this bill will solve all of the problems.

But as Senator Coleman said earlier, to say that since it doesn't solve all the problems we should do nothing is wrong. And when it comes to the issue of that sense of security, and that might lead to a question, is there anything in this bill that could have prevented that tragedy at Sandy Hook, I mean, the short answer is we'll never know.

But if this bill had been in effect when Adam Lanza was a small boy going off to school for the first time, I think we have to ask ourselves, what would have happened if his primary caregivers, if his pediatrician, as a young boy, had had access to specialists, behavior consultants, not just folks who were looking at learning disabilities but behavioral issues?

What if, as he got older in school, there was a heightened sense of awareness among everyone in the school about the behavioral issues, the mental health issues? What if there could have been greater outreach to him and others like him to remove him from his isolation and connect him to peers and adults? If you don't think these issues are going on right now in our schools in Connecticut and across the country, you're wrong. We ought to be making these efforts, taking these steps now.

This bill does that. And what if, at the time that his mother purchased firearms, she could not have purchased an assault rifle, not a military assault rifle designed to shoot dozens if not hundreds of people in a matter of minutes and could not have bought high-capacity magazines to go along with it?

I don't know what the outcome would have been. I don't know. But I can tell you this. It's worth our effort to pass this bill. This has been a tremendous effort of Democrats and Republicans putting aside partisanship, transcending politics. This is a new and historic model for the country on an issue that has typically been the most controversial and divisive.

We, in Connecticut, are breaking new ground today. So I am proud of this process. I am proud of my colleagues, Democrats and Republicans in the Senate, in the House. We have done things differently, and we should have done things differently given the magnitude of the tragedy that we face.

Madam President, I urge passage of this bill.

THE CHAIR:

Thank you.

Will you remark? Will you remark?

If not, Mr. Clerk, will you call, call for a roll call vote, and the machine is open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators, please return to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

If all members have voted, all members have voted? The machine will be locked.

Mr. Clerk, will you please call a tally.

THE CLERK:

Emergency Certified Bill Number 1160.

Total Number Voting 36

Necessary for Adoption 19

Those voting Yea 26

Those voting Nay 10

Those absent and not voting 0

THE CHAIR:

The bill passes.

Senator Looney.

Please, ladies and gentlemen.

Senator Looney.

SENATOR LOONEY:

Thank you. Thank you, Madam President. Madam President, I move for immediate transmittal to the House of Representatives of Emergency Certified Bill 1160 for which the House awaits.

THE CHAIR:

Seeing no objection, so ordered, sir.

# EXHIBIT D

## Declaration of Lucy P. Allen

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN, <br><br> Plaintiffs, <br><br> v. <br><br> NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, <br><br> Defendants. | C.A. No. 3:22-CV-1118 |

## DECLARATION OF LUCY P. ALLEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**January 31, 2023**

I, Lucy P. Allen, the undersigned, declare as follows:

1.      I am a Managing Director of NERA Economic Consulting ("NERA"), a member of NERA's Securities and Finance Practice and Chair of NERA's Product Liability and Mass Torts Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide.

2.      In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving economics and statistics. I have been qualified as an expert and testified in court on various economic and statistical issues relating to the flow of guns into the criminal market. I have testified at trials in Federal and State Courts, before the New York City Council Public Safety Committee, the American Arbitration Association and the Judicial Arbitration Mediation Service, as well as in depositions.

3.      I have an A.B. from Stanford University, an M.B.A. from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers. My resume with recent publications and testifying experience is included as Exhibit A.

4.      I have been asked by the Office of the Attorney General of Connecticut to address the following issues: (a) the number of rounds of ammunition fired by individuals using a gun in self-defense;[1] (b) the estimated rate at which firearms are used in Connecticut for self-defense against violent attackers outside the home; and (c) the outcomes when assault weapons and large-capacity magazines are used in public mass shootings, including the associated number of casualties.

---

[1]  I have also been asked to analyze the percent of incidents in which rifles were used in self-defense according to The Heritage Foundation's "Defensive Gun Uses in the U.S." database.

<center>OPINIONS</center>

**A.    Use of Guns in Self-Defense**

**1.    The number of rounds used by individuals in self-defense**

5.      Plaintiffs claim the large-capacity magazines (magazines capable of holding more than ten rounds, "Large Capacity Magazines") and "assault weapons" covered by Connecticut General Statutes §§ 53-202w and 53-202a-c[2] are commonly used for lawful purposes, including for self-defense.[3]

6.      The number of rounds commonly needed by individuals to defend themselves cannot be practically or ethically determined with controlled scientific experiments and there is no source that systematically tracks or maintains data on the number of rounds fired by individuals in self-defense. Due to these limitations, I have analyzed available data sources to estimate the number of rounds fired by individuals to defend themselves. In particular, I have analyzed data from the NRA Institute for Legislative Action, as well as my own study of news reports on incidents of self-defense with a firearm. In all, I have analyzed almost 1,000 incidents of self-defense with a firearm and found that it is extremely rare for a person, when using a firearm in self-defense, to fire more than ten rounds.

7.      The NRA maintains a database of "Armed Citizen" stories describing private citizens who have successfully defended themselves, or others, using a firearm ("NRA Armed Citizen database"). According to the NRA, the "Armed Citizen" stories "highlight accounts of law-abiding gun owners in America using their Second Amendment rights to defend self, home

---

[2]    Under Connecticut General Statute § 53-202a, a firearm is classified as an assault weapon if it is one of the firearm types and models listed, or a copy of one, or if it has certain features. Examples of assault weapons include the "Armalite AR-180," "Avtomat Kalashnikov AK-47 type," and "Calico M-900." A semiautomatic, centerfire rifle that can accept a detachable magazine can also be considered an assault weapon if it includes certain features, including a "forward pistol grip," a "thumbhole stock," a "flash suppressor," or a "folding or telescoping stock." *See*, Connecticut General Statute § 53-202a.

[3]    *See*, for example, Amended Complaint for Declaratory and Injunctive Relief, filed September 13, 2022, (the "Complaint") ¶¶1, 17, and 28-31.

<center>3</center>

<center>**JA-790**</center>

and family."[4] Although the methodology used to compile the NRA Armed Citizen database of stories is not explicitly detailed by the NRA, the NRA Armed Citizen database is a useful data source in this matter for at least three reasons. First, the Armed Citizen database was the largest collection of accounts of citizen self-defense compiled by others that I was able to find.[5] Second, the incidents listed in the Armed Citizen database highlight the very conduct that Plaintiffs claim the Connecticut law impedes (*i.e.*, the use of firearms by law-abiding citizens for self-defense).[6] Third, the Armed Citizen database is compiled by an entity that actively opposes restrictions on magazine capacity and restrictions on the possession and use of firearms in general.[7] In light of the positions taken by the entity compiling the data, I would expect that any selection bias would be in favor of stories that put use of guns in self-defense in the best possible light and might highlight the apparent need of guns and/or multiple rounds in self-defense incidents.

8.     My team and I performed an analysis of incidents in the NRA Armed Citizen database that occurred between January 2011 and May 2017.[8] For each incident, the city/county, state, venue (whether the incident occurred on the street, in the home, or elsewhere) and the number of shots fired were tabulated.[9] The information was gathered for each incident from both the NRA synopsis and, where available, an additional news story. An additional news story was found for over 95% of the incidents in the NRA Armed Citizen database.

---

[4]   NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-citizen/, accessed May 28, 2017.

[5]   Note that in 2020, after the time my research was conducted, The Heritage Foundation began an online database of its own sample of defensive gun use incidents (https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us).

[6]   See, for example, Complaint, ¶1.

[7]   See, for example, NRA Civil Rights Defense Fund website, http://www.nradefensefund.org/current-litigation.aspx, accessed October 12, 2018.

[8]   My collection and coding of the NRA Armed Citizen stories was last performed in mid-2017.

[9]   The following incidents were excluded from the analysis: (1) duplicate incidents, (2) wild animal attacks, and (3) one incident where the supposed victim later pleaded guilty to covering up a murder. When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

4

9.      According to this analysis of incidents in the NRA Armed Citizen database, it is extremely rare for a person, when using firearms in self-defense, to fire more than ten rounds. Out of 736 incidents, there were two incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets.[10] Defenders fired 2.2 shots on average.[11] In 18.2% of incidents, the defender did not fire any shots. These incidents highlight the fact that in many instances defenders are able to defend themselves without firing any shots. For example, according to one of the incidents in the NRA Armed Citizen Database:

> "A man entered a Shell station in New Orleans, La. and attempted to rob a cashier, by claiming he was carrying a gun. The cashier responded by retrieving a gun and leveling it at the thief, prompting the criminal to flee. (The Times Picayune, New Orleans, La. 09/02/15)"[12]

10.      For incidents occurring in the home (56% of total), defenders fired an average of 2.1 shots, and fired no shots in 16.1% of incidents. For incidents occurring outside the home (44%) of total, defenders fired an average of 2.2 shots, and fired no shots in 20.9% of incidents.[13] The table below summarizes these findings. (Note that we did not perform a Connecticut-specific analysis, as there were only six incidents in the NRA Armed Citizen database that occurred in Connecticut, of which only three were outside the home. We found no indication that more than 10 shots were fired in any of these Connecticut incidents.[14])

---

[10]  Note that the only two incidents with more than 10 bullets fired were added to the NRA Armed Citizen database in 2016 and 2017 after an earlier analysis that I had conducted of the database had been submitted to and cited by the Court in *Kolbe v. O'Malley*, Case No. CCB-13-2841 (Dkt. 79).

[11]  Note that the analysis is focused on shots fired when using a gun in self-defense and therefore the average includes instances when no shots are fired. If one calculates the average excluding incidents of self-defense with a gun without firing shots, the average is still low, 2.6 shots when at least one shot is fired.

[12]  "Gas station clerk scares off robber," NRA-ILA Armed Citizen, September 9, 2015.

[13]  A separate study of incidents in the NRA Armed Citizen database for an earlier period (the five-year period from 1997 through 2001) found similar results. Specifically, this study found that, on average, 2.2 shots were fired by defenders and that in 28% of incidents of armed citizens defending themselves the individuals fired no shots at all. See, Claude Werner, "The Armed Citizen – A Five Year Analysis," https://tacticalprofessor.files.wordpress.com/2014/12/tac-5-year-w-tables.pdf, accessed January 26, 2023.

[14]  Regarding the Connecticut incidents outside the home, according to news stories cited in the NRA database: In the first incident, a store clerk "fired two shots" and hit a robber; in the second incident, a

**Number of Shots Fired in Self-Defense**
**Based on NRA Armed Citizen Incidents in the United States**
**January 2011 - May 2017**

| | Shots Fired by Individual in Self-Defense | | |
| --- | --- | --- | --- |
| | Overall | Incidents in Home | Outside the Home |
| Average Number of Shots Fired | 2.2 | 2.1 | 2.2 |
| Number of Incidents with No Shots Fired | 134 | 66 | 68 |
| Percent of Incidents with No Shots Fired | 18.2% | 16.1% | 20.9% |
| Number of Incidents with >10 Shots Fired | 2 | 2 | 0 |
| Percent of Incidents with >10 Shots Fired | 0.3% | 0.5% | 0.0% |

**Notes and Sources:**

Data from NRA Armed Citizen database covering 736 incidents (of which 411 were in the home) from January 2011 through May 2017. Excludes duplicate incidents, wild animal attacks and one incident where the supposed victim later pleaded guilty to covering up a murder.

11. In addition to our analysis of incidents in the NRA Armed Citizen database, we performed a systematic, scientific study of news reports on incidents of self-defense with a firearm in the home, focusing on the same types of incidents as the NRA stories and covering the same time period.[15]

---

store owner "fire[d] a warning shot" at two robbers and sent them fleeing; and in the third incident, the potential victim was "charged with first-degree assault" after shooting a fleeing car thief. See, NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-citizen/, last accessed May 28, 2017, citing "Clerk Turns Tables on Robber," *New Haven Independent*, November 30, 2011, "Bridgeport store owner fires shot at would-be robbers, sending them fleeing," *ABC 7 NY*, April 22, 2016, and "Cops: Man shoots fleeing car thief," *Connecticut Post*, January 16, 2017. Regarding the Connecticut incidents inside the home, there is similarly no indication from the NRA database that more than 10 shots were fired.

[15] This analysis was initially conducted to research issues regarding self-defense in the home, which was a focus of federal Second Amendment jurisprudence before the 2022 *New York State Rifle & Pistol Association v. Bruen* Supreme Court decision. The analysis of the NRA Armed Citizen incidents described above indicates that the number of shots fired in self-defense outside the home is similar to those inside the home.

6

12.     To identify relevant news stories to include in our analysis, we performed a comprehensive search of published news stories using Factiva, an online news reporting service and archive owned by Dow Jones, Inc. that aggregates news content from nearly 33,000 sources.[16] The search was designed to return stories about the types of incidents that are the focus of the NRA Armed Citizen database and that Plaintiffs claim the Connecticut law impedes – in particular, the use of firearms for self-defense.[17] The search identified all stories that contained the following keywords in the headline or lead paragraph: one or more words from "gun," "shot," "shoot," "fire," or "arm" (including variations on these keywords, such as "shooting" or "armed"), plus one or more words from "broke in," "break in," "broken into," "breaking into," "burglar," "intruder," or "invader" (including variations on these keywords) and one or more words from "home," "apartment," or "property" (including variations on these keywords).[18] The search criteria match approximately 90% of the NRA stories on self-defense with a firearm in the home, and an analysis of the 10% of stories that are not returned by the search shows that the typical number of shots fired in these incidents was no different than in other incidents. The search covered the same period used in our analysis of incidents in the NRA Armed Citizen database (January 2011 to May 2017). The region for the Factiva search was set to "United States." The search returned approximately 35,000 stories for the period January 2011 to May 2017.[19]

---

[16]   Factiva is often used for academic research. For example, a search for the term "Factiva" on Google Scholar yields over 28,000 results. As another example, a search on Westlaw yields at least 83 expert reports that conducted news searches using Factiva.

[17]   NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-*citizen*/, accessed May 28, 2017. See, also Complaint, ¶1.

[18]   The precise search string used was: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"). An asterisk denotes a wildcard, meaning the search includes words which have any letters in place of the asterisk. For example, a search for shoot* would return results including "shoots," "shooter" and "shooting." The search excluded duplicate stories classified as "similar" on Factiva.

[19]   The effect of using alternative keywords was considered. For example, removing the second category ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and including incidents in which the assailant was already inside the home and/or was known to the victim

7

13.     Using a random number generator, a random sample of 200 stories was selected for each calendar year, yielding 1,400 stories in total.[20] These 1,400 stories were reviewed to identify those stories that were relevant to the analysis, *i.e.*, incidents of self-defense with a firearm in or near the home. This methodology yielded a random selection of 200 news stories describing incidents of self-defense with a firearm in the home out of a population of approximately 4,800 relevant stories.[21] Thus, out of the over 70 million news stories aggregated by Factiva between January 2011 and May 2017, approximately 4,800 news stories were on incidents of self-defense with a firearm in the home. We analyzed a random selection of 200 of these stories.

14.     For each news story, the city/county, state and number of shots fired were tabulated. When tabulating the number of shots fired, we used the same methodology as we used to analyze stories in the NRA Armed Citizen database.[22] We then identified other stories describing the same incident on Factiva based on the date, location and other identifying information, and recorded the number of times that each incident was covered by Factiva news stories.

15.     To determine the average number of shots fired per *incident*, we first determined the average number of shots fired per *story* and then analyzed the number of stories per incident.

---

was considered. *A priori*, there was no reason to believe that a larger number of shots would be used in these incidents and based on an analysis of the NRA stories we found that the number of shots fired in incidents when defending against someone already in the home was not different than those with an intruder.

[20]   The random numbers were generated by sampling with replacement.

[21]   The approximately 4,800 relevant news stories were estimated by calculating the proportion of relevant news stories from the 200 randomly selected stories each year and applying that proportion to the number of results returned by the search for each year of the analysis. For example, in 2017, 33 out of 200 (17%) randomly selected news stories involved incidents of self-defense with a firearm in the home. Applying that proportion to the 1,595 results from the Factiva search in 2017 yields 263 relevant news stories in 2017. This process was repeated every year to arrive at a total of 4,841 relevant news stories from 2011-2017.

[22]   When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

According to our study of a random selection from approximately 4,800 relevant stories on Factiva describing incidents of self-defense with a firearm in the home, the average number of shots fired per story was 2.61. This is not a measure of the average shots fired *per incident*, however, because the number of stories covering an incident varies, and the variation is not independent of the number of shots fired. We found that there was a statistically significant relationship between the number of shots fired in an incident and the number of news stories covering an incident.[23] We found that on average the more shots fired in a defensive gun use incident, the greater the number of stories covering an incident. For example, as shown in the table below, we found that incidents in Factiva news stories with zero shots fired were covered on average by 1.8 news stories, while incidents with six or more shots fired were covered on average by 10.4 different news stories.

---

[23] Based on a linear regression of the number of news stories as a function of the number of shots fired, the results were statistically significant at the 1% level (more stringent than the 5% level commonly used by academics and accepted by courts. See, for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," 80 *Columbia Law Review* 702 (1980).)

**Average Number of News Stories by Number of Shots Fired
In Factiva Stories on Incidents of Self-Defense with a Firearm
January 2011 - May 2017**

| Number of Shots Fired By Defender | Average Number of News Stories |
|---|---|
| 0 | 1.8 |
| 1 to 2 | 2.8 |
| 3 to 5 | 3.8 |
| 6 or more | 10.4 |

Notes and Sources:
  Based on stories describing defensive gun use in a random selection of Factiva stories between 2011 to May 2017 using the search string: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"), with region set to "United States" and excluding duplicate stories classified as "similar" on Factiva. Methodology for tabulation of shots fired as per footnote 22.

16.    After adjusting for this disparity in news coverage, we find that the average number of shots fired per incident covered is 2.34.[24] Note that this adjustment does not take into account the fact that some defensive gun use incidents may not be picked up by *any* news story. Given the observed relationship that there are more news stories when there are more shots fired, one would expect that the incidents that are not written about would on average have fewer shots than those with news stories. Therefore, the expectation is that these results, even after the

---

[24] The adjustment reflects the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home. The formula used for the adjustment is:

$$\frac{\sum_{i=1}^{n}\left(Shots\ Fired_i \times \frac{R_i}{C_i}\right)}{\sum_{i=1}^{n}\left(\frac{R_i}{C_i}\right)}$$

where:
$n$ = random selection of news stories on incidents of self-defense with a firearm in the home
$R_i$ = number of search results on Factiva in the calendar year of incident $i$
$C_i$ = number of news stories covering incident $i$

10

adjustment, are biased upward (*i.e.*, estimating too high an average number of shots and underestimating the percent of incidents in which no shots were fired).

17.     As shown in the table below, according to the study of Factiva news stories, in 11.6% of incidents the defender did not fire any shots, and simply threatened the offender with a gun. In 97.3% of incidents the defender fired 5 or fewer shots. There were no incidents where the defender was reported to have fired more than 10 bullets.

<div style="border:1px solid">

### Number of Shots Fired in Self-Defense in the Home Based on Random Selection of Articles from Factiva
### January 2011 - May 2017

| | Incidents in the Home |
|---|---|
| Estimated popuilation of news reports in Factiva on self-defense with a firearm in the home | 4,841 |
| Random selection of news reports | 200 |
| Average Number of Shots Fired | 2.34 |
| Median Number of Shots Fired | 2.03 |
| Number of Incidents with No Shots Fired | 23 |
| Percent of Incidents with No Shots Fired | 11.6% |
| Number of Incidents with <=5 Shots Fired | 195 |
| Percent of Incidents with <=5 Shots Fired | 97.3% |
| Number of Incidents with >10 Shots Fired | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% |

**Notes and Sources:**
Based on news stories describing defensive gun use in a random selection of Factiva stories 2011 to May 2017 using search string (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property") with region set to United States and excluding duplicate stories classified as "similar."
Calculated using weights reflecting the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home.

</div>

11

18.      In sum, an analysis of incidents in the NRA Armed Citizen database, as well as our own study of a random sample from approximately 4,800 news stories describing incidents of self-defense with a firearm, indicates that it is extremely rare for a person, when using a firearm in self-defense, to fire more than ten rounds.

**2.      Percent of incidents in which rifles were used in self-defense according to Heritage Defensive Gun Uses Database**

19.      I have been asked to analyze The Heritage Foundation's "Defensive Gun Uses in the U.S." database ("Heritage DGU Database"), a database of defensive gun incidents that was first published after my research on the number of rounds used by individuals in self-defense was performed.[25] In particular, I have been asked to analyze the percent of incidents in which rifles were used in self-defense according to the Heritage DGU Database. The analysis of the Heritage DGU Database indicates that it is rare for a rifle to be used in self-defense.

20.      The Heritage Foundation is a think tank focused on "formulat[ing] and promot[ing] public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense."[26] According to The Heritage Foundation, "[t]he right of the people to keep and bear arms is a fundamental part of American liberty, serving as an important individual defense against crime and a collective defense against tyranny."[27]

21.      In April 2020, The Heritage Foundation began publishing and periodically updating a database of news stories describing incidents in the U.S. in which individuals purportedly defended themselves using firearms.[28] The Heritage Foundation notes that its

---

[25]  "Defensive Gun Uses in the U.S.," *The Heritage Foundation,* as of October 7, 2022, https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us.

[26]  "About Heritage," *The Heritage Foundation*, https://www.heritage.org/about-heritage/mission.

[27]  "Firearms," *The Heritage Foundation*, https://www.heritage.org/firearms.

[28]  "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

database is not comprehensive but meant to "highlight" stories of successful self-defense.[29,30] As a result, one would expect the Heritage DGU Database to be more likely to identify successful uses of rifles in self-defense than a randomized review of news stories.

22.    As of October 7, 2022, the Heritage DGU Database included 2,714 incidents from January 1, 2019 through October 6, 2022.[31] The Heritage DGU Database codes the following information for each incident:[32]

- Date of the incident;
- Website link to the news story;
- Location (city and state);
- Context (e.g., domestic violence, home invasion, robbery, etc.);
- Whether the defender had a concealed-carry permit;
- Whether there were multiple assailants;
- Whether shots were fired; and
- Firearm type (handgun, shotgun, rifle, pellet rifle, long gun, or unknown).[33]

23.    I performed an analysis of all 2,714 incidents in the Heritage DGU Database as of October 7, 2022 to determine what number and percent of the incidents involved a rifle. I found there were 51 incidents indicating a rifle was involved. These 51 incidents represent 2% of all incidents in the database and 4% of incidents with a known gun type.[34] The table below shows the breakdown of incidents by coded firearm type for the 2,714 incidents.

---

[29]  "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[30]  Note that a review of the news stories cited in the database indicates that a number of the incidents may not involve individuals defending themselves. For example, in one incident ("Two Burglary Suspects Caught By Victim's Brother And Friend, Held At Gunpoint For Police," *5NewsOnline*, February 11, 2019), a homeowner's brother and friend appear to have found and apprehended burglars on the roadside.

[31]  "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[32]  "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[33]  A review of the data and linked news stories from the Heritage DGU Database indicates that the firearm type corresponds to the firearm associated with the defender.

[34]  This analysis is based on The Heritage Foundation's coding of these incidents. We have not independently verified the coding of these incidents.

| The Heritage Foundation<br>Defensive Gun Uses Database | | | |
|---|---|---|---|
| **Firearm Type** | **Incidents**[1] | **% of Total** | **% of Known** |
| **(1)** | **(2)** | **(3)** | **(4)** |
| Handgun | 1,113 | 41% | 90% |
| Shotgun | 78 | 3% | 6% |
| Rifle | 51 | 2% | 4% |
| Long Gun | 1 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,473 | 54% | |
| **Total known:** | **1,241** | | |
| **Total:** | **2,714** | | |

Source:

"Defensive Gun Uses in the U.S.," *The Heritage Foundation* .

Data as of October 7, 2022.

[1] Note that three incidents are coded as having more than one firearm type and thus the sum by firearm type is larger than the total number of incidents.

24.    I conducted the same analysis of the Heritage DGU Database excluding incidents that occurred in states that have restrictions on assault weapons. In particular, I excluded incidents in California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as Washington D.C.[35] In states without assault weapons restrictions, the Heritage DGU Database has 48 incidents indicating a rifle was involved. These 48 incidents represent 2% of incidents in these states and 4% of incidents with a known gun type in these states. The table

---

[35] See, "Assault Weapons," *Giffords Law Center*, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/. Delaware is not excluded since restrictions in Delaware were enacted in June 2022.  See, "Governor Carney Signs Package of Gun Safety Legislation," *Delaware.gov,* June 30, 2022, https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.

below shows the breakdown of incidents by coded firearm type for states that do not restrict assault weapons.

| The Heritage Foundation Defensive Gun Uses Database States Without Assault Weapon Restrictions | | | |
|---|---|---|---|
| Firearm Type | Incidents[1] | % of Total | % of Known |
| (1) | (2) | (3) | (4) |
| Handgun | 1,033 | 41% | 90% |
| Shotgun | 63 | 3% | 6% |
| Rifle | 48 | 2% | 4% |
| Long Gun | 0 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,357 | 54% | |
| Total known: | 1,142 | | |
| Total: | 2,499 | | |

Source:

"Defensive Gun Uses in the U.S.," *The Heritage Foundation.* Data as of October 7, 2022. Excludes the following states with assault weapon restrictions: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York as well as Washington D.C. Classification from Giffords Law Center. Incidents in Delaware not excluded as restrictions were enacted in June 2022.

[1] Note that three incidents are coded as having more than one firearm type and thus the sum of the individual firearm types is larger than the total number of incidents.

15

### 3. Rate in Connecticut that victims use a firearm in self-defense outside the home

25.     We estimated how common it is in Connecticut for a person to defend themselves or their family with a gun against a violent attack outside the home. In particular, we estimated the rate in Connecticut at which victims use a firearm in self-defense against an armed non-residential robbery or aggravated assault by a stranger.

26.     We used Connecticut-specific data on two types of crimes – robbery and aggravated assault – collected by the Connecticut Department of Emergency Services and Public Protection. For these two types of crimes, we estimated average rates for the five-year period between 2014 and 2018 using annual data on the number of non-residential robberies, adjusted for the percentage of robberies committed with a firearm, and the number of aggravated assaults committed with a firearm. [36] To these estimates, the national rates of non-residential robbery committed by a stranger with a firearm and of aggravated assault committed by a stranger with a firearm, both from the 2012 Bureau of Justice Statistics study, were applied. [37] The resulting estimated rates were summed to obtain the average annual rate in Connecticut of armed non-residential robbery and aggravated assault by a stranger. To this combined rate, the national rate from the 2013 Bureau of Justice Statistics study at which victims in nonfatal violent crimes used a firearm in self-defense was applied. [38] We estimated an annual rate of 0.24 instances per 100,000 persons in Connecticut in which a victim used a firearm in self-defense against an armed non-residential robbery or aggravated assault by a stranger (2.4 incidents per million people).

---

[36] "Crime in Connecticut," *Connecticut Department of Emergency Services and Public Protection: Crimes Analysis Unit*, 2014-2018.

[37] These rates are obtained from "Violent Victimization Committed by Strangers, 1993-2010," *US Department of Justice: Bureau of Justice Statistics*, December 2012, pp. 2, 5 and 7 (Tables 1, 6 and 9).

[38] This rate is obtained from "Firearm Violence, 1993-2011," *US Department of Justice: Bureau of Justice Statistics*, May 2013, p. 12 (Table 11).

27.     The chart below illustrates how this rate compares with annual rates of other

events:



As the chart shows, the odds of using a firearm in self-defense against a violent attack by an

armed stranger outside the home in Connecticut are very small – bracketed between other rare

events, including a bear entering one's home and being struck by lightning. The data indicates

that a person is almost 30 times more likely to commit suicide with a firearm, over 35 times

more likely to be killed or injured in an accidental/unintentional shooting, [39] and over 250 times

more likely to be hit by a car as a pedestrian.

---

[39]   In addition, see alternative earlier estimates of the rate of unintentional shootings: Gani, Faiz, Joseph V.
Sakran, and Joseph K. Canner, "Emergency Department Visits For Firearm-Related Injuries In The
United States, 2006–14," *Health Affairs* 36(10): 2017 (9.0 per 100,000 population), and Fowler,
Katherine A., Linda L. Dahlberg, Tadesse Haileyesus, and Joseph L. Annest, "Firearm Injuries in the
United States," *Preventive Medicine* 79: 2015 (3.9 per 100,000 population). Note that, using a rate of 3.9,

17

**JA-804**

28.     Using government data, including Connecticut-specific rates of crime, I find that it is very rare for a person in Connecticut to defend themselves or their family with a gun against a violent attack outside the home. The data indicates that the rate in Connecticut at which victims use a firearm in self-defense against an armed non-residential robbery or aggravated assault by a stranger is 0.24 instances per 100,000 persons (or 2.4 incidents per million people).

### B.     Public Mass Shootings

29.     We analyzed the use of assault weapons and Large-Capacity Magazines[40] in public mass shootings using four sources for identifying public mass shootings: Mother Jones,[41] the Citizens Crime Commission of New York City,[42] the Washington Post[43] and the Violence Project.[44, 45] The analysis focused on public mass shootings because it is my understanding that

---

a person is over 15 times more likely to be killed or injured in an accidental/unintentional shooting than to use a firearm in self-defense against a violent attack by an armed stranger outside the home in Connecticut.

[40] My analysis is based on the definitions of assault weapons ("Assault Weapons") provided by California law, specifically: California Penal Code sections 30510 and 30515, and California Code of Regulations, title 11, section 5499. California law defines Assault Weapons based on either their "make and model" or on certain "features." See, for example, California Department of Justice: "What is considered an assault weapon under California law?" and "What are AK and AR-15 series weapons?" https://oag.ca.gov/firearms/regagunfaqs, accessed October 25, 2018.

[41] "US Mass Shootings, 1982-2022: Data From Mother Jones' Investigation," Mother Jones, updated November 23, 2022, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data.

[42] "Mayhem Multiplied: Mass Shooters and Assault Weapons," Citizens Crime Commission of New York City, February 2018 update. Additional details on the mass shootings were obtained from an earlier source by the Citizens Crime Commission. "Mass Shooting Incidents in America (1984-2012)," Citizens Crime Commission of New York City, http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017.

[43] "The terrible numbers that grow with each mass shooting," The Washington Post, updated May 12, 2021.

[44] "Mass Shooter Database," The Violence Project, https://www.theviolenceproject.org/mass-shooter-database/, updated May 14, 2022.

[45] When I began research in 2013 on mass shootings, I found Mother Jones and Citizens Crime Commission to maintain the most comprehensive lists of relevant mass shootings. More recently, two additional sources, the Washington Post and The Violence Project, have compiled lists of public mass shootings. The Violence Project began work on its mass shootings database in September 2017 and its database first went online in November 2019, while the Washington Post first published its mass shootings database in

the state of Connecticut is concerned about public mass shootings and enacted the challenged law, in part, to address the problem of public mass shootings.[46]

30.     The type of incident considered a mass shooting is generally consistent across the four sources. In particular, all four sources consider an event a mass shooting if four or more people were killed in a public place in one incident and exclude incidents involving other criminal activity such as a robbery.[47]

---

February 14, 2018. There is substantial overlap between the mass shootings in all four sources. For example, the Mother Jones data contains 93% of the mass shootings in the Citizens Crime Commission data for the years covered by both data sources, 1984 to 2016, while the Washington Post contains 94% of the mass shootings in The Violence Project data for the years covered by both data sources, 1966 to 2019.

[46]  See, for example, *N.Y. State Rifle & Pistol Ass'n v. Cuomo,* 804 F.3d 242, 262 (2d Cir. 2015) ("The legislation is also specifically targeted to prevent mass shootings like that in Newtown…")

[47]  Citizen Crime Commission describes a mass shooting as "four or more victims killed" in "a public place" that were "unrelated to another crime (e.g., robbery, domestic violence)." Citizen Crime notes that its sources include "news reports and lists created by government entities and advocacy groups." "Mayhem Multiplied: Mass Shooters and Assault Weapons," Citizens Crime Commission of New York City, February 2018 update.

Mother Jones describes a mass shooting as "indiscriminate rampages in public places resulting in four or more victims killed by the attacker," excluding "shootings stemming from more conventionally motivated crimes such as armed robbery or gang violence." Although in January 2013 Mother Jones changed its definition of mass shooting to include instances when three or more people were killed, for this declaration we only analyzed mass shootings where four or more were killed to be consistent with the definition of the other three sources. "A Guide to Mass Shootings in America," Mother Jones, updated November 23, 2022, http://www.motherjones.com/politics/2012/07/mass-shootings-map. See also, "What Exactly is a Mass Shooting," Mother Jones, August 24, 2012. http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting.

The Washington Post describes a mass shooting as "four or more people were killed, usually by a lone shooter" excluding "shootings tied to robberies that went awry" and "domestic shootings that took place exclusively in private homes." The Washington Post notes that its sources include "Grant Duwe, author of 'Mass Murder in the United States: A History,' Mother Jones and Washington Post research," as well as "Violence Policy Center, Gun Violence Archive; FBI 2014 Study of Active Shooter Incidents; published reports." "The terrible numbers that grow with each mass shooting," The Washington Post, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

The Violence Project indicates that it uses the Congressional Research Service definition of a mass shooting: "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." The Violence Project notes that its sources include "Primary Sources: Written journals / manifestos / suicide notes etc., Social media and blog posts, Audio and video recordings, Interview transcripts,

19

31. Each of the four sources contains data on mass shootings covering different time periods. The Mother Jones data covers 112 mass shootings from 1982 to October 13, 2022,[48] the Citizens Crime Commission data covers 80 mass shootings from 1984 to February 2018,[49] the Washington Post data covers 185 mass shootings from 1966 to May 12, 2021,[50] and The Violence Project data covers 182 mass shootings from 1966 to May 14, 2022.[51, 52]

32. Note that the two more recently compiled sources of mass shootings, the Washington Post and The Violence Project, include additional mass shootings that were not covered by either Mother Jones or Citizens Crime Commission. In general, we found that these additional mass shootings were less covered by the media and involved fewer fatalities and/or

---

Personal correspondence with perpetrators" as well as "Secondary Sources (all publicly available): Media (television, newspapers, magazines), Documentary films, Biographies, Monographs, Peer-reviewed journal articles, Court transcripts, Law Enforcement records, Medical records, School records, Autopsy reports." "Mass Shooter Database," The Violence Project, https://www.theviolenceproject.org/methodology/, accessed January 17, 2020.

[48] "A Guide to Mass Shootings in America," Mother Jones, updated November 23, 2022, http://www.motherjones.com/politics/2012/07/mass-shootings-map. Excludes mass shootings where only three people were killed. Note this analysis of the Mother Jones data may not match other analyses because Mother Jones periodically updates its historical data.

[49] "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, February 2018 update.

[50] "The terrible numbers that grow with each mass shooting," *The Washington Post*, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

[51] "Mass Shooter Database," *The Violence Project* https://www.theviolenceproject.org/mass-shooter-database/, updated May 14, 2022.

[52] Note that I have updated this mass shooting analysis to include more recent incidents, as well as more recently available details. In my 2017 declaration in *Virginia Duncan et al. v. California Attorney General*, I included data on mass shootings through April 2017. In my 2018 declaration in *Rupp v. California Attorney General*, I updated the analysis to include data on mass shootings through September 2018. The analyses in both of these declarations included mass shootings only from Mother Jones and the Citizen Crime Commission. In my 2020 declaration in *James Miller et al. v. California Attorney General*, I updated the analysis to include mass shootings through December 2019 and added mass shootings from two more sources, the Washington Post and the Violence Project. The number of mass shootings, as well as some details about the shootings, are not identical across these declarations for three main reasons. First, I have updated the analysis to include more recent incidents as well as more recently available details. Second, starting in 2020, I added two more sources (Washington Post and Violence Project), which include additional mass shootings and details not included in the initial sources. Third, even though Mother Jones included instances when three or more people were killed, for my declarations and reports starting in 2020, I only included mass shootings where four or more were killed to be consistent with the definition of the other three sources.

injuries than the ones previously identified by Mother Jones or Citizens Crime Commission. For example, using the mass shooting data for the period 1982 through 2019, we found that the median number of news stories for a mass shooting included in Mother Jones and/or Citizen Crime Commission was 317, while the median for the additional mass shootings identified in the Washington Post and/or The Violence Project was 28.[53] In addition, using the mass shooting data through 2019, we found an average of 21 fatalities or injuries for a mass shooting included in Mother Jones and/or Citizen Crime Commission, while only 6 fatalities or injuries for the additional mass shootings identified in the Washington Post and/or The Violence Project.

33.       We combined the data from the four sources for the period 1982 through October 2022, and searched news stories on each mass shooting to obtain additional details on the types of weapons used as well as data on shots fired where available. We compared the details on the weapons used in each shooting to the list of prohibited firearms and features specified in California law to identify, based on this publicly available information, which mass shootings involved the use of Assault Weapons. In addition, we identified, based on this publicly available information, which mass shootings involved the use of Large-Capacity Magazines. See attached Exhibit B for a summary of the combined data, and Exhibit C for a summary of the weapons used in each public mass shooting based on Mother Jones, Citizens Crime Commission, the Washington Post, the Violence Project, and news reports.[54]

### 1.       Use of Assault Weapons in public mass shootings

34.       Based on the 179 mass shootings through October 2022, we found that Assault Weapons are often used in public mass shootings. Whether an Assault Weapon was used in a mass shooting can be determined in 153 out of the 179 incidents (85%) considered in this analysis. Out of these 153 mass shootings, 36 (or 24%) involved Assault Weapons. Even

---

[53]  The search was conducted over all published news stories on Factiva. The search was based on the shooter's name and the location of the incident over the period from one week prior to three months following each mass shooting.

[54]  Note that the Citizens Crime Commission data was last updated in February 2018 and the Washington Post was last updated in May 2021.

assuming the mass shootings where it is not known whether an Assault Weapon was used *all* did not involve an Assault Weapon, 36 out of 179 mass shootings, or 20%, involved Assault Weapons.

35.     Based on our analysis, casualties were higher in the mass shootings that involved Assault Weapons than in other mass shootings. In particular, we found an average number of fatalities or injuries of 36 per mass shooting with an Assault Weapon versus 10 for those without. Focusing on just fatalities, we found an average number of fatalities of 12 per mass shooting with an Assault Weapon versus 6 for those without. (See table below.)

### 2.     Use of Large-Capacity Magazines in public mass shootings

36.     Based on the 179 mass shootings through October 2022, we found that Large-Capacity Magazines (those with a capacity to hold more than 10 rounds of ammunition) are often used in public mass shootings. Magazine capacity is known in 115 out of the 179 mass shootings (or 64%) considered in this analysis. Out of the 115 mass shootings with known magazine capacity, 73 (or 63%) involved Large-Capacity Magazines. Even assuming the mass shootings with unknown magazine capacity *all* did not involve Large-Capacity Magazines, 73 out of 179 mass shootings or 41% of mass shootings involved Large-Capacity Magazines. (See table below.)

37.     Based on our analysis, casualties were higher in the mass shootings that involved weapons with Large-Capacity Magazines than in other mass shootings. In particular, we found an average number of fatalities or injuries of 25 per mass shooting with a Large-Capacity Magazines versus 9 for those without. Focusing on just fatalities, we found an average number of fatalities of 10 per mass shooting with a Large-Capacity Magazines versus 6 for those without. (See table below.)

22

**JA-809**

38.     In addition, we found that casualties were higher in the mass shootings that involved both Assault Weapons *and* Large-Capacity Magazines. In particular, we found an average number of fatalities or injuries of 40 per mass shooting with both an Assault Weapon and a Large-Capacity Magazine versus 8 for those without either. Focusing on just fatalities, we found an average number of fatalities of 13 per mass shooting with both an Assault Weapon and a Large-Capacity Magazine versus 6 for those without either. (See table below.)

### Numbers of Fatalities and Injuries in Public Mass Shootings
### 1982 - October 2022

| Weapon Used | # of Incidents | Average # of | | |
| --- | --- | --- | --- | --- |
| | | Fatalities | Injuries | Total |
| Assault Weapon | 36 | 12 | 24 | 36 |
| No Assault Weapon | 117 | 6 | 4 | 10 |
| Unknown | 26 | 5 | 3 | 9 |
| | | | | |
| Large-Cap. Mag. | 73 | 10 | 16 | 25 |
| No Large-Cap. Mag. | 42 | 6 | 3 | 9 |
| Unknown | 64 | 5 | 3 | 7 |
| | | | | |
| Assault Weapon & Large-Cap. Mag. | 31 | 13 | 27 | 40 |
| Large-Cap. Mag. Only[1] | 36 | 8 | 7 | 15 |
| No Assault Weapon or Large-Cap. Mag.[2] | 41 | 6 | 3 | 8 |
| Unknown[3] | 71 | 5 | 3 | 8 |

**Notes and Sources:**

Casualty figures exclude the shooter. Assault Weapon and large-capacity magazine classification and casualties updated based on review of stories from Factiva/Google searches.

[1] Shootings involving large-capacity magazine and no Assault Weapon.

[2] Shootings involving neither a large-capacity magazine nor Assault Weapon.

[3] Shootings where it is either unknown whether a large-capacity magazine was involved or unknown whether an Assault Weapon was involved.

39.     Our results are consistent with those of other studies that have analyzed mass shootings. Note that although the other studies are based on alternate sets of mass shootings,

23

**JA-810**

including covering different years and defining mass shootings somewhat differently, the results are similar in finding that fatalities and injuries are larger in mass shootings in which large capacity magazines and assault weapons are involved. A 2019 academic article published in the *American Journal of Public Health* by Klarevas et al. found that "[a]ttacks involving LCMs resulted in a 62% higher mean average death toll."[55] This study found an average number of fatalities of 11.8 per mass shooting with a large-capacity magazine versus 7.3 for those without. The results in this study were based on 69 mass shootings between 1990 and 2017.[56] An analysis of the mass shootings detailed in a 2016 article by Gary Kleck yielded similar results (21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without).[57] The Kleck study covered 88 mass shooting incidents between 1994 and 2013.[58] In a 2018 study, Koper et al. found that mass shootings involving assault weapons and large-capacity magazines resulted in an average of 13.7 victims versus 5.2 for other cases.[59] The Koper et al. study covered 145 mass shootings between 2009 and 2015.[60] The table below summarizes their results.

---

[55] Louis Klarevas, Andrew Conner, and David Hemenway, "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017," *American Journal of Public Health* (2019).

[56] The Klarevas et al. study defines mass shootings as "intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators" and, unlike my analysis, does not exclude incidents in private places or incidents involving other criminal activity such as robbery.

[57] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[58] The Kleck study defines a mass shooting as "one in which more than six people were shot, either fatally or nonfatally, in a single incident." See, Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[59] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," *Journal of Urban Health* (2018).

[60] The Koper et al. study defined mass shooting as "incidents in which four or more people were murdered with a firearm, not including the death of the shooter if applicable and irrespective of the number of additional victims shot but not killed."

**Comparison of Studies on the Use of Large-Capacity Magazines in Mass Shootings**

| Source | Criteria | | Time Period | # of Incidents | Avg. # of Fatalities + Injuries / Fatalities | |
|---|---|---|---|---|---|---|
| | # Victims | Other Criteria | | | With LCM | Without LCM |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Allen (2020)[1] | at least 4 killed[2] | Includes shootings "in a public place in one incident, and exclude[s] incidents involving other criminal activity such as a robbery" | 1982-2019 | 161 | 27 / 10 | 9 / 6 |
| Kleck et al. (2016)[3] | at least 6 shot | Excludes "spree shootings" and includes shootings in both "public" and "private" places | 1994-2013 | 88 | 21 / n/a | 8 / n/a |
| Klarevas et al. (2019)[4] | at least 6 killed[2] | Includes "intentional crimes of gun violence" | 1990-2017 | 69 | n/a / 12 | n/a / 7 |
| Koper et al. (2018)[5] | at least 4 killed[2] | Includes shootings in both public and private places | 2009-2015 | 145 | 14 / n/a | 5 / n/a |

**Notes and Sources:**

[1] Declaration of Lucy P. Allen in Support of Defendants' Opposition to Motion for Preliminary Injunction in *James Miller et al. v. Xavier Becerra et al.*, dated January 23, 2020.

[2] Excluding shooter.

[3] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 Justice Research and Policy 28 (2016).

[4] Klarevas et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings 1990-2017," American Journal of Public Health (2019).

[5] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," Journal of Urban Health (2018). Note that the Koper et al study includes shootings involving both LCM and assault weapons.

### 3. Number of rounds fired in public mass shootings with Assault Weapons or Large-Capacity Magazines

40.     The data on public mass shootings indicates that it is common for offenders to fire more than ten rounds when using an Assault Weapon. Of the 36 mass shootings we analyzed through October 2022 that are known to have involved an Assault Weapon, there are 24 in which the number of shots fired is known. Shooters fired more than ten rounds in *all* 24 incidents, and the average number of shots fired was 149.

41.     In addition, the data indicates that it is common for offenders to fire more than ten rounds when using a gun with a Large-Capacity Magazine in mass shootings. Of the 73 mass shootings that are known to have involved a Large-Capacity Magazine, there are 49 in which the number of shots fired is known. Shooters fired more than ten rounds in 46 of the 49 incidents, and the average number of shots fired in those incidents was 99.

### 4. Percent of mass shooters' guns legally obtained

42. The data on public mass shootings indicates that the majority of guns used in these mass shootings were obtained legally.[61] Of the 179 mass shootings analyzed through October 2022, there are 112 where it can be determined whether the gun was obtained legally. According to the data, shooters in 79% of mass shootings obtained their guns legally (89 of the 112 mass shootings) and 80% of the guns used in these 112 mass shootings were obtained legally (202 of the 252 guns). (Note that even if one assumes that *all* of the mass shootings where it is not known were assumed to be illegally obtained, then one would find 50% of the mass shootings and 62% of the guns were obtained legally.)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

<div style="text-align: right">

_____

Lucy P. Allen

</div>

---

[61] The determination of whether guns were obtained legally is based on Mother Jones and Washington Post reporting.



**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# Exhibit A

## LUCY P. ALLEN
## MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present      **National Economic Research Associates, Inc.**
<u>Managing Director</u>. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
<u>Senior Vice President (2003-2016)</u>.
<u>Vice President (1999-2003)</u>.
<u>Senior Consultant (1994-1999)</u>.

1992-1993      **Council of Economic Advisers, Executive Office of the President**
<u>Staff Economist</u>. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force.

1986-1988      **Ayers, Whitmore & Company (General Management Consultants)**
1983-1984      <u>Senior Associate</u>. Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.

1

Marketing plan to increase international market share for major accounting firm.

Summer 1985    **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>. Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983    **Arthur Andersen & Company**
<u>Consultant</u>. Designed, programmed and installed management information systems. Participated in redesign/conversion of New York State's accounting system. Developed municipal bond fund management system, successfully marketed to brokers. Participated in President's Private Sector Survey on Cost Control (Grace Commission). Designed customized tracking and accounting system for shipping company.

## Teaching

1989- 1992    <u>**Teaching Fellow,**</u> **Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

# Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

 "Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

2

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

 "Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Depositions & Testimony (4 years)

Supplemental Declaration before the United States District Court, Central District of California, Southern Division, in *Steven Rupp et al. v. California Attorney General et al.*, 2023.

Deposition Testimony before the United States District Court for the District of Harris County, Texas in *Boxer Property Management Corp. et al. v. Illinois Union Ins. Co. et al.*, 2022.

Declaration before the United States District Court, Southern District of California, in *Virginia Duncan, et al. v. Rob Bonta, et al.*, 2022.

Declaration before the United States District Court, Eastern District of Washington, in *Michael Scott Brumback, et al. v. Robert W. Ferguson, et al.*, 2022.

Trial Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Supplemental Declaration before the United States District Court, Southern District of California, in *James Miller et al. v. California Attorney General et al.*, 2022.

Declaration before the United States District Court, Northern District of Texas, Dallas Division, in *Samir Ali Cherif Benouis v. Match Group, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

4

Lucy P. Allen

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.,* 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

5

Lucy P. Allen

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Declaration before the United States District Court for the Northern District of Georgia, in *Sunil Amin et al. v. Mercedes-Benz USA, LLC and Daimler AG*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Declaration before the United States District Court for the Southern District of California in *James Miller et al. v. Xavier Becerra et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation*, 2019.

Testimony and Declaration before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Declaration before the United States District Court Western District of Oklahoma in *In re: Samsung Top-Load Washing Machine Marketing, Sales Practices and Products Liability Litigation*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

6

**Exhibit B**

**Public Mass Shootings Data**

**1982 – October 2022**

| Case (1) | Location (2) | Date (3) | Source (4) | Large Capacity Mag.?[a] (5) | Assault Weapons[b] (6) | Fatalities[c] (7) | Injuries[c] (8) | Total Fatalities & Injuries[c] (9) | Shots Fired[d] (10) | Gun(s) Obtained Legally?[e] (11) | Offender(s)' Number of Guns (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Raleigh spree shooting | Hedingham, NC | 10/13/22 | MJ | - | - | 5 | 2 | 7 | - | - | 2 |
| 2. Highland Park July 4 parade shooting | Highland Park, IL | 7/4/22 | MJ | Yes | - | 7 | 48 | 55 | 83 [ba] | Yes | 1 |
| 3. Tulsa medical center shooting | Tulsa, OK | 6/1/22 | MJ | - | - | 4 | 9 [bb] | 13 [bb] | 37 [bc] | Yes | 1 [be] |
| 4. Robb Elementary School massacre | Uvalde, TX | 5/24/22 | MJ | Yes | Yes | 21 | 17 | 38 | 164 [bd] | Yes | 1 |
| 5. Buffalo supermarket massacre | Buffalo, NY | 5/14/22 | MJ/VP | Yes | Yes | 10 | 3 | 13 | 60 [bf] | Yes [bg] | 1 |
| 6. Sacramento County church shooting | Sacramento, CA | 2/28/22 | MJ | Yes | - | 4 | 0 | 4 | - | Yes [bi] | 1 |
| 7. Oxford High School shooting | Oxford, MI | 11/30/21 | MJ/VP | Yes | No | 4 | 7 | 11 | 30 [bh] | Yes [bi] | 1 |
| 8. San Jose VTA shooting | San Jose, CA | 5/26/21 | MJ/VP | Yes | No | 9 | 0 | 9 | 39 [bj] | Yes [bk] | 3 |
| 9. Canterbury Mobile Home Park shooting | Colorado Springs, CO | 5/9/21 | WaPo | Yes | - | 6 | 0 | 6 | 17 [bl] | - | 1 |
| 10. FedEx warehouse shooting | Indianapolis, IN | 4/15/21 | MJ/VP/WaPo | Yes | Yes | 8 | 7 | 15 | - | Yes | 2 [bm] |
| 11. Orange office complex shooting | Orange, CA | 3/31/21 | MJ/VP/WaPo | - | - | 4 | 1 | 5 | - | - | 1 |
| 12. Essex Royal Farms shooting | Baltimore County, MD | 3/28/21 | WaPo | - | - | 4 | 1 | 5 | - | - [bn] | 1 |
| 13. King Soopers supermarket shooting | Boulder, CO | 3/22/21 | MJ/VP/WaPo | Yes | - | 10 | 0 | 10 | - | Yes | 2 |
| 14. Atlanta massage parlor shootings | Atlanta, GA | 3/16/21 | MJ/VP/WaPo | Yes | - | 8 | 1 | 9 | - | Yes [bo] | 1 |
| 15. Hyde Park shooting | Chicago, IL | 1/9/21 | WaPo | - | - | 5 | 2 | 7 | - | - | 1 |
| 16. Englewood block party shooting | Chicago, IL | 7/4/20 | WaPo | - | - | 4 | 4 | 8 | - | - | 2 |
| 17. Springfield convenience store shooting | Springfield, MO | 3/15/20 | MJ/VP/WaPo | - | - | 4 | 2 | 6 | - | Yes [bp] | 2 |
| 18. Molson Coors shooting | Milwaukee, WI | 2/26/20 | MJ/VP/WaPo | - | - | 5 | 0 | 5 | 12 [bq] | - | 2 [br] |
| 19. Jersey City Kosher Supermarket | Jersey City, NJ | 12/10/19 | MJ/VP/WaPo | No | No | 4 | 3 | 7 | - | - | 5 |
| 20. Football-watching party | Fresno, CA | 11/17/19 | WaPo | No | No | 4 | 6 | 10 | - | - | 2 |
| 21. Halloween Party | Orinda, CA | 11/1/19 | WaPo | - | - | 5 | 0 | 5 | - | - | 1 |
| 22. Tequila KC bar | Kansas City, KS | 10/6/19 | WaPo | - | - | 4 | 5 | 9 | - | No | 2 |
| 23. Midland-Odessa Highways | Odessa, TX | 8/31/19 | MJ/VP/WaPo | - | Yes | 7 | 25 | 32 | - | No | 1 |
| 24. Dayton | Dayton, OH | 8/4/19 | MJ/VP/WaPo | Yes | Yes | 9 | 27 | 36 | 41 [f] | Yes | 1/2 |
| 25. El Paso Walmart | El Paso, TX | 8/3/19 | MJ/VP/WaPo | Yes | Yes | 22 | 26 | 48 | - | Yes | 1 |
| 26. Casa Grande Senior Mobile Estates | Santa Maria, CA | 6/19/19 | WaPo | - | - | 4 | 0 | 4 | - | - | 1 |
| 27. Virginia Beach Municipal Center | Virginia Beach, VA | 5/31/19 | MJ/VP/WaPo | Yes | No | 12 | 4 | 16 | - | Yes | 2 |
| 28. Henry Pratt Co. | Aurora, IL | 2/15/19 | MJ/VP/WaPo | - | No | 5 | 6 | 11 | - | No | 1 |
| 29. SunTrust Bank | Sebring, FL | 1/23/19 | MJ/VP/WaPo | - | No | 5 | 0 | 5 | - | Yes | 1 |
| 30. Borderline Bar & Grill | Thousand Oaks, CA | 11/7/18 | MJ/VP/WaPo | Yes | No | 12 | 1 | 13 | 50 [g] | Yes | 1 |

**Exhibit B**

**Public Mass Shootings Data**

**1982 – October 2022**

| Case (1) | Location (2) | Date (3) | Source (4) | Large Capacity Mag.? ᵃ (5) | Assault Weapon? ᵇ (6) | Fatalities ᶜ (7) | Injuries ᶜ (8) | Total Fatalities & Injuries ᶜ (9) | Shots Fired ᵈ (10) | Gun(s) Obtained Legally? ᵉ (11) | Offender(s)' Number of Guns (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 31. Tree of Life Synagogue | Pittsburgh, PA | 10/27/18 | MJ/VP/WaPo | - | Yes | 11 | 6 | 17 | - | Yes | 4 |
| 32. T&T Trucking | Bakersfield, CA | 9/12/18 | MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 33. Capital Gazette | Annapolis, MD | 6/28/18 | MJ/VP/WaPo | - | No | 5 | 2 | 7 | - | Yes | 1 |
| 34. Santa Fe High School | Santa Fe, TX | 5/18/18 | MJ/VP/WaPo | No | No | 10 | 13 | 23 | - | - | 2 |
| 35. Waffle House | Nashville, TN | 4/22/18 | MJ/VP/WaPo | - | Yes | 4 | 4 | 8 | - | Yes | 1 |
| 36. Detroit | Detroit, MI | 2/26/18 | VP | - | No | 4 | 0 | 4 | - | - | - |
| 37. Stoneman Douglas HS | Parkland, FL | 2/14/18 | CC/MJ/VP/WaPo | Yes | No | 17 | 17 | 34 | - | Yes | 1 |
| 38. Pennsylvania Carwash | Melcroft, PA | 1/28/18 | MJ/VP/WaPo | - | - | 4 | 1 | 5 | - | - | 3 ʰ |
| 39. Rancho Tehama | Rancho Tehama, CA | 11/14/17 | MJ/VP/WaPo | Yes | Yes | 4 | 10 | 14 | 30 ⁱ | No | 2 |
| 40. Texas First Baptist Church | Sutherland Springs, TX | 11/5/17 | CC/MJ/VP/WaPo | Yes | Yes | 26 | 20 | 46 | 450 ʲ | Yes | 1 |
| 41. Las Vegas Strip | Las Vegas, NV | 10/1/17 | WaPo | Yes | Yes | 58 | 422 | 480 | 1100 ᵏ | Yes | 23 |
| 42. Taos and Rio Arriba counties | Abiquiu, NM | 6/15/17 | CC/MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 43. Fiamma Workplace | Orlando, FL | 6/5/17 | CC/MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 44. Marathon Savings Bank | Rothschild, WI | 3/22/17 | VP/WaPo | - | No | 4 | 0 | 4 | - | - | 2 |
| 45. Club 66 | Yazoo City, MS | 2/6/17 | VP/WaPo | - | - | 4 | 0 | 4 | - | - | - |
| 46. Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/17 | CC/MJ/VP/WaPo | No | Yes | 5 | 6 | 11 | 15 ˡ | Yes | 1 |
| 47. Cascade Mall | Burlington, WA | 9/23/16 | MJ/VP/WaPo | Yes | No | 5 | 0 | 5 | - | - | 1 |
| 48. Dallas Police | Dallas, TX | 7/7/16 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 11 | 16 | - | Yes | 3 |
| 49. Walgreens Parking Lot | Las Vegas, NV | 6/29/16 | WaPo | - | - | 4 | 0 | 4 | - | - | 1 |
| 50. Orlando Nightclub | Orlando, FL | 6/12/16 | CC/MJ/VP/WaPo | Yes | Yes | 49 | 53 | 102 | 110 ᵐ | Yes | 2 |
| 51. Franklin Avenue Cookout | Wilkinsburg, PA | 3/9/16 | VP/WaPo | Yes | Yes | 6 | 3 | 9 | 48 ⁿ | No | 2 |
| 52. Kalamazoo | Kalamazoo County, MI | 2/20/16 | MJ/VP/WaPo | Yes | No | 6 | 2 | 8 | - | Yes | 1 |
| 53. San Bernardino | San Bernardino, CA | 12/2/15 | CC/MJ/VP/WaPo | Yes | Yes | 14 | 22 | 36 | 150 ᵒ | Yes | 4 |
| 54. Tennessee Colony campsite | Anderson County, TX | 11/15/15 | VP/WaPo | - | - | 6 | 0 | 6 | - | - | 1 |
| 55. Umpqua Community College | Roseburg, OR | 10/1/15 | CC/MJ/VP/WaPo | No | No | 9 | 9 | 18 | - | Yes | 6 |
| 56. Chattanooga Military Center | Chattanooga, TN | 7/16/15 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 2 | 7 | - | Yes | 3 |
| 57. Charleston Church | Charleston, SC | 6/17/15 | CC/MJ/VP/WaPo | No | No | 9 | 3 | 12 | - | Yes | 1 |
| 58. Marysville High School | Marysville, WA | 10/24/14 | CC/MJ/VP/WaPo | Yes | No | 4 | 1 | 5 | - | No | 1 |
| 59. Isla Vista | Santa Barbara, CA | 5/23/14 | MJ/VP/WaPo | Yes | No | 6 | 13 | 19 | 50 ᵖ | Yes | 3 |
| 60. Alturas Tribal | Alturas, CA | 2/20/14 | MJ/VP/WaPo | - | No | 4 | 2 | 6 | - | - | 2 |
| 61. Washington Navy Yard | Washington, D.C. | 9/16/13 | CC/MJ/VP/WaPo | No | No | 12 | 8 | 20 | - | Yes | 2 |

Page 2 of 9

JA-821

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case (1) | Location (2) | Date (3) | Source (4) | Large Capacity Mag.ª (5) | Assault Weaponᵇ (6) | Fatalitiesᶜ (7) | Injuriesᶜ (8) | Total Fatalities & Injuriesᶜ (9) | Shots Firedᵈ (10) | Gun(s) Obtained Legally?ᵉ (11) | Offender(s)' Number of Guns (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62. Hialeah | Hialeah, FL | 7/26/13 | CC/MJ/VP/WaPo | Yes | No | 6 | 0 | 6 | 10 q | Yes | 1 |
| 63. Santa Monica | Santa Monica, CA | 6/7/13 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 3 | 8 | 70 r | Yes | 2 |
| 64. Federal Way | Federal Way, WA | 4/21/13 | MJ/VP/WaPo | - | No | 4 | 0 | 4 | - | Yes | 2 |
| 65. Upstate New York | Herkimer County, NY | 3/13/13 | MJ/VP/WaPo | - | No | 4 | 2 | 6 | - | Yes | 1 |
| 66. Newtown School | Newtown, CT | 12/14/12 | CC/MJ/VP/WaPo | Yes | Yes | 27 | 2 | 29 | 154 | No | 4/3 |
| 67. Accent Signage Systems | Minneapolis, MN | 9/27/12 | CC/MJ/VP/WaPo | Yes | No | 6 | 2 | 8 | 46 | Yes | 1 |
| 68. Sikh Temple | Oak Creek, WI | 8/5/12 | CC/MJ/VP/WaPo | Yes | No | 6 | 4 | 10 | - | Yes | 1 |
| 69. Aurora Movie Theater | Aurora, CO | 7/20/12 | CC/MJ/VP/WaPo | Yes | Yes | 12 | 70 | 82 | 80 | Yes | 4 |
| 70. Seattle Café | Seattle, WA | 5/30/12 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 2 |
| 71. Oikos University | Oakland, CA | 4/2/12 | CC/MJ/VP/WaPo | No | No | 7 | 3 | 10 | - | Yes | 1 |
| 72. Su Jung Health Sauna | Norcross, GA | 2/22/12 | MJ/WaPo | - | No | 4 | 0 | 4 | - | Yes | 1 |
| 73. Seal Beach | Seal Beach, CA | 10/14/11 | CC/MJ/VP/WaPo | No | No | 8 | 1 | 9 | - | Yes | 3 |
| 74. IHOP | Carson City, NV | 9/6/11 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 7 | 11 | - | Yes | 3 |
| 75. Akron | Akron, OH | 8/7/11 | VP | No | No | 7 | 2 | 9 | 21 s | - | - |
| 76. Forum Roller World | Grand Prairie, TX | 7/23/11 | WaPo | - | No | 5 | 4 | 9 | - | - | 1 |
| 77. Grand Rapids | Grand Rapids, MI | 7/7/11 | CC | Yes | No | 7 | 2 | 9 | 10 | - | 1 |
| 78. Family law practice | Yuma, AZ | 6/2/11 | WaPo | - | - | 5 | 1 | 6 | - | - | 1 |
| 79. Tucson | Tucson, AZ | 1/8/11 | CC/MJ/VP/WaPo | Yes | No | 6 | 13 | 19 | 33 | Yes | 1 |
| 80. Jackson | Jackson, KY | 9/11/10 | VP | No | No | 5 | 0 | 5 | 12 t | - | - |
| 81. City Grill | Buffalo, NY | 8/14/10 | VP/WaPo | - | No | 4 | 4 | 8 | 10 u | - | 1 |
| 82. Hartford Beer Distributor | Manchester, CT | 8/3/10 | CC/MJ/VP/WaPo | - | No | 8 | 2 | 10 | 11 | Yes | 2 |
| 83. Yoyito Café | Hialeah, FL | 6/6/10 | CC/VP/WaPo | No | No | 4 | 3 | 7 | 9 v | - | - |
| 84. Hot Spot Café | Los Angeles, CA | 4/3/10 | VP/WaPo | - | No | 4 | 2 | 6 | 50 w | - | 1 |
| 85. Coffee Shop Police | Parkland, WA | 11/29/09 | CC/MJ/VP/WaPo | No | No | 4 | 0 | 4 | - | No | 2 |
| 86. Fort Hood | Fort Hood, TX | 11/5/09 | CC/MJ/VP/WaPo | Yes | No | 13 | 32 | 45 | 214 | Yes | 1 |
| 87. Worth Street | Mount Airy, NC | 11/1/09 | VP/WaPo | - | Yes | 4 | 0 | 4 | 16 x | No | 1 |
| 88. Binghamton | Binghamton, NY | 4/3/09 | CC/MJ/VP/WaPo | Yes | No | 13 | 4 | 17 | 99 | Yes | 2 |
| 89. Carthage Nursing Home | Carthage, NC | 3/29/09 | CC/MJ/VP/WaPo | No | No | 8 | 2 | 10 | - | Yes | 2 |
| 90. Skagit County | Alger, WA | 9/2/08 | VP/WaPo | - | No | 6 | 4 | 10 | - | No | 2 |
| 91. Atlantis Plastics | Henderson, KY | 6/25/08 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |
| 92. Black Road Auto | Santa Maria, CA | 3/18/08 | CC/MJ/VP/WaPo | - | No | 4 | 0 | 4 | 17 y | - | 1 |

JA-822

**Exhibit B**

**Public Mass Shootings Data**

**1982 – October 2022**

| Case (1) | Location (2) | Date (3) | Source (4) | Large Capacity Mag.?[a] (5) | Assault Weapon?[b] (6) | Fatalities[c] (7) | Injuries[c] (8) | Total Fatalities & Injuries[c] (9) | Shots Fired[d] (10) | Gun(s) Obtained Legally?[e] (11) | Offender(s)' Number of Guns (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 93. Northern Illinois University | DeKalb, IL | 2/14/08 | CC/MJ/VP/WaPo | Yes | No | 5 | 21 | 26 | 54 | Yes | 4 |
| 94. Kirkwood City Council | Kirkwood, MO | 2/7/08 | CC/MJ/VP/WaPo | No | No | 6 | 1 | 7 | - | No | 2 |
| 95. Youth With a Mission and New Life Church | Colorado Springs, CO | 12/9/07 | VP/WaPo | Yes | Yes | 4 | 5 | 9 | 25 [z] | - | 3 |
| 96. Westroads Mall | Omaha, NE | 12/5/07 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 5 | 13 | 14 [aa] | No | 1 |
| 97. Crandon | Crandon, WI | 10/7/07 | CC/MJ/WaPo | Yes | - | 6 | 1 | 7 | 30 [aa] | Yes | 1 |
| 98. Virginia Tech | Blacksburg, VA | 4/16/07 | CC/MJ/VP/WaPo | Yes | No | 32 | 17 | 49 | 176 | Yes | 2 |
| 99. Trolley Square | Salt Lake City, UT | 2/12/07 | CC/MJ/VP/WaPo | No | No | 5 | 4 | 9 | - | No | 2 |
| 100. Amish School | Lancaster County, PA | 10/2/06 | CC/MJ/VP/WaPo | No | No | 5 | 5 | 10 | - | Yes | 3 |
| 101. The Ministry of the Jesus Christ | Baton Rouge, LA | 5/21/06 | VP/WaPo | - | No | 5 | 1 | 6 | - | - | 1 |
| 102. Capitol Hill | Seattle, WA | 3/25/06 | CC/MJ/VP/WaPo | Yes | Yes | 6 | 2 | 8 | - | Yes | 4 |
| 103. Goleta Postal | Goleta, CA | 1/30/06 | CC/MJ/VP/WaPo | Yes | No | 7 | 0 | 7 | - | Yes | 1 |
| 104. Sash Assembly of God | Sash, TX | 8/29/05 | VP/WaPo | - | No | 4 | 0 | 4 | - | - | 2 |
| 105. Red Lake | Red Lake, MN | 3/21/05 | CC/MJ/VP/WaPo | No | No | 9 | 7 | 16 | - | No | 3 |
| 106. Living Church of God | Brookfield, WI | 3/12/05 | CC/MJ/VP/WaPo | Yes | No | 7 | 4 | 11 | - | Yes | 1 |
| 107. Fulton County Courthouse | Atlanta, GA | 3/11/05 | VP/WaPo | - | No | 4 | 0 | 4 | - | No | 1 |
| 108. Damageplan Show | Columbus, OH | 12/8/04 | CC/MJ/VP/WaPo | No | No | 4 | 3 | 7 | 15 [ab] | Yes | 1 |
| 109. Hunting Camp | Meteor, WI | 11/21/04 | CC/VP/WaPo | Yes | Yes | 6 | 2 | 8 | 20 | - | 1 |
| 110. ConAgra Foods Plant | Kansas City, KS | 7/3/04 | VP/WaPo | - | No | 6 | 1 | 7 | 10 [ac] | - | 2 |
| 111. Statline Tavern | Oldtown, ID | 10/24/03 | VP/WaPo | Yes | No | 4 | 0 | 4 | 14 [ad] | - | 1 |
| 112. Windy City Warehouse | Chicago, IL | 8/27/03 | CC/VP/WaPo | No | No | 6 | 0 | 6 | - | - | 1 |
| 113. Lockheed Martin | Meridian, MS | 7/8/03 | CC/MJ/VP/WaPo | - | No | 6 | 8 | 14 | - | Yes | 5 |
| 114. Labor Ready | Huntsville, AL | 2/25/03 | VP/WaPo | - | No | 4 | 1 | 5 | - | - | 1 |
| 115. Bertrand Products | South Bend, IN | 3/22/02 | VP/WaPo | - | No | 4 | 2 | 6 | - | - | 2 |
| 116. Burns International Security | Sacramento, CA | 9/10/01 | VP/WaPo | Yes | Yes | 5 | 2 | 7 | 200 [ae] | - | 2 |
| 117. Rifle | Rifle, CO | 7/3/01 | VP/WaPo | No | No | 4 | 3 | 7 | 6 [af] | - | 1 |
| 118. Navistar | Melrose Park, IL | 2/5/01 | CC/MJ/VP/WaPo | Yes | No | 4 | 4 | 8 | - | Yes | 4 |
| 119. Houston | Houston, TX | 1/9/01 | VP | - | No | 4 | 0 | 4 | - | - | 1 |
| 120. Wakefield | Wakefield, MA | 12/26/00 | CC/MJ/VP/WaPo | Yes | - | 7 | 0 | 7 | 37 | Yes | 3 |
| 121. Mount Lebanon | Pittsburgh, PA | 4/28/00 | VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |
| 122. Mi-T-Fine Car Wash | Irving, TX | 3/20/00 | VP/WaPo | - | No | 5 | 1 | 6 | - | - | - |
| 123. Hotel | Tampa, FL | 12/30/99 | CC/MJ/VP/WaPo | No | No | 5 | 3 | 8 | - | Yes | 2 |

**JA-823**

**Exhibit B**

**Public Mass Shootings Data**

**1982 – October 2022**

| | Case (1) | Location (2) | Date (3) | Source (4) | Large Capacity Mag.?[a] (5) | Assault Weapon?[b] (6) | Fatalities[c] (7) | Injuries[c] (8) | Total Fatalities & Injuries[c] (9) | Shots Fired[d] (10) | Gun(s) Obtained Legally?[e] (11) | Offender(s)' Number of Guns (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 124. | Xerox | Honolulu, HI | 11/2/99 | CC/MJ/VP/WaPo | Yes | No | 7 | 0 | 7 | 28 | Yes | 1 |
| 125. | Wedgwood Baptist Church | Fort Worth, TX | 9/15/99 | CC/MJ/VP/WaPo | Yes | No | 7 | 7 | 14 | 30 | Yes | 2 |
| 126. | Atlanta Day Trading | Atlanta, GA | 7/29/99 | MJ/VP/WaPo | - | No | 9 | 13 | 22 | - | Yes | 4 |
| 127. | Albertson's Supermarket | Las Vegas, NV | 6/3/99 | VP/WaPo | - | No | 4 | 1 | 5 | - | - | 1 |
| 128. | Columbine High School | Littleton, CO | 4/20/99 | CC/MJ/VP/WaPo | Yes | Yes | 13 | 23 | 36 | 188 | No | 4 |
| 129. | New St. John Fellowship Baptist Church | Gonzalez, LA | 3/10/99 | VP/WaPo | - | No | 4 | 4 | 8 | - | No | 1 |
| 130. | Thurston High School | Springfield, OR | 5/21/98 | CC/MJ/VP/WaPo | No | No | 4 | 25 | 29 | 50 | No | 3 |
| 131. | Westside Middle School | Jonesboro, AR | 3/24/98 | CC/MJ/VP/WaPo | Yes | No | 5 | 10 | 15 | 26 | No | 9/10 |
| 132. | Connecticut Lottery | Newington, CT | 3/6/98 | CC/MJ/VP/WaPo | No | No | 4 | 0 | 4 | 5 | Yes | 1 |
| 133. | Caltrans Maintenance Yard | Orange, CA | 12/18/97 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 2 | 6 | 144 | Yes | 1 |
| 134. | Erie Manufacturing | Bartow, FL | 12/3/97 | VP | - | No | 4 | 0 | 4 | 12 [ag] | - | - |
| 135. | R.E. Phelon Company | Aiken, SC | 9/15/97 | CC/MJ/VP/WaPo | No | No | 4 | 3 | 7 | - | No | 1 |
| 136. | News and Sentinel | Colebrook, NH | 8/20/97 | VP/WaPo | - | Yes | 4 | 4 | 8 | - | - | 2 |
| 137. | Fire Station | Jackson, MS | 4/25/96 | VP/WaPo | - | No | 5 | 3 | 8 | - | - | 3 |
| 138. | Fort Lauderdale | Fort Lauderdale, FL | 2/9/96 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | 14 [ah] | Yes | 2 |
| 139. | Little Chester Shoes | New York, NY | 12/19/95 | VP/WaPo | No | No | 5 | 3 | 8 | - | - | 1 |
| 140. | Piper Technical Center | Los Angeles, CA | 7/19/95 | CC/VP/WaPo | Yes | No | 4 | 0 | 4 | - | - | - |
| 141. | Walter Rossler Company | Corpus Christi, TX | 4/3/95 | CC/MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | Yes | 2 |
| 142. | Puppy creek | Hoke County, NC | 12/31/94 | VP | - | - | 5 | 1 | 6 | - | - | - |
| 143. | Air Force Base | Fairchild Base, WA | 6/20/94 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 23 | 27 | 50 [ai] | Yes | 1 |
| 144. | Chuck E. Cheese | Aurora, CO | 12/14/93 | CC/MJ/VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |
| 145. | Long Island Railroad | Garden City, NY | 12/7/93 | CC/MJ/VP/WaPo | Yes | No | 6 | 19 | 25 | 30 | Yes | 1 |
| 146. | Unemployment Office | Oxnard, CA | 12/2/93 | VP/WaPo | - | - | 4 | 4 | 8 | - | - | - |
| 147. | Family Fitness Club | El Cajon, CA | 10/14/93 | VP/WaPo | No | No | 4 | 0 | 4 | - | Yes | 1 |
| 148. | Luigi's Restaurant | Fayetteville, NC | 8/6/93 | CC/MJ/VP/WaPo | No | Yes | 4 | 8 | 12 | - | Yes | 3 |
| 149. | Washington County Bar | Jackson, MS | 7/8/93 | WaPo | - | - | 5 | 0 | 5 | - | - | 1 |
| 150. | 101 California Street | San Francisco, CA | 7/1/93 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 6 | 14 | 75 | No | 3 |
| 151. | Card club | Paso Robles, CA | 11/8/92 | VP/WaPo | No | No | 6 | 1 | 7 | - | - | 1 |
| 152. | Watkins Glen | Watkins Glen, NY | 10/15/92 | CC/MJ/VP/WaPo | No | No | 4 | 0 | 4 | - | Yes | 1 |
| 153. | Lindhurst High School | Olivehurst, CA | 5/1/92 | CC/MJ/VP/WaPo | No | No | 4 | 10 | 14 | - | Yes | 2 |
| 154. | Phoenix | Phoenix, AZ | 3/15/92 | VP | - | - | 4 | 0 | 4 | - | - | - |

JA-824

Case 3:22-cv-01118-TAM Document 37-43 Filed 01/31/23 Page 6 of 61

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| | Case (1) | Location (2) | Date (3) | Source (4) | Large Capacity Mag.?[a] (5) | Assault Weapon?[b] (6) | Fatalities[c] (7) | Injuries[c] (8) | Total Fatalities & Injuries[c] (9) | Shots Fired[d] (10) | Gun(s) Obtained Legally?[e] (11) | Offender(s)' Number of Guns (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 155. | Royal Oak Postal | Royal Oak, MI | 11/14/91 | CC/MJ/VP/WaPo | Yes | No | 4 | 4 | 8 | - [ij] | Yes | 1 |
| 156. | Restaurant | Harrodsburg, KY | 11/10/91 | VP/WaPo | No | No | 4 | 0 | 4 | 6 [ij] | No | 1 |
| 157. | University of Iowa | Iowa City, IA | 11/1/91 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |
| 158. | Luby's Cafeteria | Killeen, TX | 10/16/91 | CC/MJ/VP/WaPo | Yes | No | 23 | 20 | 43 | 100 | Yes | 2 |
| 159. | Post office | Ridgewood, NJ | 10/10/91 | VP/WaPo | Yes | Yes | 4 | 0 | 4 | - | - | 2 |
| 160. | GMAC | Jacksonville, FL | 6/18/90 | CC/MJ/VP/WaPo | Yes | No | 9 | 4 | 13 | 14 | Yes | 2 |
| 161. | Standard Gravure Corporation | Louisville, KY | 9/14/89 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 12 | 20 | 21 | Yes | 5 |
| 162. | Stockton Schoolyard | Stockton, CA | 1/17/89 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 29 | 34 | 106 | Yes | 2 |
| 163. | Montefiore School | Chicago, IL | 9/22/88 | VP/WaPo | No | No | 4 | 2 | 6 | - | - | 1 |
| 164. | Old Salisbury Road | Winston-Salem, NC | 7/17/88 | VP/WaPo | - | No | 4 | 5 | 9 | - | - | 1 |
| 165. | ESL | Sunnyvale, CA | 2/16/88 | CC/MJ/VP/WaPo | No | No | 7 | 4 | 11 | - | Yes | 7 |
| 166. | Shopping Centers | Palm Bay, FL | 4/23/87 | CC/MJ/VP/WaPo | Yes | No | 6 | 14 | 20 | 40 [ak] | Yes | 3 |
| 167. | United States Postal Service | Edmond, OK | 8/20/86 | CC/MJ/VP/WaPo | No | - | 14 | 6 | 20 | - | Yes | 3 |
| 168. | Anchor Glass Container Corporation | South Connellsville, PA | 3/16/85 | VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |
| 169. | Other Place Lounge | Hot Springs, AR | 7/24/84 | VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |
| 170. | San Ysidro McDonald's | San Ysidro, CA | 7/18/84 | CC/MJ/VP/WaPo | Yes | Yes | 21 | 19 | 40 | 257 | Yes | 3 |
| 171. | Dallas Nightclub | Dallas, TX | 6/29/84 | CC/MJ/VP/WaPo | Yes | No | 6 | 1 | 7 | - | No | 1 |
| 172. | Alaska Mining Town | Manley Hot Springs, AK | 5/17/84 | VP/WaPo | No | No | 7 | 0 | 7 | - | - | 1 |
| 173. | College Station | College Station, TX | 10/11/83 | VP | - | - | 6 | 0 | 6 | - | - | - |
| 174. | Alaska Back-County | McCarthy, AK | 3/1/83 | VP/WaPo | - | No | 6 | 2 | 8 | - | - | 2 |
| 175. | Upper West Side Hotel | New York, NY | 2/3/83 | VP | No | No | 4 | 1 | 5 | - | - | 1 |
| 176. | The Investor | Noyes Island, AK | 9/6/82 | WaPo | - | No | 8 | 0 | 8 | - | - | 1 |
| 177. | Welding Shop | Miami, FL | 8/20/82 | MJ/VP/WaPo | No | No | 8 | 3 | 11 | - | Yes | 1 |
| 178. | Western Transfer Co. | Grand Prairie, TX | 8/9/82 | VP/WaPo | No | No | 6 | 4 | 10 | - | - | 3 |
| 179. | Russian Jack Springs Park | Anchorage, AK | 5/3/82 | VP/WaPo | - | No | 4 | 0 | 4 | - | No | 1 |

Large-Capacity Magazine Average: 10 | 16 | 25 | 99
Non-Large-Capacity Magazine Average: 6 | 3 | 9 | 16

Assault Weapon Average: 12 | 24 | 36 | 149
Non-Assault Weapon Average: 6 | 4 | 10 | 38

JA-825

Exhibit B

## Public Mass Shootings Data
### 1982 – October 2022

| Case (1) | Location (2) | Date (3) | Source (4) | Large Capacity Mag.?[a] (5) | Assault Weapons[b]? (6) | Fatalities[c] (7) | Injuries[c] (8) | Total Fatalities & Injuries[c] (9) | Shots Fired[d] (10) | Gun(s) Obtained Legally?[e] (11) | Offender(s)' Number of Guns (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|

**Notes and Sources:**

Public Mass Shootings from Mother Jones ("US Mass Shootings, 1982–2022: Data from Mother Jones' Investigation," updated November 23, 2022). MJ indicates a mass shooting identified by Mother Jones.

The Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," February 2018 update, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017). CC indicates a mass shooting identified by Citizens Crime Commission of New York City data.

The Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting.", updated May 12, 2021). WaPo indicates a mass shooting identified by The Washington Post.

The Violence Project ("Mass Shooter Database," updated May 14, 2022). VP indicates a mass shooting identified by the Violence Project.

[a] Large capacity magazines are those with a capacity to hold more than 10 rounds of ammunition. Stories from Factiva and Google searches reviewed to determine whether an LCM was involved.

[b] See Exhibit C for details.

[c] Offender(s) are not included in counts of fatalities and injuries. Stories from Factiva and Google searches reviewed to determine number of fatalities and injuries.

[c] Except where noted, all data on shots fired obtained from CC.

[e] The determination of whether guns were obtained legally is based on Mother Jones and Washington Post reporting.

[ba] "'This is the norm in our country': Highland Park Mayor speaks to Senate committee about gun violence," *CBS Chicago*, July 20, 2022.

[bb] MJ reported "fewer than 10" injuries for this incident.

[bc] "Update: Man among those killed held door to allow others to escape, Tulsa police chief says," *TulsaWorld*, June 2, 2022.

[bd] "The gunman in Uvalde carried more ammunition into Robb Elementary School than a U.S. soldier carries into combat," CBS News, May 27, 2022. Note the number of shots fired has been updated since Allen 2022 in Duncan v. Bonta which listed 315 shots fired based on the number of rounds found at the school.

[be] "Uvalde gunman legally bought AR rifles days before shooting, law enforcement says," *The Texas Tribune*, May 25, 2022.

[bf] "Buffalo shooting suspect says his motive was to prevent 'eliminating the white race'," *NPR*, June 16, 2022.

[bg] "Sacramento Church Mass Shooting Follows Disturbing Trend of Domestic Violence, Mass Shooting Connection; Rise of Ghost Guns," *Everytown*, March 7, 2022.

[bh] "Oxford High School shooter fired 30 rounds, had 18 more when arrested, sheriff says," *Fox2Detroit*, December 1, 2021.

[bi] "Father of suspected Oxford High School shooter bought gun 4 days before shooting," *Fox 2 Detroit*, December 1, 2021.

[bj] "VTA shooter fired 39 rounds during attack; carried 32 high-capacity magazines," *KTVU Fox 2*, May 27, 2021.

[bk] "Sam Cassidy legally owned guns used in San Jose VTA shooting: Sheriff," *Kron4*, May 28, 2021.

[bl] "Colorado Springs shooter who killed 6 at party had 'displayed power and control issues,'" police say," *The Denver Post*, May 11, 2021.

[bm] "Indianapolis FedEx Shooter Who Killed 4 Sikhs Was Not Racially Motivated, Police Say," *NPR*, July 28, 2021.

Page 7 of 9

**JA-826**

**Exhibit B**

**Public Mass Shootings Data**

**1982 – October 2022**

| Case (1) | Location (2) | Date (3) | Source (4) | Large Capacity Mag.?[a] (5) | Assault Weapon?[b] (6) | Fatalities[c] (7) | Injuries[c] (8) | Total Fatalities & Injuries[c] (9) | Shots Fired[d] (10) | Gun(s) Obtained Legally?[e] (11) | Offender(s)' Number of Guns (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|

[bn] "Police Investigate Three Separate Fatal Shooting Incidents In Baltimore County," *Baltimore County Government Website*, March 29, 2021.

[bo] "Atlanta Shooting Suspect Bought Gun on Day of Rampage," *Courthouse News*, March 26, 2021.

[bp] "Search warrant reveals new information in Springfield Kum & Go shooting," *Springfield News-Leader*, April 8, 2020.

[bq] "'There was no warning this was going to happen,' Miller shooting witnesses told investigators," *WISN 12 News*, November 24, 2020.

[br] "Milwaukee Miller brewery shooting: Six Molson Coors workers, including shooter, dead in rampage," *Milwaukee Journal Sentinel*, February 26, 2020.

[f] "The Dayton gunman killed 9 people by firing 41 shots in 30 seconds. A high-capacity rifle helped enable that speed," *CNN*, August 5, 2019.

[g] "Authorities Describe 'Confusion And Chaos' At Borderline Bar Shooting In California," *NPR*, November 28, 2018.

[h] "Suspect in quadruple killing at car wash dies," *CNN*, January 30, 2018.

[i] "California gunman fired 30 rounds at elementary school, left when he couldn't get inside," *ABC News*, November 15, 2017.

[j] "'Be quiet! It's him!' Survivors say shooter walked pew by pew looking for people to shoot," *CNN*, November 9, 2017.

[k] "Sheriff Says More than 1,100 Rounds Fired in Las Vegas," *Las Vegas Review-Journal*, November 22, 2017

[l] "Fort Lauderdale Shooting Suspect Appears in Court, Ordered Held Without Bond," *Washington Post*, January 9, 2017.

[m] "We Thought It Was Part of the Music': How the Pulse Nightclub Massacre Unfolded in Orlando," *The Telegraph*, June 13, 2016.

[n] "Two men charged with homicide in connection with Wilkinsburg backyard ambush," *Pittsburgh's Action News*, June 24, 2016.

[o] "San Bernardino Suspects Left Trail of Clues, but No Clear Motive," *New York Times*, December 3, 2015.

[p] "Sheriff: Elliot Rodger Fired 50-plus Times in Isle Vista Rampage," *Los Angeles Times*, June 4, 2014.

[q] "Shooter Set $10,000 on Fire in Hialeah Shooting Rampage," *NBC News*, July 28, 2013.

[r] "Police Call Santa Monica Gunman 'Ready for Battle,'" *New York Times*, June 8, 2013.

[s] "Questions linger in slayings; investigation continues in rampage as community searches for answers on why gunman shot eight people," *The Beacon Journal*, August 14, 2011.

[t] "Kentucky Tragedy: Man Kills Wife, Five Others, in Rampage Over Cold Eggs, Say Cops," *CBS News*, September 13, 2010.

[u] "Ex-gang member guilty of shooting 5 in deadly 17-second rampage," *NBC*, April 1, 2011.

[v] "Hialeah Gunman's Rage Over Estranged Wife Leaved 5 Dead," *Sun-Sentinel*, June 7, 2010.

[w] "Man convicted of killing 4 at Los Angeles restaurant," *Associated Press*, March 15, 2016.

Page 8 of 9

**JA-827**

**Exhibit B**

# Public Mass Shootings Data
## 1982 – October 2022

| Case (1) | Location (2) | Date (3) | Source (4) | Large Capacity Mag.?[a] (5) | Assault Weapon?[b] (6) | Fatalities[c] (7) | Injuries[c] (8) | Total Fatalities & Injuries[c] (9) | Shots Fired[d] (10) | Gun(s) Obtained Legally?[e] (11) | Offender(s)' Number of Guns (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|

x "4 Victims In Mount Airy Shooting Related, Police Say," *WXII 12 News*, November 2, 2009.

y "Arrested suspect might have warned of Santa Maria shooting", *Associated Press*, March 20, 2008.

z "Profile: New information released on Matthew Murray; gunman in church-related shootings in Colorado; Larry Bourbannais, wounded in one of the shootings, discusses his experience," *NBC News*, December 11, 2007.

aa "Small Town Grieves for 6, and the Killer," *Los Angeles Times*, October 9, 2007.

ab "National Briefing | Midwest: Ohio: Shooter At Club May Have Reloaded," *New York Times*, January 15, 2005.

ac "Sixth person dies of injuries from shooting at Kansas meatpacking plant," *Associated Press*, July 3, 2004.

ad "Four Killed In Oldtown Shooting," *The Miner*, October 30, 2003.

ae "Sacramento shooter unscathed before killing self, autopsy shows," *Associated Press*, September 14, 2001.

af "Gunman kills 3, wounds 4 in Rifle rampage; mental patient is arrested," *The Denver Post*, April 2, 2015.

ag "Unfinished business," *Dateline NBC*, December 21, 2006.

ah "5 Beach Workers in Florida are Slain by Ex-Colleague," *New York Times*, February 10, 1996.

ai "Man Bent On Revenge Kills 4, Hurts 23 -- Psychiatrist Is First Slain In Rampage At Fairchild Air Force Base," *The Seattle Times*, June 21, 1994.

aj "Man Killed Estranged Wife, Three Others as They Drove to Dinner," *Associated Press*, November 11, 1991.

ak "6 Dead in Florida Sniper Siege; Police Seize Suspect in Massacre," *Chicago Tribune*, April 25, 1987.

**JA-828**

Exhibit C

## List of Firearms Used in Public Mass Shootings
## 1982 – October 2022

| | | | Weapon Description From | | | Assault Weapon?[d] |
|---|---|---|---|---|---|---|
| **Case** | **Location** | **Date** | **Citizens Crime Commission[a]** | **Mother Jones[b]** | **Washington Post[c]** | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1. Raleigh spree shooting | Hedingham, NC | 10/13/22 | | shotgun, semiautomatic handgun | | - |
| 2. Highland Park July 4 parade shooting | Highland Park, IL | 7/4/22 | | AR-15 style rifle, possibly modified for rapid fire | | - |
| 3. Tulsa medical center shooting | Tulsa, OK | 6/1/22 | | AR-15 style rifle | | - |
| 4. Robb Elementary School massacre | Uvalde, TX | 5/24/22 | | **semiautomatic rifles** | | Yes[ca] |
| 5. Buffalo supermarket massacre | Buffalo, NY | 5/14/22 | | **Bushmaster M-15 semiautomatic rifle** | | Yes |
| 6. Sacramento County church shooting | Sacramento, CA | 2/28/22 | | AR-15-style "ghost gun" | | - |
| 7. Oxford High School shooting | Oxford, MI | 11/30/21 | | Sig Sauer 9mm pistol | | No[cb] |
| 8. San Jose VTA shooting | San Jose, CA | 5/26/21 | | semiautomatic handguns | | No[cc] |
| 9. Canterbury Mobile Home Park shooting | Colorado Springs, CO | 5/9/21 | | | Smith & Wesson handgun | - |
| 10. FedEx warehouse shooting | Indianapolis, IN | 4/15/21 | | **semiautomatic rifle** | Ruger AR 556, M Defense M15F rifle | Yes[cd] |
| 11. Orange office complex shooting | Orange, CA | 3/31/21 | | semiautomatic handgun | Glock semiautomatic handgun | - |
| 12. Essex Royal Farms shooting | Baltimore County, MD | 3/28/21 | | | | - |
| 13. King Soopers supermarket shooting | Boulder, CO | 3/22/21 | | **uger A -556** | **uger A 556 pistol, 9mm pistol** | Yes[ce] |
| 14. Atlanta massage parlor shootings | Atlanta, GA | 3/16/21 | | semiautomatic handgun | 9mm handgun | - |
| 15. Hyde Park shooting | Chicago, IL | 1/9/21 | | | .45-caliber pistol | - |
| 16. Englewood block party shooting | Chicago, IL | 7/4/20 | | | - | - |
| 17. Springfield convenience store shooting | Springfield, MO | 3/15/20 | | SKS 7.62-caliber rifle; Glock 9mm | Glock 9mm, SKS 7.62-caliber rifle | - |
| 18. Molson Coors shooting | Milwaukee, WI | 2/26/20 | | semiautomatic handgun | Handgun | - |
| 19. Jersey City Kosher Supermarket | Jersey City, NJ | 12/10/19 | - | - | mossberg 12-gauge. .22-caliber ruger Mark IV; AR-15-style rifle; Ruger 9mm semiautomatic pistol; 9mm glock 17 | No |
| 20. Football-watching party | Fresno, CA | 11/17/19 | - | - | - | No |
| 21. Halloween Party | Orinda, CA | 11/1/19 | - | - | - | - |

**JA-829**

**Exhibit C**

## List of Firearms sed in Public Mass Shootings
## 1982 – October 2022

| | | | Weapon Description From | | | |
|---|---|---|---|---|---|---|
| Case | Location | Date | Citizens Crime Commission [a] | Mother ones [b] | Washington Post [c] | Assault Weapon? [d] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 22. Tequila KC bar | Kansas City, KS | 10/6/19 - | | | Handgun | No |
| 23. Midland-Odessa Highways | Odessa, TX | 8/31/19 - | | semiautomatic rifle | A -style rifle | Yes e |
| 24. Dayton | Dayton, OH | 8/4/19 - | | A -15-style rifle, with a 100-round capacity ammunition drum | 23 caliber anderson AM-15 pistol modified to function li e an A -15 rifle, shotgun | Yes cf |
| 25. El Paso Walmart | El Paso, TX | 8/3/19 - | | A -47-style rifle, per authorities | 7.62 caliber A -47 style rifle | Yes |
| 26. Casa Grande Senior Mobile Estates | Santa Maria, CA | 6/19/19 - | | | | - |
| 27. Virginia Beach Municipal Center | Virginia Beach, VA | 5/31/19 - | | .45-caliber handguns; noise suppressor (silencer); several high-capacity magazines | .45 caliber handgun with noise suppressor, .45 caliber handgun | No |
| 28. Henry Pratt Co. | Aurora, IL | 2/15/19 - | | Smith & Wesson handgun, with a green sighting laser | .40-caliber Smith & Wesson semiautomatic handgun | No |
| 29. SunTrust Bank | Sebring, FL | 1/23/19 - | | 9 mm handgun | 9mm semiautomatic handgun | No |
| 30. Borderline Bar & Grill | Thousand Oaks, CA | 11/7/18 - | | Glock 21, .45 caliber; high-capacity magazine | Glock 21, .45-caliber handgun | No |
| 31. Tree of Life Synagogue | Pittsburgh, PA | 10/27/18 - | | A -15 Glock .357 | Colt A -15 semiautomatic rifle; three glock .357 pistols | Yes f |
| 32. T&T Trucking | Bakersfield, CA | 9/12/18 - | | | .50-caliber Smith & Wesson 500 | No g |
| 33. Capital Gazette | Annapolis, MD | 6/28/18 - | | 12-gauge pump-action shotgun | 2 gauge shotgun | No |
| 34. Santa Fe High School | Santa Fe, TX | 5/18/18 - | | shotgun, .38 revolver | .38 caliber revolver, shotgun | No |
| 35. Waffle House | Nashville, TN | 4/22/18 - | | A -15 | A -15-style semiautomatic rifle | Yes h |
| 36. Detroit | Detroit, MI | 2/26/18 - | | | - | No |
| 37. Stoneman Douglas HS | Parkland, FL | 2/14/18 - | | AR-15 | .223 caliber smith & wesson M&P 15 semiautomatic ar 15 rifle | No i |
| 38. Pennsylvania Carwash | Melcroft, PA | 1/28/18 - | | semiautomatic rifle and semiautomatic handgun | AR-15 .223-caliber semiautomatic rifle; 9mm handgun | - j |
| 39. Rancho Tehama | Rancho Tehama, CA | 11/14/17 - | | Two illegally modified rifles | t o semiautomatic rifles; two handguns | Yes k |
| 40. Texas First Baptist Church | Sutherland Springs, TX | 11/5/17 - | | uger A -556; Kelley also possessed semiautomatic handguns | 9mm Glock pistol; Ruger .22-caliber; Ruger A -556 | Yes l |

JA-830

Exhibit C

# List of Firearms ... sed in Public Mass Shootings
## 1982 – October 2022

| Case (1) | Location (2) | Date (3) | Weapon Description From | | | Assault Weapon?[d] (7) |
|---|---|---|---|---|---|---|
| | | | Citizens Crime Commission[a] (4) | Mother Jones[b] (5) | Washington Post[c] (6) | |
| 41. Las Vegas Strip | Las Vegas, NV | 10/1/17 | - | A -15-style and A -47-style rifles and "a large cache of ammunition"; four Daniel Defense DDM4 rifles, three FN-15s and other rifles made by Sig Sauer. | - | Yes [m] |
| 42. Taos and Rio Arriba counties | Abiquiu, NM | 6/15/17 | - | | .38 caliber revolver | No |
| 43. Fiamma Workplace | Orlando, FL | 6/5/17 | | semiautomatic handgun | semiautomatic rifle (2); handgun (2) | No |
| 44. Marathon Savings Bank | Rothschild, WI | 3/22/17 | - | - | Rifle, handgun | No |
| 45. Club 66 | Yazoo City, MS | 2/6/17 | - | - | | - |
| 46. Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/17 | - | Walther 9mm semi-automatic pistol | 9mm semiautomatic handgun | No |
| 47. Cascade Mall | Burlington, WA | 9/23/16 | | Ruger .22-caliber | Ruger .22-caliber rifle | No [n] |
| 48. Dallas Police | Dallas, TX | 7/7/16 | - | Izhmash-Saiga 5.45mm (A -style) semiautomatic rifle with large capacity magazines; Glock 9mm handgun, .25-caliber semiautomatic handgun | S S-type semiautomatic rifle | Yes [o] |
| 49. Walgreens Parking Lot | Las Vegas, NV | 6/29/16 | - | - | - | - |
| 50. Orlando Nightclub | Orlando, FL | 6/12/16 | - | Sig Sauer MC rifle Glock 17 9mm; high-capacity magazines (30 rounds) | .223-caliber Sig Sauer MC semiautomatic rifle; 9mm semiautomatic glock 17 pistol | Yes [p] |
| 51. Franklin Avenue Cookout | Wilkinsburg, PA | 3/9/16 | | | A -47-style rifle, .40-caliber handgun | Yes |
| 52. Kalamazoo | Kalamazoo County, MI | 2/20/16 | - | 9 mm handgun (ammo used unclear) | Walther P-99 9mm semiautomatic handgun | No |
| 53. San Bernardino | San Bernardino, CA | 12/2/15 | | T o semiautomatic A -15-style rifles one a DPMS A-15 the other a Smith & Wesson M&P15, both with .223 calibre ammunition. Two 9mm semiautomatic handguns. High capacity magazines. | DPMS A -15-style rifle; Smith & Wesson M&P A -15-style rifle; Llama semiautomatic 9mm pistol; Smith & Wesson semiautomatic 9mm pistol | Yes [q] |
| 54. Tennessee Colony campsite | Anderson County, TX | 11/15/15 | - | - | - | - |
| 55. Umpqua Community College | Roseburg, OR | 10/1/15 | - | 9 mm Glock pistol, .40 caliber Smith & Wesson, .40 caliber Taurus pistol, .556 caliber Del-Ton (ammo details unclear) | rifle; five pistols | No [r] |

JA-831

Exhibit C
## List of Firearms used in Public Mass Shootings
### 1982 – October 2022

| Case (1) | Location (2) | Date (3) | Weapon Description From | | | Assault Weapon?[d] (7) |
|---|---|---|---|---|---|---|
| | | | Citizens Crime Commission[a] (4) | Mother ones[b] (5) | Washington Post[c] (6) | |
| 56. Chattanooga Military Center | Chattanooga, TN | 7/16/15 | - | A -47, AR-15, and 30-round magazines; 9mm handgun | AR-15-style semiautomatic rifle; 9mm pistol; A -47-type semiautomatic rifle | Yes [s] |
| 57. Charleston Church | Charleston, SC | 6/17/15 | - | .45-caliber Glock (model 41, with 13-round capacity magazine) | .45-caliber glock 41 pistol | No |
| 58. Marysville High School | Marysville, WA | 10/24/14 | - | Beretta .40-caliber handgun | .40-caliber beretta pistol | No |
| 59. Isla Vista | Santa Barbara, CA | 5/23/14 | - | Two Sig Sauer P226 semiautomatic pistols and Glock 34 pistol, and hundreds of rounds of ammo. A 6- inchand 8-inch "SRK" and "Boar Hunter" hunting knives. | Sig Sauer P226s pistol; Glock 34 pistol; Sig Sauer P226s pistol | No |
| 60. Alturas Tribal | Alturas, CA | 2/20/14 | - | 9mm semi-automatic handgun | Unknown | No |
| 61. Washington Navy Yard | Washington, D.C. | 9/16/13 | - | Remington 870 Express 12-gauge shotgun; Beretta handgun | beretta pistol; Remington 970 Express 12-gauge shotgun | No |
| 62. Hialeah | Hialeah, FL | 7/26/13 | - | Glock 17 | Glock 17 pistol | No |
| 63. Santa Monica | Santa Monica, CA | 6/7/13 | - | .223-caliber semi-automatic assault rifle, about 40 high capacity magazines, "black powder" handgun (likely antique) | Black powder, .33-caliber handgun; A -15 type .223-caliber semiautomatic rifle | Yes [t] |
| 64. Federal Way | Federal Way, WA | 4/21/13 | - | .40 caliber semi-automatic handgun, pistol grip shotgun | .40 caliber semiautomatic pistol; pistol grip shotgun | No [u] |
| 65. Upstate New York | Herkimer County, NY | 3/13/13 | - | Unknown | Unknown | No [v] |
| 66. Newtown School | Newtown, CT | 12/14/12 | An un no n ma e and model .22-caliber rifle a Bushmaster M15 .223-caliber semiautomatic assault rifle equipped with a 30-round large capacity ammunition magazine, and a GLOCK 10mm handgun were used. According to the Danbury State's Attorney, police also recovered in Lanza's possession a SIG SAUER P226 9mm handgun and three loaded 30-round large capacity ammunition magazines for the Bushmaster. Six additional 30-round large capacity ammunition magazines were recovered at the scene. A loaded unknown make and model 12-gauge shotgun was found in the passenger compartment of the car (later moved to the trunk by police). All of the guns used in the shooting were purchased by Lanza's mother. | 10mm Glock, 9mm SIG Sauer P226 semiautomatic handguns; .223 Bushmaster M15-E2S semiautomatic rifle; Izhmash Saiga-12 12-gauge semiautomatic shotgun | 9mm SIG Sauer P226 pistol .Savage Mark II bolt-action .22-caliber rifle; .223 Bushmaster M15-E2S semiautomatic rifle; izhmash Saiga 12-gauge semiautomatic shotgun; 10mm Glock pistol | Yes [w] |

JA-832

Exhibit C

## List of Firearms   sed in Public Mass Shootings
### 1982 – October 2022

| | | | Weapon Description From | | | Assault Weapon?[d] |
|---|---|---|---|---|---|---|
| Case | Location | Date | Citizens Crime Commission[a] | Mother ones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 67. Accent Signage Systems | Minneapolis, MN | 9/27/12 | GLOCK 19 9mm semiautomatic pistol equipped with a 15-round large capacity ammunition magazine. Engeldinger purchased the firearm one year before the shooting at KGS Guns and Ammo in Minneapolis after passing a background check and obtaining a permit to purchase. Police reportedly found packaging for 10,000 rounds of ammunition and another handgun in Engeldinger's home. | 9mm Glock semiautomatic handgun | 9mm glock pistol | No |
| 68. Sikh Temple | Oak Creek, WI | 8/5/12 | Springfield Armory XD(M) 9mm semiautomatic handgun equipped with a 19-round large capacity ammunition magazine. Weeks before the shooting, Wade legally purchased the handgun and three 19-round large capacity ammunition magazines from a federal firearms licensed dealer in nearby West Allis, WI. According to media reports, Wade served in the U.S. Army from 1992 until 1998, when he was given an other-than-honorable discharge or general discharge. In 1994, while stationed at Fort Bliss in Texas, he was arrested by El Paso police, and pled guilty to a misdemeanor charge of criminal mischief. Federal law does not prohibit persons with convictions for misdemeanors other than domestic violence misdemeanors or persons who have been discharged from the military for reasons other than "dishonorably" from purchasing firearms. | 9mm Springfield Armory XDM semiautomatic handgun | 9mm springfield armory XDM pistol | No |
| 69. Aurora Movie Theater | Aurora, CO | 7/20/12 | A Smith & Wesson M&P15 assault rifle equipped with a 100-round drum large capacity ammunition magazine, a Remington Model 870 12-gauge pump shotgun, and two GLOCK .40 caliber handguns, were recovered at the scene by police. In the months leading to the shooting, Holmes purchased the weapons and 6,000-rounds of ammunition at gun shops and over the Internet. In addition to the weapons used in the shooting, Holmes booby-trapped his apartment, rigging trip wire to detonate 30 plastic shells stuffed with gunpowder, several glass jars filled with gasoline and gunpowder, and 10 gallons of gasoline in canisters. | Two 40-caliber Glock semiautomatic handguns; .223-caliber Smith & Wesson M&P15 semiautomatic rifle; 12-gauge Remington 870 pump-action shotgun | 40-caliber glock pistol; 12-gauge pump-action Remington 870 shotgun; .223-caliber Smith & Wesson M&P15 semiautomatic A -15-style rifle | Yes [x] |
| 70. Seattle Café | Seattle, WA | 5/30/12 | - | Two 45-caliber semiautomatic handguns | 45-caliber pistol (2) | No |
| 71. Oikos University | Oakland, CA | 4/2/12 | - | .45-caliber semiautomatic handgun | 45-caliber pistol | No |
| 72. Su Jung Health Sauna | Norcross, GA | 2/22/12 | - | .45-caliber semiautomatic handgun | - | No |

JA-833

Exhibit C
**List of Firearms Used in Public Mass Shootings**
**1982 – October 2022**

| | Case | Location | Date | Weapon Description From | | | Assault Weapon? [d] |
|---|---|---|---|---|---|---|---|
| | | | | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 73. | Seal Beach | Seal Beach, CA | 10/14/11 | - | .45-caliber Heckler & Koch, 9mm Springfield semiautomatic handguns; .44 Magnum Smith & Wesson revolver | - | No |
| 74. | IHOP | Carson City, NV | 9/6/11 | **AK-47 type assault rifle** equipped with a 30-round large capacity ammunition magazine. Two additional guns and two more magazines were found in his vehicle. | **AK-47 Norinco Arms variant** **AK-47 omarm Cugir variant rifles**; .38-caliber Colt revolver | **AK-47 variant semiautomatic rifle** | Yes [y] |
| 75. | Akron | Akron, OH | 8/7/11 | - | - | - | No [z] |
| 76. | Forum Roller World | Grand Prairie, TX | 7/23/11 | GLOCK 9mm semiautomatic pistol (unknown model) equipped with a 30-round large capacity ammunition magazine. | | - | No [aa] |
| 77. | Grand Rapids | Grand Rapids, MI | 7/7/11 | | - | - | No |
| 78. | Family law practice | Yuma, AZ | 6/2/11 | | | - | - |
| 79. | Tucson | Tucson, AZ | 1/8/11 | GLOCK 19 9mm semiautomatic pistol equipped with a 33-round large capacity ammunition magazine. Loughner was also carrying two 15-round large capacity ammunition magazines, and a knife. The ATF determined Loughner legally purchased the GLOCK pistol with an extended magazine and one box of Winchester ammunition on November 30, 2010, from Sportsman's Warehouse in Tucson. | 9mm Glock 19 semiautomatic handgun | 9mm glock 19 pistol | No |
| 80. | Jackson | Jackson, KY | 9/11/10 | - | - | - | No [ab] |
| 81. | City Grill | Buffalo, NY | 8/14/10 | - | | 9mm pistol | No |
| 82. | Hartford Beer Distributor | Manchester, CT | 8/3/10 | Two Ruger SR9 9mm semiautomatic pistols equipped with 17-round magazines. Thornton purchased both firearms legally from an East Windsor, CT gun dealer. | Two 9mm Ruger SR9 semiautomatic handguns | 9mm Ruger SR9 pistol (2) | No |
| 83. | Yoyito Café | Hialeah, FL | 6/6/10 | - | | .45-caliber Glock pistol | No [ac] |
| 84. | Hot Spot Café | Los Angeles, CA | 4/3/10 | - | | - | No [ad] |
| 85. | Coffee Shop Police | Parkland, WA | 11/29/09 | - | 9mm Glock 17 semiautomatic handgun; .38-caliber Smith & Wesson revolver | .38-caliber Smith & Wesson revolver; 9mm Glock 17 pistol | No |

JA-834

Case 3:22-cv-01118-IM    Document 32-43    Filed 01/31/23    Page 49 of 61

Exhibit C

# List of Firearms Used in Public Mass Shootings
## 1982 – October 2022

|  | Case | Location | Date | Weapon Description From | | | Assault Weapon? [d] |
|---|---|---|---|---|---|---|---|
|  |  |  |  | Citizens Crime Commission [a] | Mother Jones [b] | Washington Post [c] |  |
|  | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 86. | Fort Hood | Fort Hood, TX | 11/5/09 | FN Herstal 5.7 Tactical Pistol equipped with 20-round large capacity ammunition magazine. When Hasan was apprehended, investigators found in his possession 177-rounds in 30-round and 20-round large capacity ammunition magazines, another handgun, a revolver, and two gunsights (for different lighting conditions). Hasan purchased the FN Herstal 5.7 Tactical Pistol legally at Guns Galore, a shop in Killeen, TX | FN Five-seven semiautomatic handgun | FN Five-seven pistol | No |
| 87. | Worth Street | Mount Airy, NC | 11/1/09 | - | - | High-powered **assault-style rifle** | Yes |
| 88. | Binghamton | Binghamton, NY | 4/3/09 | Beretta .45-caliber semiautomatic pistol, Beretta 9mm semiautomatic pistol (models unknown), and two 30-round large capacity ammunition magazines and two 15-round large capacity ammunition magazines. | 9mm Beretta, .45-caliber Springfield semiautomatic handguns | 9mm Beretta pistol, .45-caliber Springfield pistol | No |
| 89. | Carthage Nursing Home | Carthage, NC | 3/29/09 | - | Winchester 1300 pump-action shotgun; .357 Magnum revolver | .357 magnum revolver; Winchester 1300 pump-action shotgun | No |
| 90. | Skagit County | Alger, WA | 9/2/08 | - | .45-caliber Hi-Point | lever-action winchester rifle, handgun | No |
| 91. | Atlantis Plastics | Henderson, KY | 6/25/08 | - | semiautomatic handgun | .45-caliber Hi-Point pistol | No |
| 92. | Black Road Auto | Santa Maria, CA | 3/18/08 | - | - | semiautomatic handgun | No |
| 93. | Northern Illinois University | DeKalb, IL | 2/14/08 | SIG SAUER Kurz 9mm semiautomatic pistol, Hi-Point CF380 .380 caliber semiautomatic pistol, GLOCK 19 9mm semiautomatic pistol, Remington Sportsman 48 12-gauge shotgun, and 33-round and 15-round large capacity ammunition magazines. Kazmierczak purchased all four weapons from Tony's Gun & Ammo in Champaign, IL between August 3, 2007 and February 9, 2008. Kazmierczak also purchased gun accessories from a website operated by TGSCOM, Inc., the same company patronized by the VA Tech shooter. | 9mm Glock 19, Hi-Point CF380, 9mm Kurz SIG Sauer P232 semiautomatic handguns; 12-gauge Remington Sportsman 48 sawed-off shotgun | 12-gauge Remington Sportsman 48 sawed-off shotgun; 9mm glock 19 pistol; 9mm Kurz SIG Sauer P232 pistol; Hi-Point CF380 pistol | No [ae] |
| 94. | Kirkwood City Council | Kirkwood, MO | 2/7/08 | - | .40-caliber Smith & Wesson semiautomatic handgun; .44 Magnum Smith & Wesson Model 29 revolver | .40-caliber Smith & Wesson pistol, .44 Magnum Smith & Wesson Model 29 revolver | No |
| 95. | Youth With a Mission and New Life Church | Colorado Springs, CO | 12/9/07 | - | - | A pistol, **.223-caliber Bushmaster M16 rifle**, .40-caliber Beretta pistol | Yes |
| 96. | Westroads Mall | Omaha, NE | 12/5/07 | **WAS -10 semiautomatic assault rifle** and two 30-round large capacity ammunition magazines. | **WAS -10 Century Arms** semiautomatic rifle | **WAS -10 Century Arms** semiautomatic rifle | Yes [af] |
| 97. | Crandon | Crandon, WI | 10/7/07 | - | AR-15 SWAT semiautomatic rifle | AR-15-style semiautomatic rifle | - [ag] |

JA-835

Exhibit C

## List of Firearms Used in Public Mass Shootings
### 1982 – October 2022

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|-------------------------|---|---|---|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 98. Virginia Tech | Blacksburg, VA | 4/16/07 | GLOCK 19 9mm semiautomatic pistol and Walther P22 .22-caliber semiautomatic pistol. Investigators found a total of 117 empty magazines at the scene of the shooting, a mix of several 15-round, and 10-round magazines loaded with hollow-point rounds (bullets with the tip hollowed out, designed to expand upon impact). He possessed over 400 rounds of ammunition. Cho ordered the Walther P22 from a website operated by TGSCOM, Inc. Kazmierczak patronized the same company before the NIU shooting. On February 9, 2007, Cho picked up the pistol from J-N-D Pawnbrokers, located across the street from the VA Tech campus. In compliance with the state law limiting handgun purchases to one every 30 days, Cho purchased the GLOCK 19 on March 13, 2007. He also purchased five 10-round magazines from eBay in March. Cho's purchase of these firearms was in violation of federal law; he was disqualified from purchasing or possessing a firearm and ammunition, because a special justice of the Montgomery County General District Court had found him to be a danger to himself on December 14, 2005. | 9mm Glock 19, .22-caliber Walther P22 semiautomatic handguns | .22-caliber Walther P22 pistol; 9mm Glock 19 pistol | No |
| 99. Trolley Square | Salt Lake City, UT | 2/12/07 | - | Mossberg Maverick 88 Field shotgun, .38-caliber Smith & Wesson M36 revolver | .38-caliber Smith & Wesson M36 revolver; Mossberg Maverick 88 Field shotgun | No |
| 100. Amish School | Lancaster County, PA | 10/2/06 | - | Springfield semiautomatic handgun; .30-06 Ruger bolt-action rifle; 12-gauge Browning pump-action shotgun | 12-gauge Browning pump-action shotgun; .30-06 Ruger bolt-action rifle; Springfield 9mm semiautomatic handgun | No [ah] |
| 101. The Ministry of Jesus Christ | Baton Rouge, LA | 5/21/06 | - | - | - | No [ai] |
| 102. Capitol Hill | Seattle, WA | 3/25/06 | - | .40-caliber Ruger, one other semiautomatic handgun; **Bushmaster M15 E2S semiautomatic rifle**; 12-gauge Winchester Defender pump-action shotgun with extended tube and pistol grip | 12-gauge pump-action Winchester Defender shotgun; .40-caliber Ruger pistol | Yes [aj] |
| 103. Goleta Postal | Goleta, CA | 1/30/06 | Smith & Wesson 915 9mm semiautomatic handgun equipped with a 15-round large capacity ammunition magazine. San Marco purchased the firearm at a pawn shop in New Mexico in August 2005. | 9mm Smith & Wesson 915 semiautomatic handgun | 9mm Smith & Wesson 915 pistol | No |

JA-836

Page 8 of 19

**List of Firearms Used in Public Mass Shootings**

**1982 – October 2022**

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|------------------------|--|--|---------------------|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 104. Sash Assembly of God | Sash, TX | 8/29/05 | | - | 9mm semiautomatic pistol, .38-caliber revolver | No |
| 105. Red Lake | Red Lake, MN | 3/21/05 | | - | .40-caliber Glock 23, .22-caliber Ruger semiautomatic handguns; 12-gauge Remington 870 shotgun | No |
| 106. Living Church of God | Brookfield, WI | 3/12/05 | - | 9mm Beretta semiautomatic handgun | 9mm beretta pistol | No |
| 107. Fulton County Courthouse | Atlanta, GA | 3/11/05 | - | | 9mm pistol | No |
| 108. Damageplan Show | Columbus, OH | 12/8/04 | - | 9mm Beretta 92FS semiautomatic handgun | 9mm beretta 92FS pistol | No |
| 109. Hunting Camp | Meteor, WI | 11/21/04 | S  S 7.62mm semiautomatic assault rifle equipped with a 20-round large capacity ammunition magazine. | - | 7.62mm S  S semiautomatic rifle | Yes [ak] |
| 110. ConAgra Foods Plant | Kansas City, KS | 7/3/04 | - | - | 9mm pistol, revolver | No |
| 111. Stateline Tavern | Oldtown, ID | 10/24/03 | - | - | semiautomatic pistol | No |
| 112. Windy City Warehouse | Chicago, IL | 8/27/03 | - | - | .38-caliber Walther pistol | No [al] |
| 113. Lockheed Martin | Meridian, MS | 7/8/03 | - | .45-caliber Ruger P90 semiautomatic handgun; .22-caliber rifle with scope, .223-caliber Ruger Mini-14 rifle; 12-gauge Winchester 1300 shotgun; .22 Magnum derringer | .223-caliber Ruger Mini-14 rifle; 12-gauge Winchester 1300 shotgun | No [am] |
| 114. Labor Ready | Huntsville, AL | 2/25/03 | - | - | semiautomatic 9mm pistol | No |
| 115. Bertrand Products | South Bend, IN | 3/22/02 | - | - | .22-caliber rifle, sawed-off shotgun | No |
| 116. Burns International Security | Sacramento, CA | 9/10/01 | - | - | A  -47-type semiautomatic rifle, 9mm pistol | Yes [an] |
| 117. Bookcliff RV Park | Rifle, CO | 7/3/01 | - | - | .38 caliber Charter Arms revolver | No |
| 118. Navistar | Melrose Park, IL | 2/5/01 | - | SKS 1954R, .30-caliber Winchester rifle; 12-gauge Remington pump-action shotgun; .38-caliber revolver | 12-gauge Remington pump-action shotgun; SKS 1954R rifle; .30-caliber Winchester rifle; .38-caliber revolver; | No [ao] |
| 119. Houston | Houston, TX | 1/9/01 | - | - | - | No [ap] |

JA-837

Exhibit C

**List of Firearms Used in Public Mass Shootings**

**1982 – October 2022**

| Case (1) | Location (2) | Date (3) | Weapon Description From | | | Assault Weapon?[d] (7) |
|---|---|---|---|---|---|---|
| | | | Citizens Crime Commission[a] (4) | Mother Jones[b] (5) | Washington Post[c] (6) | |
| 120. Wakefield | Wakefield, MA | 12/26/00 | A -47-type semiautomatic assault rifle, unknown make and model 12-gauge shotgun, unknown make and model .32-caliber semiautomatic pistol, and 60-round large capacity ammunition magazine. | .32-caliber Retolaza semiautomatic handgun; A -47 variant semiautomatic rifle; 12-gauge Winchester 1300 pump-action shotgun | .32-caliber Retolaza pistol; AK-47 variant semiautomatic rifle; 12-gauge Winchester 1300 pump-action shotgun | - [aq] |
| 121. Mount Lebanon | Pittsburgh, PA | 4/28/00 | - | - | .357 Magnum revolver | No |
| 122. Mi-T-Fine Car Wash | Irving, TX | 3/20/00 | - | - | semiautomatic .9mm pistol | No |
| 123. Hotel | Tampa, FL | 12/30/99 | 9mm Lorcin semiautomatic handgun, .38-caliber Charter Arms revolver | 9mm Lorcin semiautomatic handgun, .38-caliber Charter Arms revolver | .38-caliber Charter Arms revolver; 9mm Lorcin pistol | No |
| 124. Xerox | Honolulu, HI | 11/2/99 | GLOCK 17 9mm semiautomatic pistol and three 17-round large capacity ammunition magazines, loaded with hollow point bullets (bullets with the tip hollowed out, designed to expand upon impact). Uyesugi legally purchased the GLOCK in 1989. | 9mm Glock 17 semiautomatic handgun | 9mm Glock 17 pistol | No |
| 125. Wedgwood Baptist Church | Fort Worth, TX | 9/15/99 | Ruger P85 9mm semiautomatic pistol, unknown make and model .380 caliber semiautomatic pistol, and three 15-round large capacity ammunition magazines. Ashbrook legally acquired both weapons from federally licensed firearms dealers in 1992. | .380-caliber, 9mm Ruger P85 semiautomatic handguns | .380-caliber revolver; 9mm Ruger P85 pistol | No |
| 126. Atlanta Day Trading | Atlanta, GA | 7/29/99 | - | .45-caliber Colt 1911-A1, 9mm Glock 17, .25-caliber Raven Arms MP-25 semiautomatic handguns; .22-caliber Harrington & Richardson revolver | .45-caliber Colt 1911-A1 pistol; .22-caliber Harrington & Richardson revolver; .25-caliber Raven Arms Mp-25 pistol; 9mm Glock 17 pistol | No |
| 127. Albertson's Supermarket | Las Vegas, NV | 6/3/99 | - | 12-gauge pump-action shotgun | 12-gauge pump-action shotgun | No |
| 128. Columbine High School | Littleton, CO | 4/20/99 | **Savage Springfield 67 12-gauge pump-action shotgun Savage Stevens 311D 12-gauge sa edoff shotgun i-Point 995 9mm semiautomatic rifle** INT ATEC TEC-DC9 **9mm semiautomatic pistol** and thirteen 10-round magazines one 32-, one 28-round large capacity ammunition magazines. Harris and Klebold illegally acquired the shotguns and Hi- Point rifle through a "straw purchase" (a transaction in which a legal buyer makes a purchase for someone who cannot legally purchase the firearm). Their friend, Robyn Anderson, purchased the three firearms at the Tanner Gun Show from unlicensed sellers in December of 1998. A pizza shop employee, Mark Manes, Illegally sold them the INTRATEC TEC-DC9. | **9mm Intratec DC-9** semiautomatic handgun **9mm i-Point 995 carbine rifle**; 12-gauge sawed-off Savage Stevens 311D, 12-gauge sawed-off Savage Springfield 67H pump-action shotguns | **9mm i-Point 995 carbine**; 12-gauge sawed-off Savage Stevens 311D shotgun; 12-gauge sawed-off Savage Springfield 67H pump-action shotgun; **9mm Intratec DC-9 machine pistol** | Yes [ar] |

Page 10 of 19

JA-838

Case 3:22-cv-01143-AMN-ML Document 132-43 Filed 01/31/24 Page 539 of 61

Exhibit C

## List of Firearms Used in Public Mass Shootings
### 1982 – October 2022

| | Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|---|---|---|---|---|---|---|---|
| | | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 129. | New St. John Fellowship Baptist Church | Gonzalez, LA | 3/10/99 | - | - | semiautomatic pistol | No |
| 130. | Thurston High School | Springfield, OR | 5/21/98 | GLOCK 19 9mm semiautomatic pistol, Ruger (unknown model) .22-caliber semiautomatic pistol, Ruger (unknown model) .22-caliber rifle, and a 50-round large capacity ammunition magazine. The GLOCK and rifle were legally purchased by Kinkel's father. | 9mm Glock, .22-caliber Ruger semiautomatic handguns, .22-caliber Ruger rifle | 9mm Glock pistol, .22-caliber Ruger pistol, .22-caliber Ruger rifle | No [as] |
| 131. | Westside Middle School | Jonesboro, AR | 3/24/98 | Universal M1 Carbine .30-caliber replica, Davis Industries .38-caliber two-shot derringer, Double Deuce Buddie .22-caliber two-shot derringer, Charter Arms .38-caliber revolver, Star .380-caliber pistol, FIE .380-caliber pistol, Ruger Security Six .357-caliber revolver, Ruger .44 magnum rifle, Smith & Wesson .38-caliber revolver, Remington 742 .30-06-caliber rifle, 15-round large capacity ammunition magazines, three 30-round large capacity ammunition magazines, and over 150-rounds of ammunition. | FIE 380, .380-caliber Star semiautomatic handguns; .44 Magnum Ruger, .30-06 Remington 742, .30-caliber Universal M-1 carbine replica rifles; .38-caliber Charter Arms, .357-caliber Ruger Security Six, .38-caliber Smith & Wesson revolvers; .22-caliber Double Deuce Buddie two-shot, .38-caliber Davis Industries two-shot derringers | .22-caliber Double Deuce revolver; .380-caliber Star pistol, .357-caliber Ruger Security six revolver; .44 Magnum Ruger revolver, .30-caliber Universal M-1 carbine; .38-caliber Smith Arms revolver; .38-caliber Smith & Wesson revolver; FIE .380 pistol, .30-06 Remington 742 rifle | No [at] |
| 132. | Connecticut Lottery | Newington, CT | 3/6/98 | GLOCK model unknown 9mm semiautomatic pistol equipped with a 19-round large capacity ammunition magazine. Beck had a permit for the 9mm pistol used in the shooting. | 9mm semiautomatic handgun | 9mm pistol | No |
| 133. | Caltrans Maintenance Yard | Orange, CA | 12/18/97 | **Chinese-made A -47-type 7.62mm semiautomatic assault rifle** and five 30-round large capacity ammunition magazines. Torres legally purchased the rifle on April 30, 1988, from B&B Gun Sales in Orange County, CA. | **7.62mm A -47 Chinese variant semiautomatic rifle** | **7.62mm A -47 Chinese variant semiautomatic rifle** | Yes |
| 134. | Erie Manufacturing | Bartow, FL | 12/3/97 | - | - | - | No [au] |
| 135. | R.E. Phelon Company | Aiken, SC | 9/15/97 | - | 9mm semiautomatic handgun | 9mm pistol | No |
| 136. | News and Sentinel | Colebrook, NH | 8/20/97 | - | - | **9mm pistol, A -15-style rifle** | Yes [av] |
| 137. | Fire Station | Jackson, MS | 4/25/96 | - | - | Mac 11 machine pistol, Tec 9 automatic pistol, .45-caliber semiautomatic handgun | No |
| 138. | Fort Lauderdale | Fort Lauderdale, FL | 2/9/96 | - | 9mm Glock semiautomatic handgun, .32-caliber revolver | 9mm Glock pistol; .32-caliber revolver | No |
| 139. | Little Chester Shoes | New York, NY | 12/19/95 | - | - | 9mm semiautomatic pistol | No |
| 140. | Piper Technical Center | Los Angeles, CA | 7/19/95 | - | - | Glock semiautomatic pistol | No [aw] |

JA-839

Page 11 of 19

**Exhibit C**

**List of Firearms used in Public Mass Shootings**

**1982 – October 2022**

| Case | Location | Date | Weapon Description From | | | Assault Weapon? [d] |
| | | | Citizens Crime Commission [a] | Mother ones [b] | Washington Post [c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 141. Walter Rossler Company | Corpus Christi, TX | 4/3/95 | - | 9mm Ruger semiautomatic handgun; .32-caliber revolver | .32-caliber revolver; 9mm Ruger pistol | No |
| 142. Puppy creek | Hoke County, NC | 12/31/94 | - | - | - | - |
| 143. Air Force Base | Fairchild Base, WA | 6/20/94 | **Chinese-made Ma -90 semiautomatic assault rifle** equipped with a 75-round drum large capacity ammunition magazine. He purchased the assault rifle on June 15, 1994, five days before the shooting, and the following day purchased 80 rounds of 7.62x39mm ammunition and a 75-round drum large capacity ammunition magazine. | **MA -90 semiautomatic rifle** | **MA -90 semiautomatic A -** style rifle | Yes [ax] |
| 144. Chuck E. Cheese | Aurora, CO | 12/14/93 | - | .25-caliber semiautomatic handgun | .25-caliber pistol | No |
| 145. Long Island Railroad | Garden City, NY | 12/7/93 | Ruger P89 9mm semiautomatic pistol and four 15-round large capacity ammunition magazines. Ferguson legally acquired the weapon in California at an outlet of Turner's Outdoorsman. | 9mm Ruger P89 semiautomatic handgun | 9mm Ruger P89 pistol | No |
| 146. Unemployment Office | Oxnard, CA | 12/2/93 | - | - | Rifle | - |
| 147. Family Fitness Club | El Cajon, CA | 10/14/93 | - | - | 12-gauge shotgun | No |
| 148. Luigi's Restaurant | Fayetteville, NC | 8/6/93 | - | .22-caliber rifle; two 12-gauge shotguns | 12-gauge shotgun (2); .22-caliber rifle | No [ay] |
| 149. Washington County Bar | Jackson, MS | 7/8/93 | - | - | - | - |
| 150. 101 California Street | San Francisco, CA | 7/1/93 | **T o INT  ATEC  TEC-DC9 semiautomatic pistols.** Colt (unknown model), .45-caliber semiautomatic pistol, and 40-round and 50-round large capacity ammunition magazines loaded with a mix of Black Talon and standard ammunition. According to the Las Vegas Metropolitan Police Department, Ferri purchased the pistols from two stores in Las Vegas: Super Pawn and Pacific Tactical Weapons. | **T  o Intratec DC-9, .45-caliber** Colt semiautomatic handguns | **.45-caliber Colt pistol; Intratec DC-9 machine pistols** | Yes [az] |
| 151. Card club | Paso Robles, CA | 11/8/92 | - | - | - | No [ba] |
| 152. Watkins Glen | Watkins Glen, NY | 10/15/92 | - | 9mm Llama semiautomatic handgun | 9mm Llama pistol | No |
| 153. Lindhurst High School | Olivehurst, CA | 5/1/92 | - | .22-caliber sawed-off rifle; 12-gauge pump-action shotgun | .22-caliber sawed-off rifle; 12-gauge pump-action shotgun | No [bb] |
| 154. Phoenix | Phoenix, AZ | 3/15/92 | - | - | - | - |
| 155. Royal Oak Postal | Royal Oak, MI | 11/14/91 | - | .22-caliber Ruger sawed-off semiautomatic rifle | .22-caliber Ruger sawed-off semiautomatic rifle | No [bc] |
| 156. Restaurant | Harrodsburg, KY | 11/10/91 | - | - | .357 Magnum | No |

JA-840

**Exhibit C**

## List of Firearms Used in Public Mass Shootings
### 1982 – October 2022

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|-------------------------|---|---|--------------------|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 157. University of Iowa | Iowa City, IA | 11/1/91 | - | .38-caliber Taurus revolver | .38-caliber Taurus revolver | No |
| 158. Luby's Cafeteria | Killeen, TX | 10/16/91 | GLOCK 17 9mm semiautomatic pistol, and Ruger P89 semiautomatic pistol, and 17-round and 15-round large capacity ammunition magazines. Hennard legally purchased the weapons from Mike's Gun Shop in Henderson, NV, in February and March of 1991. | 9mm Glock 17, 9mm Ruger P89 semiautomatic handguns | 9mm Glock 17 pistol; 9mm Ruger P89 pistol | No |
| 159. Post office | Ridgewood, NJ | 10/10/91 | - | **9mm zi machine gun** | **9mm zi machine pistol**, .22-caliber machine gun | Yes[br] |
| 160. GMAC | Jacksonville, FL | 6/18/90 | Universal M1 .30-caliber semiautomatic assault rifle, unknown make and model .38-caliber revolver, and a 30-round large capacity ammunition magazine. | .30-caliber Universal M1 carbine rifle; .38-caliber revolver | .30-caliber Universal M1 carbine; .38-caliber revolver | No[bd] |
| 161. Standard Gravure Corporation | Louisville, KY | 9/14/89 | **Chinese-made A -47-type semiautomatic assault rifle,** two INTRATEC MAC-11 semiautomatic assault pistols, SIG SAUER unknown model 9mm semiautomatic pistol, unknown make and model .38-caliber revolver, and 30-round large capacity ammunition magazines. Wesbecker legally purchased the AK-47-type assault rifle from Tilford's Gun Sales in Louisville. | Two Intratec MAC-11, 9mm SIG Sauer semiautomatic handguns; **A -47 Chinese variant semiautomatic rifle**; .38-caliber revolver | 9mm SIG Sauer pistol; A -47 **Chinese variant semiautomatic rifle**; Intratec MAC-11 machine pistol; .38-caliber revolver; 9mm SIG Sauer pistol | Yes |
| 162. Stockton Schoolyard | Stockton, CA | 1/17/89 | **Chinese-made A -47-type semiautomatic assault rifle.** Taurus unknown model 9mm semiautomatic pistol, a 75-round large capacity ammunition drum magazine, a 75-round large capacity ammunition rotary magazine, and four 35-round large capacity ammunition banana magazines. Purdy legally purchased the AK-47-type rifle at Sandy Trading Post, in Sandy, OR on August 3, 1988, and the Taurus 9mm pistol at Hunter Loan and Jewelry Co. in Stockton, CA on December 28, 1988. | 9mm Taurus semiautomatic handgun; **A -47 Chinese variant semiautomatic rifle** | 9mm Taurus pistol; A -47 **Chinese variant semiautomatic rifle** | Yes |
| 163. Montefiore School | Chicago, IL | 9/22/88 | - | - | .38-caliber revolver | No |
| 164. Old Salisbury Road | Winston-Salem, NC | 7/17/88 | - | - | .22-caliber rifle | No |
| 165. ESL | Sunnyvale, CA | 2/16/88 | - | .380 ACP Browning, 9mm Smith & Wesson semiautomatic handguns; Ruger M-77 .22-250 bolt-action rifle with scope; Mossberg 12-gauge pump-action, 12-gauge Benelli semiautomatic shotguns; .357 Magnum Smith & Wesson, .22 Sentinel WMR revolvers | .22 Sentinel WMR revolver; 9mm Smith & Wesson pistol; Mossberg 12-gauge pump-action shotgun; Ruger M-77 .22-250 bolt-action rifle with scope; .380 AP Browning pistol; 12-gauge Benelli semiautomatic shotgun; .357 Magnum Smith & Wesson revolver; | No[be] |

JA-841

Case 3:22-cv-01118-AWT Document 37-3 Filed 01/31/23 Page 289 of 61
Exhibit C
List of Firearms   sed in Public Mass Shootings
1982 – October 2022

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
| | | | Citizens Crime Commission[a] | Mother  ones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 166. Shopping Centers | Palm Bay, FL | 4/23/87 | Strum, Ruger Mini-14 semiautomatic assault rifle equipped with a 30-round large capacity ammunition magazine, five 30-round large capacity ammunition magazines, 180 rounds of ammunition, a shotgun (unknown make and model), and a pistol (unknown make and model). Cruse ordered the assault rifle on March 21, 1987. On April 17, 1987, he purchased 100-rounds of ammunition and six 30-round large capacity ammunition magazines. | Sturm, Ruger Mini-14 semiautomatic rifle; 20-gauge Winchester pump-action shotgun; .357 Ruger Blackhawk revolver | .357 Ruger Blackhawk revolver; Ruger Mini-14 semiautomatic rifle; Sturm; 20-gauge Winchester pump-action | No  bf |
| 167. United States Postal Service | Edmond, OK | 8/20/86 | - | .22-caliber, two .45-caliber Colt Model 1911-A1 semiautomatic handguns | .45-caliber Colt Model 1911-A1 pistol, .45-caliber Colt Model 1911-A1 pistol, .22-caliber pistol | -  bg |
| J68. Anchor Glass Container Corporation | South Connellsville, PA | 3/16/85 | - | - | .38-caliber snub-nosed revolver | No |
| J69. Other Place Lounge | Hot Springs, AR | 7/24/84 | - | - | .45-caliber semiautomatic pistol | No |
| 170. San Ysidro McDonald's | San Ysidro, CA | 7/18/84 | - | 9mm Browning P35 Hi-Power semiautomatic handgun; **9mm Israeli Military Industries  zi Model A carbine semiautomatic rifle**; 12-gauge Winchester 1200 pump-action shotgun | **9mm Israeli Military industries zi Model A machine pistol**, 12-gauge Winchester  1200 pump-action shotgun, 9mm Browning P35 Hi-Power pistol | Yes |
| 171. Dallas Nightclub | Dallas, TX | 6/29/84 | - | 9mm Smith & Wesson 459 semiautomatic handgun | 9mm Smith & Wasson 459 pistol | No  bh |
| 172. Alaska Mining Town | Manley Hot Springs, AK | 5/17/84 | - | - | .30-06-caliber Ruger single-shot rifle | No |
| 173. College Station | College Station, TX | 10/11/83 | - | - | - | No  bi |
| 174. Alaska Back-County | McCarthy, AK | 3/1/83 | - | - | .223-caliber Ruger Mini-14 semiautomatic rifle, .22-caliber pistol | No |
| 175. Upper West Side Hotel | New York, NY | 2/3/83 | - | - | - | No  bj |
| 176. The Investor | Noyes Island, AK | 9/6/82 | - | - | .22-caliber | No |
| 177. Welding Shop | Miami, FL | 8/20/82 | - | Mossberg 500 Persuader pump-action shotgun with pistol grip | 12-gauge shotgun | No |
| 178. Western Transfer Co. | Grand Prairie, TX | 8/9/82 | - | - | .38-caliber revolver, .25-caliber semiautomatic pistol, carbine rifle | No |

JA-842

Exhibit C
**List of Firearms  sed in Public Mass Shootings**
**1982 – October 2022**

| Case | Location | Date | Citizens Crime Commission [a] | Weapon Description From | | Washington Post [c] | Assault Weapon? [d] |
|------|----------|------|-------------------------------|-------------------------|---|---------------------|---------------------|
| | | | | Mother  ones [b] | | | |
| (1) | (2) | (3) | (4) | (5) | | (6) | (7) |
| 179.  Russian Jack Springs Park | Anchorage, AK | 5/3/82 | - | - | | .38-caliber pistol | No |

**Notes and Sources:**

Public Mass Shootings from Mother Jones ("US Mass Shootings, 1982-2022: Data from Mother Jones' Investigation," updated November 23, 2022), the Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," February 2018 update, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017), Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting.", updated May 14, 2022). Identified Assault Weapons are in bold.

a   Description of weapons from "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017.

b   Description of weapons from Mother Jones ("US Mass Shootings, 1982-2022: Data from Mother Jones' Investigation," updated November 23, 2022).

c   Description of weapons from Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting.", updated May 12, 2021).

d   California Penal Code sections 30510 and 30515 and California Code of Regulations, title 11, section 5499.

ca   "House Investigative Committee on the Robb Elementary Shooting Texas House of Representatives Interim Report 2022," July 17, 2022; "DDM4 V7", *Daniel Defense*  https://danieldefense.com/ddm4-v7.html, accessed January 4, 2023.

cb   "Sheriff: Oxford High School shooter used 9 mm pistol recently purchased by father," *Click  nDetroit*, December 1, 2021; "SlP2022 Nitron Carry," *Sig Sauer*, https://www.sigsauer.com/sp2022-nitron-carry-size.html, accessed January 4, 2023.

cc   "The San Jose gunman appeared to specifically target his victims, sheriff says", *CNN*  May 28, 2021.

cd   "HM DEFENSE HM15F-MB-S56 DEFENDER M5 223 REM,5.56X45MM NATO 16" 30  1 BLACK HARD COAT ANODIZED BLACK MIL-SPEC HM STOCK," *Carter's Country*, https://www.carterscountry.com/product/hm-defense-defender-m5-223-rem5.56-nato-16-301-black-hard-coat-anodized-mil-spec-hm-stock, accessed January 5, 2023.

ce   "Instruction Manual for Ruger AR-556 Pistol," https://ruger-docs.s3.amazonaws.com/  manuals/AR-556  Pistol-K94Vg4d.pdf.

e   "From Midland to Odessa, shooter cut a 64-minute path of terror,"   ouston Chronicle, September 8, 2019.

cf   "The Pistol That Looks Like A Rifle: The Dayton Shooter's Gun," *npr* , August 8, 2019.

f   "11 Killed in Synagogue Massacre: Suspect Charged With 29 Counts," *New York Times*, October 27, 2018.

g   "Bakersfield mass shooting 'very calculated,' came after ugly divorce, officials say," *Los Angeles Times* , September 14, 2018; "Model S&W500," Smith & Wesson, https://www.smith-wesson.com/firearms/model-sw500-0, accessed September 25, 2018.

h   "Authorities seized Waffle House shooting suspect's AR-15 after arrest, dad gave them back," *The Mercury News* , April 23, 2018; "Family of murder victim sues Waffle House suspect and his father for $100 million," CBSWTTV, July 11, 2018; "Family of Waffle House victim in Nashville sues accused shooter's father," Reuters, May 15, 2018.

**Exhibit C**

**List of Firearms used in Public Mass Shootings**

**1982 – October 2022**

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|---|---|---|---|---|---|---|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

[i] "Florida shooting suspect bought gun legally, authorities say," *USA Today*, February 15, 2018; "Florida school shooter's AR-15 may have jammed, saving lives, report says," *Miami Herald*, February 27, 2018.

[j] "Suspect in quadruple killing at car wash dies," *CNN*, January 30, 2018.

[k] "California mass shooter made his own rifles," *NBC News*, November 16, 2017; "California shooter built his own illegal guns, officials say," *USA Today*, November 15, 2017.

[l] "What we know about the rifle used in the Texas church massacre," *CNN*, November 6, 2017; "The Latest: 2 men who pursued gunman attend shooting vigil," *The Associated Press*, November 6, 2017; "Ruger AR-556," Ruger, https://ruger.com/products/ar556/specSheets/8500.html, accessed October 22, 2018.

[m] "List: Guns and evidence from Las Vegas shooter Stephen Paddock," *KTNV*, January 19, 2018; "47 guns, loaded high-capacity magazines found in Vegas shooter's hotel suite and Nevada home," *ABC News*, October 4, 2017; "The 'tricked out' guns Las Vegas shooter used in massacre," *New York Post*, October 3, 2017.

[n] "Washington shooting victims ranged in age from 16 to 95, coroners say," *CNN*, September 27, 2016; Brown, Jason, "What You Should Know About .22 Rimfire," NRA, August 16, 2017; Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

[o] "Exclusive: Photo of the Saiga AK-74 Rifle Used at Dallas Shooting," *Law Officer*, July 10, 2016.

[p] "Sig MCX Owners Manual: Handling & Safety Instructions," Sig Sauer, https://www.sigsauer.com/wp-content/uploads/2016/07/MCX.pdf, accessed October 23, 2018; Sig Sauer website, https://www.sigsauer.com/products/firearms/rifles/ state compliant 1103, accessed October 24, 2018.

[q] "San Bernardino Guns Originally Bought Legally, Later Modified," *The Wall Street Journal*, December 4, 2015.

[r] "Umpqua Community College 2015 shooting report: What we've learned," *The Oregonian*, September 8, 2017.

[s] "Chattanooga Shooting Reignites Gun Control Debate After Mohammad Youssef Abdulazeez Used AK-47 Assault Weapon To Kill Marines," *International Business Times*, July 17, 2015; "Purple Hearts just approved for Marines and sailor targeted in Chattanooga attack," *The Washington Post*, December 17, 2015.

[t] "John Zawahri, suspected gunman in deadly Santa Monica shooting, left farewell note, police say," *CBS News*, June 14, 2013.

[u] "Names of victims emerge after deadly Federal Way shooting," *Federal Way Mirror*, April 24, 2013.

[v] "Upstate New York Shooting Update: Kurt Myers, suspected gunman, killed by police in shootout," *CBS News*, March 14, 2013.

[w] "Fate of Sandy Hook lawsuit against gun maker could be decided by a slingshot," *NBC News*, November 14, 2017; "Embargo firing a run on Russian-made guns: Added restrictions put arms in short supply," *San Antonio Express-News*, August 11, 2014.

[x] "Aurora Gunman's Arsenal: Shotgun, Semiautomatic Rifle and, at the End, a Pistol," *New York Times*, July 24, 2012; "M&P15 Centerfire Rifles Safety & Instruction Manual," *Smith & Wesson*, https://www.smith-wesson.com/sites/default/files/owners-manuals/M 26P15 CF Rifle Manual 10-20-15.pdf, accessed October 25, 2018.

[y] "IHOP gunman used illegally altered AK-47, sheriff says," *Las Vegas Review-Journal*, October 5, 2011.

Exhibit C

## List of Firearms ... sed in Public Mass Shootings
## 1982 – October 2022

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|---|---|---|---|---|---|---|
| | | | Citizens Crime Commission[a] | Mother[b] ones | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

z "The mass killer, the cop and the armed citizen,(THE AYOOB FILES)," *The American andgunner*, November 1, 2013.

aa "6 Killed In Grand Prairie Roller Rink Shooting," *CBS DFW*, July 23, 2011.

ab "Kentucky Tragedy: Man Kills Wife, Five Others, in Rampage Over Cold Eggs, Say Cops," *CBS News*, September 13, 2010.

ac "Hialeah: Only the Latest Mass Shooting by a Concealed Carry Killer," Huffington Post, July 30, 2013; "Hialeah gunman's rage over estranged wife leaves 5 dead," *Sun Sentinel*, June 7, 2010.

ad "Man convicted of killing 4 at Los Angeles restaurant," *Associated Press*, March 15, 2016.

ae "Instructions for Operation and Care of the Remington Model 11-48, Sportsman-48 Autoloading Shotguns," https://www.remington.com/sites/default/files/Model 2011-48.pdf, accessed October 24, 2018.

af "Images, suicide note released in mall massacre," *Nation World News*, December 7, 2007; "Romanian Kalashnikov Rifles," guns.net, accessed at http://www.gunsnet.net/Linx310/model.htm on July 28, 2005 via the Internet Archive WayBack Machine (accessed September 26, 2018).

ag "What happened in Crandon on Oct. 7," *Los Angeles Times*, June 8, 2008.

ah "Firearms Tutorial: Terminology," https://library.med.utah.edu/WebPath/TUTORIAL/GUNS/GUNTERM.html, accessed October 24, 2018.

ai "5 Dead After Louisiana Church Shooting," *New York Times*, May 21, 2006.

aj "Police: Seattle shooter said 'plenty for everyone'," *NBC News*, March 27, 2006.

ak "Both sides cite anger, hostility in killings; Hearings begin with law officers' testimony, grisly images," *Pioneer Press*, September 11, 2005.

al "Seven die in Chicago warehouse shooting," *CNN*, August 27, 2003.

am "Man Kills 5 Co-Works at Plant and Himself," *New York Times*, July 9, 2013; "Instruction Manuals & Product History," *Ruger*, https://ruger.com/service/productHistory.html, accessed October 23, 2018; Ruger Mini-14 manuals https://ruger-docs.s3.amazonaws.com/ manuals/mini14-180.pdf, https://ruger-docs.s3.amazonaws.com/ manuals/mini14-181-186.pdf, https://ruger-docs.s3.amazonaws.com/ manuals/mini14-580.pdf, accessed October 23, 2018; "What You Should Know About .22 Rimfire," *NRA*, August 16, 2017; Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

an "Sacramento shooter unscathed before killing self, autopsy shows," *Associated Press*, September 14, 2001.

ao "Workplace Deaths Leave No One Untouched," *Chicago Tribune*, February 7, 2001; "Update 1-Source of guns used in US factory shootings sought," *Associated Press*, February 6, 2011; "SKS Rifle: Simonov Type 56," Department of the Army, October 1969, http://pdf.textfiles.com/manuals/FIREARMS/sks 56.pdf, accessed October 24, 2018; "Why .30-30 Winchester Will Never Die," *NRA*, February 2, 2016; "Firearms Tutorial: Terminology," https://library.med.utah.edu/WebPath/TUTORIAL/GUNS/GUNTERM.html, accessed October 24, 2018.

ap "Houston Rampage Leaves 4 Victims, Gunman Dead," *The Record*, January 10, 2001.

aq "Man Charged in Killings Evaded Strict Gun Laws," *New York Times*, December 28, 2000.

ar "How they were equipped that day," *Jefferson County Sheriff*, http://www.cnn.com/SPECIALS/2000/columbine.cd/Pages/EQUIPMENT TEXT.htm, accessed September 26, 2018.

JA-845

**Exhibit C**

## List of Firearms ...sed in Public Mass Shootings
### 1982 – October 2022

| Case | Location | Date | Citizens Crime Commission [a] | Weapon Description From | | Assault Weapon? [d] |
|---|---|---|---|---|---|---|
| | | | | Mother ones [b] | Washington Post [c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

[as] "What You Should Know About .22 Rimfire," *NRA*, August 16, 2017, Kipland Philip Kinkel v. Rob Persson, 13C13698;A155449 (2018); Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

[at] "Powerful, semiautomatic rifles in Jonesboro killers' arsenal." *Associated Press*, April 3, 1998; "Post WWII Commercially Manufactured M1 Carbines," *Universal Firearms*, http://www.m1carbinesinc.com/carbine universal.html, accessed September 26, 2018; "77-Series Ruger 77/44," Ruger, https://ruger.com/products/77series7744/models.html, accessed October 24, 2018; "Model 742," Remington, https://www.remington.com/sites/default/files/Model742.pdf, accessed October 24, 2018.

[au] "Unfinished business," *Dateline NBC*, December 21, 2006.

[av] "Explosive hoarded by killed of 4," *Chicago Tribune*, August 21, 1997

[aw] "High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States," *Violence Policy Center*, accessed September 9, 2018.

[ax] "An Airman's Revenge; 5 Minutes of Terror," *The New York Times*, June 22, 1994.

[ay] "Soldier from Pasco held in N.C. killings," *The St. Petersburg Times*, August 8, 1993; "What You Should Know About .22 Rimfire," *NRA*, August 16, 2017.

[az] "San Francisco massacre prompts families' suits," *The Las Vegas Review-Journal*, May 19, 1994; "Death Over the Counter," *The Washington Post*, July 27, 1993; "TEC-DC9 Manual," Intratec Firearms, http://pdf.textfiles.com/manuals/FIREARMS/intratec tec dc9.pdf, accessed October 22, 2018.

[ba] "Morro Bay changed forever by killings," *The Fresno Bee*, November 10, 1992

[bb] "Gunman may have blamed teacher who flunked him," *ouston Chronicle*, May 3, 1992; "What You Should Know About .22 Rimfire," *NRA*, August 16, 2017.

[bc] "3 Killed, 8 Injured in Shooting Rampage at Post Office Crime," *Los Angeles Times*, November 15, 1991; "A 'Primer' About Rimfire Vs. Centerfire Ammunition," *NRA*, November 21, 2017; Ruger Homepage, https://ruger.com/, accessed October 24, 2018.

[br] "Four Killed in Post Office, Home; Ex-Postal Employee In Custody," *AP News*, October 10, 1991.

[bd] "Post WWII Commercially Manufactured M1 Carbines," *Universal Firearms*, http://www.m1carbinesinc.com/carbine universal.html, accessed September 26, 2018.

[be] "Firearms Tutorial: Terminology," https://library.med.utah.edu/WebPath/TUTORIAL/GUNS/GUNTERM.html, accessed October 24, 2018.

[bf] "Sales of Exotic Weapons Are Mostly Cash And Carry," *rlando Sentinel*, May 18, 1987; "Instruction Manuals & Product History," *Ruger*, https://ruger.com/service/productHistory.html, accessed October 23, 2018; and Ruger Mini-14 manuals,

[bg] https://ruger-docs.s3.amazonaws.com/ manuals/mini14-180.pdf; https://ruger-docs.s3.amazonaws.com/ manuals/mini14-181-186.pdf; https://ruger-docs.s3.amazonaws.com/ manuals/mini14-580.pdf, accessed October 23, 2018; "Authorities Piece Together Tragedy Gunman at Edmond Post Office 'Knew Where to Shoot People'," *The klahoman*, August 22, 1986.

[bh] "6 Die in Dallas Club as Enraged Man Fires Wildly," *New York Times*, June 30, 1984.

[bi] "Multiple charges filed in murder, kidnapping spree," *UPI Archives*, October 12, 1983.

JA-846

Exhibit C

**List of Firearms Used in Public Mass Shootings**

**1982 – October 2022**

| Case | Location | Date | Weapon Description From | | | Assault Weapon?[d] |
|------|----------|------|-------------------------|---|---|---------------------|
| | | | Citizens Crime Commission[a] | Mother Jones[b] | Washington Post[c] | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

b) "Gunman kills four and wounds a fifth at west side hotel," *The New York Times*, February 4, 1983.