# 23-1162

## United States Court of Appeals for the Second Circuit

National Association for Gun Rights, Toni Theresa Spera Flanigan,
*Plaintiffs-Appellants*,
Patricia Brought,
*Plaintiff*,
v.
Ned Lamont, in his official capacity as the Governor of the State of Connecticut,
Patrick J. Griffin, in his official capacity as the Chief States Attorney of the State
of Connecticut, Sharmese L. Walcott, in her official capacity as the States's
Attorney, Hartford Judicial District,
*Defendants-Appellees*,
David R. Shannon, in his official capacity as the State's Attorney, Lichfield
Judicial District,
*Defendant*.

**On Appeal from the United States District Court
for the District of Connecticut (New Haven), No. 22-cv-1118**

———————————

**JOINT APPENDIX VOL. IV OF V (JA-848—JA-1029)**

———————————

JAMES MICHAEL BELFORTI
JANELLE MEDEIROS
CONNECTICUT OFFICE OF THE
ATTORNEY GENERAL
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5436
james.belforti@ct.gov
janelle.medeiros@ct.gov

*Counsel for Defendants-Appellees*

BARRY K. ARRINGTON
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com

*Counsel for Plaintiffs-Appellants*

## CASE NO. 23-1162
## INDEX TO DOCUMENT REFERENCES IN APPENDIX

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **VOLUME I** | | |
| **Docket U.S. District Court for the District of Connecticut (New Haven) Case #: 3:22-cv-01118-JAM**............................................ | NA | JA-1 |
| **Complaint for Declaratory Judgment and Injunctive Relief** (09/06/2022) ..................................................... | 1 | JA-13 |
| **First Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right** (09/13/2022) ..................................................... | 9 | JA-27 |
| **Unopposed Motion for Leave to Amend Complaint** (110/21/2022) .................................................... | 24 | JA-40 |
| **Attachment – Second Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right**..................................................... | 24-2 | JA-43 |
| **Second Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right** (10/25/2022) ..................................................... | 26 | JA-57 |
| **Plaintiff's Motion for Preliminary Injunction** (11/03/2022)................................................... | 28 | JA-71 |
| **Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction (11/03/2022)** . | 28-1 | JA-74 |
| **Declaration of Dudley Brown**................................ | 28-2 | JA-102 |

i

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| Declaration of Toni Theresa Spera Flanigan ....... | 28-3 | JA-104 |
| Declaration of James Curcuruto ........................... | 28-4 | JA-106 |
| Defendants' Motion to Dismiss (11/18/2022) ................................................................. | 32 | JA-108 |
| Memorandum of Law in Support of Defendants' Motion to Dismiss ............................. | 32-1 | JA-110 |
| Response in Opposition to Defendants' Motion to Dismiss (12/09/2022) ................................................................. | 33 | JA-126 |
| Attachment – Declaration of Ryan J. Flugaur | 33-1 | JA-137 |
| Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss (12/23/2022) ................................................................. | 34 | JA-139 |
| Motion to Strike Defendants' Reply in Support of Their Motion to Dismiss (12/24/2022) ................................................................. | 35 | JA-150 |
| Defendants' Memorandum in Support of Their Opposition to Plaintiffs' Motion for Preliminary Injunction (01/31/2023) ................................................................. | 37 | JA-153 |
| Exhibit A – Declaration of Detective Brindiana Warenda ................................................................. | 37-1 | JA-195 |
| Exhibit B – Declaration of Professor John J. Donohue ................................................................. | 37-2 | JA-203 |

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **VOLUME II** | | |
| **Exhibit C – Declaration of Professor Louis Klarevas**................................................ | **37-3** | **JA-270** |
| **Exhibit A – Expert Report of Louis Klarevas** ................................................ | | **JA-272** |
| **VOLUME III** | | |
| **Exhibit C – Declaration of Professor Louis Klarevas –Continued–** ............................................ | | |
| **Exhibit A – Expert Report of Louis Klarevas –Continued–**....................................... | | **JA-560** |
| **Exhibit D – Declaration of Lucy P. Allen** ............. | **37-4** | **JA-787** |
| **VOLUME IV** | | |
| **Exhibit E – Declaration of Dr. Dennis E. Baron** .. | **37-5** | **JA-848** |
| **Exhibit F – Declaration of Professor Randolph Roth** ........................................................ | **37-6** | **JA-884** |
| **Exhibit G – Declaration of Professor Saul Cornell**....................................................... | **37-7** | **JA-935** |
| **Exhibit H – United Nations Office on Drugs and Crime Diagrams**........................................ | **37-8** | **JA-965** |
| **Reply in Support of Plaintiffs' Motion for Preliminary Injunction (03/02/2023)** ..................................................... | **64** | **JA-968** |

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Exhibit 1 – Detailed Analysis of Ten Laws Cited by State**.................... | **64-1** | **JA-1019** |
| **Declaration of Mark Passamaneck**........................ | **64-2** | **JA-1026** |

### VOLUME V

| | | |
|---|---|---|
| **Third Amended Complaint for Declaratory Judgment and Injunctive Relief (03/07/2023)** ................................................. | **69** | **JA-1030** |
| **Answer and Affirmative Defenses (03/31/2023)** ................................................. | **73** | **JA-1045** |
| **Amicus Brief of Everytown for Gun Safety Support Fund in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction (04/17/2023)** ................................................. | **78** | **JA-1052** |
| **Transcript Hearing regarding Motion for Preliminary Injunction held June 5, 2023 (06/12/2023)** ................................................. | **83** | **JA-1072** |
| **Notice of Appeal (08/16/2023)** ................................................. | **86** | **JA-1150** |

# EXHIBIT E

## Declaration of Dr. Dennis E. Baron

I, Dennis Baron, the undersigned, declare as follows:

1.     I have been retained by the State of Connecticut, Office of the Attorney General to provide expert opinion and testimony regarding Corpus Linguistics research.  I am being compensated at a rate of $350 per hour.

2.     I have evaluated the historical use of the terms *arms* and *accoutrements* in order to determine whether large-capacity magazines (henceforth, LCMs), along with magazines, ammunition cases, cartridge cases or boxes, and other ammunition storage containers were considered arms in the time during and just after the Founding Era (1750–1820) through the Reconstruction Era, i.e., the period following the ratification of the Fourteenth Amendment (1868–1890).

3.     I have also evaluated the lexical evidence for "repeater air guns," which are sometimes referred to as "wind guns," and the rare terms "magazine wind-gun" and a "magazine gun" in the Founding Era.  "Air guns" used compressed air instead of gunpowder to propel a ball. Repeater air guns were capable of firing multiple shots before requiring the user to reload the weapon.

4.     The lexical evidence leads me to conclude that (1) LCMs, magazines, ammunition cases, cartridge cases, boxes and other ammunition storage containers were considered accoutrements and not arms during the Founding and Ratification Eras, and (2) although a few artisans did invent air guns capable of firing multiple balls without reloading the ammunition or recharging the air cylinder, such guns were rare in England and America.

1

**BACKGROUND AND QUALIFICATIONS**

5.     I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975.  I served as Head of the Department of English for six years and before that as Director of Rhetoric at the University for 11 years.  I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, in addition to topics related to language and law.  I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English.  I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship for work on a book on language and law, and, most recently, a Guggenheim Fellowship for work on my latest book on language and law.  I have also published books on language reform, on usage, and on gender in language.

6.     Most relevant for this report, I published two books on language and law: *The English-Only Question: An Official Language for Americans?* (Yale Univ. Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free Speech* (Cambridge Univ. Press, 2023). In addition, I served as lead author on what came to be called "the Linguists' Brief" in *District of Columbia v. Heller*, 554 U.S. 570 (2008), a brief cited both by Justice Scalia in the majority opinion, and by Justice Stevens in his dissent.  I was a co-author on another brief by professors of linguistics and corpus linguistics, cited in *New York State Rifle and Pistol Ass'n. v. Bruen* (No. 20-843, 2022), which Justice Breyer cited in his dissent.  In that dissent, Justice Breyer also quoted

2

**JA-850**

directly from my essay "Corpus Evidence Illuminates the Meaning of 'Bear Arms'" (*Hastings Constitutional Law Quarterly*, 46.3: 2019). I have spoken about historical meaning and the Second Amendment at the Federalist Society at the University of Chicago Law School, at the Neubauer Symposium on Historical Semantics at the University of Chicago, at Brigham Young University Law School, at Stanford University, and at the conference "*Heller* after Ten Years" at Hastings College of Law. I have also written opinion essays on historical meaning and the Second Amendment for the *Washington Post* and the *Los Angeles Times*. And I have submitted a declaration on behalf of the State of Rhode Island in *Ocean State Tactical, LLC, et al. v. State of Rhode Island* (Case No. 1:22-cv-00246-JJM-PAS) (D. R.I.), and declarations on behalf of the State of California in *Rupp, et al. v. Bonta* (Case No. 8:17-cv-00746-JLS-JDE), *Duncan, et al. v. Bonta* (Case No. 3:17-cv-01017-BEN-JLB), and *Fouts, et al.v. Bonta* (Case No. 3:19-cv-01662-BEN-JLB). In the past twenty years I have been an expert consultant in fourteen cases involving document interpretation.

7.    My recent essay, "Look It Up in Your *Funk and Wagnalls*: How Courts Define the Words of the Law," an analysis of how judges incorporate information from dictionaries and digitized corpora as they ascertain legal meaning, appears in the latest issue of *Dictionaries*, the academic journal of the Dictionary Society of North America.

8.    This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of one or more large, digitized corpora consisting of many millions of words.

3

**JA-851**

## OPINIONS

### Summary of Conclusions

9.      Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, "arms" is used as a general term for weapons (typically swords, knives, rifles, and pistols), but arms does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category "accoutrements." Nor does arms refer to parts of weapons, for example the trigger of a gun, the hilt of a sword, or the cartridge box or magazine that holds the bullets.

10.      Instead, when this additional equipment is mentioned, we find phrases like "arms and ammunition"; "arms and accoutrements"; or "arms, ammunition, and accoutrements." For example, "arms and accoutrements" is frequently used in military contexts to distinguish weaponry and related equipment from the rest of a soldier's or militia member's equipment. For example, militia requirements often specify that soldiers have certain arms (pistols, swords, rifles, according to their rank) as well as certain "accoutrements" (the word is typically plural) (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on). When the term "accoutrements" occurs alone, as in "the accoutrements of a soldier," it may include both arms and accessories. "Cartridge boxes" and "cartouch boxes" are the terms used for ammunition containers in the eighteenth and nineteenth centuries and are analogous to today's "magazines." When "arms and accoutrements" occurs as a phrase, there is a clear distinction made between weapons themselves and the soldier's cartridge boxes or cartouch boxes, which are typically identified as accessories along with scabbards, saddles, holsters, belts, caps, pouches, and the rest of a soldier's equipment.

4

11.     I have found no lexical evidence that repeater air guns were used as military weapons in England or America in the Founding Era, or that they were used as weapons of personal self-defense at that time.

**Theory and Methodology**

12.     Corpus linguistics as a field developed in the late 1960s, when scholars began using computer programs to analyze large bodies of digitized text.  Initial work in corpus linguistics did not typically involve legal issues.  Literary scholars developed computerized concordances to the works of Shakespeare, Milton, and other major English writers.  Scholars plotted the frequency of words and phrases in order to develop a picture of an author's style, and to determine authorship of a particular work when the provenance was in doubt.  Soon, in addition to solving literary mysteries, the methodologies used by corpus linguists were successfully applied in a number of criminal cases in the United States and in England involving, for example, the authorship of a ransom note or an email.  Lexicographers, who began compiling large analog databases of text in the late nineteenth century, began to digitize their libraries of paper data and to add to that material, assembling computerized databases of historical and contemporary text and, more recently, of spoken language as well, in order to arrive at more precise definitions of the multiple senses of words and phrases.

13.     The Oxford English Dictionary (OED) is the standard dictionary of the English language compiled on historical principles. As a graduate student at the University of Michigan in 1970, I coded analog texts from the relevant OED files to help build the computerized database for the Dictionary of Early Modern English, the period from 1500–1800 that is particularly relevant to the language of the Founding Era.  Today, major dictionaries like the OED and the Merriam-

5

**JA-853**

Webster suite of dictionaries rely on public databases of oral and written language, as well as their own proprietary databases, in order to revise older definitions and to track the spread of new words and meanings. The major dictionary makers of Europe use similar databases in their own work.

14. Over the past twenty years, legal corpus linguistics (LCL) has developed as a subset of corpus linguistics. LCL involves the analysis of digitized corpora of current and historical English to establish meaning—often referred to as "original public meaning" —in statutes and the Constitution. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt. In *Muscarello v. United States*, 524 U.S. 125 (1998), a case which held that "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or truck, can be deemed to be within the scope of the statutory phrase 'carries a firearm,'" Justice Breyer searched two computerized newspaper databases (Lexis/Nexis, for the *New York Times*, and Westlaw, for "US News") to clarify the meaning of the words "carry, vehicle," and "weapon." In 2012, Judge Richard Posner, of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute. Not satisfied with the dictionary definition that the government relied on in the case before him, Judge Posner ran a Google search to confirm that the word "harbor" in the Immigration Act of 1917 does not mean "shelter," as the government claimed, but rather "hide, conceal from view," as he felt it must mean in the context of the statute. *United States v. Costello*, 666 F.3d 1040 (7th Cir. 2012).

15. More principled, scientific database searches soon followed, and in 2018 Judge Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, summarized the latest research in corpus linguistics and

LCL as a way to determine ordinary meaning, and more specifically, original public meaning with more clarity (Thomas Lee and Stephen Mouritsen, "Judging Ordinary Meaning," *Yale Law Journal* 127(2018): 788–879). Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the Oxford English Dictionary, as well, allowing a more precise interpretation of historical text data.

16.    In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on legal corpus linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, corpus linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth Circuits, as well as a comment by Justice Alito in his concurrence in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation.

17.    Several large databases have come online in the past few years that facilitate LCL research. Brigham Young University's Center for Law and Corpus Linguistics hosts the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words and covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), with data from 1475–1800, contains over 40,000 texts and 1.1 billion words. For the nineteenth century, the Corpus of Historical American English (COHA), initially developed at BYU but now independent of that institution, currently contains 475 million words of text from

1820–2020.  The size of these databases continues to grow as more works are digitized, coded, and added to the corpora.  In compiling this report, I reviewed each of these databases.  Some of the corpora provided data for some lexical searches, but not for others.  The examples cited in this declaration specify which corpus they are drawn from.

18.  Critics of LCL have complained that databases like COFEA and COEME contain only texts written by "elites," whose language may differ from that of "ordinary people" who do not write at all, or who for various reasons do not write texts likely to be included in the available corpora.  It is certainly the case that many printed books and periodicals, along with documents like the Constitution, its amendments, and state and federal statutes, tend to be written by educated specialists and professional writers.  Although "ordinary people" are expected to understand the language of the Constitution, the Declaration of Independence, and other founding documents, as well as the laws that govern the nation, such texts typically require specialized knowledge.  A reading-difficulty formula like the commonly used Flesch-Kincaid scale suggests that the Declaration of Independence and the Constitution require a fifteenth-grade reading level, while according to one comprehensive study, *Adult Literacy in America* (US Department of Education, 1993), the average American today tends to have a seventh-grade reading level.

19.  In order to counter any "elite" bias that may be found in databases like COFEA, COEME, and COHA, I rely as well on five digitized newspaper databases covering the period 1750–1900, focusing for this report on the Founding Era and on the period of Reconstruction after the passage of the Fourteenth Amendment.  Newspapers of the eighteenth and nineteenth centuries were the principal means of communicating news and information.  As such, they embodied much of the language of the "ordinary people" who read them.  These early newspapers also provide

8

**JA-856**

researchers with more data for the nineteenth century than a corpus like COHA, which covers the same period but tends to focus on literary and specialized texts rather than material for the general reader. Because of changes in print technology and the spread of literacy, Founding Era newspapers differed from the newspapers of the post-Civil War era. Print technology remained relatively static between the 1450s, when printing presses first appeared in Europe, and the early nineteenth century, when the Industrial Revolution drastically changed printing methods. The first printing press was adapted by Gutenberg from the design of the traditional wine press, and for centuries, printing was a slow and labor-intensive process. As a result, newspapers in the founding era were small, averaging four to eight pages. Publication was less frequent as well. Papers tended to appear weekly or semi-weekly, rather than daily. Even so, newspapers in the Founding Era and later, during Reconstruction, provided average Americans with their principal access to all the critical events and documents of their time, along with coverage of local and international news. Although newspaper subscribers tended to be "elites," newspaper content was widely shared by word of mouth: ultimately, most Americans in the Founding Era, including those who would be classified as illiterate or poorly educated by today's standards, got their news from newspapers.

20.    Since the 1960s, database compilers have been able to track contemporary spoken English more successfully, though none of the databases for the Founding Era and for the post-Civil War period cover the spoken language of Americans. Although scholars can reconstruct some of that oral language, we are always doing so through the lens of print versions purporting to represent or comment on ordinary speech.

21.    The newspaper databases that I have examined are Readex Historical American Newspapers; Chronicling America (newspapers digitized by the Library of Congress); the British

9

Newspaper Archive (a service of the British Library); and two private subscription services, newspapers.com and newspaperarchive.com. For this report, both Readex and newspapers.com provide the most-complete picture of the language of the Founding Era newspapers as well as the ordinary language of the later nineteenth century.

22. All the databases contain some duplicates. COFEA and COEME digitize multiple editions of the same work; and the newspaper databases not only duplicate some, though not all, of one another's content, but they also contain a number of duplicate stories because, particularly in the period of newspaper growth during the nineteenth century—in an age before the wire services and syndication appeared, and before the larger papers began to set up news bureaus in key areas around the country and around the world—newspapers routinely printed each other's stories, sometimes acknowledging their source and sometimes not. Still, the databases often offer more insight into the meaning of words and phrases than simply going to a dictionary. Jurists from Learned Hand and Felix Frankfurter to Frank Easterbrook and Richard Posner have warned their colleagues not to make a fortress of the dictionary. The corpora are by necessity incomplete. LCL does not replace dictionaries, but it does provide an important supplement to them.

**The meaning of arms and accoutrements in the databases**

23. I was asked to look at the meaning of "arms" and "accoutrements" as used individually, along with the phrase "arms and accoutrements" in the Founding Era and during the period immediately following the adoption of the Fourteenth Amendment. I focused on whether the term "magazine" as used today falls within the meaning of the term "arms" when used on a standalone basis during those eras. I was also asked to look at lexical evidence in the Founding

10

Era for the names of inventors associated with the "air rifle," or "air gun," and to assess any lexical evidence about the availability and popularity of the repeater air gun.

24.     Before undertaking that analysis, I explain briefly why a search for the term "magazine" did not make sense.  In the eighteenth and nineteenth centuries, "magazine" was a word that meant "storehouse, depot."  A magazine was a place, often a building or warehouse, to store goods and supplies.  When used in a military sense, a magazine was a building designated for storing gunpowder, and as such, it was subject to strict regulation.  Because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits.  The word "magazine" was not typically used to refer to the compartment of a gun containing bullets until late in the nineteenth century.  Although the term "magazine" appears in the phrase "magazine wind gun" in 1744, that usage is marked as "rare" by the Oxford English Dictionary, which also marks the phrase "magazine wind gun" as "obsolete."  In its separate, main entry for "magazine," the OED gives the earliest use of "magazine" meaning "a bullet storage container" as 1888, and the term remained relatively rare until the 1920s.  Before that time, bullets were kept in "cartridge boxes," sometimes called "cartouch boxes," or "cartridge cases" or pouches, and these bullet storage containers were part of the general category of military accoutrements, not arms.

25.     The data suggests that "cartridge boxes," and therefore today's LCMs, would have been viewed as accoutrements, the ancillary equipment associated with soldiering, or service in the military.

11

26.     The OED defines "accoutrements" as, "items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments." [OED online, s.v. "accoutrement"; the word typically appears as a plural.]

27.     Thus, the military sense of "accoutrements" generally refers to other accessories worn or carried by soldiers.  The OED illustrates this second, military, sense, with an example from the Duke of Wellington's dispatches in 1813: "In order to collect the wounded and their arms and accoutrements."  Here Wellington, widely recognized as a consummate soldier, and who would soon defeat Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between "arms" and "accoutrements."

28.     The OED definitions are instructive.  But in order to determine more specifically whether the term "accoutrements" included "cartridge boxes," the predecessor to modern magazines, I consulted two digitized historical databases: COFEA and COEME.  A COFEA search returns these examples where "cartridge boxes" and "cartouch boxes" are specifically included in the category of accoutrements, not arms:

a) 1774 – "The cartouch boxes and other military accoutrements belonging to the noncommissioned officers and privates.…" (Journals of the Continental Congress).

b) 1774 – "The cartouch boxes and every other species of military accoutrements annexed to the persons of the officers and soldiers of General Burgoyne's army." (Journal of the Continental Congress).

c) 1776 – "The General is surprised to find the Militia applying for Cartouch Boxes and other Accoutrements." (George Washington, General Orders, February 17).

d) 1777  "Many of their Arms are indifferent, and almost the whole [of Washington's troops] are destitute of pouches and Other necessary Accoutrements." (George Washington, Letter to John Hancock, October 10–11; the pouches in question are ammunition holders).

12

   e)  1777 – "The officers and men were to … deliver up their arms, the cartouch boxes
       and other military accoutrements…." (William Duer, Congressional Resolution: A
       State of Facts, December).

   f)  1778 – "[T]he board, on the 17th of April, impowered a Capt. Starr of Middleton in
       Connecticut to receive a quantity of public leather of Colo. Trumbull, and get it
       made up into shoes and accoutrements, half of each, the cartridge boxes upon the
       new model; and to send on both to the main army…." (Timothy Pickering, Letter
       to George Washington, June 9, 1778. At the time, cartridge boxes were made of
       wood or leather, or a combination of the two).

   g)  1783 – "And as to cartridge boxes and other leathern accoutrements, saddles &
       other furniture for dragoons…. " (Timothy Pickering, Letter to George
       Washington, April 22).

29.    And COEME adds this example, where "cartridge box" appears in a list that
includes "accoutrements" but not "arms":

   a)  1788 - "If you could only tell us how to keep papa at home, my drum, spontoon,
       cartouch box, and accoutrements, should all be yours." (*The Children's Friend,
       Translated from the French*).

30.    My review of the corpora also confirmed that "accoutrements" are regularly
referred to separately from "arms." A COFEA database search for the occurrence "accoutrements"
within 6 words of "arms" returned 873 hits (including a small number of duplicates). A similar
search of COEME returned 126 hits, the earliest from 1656. I determined that the two search
terms, "arms" and "accoutrements," often appear together as a single phrase, "arms and
accoutrements," typically in military contexts having to do with an army or militia unit.
"Accoutrements" often occurs in a list alongside, but separate from, ammunition: "arms,
accoutrements, (and) ammunition," though when ammunition is not listed separately, the term
"accoutrements" will generally include ammunition.[1]

---

[1] The second OED citation for "accoutrements," dated 1902, differentiates "ammunition" and
"accoutrements": "When they landed they brought on shore besides a quantity of ammunition

13

31.    "Arms" as a stand-alone term refers to weapons. "Arms" almost never includes ammunition or ammunition storage containers such as cartridge boxes.  These are the three examples that a COHA search returns:

   a) 1821 – "It is necessary to obtain ammunition, arms and accoutrements, and as many horses as you can get" (William Dobein James, "A Sketch of the life of Brig. Gen. Francis Marion and a history of his brigade").

   b) 1909 –  "Lyon was ordered to deliver to Governor Yates 10,000 stand of arms with accoutrements and ammunition." (Robert J. Rombauer, "The Union Cause in St. Louis in 1861).

   c) 1949 – "It will be necessary that arms, ammunition, accoutrements, tents and camp equipage be deposited there for them the troops." (Francis F. Beirne, "War of 1812").

32.    The "cartridge box" or "cartouch box"—the precursor to today's "magazine"—is typically mentioned in lists of accoutrements, often in connection with other items worn with a soldier's uniform.  The "cartridge box" almost never appears to be included among a soldier's weapons. The OED defines "cartridge box" as "a box for storing or carrying cartridges; the case in which a soldier carries his supply of cartridges" (OED online; this definition covers "cartouch box" as well), offering this example from Smyth and Belcher, *Sailor's Word-book* (1867) which illustrates its function: "*Cartridge-box*, a cylindrical wooden box..just containing one cartridge, and used for its safe conveyance from the magazine to the gun. The term is loosely applied to the ammunition-pouch."

33.    A search of Readex America's Historical Newspapers for "cartridge box," and the synonymous "cartouch-box," for the Founding Era years 1750–1790 returns 176 citations. including multiple duplicates. A Readex search for the period after the adoption of the Fourteenth

---

and accoutrements..and large stores of flour, sugar and tobacco, &c." (G. S. Whitmore *Last Maori War* i. 4).

Amendment, from 1868–1890, returns 1,306 citations, also with many duplicates. The following examples show instances where "cartouch boxes" or "cartridge boxes," are treated as categories separate from arms. Note that in example (d) the list separates small arms from cutlasses as well. And example (j) clearly shows that cartridge boxes are accoutrements, not arms:

a) 1756 – "Every such Male Person . . . provide himself with one well fixed Musket, or Fuzee, with a Worm and Priming Wire, one Cartouch Box, with nine charges of Gun Powder, and Ball suitable therein, and three good Flints … and shall keep such Arms and Ammunition by him, in good Order." *Pennsylvania Gazette,* May 13, 1756.

b) 1774 – "That each man be provided with a good firelock and bayonet fitted thereon, half a pound of powder, two pounds of lead, and a cartouch box, or powder-horn and bag for ball, and be in readiness to act on any emergency." Proceedings of the Continental Congress, *Pennsylvania Journal,* December 21, 1774.

c) 1775 – "That each Inhabitant, or Person, as aforesaid, who shall provide Arms for himself, well fixed with a good Bayonet and Cartouch-Box, shall be paid a minimum of 10s." *The Massachusetts Gazette,* May 19, 1775.

d) 1775 – "We hear from Charlestown, South-Carolina, that on the 21st of March, at Night, about eight Hundred Stand of Small Arms, 2 Hundred Cutlasses, and all the Cartouch-Boxes, fit for Service, with several Bundles of Match & some Flints, were taken out of the public Armoury." *New Hampshire Gazette,* June 2, 1775.

e) 1775 – "Deserted from Colonel Woodridge's regiment . . . Martin Nash . . . carried away a long gun of Gen. Pomeroy's make, a cartridge box and good stock of ammunition belonging to the province." *New England Chronicle,* November 9, 1775.

f) 1778 – "numbers of the cartouch-boxes and several other articles of military accoutrements annexed to the persons of the non-commissioned officers and soldiers in General Burgoyne's army, have not been delivered up." *Massachusetts Spy,* February 19, 1778.

g) 1778 – "List of Necessaries and Accoutrements for each Horseman: 1. A well-tempered sword . . . 2. A carbine, fusee, or short blunderbuss . . . 3. A pair of pistols and holsters. 4. A sword-belt—a belt for the carbine . . . 5. A cartridge-box to buckle round the waist, with twelve tin pipes for the cartridges. 6. A helmet . . . 7. A saddle…." *New-Jersey Gazette* March 25, 1778.

15

h) 1785 – "A Neapolitan officer was killed in the same engagement by a cartouch box taking fire while charging the guns." *South-Carolina Weekly Gazette,* August 4, 1785.

i) 1787 – Abstract from the Militia Law. "That every non-commissioned officer and private soldier of the said militia . . . shall equip himself . . . with a good fire-arm, with a steel or iron ramrod, a spring to retain the same, a worm, priming wire and brush, a bayonet fitted to his fire-arm, and a scabbard and belt for the same, a cartridge box that will hold fifteen cartridges at least, six flints, one pound of powder, forty leaden balls suitable for his fire-arm, a haversack, blanket, and canteen." *Massachusetts Gazette,* February 2, 1787.

j) 1787 – "All persons liable to do Militia Duty . . . must provide themselves with proper arms and accoutrements, viz. a musket and bayonet, a cartouch box or pouch that will contain twenty-four cartridges." *State Gazette of South Carolina,* July 16, 1787.

k) 1868 – "Government Sale at Watertown Arsenal Mass. . . . Lot of cavalry accoutrements, consisting of Cartridge Boxes, Pistol Holsters, Sabre Belts, Knots, &c.: lot of Infantry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings." *Evening Star* (Washington, D.C.), January 9, 1868. [Perhaps the clearest and most direct citation specifying cartridge boxes as accoutrements.]

l) 1868 – Another government sale lists weapons (carbines, muskets, rifles, and pistols) followed by a list of items that are separate from weapons: "254 carbine cartridge boxes," carbine slings, cavalry sabre belts, bayonet scabbards, cap pouches, "1,619 cartridge boxes," "257 cartridge-box Belts," gun slings, waist belts, "and various other articles." *Daily Morning Chronicle* (Washington, D.C.), April 22, 1868.

m) 1869 – This account describes the new French "Mitrailleuse," a field weapon which would seem to be analogous to what we call a machine gun today, and the cartridge box would be the equivalent of what today we call a removable magazine. The Mitrailleuse is "a new 'ball syringe' in the shape of a small cannon. . . . It contains thirty-seven common infantry cartridges, arranged like cigars in a bundle. As soon as it is attached to the breech of the cannon, the Mitrailleuse is loaded. A man sitting on the carriage fires it by turning a crank. . . . The crank is turned once more and the cartridge box is removed from the cannon; a man to the right takes it, removes it from the 'cigar box'; the men to the left put a new one in." *Daily Albany Argus,* November 6, 1869.

n) 1870 – In this description of the French National Guard, the writer notes the importance of rapid-fire rifles for defense against the Prussian troops. Several paragraphs later, the cartridge box is listed along with a guard's uniform

16

requirements: "a uniform will be obligatory for all. Each one must be provided with a weather-proof knapsack. . . , a cartridge-box or pouch, and a half-woolen covering of the material of a tent." *New York Tribune,* November 5, 1870.

o) 1871 – Article about a memorial statue in which the cartridge box is identified as part of the soldier's uniform: "a soldier dressed in full uniform (overcoat, cartridge box, belt, etc.,) leaning on his musket." *Boston Journal,* November 12, 1870.

p) 1872 – This list of government ordnance and ordnance stores for sale groups weapons and accoutrements separately, with cartridge boxes clearly identified as accoutrements. The weapons for sale are muskets, rifled muskets, and revolvers, followed by this comment, "Nearly all the Starr's Revolvers and about two-thirds of the other arms are in fair order." After the arms list comes the list of accoutrements, consisting of cap pouches, waist belts, bayonet scabbards, "cartridge box and belt plates," musket and pistol appendages, "and an assortment of other accoutrements and appendages." *Daily Morning Chronicle* (Washington, D.C.), February 3, 1872.

q) 1876 – In this description of a dead body of a soldier found on a beach, the cartridge box is described as an article of the deceased's uniform: "The body was clothed in a blue overcoat and pants, and had on waist-belt, cross-belt and cartridge-box." *Wilmington Morning Star* (North Carolina), February 8, 1876.

r) 1879 – The cartridge box forms part of a new military uniform: "In the rest of the brigade the multiplicity of belts is done away with, and in place is substituted a simple body belt to which the bayonet scabbard and cartridge box is attached. Equipped in such a uniform . . . the brigade will present a solid and soldierly appearance." *New Haven Register,* July 28, 1879.

34. In sum, in the vast majority of examples, arms referred to weapons. Arms generally did not include ammunition or other weapon accessories, including the historical analogue to the magazines. Instead, "cartridge boxes" and "cartouch boxes" were considered "accoutrements," or uniform accessories, like the other military equipment (scabbards, belts, and so forth) that was separate from, and did not include, arms.

35. But English usage is never simple. As linguists often say, "all grammars leak"— which is to say, there are always a few counterexamples in the data. The existence of counterexamples does not invalidate the data or undercut an interpretation, it simply shows that

17

although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage occurs in all human language. Given the volume of samples, that is not surprising. Thus, for example, in COFEA, "accoutrements" does occasionally encompass arms, as in this example:

> A few years since, some boys, equipped in mock military accoutrements, such as paper-caps, paper-belts, wooden swords, &c. were beating up for recruits in Parliament-street, Boston. [*The American jest book*: Part I[-II], 1789; emphasis added; here military accoutrements includes toy swords.]

In addition, four of the Readex newspaper citations appear to sweep cartridge-boxes or cartouch-boxes into the broader category of arms. However it is not clear from the context in these examples whether cartridge boxes are arms or accoutrements:

a) 1753 – "[E]very listed Soldier and other Householder . . . be always provided with a well-fix'd Firelock . . . a Snapsach, Cartouch Box, one Pound of Powder, twenty Bullets fit for his Gun, twelve Flints, a good Sword or Cutlass, a Worm and Priming Wire, on penalty of six Shillings for want of such Arms as is hereby required, and two Shillings for each other Defect." *Boston Post-Boy,* April 30, 1753. Considering citation (c), below, dated 1756, it is likely that the fine for not having a cartouch box in this example would not be the higher fine for a weapons defect, but rather the lower fine of 2s. levied for "other defects."

b) 1755 – "whoever provides himself a good Firelock, Sword or Hatchet, Belt and Cartridge-Box, to receive 16s. more . . . . but the Arms to be returned when the Service is over." *Boston Gazette,* April 21m 1755. It is not clear from the context whether the cartridge boxes are part of the arms that must be returned. In other articles, cartridge boxes are treated as a soldier's personal items. They may bear a variety of decorations, and they are sometimes listed along with other uniform items in a description of a soldier's funeral.

c) 1756 – "That every Male Person . . . shall . . . provide himself with one well fixed Musket, or Fuzee, with a Worm and Priming Wire, one Cartouch Box with nine Charges of Gun Powder, and Ball suitable therein, and three good Flints . . . and shall keep such Arms and Ammunition by him, in good Order, and fit for Service, at all Times . . . under the Penalty of Twenty Shillings for Want of a well fixed Musket or Fuzee, with a Worm and Priming Wire, and Two Shillings for the Want of every Cartouch Box, and Two Shillings for the Want of nine Charges of Gun Power and Ball, and three Flints, or any of them." *Pennsylvania Gazette,*

18

May 13, 1756. The larger fine for lack of arms, along with lower fines for missing Cartouch Boxes and ammunition, suggest that cartouch boxes and cartridge boxes do not belong to the category "arms" but are instead a form of accessory.

d) 1785 – "His European weapons consisted of a musket, bayonet and cartouch-box; a fowling piece; two pair of pistols; and two or three swords or cutlasses." *History of Capt. Cook's Voyage, Massachusetts Centinel,* January 15, 1785. Here cartouch box appears among the list of weapons carried by an islander that Cook encountered.

36.     Another cite, from 1777, refers to firearms and other military accoutrements, implying, too, that arms may be a subcategory of "accoutrements":

"any drafted soldier . . . who is unprovided with a fire-arm, and other military accoutrements prescribed by the militia law**."** Massachusetts, Acts & Laws, March Session, Colony of Massachusetts Bay, 1777, p. 10 (but see Par. 38, ex. a).

37.     But the fact that "arms" are sometimes included as a subcategory of "accoutrements" does not mean that "arms" includes weapon accessories or other "accoutrements."

38.     Moreover, despite a handful of exceptions like those just cited, in literally hundreds of cases, "arms" and "accoutrements" are treated as separate categories of military gear. Here are some typical examples from the Founding Era:

a) 1776 – "The Sum of ten Shillings … to purchase said Fire Arms and Accoutrements" (Acts and Laws March Session, Colony of Massachusetts Bay; here arms and accoutrements are separate, unlike the citation from 1777, above, from the same source, where arms and accoutrements are lumped together).

b) 1780 – "arms, ammunition, accoutrements, drums and fifes in possession of the respective regiments" (George Washington, General Orders January 22).

c) 1783 – "Such of the Noncommissioned officers and privates … shall be allowed the fire arms and accoutrements as an extra reward" (George Washington, General Orders, May 1).

d) 1795 – "you will march …. with arms and accoutrements in good order." (*Incidents of the Insurrection in the Western Part of Pennsylvania, in the year 1774*. This example is from COEME; the other examples in this list are from COFEA).

19

e) 1798 – "To hold his powder and his ball, his gun, accoutrements and all …."[French Arrogance, or, "The Cat Let Out of the Bag." This poetic example shows that the idiomatic phrase arms and accoutrements has become part of the general language available not just to military specialists but also to poets and novelists.]

39. A newspapers.com search for "accoutrements" returns 1,392 hits. There are 692 matches for the exact phrase "arms and accoutrements."

40. Here is a mid-eighteenth-century British example from the newspapers.com corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*: "This Militia shall receive their Arms, Accoutrements, and Ammunition from the Ordnance." *Derby Mercury,* March 19, 1756, p. 3.

41. Similarly, there is this "ploughshares into swords" example of a Cambridge University library to be converted to military use: "[T]he new Building intended for a publick Library . . . may be converted into a Barrack, and be supplied with Provisions, Arms, and Accoutrements, at the Expence of the University." (*Jackson's Oxford Journal,* March 20, 1756, p. 2).

42. A search of "arms and accoutrements" in the Readex database of America's Historical Newspapers returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880. This early example from the colonial period appeared in the *Boston Evening Post* in 1750. It distinguishes "arms" from uniforms, "accoutrements," and other military equipment: "All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Provisions, and all other Things necessary for a Gentleman Ranger."

43. This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that "arms" and "accoutrements" are distinct categories in the new nation as well: "The militia . . . must be

20

considered as the palladium of our security …. The formation and discipline of the militia of the continent should be absolutely uniform; and that the same species of arms, accoutrements, and military apparatus, should be introduced in every part of the United States."

44.    The text of a bill in Congress to establish a uniform militia appeared in the *New York Journal* in 1790. It confirms the Founding-Era sense that "arms," "ammunition," and "accoutrements" make up distinct and separate elements of a soldier's kit: "There shall be appointed an adjutant general for each state … whose duty it shall be to …report[] the actual situation of their arms, accoutrements, and ammunition…. Every non-commissioned officer or private … for appearing at such meeting or rendezvous without his arms, ammunition, or accoutrements, as directed by this act, shall pay the sum of twenty-five cents."

45.    And this cite from 1868 clearly distinguishes what counts as "arms," and what counts, separately, as "accoutrements": "At Watertown Arsenal, Massachusetts … the following Arms, &c., will be sold:10,699 rifled and smooth-bore Muskets … ; 261 Carbines … ; 305 Sabres … ; lot of cavalry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c." *Daily Morning Chronicle* (Washington, DC).

46.    The newspaper data parallels that of COFEA: the phrase "arms and accoutrements" is almost always military. The phrase sometimes occurs alongside "ammunition" as a separate list item. "Accoutrements," when it appears alone in a military context, is a more general term, used for gear and rarely, for arms as well.

47.    It is clear that "arms and accoutrements" was, during the eighteenth and nineteenth centuries, a common military phrase, in both England and America. English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like "bacon and

21

eggs," "salt and pepper," or, in a legal context, "assault and battery" or "breaking and entering." Such pairs take on the characteristics of a formula and often appear in the same order (this order may be dictated by logical succession of events, or it may be random). "Eggs and bacon" is rarer than "bacon and eggs." And it would be unusual to find "battery and assault." Such ordered pairs are called "irreversible binomials," though there is nothing but custom (as in "salt and pepper") and sometimes logic (as in "breaking and entering") to prevent anyone from reversing the order.

48. The word "accoutrements" typically occurs in a list after "arms" (more rarely, it may occur before "arms" as well), and it is typically a separate category from "arms" (though not always, as the above examples show).

49. There are over 47,000 citations in newspapers.com for "arms" or "accoutrements" in the period 1868–1900, and 15,799 cites for the exact phrase "arms and accoutrements." Examining a selection of the 15,799 citations of the phrase confirms that both in England and the United States, "arms" and "accoutrements" are separate categories. Here is one example from Gloucestershire, in England, in 1868: "[A] letter was received from the Home Secretary, pointing out the danger of permitting an accumulation of arms and accoutrements to take place in prisons, and requesting, if there were any arms or munitions of war stored in the prison, that they should be removed to the nearest military depot."

50. A similar cite from Iowa in 1868 states: "Persons having in their possession any arms, accoutrements or ammunition belonging to the State, are requested to return the same at once to the Adjutant General, as proper places have been provided by the State for the safe keeping of all such property." *Cedar Falls Gazette* (Cedar Falls, Iowa).

51. And this, from Stroudsburg, Pennsylvania, also 1868, states: "More than half of the Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements, and probably made their way to the gold regions of Colorado and Montana." *The Jeffersonian* (Stroudsburg, Pennsylvania).

52. The circa-1868 data confirmed the Founding Era data that "accoutrements" is primarily a military term, and that when "accoutrements" co-occurs with "arms," the terms refer to separate categories of equipment.

53. One final note on "accoutrements": the United States Supreme Court's recent decision in *New York State Rifle and Pistol Association v. Bruen* (No. 20-843, 2022) references *North Carolina v. Huntley* (25 N.C. 418, 1843), a decision by the North Carolina Supreme Court affirming Huntley's conviction for carrying a shotgun illegally "to the terror of the people," as forbidden by the Statute of Northampton in 1328. In that decision, the North Carolina Supreme Court stated, "A gun is an 'unusual weapon,' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his everyday accoutrements—as a part of his dress."

54. In the citation above, "accoutrements" does not refer to weaponry, but to the more general category of "everyday attire, or clothing." The court is saying that it may be normal to wear a shirt, or a belt, or shoes, but it is not normal to wear a gun in North Carolina in 1843. It is legal—the court agrees—to carry a gun for any lawful purpose, "either of business or amusement"—but it is not normal or typical to do so. In affirming Huntley's conviction, the court noted that his purpose in carrying a shotgun was not a legal one.

23

**Some early use of the words "magazine" and "magazine wind gun," along with instances of repeater air guns in the Founding Era**

55.     Although most uses of the word "magazine" still refer to printed periodicals, during the nineteenth century, one sense of the term *magazine* narrows, referring more and more to an "ammunition container," a primary sense of the word in reference to firearms today.  The OED defines *magazine*, sense IV b, as "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868.  The earliest example in COHA is from 1882: "Solitary travelers still find it prudent to make a display of a magazine rifle, and to keep a sharp eye on any roving bands" (E. V. Smalley, "The New North-West," *Century,* September, 1882, pp. 769–79).  COHA lists only 40 examples of "magazine rifle," most of them between 1890 and 1930. "Magazine gun" appears in the COHA data 16 times between 1920–2010.  And an 1893 editorial in the *New York Times* refers to the army's "new magazine rifle" ("New Powder for the Army," *New York Times,* December 7, 1893, p. 4).    However, as with a very few instances of "accoutrements" including "arms," there are an extremely small number of early counterexamples between 1744 and 1820 where "magazine" refers to the bullet compartment of a gun—not a pistol or rifle using conventional gunpowder and bullets, but an air gun.

56.     The common, single-shot "wind gun" or "air gun" used compressed air rather than ignited gunpowder to propel a ball, and was much quieter than a traditional gun.  Although the air gun did not require powder or a match, the user had to re-charge the compressed air cylinder once the air had been expended.  The writer Oliver Goldsmith found air guns to be useful for

24

experiments in physics, adding, "THIS, however, is but an instrument of curiosity, and sometimes of mischief" (Oliver Goldsmith, *A survey of experimental philosophy, considered in its present state of improvement*, 1776). This newspaper story reports that the scientist Joseph Priestley was injured by an accidental discharge of an air gun: "We hear from Birmingham, that the celebrated Dr Priestley, in a late trial of some experiments with an air gun, was badly wounded by an accidental discharge of it; the ball with which it was loaded, passing thro' one of his hands, and shattering it to pieces" (*The Leeds Intelligencer and Yorkshire General Advertiser*, June 5, 1781, p. 3).

57.     A number of newspaper references suggest that its quietness made the air gun popular with criminals, and many references to air guns refer either to accidental discharges or to criminal assaults (for example, numerous newspaper accounts in 1785 suggested that the weapon which broke a window in the carriage of King George III was an air gun).

58.     Air guns typically fired a single shot. However, there are references in the corpora to approximately eight inventors between 1744 and 1820 who built air guns capable of firing anywhere from 9 to 50 balls without reloading the ammunition or recharging the compressed-air cylinder. Lexical evidence suggests almost all of these repeater air guns were experimental models rather than guns available for military or civilian use.

59.     The OED dates the term "magazine wind-gun" to 1744 in a reference to an air gun capable of firing more than one shot without reloading. "Magazine wind-gun" is the term used by its inventor, a man named L. Colbe. I have found no other examples of the term "magazine wind gun" in any database, suggesting that the phrase is a *hapax legomenon,* or "oncer," terms that lexicographers use to define a word that merits a definition, but that does not appear anywhere

else. Colbe also uses the term "magazine gun" for his device, and that term does occur twice more in the data, suggesting that it was never a common term. In an entry separate from its entry for "magazine," the OED marks the usage of both "magazine wind gun" and "magazine gun" as "rare" and "obsolete":

> †magazine wind-gun *n. Obsolete rare* a type of wind-gun fitted with a magazine of bullets. 1744 J. T. Desaguliers *Course Exper. Philos.* II. 399 An ingenious Workman call'd L. Colbe has very much improv'd it [sc. the old Wind-Gun], by making it a Magazine Wind-Gun; so that 10 Bullets are so lodg'd in a Cavity..that they may be..successively shot. [Oxford English Dictionary Online, s.v. magazine wind-gun.]

60. The OED citation is from John Theophilus Desaguliers, *A Course of Experimental Philosophy* (London, 1744), vol. II: 399-402. Desaguliers was a member of the Royal Society and an assistant to Isaac Newton specializing in mechanics and hydraulics. In his treatise, he offers an elaborate description of the common, single-shot wind gun, more typically referred to as an air an gun, along with a three-page description of Colbe's so-called "Magazine Wind-Gun," accompanied by a detailed drawing of the mechanism of that gun. I have found no biographical information about L. Colbe, inventor of the gun, and I have found no lexical evidence that Colbe made more than one such gun, or if he did, that it was produced in any significant numbers. Although Desaguliers suggests that this "magazine gun" may be "the best Defence against Highway-men, or Robbers that Travellers are aware of because when they have cause to suspect them, they may make five or six Discharges before a Thief can come within Pistol-Shot" (p. 402), there is no evidence in any of the corpora that Colbe's invention was ever used either by the military or by civilians for individual self defense. And there is no lexical evidence that the other repeater air guns invented before the mid-nineteenth century were ever more than a curiosity until

26

workable models of what we now call machine guns using conventional gunpowder and bullets, not compressed air and balls, were produced during and after the Civil War.

61.     As further confirmation that the magazine wind gun was an anomalous and uncommon term, the OED definition of "magazine," updated most-recently in 2022, gives the earliest date of the sense of the word as 'a bullet-container' as 1888. The corpus evidence confirms that the magazine wind gun is correctly dated by the OED as 1744, and I have found only two references to "magazine guns" in the 1790s and early 1800s, confirming that this usage of the word remained rare. "Magazine wind-gun" and "magazine gun" do not appear in the COEME or COFEA corpora. I have found no information in the corpora on the availability or popularity of such guns, but the sparse lexical data suggests that they were not in common use.

62.     A small number of references to later repeater wind guns indicate they were made, not by armourers, but by clockmakers and other highly-skilled artists or artisans. There is no indication in the lexical evidence that repeater air guns were ever mass produced or publicly available in the Founding Era (1776-1820). Several of the citations I found treat these guns as curiosities and their owners charge a small fee to anyone interested in looking at them (and in one case, trying the gun out). Like Colbe's wind gun, they seem to be rare inventions or curiosities, not weapons commonly available to the military or to the American or English public. Besides Colbe's gun, there are only two examples from the data that use the word "magazine" in connection with a repeater air gun:

   a)  1784 – "An artist of this town [Birmingham, Eng; the artist is also identified as a
       compass maker] has lately invented a magazine gun, that will discharge 45 bullets
       separately in two minutes and a half, each bullet would kill an ox at 40 yards
       distance; it is only charged once, and aim is taken with more certainty than with the
       fowling piece" (*New York Packet and American Advertiser,* New York, NY,
       August 5, 1784).

27

b) 1815 – Advertisement for "one magazine Gun, when once loaded can be discharged ten times in a minute" (*New York Gazette*, Aug. 30, 1815).

63.    The corpora contain just nine other references to repeater air guns, none of them using the word "magazine":

a) 1783 – "Vienna. A watchmaker has invented an Air Gun, which, without recharging, fires 15 times successively.  A corps of Hunters are to be armed with these guns." (*The Newcastle Weekly Courant* (England), May 10, 1783, p. 3).  There is no follow-up to indicate whether the corps of Viennese hunters did employ such a weapon.

b) 1792 – A number of American newspapers report on the invention by a man, only identified as someone from Rhode Island, of a repeating air gun capable of firing twenty times without reloading.  Here is one: "A person in Rhode Island has invented an Air-gun, which can be discharged, to do execution, 20 times, each time it is loaded.—As nothing is cheaper, and easier to be transferred, than the ammunition for the above pieces; and as saving much expense, they recommend themselves strongly to the Secretary at War, to be used in the approaching campaign against the Indians" (*National Intelligencer: National Gazette*, April 26, 1792, p. 3).  There is no indication that the Secretary of War acted on this suggestion.  In fact, the following advertisement suggests that the repeater air gun in question was treated as a curiosity to be admired in a museum:

c) 1792 –  "An air-gun, made by a young man, a native of Rhode-Island, but now resident in this city [New York], and which has been purchased by the subscriber, with a view eventually to make it the property of the American museum but wishes to reimburse himself in the following manner, viz.  He will exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence.  This gun, when properly filled with air, will do execution twenty times, without renewing the charge, and for several times will send a ball thro' an inch board, at the distance of sixty yards, to be seen at the subscribers, No. 13 Maiden Lane, every day in the week, from 10 to 12 in the forenoon, and from 3 to 5 in the afternoon, Tuesday and Friday afternoons excepted, at which time it may be seen at the Museum.  Gardiner Baker, Keeper of the Museum" (*New York Daily Advertiser*, February 9, 1792).

d) 1796 –  "This carabine, lighter and smaller than the common ones, is composed of two barrels, the smallest of which contains 25 balls: and by a slight movement, they pass from the one to the other; which ball, by lowering the firelock, goes off with the same rapidity and carries further than if fired with powder, without the least noise, and that as often as a hundred times alternately, during the space of 8 or 10 minutes; after which, the reservoir being exhausted, it requires to pump in fresh air, which takes up at most, 16 minutes (*The Independent Gazetteer* (Philadelphia),

28

August 6, 1796, p. 1). This report adds that the repeater air gun, invented in the reign of Emperor Joseph II (reg. 1765–1790), was distributed to German troops, and that a sample weapon was given to the Prince of Wales. The writer suggests such guns would be useful at sea, since they are not affected by dampness. But there is no indication in the corpora that the Royal Navy ever considered such a weapon.

e) 1797 – "An Air GUN has been constructed by Messrs. Darlings and Wilkinson, of Cumberland, Rhode Island, upon a plan entirely new. It can be discharged twelve times with once loading, and will do execution with great exactness, at fifty yards distance" (*Columbian Centinel* (Boston), June 21, 1797).

f) 1801 – Multiple newspapers run the story of a repeater air gun invented by a man known as Girardami, identified as a peasant, artist, and watchmaker, and variously referred to in gun history articles as Girandoni or Girardoni (those spellings do not appear in the corpora that I consulted): "Girardami, a Tyrolese peasant, and self-taught artist, has invented an air-gun, which may be discharged fifty times without pumping again. The first twenty shots penetrate through a door at an uncommon distance. Girardami makes these air-guns himself, and likewise very good wooden watches" (*The Caledonian Mercury* (Edinburgh), March 2, 1801, p. 2).

g) 1802 – The Newly-Invented Philosophical Air Gun That can be used as Gun or Pistol, and discharge 20 balls with one loading of the globe [that is, the compressed-air cylinder], unless the charge of air is let out at once. To be seen at Mr. Wyant's tavern, Market street, both night and day. Admittance one fourth of a dollar (*Telegraphe and Daily Advertiser* (Baltimore), March 17, 1802). "Philosophical" in this sense is often used to refer to physicists experimenting with air guns to measure air temperature, pressure, and volume, among other things (see, for example, the work of Desaguliers and the experiments of Goldsmith and Boyle mentioned above).

h) 1807 – An ad for an auction includes, among other items, "an air gun in compleat order which, when loaded will discharge twenty five times after being pumped" (*American Citizen* (New York, NY), May 28, 1807).

i) 1814 – One article in the corpora refers to a repeater air gun taken by Lewis and Clark on their expedition to the Pacific some eight years earlier, though the article itself has nothing to do with the expedition. Instead, this letter to the newspaper, criticizing a politician for repeating the same things that he has been saying for years, suggests as well that the Lewis and Clark repeater air gun was used not for hunting or warfare but rather to dazzle the Indians that the explorers encountered with their "great medicine," thereby ensuring a peaceful encounter: "he [the politician in question], forthwith, becomes a "great medicine," as the Shoshones called captain Lewis' air gun"(*National Advocate*, Mar. 23, 1814). This article was written ten years after the start and eight years after the completion of the

29

expedition. I did not find any contemporaneous articles or firsthand accounts in the corpora of such a gun or how it may have been used.

j) 1819 – Finally, there is an ad for a French repeater air gun, for sale at 90 crowns: "which discharges 20 times before the air is expended" (*Salem Gazette* (Massachusetts), February 5, 1819).

64. To summarize: the corpus data shows that the terms "magazine gun," "magazine wind gun," and "magazine air gun" are extremely rare, occurring a mere three times in the corpora, along with nine instances of repeater air guns that do not include the word "magazine." In contrast, there are approximately 1,200 references to the single-shot "air gun" in the several databases that I consulted. Subtracting an estimated 150 duplicates, that leaves about 1,050 references to a single-shot air gun. Two of the references, ¶ 61 (b) and (d) in the list above, suggest that they would be useful weapons for the military; one, ¶ 61 (a) above, recommends their use to hunters; and one writer, Desaguliers, in 1744 (above, ¶ 61 (d)), speculates that the weapon could be useful for self-defense. But for the most part, the references listed above to early repeater guns seem to be treated as curiosities: marvels of engineering constructed by clockmakers or other skilled artisans, items to be seen in a museum or exhibited at a tavern (*see* examples ¶ 61 (c) and (g) above). There is no lexical evidence that they were manufactured in quantity. Their mechanisms were complex, requiring a clockmaker's skill to design, make, and repair. And it took time to re-charge the air cylinder (one source in the list above, ¶ 61 (d), suggests sixteen minutes for one such repeater air gun, which would render them suboptimal in battle situations). A couple of entrepreneurs charged admission to view them (¶ 61 (c) and (g) above), and in one case, in ¶ 61 (c) above, patrons may pay six pence to try shooting the gun. The writer who cites the Lewis and Clark repeater gun ((¶ 61 (i)) suggests that the explorers used the gun to "impress" potentially hostile Native Americans rather than as a weapon against them. It too may have been a one-off. Furthermore, only three of

30

the twelve references to repeater air guns refer to the bullet container as a "magazine," a further indication that this usage of "magazine" is extremely rare before 1820 (*see* ¶¶ 57 and 60, above).

65. With advances in the design and manufacture of guns and ammunition, by the mid-nineteenth century, the term "magazine" starts to appear in the sense 'ammunition container' (gradually replacing the earlier terms "cartridge box" or "cartridge case"), not in air guns but in ones using gunpowder and bullets.

66. COFEA and COEME do not cover the period past 1800. COHA, which does have nineteenth century coverage, turns up only a handful of uses of "magazine" in collocation with bullets, guns, rifles, or weapons in the 1890s, and only three such uses cited above before 1820. Most COHA cites for "magazine" refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses.

67. Searching the word "magazine" in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. It is not currently possible to tease out the subset of these citations to determine exactly how many refer to weapons rather than print journals. I did try to estimate, indirectly, the frequency of the gun-specific use of "magazine" by running a Google n-gram search.

68. Google's n-gram viewer searches the corpus of digitized Google Books. It can give a rough approximation of a word's frequency in relation to the other words in the Google Books corpus. The results appear as a graph. The n-gram viewer is capable of showing the relative frequency of several words on the same graph. My n-gram search showed that between 1750–1880 the word "magazine" occurs with a frequency of 0.0005121511% in 1789 and a frequency of

31

0.0007324368 in 1880.[2] A search for "magazine gun" returns no hits for that same period. But a search for "magazine rifle" shows that it does not appear in the database before 1813; there are few instances from 1813 to 1820, with a frequency of 0.0000000185%; and then a sharp rise between 1863 and 1880, when the frequency reaches a high of 0.000000936%, reflecting both the increased use of the revolver and the invention of repeating rifles and machine guns during the Civil War.[3] The Google n-gram data shows that the use of "magazine" in the Founding Era was not associated with guns. By 1880, the association with guns had become more common. Comparing the use of "magazine" in 1880 in all contexts with the use of "magazine rifle" that same year, it appears that the gun-related sense of "magazine" represents approximately 0.0012% of the occurrences of the word "magazine." In other words, the association exists in the period surrounding the ratification of the Fourteenth Amendment, but it is still a rare term.

69. The n-gram estimate, together with the sparse evidence in COHA and the OED, all suggest that "magazine" in the sense "device for holding bullets" forms only a very small subset of the 3.3 million occurrences of "magazine" in the newspaper corpora. Although "magazine" in the gun-related sense shows a distinct rise between 1864 and 1880, it took another thirty to forty years for the "bullet holder" sense of the word "magazine" to become more common. Even then, text references to ammunition magazines often appear, not in general discourse, but in legislation passed early in the twentieth century restricting their size or use.

70. Most militia laws and regulations from the Founding Era specify minimum requirements for soldiers' weapons, ammunition, and accoutrements. Most laws regulating

---

[2]https://books.google.com/ngrams/graph?content=magazine&year_start=1750&year_end=1880&corpus=en-2019&smoothing=3).

[3](https://books.google.com/ngrams/graph?content=magazine+rifle&year_start=1750&year_end=1880&corpus=en-2019&smoothing=3).

weapons in the mid-nineteenth century restrict or ban specific kinds of weapons, often enumerating them, sometimes in terms we find colorful today but which were common at the time (Arkansas toothpicks, Bowie knives, slung shots, swords in canes, pistols capable of being concealed in a pocket). Occasionally, these laws further identified such weapons as those used by "brawlers," thieves robbers, or others bent on illegal activities. Other weapons restrictions follow the English tradition of limiting possession of weapons by social class, nationality, or race.

71.     I surveyed the gun regulations in the Duke Historical Database (firearmslaw.duke.edu) from the early medieval period through 1885 to see what terminology was used. Although militia laws do specify weapons and other required accoutrements or pieces of military equipment, including horses for the officers, those laws that prohibit certain kinds of weapons during the two critical periods (1789–1810; 1868–1880) do not single out *parts* of weapons. Here is one exception, from a 1776 Maryland statute: "Resolved, that no muskets or rifles, except by the owner thereof on his removal to reside out of this province, or any gun barrels, gun locks, or bayonets, be carried out of this province, without the leave of the council of safety for the time being." [Proceedings of the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776, 147]

72.     None of the laws that prohibit weapons, aside from the Maryland statute mentioned above, specifies a gun part or ammunition case or accoutrements of any kind. Although many present a list of banned or prohibited weapons—usually without defining them (the assumption is that the reader knows what they refer to), none of the laws mention cartridge boxes, bullets, barrels, or other parts of any weapons.

33

73.     Later however, in the decades after the introduction of "magazines" as 'carriers or holders of one or more bullets,' laws and regulations against their nonmilitary use started to appear. A 1919 Maine law bans guns with loaded magazines: "No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests." [1919 Me. Laws 193, Possession of loaded shotgun or rifle in motor vehicle on highways, fields or forests prohibited; penalty.]

74.     Laws banning "machine guns" or firearms with "magazines" capable of firing multiple times without reloading appear in Vermont (1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 10); Rhode Island (1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms), and Massachusetts (1927 Mass. Acts 145, An Act Relative to Machine Guns and Other Firearms, ch. 326), among other states.  In defining "machine gun," Rhode Island's law bans magazines which fire automatically or which hold more than twelve rounds: "'machine gun' shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."

75.     A 1933 Texas law bans "machine guns" capable of firing "more than five (5) shots or bullets." [1933 Tex. Gen. Laws 219–20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns, ch. 82]

76.     Finally, the Federal Firearms Act of 1934, which introduced a nationwide system of taxes, fees, and registration requirements for the transfer of certain types of guns, specifies in great detail the nature of the "firearms" covered by the statute, including their barrel length and type of firing mechanisms: "(a) The term 'firearm' means a shotgun or rifle having a barrel of less

34

than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition."

77.    The Act also provides a specific definition of "machine gun": "(b) The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." [48 Stat. 1236. 73rd Congress, 2nd Session, Ch. 757, HR 9741].

**Conclusion**

78.    To repeat, there is virtually no lexical data that I have found showing that "arms" includes "accoutrements," "cartridge boxes," "cartouch boxes," "magazines," or any other parts of weapons.  To the contrary, while "arms" is used as a general term for weapons (typically swords, knives, rifles, and pistols), it does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category "accoutrements." And there is no evidence from the small number of mentions of the repeater air guns in the databases before the Civil War that such guns were used in the Founding Era by the American or British military, or that they were widely available in that period to civilians for hunting or self-defense.

**DECLARATION UNDER PENALTY OF PERJURY**
**PURSUANT TO 28 U.S.C. § 1746**

I declare that the foregoing is true and correct under penalty of perjury under the laws of the United States.

Executed on _January 24_, 2023     _____
                                              Dr. Dennis E. Baron

35

# EXHIBIT F

## Declaration of Professor Randolph Roth

## DECLARATION OF RANDOLPH ROTH

I, Randolph Roth, declare under penalty of perjury that the following is true and correct:

1.      I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University.  I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would testify competently as to those facts.

2.      I have been retained by the State of Connecticut to render expert opinions in this case.  I am being compensated at a rate of $250 per hour.

## BACKGROUND AND QUALIFICATIONS

3.      I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter Prize for the outstanding honors thesis in History.  I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field Prize for the outstanding dissertation in the humanities and the George Washington Eggleston Prize for the outstanding dissertation in American history.  I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology and the history of crime.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

4.      I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to research in criminology over the previous three years,"[1] and the

---

[1] See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

2010 Allan Sharlin Memorial Book Award from the Social Science History Association for outstanding books in social science history.[2] *American Homicide* was also named one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding book of 2009 by *reason.com*. The book is an interregional, internationally comparative study of homicide in the United States from colonial times to the present. I am a Fellow of the American Association for the Advancement of Science, and I have served as a member of the National Academy of Sciences Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board of the *American Historical Review*, the most influential journal in the discipline. And in 2022 I received the inaugural Distinguished Scholar Award from the Historical Criminology Division of the American Society of Criminology.

5. I am the principal investigator on the National Homicide Data Improvement Project, a project funded by the National Science Foundation (SES-1228406, https://www.nsf.gov/awardsearch/showAward?AWD_ID=1228406) and the Harry Frank Guggenheim Foundation to improve the quality of homicide data in the United States from 1959 to the present. The pilot project on Ohio has drawn on a wide range of sources in its effort to create a comprehensive database on homicides (including narratives of each incident) based on the mortality statistics of the Ohio Department of Health, the confidential compressed mortality files of the National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports, death certificates, coroner's reports, the homicide case files of Cincinnati, Cleveland, and Columbus, obituaries, and newspaper accounts.

6. I have published numerous essays on the history of violence and the use of firearms in the United States, including a) "Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and

---

[2] See Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240 (https://www.jstor.org/stable/3491655#metadata_info_tab_contents); b) "Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708 (https://www.jstor.org/stable/40267796#metadata_info_tab_contents); c) "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); and d) "The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of Research in Crime and Delinquency* (2021) (https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_Homicide_in_the_United_States).

7.      I am also co-founder and co-director of the Historical Violence Database.  The web address for the Historical Violence Database is: http://cjrc.osu.edu/research/interdisciplinary/hvd.  The historical data on which this declaration draws are available through the Historical Violence Database.  The Historical Violence Database is a collaborative project by scholars in the United States, Canada, and Europe to gather data on the history of violent crime and violent death (homicides, suicides, accidents, and casualties of war) from medieval times to the present.  The project is described in Randolph Roth et al., "The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods* (2008) 41: 81-98 (https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-98?casa_token=PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-

L4wqloRc2DFsM4eRmKEc346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU).
The only way to obtain reliable historical homicide estimates is to review every
scrap of paper on criminal matters in every courthouse (indictments, docket books,
case files, and judicial proceedings), every jail roll and coroner's report, every
diary and memoir, every article in every issue of a number of local newspapers,
every entry in the vital records, and every local history based on lost sources, local
tradition, or oral testimony. That is why it takes months to study a single rural
county, and years to study a single city.[3]

      8.     My work on data collection and my research for *American Homicide*,
together with the research I have conducted for related essays, has helped me gain

---

[3] It is also essential, in the opinion of historians and historical social scientists
involved in the Historical Violence Database, to use capture-recapture
mathematics, when multiple sources are available, to estimate the number of
homicides where gaps or omissions exist in the historical record. The method
estimates the percentage of the likely number of homicides that appear in the
surviving records by looking at the degree to which homicides reported in the
surviving legal sources overlap with homicides reported in the surviving non-legal
sources (newspapers, vital records, diaries, etc.). A greater degree of overlap
means a higher percentage in the surviving records and a tighter confidence
interval. A lesser degree of overlap, which typically occurs on contested frontiers
and during civil wars and revolutions, means a lower percentage and a wider
confidence interval. See Randolph Roth, "American Homicide Supplemental
Volume: Homicide Estimates" (2009)
(https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf); Roth,
"Child Murder in New England," *Social Science History* (2001) 25: 101-147
(https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and
James M. Denham, "Homicide in Florida, 1821-1861: A Quantitative Analysis,"
*Florida Historical Quarterly* 86 (2007): 216-239; and Douglas L. Eckberg,
"Stalking the Elusive Homicide: A Capture-Recapture Approach to the Estimation
of Post-Reconstruction South Carolina Killings." *Social Science History* 25 (2001):
67-91 (https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

expertise on the causes of homicide and mass violence, and on the role technology has played in changing the nature and incidence of homicide and mass violence. I hasten to add that the insights that my colleagues and I have gained as social science historians into the causes of violence and the history of violence in the United States stem from our tireless commitment to empiricism. Our goal is to gather accurate data on the character and incidence of violent crimes and to follow the evidence wherever it leads, even when it forces us to accept the fact that a hypothesis we thought might be true proved false. As my colleagues and I are fond of saying in the Criminal Justice Network of the Social Science History Association, the goal is not to be right, but to get it right. That is the only way to design effective, pragmatic, nonideological laws and public policies that can help us address our nation's problem of violence.

9.     I have previously served as an expert witness in cases concerning the constitutionality of state and municipal gun laws, including *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-1017 (S.D. Cal.); *Ocean State Tactical v. Rhode Island*, No. 22-cv-246 (D.R.I.); *Hanson v. District of Columbia*, No. 1:22-cv02256-RC (D.C.); *State of Vermont v. Max B. Misch*; *National Association for Gun Rights and Capen v. Healey*, No. 22-cv-11431-FDS (D.MA.); *National Association for Gun Rights, and Susan Karen Goldman v. City of Highland Park, Illinois*, No. 1:22-cv-04774 (N.D. Ill. Eastern Division); and

*Steven Rupp et al. and California Rifle and Pistol Association v. Bonta*, 8:17-cv-00746-JLS-JDE (CA. Central District Western Division).

## OPINIONS

### I. SUMMARY OF OPINIONS

10.     I have been asked by the State of Connecticut Office of the Attorney General to provide opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders.

11.     For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today.  I discovered that the key to low homicide rates over the past 450 years has been successful nation-building. High homicide rates among unrelated adults—friends, acquaintances, strangers—coincide with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[4]  As a nation, we are still feeling the aftershocks of

---

[4] See Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217 (https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token=dk

(continued…)

our catastrophic failure at nation-building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and 1850s through the Civil War, Reconstruction, and the rise of Jim Crow.

12.    Our nation's homicide rate would thus be high today even in the absence of modern technologies that have made firearms far more capable of injuring multiple people over a short span of time than they were in colonial and Revolutionary era.  But the evidence also shows that the availability of guns and changes in firearms technology, especially the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been.

13.    My opinion will address in turn: 1) firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur; 2) the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives; 3) the spread of restrictions on carrying concealed weapons in

---

P_nZZxCaYAAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpR liTesFI_1SDY6tepvZbjwiRWPEom7M), for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building.  My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present.  In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that persist across wide stretches of time and space are not random. They reveal deep patterns that are causal.

every state by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I— a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century; 4) the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups; and 5) the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder.

## II. GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS

### A. Homicide and Firearms in the Colonial Era (1688-1763)

14.     In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[5] But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons.  First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[6]  By the late

---

[5] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016). Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

[6] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together.  The late seventeenth century thus marks the discernible

(continued…)

1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[7] Violence among colonists was not a pressing problem on the eve of the Revolution.

15. Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread. Approximately 50 to 60 percent of households in the colonial and Founding eras owned a working firearm, usually a musket or a fowling piece.[8] Fowling pieces, like muskets, were muzzle-loading. But unlike muskets, which were heavy, single-shot firearms used for militia service, fowling pieces were manufactured specifically to hunt birds and control vermin, so they were designed to fire shot, primarily, rather than ball, and were of lighter construction than muskets.[9] Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns. In New England, the rate of family and intimate partner homicides stood at only 2 per million persons per year for European Americans and 3 per

---

beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[7] Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91. By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016—an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era—was 7 per 100,000 per year. See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[8] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[9] *See, e.g.*, Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment," in Saul A. Cornell and Nathan Kozuskanich, eds., *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (University of Massachusetts Press, 2013), 310, 327 & nn. 101-102.

million for African Americans for the seventeenth and most of the eighteenth century, and fell to 1 per million for both European and African Americans after the Revolution. The rates in the Chesapeake were likewise low, at 8 per million per year for European Americans and 4 to 5 per million for African Americans.[10] And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low—never more than 10 to 15 percent.[11]

16.    Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era.[12] They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[13] They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[14] And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[15] It took at

---

[10] Roth, "Why Guns Are and Aren't the Problem," 116.

[11] Ibid., 116-119.

[12] Ibid., 117.

[13] Ibid.

[14] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[15] Roth, "Why Guns Are and Aren't the Problem," 117.

least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[16] The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[17] The firing mechanism also had to be readied, often with a fresh flint.[18] And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[19] The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage.[20] That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[21]

17.     The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[22] It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured

---

[16] Ibid.

[17] Ibid.

[18] Ibid.

[19] Ibid.

[20] Ibid.

[21] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[22] Roth, "Why Guns Are and Aren't the Problem," 117.

servitude or the early years of racial slavery.[23]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[24]

18.     When colonists anticipated violence or during times of political instability gun use was more common.  When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[25] so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier.[26]  Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so 60 percent of homicides of Native Americans by European Americans in New England were committed with firearms.[27]  And slave catchers and posses kept their firearms at the ready, so 90 percent of runaway slaves who were killed in Virginia were shot.[28]  Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[29]  That is why firearms had a modest impact on homicide rates among colonists.

---

[23] Ibid.

[24] Ibid.  Contrary to popular belief, dueling was also rare in colonial America.  Roth, *American Homicide*, 45, 158.

[25] Roth, "Why Guns Are and Aren't the Problem," 118-119.

[26] Ibid., 116-117.

[27] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

[28] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[29] Ibid., 118-119.

**B. The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)**

19.     The Founding Generation was zealous in its defense of the people's rights, and so enshrined them in the Constitution.  At the same time, they recognized that some citizens could be irresponsible or motivated by evil intent and could thus threaten the security of the government and the safety of citizens.[30] The threats that such citizens posed to public safety could be checked in most instances by ordinary criminal statutes, drawn largely from British common law. But at times those threats could be checked only by statutes that placed limits on basic rights.[31]

---

[30] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, see Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 65-70, 282-291, 319-328, 413-425, 463-467; Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989), 42-45; and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003), 6-9, 60-65, 86-104, 113-114.

[31] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016), 1-8, on restraints on freedom of speech and the press during the administration of John Adams; Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963), 93-141, on loosening restrictions on searches and seizures during the administration of Thomas Jefferson; and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-121, especially 108-109, as well as Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 39-70, and Jack N. Rakove, "The Second Amendment: The Highest State of Originalism," in Carl T. Bogus, ed., *The Second Amendment in Law and History: Historians and Constitutional Scholars on the Right to Bear Arms* (New York: The New Press, 2000), 74-116, on the limited scope of the

(continued…)

20.     The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[32]  And they recognized that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[33]  But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas homicide

Second Amendment. Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996), 291, notes that "Nearly all the activities that constituted the realms of life, liberty, property, and religion were subject to regulation by the state; no obvious landmarks marked the boundaries beyond which its authority could not intrude, *if* its actions met the requirements of law." See also Rakove, "The Second Amendment: The Highest State of Originalism," Chicago-Kent Law Review 76 (2000), 157 (https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=3289&context=cklawreview): "[At] the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles, rather than the codification of legally enforceable restrictions or commands."

[32] Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

[33] Roth, "Why Guns Are and Aren't the Problem," 119-120.

rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century. By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year.[34] And the proportion of domestic and nondomestic homicides committed with firearms was correspondingly low— between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[35]

21.     The keys to these low homicide rates and low rates of gun violence in New England, the Mid-Atlantic states, and the settled Midwest were successful nation-building and the degree to which the promise of the democratic revolution was realized. Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[36] And self-employment—the bedrock of citizenship, self-respect, and respect from others—was widespread. By 1815, roughly 80 percent of women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[37] African Americans still faced discrimination and limits

---

[34] Roth, *American Homicide,* 180, 183-186; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

[35] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf). On weapons use in homicides in the North, see Figures 25 through 46.

[36] Roth, *American Homicide*, 180, 183-186.

[37] Ibid., 180, 183-186.

on their basic rights in most Northern states.  But despite these barriers, most African Americans in the North were optimistic, after slavery was abolished in the North, about earning their own living and forming their own churches and voluntary organizations.[38]

22.     That is why there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels.  They took a strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the practice posed for the nation's democratic polity and the lives of public men: editors, attorneys, military officers, and politicians.[39]

23.     Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states,[40] where violence among citizens increased after the Revolution to extremely high levels.  Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South,

---

[38] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

[39] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=1884&context=vlr).

[40] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999); and Cornell, *Well-Regulated Militia*, 141-144.

where homicide rates ranged from 8 to 28 per 100,000 adults per year.[41]  Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical.[42]  Prominent whites were subjected to the rough and tumble of partisan politics and their position in society was threatened by people from lower social positions.[43]  African Americans despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of African American rebellion.[44]  As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killings.[45]  The violence spread to frontier Florida and Texas, as well as to southern Illinois and Indiana—wherever Southerners settled in the early national period.[46]  During the Early National period, the proportion of homicides committed with firearms went up accordingly, to a third or two-fifths, as Southerners armed themselves in anticipation of trouble, or set out to cause trouble.[47]

24.     Citizens and public officials in these states recognized that concealable weapons—pistols, folding knives, dirk knives, and Bowie knives—

---

[41] Roth, *American Homicide*, 180, 199-203.

[42] Ibid., 182.

[43] Ibid.

[44] Ibid.

[45] Ibid., 182, 199-203.

[46] Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

[47] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

were used in an alarming proportion of the era's murders and serious assaults.[48]
They were used to ambush both ordinary citizens and political rivals, to bully or
intimidate law-abiding citizens, and to seize the advantage in fist fights.  As the
Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in
1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle
> aged and the aged to arm themselves with Pistols, dirks knives sticks &
> spears under the specious pretence of protecting themselves against
> insult, when in fact being so armed they frequently insult others with
> impunity, or if resistance is made the pistol dirk or club is immediately
> resorted to, hence we so often hear of the stabbing shooting & murdering
> so many of our citizens.[49]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly"
men carried concealed weapons to gain "secret advantages" over their
adversaries.[50]  These concealed weapons laws were notably difficult to enforce,
however, and did not address underlying factors that contributed to rising homicide
rates.  Nevertheless, these laws represent governmental efforts at that time to
address the use of new weapons in certain types of crime.

    25.    The pistols of the early national period represented a technological
advance.  Percussion-lock mechanisms enabled users to extend the life of a charge,
because unlike flint-lock mechanisms, they did not use hydroscopic black powder
in their priming pans; they used a sealed mercury-fulminate cap as a primer and
seated it tightly on a small nipple (with an inner diameter the size of a medium
sewing needle) at the rear of the firing chamber, which restricted the flow of air
and moisture to the chamber.  Percussion cap pistols, which replaced flint-lock

---

[48] Roth, *American Homicide*, 218.

[49] Ibid., 218-219.  See also the concerns of the Grand Jurors of Wilkes
County, Georgia, Superior Court Minutes, July 1839 term.

[50] Roth, *American Homicide*, 219.

pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[51]  The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting.  Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[52]

26.     The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838.  These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct.  Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive.  It made it unlawful for merchants

> and any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere . . . Bowie, or any other kind of knives, manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers.  But the laws in the other five states were

---

[51] Roth, "Why Guns Are and Aren't the Problem," 117.

[52] Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

also strict: they forbid the carrying of concealable weapons in all circumstances. Indiana made an exemption for travelers.[53]

27.     Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[54]

---

[53] Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws. Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols. See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9, 2022). Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms. That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[54] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836. On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361 (https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1283&context=faculty_scholarship); Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*, revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of*

(continued…)

### C. Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)

28.    By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession.[55]  They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse.  Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[56]  But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North.  Rates that had ranged in the North in the 1830s and early 1840s from a low of 1 per 100,000 adults per year in northern New England to 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities. In the South, rates in the plantation counties of Georgia rose from 10 per 100,000 adults to 25 per 100,000, and rates soared even higher in rural Louisiana

_____

*Themselves and the State*, 74, 83-85, 97-140.

[55] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22.  These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont.  However, Vermont also had such a law by the early twentieth century.  *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

[56] Roth, *American Homicide*, 297-300.

to 90 per 100,000 and in mountain communities in Georgia and Missouri from less than 5 per 100,000 adults per year to 60 per 100,000. And in the West, the rates reached 65 per 100,000 adults per year in California, 76 per 100,000 in Texas, 119 per 100,000 in mining towns in South Dakota, Nevada, and Montana, and 155 per 100,000 in cattle towns in Kansas. Americans, especially men, were more willing to kill friends, acquaintances, and strangers. And so, the United States became—and remains today—by far the most murderous affluent society in the world.[57]

29. The increase occurred because America's heretofore largely successful effort at nation-building failed catastrophically at mid-century.[58] As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust.[59] Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors.[60] They were losing the sense that they were participating in a great adventure with their fellow Americans.[61] Instead, they were competing in a cutthroat economy and a combative political system against millions of strangers whose interests and values

---

[57] Ibid., 199, 297-300, 302, 337, 347; and Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[58] Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

[59] Roth, *American Homicide*, 299-302, 384-385. See also Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide."

[60] Roth, *American Homicide*, 300.

[61] Ibid.

were antithetical to their own.[62]  And most ominously, law and order broke down in the wake of the hostile military occupation of the Southwest, the political crisis of the 1850s, the Civil War, and Reconstruction.[63]

30.     The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[64]  Because the pistols, muskets, and rifles in use in the early years of the crisis of the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder weapons, the proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[65]  Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons. But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

31.     Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity quickly because of their association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[66]  They retained some of the limitations of earlier firearms, because their rotating cylinders—two of which came with each revolver—had to be loaded one chamber at a time.  Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each

---

[62] Ibid.

[63] Ibid., 299-302, 332, 337, 354.

[64] Roth, "Why Guns Are and Aren't the Problem," 116-117.

[65] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

[66] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever. Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun. But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[67]

32. Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway. But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers. It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[68] And it did not require a new percussion cap for each chamber, because the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[69] As Smith and Wesson noted in its advertisements,

> Some of the advantages of an arm constructed on this plan are:
>
> The convenience and safety with which both the arm and ammunition may be carried;

---

[67] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

[68] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

[69] Ibid., 38-57.

The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);

Certainty of fire in damp weather;

That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[70]

33.    Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[71]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading.  The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[72]

34.    These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they

---

[70] Ibid., 39.

[71] Ibid., 38-57.

[72] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media, 2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

were used in novel ways.[73]  Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards.[74]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction.  By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states. In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico.  Homicide rates whipsawed, however, in the South. They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana,

---

[73] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis added).

[74] Ibid., 124-125.

Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.[75]

Ominously, too, firearms invaded families and intimate relationships, so relatives,

spouses, and lovers were as likely to be killed with guns as unrelated adults—

something that had never happened before in America's history.[76]  That is why the

proportion of homicides committed with firearms—overwhelmingly, concealed

revolvers—reached today's levels by the 1920s, ranging from a median of 56

percent in New England and over 70 percent in the South and West.[77]  And that is

why every state in the Union restricted the right to carrying certain concealable

weapons.

35.    It is important to note that state legislators experimented with various

degrees of firearm regulation, as the nation became more and more violent.  In

Texas, where the homicide rate soared to at least 76 per 100,000 adults per year

from June, 1865, to June, 1868,[78] the legislature passed a time-place-manner

restriction bill in 1870 to prohibit the open or concealed carry of a wide range of

---

[75] Ibid., 125-127, 388, 403-404; and Roth, "American Homicide Supplemental Volume: American Homicides in the Twentieth Century," Figures 4a and 5a.

[76] Ibid., 125.

[77] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[78] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

weapons, including firearms, on social occasions;[79] and it followed in 1871 with a

bill banning in most circumstances the carrying, open or concealed, of small

deadly weapons, including pistols, that were not designed for hunting or militia

service.[80]  These laws were enforced with little or no racial bias until the 1890s,

---

[79] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610 (https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf). "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law."  An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63. See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019) (https://repository.tcu.edu/handle/116099117/26778).

[80] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611.  Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the

(continued…)

---

Declaration of Randolph Roth (NAGR v. Lamont, 3:22-cv-01118-JBA)

**JA-912**

_____

same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.'  An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25.  The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.'  Id. § 3."  The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces.  Also, the deadly weapon law did not apply to all guns

(continued…)

when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[81]

36.     Tennessee and Arkansas went farther than Texas to stem the tide of post-Civil War interpersonal violence.  In 1871, Tennessee flatly prohibited the carrying of pocket pistols and revolvers, openly or concealed, except for the large army and navy pistols commonly carried by members of the military, which could be carried openly, but not concealed.[82]  Arkansas followed suit in 1881.[83]

---

or firearms but just pistols.  The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'"

See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 (Ph. D. dissertation: Texas Christian University, 2019), 72-83, 124-163 (https://repository.tcu.edu/handle/116099117/26778).

[81] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620.  The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication.  See also Rivas, "Deadly Weapon Laws of Texas," 164-195.

[82] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872) ("It shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.").

[83] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and
(continued…)

Tennessee's law withstood a court challenge, and Arkansas's was never challenged.[84]  And both states moved to prevent the sale or transfer of pocket pistols or ordinary revolvers.  In 1879, Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[85]  Arkansas passed a similar prohibition in 1881, but went even further by prohibiting the sale of pistol cartridges as well: "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[86]

---

on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[84] See Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan. 20, 2022), https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee/.

[85] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).
[86] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

37.     California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[87] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar.... For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons. A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[88]

38.     But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves. And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and

---

[87] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

[88] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851).

other weapons and to carry them at their pleasure."[89]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances that they enforced.[90]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[91]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[92]

39.    Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[93]

The burden of proof remained with the person who carried the concealed weapon.

---

[89] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[90] Ibid., 11.

[91] Ibid., 11-13.

[92] Ibid., 13-15.  Note that the title of the Cramer and Olson essay is misleading.  It does not refer to the origins of the laws discussed here or to the ways in which they were enforced.  It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

[93] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

40.     It is important to remember, however, that even when states enacted
different types of firearms restrictions, the fact remains that many jurisdictions
enacted statutory restrictions at that time to ensure the safety of the public and law
enforcement.

### III. Addressing Threats to the Republic and Its Citizens from Mass Murderers from the Revolution into the Early Twentieth Century

41.     The Republic faced threats not only from individual murderers, but
from groups of murderers.  Mass murder has been a fact of life in the United States
since the mid-nineteenth century, when lethal and nonlethal violence of all kinds
became more common.  But mass murder was a group activity through the
nineteenth century because of the limits of existing technologies.[94]  The only way
to kill a large number of people was to rally like-minded neighbors and go on a
rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were
certainly lethal but did not provide individuals or small groups of people the means
to inflict mass casualties on their own.  Mass killings of this type were rare in the
colonial, Revolutionary, and Early National eras, outside of massacres of Native
Americans, irregular warfare among citizens seeking political power, or public
demonstrations that turned deadly, like the Boston Massacre, in which seven
soldiers opened fire on a crowd of roughly fifty men and boys, killing five and

---

[94] On the history of mob violence, including riots and popular protests that
led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana
University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil
War* (New York: Oxford University Press, 1996). On the Boston Massacre, see
Alan Taylor, *American Revolutions: A Continental History, 1750-1804* (New York:
W. W. Norton, 2016), 109-110; Eric Hinderaker, *Boston's Massacre* (Cambridge:
The Belknap Press of Harvard University Press, 2017); Bernard Bailyn, *The
Ordeal of Thomas Hutchinson* (Cambridge: Belknap Press of Harvard University
Press, 1974), 156-163; and Alfred F. Young, *The Shoemaker and the Tea Party:
Memory and the American Revolution* (Boston: Beacon Press, 1999), 36-41.

wounding six.[95]  But from the 1830s into the early twentieth century, mass killings were common.

42.     Examples include Nat Turner's rebellion in Southampton County, Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871.  Because these mass killings were almost always spontaneous and loosely organized, they were difficult for government to prevent.  Worse, in some incidents, such as the Haun's Mill Massacre, state and local governments were complicit; and in others, state and local governments turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in Chico, California, in 1877.[96]

---

[95] For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644 (https://www.jstor.org/stable/25096733#metadata_info_tab_contents)]. For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 31-34]; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

[96] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall*

(continued…)

43. The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments. The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[97] But when federal troops were withdrawn, white supremacist mass killings resumed. In New Orleans, for example, an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens of Republican officials and police officers shot dead and scores wounded.[98] And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and

---

*Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates*, The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney*, The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

[97] Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

[98] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 151-158. See also LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.

loosely organized vigilantes. Rioters and vigilantes remained a threat well into the twentieth century. In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[99]

## IV. ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE EARLY TWENTIETH CENTURY TO THE PRESENT

44.     The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time. These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers. The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the Thompson submachine gun, invented in 1918 by General John T. Thompson, who improved upon a pioneering German design.

45.     The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare. The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[100]

---

[99] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001).

[100] Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New
(continued…)

46.    Criminals and terrorists quickly discovered how accessible and useful these new technologies were.  They could be purchased legally by private citizens. In the 1920s, Thompson submachine guns were expensive.  They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, while now a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as $10).[101]  That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers. Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), so it was favored by labor activists and anarchists.[102]  Federal, state, and local officials and law enforcement officers suddenly confronted novel threats to their personal safety.  Submachine guns were used most notoriously in gangland

_____

York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

[101] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today.  See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022. The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-%20%24499), accessed October 4, 2022.  The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[102] Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6.  Note that a pound of dynamite would be far more expensive today—potentially hundreds of thousands of dollars—because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker.  See U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012* (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download), accessed October 4, 2022.

slayings in Chicago during the Prohibition Era, such as the St. Valentine's Day Massacre and the Kansas City Massacre.[103]  Dynamite was used in a string of anarchist bombings in 1919-1920.  Those included the murder of 38 people and the wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice officials, newspaper editors, and businessmen (including John D. Rockefeller), and a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[104] Dynamite was also used effectively for malicious, private ends.  For example, Osage Indians were murdered by an individual in Oklahoma in an attempt to gain their headrights and profit from insurance policies on them.[105]

47.     Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons.  Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms between 1927 and 1934,[106] and Congress

---

[103] William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

[104] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110.  Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

[105] For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[106] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238 (https://scholarship.law.duke.edu/lcp/vol83/iss3/13).  In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machine guns and submachine guns (known today as automatic weapons) because of their ability to fire rapidly from large-capacity magazines.[107] And the Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives, building upon regulations that began in 1917 with the passage of the Federal Explosives Act, which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[108]

48. Since 1970, public officials have continued to reserve the right to regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder. The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder. The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in 1995.[109] And in the wake of the massacre of 58 people and wounding of hundreds of others at a concert in Las Vegas in 2017, the Trump administration issued a regulation that banned the sale or possession of bump stocks. It gave owners 90

---

[107] The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

[108] The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

[109] Public Law 107-296, November 25, 2002, "To Establish the Department of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and 6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J). The ammonium nitrate regulations were to be enforced no later than 90 days after December 26, 2007. Accessed August 31, 2022.

days to destroy their bump stocks or turn them in to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[110]

49.     In recent decades, criminal organizations, terrorists, and lone gunmen with an intent to commit mass murder have also discovered the effectiveness of rapid-fire semiautomatic weapons with large capacity magazines.  These weapons, which were designed for offensive military applications rather than individual self-defense, emerged from technologies developed for military use during the Cold War, beginning with the Soviet AK-47 assault rifle, which was invented in 1947, adopted by the Soviet Army in 1949, and used in the 1950s by the Soviets or their allies during the Hungarian Revolution, the Vietnam War, and the Laotian Civil War.[111]  The signature military firearm of that era—the M-16 rifle with a 30-round magazine and a muzzle velocity of over 3,000 feet per second[112]—was capable of firing 750 to 900 rounds per minute when set on fully automatic.[113]  But the M-16 was used more often in combat—and more accurately, effectively, and sustainably as a weapon for inflicting mass casualties—when set on semiautomatic, which was

---

[110] *New York Times*, December 18, 2018 (https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html), accessed October 4, 2022.

[111] Edward and Ezell, *The AK-47 Story: Evolution of the Kalashnikov Weapons* (Harrisburg, Pennsylvania: Stackpole Books, 1986).

[112] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[113] Edward Ezell, *The Great Rifle Controversy: Search for the Ultimate Infantry Weapon from World War II through Vietnam and Beyond* (Harrisburg, Pennsylvania: Stackpole Books, 1984)

standard military procedure. That is why the U.S. Army defines "rapid fire" as 45 rounds per minute (the rate of fire of an M-16 when set on semiautomatic), not 750 to 900.[114] And that is why in 1998 the U.S. Marine Corps adopted the M-16A4, which replaced the "fully automatic" switch with a three-round burst (but otherwise the same weapon as the M-16)—an alteration that slows the potential rate of fire, conserves ammunition, and improves accuracy.[115] The civilian version of the M-16—the ArmaLite AR-15—has approximately the same muzzle velocity as the M-16 (3,300 feet per second) and the same rate of fire as the M-16 on semiautomatic: 45 rounds per minute.[116]

50. The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower than that of an M-16 or its civilian counterparts: around 1,350 feet per second. But technological advances have increased the speed at which semiautomatic handguns can be fired. An expert can fire an entire 30-round clip from a Glock 17 handgun in five seconds.[117] And they are affordable. A new

---

[114] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC 3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May 2016). Available at the Army Publishing Directorate Site (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed October 4, 2022.

[115] See military-today.com (http://www.military-today.com/firearms/m16.htm), accessed October 4, 2022.

[116] Ezell, *The Great Rifle Controversy, 177-192*.

[117] See Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM." YouTube (https://www.youtube.com/watch?v=1H5KsnoUBzs), accessed September 1, 2022.

semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15.[118]

51.    It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire semiautomatic handguns and rifles with large capacity magazines that arrived on the domestic market in the 1970s and 1980s.  These firearms can inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff, which is why many police and sheriff departments across the United States have purchased semiautomatic rifles and armored vehicles to defend themselves and decrease the likelihood that officers are killed or wounded.[119]

52.    Manufacturers soon discovered ways to increase the rate of fire of these new semiautomatic weapons even further.  Some innovations, such as bump stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when*

---

[118] See guns.com for the price of semiautomatic handguns (https://www.guns.com/firearms/handguns/semi-auto?priceRange=Less%20than%20%24250) and bymymags.com for the price of large capacity magazines (https://www.buymymags.com/), accessed October 4, 2022.

[119] Sam Bieler, "Police Militarization in the USA: The State of the Field," Policing: An International Journal 39 (2016): 586-600, available at https://www.emerald.com/insight/content/doi/10.1108/PIJPSM-03-2016-0042/full/pdf?casa_token=TYUuIouUCc8AAAAA:IWXQRQOtW90KZ2AKwzHNMX2tfRix0zAxRRkjQSy3rA-uUpnylZrnp0Xolhj7UFIf05WGZkr_92L__QGk_OAxnSH-3h26oxKC4e7vM79VCBpFl9_cHg.

*released*—a modification that doubles the rate at which semiautomatic weapons can be fired.[120]

53.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15—the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[121]

54.     The threat to public safety and law enforcement posed by semiautomatic rifles—with or without dangerous modifications—is a modern phenomenon that has a direct correlation with mass murder and mass shootings.

---

[120] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022 (https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download), accessed October 4, 2022.  The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement.  Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida.  (https://lundestudio.com/are-binary-triggers-legal/), accessed October 4, 2022.  See also americanfirearms.org, "A Complete Guide to Binary Triggers," (https://www.americanfirearms.org/guide-to-binary-triggers/), accessed October 4, 2022.

[121] See "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v=PVfwFP_RwTQ), accessed October 4, 2022.

The danger these firearms pose is intrinsically different from past weaponry.  In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present (see Figure 1, below).

Figure 1

| | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have been as deadly as mass shootings with fully automatic weapons.

55.     And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below).

Figure 2

| | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with | 13.0 | 37.1 |

45

| semiautomatic rifle | | |
|---|---|---|

56.    Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and 26 percent more than semiautomatic handguns.  But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns.  And extended magazines are two-and-a-half times more likely to be used in mass shootings with semiautomatic rifles than with semiautomatic handguns: in 30 percent versus 12 percent of incidents.  Semiautomatic rifles and extended magazines are deadly on their own.  But in combination, they are extraordinarily lethal.

57.    The data in Figures 1 and 2, and in the immediately above paragraph, are from the Violence Project.[122]  The Violence Project, which has compiled data

---

[122] The Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022.  The Violence Project database provides information on the weapons used in the shootings.  It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons.  Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2 AK-47 rifles converted to automatic.  I have not participated in Violence Project or in the collection of their data.  In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, not yet included in the Violence Project's data, that fit the Violence Project's definition of a mass shooting: the Buffalo, New York, supermarket shooting on May 14; the Robb Elementary School shooting in Uvalde, Texas, on May 24; the Tulsa, Oklahoma medical center shooting on June 1; the concrete company shooting in Smithsburg, Maryland, on June 9; the Highland Park, Illinois, Fourth of July Parade shooting; and the Greenwood, Indiana, Park Mall shooting on July 17.  Three were committed with semiautomatic rifles and three with semiautomatic

(continued…)

Declaration of Randolph Roth (NAGR v. Lamont, 3:22-cv-01118-JBA)

**JA-930**

on mass shootings from 1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)."  Other authorities have adopted similar definitions of "mass shootings" and "mass murder."  For example, the FBI has defined mass murder as "a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murderers."[123]  Federal legislation enacted in 2013 authorized the Attorney General to assist in the investigation of mass killings, defined to mean "3 or more killings in a single incident."[124]

58.　　What is remarkable about the mass shootings that have plagued the United States since 1965 is that all but four involved a lone shooter, and those that have involved more than one assailant have involved only two: in 1998 in

_____

handguns.  The table in this declaration, unlike the tables in the Violence Project, does not include the Las Vegas shooting of 2017 (58 killed,  887 wounded). The Las Vegas shooting is an outlier in the number killed and wounded which would skew the results of the analysis

[123] FBI, *Serial Murder: Multi-Disciplinary Perspectives for Investigators* at 8 (2005) (https://www.fbi.gov/stats-services/publications/serial-murder#two), accessed January 3, 2023.

[124] 28 U.S.C. § 530C(b)(1)(M).

Jonesboro, Kentucky; in 1999 in Littleton, Colorado; in 2015 in San Bernardino, California; and in 2019 in Jersey City, New Jersey. In the nineteenth and early twentieth centuries, it required scores of individuals to gather together as mobs, rioters, vigilantes, or terrorists to kill or wound dozens of people in a short space of time—generally because of their race, ethnicity, or faith.

59.     Today, thanks especially to extended magazines and certain classes of semiautomatic firearms, it requires only one or two individuals to kill or wound that many people. And because of these modern technologies, which were developed for warfare, angry, alienated individuals can commit mass murder for reasons that are simply personal. Mass murderers no longer require collaborators to rally to a cause.  For example, they can kill large numbers of people simply because they feel slighted at school, because they don't get along with their coworkers, because they were rejected romantically, or because they simply want to make a name for themselves.  And since it is impossible in our society—indeed, in any society—to ensure that no one is angry or alienated, restricting access to extended magazines and certain classes of semiautomatic firearms mitigates the risk to every American.

60.     For these reasons, local governments have enacted bans on the sale of semiautomatic rifles with features that enhance their military utility, as the federal government did from 1994 to 2004.  And local governments have banned the sale

of large capacity magazines, because they allow mass murderers to prolong their attacks before citizens or law enforcement can intervene—usually when the shooter is reloading.  For example, the shooter who wounded U.S. House Representative Gabby Giffords in Tucson, Arizona, in 2011 was able to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before bystanders could disarm him as he changed magazines.  Every one of those rounds hit an individual, killing six and injuring twelve.[125]

## V.  CONCLUSION

61.     From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions.  That is why the majority of states passed and enforced laws against the carrying of concealable weapons, why the federal government passed the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and the federal government have passed and enforced laws since World War I to restrict ownership or control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit mass murder.  Public

---

[125] "2011 Tucson Shooting," Wikipedia (https://en.wikipedia.org/wiki/2011_Tucson_shooting), accessed September 2, 2022.

officials are not required to pass such laws, of course, but historically, they have always retained the ability to do so. There is no evidence in the historical record to suggest that they took their decisions lightly when they imposed these restrictions on weapons and armed voluntary organizations. And mass murders by individuals, including mass shootings, are a recent phenomenon, caused by changes in technology that emerged in the late nineteenth through the late twentieth century. Public officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence.

### DECLARATION UNDER PENALTY OF PERJURY
### PURSUANT TO 28 U.S.C. § 1746

I declare that the foregoing is true and correct under penalty of perjury under the laws of the United States.

Executed on ⏐ 27 , 2023

Randolph Roth

# EXHIBIT G

## Declaration of Professor Saul Cornell

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN | : | CIVIL NO. 3:22-CV-01118(JBA) |
| RIGHTS, ET. AL. | : | : |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | JANUARY 31, 2023 |
| *Defendant.* | | |

## DECLARATION OF PROFESSOR SAUL CORNELL

**I.     Assignment**

1. I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition. I have further been asked to opine on how the Founding-era generation understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.

**II.     Qualifications and Background**

2. I am the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther chair is one of three endowed chairs in the history department at Fordham and the only one in American history. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.

3. My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority opinion and dissenting opinion in *NYSRPA v.*

*Bruen*.[1] My scholarship on this topic has appeared in leading law reviews and top peer reviewed legal history journals. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[2] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*, No. 2018 cv 3085 (C.D. Ill.); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.).

## III.    Retention and Compensation

4. I am being compensated for services performed in the above-entitled case at an hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports; $1,000 per hour for depositions and court appearances; and an additional $100 per hour for travel time. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## IV.    Basis for Opinion and Materials Considered

5. The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit; my review of the local ordinances at issue in this lawsuit; my education, expertise, and research in the field of legal history. Additionally, my conclusions draw on a detailed review and analysis of the primary sources, secondary sources, and other materials cited in the footnotes and text of this report. The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

## V.    Summary of Opinion

---

[1] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2022 U.S. Lexis 3055 (2022).

[2] Saul Cornell, *The Right to Bear Arms, in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System, in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

6. In *Bruen*, the Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. Understanding text, history, and tradition require a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment.

7. It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way it fits within the larger context of American law in the Founding era. The members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[3] Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law that had been in effect in the English colonies for generations.[4] No concept was more important to the common law than the concept of the peace.[5] As one early American justice of the peace manual published after the adoption of the Second Amendment noted: "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[6]

8. In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's observation that there was a "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."[7] The dominant understanding of the Second Amendment and its state

---

[3] William B. Stoebuck, Reception of English Common Law in the American Colonies, 10 Wm. & Mary L. Rev. 393 (1968); MD. CONST. of 1776, DECLARATION OF RIGHTS, art. III, § 1. William B. Stoebuck, Reception of English Common Law in the American Colonies, 10 Wm. & Mary L. Rev. 393 (1968); Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[4] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903). FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern 1792). Commonwealth v. Leach, 1 Mass. 59 (1804).

[5] Laura F. Edwards, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (2009).

[6] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[7] *District of Columbia v. Heller*, 554 U. S. 570, at 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation described these types of limits in slightly different terms. The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012).; It is also possible that the phrase was an example

3

constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[8]

9. In the years following the adoption of the Second Amendment and its state analogues, gun regulation increased. Indeed, the individual states exercised their police power to address long standing issues and novel problems created by firearms in American society.

### The Historical Inquiry Required by *Bruen, McDonald,* and *Heller*

10. The United States Supreme Court's decisions in *Heller and McDonald,*[9] and *Bruen,* have directed courts to look to text, history, and tradition for guideposts in evaluating the scope of permissible firearms regulation under the Second Amendment. Justice Thomas, the author of the majority opinion in *Buren,* has noted that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[10] Legal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts.[11]

11. Following the mandates set out in *Heller, McDonald* and more recently in *Bruen,* history provides essential guideposts in evaluating the scope of permissible regulation under the Second Amendment.[12] Moreover, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[13] In particular, the court acknowledged that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen* differentiates between cases in which contested regulations are

---

of an archaic grammatical and rhetorical form hendiadys, see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA LAW REVIEW 687 (2016).

[8] On Founding era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013). On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[9] *McDonald v. City of Chicago*, 557 U.S. 965 (2009).

[10] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").

[11] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[12] *Supra* note 2 at 21

[13] *Id.*

responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

12. In the years between *Heller* and *Bruen,* historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[14] Indeed, such research is still ongoing: new materials continue to emerge, and in the months since *Bruen* was decided additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[15]

13. Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence: "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Crucially, the court further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[16]

14. One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard wired into the Second Amendment itself. As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of a form of interest balancing undertaken by the people themselves in framing the federal constitution and the first ten amendments. Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as

---

[14] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 Law & Contemp. Probs. 1 (2017).

[15] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public* 55 U.C. Davis L. Rev. 2495 (2022).
New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).
[16] *Supra* note 2.

complimentary. Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits a diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed." In Founding era American English, the word "infringement" meant to "violate" or "destroy." Richard Burns, in his influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of violations of the common law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[17] Regulation was therefore not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[18] In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the text of the two Amendments was seen to set up very different frameworks for thinking about the rights they protect. Members of the Founding generation would have understood that legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long such regulations did not destroy the underlying *right*. In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.[19] In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.

## From Muskets to Pistols and Beyond: Change and Continuity in American Firearms Regulation

---

[19] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

15. Guns have been regulated from the dawn of American history.[20] At the time *Heller* was decided there was little scholarship on the history of gun regulation and little quality scholarship on early American gun culture.[21] Fortunately, a burgeoning body of scholarship has illuminated both these topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen's* framework.[22]

16. The common law inherited from England acknowledged that the right of self-defense existed within a well delineated jurisprudential framework. There was universal agreement in the Founding era that individuals traded the absolute right of self-defense enjoyed in the state of nature for a more limited right under common law. The entire body of the common law was designed to preserve the peace and the scope of legitimate self-defense was no exception to this principle.[23] Statutory law, both in England and America functioned to further secure the peace and public safety. Given these indisputable facts, *Heller* correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety. To deny such an authority would be to convert the Constitution into a suicide pact and not a charter of government The Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[24]

17. *Bruen's* methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[25] Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[26]

---

[20] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[21] *Id.*

[22] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 Law and Contemporary Problems 1 (2017).

[23] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11 (2017).

[24] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[25] Pamela Haag, GUNNING OF AMERICA : BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE. (2016).

[26] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

18. Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment. A combination of factors, including the nature of firearms technology and the realities of living life in small face to face and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government gun policy needed to address at the time of the Second Amendment.[27]

19. The surviving data for New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy. Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region. This data underscores the necessity of a well regulated militia and the imperative to arm it with weapons suitable to ground warfare. The data presented in Figure 1 is based on the pioneering research of Ohio-State historian Randolph Roth whose work must be read in conjunction with the recent work of Amherst College historian, Kevin Sweeney.[28] The problem Americans faced at the time of the Second Amendment was not too many guns, but too many of the wrong type of guns. Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets. Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and a pair of polished dueling pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men. Sweeney's work shows that by the time of Jefferson's presidency the state militias in much of America had managed to equip less than half the militia eligible-population with a working musket.[29]

20. Limits in Founding era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle loading

---

[27] Randolph Roth, AMERICAN HOMICIDE 56, 315 (2009).

[28] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America, in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[29] *Id.*

weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge. Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume. As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded. Why do they always show the gun over the fireplace? Because that's the warmest, driest place in the house."[30] Similar problems also limited the utility of muzzle loading pistols as practical tools for self-defense or criminal offenses. Indeed, at the time of the Second Amendment, over ninety percent of the weapons owned by Americans were long guns, not pistols.[31]



**Figure 2.3** Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

21. As Roth's data makes clear there was not a serious homicide problem looming over debates about the Second Amendment. Nor were guns the primary weapon of choice for those with evil intent during this period.[32] The problem facing government was how to shape consumer preferences and behavior so that individuals would acquire the types of weapons government felt

---

[30] Randolph Roth, transcript interview, *Why is the United States the Most Homicidal in the Affluent World*, available at https://nij.ojp.gov/media/video/24061#transcript--0 (last visited 9/14/2022).
[31] *Id.*
[32] *Id.*

essential to a militia.  The most valuable tool to achieve this  goal, militia statutes, amounted to a tax. Government required white citizens capable of bearing arms to acquire at their own expense a military quality musket and participate in mandatory training and other martial activities.[33] Gun policy in the Founding era reflected these realities, and accordingly one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogenous industrial society capable of producing  a bewildering assortment of firearms whose lethality would have been almost unimaginable to the Founding generation.[34] Put another way, laws created for a society without much of a gun violence problem enacted at a time of relative gun scarcity have limited value in illuminating the challenges Americans face today.

22. The calculus of individual self-defense changed dramatically in the decades following the adoption of the Second Amendment.[35] The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[36]  The same technological changes and economic forces that made wooden clocks and other consumer goods such as Currier and Ives prints common items in many homes transformed  American gun culture. [37] These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common. Economic transformation was accompanied by a host of profound social and economic changes that gave rise to America's first gun violence crisis.  As cheaper, more dependable, and easily concealable handguns proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity.[38]  The change in behavior was most noticeable in the case of handguns. The culmination of this gradual process of evolution in both firearms and ammunition technology was the development of Samuel Colt's pistols around the time of the Mexican War.[39]

---

[33] Saul Cornell, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006).

[34] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495 (2022)

[35] *Supra* note 28.

[36] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion* 93 BUSINESS HISTORY REVIEW  57 (2018).

[37] Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW AMERICAN HISTORY, edited by Eric Foner (1990).

[38] *Supra* note 28.

[39] William N. Hosley, COLT: THE MAKING OF AN AMERICAN LEGEND (1986).

23. The response of states to the emergence of new firearms and new perceptions of threats to the peace was a plethora of new gun laws. These new laws regulated, and in some instances limited the sale of weapons and the use of weapons that threatened the peace. Governments continued to keep track of and inspect privately owned weapons as had been the case at the time of the Second Amendment's enactment. In short, when faced with changes in technology, consumer behavior, and faced with novel threats to public safety, the individual states enacted laws to address these problems.

The most sweeping laws were passed in the Slave South. In every instance apart from a few outlier cases in this region, courts upheld such limits on the unfettered exercise of a right to keep and bear arms. The primary limit identified by courts in evaluating such laws was the threshold question about abridgement: did the law negate the ability to act in self defense.[40] Thus, the people themselves acting through their legislatures retained the fundamental right to determine which dangerous weapons were exempted from the full protection of the constitutional right to keep and bear arms.

24. The common law constraints on gun use also persisted into the early republic. One useful metric inherited from English common law that helped maintain the peace was the concept of *in terrorem populi*.[41] In his influential treatise on criminal law, Joel Prentis Bishop summarized the strong continuities between English and American law regarding dangerous weapons. "The same thing has, moreover has been very properly held in the United States; and so here, whether we receive the English statute or not, we hold criminal by our common law the going or riding about armed, with unusual and dangerous weapons, to the terror of the people."[42] The key determinant of legality according to this view was the probability that a particular weapon would provoke a terror and undermine the peace: a determination that was inescapably tied to contextual judgments made by legislatures and courts about how a particular class of weapons impacted society. The long-standing prohibition on dangerous or unusual weapons in part reflects this ancient common law principle.

---

[40] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F. 121, 128 (2015)

[41] John Bouvier 1 A LEGAL DICTIONARY 2nd ed., (1843) at 660.

[42] Joel Prentis Bishop, 2 COMMENTARIES ON CRIMINAL LAW 2nd ed. (1859) at 678; Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Understanding of the Second Amendment*, 42 S. Ill. U. L.J. 61 (2018).

**Firearms Then and Now: Lethality in Historical Perspective**

Modern firearms are not only more deadly, but they are lighter, easier to use, more accurate, and require far less training to be effective. Although comparisons of weapons from different eras is inherently subjective, one effort to compile a comparative lethality index for military weapons is instructive. Military historian and defense analyst Trevor DuPuy's theoretical lethality index captures the exponential growth in the lethality of modern firearms. Of course, this intellectual construct, was developed to compare weapons on the battlefield. The increased lethality of these weapons in a civilian context is almost unimaginable. An attack on a school with an eighteenth-century musket could easily result in no casualties given the difficulty of using such weapons and the likelihood of misfiring. The attack on Sandy Hook Elementary School and the scores of mass shootings in recent years would have been impossible using common eighteenth-century firearms. Given these facts any effort to analogize Founding era weapons with modern semi-automatic weapons invariably understates the increase in the level of carnage that contemporary firearms can cause in a non-military setting.[43]

**Dupuy's Theoretical Lethality Index[74]**

| Weapon | TLI |
|---|---|
| Sword, pike, etc. | 23 |
| Longbow | 36 |
| 17th c. musket | 19 |
| 18th c. flintlock | 43 |
| Early 19th c. rifle | 36 |
| Mid-19th c. rifle/conoidal bullet | 102 |
| Late 19th c. breech-loading rifle | 153 |
| Springfield Model 1903 rifle (magazine) | 495 |
| World War I machine gun | 3,463 |
| World War II machine gun | 4,973 |

[43] Darrell Miller and Jennifer Tucker, *Common Use Lineage, and Lethality* 55 U.C DAVIS. L. REV 2495, 2509 (2022).

Another important insight derived from Dupuy's work concerns the increased lethality of guns in the late nineteenth century. The expansion of gun laws after the Civil War, in part, reflects the improvements in firearms lethality and their wider availability to the civilian population. The ease of use of these weapons compared to earlier firearms also increased their popularity. The rise of easily concealed weapons, especially pocket pistols, contributed to rising urban crime and violence. The expansion of arms in the post-Civil War era made these and other arms more readily available for use in crimes of violence so states and localities enacted laws to regulate the baneful consequences of arms proliferation.[44]

### The Police Power and Firearms Regulation

25. The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[45] The phrase "internal police" had already become common, particularly in state laws establishing towns and defining the scope of their legislative authority.[46] By the early nineteenth century the term "police" was a fixture in American law.[47] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided

---

[44] *Supra* note 28 352.

[45] PA. CONST. OF 1776, Ch. I, art iii.

[46] For other examples of similar constitutional language, see N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV. For other examples of this usage in laws creating municipal governments, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791). For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[47] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

for maintaining order, cleanliness &c."[48] The Founding era's police right, and its heir the Marshall Court's doctrine of the police power became a fixture in American law.

26. The power to regulate firearms and gunpowder has always been central to the police power and historically was shared by both states, local municipalities and the federal government on federal land and buildings.[49] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered Anti-Federalists, strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority.[50]

27. Federalists and Anti-Federalist bitterly disagreed over many legal issues, but this one point of accord was indisputable. Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ." Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[51]

28. At the Founding it was recognized that state police power authority was at its pinnacle in matters relating to guns or gun powder. Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[52] New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

---

[48] 10 ENCYCLOPÆDIA AMERICANA 214 new edition (Francis Lieber ed.).

[49] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[50] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[51] Brutus, ESSAYS OF BRUTUS VII, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981). Tench Coxe, A Freeman, PA. GAZETTE, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[52] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[53]

29. The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities. A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court. This concept would become the primary tool for courts attempting to adjudicate cases involving gun regulation.[54]

30. The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[55]  Nor was Marshall unique in highlighting the centrality of this idea to American law. [56] The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety.[57]

---

[53] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 191-2 (Thomas Greenleaf, ed., 1792).

[54] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864, https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/**.**

[55] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

[56] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340)  464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[57] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY

Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power. Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[58]

31. Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[59] A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town,

---

AMERICA (1996); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005); MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (2015).

[58] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851). For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[59] SPITZER, GUNS ACROSS AMERICA *supra* note 6 at 39-64.

according to the provisions of this Act, first having obtained a search warrant therefore according to law.[60]

32. No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance. Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged. This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[61] Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[62] This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[63]

33. One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[64] The case was a classic example of antebellum police power jurisprudence: "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public

---

[60] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

[61] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 190-1900: LEGAL THOUGHT BEFORE MODERNISM (2013).

[62] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

[63] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

64 *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

morals."[65] The regulation of arms was in the court's view something at the very core of state police power.[66]

### Reconstruction and the Expansion of State Police Power to Regulate Firearms

34. Although Founding-era constitutions separated the right of the people to regulate their internal police from statements about the right to bear arms, Reconstruction-era Constitutions adopted a new formulation, fusing the two rights together as one. Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military. By contrast constitution writers in the era of the Fourteenth Amendment were motivated by a different fear: the proliferation of especially dangerous weapons. The language of the right to bear arms provisions in state constitutions enacted during Reconstruction and after began to recognize that the police power of the state could be used to regulate firearms.[67] Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms. For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[68] Nor was Texas an outlier in this regard. Sixteen state constitutions adopted during this period employed similarly expansive language.[69] Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating the use of guns in public.[70]

---

[65] *Id.* at 616.

[66] Apart from rare outlier decisions, such as Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms. For a useful discussion of *Bliss* in terms of the police power, see ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 91 (1904).

[67] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2021).

[68] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[69] *Supra* note 64.

[70] *Id.*

35. This new constitutional focus on regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and Republicans hoping to further the goals of Reconstruction.[71] The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[72] As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good pursuant to their police power authority that was "inalienable." [73]

36. It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation. Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms. Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[74] Not only did the number of laws increase, but the number of states passing such laws expanded.[75]

37. Henry Campbell Black, the author of *Black's Law Dictionary*, reiterated a point that was beyond dispute for jurists in this era, the police power was "inalienable" and not easily defined in the abstract. In keeping with the continuing influence of common law modes of legal thought, virtually every jurist and legal scholar underscored that the determination of its limits was best left to courts on a case-by-case basis.[76] Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that "police power of the

---

[71] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019).

[72] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043. 1058 (2010).

[73] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[74] *See* Robert F. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55, 59-61 tbl. 1 (2017).

[75] *Id.*

[76] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[77]

38.  Reconstruction (1863-1877) ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety. Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder. In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[78]

39.  In keeping with the larger goals of Reconstruction, this period witnessed an intensification of firearms regulation. Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety. The violence of the Reconstruction period led to the enactment of a range of more robust firearms regulations.[79]

40.  The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but simply an example of the flexibility inherent in this accepted legal concept.

**Firearms and the Peace: Terror Enters the Modern Age**

41.  With the dawn of a new century, changes in technology, consumer behavior, and society once again created a novel gun violence problem requiring state action.[80] Although breech loading rifles and repeating rifles emerged in the late nineteenth century these weapons did not achieve sufficient market penetration to impact gun violence which remained disproportionately an urban

---

[77] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886), *citing Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854).

[78] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (2005-2006).

[79] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

[80] ERNST FREUND, THE POLICE POWER 246–47 (1904); Spitzer, *supra* note 16 at 60.

problem. In fact, the marketing of these weapons focused on their utility in western and rural contexts, not the urban areas most plagued by crime.[81]   By contrast the emergence of fully automatic and semi-automatic weapons in the early decades of the twentieth century followed a different trajectory. These weapons did exacerbate urban crime prompting multiple legislatures to aggressively regulate them and, in some instances, prohibit their sale and possession. Fears about gangster weapons echoed  pre-Civil War fears about weapons of "bravado, and affray" associated with earlier periods of intensive firearms regulation.[82]

    42. As was true for the first wave of state gun control laws, passed in response to the proliferation of handguns in the antebellum era, the  new concern over "gangster weapons" did not emerge  simultaneously with the development of new firearms technology. Semi-automatic and fully automatic weapons did immediately produce social problems requiring government action. The passage of new regulations governing firearms invariably has trailed technological developments in gun design, manufacture, and marketing. Legislation was only necessary once new weapons became popular enough to cause a problem that required government action. This well-established pattern repeated itself in the case of rapid-fire weapons, including semi-automatic and fully automatic guns. As these weapons proliferated and undermined public safety, new laws were crafted to mitigate their harms.[83]

    43. Nothing better illustrates this process than  popular concerns about "gun toting" and "gangster weapons," including the notorious "Tommy Gun," a machine gun that was popularly associated with the Saint Valentine's Day Massacre and criminals such as Machine Gun Kelly. Until the 1920s these weapons were not perceived to present a sufficient public safety concern to prompt regulation. Political scientist Robert Spitzer's overview of the history of firearms regulation underscores this point: "So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I. But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a

---

[81]  Pamela Haag, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).
[82] S*upra* note 41.
[83] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).

preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[84]

44. Laws targeting fully automatic and semi-automatic rapid-fire weapons were a classic example of the flexibility of the police power. Michigan's law is illustrative of these laws:

> It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen (16) times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm. [85]

45. In response to the rise of "gun toting" and "gangsterism" in the 1920s, a number of states passed new laws banning fully automatic machine guns and in some instances semi-automatic weapons.[86] It is important to note that the weapons singled out for prohibition were not simply those capable of fully automatic fire, but also included many semi-automatics as well.[87] By the early 1930s more than half the states had passed some type of prohibition on fully automatic or semi-automatic weapons.[88] A number of states embraced the view that fully automatic and semi-automatic weapons ought to be classified as "machine guns" for legal purposes. [89] Minnesota's 1933 law was among the most detailed drafted:

> Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of

---

[84] Id. at 68

[85] Michigan Pub. Acts 1929, Act No. 206, Section 3, Comp. Laws 1929, § 16751:

[86] Adam Winkler: GUN FIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (211) at 191. Deconde, GUN VIOLENCE IN AMERICA.

[87] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).

[88] Among the western and mountain states passing such laws: Act effective July 29, 1927, ch. 552, 1927 Cal. Stat. 938; Act of Mar. 9, 1931, ch. 178, 1931 N.D. Laws 305; Or. Laws 488, 489; 1933 S.D. Sess. Laws 245;Act of Mar. 6, 1933, ch. 64, 1933 Wash. Sess. Laws 335. There were also unprecedented efforts to coordinate such actions nationally, including the creation of model statutes for states to use for their own legislative efforts, see Patrick J. Charles, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY (2018). Charles, ARMED IN AMERICA at 193.

[89] *Report of Chairman of Section on Torts and Criminal Law*, 39 HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEEDINGS OF THE ANNUAL CONFERENCE MEETING 346 (1920) at 350.

automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun within the provisions of this Act."[90]

Similarly, South Dakota defined machine guns as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine."[91]

**Assault Weapons Bans, the Police Power, and the  Latest Face of Terror**

46.    Another major inflection point in the debate over firearms regulation focused on "assault weapons," and was closely connected to the rise of mass shootings in the last decades of the twentieth century.[92] California led the way with its ban on assault weapons enacted after the Stockton School Massacre in 1989.[93]  Proposals to ban  "assault weapons" are part of a larger national movement to deal with the carnage caused by high capacity, high velocity weapons.  The popularity of these weapons and accessories is a recent development in American gun culture.[94]

47. Defining what types of weapons ought to be included under the category of "assault weapons" has become one of the most deeply contentious issue in the fraught political debate over gun regulation. Gun rights advocates have insisted that the term  "assault weapon" is an invention of gun control activists and that the term is essentially meaningless.[95]  For those in the  gun rights

---

[90] 1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.

[91] 1934 S.C. Acts 1288, An Act Regulating the use and Possession of Machine Guns: §§ 1 to 6.

[92] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction* 68 EMORY L.J. 1043 (2020).

[93] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.

[94]   Robert Spitzer, THE POLITICS OF GUN CONTROL (2012)14.

[95] For a good illustration of the gun rights point of view, Stephen P. Halbrook, *New Yorkers Not So "Safe" Act: The Second Amendment in an Alice-In-Wonderland World Where Words Have No Meaning* 78 ALBANY L. REV. 789 (2015).

community these "modern sporting rifles" share functions and features with many other guns including some hunting rifles.[96] Much of the current controversy over bans or restrictions on dangerous or unusual weapons revolves around the AR-15 and similar types of weapons.[97] The debates heavy focus technological factors obscures the  fact that legislative efforts to ban these weapons fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror.

48. The  history of the AR- 15 clearly shows why legislatures have singled out this class of weapon. The development of the AR-15 was tied to the strategic requirements of the American military to find a replacement for heavier World War II era rifles. The military M-16 and the civilian AR-15 are closely related. In contrast to standard issue military weapons such as the M-16, the AR-15 and other similar civilian weapons are all semi-automatic, not selective fire weapons capable of firing in either fully automatic or semi-automatic modes.

49. When they were first introduced military-style AR-15 types of weapons were not especially popular.[98] When first marketed this  military connection was a liability because of lingering opposition to the Vietnam War slowed down early civilian interest in a weapon that was closely related to the M-16.[99]  Gun makers eventually developed a more effective set of marketing strategies that linked these products to their origins in the military but did so in manner that made them avatars of  masculinity and libertarian ideology.[100]

---

[96]  On modern marketing of firearms, see Pamela Haag, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

[97] James Jacobs, "Why Ban Assault Weapons?" 37 CARDOZO L. REV. 681 (2015) at 687. For a useful overview of the legal issues in regulating this class of weapons, see Vivian S. Chu *Federal Assault Weapons Ban: Legal Issues Congressional Research Service*, February 14, 2013.

[98] David M. Studdert et. al. *Testing the Immunity of the Firearm Industry to Tort Litigation* 177 JAMA INTERNAL MEDICINE 102  (2017) 102–5.

[99] On the insurrectionary tradition, see David C. Williams, *Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment* 74 TULANE L. REV. 387 (1999).

[100] Joseph Blocher,  *Has the Constitution Fostered a Pathological Rights Culture? The Right to Bear Arms: Gun Rights Talk*, 94 B.U.L. Rev. 813 (2014) and Joseph Blocher, *Hunting and The Second Amendment* 91 NOTRE DAME L. REV. 133 (2015).

50. There is no doubt that many of the pragmatic and cosmetic features of AR-15 type weapons now account for their popularity among some segments of the gun owning public.[101] The weapons are lighter, produce less recoil, and are easier to fire than an older generation of hunting rifles. The fact that these weapons are also highly customizable has increased their appeal. Commentators have analogized them to other consumer products, describing them as an adult and hyper-masculine version of a "Barbie Doll."[102] Opponents of robust regulation of assault weapons insist that the targeted weapons are neither especially dangerous nor unusual. Moreover, gun rights advocates insist that the category is an invention of gun control advocates and the prohibition targets cosmetic features.[103]

51. Dismissing marketing strategies tying these weapons to the military as simply cosmetic misses an important point about the history of firearms technology and government regulation. The history and tradition of arms regulation has always recognized that the ability to inspire *terrorem populi* is a legitimate justification for regulation. The perpetrator of the Newtown killings, used a Bushmaster AR-15-type weapon that was marketed with a slogan that traded on hyper-aggressive forms of toxic masculinity: "Consider Your Man Card Reissued."[104] There is little disputing the fact that despite protestations that these are merely sporting rifles the marketing campaigns used to sell these weapons evokes images of military assault capabilities.[105] The advertisement from two popular arms manufacturers are illustrative of these campaigns.[106]

---

[101] Rachel A. Callcut et. al., *Effect Of Mass Shootings on Gun Sales-A 20-Year Perspective* 87 J. TRAUMA ACUTE CARE SUR. 531 (2019).

[102] Robert J. Spitzer, *Why Assault Rifles are Selling*, CHICAGO TRIBUNE, June 16, 2015.

[103] Stephen P. Halbrook, *Reality Check: The Assault Weapon Fantasy and Second Amendment Jurisprudence* 14 GEORGETOWN J. OF L. & PUBLIC POLICY 47 (2016). For a good example of this type of flawed technological determinist approach, see David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994). For a general discussion of the problems with technological determinism, see Merritt R. Smith, and Leo Marx, DOES TECHNOLOGY DRIVE HISTORY? THE DILEMMA OF TECHNOLOGICAL DETERMINISM (Cambridge, MA: MIT, 1994); Allan Dafoe , *On Technological Determinism: A Typology, Scope Conditions, and a Mechanism Science*, 40 TECHNOLOGY, & HUMAN VALUES 1047 (2015).

[104] Deconde, GUN VIOLENCE IN AMERICA; Cornell and DeDino, *A Well Regulated Right.*

[105] Mark Berman and Todd C. Frankel , "Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence,", WASHINGTON POST, July 27, 2022

[106] Carolyn Maloney, Supplemental Memorandum
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf





52. *Bruen* brushes past these technology focused arguments. From the perspective of text, history, and tradition the key legal fact is that that these weapons are perceived by important segments of the public to weapons capable of provoking a terror. Even if one accepted that some of the specified features on these weapons were simply cosmetic, a point hotly contested by proponents of stronger regulation, this does not negate the undeniable fact that these weapons are capable of producing terror.[107] Firearms manufacturers created a type of weapon and marketed it

---

[107] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018). There has been considerable debate over the category of assault weapons for over thirty years, see Franklin E. Zimring, *The Problem of Assault Firearms* 35 CRIME & DELINQUENCY 538 (1989). Mass shootings have been rendered more deadly by the proliferation of assault weapons, see John Donahue, https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/. For the most recent assessment of the impact of assault weapons on the American gun violence problem, see Christopher S. Koper *et. al., Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources* 95 J. URBAN HEALTH 313 (2018).

to distinct demographics, stressing characteristics and cultural associations that tied them to war and then used these associations to effectively market them. The fact that a successful marketing strategy earned gun companies over a billion dollars contradicts the claims of gun rights advocates these weapons are no different than other guns available to consumers. If that were true than gun companies would have abandoned these marketing strategies long ago and replaced them with something more effective. It would be illogical and run counter to the most basic principles of Anglo-American law to argue that people themselves are powerless to regulate these weapons to mitigate the threats they pose to peace and public safety. The appeal of these weapons and their contribution to gun violence are two sides of the same coin.[108] From a constitutional perspective the holding in *Bruen* makes issues about technology less relevant to evaluating the ability of these weapons to provoke terror.[109]

### *Bruen's* Framework and Modern Assault Weapons Bans

53. The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities. At different moments in American history communities have deemed categories of weapons to be especially dangerous and have regulated them, and when it appeared necessary enacted bans on some types of weapons. Such determinations were not made based on technological features in isolation but reflected the ancient common law tradition of singling out weapons capable of producing a terror. Such weapons undermined the peace and the constitutional imperative embedded in the text of the Second Amendment to protect the security of a free state. Defining exactly which category of weapons have fallen outside of the scope of constitutional protection has shifted over time as society has addressed new developments in firearms technology, evolving societal norms, and

---

[108] Polly Mosendz, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, June 20, 2018, BLOOMBERG, https://www.bloomberg.com/news/articles/2018-06-20/why-gunmakers-would-rather-sell-ar-15s-than-handguns.Donohue, *The Swerve*. Christopher S. Koper, *Assessing The Potential to Reduce Deaths And Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other High-Capacity Semiautomatic 19 Firearms* CRIMINOLOGY AND PUBLIC POLICY 147( 2020); Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings* 22 APPLIED ECONOMICS LETTERS 281 (2014).
[109] David Hemenway, and Eliot Nelson, *The Scope of the Problem: Gun Violence in the USA* 6 CURRENT TRAUMA REPORTS 29 (2020).

other changes. In short, social, and economic transformation were always accompanied by legal transformation. Put another way, as times change, the law changes with them.[110]

54. Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a point about American law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[111] The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day. The adaptability of state and local police power has always provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

---

[110] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).
[111] *Id.*

Pursuant to 28 USC §1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on January _31_ , 2023 in Redding, CT.

_____

Professor Saul Cornell

# EXHIBIT H

## United Nations Office on Drugs and Crime Diagrams

Tertiary ▶ Firearms ▶ Module 2:Basics on Firearms and Ammunition ▶ Key Issues ▶ Common Firearms Types

# E4J University Module Series: Firearms

## Module 2: Basics on Firearms and Ammunition

**Introduction and learning outcomes**

**Key Issues**
- Typology and classification of firearms
- Common types of firearms
- 'Other' types of firearms
- Parts and components
- Ammunition
- Summary
- References

**Exercises**

**Possible class structure**

**Core reading**

**Advanced reading**

**Student assessment**

**Additional teaching tools**

*First published in February 2019*

## Common firearms types

The most common classification of firearms is done by types, and the most commonly used tool for firearms identification is the Firearms Reference Table (FRT). The FRT is a computerized database available online and offline. It was proposed and developed by Canadian Royal Mounted Police and it was further adopted by INTERPOL as a reference classification tool. Use of the FRT Web is limited to individuals who have been authorized by the RCMP. Authorized users include members of the police community, specific Public Agents and approved firearms verifiers.

UNODC adopted a simplified classification in its 2015 study and also in its global illicit arms flow questionnaire, which is based on the following types:

### Revolver

Is a short or hand-held firearm with a revolving cylinder typically of five to nine chambers, manually loaded with cartridges. As the cylinder rotates into position, the trigger can be pulled, releasing the hammer firing the cartridge. Expanded cartridge cases remain in the cylinder until manually unloaded.

**Action:** Revolvers are usually repeating firearms. According to the system of operation of the trigger (s), revolvers can be of double (when the trigger also cocks the hammer) or single action (when the hammer is cocked manually).



**Figure 1: Revolver models. Source: Firearms Reference Table (RCMP-GRC / Interpol)**

### Pistol

Is a short or hand-held firearm designed for semi-automatic operation. The chamber is part of the barrel. Cartridges are generally loaded into a magazine, which is inserted into the grip. The action of the firearm feeds the next cartridge and expels the spent round.

**Action:** single shot; repeating; semi-automatic and automatic pistol.



**Figure 2: Pistol models. Source: Firearms Reference Table (RCMP-GRC / Interpol)**

### Shotgun

Is a shoulder-fired long gun with one or two certified barrels (side-by-side or over configuration), usually designed to shoot many small projectiles ("shot") rather than a bullet. The calibre of a shotgun is referred to as the gauge and is usually larger in diameter than other small arms.

**Action:** Usually single-shot. May also be repeating, or semi-automatic.



**Figure 3: Shotgun models. Source: Firearms Reference Table (RCMP-GRC / Interpol)**

### Rifle or Carbine

Is a shoulder-fired long gun, with a series of spiral grooves cut inside the barrel ("rifling") imparting spin to the projectile. Some rifles have a detachable magazine like the pistols described above, and others have integral magazines. A carbine resembles a rifle but has a shorter barrel.

**Action:** Single-shot, repeating, semi-automatic or fully automatic.



**Figure 4: Rifle models. Source: Firearms Reference Table (RCMP-GRC / Interpol)**

### Assault rifle

Can be considered a subcategory of rifles and represents "any of various intermediate-range, magazine-fed military rifles (such as the M-42 or M16) that can be set for automatic or semiautomatic fire ..." (Merriam-Webster).

**Action:** Semi-automatic or fully automatic.



**Figure 5: Assault Rifle models. Source: Firearms Reference Table (RCMP-GRC / Interpol)**

### Sub-machine gun

It is a hand-held, lightweight short-barrelled machine gun consisting of relatively low-energy handgun-type cartridges and fired from the hand, hip or shoulder.

**Action:** Semi-automatic or fully automatic. Where the firing system is automatic, the firearm would be classified as an automatic pistol or automatic sub-machine gun.



**Figure 6: Sub-machine Gun models. Source: Firearms Reference Table (RCMP-GRC / Interpol)**

### Machine gun

It is a firearm that is capable of full automatic firing (more than one shot without manual reloading, by a single function of the trigger) and that fires rifle ammunition. It is generally crew-operated ("heavy machine gun"), but some firms may be fired by single individuals ("light machine gun"). Most machine guns have the ammunition fed by belts, although some use magazines.

**Action:** Semi-automatic or fully automatic.



**Figure 7: Machine Gun models. Source: Firearms Reference Table (RCMP-GRC / Interpol)**

The above enumerated types cover the large universe of all legal arms. There are, however, others that do not fall clearly under any of them, either because of their technical characteristics, or because of the manufacturing process (craft or artisanal production; assembly of kits, modifications, 3D printing, etc.). They are all listed under the category "other".

**Next: 'Other' types of firearms**

**Back to top**




JA-966

# Firearms parts and components

## Main components of a firearm

**Summary of a firearm's parts and components**



## General anatomy of a revolver

## General anatomy of a semiautomatic pistol

## General composition of a rifle

## General composition of a sub-machine gun

## Firearms tracing

**NEW CONCEPT OF PROACTIVE INVESTIGATION (UNODC)**




**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN )<br><br>Plaintiffs, )<br><br>v. )<br><br>NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, )<br><br>Defendants. ) | Civil Action No.<br>3:22-cv-1118 (JBA) |

**REPLY IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

I.  Justice Thomas: Laws Like the Connecticut Statute are Clearly
    Unconstitutional ................................................................................ 1

II.  The State's Central Premise is False ................................................ 2

III.  This Case is Very Simple ................................................................. 4

IV.  The Legal Analysis Controlling This Case is Indistinguishable
     from *Heller* .................................................................................... 7

V.  The State Misapprehends *Bruen's* Historical Test .......................... 8

VI.  The State's Burden is to Identify "an Enduring American
     Tradition," Not a Handful of Isolated Examples and Outliers .......... 9

VII.  The State's "Advanced Technology" Argument Wilts in *Heller's* Glare ........... 9

VIII.  The State Cannot Identify a Historical Tradition of Absolute
       Bans of Commonly Held Arms .................................................... 10

A.  The Relevant Time Period Does Not Include the 20th Century ........ 10

B.  The State Was Unable to Show Historical Analogues .................... 12

C.  Conclusion: An Arms Ban Would Have Been Unthinkable to the Founders ...... 15

IX.  The State's Reliance on *Cuomo's* "Pre-*Bruen* Analysis" is Baffling ........ 16

X.  The Court Should Reject the State's Attempt to Shift its Burden
    onto Plaintiffs ................................................................................ 17

XI.  Magazines Are Arms ..................................................................... 19

   A.  The State's Argument is Counter to *Heller* ............................... 19

   B.  The State's Argument is Contrary to Lower Courts' Holdings ........ 19

   C.  Magazines are an Essential Component to Semi-automatic Firearms ..... 20

   D.  Silencers Are Not Essential to the Operation of Any Firearm ........ 26

XII.  The State Bans Firearms, Not Firearm Accessories ....................... 27

XIII.  The Banned Arms Do Not Fall Within the Category
       of Weapons That Are Not Protected by the Second Amendment ...... 27

   A.  The Court is Bound by Second Circuit Precedent:
       The Banned Arms are in Common Use ...................................... 28

i

B. The Banned Firearms are Not Dangerous and Unusual...........................28

C. The State's "Weapons Most Useful in Military Service"
Argument Fails...........................................................................................31

XIV. The Court Should Reject the State's Efforts to Distort
the *Heller/Bruen* "Common Use" Analysis ........................................35

A. There is No Requirement to Show Actual Use ........................................35

B. The State's Effort to Distort the Common Use Metric Fails ..................37

XV. The Overwhelming Majority of the State's Response
Does Not Address Any Matter Relevant to the *Heller/Bruen* Test ....39

A. The State's Means-End Argument is Simply Irrelevant .........................39

B. Constitutional Law is Not Grounded in Emotional Appeals ..................41

C. The Availability Heuristic is not a Constitutional Doctrine ..................42

XVI. There is No Historic Tradition Supporting a Magazine Ban ...............................43

XVII. The State Tacitly Admits its Handgun Ban is Unconstitutional ........................43

XVIII. Plaintiffs' Facial Challenge is Supported by Supreme Court Precedent ............44

XIX. The Other Temporary Injunction Factors Are Met................................................46

XX. Conclusion ....................................................................................................47

## I.  Justice Thomas: Laws Like the Connecticut Statute are Clearly Unconstitutional

This is not a close case. The Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes." *D.C. v. Heller*, 554 U.S. 570, 625 (2008). Justice Thomas, the author of *Bruen* (joined by Justice Scalia, the author of *Heller*), provided a roadmap to the resolution of this matter in his dissent from denial of certiorari in *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015). Justice Thomas examined an arms ban that was for practical purposes identical to Connecticut's Statute. He noted millions of Americans own AR-style semiautomatic rifles for lawful purposes, including self-defense and target shooting. *Id.* (Thomas, J., dissenting). "**Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons**." *Id.* (emphasis added).

The State has hired numerous experts and submitted hundreds of pages of material in an effort to make this case seem complicated. It is not. This case turns on *Heller's* simple rule to which Justice Thomas alluded. Is the firearm hardware commonly owned by law-abiding citizens for lawful purposes? "If the answer[ is] "yes," the test is over." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019) (emphasis added).[1] Here, the answer is unquestionably "yes." The test is over. The State has categorically banned weapons commonly possessed by law-abiding citizens for lawful purposes. The law is unconstitutional. It is just that simple.

---

[1] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 213 L. Ed. 2d 1109, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022), *and rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).

1

## II.    The State's Central Premise is False

The Central Premise of the State's argument is that when it decided *Heller*, the Supreme Court surely never intended to extend Second Amendment protection to a category of arms that can be used in mass shootings. Resp. 18-19. The State's Central Premise rests on a fundamental misunderstanding of *Heller* and is therefore false. This is easily demonstrated.

On April 16, 2007, Seung Hui Cho committed a mass shooting at Virginia Tech University.[2]  At the time, Cho's crime was the worst mass shooting in American history. *Id*. Cho fired 174 rounds, killed 32 people, and wounded around 17 others.[3] Aside from the first two murders, Cho was able to do all of this in only a few minutes. *Id*. Cho did not use an "assault rifle" to commit his crimes.[4] He used two semiautomatic handguns. *Id*.

*Helle*r was argued less than one year later on March 18, 2008,[5] and D.C. made sure the Court was aware that the worst mass shooting in U.S. history up until then had recently been committed with handguns like those banned by its ordinance. It wrote in its brief: "In the recent Virginia Tech shooting, a single student with two **handguns** discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53 (emphasis added). Thus, when it decided *Heller*, the Supreme Court was keenly aware that semiautomatic handguns could be used in mass shootings. Nevertheless, it held that D.C.'s ban was unconstitutional. In doing so, the Court wrote:

> **We are aware of the problem of handgun violence** in this country, and **we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution**. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating

---

[2] Ben Williamson, *The Gunslinger to the Ivory Tower Came: Should Universities Have A Duty to Prevent Rampage Killings?,* 60 Fla. L. Rev. 895, 895–96 (2008).
[3] Grant Arnold, *Arming the Good Guys: School Zones and the Second Amendment*, 2015 B.Y.U. Educ. & L.J. 481, 500–01 (2015).
[4] *Craig R. Whitney, A Liberal's Case for the Second Amendment, 31 T.M. Cooley L. Rev. 15, 19 (2014).*
[5] *Id*., 554 U.S. at 570.

handguns, [] But the enshrinement of constitutional rights necessarily **takes certain policy choices off the table. These include the absolute prohibition of handguns** held and used for self-defense in the home.

*Heller*, 554 U.S. at 636 (emphasis added).

The Virginia Tech shooter killed more people with his semi-automatic handguns (32 fatalities) than the Sandy Hook (26 fatalities), Aurora (12 fatalities), and San Bernadino (14 fatalities) shooters killed with their semi-automatic rifles. Yet only months later the Supreme Court held that the very weapons used by the Virginia Tech shooter were protected by the Second Amendment. It follows that the State's Central Premise is false. The fact that a weapon can be used in mass shootings does not disqualify it from Second Amendment protection.[6]

In *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), *abrogated on other grounds by Bruen*, the Second Circuit recognized this logic (though it failed to apply the logic, which is why its approach has been abrogated). In that case the Court noted that, if anything, the handguns held constitutional in *Heller* were more dangerous than the semi-automatic rifles banned by the State. *Id.*, 804 F.3d at 256. The Court stated: "Though handguns comprise only about one-third of the nation's firearms, by some estimates they account for 71 percent to 83 percent of the firearms used in murders and 84 percent to 90 percent of the firearms used in other violent crimes. That evidence of disproportionate criminal use did not prevent the Supreme Court from holding that handguns merited constitutional protection." *Id.*

---

[6] *See also Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (Posner, J.). The Court reviewed the evidence Illinois submitted to prove its regulation would reduce violence. The Court held this evidence was irrelevant under *Heller*, writing: "Anyway the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts. 554 U.S. at 636, 128 S.Ct. 2783. **If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban,** *Heller* **would have been decided the other way,** for that possibility was as great in the District of Columbia as it is in Illinois." *Id.*, 702 F.3d at 939.

3

The case for upholding Second Amendment rights is even more compelling here than in *Heller*. In *Heller*, the Court held that the rights of the millions of Americans who possess handguns will not be taken away even though handguns are used by thousands of criminals to kill over ten thousand people every year.[7] The Court was unpersuaded by Justice Breyer's dissent in which he pointed out that handguns "are specially linked to urban gun deaths and injuries, and [] are the overwhelmingly favorite weapon of armed criminals." *Id.*, 554 U.S. at 682 (Breyer, J., dissenting). In contrast, as horrific as mass shootings are, they account for only a fraction of 1% of firearm homicides.[8] Millions of law-abiding citizens own semi-automatic rifles like those banned by the State. Curcuruto Dec. ¶ 6. The rights of those millions cannot be taken away because a few maniacs use semi-automatic rifles to kill tens of people each year in mass shootings.

Then-Judge Kavanaugh expressed the matter this way in his dissent in *Heller II*:

> [C]onsidering just the public safety rationale invoked by D.C., **semi-automatic handguns are more dangerous as a class** than semi-automatic rifles . . . [H]andguns 'are the overwhelmingly favorite weapon of armed criminals.'… So it would seem a bit backwards – at least from a public safety perspective – to interpret the Second Amendment to protect semi-automatic handguns but not semi-automatic rifles. … [Heller erects a] serious hurdle … in the way of D.C.'s attempt to ban semi-automatic rifles. Put simply, **it would strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles**.

*Heller v. D.C.*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (emphasis added).[9]

## III.    This Case is Very Simple

---

[7] U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at https://bit.ly/31WmQ1V (last visited Feb. 12, 2023).

[8] Compare FBI total firearm homicides in 2019 (10,258), *supra*, note 7, to 2019 mass shooting homicides from Exhibit B to the Klarevas Declaration (51).

[9] Plaintiffs shall refer to Judge Kavanaugh's dissent in this case as "*Heller II*." Even though Judge Kavanaugh was in dissent, after *Bruen* his analysis almost certainly accurately reflects the law. Indeed, in *Bruen,* the Court cited Judge Kavanaugh's dissent with approval multiple times. *See, id*., 142 S. Ct. at 2129, n.5, 2134, 2137,

4

The State has submitted over 800 pages of material to the Court in an effort to make the issues in this case appear complex. They are not. This is a very simple case. The two-part *Heller/Bruen* test states:

> [T]he standard for applying the Second Amendment is as follows:
>
> [Step One:] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> [Step Two:] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.*, 142 S. Ct. at 2129–30.

"*Bruen* makes clear that the first step is one based **solely** on the text of the Second Amendment to determine if it presumptively protects an individual's conduct – a presumption that the [government] can **then** rebut with history and tradition. *U.S. v. Harrison*, 2023 WL 1771138 *4 (W.D. Okla. 2023) (emphasis in original). "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., possessing certain bearable arms – "the Constitution presumptively protects that conduct." *Id.*, 142 S. Ct. at 2126. It is just that simple. Plaintiffs have met their burden.

"Given that the Second Amendment presumptively protects [Plaintiffs'] conduct, the burden shifts to the [government] to demonstrate that [its absolute ban] is "consistent with the Nation's historical tradition of firearm regulation." *U.S. v. Harrison*, *supra*, *5. But under *Heller*, absolute bans of commonly held firearms are "categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right – like the handgun bans at issue in those cases … are categorically unconstitutional.")

5

Therefore, it is impossible for the State to carry its burden under step two of the *Heller/Bruen* test. The reason for this is apparent from *Heller* itself – there is no historical analogue to such a ban. "[A]fter considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Bruen*, 142 S. Ct. at 2131.

Here, the State has also been unable to identify a regulation analogous to its absolute ban on a category[10] of guns that is in common use by law-abiding citizens for lawful purposes. This is unsurprising. After a no doubt exhaustive search, D.C. was unable to identify a single historical analogue (far less a widespread American tradition) of banning any category of commonly held firearms. And no one else has come close to doing so in the intervening 15 years. There is no reason to expect the State would be able to do so now. This is not to say that the State has not proposed analogues. But as discussed in more detail below, their search was no more successful than D.C.'s, and their proposals can be rejected for the same reason *Heller* rejected D.C.'s proposals – i.e., they do not "remotely burden the right of self-defense as much as [the State's] absolute ban." *Heller*, 554 U.S. at 632

In summary, the complete absence of regulations even remotely analogous to D.C.'s absolute ban allowed *Bruen* to characterize the *Heller* historical inquiry as "relatively simple." *Id.*, 142 S. Ct. at 2132. It was simple because, under *Heller*, absolute bans of commonly held firearms are, in the words of the Seventh Circuit, "categorically unconstitutional." *Ezell, supra*. *See also People v. Webb*, 2019 IL 122951, 131 N.E.3d 93) (absolute bans are "necessarily"

---

[10] The State admits its ban is categorical. It writes that the Statutes ban a sub-category of arms. Resp. 5. A "sub-category" is, of course, a category.

unconstitutional).[11] To this day no regulation even remotely analogous to the State's ban has ever been identified. Therefore, this case, like *Heller*, is simple. The Statute cannot withstand constitutional scrutiny because the State cannot carry its burden under step two of the *Heller/Bruen* test. The Court could end its analysis here.

## IV. The Legal Analysis Controlling This Case is Indistinguishable from *Heller*

In *Bruen*, the Court stated: "In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*, 142 S. Ct. at 2131. "The District in *Heller* addressed a perceived societal problem … and it employed a regulation – a flat ban on the possession of handguns in the home – that the Founders themselves could have adopted to confront that problem." *Id.* And since none of the laws adopted by the Founders "was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Id.*

The State has identified mass shootings as the societal problem it seeks to address with its arms ban. Resp. 28. But the State concedes that lawmakers in the founding era "were not strangers to the idea of mass casualty events, and even mass murder." Resp. 30. Thus, the State admits that the problem it has identified is, in *Bruen's* words, "a general societal problem that has persisted since the 18th century." In addressing a societal problem, the State has employed a regulation – a flat ban on the possession of certain arms – that the Founders themselves could

---

[11] In that case, the Court held that a commonly held bearable arm may not be "subjected to a categorical ban." *Id.*, 2019 IL 122951, ¶ 21, 131 N.E.3d 93, 98. And since the Illinois statute in question constituted a categorical ban "that provision **necessarily** [could not] stand." *Id.* (emphasis added).

have adopted to confront that problem. And since none of the laws adopted by the Founders are analogous to the State's ban, the ban is unconstitutional.

The State seems to believe that even though the general problem of mass casualty events was familiar to the Founders, the logic of *Heller* does not apply to the specific problem of mass shootings by a single shooter. Resp. 30. But the State's focus on this subset of gun violence does not distinguish this case from *Heller*, because D.C. could have made an identical argument. In fact, D.C. **did** make an identical argument. D.C. identified the "harms posed by handguns" it was seeking to address. Brief of Petitioners, *D.C. v. Heller*, *supra*, 49-55. One of those harms was the use of semi-automatic handguns in mass shootings. *Id*., at 53. And D.C. specifically identified the single shooter incident at Virginia Tech as an example of the harm it was seeking to address with its ban. Thus, D.C. identified mass shootings by a single shooter as one of the societal problems it was seeking to address. But the single shooter mass shooting problem D.C. identified did not change the result. The Court held, even in the face of this issue, that D.C. was required to demonstrate a historical tradition comparable to its absolute firearms ban. There is no such tradition and the law was declared unconstitutional.

## V.     The State Misapprehends *Bruen's* Historical Test

The State seems to believe that if it is able to identify an unprecedented societal concern, it need not identify a founding era analogue that is "relevantly similar" to its Statute. This is why it spends nearly four pages of its brief arguing that gunpowder storage regulations are analogous to a categorical firearms ban. Resp. 36-39.

The State misapprehends *Bruen's* historical test. Under *Bruen*, a court must determine whether the Statute imposes a **comparable** burden as that imposed by an historical analogue from the founding era. *Id*., 142 S. Ct. at 2132–33 (emphasis added). The Court did note that

8

when a regulation implicates unprecedented societal concerns or dramatic technological changes, the search for historical analogies may be more "nuanced." *Id.* But it never suggested that in those cases, the search for similar founding era analogues may be abandoned altogether. Even in these cases, the government is required to identify a "**relevantly similar**" tradition justifying its regulation. *Id.* (emphasis added). As discussed above, this case is straightforward and simple. It is not in the "nuanced" category. But even if that were not the case, the State would still be required to show founding era regulations that are relevantly similar to its absolute ban. It has not.

## VI.    The State's Burden is to Identify "an Enduring American Tradition," Not a Handful of Isolated Examples and Outliers

Even if the State were able to identify a handful of isolated examples and outliers, that would not carry its burden. "[T]he burden falls on [the State] to show that [its regulation] is consistent with this **Nation's** historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135 (emphasis added). The issue is whether a widespread and enduring tradition of regulation existed, and a few isolated regulations do not establish such a tradition. The "bare existence" of "localized restrictions" is insufficient to counter an American tradition." *Id.*, 142 S. Ct. at 2154. A handful of examples is insufficient to show a tradition. *Id.*, 142 S. Ct. at 2142 (three regulations insufficient to show a tradition). Isolated examples do not "demonstrate a broad tradition of [the] States." *Id.*, 142 S. Ct. at 2156.

## VII.   The State's "Advanced Technology" Argument Wilts in *Heller's* Glare

The thrust of the State's argument appears to be that even if there is no founding era precedent analogous to its ban, the ban is nevertheless constitutional because of the increase in firearms' lethality compared to firearms of the founding era. Resp. 29-30. But the State's argument wilts in *Heller's* glare. The modern handguns at issue in *Heller* were the product of

9

exactly the same sort of technological innovation described by the State. Those handguns produced the same societal problem identified by the State (i.e., mass shooting). Nevertheless, the Supreme Court held that D.C.'s ban was an extreme historical outlier, *Heller*, 554 U.S. at 629, and for that reason the ban was unconstitutional.

The flaw in the State's argument is that it believes that merely identifying advances in firearm technology satisfies its burden. But *Bruen* flatly states it does not: "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*, 142 S.Ct. at 2132, *quoting Heller*, 554 U.S. at 582.

In summary, the issue before the Court is whether historical precedent from the founding era evinces a comparable tradition of regulation with the purpose of controlling the societal problem identified by the State. *Id.* 142 S. Ct. at 2131-32 (internal citations and quotation marks omitted). Like D.C., the State cannot point to a single founding-era law (far less a national tradition) that prohibited the mere possession of an entire class of commonly held firearms. The significance of this dearth of evidence cannot be overstated. As Judge Kavanagh stated in *Heller II* with respect to D.C.'s ban of semi-automatic rifles, the historical facts are substantially the same as in *Heller* and therefore the result should be the same as well. *Id.*, 670 F.3d at 1287.

**VIII. The State Cannot Identify a Historical Tradition of Absolute Bans of Commonly Held Arms**

**A. The Relevant Time Period Does Not Include the 20th Century**

The first issue in an historical inquiry is to identify the relevant time period, and the State does not appear to understand what that time period is. In *Bruen*, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood

10

**JA-980**

to have **when the people adopted them**.'" *Id.*, 142 S.Ct at 2136, *citing Heller*, 554 U.S. at 634-35 (emphasis in the original). The Second Amendment was adopted in 1791. The Court cautioned against "giving postenactment history more weight than it can rightly bear." 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted). In examining the relevant history that was offered in that case, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614). The Court need not resolve the issue of whether 1791 or 1868 is the proper timeframe, because, as in *Bruen*, "the lack of support for [the State's] law in either period makes it unnecessary to choose between them." *Id.*, 142 S.Ct at 2163 (Barrett, J., concurring)[12]

Finally, whatever may be the case as to 19th century laws, *Bruen* held that 20th century laws are certainly irrelevant to the historical inquiry. *Id.*, 142 S. Ct. at 2154, n. 28 ("We will not address 20th century historical evidence …").

---

[12] *Bruen* noted an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope ..." *Id.*, 142 S.Ct. at 2138. At the same time, however, the Court noted that it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*, 142 S.Ct. at 2137 (citations omitted). The founding era is key. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (2022), available at bit.ly/3Xwtgze (last visited Feb. 16, 2023). This is evident for at least two reasons. First, in *McDonald*, the Court held that the Second Amendment bears the same meaning as applied against the federal government as it does against the states. *Id.*, 561 U.S. at 765. Second, the Supreme Court has always treated the time of the ratification of the Bill of Rights as the key historical period for understanding the scope of those rights – regardless of whether the Court was applying the Amendments against the federal government or against the states. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011); *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

## B.     The State Was Unable to Show Historical Analogues

In *Heller*, the Court held there was no historical justification for a categorial ban of commonly held arms such as the one at issue in this case. The State has not identified anything in the historical record that even remotely suggests that *Heller's* conclusion should be reconsidered. As then-Judge Kavanaugh stated in *Heller II*, weapons of the type banned by the State "have not traditionally been banned and are in common use today, and are thus protected under *Heller*." *Heller II*, 670 F.3d at 1287; see also *Bonta*, 542 F. Supp. 3d at 1024 ("a ban on modern rifles has no historical pedigree."). [13]

Though, as discussed above, this is a simple case, the Court might nevertheless want to review the State's historical analysis, such as it is. The State's burden is to justify its arms ban by demonstrating it is consistent with the Nation's historical tradition of firearm regulation. To do this, it must identify a relevantly similar historical analogue to its ban.  The State's brief is 42 pages long. The State does not even attempt to carry its burden until page 33. In other words, nearly 80% of the State's brief does not address any issue relevant to its burden under *Bruen's* second step. When the State does, finally, get around to addressing the sole issue relevant to its case, it is unable to identify any historical analogues that "remotely burden the right of self-defense as much as [its] absolute ban." *Heller*, 554 U.S. at 632.

The State gets off to a rough start by nominating certain handgun regulations as historical analogues. Resp. 34. The State writes that the "regulations on classes of unprecedentedly dangerous weapons also included some handguns. For example, during the Founding era, some areas in the country restricted newly developed percussion-cap pistols, which users could carry loaded for a long period without concern for corrosion—a concern that previously limited the use

---

[13] *Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021), vacated and remanded on other grounds, 2022 WL 3095986 (9th Cir. 2022). Plaintiffs will refer to this opinion as "*Bonta*."

of weapons." But if these regulations on **handguns** could serve as historical analogues for a categorical ban on arms, *Heller* would have gone the other way. This will not do.

The state next nominates regulations on dynamite. Resp. 34. But dynamite was not invented until 1867.[14] That is nearly a century after the founding era. Moreover, dynamite, to the extent it can be considered an arm, would obviously be a dangerous and unusual arm, not analogous to the commonly held arms banned by the State. Also, even dynamite was never absolutely banned, so any regulation would not burden the right as much as a ban.

Next, the state nominates regulation of machineguns. It is hard to understand why the State would cite machinegun regulations from the 20th century, because, as noted above, such precedents are irrelevant to the historical analysis. *Bruen*, 142 S. Ct. at 2154, n. 28. Moreover, *Heller* clearly states that regulation of machineguns is not analogous to a ban on commonly held arms.

Next, the State writes that "every state (including Connecticut) except one passed regulations restricting carrying certain concealable weapons" (Resp. 35), and suggests that its absolute arms ban is "equivalent" to such laws. Again, *Heller* stated the opposite. The Court noted that prohibitions on carrying concealed weapons were always considered lawful under the Second Amendment. *Id*., 554 U.S. at 626. Yet, such prohibitions on the **method of carry**, were not analogous to D.C.'s **absolute ban** on commonly held arms. *Andrews v. State*, 50 Tenn. 165 (1871), is an early case cited multiple times in *Heller*. The Tennessee Supreme Court made this same point:

> So we may say, with reference to such arms, as we have held, [a citizen] **may keep** and use in the ordinary mode known to the country, no law can punish him for so doing, while he uses such arms at home or on his own premises; he may do with his own as he will, while doing no wrong to others. **Yet, when he carries his**

---

[14] Encyclopedia Britannica, available at https://www.britannica.com/technology/dynamite (last visited Feb. 17, 2023).

> property abroad, goes among the people in public assemblages where others are to be affected by his conduct, then he brings himself within the pale of public regulation, and must submit to such restriction on the mode of using or carrying his property as the people through their Legislature, shall see fit to impose for the general good.

*Id*. 50 Tenn. at 185–86 (emphasis added).

The distinction between possession and carry has come down to the present day. In *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012), *abrogated on other grounds by Bruen*, the Second Circuit made the same point as *Andrews*: "It seems quite obvious to us that possession of a weapon in the home has far different implications than carrying a concealed weapon in public." *Id*., 701 F.3d at 99. As the Court made clear in *Heller*, regulation of concealed carry is not analogous to a prohibition on possession and the State's assertion that the regulations are "equivalent" is false.

Next, in an extended discussion, the State argues that regulation of gunpowder storage and firearm storage are analogous to a ban on commonly held arms. Resp. 36-39. The Court can safely ignore this argument because the Supreme Court has already rejected an identical argument. In *Heller*, the Court stated:

> The other laws Justice Breyer cites are gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. Post, at 2849 – 2850. Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns. Nor, correspondingly, does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents.

*Id*., 554 U.S. at 2819-20 (emphasis added).

Finally, the State drops a footnote in which it identifies ten specific laws as possible historical analogues. Resp. 33, n.8.[15] This is, to say the least, an odd way for the State to attempt

---

[15] 1837 Ala. Laws 7, No. 11, § 2; 1837 Ga. Laws 90, § 1; 1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2; 1838 Fla. Laws 36, No. 24, § 1; 1838 Va. Acts 76, ch. 101, § 1; 1839 Ala. Acts 67, ch. 77; 1858-1859 N.C. Sess. Laws 34-36,

to carry its burden under the historical inquiry. One would expect that, since this is the crux of the case the State must demonstrate, it would set out the text of the laws followed by a discussion of why they are analogous to its law. In a very real sense, the State has literally relegated the main argument it needed to make in its brief to a single footnote. Be that as it may, Plaintiffs have attached Exhibit 1 in which they set forth the text of the laws cited by the State and their detailed analysis of each of those laws.

### C.  Conclusion: An Arms Ban Would Have Been Unthinkable to the Founders

The Founders would never have tolerated a categorical arms ban – much less insisted upon it like the State. We can know this because the Founders never did impose any gun ban as a solution to a societal problem, no matter how serious. Mark W. Smith, *NYSRPA v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms-and A Strong Rebuke to "Inferior Courts,"* 2022 Harv. J.L. & Pub. Pol'y Per Curiam 24, 8 (2022). Bans on the possession of commonly held firearms are a strictly 20th and 21st century phenomenon. *Id*. So, the State's historical burden is impossible to meet, because such bans have no basis whatsoever in the early history of the republic. *Id*.

Indeed, far from banning arms in the Founding period, there were laws **requiring** people to be armed with particular kinds of weapons. *Id*. The Militia Act of 1792, 1 STAT. 271 (1792), required every "free able-bodied white male citizen of the respective states" between eighteen and forty-five years of age to be enrolled in the militia. Those men were required to provide themselves, at their own expense, very specific firearms, ammunition, and equipment. Thus, the laws at the Founding prescribed the firearms citizens **had to have**, not those they **could not have**. *Smith, supra*.

---

Pub. Laws., ch. 25, § 27, pt. 15; 1868 Ala. Laws 11; 1868 Fla. Laws 95, ch. 7, § 11; 1850 Mass. Gen. Law, ch. 194 § 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

15

The Founding generation's solution for mass killings was not to deprive ordinary citizens of weapons needed for defense, but for armed citizens to have an active role in preventing, or minimizing the harm caused by, such killings. *Id*. The *North-Carolina Gazette* published an account of an incident in which "a Demoniac being left in a Room, in which were 18 loaded Muskets," shot three men and wounded another with a sword, "upon which the People present, without further Ceremony, shot him dead." Quoted in Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms*, 105 (2008), citing *North Carolina Gazette* (Newbern), July 7, 1775 at 3, col. 1. Halbrook concludes: "For the Founders, the right of the subject to be armed for defense of self and the community was necessary to suppress such tragedies – they never imagined a world in which they would be disarmed for the supposed benefit of preventing access to weapons by madmen." *Id*.

Passing a law that deprived citizens of commonly held arms would have been unthinkable to the Founders. That is why the State's task of identifying such a founding era law is hopeless. There is no historical analogue to the State's arms ban, and for that reason it is unconstitutional. The remainder of this brief discusses various errors and distortions in the State's brief, but the Court could end its analysis here as well.

## IX.    The State's Reliance on *Cuomo's* "Pre-*Bruen* Analysis" is Baffling

The State repeatedly cites *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) for the proposition that the Statutes are constitutional. *See, e.g.*, Resp. 7, n. 3, 9, 11. This is baffling, because *Cuomo* reached the holding cited by the State pursuant to the two-tiered means-end test specifically rejected in *Bruen*. The State does note in passing that *Cuomo* upheld the Statutes "under a pre-*Bruen* analysis." If "pre-*Bruen* analysis" is a euphemism for

"that analysis which *Bruen* expressly and repeatedly rejected," then the State is correct.[16] The whole point of *Bruen* was to repudiate the means-end test adopted by the circuit courts, including the one adopted by the Second Circuit in *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) (expressly abrogated in *Bruen*). *Cuomo* rests squarely on *Kachalsky's* abrogated means-end test and falls with it, which is why the State's continued reliance on that case is inexplicable.

## X.   The Court Should Reject the State's Attempt to Shift its Burden onto Plaintiffs

The State asserts that Plaintiffs must make a "threshold showing" that the banned arms are: (1) not "dangerous and unusual"; (2) in "common use"; and (3) "typically owned by 'law-abiding citizens for lawful purposes.'" Resp. 11-12. This is false. Plaintiffs' burden does not require showing any of these things, much less all of them. Under *Bruen*, Plaintiffs need only show that the Second Amendment's plain text covers their conduct. *Id.*, 142 S. Ct. at 2129–30. Under *Heller* "the Second Amendment extends, prima facie, to **all** instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132 (emphasis added). Wait a second. Didn't *Heller* expressly say that dangerous and unusual weapons are not protected? Yes, but it reached this issue under the "history" prong, not the "text" prong. That is why the phrase "prima facie" in the quoted passage is important. Under the text prong "all" bearable arms (including dangerous and unusual arms) are **presumptively** protected. *Bruen*, 142 S. Ct. at 2116. Under the history prong, that presumption has been rebutted with respect to "dangerous and unusual" arms.

In other words, when an individual establishes that her regulated conduct involves possessing any instrument that constitutes a bearable arm, she has established a prima facie case

---

[16] *Cuomo* is not the only case abrogated by *Bruen* that the State relies on in its brief. When a case has been abrogated, the customary practice is to alert the Court with the signal "*abrogated by*." This is true even if the particular point for which the case is cited was not rejected by the higher court, in which case the note "*abrogated on other grounds by*" would be appropriate. **26 times** the State cites cases that were abrogated by *Bruen*. Yet, a search reveals the word "abrogated" does not appear in the brief.

that "the Constitution presumptively protects that conduct." *Id*, 142 S. Ct. at 2116. The government can rebut that presumption by establishing that its "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. One way the government can do that is by showing the firearm is dangerous and unusual, because a prohibition of such arms "is fairly supported" by "historical tradition." *Heller*, 554 U.S. at 627. Thus, while all bearable arms are prima facie protected, history is used to determine which modern arms are actually protected, *Bruen*, 142 S. Ct. at 2132, and dangerous and unusual weapons are not.

This is not an academic point. The State is pushing its skewed interpretation of the first prong of the *Heller* test in an attempt to shift its burden onto Plaintiffs. In *U.S. v. Harrison*, 2023 WL 1771138 (W.D. Okla. 2023), the Court rejected a similar tactic, holding that the government's "approach shoehorns the government's historical-tradition burden onto *Bruen's* initial presumption, a presumption based simply on the Second Amendment's plain text." *Id*., *4.

The Court might reasonably ask why, if this is so, Plaintiffs have submitted so much evidence regarding the "common use" issue if they are not required to do so to meet their burden. The answer is that while Plaintiffs are not required to submit evidence of common use, they may submit such evidence to shortcut, as it were, the resolution of the second prong. As discussed in detail above (*See* Section III), an absolute ban of a commonly used firearm is "categorically" or "necessarily" unconstitutional. That means that if Plaintiffs do show that the banned weapons are in common use (which they have), the State cannot meet its burden under the historical tradition test and the Ordinance is "necessarily" unconstitutional.

## XI.     Magazines Are Arms

### A.     The State's Argument is Counter to *Heller*

"Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications … the Second Amendment extends, prima facie, to all [bearable arms] even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 583. The State's arguments about magazines come perilously close to the borderline frivolous arguments to which *Heller* alluded. The State notes that in the founding era the word "magazine" referred to a building where gunpowder was stored. Resp. 13. The point seems to be that since the Founders did not use the word "magazine" to refer to an arm, modern magazines are not arms. The Founders did not use the phrase "stun gun" to refer to an arm either. But a stun gun is certainly an arm. *Caetano v. Connecticut*, 577 U.S. 411 (2016).

### B.     The State's Argument is Contrary to Lower Courts' Holdings

Lower courts have rejected the "accessory" argument asserted by the State here. For example, in *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014), the Court rejected the argument, writing:

> [The government] also contends that the prohibited magazines are not 'arms' within the meaning of the Second Amendment. This argument is not persuasive. First, … no court has found that such magazines do not qualify as 'arms' under the Second Amendment. [gathered cases omitted] Second, if [the government] is right that magazines and ammunition are not 'arms,' any jurisdiction could effectively ban all weapons simply by forbidding magazines and ammunition. This argument's logic would abrogate all Second Amendment protections. Rather, the court finds that the prohibited magazines are 'weapons of offence, or armour of defence,' as **they are integral components to vast categories of guns**.

*Id*. at 1276 (emphasis added).

The Ninth Circuit affirmed in *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015). In that case, the Court held that "to the extent that certain firearms capable of use with a magazine – e.g., certain semiautomatic handguns – are commonly possessed by law-abiding citizens for lawful purposes, **our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines** necessary to render those firearms operable." *Id.* 779 F.3d at 998 (emphasis added). To be sure, pursuant to its pre-*Bruen* analysis, the Court upheld the ban on "large capacity" magazines. But it did so on the basis the government's ban on the subset of magazines survived intermediate scrutiny. *Id.* 779 F.3d at 1000. The Court never held that magazines are not arms. In fact, it held just the opposite. That holding is subsumed within the Court's holding that the Second Amendment protects the right to possess at least some magazines. *Id.* 779 F.3d at 998.

### C. Magazines are an Essential Component to Semi-automatic Firearms

The State attempts to define an entire class of arms out of existence. Resp. 12. But the State's effort to define its problem away fails, because whether magazines are "arms" is not decided by the State's linguistic fiat. The State's primary argument is based on the declaration of Dennis Baron, an expert in "corpus linguistics. Baron states the "lexical data" indicates that in the founding era the term "arms" did not include "magazines." Baron Dec. ¶ 78. This argument proves nothing. Rather, it demonstrates why the "counting words" approach of corpus linguistics advocates like Baron is all but worthless for constitutional analysis.[17] Indeed, in *Heller* Justice Scalia described the conclusions drawn by the dissent based on Baron's and his colleagues' work as "worthy of the Mad Hatter." *Id.*, 554 U.S. at 589. Nothing has changed since then.

---

[17] *See generally* Mark W. Smith & Dan M. Peterson, *Big Data Comes for Textualism: The Use and Abuse of Corpus Linguistics in Second Amendment Litigation*, 70 Drake L. Rev. 387 (2022).

Baron states that in the founding era "magazine" referred to a kind of building. Baron Dec. ¶ 24. Therefore, Baron applied his approach to the term "cartridge boxes"[18] instead and concluded that in the founding era a box containing cartridges was considered an "accoutrement" and not an arm. Baron Dec. ¶ 34. And since a modern magazine is like a "cartridge box," it is not an arm either. *Id.* No one disputes that everyone in the founding era understood a box containing ammunition was an accoutrement and not itself an arm. But Baron goes off the rails when he asserts that a modern magazine, like a cartridge box, is also nothing but an "ammunition container" (*Id.*, ¶ 55) and therefor it is an accoutrement too. If a magazine were merely a box containing ammunition, no one would argue that it is an arm. But the very source Baron cites states that it is more than merely a container. It performs a function, i.e., feeding ammunition. The OED, which Baron cites, states that a magazine **feeds ammunition** into the breech of a firearm. *Id.*, ¶ 55 (emphasis added). Even the State admits a magazine has an active function and is not a mere box. Resp. 14 (magazine holds "ammunition **and** feeds it into a firearm" (emphasis added)). As discussed in detail below, the fact that a magazine performs an essential active function in the operation of a semi-automatic firearm (indeed, it is what makes semi-automatic fire possible) is what sets it aside from a mere box. Baron's fundamental premise upon which all of his conclusions rest (i.e., a modern magazine is just a box) is flawed, and the conclusions he reaches based on that premise are false.

Moreover, according to Baron, the term "arms" does not include ammunition or critical parts of weapons like the trigger either. Baron Dec. ¶ 9, 78. Thus, under Baron's analysis, Connecticut could ban the sale and possession of ammunition and firearms parts essential for firearms to function without violating the Second Amendment, because it would not have banned

---

[18] And "cartouch boxes," but the terms mean the same thing.

any "arm" as the Founders understood the word. That Baron's methods lead to such an absurd conclusion demonstrates why his methods are unsuitable for constitutional analysis. *See Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) (If the magazines are not arms, "any jurisdiction could effectively ban all weapons simply by forbidding magazines … This argument's logic would abrogate all Second Amendment protections.").

Contra Professor Baron, the issue is not whether a magazine is analogous to an 18th century box. Rather, the issue is whether they fit within the 18th century meaning of the word "arms." The meaning of that word in the 18th century is no different from the meaning today. *Heller*, 554 U.S. at 581. *Heller* noted that Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id*, *quoting* 1 A New and Complete Law Dictionary.

Consider an 18th century musket. The lead ball the musket fired is not, standing alone, an arm, but it is essential to the functioning of a musket. Thus, the lead ball is a "thing that a man … takes into his hands to … strike another." Thus, it would be absurd to argue that the Founders would have interpreted the Second Amendment to protect muskets but not the ammunition necessary to make them function. That is why in *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), the Court noted that while recognizing the Second Amendment does not explicitly protect ammunition, "without bullets, the right to bear arms would be meaningless." *Id*. at 967. *Jackson* thus held that "'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Id. See also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (closely related rights protected). Justice

Thomas, the author of *Bruen*, cited both *Jackson* and *Ezell* with approval in *Luis v. United States*, 578 U.S. 5 (2016), in which he explained that constitutional rights implicitly protect those closely related items necessary to their exercise. *Id.*, 578 U.S. at 26-27 (Thomas J., concurring).

Thus, whether a magazine falls within the definition of "arms" involves a functional analysis – i.e., is a magazine necessary for a semi-automatic firearm to function?[19] The answer to that question is that a magazine is vital to the operation of a semi-automatic firearm. Indeed, magazines are what make semi-automatic fire possible at all.

Detachable magazines are necessary to make semi-automatic firearms operate safely and effectively. Passamaneck Dec. ¶ 6. Without such magazines, semi-automatic firearms are inoperable. *Id*. The feed angle, magazine spring pressure, and feed ramps are all design features coupled between the magazine (when inserted into the magazine well) and the firearm to ensure function as intended. *Id*. A magazines is not merely a box in which ammunition is stored. *Id*. ¶ 7. Rather, it is a dynamic component that performs a function in any semi-automatic firearm. *Id*. The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. *Id*. If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. *Id*. Thus, without magazines as designed dynamic components, semi-automatic firearms would not exist. *Id*. In other words, a magazine is a necessary and integral part of the operation of every semi-automatic firearm. *Id*.

---

[19] If the State wanted to introduce expert testimony on the crucial question, it should have retained a firearms expert, not a linguist. That the State opted for a linguist is telling.

It may be technically possible to fire a semi-automatic weapon without a magazine by manually opening the action each time the weapon is fired and manually inserting a single round into the chamber. Bu this makes the semi-automatic firearm unreliable, unsafe, and subject to being damaged. *Id*. ¶ 8. The interaction of the extractor and ejector to the cartridge as it is loaded into the chamber is necessary to ensure safe and reliable function. *Id*. Closing the action of a semi-automatic firearm after a cartridge has been placed manually into the chamber may damage the extractor and or ejector. *Id*. Furthermore, since the case head of the cartridge cannot be held in proper relation to the bolt or breech face, the action may not fully close. *Id*. This is called an "out of battery" condition and the firearm, depending on the degree of the out of battery condition, may not fire at all, or it may fire with a resulting case rupture that is dangerous to the user and damaging to the firearm. *Id*. On those firearms (such as the AR15) with a floating firing pin, closing the action on a chambered round without the necessary magazine in place can result in an unintended discharge without a pull of the trigger known as a "slam-fire." *Id*. This is obviously a dangerous condition, and while rare, closing the bolt without the magazine in place increases the chances of a slam-fire. *Id*.

In *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175 (D.R.I. 2022), apparently acting as its own firearms expert, the district court asserted that a "a firearm can fire bullets without a detachable magazine." *Id*. *12 (citing no expert). As Plaintiffs' expert has demonstrated, this is a dubious proposition. But even assuming *arguendo* the Court were correct, the statement has no constitutional relevance. Plaintiffs' expert, Mark Passameneck states that in order for a semi-automatic firearm to operate qua semi-automatic firearm, a magazine must be inserted. Passameneck Dec. ¶ 7. This is just common sense. If cartridges are not being fed from a magazine, semi-automatic fire is impossible because the cartridges would have to be fed

24

manually after each shot. In other words, without a magazine, a semi-automatic firearm is reduced to a single shot firearm. Thus, *Ocean State Tactical* effectively holds that the State could constitutionally outlaw multi-shot firearms by outlawing magazines. That is obviously inconsistent with *Heller*, to say the least.

Apparently recognizing this obvious point, the State seems to concede that some sized magazine is necessary. Resp. 14 (arguing that a magazine of a particular size is not necessary but not arguing that no magazine at all is necessary). And even one of the cases cited by the State recognizes that a magazine of some size is necessary. *See Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, \*9 (D. Or. 2022) ("magazines in general **are necessary** to the use of firearms for self-defense").

The State's confusion regarding this issue results from conflating the first step of the *Heller/Bruen* test (text) with the second step (history). The Courts in *Brown* and *Ocean State Tactical* are also confused in this regard. That is why those cases are patently erroneous. Under the first step, a magazine is a bearable arm and thus presumptively protected. Does this mean that the State cannot ban so-called large capacity magazines? Not necessarily. Just like any arm, if the State can demonstrate that a regulation banning large capacity magazines is "consistent with the Nation's historical tradition of firearm regulation," it can ban them (though, as discussed below, it cannot make such a demonstration).

In summary, a magazine of some size is necessary to make the Second Amendment right to fire a semi-automatic rifle effective. Therefore, magazines, in general, constitute bearable arms that are prima facia protected by the Second Amendment under prong one (text) of the *Heller/Bruen* test. Whether magazines of a particular size can be banned is a different question that must be resolved under prong two (history) of that test.

25

That issue is easily resolved under *Heller's* "common use" analysis. The State does not dispute that American citizens hold over 150 million such magazines. Instead, it resorts to the "plaintiffs have access to other arms" canard specifically rejected by *Heller*, which held that "[i]t is no answer to say … that it is permissible to ban the possession of [some arms] so long as the possession of other [other arms]… is allowed." *Id.*, 554 U.S. at 629. The State also argues that those 150 million magazines are not "commonly used" because smaller magazines are available. This is a *non sequitur*. The State cannot reasonably dispute that the Banned Magazines are arms that are commonly used for lawful purposes. Therefore, a categorical ban of the magazines is "necessarily" unconstitutional.

### D. Silencers Are Not Essential to the Operation of Any Firearm

The State argues that magazines are like silencers, and since courts have held that silencers are accessories (and not arms), magazines are also not arms. Resp. 14-15. But the State assumes that magazines are like silencers. It does not demonstrate it. And, in fact, one of the very cases cited by the State, *United States v. Hasson*, 2019 WL 4573424 (D. Md. 2019), destroys its own argument. In *Hasson*, the Court held that silencers are not arms because they do "not contain, **feed**, or project ammunition." Id., *4 (emphasis added). But, as discussed above, a magazine does **feed** ammunition. In *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) (*abrogated on other grounds by Bruen*), the Court held that "[b]ecause magazines **feed** ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." (emphasis added). And in *Hasson*, the Court cited *Ass'n of New Jersey Rifle & Pistol Clubs* to distinguish silencers (which it held are accessories) from magazines (which it

26

acknowledged are arms). For the reasons noted in *Hasson*, the State's reliance on silencer cases is unavailing.

## XII. The State Bans Firearms, Not Firearm Accessories

In a similar argument, the State asserts that "to the extent that Conn. Gen. Stat. § 53-202a lists banned features rather than weapons themselves, such restrictions fall outside the Second Amendment because those features are not 'arms.'" Resp. 15. This argument fails as well. The statute does not ban the features (e.g., folding stocks, pistol grips, flash suppressors, etc.). This is easily demonstrated. An "assault weapons" banned by the statute is defined as a "semiautomatic, centerfire rifle that has an ability to accept a detachable magazine **and** has at least one of the following [features]." Conn. Gen. Stat. § 53-202a(1)(E)(i). The conjunctive is important. The statute bans semi-automatic rifles with at least one of the features. It does not ban the features themselves. Thus, a bolt action rifle with a folding stock (or any of the other features) is not an "assault weapon."

The issue in this case is not whether the State can ban various features. The issue is whether the State can ban rifles that that are commonly used by law-abiding citizens for lawful purposes that happen to bear those features. The difference, which the State attempts to elide with this argument, is, needless to say, important.

## XIII. The Banned Arms Do Not Fall Within the Category of Weapons That Are Not Protected by the Second Amendment

The State's effort to fit the banned arms into a constitutionally unprotected category fails. *Heller* stated "dangerous and unusual" weapons may be subjected to a categorical ban. *Id*., 554 U.S. at 627. Sophisticated military arms that are "highly unusual in society at large" are a sub-category of dangerous and unusual weapons. *Id*. The State argues that it may ban commonly held

27

semi-automatic rifles because they are dangerous weapons of war. Resp. 16. This argument is meritless.

**A.**  **The Court is Bound by Second Circuit Precedent: The Banned Arms are in Common Use**

Plaintiffs have submitted overwhelming (and uncontested evidence) that the banned arms are in common use (more than 20 million rifles; more than 150 million magazines). But even if Plaintiffs had presented no evidence on this issue, the Court will nevertheless be bound to hold that the banned arms are in common use. In *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated on other grounds by Bruen*, the Court considered the common use evidence submitted by the plaintiffs in that case and held as follows: "Even accepting the most conservative estimates cite0d by the parties and by *amici*, the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*. The D.C. Circuit reached the same conclusion in its well-reasoned decision in *Heller II* …" *Id.*, 804 F.3d at 255. As set forth below, the fact that the arms are in common use destroys the State's "dangerous and unusual" argument.

**B.**  **The Banned Firearms are Not Dangerous and Unusual**

The State argues that it may ban certain semi-automatic rifles that it calls "assault weapons" because they "have been understood to pose unusual risks." Resp. 16, *quoting Cuomo*, 804 F.3d at 262, *abrogated by Bruen*. Even if this is true (which Plaintiffs do not concede), it does not matter for purposes of the *Heller* test, because "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. … If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." *Caetano v. Connecticut*, 577 U.S. 411, 418 (2016) (Alito, J., concurring).

28

The State misapprehends the issue. The banned rifles are perfectly legal to build, buy, and own under federal law and the laws of over 40 states. *Bonta*, 542 F. Supp. 3d at 1022. There are probably more rifles such as those banned by the State in circulation than there are Ford F-150 pickup trucks. *Id*. In 2018, 909,330 Ford F-150s were sold; twice as many rifles of this type were sold the same year. *Id*. The AR-15 in particular, the quintessential arm banned by the State, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287, and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). These rifles are the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. See National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report*, 9, available at https://bit.ly/3gWhI8E (last visited Jan. 30, 2023).[20]

Similarly, the Banned Magazines are in common use. In 2021, a professional survey firm conducted a comprehensive assessment of firearms ownership and use patterns in America. William English, *2021 National Firearms Survey: Updated Analysis (*hereinafter, "English"), 1, available at https://bit.ly/3yPfoHw (last visited Jan. 30, 2023). The survey was administered to a representative sample of approximately 54,000 U.S. residents aged 18 and over, and it identified 16,708 gun owners. *Id*. According to the survey, 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned. English, 20. There is nothing surprising about that result. Many of the most popular semi-automatic rifles are manufactured with standard magazines holding more than ten rounds. *See, e.g*., David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 and

---

[20] *See also* Mot. 14-20 for an extensive discussion of this issue.

ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."). Indeed, over three quarters of modern sporting rifle magazines in the country have a capacity of more than 10 rounds. *See* Modern Sporting Rifle Comprehensive Consumer Report, at 31, NSSF (July 14, 2022), available at https://bit.ly/3GLmErS (last visited Jan 30, 2023). The State does not attempt to refute Plaintiffs' evidence regarding these numbers. Thus, the State has conceded that Americans own over 100 million magazines like the ones it has banned.

Because the arms banned by the State are not unusual, they cannot be both dangerous and unusual. It follows that, as Justice Alito wrote, their relative dangerousness is irrelevant because they belong to a class of arms commonly used for lawful purposes.[21] Thus, the State's argument about whether these weapons are more dangerous relative to other weapons is irrelevant. The argument misses the point, because even if they are dangerous, they are not both dangerous and unusual.

Finally, the State's argument proves too much. If semi-automatic weapons and the magazines that make them function may be banned as such merely because they are excessively dangerous, *Heller* would have been decided the other way. As then-Judge Kavanaugh noted in *Heller II*, "the Supreme Court held that handguns – the vast majority of which today are semi-automatic – are constitutionally protected because they have not traditionally been banned and are in common use by law-abiding citizens. There is **no meaningful or persuasive constitutional distinction** between semi-automatic handguns and semi-automatic rifles." *Id*., 670 F.3d at 1269 (emphasis added). "It follows from *Heller's* protection of semi-automatic handguns that semi-automatic rifles are also constitutionally protected." *Id*. The reason there is

---

[21] *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring).[21]

30

no meaningful constitutional distinction is "that semi-automatic **rifles** fire at the same general rate as semi-automatic **handguns**." *Id.*, at 1289.[22] *See also, Bonta*, 542 F. Supp. 3d at 1061 (same). In summary, the State's effort to cast the most popular rifle in America as "dangerous **and** unusual" fails.

### C.        The State's "Weapons Most Useful in Military Service" Argument Fails

The State asserts that these commonly possessed arms may be banned because they are "weapons that are most useful in military service." Resp. 16. The State misapprehends *Heller* because it held no such thing. Two passages from *Heller* show that the State's interpretation is the opposite of what the Court meant. First, the Court stated:

> We may as well consider at this point … what types of weapons *Miller* permits. Read in isolation, *Miller's* phrase 'part of ordinary military equipment' could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on **machineguns** (not challenged in *Miller*) might be unconstitutional, **machineguns being useful in warfare in 1939**. We think that *Miller's* 'ordinary military equipment' language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.' [*United States v. Miller*, 307 U.S. 174, 179 (1939)]. The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense. … We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes …

*Id.*, 554 U.S. at 624-25 (emphasis added). Expanding on this passage from *Miller*, the Court stated:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.' 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' [citations omitted]
>
> It may be objected that if weapons that are most useful in military service – M–16 rifles and the like – may be banned, then the Second Amendment right is completely detached

---

[22] Judge Kavanaugh was undoubtedly correct. Indeed, as comparing the Highland Park shooting with the Virginia Tech shooting shows, semi-automatic handguns can sometimes be more dangerous than semi-automatic rifles.

from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require **sophisticated arms that are highly unusual in society at large**. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

*Heller*, 554 U.S. 570, 627–28 (emphasis added).

Both of these passages are extended discussions of *Miller* in which the Court clarified "what types of weapons *Miller* permits." In both passages, the Court distinguishes between two categories of weapons, the first of which is not protected by the Second Amendment and the second of which is. In the first passage, the Court refers to: (1) "[O]rdinary military equipment"; and (2) Arms supplied by men called for militia service. The Court noted that this second category consists of arms in common use for lawful purposes. In the second passage, the Court refers to these same categories using slightly different terms: (1) "[W]eapons that are most useful in military service." This phrase means the same thing as "ordinary military equipment" in *Miller*. The Court gives three examples of this type of weapon: machineguns like the M-16,[23] bombers, and tanks. (2) Arms supplied by men called for militia service. Again, this category has the same "weapons in common use" meaning set forth in *Miller*.

One thing is clear. Weapons in common use brought to militia service by members of the militia are protected by the Second Amendment. What do militia members do with those weapons when they bring them to militia service? They fight wars.[24] It would be extremely anomalous, therefore, if *Heller* were interpreted to mean simultaneously that (1) weapons in common use brought for militia service for fighting wars are protected by the Second

---

[23] *See Staples v. United States*, 511 U.S. 600, 603 (1994) (stating that the M-16 rifle is a military machinegun).
[24] *See* U.S. Const. amend. V (referring to "the Militia, when in actual service in time of War").

Amendment, and (2) all weapons useful for fighting wars are not protected by the Second Amendment. If the Court were to adopt the State's argument, this is the nonsensical result it would have to reach. This is not the law. "*Miller* and *Heller* [merely] recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano v. Connecticut*, 577 U.S. 411, 419 (2016) (Alito, J., concurring). The State's error lies in distorting the language Justice Scalia used. He said that "weapons that are most useful for military service" may be banned. But in the very passage cited by the State, Justice Scalia clarified that by "weapons that are most useful for military service" he meant "sophisticated arms that are highly unusual in society at large" such as machineguns, bombers, and tanks that are wielded by a nation-state's standing army. He contrasted such sophisticated and "highly unusual arms" with arms brought by men for militia service that were "'in common use at the time' for lawful purposes."[25]

In summary, when he used the phrase "weapons that are most useful for military service," Justice Scalia did not, as the State asserts, mean all weapons useful in warfare. Rather, he used the phrase to contrast specialized weapons employed by a standing army (not protected by the Second Amendment) with weapons in common use by law abiding-citizens for lawful purposes (protected by the Second Amendment). At the end of the day, Justice Scalia was simply stating the "common use" formulation in different terms.[26]

---

[25] *See Bonta* 542 F. Supp. 3d at 1014–15 (The banned rifles are not "bazookas, howitzers, or machineguns" solely useful for military purposes; they are ordinary, popular, rifles.).

[26] In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (*abrogated by Bruen*), Judge Traxler made this same point. He wrote that just calling an arm a "weapon of war" is irrelevant, because under *Heller* the phrase "weapons that are most useful for military service" does not include "weapons typically possessed by law-abiding citizens." *Id*., 849 F.3d at 156 (Traxler, J., dissenting).

33

It is easily demonstrated that *Heller* did not hold that any weapon used in a war may be banned. From 1911 to 1986, the United States Army issued Colt M1911 pistols to its soldiers. Passamaneck Dec. ¶ 3. After 1986 the Army issued Beretta Model 92 pistols to its soldiers. *Id.*, ¶ 4. The Colt M1911 was used by soldiers in war (World War I, World War II, Korea, Vietnam, etc.). *Id.*, ¶ 3. The Beretta Model 92 was also used by soldiers in war (the Gulf War, Iraq, Afghanistan, etc.). *Id.*, ¶ 4. Colt and Beretta have all along sold identical models of these semi-automatic handguns in the civilian market, and they are widely possessed by civilians. *Id.*, ¶¶ 3-5. The possession of these handguns is protected under *Heller*. Thus, certain "weapons of war" are indeed protected by the Second Amendment if the weapons are of a type that is widely possessed by law-abiding citizens for lawful purposes. *Id*.

Finally, in its argument, the State focuses on the military's M-16 machine gun (Resp. 17) and argues there is no practical difference between that weapon and semi-automatic weapons like the AR-15, and therefore the latter may be banned like the former. But this argument is precluded by *Staples v. United States*, 511 U.S. 600 (1994). In that case the Court held that the distinction between the fully automatic M-16 and semi-automatic weapons such as the AR-15 is legally significant. *Accord, Bonta*, 542 F. Supp. 3d at 1056–57 (same). It stated that it is not lawful for a civilian to possess a machine gun like an M-16, and it contrasted that with semi-automatic weapons (like the AR-15 at issue in that case) which "**traditionally have been widely accepted as lawful possessions**." *Id.*, 511 U.S. at 612 (emphasis added). The AR-15 is the quintessential semi-automatic rifle that the State seeks to ban. Yet as the Supreme Court noted in *Staples*, the AR-15 is in common use by law-abiding citizens and has traditionally been lawful to possess. *Heller II*, 670 F.3d at 1288. Thus, even if the AR-15 were useful for warfare as the State says (a debatable question, since the State has not introduced a single example anywhere in the

34

JA-1004

world of a national army that uses the AR-15), it is nevertheless protected by the Second

Amendment because it is exactly the sort of arm "in common use at the time" contemplated by

*Heller*.

## XIV. The Court Should Reject the State's Efforts to Distort the *Heller/Bruen* "Common Use" Analysis

### A. There is No Requirement to Show Actual Use

According to the State, an arm is not protected unless it is in fact frequently actually used

for self-defense. Resp. 20. The State's interpretation flies in the face of *Heller's* plain language.

In *Heller* the Supreme Court did not focus on "use" in isolation; the Court held that the Second

Amendment conferred an individual right to **keep** and bear arms. *Id.*, 554 U.S. at 595 (emphasis

added). The Court held that "keep arms" means "possessing arms." *Id.*, 554 U.S. at 583. And the

Court held that banning "the most preferred firearm in the nation to **keep** and use for protection

of one's home and family [fails] constitutional muster." *Id.*, 554 U.S. at 628–29 (cleaned up;

emphasis added). The conjunctive is important. If the State's interpretation of *Heller* were

correct, the word "keep" in that sentence would be superfluous. It is not. *Heller* held that the

Second Amendment protects both the right to possess (i.e., keep) arms and the right to use those

arms should the occasion arise. To be constitutionally protected, it is enough that the arms in

question are commonly possessed for self-defense and other lawful purposes. *Heller* cast the

matter alternatively in terms of "use" (in the passage quoted by the State) and "possession" in

other places: "[The Second Amendment protects arms that are ] typically **possessed** by law-

abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added).

Moreover, by posing and then using cherry-picked data to answer its own question of

whether "assault weapons" are frequently used in self-defense, the State is simply reframing this

case into a policy question: Does the average citizen really need a semi-automatic rifle like those

35

it has banned? But the premise of its question was already rejected by *Heller*, which held that it is the choices of the American People – and not their government – that settle the question.

Nowhere in *Heller* did the Court suggest that it is necessary to show that a weapon's actual use in self-defense meets some threshold the State has not identified. *Heller* simply listed some of the reasons why Americans "may prefer" handguns; for example, a defender can dial a phone with one hand while holding the gun with the other hand. *Id*., 554 U.S. at 629. *Heller* offered no data about defensive handgun use – such as whether anyone has ever actually dialed a phone with one hand while holding a handgun in the other. Instead, *Heller* concluded that the reasons people chose handguns was not, in the end, relevant to the constitutional analysis. The Court wrote: "**Whatever the reason**, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid." *Id*. (emphasis added).

In *Bruen*, the Court picked up where *Heller* left off. In its discussion of whether the plain text of the Second Amendment protected the course of conduct at issue, the Court stated that the Second Amendment protects the right to "**possess** and carry weapons **in case of** confrontation." *Bruen*, 142 S. Ct. at 2134 (internal citations and quotation marks omitted; emphasis added). The right encompasses the right to be "**armed and ready** for offensive or defensive action in a case of conflict with another person." *Id*. (internal citations and quotation marks omitted; emphasis added). The right thus encompasses the right to "'keep' firearms … at the ready for self-defense … **beyond moments of actual confrontation**." *Id*.[27]

Not only is the State wrong as a legal matter, but also it gets its basic facts wrong. As Plaintiffs demonstrated in their Motion, the assertion that citizens do not use these weapons for

---

[27] Moreover, this argument fails because the Second Amendment protects a personal right to keep arms for all lawful purposes, not only self-defense. *Heller*, 554 U.S. at 624.

self-defense is not true. Mot. 17.[28] Of the 25.3 million Americans who have defended themselves with a firearm, 13.1% (3.3 million) have used a rifle. English, 12, 15.

### B. The State's Effort to Distort the Common Use Metric Fails

Next, the State makes the astounding argument that even if there are more than 20 million people who owne firearms like the one it has banned, that is not enough to show common use. Resp. 25. The State argues that the absolute number of firearms is irrelevant and the important metric is the proportion of people in the population as a whole who own such firearms. *Id*. The State then argues that since "only" 6.4 million of 333 million Americans own firearms like those it has banned, those firearms are not in common use. *Id*. The State's argument fails as a matter of fact because 30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly styled rifle. English, 33. It also fails as a matter of law. Nothing in *Heller* suggests that ownership as a percentage of the population is the relevant metric.[29]

In his *Friedman*, Justice Thomas simply noted that millions of Americans own AR-style rifles. *Id*. (Thomas, J., dissenting). That bare fact, standing alone, was sufficient to establish common use. *Id*. Justice Alito concurs. In *Caetano,* he wrote that in determining whether the arms at issue (i.e., stun guns and Tasers) are commonly used, the relevant statistic is that over **200,000** Tasers and stun guns have been sold to private citizens who may lawfully possess them in 45 States. *Id*., 577 U.S. at 420 (internal citations and quotation marks omitted; emphasis added). And while semi-automatic rifles are less popular than handguns, Connecticut's categorical ban of such weapons violates the Second Amendment. If this were not the case, a

---

[28] *See also Friedman v. City of Highland Park*, *Illinois*, 784 F.3d 406, 411 (7th Cir. 2015). *Friedman* (*abrogated on other grounds by Bruen*). ("[A]ssault weapons can be beneficial for self-defense because they are lighter than many rifles and less dangerous per shot than large-caliber pistols or revolvers [and] Householders too frightened or infirm to aim carefully may be able to wield them more effectively than the pistols.")

[29] The State's focus only on arms owned in Connecticut is misplaced. Resp. 25. The metric is arms chosen by the "American people," not the people of a particular state. *Heller*, 554 U.S. at 629.

state would be free to ban all weapons except handguns, because handguns are the most popular weapon chosen by Americans for self-defense, *Id*., and all other arms are less commonly used. If approximately 200,000 arms in 45 states meets the "commonly used" threshold, surely tens of millions of arms in 41 states meets it as well.

Following *Caetano*, the Illinois Supreme Court held the same thing with respect to stun guns. See *People v. Webb*, 2019 IL 122951, 131 N.E.3d 93 (stun gun ban "necessarily" unconstitutional). Other courts are in accord as well. *See Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (analyzing commonality by reviewing raw number percentage and jurisdiction counting); *Duncan v. Becerra ("Duncan IV")*, 970 F.3d 1133, 1147 (9th Cir. 2020)[30] ("Commonality is determined largely by statistics."); *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen*., 910 F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned because the record shows that "millions" are owned); *Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017*), abrogated by Bruen* (2022) (Traxler, J. dissenting) (consensus among courts is that the test is an "objective and largely statistical inquiry); and *Heller v. D.C*., 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'").

Finally, this matter was settled in the Second Circuit by *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated on other grounds by Bruen*. There, the court held: "Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller*."

---

[30] *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

**XV.  The Overwhelming Majority of the State's Response Does Not Address Any Matter Relevant to the *Heller/Bruen* Test**

    **A.  The State's Means-End Argument is Simply Irrelevant**

Instead of attempting to carry its burden under *Heller/Bruen*, the vast majority of the State's brief consists of an elaborate means-end argument of the type specifically prohibited by *Bruen*. For page after page, the State goes on trying to demonstrate that banning semi-automatic firearms and certain magazines promotes the important governmental interest of public safety. *See,* e.g., Resp. 18-22. In other words, the State argues that the means it has employed (banning arms) serves a salutary end (increasing public safety). This argument is astonishing. The State appears to be so devoted to its discredited Central Premise (See Section II), that it cannot grasp *Bruen's* clear holding. The means-end argument it advances is precisely what the Supreme Court held a government may not do to justify a firearms regulation. "To justify its regulation, the government **may not simply posit that the regulation promotes an important interest**. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added). This is because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*., 142 S. Ct. at 2127. Certainly, the State believes its law promotes an important governmental interest, but just as certainly, under *Bruen*, the State's belief is irrelevant to the constitutional analysis.

Perhaps anticipating that governments would push back or ignore its holding as the State has done here, *Bruen* emphasized its rejection of means-end scrutiny by repeating it over and over: *Heller* does "not support applying means-end scrutiny in the Second Amendment context."

*Id.* "[*Heller*] did not invoke any means-end test." *Id.*, 142 S. Ct. at 2129. "[*Heller*] expressly rejected the application of any judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id.* (internal citations and quotation marks omitted). "[T]he Second Amendment does not permit – let alone require – judges to assess the costs and benefits of firearms restrictions under means-end scrutiny." *Id.* (cleaned up). "We declined to engage in means-end scrutiny because the very enumeration of the right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id.* (cleaned up). "We then concluded [that a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id.* "*Heller* specifically ruled out the intermediate-scrutiny test." *Id. Heller* expressly rejected the dissent's interest-balancing inquiry. *Id.* (internal quotation marks omitted).

It is impossible to come away from even a cursory reading of *Bruen* and not understand that means-end scrutiny is forbidden. Yet, the State devoted most of its brief to a means-end argument. Plaintiffs are sorely tempted to get into the factual weeds with the State, because practically everything the State says in support of its means-end analysis is either flat out wrong or substantially distorted. But Plaintiffs will resist this temptation, because almost the whole point of *Bruen* is that it is not "legitimate" for judges to make "empirical judgments" about the "costs and benefits of firearms restrictions." *Id.*, 142 S. Ct. at 2130, *quoting McDonald*, 561 U.S. at 790-91. There is, therefore, nothing to be gained by challenging the empirical predicate of the State's means-end analysis. That discussion – though it makes up the bulk of the State's brief – is

simply irrelevant to the Court's resolution of this case. Accordingly, as difficult as it is, Plaintiffs will ignore the means-end red herring, and they hope the Court will ignore it as well.

### B.      Constitutional Law is Not Grounded in Emotional Appeals

When the State was not engaging in a means-end analysis, it was making a raw emotional argument centered on the Sandy Hook shooting. This argument does not help the State carry its burden under *Heller/Bruen*, and, of course, that is not its purpose. In this case, all of the law is on Plaintiffs' side, and all of the emotion is on the State's side, so naturally the State plays to its strength. The State has an advantage. Plaintiffs sound heartless and callous when they point out that the State's argument is legally irrelevant. The State's brief is a masterpiece of the rhetorical art of *pathos* (appeal to emotion). But as Justice Alito wrote in *Bruen* in response to a similar appeal by Justice Breyer, the State's emotional appeal is not relevant to the issues before the Court. *Id.*, 142 S. Ct. 2111, 2157 (Alito, J., concurring).

This case is like *Heller II*, in which then-Judge Kavanaugh noted that "emotions run high on both sides of the policy issue because of the vital public safety interests at stake." *Id.*, 670 F.3d at 1295. Judge Kavanaugh wrote that he was "acutely aware" of the gun violence that plagued D.C. and, as a citizen, he shared the city's goal of reducing or eliminating the violence. *Id.* And while he respected the motivation behind the city's gun laws, a faithful application of *Heller* precluded him from deferring to the city's assault weapon ban. A judge's task, he said, is to apply the Constitution and the precedents of the Supreme Court, regardless of whether he or she personally agrees as a matter of first principles or policy. *Id.*, 670 F.3d at 1295-96. Judge VanDyke put the matter this way: "The emotional impact of these tragedies does all the work for the government [but] that is precisely where judges must cut through the emotion and do their

41

job of holding the government to its … burden." *Duncan V*, 19 F.4th at 1168 (VanDyke, J., dissenting).

### C.     The Availability Heuristic is not a Constitutional Doctrine

In *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015), Judge Easterbrook wrote that "[i]f it has no other effect, Highland Park's ["assault weapon" ban] may increase the public's sense of safety. Mass shootings are rare, but they are highly salient, and people tend to overestimate the likelihood of salient events … If a ban on semiautomatic guns and large-capacity magazines reduces the **perceived** risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit." *Id.*, 784 F.3d at 412 (emphasis added). In other words, Judge Easterbrook relied on the availability heuristic[31] as a justification for upholding the ordinance. *See also Kolbe v. Hogan*, 813 F.3d 160, 182 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017) (Traxler, J., dissenting) (rejecting *Friedman* because under its "view, a significant restriction on a fundamental right might be justified by benefits that are quite literally imagined into existence."); *Bonta*, 542 F. Supp. 3d at 1055 (*Friedman* upheld the ban because it was "good for the community psyche."). The State downplays the fact that the actual risk of these weapons being used by criminals is extremely low, Resp. 27, and instead attempts to justify its ban based on the perceived risk in the community. Resp. 17. But *pace* Judge Easterbrook, it was never constitutionally licit to justify a burden on constitutional rights by appealing to the psychological distortions of risk assessment caused by the availability heuristic. And *Bruen* makes clear that all means-end arguments, including this one, are out of bounds.

---

[31] The "availability heuristic" is the psychological phenomenon where judgments are heavily biased by dramatic incidents. Louis Klarevas, *Rampage Nation* 61 (2016). An example of the availability heuristic is the fact that many people are afraid to fly because airplanes have crashed, even though airplane crashes are exceedingly rare and airplane travel is very safe.

## XVI.  There is No Historic Tradition Supporting a Magazine Ban

Plaintiffs demonstrated there is no historic tradition in this Nation supporting the State's magazine ban. Motion 21-25. *See also Duncan III*, 366 F.Supp.3d at 1149-53 ("History shows … restrictions on the possession of firearm magazines of any size have no historical pedigree."); *Duncan IV*, 970 F.3d at 1147-51 (when the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years); *Duncan V*, 19 F.4th at 1148-59 (Bumatay, J., dissenting) (summarizing history). In response, the State cites *Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829 (D. Or. 2022), a case in which the Court upheld a magazine ban. In that case, the Court made the same error the State has made in its brief when it failed to recognize the overwhelming evidence that such magazines are in common use. *Id.* *9. That case is also irrelevant, because the Oregon law in question was later enjoined in a state court proceeding as an unreasonable restriction on the right to keep and bear arms under state law.[32]

## XVII.  The State Tacitly Admits its Handgun Ban is Unconstitutional

*Heller's* central holding is that a categorical ban of handguns violates the Second Amendment. *Id.*, 554 U.S. at 628–29. But under Conn. Gen. Stat. Ann. § 53-202c(a), it is a felony to possess an "assault weapon," and the definition of "assault weapon" includes a number of handguns. Conn. Gen. Stat. § 53-202a(1). For example, the definition includes "any of the following specified semiautomatic firearms . . . Wilkinson 'Linda' **Pistol**." [33] *Id.* (emphasis

---

[32] *See Arnold v. Kotek*, 370 Or. 716, 719 (2023).
[33] The Statute uses the term "pistol," but the term is synonymous with "handgun." *Merriam-Webster's Collegiate Dictionary* 525 (10th ed.2001). The State says that of the 22 pistols listed, 13 are variants of rifles. Resp. 6, n. 2. That leaves 9 that are not plus the catchall category for pistols with fixed magazines. There can be no doubt. The Statute bans handguns.

43

added). Also, the definition includes a general ban of any semiautomatic **pistol** with a fixed magazine that accepts 11 or more rounds. *Id.* (emphasis added).

The State admits the challenged Statutes ban certain handguns. Resp. 6, n.2. To be sure, the State labels the banned handguns with the ominous sounding epithet "assault pistol." But the term "pistol" is synonymous with "handgun." *Merriam-Webster's Collegiate Dictionary* 525 (10th ed. 2001). And adding the ominous descriptor "assault" does not change the fundamental reality. The State bans handguns, and a constitutional principle cannot be evaded through semantics. Thus, the State's handgun ban cannot be reconciled with *Heller*, and, notably, the State does not attempt to do so. By not defending its handgun ban, the State tacitly admits that its handgun ban is indefensible. Therefore, irrespective of anything else, at the very least, the State's handgun ban must immediately be declared unconstitutional and enjoined.

## XVIII. Plaintiffs' Facial Challenge is Supported by Supreme Court Precedent

As one of its main defenses, the State repeatedly relies on the "no set of circumstances" standard that was articulated in *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 184 (2d Cir. 2017). The State argues that at the very least its ban of grenade launchers is constitutional, and therefore the law may not be challenged facially even if it unconstitutionally bans millions of other arms. This is not the law.

The "no set of circumstances" rule does not apply because *Bruen* created an exception to the rule. Under the standard set forth in *Bruen*, if the Second Amendment covers the Plaintiffs' conduct, and the government cannot "demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation," then the regulation is invalid. Period. It would appear to defy this standard for this Court to find that the Statutes are is inconsistent with history and tradition, just to watch them be saved by the one possible application that may be

constitutional. *Antonyuk v. Hochul* 2022 WL 16744700, 47-48 (N.D.N.Y.) (rejecting "no set of circumstances" defense in Second Amendment challenge).

Moreover, even before *Bruen*, the Supreme Court created the "large fraction" exception to the general "no set of circumstances" rule. In *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992), *abrogated on other grounds, Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, (2022), the Court allowed a facial challenge to a statute when the statute would unconstitutionally impact a fundamental right in "a large fraction" of the cases to which the statute applies. *Id.*, 505 U.S. at 895. And, in 2016, the Supreme Court expressly adopted the *Casey* plurality's "large fraction" framework. *See Whole Woman's Health v. Hellerstedt,* 579 U.S. 582 (2016), *abrogated on other grounds in Dobbs*. This case, in which the State argues its law cannot be challenged because one small area of application may be constitutional even if millions of other applications are not is exactly why the Supreme Court developed the "large fraction" rule.

The "no set of circumstances" rule also does not apply in cases involving the loss of fundamental rights. *See Farrell v. Burke*, 449 F.3d 470, 496 (2d Cir. 2006) ("When fundamental rights are implicated … the rules are different.") Second Amendment rights are "fundamental rights." *McDonald v. City of Chicago, Ill*., 561 U.S. 742, 778 (2010). The general rule disfavoring facial vagueness challenges does not apply in the First Amendment context. *Id*. Under *Bruen*, Second Amendment rights are now on par with First Amendment rights. *Id*., 142 S.Ct. at 2156. To the extent *Cuomo* held otherwise in the context of facial challenges, this holding too was abrogated by *Bruen*. When fundamental rights are at stake, the question is not whether the law is unconstitutional in all of its applications. Rather, a facial challenge may go forward when the "challenged regulation reaches a substantial amount of constitutionally

protected conduct." *Farrell*, 449 F.3d at 496, *citing Kolender v. Lawson*, 461 U.S. 352, 358 n. 8 (1983).

Finally, even if the "no set of circumstances" rule applies (which Plaintiffs do not concede), the State's law may still be challenged facially because it "lacks a plainly legitimate sweep." *See United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) ("In order to succeed in his facial challenge … Decastro would need to show that no set of circumstances exists under which the statute would be valid, i.e., that the law is unconstitutional in all of its applications, or at least that it lacks a plainly legitimate sweep.") (internal quotation marks omitted). Thus, for Plaintiffs' challenge to go forward, they need only show that the Statutes have "a substantial chilling effect on protected conduct." *Farrell*, 449 F.3d at 497.

## XIX. The Other Temporary Injunction Factors Are Met

Finally, the State argues that Plaintiffs have not demonstrated the other preliminary injunction factors in addition to probable success on the merits. But Plaintiffs cited *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). In that case the Second Circuit held that in a constitutional case likelihood of success on the merits is the dominant, if not the dispositive, factor. The State did not cite, much less attempt to distinguish, this case.

But even if the other factors are somehow relevant, Plaintiffs have met them. First, the State claims that Plaintiffs have not suffered irreparable injury because they have access to weapons that have not been banned. Resp. 40. This argument, again, runs headlong into *Heller*, which held that "[i]t is no answer to say … that it is permissible to ban [certain firearms] so long as the possession of other firearms … is allowed." *Id.*, 554 U.S. at 629.

Moreover, when a plaintiff establishes a constitutional violation has occurred, she has necessarily established irreparable harm. *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211,

224 (2d Cir. 2021), *quoting Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984), *quoting* 11C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948, at 440 (1973).[34] See also *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (quoting Wright & Miller for same proposition in Second Amendment context).

As for the public interest prong, securing constitutional rights is always in the public interest, because the government does not have an interest in the enforcement of an unconstitutional law. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). "In a suit against the government, balancing of the equities merges into [a court's] consideration of the public interest." *SAM Party of New York v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021). And the balance of the equities and the public interest favor securing constitutional rights. *In re A.H.*, 999 F.3d 98, 103 (2d Cir. 2021).

In summary, as argued in the Motion, the probable success on the merits prong is determinative. If Plaintiffs have established their constitutional rights are violated by the Statutes, they have necessarily established the irreparable harm, public interest and balance of the equities prongs. They have established probable success on the merits. Therefore all preliminary injunction factors weigh in favor of granting injunctive relief.[35]

## XX.   Conclusion

For the foregoing reasons, Plaintiffs respectfully renew their motion for entry of a preliminary injunction enjoining enforcement of the Ordinance against them.

---

[34] The current edition of Wright and Miller has identical language.

[35] The State quotes *Sound Around Inc. v. Shenzhen Keenray Innovations Ltd*., 2022 WL 17811475, at *2 (E.D.N.Y. 2022), for the proposition that the preliminary injunction factors must be established by clear and convincing evidence. And *Sound Around, Inc.* does say that, but this is clear error based on the Court's misreading of *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007). In *Sussman* the Court required a "clear showing" from the movant. In context, *Sussman* stated the movant must make a clear showing (in the sense of "strong showing") of likelihood of success on the merits. Nothing in *Sussman* hints at changing the normal preponderance standard in civil cases. Any such holding would be precluded by Second Circuit precedent. *See, e.g., Fed. Exp. Corp. v. Fed. Espresso, Inc*., 201 F.3d 168, 177 (2d Cir. 2000) (preponderance standard is applicable for preliminary injunction).

*/s/ Barry K. Arrington*

_____
Barry K. Arrington
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com
Pro Hac Vice

John J. Radshaw (ct19882)
65 Trumbull Street
2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*

_____
Barry K. Arrington

48

JA-1018

## Exhibit 1
## Detailed Analysis of Ten Laws Cited by State

1.    **1837 Ala. Laws 7, No. 11, § 2**

Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought. And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

This law is not "relevantly similar" to the challenged laws. *Bruen*, 142 S. Ct. at 2133. The law has two parts. The main part creates a presumption of malice for the illegal use of a dangerous and unusual weapon. This is in no way analogous to a complete ban on possession of a weapon in common use.

The second part of the law is also not relevantly similar to the challenged law. It imposes a tax on the sale of dangerous and unusual weapons. This tax is analogous to taxes on dangerous and unusual weapons today. *See, e.g.*, 26 U.S.C.A. § 5811 (imposing a tax on the transfer of machineguns). But a tax on the transfer of dangerous and unusual weapons is not analogous to the State's law, which makes it illegal to sell, make, or possess an arm in common use. This law has no application here.

2.    **1837 Ga. Laws 90, § 1**

. . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears,

1

&c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.

This law was held unconstitutional under the Second Amendment in *Nunn v. State*, 1 Ga. 243 (1846). *Bruen* called *Nunn* "particularly instructive." *Id.*, 142 S. Ct. at 2147. *Heller* said the "opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause, in continuity with the English right." *Id.*, 554 U.S. at 612.

This law is also not "relevantly similar" to the challenged laws. *Bruen*, 142 S. Ct. at 2133. As limited by *Nunn*, it merely prohibited concealed carry. As set forth in the brief, under *Heller*, laws against concealed carry are not analogous to laws, such as the State's law challenged here, that prohibit possession of commonly held arms.

### 3.      1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2

§ 1. That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

§ 2. That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

Section one of the law is an historical outlier, as one of the few that banned all sales of Bowie knives, rather than merely regulating their method of carry or imposing a tax on them.

Section two of the law is not "relevantly similar" to the challenged laws. *Bruen*, 142 S. Ct. at 2133. It merely prohibited concealed carry. As set forth in the brief, under *Heller*, laws

against concealed carry are not analogous to laws, such as the State's law challenged here, that prohibit possession of commonly held arms.

Neither section is "relevantly similar" to the challenged laws. *Bruen*, 142 S. Ct. at 2133. Both this historical law targeted "dangerous and unusual weapons," the regulation of which did not impact the right to possess and use arms "that are in common use at the time." *Id.*, 142 S. Ct. at 2128 (quotations omitted). The arms banned by the State today are in common use, so these laws have no application here.

**4.      1838 Fla. Laws 36, No. 24, § 1**

> Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.

Florida was a territory in 1838. Territorial laws like this one "were rarely subject to judicial scrutiny" and applied only to "miniscule territorial populations" but would have been "irrelevant to more than 99% of the American population." *Id.*, 142 S. Ct. at 2154–55. Accordingly, such territorial laws are not relevant to the constitutional analysis.

The law is not "relevantly similar" to the challenged laws. *Bruen*, 142 S. Ct. at 2133. The law imposes a tax on the sale of dangerous and unusual weapons. This tax is analogous to taxes on dangerous and unusual weapons today. *See, e.g.*, 26 U.S.C.A. § 5811 (imposing a tax on the transfer of machineguns). But a tax on the transfer of dangerous and unusual weapons is not analogous to the State's law, which makes it illegal to sell, make or possess an arm in common use.

3

The law is also not relevantly similar to the State's law because it merely imposes a tax on the open carry of the weapons. Such a regulation specifically contemplates that the possession and open carry of the weapons are legal, unlike the State's law which prohibits the possession and carry of arms that are in common use.

The law is also not relevantly similar because it targeted "dangerous and unusual weapons," the regulation of which did not impact the right to possess and use arms "that are in common use at the time." *Id.*, 142 S. Ct. at 2128 (quotations omitted). The arms banned by the State today are in common use, so these laws have no application here.

**5.  1838 Va. Acts 76, ch. 101, § 1**

Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

The law is not "relevantly similar" to the challenged laws. *Bruen*, 142 S. Ct. at 2133. It merely prohibited concealed carry. As set forth in the brief, under *Heller*, laws against concealed carry are not analogous to laws, such as the State's law challenged here, that prohibit possession of commonly held arms.

**6.  1839 Ala. Acts 67, ch. 77**

That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

4

The law is not "relevantly similar" to the challenged laws. *Bruen*, 142 S. Ct. at 2133. It merely prohibited concealed carry. As set forth in the brief, under *Heller*, laws against concealed carry are not analogous to laws, such as the State's law challenged here, that prohibit possession of commonly held arms.

The law is also not relevantly similar because it targeted "dangerous and unusual weapons," the regulation of which did not impact the right to possess and use arms "that are in common use at the time." *Id.*, 142 S. Ct. at 2128 (quotations omitted). The arms banned by the State today are in common use, so these laws have no application here.

### 7.    1858-1859 N.C. Sess. Laws 34-36, Pub. Laws., ch. 25, § 27, pt. 15

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

The law is not "relevantly similar" to the challenged laws. *Bruen*, 142 S. Ct. at 2133. The law imposes a tax on the carry of dangerous and unusual weapons. This tax is analogous to taxes on dangerous and unusual weapons today. *See, e.g.*, 26 U.S.C.A. § 5811 (imposing a tax on the transfer of machineguns). But a tax on the transfer of dangerous and unusual weapons is not analogous to the State's law, which makes it illegal to sell, make or possess an arm in common use.

The law is also not to the challenged laws, because it merely imposes a tax on the carry of the weapons. Such a regulation specifically contemplates that the possession and carry of the weapons are legal, unlike the State's law which prohibits the possession and carry of arms that are in common use.

The law is also not relevantly similar to the challenged law because it targeted "dangerous and unusual weapons," the regulation of which did not impact the right to possess

5

and use arms "that are in common use at the time." *Id.*, 142 S. Ct. at 2128 (quotations omitted). The arms banned by the State today are in common use, so these laws have no application here.

**8.      1868 Ala. Laws 11 [Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4111 (Act of Aug. 5, 1868, at 1]**

To prevent the carrying of hostile deadly weapons, known as Rifle Walking Canes, or Gunshot Canes. …That any person who shall carry 'rifle' walking canes, or 'gunshot' walking canes, shall upon conviction be fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the Penitentiary not less than two years.

This law comes too late to shed much light on the scope of the Second Amendment. "[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, 142 S. Ct. at 2137.

The law is also not relevantly similar because it targeted "dangerous and unusual weapons" (rifle or shotgun disguised as a walking cane), the regulation of which did not impact the right to possess and use arms "that are in common use at the time." *Id.*, 142 S. Ct. at 2128 (quotations omitted). The arms banned by the State today are in common use, so these laws have no application here.

The law is not "relevantly similar" to the challenged laws. *Bruen*, 142 S. Ct. at 2133. It is, in effect, a prohibition on concealed carry (disguised weapons). As set forth in the brief, under *Heller*, laws against concealed carry are not analogous to laws, such as the State's law challenged here, that prohibit possession of commonly held arms.

**9.      1868 Fla. Laws 95, ch. 7, § 11**

Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

6

This law comes too late to shed much light on the scope of the Second Amendment. "[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S. Ct. at 2137.

The law is also not relevantly similar because it targeted "dangerous and unusual weapons," the regulation of which did not impact the right to possess and use arms "that are in common use at the time." *Id.*, 142 S. Ct. at 2128 (quotations omitted). The arms banned by the State today are in common use, so these laws have no application here.

## 10.   1850 Mass. Gen. Law, ch. 194 § 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 11

Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

The law is also not relevantly similar because it targeted "dangerous and unusual weapons," the regulation of which did not impact the right to possess and use arms "that are in common use at the time." *Id.*, 142 S. Ct. at 2128 (quotations omitted). The arms banned by the State today are in common use, so these laws have no application here.

## DECLARATION OF MARK PASSAMANECK

1.    My name is Mark Passamaneck. I am over the age of 18 and have personal knowledge of the matters set forth in this Declaration.

2.    I have extensive knowledge of firearms. I have designed magazines, barrels, muzzle devices, gas blocks and complete firearms for manufacturers. I have extensively tested firearms, ammunition and accessories. I have conducted shooting reconstructions related to both intentional and unintentional firing of firearms. I have been admitted in courts as a firearms expert and as a ballistics expert. I hold several training certifications and I have trained and coached shooting in a wide array of disciplines.

3.    From 1911 to 1986, the United States Army issued Colt M1911 pistols to its soldiers as the primary side arm. While most infantry soldiers were issued rifles, officers, corpsmen and others were issued M1911s for defense against over-run positions and internal security. During that time period, other branches largely followed the Army's lead and also issued M1911s in large numbers. The 1911, as sold to civilians, was identical in capacity and operation as the military version. The handgun was also used by civilian law enforcement during the same time period, along with numerous other handguns, and still is today. The Colt 1911 (designated the M1911) was used by soldiers in World War I, World War II, Korea, and Vietnam. Versions of the 1911 pistols are in use by several special units within the military establishment to this day. Originally produced by Colt, chambering the .45 Automatic Colt Pistol (.45 ACP) cartridge, when patent protection ceased, it became one of the most sought after pistol designs for target shooting. US citizens use the 1911 currently, in large numbers for self-defense, target shooting, and competition. Besides Colt, there have been close to 100 manufacturers of 1911 style pistols sold to civilians with the same operating systems.

1

4.      In 1986 the Army began to issue Beretta M9 pistols to its soldiers.  The Beretta Model 92 FS, chambered in 9mm Nato, is the same pistol, predating the military adoption, that was sold to civilians.  The M9 was also used by solders in war (the Gulf War, Iraq, Afghanistan, etc.).  Like the Colt 1911, when the M92 patent expired, it was not long before other manufacturers produced and sold similar pistols to civilians with a variety of aesthetic features and in a variety of calibers.  However, the operation and function were the same for all of these models.  They are widely possessed by civilians and have also served as the sidearm for US civilian police officers.  These pistols are also used in large numbers by citizens for self-protection, target shooting and competition.

5.      Colt and Beretta have all along sold identical models of these semi-automatic handguns in the civilian market, and they are widely possessed by civilians.  Furthermore, the multitude of manufacturers of the same design significantly increase the number models and possession of these pistols by citizens in the United States.

6.      Detachable magazines are necessary to make semi-automatic firearms operate safely and effectively.  Without such magazines, semi-automatic firearms are inoperable.  The feed angle, magazine spring pressure, and feed ramps are all design features coupled between the magazine (when inserted into the magazine well) and the firearm to ensure function as intended.  Magazines, by nature and with use, are wear items that must be periodically replaced.  The largest percentage of semi-automatic firearms failures are due to damage, or wear, of the magazines.

7.      Magazines are not merely a box in which ammunition is stored.  Rather, it is a dynamic component that performs a function in any semi-automatic firearm.  The magazine

2

holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. Thus, without magazines as a designed dynamic component, semi-automatic firearms would not exist. In other words, a magazine is a necessary and integral part of the operation of every semi-automatic firearm.

8.     As noted, magazines are intrinsic to semi-automatic firearms, and without the spring pressure of the magazine holding the cartridge in the proper orientation to the bolt or breech face, a semi-automatic firearm is unreliable, unsafe, and subject to being damaged. The interaction of the extractor and ejector to the cartridge as it is loaded into the chamber is necessary to ensure safe and reliable function. Closing the action of a semi-automatic firearm after a cartridge has been placed manually into the chamber may damage the extractor and or ejector. Furthermore, since the case head of the cartridge cannot be held in proper relation to the bolt or breech face, the action may not fully close. This is called an "out of battery" condition and the firearm, depending on degree of the out of battery condition, may not fire at all, or may fire with a resulting case rupture that is dangerous to the user and damaging to the firearm. On those firearms (such as the AR15) with a floating firing pin, closing the action on a chambered round without the necessary magazine in place can result in an unintended discharge without a pull of the trigger known as a "slam-fire." This is obviously a dangerous condition, and while rare, closing the bolt without the magazine in place increases the chances of a slam-fire.

3

9. There are several semi-automatic .223 (and or 5.56) chambered rifles available that do not have the features associated with "assault weapons," as defined. For example, the Ruger Mini 14 has been, over the years, produced in several variations with model names such as "Ranch", "Tactical", "Target" and others, none of which have "assault weapon" features. Other examples are the SLR-106 in .223, Bushmaster the ACR in .223, FN the SCAR in .223, CZ-USA the 805 Bren S1. H&K produces the Model 630. Saiga, Century Arms, Kel-Tec, Benelli, Volquartsen and Remington have also produced semi-auto .223 chambered rifles with conventional, non-military features.

10. Beginning in 1858, Remington manufactured revolvers known as the 1858 Army and the 1858 Navy. These firearms had a detachable cylinder. Spare cylinders could be preloaded with ammunition and carried separately. This feature, like a detachable magazine, offered the option of a speedy reload. With a little practice, the empty cylinder could be removed and swapped with a loaded cylinder in just a few seconds.

I, Mark Passamaneck, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that I have reviewed the foregoing, that I am competent to testify in this matter, and that the facts contained therein are true and correct

Mark Passamaneck

Date: February 24, 2023

4