# 23-1162

## United States Court of Appeals for the Second Circuit

National Association for Gun Rights, Toni Theresa Spera Flanigan,
*Plaintiffs-Appellants*,
Patricia Brought,
*Plaintiff*,
v.
Ned Lamont, in his official capacity as the Governor of the State of Connecticut,
Patrick J. Griffin, in his official capacity as the Chief States Attorney of the State
of Connecticut, Sharmese L. Walcott, in her official capacity as the States's
Attorney, Hartford Judicial District,
*Defendants-Appellees*,
David R. Shannon, in his official capacity as the State's Attorney, Lichfield
Judicial District,
*Defendant*.

**On Appeal from the United States District Court
for the District of Connecticut (New Haven), No. 22-cv-1118**

---

**JOINT APPENDIX VOL. V OF V (JA-1030—JA-1151)**

---

JAMES MICHAEL BELFORTI
JANELLE MEDEIROS
CONNECTICUT OFFICE OF THE
ATTORNEY GENERAL
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5436
james.belforti@ct.gov
janelle.medeiros@ct.gov

*Counsel for Defendants-Appellees*

BARRY K. ARRINGTON
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com

*Counsel for Plaintiffs-Appellants*

## CASE NO. 23-1162
## INDEX TO DOCUMENT REFERENCES IN APPENDIX

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|

### VOLUME I

**Docket U.S. District Court for the District of Connecticut (New Haven) Case #: 3:22-cv-01118-JAM**............................................ NA — JA-1

**Complaint for Declaratory Judgment and Injunctive Relief (09/06/2022)** ..................................................... 1 — JA-13

**First Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right (09/13/2022)** ..................................................... 9 — JA-27

**Unopposed Motion for Leave to Amend Complaint (110/21/2022)** ..................................................... 24 — JA-40

    **Attachment – Second Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right** ..................................................... 24-2 — JA-43

**Second Amended Complaint for Declaratory Judgment and Injunctive Relief as of Right (10/25/2022)** ..................................................... 26 — JA-57

**Plaintiff's Motion for Preliminary Injunction (11/03/2022)** ..................................................... 28 — JA-71

    **Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction (11/03/2022)** . 28-1 — JA-74

    **Declaration of Dudley Brown** ................................. 28-2 — JA-102

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| Declaration of Toni Theresa Spera Flanigan ....... | 28-3 | JA-104 |
| Declaration of James Curcuruto .......................... | 28-4 | JA-106 |
| **Defendants' Motion to Dismiss (11/18/2022)** ................................................... | **32** | **JA-108** |
| Memorandum of Law in Support of Defendants' Motion to Dismiss ............................ | 32-1 | JA-110 |
| **Response in Opposition to Defendants' Motion to Dismiss (12/09/2022)** .................................................... | **33** | **JA-126** |
| Attachment – Declaration of Ryan J. Flugaur | 33-1 | JA-137 |
| **Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss (12/23/2022)** .................................................... | **34** | **JA-139** |
| **Motion to Strike Defendants' Reply in Support of Their Motion to Dismiss (12/24/2022)** .................................................... | **35** | **JA-150** |
| **Defendants' Memorandum in Support of Their Opposition to Plaintiffs' Motion for Preliminary Injunction (01/31/2023)** .................................................... | **37** | **JA-153** |
| Exhibit A – Declaration of Detective Brindiana Warenda ................................................................ | 37-1 | JA-195 |
| Exhibit B – Declaration of Professor John J. Donohue ................................................................. | 37-2 | JA-203 |

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **VOLUME II** | | |
| **Exhibit C – Declaration of Professor Louis Klarevas**................................................ | **37-3** | **JA-270** |
| **Exhibit A – Expert Report of Louis Klarevas** ........................................... | | **JA-272** |
| **VOLUME III** | | |
| **Exhibit C – Declaration of Professor Louis Klarevas –Continued–** ........................................... | | |
| **Exhibit A – Expert Report of Louis Klarevas –Continued–**....................................... | | **JA-560** |
| **Exhibit D – Declaration of Lucy P. Allen** ............. | **37-4** | **JA-787** |
| **VOLUME IV** | | |
| **Exhibit E – Declaration of Dr. Dennis E. Baron ..** | **37-5** | **JA-848** |
| **Exhibit F – Declaration of Professor Randolph Roth** ......................................................... | **37-6** | **JA-884** |
| **Exhibit G – Declaration of Professor Saul Cornell**....................................................... | **37-7** | **JA-935** |
| **Exhibit H – United Nations Office on Drugs and Crime Diagrams**........................................... | **37-8** | **JA-965** |
| **Reply in Support of Plaintiffs' Motion for Preliminary Injunction (03/02/2023)** ...................................................... | **64** | **JA-968** |

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Exhibit 1 – Detailed Analysis of Ten Laws Cited by State**............................ | **64-1** | **JA-1019** |
| **Declaration of Mark Passamaneck**........................ | **64-2** | **JA-1026** |

**VOLUME V**

| | | |
|---|---|---|
| **Third Amended Complaint for Declaratory Judgment and Injunctive Relief (03/07/2023)** ..................................... | **69** | **JA-1030** |
| **Answer and Affirmative Defenses (03/31/2023)** ..................................... | **73** | **JA-1045** |
| **Amicus Brief of Everytown for Gun Safety Support Fund in Support of Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction (04/17/2023)** ..................................... | **78** | **JA-1052** |
| **Transcript Hearing regarding Motion for Preliminary Injunction held June 5, 2023 (06/12/2023)** ..................................... | **83** | **JA-1072** |
| **Notice of Appeal (08/16/2023)** ..................................... | **86** | **JA-1150** |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:22 CV 1118 |
| | ) | |
| NED LAMONT, is his official capacity as the Governor of the State of Connecticut; PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | September 13, 2022 |

## THIRD AMENDED COMPLAINT FOR
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Pursuant to the Court's March 3, 2023, Order, Plaintiffs submit the following Amended Complaint:

## I. DEFINITIONS

1.    For purposes of this Complaint, CONN. GEN. Stat. § 53-202c(a) and CONN. GEN. STAT. § 53-202w(b) and (c) shall be referred to collectively as the "Statutes."

2.    For purposes of this Complaint, the term "Banned Firearm" shall have the same meaning as the term "assault weapon" in CONN. GEN. STAT. § 53-202a(1).

3.    For purposes of this Complaint, the term "Banned Magazine" shall have the same meaning as the term "large-capacity magazine" in CONN. GEN. STAT. § 53-202w(a)(1).

- 1 -

## II. PARTIES

4.      Plaintiff Toni Theresa Spera Flanigan is a resident of Connecticut and is a law-abiding citizen of the United States.  She is a member of NAGR.

5.      Though not the subject of this action, Connecticut's "may issue" gun permitting regime, which vests unbridled discretion in permitting officials, is manifestly unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*").

6.      Nevertheless, Ms. Flanigan currently possesses a valid permit to carry a pistol or revolver issued pursuant to CONN. GEN. STAT. § 29-28(b).

7.      Ms. Flanigan is eligible under the laws of the United States and the State of Connecticut to receive and possess firearms, including pistols, rifles, and shotguns. The Statutes are the only legal impediment to her acquisition of arms that fall within the definition of Banned Firearms and the Banned Magazines.

8.      As set forth in more detail below, the Statutes infringe on Ms. Flanigan's right to keep and bear arms under the Second Amendment by generally prohibiting the possession of arms that are commonly possessed by millions of Americans for lawful purposes.

9.      Ms. Flanigan is affected by State's prohibition of commonly possessed arms.  She has a present intention of exercising her constitutionally protected right to acquire, keep and bear commonly possessed arms, and specifically commonly possessed firearms and magazines that fall with the definition of Banned Firearms and the Banned Magazines, without being subjected to criminal prosecution. She is presently ready, willing, able and eligible to acquire such arms and, but for her reasonable fear of criminal prosecution, would do so. Specifically, she would

- 2 -

acquire and keep an AR-15 or similar rifle and magazines that hold more than 10 rounds. The

State has no license requirement for the acquisition and possession of firearm magazines.

10.     Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit

membership and donor-supported organization qualified as tax-exempt under 26 U.S.C. §

501(c)(4).  NAGR seeks to defend the right of all law-abiding individuals to keep and bear arms.

NAGR has members who reside within the State of Connecticut (the "State").  NAGR represents

the interests of its members who reside in the State. This litigation and the interests that NAGR

seeks to vindicate and protect in this litigation, are germane to, and within a core purpose of,

NAGR and its mission.

11.     NAGR represents the interests of those who are affected by State's prohibition of

commonly used firearms and magazines. These members' interests include their intention to

exercise their constitutionally protected right to acquire, keep and bear arms, and specifically the

arms that are currently prohibited, without being subjected to criminal prosecution.  NAGR

members have a present intention to seek to acquire, keep, possess and/or transfer lawful arms

for self-defense and other lawful purposes, which are prohibited by the challenged Statutes.  For

purposes of this Complaint, the term "Plaintiffs" is meant to include NAGR in its capacity as a

representative of its members.[1]

12.     As set forth in more detail below, the Statutes infringe on NAGR's members'

right to keep and bear arms under the Second Amendment by generally prohibiting the

possession of arms that are commonly possessed by millions of Americans for lawful purposes.

---

[1] NAGR recognizes that Second Circuit precedent precludes asserting associational standing in a Section 1983 action. NAGR does so for the purpose of requesting the Second Circuit to reconsider its minority position, and if it declines to do so seeking review in the Supreme Court.

13. Many members of NAGR are eligible under the laws of the United States and the State of Connecticut to receive and possess firearms, including pistols, rifles, and shotguns. The Statutes are the only legal impediment to these members acquisition of firearms and magazines that fall within the definition of Banned Firearms and Banned Magazines.

14. NAGR's members are affected by State's prohibition of commonly possessed arms. Many of them have a present intention of exercising their constitutionally protected right to acquire, keep and bear commonly possessed arms, and specifically commonly possessed firearms and magazines that fall with the definition of Banned Firearms and the Banned Magazines, without being subjected to criminal prosecution. They are presently ready, willing, able and eligible to acquire such arms and, but for their reasonable fear of criminal prosecution would do so.

15. NAGR has expended and diverted resources otherwise reserved for different institutional functions and purposes and is adversely and directly harmed by the illegal and unconstitutional actions of the Defendants. NAGR has diverted, and continues to divert, time, money, effort, and resources to addressing the Defendants' unconstitutional enforcement of the Statutes that would otherwise be used for educational outreach, public relations, and/or programmatic purposes. For example, NAGR sent out a communication to its Connecticut members advising them: (1) that Connecticut law enforcement officers were actively enforcing the unconstitutional magazine ban; and (2) of the legal risk of noncompliance with the unconstitutional law.

16. It is likely that NAGR and its agents will continue to divert time, money, effort, and resources from its normal educational, outreach, public relations, and/or programmatic

- 4 -

events and operations so long as the Defendants' unconstitutional enforcement of the Statutes persists.

17.     NAGR employs a sweepstakes multiple times a year and has done so for at least 10 years in order to increase donations and membership.  The sweepstakes works by sending communications to members and potential members around the country informing them that they may be eligible to participate in the sweepstakes. The prize for the sweepstakes often is an AR-15 and almost always a firearm of the type that that is banned in Connecticut pursuant to the Statutes. The communications request that the recipient send in a sweepstakes entry form. A donation to NAGR is suggested but not required.  Even though donations are not required, numerous sweepstakes participants send donations with their sweepstakes entry.

18.     The sweepstakes entry form states that citizens of states that are not eligible to receive the firearm prize are not eligible to participate in the sweepstakes.

19.     This sweepstakes is one of NAGR's main fundraising techniques and has been tremendously successful in many states across the country.

20.     Citizens of Connecticut are almost always not eligible to participate in the sweepstakes and this disincentivizes their participation in the sweepstakes, which in turn reduces the rate at which citizens of Connecticut donate to NAGR.

21.     But for the fact that the State enforces its unconstitutional laws, NAGR would receive sweepstakes revenue from Connecticut residents who would send in sweepstakes entries and the donations that often accompany such entries. While some of the Connecticut residents who are ineligible to participate in the sweepstakes would be otherwise ineligible to receive the prize for reasons other than the Statutes, many Connecticut residents who are otherwise ready,

- 5 -

willing, able and eligible to receive the prize but for the existence of the Statutes do not participate or donate because the Statutes prohibit them from receiving the prize even if they were to win the sweepstakes.

22.     The decrease in sweepstakes participation by Connecticut residents as compared to residents of states that do not have unconstitutional arms bans is measurable. The decrease in donation revenue from Connecticut residents as compared to residents of states that do not have unconstitutional arms bans is also measurable.  NAGR loses many thousands of dollars in donations each year because citizens of Connecticut are not eligible to participate in the sweepstakes.

23.     Defendant Ned Lamont is the Governor of Connecticut.  His principal place of business is in Hartford (Hartford County), Connecticut.  Defendant Lamont is required to "take care that the laws be faithfully executed." CONN. CONST., Article IV, § 12.

24.     Defendant Patrick J. Griffin is the Chief State's Attorney for the State of Connecticut.  His principal place of business is in Rocky Hill (Hartford County), Connecticut.  Pursuant to Article XXIII of the Connecticut Constitution, "[t]he prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district."  As Chief State State's Attorney for the State of Connecticut, Defendant Griffin is the "chief of the division of criminal justice." CONN. GEN. STAT. § 51-275. The division is responsible for prosecuting all crimes and offenses against the laws of the state. CONN. GEN. STAT. § 51-277(b). The Chief State's Attorney may sign any warrants, informations, and applications for grand jury investigations; may in certain circumstances appear in court to represent the state or represent the state in lieu of a state's attorney for a judicial district; and shall participate on behalf of the state

- 6 -

in all appellate, post-trial and post-conviction proceedings arising out of the initiation of any criminal action. CONN. GEN. STAT. §§ 51-277(c), (d). These prosecutorial activities include commencement of criminal actions against those individuals and/or entities accused of violating the Statutes. Further, under CONN. GEN. STAT. § 51-281, "[t]he Chief State's Attorney … shall be qualified to act in any judicial district in the state and in connection with any matter regardless of the judicial district where the offense took place, and may be assigned to act in any judicial district at any time on designation by the Chief State's Attorney or the Inspector General, as applicable."

25.     Defendant Sharmese L. Walcott is the State's Attorney, Hartford Judicial District, which encompasses the district where Plaintiff Flanigan resides. Pursuant to Article XXIII of the Connecticut Constitution, "[t]he prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district." Further, under CONN. GEN. STAT. § 51-281, "[t]he … State's Attorney … shall be qualified to act in any judicial district in the state and in connection with any matter regardless of the judicial district where the offense took place…." And, under CONN. GEN. STAT. § 51-286a, "[e]ach state's attorney… shall diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court or in which the court may proceed, whether committed before or after his appointment to office."

26.     Defendants are, have, and/or will enforce the unconstitutional provisions of the Statutes against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

### III.  JURISDICTION AND VENUE

- 7 -

JA-1036

27. The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

28. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

29. Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV. GENERAL ALLEGATIONS

30. The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. CONST. Amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *Bruen, supra*.

31. The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment. *McDonald, supra*.

32. This action challenges the constitutionality of CONN. GEN. Stat. § 53-202c(a) and CONN. GEN. STAT. § 53-202w(b) and (c).

33. CONN. GEN. STAT. § 53-202a(1) defines the term "assault weapon."

34.     CONN. GEN. Stat. § 53-202c(a) providers that any person within the State who possesses a Banned Firearm shall be guilty of a class D felony.

35.     Plaintiffs and/or their members have the present intention, and seek to acquire, keep, possess and/or transfer the Banned Firearms for self-defense in the home and other lawful purposes.

36.     The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes.  *Heller*, *supra*, at 627.

37.     There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles such as those banned by the Statutes.  The Supreme Court has held as much. In *Staples v. United States*, 511 U.S. 600 (1994), the Court noted that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions. " *Id*., 511 U.S. 611-12 (identifying the AR-15 – the archetypal "assault weapon" – as a traditionally lawful firearm).  The vast majority of States do not ban they type of semiautomatic rifles deemed "assault weapons" in the Statutes.

38.     Millions of law-abiding citizens choose to possess firearms such as the Banned Firearms. *Duncan v. Becerra ("Duncan IV)"*, 970 F.3d 1133, 1147 (9th Cir. 2020) [2] ("Commonality is determined largely by statistics."); *Ass 'n of N.J Rifle & Pistol Clubs, Inc. v. Att '.Y Gen*., 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term

---

[2] , *reh 'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh 'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

- 9 -

was used in *Heller*."); *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modem semiautomatic rifles, which epitomize the firearms that the State bans.

39.    The AR-15, as just one example among many of a Banned Firearm, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). Already in early 2013, sources estimated that there were five million AR- 15s in private hands. Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9, 2013), https://bit.ly/3whtDTj (last visited August 25, 2022); *see also Duncan v. Becerra ("Duncan III")*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019). [3]

40.    Millions of law-abiding citizens own and use for lawful purposes semi-automatic firearms such as the Banned Firearms.  The Statutes' prohibition on the possession, sale, or other transfer of the Banned Firearms violates the Second Amendment.

41.    CONN. GEN. STAT. § 53-202w(a)(1) defines the term "large-capacity magazine" to mean any firearm magazine capable of holding more than ten rounds of ammunition.

42.    CONN. GEN. STAT. § 53-202w(b) and (c) generally state that any person who within the State, possesses, distributes, imports, keeps for sale, offers or exposes for sale, transfers, or purchases a Banned Magazine shall be guilty of a class D felony.

---

[3] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and on *reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

- 10 -

43.     Magazines are indisputably "arms" protected by the Second Amendment, as the right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate. *See United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless").

44.     The magazines the State has banned unquestionably satisfy the "common use" test. *Duncan III,* 366 F. Supp. 3d at 1143-45; *Duncan IV*, 970 F.3d at 1146-47.

45.     In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated by Bruen*, *supra*, Judge Traxler (whose dissenting opinion almost certainly accurately states the law post *Bruen*) stated:

> The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States.  These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.  Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds."

*Id*., 849 F.3d at 154, Traxler, J. dissenting (internal citations and quotation marks omitted).

46.     Magazines capable of holding more than 10 rounds of ammunition are commonly owned by millions and millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting. They come standard with many of the most popular handguns and long guns on the market, and Americans own roughly 115 million of them, *Duncan IV*, 970 F.3d at 1142, accounting for "approximately half of all privately owned magazines in the United

- 11 -

States," *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022). Indeed, the most popular handgun in America, the Glock 17 pistol, comes standard with a 17-round magazine. *See Duncan III*, 366 F.Supp.3d at 1145.

47.     There can be no serious dispute that magazines capable of holding more than 10 rounds are bearable arms that satisfy the common use test and thus are presumptively protected by the Second Amendment. Law-abiding citizens own over 100 million magazines such as the Banned Magazines. The Statutes' prohibition on the possession, sale, or other transfer of the Banned Magazines violates the Second Amendment.

48.     The Second Amendment's plain text covers the Banned Firearms and the Banned Magazines. It therefore falls to the Defendants to justify its regulation as consistent with historical tradition rooted in the Founding. This they cannot possibly do so, because *Bruen* has already established that there is no tradition of banning commonly possessed arms, such as the Banned Firearms and the Banned Magazines.

49.     In the post-*Bruen* decision of *Rocky Mountain Gun Owners v. The Town of Superior*, Case No. 22-cv-1685 (July 22, 2022), the court entered an order in which it restrained enforcement of certain provisions of a Town of Superior, Colorado ordinance that banned semiautomatic weapons and magazine with a capacity greater than ten rounds. The court held there was a strong likelihood that the plaintiffs in that case would prevail on the merits of their constitutional challenge to the ordinance provisions. The restrained ordinance is substantially identical to the statutory provisions challenged in this action.

50.     There is an actual and present controversy between the parties. Plaintiffs desire a judicial declaration that the Statutes sections identified above, facially and/or as applied to them,

violate their constitutional rights.  Plaintiffs should not be forced to choose between risking criminal prosecution and exercising their constitutional rights.  This is true even if certain provisions of the Statutes provide affirmative defenses to criminal prosecution.  The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

51.    Plaintiffs are and will continue to be injured by Defendants' enforcement of the Statutes sections identified above insofar as those provisions violate Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, transfer and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.  If not enjoined by this Court, Defendants will enforce the Statutes in derogation of Plaintiffs' constitutional rights.  Plaintiffs have no plain, speedy, and adequate remedy at law.  Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity due to Defendants' present or contemplated enforcement of these provisions.

### V. FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

51.    Paragraphs 1 through 52 are realleged and incorporated by reference.

52.    The Statutes bans firearms and firearm magazines that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.  The Statutes, therefore, generally prohibit residents of State, including Plaintiffs, from acquiring, keeping, possessing, and/or transferring

- 13 -

arms protected by the Second Amendment.  There are significant penalties for violations of the Statutes.

52.     These restrictions infringe on the right of the people of the State, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to the states and its political subdivisions by the Fourteenth Amendment.

53.     The Statutes' prohibitions extend into Plaintiffs' homes, where Second Amendment protections are at their zenith.

54.     Defendants cannot satisfy their burden of justifying these restrictions on the Second Amendment right of the People, including Plaintiffs, to bear, acquire, keep, possess, transfer, and use arms that are in common use by law-abiding adults throughout the United States for the core right of self-defense in the home and other lawful purposes.

## PRAYER FOR RELIEF

Plaintiffs pray that the Court:

1.  Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Statutes are unconstitutional on their face or as applied to the extent their prohibitions apply to law-abiding adults seeking to acquire, use, transfer, or possess arms that are in common use by the American public for lawful purposes;

2.  Enter preliminary and permanent prospective injunctive relief enjoining Defendant and its officers, agents, and employees from enforcing the unconstitutional Statutes;

3.  Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law; and

4.  Grant any such other and further relief as the Court may deem proper.

- 14 -

*/s/ Barry K. Arrington*
_____

Barry K. Arrington
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com
Pro Hac Vice

John J. Radshaw (ct19882)
65 Trumbull Street
2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to counsel of record:

*/s/ Barry K. Arrington*
_____

Barry K. Arrington

- 15 -

JA-1044

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ET. AL. | : | CIVIL NO. 3:22-CV-01118(JBA) |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | MARCH 31, 2023 |
| *Defendant.* | | |

### ANSWER AND AFFIRMATIVE DEFENSES

      Pursuant to Rule 8 of the Federal Rules of Civil Procedure, Defendants Lamont, Griffin and Walcott hereby file their Answer and Affirmative Defenses to the Plaintiffs' Third Amended Complaint[1] (Doc. #69), as follows:

### ANSWER

1.      This is not an allegation of fact, but rather a "definition" utilized by Plaintiffs in their Complaint, therefore no responsive pleading is required.  To the extent a responsive pleading is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

2.      This is not an allegation of fact, but rather a "definition" utilized by Plaintiffs in their Complaint, therefore no responsive pleading is required.  To the extent a responsive pleading is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

3.      This is not an allegation of fact, but rather a "definition" utilized by Plaintiffs in their Complaint, therefore no responsive pleading is required.  To the extent a responsive pleading is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

---

[1] Throughout their Third Amended Complaint, Plaintiffs make a number of legal assertions and arguments that are inappropriate in a complaint.  *See* Fed. R. Civ. P. 8(d)(1)*; see also Barletta v. Bank of Am.*, No. 3:10-cv-01311-WWE, 2011 U.S. Dist. LEXIS 121311, at *2-3 (D. Conn. Oct. 20, 2011) (holding paragraph in complaint containing "legal argument adopted from federal cases" is "not a short and plain statement" as required Rule 8).  Nevertheless, Defendants have endeavored to answer these paragraphs in accordance with the Federal Rules.  Defendants generally deny that the challenged statutes are unconstitutional or that they have taken any "unconstitutional acts" in relation to these statutes.

4.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

5.      This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, denied.

6.      Admitted.

7.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

8.      Denied.

9.      As to the allegation that Plaintiff Flanigan "is affected by State's prohibition of commonly possessed arms," and that "commonly possessed firearms and magazines . . . fall with the definition of Banned Firearms and the Banned Magazines," denied.  As to the remainder of the allegations in the paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

10.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

11.     As to the allegation that Plaintiff "NAGR represents the interests of those who are affected by State's prohibition of commonly used firearms and magazines," denied.  As to the allegation, NAGR members have a "constitutionally protected right," to "acquire, keep and bear arms" that "are currently prohibited," this is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, denied. As to the remainder of the allegations in the paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.[2]

12.     Denied.

13.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

14.     As to the allegation that Plaintiff NAGR "is affected by State's prohibition of commonly possessed arms," and that "commonly possessed firearms and magazines . . . fall with the definition of Banned Firearms and the Banned Magazines," denied. As to the remainder of the allegations in the paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

---

[2] Defendants maintain their objection to Plaintiffs' attempt to invoke associational standing on behalf of its members, as this is clearly prohibited by binding precedent in this Circuit.

15.     As to the allegation that "NAGR. . . is adversely and directly harmed by the illegal and unconstitutional actions of the Defendants," denied. As to the remainder of the allegations in the paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

16.     As to the allegation that Defendants' "enforcement of the statutes" is "unconstitutional," denied. As to the remainder of the allegations in the paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

17.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

18.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof..

19.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

20.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

21.     As to the allegation that "the State enforces its unconstitutional laws," denied. As to the remainder of the allegations in the paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

22.     As to the allegation that Connecticut has an "unconstitutional arms ban," denied. As to the remainder of the allegations in the paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

23.     Admitted.

24.     As to the allegations that Defendant Griffin's "prosecutorial activities include commencement of criminal actions against those individuals and/or entities accused of violating the Statutes," denied. As to the remainder of the allegations in the paragraph, admitted.

25.     Admitted.

26.     As to the allegation that there are "unconstitutional provisions of the Statutes," denied. As to the remainder of the allegations in the paragraph, admitted.

27.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

28.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

29.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

30.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, admitted.

31.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, admitted.

32.     Admitted.

33.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, admitted.

34.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, admitted.

35.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

36.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, admitted.

37.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

38.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

39.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

40.     As to the allegation that "[t]he Statutes' prohibition on the possession, sale, or other transfer of the Banned Firearms violates the Second Amendment," This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, denied.

41.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, admitted.

42.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, denied.

43.     Denied.

44.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, denied.

45.     As to the allegation that the dissenting opinion in Kolbe v. Hogan "almost certainly accurately states the law post *Bruen*," this is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, denied.  As to the remainder of the allegations in the paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

46.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

47.     As to the allegation that "[t]here can be no serious dispute that magazines capable of holding more than 10 rounds are bearable arms that satisfy the common use test and thus are presumptively protected by the Second Amendment," denied.  As to the allegation that "[t]he Statutes' prohibition on the possession, sale, or other transfer of the Banned Magazines violates the Second Amendment," this is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, denied.  As to the remainder of the allegations in the paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and leave Plaintiffs to their proof.

48.     This is a legal assertion to which no responsive pleading is required.  To the extent a responsive pleading is required, admitted.

49.     This is not a factual allegation but rather a legal argument about an out-of-Circuit case that has no binding impact on this Court, so no responsive pleading is required.  To the extent a responsive pleading is required, denied.

50.     This is not a factual allegation but rather a legal argument, so no responsive pleading is required.  To the extent a responsive pleading is required, denied.

51.     This is not a factual allegation but rather a legal argument, so no responsive pleading is required.  To the extent a responsive pleading is required, denied.

52.      Defendants reincorporate their responses to paragraph 1 through 51.[3]

53.      This is a legal assertion to which no responsive pleading is required. To the extent a responsive pleading is required, denied.

54.      This is a legal assertion to which no responsive pleading is required. To the extent a responsive pleading is required, denied.

55.      This is a legal assertion to which no responsive pleading is required. To the extent a responsive pleading is required, admitted.

56.      This is a legal assertion to which no responsive pleading is required. To the extent a responsive pleading is required, denied.

Plaintiff's prayers for relief are neither admitted nor denied, as they seek legal relief instead of alleging facts.

## JURY CLAIM AND DEMAND

The Defendants seek, claim, and demand trial by jury.

## AFFIRMATIVE DEFENSES

Pursuant to Rules 7 and 12 of the Federal Rules of Civil Procedure, the Defendants raise the following affirmative defenses to the allegations contained in the Complaint.

## FIRST AFFIRMATIVE DEFENSE

To the extent Plaintiffs seek any money damages or attorney's fees against the Defendants in their individual capacities, the Defendants acted in an objectively reasonable manner, within the scope of their employment, and with an objective belief that their actions did not violate any clearly established law. For that reason, the Defendants are entitled to qualified immunity from money damages or attorney's fees.

                   DEFENDANTS
                   Lamont et al.

---

[3] Plaintiffs misnumber their paragraphs by repeating paragraphs 51 and 52 twice. Defendants will continue to respond to the paragraphs in order as if Plaintiffs had correctly numbered the paragraphs in their third Amended Complaint.

WILLIAM TONG
ATTORNEY GENERAL

BY: _____

_____
James M. Belforti
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Tel:  (860) 808-5450
Fax:  (860) 808-5591
Federal Bar No. ct30449
E-Mail:  james.belforti@ct.gov

By: *Janelle R. Medeiros*
Janelle R. Medeiros
Assistant Attorney General
Federal Bar No. ct30514
110 Sherman Street
Hartford, CT  06105
Telephone: (860) 808-5450
Fax No.: (860) 808-5591
E-Mail: Janelle.medeiros@ct.gov

## **CERTIFICATION**

I hereby certify that on March 31, 2023, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing

system.  Parties may access this filing through the Court's system.

_____
James M. Belforti
Assistant Attorney General

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

NATIONAL ASSOCIATION FOR GUN RIGHTS
and TONI THERESA SPERA FLANIGAN,

*Plaintiffs*,

v.

NED LAMONT, in his official capacity as the
Governor of the State of Connecticut,

PATRICK J. GRIFFIN, in his official capacity as
the Chief State's Attorney of the State of
Connecticut, and

SHARMESE L. WALCOTT, in her official capacity
as the State's Attorney, Hartford Judicial District,

*Defendants*.

Civil Action No. 3:22-cv-01118-JBA

February 7, 2023

# AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY SUPPORT FUND
## IN SUPPORT OF DEFENDANT'S OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 2

ARGUMENT ............................................................................................................. 3

    I.      Plaintiffs Have Not Met Their Burden To Establish that the Second
            Amendment's Plain Text Covers Their Conduct .................................... 3

    II.     The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ......... 6

    III.    This Court Should Reject Any Effort To Dismiss the State's Historical
            Analogues as "Outliers" or "Anomalous" ......................................... 13

CONCLUSION .......................................................................................................... 16

# TABLE OF AUTHORITIES

*Cases*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
 910 F.3d 106 (3d Cir. 2018) ........................................................................................... 2

*Davenport v. Wash. Educ. Ass'n*,
 551 U.S. 177 (2007) ........................................................................................................ 18

*Defense Distributed v. Bonta*,
 No. 2:22-cv-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), *adopted by* 2022 WL
 15524983 (C.D. Cal. Oct. 24, 2022) .............................................................................. 7

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ................................................................................................. passim

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) ........................................... 8

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................... 8, 12

*Friedman v. City of Highland Park*,
 784 F.3d 406 (7th Cir. 2015) ......................................................................................... 18

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) .......................................................... 8

*Heller v. District of Columbia* (*Heller II*),
 670 F.3d 1244 (D.C. Cir. 2011) .............................................................................. 14, 17

*Kennedy v. Bremerton School District*,
 142 S. Ct. 2407 (2022) .................................................................................................... 5

*McDonald v. City of Chicago*,
 561 U.S. 742 (2010) ............................................................................................. 6, 11, 17

*New York State Rifle & Pistol Ass'n v. Bruen*,
 142 S. Ct. 2111 (2022) ............................................................................................. passim

*Ocean State Tactical, LLC v. Rhode Island*,
 No. 1:22-cv-00246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022), *appeal docketed*, No. 23-
 1072 (1st Cir. Jan. 18, 2023) .......................................................................................... 6

*Or. Firearms Fed'n v. Brown*,
 No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ................................... 6, 14, 15

*Rehaif v. United States*,
 139 S. Ct. 2191 (2019) .................................................................................................... 2

## TABLE OF AUTHORITIES—Continued

*Rupp v. Becerra*,
  401 F. Supp. 3d 978 (C.D. Cal. 2019) *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022) ............................................................................................. 2

*Teter v. Connors*,
  460 F. Supp. 3d 989 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020) .......................................................................................................................................... 2

*United States v. Greeno*,
  679 F.3d 510 (6th Cir. 2012) ....................................................................................................... 8

*United States v. Reyna*,
  No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ........................................ 4

*United States v. Tilotta*,
  No. 3:19-cr-4768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ............................................. 7

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ................................... 9

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ........................................................................................................... 10, 14

Conn. Gen. Stat. § 53-202b ............................................................................................................. 7

Conn. Gen. Stat. § 53-202w ............................................................................................................ 7

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ............................................. 10, 14

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ................................................ 9

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ......................................................................................................................................... 8

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) .......................................................................................................................... 11

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety Support Fund ("Everytown") is the education, research, and litigation arm of Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund), the nation's largest gun-violence-prevention organization, including over 110,000 in Connecticut. The organization has nearly ten million supporters across the country. Everytown for Gun Safety was founded in 2014 as the combined effort of (a) Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and (b) Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Mayors representing 11 Connecticut cities and towns are members of Mayors Against Illegal Guns. Everytown for Gun Safety also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 60 amicus briefs in Second Amendment and other firearms cases. Everytown's briefs have offered historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *Christian v. Nigrelli*, No. 22-2987, Dkt. 79 (2d Cir. Jan. 30, 2023); *Antonyuk v. Nigrelli*, No. 22-908, Dkt. 193 (2d Cir. Jan. 17, 2023); *Nat'l Ass'n for Gun Rts. v. City of Highland Park, Ill.*, No. 1:22-cv-04774, Dkt. 70 (N.D. Ill. Feb. 1, 2023). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

For the reasons set out in Defendant's Memorandum in Support of their Opposition to Plaintiffs' Motion for Preliminary Injunction, Dkt. 37 (Jan. 31, 2023) ("State Mem."), Connecticut's law prohibiting the sale and possession of assault weapons and large-capacity magazines is constitutional under the Second Amendment framework adopted in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).[2] Everytown submits this amicus brief to address in depth three methodological points. ***First***, as to the initial, textual inquiry required by *Bruen*, Plaintiffs have not met their burden to establish that assault weapons and large-capacity magazines are protected "arms" within the meaning of the Second Amendment. ***Second***, in applying *Bruen*'s historical inquiry—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis not on 1791 (when the Second Amendment was ratified), but on 1868 (when the Fourteenth Amendment made the Second Amendment applicable to the states). Moreover, 1868 is not a cutoff date for the analysis; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added).

---

[2] This amicus brief addresses only some aspects of Plaintiffs' Second Amendment claim. However, the Court should deny Plaintiffs' motion for a preliminary injunction in its entirety for the reasons set forth by the State.

This is particularly so where, as here, the challenged ordinance implicates "unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132. **Third**, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. This third point is not directly implicated here, given the robust historical record adduced by the State, *see* State Mem. at 26–39, but we highlight the issue in case the Court chooses to address it.

## ARGUMENT

### I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen* requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, weapons, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See, e.g.*, *United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) (dismissing defendant's challenge to indictment and plea because "§ 922(k)'s regulated conduct [possession of a firearm with an obliterated serial number] is outside [the] scope of the Second Amendment" and that fact "is enough to decide" the case; declining to reach historical inquiry).

As the State notes, *see* State Mem. at 11-12, it is Plaintiffs' burden to satisfy the initial, textual inquiry. This is so for at least two reasons. First, *Bruen* itself makes this clear, by indicating

that a presumption that the Constitution protects a plaintiff's conduct arises only *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of litigation—then *Bruen* would have said that the presumption exists from the outset. Second, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional rights. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421. Accordingly, multiple courts have read *Bruen* to place the burden on the plaintiff challenging a regulation to establish that the Second Amendment's plain text covers their conduct. *See, e.g.*, *Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-CV-01815-IM, 2022 WL 17454829, at *11 (D. Or. Dec. 6, 2022) ("Plaintiffs have not shown that large-capacity magazines are weapons in common use for lawful purposes like self-defense such that they fall within the plain text of the Second Amendment." (cleaned up)).

Here, Plaintiffs have failed to satisfy their burden under the Second Amendment's textual inquiry because they have failed to establish that assault weapons and large-capacity magazines are among the "arms" that the Second Amendment protects. In *Heller*, the Court held that, to fall within the Second Amendment's text, a weapon must not only be a "bearable arm" or "[w]eapon[] of offence," but must also be one "in common use" and "typically possessed by law-abiding citizens for lawful purposes" like self-defense. *Heller*, 554 U.S. at 581-82, 625-27.[3] *Bruen* further

---

[3] Specifically, *Heller* began with dictionary definitions of "arms," including as "[w]eapons of offence, or armour of defence" and observed that the Second Amendment "extends, prima facie,

confirmed that the inquiry should focus on common use for the lawful purpose of self-defense.[4]

As the State explains, *see*, State Mem. at 11-26, Plaintiffs have not carried this burden here with

respect to either assault weapons or large-capacity magazines.[5] That alone is enough to defeat

Plaintiffs' motion. *See Ocean State Tactical*, 2022 WL 17721175, at *2, *11-15 (denying motion

for preliminary injunction in challenge to large-capacity magazine law because "plaintiffs have

failed in their burden to demonstrate that LCMs are 'Arms' within the meaning of the Second

Amendment's text" and "have failed to prove that LCMs are weapons relating to self-defense");

*Or. Firearms Fed'n*, 2022 WL 17454829, at *9-12 (making similar findings in denying motion for

a temporary restraining order as to Oregon large-capacity magazine law).[6]

---

to all instruments that constitute bearable arms." 554 U.S. at 581-82. It then explained that the Second Amendment applies only to weapons "in common use" and "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625-27; *see also id.* at 627 (noting that "M-16 rifles and the like" may be banned).

[4] *Bruen* had no occasion to detail the operation of the textual inquiry with respect to "arms," because in that case, New York did not dispute that the Second Amendment's text applied to the "people" ("two ordinary, law-abiding, adult citizens") and the arms ("handguns") at issue. *See* 142 S. Ct. at 2134. But in applying that test, the Court's articulation—"[n]or does any party dispute that handguns are *weapons 'in common use' today for self-defense*," *id.* (emphasis added)— indicated that the "arms" the Second Amendment covers are those commonly used for self-defense. This limitation coheres with the Supreme Court's repeated emphasis that "individual self-defense is the central component of the Second Amendment right." 142 S. Ct. at 2133 (cleaned up) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599)); *see also id.* at 2132 (explaining that "the Second Amendment's definition of 'arms' … covers modern instruments that facilitate armed self-defense"); *Ocean State Tactical, LLC v. Rhode Island*, No. 1:22-cv-00246, 2022 WL 17721175, at *11 (D.R.I. Dec. 14, 2022) (noting, in a Second Amendment challenge to a state law prohibiting large-capacity magazines, that the focus under *Bruen*'s plain-text inquiry "must be on whether the LCM Ban unduly impairs the right of an individual to engage in self-defense"), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

[5] As the State demonstrates, assault weapons and large-capacity magazines are "dangerous and unusual weapons." *See* State Mem. at 16-20.

[6] With respect to any challenge to Connecticut's prohibitions on the sale, offer or exposure for sale, importation into the state, transfer, distribution, or giving of assault weapons and large-capacity magazines and on the purchase of large-capacity magazines, *see* Conn. Gen. Stat. §§ 53-202b, 53-202w, the textual arguments here fall even further from the mark. *Cf. United States v. Tilotta*, No. 3:19-cr-4768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (explaining that,

5

In sum, the conduct in which Plaintiffs seek to engage is not covered by the plain text of the Second Amendment and Plaintiffs have not met their burden to establish otherwise. Accordingly, they are not entitled to relief and the Court need not proceed further.

## II.    The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

As just explained, the text of the Second Amendment is dispositive. Additionally, as the State's brief explains, if the Court proceeds to *Bruen*'s historical inquiry—under which it must inquire whether the regulation is consistent with the Nation's historical tradition of firearm regulation—Plaintiffs' motion should be denied regardless whether the historical analysis focuses on 1791 or 1868. As a legal matter, however, the historical inquiry should center on 1868, when the Fourteenth Amendment was ratified and the Second Amendment was made applicable to the states.

Prior to *Bruen*, several circuits concluded that the relevant time period for Second Amendment historical analysis of state and local laws was the Fourteenth Amendment's ratification.[7] *See Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim

---

"textually, the ordinary meaning of 'keep and bear' does not include 'sell or transfer'"); *Defense Distributed v. Bonta*, No. 2:22-cv-6200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (concluding that the Second Amendment's plain text "quite-clearly" does not include any "implicit[]" right to "acquire and manufacture firearms" or "to purchase arms" (internal quotation marks omitted)), *adopted by* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

[7] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

6

concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).

*Bruen* does not alter that sensible conclusion. It is true that *Bruen* did not formally resolve "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." 142 S. Ct. at 2138 (explaining that it did not need to resolve the issue because the public understanding "for all relevant purposes" in the case before it was the same in 1791 and 1868). However, the Supreme Court also explained in *Bruen* that the historical inquiry applied in the lower courts pre-*Bruen* was "broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the historical analyses in the cases cited above remain good law.

As the State's brief explains, the law challenged in this case is constitutional whether the historical analysis focuses on the period around 1791 or the period around 1868: neither time period supports any viable Second Amendment rights with respect to assault weapons and large-capacity magazines. *See* State Mem. at 26-39.[8] But if the Court reaches the question of which historical time period is relevant, it should conclude that 1868 is the correct focus.

---

[8] Even if this Court were to focus on 1791 and conclude—contrary to the State's evidence—that history left the Second Amendment's meaning at that time unclear, 19th-century (and even 20th-century) history should be used to clarify that meaning. *See, e.g.*, State Mem. at 33-35; *Or. Firearms Fed'n*, 2022 WL 17454829, at *14 n.22 (finding that 20th-century regulations "confirm[] earlier historical trends offered by Defendants of legislative efforts to ban weapons that 'were developed with a focus on military applications and supplying military needs,' 'spread to ... civilian markets and use,' and then became commonly used for criminality rather than self-defense"); *infra* pp. 11-13.

To begin with, in a case involving a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

As noted, *Bruen* did not formally resolve this timing question. It also acknowledged prior cases that had "assumed" that the scope of the right for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions

8

controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[9] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

---

[9] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

9

There is good reason for this to be the leading originalist view. For one thing, insisting that the 1791 understanding should govern states and localities simply would not make sense in light of the Supreme Court's lengthy discussion in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by now-Chief Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period would also be inconsistent with *Bruen.* In *Bruen*, the Supreme Court instructed the lower courts on how to apply the historical methodology by using the example of the longstanding tradition of sensitive-places restrictions. In doing so, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added). That reference to the "19th century" would be incomprehensible if the 18th century were the only relevant analytical period. Notably, in the pages of the article and brief the Court cited for that proposition, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[10]

---

[10] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing

Finally, an exchange at the oral argument in *Bruen* illustrates that 1868 is the correct focus. During argument, the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

In sum, should the Court reach *Bruen*'s historical inquiry, the correct focus is the period around 1868, not the period around 1791. Moreover, 1868 is not a cutoff: *Heller* teaches that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).[11] *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting a decision quoting James Madison).

---

relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

[11] Nor is 1868 a firm starting line for the inquiry; indeed, both *Heller* and *Bruen* examined history preceding even 1791. *See Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45.  correctly points to such history in its brief. *See* State Mem. at 36-37.

Furthermore, *Bruen* recognized that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period. That is precisely the situation presented by this case. As the State explains, *see* State Mem. at 4-5, 27-32, the challenged law was adopted primarily in response to "dramatic technological changes," *Bruen*, 142 S. Ct. at 2132—the exponential increase in the lethality of firearms and magazines—and the "unprecedented societal concern[]," *id.*, that followed, namely, an epidemic of mass shootings. *See Or. Firearms Fed'n*, 2022 WL 17454829, at *12-13 (similarly finding, in denying plaintiffs' motion for a temporary restraining order, that large-capacity magazines "implicate a dramatic change in firearms technology" and "also implicate unprecedented societal concerns" arising from mass shootings). A "more nuanced approach" to history is thus fully warranted.

Here, state and local laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of Massachusetts's law. *See, e.g.*, State Mem. at 33-35 (discussing late 19th- and early 20th-century laws regulating particularly dangerous weapons, features, and accessories soon after they emerged in the commercial market, including prohibitions and restrictions of multi-shot guns and automatic

12

and semiautomatic firearms capable of firing a large number of rounds without reloading, which were consistent with earlier laws restricting access to weaponry that demonstrably threaten public safety but have no legitimate use for self-defense, such as Bowie knives, as well as earlier regulations restricting access to gunpowder); *see also, e.g.*, *Or. Firearms Fed'n*, 2022 WL 17454829, at *12-14 (finding, in denying plaintiffs' motion for a temporary restraining order, that large-capacity magazine prohibitions are "consistent with the Nation's historical tradition of firearm regulation").[12] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, it should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like Connecticut's law.

## III. This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers" or "Anomalous"

Plaintiffs contend that purportedly "anomalous laws" from a "few" jurisdictions are insufficient to establish a historical tradition under *Bruen*. Plaintiffs' Motion for Preliminary Injunction ("Pl. Mot.") at 26.[13] That assertion is not implicated in this case, given the robust record of historical laws adduced by the State. *See, e.g.*, Dkts. 37-6 & 37-7 (expert historian declarations of Professor Randolph Roth and Professor Saul Cornell discussing analogous historical weapon and weapon feature and accessories regulations from before the founding, through the

---

[12] To be clear, whether laws precisely like the challenged law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

[13] Challengers in other recent Second Amendment cases have similarly sought to dismiss historical regulations as "outliers" insufficient to satisfy the requirements of *Bruen*. *See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers").

Reconstruction era, and into the 20th century); State Mem. at 26--39. But to the extent this Court chooses to address the issue here, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

*Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* In doing so, the Court cited sources for the historical record that justified restrictions in those three locations based on *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[14] In addition, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single colony, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[15] Thus, under *Bruen*'s analysis, a small number of laws can establish this nation's tradition of

---

[14] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

[15] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* pp. 15-16 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[16]

That a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles: states are entitled to effectuate policies of their choice, tailored to local conditions, so long as such policies lie within constitutional bounds.  Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. *See, e.g.*, State Mem. at 39. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second

---

[16] Although *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition," 142 S. Ct. at 2142, that tentative statement should not be given undue weight, given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *Id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is indisputably no such "overwhelming" evidence of a right to sell, offer or expose for sale, import into the state, transfer, distribute, give, possess, or purchase assault weapons or large-capacity magazines. In addition, Plaintiffs also appear to suggest (with a "*cf.*" citation) that then–D.C. Circuit Judge Kavanaugh's dissent in *Heller II* endorsed a rule that laws in six states are not enough to establish a history of regulation. *See* Pl. Mot. at 26. But that is not so (nor would it be controlling in any event). Then-Judge Kavanaugh was not referring to historical laws, but instead to the question whether "modern laws alone" could demonstrate constitutionality under the Second Amendment, and his reference to "six states" (in his own "*cf.*" citation) was in a parenthetical summary of a death-penalty case, not a case involving guns or the Second Amendment. *See Heller II*, 670 F.3d at 1292 (Kavanaugh, J., dissenting).

15

Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate all the way to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not support any inference that their citizens considered such restrictions unconstitutional.[17]

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: February 7, 2023

Respectfully submitted,

<table>
<tr><td>

William J. Taylor, Jr. (*pro hac vice* forthcoming)
EVERYTOWN LAW
450 Lexington Ave, P.O. Box 4184
New York, NY 10017
Phone: (646) 324-8124
Fax: (917) 410-6932
wtaylor@everytown.org

</td><td>

/s/ Damian K. Gunningsmith
Damian K. Gunningsmith (Bar No. ct29430)
CARMODY TORRANCE SANDAK &
HENNESSEY LLP
195 Church Street
New Haven, CT 06509
Telephone: (203) 784-3185
Fax: (203) 784-3199
dgunningsmith@carmodylaw.com

</td></tr>
</table>

---

[17] Indeed, any such inference would be untenable in light of the Court's statement the very next day after *Bruen* was decided that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).

16

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
 2

 3   _____ )
     NATIONAL ASSOCIATION FOR       )
 4   GUN RIGHTS, ET AL              ) No. 3:22-cv-01118-JBA
                                    )
 5              Plaintiffs,         ) June 5, 2023
     v.                             )
 6                                  ) 11:14 a.m.
     NED LAMONT, ET AL,             )
 7                                  ) 141 Church Street
                Defendants.         ) New Haven, Connecticut
 8   _____ )

 9
                     ORAL ARGUMENT
10
     B E F O R E:
11
             THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
12

13   A P P E A R A N C E S:

14   For the Plaintiffs:

15          ARRINGTON LAW FIRM
                 4195 Wadsworth Boulevard
16               Wheat Ridge, CO 80033
                 (303) 205-7870
17               E-mail:  barry@arringtonpc.com
            BY:  BARRY K. ARRINGTON, ESQ.
18
            JOHN J. RADSHAW III, ESQUIRE
19               65 Trumbull Street, 2nd Floor
                 New Haven, CT  06510
20               (203) 654-9695
                 E-mail:  jjr@jjr-esq.com
21          BY:  JOHN J. RADSHAW, III, ESQ.

22

23
     (Continued)
24               Official Court Reporter:
                  Corinne T. Thomas, RPR
25                  (203) 809-0848
```

```
1   For the Defendants:

2        OFFICE OF THE ATTORNEY GENERAL
             110 Sherman Street
3            Hartford, CT 06002
             (860) 808-5436
4            E-mail:  james.belforti@ct.gov
                      janelle.medeiros@ct.gov
5        BY:  JAMES MICHAEL BELFORTI, ESQ.
         BY:  JANELLE MEDEIROS, ESQ.
6

7            (Call to Order, 11:14 a.m.)

8            THE COURT:  Good morning, counsel, ladies and

9   gentlemen.  Please be seated.

10           We are here this morning in the matter of

11  National Association for Gun Rights, et al v. Lamont,

12  et al, 22-cv-1118, and for a hearing on the

13  plaintiffs' motion for injunctive relief.

14           May I have appearances of counsel starting

15  with the plaintiff.

16           MR. RADSHAW:  Good morning, Your Honor.

17           John Radshaw for the plaintiff.  With me here

18  today is Barry Arrington on behalf of both parties,

19  the plaintiff Toni Flanigan, and representatives of

20  the National Association for Gun Rights are in the

21  gallery.

22           THE COURT:  Thank you.  And will

23  Mr. Arrington be doing the argument?

24           MR. RADSHAW:  Yes, Your Honor.

25           THE COURT:  For the defendants.
```

```
1              MR. BELFORTI:  Good morning, Your Honor.
2              Assistant Attorney General James Belforti for
3    the defendants.
4              MS. MEDEIROS:  Good morning, Your Honor.
5              Assistant Attorney General Janelle Medeiros
6    also for the defendants.
7              THE COURT:  And who will be arguing this
8    morning or will you be dividing it up?
9              MR. BELFORTI:  Your Honor, with the Court's
10   permission, we'd like to divide it up.
11             THE COURT:  How would you divide it?
12             MR. BELFORTI:  Your Honor, I believe --
13             MS. MEDEIROS:  Your Honor, we had intended,
14   of course, with the Court's permission, to split the
15   argument as follows:  I intended to address the
16   preliminary issue of plaintiffs' challenge as a
17   facial challenge versus as applied and then also go
18   into step one of the Second Amendment analysis under
19   likelihood of success on the merits, while Attorney
20   Belforti will address step two of the Bruen analysis
21   and the remaining preliminary injunction factors if
22   that's all right with the Court.
23             THE COURT:  All right.  We have a number --
24   thank you.  Please be seated.
25             We have a number of affidavits and
```

```
 1    declarations that have been filed that none of which
 2    has been objected to.  Is it appropriate for the
 3    Court to therefore adopt those as the evidentiary
 4    record in this case?
 5          MR. ARRINGTON:  So, Your Honor, I'm glad that
 6    you brought this issue up because that's what I was
 7    intending or at least what I understood when this was
 8    scheduled as an oral argument and not an evidentiary
 9    hearing.
10          THE COURT:  And that's because I'm going to
11    hear you orally, but the context that I'm trying to
12    clarify is the evidentiary basis provided by the
13    declarations and affidavits on both sides.
14          MR. ARRINGTON:  And that's what I
15    anticipated.
16          THE COURT:  Okay.
17          MR. ARRINGTON:  And the reason I stand to
18    address the Court with respect to this matter is, as
19    the Court knows, we got what I would refer to as an
20    evidence dump on Friday, videos and several hundred
21    pages.  I don't know -- I mean, the Court is going to
22    do what it's going to do with those, but I did not
23    anticipate that as part of my preparations.
24          THE COURT:  All right.  And is the -- are the
25    defendants agreeable to having the declarations and
```

1    affidavits be deemed the evidentiary record?

2         MR. BELFORTI:  Yes, Your Honor.  I imagine

3    we'll address the video issue as well.

4         THE COURT:  Okay.  All right.  I'd like to

5    start -- since the plaintiff had the last word in the

6    briefing through the reply, I'd like to address some

7    questions, at least initially, to the defendant and

8    then the plaintiff is welcome to reply to that.  And

9    then I have some more questions for the plaintiff and

10   then I will give you the opportunity for your summary

11   arguments before we conclude.

12        I'd like to direct the following question,

13   and I don't know who is going to pick it up,

14   Ms. Medeiros or Mr. Belforti, but what is your view

15   of the distinction between common use for

16   self-defense and typical possession by law-abiding

17   citizens for lawful purposes assuming that

18   self-defense is a lawful purpose?

19        MS. MEDEIROS:  Sure, Your Honor.  So I'm

20   happy to address that.

21        THE COURT:  Okay.  Would you move the

22   microphone?  And you're welcome to the podium if you

23   would prefer.

24        MS. MEDEIROS:  Thank you, Your Honor.  So I

25   think when it comes to the issue of common use for

1    self-defense versus lawful purpose, typical
2    possession for lawful purpose, at the end of the day
3    the two questions kind of end up being the same
4    issue.  It seems like under *Bruen,* the step-one
5    analysis, the key thing with regard to the step-one
6    analysis is whether the Second Amendment applies at
7    all.  And under that entire umbrella, there are
8    really three particular questions regardless of how
9    they're phrased, whether it be typical possession for
10   a lawful purpose or common use for self-defense,
11   there has to be some tether to actual use and the
12   Supreme Court has repeatedly emphasized that that
13   actual use really should be centered on self-defense.
14          In the *Bruen* case alone, the Supreme Court
15   used the phrase "common use for self-defense" almost
16   a dozen times.  And the *Heller* Court focused on the
17   issue of self-defense even more -- even more
18   repeatedly.  In *Heller*, the Court repeatedly stated
19   that the core of the Second Amendment right is use
20   for self-defense and it also used the phrase "common
21   use for self-defense."
22          So defendants have really posited that the
23   issue of actual use for self-defense is the key
24   inquiry that the Court needs to take under the
25   umbrella of the step-one analysis.

1      THE COURT:  So that is obviously not the

2  position taken by the plaintiff.  What is it about

3  the plaintiffs' position that you in particular take

4  issue with or believe is unfounded?

5      MS. MEDEIROS:  Absolutely, Your Honor.  So

6  when it comes to the step-one analysis, the plaintiff

7  has really simplified the step-one question down to a

8  really very oversimplified version of the only

9  question being is this instrument or is the thing

10  that's being regulated a bearable arm and that just

11  takes the *Bruen* analysis way too far.

12      The way that *Bruen*, *Heller*, and all lower

13  courts that have really considered the step-one

14  analysis break it down is there's really three

15  touchstone questions under step one.  First of all,

16  is whatever is being regulated an arm; second, is

17  that thing in common use for self-defense; and three,

18  is that thing dangerous and unusual and therefore

19  outside the Second Amendment scope.

20      Plaintiff seems to take this one question and

21  reduce it down to just an inquiry into numerosity as

22  in how many of these particular weapons or magazines

23  are out there and exist, but that really can't be the

24  analysis.  First of all, it's inconsistent, again,

25  with the way the Supreme Court has articulated common

1   use and repeatedly emphasized common use for
2   self-defense, but also, it's really illogical and
3   circular because if the only question were numerosity
4   and the only evidence that could be relied upon is
5   the evidence that the plaintiff brings forward here,
6   which is really just evidence about manufacturing and
7   sales, that would allow a manufacturer or seller of
8   these types of weapons to essentially put anything
9   into common use by just producing a lot of them.  So
10  that really can't be the analysis.
11          Instead, the common use question has to be
12  tethered to the question of self-defense and actual
13  use for self-defense.  And here, looking at the
14  record, plaintiff simply has not come forward with
15  enough evidence to meet the substantial burden that
16  she has at this stage to demonstrate actual use for
17  self-defense.
18          Again, the only evidence in the record even
19  with regard to this numerosity argument that
20  plaintiff has is really manufacturing and sales, not
21  even ownership.  So there's nothing in the record
22  from the plaintiff to even demonstrate how many
23  people and individuals actually own these things let
24  alone how many individuals actually use them and in
25  self-defense.  And rather the evidence that's in the

```
1   record that defendants have submitted is that the

2   only evidence is neither large-capacity magazines or

3   assault weapons are frequently needed or used in

4   self-defense whether that be discharged, carried or

5   brandished.

6        The plaintiff hasn't come forward with enough

7   evidence to demonstrate that there is any actual use

8   for self-defense.  And for that reason alone, they

9   haven't -- she hasn't met her substantial burden to

10  demonstrate that the Second Amendment even applies.

11       THE COURT:  Before I allow plaintiff to

12  respond, I have a bit of a follow-up and that is is

13  it your view that even if assault weapons are often

14  used in crime or mass shootings, does that mean they

15  are not typically used for a lawful purpose?

16       MS. MEDEIROS:  Well, I think, Your Honor,

17  that is evidence of what the typical purpose and

18  typical use of these weapons are, but the key here is

19  at this stage plaintiff bears the burden of coming

20  forward with evidence that demonstrates that the

21  actual use is a lawful purpose and namely

22  self-defense.

23       There is no evidence of that in the record

24  from the plaintiff, certainly not enough to meet her

25  high burden at the preliminary injunction stage,
```

1    rather the only evidence that has been produced in

2    terms of actual use is, as Your Honor noted, from the

3    defendants in the form of Professor Klarevas'

4    declaration, Professor Donohue's declaration

5    demonstrating that the more frequent typical use is

6    in mass shootings.

7         THE COURT:  So what about the English survey

8    presented by the plaintiffs, why doesn't that meet

9    your criticism that the only evidence the plaintiff

10   has put forward comes from manufacturing and sales

11   data?

12        MS. MEDEIROS:  Absolutely, Your Honor.  So

13   the English study is relied on for a few different

14   propositions by the plaintiff, none of which really

15   help her here.  First, with regard to numerosity,

16   there is -- the English study is cited just for

17   manufacturing as is the affidavit.  But when it comes

18   to actual use, the English study is cited for the

19   proposition that 13 percent of the time in

20   self-defense incidents, rifles are used in

21   self-defense.

22        That statistic is entirely meaningless here

23   because rifles is overinclusive and underinclusive

24   when it comes to our actual statute.  The assault

25   weapon statute that we have here includes shotguns

1    and pistols which is not captured by that statute.

2    But also, the term rifles includes potentially

3    thousands of other firearms that are not covered by

4    the assault weapon statute.  So that 13 percent

5    figure is really pretty meaningless.

6         In contrast, defendants have produced the

7    declaration of Lucy Allen who looked at defensive

8    firearms use and she actually used the metric and the

9    definition of assault weapons as defined by our

10   statute and found they are rarely, if ever, used or

11   needed in self-defense let alone carried.  Her study

12   actually showed that most of the time, assault

13   weapons as defined by our statute are not even

14   carried on the street and therefore available to be

15   brandished or used in self-defense on the street.

16        THE COURT:  All right.  There are many

17   questions to come, but let me invite Mr. Arrington to

18   respond to those that I have put to the defendant

19   particularly because I've asked for that to happen in

20   relation to the contentions of the plaintiff.

21        MS. MEDEIROS:  Thank you, Your Honor.  So the

22   first issue is what constitutes common use, is that

23   different from typical possession meant for lawful

24   purposes.  If you read *Heller*, Justice Scalia uses

25   the terms interchangeably.  And what the state would

1   have the Court believe is that *Heller* imposes upon

2   the plaintiff some obligation to do an empirical

3   study regarding how much these arms are actually used

4   for a particular purpose.  They don't say what the

5   threshold is, some unknown threshold the plaintiffs

6   have to demonstrate actual use beyond -- you can look

7   at *Heller* all day long --

8         THE COURT:  So what I'd like to know is

9   whether or not this analysis that you urge and the

10  way that you urge it to be done is common use and

11  typical possession for self-defense because that

12  certainly is the theme of *Heller* and carried over in

13  subsequent case law.

14        MR. ARRINGTON:  So --

15        THE COURT:  Do you think --

16        MR. ARRINGTON:  I'm sorry.

17        THE COURT:  Do you think -- is it your

18  position that self-defense is not a properly-based

19  legislating purpose?

20        MR. ARRINGTON:  So the legislative purpose is

21  irrelevant in my view.  The issue is under *Heller* and

22  under *Bruen* whether these arms are owned or typically

23  possessed by law-abiding citizens for lawful

24  purposes, one of which is self-defense.

25        THE COURT:  Okay.  Are you saying that

1   self-defense -- where do you put that in the scheme

2   of lawful purpose as opposed to being the focus of

3   lawful purpose, and if it's not the focus of lawful

4   purpose, where is the outside parameter of your

5   analysis?

6        MR. ARRINGTON:  And so there is no, in my

7   view, outside parameter.  Certainly, self-defense is

8   a central component of the Second Amendment.  Nobody

9   disputes that.  But it's not the only component of

10   the Second Amendment.  There is self-defense.

11   There's target shooting.  There's hunting.  There's

12   competitions.

13        So there's many uses that firearms can be put

14   and self-defense is certainly -- especially

15   self-defense within the home, certainly a key

16   component of the interest protected by the Second

17   Amendment.  But the state would say that that's the

18   only component protected by the Second Amendment

19   which imposes upon us, the plaintiffs, the burden of

20   showing actual use for self-defense, but *Heller*

21   doesn't say that.

22        Nothing in *Heller* requires or even

23   contemplates that a plaintiff in these cases is

24   required to show the actual use.  If you look at

25   *Heller*, it is basically a numerosity decision.

1    Justice Scalia in *Heller* didn't talk about how many

2    times handguns have been actually used.  He said they

3    are used for self-defense, and for whatever reason,

4    they are most popular for use as self-defense, and

5    therefore, they're protected.  He didn't require an

6    empirical study as to actual use for self-defense to

7    arrive at that conclusion.

8           Same thing in *Bruen*, there was no requirement

9    that there was an actual study of how much these guns

10   are used in the streets as they're carried for

11   self-defense.  The only issue was whether they are

12   used by law-abiding citizens.

13          And so let's also talk about the fact that

14   the state wants to shift their burden onto

15   plaintiffs.  This is not plaintiffs' burden.  This is

16   absolutely not plaintiff's burden.  Plaintiffs'

17   burden under *Bruen* is to show that the plain text of

18   the Second Amendment covers their conduct and the

19   plain text -- so let's talk about whether that's --

20   they say, well, that's a very complicated situation

21   that the plaintiffs haven't devoted enough attention

22   to.  I would just simply ask the Court to read *Bruen*.

23          THE COURT:  You might have guessed that I

24   have read it.

25          MR. ARRINGTON:  *Bruen* -- I'm sorry.  Bruen's

1 -- the way *Bruen* dealt with the textual issue, this

2 is several pages, many, many pages long, that

3 decision.  Five paragraphs go to textual -- the plain

4 text.  It says this need not detain this law; they

5 want to carry guns.  That implicates the Second

6 Amendment.  It's just that simple.  There was no

7 requirement that there be some sort of empirical

8 study.  It is --

9    THE COURT:  Is there no limitation on that?

10    MR. ARRINGTON:  Absolutely none.

11    THE COURT:  So your view is that if, in fact,

12 they want to carry guns, they are automatically

13 protected by the Second Amendment?

14    MR. ARRINGTON:  Prima fascia, yes.  So that's

15 what *Bruen* says.  The first step is a prima fascia

16 step or it creates a presumption.  And so the mere --

17 *Bruen* said the mere fact that the plaintiffs there

18 want to carry guns in public creates a presumption

19 that the text of the Second Amendment applies because

20 that's -- carrying guns is what the Second Amendment

21 is all about.

22    Now, to be sure, the government has the

23 opportunity to come in and rebut that presumption

24 through the history and tradition part of the test,

25 but establishing the first part was remarkably

1    simple.  Five paragraphs is how much Justice Thomas
2    dealt with the text issue in *Bruen*.

3         THE COURT:  So if that analysis is the one
4    that guides us, does that mean that whether the
5    weapon is unusually dangerous, I mean, you say all
6    guns are dangerous, I understand that, but whether
7    the weapon is dangerous and therefore can't be banned
8    under the Second Amendment under your first -- under
9    your prima fascia analysis?

10        MR. ARRINGTON:  All bearable arms are prima
11   fascia protected by the Second Amendment.  That's
12   what *Bruen* says, all bearable arms are protected.
13   Prima fascia on the face, protected, it creates a
14   presumption.  And it's the government's job to come
15   in and rebut that presumption by saying this is a
16   dangerous and unusual arm.

17        The government is trying to shift their
18   burden.  That's -- a lot of what the government's
19   brief does in this case is try to shift its burden
20   back onto plaintiff.  Plaintiff does not have to show
21   that it's not dangerous and unusual; the government
22   has to show that it is dangerous and unusual.

23        How do I know that?  Look at *Heller*.  *Heller*
24   says that the common use test or the fact that the
25   Second Amendment protects arms in common use at the

1   time is supported by -- here are the key words, the

2   historical tradition, the historical tradition of

3   prohibiting dangerous and unusual arms.  The word is

4   historical.  So if you've got a plain text and

5   historical tradition prongs of the test, where does

6   historical tradition fall?  It obviously falls under

7   historical tradition.

8          So the way the *Bruen* test works is the first

9   part of the test creates a presumption, a very

10  simple, very simple analysis, and *Bruen* took five

11  paragraphs, they want to carry the guns.  That's

12  prima fascia protected by the Second Amendment.

13         THE COURT:  It doesn't matter the level of

14  lethality or dangerousness of those weapons?

15         MR. ARRINGTON:  That's something that can be

16  -- that's an issue.

17         THE COURT:  But is that -- in your

18  evaluation, is that -- does that enter the question

19  at the first step where you say all bearable arms are

20  protected by the Second Amendment, and I want to know

21  if there's any limitation on that view or you think

22  that is a blanket principle to be applied?

23         MR. ARRINGTON:  It's -- those are not my

24  words, those are from *Bruen*, all bearable arms.  And

25  here's other key words, prima fascia protected by the

1    Second Amendment.  I'm not saying that all bearable

2    arms are protected by the Second Amendment.  They're

3    obviously not.  The shotgun, sawed-off shotgun is a

4    bearable arm.  Is it prima fascia protected by the

5    Second Amendment?  Sure.  It's a bearable arm.

6         Is it actually protected by the Second

7    Amendment?  No.  Because under the history and

8    tradition of prohibiting dangerous and unusual arms,

9    it is the state has -- can legitimately prohibit it.

10        This is not unique to the Second Amendment.

11   Let me give you a First Amendment analogy.  No one

12   would dispute that libel is speech and the First

13   Amendment protects speech.  There should be no law

14   prohibiting free speech.  And so prima fascia, libel

15   is protected.  But if you look at the Supreme Court

16   case in Nevada Gaming Commission, I think it was, or

17   Election Commission, the Court said, well, yes, it's

18   speech, but there's a history and tradition going

19   back to 1791 of prohibiting libel, therefore even

20   though it's prima fascia speech and protected, given

21   history and tradition, it's not protected.

22        So there's a set of speech, all speech, prima

23   fascia protected by the First Amendment, but there's

24   a subset of speech, libel, slander in particular,

25   defamation, that is not protected under the history

1    and tradition test.

2            Same thing, Second Amendment, all firearms

3    are protected prima fascia by the Second Amendment.

4    There's a subset of firearms where that prima fascia

5    presumption is rebutted and *Heller* talks about two

6    areas -- well, actually, one area and two components

7    of it where that set is reduced by the subset that is

8    not protected, dangerous and unusual arms.  Under the

9    history and tradition of firearm regulation,

10   dangerous and unusual arms are not protected.

11           But who has to show the history and tradition

12   that they are dangerous and unusual?  Plaintiffs

13   don't have to show that they're not dangerous and

14   unusual.  The government has to show that they are

15   dangerous and unusual.

16           The other one is military weapons that are

17   highly unusual in society at large.  And the examples

18   that Justice Scalia gave were machine guns, tanks and

19   bombers.  If you've got the type of weapons that a

20   nation-state uses, sophisticated military weapons

21   that a nation-state uses in its armed forces, those

22   are not protected by the Second Amendment.  What's

23   protected, what Justice Scalia in contradistinction

24   said weapons that are in common use.  And so by

25   definition, weapons that are in common use are not

1   part of that military exception.

2        THE COURT:  So what if Congress deregulated

3   the M16, the fully-automatic rifles, and they were

4   permitted to be sold to civilians, in time they

5   became commonly owned by people for the intention of

6   using them in self-defense.  Are you saying that the

7   M16s could not be constitutionally banned by any

8   state regardless of how dangerous they are?

9        MR. ARRINGTON:  So again, let me just talk --

10  answer that question by quoting Justice Alito from

11  the *Caetano* case.  He said, "The relative

12  dangerousness of an arm is irrelevant."  "The

13  relative dangerousness of an arm is irrelevant" if

14  that arm is in common use.

15       THE COURT:  That's the purpose I'm asking the

16  question.

17       MR. ARRINGTON:  I'm sorry?

18       THE COURT:  That's the focus of my question.

19       MR. ARRINGTON:  And Justice Alito answered

20  it.

21       THE COURT:  So if the M16 were deregulated

22  and they were sold commercially and became commonly

23  owned for self-defense, they could no longer be

24  constitutionally banned by any state; is that right?

25       MR. ARRINGTON:  So what -- the example that

1    you used is actually right out of the pages of *Bruen*.

2    Justice Thomas talked about a particular weapon that

3    was deemed to be dangerous and unusual in the 1600s.

4    He says, well, maybe it was dangerous and unusual

5    then but it's not now, therefore it's protected.  So

6    the answer is --

7            THE COURT:  It didn't exist then, right?

8            MR. ARRINGTON:  No.  He's talking about

9    weapons that did exist, handguns.

10           THE COURT:  But we're not talking about

11   handguns.  We're talking about semi-automatic

12   weapons, right?

13           MR. ARRINGTON:  And so the general principle

14   is Justice Thomas said that something that is

15   dangerous and unusual over time can become not

16   dangerous and unusual given the practices of the

17   American people because it is the choices of the

18   American people that are to be given precedence under

19   *Heller* and under *Bruen* and if the legislatures of the

20   American people decided to deregulate a particular

21   weapon and over the centuries that weapon became

22   owned by tens of millions of people, it would then

23   not be dangerous and unusual, and therefore, not

24   subject to being banned because of that reason.

25           Now, there is a -- we should keep in mind,

1   though, that plaintiffs' burden is very simple.  The

2   textual burden is not an empirical analysis.  An

3   empirical textual analysis is an oxymoron, right?

4   The government is coming in here and saying the

5   plaintiff has an empirical burden in order to satisfy

6   their textual analysis.  That doesn't make any sense.

7   *Bruen* didn't have an empirical element to the textual

8   burden.  It just said, look, they want to carry guns.

9           I will go back to Bruen's statement, the

10  textual issue need not detain this law.  They said,

11  yeah, they want to carry guns.  That's obviously

12  protected -- prima fascia protected by the Second

13  Amendment.  I will also talk about Justice Thomas and

14  Justice Scalia and their dissent from denial of

15  certiorari in the *Friedman* case.

16          Justice Thomas wrote *Bruen*.  Justice Scalia

17  wrote *Heller*.  So one would suspect they know

18  something about what *Heller* and *Bruen* mean.  And they

19  said in that dissent, millions of people own AR-15s,

20  case closed.  I paraphrased.  Millions of people own

21  AR-15s.  Under our precedence, that's all that is

22  necessary for these weapons to be protected by the

23  Second Amendment.

24          So -- and so we know how Justice Scalia,

25  Justice Thomas, Justice Alito feel about these.

1    Justice Kavanaugh in *Heller II* basically said there's
2    no rational distinction between the weapons that are
3    at issue here and the weapons that were held to be
4    protected in *Heller*. As a matter of fact, Justice
5    Kavanaugh used an a fortiori argument in *Heller II*
6    which admittedly was the dissent, but his dissent, I
7    am certain, has become the majority position on the
8    Supreme Court. And how do I know that? In *Bruen*,
9    the Court cited to his dissent favorably three times.
10         And so that's the law I would posit to the
11   Court. And in *Heller II*, Justice -- then Judge
12   Kavanaugh said, look, you've got semi-automatic
13   firearms, handguns, that are used overwhelmingly by
14   criminals, we've just said those are protected by the
15   Second Amendment, but you've got semi-automatic
16   rifles that are used far, far, far less by criminals,
17   what -- how in the world can you say that the
18   handguns are protected and the rifles aren't, it
19   makes no sense because they shoot at the same rate.
20        THE COURT: So is that supported by the
21   affidavits and the declarations on use that we have
22   in the defendants' filing?
23        MR. ARRINGTON: Is what supported?
24        THE COURT: Is it supported that it doesn't
25   make any sense because they shoot at the same rate or

1  something like that?

2      MR. ARRINGTON:  That's what Justice Kavanaugh

3  said in *Heller II*.

4      THE COURT:  I'm asking you whether or not

5  that should apply to the analysis here where you have

6  -- I mean, I take it that we can agree that these

7  semi-automatic weapons can be or are more dangerous

8  than the non-semi-automatic because of their force

9  frequency and all the statistics on the outcomes for

10 victims that we have in the declarations.

11     MR. ARRINGTON:  Yes.  Which is -- the

12 information about semi-automatic firearms, and it's a

13 logical argument more than an evidentiary argument

14 that Justice Kavanaugh was making in *Heller II*, yes,

15 they're both semi-automatic firearms.  Semi-automatic

16 handguns are overwhelmingly used.  And let me just

17 say this, Your Honor, this is not an issue that the

18 Court gets to rule on.  It's bound by binding Second

19 Circuit precedent.  This has already been decided by

20 the Second Circuit and I would just point the Court

21 to *Cuomo*.

22     The first thing about *Cuomo* that this Court

23 should know is that in *Cuomo*, the Second Circuit --

24 let's back up on *Cuomo*.  *Cuomo* -- in *Bruen*, the Court

25 said that the two-step analysis that the circuit

```
1   courts had been using was one step too many and by
2   which it meant that the ends means and -- means-ends
3   analysis engaged in was illegitimate.  It was not
4   part of the Second Amendment test.  But the prior
5   part of what the courts were saying, perfectly valid.
6   And so what did Cuomo say about the common use test?
7   It said, and I'm quoting now from 804 F.3d at 255,
8   This much is clear, Americans own -- not use -- own
9   millions of the firearms that the challenged
10  legislation prohibits.  The same is true of
11  large-capacity magazines as defined by the New York
12  and Connecticut statutes.  Based on the ownership
13  numbers, the very next sentence, quote, Even
14  accepting the most conservative estimates cited by
15  the parties and by amici, the assault weapons and
16  large-capacity magazines at issue are in common use
17  as that term was used in Heller.
18          THE COURT:  So Cuomo comes between Heller and
19  Bruen, right?
20          MR. ARRINGTON:  Correct.
21          THE COURT:  And Bruen purports to clarify
22  that area that was left unclear by Heller that the
23  Second Amendment is a right to self-defense, not just
24  the right to own it within your home for that
25  purpose; is that correct?
```

1       MR. ARRINGTON:  That's too narrow.  The whole

2   purpose of *Bruen*, the first half third of *Bruen*, was

3   to say that the circuit courts had basically ignored

4   *Heller* and had not followed it faithfully, all of the

5   circuit courts, not just one of them or two of them,

6   all of them, and how had the circuit courts failed to

7   faithfully apply the *Heller* test.  Keep in mind,

8   *Bruen* did not establish a new test.

9       Twice the Court said, this is the *Heller* test

10  that we reiterate.  We're not establishing a new

11  test.  This is the *Heller* test that we reiterate

12  which the circuit courts have been getting wrong for

13  the last ten years.  And how have the circuit courts

14  been getting it wrong for the last ten years, by

15  getting it -- by taking the first step, yes, this is

16  covered by the Second Amendment step one; step two,

17  that doesn't matter because using the means-ends

18  scrutiny, we're going to say it's not protected.

19  Step one, the Court said okay; step two,

20  illegitimate.

21      THE COURT:  Is *Cuomo*, in your view, still

22  good law?

23      MR. ARRINGTON:  Parts of *Cuomo* are definitely

24  still the law.  So let's go to the Court specific

25  question which *Cuomo* also addressed.  And quoting

```
 1   here in 804 F.3d at 256 talking about whether these
 2   handguns that are protected are more lethal, more
 3   harmful, a greater threat to society than the rifles.
 4   So Second Circuit in Cuomo are saying at 804 F.3d
 5   256, even if defendants are correct, in other words,
 6   these rifles are used for crime and bad things, even
 7   if defendants are correct, however, the same could be
 8   said for the handguns in Heller, though handguns
 9   comprise only about one-third of the nation's
10   firearms by some estimates that count for 71 percent
11   to 83 percent of the firearms used in murders and
12   84 percent to 90 percent of firearms used in other
13   violent crimes.
14        That evidence of disproportionate criminal
15   use did not prevent the Supreme Court from holding
16   that handguns merited constitutional protection.
17   That's -- this is Cuomo.  This is binding law.
18   Disproportionate criminal use does not render a
19   firearm unprotected.
20        THE COURT:  That's handguns?
21        MR. ARRINGTON:  I'm sorry.
22        THE COURT:  That was said with respect to
23   handguns, right?
24        MR. ARRINGTON:  Not they're saying that with
25   respect to rifles.  That's what was issued.  This
```

1    very statute was at issue in *Cuomo*.

2         THE COURT: Whether a weapon is dangerous and

3    unusual, is that the same question as whether that

4    weapon is used commonly for self-defense typically

5    possessed for a lawful -- a law-abiding purpose?

6         MR. ARRINGTON: So a couple of things. Back

7    to Alito, Justice Alito in *Caetano*, he said that in

8    order for a weapon to be dangerous and unusual, it

9    has to be both. He said the conjunctive is very,

10    very important, that it has to be both dangerous and

11    unusual. What does unusual mean? It's an antonym of

12    common. And so basically, yes, the answer is that

13    dangerous and unusual is the flip side of in common

14    use.

15         And how did *Heller* address these two things?

16    In *Heller*, the Court said that *Miller*, *United States*

17    *v. Miller*, had established the in common use at the

18    time, that's the common arm that is protected by

19    Second Amendment. That test, *Miller's* in common use

20    at the time test, is supported by the historical

21    tradition of banning weapons that are dangerous and

22    unusual. So *Heller* said that they're the flip side.

23         *Bruen* said the exact same thing, that the in

24    common use test is the flip side of the dangerous and

25    unusual test. Unusual is -- that's why Justice Alito

```
1    said that its relative dangerousness is irrelevant
2    because it has to be both dangerous and unusual.  So
3    a very dangerous weapon if it's commonly used, owned
4    by millions and millions of people, is protected by
5    the Second Amendment.
6         And so this idea that -- which I call the
7    state's central premise, this -- if the Court will
8    indulge me, go to page 22 of the state's brief.  On
9    page 22 of the state's brief, there's a breakout
10   paragraph that they quote from Duncan v. Bonta.  It
11   says other -- it talks about other shootings had been
12   carried out with handguns, and it lists Virginia
13   Tech, 32 killed and at least 17 wounded; Fort Hood,
14   13 killed and more than 30 wounded; Binghamton, New
15   York, 13 killed and four wounded; Tucson, Arizona,
16   six killed and 13 wounded.
17        Virginia Tech in particular --
18        THE COURT:  I know, you're going to tell me
19   it wasn't a semi-automatic weapon.
20        MR. ARRINGTON:  It was a semi-automatic
21   handgun.  What do all of these incidents have in
22   common?  The weapons used in those incidents are
23   protected by the Second Amendment because they're
24   semi-automatic handguns.
25        THE COURT:  So let's get back to your
```

1    historical precedence arguments and I would like you

2    to comment on Professor Roth's declaration where he

3    is saying that the mass murder that you have with the

4    semi-automatic firearms is fundamentally different

5    than it was to the founding because it could only be

6    carried out by essentially assembling a small group

7    or a mob as opposed to now with current firearm

8    technology, one person can do all the damage.

9            Why isn't the -- why is the text -- if

10   you base much of your argument on the textual

11   analysis informed by the fact that this kind of mass

12   murder was unprecedented?

13           MR. ARRINGTON:  So the text is the text.

14   It's not -- this is what *Bruen* said, the text need

15   not detain this law.  I looked at -- I look at the

16   right to keep and bear arms shall not be infringed.

17   An arm is an arm.

18           THE COURT:  Let's go to Professor Roth's

19   analysis that what is the public danger now of the

20   mass murder from the current weapons sought to be

21   regulated is fundamentally different than during the

22   founding.  Do you disagree with that?

23           MR. ARRINGTON:  So I take it that Professor

24   Roth's -- to the extent that it's relevant at all,

25   and I don't think that it is, it goes to history.  I

1  mean, he's a history professor.  And so as between a

2  text step and a history step, which is the history

3  professor relevant to?  He's not relevant to the text

4  step; he's relevant to the history step.

5       THE COURT:  Yeah.  His declaration goes to

6  the history step.

7       MR. ARRINGTON:  Goes to the government's

8  burden under the history step.  It doesn't go to the

9  plaintiffs' burden under the text step.

10      And so let me just say this about dramatic

11  technological increases, et cetera, the government

12  comes in and says, well, these semi-automatic rifles

13  are the product of the dramatic technological change

14  and allow people to kill a lot of people at once, and

15  that's true, they do.  It was also true in 2008.

16      And so why is that relevant?  In 2007, a

17  young man used two semi-automatic handguns to kill 32

18  people in Virginia Tech.  Less than a year later,

19  *Heller* was argued and the District of Columbia said

20  to the Supreme Court in their briefs, I quote their

21  brief, look, we got this guy killing all these

22  people, 32 people in nine minutes, and the Supreme

23  Court said, yes, we understand that, we understand

24  that handgun violence is a problem, and I quote this

25  in the brief, we understand that handgun violence is

1   a problem but that does not mean that we're going to

2   allow you to use the bad acts of the few to deny the

3   rights the of millions.

4        This is what this is all about, Your Honor.

5   There are 24 million of these AR-15s owned by

6   millions and millions of law-abiding citizens.  Some

7   handful of people have used them improperly.  And so

8   if you look at the numbers, the FBI numbers, about

9   300 people a year, 350 people a year, are killed by

10   rifles of all types of which these so-called assault

11   weapons are a subset, but let's say all 350 just to

12   be conservative.  So what percentage of these 24

13   million rifles are used to kill people in the average

14   year?  .001 percent of these weapons are used to kill

15   people in the average year.

16        And that's the point of *Heller*.  That's the

17   point of *Bruen*.  We're not going to let the acts of

18   the deranged maniacs, these few deranged maniacs,

19   take away the rights of millions.  And let me just

20   say, this is the argument that Justice Kavanaugh,

21   again, made when he was a judge in *Heller II*.

22        THE COURT:  But why is that binding this

23   Court?  That was, in fact, at the appellate level.

24   It was not the Supreme Court.  I'm not sure why you

25   make such an emphasis on that as directing the

1  analysis required to be used.

2       MR. ARRINGTON:  Okay.  I will certainly agree

3  that Justice Kavanaugh's dissent was not -- is not

4  binding on this Court.  Justice Thomas --

5       THE COURT:  It's a dissent and it's the Court

6  of Appeals.

7       MR. ARRINGTON:  Justice Thomas's dissent is

8  not binding on this Court.  Justice Scalia's dissent,

9  not binding.  Justice Alito concurrent, not binding.

10  But certainly what all these Supreme Courts justices

11  are saying should be something that this Court should

12  notice and take account of as persuasive authority.

13  I'm not saying they're binding.

14       But I am saying that in *Cuomo*, who did the

15  Court cite when it said that the disproportionate

16  criminal use does not affect the constitutionality?

17  It cited *Heller II*.  So the binding authority is the

18  Second Circuit.

19       *Cuomo* abrogated in part by *Bruen,* but not on

20  this ground, cited that it's -- the mere fact that

21  it's used in crime does not determine that it's --

22  even substantially used in crime does not determine

23  that it's not protected by the Second Amendment.

24  And, again, *Cuomo* was making the same a fortiori

25  argument that Justice Kavanaugh made.

1    THE COURT:  I'm still trying to understand

2    why we should be focused on concurrences, dissents,

3    et cetera, as opposed to -- which obviously we're not

4    adopted by the majority in those cases.

5    MR. ARRINGTON:  I cite those for persuasive

6    authority, Your Honor.  I'm not -- I'm not suggesting

7    that you're bound by anything but *Cuomo*, which *Cuomo*

8    said the same thing by which you are bound.

9    THE COURT:  So let's talk about historical

10   analogs and then I'll get back to the defendant.

11   What in your view is the kind of historical

12   analog that would be required to show a tradition of

13   regulating categories of firearms if regulations that

14   banned particular kinds of weapons going back to 1837

15   banned them for their dangerousness?  Why weren't the

16   founding fathers concerned about the -- supporting

17   the regulation of kinds of weapons that are too

18   dangerous.

19   MR. ARRINGTON:  So first of all, let me just

20   suggest -- state that there are zero bans from the

21   founding era, zero.  To the extent someone says that

22   they can point to a founding era ban of any weapon,

23   they are wrong.  And if the state could point to a

24   particular law that said here's a common weapon and

25   here's where it was banned by founding era precedent,

1    I'm sure they would have in their brief but they
2    didn't.
3        As a matter of fact, I point this out in my
4    brief, the state more or less gave up on its analog
5    argument.  It's in all -- every single statute that
6    it cited was relegated to a footnote on page 33.
7    That's not how we do this.  And then we get hundreds
8    of pages of dumped statutes from last Friday, it's
9    all in there somewhere, Judge, you just look it up.
10        Well, Justice Thomas addressed this very
11   issue in *Bruen*.  He said that's not the way we do
12   things.  If you've got a statute that bans a
13   commonly-used weapon, point it out -- point it out,
14   quote it, and show us.  It's not the Court's job to
15   start digging through hundreds of pages of statutes
16   to try to do the state's job for them.
17        As a matter of fact, the state says the
18   opposite.  Page 31 of the state's brief, and I
19   commend them for their candor, during the founding
20   era, they targeted the perpetrators rather than the
21   particular instruments, that's true.  That's
22   absolutely true.  And so we have known since *Heller*,
23   what's that, 15, 16 years ago, that there is no
24   founding era statute that's analogous to an absolute
25   ban on a commonly-held weapon.  That's what *Heller*

```
 1    said, that the -- D.C.'s ban was, quote, an extreme
 2    historical outlier compared to the founding era
 3    precedent.
 4         THE COURT:  So you say that there are no
 5    founding era statutes that are absolute bans.
 6         MR. ARRINGTON:  That's what Heller said.
 7         THE COURT:  What about the Bowie knives and
 8    all the those that were banned, why does that not --
 9         MR. ARRINGTON:  Those weren't bans, Your
10    Honor.
11         THE COURT:  Pardon me?
12         MR. ARRINGTON:  Those were not bans.  The
13    state says they were bans.  That's error.  None of
14    those statutes banned possession of those weapons in
15    the home for self-defense.  They regulated concealed
16    carry.  They regulated sometimes sales.  They
17    regulated use.  None of them says no one can own
18    these, period, not even one.
19         THE COURT:  So tell me about the 1837 Georgia
20    statute that prohibits sale and possession of Bowie
21    and other kinds of knives as well as pistols, dirks,
22    sword canes and spears.  Why is that not a
23    prohibition on a category of weapons?
24         MR. ARRINGTON:  In that case, that's Georgia
25    v. Gunn, was specifically -- when the Courts got a
```

1    hold of that, they held that this is unconstitutional

2    if you're doing an outright ban on possession by

3    law-abiding citizens.  It is constitutional only to

4    the extent that it prohibits carry or concealed

5    carry, going abroad.

6            And so this is what *Bruen* said.  *Bruen*

7    analyzed all of these same statutes, all of these

8    same cases, and it said no -- none of these cases

9    banned it, and to the extent that they did, they were

10   -- for example, a statute that purported to ban a

11   particular kind of pistol would have been a violation

12   of *Bruen*.  And so the *Bruen* Court said -- examined

13   all of these same things, said does not provide an

14   analog for a commonly -- use of a -- carrying of a

15   commonly-held weapon.

16           We've known this since *Heller,* there are

17   no -- and plus, here's the other thing, the state

18   seems to think if they can point to one, two, three,

19   they can't, but even if they could, that doesn't get

20   them there.  The fact that there are outliers doesn't

21   create a national tradition.  This is something to

22   keep in mind, Your Honor.  If the state says, ah-hah,

23   found one, one doesn't get them there.  This is what

24   *Bruen* said, a few outliers don't get you there.  They

25   have to establish a widespread national tradition of

1   banning commonly-held arms.  We've known since *Heller*

2   that that's impossible.

3         THE COURT:  Your brief talks about that a

4   weapon can't be both commonly used and unusual, do I

5   have that right?

6         MR. ARRINGTON:  Yes.

7         THE COURT:  And whether a weapon is dangerous

8   can't be the basis for banning it in the abstract

9   sense because all guns are dangerous.

10         MR. ARRINGTON:  Correct.

11         THE COURT:  So why doesn't it make sense to

12   say that the question of whether a weapon is

13   dangerous and unusual is the same thing as whether

14   the weapon is commonly used for self-defense and

15   typically possessed for a law-abiding purpose as

16   opposed to characteristics that typically make it

17   possessed for an unlawful purpose by a

18   non-law-abiding citizen?

19         MR. ARRINGTON:  I'm sorry, Your Honor.

20         THE COURT:  Sure.

21         MR. ARRINGTON:  Can you make another run at

22   that?

23         THE COURT:  So what I'm trying to understand

24   is if a weapon is dangerous and unusual, is that the

25   same question on the other side of whether that

1   weapon is commonly used for self-defense and

2   typically possessed for a law-abiding purpose?

3          MR. ARRINGTON:  So *Heller* said that Miller's

4   in common use at the time test is supported by the

5   historical tradition of banning dangerous and unusual

6   arms.  So as I said earlier, those seem to be the

7   flip side of one another, 627 -- 554627, I believe

8   it's 554.

9          THE COURT:  So if there were a historical

10  analog of being a certain kind of weapon because of

11  dangerousness, are you saying that that's

12  unconstitutional?

13         MR. ARRINGTON:  So the Court did not address

14  it in that fashion.  It said that the common use test

15  is supported by the tradition, the historical

16  tradition of banning dangerous and unusual weapons.

17  It doesn't say that the common use test is supported

18  by the historical tradition of banning dangerous

19  weapons because there is no such tradition.

20         So the set that the Court has posited is an

21  empty set.  There's no historical tradition of

22  banning merely dangerous weapons because if you could

23  ban merely dangerous weapons, that means you can ban

24  all weapons because all weapons are dangerous.

25         THE COURT:  Okay.  Let me pivot back and get

1    the defendants' response to your positions and your

2    characterization of what you believe they are

3    arguing.

4         MS. MEDEIROS:  So, Your Honor, just very

5    briefly, I will address a few points from plaintiffs'

6    counsel as to what we posit as the step-one analysis.

7         So a couple of problems with plaintiffs'

8    argument here, plaintiff makes much of the prima

9    fascia language in *Bruen* and makes much of the fact

10   that the step-one analysis there is very brief, but

11   that completely misunderstands what was going on in

12   *Bruen*.

13        In *Bruen* we're talking about handguns which,

14   keep in mind, the step-one analysis had already been

15   done as to handguns in *Heller* and it was a much more

16   substantial analysis there.  And in *Heller,* it's

17   important to note that in *Heller*, it's not just a

18   simple is a handgun a bearable arm, if so, that's it,

19   it's presumptively covered.  Instead what the Court

20   did is look at suitability for self-defense and

21   reasons why handguns might be the preferred weapon

22   for self-defense.

23        So the idea that self-defense, suitability

24   for self-defense and use for self-defense is

25   completely out of the picture when it comes to

```
 1   whether the Second Amendment is even implicated is
 2   just completely unsupported by Heller and Bruen
 3   themselves.
 4        And that's -- the idea that looking at common
 5   use and the dangerous and unusual questions are part
 6   of a step-one analysis are also -- that's also
 7   supported by the Supreme Court's decision in Miller
 8   where they say that the particular weapons that are
 9   considered there are, quote, not protected by the
10   Second Amendment.
11        Also, in Heller, the Court's looking at a
12   class of weapons, M16 rifles and the like, that would
13   not be protected by the Second Amendment.  All of
14   these things are considering under step one whether
15   the Second Amendment is even implicated and that's
16   exactly what the Second Circuit said in Cuomo as
17   well.
18        Plaintiff wants to focus on the first
19   question in Cuomo, whether these particular weapons
20   are numerous, but ignores the fact that the Second
21   Circuit then went on to look at the purpose, the
22   lawful purpose, the use of self-defense, and the
23   dangerous and unusual question.  And in Cuomo, the
24   Court also again said that a class of weapons
25   classified and dangerous and unusual or unusually
```

1   dangerous weapons are ones that, quote, could be

2   banned without implicating the Second Amendment.

3          All of these things show that this question,

4   dangerous and unusual and/or common use for

5   self-defense, are step-one questions which is the

6   plaintiffs' burden under *Bruen*.  Whether or not the

7   Second Amendment is implicated is the plaintiffs'

8   burden to demonstrate.

9          When it comes to -- oh, and one other case

10  that supports that as well, plaintiff makes much of

11  the *Caetano* case, but there the Court is again saying

12  the question of dangerousness goes to the question of

13  whether, quote, such weapons would fall outside the

14  scope of the Second Amendment.  Just again, another

15  instance of where that type of question is under step

16  one whether the Second Amendment is even implicated,

17  and not under step two the historical analog

18  question.

19         And the question of dangerous and unusual

20  wouldn't make sense under step two in fitting with

21  cases like *Miller* and cases where we have notations

22  that weapons like machine guns, M16s can be banned

23  because in those cases there was no discussion of

24  historical analogs under the step-two *Bruen* test

25  because it didn't exist.

```
1          So in Miller, there we know that

2    short-barreled shotguns are not protected, but

3    there's no question of what historical analog says

4    that those would not be protected.  So it really

5    wouldn't make sense to fit under step two.

6          And I think at this point I will just turn it

7    over to my co-counsel for his discussion of the

8    historical analogs.

9          THE COURT:  Okay.  I want to know do we have

10   agreement that this is a facial challenge?

11         MS. MEDEIROS:  Your Honor, defendants would

12   say that plaintiffs have very clearly made this a

13   facial challenge to both statutes.

14         THE COURT:  Is this to be analyzed as a

15   facial challenge, Mr. Arrington?

16         MR. ARRINGTON:  The complaint brings a facial

17   and an as-applied challenge.  At this point, I think

18   both are on the table.

19         THE COURT:  Okay.

20         MR. ARRINGTON:  So part of it is definitely a

21   facial challenge.

22         THE COURT:  All right.  You're going to talk

23   about history?

24         MR. BELFORTI:  Yes, Your Honor.  I'm going to

25   try.
```

1    So I think kind of building off my

2    co-counsel's argument there, when we look at the

3    step-two analysis of *Bruen*, the historical analogs,

4    there's a particular problem which the plaintiff

5    confronts which is there's a laundry list of weapons

6    that could be regulated or even taxed to a point of

7    prohibition or, frankly in modern times, outright

8    banned.  Obviously, we heard about short-barreled

9    shotguns from the National Firearms Act, machine

10   guns.  We know M16s and the like, that's from *Heller*

11   itself, but we also have things like Bowie knives,

12   sword canes, slungshots, rifle walking canes.

13       I want to talk about one thing, the idea

14   that -- and I think this was in Plaintiffs' Exhibit 1

15   to his reply brief where he tries to analyze each of

16   the cited statutes, plaintiff seems to make a lot

17   about the idea of, well, a tax is not the same thing

18   as a ban, but a prohibitive tax that would prevent

19   somebody from purchasing a weapon has the same

20   function as a ban and that was ultimately what the

21   NFA was in 1934.  That's a pretty good example where

22   you have a mass casualty incident like the

23   St. Valentine's Day Massacre which happened in the

24   late '20s.

25       Congress then responds by passing a law, the

1   National Firearms Act, which heavily regulates and

2   taxes machine guns, short-barreled shotguns,

3   short-barreled rifles.  Then five years later it

4   comes before the Court and the ban is upheld.

5        That's very similar to what we have here

6   today and I think the plaintiffs' argument that these

7   other laws from the 1830s and such that place heavy

8   taxes on things like Bowie knives and sword canes and

9   swords -- excuse me, cane -- walking rifles, the

10  idea, well, that's just a tax, it's not a ban, I

11  don't think the plaintiff would be okay if

12  Connecticut had passed a law placing a $100,000 tax

13  on the AR-15.  Something tells me if that had been

14  the law, we'd still be standing before Your Honor

15  today.

16       So this argument that, well, there's some

17  distinction between heavy taxation and heavy

18  regulation and an outright ban, I just don't think

19  that that's -- I think it's a bit of a disingenuous

20  argument.

21       THE COURT:  Let me interrupt you, if I may.

22  Do you have a position on whether the initial

23  ratification of the Second Amendment in 1792 or the

24  incorporation of the Second Amendment in 1868 is the

25  important time period for the Court's historical

1   analysis?

2           MR. BELFORTI:  So I think, Your Honor, in

3   this case, we have analogs from both those time

4   periods, both before and after the founding and

5   before and after ratification.  Getting directly to

6   the ratification question, I think Section II-B of

7   *McDonald* is most instructive on this and that was the

8   case a couple years after *Heller* where the Second

9   Amendment was actually incorporated to the states to

10  the Fourteenth Amendment.

11          In that case, the Court had a large section

12  talking about how those who were ratifying the

13  Fourteenth Amendment were focused heavily on the idea

14  of ensuring the right of arms self-defense to

15  newly-freed slaves in some of the southern states and

16  that's why the Fourteenth Amendment was required in

17  addition to all the other things that are

18  incorporated within the Fourteenth Amendment.

19          So I think that's particularly relevant here

20  because we look at some of the laws that we cited to,

21  for example, the Alabama law from 1868 banning rifle

22  walking canes, that was passed on August 5, 1868.

23  The Alabama legislature ratified the Fourteenth

24  Amendment on July 13, 1868.  So that literally means

25  the people who were voting on the amendment 23 days

```
 1   earlier -- or excuse me, 23 days later passed a law
 2   banning weapons.
 3          So these people who are -- the whole premise,
 4   and this comes from *Heller* too, is that we're looking
 5   at what are the people voting on, what are they
 6   understanding themselves to be voting on.  That's why
 7   I think that the ratification era at least as to have
 8   equal weight in this kind of analysis because,
 9   otherwise, we wouldn't even be considering what --
10   the whole premise of this is that the people who were
11   ratifying the Fourteenth Amendment were voting on a
12   panoply of rights to be extended to their citizens in
13   the states and their understanding of what that meant
14   including the Second Amendment is essential because
15   as the Court notes in *Bruen*, technically what bounds
16   the State of Connecticut to respect the Second
17   Amendment is the Fourteenth Amendment.
18          It's not the Second Amendment because nobody
19   would have argued that the Second Amendment applied
20   to the states at the time of the drafting.  In fact,
21   a lot of people would argue that it wasn't necessary
22   to have a Second Amendment because Congress could
23   only do what it was specifically enabled to do and it
24   wasn't enabled to take away anyone's firearms or
25   anything like that and that would have been the
```

1 province of the state's police power.

2      So I think the idea that the ratification of

3 the Fourteenth Amendment has no relevance to this

4 analysis, which is an argument that the plaintiffs

5 make in their briefing several times, is just -- it

6 misses the mark.

7      THE COURT:  So if historically, and this is

8 what I think the record is showing, that founders saw

9 small conceivable -- concealable weapons as more

10 dangerous than many of the larger weapons, what does

11 that -- A, is that correct, and, B, what does that

12 tell us?

13      MR. BELFORTI:  So I think when we're talking

14 about the kind of weapons analogs, like the concealed

15 pocket pistols and things of that nature, I think it

16 shows a pretty common American tradition which is

17 weapons come on the scene, they present a societal

18 problem, they're causing issues, and then the

19 legislatures respond either through a tax, a ban,

20 limitations on carrying, something like that.

21      The weapons that were concealable either

22 because of their size or because they didn't make as

23 much noise was trying to attack a specific type of

24 societal problem which is the kind of crime one would

25 commit and then try to get away with it.  So a good

1  example, this would be like a slungshot, which is
2  something that comes up a lot.
3        A slungshot was -- it's actually a maritime
4  tool.  It's a rope with a heavy thing at the end of
5  it and it's used to throw mooring lines.  But what
6  people would do is they would put a heavy lead ball
7  in it and they could hang it from their wrists, sneak
8  up behind someone and strike them in the skull with
9  it.
10        These were highly common, but they were made
11  illegal because of that.  The reason is because you
12  could kill somebody in secret in a way that you
13  couldn't kill somebody with a firearm at the time
14  because if you shot somebody in an alleyway, it would
15  make a loud noise and people could come and find you.
16  Also, it would be much more difficult to carry a
17  musket or something like that for that purpose.  So
18  it's the legislature is approaching a problem and
19  saying we have to find a way to deal with this
20  problem.
21        Now, that's where we get into the idea of
22  unprecedented societal concern and dramatic
23  technological change.  The problem that the
24  Connecticut legislature is addressing is not someone
25  who is trying to commit a crime and get away with it.

1    In the situations of high-casualty mass shootings,

2    sadly the perpetrators don't seem to care about

3    getting away with it.  Most of them are writing

4    manifestos, they're coming, they're killing people in

5    such a public way.  The publicity of it is partially

6    the point.  So to say, well, we didn't ban big

7    weapons like this, first of all, there were no big

8    weapons like this at the time and therefore there's

9    no historical analog for this is kind of missing the

10   mark.

11        The fact of the matter is we have dramatic

12   technological change driving an unprecedented

13   societal concern of high-casualty mass shootings and

14   then the state legislature is responding.  That's why

15   I think depending on which era you look at; I think

16   we've provided several relevant historical analogs

17   not the least of which is the gunpowder storage laws.

18   Plaintiff takes issue with it and they say, no, no,

19   no, *Heller* talked about this already.

20        First of all, the laws we cite to, *Heller*

21   didn't address.  The Boston law from 1706, the text

22   of that law on its face prohibits the storage of

23   gunpowder in any place except at the public storage

24   house or in a shop for sale or as the governor or

25   counsel may deem.  So it essentially gives discretion

1   to state and local officials -- excuse me, I

2   shouldn't say state officials, colonial officials, to

3   say you can have this much if we decide you can have

4   this much, and that's from 1706.

5         If we flash forward 130 years later,

6   Connecticut of all places has a very similar law and

7   essentially says that town officials can decide if

8   someone has an amount of gunpowder that might present

9   a risk to any persons or property whatsoever.  Now,

10   why is that important here, because we're talking

11   about the mass casualty incident of the time, an

12   explosion either by accident or sabotage or something

13   like that.

14         No one could have committed a high-casualty

15   mass killing in 1776 with a single weapon.  It was

16   just impossible.  And that gets into something that

17   Your Honor brought up with the Roth declaration.

18   Professor Roth highlights the Boston Massacre, right,

19   which was a world-shaking event, drew us ever closer

20   to revolution.  That happened not too far from here.

21   That was a squad of British soldiers firing into a

22   crowd of 50 people and five people were killed.

23         The suggestion that somebody could take a

24   single weapon and kill 30, 40, 50, 60 people before

25   they were stopped would have sounded like science

1    fiction to the founders.  And that's why this mass

2    casualty incident -- that's why *Bruen* talks about the

3    more nuanced approach to the historical analysis

4    because we can't just say, well, there were no bans

5    like this on AR-15s or M16s and the like at

6    the founding, therefore these are legal.  That

7    wouldn't make any sense, and even the Supreme Court

8    recognized that in *Bruen*, and they say that's not the

9    analysis we're doing here today.

10       *Bruen* and *Heller* were about handguns.  And

11   *Bruen* wasn't even about a regulation of handguns that

12   you can possess.  It was about carry law, and that's

13   something that Justice Alito's concurrent talks

14   about.  This isn't about what kinds of weapons can be

15   regulated.  This is a case about what kinds of

16   weapons, and that's why those historical analogs, I

17   think particularly the gunpowder storage laws, are

18   highly relevant to this analysis.

19       That's somebody who completely committed to

20   both the how and the why.  The why in that situation

21   was mass casualties.  The how was we can regulate how

22   much of this stuff you have in your home which is

23   where the right of armed self-defense is at its

24   zenith.

25       And gunpowder at that time, if you ran out of

```
1   gunpowder, you weren't firing rifles, muskets,
2   pistols, artillery pieces, anything.  Gunpowder
3   worked on any kind of weapon.  Our current law
4   prohibits --
5            THE COURT:  Kind of like a high-capacity
6   magazine?
7            MR. BELFORTI:  I'm sorry, Your Honor?
8            THE COURT:  Kind of like a high-capacity
9   magazine?
10           MR. BELFORTI:  Kind of like a high-capacity
11   magazine, Your Honor, but I would say our current law
12   doesn't prohibit your ability to have as many pistols
13   as you want so long as they don't come within that
14   subclass, as many rifles as you want, as many bullets
15   as you want in your house.  You can carry as many
16   weapons as you want as long as they don't fit under
17   this subset of weapons.  So the how in that situation
18   in our law is far less intrusive on the right of arms
19   self-defense which is the whole point of the Second
20   Amendment.
21           THE COURT:  I want to ask you are there --
22   what semi-automatic weapons are not covered by the
23   statute?
24           MR. BELFORTI:  Well, certainly, I think the
25   typical handgun of *Heller*, an M9 Beretta or a Glock
```

1   pistol that accepts a ten-round magazine, any of
2   those things are completely fine.  There are rifles
3   that are protected as well.  I don't profess to be a
4   firearms expert, but I think that this goes into, I
5   believe it's Exhibit A which is Detective Warenda's
6   declaration gets into all the various types of
7   weapons that are not prohibited by our statute.

8           So this is about a specific type of weapon,
9   specific kind of weapon, that has high lethality,
10  that's incredibly dangerous, and that ultimately --
11  not to jump back to the first step but this argument
12  about, well, they're in common use so you can't ban
13  them, they're in common use, that presumes that
14  issue.  And the question of if they're in common use,
15  one, it's not common ownership or common existence,
16  it's use.  And secondly, you can't just ignore the
17  denominator and focus on the numerator.  Yeah, there
18  might be 20 million of these out in circulation that
19  have been produced, but in a gun stock of 461
20  million, which is, I believe, in the Klaraves
21  declaration, that's not common.  We're getting into
22  five percent or under.

23          So commonality is not the same thing as
24  numerosity.  You have to look at the percentage of
25  what you're talking about.  A hundred panda bears is

1    a lot.  A hundred grains of sand is not a lot,
2    because there aren't that many pandas and there's
3    lots of sand.  So the question of commonality is
4    something that we have to talk about and that's kind
5    of what the plaintiff focuses on, which is there's
6    not a single law banning common weapons, but that
7    presumes too much, that they're common weapons, and
8    it also raises the issue of, well, then how is the
9    National Firearms Act constitutional, because there's
10   no analysis on whether or not short-barreled shotguns
11   or rifles or machine guns were numerous as the
12   plaintiff would adopt.
13          There's no evidence of that in the record and
14   that's what they're relying on and on that basis
15   alone, the plaintiff has failed.  And it also
16   wouldn't make sense that Congress or any of the
17   states would regulate something that wasn't common,
18   that wasn't creating problems.  You don't make laws
19   against things that aren't presenting a problem.
20   There's no purpose to do that.  The whole point of
21   something like the National Firearms Act or the laws
22   against slungshots or brass knuckles, sword canes,
23   Bowie knives, is that they were presenting a problem.
24   They were all too common and they were being commonly
25   used for crimes and nefarious purposes.

1    THE COURT:  So even if assault weapons are

2    often used in crime or mass shootings, does that in

3    your view mean they're not typically used for a

4    lawful purpose?

5    MR. BELFORTI:  I don't think that it's just

6    that they're often used in mass shootings, that they

7    can't be used in that lawful purpose, but I think the

8    tether, as my co-counsel talked about, is that idea

9    of typical use for self-defense.  And the fact of the

10   matter is it's pretty clear that they are not

11   typically used for self-defense.  They are typically

12   -- if there is a self-defense incident involving a

13   rifle, which is I think two percent or less, and

14   that's all rifles, not just the subset, and that's

15   including discharging the weapon or brandishing the

16   weapon, so it's not a question of just firing it, you

17   can use a weapon in self-defense without actually

18   having to fire it, and all the data seems to suggest

19   that these just aren't used for self-defense.  And to

20   the extent they're used for something else, that's

21   not what *Heller* and *Bruen* are about.

22   The themes of *Heller* and *Bruen* are always

23   self-defense, self-defense, self-defense.  When we

24   look at what the Court's writing in *Heller*, it's

25   trying to explain, frankly explain the existence of

1    the prefatory clause which is focused on militia

2    service, and the idea is, well, it's not just a right

3    of militia service, it's a right of armed

4    self-defense, and that's why it's an individual

5    right.

6          So that -- so this idea of like, well, if I

7    can collect it and I want to have it and then I say

8    it's for self-defense, that's all there has to be,

9    that's not the test and that can't be the test

10   because it makes it no test at all.  It's not

11   tethered to anything objective.

12         THE COURT:  So military use of a weapon does

13   or does not necessarily make it unsuitable for

14   self-defense?

15         MR. BELFORTI:  So, Your Honor, and I think

16   this was part of the plaintiffs' counsel's argument

17   about the idea of what *Heller* said about military use

18   and this idea of the exceptions of tanks and bombers

19   and M16s, I don't think the *Heller* Court was saying,

20   well, if they're useful in the military, they are

21   therefore capable of being automatically banned, and

22   I don't think that's the argument that the plaintiff

23   was trying to put forward, but that's, frankly, how

24   it came across to me.

25         I think the fact of the matter is if they are

1 useful in military service, then that goes to the

2 question of dangerous and unusual and are they

3 commonly used for self-defense. I think the part of

4 that paragraph which is right before Section IV in

5 the *Heller* case, it's going into why can we ban

6 things like M16 rifles and the like. That's the

7 whole point of that and it's talking about indeed it

8 may be true that no amount of small arms can be

9 useful against modern-day bombers and tanks, but the

10 fact that modern developments have limited degree of

11 fit between the --

12        (Reporter clarification.)

13        MR. BELFORTI: I'm sorry. I'll slow down.

14        I said but the fact that modern developments

15 have limited the degree of fit between the prefatory

16 clause and the protected right cannot change our

17 interpretation of that right. What Justice Scalia

18 and the majority is saying there has nothing to do

19 with the idea that, well, it's a question of military

20 usage. It's a question of does the prefatory clause

21 about a well-regulated militia limit the individual

22 nature of the right.

23        But what Justice Scalia is doing in that

24 paragraph which is important for our purposes today

25 is he's using what he considers to be such an obvious

1    example of a ban of a weapon, M16 rifles and the

2    like.  And when we look at our record in this case

3    M16 rifles are almost exactly like AR-15s.  The AR-15

4    was produced as a military weapon.  Then it became --

5    basically, it was modified to be called the M16.  We

6    also have the M4.  But these are just essentially

7    brand names for lack of a better term.  That would be

8    like saying Coke isn't like Pepsi because one is

9    called Coke and one is called Pepsi.

10              THE COURT:  We all know there's a huge

11   difference.

12              MR. BELFORTI:  I imagine Coke and Pepsi would

13   not like me making that argument.

14              But my point is that the real difference

15   between those rifles functionally is the idea of the

16   ability to fire automatically or simply

17   semi-automatically, that can't be the only standard

18   because that's just -- according to the plaintiffs'

19   test because that's just a dangerousness standard.

20              So if the argument is, well, the M16 is more

21   dangerous because it can fire auto and the AR-15, it

22   can't fire auto, so therefore it's not as dangerous,

23   but his argument isn't that.  His argument is, well,

24   there's a lot of these, but there's no analysis of

25   the existence of M16s and the only reason one would

1    argue that M16s are not proliferating around the

2    country is because they're just called that by the

3    military and we have the National Firearms Act which

4    prohibits you from getting weapons like that.

5         So it all comes back on itself which is if

6    that's true, if the premise of the plaintiffs'

7    argument is true, how do we account for the National

8    Firearms Act?  How do we account for these laws about

9    slungshots and Bowie knives and sword canes and

10   pocket pistols?  How do we account for the Boston law

11   about limiting someone's right to possess gunpowder

12   or the Connecticut law limiting someone's right to

13   possess gunpowder?

14        There's no explanation for that.  It's just,

15   well, we know that slungshots were dangerous and

16   unusual.  Where does it say that?  What evidence is

17   there of that?  And it would also make no logical

18   sense because why would you regulate something that

19   wasn't presenting a problem, that wasn't

20   proliferating in society?

21        THE COURT:  All right.  I'm going to give you

22   each ten minutes to make any final arguments that you

23   have, but I want to make sure that we don't have any

24   dispute that the plaintiff, Toni Flanigan, is a

25   law-abiding citizen and intends to keep or bear a

1    firearm for the purposes of our Second Amendment

2    analysis.

3          MR. BELFORTI:  I don't think there's any

4    evidence to suggest that the plaintiff is not a

5    law-abiding citizen.

6          THE COURT:  All right.  Then we will assume

7    that.

8          Okay.  It is the plaintiffs' motion, so let

9    me have you all wrap up in this very interesting

10   case.

11         MR. ARRINGTON:  Let's talk about what counsel

12   said at the very end, why would you regulate

13   slungshots if they weren't dangerous and unusual, the

14   state's entire historical analysis relies upon

15   obfuscating the difference between a regulation and a

16   ban.  Yes, you can regulate the so-called assault

17   weapons.  You can regulate them.  You can regulate

18   slungshots.  You can regulate Bowie knives.  You can

19   regulate pistols.  You can regulate semi-automatic

20   pistols.  You can regulate, regulate, regulate.

21   There's lots of regulations.  This is what *Heller*

22   says.  You can regulate, but you can't ban.  There's

23   a difference.

24         So the entire argument you just heard was a

25   straw man because we're not saying that they couldn't

1  regulate them because they were dangerous and

2  unusual.  If you -- they cannot be banned unless they

3  are dangerous and unusual, and plaintiffs admit there

4  are lots of regulations, dozens of regulations.  So

5  did *Heller*; so did *Bruen*.  They analyzed them.  They

6  said none of them is remotely analogous to a ban on a

7  commonly-used weapon.

8          And the -- when counsel stood up, he

9  obfuscated the difference.  He said, well, sales tax

10  bans weapons.  Well, they don't.  Sales tax is not a

11  ban, plus it's only one state.

12          THE COURT:  I think he was using the

13  prohibitory sales tax.

14          MR. ARRINGTON:  Right.  Even a prohibitive

15  sales tax is not a ban because you can get these same

16  weapons other ways.  You can carry them in from other

17  states.  They can be given to you.  Never, never did

18  even Alabama prohibit the use of these weapons for

19  self-defense in the home or even carrying them.  So

20  you can carry these weapons in Alabama.  If you want

21  to buy them in Alabama, it would be expensive.  And

22  so regulations are not the same as bans.  *Heller* made

23  that clear.

24          The other thing is even if Alabama was a ban,

25  which it wasn't, but even if it is, that's one state,

1   one state.  That's not a national tradition.  The

2   state simply ignores the fact that its obligation is

3   to establish historical analogs that create -- that

4   demonstrate a national tradition of banning

5   commonly-used arms.  They haven't.  They haven't even

6   begun to do that.

7       And why haven't they begun to do that,

8   because they acknowledge right there in their brief

9   that they didn't ban these instruments.  They

10   regulated the perpetrator is what the state says.

11   *Heller* says this.  We've known this since *Heller*.

12   There is no tradition remotely analogous to banning a

13   commonly-used arm.  Yes, Justice Alito says you can

14   regulate.  You can regulate.  You can't ban a

15   commonly-used arm.

16       So let's talk about the other thing.  I've

17   been keeping track of the arguments that the state

18   has made that are barred by the Second Circuit

19   precedent in *Cuomo*, the common use argument.  It's

20   not numerosity about how many are owned.  *Cuomo* says

21   it is numerosity about how many are owned in so many

22   words.  They say it's a proportion; it's not absolute

23   numbers.  No.  *Cuomo* says -- the state made the

24   identical argument.  It's proportion, not absolute

25   numbers.  *Cuomo* said in response to that, no, it's

1    numbers, absolute numbers.  So that's two.

2         Use of crime precludes Second Amendment

3    protection, nope.  *Cuomo* said even disproportionate

4    use of a weapon in crime does not preclude Second

5    Amendment protection.

6         Not suited for self-defense, here's one that

7    they haven't focused on.  The state made the

8    identical argument they're making today in *Cuomo* that

9    these weapons are not suitable for self-defense and

10   *Cuomo* drops a footnote to that effect.  That state

11   has submitted affidavits from law enforcement saying

12   these weapons are not suitable for self-defense.  It

13   did not stop *Cuomo* from holding that the weapons are

14   in common use for lawful purposes under *Heller*.

15   That's four, I think.

16        Military weapons, so going back to the

17   difference between an AR-15 and an AR-16, *Cuomo*

18   specifically said the exact opposite of what the

19   state just said.  The state didn't even acknowledge

20   the fact that it's making an argument that's barred

21   by *Cuomo* much less try to address the fact that *Cuomo*

22   bars it.

23        How did *Cuomo* bar it?  *Cuomo* points to

24   *Staples* and what does *Staples* say, *Staples v. United*

25   *States*, the Supreme Court says there is a legally

1  significant difference between AR-15s, semi-automatic
2  weapons like AR-15s, and machine guns like M16s.  And
3  *Cuomo* picked up on that and said, yup, the fact that
4  it's like an M16 doesn't get you there.  This is
5  *Cuomo,* Second Circuit.  This is not dissents or
6  concurrences or other circuits.  This is binding
7  Second Circuit precedence saying that the difference
8  between an AR-15 and an M16 under *Staples* is
9  constitutionally significant.
10        And so mere ownership is the metric for
11  common use, numerosity, in other words, and so I
12  counted six arguments that the state has made that
13  are flat out barred by *Cuomo* which the state goes on
14  to say, well, *Cuomo* talks about in its means-use
15  analysis, it says something different.  Well, sure it
16  did.  That's why the means-use analysis was abrogated
17  by *Bruen*.
18        And I would also point out when you're
19  reading the state's brief, I counted 26 times, 26
20  times, they cited either Second Circuit or other
21  circuit precedent of those cases specifically
22  abrogated by *Bruen* as if they were still good law, in
23  particular, the means-end test.  I didn't an
24  electronic search, the word "abrogated" doesn't
25  appear in the brief.

1          The state has failed to point out to the
2     Court that the law that it's relying upon is not good
3     law.  It's done it again here.  It points to the
4     *Cuomo* ends-means -- in this very argument today,
5     point to *Cuomo* means and use analysis and asked the
6     Court to follow it which it shouldn't.
7          Now, in terms of the as-applied issue, the
8     state relies upon the -- the outdated no conceivable
9     use or no conceivable application, constitutional
10    application.  As I argue in my brief, that's no
11    longer the law.  That analysis has been abrogated by
12    the Supreme Court.  It is in favor if a substan- --
13    in favor on a facial challenge if a substantial
14    amount of the law is unconstitutional.  Even in a
15    facial challenge, it can go forward.  The no
16    conceivable use law has -- or analysis has been
17    abrogated and it doesn't make sense.
18         So for example, the Court will, I hope,
19    concede that if the State of Connecticut were to pass
20    a law tomorrow that said all handguns are illegal,
21    that would violate *Heller*, right?  But if they said,
22    passed the same law and said all handguns are illegal
23    and grenade launchers are also illegal, would that
24    also be unconstitutional?  And the answer is of
25    course, you can insulate a law by giving one tiny

1   little aspect of its constitutional reach.

2          And so if the state said all handguns are

3   illegal and nuclear bombs are also illegal and we

4   brought a challenge, they just banned all handguns

5   and the state would say, well, we also banned nuclear

6   bombs and that's certainly constitutional, that

7   wouldn't get very far.

8          That's the same thing.  If a substantial

9   reach of the law, which is what this is, the vast

10  majority of what this law reaches is the millions and

11  millions and millions of guns that are owned by

12  law-abiding citizens for lawful purposes including

13  self-defense.  The fact that there might be some

14  conceivable somewhere constitutional reach does not

15  affect the facial challenge.

16         THE COURT:  All right.  Thank you.

17         MR. ARRINGTON:  Thank you.

18         MS. MEDEIROS:  Your Honor, if I may just

19  address two quick points and I'll turn it over to

20  Attorney Belforti to wrap up.  First, with regard to

21  plaintiffs' statements about *Cuomo*, they're just flat

22  wrong.  It's not true that the Second Circuit

23  definitively decided and definitively held that the

24  Second Amendment applied, simply ignores the second

25  step of that first-step analysis the *Cuomo* court did,

1    and it's not the case that the Second Circuit

2    determined that typical possession for lawful

3    purposes was satisfied.  In fact, it's the opposite.

4         The Court there assumed without deciding to

5    move on to the second step and specifically stated

6    that evidence of lawful possession for lawful

7    purposes was, quote, elusive beyond ownership

8    statistics, and then went on to say we assume for the

9    sake of argument that these weapons were typically

10   possessed by law-abiding citizens for lawful

11   purposes.

12        So that's just -- what plaintiff has said

13   about *Cuomo* is just not the case.  It doesn't bind

14   this Court on the step-one analysis.  It's still open

15   whether the Second Amendment even applies here.

16        Now, with regard to the facial versus

17   as-applied challenge, plaintiffs' counsel stated a

18   little bit earlier that there's a facial challenge or

19   an as-applied challenge.  It's completely unclear

20   what that as-applied challenge is.  As the Supreme

21   Court has said many times, the determination of

22   whether a challenge is facial or as applied is based

23   upon the relief and the plaintiff is the master of

24   her own complaint.  Her own complaint says she's

25   seeking a declaratory judgment that the statutes are

1  unconstitutional on their face or as applied to the

2  extent their prohibitions apply to law-abiding adults

3  seeking to acquire, use, transfer or possess arms

4  that are in common use by the American people for

5  lawful purposes.

6        It's just a facial challenge no matter which

7  way it's stated there.  Plaintiff could have said I'm

8  only bringing this as applied to AR-15s; she didn't.

9  That's not the type of challenge that we have here.

10        So because this is a facial challenge,

11  plaintiff is required to demonstrate that the statute

12  is unconstitutional in its entirety.  *Salerno* says

13  that.  *Salerno* says the plaintiff bears the burden to

14  demonstrate there is no set of circumstances in which

15  the statutes can be constitutional.  And plaintiff

16  tries to ignore the *Salerno* standard by somehow

17  saying that *Bruen* kind of silently overturned *Salerno*

18  and there is just absolutely no support for that

19  whatsoever in *Bruen*.

20        *Bruen* does not address the *Salerno* standard,

21  doesn't talk about it at all.  And since the *Bruen*

22  case, multiple courts have applied this no set of

23  circumstances test to Second Amendment cases

24  including in New York, in Iowa, in Maryland, among

25  others.  So the idea that this test is somehow

```
 1    defunct is just not out there.  And to the extent
 2    that this test does apply, plaintiff hasn't even
 3    attempted to meet her burden.
 4          It's not just about some small possibility
 5    that there's one weapon out that's covered by the
 6    statute where it would be unconstitutional.  There
 7    are entire classes of weapons under the statutes that
 8    are prohibited that plaintiff has not even addressed.
 9    There is a whole section of shotguns that are
10    prohibited.  There is a whole section of assault
11    pistols that are prohibited.  There is an entire list
12    of rifles and semi-automatic firearms including Uzis,
13    including street sweeper shotguns that plaintiff has
14    not even attempted to address in the context of her
15    entire argument.  Because she hasn't done that, the
16    Court can deny this motion on that reason alone.
17          And now I will just turn it over to Attorney
18    Belforti.
19          MR. BELFORTI:  Your Honor, just to get back
20    to the points on the historical analysis, there's one
21    thing I was struck by in the plaintiffs' counsel's
22    just most recent argument about there were no total
23    bans, and he actually used slungshots as an example,
24    there were no total bans of slungshots.
25          I'm looking at plaintiffs' own filing here,
```

1    64-1 on the docket, pages 6 and 7 which is the

2    analysis of the statutes that we presented, one of

3    which is the Florida law.  Whoever manufactures or

4    causes to be manufactured or sells or exposes for

5    sale any instrument or weapon of the kind usually

6    known as slungshot or metallic knuckles shall be

7    punished by imprisonment not exceeding six months or

8    by fine not exceeding $100.  It's nothing to do with

9    a tax, nothing to do with carrying.  That is actually

10   being able to manufacture or sell the weapon.  That's

11   a ban.

12        It's the same thing with the Massachusetts

13   law on the next page.  Manufactures or caused to be

14   manufactured -- it's basically the same exact

15   language.  This was a law from 1850, the

16   Massachusetts law.  The Florida law that I referenced

17   was from 1868, passed in the exact same year the

18   Florida legislature ratified the Fourteenth

19   Amendment.  So the suggestion that was no such thing

20   as a ban on weapons that were dangerous and unusual

21   or weapons at that time, it's just not the case.

22        But I still think that the argument about,

23   well, so long as it's a tax, it's okay, I just

24   don't -- I think that's a disingenuous argument

25   because ultimately if we had taxed AR-15s or the

1    features at a level of $100,000 a piece, I'm sure

2    we'd be in front of Your Honor arguing that right

3    now.

4         So this suggestion otherwise that oh, no,

5    it's fine to tax just so long -- plaintiff has to

6    make that argument because of the National Firearms

7    Act, and he has to make that argument because of the

8    fact that plaintiff has to concede and has conceded

9    short-barreled shotguns, short-barreled rifles,

10   machine guns, those are things that are around, were

11   around, and were heavily regulated to the point of

12   basically as of 1986, you cannot get a tax stamp for

13   a machine gun that was produced after 1986.

14        So we're going on now almost half a century

15   we're talking about where these things are basically

16   prohibited.  So that whole idea of there's no such

17   thing as a total ban, I just don't think that's true.

18        I want to wrap up shortly by just talking

19   about, which I think all ties into the unprecedented

20   societal concern, the other two PI factors that we

21   haven't addressed yet which is balance of the

22   equities and public interest.  There's no evidence in

23   this record from the plaintiff that they've met their

24   burden on either of those two factors.  All the

25   plaintiff says is, well, we're invoking the

1    constitutional right, so therefore, we have it.

2         That can't be the standard because the

3    standard here on a mandatory preliminary injunction

4    against the state is higher than a typical temporary

5    restraining order or preliminary injunction and

6    therefore there has to be something to that.  It

7    can't just be I'm invoking a constitutional right.

8         In a situation like this, the danger of the

9    public interest and the balance of equities are

10   pretty clear.  We have one person who's saying I

11   would like to buy a certain type of weapon or have a

12   certain type of weapon.  She makes no showing of how

13   her right of armed self-defense is actually harmed by

14   the laws, makes no showing that she needs these

15   things for any purpose.

16        On the other side, we have a state that is

17   regulating using its police power to keep its

18   citizens safe, and it's the same thing with the

19   public interest.  It kind of merges into that.

20        And I'll just end by focusing on one thing,

21   plaintiff made the argument, I think it was during

22   step one, the idea of whether or not something is in

23   common use or dangerous and unusual or it's protected

24   by the text of the Second Amendment is based on the

25   choices of the American people, right.  So those can

1    wax and wane.  Those can change over time.

2        First of all, that's problematic because the

3    idea is that something that was constitutionally

4    protected at one point could no longer be

5    constitutionally protected sometime in the future and

6    vice versa.

7        But even more problematic with that -- is

8    make no mistake, this case from the plaintiff does

9    not have anything to do with the choices of the

10    American people or particularly the choices of the

11    citizens of Connecticut.  It's about the ability of

12    an extreme minority to say we want a certain type of

13    weapon and we don't care what the rest of the

14    citizens of the state have overwhelmingly demanded be

15    adopted.  So the suggestion that this is in any way

16    about choice or representative democracy or

17    federalism is just not true.

18        And Your Honor, I don't have anything else to

19    add in terms of the argument, but I would say before

20    we close today, we want to address the issue of the

21    videos in the record just to clear that up.

22        THE COURT:  All right.  Very quickly.  I

23    don't know what is so -- what those videos make so

24    probatively different, if it is simply demonstration

25    of how certain weapons are used or what a good shot

1    that guy was.

2         MR. BELFORTI:  Yes, Your Honor.  No.  I think

3    what it demonstrates is something that you can't get

4    from just the paper of the rate of fire.  We see how

5    quickly these weapons are being fired.  We see -- I

6    believe in the first two videos, it's -- I think it's

7    two 30-round magazines fired within 18 seconds

8    including a reload.  And then we also see how quickly

9    a semi-automatic pistol can be fired with a

10   high-capacity magazine like a 31-round extended

11   magazine or a 50-round drum magazine.  Even when we

12   look at those, the rifle, the AR-15 is being fired

13   more quickly.

14        So the suggestion -- and that's -- I think

15   that enhances the record particularly when we look at

16   the voluminous record about the ballistic power of a

17   rifle versus a handgun, when we add that to the rate

18   of fire, in addition to the evidence we already have

19   in the dry paper record of the rate of fire, I think

20   it's incredibly probative to the Court of that

21   question of unprecedented societal certain and

22   dramatic technological change, and, therefore, we

23   think it should be included in the record for the

24   Court's consideration.

25        THE COURT:  Do you think -- do you claim it

1  is separate and different or corroborative of the

2  declarations of your witnesses?

3      MR. BELFORTI:  Your Honor, I think it

4  certainly does corroborate, but I think it shows

5  things that are not fully visible or included or

6  findable just in the dry papers.  I think that it

7  shows something in reality how quickly these can be

8  fired.  And even when you look at things like the

9  manuals for these weapons, which I think we have

10 references in there, those don't always show how fast

11 one of these things can be fired in reality.

12     So the idea is, well, you know, in controlled

13 circumstances, it's, you know, 45 rounds in a period

14 of seconds or whatever.  This shows that it can be

15 much faster, and, therefore, I think it's something

16 that can enhance the Court's ability to answer these

17 factual questions that are present in this case.

18     THE COURT:  All right.  Let me ask

19 Mr. Arrington whether or not to the extent the video

20 is illustrative of what is already in the record,

21 what's -- why not include it?

22     MR. ARRINGTON:  The first thing is that's not

23 how we do evidence.  There's no authentication.

24 Here's a video, it's evidence; that's not how we do

25 evidence.  And I've never seen a case, never been

```
 1   involved in a case where -- on the eve of a trial or
 2   a hearing someone says here's a video, it's evidence
 3   now.  I mean, there's no witnesses, no
 4   authentication.
 5           Also, there's language in at least one of the
 6   videos that's hearsay.  I don't know who that is.
 7   That's an out-of-court declaration.  And, of course,
 8   the Court -- this is an evidence issue.  You're going
 9   to do what you want to do, broad discretion.  We
10   object, but if the Court in its broad discretion
11   think's that they're somehow relevant, even though
12   they're obviously cumulative, there's obviously
13   nothing we can do about that.
14           THE COURT:  Okay.  Thank you very much,
15   counsel.  This -- while at some point Mr. Arrington
16   said this is simple, it's really not simple, and I
17   thank you all for your thoughtful and thorough
18   presentations and we stand in recess and the motion
19   is under advisement.
20           (Proceedings adjourned, 1:05 p.m.)
21
22              C E R T I F I C A T E
23
24   RE:  NATIONAL ASSOCIATION FOR GUN RIGHTS, ET AL v.
                    NED LAMONT, ET AL
25              No.  3:22-cv-01118-JBA
```

**JA-1148**

1        I hereby certify that the within and
foregoing is a true and accurate transcript taken in
2   the aforementioned matter to the best of my skill and
ability.

3
                    /s/ Corinne T. Thomas
4
                    CORINNE T. THOMAS, RPR
5                   Official Court Reporter
                    United States District Court
6                   141 Church Street
                    New Haven, Connecticut 06510
7                   (203) 809-0848

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA SPERA FLANIGAN | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | 3:22 CV 1118 |
| | ) | |
| NED LAMONT, is his official capacity as the Governor of the State of Connecticut;  PATRICK J. GRIFFIN, is his official capacity as the Chief State's Attorney of the State of Connecticut; and SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | August 16, 2023 |

**NOTICE OF APPEAL**

The Plaintiffs, NATIONAL ASSOCIATION FOR GUN RIGHTS, and TONI THERESA

SPERA FLANIGAN, appeal to the United States Court of Appeals for the Second Circuit from

the Order (Docket Entry No. 85) denying the Plaintiffs' Motion for Preliminary Injunction

(Docket Entry No. 28)  entered on August 3, 2023.

> THE PLAINTIFFS
> NATIONAL ASSOCIATION FOR
> GUN RIGHTS, and TONI
> THERESA SPERA FLANIGAN
>
> Barry K. Arrington, *pro hac vice*
> 3801 E. Florida Ave., Suite 830
> Denver, CO 80210
> (303) 205-7870
> barry@arringtonpc.com

*/s/ John Radshaw*
John J. Radshaw (ct19882)
65 Trumbull Street, 2d Floor
New Haven, CT 06510
(203) 654-9695 | (203) 721-6182 f
jjr@jjr-esq.com

**C E R T I F I C A T I O N**

I hereby certify that on AUGUST 16, 2023, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all appearing parties by operation of the Court's electronic filing. Parties may access this filing through the Court's system.

/s/ John J. Radshaw III

_____
John J. Radshaw III

- 2 -