# 23-1162

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

National Association for Gun Rights, Toni Theresa Spera Flanigan,
*Plaintiffs-Appellants,*
Patricia Brought,
*Plaintiff,*
v.

Ned Lamont, in his official capacity as the Governor of the State of
Connecticut, Patrick J. Griffin, in his official capacity as the Chief
States Attorney of the State of Connecticut, Sharmese L. Walcott, in her
official capacity as the States's Attorney, Hartford Judicial District
*Defendants-Appellees,*
David R. Shannon, in his official capacity as the State's Attorney,
Lichfield Judicial District,
*Defendant.*

**On Appeal from the United States District Court
for the District of Connecticut, No. 3:22-1118**

**BRIEF *AMICI CURIAE*
THE INTERNATIONAL LAW ENFORCEMENT
EDUCATORS AND TRAINERS ASSOCIATION AND
NATIONAL ASSOCIATION OF CHIEFS OF POLICE
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

E. GREGORY WALLACE
Campbell University School of Law
225 Hillsborough Street
Raleigh, North Carolina 27603
(919) 696-3057
wallaceg@campbell.edu
*Counsel for Amici*

## CORPORATE AND FINANCIAL DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certifies that none of the *amici* has a parent corporation and no publicly held corporation owns 10% or more of the stock of any of the *amici*.

<u>*s/ E. Gregory Wallace*</u>
November 28, 2023

# TABLE OF CONTENTS

CORPORATE AND FINANCIAL DISCLOSURE STATEMENT ............. i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES .................................................................... iv

INTERESTS OF *AMICI CURIAE* ........................................................ 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT ............................................................................................ 3

I. Comparing the AR-15 to military rifles, which themselves are not extremely lethal, does not prove the AR-15 is unusually dangerous. ........................................................................ 4

    A. The AR-15 is a semiautomatic rifle used by civilians, not a machine gun used by the military ................................. 5

        1. The AR-15's rate-of-fire is much slower than military machine guns. ................................................ 6

        2. The AR-15's capability for "rapid semiautomatic fire" does not make it unusually dangerous. ..................... 7

        3. The Seventh Circuit in *Bevis v. City of Naperville* exaggerated the AR-15's rate-of-fire to make it "indistinguishable" from a machine gun........................... 8

    B. Reports of the AR-15's "phenomenal lethality" in Vietnam are preposterous and were proven false by subsequent testing... 11

    C. There are longstanding complaints within the military about the relatively weak stopping power of AR bullets........ 14

    D. Even if the AR-15 can be used in war, it is protected by the Second Amendment. .................................................... 18

II. The AR-15 has less wounding power than most non-banned rifles and shotguns ........................................................ 19

    A. The small size of common AR bullets makes their terminal performance inferior to other rifles and shotguns........................................................................ 19

    B. The AR-15's wounding power is no more severe than non-banned long guns and even some powerful handguns.................................................................... 22

    C. Descriptions of AR-15 wounds are often embellished. ......... 24

III. AR-15 bullets are not unusually dangerous because they pose greater risk from overpenetration…..................................... 27

    A. AR-15 rounds typically penetrate walls *less* than handgun and shotgun rounds................................................ 28

    B. *Every* centerfire rifle bullet penetrates police soft body armor. ........................................................... 29

IV. The AR-15 is not unusually dangerous even though it has been used in mass shootings. .................................................. 30

V. Features that make the AR-15 well-suited for lawful defense do not make it unusually dangerous. ............................ 34

    A. AR-15 rifles are often chosen for lawful defense by law enforcement officers and citizens. .. ............................... 34

    B. The AR-15's features make it well-suited for self-defense... 35

VI. Connecticut's ban implicitly disparages law enforcement officers and harms community relations. .................................... 37

CONCLUSION ........................................................................ 38

CERTIFICATE OF COMPLIANCE ......................................................... 40

CERTIFICATE OF SERVICE ............................................................... 41

iii

# TABLE OF AUTHORITIES

**CASES**

Bevis v. City of Naperville, — F.4th —, 2023 WL 7273709
    (7th Cir. Nov. 3, 2023) ................................................................ 8, 10, 11
District of Columbia v. Heller, 554 U.S. 570 (2008) .......................... 5, 18
Kolbe v. Hogan, 849 F.3d 114 (4th Circ. 2017) ............................ 6, 10, 28
Staples v. United States, 511 U.S. 600 (1994) ....................................... 4
State v. DeCicco, 105 A.3d 165 (Conn. 2014) ....................................... 35

**STATUTES**

Conn. Gen. Stat. §53-202c(b) ................................................................ 37

**REGULATIONS**

2 Code of Colo. Reg. 406-2-I-203(A)(1) ................................................. 22
Va. Admin. Code 15-270-10 .................................................................. 22
Wash. Admin. Code 220-414-020(1)(c) .................................................. 22

**MEDICAL AUTHORITIES**

Fackler, Martin L., *Literature Review,* 5 Wound Ballistic Rev. 39
    (Fall 2001) .................................................................................. 14, 22
Fackler, Martin L., *Questions and Comments,* 5 Wound Ballistic
    Rev. 5 (Fall 2001) ............................................................................ 23
Fackler, Martin L., *Wound Profiles,* 5 Wound Ballistic Rev. 25
    (Fall 2001) ....................................................................................... 23
Fackler, Martin L., *Civilian Gunshot Wounds and Ballistics:
    Dispelling the Myths,* 16 Emerg. Med. Clin. North Am. 17 (1998)..... 20
Fackler, Martin L., et al., *Wounding Effects of the AK-47 Rifle
    Used by Patrick Purdy in the Stockton, California, Schoolyard
    Shooting of January 17, 1989,* 113 Amer. J. Forensic Med. &
    Path. 185, 187-88 (1990) .................................................................. 27
Fackler, Martin, *Gunshot Wound Review,* 28 Annals of Emergency
    Medicine 194 (Aug. 1996) ........................................................... 14, 26

iv

Peonim, Vichan et al., *Entrance and Exit Wounds of High Velocity Bullet: An Autopsy Analysis in the Event of Dispersing the Mass Rally in Bangkok Thailand, May 2010,* 23 Legal Med. 10 (Nov. 2016) ...................................................................... 25

Sarani, Babak, et al., *Wounding Patterns Based on Firearm Type in Civilian Public Mass Shootings in the United States,* 228 J. Amer. College Surgeons 228 (March 2019) .................. 31, 32, 33

Stefanopoulos, P. K., et al., *Wound Ballistics of Firearm-Related Injuries—Part 1: Missile Characteristics and Mechanisms of Soft Tissue Wounding,* 43 Int. J. Oral Maxillofac. Surg. 1445 (2014) ....... 24

Stefanopoulous, P.K., et al., *Wound Ballistics of Military Rifle Bullets: An Update on Controversial Issues and Associated Misconceptions,* 87 J. Trauma Acute Care Surg. 690 (2019) ............. 24

## OTHER AUTHORITIES

Advanced Research Projects Agency, *Test of Armalite Rifle, AR-15, Annex A* (July 31, 1962) ........................................................ 12

BATFE, *27 CFR 179.11: Meaning of Terms* ........................................... 11

Boone Decl. at J.A. 2168-69, Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) (No. 14-1945) ................................................ 28

Bowden, Mark, Black Hawk Down: A Story of Modern War (1999) ...... 17

Chapman Dennis, *The 'Weapons of War' Myth*, Linkedin (Dec. 7, 2015) ........................................................................................ 5

Chivers, C.J., The Gun (2010) ...................................................... 12, 13

Crist, Carolyn, *Handguns more lethal than rifles in mass shootings,* Reuters (Dec. 31, 2018) .............................................................. 32

Dean, Glenn & David LaFontaine, *Small Caliber Lethality: 5.56mm Performance in Close Quarters Battle*, WSTIAC Q., Jan. 2008 .......... 17

Klarevas, Louis, *Rampage Nation: Securing America From Mass Shootings* (2016) ............................................................................. 6

Kopel, David & E. Gregory Wallace, *How Powerful Are AR Rifles?,* The Volokh Conspiracy (Feb. 27, 2023) ......................................... 24

Lopez, C. Todd, *Army Announces 2 New Rifles for Close-Combat Soldiers,* U.S. Dep't of Defense (Apr. 22, 2022) ................................ 18

Massachusetts Municipal Police Training Committee, Basic Firearms Instructor Course: Patrol Rifle (Sept. 2007) ................................... 29

v

Rafique, Sarah, *'People Will Lose Their Lives' 13 Investigates Explosion in Illegal 'Glock Switches,'* ABC-13 News (Jan. 30, 2022) .................................................................................. 10

Schatz, Jim, *Do We Need A New Service Rifle Cartridge? End User Perspective and Lessons Learned,* Small Arms Def. J. 119 (Spring 2011) ........................................................................... 16, 17

Scheifke, R.W., *Penetration of Exterior House Walls by Modern Police Ammunition,* Canadian Police Research Centre (Oct. 1997) ... 28

Stevens, H. Blake & Edward Ezell, The Black Rifle: M16 Retrospective (1994) .......................................................... 12

Suarez, Gabriel. *The Tactical Rifle: The Precision Tool for Urban Police Operations* (1999) ......................................................... 29

The Violence Project, *Mass Shooter Database* (vers. 7.0 5.28.23).... 31, 33

U.S. Dep't of the Army, *Field Manual 3-22.9, Rifle and Carbine* (2016) .......................................................................................... 7

U.S. Dep't of the Army, *Field Manual 3-22.9, Rifle Marksmanship: M16/M4-Series Weapons* (2008) ....................................... 6, 7

U.S. Dep't of Justice, National Inst. of Justice, *Guide to Body Armor* (2014) ......................................................................................... 29

United States Military Small Arms Requirements, Hearing Before the Subcommittee on Airland of the Senate Committee on Armed Services, 115 Cong. S. Hrg. 115-425 (May 17, 2017) ............. 16

Wallace, E. Gregory, *"Assault Weapon" Lethality,* 88 Tenn. L. Rev. 1 (2020) ........................................................................ 21, 35

Wallace, E. Gregory, *"Assault Weapon" Myths,* 43 So. Ill. U. Law J. 193 (2018) ....................................................................... 5, 6, 9

Woodward, Todd, (ed.), Cartridges of the World (17th ed. 2022) ........... 20

## INTEREST OF *AMICI CURIAE* [1]

**International Law Enforcement Educators and Trainers Association (ILEETA)** is comprised of 4,000 professional law enforcement instructors committed to reducing risk and saving lives of police officers and citizens through training enhancements for criminal justice practitioners. ILEETA's briefs were cited by Justice Breyer in *Heller* and by Justices Alito and Stevens in *McDonald*.

**National Association of Chiefs of Police** is a non-profit founded in 1967 to promote and support the law enforcement profession. Membership is limited to command staff officers and currently is over 7,000 members.

*Amici* believe that the perspectives of law enforcement personnel and organizations will be of assistance to this Court in evaluating whether Connecticut's "assault weapons" ban is constitutional.

All parties have consented to the filing of this brief.

---

[1] No party's counsel authored this brief, and no one other than *amici* or their counsel contributed money to it.

## SUMMARY OF ARGUMENT

The District Court makes astonishing and erroneous claims that the semiautomatic firearms at issue in this case are "unusually dangerous." They are not.

The rifles banned by Connecticut are not machine guns. They are less powerful than most common rifles and shotguns. Their wounding potential is no more severe than non-banned long guns and even some powerful handguns. They are not unusually dangerous just because they have been used in some mass public shootings.

The banned rifles often are chosen by law enforcement officers and by law-abiding citizens for the same reasons: their features make them excellent for lawful defense of self and others.

The District Court's mischaracterization of these firearms disparages law enforcement officers. The ordinary arms of civil peace officers are not "unusually dangerous" weapons of war. These officers are not an army of occupation, wielding the weapons of militarized mass killers.

## ARGUMENT

The District Court's decision derives from its findings about the supposed extreme firepower of so-called "assault weapons." Its common use analysis turns upon these firearms being too dangerous for lawful self-defense and suitable only for military or criminal use. Its historical tradition analysis identifies analogous laws restricting unusually dangerous firearms. If the banned firearms are no more dangerous than firearms Connecticut does not ban, denial of the preliminary injunction cannot stand.

The District Court acknowledges that "there must be some level of lethality or capacity for injury beyond socially accepted norms that makes [a firearm] especially dangerous." (Sp.App. 34). It treats military rifles as beyond such norms, but the banned firearms are not military rifles and, as explained below, the military's current service rifles are not extremely lethal. Such norms are best reflected by non-banned firearms commonly possessed by citizens and by firearms used by law enforcement. Measured against these, the banned firearms are not especially dangerous.

## I. Comparing the AR-15 to military rifles, which themselves are not extremely lethal, does not prove the AR-15 is unusually dangerous.

The main target of Connecticut's ban is the widely-popular AR-15 rifle, owned by millions for lawful purposes including self-defense. The AR-15 is the semiautomatic-only, civilian version of the military's select-fire M16 rifle and its successor, the smaller M4 carbine. *See Staples v. United States,* 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is…a semiautomatic weapon. The M-16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire."). A semiautomatic firearm fires one bullet (or "round") for each pull of the trigger, while an automatic weapon (machine gun) fires continuously so long as the shooter presses and holds the trigger. *Id.* at 602 n.1.

The District Court describes the civilian AR-15 as a "weapon of war" and "a very deadly weapon with the same basic functionality that our troops use to kill the enemy." (Sp.App. 49). These descriptions are inaccurate.

### A. The AR-15 is a semiautomatic rifle used by civilians, not a machine gun used by the military.

As a simple factual matter, the AR-15 is not a military weapon. While the AR-15 looks like the M16/M4, it is not a machine gun nor does it fire as rapidly as a one. Because the AR-15 lacks automatic-fire capability, the U.S. military does not use it on the battlefield. *See* E. Gregory Wallace, *"Assault Weapon" Myths,* 43 So. Ill. U. Law J. 193, 207-11 (2018). Select-fire capability "is the single, essential feature that makes a military firearm more useful in combat than its civilian counterpart." Dennis Chapman, *The 'Weapons of War' Myth*, Linkedin (Dec. 7, 2015).[2]

Lacking automatic fire capability, the AR-15 is *not* "most useful" in military service. *See District of Columbia v. Heller,* 554 U.S. 570, 627-28 (2008) ("weapons that are most useful in military service—M-16 rifles and the like—may be banned"). It is not used in military service at all, and has been sold to citizens for decades.

---

[2] https://www.linkedin.com/pulse/weapons-war-myth-dennis-chapman. Chapman is an Army veteran with nearly 25 years of service, spent mostly as an infantry officer, infantry platoon leader, and rifle company commander.

5

### 1. The AR-15's rate-of-fire is much slower than military machine guns.

The military's M16/M4 rifles have a rate-of-fire of 700-to-900 rounds-per-minute in automatic mode. U.S. Dep't of the Army, *Field Manual 3-22.9, Rifle Marksmanship: M16/M4-Series Weapons*, Table 2-1 (2008).

By contrast, the AR-15 is no more dangerous in its rate-of-fire than the vast majority of modern handguns. Both have a semiautomatic firing mechanism, both fire only one round with each trigger pull, and both fire only as fast as the shooter can pull the trigger.

Louis Klarevas, one of Defendants' experts, sets the average shooter's rates-of-fire for semiautomatic handguns and semiautomatic "assault rifles" at an identical two rounds per second, while the expert shooter can fire both weapons at three rounds per second. Louis Klarevas, *Rampage Nation: Securing America From Mass Shootings* 212 (2016); *see* Wallace, *Myths* at 214-26 (rate-of-fire comparisons for AR-15, M16/M4, and handguns).

The Fourth Circuit in *Kolbe v. Hogan,* 849 F.3d 114, 125 (4th Circ. 2017), asserted there is only a "slight" difference between automatic and semiautomatic fire. But an average shooter firing a military M16 in automatic mode can fire 100 rounds in less time than it would take the

6

same shooter firing a semiautomatic AR-15 to fire 30 rounds. If the shooter fires indiscriminately into a crowded bar, church, or classroom, the fully automatic M16 would launch some 70 more bullets into the crowd. That difference is not "slight."

**2.    The AR-15's capability for "rapid semiautomatic fire" does not make it unusually dangerous.**

The District Court obscures the rate-of-fire differences by emphasizing that both the military M16/M4 and civilian AR-15 have the ability to engage in "devastatingly accurate rapid semiautomatic fire." (Sp.App. 49). No one disputes that aimed semiautomatic fire is more accurate than automatic fire and most appropriate for individual soldiers in the vast majority of combat scenarios. But that doesn't make the AR-15 as dangerous as the M16/M4.

"Rapid semiautomatic fire" much slower than automatic fire. The 2008 Army Manual states that such fire "will result in a well-aimed shot every one or two seconds." Army Field Manual 3-22.9, at ¶7-15. The updated 2016 Manual states that "[r]apid semiautomatic fire is approximately 45 rounds per minute." U.S. Dep't of the Army, *Field Manual 3-22.9, Rifle and Carbine*, ¶8-19 (2016). That rate is far closer to handguns than to the M16/M4 in automatic mode. Moreover, the "devastating accuracy" of

7

rapid semiautomatic fire depends on the soldier's proficiency in holding a steady position, aiming, breath control, and trigger squeeze. Army Manual (2008) at ¶¶7-16 to 7-26. It's a function of the shooter, not the rifle.

### 3. The Seventh Circuit in *Bevis v. City of Naperville* exaggerated the AR-15's rate-of-fire to make it "indistinguishable" from a machine gun.

The Seventh Circuit held in *Bevis v. City of Naperville,* 2023 WL 7273709 (7th Cir. Nov. 3, 2023), that AR-15s are not "arms" protected by the Second Amendment because they are "almost the same" as machine guns and other weapons "exclusively or predominantly useful in military service" or "reserved to the military." *Id.* at *11-14.

Since the military does not use the AR-15 because it lacks automatic fire capability, the Seventh Circuit's decision is implausible. AR-15s are not exclusively or predominately used in military service, nor are they otherwise reserved to the military—they're not used at all.

To force the AR-15 into the unprotected arms category, the Seventh Circuit found it "indistinguishable" from the M16. *Id.* at *14. According to the panel, they look the same ("same core design"), operate the same ("same patented operating system"), and use the same ammunition

8

(having the "same kinetic energy," "same muzzle velocity," and "same effective range"). *Id.* at *12-13. That's like saying a Prius is like a Porsche because they both are red, have four wheels and internal combustion engines, and can drive more than 250 miles on a single tank of gas. Regardless of its general resemblance to the M16, the civilian AR-15 is *not* a machine gun, and that's why the military does not use it.

The Seventh Circuit minimized this distinction by claiming the AR-15 can fire 300 rounds-per-minute. *Id.* at *13. It found no relevant difference between that rate and the 700 rounds-per-minute automatic rate-of-fire for the military M16/M4. *Id.* at *13-14.

Anyone who actually has fired an AR-15 knows that the Seventh Circuit's "300 rounds a minute" claim is plainly false. Since the AR-15 fires only one round for each trigger pull, that rate would require a super-human trigger finger—one that can pull the trigger *five times per second for an entire minute. See* Wallace, *Myths* at 214-22 (discrediting 300-rounds-per-minute figure and tracing its origins to a single unsourced claim by gun-control advocate in 1991).

The Seventh Circuit further asserted that even if the AR-15 is not a machine gun, modifications like bump stocks and auto-sears can

9

transform it into one. *Bevis* at *13. The point of these devices is to make the semiautomatic AR-15 fire almost as rapidly as the M16 in automatic mode. If the difference between the two weapons' unmodified rates of fire is only "slight"—a description *Bevis* adopts from *Kolbe*—these devices would be unnecessary.

Popular handguns can be modified to fire at a fully automatic rate. The so-called "Glock switch" is a relatively simple auto-sear device that allows a conventional semiautomatic Glock pistol to function as a fully automatic firearm. *See* Sarah Rafique, *'People Will Lose Their Lives' 13 Investigates Explosion in Illegal 'Glock Switches,'* ABC-13 News, (Jan. 30, 2022).[3] Using the Seventh Circuit's logic, Glock handguns could be banned because criminals use these switches to make them fire like machine guns.

The solution is to regulate the aftermarket devices, not ban the entire firearm as originally sold—especially when a constitutional right is at issue. The ATF has classified an auto-sear as a machine gun, as defined by 26 U.S.C. 5845(b). BATFE, *27 CFR 179.11: Meaning of Terms.*[4]

---

[3]     https://abc13.com/glock-switches-are-illegal-downtown-houston-officers-shot-hpd-shooting/11518379/.

[4] https://www.atf.gov/resource-center/docs/atf-ruling-81-4pdf/download.

Due to its factual errors and implausible reasoning, *Bevis* should not be followed.

**B. Reports of the AR-15's "phenomenal lethality" in Vietnam are preposterous and were proven false by subsequent testing.**

The District Court says the military adopted the select-fire AR-15 (later renamed M16) because of its "phenomenal lethality." (Sp.App. 49). That description comes from military field testing from Vietnam in 1962, which was conducted as part of Project AGILE, a research program initiated by the Defense Department's Advanced Research Projects Agency (ARPA). At the time, the military was considering whether to replace the older M14 with the select-fire AR-15 as its primary combat rifle. Project AGILE supplied AR-15s to South Vietnamese troops for field trials.

ARPA's report on these trials included claims of massive injuries from the AR-15, including two amputations and a decapitation. ARPA, *Test of Armalite Rifle, AR-15,* Annex A, at 5, 7 (July 31, 1962).[5] According to the report, the AR-15 inflicted "catastrophic wounds," including one round that "took [the head] completely off" an enemy soldier, while another

---

[5] https://apps.dtic.mil/sti/pdfs/AD0343778.pdf.

round "in the right arm, took it completely off, too." Wounds to the torso caused "the abdominal cavity to explode" and all wounds were fatal, including "extremity hits."

These gruesome anecdotes subsequently were exposed as gross exaggerations designed to convince the military to adopt the rifle. The Army's Wound Ballistic Laboratory tested the lethality of the rifle in gelatin, animals, and cadavers but could not duplicate the "theatrically grotesque wounds" reported by Project AGILE. C.J. Chivers, *The Gun* 283, 284-88 (2010); *see* Blake Stevens & Edward Ezell, *The Black Rifle: M16 Retrospective* 110-16 (1994).

Testing included hollow-point rounds. While not used by the military, hollow-points are ubiquitous among American law enforcement and often chosen by citizens. Hollow-points generally produce relatively more destructive wounds. Yet "even the hollow-points failed to duplicate anything like the spectacular effects recorded by the Vietnamese unit commanders and their American advisors, which had subsequently been

taken as fact and much used in the...campaign to sell the AR-15." Stevens & Ezell at 116.[6]

C.J. Chivers, Pulitzer Prize-winning *New York Times* journalist, extensively researched the testing for his book *The Gun*. "No matter what they did, they were unable to reproduce the effects that the participants in Project AGILE claimed to have seen." Chivers at 288.

The Wound Ballistic Laboratory's study was kept secret for more than four decades. As a result, "at the most important time, during the early and mid-1960s, the Project AGILE report, with its suspicious observations and false conclusions, remained uncontested. The AR-15 continued to rise, boosted by a reputation for lethality and reliability that it did not deserve." *Id.* at 289.

Dr. Martin Fackler, military trauma surgeon, served as director of the Army's Wound Ballistics Laboratory for 10 years. He was one of the world's foremost wound ballistics experts. He recounts how other claims in the 1960s and 1970s about the M16's bullets causing "massive" and

---

[6] Ezell served as Curator of the National Firearms Collection at the National Museum of American History, which is part of the Smithsonian Institution. He founded the Institute for Research on Small Arms in International Security.

"devastating" injuries were disproven or contradicted by other reports. Martin Fackler, *Gunshot Wound Review,* 28 Annals of Emergency Medicine 194, 194-95 (Aug. 1996). Delegates to war surgery conferences in the early 1970s "reported no unusual problems associated with 'high-velocity' bullet wounds in Vietnam. There were no reports of rifle bullet wounds causing traumatic amputations of an extremity." *Id.* Dr. Fackler observes that "[i]n my experience and research, at least as many M16 users in Vietnam concluded that [the M16 round] produced unacceptably minimal, rather than 'massive,' wounds." Martin Fackler, *Literature Review,* 5 Wound Ballistic Rev. 39, 40 (Fall 2001).

### C. There are longstanding complaints within the military about the relatively weak stopping power of AR bullets.

The District Court claims that "the designers have stated that the AR-15 was engineered to generate 'maximum wound effect.' " (Sp.App 48). The source is *Rolling Stone* magazine. *See* Declaration of John Donohue ¶108 (J.App. 242) (quoting Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*,

14

February 22, 2018).[7] *Rolling Stone* does not cite the original source for the "maximum wound effect" quote.

The military M16/M4 and the civilian AR-15 fire a similar cartridge. The military uses the 5.56mm NATO round, which is nearly identical to the .223 (inches) caliber round. In the civilian market, the majority of AR-15 rifles use either .223 or 5.56 caliber bullets. The 5.56 round is smaller and lighter, and thus less powerful, than those used in previous combat rifles, such as the 7.62mm round (.308) in the M14 and .30-06 round in the M1 Garand. Its size and bulk, however, allows soldiers to carry more ammunition and the smaller cartridge softens recoil when firing, especially in automatic mode.

Longstanding complaints from combat soldiers belie any claim that these firearms were designed for "maximum wound effect." Major General Robert Scales testified to the Senate that the 5.56mm cartridge "is simply too small for modern combat….The civilian version of the 5.56-mm bullet was designed as a 'varmint killer' and six states prohibit its use for deer hunting because it is not lethal enough to ensure a quick

---

[7]    https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/.

kill." United States Military Small Arms Requirements, Hearing Before the Subcommittee of the Senate Committee on Armed Services, Cong. S. Hrg. 115-425, at 12 (May 17, 2017).

Soldiers have complained that the small 5.56mm round lacks sufficient effectiveness in killing or incapacitating the enemy. According to combat veteran and small arms expert Jim Schatz, "[t]he disturbing failure of the 5.56x45mm caliber to consistently offer adequate incapacitation has been known for nearly 20 years." Jim Schatz, *Do We Need A New Service Rifle Cartridge? End User Perspective and Lessons Learned,* Small Arms Def. J. 119 (Spring 2011).[8]

Schatz describes one Special Forces (SF) mission in Afghanistan when an insurgent was shot seven or eight times in the torso, got back up, climbed over a wall, and reengaged other SF soldiers, killing a SF medic. The insurgent then was shot another six-to-eight times from about 20-30 yards before finally being killed by a SF soldier with an M1911 handgun. Schatz at 125. *See* Glenn Dean & David LaFontaine, *Small Caliber Lethality: 5.56mm Performance in Close Quarters Battle*, WSTIAC Q.,

---

[8] https://www.yumpu.com/en/document/read/37272962/do-we-need-a-new-service-rifle-cartridge-hkprocom.

16

Jan. 2008, at 3 (describing multiple reports from soldiers in Afghanistan using 5.56mm rounds that they "were experiencing multiple 'through-and-through' hits on an enemy combatant where the target continued to fight").[9]

Mark Bowden's bestselling book *Black Hawk Down* vividly recounts the less-than-lethal performance of the Army's 5.56mm bullet in the Battle of Mogadishu in 1993. One Delta operator's rounds "were passing right through his targets….The bullet made a small, clean hole, and unless it happened to hit the heart or spine, it wasn't enough to stop a man in his tracks. [The operator] felt like he had to hit a guy five or six times just to get his attention." Mark Bowden, *Black Hawk Down: A Story of Modern War* 208 (1999).

Reports about the terminal underperformance of the smaller projectile fired by the M16/M4 suggest that these rifles are adequately lethal, but not exceptionally so. That is the main reason why the military recently decided to adopt the larger-caliber 6.8mm rifle. *See* C. Todd Lopez, *Army*

---

[9] https://perma.cc/682N-7E6S.

17

*Announces 2 New Rifles for Close-Combat Soldiers,* U.S. Dep't of Defense (Apr. 22, 2022).[10]

### D. Even if the AR-15 can be used in war, it is protected by the Second Amendment.

While the civilian AR-15 is not a weapon of war, it can be used in war. Given the common practice of revolutionary militiamen using their rifles on the battlefield and at home, such dual-use rifles were at the core of Second Amendment protection. *See Heller,* 554 U.S. at 624-25. The AR-15 is a protected arm even under the narrower militia-centered view of the Second Amendment espoused by the *Heller* dissenters, who maintained that *only* firearms useful in war are protected. *See Heller,* 554 U.S. at 647, 648 n.10 (Stevens, J., dissenting).

Citizens lawfully have possessed weapons used in war since musket days, often with little or no difference between military and civilian versions. Civilian firearms used by military forces include the most popular handguns in the world—the iconic Browning-designed 1911, Sig Sauer P226, and Glock 17—as well as familiar hunting rifles and shotguns, such as the Remington 700 bolt-action rifle and Remington 870

---

[10] https://perma.cc/34NR-AGRW.

pump-action shotgun. Wallace, *Myths* at 201-02. If firearms are especially lethal simply because they can be used in war, a wide array of common handguns and long guns are too dangerous for civilian use.

## II. The AR-15 has less wounding power than most non-banned rifles and shotguns.

The District Court finds that "injuries caused by AR-15s are also particularly severe." (Sp.App 48). Like all guns, the AR-15 can cause severe or fatal wounds. But the wounds caused by the AR-15 typically are no more severe than wounds caused by firearms Connecticut does not ban.

### A. The small size of common AR-15 bullets makes their terminal performance inferior to other rifles and shotguns.

The AR-15 is not more dangerous because of its projectile. While AR-15 bullets travel at high velocity, more velocity does not necessarily mean greater wound severity. A ping-pong ball and a rifle bullet fired at the same velocity will produce very different terminal results.

Consider the wounding effects of three common cartridges. The diminutive .22 rifle fires bullets weighing 30-40 grains. The .44 caliber Magnum handgun, a powerful defensive revolver, shoots bullets weighing around 200 grains. The 12-gauge 00-buckshot shotgun

19

cartridge, so named because it is a favorite for deer hunting, fires nine pellets all at once, each of them weighing 54 grains. *See* Todd Woodward (ed.), *Cartridges of the World* (17th ed. 2022). At 15 feet, all of the above will have approximately the same velocity. The nine shotgun pellets will cause far more tissue disruption than the single big handgun bullet, and the big handgun bullet will cause far more disruption than the tiny rifle bullet. *See* Martin Fackler, *Civilian Gunshot Wounds and Ballistics: Dispelling the Myths,* 16 Emerg. Med. Clin. North Am. 17, 23 (1998).

The energy that a bullet imparts to its target is called *kinetic energy* (KE), which is calculated by a formula based on its velocity and its mass: KE = ½ x M x V². The following table compares the typical weight, velocity, and kinetic energy of some modern handgun, rifle, and shotgun projectiles, measured at the firearm's muzzle and at a distance of 100 yards.

20

| Caliber | Bullet Weight (Grains) | Velocity @Muzzle ft/s | Velocity @100 yds ft/s | Energy @Muzzle ft lbs | Energy @100 yds ft lbs |
|---|---|---|---|---|---|
| **Handguns** | | | | | |
| 9 mm | 115 | 1140 | 954 | 332 | 232 |
| .357 Magnum | 125 | 1500 | 1147 | 624 | 365 |
| .40 S&W | 175 | 1010 | 899 | 396 | 314 |
| 10mm | 180 | 1275 | 1052 | 650 | 443 |
| .44 Magnum | 200 | 1500 | 1196 | 999 | 635 |
| .45 ACP +P | 230 | 950 | 872 | 461 | 385 |
| **Long guns** | | | | | |
| .22LR Rimfire | 40 | 1070 | 908 | 102 | 73 |
| **.223/5.56** | **55** | **3240** | **2854** | **1282** | **995** |
| .243 Winchester | 90 | 3150 | 2911 | 1983 | 1693 |
| 6.5 Creedmoor | 143 | 2700 | 2557 | 2315 | 2076 |
| .308/7.62 | 165 | 2700 | 2496 | 2670 | 2282 |
| .30-06 | 178 | 2750 | 2582 | 2989 | 2635 |
| .300 Win. Mag | 180 | 2960 | 2766 | 3502 | 3058 |
| .338 Lapua Mag | 270 | 2800 | 2680 | 4699 | 4304 |
| .50 BMG | 750 | 2820 | 2728 | 13241 | 12388 |
| 12-ga shotgun slug | 438 | 1610 | 1139 | 2521 | 1262 |

E. Gregory Wallace, *"Assault Weapon" Lethality,* 88 Tenn. L. Rev. 1, 44-45 (2020).

As the table shows, centerfire rifles of all sorts have higher velocity than handguns or shotguns.[11] Compared to other rifles, the .223/5.56 ammunition for AR-15 rifles has slightly higher velocity, but uses a

---

[11] Most modern ammunition is "centerfire." The gunpowder explosion is initiated by the gun's firing pin striking the primer in center of the cartridge base. With a "rimfire" cartridge, such as the .22LR, the primer is contained in the rim of the cartridge base.

smaller bullet. As a result, the AR-15's projectiles impart much *less* kinetic energy to the target than do many other rifles, including classic hunting rifle cartridges, the .308 and .30-06. The AR-15's bullets also strike with less energy than a shotgun slug, often used for hunting deer and similar game.

Dr. Fackler calls the .223 round "a 'varmint' cartridge, used effectively for shooting woodchucks, crows, and coyotes." Martin L. Fackler, *Literature Review,* 5 Wound Ballistic Rev. 39, 41 (Fall 2001). In some states, it is illegal to hunt deer or larger game with the .223 cartridge because it is considered too *underpowered* to result in clean, humane kills. *See, e.g.,* 2 Code of Colo. Reg. 406-2-I-203(A)(1); 4 Va. Admin. Code 15-270-10; Wash. Admin. Code 220-414-020(1)(c).

## B. The AR-15's wounding power is no more severe than non-banned long guns and even some powerful handguns.

Comparing the AR-15's wounding power to common handguns confuses apples with oranges. Rifles by nature are more powerful than handguns—that's why soldiers and hunters typically use them. The apples-to-apples comparison is to other long guns. The District Court

opinion is lacking any comparison of the AR-15's wounding power to non-banned rifles and shotguns.

The Army's Wound Ballistics Laboratory examines all aspects of wounds from various arms, including permanent and temporary cavities in the target, penetration depth, and deformation and fragmentation of bullets. Compared to .223 and 5.56mm bullets, wound profiles of bullets from very common hunting calibers, such as .30-30 and .308, are at least as extensive and typically more so. Martin L. Fackler, *Wound Profiles,* 5 Wound Ballistic Rev. 25, 29-31, 33-34 (Fall 2001). *See* Wallace, *Lethality* at 43-56 (in-depth analysis of wound ballistics).

Most gun crimes, including mass shootings, take place at close range. Dr. Fackler observes that at close range "the 12 gauge shotgun (using either buckshot or a rifled slug) is far more likely to incapacitate than is a .223 rifle. The 12 gauge shotgun is simply a far more powerful weapon." Martin L. Fackler, *Questions and Comments,* 5 Wound Ballistic Rev. 5 (Fall 2001). P.K. Stefanopoulos, trauma surgeon and former career military officer who has written extensively on wound ballistics, states that at distances of less than 10 feet "the shotgun produces the most devastating injuries of all small arms." P.K. Stefanopoulos, et al., *Wound*

*Ballistics of Firearm-Related Injuries—Part 1: Missile Characteristics and Mechanisms of Soft Tissue Wounding,* 43 Int. J. Oral Maxillofac. Surg. 1445, 1453 (2014).

Powerful handgun rounds can cause similar wounding effects to the AR-15. "A similarly deforming or disintegrating bullet from a powerful handgun cartridge (e.g., Magnum) can also produce 'high-energy' effects to tissue, resembling those from a much faster assault rifle bullet." P.K. Stefanopoulos, et al., *Wound Ballistics of Military Rifle Bullets: An Update on Controversial Issues and Associated Misconceptions,* 87 J. Trauma Acute Care Surg. 690, 696 (2019).

Every misused firearm is dangerous and potentially lethal. But AR-15s are not exceptionally dangerous compared to other common firearms.

## C. Descriptions of AR-15 wounds are often embellished.

Embellishments about the AR-15's wounding power are common in "assault weapon" litigation. *See* David Kopel & Gregory Wallace, *How Powerful Are AR Rifles?,* The Volokh Conspiracy (Feb. 27, 2023) (absurd claim by government expert that a single bullet from an AR-15 can sever a human body in half).[12]

---

[12] https://perma.cc/3ZDC-LA5E.

The District Court again relies on *Rolling Stone* for a quote from a doctor who claims that being shot with an AR-15 is like being shot "with a Coke can." (Sp.App. 48) (citing Donohue Decl. ¶109) (quoting *Rolling Stone* article). The doctor cannot mean that the entry wound as wide as a Coke can. The diameter of a Coke can is 2.6 inches, while the diameter of a typical AR-15 round is .223 inches—the diameter of pencil eraser.

An exit wound might be that wide, but it's unlikely. Researchers examined autopsy records from 27 persons who were killed with 5.56mm ammunition during dispersion of a mass protest. Vichan Peonim, et al., *Entrance and Exit Wounds of High Velocity Bullet: An Autopsy Analysis in the Event of Dispersing the Mass Rally in Bangkok Thailand, May 2010,* 23 Legal Med. 10 (Nov. 2016). Of the 32 rounds studied, only two produced exit wounds with measurements approximating the diameter of the Coke can. The remaining produced either much smaller exit wounds or no exit wounds because the bullet stopped before exiting.

The doctor also cannot be referring to the permanent cavity created by the bullet passing through tissue. The AR-15's .223/5.56 bullets typically are .75 to .98 inches long, so the cavity would be less than an inch even at maximum yaw, which does not always occur. High-speed bullets from

rifles and some handguns can cause a transient displacement of tissue known as the "temporary cavity," which can produce significant wound damage. But the size of the cavity and severity of the injury is quite variable, erratic, and highly dependent on anatomic and physiologic considerations. Fackler, *Gunshot Wound Review* at 197-99.

Wound ballistics is far more complex than the doctor's hyperbolic description suggests. *See* Wallace, *Lethality* at 43-56. There are too many variables to say an AR-15 bullet will produce any uniform result.

These exaggerations are nothing new. Thirty-three years ago, Dr. Fackler described how media accounts embellished the injuries suffered in the 1989 elementary school shooting in Stockton, California, the crime that created the national "assault weapon" controversy. Dr. Fackler conducted ballistics testing on the ammunition used in the criminal's semiautomatic AK rifle. That rifle's 7.62mm rounds are around 123 grains, more than double the typical 55-grain weight of .223/5.56mm AR bullets. Dr. Fackler reviewed the autopsies of the five children murdered. He explained:

> Much of the media coverage generated by the Stockton shooting has contained misstatements and exaggerations. The myth of "shock waves" resounding from these "high velocity" bullets "pulverizing bones and exploding organs"

26

(even if they were not hit by the bullet) "like a bomb" going off in the body was repeated by the media, in certain cases even after they were furnished solid evidence that disproved these absurdities. None of the autopsies showed damage beyond the projectile path. One "expert" was quoted as stating that the death rate from "assault weapons . . . approaches 50[%]." Another, reporting on the effects of "high speed" bullets, stated that "most of those hit in an extremity will end up with amputations. If you're hit in the trunk, it becomes a lethal injury. . ." In the Stockton schoolyard, the death rate was 14% and none of the [wounded] victims died later or required extremity amputation.

Martin L. Fackler, et al., *Wounding Effects of the AK-47 Rifle Used by Patrick Purdy in the Stockton, California, Schoolyard Shooting of January 17, 1989,* 113 Amer. J. Forensic Med. & Path. 185, 187-88 (1990).

AR-15s are dangerous in the wrong hands, as are all other firearms. But the notion that AR-15 bullets typically cause massive wounds compared to other firearm ammunition is false.

### III. AR-15 bullets are not unusually dangerous because they pose greater risk from overpenetration.

The District Court claims that the AR-15 is unusually dangerous because its bullets can penetrate building walls and police body armor. (Sp.App. 44,46).

27

## A. AR-15 bullets typically penetrate walls *less* than handgun and shotgun rounds.

Overpenetration of walls is a risk with *all* firearms. Almost all handgun, rifle, and shotgun rounds will pass through multiple walls. Handgun rounds will penetrate several layers of sheetrock as well as exterior house walls. *See* R.W. Scheifke, *Penetration of Exterior House Walls by Modern Police Ammunition,* Canadian Police Research Centre (Oct. 1997).[13]

AR-15 bullets generally penetrate *less* though building materials than do common handgun rounds. That is one reason law enforcement officers often use AR-15s for raiding buildings and hostage situations, especially in urban areas. *See* Boone Decl. at J.A. 2168-69, in Kolbe v. Hogan*,* 849 F.3d 114 (4th Cir. 2017).[14] A Massachusetts Municipal Police training manual states that AR-15s are less dangerous to bystanders because "the most popular patrol rifle round, the 5.56mm NATO (.223 Remington) will penetrate fewer walls than service pistol rounds or 12 gauge slugs."

---

[13] https://perma.cc/8V6N-8MK9.

[14] Buford Boone is a firearms and ballistics expert and former FBI agent who directed the FBI Ballistic Research Facility for 15 years.

28

Massachusetts Municipal Police Training Committee, *Basic Firearms Instructor Course: Patrol Rifle* 3 (Sept. 2007).[15]

Founder and senior instructor of the Los Angeles Police Department's Tactical Rifle Team explains that "concerns about overpenetration and the danger to the populace presented by missed rounds have been greatly exaggerated….[T]he 5.56mm/.223 is relatively safer than pistol bullets for everyone in close-quarter-battle (CQB) application." Gabriel Suarez, *The Tactical Rifle: The Precision Tool for Urban Police Operations* 38 (1999).

## B. *Every* centerfire rifle bullet penetrates police soft body armor.

Ordinary law enforcement officers wear soft body armor that is designed to stop rounds from handguns and shotguns. Soft body armor does not stop rifle bullets. Those require hard plates of steel, ceramic, or composites. *See* U.S. Dep't of Justice, National Inst. of Justice, *Guide Body Armor* 12-13 (2014).[16] Combat soldiers usually wear hard plates, and so do law enforcement officers in high-risk situations, such as hostage rescue.

---

[15] https://perma.cc/M8VW-DUXR.
[16] https://www.ojp.gov/pdffiles1/nij/247281.pdf.

29

Centerfire rifles are more likely than handguns to penetrate soft body armor, but AR-15 bullets do not penetrate soft armor any more than non-banned centerfire rifles.

## IV. The AR-15 is not unusually dangerous even though it has been used in mass shootings.

The District Court asserts that attacks with "assault weapons" like the AR-15 result in more deaths, more injuries, and more severe injuries than attacks involving conventional firearms. (Sp.App. 48). Simplistically counting incidents and casualties in mass public shootings does not prove that the AR-15 is exceptionally harmful.

Neither the District Court nor Defendants address the relevant question: *Would there have been fewer injuries or deaths if the mass shooter had used a different firearm?* If the shooter's bullet strikes the victim's head, heart, or other vital organ, it is unlikely the firearm type will make much difference. If the shooter fires into a large, dense crowd in a venue with limited routes of escape (Las Vegas, Orlando, Aurora) or fires multiple rounds that strike stationary targets at very close range (Sutherland Springs, Orlando, Sandy Hook, Virginia Tech, Columbine, and others), the type of firearm used may not make a significant difference. If the shooter uses multiple types of firearms (Orlando,

30

Aurora, Columbine, and others), specific casualties must be associated with each weapon.

Shooters armed with handguns perpetrated high-casualty shootings at Virginia Tech (58), Ft. Lauderdale (48), Killeen, Texas (45), Ft. Hood (45), and Thousand Oaks (33), where the total casualties approximate or exceed mass shootings with "assault weapons" at Highland Park (53), El Paso (49), Sutherland Springs (45), Uvalde (38), and Parkland (34). *See* The Violence Project, *Mass Shooter Database* (vers. 7.0 5.28.23).[17]

The District Court's claim is directly contradicted by social science research showing that "assault weapons" are *less* deadly than handguns in mass public shootings. Researchers led by Dr. Babak Sarani, founder and chief of the Center for Trauma and Critical Care at GWU Hospital, examined the relationship between the type of firearm used, wounding characteristics, and probability of death in mass shootings. Babak Sarani, et al., *Wounding Patterns Based on Firearm Type in Civilian Public Mass Shootings in the United States,* 228 J. Amer. College Surgeons 228 (March 2019). They studied firearm types and autopsy

---

[17] https://www.theviolenceproject.org/mass-shooter-database/.

reports for 232 victims from 23 mass shootings, including high-casualty shootings with "assault weapons" at Orlando and Las Vegas.

To their surprise, the researchers found that that mass shootings with handguns are more lethal than those with rifles because they result in more wounds per victim and more injuries to vital organs. *Id.* at 228-29, 232-33. "All of us were shocked," Dr. Sarani said. "We came to the table with our bias that an assault weapon would be worse." Carolyn Crist, *Handguns More Lethal Than Rifles in Mass Shootings,* Reuters (Dec. 31, 2018).[18]

Victims shot with a handgun were almost four times more likely to have three or more wounds compared to those shot with a rifle. Thus "the probability of death is higher for events involving a handgun than a rifle." Sarani at 232. Twenty-six percent of victims shot with handguns and 16% shot with shotguns had multiple fatal organ injuries; only 2% of those shot by a rifle had two or more fatal organ injuries. *Id.* Wounds to the brain and heart, which have higher fatality rates than gunshots to other organs, were most likely to occur when handguns were used. *Id.* at 233.

---

[18] https://perma.cc/N9VY-CVUX.

Victims shot with rifles were twice as likely to have a preventable death (if medical care is rendered in time) than those shot with other firearms. *Id.* at 231.

Contrary to media hype, "assault weapons" are not the favorite gun of mass shooters:

> The most common weapon used to commit mass shootings is a handgun. Eighty percent of all mass shooters used at least one handgun during their crime. A semiautomatic rifle is the next most used weapon with 28% of shooters using them. Seventy-three percent of shooters who used a semiautomatic rifle also used a handgun at the scene.

The Violence Project, *Mass Shooter Database.*

A firearm's relative dangerousness often is situational. For the mass shooter who wants to enter a school, business, or other venue undetected, the handgun is more dangerous because it is concealable. The Virginia Tech shooter would not have been able to enter a student dormitory, kill two persons, return to his own room in another dormitory, and then walk across campus to the building where he killed 30 and wounded 17 more if he had been carrying an AR-15. Because of their concealability, the handguns used by the Virginia Tech shooter were far more deadly than an AR-15.

## V. Features that make the AR-15 well-suited for lawful defense do not make it unusually dangerous.

The District Court found no persuasive evidence that AR-15s "are particularly suitable for self-defense." (Sp.App. 44) To the contrary, AR-15s have exceptional utility for lawful self-defense.

### A. The AR-15 often is chosen for lawful defense by law enforcement officers and citizens.

Most law enforcement patrol cars carry a rifle, a shotgun, or both. Officers often choose the very arms that Connecticut bans. The patrol rifle usually is a semiautomatic AR-15, which the District Court labels "unusually dangerous."

American citizens have always looked to law enforcement for guidance in choosing defensive firearms. This is prudent, because law enforcement firearms are selected with care. Officers choose their duty arms for one purpose: lawful defense of innocents.

The most important reason why citizens should copy law enforcement officers' firearms selections is to ensure that citizens will have reliable firearms for defense of self and others. These arms are well-suited for defense against violent criminals. They are appropriate for use in civil society, because officers' typical arms are neither military arms nor

34

unusually dangerous. *See State v. DeCicco,* 105 A.3d 165, 200 (Conn. 2014) ("[W]idespread acceptance of batons within the law enforcement community…supports the conclusion that they are not so dangerous or unusual as to fall outside the purview of the second amendment.").

## B. The AR-15's features make it well-suited for self-defense.

There is little doubt that the AR-15 is useful for self-defense, especially as a home defense weapon. *See* Wallace, *Lethality* at 62-67. Effective self-defense requires incapacitating the attacker as quickly as possible. AR-15 ammunition typically has better terminal effectiveness than handgun rounds. While an AR-15 rifle with .223/5.56mm ammunition is not especially powerful compared to other long guns, firepower is not the only characteristic that lawful defenders care about.

The AR-15 is comparatively easy to shoot. Its lighter weight, shorter barrel, and ergonomic stock and grip make it easier to handle than most long guns. Its reduced recoil makes it more manageable than shotguns or hunting rifles and helps increase the accuracy of follow-up shots. Low weight and low recoil make the AR-15 an especially good choice for some people with less upper body strength. The AR-15 also is safer for home

defense than other firearms. Its bullets typically penetrate less in walls or building materials than handguns or shotguns.

The AR-15's standard capacity 30-round magazine is larger than standard capacities for semiautomatic handguns (15-18 rounds), revolvers (5-6 rounds), and shotguns (3-6 rounds). This ensures the user is prepared for multiple defensive scenarios without carrying additional ammunition and pausing to reload, such as when facing multiple attackers in a home invasion.

Handguns are superior in portability and maneuverability, and can be fired one-handed. But they require a higher degree of skill to shoot accurately and hold about half as many (or fewer) rounds. The 12-gauge shotgun is most likely to deliver an attack-stopping hit at close range, but it has much greater recoil, making it more difficult to control. It also holds an even smaller number of rounds and is more difficult to reload, especially under the life-or-death conditions of self-defense.

There is no "best" type of gun for self- or home-defense. Different guns are best in different situations. That is why law enforcements officers usually have a handgun in a holster and different arms in the patrol car.

36

Many citizens also have different arms. The Second Amendment guarantees citizens the individual right to choose any common arm.

## VI. Connecticut's ban implicitly disparages law enforcement officers and harms community relations.

Suppose arguments about the AR-15's "unusual dangerousness" are accurate: the banned weapons are useless for self-defense and instead are made for solely mass homicide—one shot splits a body in half, severs a limb, leaves a wound the size of a Coke can. Every characteristic these arms possess is designed for killing large numbers of people. They are so hideous—so useless for anything except carnage—that no one may have them. Except government law enforcement personnel. Conn. Gen. Stat. §53-202c(b).

Amici reject the libel that ordinary arms of American peace officers are weapons of militarized mass killers. Consider the following descriptions:

- "Officer Smith shot the suspect with a common rifle, well-suited for lawful defense of self and others."

- "Officer Smith shot the suspect with a weapon of war whose only purpose is mass killing."

The first statement is accurate. The second is the Defendants' view, and inflames anger and hatred against law-abiding law enforcement officers.

If Defendants prevail because AR-15s are "unusually dangerous"— they really sever limbs and so on—there is no justification for the exemption for routine law enforcement purposes. Police use of patrol rifles will trigger complaints of excessive use of deadly force. Police officers may be exempted from the ban, but they are not excused from the consequences of using excessive force.

Public perceptions of police also will change. Police officers are not soldiers wielding weapons of war and their interactions with citizens are not governed by rules of engagement on the battlefield. The statute implicitly denigrates law enforcement officers by treating them like an occupying army. Such negative attitudes make the public less willing to cooperate with law enforcement and damage community relations.

## CONCLUSION

The banned arms are very useful for lawful defense of self and others. The assertions against them are implausible. The decision below should be reversed.

38

Respectfully submitted,

*s/E. Gregory Wallace*
E. Gregory Wallace
Campbell Univ. School of Law
225 Hillsborough Street
Raleigh, North Carolina 27603
(919) 696-3057
wallaceg@campbell.edu
Arkansas Bar No. 90184
*Counsel for Amici*

November 28, 2023

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the volume limitation of Local Rule 29.1(c) because, according to the word-counting feature of Microsoft Word, it contains 6,994 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Century Schoolbook 14-point font.

3. A virus check was performed and did not indicate any viral presence.

4. I am a member of the Second Circuit bar. I am admitted to practice in the State of Arkansas, No. 90184.

*s/ E. Gregory Wallace*
November 28, 2023

40

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>*s/ E. Gregory Wallace*</u>
November 28, 2023