# 23-1162

———————————————

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————————

National Association for Gun Rights, Toni Theresa Spera Flanigan,
*Plaintiffs-Appellants*,
Patricia Brought,
*Plaintiff*

v.

Ned Lamont, in his official capacity as the Governor of the State of
Connecticut, Patrick J. Griffin, in his official capacity as the Chief
States Attorney of the State of Connecticut, Sharmese L. Walcott, in her
official capacity as the States's Attorney, Hartford Judicial District,
*Defendants-Appellees*,
David R. Shannon, in his official capacity as the State's Attorney,
Lichfield Judicial District,
*Defendant*

———————————————

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

———————————————

## BRIEF OF THE DEFENDANTS-APPELLEES

———————————————

William Tong
Attorney General

Joshua Perry
Solicitor General

Janelle R. Medeiros
James M. Belforti
Assistant Attorneys General
165 Capitol Avenue
Hartford, CT 06105
860-808-5450
janelle.medeiros@ct.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUE ...............................................................2

INTRODUCTION.................................................................................3

STATEMENT OF THE CASE ..............................................................5

I. Responding to an Epidemic of Mass Shootings, Connecticut Restricts Assault Rifles, Large Capacity Magazines, and Other Deadly Firearm Features and Accessories.........................................................5

II. The District Court Refuses to Enjoin Connecticut's Gun Safety Laws Pending Trial.................................................................................12

SUMMARY OF ARGUMENT ................................................................17

ARGUMENT ......................................................................................19

I. The District Court Correctly Held that Plaintiffs Are Unlikely to Succeed on the Merits Because They Did Not Show that Assault Weapons and LCMs Are Presumptively Protected by the Second Amendment. ..20

    A. Plaintiffs' facial challenge fails because some of Connecticut's gun safety law applications plainly fall outside the Second Amendment's protections. ...............................................................21

    B. Plaintiffs did not meet their threshold burden merely by adducing manufacturing and ownership statistics. ........................24

    C. Assault weapons and LCMs are unusually dangerous weapons of war, not "arms" commonly used or useful for self-defense. ..........30

II. The District Court Correctly Held that Plaintiffs Are Unlikely to Succeed on the Merits Because Connecticut's Laws Are Consistent with the Nation's Historical Tradition of Firearm Regulation.......................50

A.     The District Court properly applied flexible and nuanced analogical reasoning because Connecticut's gun safety laws respond to unprecedented societal concerns and technological advancements.........................................................................................51

B.     Compared with historical regulations throughout our history, Connecticut's gun safety laws are similarly justified and impose a similar burden on the right of armed self-defense...........................57

III.  Plaintiffs Failed to Carry Their Burden on the Other Preliminary Injunction Factors. ..............................................................................70

CONCLUSION ...........................................................................................74

CERTIFICATION OF COMPLIANCE ....................................................75

CERTIFICATION OF SERVICE ............................................................76

# TABLE OF AUTHORITIES

## Cases

*A.H. v. French*, 985 F.3d 165 (2d Cir. 2021) ..................................... 19, 70

*Antonyuk v. Chiumento*, 89 F.4th 271, 2023 U.S. App. LEXIS 32492 (2d Cir. 2023)..................................................................................... passim

*Bevis v. City of Naperville*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023) ... 59, 61

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023)............. passim

*Brown v. Maryland*, 25 U.S. (12 Wheat) 419 (1827) .............................. 68

*Brumback v. Ferguson*, 22-3093, 2023 U.S. Dist. LEXIS 170819 (E.D. Wash. Sep. 25, 2023)............................................................................ 13

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) ............................................ 21

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)...................................... 43

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ............................................ 73

*Capen v. Campbell*, 22-11431, 2023 U.S. Dist. LEXIS 227385 (D. Mass. Dec. 21, 2023)................................................................. 13, 39, 40, 46

*Clementine Co., LLC v. Adams,* 74 F.4th 77 (2d Cir. 2023) ................... 70

*Cockrum v. State*, 24 Tex. 394 (1859) ....................................................... 61

*Del. State Sportsmen's Ass'n, Inc v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584 (D. Del. 2023).................................... 13, 62, 64, 65

*Duncan v. Bonta*, 17-1017, 2023 U.S. Dist. LEXIS 169577 (S.D. Cal. Sep. 22, 2023) ........................................................................... 13

*Duncan v. Bonta*, 83 F.4th 803 (9th Cir. 2023) ....................................... 12

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) .. 27, 43

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) .......... 32, 37, 71

*Gallinger v. Becerra*, 898 F.3d 1012 (9th Cir. 2018) ............................... 38

*Grant v. Lamont*, 22-1223, 2023 U.S. Dist. LEXIS 151015 (D. Conn. Aug. 28, 2023) ........................................................................................ 7

*Hanson v. District of Columbia*, 22-2256, 2023 U.S. Dist. LEXIS 68782 (D.D.C. Apr. 20, 2023) ........................................................................ 13

*Hartford v. Ferguson*, 23-5364, 2023 U.S. Dist. LEXIS 98579 (W.D. Wash. June 6, 2023) ....................................................................................... 13

*Heller v. District of Columbia*, 670 F.3d 1244 (2011) ....................... 25, 31

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ................................. passim

*Lincoln Prop. Co. v. Roche*, 546 U.S. 81 (2005) ...................................... 23

*Mastrovincenzo v. City of New York*, 435 F.3d. 78 (2d Cir. 2006) .......... 20

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................. 56

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................. 31

*Miller v. Bonta*, 19-1537, 2023 U.S. Dist. LEXIS 188421 (S.D. Cal. Oct. 19, 2023) ........................................................................... 13

*Miller v. Bonta*, 23-2979 (9th Cir. Oct. 28, 2023) ................................... 13

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018) .................................................................... 20

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2012) ................................................................................. 19

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ............................................................................................. passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ................................................................................. passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349 (W.D.N.Y. 2013) ................................................................. 23

*Ocean State Tactical, LLC v. Rhode Island* 646 F. Supp. 3d 368 (D.R.I. 2022) ................................................................................. 13, 46, 73

*Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782 (D. Or. 2022) . 12, 46, 48, 49

*Or. Firearms Fed'n, Inc. v. Kotek*, 2023 U.S. Dist. LEXIS 121299 (D. Or. 2023) ................................................................................. 13, 64

*Staples v. United States*, 511 U.S. 600 (1994) .......................................... 41

*Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004) ..... 74

*United States v. Alaniz*, 69 F.4th 1192 (9th Cir. 2023) .......................... 31

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) ............................ 49

*United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008) .......................... 23

*United States v. Hasson*, 19-96, 2019 U.S. Dist. LEXIS 160498 (D. Md. Sept. 20, 2019) ........................................................................ 50

*United States v. Miller*, 307 U.S. 174 (1939) .............................. 25, 30, 65

*United States v. Salerno*, 481 U.S. 739 (1987) ...................................... 22

*United States v. White*, 13-440, 2017 U.S. Dist. LEXIS 229493 (W.D. Mo. Oct. 13, 2017) .......................................................................... 23

*We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2021) ......... 19, 20, 72

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...................... 19

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ...................................... 27

## Statutes, Regulations, and Rules

1706-7 Mass. Acts ch. 4 .......................................................................... 67

1763-1775 N.J. Laws 346, ch. 539 (1771) .............................................. 59

1799 Conn. Pub. Acts 511 ....................................................................... 47

18 U.S.C. § 921 ....................................................................................... 66

18 U.S.C. § 925 ...................................................................65

1821 Me. Laws 98, ch. 25 ...................................................68

1832 Conn. Acts 391, ch. 25 ...............................................68

1837 Ala. Laws 7, No. 11 .....................................................60

1837 Ga. Laws 90, § 1 .........................................................60

1837-1838 Tenn. Pub. Acts 200-01 .....................................60

1838 Fla. Laws 36, No. 24 ...................................................60

1838 Va. Acts 76, ch. 101 ...................................................60

1868 Ala. Laws 11 ...............................................................61

1871 Tenn. Pub. Acts 81, ch. 90 .........................................62

1881 Ark. Acts 191, ch. XCVI..............................................62

1993 Conn. Pub. Acts 93-306 ........................................7, 65

2023 Conn. Pub. Acts 23-53 ..................................................7

28 U.S.C. § 1292 ...................................................................1

28 U.S.C. § 1331 ...................................................................1

33 Hen. 8, ch. 6 §§ 1, 18 (1541) .........................................58

7 Rich. 2, ch. 13 (1383) .......................................................58

*A Digest of the Acts of Assembly, and the Ordinances, of the*
*Commissioners and Inhabitants of the Kensington District of the*

*Northern Liberties: for the Government of that District,* Pg. 45-47,
   Image 48-50 (1832) ............................................................68

A Law for the Better Securing of the City of New York from the Danger
   of Gun Powder (1763) .......................................................68

*An Act Against Wearing Swords* (1686), reprinted in *The Grants,
Concessions, and Original Constitutions of the Province of New Jersey*
   289-290 (1881)................................................................59

Conn. Gen. Stat. § 53-202a-c........................................ 1, 6, 50

Conn. Gen. Stat. § 53-202b .......................................................7

Conn. Gen. Stat. § 53-202d .......................................................7

Conn. Gen. Stat. § 53-202w...................................... 1, 6, 11, 23

Fla. Laws 95, ch. 7................................................................61

Pub. L. No. 73-474, 48 Stat. 1236 (1934) ...............................43

## Other Authorities

Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and
   Lethality*, 55 U.C. Davis L. Rev. 2495 (2022)...............................53, 54

Heather Sher, *What I Saw Treating the Victims From Parkland Should
   Change the Debate on Guns*, The Atlantic (Feb. 22, 2018) .................39

Matthew Green, *Gun Groups: More Than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED (Apr. 12, 2019) ........................................................................... 73

NSSF, *Commonly Owned* (July 20, 2022) ................................................. 6

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016) ................ 44

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487 (2004) ... 67

U.S. Dep't of Justice, ATF, *Firearms Commerce in the United States: Annual Statistical Update* 16 (2021) .................................................. 43

*Use*, Black's Law Dictionary (11th ed. 2019) ......................................... 25

# JURISDICTIONAL STATEMENT

In 2013, Connecticut enacted gun safety laws restricting the possession and sale of assault weapons and large-capacity magazines (LCMs). Conn. Gen. Stat. §§ 53-202a-c, 53-202w.

Plaintiffs, Toni Theresa Spera Flanigan and the National Association for Gun Rights (NAGR), facially challenged those gun safety laws under the Second Amendment, invoking the District Court's 28 U.S.C. § 1331 federal question jurisdiction.

The District Court denied Plaintiffs' preliminary injunction motion on August 3, 2023. Plaintiffs now ask this Court to enjoin the challenged gun safety laws without a trial. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the District Court abused its discretion in declining to preliminarily enjoin Connecticut's gun safety laws, which restrict the sale and possession of assault weapons—including AR-15 rifles, grenade launchers, and Street Sweeper shotguns—and large capacity magazines.

**INTRODUCTION**

A mass murderer killed 26 children and teachers at Connecticut's Sandy Hook Elementary School in 2012 using an AR-15 assault rifle with large capacity magazines (LCMs). The Sandy Hook shooting exemplified a worsening national epidemic of devastating mass shootings perpetrated with assault weapons and LCMs. Connecticut responded by bolstering its gun safety laws to restrict possession and sale of those military-style weapons, while protecting residents' right to armed self-defense with more than a thousand other kinds of guns.

Now Plaintiffs ask this Court to declare a new constitutional right to possess AR-15s and other assault weapons. Their facial challenge to Connecticut's gun safety laws even extends to grenade launchers and Street Sweeper shotguns. And they want to flood the state with assault weapons and LCMs prematurely, without discovery or a trial.

The District Court refused Plaintiffs' radical request for a preliminary injunction against Connecticut's gun safety laws, and this Court should affirm. Nine years ago, this Court rejected a Second Amendment challenge against these same laws. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) changed part of the analysis,

3

but not the outcome. That is why the great majority of federal courts—and the only Court of Appeals—to consider the issue since *Bruen* have rightly refused to enjoin restrictions on assault weapons and LCMs.

The Supreme Court has already said that M-16 machine guns "and the like" may be banned, and the AR-15 is "like" its M-16 descendant in every relevant way—muzzle velocity, maneuverability, ammunition, rapid fire rate, damage done to the human body—but even more accurate and lethal in mass shootings. Along with LCMs and the other restricted assault weapons, the AR-15 falls outside the Second Amendment's protections because it is an unusually dangerous weapon of war, neither used nor useful for self-defense. And even if assault weapons and LCMs were presumptively protected: states have always used their police power to restrict newly proliferating technologies, like assault weapons and LCMS, that pose extraordinary public safety risks and inflict mass terror. So Plaintiffs have shown no likelihood of success on the merits—and, even if they had, the other preliminary injunction factors tip sharply against them.

## STATEMENT OF THE CASE

I. **Responding to an Epidemic of Mass Shootings, Connecticut Restricts Assault Rifles, Large Capacity Magazines, and Other Deadly Firearm Features and Accessories.**

On December 14, 2012, a mass murderer broke into the Sandy Hook Elementary School in Newtown, Connecticut, and slaughtered twenty schoolchildren and six adults. *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 247 (2d Cir. 2015). He used an AR-15 assault rifle—a platform adopted by the U.S. Army as the M-16 machine gun, Joint Appendix (JA) 199—and ten 30-round magazines, firing 154 rounds in less than five minutes, too quickly for law enforcement to intervene. JA263.

Sandy Hook exemplified a national epidemic unknown at the Founding and during Reconstruction. JA918; JA285 ("[T]here is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948."). In the last three decades, the "rise in mass shooting violence"—here, shootings with more than six victims—"has far outpaced the rise in national population—by a factor of 13." JA275. All told, "mass shootings presently pose the deadliest threat to the safety of

American society in the post 9/11 era, and the problem is growing nationwide." JA274.

Semiautomatic assault weapons and LCMs drive the mass shooting trend.[1] Born from Cold War military technology, assault weapons first meaningfully penetrated civilian society after a gun industry marketing push in the 1980s. JA925, 237. In 1990, 43,000 AR-15 platform rifles were produced in this country. That rose to 653,000 by 2011, and 1,882,000 in 2013.[2] And mass murderers took advantage. The killers in all U.S. mass shootings since 2014, and in all eleven of the deadliest acts of mass violence in the country since 9/11, have used assault weapons, LCMs, or both. JA228, 216.

Four months after Sandy Hook, Connecticut's General Assembly responded with an "Act Concerning Gun Violence Prevention and Children's Safety," including General Statutes §§ 53-202a-c and 53-202w,

_____

[1] Gun industry marketers coined the term "assault weapon." JA237. Plaintiffs insist that "assault weapon" is a "political term" developed by "anti-gun publicists" sometime after 1989. Pl. Br. 3. But, for instance, the 1981 cover of Guns and Ammo magazine touted "the new breed of assault rifle." JA238. And a Heckler & Koch advertising pamphlet from the 1980s bills their HK 91 as a "Semi-Automatic Assault Rifle." JA338.

[2] NSSF, *Commonly Owned* (July 20, 2022), https://tinyurl.com/yc8kd6ps.

the gun safety laws challenged here. JA297 (summarizing legislative history). Those laws, which update regulations that have now been in place for more than 30 years, *see* 1993 Conn. Pub. Acts 93-306, restrict possession and sale of assault weapons and LCMs—unusually lethal, military-style weapons and accessories designed and used not for lawful self-defense but for combat, crime, and mass violence.

Like other federal, state, and local laws that have long kept communities safe, Connecticut's gun safety laws preserve residents' right to protect themselves—here, with more than a thousand makes and models of legal firearms.[3] JA201. And the restrictions carve out exceptions for classes of residents including law enforcement personnel and residents who owned the weapons and accessories before the laws' effective date. *See* Conn. Gen. Stat. §§ 53-202d(a), 53-202b(b)(1).

*Enumerated weapons.* The gun safety laws list and restrict 49 specific makes of assault rifles—almost all "centerfire" semiautomatic

---

[3] On June 6, 2023, Connecticut Governor Ned Lamont signed Public Act 23-53, reinforcing existing assault weapons restrictions. The 2023 amendments, which are not challenged here, were upheld by the District Court in *Grant v. Lamont*, 22-1223, 2023 U.S. Dist. LEXIS 151015 (D. Conn. Aug. 28, 2023).

rifles, which fire larger, higher-velocity centerfire cartridges—by name or style. JA200.

These enumerated weapons are "essentially civilian versions of military weapons used by armed forces around the world." JA199. Twenty are variants on the AK-47—the Kalashnikov rifle developed for the Soviet army after World War II. *Id*. Thirteen are versions of the AR-15/M-16 platform. *Id*. Another three of the enumerated rifles are variants on the HK 91 or FN type military rifle. JA199.Between them, AK-47s and AR-15/M-16s are "the most prolific military firearms in the world." *Id*.

The statutes also enumerate and restrict some semiautomatic assault pistols with especially deadly features. JA200. Of the 22 assault pistols listed in the statutes, 6 are variants of the AK-47 and 7 are variants of the M-16/AR-15. *Id*.

*The AR-15 assault rifle.* Though Plaintiffs facially challenge the entire statutory scheme, their arguments focus on AR-15-type assault rifles, which the only individual plaintiff, Ms. Flanigan, seeks to carry in Connecticut. JA1032.

Designed in response to the U.S. military's request for an improved infantry weapon, the AR-15 aced its Vietnam field test: "[t]he lethality of

the AR-15 and its reliability record were particularly impressive," crowed the testing report. JA241. Testers described an Army Ranger with an AR-15 shooting an enemy from about 50 feet away: "One round in the head—took it completely off. Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter." *Id*. Because of its "phenomenal lethality," the Army adopted the AR-15 as its standard-issue rifle, rebranding it as the M-16. JA199, 241-42. The AR-15 marketed to civilians is semiautomatic, an adaptation that can be easily evaded: in 2017, a murderer killed 60 people in Las Vegas using an AR-15 manipulated to allow for automatic-style fire. JA242; *and see* JA927-28 (describing simple modifications, including using an elastic band, to increase the AR-15's fire rate).

With a muzzle velocity of 3300 feet per second, just like the M-16, JA926, the AR-15 can penetrate both police body armor and standard construction walls. JA214, 257. Also just like the M-16, the AR-15 can shoot .223 caliber rounds "designed to mushroom and fragment" in a victim's body, JA224, boring a hole in human tissue that one trauma surgeon described as less like a nail puncture than like being shot by "a Coke can." JA242. And even without any adaptations to increase its fire

rate, the AR-15—like the M-16—meets the military definition of "rapid fire." JA926. It takes "as little as five seconds" for a semiautomatic rifle like the AR-15 to empty a thirty-round LCM. *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017) (en banc) (*abrogated on other grounds by Bruen*, 597 U.S. 1).

No surprise, then, that the Army Field Manual describes the AR-15 as no less dangerous than the M-16. To the contrary: according to the Manual, semiautomatic fire from an assault rifle "is superior to automatic fire in all measures" in the circumstances of a typical mass shooting. JA263. Semiautomatic fire is "the most important firing technique during fast-moving, modern combat," and "the most accurate technique of placing a large volume of fire on poorly defined targets or target areas, such as short exposure, multiple, or moving targets." *Id.*; *and see Kolbe*, 849 F.3d at 125 ("[S]oldiers and police officers are often advised to choose and use semiautomatic fire, because it is more accurate and lethal than automatic fire in many combat and law enforcement situations.").

*Features*. Connecticut's gun safety laws also define assault weapons based on particularly lethal features, either built-in or added

aftermarket, designed to "serve specific, combat-functional ends," *Kolbe*, 849 F.3d at 137, or to help criminals kill more people and evade detection by law enforcement. For instance, General Statutes § 52-202(a)(1)(E) prohibits semiautomatic, centerfire rifles with one or more of these features: telescoping stocks, which facilitate crime by making guns more concealable, JA198; flash suppressors, which hide a shooter's location by masking muzzle flash, *id.*; grenade launchers, *id*; and pistol grips, thumbhole stocks, and forward grips. JA224. With these grips, shooters can "spray ('hose down') a large number of bullets over a broad killing zone, without having to aim at each individual target." JA381. And Connecticut restricts semiautomatic weapons with barrel shrouds—typically, ventilated covers that allow shooters to grip the weapon by the barrel, shooting many bullets rapidly without burning themselves on the hot metal, JA381-82.

*LCMs.* Finally, the gun safety laws restrict LCMs. An LCM is a detachable "magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device" that can hold more than ten rounds of ammunition. Conn. Gen. Stat. § 53-202w(a)(1). With LCMs, shooters can rapidly fire without having to stop and reload—pauses that can give

victims time to escape, and law enforcement time to intervene. JA252. Most semiautomatic firearms can accept magazines with a capacity of ten rounds or fewer. So they can still be used self-defense absent an LCM, though without the same mass-killing capacity. JA201.

## II. The District Court Refuses to Enjoin Connecticut's Gun Safety Laws Pending Trial.

No federal appellate court has ever enjoined a state from restricting any kind of assault weapons and LCMs—much less weapons with flash suppressors and grenade launchers. In *Cuomo*, this Court upheld Connecticut's gun safety laws, and six other federal appellate courts have upheld similar restrictions. *See Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 796 (D. Or. 2022) (collecting cases). *Bruen* abrogated those decisions to the extent they used means-end scrutiny. But post-*Bruen*, the Seventh Circuit—the only Circuit to decide the issue—has refused to enjoin restrictions much like Connecticut's. *Bevis v. City of Naperville*, 85 F.4th 1175, 1197 (7th Cir. 2023); *and see Duncan v. Bonta*, 83 F.4th 803, 805 (9th Cir. 2023) (concluding that California "is likely to succeed on the

12

merits" in defending its LCM restrictions). The large majority of district courts across the country have, too.[4]

Still, Plaintiffs—Toni Theresa Spera Flanigan and the National Association for Gun Rights—brought this facial challenge to Connecticut's gun safety laws and moved for a preliminary injunction to bar enforcement of the gun safety laws entirely and for everyone.[5] To

---

[4] *See Capen v. Campbell*, 22-11431, 2023 U.S. Dist. LEXIS 227385 (D. Mass. Dec. 21, 2023) (denying preliminary injunction against Massachusetts' assault weapon and LCM restrictions); *Del. State Sportsmen's Ass'n, Inc v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584 (D. Del. 2023) (same in Delaware); *Or. Firearms Fed'n, Inc. v. Kotek*, 2023 U.S. Dist. LEXIS 121299 (D. Or. 2023) (upholding Oregon's LCM restrictions after trial); *Brumback v. Ferguson*, 22-3093, 2023 U.S. Dist. LEXIS 170819 (E.D. Wash. Sep. 25, 2023) (denying preliminary injunction against Washington's LCM restrictions); *Hanson v. District of Columbia*, 22-2256, 2023 U.S. Dist. LEXIS 68782, (D.D.C. Apr. 20, 2023) (same in the District of Columbia); *Ocean State Tactical, LLC v. Rhode Island* 646 F. Supp. 3d 368 (D.R.I. 2022) (same in Rhode Island); *Hartford v. Ferguson*, 23-5364, 2023 U.S. Dist. LEXIS 98579 (W.D. Wash. June 6, 2023) (denying preliminary injunction against Washington's assault weapons restrictions). *But see Duncan v. Bonta*, 17-1017, 2023 U.S. Dist. LEXIS 169577 (S.D. Cal. Sep. 22, 2023) (enjoining California's LCM restrictions), *stayed pending appeal by* 83 F.4th 803 (9th Cir. 2023) (en banc) (concluding that California is likely to succeed on the merits); *Miller v. Bonta*, 19-1537, 2023 U.S. Dist. LEXIS 188421 (S.D. Cal. Oct. 19, 2023), *administratively stayed pending appeal by* 23-2979 (9th Cir. Oct. 28, 2023).

[5] Defendants do not concede that NAGR has independent standing to bring this action.

carry their burdens, Plaintiffs offered ten pages of declarations. JA102-07; JA1026-29. Defendants responded with 772 pages.

The District Court denied Plaintiffs' motion on August 3, 2023, holding that they failed to show a likelihood of success on the merits. Plaintiffs' Special Appendix (SPA) 4-5.

The District Court first explained that Plaintiffs bring a facial challenge, since they seek to enjoin the entire statutory scheme. SPA13-16. Under this Court's established standard—with no exception for Second Amendment cases—Plaintiffs' facial challenge cannot succeed unless they show that there is "no set of circumstances" under which the scheme is constitutional. *Id*. This initial holding was not dispositive, since the District Court also rejected Plaintiffs' challenge under the less demanding standard that they proposed. *Id*.

Next, the District Court concluded that Plaintiffs failed to show assault weapons and LCMs are presumptively protected by the Second Amendment. SPA52. Plaintiffs tried and failed to meet their threshold burden with the bare assertion that many of the restricted weapons and accessories are manufactured and owned nationally. SPA5. Defendants, meanwhile, even though they did not bear the burden at this stage,

"submitted persuasive evidence that assault weapons and LCMs are more often sought out for their militaristic characteristics than for self-defense, that these characteristics make the weapons disproportionately dangerous to the public based on their increased capacity for lethality, and that assault weapons and LCMs are more often used in crimes and mass shootings than in self-defense." SPA5.

Finally, although Plaintiffs' threshold "failure alone would have been fatal to [their] claim," the District Court held that Defendants carried their burden at *Bruen*'s second step. *Id.* Applying the more nuanced inquiry mandated by *Bruen* where firearm restrictions respond to previously unimaginable social or technological change, the District Court found that Defendants adduced "historically analogous statutes and expert declarations" showing a history and tradition of relevantly similar regulations: "[W]hen a modern innovation in firearm technology results in a particular type of weapon or method of carrying being utilized for unlawful purposes to terrorize and endanger the public, the Nation has a longstanding history and tradition of regulating those aspects of the weapons or manners of carry that correlate with rising firearm violence." *Id*.

15

Since Plaintiffs showed no likelihood of success on the merits, the

District Court did not reach the other preliminary injunction factors.

## SUMMARY OF ARGUMENT

The District Court was well within its discretion in refusing to enjoin Connecticut's gun safety laws, and this Court should affirm.

First: Plaintiffs' facial challenge fails. They must show that Connecticut's gun safety laws are unconstitutional in all applications. *Antonyuk v. Chiumento*, 89 F.4th 271, 2023 U.S. App. LEXIS 32492, *76 (2d Cir. 2023). But the laws restrict many weapons, features, and accessories—like grenade launchers, Street Sweeper shotguns, and 100-round drum magazines—that the Second Amendment plainly does not protect.

Second: Plaintiffs showed no likelihood of merits success. They tried to meet their threshold burden with a handful of imprecise statistics about manufacturing and ownership. The Supreme Court requires more, and so did this Court in *Cuomo*. Plaintiffs had to show that assault weapons and LCMs are used and useful for lawful purposes like self-defense—not unusually dangerous weapons of war. But the restricted weapons, features, and accessories are made and used for combat. The AR-15, for instance, is "indistinguishable" from the M-16 military machine gun that states unquestionably may ban. *Bevis,* 85 F.4th at

17

1197. And neither LCMs nor the restricted features are "arms" within the Second Amendment's original public meaning.

Third: Even if assault weapons and LCMs were presumptively protected, Plaintiffs could not prevail on the merits. Defendants showed a robust historical tradition, starting before the Founding, of restricting technologies—and especially newly-proliferating technologies—that pose unusual threats to public safety, from black powder to percussion cap pistols to Bowie knives to submachine guns.

Fourth and finally: Plaintiffs did not carry their burden on the other preliminary injunction factors. Connecticut, not Plaintiffs, faces an imminent risk of irreparable harm. Connecticut residents can buy and own more than a thousand makes and models of legal firearms for self-defense, together with as many ten-round magazines as they want. But an injunction would irretrievably release weapons of war onto Connecticut's streets without a trial.

# ARGUMENT

Plaintiffs seek "an extraordinary and drastic remedy that is never awarded as of right." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2021) (internal quotation marks omitted).

Since they would enjoin "government action taken in the public interest pursuant to a statute or regulatory scheme," Plaintiffs must satisfy all four *Winter* factors, showing at a minimum (1) "a likelihood of success on the merits"; (2) "irreparable harm absent injunctive relief"; (3) "public interest weighing in favor of granting the injunction"; and that (4) "the balance of equities supports the issuance of an injunction." *Id.* at 279-80 (adapting and applying *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

And since Plaintiffs want a mandatory injunction, "a heightened legal standard" applies. *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). Plaintiffs must "make a strong showing of irreparable harm and demonstrate a clear or substantial likelihood of success on the merits." *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

The District Court mistakenly (but not dispositively) applied the lower "likelihood" merits standard because it reasoned that an injunction would not make Defendants perform "any specific tasks." SPA 13. But an injunction here would both alter the long-enduring status quo and force Connecticut to issue permits for now-restricted weapons. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36–37 (2d Cir. 2018) (injunctions are "mandatory, if they change the status quo"); *Mastrovincenzo v. City of New York*, 435 F.3d. 78, 90 (2d Cir. 2006) (injunctions are mandatory if they would command defendants "to perform any specific tasks"); JA201 (explaining Connecticut's permitting requirements).

Even applying the lower standard, the District Court correctly denied Plaintiffs' preliminary injunction. This Court reviews that denial for abuse of discretion. *We the Patriots*, 17 F.4th at 280. It should affirm, whether or not it applies the "substantial likelihood" standard.

## I. The District Court Correctly Held that Plaintiffs Are Unlikely to Succeed on the Merits Because They Did Not Show that Assault Weapons and LCMs Are Presumptively Protected by the Second Amendment.

The Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose." *Heller*, 554 U.S. at 626. Instead, it only covers "certain types of weapons." *Id*. at 623; *and see Antonyuk*, 2023 U.S. App. LEXIS 32492, at *42 (reaffirming that the Second Amendment's text "is not unlimited as the Supreme Court has repeatedly observed."). To claim constitutional protections, a plaintiff must first show that "the Second Amendment's plain text" covers her conduct. *Bruen*, 597 U.S. at 24. If she cannot, her challenge fails. Otherwise the government, by adducing a historical analogue, may show that its restrictions reflect our national tradition of regulating weapons. *Id.* The District Court correctly found that Plaintiffs failed to cross the threshold, because they did not show that Connecticut's gun safety laws restrict any protected right.

### A. Plaintiffs' facial challenge fails because some of Connecticut's gun safety law applications plainly fall outside the Second Amendment's protections.

Plaintiffs facially challenge Connecticut's gun safety laws. JA1043 (Plaintiffs' prayer for relief, asking to enjoin the entire statutory scheme); SPA13 (District Court's conclusion that "this challenge is a facial one"); *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."). To win, they must show that "no set of circumstances

exists under which" Connecticut's gun safety laws "would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). But some restricted weapons are plainly beyond the Second Amendment's reach. So the whole challenge fails.

Months ago, this Court rejected an unsupported assertion, just like Plaintiffs', that "the rules are different" for Second Amendment facial challenges. Pl. Br. 63-65. *Antonyuk v. Chiumento* held that *Bruen* did not "create an 'exception' to the normal rules about facial and as-applied challenges," since "it is highly unlikely that the Court upended longstanding principles of constitutional litigation by mere implication." 2023 U.S. App. LEXIS 32492, at *76. So in their facial challenge to these gun safety laws, Plaintiffs must "establish that no set of circumstances exists under which the [statutes] would be valid, or show that the law lacks 'a plainly legitimate sweep.'" *Id*. at *72-73 (internal citations omitted).

The District Court properly determined that Plaintiffs cannot meet their heavy burden. SPA 14-15. The challenged laws restrict ownership and possession of a wide range of weapons, features, and accessories, including "grenade launcher[s]"; types of "Uzis"; certain shotguns,

including "Street Sweepers"; and 50 and 100 round drum magazines. *Id.*; Conn. Gen. Stat. 53-202w.

Plaintiffs have never claimed that those weapons and accessories are protected by the Second Amendment. Nor could they. *See, e.g.*, *Heller*, 554 U.S. at 625-627 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 369-70 (W.D.N.Y. 2013), *affirmed in relevant part by Cuomo*, 804 F.3d at 247 (bans on "outlawed features" like "a grenade launcher, bayonet mount, or a silencer" are self-evidently constitutional and "require no explanation"); *United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008) (sawed-off shotgun is unprotected by the Second Amendment); *United States v. White*, 13-440, 2017 U.S. Dist. LEXIS 229493, at *8-9 (W.D. Mo. Oct. 13, 2017) ("[T]he Street Sweeper is both a 'dangerous and [un]usual weapon'" and properly banned) (quoting *Heller*, 554 U.S. at 627).

Plaintiffs are the "masters of their complaint." *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 94 (2005). They could have shaped it to challenge only some of the restricted weapons and accessories. They chose an

23

unwinnable facial challenge instead. With a wide swathe of the restricted weapons and accessories plainly unprotected by the Second Amendment, this Court should affirm.

### B. Plaintiffs did not meet their threshold burden merely by adducing manufacturing and ownership statistics.

To claim presumptive constitutional protection, Plaintiffs must show that the restricted weapons and accessories are "in common use today for self-defense," *Bruen*, 597 U.S. at 32, rather than unusually dangerous weapons of war like M-16 machine guns, which are "most useful in military service" and can be banned. *Heller,* 554 U.S. at 627.

Plaintiffs, though, tried to carry their threshold burden with raw manufacturing and ownership statistics. Their sole record evidence: "between 1990-2021," a single declaration asserts in a single paragraph, "more than 20 million AR-platform rifles have been manufactured in the United States and are owned by millions of persons in the United States." JA107.[6] Even if those imprecise and unsourced statistics were correct

---

[6] Plaintiffs' brief bootstraps in similarly imprecise data from outside the record. They cite one study discussing "modern sporting rifles"—am undefined term that does little to help them. And their data speaks to "modern sporting rifles" in circulation—including in law enforcement and

and relevant, they would not be enough. The threshold inquiry is functional and practical: what the weapons are "useful" for, *Heller*, 554 U.S. at 627, and how they are actually "used." *Bruen*, 597 U.S. at 38; *and see Use*, Black's Law Dictionary (11th ed. 2019) (An instrumentality is "used" when it is "employ[ed] . . . for the purpose for which it is adapted.").

*Heller* did not stop at ownership statistics, instead exploring handguns' functionality—the "reasons that a citizen may prefer a handgun for home defense." 554 U.S. at 629 (discussing, among other things, the ready accessibility and maneuverability that make handguns ideally suited to self-defense in the home); *accord Heller v. District of Columbia*, 670 F.3d 1244, 1261 (2011) (*Heller II*) (numerosity is not enough where "we cannot be certain whether" the weapons are "used or useful specifically for self-defense or hunting."). And, like *United States v. Miller*, 307 U.S. 174 (1939) before it, *Heller* decreed that machine guns and short-barreled shotguns can be restricted without even considering their prevalence. The "type" and "character of the weapon," not its

---

military applications—not ownership by law-abiding civilians for self-defense.

commonality, makes the constitutional difference. *Heller*, 554 U.S. at 622-23; *accord Kolbe*, 849 F.3d at 142 ("[T]he *Heller* majority said nothing to confirm that it was sponsoring [a] popularity test.").

*Bruen*'s function-focused threshold inquiry largely built on *Cuomo*'s framework, and both cases—confirmed by this Court's recent decision in *Antonyuk*—foreclose Plaintiffs' attempts to reduce the threshold inquiry to a mere numbers game. *See Antonyuk*, 2023 U.S. App. LEXIS 32492, at *36-37 (*Bruen* "rejected" only "step two" of this Court's pre-*Bruen* framework). Like *Heller*, *Cuomo* looked past statistics on common ownership, 804 F.3d at 255, to examine "broad patterns of use and the subjective motives of gun owners." *Id*. at 256. And *Cuomo* understood that this functional inquiry meant examining, among other things, whether the restricted weapons and accessories are "dangerous and unusual" and "most useful in military service." *Id. Bruen* reaffirmed that part of *Cuomo*'s functional core, upholding restrictions on "dangerous and unusual weapons" as part of the inquiry into "common use." 597 U.S. at 21; *and see Bevis,* 85 F.4th at 1197 (applying *Bruen* to uphold Illinois' assault weapons restrictions because military assault weapons are unprotected).

26

*Bruen* and other federal appellate court decisions have also given this Court the clarification that it sought in *Cuomo*. 804 F.3d at 257 (looking for "clearer guidance" on the threshold inquiry). Mere ownership statistics, we now know, have no constitutional significance. After all, *Bruen* asks not generally about "common use," full stop, but specifically about "common use today *for self-defense*," 597 U.S. at 32 (emphasis added), a mandate to inquire into purpose and function. *See* SPA 29 (*Bruen* abrogated the portion of *Cuomo*'s analytical framework looking to ownership statistics).

Plaintiffs are wrong not just doctrinally but also logically. That, too, has been clarified by other appellate courts since *Cuomo*. Plaintiffs' unworkable circular inquiry would elevate a "law's existence" into "the source of its own constitutional validity." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015); *accord Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (reducing the constitutional threshold test to a popularity contest is "somewhat illogical"). A robust marketing

27

campaign that drives a run on weapons of war or instruments of crime cannot set the Second Amendment's presumptive scope.[7]

And Plaintiffs are wrong empirically, on their own terms. Plaintiffs' sole declarant never reveals his source or method. JA107. But even if he is accurate: neither the number of guns made nor the number of guns owned tell us the number of owners, since the average assault weapons owner has "three or more of the guns." JA236. And even if there really are "millions" of assault weapon owners in a country of 333 million people, a raw ownership number does not tell us how many of those people are the "law abiding citizens" at the core of the Second Amendment's concerns, or whether they possess the weapons "for lawful purposes." *Heller*, 554 U.S. at 625.

---

[7] Plaintiffs would make gun dealers into Second Amendment gatekeepers, allowing them to manipulate ownership statistics by flooding the market with assault weapons. As a gun dealer in South Carolina advertises: "We want to sell as many AR-15 and AK-47 rifles as we can and put them into common use in America today." Palmetto State Armory, *About Palmetto State Armory,* https://palmettostatearmory.com/about-psa.html (last visited Feb. 12, 2024).

Only a tiny percentage of residents, in Connecticut and nationally, own assault weapons and LCMs. AR-15 platform rifles—including assault weapons regulated in Connecticut—make up about 5% of privately owned guns, compared to 50% for handguns. JA291-92. The number of individual assault weapon owners is likely even smaller— estimated by Defendants' expert at about 2% of all Americans. JA280, 291. Connecticut has issued only 81,982 assault weapon certificates since the gun safety laws' passage in 2013. JA199. So even if each assault weapon is owned by a unique individual, at most about 2% of the Connecticut population owns an AR-15 style weapon. And only about 1% of the state's 3.6 million residents lawfully own LCMs. JA201. The preferences of this small minority of the population does not amount to constitutionally significant common ownership.[8]

---

[8] What is actually common, in Connecticut and nationally, is the desire to protect public safety by restricting the sale and possession of assault weapons and LCMs. JA209 (citing 2021 Pew survey showing that 63% of Americans support assault weapons ban); JA210 (same survey showing 64% of Americans supporting ban on magazines that can hold more than ten rounds).

The District Court correctly rejected Plaintiffs' attempt, which they repeat here, to pass the constitutional test with the bare assertion that some of the covered weapons and accessories are mass-manufactured and (inferentially) owned by a lot of people. SPA 29. This Court should affirm.

## C. Assault weapons and LCMs are unusually dangerous weapons of war, not "arms" commonly used or useful for self-defense.

Plaintiffs would lose at this threshold stage even if their cherry-picked statistics had some constitutional significance. *See Cuomo*, 804 F.3d at 255 (treating common ownership as relevant but not dispositive). The Second Amendment only protects arms "'in common use... for lawful purposes like self-defense." *Heller,* 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179). Plaintiffs have not shown that the regulated weapons and accessories satisfy that threshold criterion, which looks to suitability, purpose, and actual deployment. They have not even shown that LCMs and other restricted features are "arms" within the original public meaning of the Second Amendment.

*Heller* reiterated the constitutional importance of self-defense thirty-seven times, explaining that self-defense is the "core" of the Second Amendment, its "*central component,*" and the original motivation for

codification. 554 U.S. at 599, 630 (emphasis in original). A few years later, *McDonald v. City of Chicago*, 561 U.S. 742, 787 (2010) underlined the centrality of self-defense to the Second Amendment inquiry. And *Bruen* tied the common-use analysis to self-defense. *Bruen*, 597 U.S. at 38 (referring to "commonly used firearms for self-defense"); *and see, e.g.*, *United States v. Alaniz*, 69 F.4th 1192 (9th Cir. 2023) (recognizing a plaintiff's obligation to show suitability for self-defense at *Bruen*'s threshold stage).

Unlike the laws at issue in *Heller*, *McDonald*, and *Bruen*, Connecticut's gun safety laws do not prohibit all ammunition or an entire class of "quintessential self-defense weapon[s]" like conventional handguns. *Heller*, 554 U.S. at 629; SPA65. Nor do they ban all semiautomatic firearms, long guns, or rifles. Instead, Connecticut regulates a small subset of weapons and accessories with features "designed to enhance [firearms'] capacity to shoot multiple human targets very rapidly." *Heller II*, 670 F.3d at 1262. Those weapons and accessories are not useful or used for self-defense or any other lawful purpose "deeply rooted in this Nation's history and tradition." *McDonald*, 561 U.S. at 768. Instead, they are unprotected "dangerous and unusual"

weapons "most useful in military service." So Connecticut can lawfully restrict them. *Heller*, 554 U.S. at 627; *accord Cuomo*, 804 F.3d at 256 (considering whether assault weapons are "dangerous and unusual in the hands of law-abiding citizens."); *Bevis*, 85 F.4th at 1194 (upholding restrictions on assault weapons because of their close kinship to military M-16s); *Kolbe,* 849 F.3d at 136 ("Are the banned assault weapons and large-capacity magazines like M-16 rifles, i.e., weapons that are most useful in military service, and thus outside the ambit of the Second Amendment? The answer to that dispositive and relatively easy inquiry is plainly in the affirmative.") (cleaned up); *Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) ("[L]ongstanding prohibitions on the possession of 'dangerous and unusual weapons' have uniformly been recognized as falling outside the scope of the Second Amendment.").

### 1. Assault weapons and LCMs are not commonly used or useful for self-defense.

Firearms of any kind are used defensively by victims in only about .8% of all U.S. violent crimes. JA256 (National Crime Victimization Survey data showed no defense with any gun in 99.2 % of violent crime incidents). When a gun is used defensively, it is almost never discharged.

*Id.* ("When victims are attacked, 98% of the time merely brandishing a gun is enough to cause the criminal to stop . . . .").

Whether brandished or discharged, guns used defensively are almost never assault rifles. Of the 2,714 incidents in the Heritage Foundation's "Defensive Gun Uses" database as of October 2022, only 2% involved assault weapons, discharged or not. JA800. And of all 406 U.S. "active shooter" incidents between January 1, 2000 and December 21, 2021, "only one . . . involved an armed civilian intervening with an assault weapon." JA290.[9]

There is also little evidence that LCMs are used in self-defense. Connecticut law allows law-abiding residents to shoot eleven times—with ten rounds in the magazine, and one in the chamber—before reloading. Even the rare violent crime victim who fires her weapon almost never needs more than ten rounds. Defendants' expert econometrician gathered and analyzed data on instances of firearm discharge in self-defense. JA789-99. Using the National Rifle

---

[9] An "active shooter" incident is an attempted mass shooting: a "violent attack that involve[s] one or more individuals actively engaged in killing or attempting to kill people in a populated area." JA289.

Association's data, she concluded that "[d]efenders fire 2.2 shots on average," and discharged more than ten rounds in only .3% of all incidents. JA792. None of those incidents were in Connecticut. *Id*. Her analysis of thousands of news stories on defensive gun use yielded a very similar number: 2.34 defensive shots fired per incident. JA797. In 97.3% of all incidents, people using a firearm in self-defense fired 5 or fewer shots. JA780. Nobody in the sample fired more than ten shots. *Id*.

In contrast, assault weapons and LCMs are often, and increasingly, used in mass shootings and unlawful violence. One of Defendants' experts determined that "[a]ssault weapons and/or high capacity magazines were used in all fifteen gun massacres since 2015 in which at least six were killed (other than the shooter)." JA228. The weapons' prevalence has steadily increased. Of all mass shooters in the last thirty-two years, for instance, 77% used LCMs. In the last four years, 100% of mass shooters did. JA278. And when they use assault weapons and LCMs, mass shooters kill and injure more people. Looking at all shootings nationally between 1982 and 2022 where four or more people were killed in a public place, another expert found an average of thirty-

six fatalities or injuries when an assault weapon was used, versus ten otherwise. JA809.

One reason that assault weapons and LCMs are not used in self-defense is that they are not useful in self-defense. Unlike handguns, assault weapons are not easily maneuverable one-handed in a confined space. JA258; *Capen v. Campbell*, 22-11431, 2023 U.S. Dist. LEXIS 227385, *38 (D. Mass. Dec. 21, 2023) ("AR-15s are physically unsuited to typical self-defense scenarios. They are significantly heavier and longer than typical handguns, making them less concealable, more difficult to use, and less readily accessible, particularly for an inexperienced user."). They are remarkably lethal against large numbers at range—but most self-defense, especially in the home, occurs "within a distance of three yards." JA260. And because they are so overpowered, assault weapons pose a terrifying risk to civilian bystanders, since "[r]ounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials." *Kolbe*, 849 F.3d at 127 (citation omitted); JA258.

Even gun manufacturers do not tout assault weapons as useful in self-defense. Instead, advertisers market assault weapons for war and

35

aggression—a message aimed at the fragile men who commit mass shootings. *See* JA959 ("Gun makers eventually developed a more effective set of marketing strategies that linked these products to their origins in the military…."). Assault weapons come "combat customized from the factory." JA961. Owning an assault rifle will "bring out the warrior in you." JA240. Carrying one is the "closest you can get" to war "without having to enlist." JA236. And young men, like the Sandy Hook killer, are told that they can use assault weapons to regain their "man card" and make their opponents "bow down." JA239, 237. The assault weapons that Connecticut restricts, as one pro-firearm-proliferation politician put it, are not tools of self-defense but "look-at-me guns." JA223. And shooters want to be seen. The killer who took seventeen lives at Parkland High School in 2018 wrote: "With the power of the A.R., you will know who I am." JA240.

In sum, "assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings." JA290.[10] As the District Court found: assault weapons and LCMs are not

---

[10] This is why restrictions like Connecticut's save lives. Between September 1, 1990—when New Jersey passed the country's first broad

designed or used for lawful self-defense, so they are not protected by the Second Amendment.

### 2. Assault weapons and LCMs are unusually dangerous weapons of war.

The Second Amendment does not protect "dangerous and unusual" weapons, including "weapons that are most useful in military service— M-16 rifles and the like . . . ." *Heller*, 554 U.S. at 627; *accord Cuomo*, 804 F.3d at 262 (the Second Amendment does not protect "dangerous and unusual" weapons, including "military style" or "military grade" weapons that pose "manifest and incontrovertible" dangers); *Bevis*, 85 F.4th at 1194; *Kolbe,* 849 F.3d at 136; *Fyock*, 779 F.3d at 997. All the evidence before the District Court showed that assault weapons, LCMs, and the other restricted features are unusually dangerous weapons that fall outside the Second Amendment's ambit.

This Court has already found that "semiautomatic assault weapons have been understood to pose unusual risks" because they "tend to result in more numerous wounds, more serious wounds, and more victims."

---

restriction on assault weapons and LCMs—and December 31, 2022, states with restrictions benefited from a 66% decline in mass shooting fatality rates. JA299.

*Cuomo*, 804 F.3d at 262; *and see Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018) (when assault weapons are paired with large-capacity magazines, "more shots are fired, and more fatalities and injuries result than when shooters use other firearms and magazines."). Assault weapons are built for rapidly inflicting "massive numbers of fatalities in a matter of minutes." JA260; *and see supra* pp. 8-10 (detailing characteristics of AR-15s and other assault weapons).[11] Assault weapons and LCMs empower shooters to do more damage more quickly, before anyone can intervene. JA219. In mass shootings, assault weapons paired with LCMs "cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns." JA930.

Assault weapons also cause unusually devastating damage to the human body. High-velocity rounds, leaving the barrel at 3300 feet per

---

[11] *See* JA243 (describing how the Sandy Hook killer used an AR-15 to "slaughter 26 in less than five minutes"; the Aurora killer, in 2012, used an AR-15 "fitted with a 100-round magazine to kill 12 and wound 58 in a Colorado movie theater"; the San Bernardino, California, killer, in 2015, "used a pair of AR-15s to kill 14"; and the Orlando nightclub killer, in 2016, "unleashed Sig Sauer's concealable 'next-generation AR' to leave 49 dead and dozens more injured at the Pulse nightclub.").

second—three times the speed of a typical .9mm round—bore huge holes, leaving exit wounds "the size of an orange." Heather Sher, *What I Saw Treating the Victims From Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), http://tinyurl.com/56d9ejzn. "A typical 9mm wound to the liver," one doctor explained, "will produce a pathway of tissue destruction in the order of [one inch] to [two inches]. In comparison, an AR 15 will literally pulverize the liver, perhaps best described as dropping a watermelon onto concrete." *Capen*, 2023 U.S. Dist. LEXIS 227385, at *40-41. The ripple effect of an AR-15's bullet, according to a radiologist who treated victims of 2018's Parkland, Florida massacre, is "like a cigarette boat traveling at maximum speed through a tiny canal," destroying tissue that it does not even touch. *Id*. Victims shot with handguns can usually be saved, she explained, but the Parkland victims mostly "died on the spot, with no fighting chance at life." *Id*.

And assault weapons pose an unusually high risk to law enforcement. *Cuomo*, 804 F.3d at 261 ("They are disproportionately used to kill law enforcement officers."). With their range and capacity for rapid fire, assault weapons enable criminals "to maintain parity with law

enforcement in a standoff." JA926. Their high muzzle velocities, and the type of rounds they can chamber, allow them to penetrate police body armor. JA214. One study quoted in *Cuomo* showed that, despite their relative rarity, *supra* p. 29, "assault weapons were used to gun down at least twenty percent of officers killed in the line of duty." 804 F.3d at 262.

All the weapons that Connecticut restricts have unusually dangerous, "combat-functional" features. *Kolbe*, 849 F.3d at 137; *and see supra* pp. 10-11 (explaining how the restricted features facilitate crime and mass murder). But the individual Plaintiff here wants an AR-15 type assault rifle, whose lethal battlefield technology typifies the reasons why unusually dangerous, military-style weapons are beyond the Second Amendment's protections. One retired Army general summed it up: "For all intents and purposes, the AR-15 and rifles like it are weapons of war…. It is a very deadly weapon with the same basic functionality that our troops use to kill the enemy." JA263.

AR-15s and M-16s are functionally "indistinguishable," and states can restrict both. *Bevis*, 85 F.4th at 1197; *Capen*, 2023 U.S. Dist. LEXIS 227385, at *37 ("[T]he AR-15 is a weapon with the same basic characteristics, functionality, capabilities, and potential for injury as the

40

standard-issue rifle for infantry troops.").[12] AR-15s have the same muzzle velocity and can fire the same ammunition, at the same "rapid fire" rate, as their military M-16 twins. JA926; JA224. Their lack of an automatic mode can be easily fixed with an aftermarket adaptation. JA927-28. Even without an adaptation: semiautomatic fire is more accurate, and can be more lethal, than automatic. JA242. "It is surprising," the Army Field Manual drily notes, "how devastatingly accurate rapid semiautomatic fire can be." JA242. That is why the Seventh Circuit—the only post-*Bruen* appellate court to rule on this issue—held that Illinois could constitutionally restrict assault weapons. *Id.* This Court should too.

None of Plaintiffs' counterarguments avails them.

First: Plaintiffs, confusingly, propose that the Second Amendment goes out of its way to protect military-style weapons. Pl. Br. 59-62. That claim is hard to square with their concession at oral argument below that "the type of weapons that a nation-state uses, sophisticated military

---

[12] *See also Staples v. United States*, 511 U.S. 600, 603 (1994) (describing the AR-15 as "the civilian version of the military's M-16 rifle"). Plaintiffs mistakenly think that *Staples* cuts in their favor. Pl. Br. 57-58. But *Staples* was about mens rea for a federal firearms convictions, not about the Second Amendment.

weapons that a nation-state uses in its armed forces, those are not protected by the Second Amendment." JA1090. More importantly, the Supreme Court feels differently. *Heller*, after all, allowed states to ban weapons "like" the M-16, which the U.S. Army's infantry carried for decades. 554 U.S. at 627; *and see id*. at 624 (it "would be startling" if machine guns, which are uncontestedly "useful in warfare," were constitutionally protected).

Second: "Dangerous and unusual," as the District Court correctly concluded, means "unusually dangerous." SPA 34 ("unusual" means "that there must be some level of lethality or capacity for injury . . . that makes it especially dangerous."). But Plaintiffs insist that the test is conjunctive. To them, a weapon must be both dangerous and unusual before it can be restricted. Pl. Br. 58-59. Since all guns are definitionally dangerous, though, Plaintiffs' mistaken insistence on a conjunctive test is just another way to insist that only common possession matters. This Court should decline the invitation to insinuate that half the Supreme Court's formula was redundant.

Plaintiffs' reading of "dangerous and unusual" would implicitly overturn *Miller* and *Heller*'s holdings allowing states to ban machine

42

guns and sawed-off shotguns, and would throw the 1934 National Firearms Act's constitutionality into question. Pub. L. No. 73-474, 48 Stat. 1236 (1934). As of 2021, the last year for which data is publicly available, over 741,000 machine guns were registered in the United States—far more than Plaintiffs' proposed 200,000 benchmark for common possession. U.S. Dep't of Justice, ATF, *Firearms Commerce in the United States: Annual Statistical Update* 16 (2021), https://www.atf.gov/resource-center/data-statistics. When Congress passed the NFA, Thompson submachine guns or "Tommy Guns"— a large focus of the law—were "all too common." *Friedman,* 784 F.3d at 408. But *Heller* reaffirmed the NFA's constitutionality. 554 U.S. at 624.[13]

Eliding "dangerous and unusual" into a conjunctive test also cuts against the historical tradition valorized by *Heller* and *Bruen. Heller* cites Blackstone for the tradition of prohibiting "dangerous and unusual"

---

[13] The per curiam in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), never holds or even hints that "dangerous and unusual" is a conjunctive test. And even Justice Alito's concurrence did not endorse the consumer data approach that Plaintiffs propose. *See id.* at 420 (explaining that stun guns were "accepted as a legitimate means of self-defense across the country.").

weapons. 554 U.S. at 627. Defendants' evidence shows that Blackstone actually spoke of "dangerous *or* unusual weapons." JA938-39 (emphasis added). *Heller* did not get the substance of the quote wrong, though. The Founding generation would have understood both "dangerous and unusual" and "dangerous or unusual" as a figure of speech, like "cruel and unusual" and "necessary and proper," that involves "two terms, separated by a conjunction, [that] are melded together to form a single complex expression." Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016). Whatever the conjunction: dangerous and unusual, together, meant *unusually dangerous*.

Finally: *Antonyuk* ended any argument that the Supreme Court's "dangerous and unusual" limitation is properly reserved for *Bruen*'s second step. In *Antonyuk*, this Court—properly relying on *Heller*—firmly situated the "dangerous and unusual" inquiry at the threshold stage. For *Antonyuk*, whether a weapon is "dangerous and unusual" goes to whether it is in "common use" for lawful purposes like self-defense—and "common use" is a threshold question. 2023 U.S. App. LEXIS 32492, at *70 ("common use" is part of the threshold inquiry); *id*. at *30-31 (explaining

that the Second Amendment only "protects the right to keep and bear the sorts of weapons that are in common use—a limitation [that] is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'") (internal quotation marks omitted); *id*. at \*41 (explaining that *Bruen*'s threshold inquiry melds text and history, requiring a court to "interpret[] the plain text of the Amendment as historically understood.").

One frightening tragedy epitomizes the difference in lethality between the assault weapons and LCMs that Connecticut restricts and the other firearms that it allows. In 2019, a gunman attacked a synagogue in Poway, California, with a "California-compliant" semiautomatic rifle—a rifle lacking the military features, like a forward hand grip, restricted in both California and Connecticut—and ten-round magazines. California, like Connecticut, restricts LCMs. Tragically, the Poway shooter killed one person—but, because he had no assault weapon or LCM, he was chased off while trying to reload. JA295.

All firearms are dangerous. But the restricted weapons and LCMs are unusually lethal. Connecticut's restrictions on assault weapons and LCMs allow residents to keep and bear the firearms they need to defend

45

themselves, but block the unusually dangerous, military-style assault weapons and LCMs that enable mass shootings. Those weapons and accessories are unprotected by the Second Amendment. So Plaintiffs' challenge fails.

### 3. LCMs and other restricted features and accessories are not protected "arms."

Even if LCMs and other restricted features and accessories were used and useful for self-defense, rather than unusually dangerous, military-style weapons, they would still not be protected by the Second Amendment, because they are not bearable "arms" as that term was understood when the Second and Fourteenth Amendments were ratified. Instead, they would have been considered "accoutrements" beyond the Second Amendment's scope. *Capen*, 2023 U.S. Dist. LEXIS 227385 (LCM is not a Second Amendment-protected "arm"); *Ocean State Tactical, LLC v. Rhode Island* 646 F. Supp. 3d 368 (D.R.I. 2022) (same); *Brown*, 644 F. Supp. 3d 782 (same).

At the Founding, "arms" meant weapons and some defensive gear: "'[w]eapons of offence, or armour of defence'" and "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Heller,* 554 U.S. at 581. Meanwhile, Americans at

46

both the Founding and during Reconstruction classified a cartridge or cartouche box—the closest historical equivalent to the modern-day magazine—as not an arm but an "accoutrement"— "ancillary equipment associated with soldiering, or service in the military." JA849.[14]

Defendants' expert came to that uncontradicted conclusion after analyzing massive databases of contemporaneous books and periodicals to determine the popular understanding of the term "arms" when the Second Amendment was ratified and incorporated. JA853-58. For instance: the Continental Congress' 1774 journals speak of soldiers' "cartouch boxes and other accoutrements," JA860; a Congressional Resolution from 1777 directed soldiers to "deliver up their arms" separately from their "cartouch boxes and other accoutrements," JA 861; in 1799, the Connecticut General Assembly distinguished between "arms," "accoutrements," and "ammunition" in its own militia regulations, 1799 Conn. Pub. Acts 511, An Act For The Militia, § 4

_____

[14] At the Founding, militiamen kept cartridge boxes with ammunition, which they manually fed into their weapons. JA859. To them, a "magazine" was a building or physical location that stored gunpowder. *Id.*

(referring to "Arms," "Ammunition," and "Accoutrements" separately); and an 1868 notice for an arsenal sale advertises a "[l]ot of cavalry accoutrements, consisting of Cartridge Boxes, Pistol Holsters," and other accessories. JA864. In sum: "'Arms' as a stand-alone term refers to weapons." JA862.

LCMs, as Connecticut defines them, are "accoutrements," not arms. An LCM is a box and a spring, holding cartridges that it feeds into a firearm. It is not itself a bullet or other type of ammunition. It contains no firing mechanism. JA201.

The District Court mistakenly concluded that an LCM, though still beyond the Second Amendment's scope, is literally a bearable arm. Under *Bruen*, it reasoned, arms are "modern instruments that facilitate armed self-defense." 597 U.S. at 28. But that reasoning proves too much. Even Plaintiffs do not claim that every instrument that may somehow "facilitate" self-defense is an "arm" within the "fixed . . . historical understanding" of the Second Amendment. *Id.*

LCMs are not "arms" even if the Second Amendment's protections extend to necessary accessories without which a firearm cannot fire. *Brown*, 644 F. Supp. 3d at 798 ("The Second Amendment covers firearms

48

and items necessary to use those firearms.") (internal quotation marks omitted). Firearms can be used for self-defense without LCMs. Any ammunition feeding device with lesser capacity will do the job. *See Cuomo*, 804 F.3d at 260 ("[W]hile citizens may not acquire high-capacity magazines, they can purchase any number of magazines with a capacity of ten or fewer rounds."). A magazine of some sort may be necessary for some firearms to work, but an LCM is not. *Capen*, 2023 U.S. Dist. LEXIS 227385, at *46-47 ("[W]hile magazines as a general class might be owed constitutional protection, LCMs as a specific subset of that class are never necessary for a firearm to function."); *Brown*, 644 F. Supp. 3d at 799 ("Plaintiffs have not shown… that magazines specifically capable of accepting more than ten rounds of ammunition are necessary to the use of firearms for self-defense.").

Because LCMs are enhancements that do not affect the basic functioning of the firearm—the firing of a projectile loaded into the chamber—they are more like silencers, falling outside the Second Amendment's scope. *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (silencers are unprotected accessories); *United States v. Hasson*,

19-96, 2019 U.S. Dist. LEXIS 160498 (D. Md. Sept. 20, 2019) (same), *aff'd*, 26 F.4th 610 (4th Cir. 2022).

Other features restricted by General Statutes § 53-202a are not "arms" either. For example, the statute restricts "folding or telescoping stock[s]" as well as "a forward pistol grip. . . a flash suppressor . . . a second hand grip." Conn. Gen. Stat. § 53-202a(1)(E). These are unnecessary added features, accessories, or "accoutrements." Firearms work without them. Connecticut allows, and manufacturers market, non-military-style semiautomatic weapons, used and useful for lawful self-defense purposes, that lack the restricted features. So, like LCMs, the restricted features do not get Second Amendment protection.

## II. The District Court Correctly Held that Plaintiffs Are Unlikely to Succeed on the Merits Because Connecticut's Laws Are Consistent with the Nation's Historical Tradition of Firearm Regulation.

The District Court correctly found that Plaintiffs would lose even if they survived the threshold inquiry, because Connecticut's regulations are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Defendants built a robust record showing a longstanding tradition, starting before the Founding, of regulating weapons—and in particular newly-proliferating

50

technologies—that pose special public safety dangers. Connecticut's restrictions fit tightly in that tradition of close historical analogues.

**A. The District Court properly applied flexible and nuanced analogical reasoning because Connecticut's gun safety laws respond to unprecedented societal concerns and technological advancements.**

Connecticut's gun safety laws responded to an epidemic of mass murder perpetrated with technology that proliferated in the late twentieth century. In *Bruen*'s terms: the laws responded to both "unprecedented societal concerns" and "dramatic technological changes" that would have been previously "unimaginable." 597 U.S. at 28. So, as *Bruen* mandated, the search for a "historical analogue, not a historical twin," is necessarily more "nuanced" and flexible. *Id.*

Plaintiffs, arguing against nuance, simply assume away the question. They say this case is "straightforward," and just like *Heller*, since "no Founding era regulation remotely burdened the right to self-defense as much as the State's absolute ban." Pl. Br. at 46-47. The premise is wrong: Connecticut has no absolute ban. Connecticut's residents can own more than a thousand types of firearms, including semiautomatic weapons and many handguns—the quintessential self-defense weapon. JA201. And the conclusion is irrelevant. The extent of

51

the burden is part of the inquiry into the analogical fit, and Defendants will show why their analogues fit tightly. *Infra* pp. 58-70. But the point here is that no "Founding Era regulation" needed to do exactly what Connecticut's restrictions do, because the Founders could not have imagined the kind of mass shooting terror that Connecticut confronts. Because of the "dramatic technological change" represented by the 20th century advent of assault weapons and LCMs, the "regulatory challenges posed by firearms today" are not those that "preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. Or, as this Court explained in *Antonyuk*: "[T]he issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction. To put it plainly, our era does not resemble those." 2023 U.S. App. LEXIS 32492, at *46.

At the Founding, gun violence was very low compared to today. JA893 (homicide rates were low); JA894 (only 10%-15% of nondomestic homicides in colonial America were committed with guns). Guns, according to one expert, were not the "weapon of choice for those with evil intent." JA944. Long rifles were expensive, relatively rare, and largely useless outside of actual warfare. *Id.* ("Nobody bayoneted turkeys…the

52

most widely owned and desired weapons were fowling pieces and light hunting muskets").

Founding Era firearms lacked the lethal potential of modern assault weapons. At the Founding, most arms were flintlock muzzleloaders. Liable to misfire and inaccurate at any significant distance, they could only shoot a single lead ball before being manually reloaded—a process that took at least half a minute even with skill and experience. JA893-95; *and see* JA943-45 (discussing technological limitations of the long guns common at the Founding); Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) (even a 1903 bolt-action rifle equipped with a magazine was "ten-fold" more lethal than a flintlock musket). In the Boston Massacre—a transformational tragedy that drove New England closer to revolution—seven British soldiers firing into a crowd took five lives. JA918-19. But in 2017, a single shooter killed 60 people in Las Vegas with an AR-15. JA242.

The violent destruction of a mass shooting would also have been unimaginable during Reconstruction. Civil War rifles could, at their mostly deadly, kill about 102 people in an hour, while an assault weapon

can empty a thirty-round magazine in five seconds. JA926; Miller & Tucker, *Common, Use, Lineage, and Lethality*, at 2508; *Kolbe*, 849 F.3d at 125. Even the revolvers that became more popular in the mid to late 19th century were still slow to load and slow to use. JA907-908 (cap and ball revolvers could not be loaded quickly or remain loaded). Ultimately, no weapon during this time was "remotely as available, lethal, effective, and portable as a modern assault weapon." JA264.

The Reconstruction Era did know mass violence, but that was a problem of group ideology rather than weapons technology. *See* JA918. Because the mass violence of the time was perpetrated with a heterogenous mix of crude melee weapons, legislatures focused on policing the perpetrators rather than restricting particular instrumentalities. JA918-20. For instance: during Reconstruction, Congress deployed federal troops to protect Black people from Ku Klux Klan lynchings. *Id*.

The mass shootings to which Connecticut's gun safety laws responded only became an epidemic when new technology, developed for military use during the Cold War, was injected into American society. JA925. Technological advancements—including the development of the

AK-47, M-16, and LCMs—bred weapons with higher rates of fire, accuracy, and muzzle velocity. JA924-926. Assault weapons equipped with LCMs could spray fire, laying "down a high volume of fire over a wide killing zone" previously unseen in civilian weapons. JA378-386. And modern weapons are lighter, easier to use, more accurate, and require less training to be effective than their distant forebears. JA947; JA264 ("Early firearms were… complicated. They required extensive training to use, and they were very slow to load."). That means more casualties— more victims wounded, and more wounds per victim, compared to older firearms.

As assault weapons proliferated and grew more deadly, they contributed to an epidemic of mass shootings unknown at the Founding and the Reconstruction. For 172 years, from 1776 to 1948, U.S. history records no mass shooting with double-digit fatalities. JA285. In the next 56 years, from 1949 through 2004, there were ten of those mass shootings. JA288. In the eighteen years since, there have been twenty mass shootings that each took at least ten lives. *Id*.

Mass shootings create not just a new scale of death but a new type of widespread terror. Today's children grow up with the omnipresent fear

of massacres, "each one harm[ing] ten of millions, if not hundreds of millions, beyond those killed or wounded at the scene." JA218. Anxiety, depression, and other symptoms of trauma echo in communities afflicted by mass violence, and spread nationwide. JA221. As the District Court noted, "[t]he psychological impact of mass shootings on the psyche of law-abiding Americans is also new and unique. Mass shootings cause 'significant emotional and mental health harms' to survivors, but also cause 'broad social damage' such as increased stress in the surrounding community and general population at large." SPA58.

Assault weapons are the weapons of choice for drug traffickers and in urban crime, and pose previously unseen concerns for law enforcement. JA334-35. LCMs allow mass murderers to prolong their attacks, shooting many people very quickly before law enforcement can intervene. JA933. And, once law enforcement does engage, assault weapons help criminals maintain parity in a standoff. JA927.

The Constitution "does not require States to regulate for problems that do not exist." *McCullen v. Coakley*, 573 U.S. 464, 481-82 (2014) (citation omitted). Because Connecticut's gun safety laws responded to a new social problem caused by twentieth-century technological change,

the District Court correctly rejected a "regulatory straightjacket" and embraced nuance and flexibility. *Bruen*, 597 U.S. at 30. So should this Court.

### B. Compared with historical regulations throughout our history, Connecticut's gun safety laws are similarly justified and impose a similar burden on the right of armed self-defense.

To identify historical analogues for contemporary restrictions, courts compare "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Connecticut's gun safety laws fit tightly with a long line of analogous regulations from both pre-colonial English and American history in both *how* and *why* they restrict weapons and accessories.[15] The consistent throughline: Our tradition has always imposed targeted restrictions on weapons

---

[15] Plaintiffs' argument that only Founding Era analogues matter is contrary to *Bruen* and foreclosed by *Antonyuk*. *Bruen* looked both to the Founding and to Reconstruction. 597 U.S. at 39. *Bruen* also explained that analogues from throughout American history can be important since they may evidence "a regular course of practice" that "liquidate[s] and settle[s]" the Second Amendment's meaning. *Id*. at 35. And this Court recently resolved the issue: "Because the [statutes are] state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." *Antonyuk*, 2023 U.S. App. LEXIS 32492, at *51-52. Nor, *Antonyuk* taught, are post-Reconstruction laws "weightless." *Id*. at n.32.

57

technologies—and in particular newly-proliferating technologies—that represent unique threats of crime and mass casualties, while preserving a wide range of alternatives for armed self-defense. Connecticut's laws hew to that tradition, protecting the public without burdening the self-defense right.

### 1. From pre-colonial England through Reconstruction, American government restricted newly-proliferating weapons that posed unique public safety threats.

The Second Amendment "codified a pre-existing right" to "public carry for self-defense"—a right that has always been qualified by restrictions on particularly dangerous weapons. Pre-colonial England, for instance, restricted launcegays (throwing spears), 7 Rich. 2, ch. 13 (1383), crossbows, handguns, hagbuts (archaic firearms), and demy hakes (same), 33 Hen. 8, ch. 6 §§ 1, 18 (1541).

The English colonies inherited and replicated the tradition of restricting weapons that uniquely threatened public safety. Colonial Era guns, as we have seen, were unreliable and not particularly useful for criminal violence. So criminals resorted to clubs and knives—and legislatures, both during the Colonial Era and during the Republic's early years, responded. For instance: concerned by the proliferation of the billy

58

club, a dangerous melee weapon, New York "enacted the first anti-club law in 1664, with sixteen states following suit." *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1070 (N.D. Ill. 2023) (*Bevis I*). And, in 1686, a New Jersey law prohibited concealed carrying of "any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons." *An Act Against Wearing Swords* (1686), reprinted in *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-290 (1881).

The Colonial and Founding eras also saw restrictions on emerging and particularly dangerous firearms. During the late Colonial Era, for instance, when public safety was threatened by the advent of trap guns—firearms set to discharge automatically when a trap was sprung—legislatures responded by banning those new enhancements without barring all access to firearms for self-defense. 1763-1775 N.J. Laws 346, ch. 539, § 10 (1771). And the late 1700s saw the development of percussion cap pistols, which unlike their flintlock predecessors could be carried loaded without concern for corrosion. The prospect of perpetually loaded guns raised a new danger of impulsive gun violence, so some states responded by restricting carry of these concealable weapons.

JA903-04 (six states promulgated restrictions against carry of new, concealable weapons technologies "during the lifetimes of Jefferson, Adams, Marshall, and Madison.").

Between the Founding and the Civil War, states continued to deploy targeted restrictions to mitigate the danger posed by emerging technologies. Many states banned folding knives, dirk knives, and Bowie knives—early 19th century enhanced iterations of existing technologies, specifically designed for and primarily used in "an alarming proportion of the era's murders and serious assaults." JA902.[16] "Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents." *Id*. All but one state ultimately banned "fighting knives,"

---

[16] *See, e.g.*, 1837 Ala. Laws 7, No. 11, § 2 (prohibitive tax on Bowie knives); 1837 Ga. Laws 90, § 1 (prohibiting sale and possession of Bowie and other kinds of knives as well as "pistols, dirks, sword canes, [and] spears"); 1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2 (prohibiting sale and carrying of Bowie knives, Arkansas toothpicks, and other fighting knives); 1838 Fla. Laws 36, No. 24, § 1 (prohibitive tax on sale and possession of pocket pistols, sword canes, and Bowie knives); 1838 Va. Acts 76, ch. 101, § 1 (banning "keep[ing] or carry[ing]" Bowie knives and other deadly weapons); 1839 Ala. Acts 67, ch. 77 (banning the concealed carry of Bowie knives and other deadly weapons).

while leaving avenues for law-abiding residents to defend themselves with many other weapons. *Bevis I*, 657 F. Supp. 3d at 1069.

Courts uniformly upheld those targeted bans. The Texas Supreme Court, for instance, explained that the Bowie knife was more dangerous than contemporary pistols, "an exceeding[ly] destructive weapon" and an "instrument of almost certain death. *Cockrum v. State*, 24 Tex. 394, 402 (1859). "Given the frequency of such regulations, and the absence of successful constitutional challenges to them," this Court should not "read out of our historical tradition the longstanding and established restriction" that the regulations embody. *Antonyuk*, 2023 U.S. App. LEXIS 32492, at *86.

By the time the Fourteenth Amendment was ratified in 1868, the historical tradition of restricting dangerous emerging technologies had become deeply entrenched. That same year, Alabama prohibited "rifle walking canes," which it called "hostile deadly weapons." 1868 Ala. Laws 11. In 1868, too, Florida prohibited the manufacture or sale of metallic knuckles. Fla. Laws 95, ch. 7, § 11. 43 states limited or prohibited sale and possession of "slung shots"—weighted slings used in silent attacks against unsuspecting opponents. *Bevis I*, 657 F. Supp. 3d at 1070. And

61

guns were no exception to the rule. As revolvers replaced their single-shot predecessors and violence surged, many states and territories restricted carrying some or all concealable weapons. JA911-15. Tennessee and Arkansas, for instance, flatly prohibited the carrying of pocket pistols and revolvers, both openly and concealed. *See* 1871 Tenn. Pub. Acts 81, ch. 90; 1881 Ark. Acts 191, ch. XCVI.

So Connecticut's gun safety laws stem from a robust tradition of relevantly similar historical analogues. Like their Founding and Reconstruction analogues, Connecticut's laws respond to the proliferation of particularly dangerous technologies, optimized for crime and combat, that pose a unique threat to public safety. And, like the analogues, Connecticut's laws minimally burden the right to self-defense. *Del. State Sportsmen's Ass'n, Inc v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 602 (D. Del. 2023) (*DSSA*) (assault weapon and LCM restrictions only impose a "slight" burden on self-defense). The weapons that Connecticut restricts are almost never used for, and are not made for, civilian self-defense. *See supra* pp. 32-36. And Connecticut continues to empower residents to defend themselves with a wide range of other firearms.

2. **American government imposed comparable restrictions on the progenitors of today's assault weapons and LCMs from the time they first emerged.**

Until the twentieth century, states did not regulate for a problem they did not have: the threat of mass death perpetrated by shooters with high-powered military-style weapons. *See Antonyuk*, 2023 U.S. App. LEXIS 32492, at *44 ("[T]he absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much."). But when modern machine gun and assault weapon technology emerged, states and the federal government quickly imposed targeted restrictions. That well-established pattern, consistent with Founding and Reconstruction tradition and consistently approved by the courts, has "liquidate[d] & settle[d]" the Second Amendment's meaning. *Bruen*, 597 U.S. at 35.

In the twentieth century, new weapons technology—explosives and automatic weapons—posed new social threats. Dynamite—an innovation for its power and stability—was invented in 1886. JA921. The Thompson submachine gun was invented in 1918, importing into civilian life a weapons technology deployed on World War I battlefields. The submachine gun was a previously unimagined force: portable,

maneuverable, and capable of sustained bursts of spray fire from large capacity magazines of 20, 50, or 100. *Id*.

Criminals swiftly put both new technologies to horrific effect. A string of dynamite bombings in 1919-1920 included the murder of 38 people in a Wall Street attack. JA923. And while "Tommy guns… were actually used relatively infrequently by criminals," they took a "devastating toll" when they were used in high-profile killings like 1929's infamous St. Valentine's Day massacre. *DSSA*, 664 F. Supp. 3d at 601.

As the new explosives and machine guns proliferated, states and the federal government responded. *Or. Firearms Fed'n, Inc. v. Kotek*, 2023 U.S. Dist. LEXIS 121299, *71 (D. Or. 2023). In 1917, the Federal Explosives Act took a first step towards comprehensive restrictions on dynamite and other explosives, a regulatory progression culminating in 1970's Organized Crime Control Act. JA924. Meanwhile, "[b]etween 1925 and 1934, at least thirty-two states enacted laws restricting or, in many instances, prohibiting the possession of fully-automatic firearms." *Id*. Around the same time, "thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms." JA923; *and see* JA957 ("By the early 1930s more than half the states had

passed some type of prohibition on fully automatic or semiautomatic weapons."); *DSSA*, 664 F. Supp. 3d at 601 (describing restrictions on LCMs and "guns that could accommodate them, based on set limits on the number of rounds."). Ultimately, Congress passed 1934's National Firearms Act, whose restrictions on machine guns and short-barreled shotguns were upheld in *Miller*, reaffirmed in *Heller*, and remain in effect today.

States and the federal government also moved to restrict semiautomatic assault weapons when those proliferated. Gun industry marketing in the 1980s pushed Cold War semiautomatic assault weapons into civilian hands. JA925. So in 1989, the federal Bureau of Alcohol, Tobacco and Firearms used its authority under the Gun Control Act of 1968 to block the importation of foreign-made semiautomatic rifles with military features, explaining that those weapons are intended for military and not sporting purposes. *See* 18 U.S.C. § 925(d)(3) (generally barring the importation of firearms that are not "particularly suitable for or readily adaptable to sporting purposes"). In 1993, Connecticut imposed its first restrictions on assault weapons. 1993 Conn. Pub. Acts 93-306. In 1994, Congress imposed a complete ban on assault weapons, which it

defined by reference to features useful for the military and criminals but unnecessary for shooting sports or self-defense. 18 U.S.C. § 921(a)(30)(B)-(D) (expired). At the same time, Congress also banned the possession of LCMs. 18 U.S.C. § 921(a)(31)(A) (expired). Gun massacres "fell substantially" when that federal ban was in place, and "rose sharply" when it expired. JA208.

The *why* and *how* of these twentieth-century restrictions closely map onto Connecticut's 2013 gun safety laws. For instance: Like the NFA, Connecticut's laws regulated a newly proliferating technology, created for warfare and imported into civilian life from military service, that posed a novel and unique threat of mass murder. Like the NFA, Connecticut's laws restrict unusually dangerous weapons suited for military combat while leaving broad swathes of firearms available for armed self-defense. And like the NFA, Connecticut's laws survive any Second Amendment scrutiny.

### 3. A tradition dating back before the Founding protected against mass casualties by restricting access to gunpowder.

Connecticut's gun safety laws are also relevantly similar to Colonial and Founding Era restrictions on stockpiling and storing gunpowder.

Like those restrictions, Connecticut's laws aim to protect the public from the threat of mass casualties, limiting residents' offensive firepower but leaving them plenty of leeway to defend themselves. *See Kotek*, 2023 U.S. Dist. LEXIS 121299, at *121 (concluding that colonial gunpowder restrictions were relevantly similar to Oregon's LCM restrictions).

Gunpowder explosions were the Founding Era's mass casualty events. Eighteenth century guns fired lead balls propelled by black powder, which was carried and stored in containers rather than encased in bullets. Keeping too much of that volatile, exposed gunpowder in private homes risked fires that could threaten entire communities. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487, 511-12 (2004).

To mitigate the risk, Founding Era laws limited how much gunpowder any individual could keep in their home, requiring residents to store excess gunpowder in the public "magazine." *See, e.g.*, 1706-7 Mass. Acts ch. 4, *available at* https://tinyurl.com/27ubvvvn (gunpowder must be stored in the "publick magazine" in the interest of "preventing

67

the great loss and danger by casualties.").[17] The Supreme Court approved these gunpowder storage laws as constitutional exercises of states' police powers. *Brown v. Maryland*, 25 U.S. (12 Wheat) 419, 442-443 (1827) ("The power to direct the removal of gunpowder is a branch of the police power."); JA948-52. Private possession of excessive munitions posed a unique danger, so government could lawfully intervene. *See id.*

Some of these gunpowder restrictions significantly burdened the right of armed self-defense. Connecticut, for instance, empowered local officials to determine, in their unqualified "opinion," whether a "quantity of gunpowder" in the possession of a private citizen "may endanger the persons or dwellings of any individuals whatsoever." 1832 Conn. Acts 391, ch. 25, § 1-2. If so, officials could order the owner to move the

---

[17] *See also, e.g.*, *A Law for the Better Securing of the City of New York from the Danger of Gun Powder* (1763), https://tinyurl.com/5273xd57; Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627, 627; 1821 Me. Laws 98, ch. 25, § 5, https://tinyurl.com/up948844; *A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District,* Pg. 45-47, Image 48-50 (1832) *available at* The Making of Modern Law: Primary Sources; Portsmouth, New Hampshire 1786 *N.H. Laws* 383-84.

gunpowder to "some safe and convenient place within said town." *Id*. If the owner refused, officials could seize the gunpowder. *Id*.

That imposition, and others like it, went beyond any burden that today's gun safety laws may impose on armed self-defense. Under Connecticut's early-Republic Era law, the only limit on government's power to seize gunpowder was an official's "opinion." A resident could have been prevented from possessing any gunpowder—and so from using any firearm at all. And even the less-burdensome Founding Era gunpowder restrictions still went further than Connecticut's gun safety laws. Founding Era guns needed gunpowder. So restricting gunpowder was like restricting bullets today. Connecticut's gun safety laws do not do that.[18]

---

[18] Plaintiffs do not address this tradition of severely limiting or, in some cases, outright banning the possession of gunpowder. Instead they claim that laws requiring militia service show that there was a "firing capacity floor in the Founding era." Pl. Br. at 51. But a militiaman's carrying "20 to 24 shots" in his cartridge box—each of which must be separately and laboriously loaded into a musket—is nothing like a contemporary shooter carrying a modern detachable LCM. Connecticut allows any resident with a permit to carry as many bullets, or 10-round magazines, as they want. But Connecticut will not allow a shooter to walk into a school with a 50-round drum that they can empty in less time than it takes to call 911.

It is not hard to understand the "why" of Founding Era gunpowder regulations, which is relevantly similar to the "why" of the challenged statutes: preventing mass casualty incidents. And if the "how" is not a perfect fit, it is only because the Founding Era regulations outstrip any negligible burden that Connecticut's gun safety laws may impose. So Connecticut's gun safety laws pass constitutional muster under *Bruen*'s history-and-tradition test.

## III. Plaintiffs Failed to Carry Their Burden on the Other Preliminary Injunction Factors.

Because the District Court correctly held that Plaintiffs cannot show any likelihood of merits success, it did not reach the other *Winter* factors. This Court should affirm on the merits, but it can also affirm because Plaintiffs have not made "a strong showing" of irreparable harm, *A.H. v. French*, 985 F.3d at 176, or proven that the equities and the public interest require immediately enjoining Connecticut's gun safety laws. *Clementine Co., LLC v. Adams,* 74 F.4th 77, 83 (2d Cir. 2023) (decision may be affirmed on any ground apparent in the record).

Plaintiffs' only (hurriedly) claimed irreparable harm is their asserted constitutional injury. Pl. Br. 66. But neither this Court nor the Supreme Court has ever presumed harm in a Second Amendment

context. *Cf. Antonyuk*, 2023 U.S. App. LEXIS 32492, at *160 (presuming harm from First Amendment violation.) And this case—where Plaintiffs can uncontestedly bear any number of other weapons for self-defense pending appeal, and where Plaintiffs seem to feel no litigation urgency—should not be the first. Any claim of irreparable harm is undercut by Plaintiffs' decision not to seek an injunction pending appeal or to move the litigation forward in any way since the District Court denied their preliminary relief. *See Fyock,* 779 F.3d at 996 (when Second Amendment plaintiff fails to pursue the underlying merits action pending preliminary injunction appeal, "it seems unlikely [he] could make the requisite showing of irreparable harm to support the issuance of a preliminary injunction at this time.").

Plaintiff Flanigan's only alleged hardship is a claim that she cannot keep herself safe pending trial without wielding multiple redundant weapons of war.[19] But she has been unable to buy and possess assault

---

[19] Ms. Flanigan does not say whether she owns an LCM. So either she does, or she chose not to buy one before 2014. Either cuts against her claim that preventing her from having an LCM pending trial would irreparably harm her.

weapons and LCMs in Connecticut since 2013, and she has never faced any threat. If she were threatened, she could rise to the challenge: Connecticut places no limit on how many firearms or magazines she can carry on her person or stockpile in her home. The risk that Ms. Flanigan or any American will be the victim of an accidental shooting is 35 times higher than the chance that she will need to defend herself at all—much less with an assault rifle—from an armed attacker. JA804.

In contrast, a mandatory injunction will work immediate and severe hardship on Defendants, the State of Connecticut, and the public. *See We the Patriots*, 17 F.4th at 279 ("When deciding whether to issue a preliminary injunction, courts should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (internal citation omitted). Enjoining the statute means ordering the State to devise and deploy a costly, short-term permitting scheme to license and track assault weapon and LCM purchases. *See* JA201 (describing Connecticut's requirement that long guns be permitted.) And the bell cannot be unrung. If any injunction issues, now-restricted weapons will flood into Connecticut. *See* Matthew Green, *Gun Groups: More Than a Million High-Capacity Magazines Flooded California*

*During Weeklong Ban Suspension*, KQED (Apr. 12, 2019),
https://tinyurl.com/586mj8fa. If a trial shows that preliminary relief was
unwarranted, it will be nearly impossible to retrieve the weapons.

Gun safety laws work, and enjoining them without a full trial risks
irreparable harm to public safety and wellbeing. JA232 (showing that
"having an assault weapon ban and/or high capacity magazine ban in
place is associated with a statistically significantly decrease in per capita
rates of deaths and casualties due to mass shootings."). Mass shootings
take a unique toll—measured in both lives and psychological distress
inflicted on entire communities. JA220-22 (discussing broad post-
traumatic stress after mass shootings). So the public interest weighs
heavily in favor of keeping Connecticut's restrictions in place pending a
full trial. *Ocean State Tactical*, 646 F. Supp. 3d at 394 ("The asserted
government interest of public safety stemming from mass gun murders
could not be more undeniably compelling.").[20]

---

[20] Any injunction that this Court does grant should be limited to these
Plaintiffs and their specific claimed injuries. *See Califano v. Yamasaki*,
442 U.S. 682, 702 (1979) (an injunction's scope is "dictated by the extent
of the violation established"); *Sunward Electronics, Inc. v. McDonald*, 362

**CONCLUSION**

Defendants respectfully ask this Court to affirm the District Court's

denial of preliminary injunctive relief.

Respectfully submitted,

WILLIAM TONG
ATTORNEY GENERAL

Joshua Perry
Solicitor General

By: Janelle R. Medeiros____
　James M. Belforti_____
Assistant Attorneys General
165 Capitol Avenue
Hartford, CT 06105
Tel: (860) 808-5450
Fax: (860) 808-5591
janelle.medeiros@ct.gov
James.belforti@ct.gov

---

F.3d 17, 26 (2d Cir. 2004) ("By necessity, the scope of the injunction must
be drawn by reference to the facts of the individual case.").

74

# CERTIFICATION OF COMPLIANCE

As required by Federal Rule of Appellate Procedure (FRAP) 32(g)(1), I hereby certify that this brief complies with the type-volume limitations of FRAP 32(a)(7)(B), as modified by Second Circuit Local Rule 32.1(a)(4), in that this brief contains 13,889 words, excluding the parts of the brief exempted by FRAP 32(f). I further certify that this brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32 (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.


/s/ *Janelle R. Medeiros*
Janelle R. Medeiros
Assistant Attorney General


Dated: February 21, 2024

## CERTIFICATION OF SERVICE

I hereby certify that on this 21st day of February 2024, I caused the foregoing brief to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Janelle R. Medeiros*

Janelle R. Medeiros
Assistant Attorney General