No. 23-1162

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

---

NATIONAL ASSOCIATION FOR GUN RIGHTS, ET AL.,
*Plaintiffs-Appellants*,

*v.*

NED LAMONT, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF CONNECTICUT, ET AL.,
*Defendants-Appellees.*

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

**BRIEF FOR AMICI CURIAE MASSACHUSETTS, NEW JERSEY, CALIFORNIA, COLORADO, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF APPELLEES AND AFFIRMANCE**

---

MATTHEW J. PLATKIN
   *Attorney General of New Jersey*
Jeremy M. Feigenbaum
   *Solicitor General*
Angela Cai
   *Deputy Solicitor General*
Christopher J. Ioannou
   *Deputy Attorney General*
25 Market St, PO Box 080
Trenton, NJ 08625
(862) 350-5800
jeremy.feigenbaum@njoag.gov

ANDREA JOY CAMPBELL
   *Attorney General of Massachusetts*
Arjun K. Jaikumar
   *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
(617) 963-2856
arjun.k.jaikumar@mass.gov

(*Additional counsel on signature page*)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTERESTS OF AMICI........................................................................1

SUMMARY OF THE ARGUMENT .......................................................2

ARGUMENT .......................................................................................4

    I.      To Promote the Safety and Well-Being of Our Residents,
           Jurisdictions Impose a Range of Restrictions, Including
           Prohibitions, on Dangerous Weapons and Accessories Not
           Commonly Used for Self-Defense. .......................................................4

    II.     Connecticut's Restrictions on LCMs and Assault Weapons
           Comport with the Second Amendment. ...............................................9

           A.     The Second Amendment Protects Neither LCMs Nor
                   Assault Weapons........................................................................9

           B.     Connecticut's Law Is Relevantly Similar to Historical
                   Restrictions on Firepower and on New, and Distinctly
                   Dangerous, Forms of Weaponry. .............................................18

CONCLUSION .....................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023) ............................................................ passim

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*,
  910 F.3d 106 (3d Cir. 2018)........................................................29

*Aymette v. State*,
  21 Tenn. 154 (1840).......................................................................24

*Beauharnais v. Illinois*,
  343 U.S. 250 (1952).......................................................................21

*Bevis v. City of Naperville*,
  85 F.4th 1175 (7th Cir. 2023) ........................................................ passim

*Brumback v. Ferguson*,
  No. 22-cv-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) ......................13

*Capen v. Campbell*,
  —F.Supp.3d—, No. 22-cv-11431, 2023 WL 8851005
  (D. Mass. Dec. 21, 2023) ........................................................ 11, 13, 18

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) ..................................................................7

*Chiafalo v. Washington*,
  140 S. Ct. 2136 (2020).......................................................................20

*Delaware State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
  No. 22-cv-951, —F. Supp. 3d—, 2023 WL 2655150
  (D. Del. Mar. 27, 2023)........................................................ 17, 18

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)....................................................................... passim

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) .................................................... 16, 20, 29

*Fyock v. Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) ...............................................11

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019) ..................................................7

*Hanson v. District of Columbia*,
   No. 22-cv-2256, —F. Supp. 3d—, 2023 WL 3019777
   (D.D.C. Apr. 20, 2023) ..........................................18

*Hartford v. Ferguson*,
   No. 23-cv-5364, 2023 WL 3836230(W.D. Wash. June 6, 2023) ............ 13, 18, 31

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ........................................ 26, 27, 28, 29

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) .................................................. 14, 17, 29

*Luis v. United States*,
   578 U.S. 5 (2016)...............................................11

*McCullen v. Coakley*,
   573 U.S. 464 (2014)...........................................22

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ...................................................... 2, 23

*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022)................................................. passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015)........................................ 2, 16, 29

*Ocean State Tactical v. Rhode Island*,
   646 F. Supp. 3d 368 (D.R.I. 2022) .................................... 10, 11, 13, 18

*Oregon Firearms Fed'n v. Kotek*,
  No. 22-1815, —F. Supp. 3d—, 2023 WL 4541027
  (D. Or. July 14, 2023) .................................................................. passim

*Roth v. United States*,
  354 U.S. 476 (1957) ............................................................. 14, 21, 26

*Silveira v. Lockyer*,
  312 F.3d 1052 (9th Cir. 2002) ................................................... 29

*State v. Reid*,
  1 Ala. 612 (1840) ...................................................................... 28

*United States v. Booker*,
  644 F.3d 12 (1st Cir. 2011) ........................................................ 20

*United States v. Cox*,
  906 F.3d 1170 (10th Cir. 2018) .................................................. 13

*United States v. Morrison*,
  529 U.S. 598 (2000) ...................................................................... 1

*United States v. Salerno*,
  481 U.S. 739 (1987) ...................................................................... 1

*United States v. Scott*,
  990 F.3d 94 (2d Cir. 2021) .......................................................... 10

*United States v. Stevens*,
  559 U.S. 460 (2010) ................................................................... 21

*United States v. White*,
  401 U.S. 745 (1971) ................................................................... 16

*Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015) ................................................................... 22

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019) ........................................... 27, 28, 29

## Statutes

18 U.S.C. §§ 921 ..........................................................................5, 6

H.R. Rep. No. 103-489 (1994)........................................................... 3, 28

National Firearm Act of 1934, Pub. L. No. 73-474 .................................26

Public Safety and Recreational Firearms Use Protection Act,
  Pub. L. No. 103-322 ...................................................................5, 6

1837 Ala. Laws 7 .............................................................................24

1839 Ala. Laws 67 ...........................................................................24

1881 Ark. Acts 191 ..........................................................................25

W. Ball, Revised Statutes of the State of Arkansas, Adopted at the
  October Session of the General Assembly of Said State, A.D. 1837, § 13, 280
    (1838) ......................................................................................24

1933 Cal. Stat. 1169 .........................................................................26

1832 Conn. Acts 391 ........................................................................25

Conn. Gen. Stat. § 53-202................................................................ 3, 9, 36

An Act to Control the Possession, Sale, Transfer, and Use of Pistols and Other
  Dangerous Weapons in the District of Columbia, Pub. L. No. 72-275, 47 Stat.
    650 (1932) ................................................................................26

1838 Fla. Laws 36............................................................................24

1837 Ga. Acts. 90............................................................................24

An Act to Regulate the Sale, Possession and Transportation of Machine Guns,
  1931 Ill. Laws 452-53 ..................................................................26

1819 Ind. Acts 39 ............................................................................24

1932 La. Acts 336 ....................................................................................26

1821 Maine Laws 98 ...............................................................................25

1771-72 Mass. Province Laws 167 ........................................................25

1782 Mass. Acts 119 ...............................................................................25

1882 Mass. Acts 212 ...............................................................................25

An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying
    of Certain Firearms, 1927 Mich. Pub. Acts 888 ................................26

1933 Minn. Laws 231 .............................................................................26

1825 N.H. Laws 73 .................................................................................25

1772 N.Y. Laws 682 ...............................................................................25

1784 N.Y. Laws 627 ...............................................................................25

1927 R.I. Pub. Laws 256.........................................................................26

1821 Tenn. Acts ch. 13 ...........................................................................24

An Act to Prevent the Sale of Pistols, 1879 Tenn. Acts 135-36.............25

1837-38 Tenn. Acts 200..........................................................................24

1852 Tenn. Acts 246 ...............................................................................25

1838 Va. Acts 76.....................................................................................24

1934 Va. Acts 137-40 .............................................................................26

An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting,
    1923 Vt. Acts and Resolves 930 ........................................................26

## Court Rules

Fed. R. App. P. 29 ...................................................................................1

## Other Authorities

C. Sunstein, *On Analogical Reasoning*,
  106 HARV. L. REV. 741 (1993) ....................................................... 23, 24

J. Brabner-Smith, *Firearm Regulation*,
  1 LAW & CONTEMP. PROBS. 400 (1934)..............................................28

R. Spitzer, *Gun Law History in the United States and Second Amendment Right*,
  80 LAW & CONTEMP. PROBS. 55 (2017)..............................................25

S. Cornell & N. DeDino,
  *A Well Regulated Right: The Early American Origins of Gun Control*,
  73 FORDHAM L. REV. 487 (2004) .......................................................25

# INTERESTS OF AMICI

The *Amici* States—Massachusetts, New Jersey, California, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, as well as the District of Columbia—have compelling governmental interests in public safety and crime prevention. In furtherance of those interests, and pursuant to Fed. R. App. P. 29(a)(2), we submit this brief to explain why Connecticut's regulation of the purchase and possession of large-capacity magazines (LCMs) and assault weapons within its borders is wholly consistent with the Second Amendment to the United States Constitution.

There are few interests more paramount to state governments than protecting public safety, and especially "the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987). *Amici* bear the solemn responsibility of ensuring the safety of the public and private spaces—the schools, grocery stores, houses of worship, and commercial centers—that make up the fabric of daily life in a free and democratic society. We work every day to promote our residents' health, welfare, and security, including by taking steps to curb the threats of mass shootings and other forms of gun violence that harm our residents and inhibit their exercise of constitutionally protected freedoms.

Exercising our police powers in service of these goals, *Amici* have adopted a range of measures that regulate weapons and weapon accessories, while ensuring that our residents have access to weapons for individual self-defense. Although our regulations differ in substance, we share the firm conviction that our Constitution allows States to address gun violence in a manner that is adapted to individual States' needs and consistent with our Nation's historical traditions. In accordance with these objectives, we urge this Court to hold that Connecticut's choice to restrict access to certain exceptionally lethal instruments with distinctly military origins— "disproportionately used in crime, and particularly in criminal mass shootings" and "disproportionately used to kill law enforcement officers," *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 262 (2d Cir. 2015), *abrogated on other grounds by New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)— comports with the Constitution.

## SUMMARY OF THE ARGUMENT

The Second Amendment is "'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Bruen*, 597 U.S. at 21 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Recognizing that "reasonable firearms regulations" can coexist comfortably with the Second Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality op.), the States have adopted a variety of restrictions on weapons and

2

accessories that are not in common use for self-defense. This case concerns one such law: since 2013, following a mass shooting at Sandy Hook Elementary School leaving 26 children and adults dead, Connecticut has prohibited the purchase and possession of LCMs, defined as ammunition magazines capable of holding more than 10 rounds, and assault weapons through its Act Concerning Gun Violence Prevention and Children's Safety. *See* Conn. Gen. Stat. § 53-202c(a), w(b), w(c). Like similar laws around the country that restrict certain weapons, accessories, and ammunition, Connecticut's law preserves the right of law-abiding, responsible citizens to use firearms for self-defense. The State's LCM restriction applies narrowly to magazines that "make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent," so that "a single person with a single [semiautomatic] weapon can easily fire literally hundreds of rounds within minutes." H.R. Rep. No. 103-489, at 19 (1994). And its regulation of assault weapons applies only to weapons with enhanced "capability for lethality— more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." *Id.* at 19-20.

Faithfully applying the framework set forth in *Bruen*, the District Court correctly concluded that the plaintiffs-appellants' Second Amendment challenge was unlikely to succeed on the merits. SA67. That conclusion should be affirmed. Although the District Court mistakenly held that LCMs—mere accessories to

weapons—are "Arms" under the historical understanding of the Second Amendment's plain text, it correctly held that both LCMs and assault weapons fall outside the Second Amendment's protection because they are neither commonly used nor suitable for self-defense. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1192-97 (7th Cir. 2023). Moreover, Connecticut's laws are constitutional because they are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. From the earliest days of our Nation through Reconstruction to the present, States and the federal government have imposed limits on firepower and have restricted novel forms of weaponry that pose unique dangers to public safety. These analogous traditions amply justify Connecticut's measured restrictions on LCMs and assault weapons today. *See Bevis*, 85 F.4th at 1197-1202.

## ARGUMENT

**I. To Promote the Safety and Well-Being of Our Residents, Jurisdictions Impose a Range of Restrictions, Including Prohibitions, on Dangerous Weapons and Accessories Not Commonly Used for Self-Defense.**

The Second Amendment "extends only to certain types of weapons." *Heller*, 554 U.S. at 623-25. States and the federal government retain latitude to regulate categories of weapons and accessories, including by restricting the public carry, possession, and sale of weapons that are not commonly used for self-defense and that pose a threat to our communities. Indeed, the Supreme Court has recognized the constitutionality of laws banning categories of bearable weapons—among them,

"short-barreled shotguns," and "M-16 rifles and the like"—because certain "type[s] of weapon[s]" are simply "not eligible for Second Amendment protection." *Id.* at 621-23, 625, 627 (emphasis removed).

Consistent with that guidance, States and the federal government have adopted laws that impose restrictions, including prohibitions, on certain categories of particularly lethal weapons that are not suitable for or commonly used in self-defense. Like the federal government from 1994 to 2004,[1] ten States and the District of Columbia prohibit the purchase and possession of semiautomatic assault weapons.[2] Although state definitions of the prohibited class of weapons differ, they typically encompass weapons like AR-15 and AK-47-style rifles that inflict catastrophic injuries and have distinct combat capabilities, rendering them uniquely devastating in mass shootings.[3] Fourteen jurisdictions ban automatic-fire machine guns, subject to limited exceptions,[4] while 26 States and the federal government ban machine guns manufactured after May 19, 1986, require registration of machine

---

[1] Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1996-2010, codified at 18 U.S.C. §§ 921(a), 922(v) (2000).

[2] *See* Appendix Table 1.

[3] *See id.*

[4] *See* Appendix Table 2.

guns owned before that date, or impose other restrictions.[5] Nine States and the District of Columbia also prohibit short-barreled shotguns or rifles,[6] while the federal government and 22 other States impose restrictions on those weapons.[7] Four jurisdictions prohibit high-caliber rifles,[8] five prohibit guns hidden in canes and other covert weapons,[9] and 19 jurisdictions and the federal government ban grenades, rocket launchers, or other hand-held destructive devices.[10]

States and the federal government likewise regulate accessories that cannot by themselves be used for offensive or defensive purposes but nevertheless enhance the lethality of weapons. Fourteen States and the District of Columbia restrict the size of ammunition magazines that may be used with semiautomatic weapons, while allowing for possession and sale of smaller-capacity magazines.[11] While 11 of these jurisdictions set a capacity limit at 10 rounds, others, like Delaware, set a higher

---

[5] *See* Appendix Table 3.

[6] *See* Appendix Table 4.

[7] *See* Appendix Table 5.

[8] *See* Appendix Table 6.

[9] *See* Appendix Table 7.

[10] *See* Appendix Table 8.

[11] *See* Appendix Table 9. From 1994 to 2004, the federal government also banned handgun and long-gun magazines capable of holding more than 10 rounds. *See* Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1998-2000, codified at 18 U.S.C. §§ 921(a), 922(w) (2000).

capacity limit.[12] Eighteen jurisdictions and the federal government ban bump stocks, trigger cranks, binary triggers, rapid-fire trigger activators, or other devices used to approximate an automatic rate of fire with a semiautomatic weapon.[13] Silencers or suppressors, used to muffle the sound of a gun when it fires, are banned in eight States and the District of Columbia[14] and subject to restrictions or registration requirements by the federal government and 20 more States.[15]

States and the federal government also restrict the type and size of ammunition that can be purchased or possessed. While all States allow for robust access to ammunition, at least 26 jurisdictions prohibit especially dangerous forms of ammunition. Twenty-one jurisdictions and the federal government prohibit the possession or sale of armor-piercing bullets, a type of ammunition designed to penetrate metal or armor.[16] Nine prohibit ammunition designed to explode, detonate,

---

[12] *See id.*

[13] *See* Appendix Table 10. Courts have split on the lawfulness of the federal regulations construing the statutory term "machine gun" to include bump stocks. *See Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), *petition for cert. granted*, No. 22-976; *Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019) (per curiam), *cert. denied*, 140 S. Ct. 789 (2020).

[14] *See* Appendix Table 11.

[15] *See* Appendix Table 12.

[16] *See* Appendix Table 13.

or segment upon impact.[17] Multiple jurisdictions prohibit certain large-caliber ammunition, usable with 50- or 60-caliber weapons[18]; hollow-point bullets, designed to expand in their target on impact[19]; and Flechette shells, expelled from guns as pieces of metal wire or dart-like projectiles.[20] Others ban certain forms of shotgun ammunition: "Dragon's breath" shells, which are used to simulate a flamethrower by making shotguns spew fireballs or columns of flames, and bolo shells, designed as two or more metal balls connected by a metal wire.[21]

All told, across our country today, States and the federal government impose restrictions, including prohibitions, on a diverse array of especially dangerous weapons, accessories, and ammunition. Connecticut's law prohibiting assault weapons and restricting magazine capacity is of a piece with this tapestry of regulation and, as discussed below, a long history of governmental efforts to deter violence and promote public safety.

---

[17] *See* Appendix Table 14.

[18] *See* Appendix Table 15.

[19] *See* Appendix Table 16.

[20] *See* Appendix Table 17.

[21] *See* Appendix Table 18.

## II. Connecticut's Restrictions on LCMs and Assault Weapons Comport with the Second Amendment.

Against the backdrop of state regulation of unusually dangerous weapons and accessories, and in light of mounting deaths and injuries from mass shootings—including the horrific attack at Sandy Hook Elementary School—Connecticut chose in 2013 to ban assault weapons and impose restrictions on large-capacity magazines, while preserving broad access to firearms commonly used for self-defense and magazines that hold up to 10 rounds of ammunition. *See* Conn. Gen. Stat. § 53-202c(a), w(b), w(c). That choice was constitutional. Under *Bruen*, courts evaluate a Second Amendment challenge by making two inquiries. First, courts must ask if the Second Amendment right is implicated—*i.e.*, whether its "plain text covers an individual's conduct." 597 U.S. at 17. If it does not, "the regulated activity is categorically unprotected," and no further inquiry is required. *Id.* at 18. Second, if the conduct is protected, courts ask if the restriction nevertheless accords with "the Nation's historical tradition of firearm regulation." *Id.* at 17. Under either step, Connecticut's restrictions prove valid.

### A. The Second Amendment Protects Neither LCMs Nor Assault Weapons.

Plaintiffs-appellants did not, and cannot, show their proposed conduct—to possess and carry assault weapons and LCMs—is presumptively protected by the Second Amendment. *Id.* That is so for two independent reasons. First, LCMs are not

bearable "Arms" under the Second Amendment's plain text as historically understood. Second, neither LCMs nor assault weapons are commonly used or suitable for self-defense, as required for Second Amendment protection. *See Bruen*, 597 U.S. at 32.

1. As accessories, LCMs are not bearable "Arms." To determine whether the Second Amendment covers the challenged item, courts conduct "a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language" as historically understood. *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 576-77); *see also Antonyuk v. Chiumento*, 89 F.4th 271, 300 (2d Cir. 2023). The question is thus whether, on the preliminary-injunction record, LCMs fall outside the historical understanding of the term bearable "Arms." *See, e.g.*, *Ocean State Tactical v. Rhode Island*, 646 F. Supp. 3d 368, 384-88 (D.R.I. 2022), *appeal pending*, No. 23-1072 (1st Cir.). They do.

"Arms" under the Second Amendment are limited to "weapons of offence" that are "use[d] in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (citations omitted). Magazines—"container[s] that hold[] ammunition for a firearm," SA10—cannot be so used: "they generally have no use independent of their attachment to a gun." *Ocean State Tactical*, 646 F. Supp. 3d at 387 (quotation and citation omitted). Indeed, Connecticut presented linguistic expert analysis of historical dictionaries and databases containing historical texts to glean the "original

public meaning" of the term "Arms." *Cf. United States v. Scott*, 990 F.3d 94, 129 n.8 (2d Cir. 2021) (Menashi, J., concurring) ("Corpus linguistics illustrates the prototypical uses of words or phrases."). That analysis showed that ammunition containers fell outside the historical meaning of "Arms," a term reserved for weapons like blades and firearms. JA852 (Baron Decl. ¶ 9); *see also Ocean State Tactical*, 646 F. Supp. 3d at 387. Rather, such ammunition containers (then referred to as "cartridge boxes," now referred to as magazines) were historically understood to be within the separate category of "accoutrements." JA852, 858-865 (Baron Decl. ¶¶ 9-10, 23-34). Simply put, as ammunition containers, magazines are historically understood as accoutrements, not arms.

Plaintiffs-appellants attempt to sidestep this evidence, instead arguing that magazines "are an essential component of all semi-automatic firearms." Appellants' Br. 20. To start, the question of functionality is unresponsive to the textual inquiry that *Bruen* requires. That some magazines may be essential to certain firearms gets at the "*corollary*, albeit not unfettered, right to possess the [instruments] necessary to render those firearms operable"—*not* whether the magazines themselves are Second Amendment arms. *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (emphasis added); *see also Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). Moreover, plaintiffs-appellants' premise is wrong: it is undisputed that magazines with a capacity above 10 rounds are *not* necessary for

11

firearm operability. *Ocean State Tactical*, 646 F. Supp. 3d at 386 ("[A] firearm does not need a magazine containing more than ten rounds to be useful."); *accord Capen v. Campbell*, —F.Supp.3d—, No. 22-cv-11431, 2023 WL 8851005, at *16-18 (D. Mass. Dec. 21, 2023), *appeal pending*, No. 24-1061 (1st Cir.); *Oregon Firearms Fed'n v. Kotek*, No. 22-1815, —F. Supp. 3d—, 2023 WL 4541027, at *25-26 (D. Or. July 14, 2023), *appeal pending*, No. 23-35479 (9th Cir.).

Plaintiffs-appellants and the District Court also wrongly conflated the textual inquiry by repeating *Bruen*'s observation that "modern instruments that facilitate armed self-defense" are constitutionally protected. SA 40 (quoting 597 U.S. at 28). Whether instruments facilitate armed self-defense does not answer the textual inquiry of whether they are "Arms" as historically understood; instead, that question goes to the *second* prerequisite for constitutional protection: that they are "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627). As this Court has recently explained, the Second Amendment right has "[n]ever been understood to 'protect those weapons not typically possessed by law-abiding citizens for lawful purposes.'" *Antonyuk*, 89 F.4th at 295 (quoting *Heller*, 554 U.S. at 625); *accord Bevis*, 85 F.4th at 1193 ("[T]he definition of 'bearable Arms' extends only to weapons in common use for a lawful purpose."). The common-use inquiry is distinct from the inquiry of whether an instrument would have historically fallen under the definition of "Arms." There is no dispute that

12

machineguns, short-barreled rifles, and grenades were historically understood to be "weapons of offence" that could be "use[d] in wrath to cast at or strike another," but nonetheless do not enjoy constitutional protection because they are not in common use for self-defense. *See Heller*, 554 U.S. at 625. Conversely, if an instrument was not historically understood as an "Arm," there is no need to examine whether it is in common use for self-defense. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018).

At bottom, the original public meaning of "Arms," which "is no different from the meaning today," *Heller*, 554 U.S. at 581, excludes accessories like LCMs. This Court should join the many others to so hold. *See Ocean State Tactical*, 646 F. Supp. 3d at 384-88; *Kotek*, 2023 WL 4541027, at *25-26; *Capen*, 2023 WL 8851005, at *17-18; *Brumback v. Ferguson*, No. 22-cv-3093, 2023 WL 6221425, at *8-10 (E.D. Wash. Sept. 25, 2023).

2. Setting aside that LCMs are not "Arms," the District Court rightly held that neither LCMs nor assault weapons "are commonly used or are particularly suitable for self-defense," thus falling outside the Second Amendment's protection. SA44, 52. As *Heller* and *Bruen* make clear, weapons must be "'in common use' today for self-defense" to receive Second-Amendment protection. *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627). Weapons like M-16s that are "most useful in military service" or not typically possessed for lawful self-defense fall outside the

Second Amendment's ambit. *Heller*, 554 U.S. at 627; *see also Antonyuk*, 89 F.4th at 295 (noting the Second Amendment has "[n]ever been understood to 'protect those weapons not typically possessed by law-abiding citizens for lawful purposes."); *Bevis*, 85 F.4th at 1192-93 (similar). So if LCMs and assault weapons "are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes"—namely "individual self-defense," *Bevis*, 85 F.4th at 1193-94, they are not presumptively protected.

There is abundant, uncontested record evidence establishing that LCMs and assault weapons are most useful in military service and not typically possessed for individual self-defense. *See* JA199-200 (Warenda Decl. ¶¶ 22-23, 27-29). Assault weapons are designed to inflict catastrophic injuries by firing high-velocity ammunition at long range, and they can easily penetrate walls to injure bystanders, making them poor civilian self-defense weapons. JA241, 257 (Donohue Decl. ¶¶ 103-104, 154). In fact, one of the designers of the AR-15, the quintessential assault weapon, explained that it was "originally engineered to generate 'maximum wound effect.'" JA242 (Donohue Decl. ¶ 108). The same holds true for LCMs, which "were originally designed for military use in World War I and did not become widely available for civilian use until the 1980s." SA48; *see also* JA925-927 (Roth Decl. ¶¶ 49-51). As the Seventh Circuit rightly concluded, "assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry,"

*Bevis*, 85 F.4th at 1195-97, which *Heller* has confirmed "may be banned," *Heller*, 554 U.S. at 627; *see also Kolbe v. Hogan*, 849 F.3d 114, 136-37 (4th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 597 U.S. 1.

Nor are those weapons typically used for self-defense. As the District Court noted, assault weapons are used *at most* in 2% of self-defense incidents; and more than five shots are fired *at most* in 2.7% of all self-defense incidents—and there were *no* incidents in Connecticut between 2011-2017 involving more than 10 shots fired. SA43 (citing JA792, 797-98, 799-800 (Allen Decl. ¶¶ 10, 16-17, 21-23)). And, unfortunately, these instruments are used disproportionately in mass shootings, especially ones resulting in particularly high numbers of fatalities. *See* SA47. Simply put, the record evidence shows that assault weapons and LCMs are "commonly used for reasons other than lawful self-defense." *Id.*

Plaintiffs-appellants' alternate methodology—looking *only* to surveys suggesting "widespread ownership," *see* Appellants' Br. 28-32—defies both precedent and common sense. First, the precedent is clear: the test for whether a specific weapon falls within the Second Amendment right turns on whether it is in common *use* for self-defense, not common *ownership*. *See Bruen*, 597 U.S. at 38 (referring to "commonly *used* firearms for self-defense"); *id.* at 70 (describing "right to bear commonly *used* arms in public"); *see also Heller*, 554 U.S. at 636 (striking down an "absolute prohibition of handguns held *and used* for self-defense")

(emphases added). Courts thus must consider whether the weapon actually "facilitate[s] armed self-defense," which is "the central component of the Second Amendment right." *Bruen*, 597 U.S. at 28-29 (citation omitted). And while "a modern American citizen might want to possess a military-grade weapon" for self-defense, as the District Court rightly held, that belief alone is insufficient. SA52; *accord Kotek*, 2023 WL 4541027, at *30 (holding purchasers' "subjective intent" cannot be dispositive); *see also Bevis*, 85 F.4th at 1195.[22] Contrary to plaintiffs-appellants' theory, *Bruen* requires analyzing the suitability and the actual use of the weapon for self-defense.[23]

Second, a tally approach of ownership figures is hopelessly circular. The number of weapons in circulation depends in significant part on when the government enacted legislation prohibiting it; had governments banned AR-15s the moment they became commercially available, their circulation numbers would be

---

[22] Subjective expectations alone do not dictate the parameters of other constitutional rights. *See Kotek*, 2023 WL 4541027, at *30-32 (collecting cases). After all, "it is the task of the law to form and project" and not just "mirror and reflect" society's "expectations" as the law. *United States v. White*, 401 U.S. 745, 786 (1971) (Harlan, J., dissenting).

[23] This Court expressly reserved whether these instruments were actually used for *self-defense*. *See Cuomo*, 804 F.3d at 256-57 (citing *Heller v. District of Columbia*, 670 F.3d 1244, 1260-61 (D.C. Cir. 2011)). But even if *Cuomo* held that such instruments were commonly owned as a statistical matter and thus in common use "as that term was used in *Heller*," *see id.* at 255-56, that holding has been abrogated by *Bruen* or, at least, is worthy of this Court's reconsideration. *See* SA29.

negligible. But "[i]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015); *see also Bevis*, 85 F.4th at 1198-99. Just as "[a] law's existence can't be the source of its own constitutional validity," that governments did not uniformly prohibit a certain firearm cannot be the reason why the firearm is presumptively protected by the Constitution. *Kolbe*, 849 F.3d at 141; *see also Antonyuk*, 89 F.4th at 301 (noting legislatures do not always "legislate[] to their constitutional limits"). And if a tally threshold were all that was needed to make a firearm protected by the Second Amendment, manufacturers could "flood[] … the market prior to any governmental prohibition in order to ensure it constitutional protection"—a wholly illogical proposition. *Kolbe*, 849 F.3d at 141; *see also Kotek*, 2023 WL 4541027, at *28. Indeed, if one "looked to numbers alone, the federal assault weapons ban would have been constitutional before 2004, but unconstitutional thereafter," when "these weapons began to occupy a more significant share of the market." *Bevis*, 85 F.4th at 1199. That result "lacks both textual and historical provenance," *id.*, not to mention common sense.

Plaintiff-appellants never address this broken logic. Instead, their position would yield a conclusion that *Heller* found "startling": that the Second Amendment somehow protects machine guns. 554 U.S. at 624-25. After all, data suggest that

civilians legally own hundreds of thousands of machine guns. *See Delaware State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.* ("*DSSA*"), No. 22-cv-951, —F. Supp. 3d.—, 2023 WL 2655150, at *5 (D. Del. Mar. 27, 2023), *appeal pending*, No. 23-1633 (3d Cir.). Under plaintiff-appellant's ownership-tally approach, that would suffice for constitutional protection—an untenable position the Supreme Court has already rejected.

In sum, the District Court properly held that LCMs and assault weapons are not actually in common use for self-defense, or suitable for that purpose. This Court should affirm and join other courts post-*Bruen* that have come to the same conclusion. *See, e.g.*, *Bevis*, 85 F.4th at 1192-97; *Ocean State Tactical*, 646 F. Supp. 3d at 390; *Kotek*, 2023 WL 4541027, at *25-34; *Hanson v. District of Columbia*, No. 22-cv-2256, —F. Supp. 3d—, 2023 WL 3019777, at *7-12 (D.D.C. Apr. 20, 2023) (same), *appeal pending*, No. 23-7061 (D.C. Cir.).

### B. Connecticut's Law Is Relevantly Similar to Historical Restrictions on Firepower and on New, and Distinctly Dangerous, Forms of Weaponry.

Should this Court nevertheless assume that assault weapons and LCMs are protected "Arms," it should conclude that there exists a longstanding tradition of restrictions that are relevantly similar to Connecticut's present-day enactment. *Accord Bevis*, 85 F.4th at 1199-1202; *Capen*, 2023 WL 8851005, at *11-16; *Kotek*, 2023 WL 4541027, at *39-46; *Hanson*, 2023 WL 3019777, at *12-17; *DSSA*, 2023

18

WL 2655150, at *9-13; *Hartford v. Ferguson*, No. 23-cv-5364, 2023 WL 3836230, at *3-6 (W.D. Wash. June 6, 2023).

1. Restrictions on protected arms are constitutional if the government can demonstrate that such restrictions are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Although the Supreme Court has left open the question whether a court should "primarily" look to Founding-era or Reconstruction-era history in evaluating the Nation's traditions, *id.* at 37-38, *Bruen* and *Heller* compel the conclusion confirmed by this Court in *Antonyuk*: that courts must consider the broad sweep of our country's history—including nineteenth- and twentieth-century history—when reviewing the constitutionality of a state law. 89 F.4th at 304-05.

Thus, "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points" of the relevant constitutional analysis. *Antonyuk*, 89 F.4th at 304-05. Indeed, as applied to state laws like Connecticut's, "evidence from Reconstruction regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is at least as relevant as evidence from the Founding Era regarding the Second Amendment itself." *Id*. at 318 & n.27. After all, in both *Heller* and *Bruen*, the Court made clear that post-ratification history is not only relevant, but a "critical tool of constitutional interpretation" that elucidates "the public understanding of a legal text in the period after its enactment or ratification." *Heller*,

19

554 U.S. at 605 (emphasis removed); *see Bruen*, 597 U.S. at 20 (same).

Moreover, "in examining history and tradition, a court must identify the societal problem that the challenged regulation seeks to address and then ask whether past generations experienced that same problem and, if so, whether those generations addressed it in similar or different ways." *Id*. at 301 (citing *Bruen*, 597 U.S. at 26-27). Therefore, the existence of "'a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases' in the Constitution." 597 U.S. at 35-36 (quoting *Chiafalo v. Washington*, 140 S. Ct. 2136, 2326 (2020)); *see Antonyuk*, 89 F.4th at 300 (same).

Twentieth-century history bears on the historical inquiry for the same reason. Although twentieth-century history that "contradicts earlier evidence" is not probative, *Bruen*, 597 U.S. at 66 n.28, "where such history "reflect[s] previously settled practices and assumptions, they remain probative as to the existence of an American tradition of regulation." *Antonyuk*, 89 F.4th at 319-20 & n.32. Indeed, the Supreme Court has relied on twentieth-century history in its Second Amendment rulings. In *Heller*, the Court characterized laws that originated in the twentieth century—among them, laws banning people with felony convictions or mental illness from possessing weapons—as "longstanding" and "presumptively lawful." 554 U.S. at 626-27 & n.26; *see United States v. Booker*, 644 F.3d 12, 23-24 (1st Cir. 2011) ("[T]he modern federal felony firearm disqualification law … is firmly rooted

in the twentieth century."). Similarly, "*Heller* deemed a ban on private possession of machine guns to be obviously valid," but "states didn't begin to regulate private use of machine guns until 1927." *Friedman*, 784 F.3d at 408. The presumptive lawfulness of these twentieth-century measures was reaffirmed by a majority of the Court in *Bruen*. *See* 597 U.S. at 71 (Alito, J., concurring); *id.* at 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *id.* at 128-29 (Breyer, J., dissenting, joined by Sotomayor and Kagan, JJ.).[24]

Furthermore, twentieth-century history can be especially probative in cases involving emergent weapons that did not become widely publicly available until the last century. The absence of eighteenth- and nineteenth-century legislative enactments addressing such weapons cannot mean there exists no historical tradition

---

[24] In addressing the scope of the Second Amendment, *Bruen* and *Heller* also "repeatedly compared the right to keep and bear arms" to the right to free speech, noting that "the government must generally point to *historical* evidence about the reach of the First Amendment's protections." *Bruen*, 597 U.S. at 24-25 (citing *United States v. Stevens*, 559 U.S. 460, 468-71 (2010)) (emphasis in original). When analyzing whether categories of speech fall outside the scope of the First Amendment, the Supreme Court has looked beyond Founding-era history to laws and practices that predominated in the nineteenth and twentieth centuries. *See, e.g.*, *Roth v. United States*, 354 U.S. 476, 484-85 (1957) (looking to "the international agreement of over 50 nations," "the obscenity laws of all of the 48 States," and "the 20 obscenity laws enacted by the Congress from 1842 to 1956" in holding obscene speech unprotected); *Beauharnais v. Illinois*, 343 U.S. 250, 254-56 (1952) (focusing on contemporary criminal codes of the States as well as colonial-era criminal codes and legal developments in the decades after ratification in concluding that libel is not protected speech).

of comparable regulation, because there would have been scant reason for States to regulate the weapons during those eras. This case is a prime example: in the eighteenth century, the most advanced technological weapon of the age was the flintlock musket, a "smooth-bored, single-shot, muzzle-loading weapon" for which the standard rate of fire even for military infantrymen was three shots per minute. JA263-64 (Donohue Decl. ¶¶ 171-72). Similarly, "[a]lthough breech loading rifles and repeating rifles emerged in the late nineteenth century these weapons did not achieve sufficient market penetration to impact gun violence" or to necessitate state action. JA955-957 (Cornell Decl. ¶¶ 41-45). Just as "[t]he First Amendment does not require States to regulate for problems that do not exist," the Second Amendment likewise does not impose such a nonsensical burden. *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (citation omitted).

Moreover, the Constitution does not require States to legislate to the zenith of their authority by, for example, restricting curio weapons or those that have yet to pose a public-safety problem; rather, the Constitution allows States the flexibility to "adopt laws to address the problems that confront them." *Id.*; *see also Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) ("A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns."). Indeed, in practice "[l]egislatures past and present have not generally legislated to their constitutional limits." *Antonyuk*, 89 F. 4th at 301.

This Court therefore may, and should, consider nineteenth- and twentieth-century practice in assessing Second Amendment challenges to state laws.

2. Laws like Connecticut's that restrict unusually dangerous weapons have a long historical pedigree. Since the early days of our republic, governments have limited firepower and restricted access to uniquely dangerous weapons that pose an inordinate public safety risk once those weapons emerged in the commercial market.

To determine whether a challenged statute is consistent with a historical tradition of firearms regulation, courts must reason by analogy. *Bruen*, 597 U.S. at 27. Cases like this that implicate "unprecedented societal concerns or dramatic technological changes" demand a "more nuanced approach" to analogical reasoning, one that looks to whether, over the course of history, there have existed "relevantly similar" analogues. *Id.* at 28-29 (citing C. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)). Although the Court did not "provide an exhaustive survey of the features that render regulations relevantly similar," it made clear that "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (stressing that "individual self-defense is the *central component* of the Second Amendment right" (quotation marks omitted)). In applying these metrics, courts must bear in mind that the analogical inquiry is not a "regulatory straightjacket," and a modern-day regulation need not be a "dead ringer for historical precursors" to be

"analogous enough to pass constitutional muster." *Id.* at 30.[25]

From the colonial period through today, States and the federal government have adopted measures that, like Connecticut's law, regulate novel, and unusually dangerous, weapons that contributed to crime without corresponding utility for self-defense. This tradition followed a predictable pattern: first, new weapons technologies were developed; second, they spread into society and created a public safety threat; and third, governments enacted regulations to dampen weapons-related criminality and violence. In the early nineteenth century, States increasingly began imposing restrictions on weapons like Bowie knives[26] and pocket pistols[27] that were contributing to rising violence. *See* JA943-953 (Cornell Decl. ¶¶18-33); *Aymette v. State*, 21 Tenn. 154, 158 (1840) (in upholding law banning sale and concealed carry of Bowie knives, distinguishing between protected weapons and "weapons which

---

[25] That nuanced approach accords with how analogical reasoning is described in the scholarly sources upon which *Bruen* relied. *See* 597 U.S. at 28-29. For example, as Cass Sunstein's study explained, analogical reasoning is similar to common-law reasoning, with "the important advantage of allowing a large degree of openness to new facts and perspectives." Sunstein, *supra*, at 782.

[26] *See, e.g.*, 1837 Ga. Acts. 90, § 1; Ch. 77, § 2, 1837 Ala. Laws 7, 7; No. 24 § 1, 1838 Fla. Laws 36, 36; Ch. 137, §§ 1-2, 1837-38 Tenn. Acts 200; Ch. 101, § 1, 1838 Va. Acts 76, 76; Ch. 77, § 1, 1839 Ala. Laws 67, 67.

[27] *See, e.g.*, 1819 Ind. Acts 39; 1821 Tenn. Acts ch. 13, p. 15; W. Ball, Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837, § 13, 280 (1838); Ch. 101, § 1, 1838 Va. Acts 76, 76.

are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin"). Many of the laws prohibited concealed carry of these weapons, and some, like Arkansas's and Tennessee's postbellum statutes regulating pocket pistols, likewise banned sales. *See* An Act to Prevent the Sale of Pistols, ch. 96, § 1, 1879 Tenn. Acts 135-36; 1881 Ark. Acts 191, no. 96, § 3.[28]

During the 1920s and 1930s, the Nation witnessed a new wave of regulation of emergent weapons that threatened public safety. During this era, more than half the states of the Union enacted laws which prohibited or regulated automatic-fire or

---

[28] States and municipalities likewise adopted measures that sought to restrict firepower in order to promote public safety. *See* S. Cornell & N. DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 511 (2004) ("Limits on the amount of gunpowder a person could possess were common and typically in the range of twenty to thirty pounds."); R. Spitzer, *Gun Law History in the United States and Second Amendment Right*, 80 LAW & CONTEMP. PROBS. 55, 80-81 (2017) (summarizing gunpowder storage laws). A 1783 Massachusetts law imposed a fine on "any Person" who "shall take into any [house or building] within the Town of Boston, any … Fire-Arm, loaded with, or having Gun-Powder." 1782 Mass. Acts 119, ch. 46. In 1784, New York required separating gunpowder in the home "into four stone jugs or tin cannisters, which shall not contain more than seven pounds each." Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627, 627. Throughout the 1780s, Pennsylvania laws "required that gunpowder be stored on the highest story of the home" in certain towns. *Heller*, 554 U.S. at 686 (Breyer, J., dissenting). Similar laws were adopted well into the nineteenth century, and *Amici* are not aware of court decisions invalidating them. *E.g.*, 1882 Mass. Acts 212, ch. 269 (requiring registration of gunpowder in excess of one pound stored in buildings); 1771-72 Mass. Province Laws 167, ch. 9 (requiring gunpowder imported into Massachusetts to be stored in public magazines); *see also* 1832 Conn. Acts 391, ch. 25; 1825 N.H. Laws 73, ch. 61; 1821 Maine Laws 98, ch. 25; 1772 N.Y. Laws 682, ch. 1549; 1852 Tenn. Acts 246, ch. 169.

semi-automatic weapons. JA881-82 (Baron Decl. ¶¶ 73-75), 957-958 (Cornell Decl. ¶¶ 45-46). Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms in a seven-year period between 1927 and 1934. JA923-24 (Roth Decl. ¶ 47). Similarly, Congress enacted the first nationwide firearms regulation statute, the National Firearms Act of 1934, to restrict machine guns, short-barreled shotguns, and other dangerous weapons. *Id*; *see* Pub. L. No. 73-474; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (machine guns "have traditionally been banned"), *abrogated in part on other grounds by Bruen*, 597 U.S. 1.[29] In the same era, regulations limiting magazine capacity were also common: twenty-three States imposed some limitation, typically restricting the number of rounds to between five and eighteen.[30]

This tradition of regulating uniquely dangerous weapons is relevantly similar

---

[29] *See* An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, no. 372 § 3, 1927 Mich. Pub. Acts 888, 888-89; Ch. 1052 §§ 1, 4, 1927 R.I. Pub. Laws 256, 256-57; An Act to Control the Possession, Sale, Transfer, and Use of Pistols and Other Dangerous Weapons in the District of Columbia, Pub. L. No. 72-275, 47 Stat. 650, 650 (1932); Ch. 190, § 1, 1933 Minn. Laws 231, 232; Ch. 96, 1934 Va. Acts 137-40.

[30] *See, e.g.*, 1933 Cal. Stat. 1169, 1170; No. 80, § 1, 1932 La. Acts 336, 337; An Act to Regulate the Sale, Possession and Transportation of Machine Guns, no. 18, §§ 1-2, 1931 Ill. Laws 452-53; An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, ch. 235, § 5711, 1923 Vt. Acts and Resolves 930.

to Connecticut's LCM and assault-weapons restrictions in how and why the enactments burden the right to armed self-defense. With respect to how: both types of measures regulate specific dangerous weapons or accessories used for criminal purposes, rather than standard weapons of self-defense. Important to this inquiry, the analogical reasoning prescribed by *Bruen* does not require that a historical tradition be precisely the same type of regulation as the modern one, nor does it suggest that the only analogue for a weapon-specific ban is another weapon-specific ban. Rather, *Bruen* and *Heller* both relied on the *degree* of burden when evaluating proposed historical analogues. *See Bruen*, 597 U.S. at 50 (examining whether analogues imposed a comparably "substantial burden"); *Heller*, 554 U.S. at 632 (similar).

Moreover, as discussed above, *supra* at 24-26, unlike the laws at issue in *Heller* and *Bruen*, the enactment at issue here, like its historical antecedents, leaves ample avenues for armed self-defense. *Contra Bruen*, 597 U.S. at 70; *Heller*, 554 U.S. at 628; *see Worman v. Healey*, 922 F.3d 26, 32 & n.2, 37 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 597 U.S. 1; *Heller II*, 670 F.3d at 1261-62. Rather, consistent with our Nation's tradition of regulating specific and particularly dangerous weapons used for criminality without meaningfully burdening self-defense capabilities, Connecticut's laws impose, at most, a minimal burden on the right to self-defense, since it permits possession of all manner of other firearms and unlimited numbers of magazines with capacities up to 10 rounds. And as the record

27

below demonstrates, LCMs and assault weapons are not commonly used for self-defense. *See supra* at 13-18; *accord Worman*, 922 F.3d at 37 (law banning assault weapons "does not heavily burden the core right of self-defense" because using these weapons for self-defense "is tantamount to using a sledgehammer to crack open the shell of a peanut"); *Heller II*, 670 F.3d at 1262 (assault weapons bans "impose only modest burdens [b]ecause they do leave open ample alternative channel[s]" for self-defense).

The *purpose* of Connecticut's law is also relevantly similar to the purpose of this tradition of regulation: to enhance public safety in the face of new weapon technology that has threatened, or already inflicted, significant harm on American citizens. The Bowie-knife restrictions of the early 1800s, for example, were intended "to promote personal security, and to put down lawless aggression and violence." *State v. Reid*, 1 Ala. 612, 617 (1840). And the early twentieth-century regulation of machine guns and semiautomatic weapons stemmed from concern over the "growth of armed gangsterism [that] resulted in the use of more deadly weapons by criminals." J. Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400, 405 (1934). Modern-day laws restricting LCMs and assault weapons, like Connecticut's, are likewise a response to the proliferation of these instruments in a contemporary form of lawlessness and violence: mass public shootings. *See* H.R. Rep. No. 103-489, at 19 (1994); *Silveira v. Lockyer*, 312 F.3d 1052, 1057 (9th Cir.

2002), *abrogated on other grounds by Heller*, 554 U.S. 570.

Courts have widely recognized that assault weapons and LCMs were designed for military use, "disproportionately used in crime, and particularly in criminal mass shootings[,]" and "disproportionately used to kill law enforcement officers." *Cuomo*, 804 F.3d at 262; *accord Worman*, 922 F.3d at 39; *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*, 910 F.3d 106, 118 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 597 U.S. 1; *Kolbe*, 849 F.3d at 126-27; *Friedman*, 784 F.3d 411; *Heller II*, 670 F.3d at 1262-64. In choosing to restrict assault weapons and LCMs within its borders, Connecticut acted to prevent these harms, without correspondingly burdening the right to self-defense. Its choice is consistent with a long tradition of relevantly similar historical antecedents, and it comports fully with the Second Amendment.

## CONCLUSION

This Court should affirm the order of the District Court.

Respectfully submitted,

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

Jeremy M. Feigenbaum
*Solicitor General*
Angela Cai
*Deputy Solicitor General*
Christopher J. Ioannou
*Deputy Attorney General*
(862) 350-5800
jeremy.feigenbaum@njoag.gov

Arjun K. Jaikumar
*Assistant Attorney General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2856
arjun.k.jaikumar@mass.gov

Date: February 28, 2024

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*The District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
Queen Street,
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

MICHELLE A. HENRY
*Attorney General*
*State of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

**<u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

This Amicus Curiae brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because this brief contains 6,963 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This Amicus Curiae brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General
New Jersey Attorney General's Office

Date: February 28, 2024

## CERTIFICATE OF SERVICE

On February 28, 2024, the undersigned caused this brief to be filed with the Clerk of the United States Court of Appeals for the Second Circuit via electronic filing. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General
New Jersey Attorney General's Office

Date: February 28, 2024

# APPENDIX

## Table 1: Assault Weapon Restrictions

The following jurisdictions restrict the possession or sale of assault weapons as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **California** | Cal. Penal Code §§ 30500-30515, 30600, 30605. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202a-202c. |
| **Delaware** | Del. Code tit. 11, §§ 1465-1466(a). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(3A), 7-2502.01, 7-2502.02(a)(6). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1.9. |
| **Maryland** | Md. Code Ann., Crim. Law §§ 4-301, 4-303. |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131M. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(w), -5(f) |
| **New York** | N.Y. Penal Law §§ 265.00(22), 265.02(7). |
| **Washington** | Wash. Rev. Code §§ 9.41.0001, 9.41.010(2), 9.41.240 (2023 Wash. Sess. Laws, ch. 162, § 1). |

## Table 2: Laws Banning Automatic Weapons

The following jurisdictions ban automatic weapons as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **California** | Cal. Penal Code § 32625. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(5), (b)(1). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(10), 7-2502.01, 7-2502.02(a)(2). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(i). |
| **Iowa** | Iowa Code §§ 724.1(a), 724.3. |
| **Louisiana** | La. Rev. Stat. Ann. §§ 40:1751 to 40:1752. |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131(o); Mass. Gen. Laws ch. 269, § 10(c). |
| **Minnesota** | Minn. Stat. § 609.67. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(*i*), -5(a) |

| | |
|---|---|
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Rhode Island** | R.I. Gen. Laws § 11-47-8(a). |
| **Wisconsin** | Wis. Stat. § 941.26(1g)(a). |

### Table 3: Laws Requiring Registration of Pre-1986 Automatic Weapons

The following jurisdictions require that all automatic weapons manufactured before 1986 be registered with a licensing agency as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(24), 922(o); 26 U.S.C. § 5845(b). |
| **Alaska** | Alaska Stat. Ann. §§ 11.61.200(a)(3), (h)(1)(C). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3). |
| **Connecticut** | Conn. Gen. Stat. § 53-202. |
| **Florida** | Fla. Stat. §§ 790.001(9), 790.221. |
| **Georgia** | Ga. Stat. §§ 16-11-121(2), 16-11-122, 16-11-124(4). |
| **Indiana** | Ind. Code Ann. §§ 35-47-5-8 to 35-47-5-8-10. |

| | |
|---|---|
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(5). |
| **Maine** | Me. Rev. Stat. Ann. tit. 17-A, §§ 1051-1052. |
| **Maryland** | Md. Code Ann. §§ 4-401 to 4-405. |
| **Michigan** | Mich. Comp. Laws §§ 750.224(1)(a), (3)(c). |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(a). |
| **Montana** | Mont. Code Ann. §§ 45-8-302 to 45-8-304. |
| **Nebraska** | Neb. Rev. Stat. § 28-1203. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.350(1)(b). |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(i), 2C:39-5(a), 2C:39-9(a). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-05-01. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17. |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. § 908. |

| Jurisdiction | Jurisdictional Law |
|---|---|
| **South Carolina** | S.C. Code Ann. §§ 16-23-230 to 16-23-250. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (23), 22-14-6. |
| **Tennessee** | Tenn. Code Ann. §§ 39-17-1302(a)(3), (d). |
| **Texas** | Tex. Penal Code §§ 46.01(9), 46.05(a)(1)(B). |
| **Virginia** | Va. Code §§ 18.2-288 to 18.2-298. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(29), 9.41.190. |
| **West Virginia** | W. Va. Code § 61-7-9. |

## Table 4: Laws Banning Short-Barreled Shotguns or Rifles

The following jurisdictions ban possession of short-barreled shotguns or short-barreled rifles as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **California** | Cal. Penal Code §§ 33210, 33215. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(4), (b)(1). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(15), (17), 7-2502.01, 7-2502.02(a)(1), (a)(3). |

| | |
|---|---|
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(ii). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, § 121; Mass. Gen. Laws ch. 269, § 10(c). |
| **Minnesota** | Minn. Stat. § 609.67. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(o), 2C:39-3(b). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47-2(15) to 11-47-2(16), 11-47-8(b). |

## **Table 5: Laws Restricting Short-Barreled Shotguns or Rifles**

The following jurisdictions restrict the possession of short-barreled shotguns or short-barreled rifles as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(6), 921(a)(8), 922(a)(4). |
| **Alaska** | Alaska Stat. Ann. §§ 11.61.200(a)(3), (h)(1)(D). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iv), 13-3102(A)(3). |
| **Connecticut** | Conn. Gen. Stat. § 53a-211. |
| **Florida** | Fla. Stat. §§ 790.001(10)-(11), 790.221. |

| | |
|---|---|
| **Georgia** | Ga. Stat. §§ 16-11-121(4)-(5), 16-11-122, 16-11-124(4). |
| **Iowa** | Iowa Code § 724.1C. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(5). |
| **Michigan** | Mich. Comp. Laws § 750.224b. |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(b). |
| **Montana** | Mont. Code Ann. § 45-8-340. |
| **Nebraska** | Neb. Rev. Stat. § 28-1203. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.275. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(i), 2C:39-5(a), 2C:39-9(a). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-02-03. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17. |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. § 908. |

| Jurisdiction | Jurisdictional Law |
|---|---|
| **South Carolina** | S.C. Code Ann. §§ 16-23-230 to 16-23-250. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (46), 22-14-6. |
| **Texas** | Tex. Penal Code §§ 46.01(10), 46.05(a)(1)(C). |
| **Washington** | Wash. Rev. Code §§ 9.41.010(41)-(42), 9.41.190. |
| **Wisconsin** | Wis. Stat. § 941-28. |

### <u>Table 6: Laws Banning 50-Caliber and Other High-Caliber Rifles</u>

The following jurisdictions ban possession of rifles designed to shoot 50-Caliber and other High-Caliber ammunition.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 30530, 30600, 30610. |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(8A), 7-2502.01, 7-2502.02(a)(7). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(15)-(16), 5/24-1.9. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(c)(3), (5), 2C:39-3(a). |

## Table 7: Laws Banning Covert Weapons

The following jurisdictions ban possession of covert and hidden firearms as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
| --- | --- |
| **Alabama** | Ala. Code § 13A-11-54. |
| **California** | Cal. Penal Code § 24410. |
| **Massachusetts** | Mass. Gen. Laws ch. 140, § 131N. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(hh), 2C:39-3(m). |
| **New York** | N.Y. Penal Law § 265.02(6). |

## Table 8: Laws Banning Destructive Devices

The following jurisdictions ban the possession of grenades, rocket launchers, bombs, and other destructive devices as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
| --- | --- |
| **California** | Cal. Penal Code §§ 16460, 18710. |
| **Colorado** | Colo. Rev. Stat. § 18-12-109(2)(a). |
| **Connecticut** | Conn. Gen. Stat. § 53-80(a). |
| **Delaware** | Del. Code Ann. tit. 11, §§ 1444(a)(1), (b)(1). |

| | |
|---|---|
| **District of Columbia** | D.C. Code § 22-4515a. |
| **Florida** | Fla. Stat. §§ 790.001(4), 790.161. |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(iii). |
| **Iowa** | Iowa Code §§ 101A.1(2A), 724.1(1)(c), 724.3. |
| **Massachusetts** | Mass. Gen. Laws ch. 266, § 102(c). |
| **Minnesota** | Minn. Stat. § 609.668. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(c)(1), 2C:39-3(a). |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Oregon** | Or. Rev. Stat. § 480.070. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. §§ 908(a), (c). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47.1-21. |
| **Utah** | Utah Code Ann. § 76-10-306(3). |
| **Virginia** | Va. Code Ann. § 18.2-85. |

| | |
|---|---|
| **Wisconsin** | Wis. Stat. § 941.26(2)(c). |

## Table 9: Laws Restricting Magazine Capacity

The following jurisdictions restrict the quantity of rounds able to be fired from a single magazine as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 16740, 32310. |
| **Colorado** | Colo. Rev. Stat. §§ 18-12-301, 302, 303. |
| **Connecticut** | Conn. Gen. Stat. § 53-202w(a)(1). |
| **Delaware** | Del. Code Ann. tit. 11, §§ 1468, 1469(a). |
| **District of Columbia** | D.C. Code § 7-2506.01(b). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1.10. |
| **Maryland** | Md. Code Ann., Crim. Law § 4-305(b). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131M. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j). |

| | |
|---|---|
| **New York** | N.Y. Penal Law § 265.02(8). |
| **Oregon** | 2022 Oregon Ballot Measure 114, § 11. |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3. |
| **Vermont** | Vt. Stat. Ann. Tit. 13, § 4021. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(22), 9.41.370. |

## **Table 10: Laws Banning Bump Stocks**

The following jurisdictions ban the possession of bump stocks, trigger cranks, trigger activators, and other devices designed to artificially increase the rate of fire for semi-automatic weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(24), 922(o);<br>26 U.S.C. § 5845(b);<br>27 C.F.R. 447.11, 478.11, 479.11. |
| **California** | Cal. Penal Code § 32900. |
| **Connecticut** | Conn. Gen. Stat. § 53-206g. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(6), (b)(2). |
| **District of Columbia** | D.C. Code Ann. § 22-4514(a). |

| | |
|---|---|
| **Florida** | Fla. Stat. § 790.222. |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8.5. |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(14). |
| **Iowa** | Iowa Code § 724.29. |
| **Maryland** | Md. Code Ann., Crim. Law §§ 4-301, 4-305.1(a). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131(o); Mass. Gen. Laws ch. 269, § 10(c). |
| **Michigan** | Mich. Comp. Laws § 750.224e. |
| **Minnesota** | Minn. Stat. § 609.67. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.274. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(ee)-(ff), 2C:39-3(*l*). |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Oregon** | Or. Rev. Stat. § 480.070. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. §§ 908(a), (c). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47-2(3), (19), 11-47-8(d), 11- |

| | |
|---|---|
| | 47-8.1. |
| **Vermont** | Vt. Stat. Ann. tit. 13, § 4022. |
| **Virginia** | Va. Code Ann. § 18.2-308.5:1. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(5), 9.41.220. |

## Table 11: Laws Banning Silencers

The following jurisdictions ban the possession of silencers, suppressors, and other accessories designed to mitigate the sound of discharging a weapon as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 33410. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(3), (b)(1). |
| **District of Columbia** | D.C. Code Ann. § 22-4514(a). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(6). |
| **Massachusetts** | Mass. Gen. Laws ch. 269, § 10A. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(g), 2C:39-3(c). |

| | |
|---|---|
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Rhode Island** | R.I. Gen. Laws § 11-47-20. |

<h3 style="text-align:center"><u>Table 12: Laws Restricting Silencers</u></h3>

The following jurisdictions restrict the possession of silencers, suppressors, and other accessories designed to mitigate the sound of discharging a weapon as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. § 921(a)(3); 26 U.S.C. §§ 5841(a), 5845(a)(7), 5861. |
| **Alaska** | Alaska Stat. §§ 11.61.200(a)(3), (c), (h)(1)(B). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(ii), 13-3102(A)(3), 17-251. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Connecticut** | Conn. Gen. Stat. § 53a-211. |
| **Georgia** | Ga. Code Ann. §§ 16-11-121(7), 16-11-122. |
| **Iowa** | Iowa Code § 724.1B. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(4). |
| **Michigan** | Mich. Comp. Laws §§ 750.224(1)(b), (3)(c). |

| | |
|---|---|
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(c). |
| **Montana** | Mont. Code Ann. § 45-8-337. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.350(1)(b). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-05-01. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(5), 2923.17(A), (C)(5). |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. § 908. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (17), 22-14-6. |
| **Vermont** | Vt. Stat. Ann. tit. 13, § 4010. |
| **Washington** | Wash. Rev. Code § 9.41.250(1)(c). |
| **Wisconsin** | Wis. Stat. § 941-298. |

## Table 13: Laws Banning Armor-Piercing Ammunition

The following jurisdictions ban the possession of ammunition designed to penetrate body armor or vehicle armor as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(17)(B)-(C), 922(a)(7)-(8). |
| **Alabama** | Ala. Code § 13A-11-60(a). |
| **California** | Cal. Penal Code §§ 16660, 30315, 30320. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202*l*(a)(1), (b)-(c). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(13A)(A)(i), 7-2506.01(a)(3). |
| **Florida** | Fla. Stat. §§ 790.31(1)(a), (2)(a)-(c). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |
| **Indiana** | Ind. Code Ann. § 35-47-5-11.5. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(6). |
| **Kentucky** | Ky. Rev. Stat. Ann. §§ 237.060(7), 237.080. |

| | |
|---|---|
| **Louisiana** | La. Rev. Stat. Ann. §§ 40:1810-40:1812. |
| **Maine** | Me. Rev. Stat. Ann. tit. 17-A, § 1056. |
| **Michigan** | Mich. Comp. Laws § 750.224c. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.273. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(gg), 2C:39-3(f). |
| **North Carolina** | N.C. Gen. Stat. § 14-34.3. |
| **Oklahoma** | Okla. Stat. tit. 21, §§ 1289.19-1289.22. |
| **Rhode Island** | R.I. Gen. Laws § 11-47-20.1. |
| **South Carolina** | S.C. Code Ann. § 16-23-520. |
| **Texas** | Tex. Penal Code §§ 46.01(12), 46.05(a)(2). |
| **Virgin Islands** | V.I. Stat. tit. 14, §§ 2256(b)-(c). |

## <u>Table 14: Laws Banning Explosive Ammunition</u>

The following jurisdictions ban the possession of high-explosive incendiary ammunition designed to explode or impart energy upon contact via a charge as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|:---:|---|
| **California** | Cal. Penal Code § 30210. |
| **Florida** | Fla. Stat. §§ 790.31(1)(b), (2)(a)-(c). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(11), 5/24-3.1(a)(6). |
| **Iowa** | Iowa Code §§ 724.1(1)(f), 724.3. |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.4). |
| **New York** | N.Y. Penal Law § 265.01(7). |
| **Tennessee** | Tenn. Code Ann. § 39-17-1304(b). |
| **Virgin Islands** | V.I. Stat. tit. 14, §§ 2256(b)-(c). |

## Table 15: Laws Banning Large-Caliber Ammunition

The following jurisdictions ban the possession of large-caliber ammunition as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **California** | Cal. Penal Code § 18735. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202*l*(a)(2), (b)-(c). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(13A)(A)(iii), 7-2506.01(a)(3). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(11), 5/24-1.9(a)(6), (b), (c) (possession ban effective Jan. 1, 2024). |

## Table 16: Law Banning Hollow-Point Bullets

The following state bans the possession of hollow-point and other ammunition designed to expand on impact as part of its firearm safety laws.

| State | State Law |
|---|---|
| **New Jersey** | N.J. Stat. Ann. § 2C:39-3(f). |

## Table 17: Laws Banning Flechette Ammunition

The following states ban the possession of flechette shells, or other ammunition that can be fired in a firearm and that expels two or more pieces of fin-stabilized solid metal wire or two or more solid dart-type projectiles, as part of their firearm safety laws.

| State | State Law |
|---|---|
| **California** | Cal. Penal Code §§ 16570, 30210. |
| **Florida** | Fla. Stat. §§ 790.31(1)(f), (2)(a)-(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |

## Table 18: Laws Banning Dragon's Breath and Bolo Shells

The following states ban the possession of "Dragon's Breath" shells, ammunition that when fired produces sparks and flames simulating a flamethrower, and bolo shells, ammunition containing two or more large lead balls connected by a wire, that when used may sever a target's limb, as part of their firearm safety laws.

| State | State Law |
|---|---|
| **Florida** | Fla. Stat. §§ 790.31(1)(d)-(e), (2)(a)-(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |
| **Iowa** | Iowa Code §§ 724.1(1)(f), 724.2, 724.3. |