# 23-1162

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

NATIONAL ASSOCIATION FOR GUN RIGHTS and TONI THERESA SPERA FLANIGAN,

*Plaintiffs-Appellants,*

PATRICIA BROUGHT,

*Plaintiff*

v.

NED LAMONT, in his official capacity as the Governor of the State of Connecticut, PATRICK J. GRIFFIN, in his official capacity as the Chief States Attorney of the State of Connecticut, SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District,

*Defendants-Appellees,*

DAVID R. SHANNON, in his official capacity as the State's Attorney, Lichfield Judicial District,

*Defendant.*

On Appeal from the United States District Court for the
District of Connecticut No. 3:22-1118 (JBA)

## BRIEF OF EVERYTOWN FOR GUN SAFETY
## AS AMICUS CURIAE IN SUPPORT OF
## DEFENDANTS-APPELLEES AND AFFIRMANCE

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
wtaylor@everytown.org
(646) 324-8215

February 28th, 2024

**CORPORATE DISCLOSURE STATEMENT**

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT .........................................................................3

    I.    Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct ......................................3

    II.    Connecticut's Restrictions Are Consistent with Historical Tradition .......8

        a.    Plaintiffs' Effort to Confine Historical Analysis to the Founding Era is Irreconcilable with Antonyuk ..............................................10

        b.    This Court Should Also Consider Consistent Later History .........14

CONCLUSION.........................................................................20

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024) ................................................................................................... *passim*

*Bevis v. City of Naperville*,
  85 F.4th 1175 (7th Cir. 2023), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879 (U.S. Feb. 14, 2024), No. 23-880 (U.S. Feb. 14, 2024) ................................. *passim*

*Capen v. Campbell*,
  No. 1:22-cv-11431, 2023 WL 8851005 (D. Mass. Dec. 21, 2023), *appeal docketed*, No. 24-1061 (1st Cir. Jan. 17, 2024).............................................................9, 19

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
  664 F. Supp. 3d 584 (D. Del. 2023), *appeals docketed*, Nos. 23-1633, 23-1634, 23-1641 (3d Cir. Apr. 7, 2023) ........................................................................9, 19

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)...................................................................................... *passim*

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ................................................................................7

*Hanson v. District of Columbia*,
  671 F. Supp. 3d 1 (D.D.C. 2023), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023) ...................................................................................................................19

*Hartford v. Ferguson*,
  No. 3:23-cv-05364, 2023 WL 3836230 (W.D. Wash. June 6, 2023)...................19

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011).........................................................................17

*Kipke v. Moore*,
  Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503 (D. Md. Sept. 29, 2023) ............................................................................................................13

*Lara v. Commissioner Pennsylvania State Police*,
  91 F.4th 122 (3d Cir. 2024), *petition for reh'g en banc filed*, No. 21-1832, Dkt. 81 (3d Cir. Feb. 15, 2024)............................................................................................13

*McCullen v. Coakley*,
573 U.S. 464 (2014)..........................................................................18

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)..........................................................................12

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995)..........................................................................17

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*, No.
23-1719 (4th Cir. July 10, 2023).......................................................12

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th
Cir. 2023).........................................................................................12

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022).................................................................. *passim*

*New York State Rifle & Pistol Ass'n v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ..............................................................8

*Ocean State Tactical, LLC v. Rhode Island*,
646 F. Supp. 3d 368 (D.R.I. 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18,
2023) ..................................................................................................5

*Or. Firearms Fed'n v. Kotek*,
No. 2:22-cv-01815, 2023 WL 3687404 (D. Or. May 26, 2023)...........................9

*Or. Firearms Fed'n v. Kotek*,
No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023), *appeals docketed*,
Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir. 2023) ...............6, 7, 8

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) .............................................................5

*United States v. Berger*,
No. 5:22-cr-00033, 2024 WL 449247 (E.D. Pa. Feb. 6, 2024)............................6

*United States v. Rowson*,
652 F. Supp. 3d 436 (S.D.N.Y. 2023) ...................................................19

*We the Patriots, Inc. v. Grisham*,
   No. 1:23-cv-00771, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), *appeal docketed*,
   No. 23-2166 (10th Cir. Oct. 20, 2023) ................................................................13

## Other Authorities

Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Cal L. Rev.
   (forthcoming 2025),
   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4546050 ......................18

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843
   (U.S. Nov. 3, 2021) ...............................................................................................14

Will Van Sant, *The Gun Industry's Trade Group Is Using Flimsy Data in Big Court Cases*,
   The Trace (Oct. 5, 2023), https://www.thetrace.org/2023/10/nssf-high-
   capacity-magazine-ammo-data ............................................................................8

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman used an assault weapon and large-capacity magazines to murder twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Connecticut's  restrictions on assault weapons and large-capacity magazines are constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), for the reasons set out in the State's brief, Dkt. 46 ("State Br."), and as multiple courts have concluded when assessing similar laws. Everytown submits this amicus brief to expand on two

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

methodological points. *First*, as this Court made clear in its recent decision in *Antonyuk v. Chiumento*, 89 F.4th 271, 383 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024), the district court was correct to conclude that on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden; and here, their burden is to establish that assault weapons and large-capacity magazines are "Arms" in common use for self-defense. *See* Pls.' Special App. ("SPA") 32.[2] Plaintiffs have not met that burden here. *Second*, also in accord with *Antonyuk*, 89 F.4th at 304-05, 318 n.27, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with this Nation's historical tradition of firearm regulation," 597 U.S. at 17—the Court should consider evidence from the periods around both 1791, when the Second Amendment was ratified, and 1868, when the Fourteenth Amendment was ratified. And if there is a conflict between the two periods, 1868 should prevail. Moreover, 1868 is not a cutoff for the historical analysis; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added) ; *see Antonyuk*, 89 F.4th at 304-05, 318 n.27, 319 n.32. As *Bruen* instructs, this is particularly so

---

[2] This special appendix is attached to Plaintiffs' opening brief. *See* Dkt. 23.

where, as here, the challenged law implicates "unprecedented societal concerns or dramatic technological changes." 597 U.S. at 27.

**ARGUMENT**

## I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether the plaintiff is "part of 'the people' whom the Second Amendment protects," whether the item at issue is an "arm" that is "'in common use' today for self-defense," and whether the "proposed course of conduct" falls within the Second Amendment. *Bruen*, 597 U.S. at 32; *see Antonyuk*, 89 F.4th at 298-99, 312. If so, the court proceeds to consider whether the government has shown that its regulation is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. *See generally id.* at 31-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, items, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1192 (7th Cir. 2023) (explaining that, if laws do not implicate protected "Arms," then "the Second Amendment has nothing to say about these laws: units of government are free to permit them, or not to permit them, depending on the outcome of the democratic

process"), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879 (U.S. Feb. 14, 2024), No. 23-880 (U.S. Feb. 15, 2024).

This Court explained in *Antonyuk* (and Plaintiffs concede, *see* Dkt. 23 ("Pls.' Br.") 7, 18) that the burden to satisfy the initial, textual inquiry is on the party challenging a law. *See Antonyuk*, 89 F.4th at 383 (explaining that plaintiffs were "required to show" that proposed conduct "was within the plain text of the Second Amendment"); *see also, e.g.*, *Bevis*, 85 F.4th at 1194 ("[P]laintiffs … have the burden of showing that the weapons addressed in the pertinent legislation are Arms that ordinary people would keep at home for purposes of self-defense[.]"); SPA32 (district court below reaching this same conclusion). *Bruen* makes this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 597 U.S. at 17, 44 n.11. The burden shifts to the government only after this threshold analysis. If the burden were on the government throughout—in what would be an unusual departure from ordinary litigation principles—the Court would have said so. Instead, *Bruen* discusses the government's burden only at the historical step. *See, e.g.*, *id.* at 33-34 ("[T]he burden falls on [the government] to show that [the challenged restriction] is consistent with this Nation's historical tradition of firearm regulation.").

Plaintiffs argue that they have met their textual burden in this case because, in their view, the regulated assault weapons and large-capacity magazines are "bearable arms." *See* Pls.' Br. 25. All that matters for this inquiry, Plaintiffs contend, is that assault weapons are firearms and, they assert, "[m]agazines are essential to the operation of all semi-automatic firearms." *Id.* 7-8; *see id.* 18-25. But this is not so. Whether a weapon or accessory is commonly used for self-defense, *see Bruen*, 597 U.S. at 31-32; whether or not it is "most useful in military service," *Heller*, 554 U.S. at 627; *see also Bevis*, 85 F.4th at 1193-94, and whether it is "dangerous and unusual," *Heller*, 554 U.S. at 627; *see Bruen*, 597 U.S. at 47, are all part of the textual analysis on which Plaintiffs bear the burden. That is apparent from *Bruen* itself, which noted the parties' agreement "that handguns are weapons 'in common use' today for self-defense" in its discussion of the Second Amendment's text. 597 U.S. at 32; *see Antonyuk*, 89 F.4th at 298-99, 312 (quoting this passage from *Bruen*, and noting that "whether the weapon concerned is 'in common use'" is part of the threshold, plain-text inquiry). Indeed, numerous courts since *Bruen*—including this Court and the district court below—have located these considerations at the textual step.[3]

---

[3] *See, e.g.*, *Antonyuk*, 89 F.4th at 298-99, 312; SPA32-33; *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 389-90 (D.R.I. 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023); *United States v. Berger*, No. 5:22-cr-00033, 2024 WL 449247, at *6-7 (E.D. Pa.

As the State explains, Plaintiffs have not carried their burden to show that the regulated assault weapons and large-capacity magazines are in common use for self-defense.[4] *See* State Br. 20-50.[5] Plaintiffs instead point to flawed and unreliable evidence on this question.[6] And, even more fundamentally, they erroneously

---

Feb. 6, 2024); *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *5 (D. Or. July 14, 2023), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir. 2023); *see also Bevis*, 85 F.4th at 1194, 1198 (assessing whether assault weapons were "Arms that ordinary people would keep at home for purposes of self defense, not weapons that are exclusively or predominantly useful in military service" at textual step but not deciding whether any broader question of "common use" should be considered at step one or two).

[4] Plaintiffs pose the relevant inquiry (which they incorrectly place at the historical step of the analysis) as whether the weapon or accessory is in common use for "lawful purposes." *See, e.g.*, Pls.' Br. 8-10, 21, 26-27. But *Bruen* specifically referred (in its discussion of the textual analysis) to whether the regulated weapons were "in common use today for self defense." 597 U.S. at 32. That focused analysis makes sense, given that "self-defense is 'the *central component* of the Second Amendment right itself.'" *Id.* (emphasis in original, alteration adopted, and quoting *Heller*, 554 U.S. at 599); *see Bevis*, 85 F.4th at 1192 (acknowledging that weapons may have "other lawful uses" but explaining that "the Arms the Second Amendment is talking about are weapons in common use for self-defense").

[5] Nor, with respect to large-capacity magazines and other features and accessories restricted under Connecticut's law, have Plaintiffs shown that these items are "bearable arms" at all. *See* State Br. at 46-50.

[6] For instance, Plaintiffs cite a firearms survey conducted by Professor William English, Pls.' Br. 30, 33-34, but that survey's findings are unpublished and were not peer-reviewed, and the survey fails to disclose its funding sources or measurement tools. A different professor closely associated with gun rights advocacy—whom plaintiffs in other similar gun cases have often used as an expert witness—recently testified, in a challenge to a large-capacity magazine law in Oregon: "I don't think you can rely on" English's survey. *Or. Firearms Fed'n*, No. 2:22-cv-01815, Dkt. 175-7 at 12-13. He testified that English is "vague about exactly how he developed his sample. And there's nothing in his report to

submit that evidence of common *ownership* is sufficient. *See* Pls.' Br. 28 (asserting that "'common use' … can be demonstrated by evidence showing widespread ownership"). But the Seventh Circuit recently rejected a similar argument when upholding Illinois's and localities' assault-weapon restrictions. *Bevis*, 85 F.4th at 1182, 1190. Specifically, the Seventh Circuit deemed it "circular" to focus on possession or ownership rather than use because the "law's existence [would be] the source of its own constitutional validity." *Id.* at 1190 (quoting *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015)). For instance, the court explained, only a few civilians owned AR-15s when the federal assault weapons prohibition was enacted, but the weapons became more widely owned after the federal law expired in 2004. *Id.* at 1199. If the court assessed the law's constitutionality based only on the number of weapons owned or possessed, the law "would have been

---

contradict the assumption that what he had was a self-selected sample …. And that's not a valid sample technique to generate a sample that's representative of the larger US population." *Id.* at 12. When asked "without that information that is missing, you would not rely on that survey for any purpose?," he stated: "That is correct. I would not rely." *Id.* at 12-13. Moreover, as the district court noted, even if English's survey were reliable, it "does not demonstrate that assault weapons … possess characteristics that make them well-suited for self-defense." SPA44.

constitutional before 2004, but unconstitutional thereafter." *Id.* An approach that produces such "anomalous consequences," *id.*,[7] cannot be correct.[8]

In sum, Plaintiffs have failed to satisfy their textual burden at *Bruen*'s first step. Accordingly, this Court may, and should, affirm the district court's decision without proceeding to a historical analysis.

## II. Connecticut's Restrictions Are Consistent with Historical Tradition

If this Court proceeds beyond the textual inquiry, it will next inquire whether Connecticut's assault weapon and large-capacity magazine restrictions are

---

[7] Even if Plaintiffs' metric were accepted, they have not established common ownership or possession. According to one of the State's experts, Dr. Louis Klarevas, a professor and policy analyst who researches gun violence and has served as an expert in several cases involving firearms restrictions, the National Sport Shooting Foundation (NSSF) weapons data on which Plaintiffs rely is likely an over-estimation because it appears to include firearms belonging to law-enforcement agencies and, in any case, the data at best demonstrates that "modern sporting rifles" constitute only 5.3% of all firearms in circulation in America. JA280; *see* Pls.' Br. 29 (citing this data). And the large-capacity magazine figures Plaintiffs point to, *see* Pls.' Br. 31, are, if anything, even more flawed. *See* Will Van Sant, *The Gun Industry's Trade Group Is Using Flimsy Data in Big Court Cases*, The Trace (Oct. 5, 2023), https://www.thetrace.org/2023/10/nssf-high-capacity-magazine-ammo-data. As one court concluded, after hearing and evaluating similar NSSF data at trial, "the NSSF Magazine Chart is entitled to little weight." *Or. Firearms Fed'n*, 2023 WL 4541027, at *11.

[8] This Court's pre-*Bruen* decision in *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), is not to the contrary and does nothing to support Plaintiffs' position here. *See* State Br. 17, 26-28.

"consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.[9]

As the district court correctly held, and several courts have found in upholding similar regulations, historical tradition—from before and throughout the founding era, to the 19th century, through Reconstruction, into the 20th century, and even up to today—consistently demonstrates the constitutionality of the State's restrictions. State Br. 50-70; SPA61-66, 73 n.51; *see, e.g.*, *Bevis*, 85 F.4th at 1201-02 (concluding Illinois' and localities' assault-weapons and large-capacity magazine restrictions are supported by historical tradition dating back to founding); *Capen v. Campbell*, No. 1:22-cv-11431, 2023 WL 8851005, at *12-13, *19 (D. Mass. Dec. 21, 2023) (same, for similar Massachusetts laws), *appeal docketed*, No. 24-1061 (1st Cir. Jan. 17, 2024); *DSSA*, 664 F. Supp. 3d at 600-01 (finding similar Delaware laws are grounded in historical tradition starting shortly after founding). Because analogous historical laws span this Nation's history, this Court can affirm without examining questions regarding the most relevant time period. *See Bruen*, 597 U.S. at 37-38

---

[9] Plaintiffs attempt to remove the historical inquiry from the analysis entirely whenever a weapon is in common use for lawful purposes. *See* Pls.' Br. 26-28. But, as courts have explained, such an approach would be contrary to *Bruen*. *See, e.g.*, *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 597 (D. Del. 2023) ("*DSSA*") (rejecting similar argument), *appeals docketed*, Nos. 23-1633, 23-1634, 23-1641 (3d Cir. Apr. 7, 2023); *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 3687404, at *3 (D. Or. May 26, 2023) (same).

(declining to resolve the timeframe question because the relevant history was consistent between 1791 and 1868).

Nevertheless, Plaintiffs take two positions regarding the time period for historical analysis that require correction. *First*, they strongly suggest that only founding-era evidence is relevant to *Bruen*'s historical inquiry. *See* Pls.' Br. 10, 40-41, 43-47, 50-51. *Second*, they claim that, "whatever may be the case as to 19th-century laws, *Bruen* held that 20th-century laws are certainly irrelevant to the historical inquiry." *Id.* at 42. Both of these positions are mistaken. *Antonyuk* conclusively rules out the view that founding-era evidence of the understanding of the Second Amendment right controls the analysis in a case against a state. And considering not only late 19th century but also 20th century history is not only permissible under *Bruen*, but is particularly important in this case, given the "dramatic technological changes" and "unprecedented societal concerns" it presents. *See Bruen*, 597 U.S. at 27.

### a. Plaintiffs' Effort to Confine Historical Analysis to the Founding Era is Irreconcilable with Antonyuk

Plaintiffs believe that the historical question controlling this case is how the people understood the right to keep and bear arms in 1791. They assert, for example, that "[t]here are no analogous Founding-era laws" to Connecticut's restriction, and that it "is therefore categorically unconstitutional." Pls.' Br. 40.

This position is impossible to reconcile with *Antonyuk*. Because the challenge it confronted involved "a state law," *Antonyuk* expressly held that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." 89 F.4th at 304; *see also id.* at 318 n.27 ("[E]vidence from Reconstruction regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is at least as relevant as evidence from the Founding Era regarding the Second Amendment itself."). That conclusion is firmly grounded in originalist principles. The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 597 U.S. at 37. In a case against a state, therefore, to disregard the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. *See Antonyuk*, 89 F.4th at 304-05. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35; emphasis added in *Bruen*).

As *Antonyuk* also recognized, insisting that only the 1791 understanding should apply against the states would not make sense given the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear

arms around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010)

(plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in

the judgment). As *Antonyuk* explained, "[i]t would be incongruous to deem the right

to keep and bear arms fully applicable to the States by Reconstruction standards

but then define its scope and limitations exclusively by 1791 standards." 89 F.4th at

304-05.

Several other courts since *Bruen* have agreed that, in challenges to state laws,

historical evidence from the Reconstruction era is at least as relevant as, if not more

relevant than, evidence from the founding. A panel of the Eleventh Circuit held

that, in cases involving state laws, where the understanding of the right to keep and

bear arms differs between the founding and Reconstruction eras, "the more

appropriate barometer is the public understanding of the right when the States

ratified the Fourteenth Amendment and made the Second Amendment applicable

to the States." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023), *vacated

on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023).[10] Other courts have

concluded likewise. *See Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736,

2023 WL 4373260, at *8 (D. Md. July 6, 2023) (concluding that "historical sources

from the time period of the ratification of the Fourteenth Amendment are equally if

---

[10] Although that panel opinion has now been vacated for rehearing en banc, its analysis of the relevant time period remains consistent with originalist principles. *See Antonyuk*, 89 F.4th at 305 (following *Bondi*).

not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) (agreeing with *Maryland Shall Issue*); *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00771, 2023 WL 6622042, at *8 (D.N.M. Oct. 11, 2023) (agreeing with *Bondi* and *Maryland Shall Issue* that Reconstruction-era sources "are more probative" than founding-era sources as to the Second Amendment's scope), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023).[11] And the conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from radical. When asked by Justice Thomas about the correct time period during oral argument in

---

[11] The Third Circuit recently took a different approach in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), *petition for reh'g en banc filed*, No. 21-1832, Dkt. 81 (3d Cir. Feb. 15, 2024), but this Court is bound by *Antonyuk*, not *Lara*. In any event, *Lara*'s reasoning is not sound. Instead of engaging with originalist principles, the Third Circuit based its conclusion on the "general assumption" in several Supreme Court cases cited by *Bruen*. *Id.* at 133-34 (citing *Bruen*, 597 U.S. at 38). But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period is most relevant to the historical inquiry and cannot have resolved the question that *Bruen* expressly left open. *See Bruen*, 597 U.S. at 37-38; *Antonyuk*, 89 F.4th at 304. Because it failed to recognize that issue and cannot be squared with originalist principles, *Lara* is not persuasive.

*Bruen*, counsel for New York's NRA affiliate responded with the Reconstruction era.[12]

In sum, if the Court reaches the time-period question, *Antonyuk* requires it to reject Plaintiffs' view that historical analysis under *Bruen* should be confined to the founding era.

### b. This Court Should Also Consider Consistent Later History

Plaintiffs are also wrong to argue that later historical laws, specifically from the 20th century, are "certainly irrelevant" and "provide no insight." Pls.' Br. 42, 50 (capitalization altered). To the contrary, consistent later history is highly relevant. To begin with, Plaintiffs rely for their claim on a passage in *Bruen* that declined to give weight to 20th-century history because it "contradict[ed] earlier evidence." *Bruen*, 597 U.S. at 66 n.28. The Court did not deem such evidence irrelevant where, as here, there is no genuinely conflicting evidence. As *Antonyuk* recognized, "[t]he *Bruen* Court's concern was with temporally distant laws *inconsistent* with prior practices," and absent inconsistency, 20th-century laws "are not weightless." 89 F.4th at 319 n.32.[13]

---

[12] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[13] To be sure, *Antonyuk* said that "[t]wentieth-century evidence is not *as* probative as nineteenth century evidence because it is less proximate to the

More generally, *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 597 U.S. at 20 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison); *see also* Pls.' Br. 50 (recognizing that "[p]ost-ratification history can be relevant to show how meaning has been liquidated and settled"). Thus, even if evidence in the period up to and around the Fourteenth Amendment's ratification in 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right.

ratification of the 14th Amendment." 89 F.4th at 319 n.32 (emphasis added). That acknowledges that 20th century evidence has *some* probative value, even if not as strong as evidence from closer to 1868. Moreover, the probative value of later evidence is stronger in cases, like this one, involving dramatical technological changes. *See infra* pp. 17-19.

Looking to later evidence can also help contextualize earlier legislative inaction.[14] For instance, suppose (contrary to *Antonyuk*) that 1791 were the correct focus for historical analysis. If a regulation passed in the decades around Reconstruction—*within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time of its passage, and there were no separate historical evidence showing that the regulation would have raised constitutional concern in the decades prior, then it can be inferred that the regulation comports with the founding-era public understanding of the right. In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era public understanding of the right (as demonstrated through a regulatory tradition or other historical materials from that period) also reflects the founding-era understanding.[15] And the same is true for later periods: absent affirmative evidence to the contrary, an early 20th-century understanding of

---

[14] *See also Antonyuk*, 89 F.4th at 301 (cautioning against "[r]easoning from historical silence" because "[l]egislatures past and present have not generally legislated to their constitutional limits").

[15] Such a presumption also reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S at 37. For the Supreme Court—which emphasized the importance of original public understanding—to take this position, it must have presumed, at least as a general matter, that constitutional rights maintained a consistent meaning between the two points of their adoption, 1791 and 1868.

the right should be presumed to reflect the Reconstruction-era, and earlier, understandings.

Here, 19th-century and later laws are convincing evidence of how the right was understood not only when those laws were passed, but also in earlier decades. Plaintiffs have provided no reason to believe that the understanding of the right underwent some startling transformation from 1791 to 1868, or to 1900, or later. Indeed, as *Antonyuk* recognized, it is "implausible that such public understanding would promptly dissipate whenever [one] era gave way to another." *Antonyuk*, 89 F.4th at 304; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness.").

Furthermore, *Bruen* counsels that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. 597 U.S. at 27; *see Antonyuk*, 89 F.4th at 302; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not

exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period—making the consideration of later history particularly crucial. *See Antonyuk*, 89 F.4th at 302 (finding that the "novelty [of a modern law] does not mean unconstitutionality[,] … even if the problems faced by past generations could be described, at a high level of generality, as similar to the problems we face today"); *see also McCullen v. Coakley*, 573 U.S. 464, 481 (2014) ("States adopt laws to address problems that confront them.").

As the State explains, Connecticut adopted the challenged measure in response to the exponential increase in the lethality of firearms and magazines—*i.e.*, "dramatic technological changes," *Bruen*, 597 U.S. at 27—and the "unprecedented societal concern[]," *id.*, that followed, namely, an epidemic of mass shootings. *See* State Br. 5-7, 51-57. In fact, assault weapons did not become "reliable enough consumer items to cause problems [until] the twentieth and twenty-first centuries," at which point "regulation quickly followed." Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Cal L. Rev. (forthcoming 2025) (manuscript at 1), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4546050; *see id.* at 11, 48 & n.206, 54 (describing same); *see also* State Br. 63-66. Accordingly, a "more nuanced approach" to history, *Bruen*, 597 U.S. at 27; *see Antonyuk*, 89 F.4th at 302, including "a broader search for historical analogies," is fully warranted,

*United States v. Rowson*, 652 F. Supp. 3d 436, 470 (S.D.N.Y. 2023); *cf. Antonyuk*, 89 F.4th at 359 n.78 (noting that "the relative novelty of public parks as institutions also justifies a flexible approach under *Bruen*").

Here, state and local laws from the period beginning around Reconstruction and continuing into the Prohibition era and later—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of Connecticut's restrictions. *See, e.g.*, State Br. 61-66 (discussing early 20th-century regulation of particularly dangerous weapons, weapon features, and weapon capacities, which were consistent with earlier laws); SPA61-66, 73 nn. 49-51; *Bevis*, 85 F.4th at 1201-02 (relying on both late 19th- and 20th-century weapons laws to uphold Illinois and municipal laws restricting assault weapons and large-capacity magazines); *DSSA*, 664 F. Supp. 3d at 600-02 (same, to uphold similar Delaware laws*); Capen*, 2023 WL 8851005, at *12-13, *19 (same, as to similar Massachusetts laws); *Hartford v. Ferguson*, No. 3:23-cv-05364, 2023 WL 3836230, at *5 (W.D. Wash. June 6, 2023) (same, for similar Washington assault-weapon law); *Hanson v. District of Columbia*, 671 F. Supp. 3d 1 (D.D.C. 2023) (same, as to similar D.C. large-capacity magazine law), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023). And, in any event, as the State notes, *see* State Br. 57 n.15, the Court should consider this later historical evidence and the "regular course of

practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like Connecticut's.

## CONCLUSION

The Court should affirm the district court's decision.

Dated: February 28, 2024

Respectfully submitted,

<u>/s/ William J. Taylor, Jr.</u>
Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8215
wtaylor@everytown.org

*Counsel for amicus curiae*
*Everytown for Gun Safety*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 4,917 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

Dated: February 28, 2024

<u>/s/ William J. Taylor, Jr.</u>
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*