# 23-1162

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————————

NATIONAL ASSOCIATION FOR GUN RIGHTS, ET AL.,

*Plaintiffs-Appellants*,

v.

NED LAMONT, ET AL.,

*Defendants-Appellees*.

———————————————

On Appeal from the United States District Court for the District of Connecticut
No. 1:22-cv-1118
Hon. Janet Bond Arterton, District Judge

———————————————

## BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, MARCH FOR OUR LIVES, AND CONNECTICUT AGAINST GUN VIOLENCE IN SUPPORT OF DEFENDANTS-APPELLEES

———————————————

Aaron R. Marcu
Brandt Henslee
Daniel Hodgkinson
Taylor Jachman
Freshfields Bruckhaus Deringer US LLP
3 World Trade Center, 51st Floor
175 Greenwich Street
New York, NY 10007
(212) 277-4000
aaron.marcu@freshfields.com
brandt.henslee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com

Jennifer B. Loeb
   *Counsel of Record*
Freshfields Bruckhaus Deringer US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
jennifer.loeb@freshfields.com

*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT AND NOTIFICATION OF PUBLICLY HELD AFFILIATES**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, March for Our Lives, and Connecticut Against Gun Violence, Inc. state that they are non-profit corporations, have no parent corporation, do not issue stock, and have no publicly-held affiliates.

Date: February 28, 2024        Freshfields Bruckhaus Deringer US LLP

*/s/ Jennifer B. Loeb*
Jennifer B. Loeb

*Counsel for Amici Curiae*
Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, March for Our Lives, and Connecticut Against Gun Violence

# TABLE OF CONTENTS

I.   INTEREST OF *AMICI CURIAE*..................................................................1

II.  INTRODUCTION...........................................................................................2

III. ARGUMENT ...................................................................................................4

   A.  *Bruen*'s Second Amendment Test Requires Considering Empirical Research.
     4

   B.  Because the Challenged Laws Address Unprecedented Societal and
   Technological Conditions, *Bruen* Requires a Nuanced Approach........................5

     1.   The Frequency, Lethality, and Geographic Concentration of Public Mass
     Shootings Are Novel Societal Concerns.............................................................5

     2.   The Rise of Mass Shootings Coincides with Unprecedented Societal
     Concerns that the Founders Could Never Have Imagined. ...............................7

     3.   Advances in Gun Technology Have Combined with Societal Changes to
     Create the Perfect Storm for Mass Shootings. ..................................................10

     4.   *Bruen* Requires Nuance in Analyzing Historical Analogues....................13

   C.  Plaintiffs' Formulation of "Common Use" Is Inherently Flawed Because the
   Challenged Laws Are Not a Categorical Ban, and Therefore the Common Use
   Standard Does Not Apply.....................................................................................15

   D.  Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-
   Defense" Weapons Protected by the Second Amendment..................................20

     1.   Pistol Grips.......................................................................................25

     2.   Forward Grips ...................................................................................26

     3.   Detachable Magazines.......................................................................26

   E.  Regulation of LCMs Likewise Does Not Burden the Individual Right to
   Self-Defense. .......................................................................................................27

IV. CONCLUSION.............................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Bevis v. City of Naperville,*
  85 F.4th 1175 (7th Cir. 2023) ..................................................*passim*

*Capen v. Campbell,*
  2023 WL 8851005 (D. Mass. Dec. 21, 2023)........................................11, 16–17

*District of Columbia v. Heller,*
  554 U.S. 570 (2008)..................................................................*passim*

*Duncan v. Bonta,*
  19 F.4th 1087 (9th Cir. 2021) .........................................................29

*Hanson v. District of Columbia,*
  2023 WL 3019777 (D.D.C. Apr. 20, 2023)...............................................2

*Kolbe v. Hogan,*
  849 F.3d 114 (4th Cir. 2017) .....................................................21, 27

*Libertarian Party of Erie Cnty. v. Cuomo,*
  970 F.3d 106 (2d Cir. 2020) ...........................................................2

*Nat'l Ass'n for Gun Rts. v. Lamont,*
  2023 WL 4975979 (D. Conn. Aug. 3, 2023)........................................2, 14, 24

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022).....................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
  804 F.3d 242 (2d Cir. 2015) ......................................................19, 25

*Or. Firearms Fed'n, Inc. v. Brown,*
  644 F. Supp. 3d 782 (D. Or. 2022) ....................................................29

*Richmond Boro Gun Club, Inc. v. City of New York,*
  97 F.3d 681 (2d Cir. 1996) ...........................................................26

*Staples v. United States,*
  511 U.S. 600 (1994)...................................................................25

iii

*Worman v. Healey*,
     922 F.3d 26, 37 (1st Cir. 2019)..........................................................29

**Statutes**                                                                    **Page(s)**

Conn. Gen. Stat. § 53-202a...........................................................*passim*

Conn. Gen. Stat. § 53-202b...........................................................*passim*

Conn. Gen. Stat. § 53-202c...........................................................*passim*

Conn. Gen. Stat. § 53-202w...........................................................*passim*

**Other Authorities**                                                           **Page(s)**

*1866 Yellowboy Rifle History*, Uberti USA,
     https://tinyurl.com/3x2wjth3......................................................12

*Are AR-15 Magazines Interchangeable? Which Ones Are*, Neckbone
     Armory, https://tinyurl.com/hppuzpb2 ...........................................11

*Assault Weapons and Large Capacity Magazines*, Educ. Fund to Stop
     Gun Violence (July 2020), https://tinyurl.com/yjmaba4k............................26, 27

Bonnie Berkowitz & Chris Alcantara, *The terrible numbers that grow
     with each mass shooting*, Wash. Post (May 9, 2021),
     https://tinyurl.com/537ww9z4 ......................................................6

Carla Astudillo et al., *What we know, minute by minute, about how the
     Uvalde shooting and police response unfolded*, Texas Tribune
     (July 28, 2022), https://tinyurl.com/mr4eyjfu ....................................13

Charles DiMaggio et al., *Changes in US Mass Shooting Deaths
     Associated with the 1994–2004 Federal Assault Weapons Ban:
     Analysis of Open–source Data*, 86 J. Trauma & Acute Care
     Surgery 11 (2019) .................................................................28

Christopher Ingraham, *It's Time to Bring Back the Assault Weapons
     Ban, Gun Violence Experts Say*, Wash. Post (Feb. 15, 2018),
     http://tinyurl.com/2fkpr72s.........................................................28

Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64..............................................................11

Christopher S. Koper, *Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high-capacity semiautomatic firearms*, 19 Criminology & Pub. Pol'y 147 (2020) ...........................................19

Claude Werner, *The Armed Citizen - A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), tinyurl.com/bdemd7ya....................................29

*Critical Incident Review: Active Shooter at Robb Elementary School*, U.S. Dep't of Justice (Jan. 18, 2024), http://tinyurl.com/2s4y5sz6 ..................24

Dan Alex, *Winchester Model 1866: Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.......................12

Decl. of Robert Spitzer, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431, ECF No. 21-10 (D. Mass. Jan. 31, 2023)...................................12

*Dep. of H. Wayne Carver II, M.D.*, Posner v. Fetzer (May 21, 2019), http://tinyurl.com/dzu8ybwu ....................................23

*Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, H. Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed ...........................................................24

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t...............................................................13

*Gun Accessories for Sale*, Impact Guns, http://tinyurl.com/2apapmh3 ...........................................................18

Gun Violence Archive 2024, https://tinyurl.com/5t4rrt56...................................................................6

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe ...........................................................23

*Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022) ............................................................8, 9

Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa ........................9

James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye ............................................................11

Jason R. Silva, *Global mass shootings: comparing the United States against developed and developing countries*, 47 Int'l J. Compar. & Applied Crim. Just. 317 (2023) ...........................................................7

Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019), https://tinyurl.com/3upbexr9 ..............................29–30

*Killing Machines: The Case for Banning Assault Weapons*, Educ. Fund to Stop Gun Violence (Sept. 2003), http://tinyurl.com/bdzjpuhp ........................................................25, 26

Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AJPH 1754 (2019) .....................................................................27

Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn ........................................6

*Marjory Stoneman Douglas High School Public Safety Commission Report* (2019), tinyurl.com/mvs34fky ...............................................28

Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023), https://tinyurl.com/dkzjskxs .................................................12

Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc ..............................................8

Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b ...................................22

N. Kirkpatrick, et al., *The Blast Effect*, Wash. Post (2023), http://tinyurl.com/2kutwsea ....................................................21, 23, 24

*One dead as 22 shot near end of Chiefs' victory parade¸* ABC News (Feb. 15, 2024), http://tinyurl.com/jzbk8kvb ............................6

Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9 ....................................................8

*Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23 ....................................................6

Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths,* 80 J. of Trauma & Acute Care Surgery 853 (2016) .....................................................................11

*Pop Culture: 1800*, U.S. Census Bureau (Dec. 14, 2023), https://tinyurl.com/78cxvafx ....................................................9

*Pop Culture: 2020*, U.S. Census Bureau (Dec. 14, 2023), http://tinyurl.com/bdcts694 ....................................................9

*Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*, U.S. Dep't of the Army (2003), https://tinyurl.com/3reu38px ..........................22

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27 .......................28

Sara Swann, *The history of the AR-15 and how it became a symbol of American gun culture,* Poynter (June 29, 2022), https://tinyurl.com/5bffkafr ....................................................21

Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt ....................................................23

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?,* 49 Hastings Const. L.Q. 145 (2022), https://tinyurl.com/zx2dvsmc ....................................................14

Serge F. Kovaleski & Mike Baker, *Gunman in 2017 Las Vegas Shooting Was Angry at Casinos, New F.B.I Files Show*, N.Y. Times (Mar. 30, 2023) http://tinyurl.com/ykxj889u...........................................10

*TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army (May 2016), https://tinyurl.com/2p963dxd ....................................................12

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa...........................................................22

Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack,* Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us .................................................................9

*What is your par time for an AR-15 emergency reload?*, AR15.com (Nov. 22, 2010), https://tinyurl.com/3csjs7kd....................................11

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough Sch. Bus. Rsch. Paper No. 4109494 (May 13, 2022), https://tinyurl.com/yc3fer46 ......................................................15, 16

*Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc.........................................12

## I. INTEREST OF *AMICI CURIAE*

*Amici Curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center"), Brady Center to Prevent Gun Violence ("Brady"), March for Our Lives ("MFOL"), and Connecticut Against Gun Violence ("CAGV") (together, "*Amici*") respectfully submit this Brief in Support of Defendants-Appellees' Brief, ECF No. 46 ("Defendants' Brief").[1]

Giffords Law Center is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.

Brady is the Nation's longest-standing non-partisan, nonprofit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action.

MFOL is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives.

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E) and Local Rule 29.1(b), all parties have consented to this filing. No party's counsel authored any part of this brief, and no one other than *Amici* contributed to its preparation or submission.

CAGV is a nationally recognized leader in state-level advocacy committed to ending gun violence in Connecticut and creating safer communities through education, grass-root organizing, and legislative initiatives.

Through partnerships with researchers, public health experts, and community organizations, *Amici* conduct research for, draft, and defend laws, policies, and programs proven to reduce gun violence.

*Amici* have filed numerous *amicus* briefs in cases involving the constitutionality of firearms regulations,[2] and judges have regularly cited the organizations' research and expertise.[3]

## II. INTRODUCTION

The Connecticut gun-safety laws regulating the possession and sale of assault weapons and large capacity magazines ("LCMs"), Conn. Gen. Stat. §§ 53-202a-c, 53-202w (together, the "Challenged Laws"), are constitutional under the test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *Bruen* instructs that when a law regulates conduct covered by the plain text of the Second Amendment, courts reviewing the law's constitutionality must determine if

---

[2] *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020).

[3] *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *12 (D. Conn. Aug. 3, 2023); *Hanson v. District of Columbia*, 2023 WL 3019777, at *10, *14, *16 & nn.8, 10 (D.D.C. Apr. 20, 2023), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023).

the "regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. *Bruen* requires a "nuanced approach" to historical analysis in cases like this one, that "implicat[e] unprecedented societal concerns or dramatic technological changes," to avoid putting a "regulatory straightjacket" on governments seeking to protect the public from being harmed by dangerous firearms. *Id.* at 27, 30. The Challenged Laws are constitutional under this test because they are relevantly similar to historical regulations that were designed to address pressing public safety concerns of their times.

This Court, however, need not reach the historical regulation question because Plaintiffs' challenge to the laws fails at *Bruen*'s critical threshold: the weapons and weapon features governed by the Challenged Laws are not covered by the plain text of the Second Amendment because they are uniquely dangerous and not quintessential self-defense weapons. The weapons regulated by the Challenged Laws are weapons of war, designed to kill large numbers of people quickly. They are significantly more lethal than any firearms of the 1700s or 1800s.

In addition, Plaintiffs' version of the common use test is inherently flawed and should be rejected.

## III. ARGUMENT

### A. *Bruen*'s Second Amendment Test Requires Considering Empirical Research.

In *Bruen*, the Supreme Court articulated a new standard for determining whether a regulation is constitutional under the Second Amendment: the party challenging a law bears the initial burden of showing that the regulated conduct is covered by the Second Amendment's plain text. The burden then shifts to the government to demonstrate that the regulation is "consistent with this Nation's historical tradition" of firearms regulation. *Bruen*, 597 U.S. at 34.

Significantly, the Court explained that a modern regulation need not be the "twin" of a historical regulation. *Id.* at 30. The Court recognized that while it is "relatively simple" to analogize modern regulations to "historical" ones in some cases, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27. The Court also identified two important—but non-exclusive—considerations for lower courts to use in determining if historical and modern regulations are similar: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (emphases added).

Comparing the motivations (the "whys") and the implementations (the "hows") of modern and historical laws requires courts to consider relevant empirical research on prevailing conditions in modern and historical American society. Such

research helps courts contextualize modern and historical laws and the prevailing societal backdrop against which those laws were passed, as *Bruen* requires.

*Bruen*'s analysis of historical analogues thus demands that gun-safety regulations be viewed in light of relevant prevailing societal conditions, and empirical research provides indispensable evidence of these conditions.

### B. Because the Challenged Laws Address Unprecedented Societal and Technological Conditions, *Bruen* Requires a Nuanced Approach.

Over the past 200 years, unprecedented societal changes and advances in firearms technology have caused a dramatic rise in the frequency and lethality of mass shootings. This uniquely modern danger motivated the Challenged Laws, which, like many regulations spanning our Nation's history, were designed to protect the public.[4]

#### 1. The Frequency, Lethality, and Geographic Concentration of Public Mass Shootings Are Novel Societal Concerns.

The United States has experienced a recent, exponential increase in the frequency of public mass shootings. *Amici* could find evidence of only two instances of mass shootings in America throughout all of the 18th and 19th centuries,[5] both of

---

[4] *See* Defs.' Br. at 3 (noting that Connecticut "bolster[ed] its gun safety laws" in response to the Sandy Hook shooting).

[5] As used here, a "mass shooting" is a shooting in which four or more people (other than the perpetrator(s)) are injured and/or killed, where victims are selected indiscriminately, and where the shootings are not attributable to any other underlying criminal activity or circumstance.

which occurred in 1891 and neither of which involved fatalities (likely given the limitations of gun technology at the time).[6] One scholar estimates that a total of 25 mass shootings occurred between 1900 and 1965.[7] In astonishing contrast, more than 2,500 mass shootings have occurred in the United States just since 2020: 610 in 2020, 689 in 2021, 644 in 2022, and 656 in 2023—an average of nearly two per day.[8] As of the drafting of this brief,[9] 61 mass shootings have been recorded in the United States in the first two months of 2024.[10]

This societal threat is remarkable not just because of its swift rise to epidemic proportions in the United States, but also because of the disproportionately high rate of mass shootings in the U.S. relative to the rest of the world. A recent comprehensive study analyzing the number of mass shooting incidents and fatalities in 36 developed countries found that: half did not have a single mass shooting

---

[6] *See* Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn.

[7] *See* Bonnie Berkowitz & Chris Alcantara, *The terrible numbers that grow with each mass shooting*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4.

[8] *See Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23.

[9] And this number is likely to grow. Only two weeks ago, 22 people, including at least nine children, were shot at Kansas City's parade celebrating the hometown Chiefs' Super Bowl win. *See One dead as 22 shot near end of Chiefs' victory parade¸* ABC News (Feb. 15, 2024), http://tinyurl.com/jzbk8kvb.

[10] Gun Violence Archive 2024*,* https://tinyurl.com/5t4rrt56 (last accessed Feb. 28, 2024).

between 1998 and 2019; only ten had more than one mass shooting; and only five had more than two.[11] The United States had more than 12 times as many mass shootings as the country with the second-highest mass shooting count and the greatest number of mass shooting fatalities of all developed countries.[12] The United States makes up 33% of the population of developed countries, yet accounts for 73% of all mass shooting incidents and 62% of fatalities.[13]

Together, these figures demonstrate that mass shootings are strikingly more prevalent in modern-day America than at any time in our history or in any comparable place in the world.

> **2.** **The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns that the Founders Could Never Have Imagined.**

Several modern social phenomena coincided with a surge in mass shootings during the 21st century, making the prevention of gun violence especially imperative. The proliferation of social media platforms and transformative urbanization are two poignant examples.

---

[11] Jason R. Silva, *Global mass shootings: comparing the United States against developed and developing countries*, 47 Int'l J. Compar. & Applied Crim. Just. 317, 331 (2023).

[12] *Id.*

[13] *Id.* ("Understood together, this study supports previous research finding mass shootings are a uniquely American problem.").

a. *Social Media*

Social media platforms create a means of communication exponentially faster, farther-reaching, and more difficult to regulate than anything the Founders could have imagined. Numerous studies correlate social media with increases in anti-social behavior; mental health disorders; political, religious, and social extremism; and ultimately, mass shootings. Social media plays an important role in the radicalization of American extremists;[14] a mounting body of evidence demonstrates that content-ranking algorithms limit users' exposure to contrary viewpoints, creating "echo chambers" that intensify biases.[15]

Many perpetrators of mass shootings have been inspired by the violent and extremist discourse they see online. One example (of far too many) is the May 2022 Tops Buffalo shooting, in which the 18-year-old gunman published a racist manifesto online before broadcasting the shooting live on social media.[16] The New York Attorney General reported that the gunman's "path towards becoming a white

---

[14] *See, e.g.,* Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc.

[15] *See* Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Ch.3 in *Social Media and Democracy*, Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9.

[16] *See generally Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022).

supremacist terrorist began upon viewing on the 4chan [social media] website a brief clip of a [previous] mass shooting."[17] The Buffalo shooter also posted material on a different social media platform, Discord, "with the explicit goal of provoking future mass shootings."[18] A *Reuters* article observed that the shooting "appear[ed] to be the latest in a line of 'copycat' gunmen carrying out deadlier mass shootings inspired by previous attackers."[19] Likewise, on May 7, 2023, another mass shooter killed eight people in Allen, Texas, after being influenced by white supremacist materials with which he engaged on social media.[20]

> b. *Urbanization*

Urbanization has also radically transformed society since the Founders' era. In 1800, the United States averaged 6.1 people per square mile.[21] By 2020, the population had increased by 1,500% to an average of 93 people per square mile.[22]

---

[17] *Id*. at 3.

[18] *Id.* at 15.

[19] Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack*, Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us.

[20] Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.

[21] *Pop Culture: 1800*, U.S. Census Bureau (Dec. 14, 2023), https://tinyurl.com/78cxvafx.

[22] *Pop Culture: 2020*, U.S. Census Bureau (Dec. 14, 2023), http://tinyurl.com/bdcts694. Because these figures are an average of the population density of all areas of the country, the much lower density in rural areas means that the numbers drastically understate the impact of population density in *urban and*

This explosion in population density has profoundly changed how people associate. People gather in large groups more frequently than could have been possible before extensive urbanization and mass industrialization, including in schools that accommodate thousands of students, tightly packed commuter trains and buses, large office buildings, crowded night clubs, sports arenas and stadiums, concerts, movie theaters, malls, and parades. This change is true even in rural areas where, because of modern transportation capabilities, relatively large crowds can gather easily, such as at a Friday night high school football game. These gatherings create "sitting duck" situations in which mass shooters can efficiently injure or kill large numbers of people in a single event. At the Route 91 Music Festival in Las Vegas, a single shooter killed 60 concertgoers and injured more than 850 others in just 11 minutes.[23]

> **3.  Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings.**

Against the backdrop of these and other societal changes, advances in gun technology allow even an inexperienced shooter to kill vastly more people more quickly than ever before.

---

*suburban* areas, where most mass shootings occur.

[23] Serge F. Kovaleski & Mike Baker, *Gunman in 2017 Las Vegas Shooting Was Angry at Casinos, New F.B.I. Files Show*, N.Y. Times (Mar. 30, 2023) http://tinyurl.com/ykxj889u.

Modern firearms far surpass their Founding-era counterparts in lethality. The typical Revolutionary-era musket (i) held just one round at a time; (ii) had a maximum accurate range of 55 yards; (iii) had a muzzle velocity of roughly 1,000 feet per second; and (iv) took a "skilled shooter" half a minute to load a single shot.[24] By contrast, a typical AR-15 rifle (i) can hold 30 rounds[25] (30 times more); (ii) can shoot accurately from around 400 yards[26] (7 times as far); (iii) produces a muzzle velocity of around 3,251 feet per second[27] (over three times faster); and (iv) can be reloaded with full magazines in as little as three seconds.[28] *See Capen v. Campbell*, 2023 WL 8851005, at *12 (D. Mass. Dec. 21, 2023) (observing that "[t]he features of modern assault weapons—particularly the AR-15's radical increases in muzzle velocity, range, accuracy, and functionality—along with the types of injuries they can inflict are so different from colonial firearms that the two are not reasonably

---

[24] Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64.

[25] AR-15 rifles use the same magazines as M16 rifles, which come in a standard size of 30 rounds. *See Are AR-15 Magazines Interchangeable? Which Ones Are*, Neckbone Armory, https://tinyurl.com/hppuzpb2; *see also* Ingraham, *supra* note 24.

[26] James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye.

[27] Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. Trauma & Acute Care Surgery 853, 856 (2016).

[28] *What is your par time for an AR-15 emergency reload?*, AR15.com, (Nov. 22, 2010), https://tinyurl.com/3csjs7kd.

comparable"), *appeal docketed*, No. 24-1061 (1st Cir. Jan. 17, 2024). Thus, a shooter wielding an AR-15 is incalculably more lethal than one with a Revolutionary-era musket.

Even the leading repeating firearm of the Civil War era was a far cry from modern weapons like an AR-15 rifle. The 1866 Winchester rifle had a magazine capacity of 11 to 15 rounds,[29] a maximum range of approximately 100 yards (one-fourth of an AR-15), a muzzle velocity of 1,100 feet per second (one-third of an AR-15),[30] required the shooter to manually manipulate a lever before each shot,[31] and could fire only ten shots per minute.[32] Using a semiautomatic assault rifle, a shooter can fire 40 rounds in as little as nine seconds,[33] which the U.S. Army defines as "rapid semiautomatic fire."[34]

---

[29] *Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc.

[30] Dan Alex*, Winchester Model 1866: Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.

[31] *See* Decl. of Robert Spitzer ¶ 48, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431, ECF No. 21-10 (D. Mass. Jan. 31, 2023).

[32] *1866 Yellowboy Rifle History*, Uberti USA, https://tinyurl.com/3x2wjth3 ("The gun's . . . rate of 10 or more shots per minute was a game changer.").

[33] *See* Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023), https://tinyurl.com/dkzjskxs.

[34] *TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army, §§ 8-19–20, (May 2016), https://tinyurl.com/2p963dxd.

Increased firepower, with advanced ballistics,[35] make modern firearms far more deadly and fundamentally different from their historical predecessors. Current events too frequently illustrate how, with modern technology, a lone individual can commit mass murder in mere seconds before he can be located and stopped. On May 24, 2022, a lone gunman armed with an AR-15-style weapon fired at least 100 rounds in two and a half minutes inside an elementary school in Uvalde, Texas, "likely murder[ing] most of his innocent victims before any responder set foot in the building."[36] The ratifiers of the Second Amendment could not in their worst nightmares have imagined such rapid, indiscriminate carnage.

### 4. *Bruen* Requires Nuance in Analyzing Historical Analogues.

In passing the Challenged Laws, the Connecticut legislature contended with realities that legislatures of the past did not: mass shootings that were occurring more frequently than ever before, structural shifts in society, and rapid advances in gun technology.[37] These drastic societal and technological changes require this Court, under *Bruen*, to employ a nuanced analysis when comparing the "hows" and "whys" of the Challenged Laws with those of historical laws.

---

[35] *See, e.g.*, Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t.

[36] Carla Astudillo et al, *What we know, minute by minute, about how the Uvalde shooting and police response unfolded*, Texas Tribune (July 28, 2022), https://tinyurl.com/mr4eyjfu.

[37] *See* Defs.' Br. at 3, 5–6.

The motivation behind the Challenged Laws—their "why"—is, fundamentally, to promote public safety.[38] Gun regulations at the Founding and throughout our history had the same motivation: protecting the public from deadly harm.[39] Thus, there is a strong and easily discernible link between the past and present "whys."

To analogize past and present "hows," this Court must determine whether the Challenged Laws impose a "burden on the right of armed self-defense" that is "comparable" to that imposed by historical laws. *Bruen*, 597 U.S. at 29. The Connecticut legislature chose to restrict the use and sale of specific, especially dangerous firearms and accessories to protect public safety, while "preserv[ing] residents' right to protect themselves—here, with more than a thousand makes and models of legal firearms."[40]

Employing *Bruen*'s nuanced approach, *id*. at 27, this Court should uphold the District Court's conclusion that the Challenged Laws are relevantly similar to many historical weapons regulations, and thus are consistent with our Nation's tradition of firearm regulation. *See Lamont*, 2023 WL 4975979, at *5 ("[W]hen a modern

---

[38] *See* Defs.' Br. at 6–7.

[39] *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 168–69 (2022), https://tinyurl.com/zx2dvsmc.

[40] Defs.' Br. at 7.

innovation in firearm technology results in a particular type of weapon . . . being utilized for unlawful purposes to terrorize and endanger the public, the Nation has a longstanding history and tradition of regulating those aspects of the weapons . . . that correlate with rising firearm violence[,]" and the Challenged Laws "are consistent with that purpose[.]").

### C. Plaintiffs' Formulation of "Common Use" Is Inherently Flawed Because the Challenged Laws Are Not a Categorical Ban, and Therefore the Common Use Standard Does Not Apply.

Preliminarily, Plaintiffs are incorrect that the restricted weapons and magazines are in "common use" and therefore presumptively entitled to Second Amendment protection because "[t]ens of millions of the banned AW Firearms and LCMs are owned by law-abiding American citizens."[41] For support, Plaintiffs rely on an unpublished, non-peer-reviewed summary of an online survey.[42] The summary itself acknowledges that actual ownership numbers are likely lower than stated because the survey asked whether respondents had "ever owned" such a rifle or

---

[41] Pls.' Br. at 28.

[42] *Id* at 30, 33–34 (citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494, at 2 (May 13, 2022) ("English Survey"), https://tinyurl.com/yc3fer46).

magazine,[43] and its estimate thus does not account for obsolescence, destruction, or transfer of ownership of these weapons.[44]

This flaw highlights just one fallacy in Plaintiffs' use of historical ownership statistics to define "common use": the argument necessarily assumes that every individual who has ever owned one of these weapons still owns it, actively uses it, uses it only for lawful self-defense purposes, and is a civilian. Plaintiffs demonstrate their fundamental misunderstanding of the law by questioning why it is appropriate to recognize that the firearms belonging to law enforcement personnel are included in the estimation of "modern sporting rifles" in circulation in the United States, "because surely law enforcement personnel are the quintessence of law-abiding citizens who own arms like those banned by the [Challenged Laws]."[45] The Challenged Laws, however, do not apply to law enforcement personnel.[46]

A recent decision by the U.S. District Court for the District of Massachusetts highlights another fallacy inherent in the claim that ownership statistics can insulate a uniquely dangerous firearm from regulation:

> [Plaintiffs' position] would lead to a host of absurd results . . . the constitutionality of the regulation of different firearms would ebb and flow with their sales receipts. Weapons that unquestionably would have

---

[43] *English Survey* at 22, 33.

[44] *Id.* at 33.

[45] Pls.' Br. at n.6.

[46] *See* Conn. Gen. Stat. §§ 53-202b(b), 53-202c(b).

been considered within the ambit of the Second Amendment at the time of ratification . . . would lose their protection because of their relative rarity today. Conversely, an entirely novel weapon that achieved rapid popularity could be rendered beyond the reach of regulation if innovation and sales out[paced] legislation . . . . Moreover, the constitutional analysis would be trapped in an infinite circularity: a weapon may be banned because it is not in common use, and it is not in common use because it is banned[.]

*Capen*, 2023 WL 8851005, at *8.[47] The Seventh Circuit similarly expounded on this fallacy of the common use argument in *Bevis v. City of Naperville*, ultimately "declin[ing] to base [its] assessment of the constitutionality of these laws on numbers alone. Such an analysis would have anomalous consequences." 85 F.4th 1175, 1198–1199 (7th Cir. 2023) (*petition for cert. pending*, No. 23-880 (Feb. 15, 2024)).

The Plaintiffs' approach of using ownership statistics spanning many decades to define "common use" also ignores the additional, immensely important requirement that such weapons must be in common use for *lawful self-defense*, not merely owned or manufactured. *See Bruen*, 597 U.S. at 28 (Second Amendment protects only "instruments that facilitate armed self-defense"); *Bevis*, 85 F.4th at 1193 ("the definition of 'bearable Arms' extends only to weapons in common use for a lawful purpose. That lawful purpose . . . is at its core the right to individual self-defense").

---

[47] *See also* Defs.' Br. at 27–28 ("A robust marketing campaign that drives a run on weapons of war or instruments of crime cannot set the Second Amendment's presumptive scope.").

Nor do Plaintiffs compare the Challenged Laws with the regulation in *Heller* or provide any other support to justify their claim that the Challenged Laws constitute an absolute, categorical ban. Conn. Gen. Stat § 53-202a does not ban possession of all "rifles" or "semiautomatic rifles." The statute regulates only those "enumerated weapons [that] are essentially civilian versions of military weapons," and certain semiautomatic firearms with "especially deadly features."[48] Far from an absolute ban, the statute regulates a selection of especially dangerous semiautomatic firearms that pose "extraordinary public safety risks and inflict mass terror."[49]

The Challenged Laws' restriction on LCMs is even further from a "prohibition of an entire class of 'arms.'" *Heller*, 554 U.S. at 628.[50] First, LCMs are not "arms" within the plain meaning of the Second Amendment, but rather non-essential firearm accessories.[51] Even if the Court considers magazines to be "arms," the Challenged Laws restrict only those that have the "capacity of, or can be readily restored or

_____

[48] Defs.' Br. at 8.

[49] Defs. Br. at 4.

[50] *See* Defs.' Br. at 31–32.

[51] *See* Defs.' Br. at 46–50. Gun retailers also make this distinction. *See, e.g.*, *Gun Accessories for Sale*, Impact Guns, http://tinyurl.com/2apapmh3 ("In addition to being one of the largest online providers of firearms and ammunition, Impact Guns has a massive selection of gun accessories online as well. […] From gun cleaning materials to extended and high-capacity magazines.").

converted to accept, more than ten rounds of ammunition."[52] By regulating LCMs, the Challenged Laws simply require an individual to reload their weapon after discharging ten rounds of ammunition.[53] *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) ("[W]hile citizens may not acquire high-capacity magazines, they can purchase any number of magazines with a capacity of ten or fewer rounds."). The Challenged Laws thus restrict only a specified type of magazine rather than imposing a blanket ban on an entire class of arms.

The Challenged Laws accord with *Heller*'s recognition that the Second Amendment right "is not unlimited" and had never been "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. The Challenged Laws thus stand in contrast to the one invalidated in *Heller*—a total ban on handgun possession in the home that "amount[ed] to a prohibition of an entire class of 'arms.'" *Id.* at 628.

The Challenged Laws regulate specific, enumerated, especially dangerous firearms, features, and accessories posing a threat to society.[54] They do not constitute

---

[52] Conn. Gen. Stat. § 53-202w(a).

[53] *See* Christopher S. Koper, *Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high-capacity semiautomatic firearms*, 19 Criminology & Pub. Pol'y 147, 149 (2020) ("LCM restrictions do not ban all firearms capable of accepting LCMs, but they do limit the capacity of the ammunition magazines that can be sold for these weapons.")

[54] Defs.' Br. at 7 (the laws apply to "unusually lethal, military-style weapons and

a complete ban on an entire class of weapons, nor do they regulate at all the particular type of arms that the Supreme Court held to be constitutionally protected in *Heller*.[55]

**D.    Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.**

The Supreme Court has held that the Second Amendment right to bear "arms" protects the right of law-abiding, responsible citizens to possess a handgun—the "quintessential self-defense weapon"—inside and outside the home for self-defense. *Heller*, 554 U.S. at 629; *Bruen*, 597 U.S. at 4. The Court expressly cautioned, however, that the Second Amendment should not be understood to bestow a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 597 U.S. at 21. Instead, it endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626–27.

The Challenged Laws fit squarely in this historical tradition of prohibiting "dangerous and unusual weapons." They regulate only a limited subset of assault rifles with features that turn them into dangerous military-style firearms designed and suited for use in war. The AR-15, for example, traces its origins to a military-

---

accessories designed and used not for lawful self-defense but for combat, crime, and mass violence.").

[55] Defs.' Br. at 51.

grade rifle designed in the late 1950s.[56] The AR-15 is functionally the same as the M16, an automatic weapon designed for military combat that the Supreme Court has recognized can be banned. *See Heller*, 554 U.S. at 627. Just because the AR-15 does not fire automatically does not make it appropriate for civilian use. *Bevis*, 85 F.4th at 1195 (finding weapons like the AR-15 do not "enjoy Second Amendment protection" because "the AR-15 is almost the same gun as the M16 machinegun . . . Both weapons share the same core design, and both rely on the same patented operating system").[57] The AR-15's and M16's gas-impingement system specifically appealed to the military—an innovation that redirects some of the energy from a fired bullet to reload the next bullet in order to reduce recoil and makes it easier for a gunman, *i.e.,* a soldier, to maintain aim, increasing accuracy.[58] This system propels the bullet "at a speed that would cross six football fields in a second."[59]

It is the AR-15's "phenomenal lethality" that has made versions of it the U.S.

---

[56] *See* Sara Swann, *The History of the AR-15 and How It Became a Symbol of American Gun Culture*, Poynter (June 29, 2022), https://tinyurl.com/5bffkafr.

[57] *See also Kolbe v. Hogan*, 849 F.3d 114, 139-40 (4th Cir. 2017) (explaining that the AR-15 "is simply the semiautomatic version of the M16 rifle used by our military and others around the world.").

[58] *Id.*

[59] N. Kirkpatrick, et al., *The Blast Effect*, Wash. Post (2023), http://tinyurl.com/2kutwsea (This calculation was made using a 55 grain .223 Remington full metal case round fired at a horizontal trajectory and accounts for drag as the bullet slows over distance and time.).

military's standard-issue assault rifle since the Vietnam War.[60] The U.S. Army Field Manual instructs soldiers that *semi*automatic fire is "[t]he most important firing technique during modern, fast moving combat," emphasizing that it is "surprising how devastatingly accurate rapid [semiautomatic] fire can be."[61] Indeed, virtually all of the world's armies now use assault rifles that are variants of the AR-15.[62] *See Bevis,* 85 F.4th at 1195 (declining to expand the scope of Second Amendment protection "because these assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense").

Not only are assault weapons exponentially more lethal than any firearms available during the ratification of the Second or Fourteenth Amendments, their military-grade mechanics and resulting devastation to the body distinguish them completely from modern handguns—the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. Though any bullet can kill when it hits a vital organ, according to Babak Sarani, a trauma surgeon and authority on casualties from mass

[60] Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.

[61] *Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*, U.S. Dep't of the Army, §§ 7-7, 7-8 (2003), https://tinyurl.com/3reu38px.

[62] Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b.

shootings, the energy of a bullet fired from an AR-15 "is so massive it has to go someplace, and your body will literally tear apart."[63] Underscoring the carnage that assault-rifle fire wreaks, Peter Rhee, a trauma surgeon at the University of Arizona, has explained that wounds inflicted by a semiautomatic rifle "look[] like a grenade went off in there," whereas wounds inflicted by a 9mm handgun "look[] like a bad knife cut."[64] While a bullet fired from a handgun takes a relatively linear path, the speed of a bullet from an AR-15 creates a blast effect on impact, causing internal damage far outside the bullet's path and gaping exit wounds that drastically reduce a person's chance of survival.[65] In a 2019 deposition, former Connecticut chief medical examiner Dr. Wayne Carver testified that not a single one of the 20 children and six adults shot by an AR-15 at Sandy Hook Elementary "had survivable or even treatable injuries."[66]

The impact of a bullet fired from an AR-15-style weapon is even more catastrophic on the compact body of a child. Roy Guerrero, a pediatrician in Uvalde,

---

[63] Kirkpatrick, *supra* note 59.

[64] Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt.

[65] *Id.*; *see also* Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe.

[66] *Dep. of H. Wayne Carver II, M.D.* at 23, Posner v. Fetzer (May 21, 2019), http://tinyurl.com/dzu8ybwu.

Texas, recalled seeing children "whose bodies had been so pulverized, decapitated by the bullets fired at them, over and over again, whose flesh had been so ripped apart, that the only clue as to their identities were the blood-spattered cartoon clothes still clinging to them."[67] Just some of the 13 bullets fired from an AR-15 that hit one Parkland student "tore [his] chest apart" and created exit wounds in his head so "gaping" that the autopsy described his head as "deformed" and his brain splatter was found on the walls.[68] "That degree of destruction . . . is possible only with a high-velocity weapon."[69]

As the District Court recognized, assault weapons are weapons of war,[70] and the features regulated by the Challenged Laws—such as pistol grips, forward grips, and detachable magazines—increase their lethality, placing them far outside the category of "quintessential self-defense weapons" at issue in *Heller* and more like

---

[67] *Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, H. Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed. *See also Critical Incident Review: Active Shooter at Robb Elementary School*, U.S. Dep't of Justice at 255 ("Families were asked to provide descriptions of their children, but due to the condition of the victims' bodies, families were also asked for descriptions of their children's clothing[.]").

[68] Kirkpatrick, *supra* note 59.

[69] *Id.*

[70] *See Lamont*, 2023 WL 4975979, at *24–26. The Seventh Circuit further explained that, while the plain text of the Amendment covers "[a]rms that ordinary people would keep at home for purposes of self-defense," it does not protect "weapons that are exclusively or predominantly useful in military service." *Bevis*, 85 F.4th at 1194.

machine guns,[71] which the Supreme Court has recognized are beyond the Second Amendment's reach. *See Staples v. United States*, 511 U.S. 600, 611–12 (1994).

As this Court previously observed in *Cuomo*, which *Bruen* has done nothing to upset, "[the] net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general," such that citizens would not require such weapons or features for ordinary self-defense. 804 F.3d at 262.

### 1. Pistol Grips[72]

Pistol grips alter the way a weapon functions and increase its lethality, especially during prolonged episodes of rapid fire. By allowing the shooter to place his shooting hand beneath the gun, he can exert leverage on the gun with both hands and maintain greater control and aim during rapid, prolonged firing.[73] Pistol grips enable a shooter to shoot from the hip instead of the shoulder. This is useless for hunting or lawful self-defense because there is hardly any accuracy when shooting

---

[71] While not challenged here, Conn. Gen. Stat. Ann. § 53-206g bans rapid fire trigger activators, including "bump stocks," a further attachment meant to increase a weapons lethality. As explained by the Seventh Circuit, "[t]he similarity between the AR-15 and the M16 only increases when we take into account how easy it is to modify the AR-15 by adding a 'bump stock' . . . thereby making it, in essence, a fully automatic weapon." *Bevis*, 85 F.4th at 1196.

[72] Conn. Gen. Stat. Ann. § 53-202a(E)(i)(II).

[73] *See Killing Machines: The Case for Banning Assault Weapons*, Educ. Fund to Stop Gun Violence ("EFSGV"), 9 (Sept. 2003).

from the hip, but this does make it easier for a shooter to indiscriminately spray fire into a crowd. *See Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685 (2d Cir. 1996) ("[P]istol grips are designed to make [] spray firing from the hip particularly easy.").

### 2. Forward Grips[74]

Forward pistol grips (such as those found on AR-15 rifles) are located in front of the trigger and are meant to be used by the shooter's non-shooting hand. Forward grips give shooters "enhanced control" by allowing a shooter to place the non-shooting hand underneath the barrel of the gun, which provides more leverage and control during episodes of rapid firing.[75] The enhanced control and aim increase the weapon's lethality, especially during prolonged episodes of offensive rapid fire.[76]

### 3. Detachable Magazines[77]

Detachable magazines equip firearms with a drastically higher ammunition capacity because the number of rounds a detachable magazine can hold is not limited by the size of the gun.[78] Detachable magazines can hold as many as 100 rounds

---

[74] Conn. Gen. Stat. Ann. § 53-202a(E)(i)(III).

[75] *See* EFSGV, *supra* note 73.

[76] *Id.*

[77] Conn. Gen. Stat. Ann. § 53-202a(E)(i).

[78] *See Assault Weapons and Large Capacity Magazines*, EFSGV (July 2020), https://tinyurl.com/yjmaba4k.

without a shooter having to reload.[79] They also allow shooters to replace an empty magazine with a pre-loaded, full magazine in a few seconds, with little practice.[80] When combined with other features regulated by the Challenged Laws, detachable magazines thus render weapons uniquely dangerous. They are especially lethal when used in combination with firearms that have "features that allow [for] enhanced control while firing multiple rounds."[81]

* * *

Assault rifles and weapons outfitted with the regulated features are uniquely dangerous and unusual weapons. They are not the "quintessential self-defense weapons" that the Supreme Court has held the Second Amendment protects.

### E. Regulation of LCMs Likewise Does Not Burden the Individual Right to Self-Defense.

"Evidence suggests that firearms equipped with LCMs are involved in a disproportionate share of mass shootings."[82] Indeed, LCMs are designed to perpetrate devastation on a massive scale by enhancing an already especially

---

[79] *Id.*

[80] *See id*.

[81] *Id.*

[82] Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AJPH 1754, 1755 (2019). LCMs are also considered especially useful in military applications, allowing gunmen "to hit multiple human targets very rapidly." *Kolbe*, 849 F.3d at 137.

dangerous firearm's ability to fire more than ten rounds in rapid succession *without the need to reload*.[83] LCMs thus increase the lethality of attacks by eliminating the critical pause during which the gunman would have to reload and the gunman's targets could escape or attempt to disarm him.[84] For this reason, states that have restricted access to LCMs—usually defined with a ten-round limit—experience 63% fewer mass shootings than states that do not.[85] At the national level, mass-shooting fatalities were 70% less likely to occur during the ten years that federal law banned assault weapons and LCMs than in other years.[86] After Congress allowed the ban to lapse, high-fatality mass shootings increased by 183%; deaths from such shootings increased by 239%.[87]

---

[83] While Plaintiffs assert that the Challenged Laws regulate the ammunition an individual may lawfully possess, Pls.' Br. at 51, they actually merely regulate the need to reload after shooting ten bullets. *See Bevis*, 85 F.4th at 1197 ("Anyone who wants greater firepower is free under these [LCM] laws to purchase several magazines of the permitted size.").

[84] During the 2018 shooting in Parkland, Florida, the shooter's 13-second pause to reload a new magazine enabled a teacher and ten students to flee. Fla. Dep't of Law Enforcement, *Marjory Stoneman Douglas High School Public Safety Commission Report* at 34 (2019), tinyurl.com/mvs34fky.

[85] Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27.

[86] Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994–2004 Federal Assault Weapons Ban: Analysis of Open–source Data*, 86 J. Trauma & Acute Care Surgery 11, 12 (2019).

[87] Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, Wash. Post (Feb. 15, 2018), http://tinyurl.com/2fkpr72s.

Numerous federal and state courts have found no evidence that firing more than ten bullets without the need to reload is necessary or even beneficial for self-defense. *See, e.g.*, *Duncan v. Bonta,* 19 F.4th 1087, 1105 (9th Cir. 2021) (observing that "as in other cases," the record offered no indication that "the added benefit of a[n] [LCM]—being able to fire more than 10 bullets in rapid succession—has *ever* been realized in self-defense in the home"); *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[N]ot one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired.").

Empirical research further demonstrates that the ability to fire more than ten rounds without reloading does not aid in self-defense. For example, the National Rifle Association's Armed Citizen database shows that, in more than 700 self-defense incidents, *less than one half of one percent* (0.5%) involved more than ten rounds of ammunition. *See Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 799–800 (D. Or. 2022). Other sources confirm that the average number of shots fired by civilians in self-defense is only about two.[88] That figure aligns with FBI statistics, which suggest that "the average gunfight includes 3 rounds fired."[89]     As     these

---

[88] *See* Claude Werner, *The Armed Citizen - A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), tinyurl.com/bdemd7ya (average of 2.2 defensive shots fired per incident from 1997–2001).

[89] Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019),

authorities and statistics show, the Challenged Laws do not impose a burden on an individual's right to possess a firearm for lawful self-defense – LCMs are not used or useful in self-defense.

Nothing exemplifies the needlessness and destructive capability of LCMs more poignantly than the words of Mark Kelly, U.S. Senator, retired astronaut, and husband of Giffords Law Center founder and mass shooting survivor Gabby Giffords. Testifying before Congress about the shooting that nearly took his wife's life, Senator Kelly said: "The first bullet went into Gabby's head. Bullet number 13 went into a nine-year-old girl named Christina-Taylor Green . . . . When [the shooter] tried to reload one 33-round magazine with another 33-round magazine, he dropped it [and was subdued]. I contend if [the shooter] . . . did not have access to a high-capacity magazine . . . Christina-Taylor Green would be alive today."[90]

## IV.   CONCLUSION

For the reasons set forth above and in the Defendants' Brief, the Challenged Laws are constitutional, and this Court should affirm the judgment of the District Court.

---

https://tinyurl.com/3upbexr9.

[90] 159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013) (statement of Sen. Leahy) (quoting Judiciary Committee testimony of Captain Mark Kelly).

Dated: February 28, 2024        Respectfully submitted,

/s/ *Jennifer B. Loeb*
Jennifer B. Loeb
  *Counsel of Record*
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
jennifer.loeb@freshfields.com

Aaron R. Marcu
Brandt Henslee
Daniel Hodgkinson
Taylor Jachman
FRESHFIELDS BRUCKHAUS DERINGER US LLP
3 World Trade Center, 51st Floor
175 Greenwich Street
New York, NY 10007
(212) 277-4000
aaron.marcu@freshfields.com
brandt.henselee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com

*Counsel for Amici Curiae*
Giffords Law Center to Prevent Gun Violence,
Brady Center to Prevent Gun Violence, March
for Our Lives, and Connecticut Against Gun
Violence

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Rules 29.1(c) and 32.1(a)(4) / Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because this brief contains 6998 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: February 28, 2024       */s/ Jennifer B. Loeb*
                                          Jennifer B. Loeb

                                          *Counsel for Amici Curiae*
                                          Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, March for Our Lives, and Connecticut Against Gun Violence