# 23-1162

## United States Court of Appeals for the Second Circuit

National Association for Gun Rights, Toni Theresa Spera
Flanigan,
*Plaintiffs-Appellants*,
Patricia Brought,
*Plaintiff*,
v.
Ned Lamont, in his official capacity as the Governor of the State of
Connecticut, Patrick J. Griffin, in his official capacity as the Chief
States Attorney of the State of Connecticut, Sharmese L. Walcott,
in her official capacity as the States's Attorney, Hartford Judicial
District,
*Defendants-Appellees*,
David R. Shannon, in his official capacity as the State's Attorney,
Lichfield Judicial District,
*Defendant*.

**On Appeal from the United States District Court
for the District of Connecticut (New Haven), No. 22-cv-1118**

---

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS
NATIONAL ASSOCIATION FOR GUN RIGHTS,
TONI THERESA SPERA FLANIGAN**

---

BARRY K. ARRINGTON
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... iii

I.  Plaintiffs' Facial Challenge is Controlled by *Antonyuk* ......... 1

II. Plaintiffs Should Prevail on the Merits ................................ 6

   A.  Connecticut's Ban of the Most Popular Rifle in America is Plainly Unconstitutional ............................ 6

   B.  Plaintiffs' Evidence Regarding Common Use is Uncontested .................................................................. 9

   C.  The State Admits the Banned Weapons Are Predominantly Used for Lawful Purposes ................................ 11

   D.  The State Misconstrues *Heller's* Discussion of Functionality .............................................................. 13

   E.  The "Common Use" Test is Not Circular .................... 15

   F.  150,000,000 is Not a Small Number ........................... 16

   G.  *Heller* Specifically Considered and Rejected the State's "Use in Crime" Argument ............................................ 17

   H.  The State Has Flipped the *Heller* Script ...................... 18

   I.  The State Expressly Invites the Court to Engage in Prohibited Interest-Balancing ...................................... 20

   J.  Plaintiffs' "Weapons Used by the Military" Argument is Not Contradictory .................................................... 22

   K.  Justice Alito did not "Insinuate" Anything ................. 23

   L.  Civilians Do Not Own 741,000 Machine Guns ........... 24

M.    The State Confuses Text and History ........................ 25

N.    The State Has No Answer Regarding its Hand-gun Ban ................................................................................ 26

O.    Professor Baron's Argument is Just Silly ................. 27

P.    Magazines Do Not Change Status from "Arm" to "Non-Arm" as Their Capacity Increases .................... 28

Q.    This is a Straightforward Arms Ban Case ................. 29

R.    *Heller* Rejected Arguments Based on Differences in the Degree and Kind of Urban Firearms Violence ..... 30

S.    *Antonyuk* Did Not Hold that Later History Can Contradict Earlier History ......................................... 32

T.    None of the Regulations Listed by the State Are Analogous to its Ban on Arms in Common Use .......... 33

U.    The State Has No Answer to Plaintiffs' Militia Argument ................................................................... 35

V.    The State Would Rather Point to Laws From 1989 Instead of 1791 .......................................................... 35

III.   The Remaining Preliminary Injunction Factors Favor Plaintiffs ................................................................................. 35

IV.   Conclusion ................................................................................. 36

CERTIFICATE OF COMPLIANCE .............................................. 37

CERTIFICATE OF SERVICE .........................................................

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Chiumento*,
   89 F.4th 271 (2d Cir. 2023) ...................................2, 3, 5, 26, 27, 32

*Ayotte v. Planned Parenthood of N. New England*,
   546 U.S. 320 (2006) ...................................................................... 1

*Baird v. Bonta*,
   81 F.4th 1036 (9th Cir. 2023)..................................................... 36

*Bevis v. City of Naperville, Illinois*,
   85 F.4th 1175 (7th Cir. 2023).......................................6, 7, 16, 23

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016) ...................................................................... 9

*D.C. v. Heller*,
   554 U.S. 570 (2008) ...............6-8, 10, 13-17, 20, 22, 23, 24, 26-35

*Duncan v. Bonta*,
   2023 WL 6180472 (S.D. Cal. Sept. 22, 2023)............................ 29

*Duncan v. Bonta*,
   83 F.4th 803 (9th Cir. 2023)....................................................... 13

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
   498 F.3d 1031 (9th Cir. 2007) ................................................. 1, 2

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ..................................................... 36

*Friedman v. City of Highland Park, Ill.*,
   577 U.S. 1039 (2015) .................................................................. 13

*Heller v. D.C.*,
　670 F.3d 1244 (D.C. Cir. 2011)....................................... 17, 18, 19

*Hollis v. Lynch*,
　827 F.3d 436 (5th Cir. 2016) ...................................... 25

*Miller v. Bonta*,
　2023 WL 6929336 (S.D. Cal. Oct. 19, 2023)..............11, 12, 21, 34

*NAGR v. Polis*,
　24-cv-1, District of Colorado....................................... 33

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
　142 S. Ct. 2111 (2022) .............. 8, 10, 20, 21, 22, 24, 25, 27-33, 35

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
　804 F.3d 242 (2d Cir. 2015)...................................9, 10, 11, 21, 22

*United States v. Salerno*,
　481 U.S. 739 (1987) ....................................................... 1

## Statutes

Conn. Gen. Stat. § 53-202a ............................................... 4

Conn. Gen. Stat. § 53-202c ...................................... 3, 26

Conn. Gen. Stat. § 53-202w .......................................... 4

## Other Authorities

Federal Bureau of Investigation, *Crime Data Explorer*,
　https://bit.ly/49Kj78o........................................... 12, 18

David B. Kopel, *The History of Firearm Magazines and
　Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) ..................... 6

iv

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases-Again*, 2023 Harv. J.L. & Pub. Pol'y Per Curiam 41 (2023) ............................................................................... 7, 20, 30

E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. U. L.J. 193 (2018) ........................................................ 23

v

## I.   Plaintiffs' Facial Challenge is Controlled by *Antonyuk*

The State argues that it can insulate even the most wildly unconstitutional firearms ban from a facial challenge by the simple expedient of adding even a single unprotected arm to the list of protected arms banned by the statute. Ans. 3. As argued in the Opening Brief, this is not the law. Op.Br. 63-65. The normal rule in facial challenges is that a statute may "be declared invalid to the extent that it reaches too far, but otherwise left intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (internal citations and quotation marks omitted). Thus, the rule in *United States v. Salerno*, 481 U.S. 739 (1987), applies on a section-by-section basis, and a plaintiff need not show that every section of a multifaceted statute is invalid in all its applications. When a statute contains both unobjectionable provisions and unconstitutional provisions, a reviewing court may maintain the statute in so far as it is valid. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1049 (9th Cir. 2007) (internal citations and quotation marks omitted). In other words, some of

the provisions of the statute might be facially invalid and some might not. *Id.*

After the opening brief was filed, this Court decided *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023).[1] *Antonyuk* involved facial Second Amendment challenges to New York's licensing and sensitive places statutes. The plaintiffs challenged four discrete subsections of New York's firearm licensing regime. 89 F.4th at 305. The Court referred to the challenged subsections as the "character requirement," the "cohabitants requirement," the "social media requirement," and the "catch-all requirement." *Id.* at 306. The Court rejected the challenges to the character, catchall, and cohabitants subsections of the statute and reversed the preliminary injunction that had been entered against enforcement of those subsections. *Id.* at 307. But it affirmed the preliminary injunction against enforcement of the social media subsection. *Id.*

The Court then reviewed the challenge to the "*assorted subsections*" of the sensitive locations statute. *Id.* 89 F.4th at 333

---

[1] The State cites *Antonyuk*, Ans. 22, but it fails to grasp the approach this Court took with respect to the various facial challenges at issue in that case.

2

(emphasis added). The emphasized language is important. As with its review of the licensing statute, the Court reviewed the facial challenges not with respect to the statute as a whole. Rather, it reviewed the facial challenges subsection by subsection. The Court affirmed the facial challenge to the places of worship subsection and the subsection that generally prohibited carriage on private property open to the public. *Id*. at 346, 386. At the same time, the Court reversed the district court's injunction with respect to the subsections dealing with certain mental health centers, urban parks, zoos, places where alcohol is served, and theaters. *Id*. at 342, 363, 364, 369, 376. In summary, in reviewing facial Second Amendment challenges to a multifaceted licensing statute and a multifaceted sensitive places statute, *Antonyuk* rejected the facial challenges with respect to certain discrete subsections of the statutes and upheld the challenges with respect to other discrete subsections.

Thus, the State is wrong. The Court is not limited to an "all or nothing" resolution of Plaintiffs' facial Second Amendment challenge. Conn. Gen. Stat. § 53-202c (a) makes it illegal to

3

possess an "assault weapon." Conn. Gen. Stat. § 53-202a (a)(1) defines "assault weapon." Importantly with respect to an *Antonyuk*-type analysis, the definition of "assault weapon" has several discrete subsections. The State asserts that Plaintiffs' facial challenge must fail unless they demonstrate that all of the "assorted subsections" are unconstitutional in all of their applications. *Antonyuk* plainly teaches otherwise.

With respect to the magazine ban, Conn. Gen. Stat. § 53-202w(b) criminalizes "large capacity" magazines. Section 53-202w(a)(1) defines a "large capacity magazine" generally as any magazine with a capacity greater than ten rounds. The evidence was that there are over 150,000,000 such magazines in circulation. A facial challenge is proper when the statute lacks a "plainly legitimate sweep." *Antonyuk*, 89 F.4th at 363 (internal citation and quotation marks omitted). The magazine ban is unconstitutional in practically all of its applications and therefore lacks a plainly legitimate sweep.

Plaintiffs have met their burden of showing that the banned weapons are bearable arms protected by the plain text of the

Second Amendment. The State is free to try to rebut that presumption with respect to any of the assorted subsections of banned weapons. It is not free to argue that this Court is bound to uphold the Statutes on an all-or-nothing basis even if the Court finds that certain discrete provisions of the Statutes are unconstitutional. As in *Antonyuk*, the Court may find that some of the subsections are constitutional (or at least not unconstitutional in all of their applications) and other subsections may be enjoined because they are facially unconstitutional. Thus, for example, the Court could uphold the challenge to the AR-15 ban while rejecting the challenge to the "Street Sweeper" shotgun ban if the State is able to establish that Street Sweeper shotguns are dangerous and unusual.[2]

---

[2] Plaintiffs note that the State has adduced no actual evidence that Street Sweeper shotguns are more dangerous and unusual than any other shotgun. It has merely asserted it, apparently relying on nothing more than the weapon's scary name to carry the day.

5

## II.    Plaintiffs Should Prevail on the Merits

### A.    Connecticut's Ban of the Most Popular Rifle in America is Plainly Unconstitutional

The State correctly notes that Plaintiffs have focused their arguments on the AR-15 ban. Ans. 8. They have done this because (1) it is the paradigmatic firearm banned by Connecticut,[3] and (2) it is the most popular rifle in America.[4] The AR-15's popularity among the American people matters immensely. Firearms are generally divided into two categories, handguns and long guns. *D.C. v. Heller*, 554 U.S. 570, 629 (2008). *Heller* held that handguns may not be banned because they are the most popular weapon in America. *Id*. at 629. As noted, the AR-15 is the most popular long gun in America.[5] If the most popular long gun in the country may be banned because it is not in "common use," it follows that all other long guns may be banned as well and *Heller* is cabined to its

---

[3] *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1183 (7th Cir. 2023).

[4] *Id*. at 1215 n.9 (7th Cir. 2023) (Brennan, J., dissenting) (AR-15 is the most popular rifle in Ameria) (*quoting* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859 (2015)).

[5] *Id*. n. 4.

6

facts. But nothing in *Heller* suggested the Court intended it to be limited to its specific facts.

Just the opposite is true. In *Heller*, the Court performed an exhaustive search of the historical record and concluded that no Founding-era regulation "remotely burden[ed] the right of self-defense as much as an absolute ban" on a weapon in common use. *Id.* 554 U.S. at 632. Thus, laws that ban weapons in common use for lawful purposes – whether handguns or long guns – are categorically unconstitutional. *Id.* at 628. There is no need to revisit this issue in each arms ban case. *See* Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases-Again*, 2023 Harv. J.L. & Pub. Pol'y Per Curiam 41, 2 (2023) ("In arms-ban cases, *Heller's* 'in common use' constitutional test controls, and there is nothing for the lower courts to do except apply that test to the facts at issue."). It follows that the State's ban on weapons in common use for lawful purposes is categorically unconstitutional. *See Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1209 (7th Cir. 2023) (Brennan J., dissenting) (A finding that a weapon is in common use is a

"sufficient condition" for holding the arm protected under *Bruen's* history and tradition step).

Perhaps recognizing that its argument with respect to absolute numbers is weak, the State also argues that AR-15s are not in common use as measured by their proportion of total firearms in circulation. The State asserts that AR-15s amount to "only" 5% of total firearms in circulation (24.4 million AR-15s of 461.9 million total firearms). Ans. 29 (*citing* Klarevas Dec. at J.App. 291-92). The State then compares that proportion to the 50% of firearms that are handguns. *Id*. There are three problems with this. First, the comparison is apples to oranges. It is meaningless to compare a particular *type* of long gun to the entire *class* of handguns. More importantly, as noted, the AR-15 is the most popular long gun in America. It follows that all other long gun models represent a lower proportion of total guns than AR-15s do. If the State's logic were valid, it could ban all of those other long gun models because the proportion of total firearms they represent will necessarily be lower than the proportion represented by AR-15s. Once again, the State is trying frenetically to cabin *Heller* to its

facts such that only handguns are protected. That is most certainly not the law. Finally, the State's argument cannot be reconciled with *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curium). The number of stun guns in circulation is a tiny fraction of the number of handguns, but nothing in the case suggests that is a barrier to stun guns being protected.

## B. Plaintiffs' Evidence Regarding Common Use is Uncontested

The State suggests that there is insufficient evidence in the record to establish that there are tens of millions of "assault weapons" in circulation. Ans. 24. The State is trying to have it both ways regarding this evidence. At first, it suggests there is insufficient evidence to establish that there are over 20 million AR-15-platform rifles in circulation. But, as discussed in the previous section, when it suits its purposes, the State affirmatively asserts that its expert established exactly that. Ans. 29.

Be that as it may, Plaintiffs provided overwhelming data regarding the millions upon millions of banned weapons in circulation. *See* Op.Br. 29-32. This is not to mention the fact that in *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255

(2d Cir. 2015), the Court noted that Americans own millions of the firearms and magazines prohibited by the Statutes and held that "accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."[6]

The State nevertheless scoffs at Plaintiffs for demonstrating common use by means of "ownership statistics." Ans. 25. This is an odd thing to say when *Cuomo* plainly held that "common use is an objective and largely *statistical* inquiry." *Id.* at 256 (cleaned up; emphasis added). It would be one thing for the State to scoff at Plaintiffs' statistical evidence if it had made the slightest effort to contest that evidence. But, knowing that evidence is irrefutable, it did not. Indeed, far from contesting Plaintiffs' evidence, as noted above, the State *agreed* with that evidence. The State's expert, Dr. Louis Klarevas, stated in his Declaration that there are approximately 24.4 million "assault weapons"[7] in circulation. In

---

[6] The State asserts this part of *Cuomo* was abrogated by *Bruen*. Ans.27. This is not true. *Bruen* did not mention *Cuomo*'s analysis of common use, much less abrogate it.

[7] J.App. 280.

summary, Plaintiffs' evidence regarding the tens of millions of banned weapons in circulation is overwhelming, uncontested, and already acknowledged by this Court in *Cuomo*.

**C.    The State Admits the Banned Weapons Are Predominantly Used for Lawful Purposes**

As noted in the Opening Brief, the State never disputed Plaintiffs' evidence that so-called "assault weapons" are rarely used in crime. Op.Br. 34. Indeed, the State conceded that evidence. The State's expert John J. Donohue acknowledged the "relative rarity of assault weapon use in crime in general." J.App. 214. The logical inverse of this admission is that the banned weapons are overwhelmingly used for lawful purposes. *See Miller v. Bonta*, 2023 WL 6929336, at *36 (S.D. Cal. Oct. 19, 2023) (appeal filed) ("If Americans own 24.4 million AR-15s and 24.4 million gun crimes are not being committed with AR-15s, Americans must be using them for lawful purposes.").

Dr. Klarevas' Declaration establishes the same thing. For example, Klarevas states that in 2022 sixty-three people were killed in seven mass shootings. J.App. 325. Thus, according to Defendant's own expert, at least 24,399,937 of the 24.4 million

11

"assault weapons" in circulation in 2022 were not used in mass shootings. General crime data paint a similar picture. According to the FBI, in 2022, 542 people were killed by rifles of all types in the entire country. Federal Bureau of Investigation, *Crime Data Explorer*, available at https://bit.ly/49Kj78o (last visited Feb. 27, 2024). If, conservatively, every rifle-related homicide involved an "assault weapon," out of 24,400,000 such firearms in circulation, fewer than .002% were used in homicides in 2022. *See also Miller v. Bonta*, 2023 WL 6929336, at *3 (S.D. Cal. Oct. 19, 2023) (appeal filed) (court arrived at the same conclusion using 2021 statistics).

The State argues it is constitutional to ban "assault weapons" even though 99.998% of them were not used in homicides in 2022, and it admits they are rarely used in crime generally. The State insists that even if tens of millions of the banned weapons are possessed by law-abiding Americans for lawful purposes, it can ban the weapons because of the infinitesimal proportion of the weapons that were not. According to the State, the mere fact that the weapons are overwhelmingly used for lawful purposes is irrelevant because "*Heller* did not stop at ownership statistics" when

assessing common use. Ans. 25. The Court can accept the State's tendentious characterization of *Heller*, or the Court can accept Justice Thomas' and Justice Scalia's view. Justice Thomas noted that millions of citizens own AR-15s and they use them overwhelmingly for lawful purposes, *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari), and according to the Supreme Court's precedents, particularly *Heller*, "*that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons." *Id.* (emphasis added).

The same is true for the banned magazines. There are over 150 million such magazines in circulation. J.App. 107. And that is all that is needed for the magazines to be protected. *Duncan v. Bonta*, 83 F.4th 803, 816 (9th Cir. 2023) (Bumatay, J., dissenting) (quoting Justice Thomas' *Friedman* dissent).

### D. The State Misconstrues *Heller's* Discussion of Functionality

The State argues that an extensive empirical inquiry into functionality – the reasons that a citizen may prefer a weapon for defense – is necessary because the Court engaged in such an

13

analysis in *Heller*. Ans. 25. *Heller* did no such thing. The brief passage cited by Defendants states:

> There are many reasons that a citizen may prefer a handgun [to a long gun] for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. *Whatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

554 U.S. at 629 (emphasis added).

This passage has absolutely nothing to do with an empirical analysis of a handgun's functionality as part of the common use test. Rather, the passage is a response to D.C.'s argument that it should be able to ban handguns as long as it allowed long guns. The Court rejected this argument because the American people have chosen handguns, not long guns, as their first choice for self-defense. The Court listed a number of reasons why this *may* be true. The word "may" is important. Note that the Court did not cite the factual record in this passage. That is because there was no factual record. The case was decided on a motion to dismiss record. Plainly, all the Court was saying was that Americans

14

prefer handguns over long guns for self-defense, and it speculated about some reasons why that might be the case. It never suggested that those were in fact the reasons American prefer handguns over long guns.

The Court then wrote the most critical part of the passage for our present purposes: "*Whatever the reason*, handguns are the most popular weapon . . . a complete prohibition of their use is invalid." This statement completely refutes the State's argument. The State insists that *Heller* requires a court to make affirmative factual findings on the "reasons that a citizen may prefer" a weapon for self-defense. *Heller* said exactly the opposite. It held that the reason citizens preferred handguns for self-defense was ultimately not important. The important thing is that for "whatever" reason, handguns are the most popular self-defense weapon, and that fact, not their functionality, precludes banning them.

### E.   The "Common Use" Test is Not Circular

*Heller* held that a firearm in common use may not be absolutely banned. 554 U.S. at 628-29. The State criticized *Heller's* "common use" test as "circular." Ans. 27. In *Heller* itself, Justice

Breyer also thought the Court was wrong and for the same reason. *See* 554 U.S. 720–21 (Bryer, J., dissenting). He argued the Court had employed faulty logic, and "[t]here is no basis for believing that the Framers intended such *circular reasoning*." *Id*. (emphasis added). In *Bevis*, the Seventh Circuit also rejected the "common use" test as circular and implicitly, if not expressly, adopted Justice Bryer's *Heller* dissent in its stead. 85 F.4th 1190.

In his dissent in *Bevis*, Judge Brennan properly took his colleagues to task on this point. First, he explained how the "common use" test, properly understood, is not circular at all. 85 F.4th at 1211. He then observed that no matter how he and his colleagues feel about the Supreme Court's reasoning, "[w]e are not free to ignore the Court's instruction as to the role of 'in common use' in the Second Amendment analysis." *Id*. at 1212. Judge Brennan was undoubtedly correct.

## F. 150,000,000 is Not a Small Number

The State asserts that it may ban arms in common use so long as they are a "small subset" of available arms. Ans. 31. This argument is wrong factually and legally. First, the only evidence

16

in the record regarding the number of banned magazines is that there are over 150,000,000 in circulation. J.App. 107. The State never attempted to dispute this. Under no circumstances can 150,000,000 arms be considered a "small subset" of arms. More importantly, *Heller* emphatically foreclosed this very argument. It is "no answer" to say that weapons in common use can be banned so long as other weapons are not banned. 554 U.S. at 629.

### G.  *Heller* Specifically Considered and Rejected the State's "Use in Crime" Argument

The State argues that AR-15s and the like may be banned because its expert has traced their use to mass shootings. Ans. 34. But as then-Judge Kavanaugh wrote, "semi-automatic *handguns* are used in connection with violent crimes far more than semi-automatic *rifles* are. It follows from *Heller's* protection of semi-automatic handguns that semi-automatic rifles are also constitutionally protected and that D.C.'s ban on them is unconstitutional." *Heller v. D.C.*, 670 F.3d 1244, 1269–70 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). This is common sense. Consider that in

2022, there were 7,937 handgun homicides.[8]  That is more than 14 times the number of rifle homicides (542). *Id*. As Justice Kavanaugh pointed out, handguns are constitutionally protected under *Heller* even though criminals use them at a far greater rate than they use rifles. Thus, it makes no sense to argue that so-called "assault weapons" can be banned because criminals use them in crime when they use them many times less than protected handguns.

### H.    The State Has Flipped the *Heller* Script

The State states that in its experts' assessment handguns are better self-defense weapons than rifles. Practically identical arguments were advanced in *Heller* only then it was the other way around. Professor Smith has summarized several such arguments advanced by D.C. and its amici in *Heller*:

- "In the recent Virginia Tech shooting, a single student with two **handguns** discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." [Brief for Petitioner at 53]

- "**Handguns** also are used in an extraordinary percentage of this country's well-publicized shootings, including

---

[8] Federal Bureau of Investigation, *Crime Data Explorer*, available at https://bit.ly/49Kj78o (last visited Feb. 27, 2024).

the *large majority of mass shootings*. A review of 50 high-profile shootings over the past four decades revealed that from 1980 onward the bulk of such incidents (39) were mass shootings. A **handgun** was used in 74 percent of these mass shootings as the only or primary weapon." [*Id*. at 24 (emphasis added)]

- "The [D.C.] Council targeted **handguns** because they are disproportionately linked to violent and deadly crime .... [The Council found that] '**handguns** are used in roughly 54% of all murders, 60% of robberies, 26% of assaults and 87% of all murders of law enforcement officials.' **Handguns** were also particularly deadly in other contexts: 'A crime committed with a pistol is 7 times more likely to be lethal than a crime committed with any other weapon.'" [Brief for Petitioner at 4]

- "The District considered evidence indicating that murders, robberies, and assaults were more likely to be committed with a **handgun**. Based on this evidence, the District concluded that **handguns** were uniquely dangerous and that it was necessary to prohibit the possession and use of such guns, while still permitting access to other weaponry if licensed and stored safely." [Brief of D.C. Appleseed Ctr. et al. as Amicus Curiae Supporting Petitioner at 22]

- "**Handguns** for the civilian market now fire ammunition capable of piercing body armor--the last line of defense responsible for saving thousands of police officers' lives." [Brief of Violence Pol'y Ctr. *et al*. as Amicus Curiae Supporting Petitioner at 18]

(emphasis added).

D.C. and its amici argued vociferously that handguns are a scourge on society and long guns are much better for self-defense.

19

*Heller*, 554 U.S. at 629. Now the State argues that handguns are great for self-defense and rifles like the AR-15 are wholly unsuitable for that purpose. "In short, arms-ban advocates switched their pre-*Heller* strategy of 'rifles good, handguns bad' to a post-*Heller* strategy of 'handguns good, rifles bad.'" *See* Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases-Again*, 2023 Harv. J.L. & Pub. Pol'y Per Curiam 41, 8 (2023). If those arguments failed in *Heller*, there is no reason they should succeed now.

## I. The State Expressly Invites the Court to Engage in Prohibited Interest-Balancing

The State's brief is chock-a-block with policy arguments. In other words, the main thrust of the State's argument is that its arms ban should be upheld because it promotes laudable policy goals. But the whole point of *Bruen* was to prohibit judges from evaluating policy arguments because such arguments involve "difficult empirical judgments" about "the costs and benefits of firearms restrictions," and judges "lack []expertise in the field." 597 U.S. at 25.

That is why for the most part the State was careful to mask its policy arguments behind its ersatz version of the "dangerous and unusual" doctrine.[9] But the State slipped up and said the quiet part out loud. After summarizing its policy arguments, it wrote that this Court should adopt those arguments for the same reasons it set forth in *Cuomo* at 804 F.3d at 262. Ans. 37. But the page in *Cuomo* cited by the State is in the section labeled "Application of Intermediate Scrutiny." The State has let the proverbial cat out of the bag.

Plaintiffs urge the Court compare the State's policy arguments – for example, those that appear on pages 34 to 40 of its brief – to this Court's intermediate scrutiny analysis in *Cuomo*, 804 F.3d at 261-64. The State's policy arguments masked as a "dangerous and unusual" analysis are for practical purposes identical to *Cuomo's* intermediate scrutiny analysis. *Bruen* warned against this very tactic. 597 U.S. at 29, n.7 (courts may not "engage in independent means-end scrutiny under the guise" of the

---

[9] *See Miller, supra*, at *4 where the court declared that it was "disheartening" when California employed an identical tactic.

historical inquiry). Is getting around *Bruen* really as simple as re-packaging *Cuomo's* intermediate scrutiny interest-balancing analysis by calling it a "dangerous and unusual" analysis? The State appears to believe that it is. Plaintiffs respectfully suggest that it is not.

### J.    Plaintiffs' "Weapons Used by the Military" Argument is Not Contradictory

The State asserts that Plaintiffs contradicted themselves when they argued that the Second Amendment protects some weapons that could be used to fight wars but not others. Ans. 41. There is no contradiction. Indeed, that is the very thing *Heller* said. The Court noted that in the Founding era militia members were expected to appear for military service bearing arms in common use supplied by themselves. 554 U.S. at 624. Thus, the sort of weapons protected were those that were in common use which were brought for military service. *Id.* at 627. Obviously, therefore, a weapon's suitability for military service did not disqualify it from protection so long as it was in common use. *Heller* then noted that modern developments have limited the degree of fit between the militia clause and the protected right. The Second Amendment

still protects all weapons in common use, but it does not protect sophisticated military weapons that are "unusual in society at large." *Id.* at 627-28. Thus, the Second Amendment protects some weapons that are used by the military if they are also in common use among civilians (for example, the venerable 1911 pistol[10]). But it does not protect military weapons that are not in common use by civilians (such as the M16).

"The AR-15 is a civilian, not military, weapon. No army in the world uses a service rifle that is only semiautomatic." *Bevis*, 85 F.4th at 1222 (Brennan J., dissenting) (citing E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. U. L.J. 193, 205–06 (2018)). But even if AR-15s were used by the military, they would still be protected by the Second Amendment because – like the 1911 pistol – they are in common use by law-abiding civilians.

### K.    Justice Alito did not "Insinuate" Anything

The State argues that Plaintiffs "insinuate" that the "dangerous and unusual" test is conjunctive. Ans. 42. They did nothing of the sort. They quoted Justice Alito who stated that expressly

---

[10] *See Bevis*, 85 F.4th at 1225.

and in no uncertain terms. Op.Br. 59. Justice Alito's position has the great benefit of being consistent with the basic rules of grammar. Basic grammar aside, the conjunctive is critical to the integrity of the *Bruen* analysis. As the State's brief demonstrates, evaluating empirical data about whether a weapon is "especially dangerous" as opposed to only "normally dangerous" opens the door wide open to the freewheeling interest-balancing banned by *Bruen*. As discussed above, the State's argument is mainly a repackaged version of intermediate scrutiny, so it is hardly surprising that it urges the Court to swing that door open. But it takes a substantial amount of linguistic contortion to conclude that "and" really means "or." The State engages in those contortions, Ans. 43-44, but Plaintiffs urge the Court to follow Justice Alito's lead and take *Heller* and *Bruen* at face value.

### L.  Civilians Do Not Own 741,000 Machine Guns

The State bandies statistics it does not understand when it argues that since there are 741,000 registered machineguns, Plaintiffs' arguments imply machineguns are in common use. Ans. 43. If the State had dug just a little deeper it would have learned

24

that the overwhelming majority of those machine guns are not in civilian hands. *See Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016).

## M. The State Confuses Text and History

If a particular weapon is covered by the plain text of the Constitution, it is presumptively protected. *Bruen*, 597 U.S. at 24. Whether the weapon is actually protected depends on whether the government can demonstrate that its ban of the weapon is consistent with the Nation's historical tradition of firearms regulation. *Id*. One way for the government to do this is by pointing to the fact that "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons,'" *Id*. 597 U.S. at 47, and demonstrating that the weapon in question falls into that category. But this is obviously a historical, not a textual, demonstration.

*Bruen's* plain text analysis was only six paragraphs long. *See* 597 U.S. at 32-33. By contrast, its "history and tradition" analysis was 37 pages long. *See* 597 U.S. 33-70. Unsurprisingly, *Bruen* situated its discussion of the "historical tradition" of banning

dangerous and unusual weapons in the "history and tradition" part of its analysis, not in the plain text analysis. Moreover, contrary to the State's assertion, *Antonyuk* did not hold that the "dangerous and unusual" issue is part of the plain text inquiry. It did just the opposite when it quoted *Heller's* reference to the *historical tradition* of banning dangerous and unusual arms. 89 F.4th at 295.

### N. The State Has No Answer Regarding its Handgun Ban

Plaintiffs pointed out that Conn. Gen. Stat. Ann. § 53-202c(a) bans certain handguns and that the district court ignored this unconstitutional subsection of the law. Op.Br. 65. It is hard to imagine an arms ban more blatantly contrary to *Heller*, which specifically held that handgun bans are unconstitutional. The State also has nothing to say about its handgun ban other than acknowledging that it exists: "The statutes also enumerate and restrict some semiautomatic assault pistols with especially deadly features." Ans. 8. The State does not attempt to explain how its handgun ban is consistent with *Heller*. It is as if the State believes that merely appending scary words like "assault" and "deadly" to

its description of the banned handguns is sufficient justification for banning them. That is certainly consistent with its overall strategy of labeling the most popular rifle in America as an "assault weapon." Be that as it may, the handgun ban surely fails under *Heller*, and this is another area where the "subsection by subsection" approach in *Antonyuk* comes into play. Faithfulness to *Heller* means that at the very least this subsection must be enjoined.

### O.    Professor Baron's Argument is Just Silly

Numerous courts have held that magazines are "arms" within the meaning of the Second Amendment because they are essential to the operation of a semi-automatic firearm. *See* Op.Br. 20 (collecting cases). This is because magazines are critical components to the operation of every semi-automatic firearm. J.App. 1027. Thus, a magazine is a "modern instrument[] that facilitate[s] armed self-defense," *Bruen*, 597 U.S. at 28, and is therefore covered by the term "arm" in the plain text. *Id*.

Defendant's linguistics expert Dennis Baron has a different idea. He says a magazine is like a cartridge box that a Founding-

era soldier would have hung from his belt, and since such boxes were not considered arms, neither is a magazine. J.App. 865. The unrebutted evidence was that a magazine is a dynamic component essential to the operation of every semi-automatic firearm. It is nothing like an inert box hung from a soldier's waist. *Heller* described the conclusions reached on the basis of Professor Baron's and his colleagues' linguistics work as "worthy of the Mad Hatter." 554 U.S. at 589. Similarly, Baron's conclusion that a magazine is not an arm because it is like a box is just silly, and fortunately the district court rejected it. Sp.App. 40.

### P. Magazines Do Not Change Status from "Arm" to "Non-Arm" as Their Capacity Increases

For obvious reasons, the State felt it needed a fallback argument for why some magazines are not arms, but its fallback fares no better than its primary argument. The State argues that while a magazine with a ten-round capacity may be an arm covered by the plain text, the addition of an eleventh round somehow transmogrifies the arm into a non-arm. Ans. 49. The State's error results from confusing the first step of the *Bruen* test (text) with the second step (history). Under the first step, a magazine of *any*

*capacity* is an "instrument" that "facilitate[s] armed self-defense," and is therefore covered by the plain text. Cf. *Bruen*, 597 U.S. at 28. Does the fact that all magazines are covered by the plain text mean that in principle a state cannot ban any magazines? No, just as all firearms are covered by the plain text, some firearms may nevertheless be banned if they are "dangerous and unusual." *See Duncan v. Bonta*, 2023 WL 6180472, at *17 (S.D. Cal. Sept. 22, 2023) (Commonly possessed magazines are protected, but "[w]hether 50-round, 75-round, or 100-round drum magazines are constitutionally protected is a different question because they may be much less common and may be unusual."). As discussed above, Plaintiffs seek to possess magazines of typical size and there are over 150 million such magazines in circulation. Thus, Plaintiffs have met their burden under step one and the State cannot meet its burden under step two.

## Q.  This is a Straightforward Arms Ban Case

The State says this is not a straightforward arms ban case like *Heller* because it has not banned all arms. Ans. 51. But the District of Columbia did not ban all arms either and *Bruen*

29

nevertheless referred to *Heller* as a "straightforward" case. 597 U.S. at 27. *Bruen* stated that only "other cases" that do not involve an arms ban might implicate a "nuanced" approach to the analogical analysis. This is not such an "other case." *See* Smith, *supra*, at 2. This is not a close question, because if this is not a "straightforward" arms ban case, neither was *Heller*.

### R. *Heller* Rejected Arguments Based on Differences in the Degree and Kind of Urban Firearms Violence

The State argues that while the Founders were obviously aware of gun violence, it was not the same kind or degree of violence experienced today. Ans. 52. But the same thing could have been said in *Heller*. Indeed, as outlined in Section II.H., *supra*, the same thing was said in *Heller*. And that is why, citing *Heller*, *Bruen* destroyed the argument advanced by the State. The Court wrote:

> *Heller* itself exemplifies this kind of straightforward historical inquiry. . . . The District in *Heller* addressed a perceived societal problem – firearm violence in densely populated communities – and it employed a regulation – a flat ban on the possession of handguns in the home – that the Founders themselves could have adopted to confront that problem. Accordingly, after considering "founding-era historical precedent," including "various restrictive laws in the colonial

30

period," and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional.

597 U.S. at 27.

The problem perceived by the District in *Heller* was firearm violence in urban areas. But *Bruen* wrote that the Founders were aware of that same problem and could have adopted the same kind of firearms ban to confront it – but they didn't. *Bruen* obviously did not mean that the Founders were aware of firearm violence of the same degree and kind as that experienced today. It follows that the State is wrong when it argues that the Founders' ignorance of the degree and kind of violence today puts its firearms ban in a different category than the one at issue in *Heller*. No, the perceived societal problem at issue in *Heller* is the same problem Connecticut seeks to address with its firearms ban. But just as in *Heller*, the Founders could have enacted a firearm ban to confront that problem but they did not, and that means the Statutes are unconstitutional for the same reason the District's ordinance was unconstitutional.

### S. *Antonyuk* Did Not Hold that Later History Can Contradict Earlier History

The State misconstrues Plaintiffs' argument regarding the relevant timeframe for the historical analysis. Ans. 57, n. 15. Plaintiffs quoted *Bruen's* analysis of the timeframe issue and then concluded that the Court need not address the 1791/1868 question because, as in *Bruen*, the lack of analogues in either period makes it unnecessary to choose. Op.Br. 42.

Moreover, the State is wrong when it suggests that *Antonyuk* resolved the issue. *Antonyuk* held the same thing that *Bruen* held: Post-ratification laws that are "inconsistent" with the text are not relevant, but more recent laws that reflect a previously settled practice may be probative of an earlier tradition. 89 F.4th at 320, n. 32. Here, *Heller* held that no relevant historical law "remotely burden[ed] the right of self-defense as much as an absolute ban" on a firearm in common use. 554 U.S. at 631-32. Thus, later laws that are inconsistent with the earlier tradition noted by *Heller* are not relevant to the resolution of this case. If the later inconsistent laws to which the State points were relevant, *Heller* would have gone the other way.

32

### T. None of the Regulations Listed by the State Are Analogous to its Ban on Arms in Common Use

Plaintiffs will not dwell long on the State's historical analysis, because they largely anticipated and rebutted that analysis in their Opening Brief. See Op.Br. 43-50. As anticipated, the State points to regulations of gunpowder storage, knives,[11] trap guns, and clubs and suggests that those regulations are analogous to the Statutes. Ans. 58-62. Here, the State is following a tradition that dates all the way back to *Heller* of spewing a list of random regulations into the record and saying "voilà, analogues." In *Bruen*, the court specifically disapproved this practice. The Court wrote that at a high enough level of generality everything is infinitely analogous to everything else. 597 U.S. at 29. Therefore, listing random regulations will not do. Instead, the government must demonstrate "relevantly similar" regulations that are similarly justified (the "why" question) and that impose similar burdens (the "how" question). *Id*. The State does not comply with *Bruen's* instructions.

---

[11] While not always clear on the matter, several days ago Spitzer admitted that none of the knife regulations he lists prohibited mere possession of the weapons. *See NAGR v. Polis*, 24-cv-1, District of Colorado, 24-cv-001, ECF 23-1 ¶¶ 56-57.

This is, again, unsurprising, because *Heller* has already held that a ban on possession of a firearm in common use even for self-defense in the home is uniquely "severe," 554 U.S. at 629, and no relevant historical law "remotely" burdened the right to self-defense as much as such a law. *Id*. at 631-32. As discussed in the Opening Brief, all of the regulations identified by the State were enacted for very different reasons (i.e., the "why" question) or imposed very different burdens (i.e., the "how" question). For example, the laws regulating public carry cited by the State imposed much less severe burdens for different reasons than bans on mere possession even in the home. And as *Miller, supra*, pointed out, "[g]unpowder was regulated because of its fire danger – not its danger for use in a firearm. Possession of firearms, on the other hand, was not regulated at all." *Id*. at *31. *Miller* went on to ruthlessly pick apart California's list of laws (basically the same list advanced by the State). *Id*. at 19-28. Space precludes Plaintiffs from engaging in such a detailed discussion here, but they hope the Court will review *Miller's* analysis.

34

## U. The State Has No Answer to Plaintiffs' Militia Argument

Plaintiffs pointed out that the most analogous Founding-era laws were the militia laws. Far from banning firearms, those laws affirmatively *required* men to obtain arms in common use. The State appears to have nothing to say about this historical tradition.

## V. The State Would Rather Point to Laws From 1989 Instead of 1791

Instead of focusing on the relevant timeframe, the State would rather point to laws from the twentieth century, including one enacted in 1989 (only four years before the State enacted the Statutes). Ans. 65. If laws enacted as late as 1989 were relevant to the historical analysis, *Heller* would have surely been decided differently. The State's argument is absurd on its face and, if taken seriously, would render *Bruen's* history step meaningless (which, of course, is the State's goal in advancing it).

## III. The Remaining Preliminary Injunction Factors Favor Plaintiffs

The State asserts that no court has ever held that violation of Second Amendment rights constitutes irreparable harm.

35

Ans. 70-71. This is false. In *Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023), the court held that in cases involving a Second Amendment claim, a likelihood of success on the merits usually establishes irreparable harm. *Id.* at 1048. Moreover, such a likelihood "strongly tips the balance of equities and public interest in favor of granting" an injunction. *Id. See also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (also applying principle in Second Amendment context).

## IV.  Conclusion

For the foregoing reasons, the Court should reverse the district court's decision and remand for further proceedings.

*/s/ Barry K. Arrington*
_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Local Rule 32.1 because it contains **6,885** words, excluding the parts of the brief exempted by Fed. R. App. P. 32, as determined by the word-counting feature of Microsoft Word.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32 and the typestyle requirements of Fed. R. App. P. 32 because it has been prepared in the proportionally spaced typeface Century Schoolbook using Microsoft Word in 14-point font.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2024, an electronic copy of the foregoing Reply Brief of The Plaintiffs-Appellants was filed with the Clerk of the Court using the ECF system and thereby served upon all counsel appearing in this case.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington