**ARRINGTON LAW FIRM**                                  Barry K. Arrington
4195 Wadsworth Boulevard                                 (303) 205-7870
Wheat Ridge, Colorado 80033                        barry@arringtonpc.com

August 23, 2024

Clerk of the Court
Catherine O'Hagan Wolfe
United States Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

   Re:  *National Association for Gun Rights v. Lamont*
        Docket No. 23-1162

Dear Ms. O'Hagan Wolfe:

   Plaintiffs-Appellants National Association for Gun Rights and Toni Theresa Spera Flanigan submit this letter brief pursuant to the Court's Order dated July 22, 2024.

## I.    *Rahimi* Confirms *Heller* and *Bruen*

   In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Court reaffirmed the plain text and historical tradition analysis for Second Amendment cases first announced in *D.C. v. Heller*, 554 U.S. 570 (2008), and reiterated in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Under that analysis, "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Rahimi*, 144 S. Ct. at 1897 (quoting *Bruen*, 597 U.S. at 24).

   *Rahimi* involved a challenge to a federal statute that prohibited an individual subject to a domestic violence restraining order from possessing a firearm. The Court noted, as it had in *Heller* and *Bruen*, that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id*. at 1897–98. "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or 'historical twin.'" *Id*. at 1898 (quoting *Bruen*, 597 U.S. at 30). *Rahimi* concluded that the federal statute was constitutional since it was analogous to historical laws preventing individuals who threatened physical harm to others from misusing firearms. *Id*., 144 S. Ct. at 1896.

   The Court noted that "the Second Amendment is not limited only to those arms that were in existence at the founding. Rather, it extends, prima facie, to all

instruments that constitute bearable arms, even those that were not yet in existence. . . . Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Id.*, 144 S. Ct.at 1897–98 (cleaned up; internal citation and quotation marks omitted). Thus, the State's argument that the modern arms at issue in this litigation are not covered by the Second Amendment's plain text is mistaken.

For purposes of this case, there are two important takeaways from *Rahimi*. First, the State's law must comport with the principles underlying the Second Amendment. As discussed in Plaintiffs' Opening Brief, this will prove to be an impossible burden for the State to carry. See Op.Br. 26-32. In *Heller*, the Court explicated the principles underlying the Second Amendment that are applicable to this case. See 554 U.S. at 631-32. Pursuant to those principles, to justify its arms ban the State must demonstrate that it falls within the historical tradition of banning "dangerous and unusual arms" or arms that are "highly unusual in society at large." 554 U.S. at 627.

But a ban on a weapon in common use by law-abiding citizens for lawful purposes does not fall within that tradition. Thus, *Heller* held that a law absolutely banning a weapon commonly possessed by law-abiding citizens for lawful purposes is categorically unconstitutional. 554 U.S. at 631-32. The Court reached this conclusion because no regulation in the Founding era "remotely burden[ed] the right of self-defense as much as an absolute ban on" a commonly possessed firearm. *Bruen*, 597 U.S. at 22 (citing *Heller*, 554 U.S. at 631-32).

The second takeaway from *Rahimi* is that the State is wrong when it attempts to shift its historical burden under stage two of the *Bruen* test onto Plaintiffs. Plaintiffs need only demonstrate that they are engaged in "arms bearing conduct." *Id.*, 144 S. Ct. at 1897. The only role history plays at the plain text stage is to elucidate how the Founders understood the plain meaning of phrases like "bear Arms." *Id.* at 1925 (Barrett, J., concurring) (citing *Heller's* use of Founding-era dictionaries). The phrase "keep arms" means to "have weapons." *Heller*, 554 U.S. at 582. Plaintiffs desire to have certain weapons, to wit the rifles and magazines banned by the State. That is obviously conduct that falls within the plain meaning of the text. Therefore, "as when the [State] regulates other constitutional rights, it bears the burden to 'justify its regulation." *Id.* (cleaned up; internal citation and quotation marks omitted).

## II.   Plaintiffs Facial Challenge Succeeds

*Rahimi* reaffirmed *United States v. Salerno*, 481 U.S. 739 (1987), which held that a statute will be declared facially unconstitutional only if no set of circumstances exists under which the statute would be valid. *Rahimi*, 144 S. Ct. at 1898. The State will undoubtedly focus on this holding in their supplemental brief.

But *Rahimi* did not blaze a new path regarding facial challenges. It merely reaffirmed *Salerno*. Thus, Plaintiffs' discussion of *Salerno* in their Reply Brief remains valid. See Reply, 1-5.

When, as here, a multi-section statute is challenged, the *Salerno* rule applies on a section-by-section basis. A plaintiff need not show that every section of the statute is invalid in all its applications. When a statute contains both unobjectionable sections and unconstitutional sections, a reviewing court may maintain the statute in so far as it is valid. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1049 (9th Cir. 2007) (internal citations and quotation marks omitted). Some of the provisions of the statute might be facially invalid and some might not. *Id.* This Court followed this process in the Second Amendment case of *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), when it sustained a facial challenge to certain sections of the statute but not others. It should follow it here as well. For example, the statute singles out the AR-15. That weapon is in common use for lawful purposes. Therefore, no set of circumstances exists under which that section of the statute is valid, and the Court may declare that section unconstitutional irrespective of the constitutionality of other sections of the statute.

## III.   The Plain Text Step Focuses on the Text

Earlier this month, the Fourth Circuit issued its en banc opinion in *Bianchi v. Brown*, 2024 WL 3666180 (4th Cir. 2024), a post-*Rahimi* case involving a Maryland law similar to the law challenged in this case. In an opinion written by Judge Richardson (which was joined by Judges Niemeyer, Agee, Quattlebaum and Rushing), the dissent correctly applied *Heller*, *Bruen* and *Rahimi*. See *Bianchi*, at *35-75. Prior to *Bruen*, the dissenting opinions in the circuit courts faithfully applied Supreme Court precedent while the majority opinions failed to do so. For example, in *Heller v. D.C.,* 670 F.3d 1244, 1271 (D.C. Cir. 2011), years before *Bruen*, then-judge Kavanaugh rejected interest balancing and applied the correct text and history analysis in his dissenting opinion. The same is true in *Bianchi*. Thus, all references to that case will be to Judge Richardson's masterful dissenting opinion.

Judge Richardson began by noting that for a plaintiff to meet her burden under the plain text step, she must show three things:  (1) the law applies to "people" entitled to the right; (2) the law covers "arms'" and (3) the law regulates keeping or bearing those arms. *Id.* at *48. The term "people" applies to all members of the political community. *Id.* The AR-15s and other rifles banned by the statute obviously fall within the plain meaning of the word "arms" as explicated in Founding-era dictionaries. *Id.* at *49. And since the law prohibits people from possessing such arms for any purpose, including self-defense, it regulates the keeping and bearing of arms. *Id.* The dissent rejected the proposition that plaintiffs are required to show that the arms are in common use for self-defense today as part of the plain text inquiry, writing:

3

The text protects the right to keep and bear "Arms" – not Arms in common use at the time. (quoting *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1209 (7th Cir. 2023), cert. denied sub nom. *Harrel v. Raoul*, 144 S. Ct. 2491 (2024) (Brennan, J., dissenting)). And when considering this plain text, the Court in *Heller* defined "Arms" to include "weapons of offence" and "anything that a man wears for his defence." *Heller*, 554 U.S. at 581, 128 S.Ct. 2783. The Court never mentioned the "common use" inquiry when discussing the Amendment's plain text. . . .

The Court derived [the common use limitation] from the historical tradition of prohibiting the carrying of dangerous and unusual weapons. *Id*. at 627, 128 S.Ct. 2783. It was thus from our Nation's historical tradition of firearm regulation, and not the plain meaning of "Arms," that *Heller* drew this limitation on the scope of the right.

*Id*. at *50 (cleaned up; emphasis in original). In summary, Judge Richardson rejected the argument advanced by the State in this case and adopted the argument advanced by Plaintiffs.

## IV. The Arms Ban is Unconstitutional Because the Banned Arms are in Common Use

Judge Richardson engaged in a lengthy exposition of *Heller's* "dangerous and unusual" limitation on the right to keep and bear arms after which he concluded:

[In *Heller*, the Court] picked up on an enduring principle that stretched back far before and extended far after the Second Amendment's adoption. This principle reveals that the Second Amendment permits the government to ban weapons that are not commonly possessed for lawful purposes and are particularly useful for criminal activity. But it does not permit the government to ban weapons that are not particularly useful for unlawful activity, nor weapons that are commonly possessed for lawful purposes, even if they happen to be dangerous.

*Bianchi*, at *59.

An arms ban must be "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Those principles prohibit banning an arm in common use. The dissent then stated:

Today, the AR-15 and its variants are one of the most popular and widely owned firearms in the Nation. As of 2021, there are at least twenty-eight million AR-style semiautomatic rifles in circulation. Roughly 2.8 million of those weapons entered the market in 2020 alone, making up around 20% of

4

all firearms sold that year. For context, this means that there are more AR-style rifles in the civilian market than there are Ford F-Series pickup trucks on the road—the most popular truck in America. And when we look at actual ownership statistics, the numbers tell the same story. Various studies estimate that at least 16 million, but possibly up to 24.6 million, Americans own or have owned AR-style rifles.

*Id.* at \*60.

In reaching these conclusions, the dissent relied heavily on the same sources cited by Plaintiffs, including figures published by the National Shooting Sports Foundation,[1]Emily Guskin, Aadit Tambe & Jon Gerberg, *Why Do Americans Own AR-15s?*, Wash. Post (Mar. 27, 2023), and William English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned 33 (May 13, 2022). Compare *Bianchi* at \*60, n. 58 with Op. Br. 29, 32-33.

Citing this data and the Second Circuit's opinion in *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), Judge Richardson concluded there is "overwhelming evidence" that it is "beyond debate" that semiautomatic rifles like the AR-15 are common for lawful purposes. Indeed, even those justices that disagree with the Supreme Court's Second Amendment jurisprudence agree that the AR-15 is "commonly available." *See Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., joined by Kagan, J., and Jackson, J., dissenting). Judge Richardson concluded that "the evidence shows that millions of Americans have chosen to equip themselves with semiautomatic rifles, like the AR-15, for various lawful purposes. So [the State has] failed to prove that these weapons are 'unusual' such that they can be constitutionally outlawed. Maryland's ban therefore violates the Second Amendment." *Bianchi*, at \*62.

## V. The State's View of the Purpose of the Second Amendment is "Overly Cramped"

Maryland, like the State in this case, asserted that protecting the right of individual self-defense is the sole purpose of the Second Amendment and therefore the text should be restricted to further only that narrow purpose. *Id.* at \*62. This is not true. First, a court may not derive exceptions to constitutional rights based on its notions of the text's underlying policies, purposes, or values. *Id.* (citing *Giles v. California*, 554 U.S. 353, 374-75 (2008)). More importantly, the State is wrong in the first place. The Second Amendment is not so limited. Nothing in *Heller, Bruen*, or

---

[1] The NSSF has issued a revised report regarding the number of magazines in circulation. The report surveyed 30-plus years of detachable magazine production and distribution and demonstrated that of the conservatively estimated 963,772,000 detachable magazines supplied from a firearm manufacturer and in the aftermarket, at least **717,900,000** have a capacity exceeding 10 rounds. See NSSF Detachable Magazine Report (available at https://nssfresearch.s3.amazonaws.com/Detachable-Magazine-NSSFReport.pdf).

*Rahimi* supports such a construction of the text. "That would have been an odd reading, indeed, seeing as the ratifying population widely agreed that the Second Amendment served larger purposes than individual self-defense, including the defense of the body politic and the prevention of tyranny." *Id*. at \*63.

Judge Richardson is surely correct. The pre-existing right to keep and bear arms codified in the Second Amendment was understood at the Founding to rest on the twin pillars of the natural right of self-preservation and the natural right of resistance to tyranny. *Bianchi*, at \*38. The right to arms thus ensured the people had the means to defend themselves against "private violence" and "public oppression." *Id*. This is what the Court meant in *Heller* when it wrote that the right secured as a result of the Stuarts' abuses secures the means to protect against "both public and private violence." *Heller*, 554 U.S. at 594. In *Rahimi*, the Court reiterated that the Second Amendment vouchsafes both aspects of the right. The Court wrote: "As a leading and early proponent of emancipation observed, 'Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.'" *Id*., 144 S. Ct. at 1897 (quoting Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens)). "Defending liberty" and self-defense against criminals are not the same thing.

## VI.    The State's "Suitability" Argument is Stealth Interest Balancing

The State argues that AR-15s are not "suitable" for self-defense. This is not accurate. More importantly, it not a matter about which this Court may properly inquire, as Judge Richardson explained:

> At no point did *Heller* instruct federal judges to decide whether a particular weapon is "reasonably related or proportional to the end of self-defense." . . . That would be an odd mandate, indeed, as it would require federal judges to decide which weapons are most suitable for a country of individuals with different needs and abilities. Rather, the Supreme Court looked to the usage of the American people to determine which weapons they deem most suitable for lawful purposes. *Heller*, 554 U.S. at 629, 128 S.Ct. 2783. . . . It is thus the customary practices of the American people—not the uninformed meditations of federal judges—that determine which weapons are protected by the Second Amendment.

*Bianchi* at \*64.

Thus, the *Bianchi* majority was engaging in the kind of interest balancing that *Heller, McDonald*, and *Bruen* rejected. Judge Richardson wrote: "The majority's new framework allows judges to decide just how important they think certain firearms are for self-defense and then to weigh this finding against the threat they believe those arms pose to the public at large. Indeed, the entire concept of 'proportionality' is merely a license for unelected judges to usurp the public's role

in determining whether a particular weapon is sufficiently *tailored* to the important *interest* of self-defense." *Id*. at \*71 (emphasis in original).

## VII.    The State's "Military Weapons" Argument Fails

The State argues that AR-15s may be banned because they are useful for military service. This is wrong factually and legally. Judge Richardson wrote: "Nor is there any support for the majority's assertion that the term 'dangerous,' at least by the time of the Revolution, included within its ambit military weapons. . . . [H]istory and tradition establish the exact opposite. At the Founding, citizens commonly possessed weapons useful for *both self-defense and for militia service*." *Id*. at \*64 (citing *Heller*, 554 U.S. at 624–25, ('In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.") (emphasis added).

## VIII.    The State's "Public Safety" Arguments Were Rejected by *Heller*

The State argues that AR-15s should be banned on public safety grounds. Resp. 34-36. First, this is a policy argument that has no place in a *Bruen* analysis. Secondly, *Heller* rejected this exact argument. Judge Richardson explains: "The majority then touts the AR-15's criminal uses, portraying it as a destructive device which is only useful for slaughtering innocents and police officers. . . . Not only are these claims exaggerated, but they also can and have been made about handguns. Yet when faced with these same arguments, the Court in *Heller* concluded that public-safety concerns cannot justify disarming millions of law-abiding citizens of the handguns they commonly own for lawful purposes. See 554 U.S. at 636, 128 S.Ct. 2783. The millions of Americans who similarly own semiautomatic rifles are entitled to the same treatment." *Bianchi* at \*69. If proportional use in crime were the correct metric (which it is not), surely rifles like the AR-15 are more deserving of protection than handguns because according to FBI statistics, rifles of all kinds were used in only 2% of firearm homicides. *Id*.

## XI.    Rare Mass Shootings Do Not Justify Disarming Millions of Law-Abiding Americans

The State argues that its arms ban is justified by mass shootings. Again, this is not correct. Mass shootings account for fewer than 1% of firearms homicides, and handguns are used more often in such shootings than rifles. *Bianchi* at \*70.

> There is little basis for claiming that semiautomatic rifles are more useful for or more used in criminal activity than other weapons. The data shows the exact opposite: Handguns are by far a greater existential threat to the peace and safety of our communities. Yet rather than assessing these facts, the majority spends pages upon pages describing mass shootings in graphic

7

detail. *This is not judicial reasoning; it is fearmongering designed to invoke the reader's passions and mask lack of substance.*

*Id.* at *71 (emphasis added).

Moreover, faced with "constant invocations of the unique dangers of handguns, the Supreme Court refused to cast aside the constitutional liberties of millions to prevent the unlawful actions of the few." *Id.* The same should be true for rifles, which, proportionately are used far less in crime than handguns.

## X. The State's Historical Analysis is Flawed

Space limitations preclude a detailed examination of Judge Richardson's rejection of the majority's historical analysis, which is all but identical to the State's analysis in this case. But highlights include:

- Gunpowder storage regulations were fire safety regulations, which was why *Heller* rejected them as analogues to gun bans. *Bianchi* at *72.

- Nineteenth century laws regulating carrying Bowie knives and pistols regulated dangerous and unusual weapons associated with criminal activity. They are not analogues to a ban on arms in common use for lawful purposes. *Id.* at *73. Moreover, they regulated only *carrying* such weapons. They did not prohibit their *possession* altogether. *Id.*

- Twentieth-century laws cannot establish a tradition that is inconsistent with the Founding-era tradition. *Id.* at 74.

## XI. Conclusion

Plaintiffs have met their burden under the "plain text" step. Thus, the State bears the burden of justifying its regulation by demonstrating it is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. No regulation in the Founding era "remotely burden[ed] the right of self-defense as much as an absolute ban on" a commonly possessed firearm. *Heller*, 554 U.S. at 631-32). In *Cuomo*, this Court wrote: "Even accepting the most conservative estimates . . . the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*." 804 F.3d at 255. It follows that the State has not met its burden and the Statute is unconstitutional.

*/s/ Barry K. Arrington*