**ARRINGTON LAW FIRM**                                    Barry K. Arrington
4195 Wadsworth Boulevard                             (303) 205-7870
Wheat Ridge, Colorado 80033                       barry@arringtonpc.com

November 22, 2024

Clerk of the Court
Catherine O'Hagan Wolfe
United States Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

    Re:  *National Association for Gun Rights v. Lamont*
           Docket No. 23-1162

Dear Ms. O'Hagan Wolfe:

    Plaintiffs-Appellants National Association for Gun Rights and Toni Theresa Spera Flanigan submit this letter brief pursuant to the Court's Order dated November 5, 2024. The Court ordered each party to address the effect *Antonyuk v. James*, No. 22-2908, 2023 WL 11963034 (2d Cir. Oct. 24, 2024), has on this appeal.

**I.**     **Facial Challenges are Considered on a Section-by-Section Basis**

    *Antonyuk* resolved an issue that was addressed at oral argument – when a plaintiff brings a facial challenge to a multi-section statute, does the court analyze the challenge with respect to the statute as a whole or on a section-by-section basis? *Antonyuk* resoundingly resolved the matter in favor of a section-by-section analysis.

    *Antonyuk* noted that the plaintiffs brought a facial challenge to four licensing statutes. (1) N.Y. Penal L. § 400.00(1)(b) (character requirement); (2) N.Y. Penal L. § 400.00(1)(o)(i) (cohabitants requirement); (3) N.Y. Penal L. § 400.00(1)(o)(iv) (social media requirement); and (4) N.Y. Penal L. § 400.00(1)(o)(v) (catch-all requirement). The court then examined the plaintiffs' facial challenge on a section-by-section basis. See *Id*. at *27 (character requirement); *37 (catch-all requirement).*40 (cohabitants requirement); and *41 (social media requirement). In the second half of the case, the court stated, "We now consider the Plaintiffs' challenges to *assorted subsections* of N.Y. Penal L. § 265.01-e banning the carriage of firearms in 'sensitive locations.'" *Id*. at *42 (emphasis added). As with the licensing statute, the court addressed the facial challenges to these subsections on a section-by-section basis. See *id*. at *50 (treatment centers); *51 (places of worship); *51 (parks); *62 (zoos); *66 (bars); and *72 (theaters).

The first thing to note is that none of the challenged statutes is a stand-alone law. Instead, they are all subsections of the licensing statute or the sensitive places statute. *Antonyuk* examined the plaintiffs' facial challenge to these statutes on a subsection-by-subsection basis, upholding some and declaring others unconstitutional.

The State has argued that if even one of the weapons banned by the challenged statutes may be constitutionally prohibited, the Court must reject Plaintiffs' entire challenge. This is not the law. As in *Antonyuk*, the Court should analyze the statutes on a section-by-section basis. If, for example, the Court decides that the subsection of the statute that explicitly bans AR-15s is unconstitutional, it may declare that subsection unconstitutional regardless of how it addresses the other subsections. Similarly, if the Court holds the large capacity magazine ban unconstitutional, it may enjoin that particular subsection.

## II. The Common Use Inquiry is Part of the Historical Tradition Analysis in *Bruen* Step Two

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Court reiterated the two-part text and history standard established in *D.C. v. Heller*, 554 U.S. 570 (2008). The Court stated:

> We reiterate that the standard for applying the Second Amendment is as follows: [1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Bruen*, 597 U.S. at 24.

In *Antonyuk*, the court recognized that in an arms ban case such as this one, the Second Amendment protects the sorts of weapons that are in common use. *Id.* at *8 (citing *Heller* at 627; cleaned up). The State has argued that the common use inquiry is in *Bruen* step one. Resp. 21. Plaintiffs argued that the common use inquiry is properly situated in *Bruen* step two. Op.Br. 22. Plaintiffs cited Judge Brennan's analysis in *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023), cert. denied sub nom. *Harrel v. Raoul*, 144 S. Ct. 2491 (2024). Judge Brennan noted that all firearms obviously fall under the plain meaning of the word "arms" for purposes of *Bruen* step one (text), and if a particular firearm is in common use, it is protected under *Bruen* step two (historical tradition). *Id.* at 1209 (Brennan, J., dissenting).

*Antonyuk* agrees with Judge Brennan's analysis.[1] The panel noted that the common use test is supported by the "*historical tradition*" of prohibiting carrying dangerous and unusual weapons. *Id.*, at *8 (citing *Heller* at 627; emphasis added; cleaned up). In summary, Plaintiffs have the burden of showing that their conduct is covered by the plain text, which they have easily done because they desire to keep and bear "weapons of offense." *Heller*, 554 U.S. at 581 (quoting the 1773 edition of Samuel Johnson's dictionary; cleaned up). The burden then shifts to the State to demonstrate that its ban is consistent with the historical tradition of prohibiting dangerous and unusual weapons. The State has failed to carry its burden because the banned AR-15s are not unusual. Instead, the AR-15 is the most popular rifle in America. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859 (2015). And therefore, it is in common use and thus protected under *Bruen* step two.[2]

This conclusion is consistent with *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024), where the Court stated: "We also clarified that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Id.* at 1897 (citing *Bruen* at 24). The Court should reject the State's attempt to flip this formulation by placing the opposite of its burden on Plaintiffs.

### III. The Dangerous and Unusual Test is Conjunctive

At oral argument in this matter, there was a discussion about whether an arm may be banned if it is dangerous *or* unusual (i.e., by casting the test in the disjunctive rather than the conjunctive as set forth in *Heller*). This analysis is inconsistent with *Antonyuk*, which stated that the common use test is supported by the historical tradition of banning "dangerous *and* unusual" arms. *Id.* at *8 (emphasis added).

There was a suggestion that *Rahimi* changed this to the disjunctive (i.e., "dangerous or unusual"). This is not accurate. *Heller* held that "dangerous and unusual" weapons may be banned. *Id.* at 627. The Court cited twelve authorities in support of this proposition: [1] 4 Blackstone 148–149 (1769); [2] 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); [3] J. Dunlap, The New–York Justice 8 (1815); [4] C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); [5] 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); [6] H. Stephen, Summary of the Criminal Law 48 (1840); [7] E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); [8] F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852); [9] *State v. Langford*,

---

[1] *Antonyuk* did **not** state that the common use test is part of the textual analysis on page *24. Rather, in that passage, the court was describing the State of New York's argument to that effect. The court did not adopt that argument. Instead, it specifically stated it would not address the issue raised by New York. *Id.* at *25.

[2] Similarly, Plaintiffs proved that the banned magazines are in common use and thus protected.

10 N.C. 381, 383–384 (1824); [10] *O'Neill v. State*, 16 Ala. 65, 67 (1849); [11] *English v. State*, 35 Tex. 473, 476 (1871); and [12] *State v. Lanier*, 71 N.C. 288, 289 (1874). Six of these authorities say "dangerous and unusual," and six say "dangerous or unusual." *Heller* chose to cast the test in the conjunctive. The choice made in *Heller* (and followed in *Antonyuk*) is binding on this Court. *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring).

None of the 12 authorities *Heller* cited in support of its conclusion about historical tradition addressed the type of weapons that may be banned as such. Instead, all the authorities were concerned with the common law offense of "affray" or "going armed." The offense of affray proscribed the *use* of weapons to incite public terror. See, e.g., *State v. Langford*, 10 N.C. 381, 383-84 (1824) (man commits "affray" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."). It was impossible to commit the offense of affray with weapons in common use. Since the core of the offense was inciting public terror, a person would be "in no danger of offending … by *wearing common weapons*" in such a way as not to give rise to a suspicion of "an intention to commit any act of violence." 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831) (emphasis added). See also 1 Timothy Cunningham, A New and Complete Law Dictionary (1783) (same).

*Heller* held that the common use test is supported by the historical tradition of prohibiting the use of dangerous and unusual weapons to commit the offense of affray. The offense of affray prohibits conduct. It does not ban particular weapons. How, then, does the prohibition support the common use test? Another way of asking this question is, what is the contrast between weapons in common use and weapons that are dangerous and unusual? All weapons are dangerous. That is the point of them. Therefore, the contrast cannot be that protected weapons are not dangerous. It is obvious that the Court was focusing on the contrast between the word "common" in the common use test and the word "unusual" in the phrase "dangerous and unusual."

It follows that any application of the common use test that focuses on the dangerousness of a particular weapon as opposed to whether it is unusual (i.e., not in common use) is wrong. That is why it would be wrong to say that the Second Amendment does not protect a weapon if it is "dangerous *or* unusual." If that were the test, *Heller* would have certainly upheld the District of Columbia's handgun ban, no matter how many millions of handguns are owned by Americans. Because whatever else they are, handguns are certainly dangerous, as the dissent in *Heller* persuasively argued. Indeed, the *Heller* majority agreed with the dissent that handguns are dangerous. The Court wrote: "We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution." 554 U.S. at 636.

4

In one sense, casting the test in the disjunctive leads to a silly analysis. If a court can uphold a ban of a weapon if it finds that the weapon is *either* dangerous *or* unusual, it can uphold the ban if it finds the weapon is merely dangerous. As a matter of logic, this leads to the conclusion that the Second Amendment protects only non-dangerous weapons. And since all weapons are dangerous, casting the test in the disjunctive would lead to the absurd conclusion that the Second Amendment protects no weapons at all. Nothing in *Heller* even hints that the Second Amendment does not protect a weapon merely because it is dangerous. That is why Justice Alito insisted that a weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano* 577 U.S. at 418 (emphasis in the original). And "the relative dangerousness of a weapon is irrelevant" if it is commonly used for lawful purposes. *Id*. While Justice Alito's opinion is a concurring opinion, it surely reflects the internal logic of the common use test.

Finally, there was a suggestion that the test could be cast as "unusually dangerous." The first problem with this test is that it stretches the syntax to the breaking point. No fair reading of "dangerous and unusual" leads to the conclusion that it means "unusually dangerous." Moreover, such a test runs headlong into *Bruen*, where the Court held that federal judges are prohibited from making "difficult empirical judgments" about firearms restrictions. 597 U.S. at 25. Surely, finding the dividing line between "unusually dangerous" and "normally dangerous" is an empirical inquiry. And thus, *Bruen* prohibits federal judges from hunting for that line. *Bruen* noted that federal judges deferred to legislatures too much when they made such empirical judgments. *Id*. That is why it would be directly contrary to *Bruen* for a court to defer to a legislative arms ban any time it can find a way to append the word "unusually" to "dangerous" with respect to a particular arm because a court determined to defer to a legislature in the first place can always find a way to do that.

In summary, *Antonyuk* confirms that the "dangerous and unusual" test is the opposite side of the coin of the common use test. The test is conjunctive. If a weapon is in common use, it is, by definition, not dangerous and unusual.

### IV. *Rahimi* Did Not Modify *Heller*

*Antonyuk* was a post-*Rahimi* case. This is significant with respect to the dangerous and unusual test. *Rahimi* noted that the "going armed laws prohibited riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land. Such conduct disrupted the public order and led almost necessarily to actual violence." *Id*. 144 S. Ct. at 1901 (citations omitted; cleaned up). It is clear that even though *Rahimi* used the disjunctive, it was not modifying *Heller*.

5

First, *Rahimi* did not address *Heller's* common use test, much less expressly modify it. Moreover, it is wrong to argue that *Rahimi* modified the common use test *sub silentio* when it did not even consider the test. Since there was no hint that *Rahimi* modified the test, after *Rahimi*, *Antonyuk* continued to use *Heller's* conjunctive "dangerous and unusual" formulation.

Second Amendment cases, like nouns, are divided into those that concern persons, places, or things. Cases like *Rahimi* concern the persons who have a right to be armed. Cases like *Antonyuk* concern the places where arms may be carried. Cases like *Heller* concern the things (i.e., the particular arms) that are protected. Confusing the analysis applicable to one type of case for that which applies to the others leads to error.

*Rahimi* was a "person" case, not a "thing" case. In *Rahimi*, the Court cited the discussion of the common law offense of affray in *State v. Huntly*, 25 N.C. 418, 421-422 (1843), to support its analysis concerning the type of *persons* who have a right to carry arms. *Huntly* cast the common law offense alternatively in the conjunctive (citing William Hawkins' treatise) and the disjunctive (citing Blackstone's Commentaries). *Id*. *Huntly* made it clear that in cases of affray, the *manner* in which arms were carried (so as to terrify people) was of paramount consideration, not the *type* of arms carried. Thus, the conduct prohibited by the offense of affray was directly relevant in *Rahimi* because the going armed laws supported the existence of a historical tradition of disarming those who use arms to threaten others.

In contrast, *Heller* cited the authorities dealing with affray in support of the common use test. *Heller* contrasted the "unusual" arms referred to in the authorities it cited with arms in common use that are protected by the Constitution.

## V. The Court Must Follow the Regulatory Principle Identified in *Heller*

In *Rahimi*, the Court stated that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit." *Id*. at 1898. (citations omitted; cleaned up). *Antonyuk* emphasized this holding. *Id*. at *12. Thus, this Court should look to the regulatory principles identified in *Heller* to determine this case.

The historical regulatory tradition applicable to arms bans that was identified in *Heller* is straightforward:

1. The sorts of weapons protected by the Second Amendment are those in common use. 554 U.S. at 627.

6

2. Conversely, "dangerous and unusual" may be banned. *Id*.

3. Few laws in the history of the nation come close to the severe restriction of a total ban of a gun in common use, even for self-defense in the home. *Id*. at 629.

4. Thus, the Second Amendment does not countenance a complete prohibition on a popular weapon chosen by the American people for self-defense. *Bruen*, 597 U.S. at 22 (cleaned up; citations omitted).

In summary, the Supreme Court has already identified the relevant regulatory tradition. And the State's complete prohibition of the most popular rifle in America clearly falls outside of that tradition.

## VI. *Heller* is Dispositive

In a passage that is devastating to the State's case, *Antonyuk* stated:

> [I]n examining history and tradition, a court must identify the societal problem that the challenged regulation seeks to address, *Bruen*, 597 U.S. at 26–27, 142 S.Ct. 2111, and then ask "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" for firearms, *Rahimi*, 144 S. Ct. at 1898. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, that regulation might more likely be unconstitutional if there is a lack of a distinctly similar historical regulation addressing that problem . . .

*Id*. at *14 (internal quotation marks omitted).

In this passage *Antonyuk* cited *Bruen's* discussion of the reason *Heller* struck down the District of Columbia's gun ban. *Bruen* stated:

> *Heller* itself exemplifies this kind of straightforward historical inquiry. One of the District's regulations challenged in *Heller* totally banned handgun possession in the home. The District in *Heller* addressed a perceived societal problem—firearm violence in densely populated communities—and it employed a regulation—a flat ban on the possession of handguns in the home—that the Founders themselves could have adopted to confront that problem.

*Bruen*, 597 U.S. at 27 (quotation marks omitted; cleaned up).

*Bruen* noted that because there was no founding-era precedent that was analogous to the District's total ban on handguns in an effort to address urban gun

7

violence, the law was unconstitutional. *Id*. The reasoning in this case should be identical. The State is attempting to address gun violence, especially in urban areas, by means of a total ban on a weapon that is popular among the American people. The founders could have done that, but they did not. Therefore, the law challenged in this action is unconstitutional for the same reason the District's law was found to be unconstitutional in *Heller*.

### VII. The Historical Laws Imposed by the State Do Not Impose a Comparable Burden on Plaintiffs

The State has not identified any bans on firearms in the founding era. This is not surprising because the historical record has not changed since *Heller* found there are none. The State has proposed several regulations of public carry, especially of Bowie knives. But *Antonyuk* emphasized that the "how" of a challenged regulation must be relevantly similar to the how of a historical regulation. *Id*. at *15. A total prohibition on the *possession* of weapons, even in the privacy of one's home, is not a comparable burden to historical regulations on the *use* of weapons in public that have been identified by the State.

Respectfully submitted,

*/s/ Barry K. Arrington*

Barry K. Arrington

8