NATHAN, *Circuit Judge*, joined by LIVINGSTON, *Chief Judge*, and WALKER, *Circuit Judge*, concurring:

I join Judge Walker's excellent and thorough opinion for the Court in full. I write additionally to explain why Plaintiffs' proposed "dangerous and unusual" standard is particularly untenable in light of our duty—as instructed by the Supreme Court—to engage in actual historical analysis.

Judge Walker's opinion carefully explains why historical restrictions on "dangerous and unusual" weapons would have been contemporaneously understood as "unusually dangerous." *See* Op. at 29–31. Nonetheless, Plaintiffs urge a contrary historical analysis based on one word in *Heller*—the "and" in "dangerous and unusual." *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (quotation marks omitted). Plaintiffs contend that *Heller's* use of the word "and" means that only those weapons both dangerous *and* unusual are unprotected. Br. of *NAGR* Appellants at 59; Br. of *Grant* Appellants at 31-32. In this view, only weapons that are numerically uncommon, and therefore unusual, may be regulated.

Adoption of Plaintiffs' conjunctive test would flatly betray our duty to engage in a careful historical analysis. *Bruen* instructs that the contours of the Second Amendment right are historically determined. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). Accordingly, when the people challenge a law on Second Amendment grounds, the judicial role is to "examin[e] text, pre-ratification and post-ratification history, and precedent." *United States v. Rahimi*, 602 U.S. 680, 714 (2024) (Kavanaugh, J., concurring).

Our commitment to history requires us to look beyond Plaintiffs' reliance on one word in *Heller* and journey to the historical

1

sources of their proposed standard. *Heller*, the first time the Supreme Court seems to have referenced the "dangerous and unusual" tradition, reads as follows:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." [*United States v. Miller*, 307 U.S. 174, 179 (1939)]. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." *See* 4 Blackstone 148-149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

*Heller*, 554 U.S. at 627. Thus, the line in *Heller* on which Plaintiffs rely appears to be a quote of Blackstone. *Id*. And indeed, *Rahimi* confirms that *Heller* derived the "dangerous and unusual" language from Blackstone. 602 U.S. at 691 (quoting *Heller* for the "dangerous and unusual" formulation and noting that *Heller* cited Blackstone).

2

A historically faithful analysis would therefore lead us to the text of Blackstone itself, which reads as follows:

> The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the Statute of Northampton, 2 Edw. III c. 3. upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armor. [Pott. Antiqu. b. 1. c. 26].

4 Blackstone 148-49 (1769). As is clear, Blackstone did not use the phrase "dangerous and unusual" and instead described prohibitions on the carrying of "dangerous *or* unusual weapons." *Id.* (emphasis added). It would seem a serious subversion of our commitment to history to enshrine a conjunctive test based on the *Heller* opinion's possible misquote of Blackstone.

Even if *Heller* were not quoting Blackstone and instead derived "dangerous and usual" from the string cite of treatises and cases that followed the cite to Blackstone, our historical analysis still requires us to reject Plaintiffs' argument. The remaining sources to which *Heller* cites use a mix of "dangerous or unusual" and "dangerous and unusual." *See, e.g.*, H. Stephen, Summary of the Criminal Law 48 (1840) ("dangerous or unusual"); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804) ("dangerous and unusual"). In light of this historical context, the word "and" cannot do the work

3

that Plaintiffs ask it to do. Instead, the interchangeable use of "dangerous and unusual" and "dangerous or unusual" supports the proposition that neither "and" nor "or" should be read so literally. *See* Cornell Decl. ¶ 20, *Grant* App'x 1220–21; Elizabeth Fajans & Mary R. Falk, *Hendiadys in the Language of the Law: What Part of "And" Don't You Understand?*, 17 Legal Comm. & Rhetoric: JAWLD 39, 40 (2020). Molding these variegated historical descriptions into a doctrinal test—as we must—the majority rightly reconstructs "unusually dangerous" as the most faithful formulation.

What's more, the historical *reasons* for regulating "dangerous or unusual" weapons further counsel against Plaintiffs' interpretation. *See Rahimi*, 602 U.S. at 692 ("Why and how the regulation burdens the [Second Amendment] right are central to this inquiry."). Closer scrutiny of historical regulations on "dangerous and unusual weapons" reveals a tradition of restrictions on public affray—that is, terrifying the public. Blackstone, for example, described "[t]he offence of riding or going armed, with dangerous or unusual weapons" as a crime that "terrif[ies] the good people of the land." Blackstone, *supra*, at 148 (emphasis omitted). Hawkins, another historical source that does use "dangerous and unusual," conveys in substance something identical. 1 W. Hawkins, A Treatise of the Pleas of the Crown, 135 (1716) (describing the offense of affray as "where a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People").

Taken together, the various historical sources on affray laws reveal a common concern about how "terrifying" dangerous and

4

unusual weapons are to the public. In fact, Blackstone, Hawkins, and other historical sources repeatedly cite one particular statute: the Statute of Northampton of 1328. *See* Blackstone, *supra*, at 148–49; Hawkins, *supra*, at 135; 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271-72 (2d. Am. ed. 1831); F. Wharton, A Treatise on the Criminal Law of the United States 726 (2d ed. 1852); Stephen, *supra*, at 48 ; W. Lambard, Eirenarcha: Or of the Office of the Justices of Peace 128-29 (4th ed. 1599); *see also Rahimi*, 602 U.S. at 693–94. And that statute—without explicit reference to the type of weapon used—prohibits "bring[ing]" any "force in affray of the peace." 2 Edw. III c. 3.[1] This broad restriction, at the heart of the "dangerous and unusual" standard, makes clear that the tradition emerges from concern about danger to the public, not statistical commonality of the threatening weapon. Indeed, glaringly absent from these historical laws is any particular focus on the commonality of the weapons used

---

[1] In relevant part:

> [I]t is enacted, that no man great nor small, . . except the King's servants in his presence and his ministers] . . . , be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain not forfeit their armour to the King, and their bodies to prison at the King's pleasure.

2 Edw. III c. 3 (1328) ("ne force mesner en affrai de la pees"). A translation of the statute, which was originally written in Law French, can be found at https://firearmslaw.duke.edu/laws/statute-of-northampton-1328-2-edw-3-c-3-eng [https://perma.cc/P396-JVBH; PDF available at https://perma.cc/2FLM-NNTU].

5

to cause that terror. Rather, when these historical sources mention weapons, they name ones that were certainly in common use. *See* Blackstone, *supra*, at 149 (citing Pott. Antiqu. b. 1. c. 26 for an Athenian law that fined those who were seen carrying a sword or wearing armor on the city streets); E. Coke, Third Part of the Institutes of the Laws of England: Concerning High Treason, and Other Pleas of the Crown, and Criminal Causes 161 (1797) (understanding armed force, in the context of the Statute of Northampton, to include the use of sticks and stones if picked up during the course of an argument).[2]

Plaintiffs ask us to go no further than our first intuition about the word "and." But we *must* go further because the Supreme Court has instructed us to take historical analysis seriously. And history requires us to reject the argument that the "dangerous and unusual" tradition focused on the numerosity of the weapons in modern society. The majority's "unusually dangerous" test earnestly and faithfully carries out the historical inquiry the Supreme Court has mandated. For these reasons and those stated in Judge Walker's opinion, I join the opinion of the Court in full.

---

[2] The relevant passage in Coke, which is in Latin, quotes 3 H. Bracton, On the Laws and Customs of England 20 (c. 1235) [https://perma.cc/Z3EM-NZ2C]. A translation of Bracton can be found at https://amesfoundation.law.harvard.edu/Bracton/ [https://perma.cc/6MNE-2NJN].